# EXHIBIT L

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## 30(B)(6) VIDEOTAPED DEPOSITION OF MARTIN KELVAS

*August 26, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Page 93

1  honestly don't remember the exact year, but it was
2  later on. I -- we may have written it before -- well,
3  it was definitely written before 2012.
4     Q.   Okay.
5     A.   That, I know because that's the year I left
6  the organization. We had that policy in place for a
7  couple of years, at least.
8     Q.   Okay. So it was probably written in 2010,
9  give or take a year?
10    A.   Yeah, before all this unfolded. Yeah,
11 because we -- again, I was having those discussions
12 and you'll see the documentation in 2011 with the
13 Board of Pharmacy that -- you know, things were
14 changing, and there was no clear guidance in the
15 industry for these changes. It's unfortunate.
16    Q.   So let me ask you about this conversation
17 with Terry Grinder. Is it your understanding, then,
18 that if a hospital were to purchase a compounded
19 pharmaceutical product and then resell it, they would
20 be in violation of Tennessee State law?
21    A.   If -- that was what I was led to believe,
22 yes.
23    Q.   And by the same token, if they were then to
24 bill Medicare for that product, they would have real
25 federal trouble as well; correct?

Page 94

1        MS. PUIG: Object to form.
2        MR. TARDIO: Object to form.
3        MS. PUIG: He's not being offered
4  here as a lawyer or to offer any legal
5  conclusions.
6        Go ahead.
7     Q.   (By Mr. Stranch) You can answer.
8     A.   My understanding was we were not allowed to
9  bill for the product. Whether or not CMS or any --
10 you know, or the federal government had the same
11 interpretation, I don't know. All I know is from the
12 Board of Pharmacy from Tennessee said, no, you can't
13 do that. But I had nothing in writing. I had no rule
14 or law to look at to tell me that that, in fact, was
15 correct. I was going by a verbal interpretation from
16 inspector from the Board of Pharmacy.
17    Q.   Okay.
18    A.   Because they're the ones who come in and
19 knock on my door and say, I'm here to inspect your
20 pharmacy. So I answered to them. So I follow what
21 they tell me. When they say jump, I say how high.
22    Q.   Okay. When was this -- approximately, when
23 was this conversation with Mr. Grinder?
24       MS. PUIG: Can we take a break and go
25 off the record and print it for him so that

Page 95

1  he has it in front of him and he doesn't
2  have to speculate? We provided it to you.
3  We've got it. Do we send it to Mark
4  Zamora?
5        MR. HOFFMAN: Send it to the
6  assistant.
7        VIDEOGRAPHER: 3:02 p.m., off the
8  record.
9        (A recess was taken.)
10       VIDEOGRAPHER: 3:15 p.m., back on the
11 record.
12    Q.   (By Mr. Stranch) Okay. So the time period
13 in which you spoke with Terry Grinder was
14 approximately early 2011; correct?
15    A.   Yes. I believe it was March.
16    Q.   Okay. Let me ask you real quick. We've
17 taken two breaks here. Did you discuss your testimony
18 with anyone during the breaks?
19    A.   Just that I'm doing okay and, you know,
20 don't be so nervous and just relax and don't -- you
21 know, just speak clearly and, you know -- I had a
22 little confusion about when I should or should not
23 speak, but, you know, just some clarification about
24 objections. I'm trying to follow proper direction.
25    Q.   Okay.

Page 96

1     A.   That's all.
2     Q.   Okay. Good.
3        MR. GASTEL: I'm confused by Yvonne's
4  objections, too.
5        MS. PUIG: I'm going to object to
6  your objection.
7        THE WITNESS: I think I'm walking
8  home.
9        MR. STRANCH: We'll give you a ride.
10 Don't worry.
11       MS. PUIG: That would be quite awry.
12 I want to be the hood ornament for that car
13 ride.
14    Q.   (By Mr. Stranch) Okay. So I want to try
15 to talk about this conversation with Terry Grinder.
16 My understanding of your -- and I may be putting words
17 into your mouth, and so if I do, please correct me.
18 I'm not trying to.
19       My understanding is that Mr. Grinder told
20 you that you could not purchase from -- as a hospital,
21 you could not purchase from a compounding pharmacy in
22 bulk and then hold it and resell it; is that correct?
23    A.   He went a step further. He said you can't
24 buy any product from them and resell it. It had, you
25 know, this relationship of one prescription, one drug.

Page 97

1  He gave me the illustration of a triangle. You have
2  the physician, the patient and the pharmacy. You're
3  now putting a second pharmacy in this triangle.
4  Doesn't belong there. That's the problem. It was a
5  great illustration.
6      So having two pharmacies, it's -- your one
7  pharmacy is compounding for the other pharmacy, and
8  it's selling to one and then the pharmacy is selling
9  again to the patient. He said that -- that, in his
10 interpretation was not legal.
11     Q.  Okay.
12     A.  That's the problem.
13     Q.  But this -- your understanding is this
14 would have been okay if the second compounding
15 pharmacy had held a manufacturer's license; correct?
16     A.  That is correct.
17     Q.  Okay.
18     A.  Because now it's not a pharmacy. It's a
19 manufacturer. That's a different entity, a different
20 licensure. They're licensed in the State of Tennessee
21 as a manufacturer or they're -- they're licensed
22 somewhere as a manufacturer and inspected by the FDA.
23     Q.  Okay.
24     A.  So you can do that. That's the model that
25 works.

