# EXHIBIT M

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH

*September 14, 2015*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Case 1:13-md-02419-RWZ Document 2820-13 Filed 04/20/16 Page 3 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                    Page 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   IN RE: NEW ENGLAND          )
     COMPOUNDING PHARMACY,       ) MDL No. 2419
 4   INC. PRODUCTS LIABILITY     ) Master Docket No.:
     LITIGATION                  ) 1:13-md-2419-RWZ
 5                               )
     THIS DOCUMENT RELATES TO:   ) Honorable Rya W. Zobel
 6   All Actions                 )
                                 )
 7
```

13   VIDEOTAPED DEPOSITION OF:

14   TERRY W. GRINDER, DPH

15   Taken on behalf of the Plaintiffs

16   September 14, 2015

20            DISCOVERY LITIGATION SERVICES
                   100 Mayfair Royal
21                 181 14th Street, NE
                Atlanta, Georgia 30309
22                   404-847-0999



Case 1:13-md-02419-RWZ   Document 2820-13   Filed 04/20/16   Page 4 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015    Pages 2..5

### Page 2

```
 1  APPEARANCES:
 2  For the Plaintiffs:
            GEORGE NOLAN, ESQ.
 3          Leader, Bulso & Nolan, PLC
            414 Union Street
 4          Suite 1740
            Nashville, Tennessee 37219-1734
 5          615-780-4114
            gnolan@leaderbulso.com
 6
            DANIEL L. CLAYTON, ESQ.
 7          Kinnard, Clayton & Beveridge
            127 Woodmont Boulevard
 8          Nashville, Tennessee 37205
            615-297-1007
 9          dclayton@kcbattys.com
10
    For Saint Thomas Outpatient Neurosurgical Center, LLC;
11  Howell Allen, a Professional Corporation; John W.
    Culclasure, M.D.; Debra V. Schamberg, RN; Specialty
12  Surgery Center; Crossville, PLLC; Kenneth R. Lister,
    M.D.; Kenneth R. Lister, M.D., PC; and Donald E.
13  Jones, M.D.:
            CHRISTOPHER TARDIO, ESQ.
14          Gideon, Cooper & Essary, PLC
            315 Deaderick Street
15          Suite 1100
            Nashville, Tennessee 37238
16          615-254-0400
            chris@gideoncooper.com
17
18  For Saint Thomas Health, Saint Thomas Network, and Saint
    Thomas Hospital:
19          AMY D. HAMPTON, ESQ.
            Bradley Arant Boult Cummings, LLP
20          Roundabout Plaza, Suite 700
            1600 Division Street
21          Nashville, Tennessee 37203
            615-244-2582
22          ahampton@babc.com
23
24
25
```

### Page 3

```
 1  APPEARANCES (Continued):
 2  For Specialty Surgery Center and Kenneth R. Lister,
    M.D.:
 3          KENT E. KRAUSE, ESQ.
            Brewer, Krause, Brooks, Chastain &
 4            Burrow, PLLC
            611 Commerce Street
 5          Suite 2600
            Nashville, Tennessee 37203
 6          615-256-8787
            kkrause@bkblaw.com
 7
    For the Witness:
 8          DEVIN M. WELLS, ESQ.
            TOM AUMANN, ESQ.
 9          Tennessee Department of Health
            Office of General Counsel
10          665 Mainstream Drive
            Second Floor
11          Nashville, Tennessee 37243
            615-253-5988
12          devin.m.wells@tn.gov
13
       *The following attorneys appeared via telephone*
14
    For Saint Thomas Health, Saint Thomas Network, and Saint
15    Thomas Hospital:
            YVONNE K. PUIG, ESQ.
16          Norton Rose Fulbright US, LLP
            98 San Jacinto Boulevard
17          Suite 1100
            Austin, Texas 78701-4255
18          512-536-2450
            yvonne.puig@nortonrosefulbright.com
19
       *The following attorneys appeared via video stream*
20
21  For Defendants Ocean State Pain Management, PC, and
      Abdul R. Barakat, M.D.:
22          THOMAS M. DOLAN, III, ESQ.
            Capplis, Connors & Carroll, PC
23          18 Tremont Street
            Suite 330
24          Boston, Massachusetts 02108
            617-227-0722 (Telephone)
25          tdolan@ccclaw.org
```

### Page 4

