# EXHIBIT N

Case 1:13-md-02419-RWZ   Document 2820-14   Filed 04/20/16   Page 2 of 6

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JOHN W. CULCLASURE, M.D.   on 03/23/2015                                    Page 1

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


   IN RE: NEW ENGLAND
   COMPOUNDING PHARMACY,
   INC. PRODUCTS LIABILITY        MDL No. 2419
   LITIGATION
                                  Master Dkt:
                                  1:13-md-02419-RWZ
   ~~~~~~~~~~~~~~~~~~~~~~~
   THIS DOCUMENT RELATES
   TO:

   All Actions


   ~~~~~~~~~~~~~~~~~~~~~~~~



                   VIDEOTAPED DEPOSITION OF
                   JOHN W. CULCLASURE, M.D.


                          9:05 a.m.
                       March 23, 2015



                          Suite 1100
                    315 Deaderick Street
                     Nashville, Tennessee



          Blanche J. Dugas, RPR, CCR No. B-2290
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**Page 114**

1  representative from a company called NECC at the FASCA
2  meeting that she attended.
3      Q.    At a what meeting?
4      A.    The Freestanding Ambulatory Surgery Center
5  Association.  I think that may not be exactly it, but
6  something along those lines.
7      Q.    And?
8      A.    And so she asked if it was worthwhile to
9  check with them and see if they could supply the
10 medication.  I said that would be fine.  Check with
11 them and see what they can do.
12     Q.    Anything else about that conversation?
13     A.    I don't know whether at that same time or
14 later that day or the next day, she told me that she
15 had seen them at that meeting for at least two years,
16 maybe that was all.  But they had been there -- she
17 had seen them there exhibiting for a couple of times,
18 that they supplied all kinds of medications including
19 steroid.  And she thought they might be an answer to
20 our -- our threatened supply shortage.
21     Q.    Anything else you remember about -- up to
22 this point in time, about speaking with anybody about
23 this issue?
24     A.    I never spoke to anyone from NECC.  The
25 only people I discussed this with would have been

**Page 115**

1  staff, probably, as I said, Cindy or Sandy and then
2  Debra.
3      Q.    Are the only people you would have talked
4  with about this supply of steroids been Cindy, Sandy
5  and Debra?
6      A.    Yes, sir.
7      Q.    It's true you never talked to anybody else
8  about this situation at that point?
9      A.    I think to the best of my recollection
10 that's true.  It wasn't a -- it wasn't a crisis.  It
11 wasn't something that stood out dramatically.  It was
12 just something to deal with in the course of taking
13 care of the patients.
14     Q.    Is there anything else about these
15 conversations up to this point in time you haven't
16 told us about yet?  Anything?
17     A.    Well, somewhere in the sequence, Debra
18 showed me some of the information from NECC.  I don't
19 know whether that was the first time I talked to her
20 about it or when she told me that she thought about
21 reaching out to them.  But she did have some -- I
22 don't remember whether it was a folder or whether it
23 was a one-page -- I mean a one-sheet on back and
24 front, but it just -- it was some advertising material
25 from NECC.  So I saw that at some point during the

**Page 116**

1  process.
2      Q.    Were you leaving it up to Debra Schamberg
3  to decide where to purchase these steroids?
4      A.    She -- it was, I guess, more of a
5  collaboration.  She just asked me if I thought that
6  was reasonable, and I said, Yeah that's very
7  reasonable, that they -- it looks like they do
8  everything correctly.  They've got -- they follow, you
9  know -- it looks like they maintain high standards,
10 everything looks like it's state of the art.  So I
11 said, That's fine.
12     Q.    Was this in the hallway also?
13     A.    It could have been in her office.  Probably
14 in her office.
15     Q.    Now, did she ever let you know anything
16 about price?
17     A.    I think -- you know, she may have mentioned
18 some things about price.  That just wasn't something
19 that concerned me, so I didn't really -- I didn't care
20 whether it was 50 cents more or less or a dollar more
21 or less.  That wasn't a large sum of money.  I mean if
22 we're talking about four or five hundred vials a
23 month, a dollar a vial wasn't going to -- it wasn't a
24 huge change in whether the center made money or not.
25     Q.    Well, what if it had been $3 more?  Would