Page 98

1      Q.  Okay.
2      A.  Yeah.
3      Q.  And so within this triangle that you just
4  described, who within that triangle of patient,
5  doctor, pharmacy is responsible for patient safety?
6      A.  They all are, including the patient.
7      Q.  Okay.
8      A.  Everyone has a responsibility.
9          I mean, we could spend the rest of the
10 afternoon talking about patient safety. I'm trying to
11 answer your questions and be specific.
12     Q.  I appreciate that.
13     A.  Yeah.
14     Q.  And that's why I'm asking.
15         So within the triangle, for the patient
16 safety, the -- what would be the pharmacy's
17 responsibility as it relates to patient safety?
18     A.  Patient safety starts with receiving the
19 order from the physician. So that you do due
20 diligence to reviewing the order to make sure it's the
21 right drug for the right patient, the right dose.
22 There's no contraindications. No drug-drug
23 interactions, so on and so forth.
24         And then the preparation of the product,
25 whatever that is, if there is preparation involved.

Page 99

1  Repackaging, compounding, whatever. So that's a safe
2  product and labeling that product in a hospital
3  setting so that the nurse can administer it.
4          It's different than retail. So we won't go
5  to retail discussion right now.
6      Q.  But the situation in which -- okay. So
7  that would be the pharmacy's responsibility as to
8  patient safety in the traditional three triangle
9  without the pharmacy being a retail pharmacy; correct?
10     A.  In a hospital setting.
11     Q.  In a hospital setting?
12     A.  Yeah.
13     Q.  Would that also apply to in a clinical
14 setting, like an ambulatory surgery center?
15         MR. KRAUSE: Object to the form.
16     Q.  (By Mr. Stranch) You can answer the
17 question.
18     A.  It's a different scenario. In a clinic
19 setting, there's no pharmacy. Again, we can talk all
20 afternoon about how I feel about that, but that's my
21 philosophy and that's a whole different discussion.
22 The triangle is different, if you will. The
23 relationship, you have the patient and the doctor and
24 the clinic. There's no pharmacy necessarily in that
25 equation. The clinic, the physician is allowed to buy

Page 100

1  and purchase pharmaceuticals. Now we're talking about
2  a different class of trade now. There's no pharmacy
3  in that equation. Do I agree with that? Well, that's
4  my own -- I have my own opinion. I'm not going to go
5  there right now.
6          But you have a physician and a patient
7  relationship that is protected, and the physician can
8  purchase drugs. They're allowed to do that. They're
9  licensed to do so, and they can administer it to the
10 patient. There's no pharmacy involved in that
11 equation. We're out of the loop.
12     Q.  Briefly, what is your -- what is your
13 concern with that setup?
14         MR. TARDIO: Object to the form.
15         THE WITNESS: Yeah. I mean, my
16     opinion has maybe no bearing on this
17     because the law allows it and it's
18     considered legal, and the physician is
19     assuming the responsibility to whatever
20     they buy, it's a good product, reliable and
21     meets all the requirements before the drug
22     is utilized and administered to the
23     patient. The nurse may administer it so
24     the doctor usually does -- well, sometimes
25     the doctor, but it depends on the

Page 101

1  situation, of course.
2      So it's a legal process. It's there.
3  It's all legal. All the checks and
4  balances should be there. The knowledge
5  base of the physician and the clinicians
6  working in that clinic, they assume all
7  those responsibilities. When there's no
8  pharmacist in the equation, somebody else
9  has to take on that responsibility and have
10  that knowledge.
11     Q.   (By Mr. Stranch) So within that triangle,
12  the physician is both the physician and serves wearing
13  the hat of the pharmacist; correct?
14     A.   You could say that.
15     Q.   Is that your understanding of how it works?
16     A.   Well, there's clearly no pharmacist in the
17  equation so there's no triangle. There's no triangle.
18  It's one to one, physician, patient. There's no
19  triangle.
20     Q.   So the portion of patient safety that the
21  pharmacist would take care of in the triangle that
22  relates to the drug itself, that now falls solely on
23  the physician; correct?
24     A.   And the nurse administering it, if there's
25  a nurse involved.

Page 102

1      Q.   Okay.
2      A.   Yeah.
3      Q.   Okay. So it would be up to the physician
4  to -- if they're going to order in bulk, to order in
5  bulk from someone with a manufacturing license;
6  correct?
7          MR. TARDIO: Object to the form.
8          MS. PUIG: Again, object to form.
9      He's not being offered as an expert. He's
10     testified he is not knowledgeable about
11     physician practices or ASC internal
12     practices. I'm going to object.
13         You can answer if you know but -- if
14     you know.
15         THE WITNESS: I'm -- you'll have to
16     restate the question. I want to make sure
17     I understand this question before I answer
18     it.
19     Q.   (By Mr. Stranch) So the question is, in a
20  situation where the physician is wearing the
21  pharmacist hat, the physician would also have the
22  responsibility of making sure when they order the
23  product, that they're keeping the patient safety in
24  mind as you have to do when it's the triangle setup;
25  correct?