```
 1  APPEARANCES (Continued):
 2  For Barry Cadden and Lisa Cadden:
            CALLAN STEIN, ESQ.
 3          Donoghue Barrett & Singal, PC
            One Beacon Street
 4          Suite 1320
            Boston, Massachusetts 02108
 5          617-720-5090
            cstein@dbslawfirm.com
 6
    For the South Bend Clinic, LLP, and Kathryn L.
 7    Park, M.D.:
            KYLE LAWRENCE, ESQ.
 8          Eichhorn & Eichhorn, LLP
            200 Russell Street
 9          Hammond, Indiana 46320
            219-931-0560
10          klawrence@eichhorn-law.com
11  For Anonymous Healthcare Provider No. 1:
            JOSEPH KLAUSING, ESQ.
12          O'Bryan, Brown & Toner
            455 South Fourth Street
13          Suite 1500
            Louisville, Kentucky 40202
14          502-585-4700
            klausingj@obtlaw.com
15
    For Tim I. Chowdhury, M.D.:
16          BARTHOLOMEW T. FREEZE, ESQ.
            Freund, Freeze & Arnold
17          65 East State Street
            Suite 800
18          Columbus, Ohio 43215-4247
            614-827-7300
19          bfreeze@ffalaw.com
20  For a Defendant Party:
            HEATHER KANNY, ESQ.
21          Fraley & Fraley, LLP
            901 Main Street
22          Suite 6300
            Dallas, Texas 75202
23          214-761-6460
            hkanny@fraley-law.com
24
25
```

### Page 5

```
 1  Also Present:
 2  The Court Reporter:
            PAMELA P. WILLIS, TLCR NO. 229
 3          Discovery Litigation Services
            100 Mayfair Royal
 4          181 14th Street NE
            Atlanta, Georgia 30309
 5          404-847-0999
            nashvillecourtreporter@yahoo.com
 6
    The Videographer:
 7          MICHAEL MITCHELL
            VCE Legal Videography
 8
 9          MOLLY MOORE
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015          Pages 6..9

### Page 6

```
                    - INDEX -
Witness                                                 Page
  TERRY W. GRINDER, DPH
Examination
  By Mr. Nolan.................................  11
Examination
  By Mr. Tardio................................  37
Further Examination
  By Mr. Nolan................................. 102
Further Examination
  By Mr. Tardio................................ 118
Further Examination
  By Mr. Nolan................................. 129
Further Examination
  By Mr. Tardio................................ 137
Further Examination
  By Mr. Nolan................................. 137

                   - EXHIBITS -
Number        Description                         Page
No. 526    NECC Document (Previously Marked)
             (Retained by Counsel)...............  32
No. 572    Notice of Deposition and Subpoena....  12
No. 573    T.C.A. 63-10-204....................  19
No. 574    Hand-Drawn Diagram of
             Prescriber-Pharmacy-Patient
             Relationship........................  24
No. 575    NECC Prescription Order Form
             Dated July 24, 2012.................  24
No. 576    State of Tennessee Board of
             Pharmacy License of New England
             Compounding Center..................  41
```

### Page 7

```
                   - EXHIBITS -
Number        Description                         Page
No. 577    Rules of the Tennessee Board of
             Pharmacy, Chapter 1140-3
             Revised 2009.......................  36
No. 578    Rules of the Tennessee Board of
             Pharmacy, Chapter 1140-7
             Revised 1999.......................  36
No. 579    Tennessee Department of Health
             Licensure Verification Web Page....  42
No. 580    Tennessee Department of Health
             Licensure Verification Web Page
             With Barry Cadden Search Results...  46
No. 581    Tennessee Department of Health
             Board of Pharmacy Disciplinary
             Actions Web Page...................  48
No. 582    Massachusetts Board of Pharmacy
             Inspection Report..................  56
No. 583    Tennessee Department of Health
             Policies Web Page and Policy
             Statement..........................  71
No. 584    Tennessee Department of Health
             Helpful Links and Frequently Asked
             Questions Web Page.................  73
No. 585    Tennessee Board of Pharmacy
             Board Meeting Minutes
             Dated January 22-23, 2014..........  75
No. 586    Tennessee Department of Health
             Board of Pharmacy Web Page.........  76
No. 587    Board of Pharmacy Emergency Rules...  80
No. 588    Tennessee Department of Health
             Board of Pharmacy Featured
             Links Web Page.....................  84
No. 589    Tennessee Board of Pharmacy
             March 2014 Newsletter..............  87
```

### Page 8

```
                   - EXHIBITS -
Number        Description                         Page
No. 590    Tennessee Board of Pharmacy
             Newsletter Dated December 2012..... 116
No. 591    New England Compounding Center
             Customer List...................... 118
No. 592    Rules of the Tennessee Board
             of Pharmacy, Chapter 1140-9........ 121
```

### Page 9

         The videotaped deposition of TERRY W. GRINDER,
DPH, was taken on behalf of the Plaintiffs on
September 14, 2015, commencing at 10:01 a.m. and
concluding at 1:31 p.m., at the offices of Leader, Bulso
& Nolan, PLC, 414 Union Street, Suite 1740, Nashville,
Tennessee, for all purposes under the Federal Rules of
Civil Procedure.