**Page 117**

1  that have made a difference to you?
2      A.    Well, I don't know what the cut-off point
3  would have been.  It wasn't -- that's not my issue.
4  I'm not the -- I'm not managing the surgery center.
5      Q.    Well, do you know whether the patient would
6  have had to pay more -- if the switch occurred in
7  steroids, that a few dollars more were charged to the
8  center; do you know that?
9      A.    That wouldn't change anything that the
10 patient -- anything in the patient's bill.  So no.
11     Q.    But what it would change is the profit of
12 the center?
13     A.    Yes, it would.
14     Q.    And we've already established that the
15 standard of care for a center is to never let profit
16 take priority over patient safety; true?
17     A.    True.  And it never did.
18     Q.    Are you telling us and the jury that money
19 had nothing to do with this decision, Doctor?
20     A.    I said that profit did not affect the
21 patient care.
22     Q.    Did money have anything to do with the
23 decision to switch?
24     A.    Not with my decision, no.
25     Q.    Did it have anything to do with the



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2820-14   Filed 04/20/16   Page 4 of 6

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JOHN W. CULCLASURE, M.D.   on 03/23/2015      Pages 174..177

**Page 174**

care of STOPNC.
   Q.   Did -- or when did you start referring those patients out?
   A.   I don't remember exactly. One and a half to two years ago would be my best guess.
   Q.   Would it have been after this catastrophe happened at STOPNC?
   A.   I don't -- I don't remember the sequence of events.
   Q.   Where would you obtain the medications used to fill the implanted pain pumps?
   A.   That varied. And sometimes it depended on the insurance company. I think Blue Cross/Blue Shield of Tennessee designated a specific pharmacy -- compounding pharmacy in Tennessee. Other patients we would use a different -- a different place. I don't remember all the different ones that we used over time.
   Q.   Tell me the names of any of them that you used over time?
   A.   I couldn't. I don't know.
   Q.   Any of them out of state?
   A.   I don't -- I just don't know. I didn't do the actual ordering. The nurse practitioner did. So I don't know the -- I just don't know the name of the

**Page 175**

company.
   Q.   Who was the nurse practitioner?
   A.   There were several. Keri Weber, Allison -- I'll think of her last name in a minute, but there were three or four that -- that did that for me.
   Q.   Did they work at the Howell Allen Clinic there on the 8th floor?
   A.   Yes.
   Q.   Do they still work at the Howell Allen Clinic?
   A.   No.
   Q.   None of the four do?
   A.   Correct.
   Q.   Do you have something that you can look at to help refresh your memory of the names of those four people?
   A.   Nothing handy.
   Q.   But back at the office you think you have it?
   A.   I wouldn't have a list of them.
   Q.   For the medications used to fill the implanted pain pumps, were those patient-specific prescriptions?
   A.   I think they were ordered on a different DEA form, and I don't know that they -- on that form

**Page 176**

it includes any information about the patient. I think it's just numbering, the drugs and concentrations. So it's not actually like a prescription that we normally would give to a patient to take to a pharmacy.
   Q.   Was the prescription for the absolute alcohol something that you would give to the patient to take to the pharmacy?
   A.   No. We would probably -- probably have faxed it to the pharmacy or somebody would -- I would have had the secretary drop it by if they couldn't take it by fax. So the patient didn't pick up that drug. They -- we either then picked it up or they delivered it. I don't remember.
   Q.   For the medications used to fill the implanted pain pumps, then, you're saying there may have been some form that was signed that would not be patient specific?
   A.   I think that's correct. I haven't seen that form in a while, so I'd have look at it to refresh my memory.
   Q.   Would you even sign any of those forms, because nurse practitioners are allowed to sign them, aren't they?
   A.   I did at one time, but -- earlier in my

**Page 177**

career when I was ordering them myself, I did fill that form out, but the nurses -- the nurse practitioners did do most of that afterwards, yes.
   Q.   When you said earlier in your career, would that have been at the Howell Allen Clinic or somewhere else?
   A.   No, somewhere else. Primarily when I was in North Carolina I know I did it myself then. And at times if somebody was on -- if the nurse practitioner was on vacation, if someone needed to be refilled early, then I would -- then I would have to order it.
   Q.   So are you saying while you have been practicing medicine in Tennessee that you have written orders for medications used to fill implanted pain pumps that have been sent to compounding pharmacies that were not patient-specific prescriptions?
   A.   I think that's the case. I'd have to see the form. It's been a long time since I filled a form out myself.
   Q.   I'm talking about in Tennessee whether or not you have done that.
   A.   Oh, I understand your question. I'm saying I just don't remember.
   Q.   Was there any prescription written for the compounding products that were received from NECC?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2820-14   Filed 04/20/16   Page 5 of 6