Page 103

1      A.   That would be my understanding.
2      Q.   Okay. And so the physician would need --
3  would need to fulfill the role that the pharmacist
4  would normally fulfill in that -- in the triangle;
5  correct?
6      A.   That's my understanding.
7      Q.   And as a pharmacist, in the triangular
8  role, you would only purchase from a manufacturer that
9  has a manufacturer's license; correct?
10     A.   Before 2012 or after?
11     Q.   Before 2012.
12     A.   Before 2012, my understanding, my
13  interpretation, yes, I'd only buy from a
14  manufacture -- a company with a manufacturer's
15  license.
16     Q.   So what was happening in March of 2011 that
17  led to you reach out to Terry Grinder? You referenced
18  earlier about things were changing. Can you explain
19  that.
20         MS. PUIG: Can I hand him this to
21     refresh his recollection?
22         MR. STRANCH: Oh, sure. Sure.
23         THE WITNESS: Yeah. This is, I
24     guess --
25     Q.   (By Mr. Stranch) Let's start with would

Page 104

1  you like to identify this document and let's go ahead
2  and mark it as 537.
3      A.   Sure. So I'll just take a moment to
4  explain what this is?
5          (Exhibit 537 was marked for
6      identification.)
7          MR. FITZPATRICK: Yes, you can.
8          THE WITNESS: Okay. This is a
9      compounding agreement between NECC -- a
10     proposed compounding agreement that they
11     had, form letter, if you will, between NECC
12     and any facility, hospital, probably could
13     be a doctor's office, too, that wanted to
14     purchase their products. The sales rep
15     came in to see me, and her name is on here,
16     Susan Maynard. She came in to see me on
17     March 28th, and I believe that's 2011. I
18     read my own scribble.
19         And I looked at this and I had
20     discussion with her and said, we can't do
21     this. And to make a long story short, she
22     said, oh, yeah, you know, we're doing this
23     all over. As long as you provide us a list
24     of patients, we can -- you know, we can
25     send you the drug and then you can send us

Page 105

1  of list of patients you're using it for.
2  It's legal. And I said, no, that's not my
3  understanding. And she explained to me
4  this is being done all over the country,
5  and I said, well, that may be so, but I'm
6  not comfortable with this.
7       So we parted company after a
8  discussion, and the next day, I dated it
9  3/29/2011, I called Terry Grinder, Board of
10 Tennessee, and he said, you cannot do this.
11 And I wrote it, cannot do this. I stapled
12 the sales rep's card to this, documented it
13 and said one day I may need this and
14 plopped it in a file. They -- a lot of
15 people think I'm nuts because I save all
16 this stuff, at least when I worked at St.
17 Thomas, but I'm glad I did because we
18 discovered this or it was discovered and it
19 was still in the file after I left.
20      So that's the long and short of it.
21 So I'll let you ask your questions.
22    Q.   (By Mr. Stranch) Why were you not
23 comfortable with this proposal?
24    A.   I had had an earlier discussion years
25 before this with the Board of Pharmacy, very same

Page 106

1  thing, and I was -- wanted to see if anything had
2  changed. I don't remember when that call was, but it
3  was years -- maybe five years before this.
4       The whole industry was changing because of
5  drug shortages, and the compounding pharmacies were
6  beginning to have a presence, but there was no clear
7  interpretation or enforcement of any rules or regs,
8  how far can a compounding pharmacy go in preparing
9  product and then selling that not only to patients, to
10 doctors' offices or even out of state.
11      I called the Board of Pharmacy with the
12 same question, and I got the same exact answer with a
13 little bit more clarity perhaps from Terry Grinder
14 this time. I'm not sure who I spoke to the first
15 time, but I got this -- I wanted to see if anything
16 has changed. Nothing had changed. Even though what I
17 was seeing around me happen, I was hearing more and
18 more of other places reconsidering and perhaps even
19 purchasing product from them, but I -- I called the
20 board and got my own clarification and said this is
21 the way we're going to do it. And I verbally
22 communicated that to my buyers, to my staff, made it
23 very clear, and that's when we began looking at our
24 own internal procedures and policies about how could
25 we clarify some of that. We focused on what we should

Page 107

1  be buying from FDA-approved manufacturers, AB-rated
2  drugs and so on. We began visiting this whole thing
3  in some of our policies.
4       But there was no written directive for me
5  because I had nothing in writing to substantiate what
6  the Board of Pharmacy interpretation was to me. I had
7  nothing in writing anywhere. I couldn't find it. So
8  I'm like, you know, I'm stuck. So I have to go by
9  what I was told.
10    Q.   Beyond the concerns about whether it was
11 legal or not, did you have any patient safety concerns
12 about ordering from a compounding pharmacy?
13    A.   At that time, it wasn't so much about
14 safety as it was the regulatory issues. I was aware
15 that other places were buying this stuff and using it,
16 not specific to NECC, but just compound -- there are
17 compounding pharmacies all over the country popping
18 up, and you hear people talking and they're buying
19 from these compounding pharmacies and using the
20 product and not having any problems.
21      So in my mind, it wasn't at that time
22 safety so much as it was regulatory issues. I needed
23 to find out from the Board of Pharmacy are we allowed
24 to do this. Can a compounding pharmacy act like a
25 manufacturer? That was my concern, the legalness of