         The formalities as to notice, caption,
certificate, et cetera, are not waived. All objections,
except as to the form of the questions, are reserved to
the hearing.

         It is agreed that Pamela P. Willis, TLCR No.
229, being a Notary Public and Court Reporter for the
State of Tennessee, may swear the witness and that the
reading and signing of the completed deposition by the
witness are reserved.

                    *   *   *



Discovery Litigation Services
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

### Page 10

```
 1                PROCEEDINGS
 2          MS. PUIG:  I just want to say that Amy and
 3   I are appearing today on behalf of the Saint Thomas
 4   entities.  And through the gracious consent of the PSC
 5   granted three weeks ago, I'm being allowed to appear as
 6   lead counsel remotely today.  So I thank you for that
 7   opportunity, but I wanted to explain that I'm not just a
 8   listener today.  So thank you so much.  Appreciate it.
 9               (Discussion off the record.)
10          THE VIDEOGRAPHER:  All right.  This is
11   Disk No. 1 in the videotaped deposition of Dr. Terry
12   Grinder, taken in the matter of New England Compounding
13   Pharmacy, Inc., product liability litigation.  The
14   deposition is being held at Leader, Bulso & Nolan in
15   Nashville, Tennessee.  My name is Michael Mitchell, and
16   I'm the videographer.  The court reporter is Pam Willis.
17          Could everybody please introduce
18   yourselves for the record.
19          MR. NOLAN:  George Nolan for the
20   plaintiffs.
21          MR. TARDIO:  Chris Tardio for the
22   Tennessee Clinic defendants.
23          MS. HAMPTON:  Amy Hampton and Yvonne Puig
24   on behalf of the Saint Thomas entities, including Saint
25   Thomas Health, Saint Thomas Network, and Saint Thomas
```

### Page 11

```
 1   Hospital.
 2          MR. CLAYTON:  Daniel Clayton on behalf of
 3   the plaintiffs.
 4          MR. KRAUSE:  Kent Krause on behalf of
 5   Specialty Surgery Center and Dr. Lister.
 6          MR. AUMANN:  Tom Aumann from the Office of
 7   General Counsel for Dr. Grinder.
 8          MR. WELLS:  Devin Wells, Deputy General
 9   Counsel, Tennessee Department of Health on behalf of
10   Dr. Grinder.
11          MS. PUIG:  Yvonne Puig, Saint Thomas
12   Entities, with Amy Hampton.
13          THE VIDEOGRAPHER:  Would the court
14   reporter please swear in the witness:
15               TERRY W. GRINDER, DPH,
16      Having been first duly sworn, was examined and
17                 testified as follows:
18                    EXAMINATION
19   BY MR. NOLAN:
20   Q.     Sir, would you please state your name.
21   A.     Terry Webb Grinder.
22   Q.     Dr. Grinder, we are here to take your
23   deposition, and do you understand that you've been asked
24   to appear and testify today pursuant to a subpoena
25   that's been served on you?
```

### Page 12

```
 1   A.     Yes.
 2   Q.     And I'd like to make the first exhibit, a copy
 3   of what we call the Notice of Deposition, as well as the
 4   subpoena, that's going to be Exhibit No. 572.
 5               (Exhibit No. 572 was marked.)
 6   BY MR. NOLAN:
 7   Q.     And I don't have extra copies for everybody
 8   because everyone has already received it.  But one of
 9   the things, Dr. Grinder, that was attached to the
10   subpoena that you received is what we call a protective
11   order.
12          And that's an order of the Court that basically
13   says that if -- if any of the lawyers reveal to you
14   what's been designated confidential information in this
15   litigation, then you'd be required to keep it
16   confidential.  In other words, you're not supposed to go
17   out and post it on the Internet or talk about it outside
18   this context.
19          Do you understand that requirement?
20   A.     Yes.
21   Q.     All right.  Where do you work?
22   A.     I work at the Tennessee Department of Health
23   for the Tennessee Board of Pharmacy.
24   Q.     And how long have you worked there?
25   A.     Eleven years and six months.
```