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JOHN W. CULCLASURE, M.D.  on 03/23/2015       Pages 178..181

Page 178

1  A.   Not that I'm aware of, no.
2  Q.   You saw earlier that prescription order
3  that had your name printed or written on it, but you
4  said that was not your signature or you had not -- you
5  did not write your name on that.
6  A.   Correct.
7  Q.   Is that not considered under Tennessee law
8  a prescription order?
9  A.   I don't know.
10      MR. GIDEON: Objection.
11  Q.   (By Mr. Clayton)  You don't know?
12  A.   I don't know if that's considered a
13 prescription or not, no.
14  Q.   And was that the only type of order that
15 was used to obtain the products from NECC?
16  A.   I don't know.
17  Q.   Have you ever allowed anyone to sign your
18 name to a prescription for a medication?
19  A.   No.
20  Q.   That would not be allowed, would it?
21  A.   No.
22  Q.   Did you review all of the brochures that
23 Debra Schamberg gave you regarding NECC?
24  A.   If she gave them to me, I -- I would have
25 looked at them, yes.

Page 179

1  Q.   Well, what is it that you recall she gave
2  to you?
3  A.   I've seen some of the things -- some of the
4  materials from NECC since that time.  So I don't
5  really -- it's a little bit hard to say what I saw at
6  the time.  I -- earlier today, I said I thought
7  what -- one thing that I saw was a two -- a glossy
8  two-sided sheet of paper with information on the
9  processes that they use, the standards that they met.
10 It could have also been a four-page foldout.  I just
11 don't remember.
12  Q.   Your ex-wife -- what was your ex-wife's
13 name?
14  A.   Maiden name?
15  Q.   Her name, please.
16  A.   Elizabeth Penny, P-E-N-N-Y.
17  Q.   And where does she currently live?
18  A.   Chicago.
19  Q.   And when were the two of you divorced?
20  A.   Probably 1987.
21  Q.   And are your children a result of the
22 marriage from her?
23  A.   Yes.
24  Q.   You were subpoenaed to give testimony to
25 the grand jury in Boston?

Page 180

1  A.   Yes.
2  Q.   Did you go?
3  A.   Yes.
4  Q.   Did you ever invoke the Fifth Amendment?
5  A.   Never.
6  Q.   With regard to the fentanyl abuse, how did
7  you account for the missing fentanyl that you stole?
8  A.   Usually by saying that I gave two vials --
9  two vials instead of one.  So the patient always got
10 an adequate amount.  I just -- I just wrote on the
11 record that I gave, you know, more as if the patient
12 had a high tolerance.  So the record would balance
13 out, but...
14  Q.   So you would falsify patient records in
15 order for you to cover up your fentanyl use?
16  A.   Yes.
17  Q.   And did you do that during both occasions
18 whenever you were abusing the fentanyl?
19  A.   I don't remember -- I don't remember in
20 Johnson City whether I had access to the records there
21 or not.  So I don't know, but definitely the first
22 time in the Army, yes.
23  Q.   Well, if you didn't have access to the
24 records in Johnson City, then how did you account for
25 the missing fentanyl there?

Page 181

1  A.   Well, there was waste.  And so if the nurse
2  set the syringe down, I could pick up the syringe.
3  Q.   Any other way?
4  A.   No, sir, not that I remember.
5  Q.   You had sent an e-mail asking How -- asking
6  if Howell Allen was going to pursue a claim on your
7  behalf for lost wages.  Do you remember sending that
8  e-mail?
9  A.   Vaguely, yes.
10  Q.   Okay.  Tell me the reasons why you sent
11 that e-mail.
12  A.   I think someone told me that that was --
13 that that was possible.  And so I just asked if that
14 was -- if that was part of the -- if that was the
15 plan.
16  Q.   Who told you?
17  A.   I don't remember.
18  Q.   What were you told when you sent that
19 e-mail?
20  A.   Probably there were -- it was possible to
21 collect damages because of lost income.
22  Q.   I'm sorry, I did not hear what you --
23  A.   It was possible -- someone -- I guess
24 someone told me it was possible to collect damages
25 because of lost income and so I guess I was just