Page 108

1  it. I had no idea that all this was going to happen.
2     Q.  But you would agree with me, though, that
3  the regulations are there to help protect patient
4  safety; correct?
5     A.  Yes.
6         MR. TARDIO: Object to the form.
7         THE WITNESS: I mean, that's what we
8  have rules and regs for. Pharmacy is a
9  highly regulated profession, probably more
10 than any other healthcare profession that
11 I'm aware of. You ever see our pharmacy
12 law books? That's why --
13    Q.   (By Mr. Stranch) Unfortunately, yes.
14    A.   Yeah. So I'm preaching to the choir.
15 It's -- but that's who we are. And that's
16 what we do, right.
17    Q.   And the regulations that are on a licensed
18 manufacturer are much greater than the ones that are
19 on just a compounding pharmacy; correct?
20    A.   They're different and they -- you used the
21 word "more restrictive." I would like to use the word
22 "they're a guidance" to say that in this setting, you
23 can do this, and in this setting you can do that. And
24 again, as I mentioned earlier, that it's about
25 compounding and expiration dates, stability,

Page 109

1  sterility. In the compounding pharmacy, you do not
2  have the same rules and regulations and requirements
3  for clean rooms and so on. Good manufacturing
4  procedures are more stringent in the manufacturing
5  than they are in the compounding pharmacy.
6      Q.  Okay. So if I'm understanding you
7  correctly, the regulations that are placed on a
8  licensed manufacturing facility are much more
9  stringent than those that are placed on a compounding
10 pharmacy; is that correct?
11     MR. KRAUSE: Object to the form.
12     THE WITNESS: Before 2012?
13     Q.  (By Mr. Stranch) Before 2012.
14     A.  Yes.
15     Q.  During this time that you just described
16 where compounding pharmacies were starting to crop up
17 and people were starting to order from them, did you
18 discuss this with other pharmacists about any concerns
19 you had or questions or things that they were seeing?
20     A.  Yes.
21     Q.  Okay. What would those discussions
22 generally center on or how would they -- what would
23 generally be the tenor of those discussions?
24     A.  After my discussion with Terry Grinder, I
25 picked up the phone within the next day or two and

Page 110

1  called my colleagues at my sister hospitals within the
2  Nashville ministry and told them of what I learned and
3  made them aware of what I learned. And I thought that
4  was my responsibility, and they had to make their
5  decisions based on the information I was sharing with
6  them.
7      If I remember correctly, I believe they
8  were telling me at that point in time -- I don't -- I
9  don't believe they were buying from compounding
10 pharmacies. So I think we were okay at that time.
11 But I did share that with them.
12     There were a lot of questions and where is
13 it in writing, Marty? Well, I don't have anything in
14 writing. You know, people want to see it in writing,
15 not just, well, you're just telling me verbally what
16 is -- you know, I don't have anything in writing. I
17 don't.
18     Q.  So you felt that this was a very important
19 issue, didn't you?
20     A.  Yes.
21     Q.  Okay. And you say you communicated with
22 the pharmacists at other hospitals in town. Did
23 that -- is that people at Vanderbilt, people at what
24 was Baptist, people at -- or only within the St.
25 Thomas community?

Page 111

1       MS. PUIG: He said his sister
2  hospitals.
3       THE WITNESS: Sister hospitals which
4  would be -- you know, at that time, it
5  was -- I know they changed the names of the
6  hospitals, but it was Baptist and MTMC.
7  Our ministry, local ministry. I wasn't --
8       Q.  (By Mr. Stranch) Okay.
9       A.  Too many -- you know, hey, I don't have the
10 time to start calling everybody. I -- but I called
11 who I felt I -- within our system, as we typically do,
12 we share information. That's what we do.
13      Q.  Okay. Did you call -- okay. In these
14 discussions that you had with your sister hospitals in
15 the Nashville area or middle Tennessee area, was there
16 any discussion about NECC, in particular?
17      A.  I am -- I believe so. I probably cited the
18 fact that the sales rep came to see me. They're
19 probably coming to see you. I called the board about
20 this and specific to this company, but it would apply
21 to any compounding pharmacy, whether it was NECC,
22 because we were being contacted by other compounding
23 pharmacies, also, not just this company.
24      Q.  So let me ask you about that meeting with
25 Ms. Maynard. What was it about this document or your

Page 112

1  meeting with Ms. Maynard that caused you to say this
2  is the one that's going to require me to call the
3  Board of Pharmacy?
4       A.  Because she was the one that came to see me
5  face to face and she was insistent that this was okay
6  and cited all kinds of examples. So I'm like maybe
7  something's changed. Let me call again. Maybe I'm
8  wrong. Again, I just had nothing in writing. It's
9  one person's interpretation from a previous phone call
10 maybe five years before. So I said, you know what, I
11 need to call again, and I got the same answer. And
12 I -- and I told the Board of Pharmacy, I said, are you
13 aware of what's going on with this company? They
14 said, we'll look into it. That was the end of the
15 conversation.
16      Q.  Did you discuss your concerns with any
17 other members of the local pharmaceutical -- or
18 pharmacy community, either at any meetings or any
19 trade groups or anything of that nature?
20      A.  Yes.
21      Q.  Okay. Tell me about with who, what
22 meetings, what trade groups.
23      A.  I wanted to know what other people were
24 doing. Was this just a Tennessee issue? What was
25 going on in other states because we have other