### Page 13

```
 1   Q.     Okay.  And are you a licensed pharmacist?
 2   A.     I am.
 3   Q.     And how long have you been a licensed
 4   pharmacist?
 5   A.     For approximately 33 years.
 6   Q.     And could you just give us a thumbnail sketch
 7   of your educational background and training in the field
 8   of pharmacy.
 9   A.     Okay.  I graduated from the University of
10   Tennessee College of Pharmacy in 1982.  I owned and
11   operated some retail pharmacies as well as performed
12   some nursing home and hospital pharmacy.
13          In 2 -- in 1993 I became a chain pharmacist,
14   worked for a chain for a number of years, and then
15   became a district manager for a pharmacy for that chain.
16          And in 2004, then I applied for and got the job
17   with the Tennessee Board of Pharmacy as an investigator.
18   Q.     And, currently, what is your position with the
19   Tennessee Board of Pharmacy?
20   A.     I am a pharmacist investigator.
21   Q.     All right.  And what are your job duties?
22   A.     We do inspections.  We investigate complaints.
23   We do follow-up visits; compliance checks; various and
24   sundry of pharmacies, manufacturers, wholesalers,
25   distributors, both -- both retail and institutional
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015    Pages 14..17

### Page 14

1  pharmacies, as well as drug researchers.
2  Q.    Okay. And who do you inspect?
3  A.    Any of our licensees are subject to be
4  inspected. Typically, it's the facilities rather than
5  the individuals.
6  Q.    Okay. And where are they typically located?
7  A.    The ones we actually inspect are in Tennessee.
8  Q.    Okay. And in addition to being a pharmacist
9  investigator, have you held any other positions with the
10 Tennessee Board of Pharmacy?
11 A.    I have also served as an interim director on
12 three different occasions over my tenure, and I think
13 the total time lapse was approximately about five years
14 of my 11 plus --
15 Q.    I see.
16 A.    -- have been dual roles.
17 Q.    Okay. And so during the approximately five
18 years of your 11 years with the board in which you
19 served as interim director of the Board of Pharmacy,
20 could you explain what your duties included.
21 A.    Officially, the custodian of records for all
22 the licensees, managing office staff and daily
23 operations of the board, attending meetings within the
24 department on behalf of -- of the board.
25 Q.    And so what -- what is the Tennessee Board of

### Page 15

1  Pharmacy?
2  A.    We are the governing body of pharmacy and the
3  profession of pharmacy in Tennessee, promulgate rules
4  subject to whatever authority the legislature gives us,
5  and we are responsible for compliance and maintaining
6  the standards for pharmacy.
7  Q.    Okay. So the board does promulgate rules and
8  regulations that govern pharmacy practice in Tennessee?
9  A.    Yes.
10 Q.    And does your job include being familiar with
11 the pharmacy rules and laws that apply in Tennessee?
12 A.    Yes.
13 Q.    Dr. Grinder, are you aware that this litigation
14 that brings us here today arises from a fungal
15 meningitis catastrophe that occurred in the fall of
16 2012?
17 A.    I'm not sure -- are you asking did I know this
18 litigation was happening, or am I --
19 Q.    Yes. Are you generally familiar with what the
20 litigation is about?
21 A.    Not other than just from the subpoena being --
22 Q.    Okay. So did you know that this litigation
23 involves a circumstance in which 16 Tennessee plaintiffs
24 died and scores of others got sick with fungal
25 meningitis or other fungal infections after receiving

### Page 16

1  contaminated epidural steroid injections that were
2  imported into Tennessee from a compounding pharmacy
3  known as the New England Compounding Center?
4        MR. WELLS:    Object to form.
5  BY MR. NOLAN:
6  Q.    You can go ahead and answer.
7  A.    I knew about the circumstances. I didn't know
8  about the litigation --
9  Q.    Okay.
10 A.    -- until this was served.
11 Q.    Well, when I ask you questions today, I'm going
12 to be asking you about the pharmacy rules and laws as
13 they existed in Tennessee in 2011 and in 2012, before
14 the fungal meningitis outbreak.
15       Do you understand that?
16 A.    Yes.
17 Q.    Okay. With that in mind, could you tell us
18 what a compounding pharmacy is.
19 A.    Compounding is defined in state law as the
20 prescribing and the preparation of a patient-specific
21 drug product.
22 Q.    Okay. And so what is the difference between a
23 compounding pharmacy and a licensed pharmaceutical
24 manufacturer?
25 A.    Manufacturers, of course, would be under FDA

### Page 17

1  jurisdiction, and they would be manufacturing bulk
2  products; whereas a compounding pharmacy typically would
3  be compounding a patient-specific product based on a
4  patient -- a prescriber-patient-pharmacy triad.
5  Q.    Okay. And is it fair to understand that --
6  that licensed pharmaceutical manufacturers that receive
7  the FDA oversight receive a different degree of
8  oversight than do compounding pharmacies?