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JOHN W. CULCLASURE, M.D.   on 03/23/2015     Pages 182..185

Page 182
1  inquiring if that was a possibility.
2     Q.    And what was the response that you
3  received?
4     A.    I don't remember.
5     Q.    Well, you're aware that -- or are you aware
6  whether or not Howell Allen has filed a claim in the
7  bankruptcy for its losses?
8     A.    I'll not sure.
9     Q.    Or lost money?
10    A.    I don't know.
11    Q.    Is it --
12    A.    I'm not a partner so I don't attend
13  business meetings and things like that. So I don't
14  know what's been filed.
15    Q.    Whenever these other physicians from ASA
16  would perform the ESIs at STOPNC, if I understand
17  correctly, Howell Allen would not pay them directly;
18  is that correct?
19    A.    Correct. They did their own billing.
20    Q.    Would you receive any sort of compensation
21  for ESIs that were performed by the ASA folks at
22  STOPNC?
23    A.    No.
24    Q.    Did you receive any type of separate
25  compensation for being the medical director of STOPNC

Page 183
1  other than the 60 percent that you would receive from
2  Howell Allen for performing the ESIs?
3     A.    No.
4     Q.    So there was no separate stipend from
5  anybody to be the medical director?
6     A.    Correct.
7     Q.    Do you personally know any compounding
8  pharmacists who live in the Nashville area?
9     A.    Yes. First name, though. I don't
10  remember -- his name is John.
11    Q.    That's a -- you don't know his last name?
12    A.    No.
13    Q.    Do you know the name of the company he
14  works for?
15    A.    No.
16    Q.    How long have you known him?
17    A.    Three or four years.
18    Q.    You were aware back in 2011 and 2012 that
19  there were compounding pharmacies in Tennessee;
20  correct?
21    A.    Yes.
22    Q.    And compounding pharmacists in Tennessee;
23  correct?
24    A.    Yes.
25    Q.    For the fentanyl -- you're -- for your

Page 184
1  fentanyl use, was there ever any -- or were there ever
2  any criminal charges that were brought against you?
3     A.    No.
4     Q.    Were you ever threatened with any criminal
5  charges?
6     A.    No.
7     Q.    Did you go straight from being a
8  non-illegal drug user to starting to use fentanyl?
9     A.    Yes.
10    Q.    Had you abused any other drugs of any kind,
11  whether they were prescription or illegal drugs, prior
12  to using fentanyl?
13    A.    I smoked some marijuana in college.
14    Q.    Were any of the -- were you familiar with
15  any of the other physicians' preference, whether they
16  preferred using Depo-Medrol versus MPA over at STOPNC?
17    A.    A preference between Depo-Medrol over MPA?
18    Q.    Yes.
19    A.    No.
20    Q.    Or Depo-Medrol over a compounded
21  pharmaceutical like the one that NECC provided.
22    A.    No.
23          MR. CLAYTON:  Short break.
24          VIDEOGRAPHER:  This is the end of
25    Tape No. 3. We're off the record and the

Page 185
1     time is 3:25 p.m. I'm sorry. That was
2     Tape No. 4.
3           (A recess was taken.)
4           VIDEOGRAPHER:  Here begins Tape No. 5
5     in the deposition of John Culclasure, M.D.
6     We're back on the record and the time is
7     3:31 p.m.
8     Q.   (By Mr. Clayton)  Dr. Culclasure, have you
9  ever attended any CMEs regarding being a medical
10  director?
11    A.    No.
12    Q.    Have you ever had any training to be a
13  medical director?
14    A.    No.
15    Q.    So while you were in your treatment program
16  in Nashville, the folks who ultimately formed the
17  Howell Allen Clinic, one of the people there came to
18  you and asked you to be a medical director --
19          MR. GIDEON:  Objection.
20    Q.    (By Mr. Clayton) -- of the pain clinic?
21    A.    He called me and then asked me to come --
22  if I could come interview. So I -- yes. So that's
23  how that happened.
24    Q.    Is it your position as the medical director
25  of STOPNC that STOPNC obtained the MPA from New



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com