Page 117

1    Tennessee. According to this sales rep,
2    she said they were buying it at other
3    hospitals in Tennessee, and I'm like I'm
4    not going there.
5        Q.   (By Mr. Stranch) Did you ever speak with
6    Mike O'Neil at -- do you know who Mike O'Neil at
7    Vanderbilt is?
8        A.   I've heard the name, but I don't know him
9    personally.
10       Q.   Okay. You worked also with the Belmont
11   pharmacy school; correct?
12       A.   That is correct.
13       Q.   Okay. Did you discuss this with anyone at
14   the Belmont pharmacy school?
15       A.   Not that I can recall. This really
16   wasn't -- we may have talked about drug shortages, in
17   general, but not about NECC, no. You know, that's --
18   that's more of the education side of things. They're
19   not into buying and selling drugs at all. So I don't
20   think that really came up.
21           MS. PUIG: Do you have a name --
22           THE WITNESS: Not that I recall.
23           MS. PUIG: -- at Belmont pharmacy
24       school?
25           MR. STRANCH: No. I'm just asking

Page 118

1    questions.
2        Q.   (By Mr. Stranch) Mike O'Neil is at
3    Vanderbilt School of Pharmacy?
4        A.   Okay.
5        Q.   Does that help jog your memory on who he
6    is?
7        A.   Little bit. Maybe that's why I recognize
8    the name. I may have met him, may have talked with
9    him, but he may be one of the professors there. I
10   don't know. I mean, I've been away from it for a
11   while.
12       Q.   Okay.
13       A.   Yeah.
14       Q.   Did you speak with a Mrs. Beckom?
15       A.   I may have. Of course, her name has become
16   much more familiar to me because of this whole
17   litigation, but prior to that, I probably interacted
18   with her maybe once or twice. They may have called
19   with a question. But we made it very clear to them
20   who are you and what's your clinic and, oh, you're not
21   part of the network. Okay. You're at the for-profit
22   side. What are your questions? We can't help you
23   with any drug procurement, any sales or anything like
24   that. They may have had possibly some procedural
25   questions. I don't know. I don't remember.

Page 119

1    But usually, those kind of -- we discourage
2    that kind of relationship because, inevitably, it
3    would lead to things we could not get involved in with
4    them. Even if they're dealing with drug shortages, I
5    can't help you. There's nothing I can do for you.
6        Q.   Yeah. So if someone from the for-profit
7    side had contacted you about potentially purchasing
8    from a -- drugs from a compounding pharmacy in bulk,
9    would you have discouraged that purchase?
10       A.   I would have probably told them what we're
11   doing and why and they have to make their own
12   decision. They're a different class of trade. So the
13   triangle doesn't exist. So they're outside the
14   triangle, which means they're allowed to buy drugs on
15   their own. And --
16       Q.   And then --
17       A.   They're not regulated by the Board of
18   Pharmacy, per se. They're by the Board of Medicine.
19   However, if they do get involved -- you know, I'm not
20   an expert on where the Board of Pharmacy -- I mean, I
21   guess they could inspect the doctor's office if they
22   wanted to, but that's kind of unusual. Usually, they
23   do that when there's a problem. It's not usual for
24   them to inspect doctors' offices.
25           So they're a different class of trade.

Page 120

1        Q.   Yeah. So if someone from that for-profit
2    side that is in that different class had contacted
3    you, would you have at least encouraged them to
4    contact the Board of Pharmacy or Board of Health to
5    determine whether they could be doing this?
6        A.   I don't know. Like I said, that didn't
7    happen. I never spoke to them about it. I didn't
8    even think of calling them because we -- you know, the
9    line is drawn in the sand. They're over there in the
10   for-profit world. We're in the nonprofit world. Our
11   worlds did not -- we did not mesh. We didn't talk to
12   each other, really.
13           So if they had called me, as an inference,
14   I would have told them what we're doing, and I would
15   have explained to them why. But then again, I might
16   have said to them -- first of all, at that point in
17   time before 2012, we had no concern at that point so
18   much about the safety of the product. It was more
19   about the regulatory issue, and being a different
20   class of trade, I couldn't speak to that for the
21   doctor's office. They're outside of that triangle.
22       Q.   But if a clinic or a doctor's office was
23   trying to meet the same standards, the same high
24   standards that you meet and provide through your
25   pharmacy, you would have discouraged them from

Page 161

1  bucket? MPA.
2  Q. MPA that's been produced in bulk, that as
3  orders came in --
4  A. I mean, is the bucket sterilized? Is it
5  clean? I don't know, you know. I don't -- you know,
6  I mean, there's a lot of questions that have to be
7  asked. Unless you're there inspecting it, it's
8  hard -- you know, I'm just looking at a picture that's
9  very fuzzy and is it -- is it a sterilized bucket? I
10 don't know.
11 Q. Yeah.
12 A. I don't know.
13 Q. But does that in general raise red flags
14 where you'd want to ask a lot of questions because of
15 that?
16 A. Sure.
17 Q. Okay. Flip over to the first page. You
18 see the filthy sticky mats rest on processing
19 equipment, missing ceiling tiles in a clean room,
20 ceiling penetrations in a clean room? Would these be
21 all things that would lead to you to raise -- that
22 would raise questions in your mind that would need to
23 be addressed?
24     MS. PUIG: Object to the form.
25     THE WITNESS: Yes.