9        MR. TARDIO:    Object to the form.
10 BY MR. NOLAN:
11 Q.    You can go ahead and answer.
12       (Clarification by the reporter.)
13       MR. NOLAN:    Mr. Tardio.
14 BY MR. NOLAN:
15 Q.    You can go ahead and answer.
16 A.    Yes, manufacturers would be under a different
17 scrutiny than -- than a pharmacy.
18 Q.    Okay. So are drugs that are produced by
19 licensed manufacturers, such as Pfizer, for example, FDA
20 approved?
21 A.    Yes. If the -- if they're FDA inspected and
22 approved, then those drugs would be approved.
23 Q.    All right. And how is that different from
24 drugs that are made by compounding pharmacies pursuant
25 to a patient-specific prescription?


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2820-13   Filed 04/20/16   Page 8 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015          Pages 18..21

Page 18

1  A.    They would not be under FDA scrutiny if they
2  were properly compounded by a pharmacy.
3  Q.    And do you know whether the FDA approval
4  process for a company such as Pfizer involves patient
5  safety?
6        MR. WELLS: Object to form.
7        THE WITNESS: I'm not sure I understand
8  that one.
9  BY MR. NOLAN:
10 Q.    Well, let me ask you this: Before the fungal
11 meningitis catastrophe, specifically, what did the law
12 require in terms of how compounding pharmacies were
13 permitted to make and distribute medications in
14 Tennessee?
15       MR. TARDIO: Object to the form.
16       THE WITNESS: Okay. Compounding was
17 defined, and it involved the triad, as we mentioned
18 before, of prescriber-patient-pharmacy. Typically, it
19 was a patient-specific order that would have not been
20 commercially available, and that also allowed for
21 anticipatory compounding, based on prescribing habits of
22 that prescriber.
23 BY MR. NOLAN:
24 Q.    Okay. And -- and this triad of prescriber,
25 patient, and pharmacy, is that arrangement set up for

Page 19

1  the purpose of protecting patient safety?
2  A.    Yes.
3  Q.    And how does it promote patient safety?
4  A.    It would allow a pharmacy to compound a
5  specific product for a patient that might not be able to
6  use the next nearest commercially available product, and
7  it would allow the oversight of the Board of Pharmacy in
8  that process.
9  Q.    Okay. And so where is this -- this law about
10 the circumstances under which compounding is legal?
11 Where is it found?
12 A.    Compounding is defined, I believe, in T.C.A.
13 63-10. And I don't have a copy with me, but I believe
14 it would be under "Definitions" in that section.
15 Q.    Let me hand you a document that we're going to
16 make Exhibit No. 573. And for the record, this is
17 T.C.A. 63-10-204.
18       (Exhibit No. 573 was marked.)
19 BY MR. NOLAN:
20 Q.    And let me first ask you whether this is the
21 law that you were mentioning a moment ago.
22 A.    Yes, it is.
23 Q.    Okay. And so this law defines when
24 it's appropriate to engage in compounding; is that
25 correct?

Page 20

1        MR. TARDIO: Object to the form.
2  BY MR. NOLAN:
3  Q.    You can go ahead and answer.
4        MS. PUIG: Counsel, this is Yvonne. May I
5  interrupt only briefly? Is he looking at one in force
6  and effect in 2012 or currently?
7        MR. NOLAN: He's looking at the one that
8  was in force in 2012 that became effective on August
9  11th, 2010.
10       MS. PUIG: Very good. Thank you so much.
11 I'm going to pull it up.
12       MR. NOLAN: Sure.
13       MS. PUIG: Thank you.
14 BY MR. NOLAN:
15 Q.    So let me ask it this way: What does this law
16 do?
17 A.    It allows a pharmacy to provide a specific
18 medication for patients that might not otherwise be able
19 to use the next nearest commercially available product.
20 Q.    Okay. And so how many circumstances does it
21 list here in which it's appropriate to compound a
22 medication?
23 A.    (A), (B), and (C); it'd be three.
24 Q.    Okay. And so let's talk about circumstance
25 (A). What is that circumstance when it's appropriate to

Page 21

1  compound a drug?
2  A.    That, again, is the triad as a result of the
3  prescription order initiative based on the
4  prescriber-patient-pharmacist relationship in the course
5  of professional practice.
6  Q.    Okay. Now, let's look at circumstance (B), and
7  I'm going to read that into the record.
8  A.    Okay.
9  Q.    It says: "In anticipation of prescription
10 orders based on routine, regularly observed prescribing
11 patterns."
12       Have I read that correctly?
13 A.    Yes.
14 Q.    Okay. And is that the circumstance that you
15 mentioned involving anticipatory compounding?
16 A.    Yes.
17 Q.    So am I correct in understanding that if a
18 particular compounding pharmacy has a customer -- say,
19 Dr. Smith, for example -- and they know that Dr. Smith
20 writes ten patient-specific prescriptions for a
21 particular medication each week, it's okay for that
22 pharmacy to, on Monday morning, compound ten vials of
23 that particular medicine anticipating that they will
24 actually receive ten patient-specific orders as is
25 Dr. Smith's custom?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Pages 22..25

Page 22