Page 162

1      MS. PUIG: Go ahead.
2      THE WITNESS: I mean, looking at
3   these pictures, yes.
4  Q. (By Mr. Stranch) Flip over --
5  A. I don't know where these pictures were
6  taken, but I'm assuming that's --
7      MS. PUIG: It's two years later,
8   July 9, 2014 site inspection.
9      THE WITNESS: Oh, this is two years
10  later. Okay. Yeah. Okay. Sorry. I
11  didn't see that.
12     But, I mean, these -- yeah, these
13  are -- this is not -- this is not a clean
14  room, guys.
15 Q. (By Mr. Stranch) Yeah. Flip over to the
16 second page. These are the sorts of things that if
17 you saw them, you would be concerned and want to ask a
18 lot of followup questions; correct?
19 A. Absolutely. Yes.
20 Q. Okay. So to make sure we're keeping
21 ourselves in the correct time frame, in early 2011,
22 there was a purchase from NECC that Ms. Leffler
23 discovered and informed you of and you ordered it
24 destroyed.
25     Shortly after that, approximately March --

Page 163

1  end of March 2011, you were contacted by a rep from
2  NECC trying to convince you that they can do business
3  with you; correct?
4  A. That is correct.
5  Q. You contacted Terry Grinder at the
6  Tennessee Department of Health or Board of Pharmacy to
7  inquire about whether you could do business with a
8  compounding pharmacy; correct?
9  A. Yes.
10 Q. And you informed NECC at that time that
11 they -- that you could not do business with them;
12 correct?
13 A. Yes, I did.
14 Q. And you also informed your direct -- people
15 that directly reported to you and your staff members
16 that they're not to do business with a compounding
17 pharmacy at that time; correct?
18 A. That's correct.
19 Q. That included Ms. Leffler, Mr. Neu and who
20 else was informed of that?
21 A. I don't remember everyone who was there but
22 I -- you know, when you give a directive to your
23 managers, they're supposed to pass it on down to the
24 people who are responsible.
25 Q. Yeah.

Page 164

1  A. I -- I don't recall exactly who was in the
2  room when I made the comment, but I made it very
3  clear. I said, you know, Carmine -- Carmen, I said,
4  we have to make sure that Chris Roberts understands
5  that we cannot order from any compounding pharmacies,
6  and when we have any relationship with any new vendor,
7  we have to ask the questions. We have to -- these
8  companies were -- unless you asked the right questions
9  and got the right documents, it could be misleading.
10 And we discovered that very quickly, this being one of
11 the examples. I said, from now on, I want -- every
12 vendor we deal with, I want a copy of their licensure.
13 I want to know exactly if they're a manufacturer, a
14 compounding pharmacy or what.
15     This kind of opened up the whole floodgate
16 for us. I said, you know what, we've got to be
17 squeaky clean on this. So that's again -- and I said,
18 we need to relook at some of our policies. So we
19 began the process of how do we tighten up our ship.
20 Q. Good. I'm going to hand you a document.
21 It was previously marked Exhibit 528. I'm going to
22 ask if you can take a look at this and if you've ever
23 seen this.
24 A. The first time I saw this document was
25 yesterday. My attorneys put this document in front of

Page 165

1  me and said, Marty, have you ever seen this before? I
2  said, no. I don't know who this individual is. I've
3  never seen this before. I don't remember ever meeting
4  this person, and I'm assuming that they were a rep for
5  the New -- NECC, New England Compounding Pharmacy.
6       Looks like they registered on our VCS site,
7  but I don't recall or remember meeting with this
8  person. It's interesting that it's April, which is a
9  month after I just met with this other person. So why
10 they would be doing this --
11    Q.   It's April 2012.
12    A.   Oh, yeah. I'm sorry.
13    Q.   So it's 13 months later.
14    A.   I'm sorry. It's a year later. Okay.
15 Thanks for correcting me. So it is a year later.
16       I wonder if they had a new sales rep. I
17 don't know.
18    Q.   Yeah. So this document, is this something
19 that when a new vendor comes, they're automatically
20 handed, this document, or is this a document that's
21 only given out once you're going to do business with a
22 vendor?
23    A.   If -- the policy, as I recall, when a
24 vendor first shows up at our door, it's their first
25 visit, we excuse them, and we may meet with them

Page 166

1  briefly, but we instruct them that they are required,
2  the next time they come in, to register VCS. And they
3  are usually given that big packet that has the policy
4  and tells them what they're required to do.
5       So the next time they come in, they're
6  expected to do this, and if they don't, they won't
7  be -- we won't meet with them. They're asked to
8  leave.
9     Q.   Okay. So Mr. Giomi would have filled this
10 out because he would have been coming to meet with
11 someone about NECC doing work for St. Thomas sometime
12 around April 23rd, 2012 or at some point after that;
13 correct?
14       MS. PUIG: Object to form.
15       THE WITNESS: I don't know what
16 happened. It could be a new sales rep.
17       The process at St. Thomas Hospital
18 was they had to go to the security
19 department, and that's where this took
20 place, the registration. They didn't come
21 to the pharmacy. So, you know, the
22 individual in the security department just,
23 okay, this is -- you're a sales rep. Go
24 ahead and fill this out. Read this.
25 Register in the system. Make sure you have