```
 1            MR. TARDIO:  Object to the leading.
 2   BY MR. NOLAN:
 3   Q.       You can go ahead and answer.
 4            MR. WELLS:  Object to form.
 5            THE WITNESS:  Yes.
 6   BY MR. NOLAN:
 7   Q.       Okay.  So that -- that type of "in anticipation
 8   of prescription" orders based upon routine, regularly
 9   observed prescribing patterns, does it allow for the
10   making of compounded medications in bulk and sending
11   them to some customer without ever receiving
12   patient-specific prescriptions?
13   A.       That was not the idea when the -- when this
14   particular clause was put in, but I'm not an attorney.
15   I can't --
16   Q.       Okay.  Well, since you've been there, or before
17   the fungal men- -- meningitis outbreak, has this
18   language, "In anticipation of prescription orders based
19   on routine, regularly observed prescribing patterns,"
20   always been in this particular law, to your knowledge?
21            MR. WELLS:  Object to form.
22            THE WITNESS:  For as long as I recall,
23   yes.
24   BY MR. NOLAN:
25   Q.       Okay.  And then am I right that the third
```

Page 23

```
 1   circumstance listed here, does that involve research or
 2   testing or -- or analysis-type endeavors?
 3   A.       It does.
 4   Q.       Is that -- what is that, like clinical trials?
 5   Or what sort of circumstance does that come up in?
 6   A.       It could be the drug researches or teaching
 7   purposes or for chemical analysis, but it's not subject
 8   to sale or dispensing.
 9   Q.       And does the individual prescription rule, as
10   found in this statute, allow for the making of -- of
11   bulk medications by compounders for distribution without
12   individual prescriptions?
13            MR. TARDIO:  Object to the form.
14            MR. WELLS:  Object to form.
15            MR. TARDIO:  Asked and answered.
16   BY MR. NOLAN:
17   Q.       You can go ahead.
18   A.       Back to the triad analogy, if any of the three
19   are missing, it would not be typical compounding.
20   Q.       Could I give you a piece of paper, if I could,
21   and ask you to just maybe draw for us kind of a
22   conceptual representation of this triad that you're
23   mentioning (tendering).
24   A.       Sure (drawing).
25            MR. WELLS:  Is that an extra copy, George?
```

Page 24

```
 1            MR. NOLAN:  Of the statute?
 2            MR. KRAUSE:  Do you not have one?  We've
 3   got one here.
 4            MR. NOLAN:  We've got one.
 5            THE WITNESS:  There is your (tendering)...
 6            MR. WELLS:  Thank you.
 7   BY MR. NOLAN:
 8   Q.       Could you hold that up to the camera and just
 9   explain --
10   A.       Sure.
11   Q.       -- this to us, what this means.
12   A.       As the patient sees the prescriber, proper
13   treatment is determined, an order is sent to the
14   pharmacy specific for that patient, and the pharmacy
15   dispenses it to the patient.
16   Q.       I see.  Let me make that Exhibit No. 574.
17            (Exhibit No. 574 was marked.)
18            MS. HAMPTON:  I'm sorry; may I see that?
19            MR. NOLAN:  Yes, you can.
20   BY MR. NOLAN:
21   Q.       Let me hand you a document that we're going to
22   make 575.
23            (Exhibit No. 575 was marked.)
24   BY MR. NOLAN:
25   Q.       And, sir, I'm going to represent to you that
```

Page 25