Page 167

1  your vaccinations, whatever, et cetera,
2  et cetera.
3       So it's kind of done at a generic
4  level, and that just allows them to get
5  into our organization, then set up
6  appointments to meet with individuals. So
7  I don't know how far --
8     Q.   (By Mr. Stranch) Okay. And would they
9  sign this document to get into anything within the St.
10 Thomas Health community or would they have a separate
11 one for St. Thomas Hospital, for St. Thomas Health,
12 for any of the clinics, et cetera?
13    A.   My understanding at the time was that this
14 would let them into any -- anything in the St. Thomas
15 campus, our hospitals. They're in the system and the
16 system was for -- this computerized system was -- they
17 had access -- they only had to do this once. They
18 could get into all the hospitals and any of the
19 clinics that they wanted to because they're now
20 registered in our system.
21    Q.   Okay.
22    A.   Yeah.
23    Q.   And so was there some sort of a thing like
24 a tickler or a thing that would have kicked out to let
25 you know here's a new vendor on the pharmacy side

Page 168

1  that's -- that's filled out this form that's going to
2  be coming in?
3     A.   No.
4     Q.   Okay.
5     A.   Unless you went into the system and
6  generated reports.
7     Q.   Okay.
8     A.   There was no automated process. Yeah.
9     Q.   Okay. So you only would have learned of
10 this if Mario decided to come and meet with you or
11 tried to set up an appointment with you?
12    A.   Yes, that is correct.
13    Q.   Okay. And at this point in time, 13 months
14 after you spoke with Mr. Grinder, your -- it was your
15 understanding that your policy was clear throughout
16 the hospital that there was to be no dealing with
17 compounding pharmacies; correct?
18    A.   I think I need to clarify that in that we
19 would not purchase from them. It doesn't mean we
20 couldn't talk to them.
21    Q.   So they're welcome to bring you lunch, but
22 you're not going to buy from them?
23    A.   No. No. We would not -- they were not
24 allowed to bring us lunch without an educational
25 program.

Page 169

1  But I would say that, you know, NECC had a
2  division, and this rep may have been representing the
3  Ameridose side of the business, which was their
4  manufacturer. So this -- I believe these sales reps
5  may have covered both divisions.
6  And I'm looking at this is NECC. I -- you
7  know, it's possible that -- I don't know. I mean, he
8  could have been representing Ameridose, too, which was
9  their manufacturing side.
10  So that's a possibility. The problem is
11  that I don't know.
12  Q. Okay. Did you have regular training
13  sessions with your employees about the guidelines and
14  ordering processes and what's forbidden and what's
15  allowed within that world for the pharmacy?
16  A. Upon hiring somebody new, they would, of
17  course, go through orientation and training, and they
18  would have an annual performance review that would be
19  done and annual competencies that would be done. So
20  that's how we had our ongoing training and assessment
21  of people's competencies.
22  With some of these changes, we began
23  revisiting some of our policies, and so as we made
24  changes in policies, we would also educate our staff
25  whatever the policy changes would be at our staff

Page 170

1  meetings. And that's how we communicated and rolled
2  out changes.
3  Q. And how often were these staff meetings?
4  A. We tried to meet monthly.
5  Q. Okay.
6  A. As much as possible.
7  Q. And if you needed to meet more often, you
8  would schedule a special one?
9  A. We would have a call meeting. Just right
10  in the middle of the department, yeah, have a call
11  meeting.
12  Q. Would you agree with me that one of the
13  purposes behind USP Chapter 797 is patient safety?
14  A. Yes.
15  Q. Okay. And that one of the reasons why you
16  would want to do your compounding under meeting all
17  the requirements of USP Chapter 797 is patient safety?
18  A. That's the ultimate goal is patient safety.
19  That's what we have rules and regs for is to maintain
20  a standard that will ensure patient safety best
21  outcomes.
22  MR. STRANCH: Why don't we take
23  another short two-minute break and let us
24  see if we can consolidate some of the last
25  couple of things.

Page 171

1  MS. PUIG: Okay.
2  VIDEOGRAPHER: 5:01 p.m., off the
3  record.
4  (A recess was taken.)
5  VIDEOGRAPHER: 5:13 p.m., back on the
6  record.
7  Q. (By Mr. Stranch) We talked a little bit
8  earlier about the distinction between the for-profit
9  side and the clinics on that side that report to Mr.
10  Neu and then the hospital and the sister kind of
11  nonprofits that are directly under you as well.
12  MR. STRANCH: Wasn't that bad of a
13  question.
14  Q. (By Mr. Stranch) We talked about that
15  earlier. Do you remember us discussing that and you
16  explaining some of the distinctions to us?
17  A. Yes. I would just make one clarification,
18  if I may, to your statement. They didn't report to
19  David Neu. The clinics did not report to him.
20  Q. Okay.
21  A. They reported to Sheila on who sent that
22  e-mail.
23  Q. Okay.
24  A. We just wanted a list of the locations.
25  Q. Okay.