```
 1   this is a -- this is a document that has been produced
 2   in the context of this litigation to us, and it's
 3   labeled "Prescription Order Form" at the top.  And you
 4   see NECC's logo there.  And the date is July 24th of
 5   2012.
 6            Now, as you look at this document, do you see
 7   that it appears to be placing an order for two drugs,
 8   one of which is called methylprednisolone?  Do you see
 9   that?
10   A.       Yes.
11   Q.       Okay.  And how many units of this drug are
12   being requested apparently by this order form?
13   A.       It says 500 units.
14   Q.       Okay.  And you see where there is a column for
15   the names of patients?
16   A.       Yes.
17   Q.       And so how many patient names do you see listed
18   on that column?
19   A.       None.
20   Q.       Okay.  Does this order form comply with
21   Tennessee law as far as you're concerned?
22            MR. TARDIO:  Object to the form.
23            MR. WELLS:  Object to form.
24            MR. TARDIO:  Object to the undisclosed
25   expert testimony and legal conclusions.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 26

1  BY MR. NOLAN:
2  Q.    You can go ahead and answer.
3  A.    This wouldn't meet several of our requirements
4  for a prescription order.
5  Q.    Could you tell us what requirements that does
6  not meet for a prescription order.
7  A.    Number one would be the name of the patient.
8  Q.    Okay.
9  A.    Directions for use.
10 Q.    Okay.
11 A.    And that's -- that'd be the main thing to make
12 it more compliant with a prescription order.
13 Q.    Okay. Now, I'm going to represent to you that,
14 in addition to using order forms like the one you have
15 in front of you, one of the parties in this case, at the
16 request of NECC, occasionally sent lists of patient
17 names to NECC that did not necessarily correspond with
18 who would receive the drug.
19       So they didn't send a list every time they used
20 an order form like that. And the few times that they
21 did send a list, the names on the list did not mean that
22 the patients would actually receive that particular
23 medication. Okay?
24       From a regulatory standpoint in Tennessee, does
25 that arrangement comply with the pharmacy rules as you

Page 27

1  understand them?
2       MR. TARDIO: Object to the form.
3       MR. WELLS: Object to form.
4       MR. TARDIO: Object to the opinion
5  testimony and legal conclusions.
6  BY MR. NOLAN:
7  Q.    You can go ahead and answer.
8  A.    Can we clarify exactly what you're asking?
9  Q.    Sure. What I'm saying is that at some point --
10 I'm saying that one of the parties in this case, a
11 party called Saint Thomas Outpatient Neurosurgical
12 Center, began buying vials of what we call MPA,
13 methylprednisolone acetate, using order forms like this
14 that didn't have patient names on them.
15 A.    Okay.
16 Q.    And that at some point in time, one of the
17 sales reps for NECC asked the facility to send lists of
18 patients. And the facility explained, Well, we really
19 can't do that. We have lists we can print out, but that
20 doesn't necessarily correspond with who's going to
21 receive these particular shots. And the sales rep said,
22 That's okay; just send the list anyway.
23       And then the local facility, the Saint Thomas
24 Outpatient Neurosurgical Center, sent some patient
25 lists, even though they didn't necessarily match up with

Page 28

1  who would receive MPA from that particular pharmacy.
2       Do you understand so far what I've explained?
3  A.    Yes.
4  Q.    Does that comply with the Tennessee rules and
5  laws as you understand them?
6       MR. TARDIO: Same objections.
7       THE WITNESS: That would not meet the
8  requirement for compounding.
9  BY MR. NOLAN:
10 Q.    Do you know why in the world a compounding
11 pharmacy would ask a customer to send a random list of
12 patient names?
13      MR. TARDIO: Object to the form.
14      MR. WELLS: Object to form.
15      THE WITNESS: Any -- any answer I would
16 have would only be speculation and...
17 BY MR. NOLAN:
18 Q.    Okay. So if a -- if a company planned to sell
19 medications in Tennessee in bulk without individual
20 patient-specific prescriptions, what type of license
21 would the company need?
22 A.    A manufacturer's license.
23 Q.    Okay. And so is that the type of license that
24 would be required to sell FDA-approved drugs such as
25 Depo-Medrol made by Pfizer, for example?

Page 29

1  A.    That would be either a manufacturer or a
2  wholesaler license.
3  Q.    Okay. And what type of license did NECC have?
4  A.    A pharmacy license.
5  Q.    All right. So was NECC authorized to sell
6  medications in bulk in Tennessee without
7  patient-specific prescriptions?
8  A.    They were not properly licensed to do so.
9  Q.    Now, has -- has your job ever included
10 answering phone calls from healthcare providers who have
11 questions about pharmacy laws?
12 A.    Very much so.
13 Q.    All right. And do you remember receiving a
14 phone call from a pharmacist named Martin Kelvas, who
15 was the Director of Pharmacy Services at Saint Thomas
16 Hospital in early 2011?
17 A.    I don't recall that specific call or, you know,
18 any specific conversation.
19 Q.    All right. So does that mean that no such call
20 occurred, or does it mean maybe there was a call and you
21 talk to a lot of people and you don't remember every
22 single call that you --
23 A.    We have lots of calls daily from lots of
24 different people, and I just can't recall the specifics.
25 Q.    All right. Well, I'll represent to you that