Page 172

1  A. So we knew -- because these were fairly new
2  business ventures and we wanted to have contact
3  information in case anything came up.
4  Q. Okay. And -- but my understanding of your
5  earlier testimony was that if they had questions about
6  pharmaceutical ordering or issues such as that, they
7  could deal with Mr. Neu and he could get certain
8  products for them and could help them out with that
9  process if they had questions; correct?
10  A. If -- if something arose to that -- to that
11  end.
12  Q. Okay. So one question I did have is if a
13  patient is going to a -- the for-profit side, one of
14  those clinics, or is coming to a clinic on the
15  nonprofit side, do they -- would they expect the same
16  level of patient safety and care?
17  MR. TARDIO: Object to the form.
18  THE WITNESS: That's a patient
19  perception and when you have a branded
20  product such as St. Thomas, and the
21  patient -- and this is my opinion -- the
22  patient of St. Thomas so they associate
23  because it has the St. Thomas name on it.
24  So you, you know, it's part of the
25  same, quote/unquote, organization and

**Page 173**

```
 1    patient perception would -- yeah, they
 2    expect that this is part of the same
 3    organization.
 4        Q.   (By Mr. Stranch) Okay. And they would
 5    expect the same level of care at STOPNC that they
 6    would receive at St. Thomas Hospital or any of the
 7    other St. Thomas entities; correct?
 8        A.   Based on my former comment, yes.
 9        Q.   Okay. And I believe you testified
10    earlier -- and I want to get this as well -- when you
11    were -- when we discussed people that you informed
12    that you had concerns about ordering from compounding
13    pharmacies, you testified that you have no
14    recollection -- or actually, let me just ask the
15    question again differently.
16             Did you tell anyone at STOPNC that they
17    should be leery of ordering from NECC?
18        A.   No. I had no real ongoing relationship
19    with STOPNC.
20        Q.   When you say no, are you saying you did not
21    tell anyone there or that you do not recall telling
22    anyone there?
23        A.   I do not recall telling anyone and I
24    believe -- I mean, there would be no reason for me to
25    call them. I have no recollection of ever having any
```

**Page 174**

```
 1    conversation in that regard during this time. Any
 2    discussions or contact I had with them was when they
 3    first opened up, and since then, there was no real
 4    ongoing -- no ongoing contact or relationship with
 5    them at all.
 6        Q.   Okay. And I'm basically going to ask you
 7    the same question, but instead of being specific to
 8    NECC, do you recall having any conversations with
 9    anyone at STOPNC about whether they should or should
10    not order from a compounding pharmacy?
11        A.   I have no recollection of ever having that
12    conversation with anybody from STOPNC.
13        Q.   Would you have expressed any concerns about
14    ordering from a compound pharmacy when they were
15    getting up and running?
16             MS. PUIG: In 2000?
17             MR. STRANCH: When he -- when he said
18        he had earlier conversations with them.
19             THE WITNESS: That was -- back then,
20        that wasn't even an issue. It wasn't an
21        issue.
22        Q.   (By Mr. Stranch) Okay. Have you ever told
23    anyone that you warned STOPNC -- any STOPNC employee
24    or employees of STOPNC not to order compounding --
25    from compounding pharmacies?
```

**Page 175**

```
 1        A.   I'm trying to understand your question.
 2    How is that different?
 3        Q.   Let me -- let me rephrase it.
 4        A.   Yeah.
 5        Q.   Have you ever told anyone that you -- have
 6    you ever told anyone else outside in the world that
 7    you told people at STOPNC that they shouldn't order
 8    from compounding pharmacies?
 9        A.   No.
10        Q.   Have you ever told anyone that you told
11    employees of STOPNC that they should not order from
12    NECC?
13        A.   No.
14             MR. STRANCH: Okay. I think that's
15        what we've got for now.
16             MS. PUIG: Okay. I've got a couple
17        of questions. Can I go ahead of you,
18        Mr. Tardio?
19             MR. TARDIO: Yeah. Sure. That's
20        fine.
21    EXAMINATION
22    BY MS. PUIG:
23        Q.   Mr. Kelvas, of course, you know me. I'm
24    Yvonne Puig, and I've got just a couple of questions.
25             Regarding David Neu, you mentioned that he
```

**Page 176**

```
 1    had oversight with respect to a for-profit side of the
 2    house. Do you recall that testimony?
 3        A.   Yes.
 4        Q.   Do you know if Mr. Neu had oversight for
 5    the nonprofit Dispensary of Hope?
 6        A.   Yes.
 7        Q.   When you describe a retail pharmacy, if
 8    someone went and presented a prescription to Mr. David
 9    Neu's pharmacy, would it have been filled?
10        A.   Yes.
11             MR. STRANCH: Objection.
12        Q.   (By Ms. Puig) So a patient of St. Thomas
13    Hospital could have gone to Plaza Pharmacy to fill a
14    prescription?
15             MR. STRANCH: Object to the form.
16             THE WITNESS: Yes.
17        Q.   (By Ms. Puig) Could a person who is not
18    affiliated with St. Thomas Hospital have presented a
19    prescription to Plaza Pharmacy in 2012 and had that
20    prescription filled?
21        A.   Yes.
22        Q.   A total stranger?
23        A.   Yes.
24        Q.   Yvonne Puig could have gone over there?
25        A.   Yes.
```