Page 30

1  Dr. Kelvas has already given some testimony in this case
2  and that during that testimony, he explained that in
3  March of 2011, a New England Compounding Center sales
4  representative came and met with him and solicited the
5  hospital's business and tried to sell the hospital
6  compounded medications.
7         And he didn't think that that arrangement was
8  appropriate or legal, so he called the Tennessee Board
9  of Pharmacy, and he talked with you. And according to
10 him, you basically explained two things: First, that
11 medications could only be procured from a compounding
12 pharmacy pursuant to a patient-specific prescription
13 involving the three-way relationship that you've
14 explained.
15 A.    Uh-huh.
16 Q.    And secondly, that medications can only be
17 purchased without prescriptions from someone with a
18 manufacturer's license.
19        Is that -- is Mr. Kelvas's description in that
20 regard consistent with what you would typically tell
21 people back in the 2011 time frame?
22        MR. TARDIO:  Object to the form.
23        MR. WELLS:  Object to form.
24 BY MR. NOLAN:
25 Q.    You can go ahead and answer.

Page 31

1  A.    Yes.
2  Q.    Okay.
3         MS. PUIG:  Mr. Nolan, could you repeat the
4  question. At the middle of it, your voice trailed off.
5         MR. NOLAN:  I think it would be best if we
6  had the court reporter read back the question.
7         MS. PUIG:  Very good. Thank you so much.
8         (Requested portion read.)
9         MR. NOLAN:  And could you go ahead and
10 read the answer.
11        COURT REPORTER:  The answer was "yes."
12 BY MR. NOLAN:
13 Q.    So when -- back in the 2011 time frame, if
14 someone called with a question about buying medications
15 from a compounding pharmacy, what would you typically
16 tell them?
17 A.    We would have told them that a compounding
18 pharmacy could only dispense products that's prepared
19 under the triad definition of compounding, and it had to
20 be patient specific.
21 Q.    And is that the explanation that you would give
22 to anyone who would call with a question like that?
23 A.    Yes, it is.
24 Q.    Okay. So would that mean you would give the
25 same answer, whether the person calling is a hospital

Page 32

1  pharmacist or the manager or director of an ambulatory
2  surgery center?
3         MR. TARDIO:  Object to the form.
4  BY MR. NOLAN:
5  Q.    You can go ahead and answer.
6  A.    Yes.
7  Q.    Let me hand you a -- a document that we've
8  already made Exhibit No. 526 in this litigation. And,
9  Dr. Grinder, I'm going to represent to you that this is
10 a document that was produced to us by the Saint Thomas
11 Outpatient Neurosurgical Center, and it consists of some
12 of the written information that the New England
13 Compounding Center provided to that particular clinic.
14 Okay?
15        And if we look on the second page, you see
16 paragraph G, which reads "Dispensing"?
17 A.    Yes.
18 Q.    Okay. And I want to read it into the record.
19 It says, "Product is dispensed by patient-specific
20 prescription only. There must be a specific
21 practitioner-patient-pharmacist relationship to dispense
22 to an individual patient or facility."
23        Have I read that correctly?
24 A.    Yes.
25 Q.    And is that statement consistent with or

Page 33

1  similar to what you would tell people if they called
2  your office with questions about how compounding
3  pharmacies were supposed to work?
4  A.    It would be.
5  Q.    Now, I'd like to talk with you for a moment, if
6  I could, about the rules that apply to the -- the
7  labeling of compounded medications.
8         Are you generally familiar with those rules?
9  A.    Yes.
10 Q.    And could you tell us basically how compounded
11 medications were supposed to be labeled if they were
12 being distributed to patients in Tennessee.
13 A.    A prescription label should include at least
14 the patient's name, drug name and strength, and
15 directions for use, as well as the date it was
16 dispensed.
17 Q.    And have you brought with you today a vial of
18 methylprednisolone acetate that the Tennessee Board of
19 Pharmacy procured during its inspection of the Saint
20 Thomas Outpatient Neurosurgical Center?
21 A.    Actually, it was procured, I think, by the
22 Department of Health --
23 Q.    Okay.
24 A.    -- not the Board of Pharmacy. But, yes, I do
25 have a vial.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com