# EXHIBIT P

## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

---

## VIDEOTAPED DEPOSITION OF ROBERT PARRINO, PH.D., CFA

*February 23, 2016*

---



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND COMPOUNDING | MDL No. 2419
PHARMACY INC. PRODUCTS LIABILITY|
LITIGATION                |

THIS DOCUMENT RELATES TO:      | Master Docket No.

All Actions Naming St. Thomas  | 1:13-md-02419-RWZ

Outpatient Neurosurgical Center |

VIDEOTAPED DEPOSITION
ROBERT PARRINO, Ph.D., CFA
February 23, 2016

Reported by
Rebecca Callow, RMR, CRR, RPR
Job No. 26374

---

Page 2

```
 1
 2       VIDEOTAPED DEPOSITION OF ROBERT PARRINO, Ph.D.,
 3   CFA, produced as a witness at the instance of the
 4   Plaintiff and duly sworn, was taken in the above-styled
 5   and numbered cause on the 23rd day of February 2016,
 6   from 9:08 a.m. to 12:00 p.m., before Rebecca J. Callow,
 7   Registered Merit Reporter, Certified Realtime Reporter,
 8   Registered Professional Reporter and Notary Public for
 9   the State of Texas, reported by computerized stenotype
10   machine at the offices of Norton Rose Fulbright US LLP,
11   98 San Jacinto Boulevard, Suite 1100, Austin, Texas,
12   pursuant to the Federal Rules of Civil Procedure.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            APPEARANCES
 2   FOR PLAINTIFFS:
 3      Leiff Cabraser Heimann & Bernstein, LLP
 4      One Nashville Place
 5      150 Fourth Avenue, North, Suite 1650
 6      Nashville, Tennessee 37219
 7      (615) 313-9000
 8         By:  Mark P. Chalos
 9            mchalos@lchb.com
10   - and -
11      Leiff Cabraser Heimann & Bernstein, LLC
12      250 Hudson Street
13      8th Floor
14      New York, New York 10013
15      (212) 355-9500
16         By:  Annika K. Martin
17            akmartin@lchb.com
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1         APPEARANCES (Cont.)
 2
 3   FOR SAINT THOMAS HOSPITAL, SAINT THOMAS HEALTH,
 4   SAINT THOMAS NETWORK:
 5      Norton Rose Fulbright
 6      98 San Jacinto Boulevard
 7      Suite 1100
 8      Austin, Texas 78701
 9      (512) 474-5201
10         By:  Yvonne K. Puig
11            yvonne.puig@nortonrosefulbright.com
12            Eric Hoffman
13            eric.hoffman@nortonrosefulbright.com
14
15
16   ALSO PRESENT:
17      Justin Talbot, Videographer
18
19
20
21
22
23
24
25
```

Page 49

1    that this is an agreement -- I'm paraphrasing --
2    between Saint Thomas Health Services and
3    Neurological Surgeons P.C.
4         Do you see that?
5    A.   Yes, I do.
6    Q.   And Saint Thomas Health Services, it's your
7    understanding, is a predecessor entity to
8    Saint Thomas Network?
9    A.   Yes.
10   Q.   And Neurological Surgeons P.C. is a
11   predecessor entity to Howell Allen Clinic.
12   A.   Yes.
13   Q.   And those two entities are referred to in
14   this agreement as members.  Right?
15   A.   Yes.
16   Q.   And under the next paragraph it says:
17        "WHEREAS, the Members desire to form a
18   limited liability company under and pursuant to the
19   Act (as defined below), to conduct certain business
20   as a limited liability company, and to set forth
21   their mutual rights and obligations in this
22   Agreement ..."
23        Correct?
24   A.   Yes.
25   Q.   And the act defined below means the

Page 50

1    "Tennessee Limited Liability Company Act in effect
2    on the date hereof and as may be hereafter amended."
3         Do you see that?
4    A.   Yes.
5    Q.   Have you reviewed the Tennessee Limited
6    Liability Company Act in any of its forms?
7    A.   I have not.
8    Q.   And if you -- continuing through the
9    definitions section here, and I've flipped over to
10   the page that now has at the bottom
11   "DEREED-STNetwork 00006."  That's the next page, I
12   believe.
13        And this is further definitions.  There
14   is, under Paragraph "1.1.5 'Articles of Organization'
15   means the Articles of Organization of the LLC filed
16   with the Secretary of State of the State of
17   Tennessee, as amended from time to time."
18        Do you see that?
19   A.   Yes, I do.
20   Q.   Okay.  Have you reviewed the articles of
21   incorporation -- I'm sorry -- Articles of
22   Organization?
23   A.   I do not recall seeing them.
24        MR. CHALOS:  Let's mark this as the
25   next exhibit.

Page 51

1         (Exhibit 1192 marked.)
2         (Discussion off the record.)
3    BY MR. CHALOS:
4    Q.   Okay.  We've marked as Exhibit 1192 the
5    Articles of Organization of Saint Thomas Outpatient
6    Neurosurgical Center, LLC, dated December the 9th,
7    1999.
8         Do you see that?
9    A.   I do.
10   Q.   Okay.  And I'll represent to you that we
11   obtained this from the Tennessee Secretary of
12   State's office.  I believe this to be the original,
13   and I believe only, Articles of Organization filed
14   with the Tennessee Secretary of State.  And if you
15   look -- well, let me back up.
16        What is your understanding of what
17   articles of organization are in general terms?
18   A.   Well, they describe the nature of the
19   company and general parameters under which it will
20   be governed.
21   Q.   Okay.  And if you look, please, at
22   Article IV of the Articles of Organization of
23   Exhibit 1192, what does it say here?
24   A.   It says: "The Company will be Board
25   managed."

Page 52

1    Q.   And is that your understanding of the
2    intention when Saint Thomas Outpatient Neurosurgical
3    Center was organized?
4    A.   My understanding is that the intent was
5    that while the board was established with four
6    members, two from each investor, since the operating
7    expertise of the business was -- for this business
8    was possessed by a neurosurgical -- Neurological
9    Surgeons P.C. that they would be -- actually manage
10   the business itself, and that authority would be
11   delegated to them by the board of governors.
12   Q.   Okay.  And pursuant to a series of services
13   agreements, or through some other means?
14   A.   Through some agreements, yes.  I'm not sure
15   the form that would take, but services agreements I
16   would expect.
17   Q.   Okay.  And in looking back now as we sit
18   here in 2016 --
19   A.   Hold on.
20   Q.   Yes.
21   A.   I'm sorry.  Just to back up.
22        Not only through services agreement,
23   but the board -- the board had to delegate through
24   a -- you know, the authority -- to the managers of
25   Saint Thomas Outpatient Neurosurgical Center the

Page 53

1 authority to enter into these agreements as part of
2 the delegation of the business authority.
3     Q.  Is there -- I guess that's what I'm a
4 little bit confused about.
5         Are you aware of any other expressions
6 of the delegation from the Saint Thomas Outpatient
7 Neurosurgical Center to the Howell Allen Clinic of
8 any authority other than the services agreements that
9 we've looked at here today?
10    A.  Well, to the extent that -- to the extent
11 that Dr. Batchelor in his deposition stated that the
12 board had delegated operating authority for the
13 business to Howell Allen Clinic.  You know, that's
14 the basis for that statement.
15        The fact that they entered into these
16 agreements, these agreements in some sense are
17 codifying sort of the compensation that will be
18 received and the services that will be provided by
19 various entities where compensation is due.
20        But the actual delegation of
21 authority, my understanding was, by the board to
22 Howell Allen Clinic and that -- I don't see that
23 reflected -- I mean, I see, for example, Howell
24 Allen Clinic being compensated for allowing one of
25 their -- assigning one of their employees to act as

Page 54

1 medical director within Saint Thomas Outpatient
2 Neurosurgical Center, I see Saint Thomas Network
3 being compensated in these agreements for services
4 they're providing to the entity, but that would --
5 that's just in the course of business, the -- you
6 know, assigning the costs to the appropriate entity
7 for services provided.
8     Q.  Other than the services agreements and
9 Dr. Batchelor's testimony, on what are you basing
10 your conclusion that the Saint Thomas Outpatient
11 Neurosurgical Center board delegated management
12 authority to Howell Allen Clinic and its
13 predecessor?
14    A.  Well, the explicit statement by
15 Dr. Batchelor is the principal.
16    Q.  And you --
17    A.  And --
18    Q.  I'm sorry.
19    A.  And -- yes.  That's all.
20    Q.  And you've seen now testimony from three
21 other board members of Saint Thomas Outpatient
22 Neurosurgical Center that refer to the Howell Allen
23 Clinic -- I'm sorry -- refer to the Saint Thomas
24 Outpatient Neurosurgical Center as a joint venture.
25 Correct?

Page 55

1     A.  I've seen -- I've seen three people
2 refer -- use that term.
3     Q.  And you've also seen at least two board
4 members of Saint Thomas Outpatient Neurosurgical
5 Center testify that the management of the center was
6 shared between Howell Allen Clinic and Saint Thomas.
7 Right?
8     A.  I think you have to look at the substance
9 of what's happening with respect to this
10 relationship in interpreting the terms that these
11 people are using in the deposition.
12        They're describing -- they're
13 describing it as a joint venture and they may --
14 some of them are seeing it as a joint venture.  And
15 to the extent that the ownership is 50/50, that may
16 be, you know, the motivation and the fact that these
17 entities are cooperating -- Saint Thomas Network and
18 Howell Allen Clinic are cooperating -- is seen as --
19 making them see it as a joint venture.
20        The fact, though, is that from a
21 practical standpoint, the substance of the way this
22 business was being operated was that it was being
23 managed by Howell Allen Clinic, and the board of
24 governors -- and particularly the two governors that
25 were representing Saint Thomas Network -- were in an

Page 56

1 oversight role, but not actively engaged in managing
2 the business, which is where I used -- why I used
3 the term "passive" in describing the relationship
4 between Howell Allen Clinic and -- I'm sorry --
5 between Saint Thomas Network and the investment that
6 they made with regards to the Saint Thomas Network
7 and the investment they made in Saint Thomas
8 Outpatient Neurosurgical Center.
9     Q.  Have you ever seen anybody associated with
10 Saint Thomas, leaving lawyers aside, refer to its
11 relationship with Saint Thomas Outpatient
12 Neurosurgical Center as passive?
13    A.  No.  That's a term that I used which is --
14 which is common in describing -- which is a
15 descriptor for an investor in an entity such as an
16 LLC or a limited liability partnership that -- who
17 is not involved in the day-to-day operation of the
18 business.
19    Q.  Okay.  I'm going to hand you what was
20 previously marked as Exhibit 160.  And let's start
21 with -- Exhibit 160 is e-mails to -- or a series of
22 e-mails.  I think there are three total from October
23 the 30th of 2012.
24        And I want to start with the e-mail
25 that's on the reverse of the first page here.  It's a

# ARTICLES OF ORGANIZATION
## OF
## SAINT THOMAS OUTPATIENT NEUROSURGICAL CENTER, LLC

Pursuant to the provisions of §48-205-101 of the Tennessee Limited Liability Company Act, T.C.A. §48-201-101 et seq., the undersigned Organizer hereby adopts the following Articles of Organization of a limited liability company:

### Article I.

The name of the limited liability company is Saint Thomas Outpatient Neurosurgical Center, LLC (the "Company").

### Article II.

The address of the initial registered office of the Company shall be: Sherrard & Roe, PLC, 424 Church Street, Suite 2000, Nashville, Davidson County, Tennessee 37219. The initial registered agent at that office shall be John R. Voigt.

### Article III.

The name and address of the organizer of the Company are John R. Voigt, c/o Sherrard & Roe, PLC, 424 Church Street, Suite 2000, Nashville, Tennessee 37219.

### Article IV.

The Company will be Board managed.

### Article V.

The number of members at the date of the filing of the Articles is: two (2).

### Article VI.

The address of the principal executive office of the Company is: 4220 Harding Road, Ninth Floor, Nashville, Tennessee 37205.

### Article VII.

The Company shall not have the power to expel a member.

195606.01   4387-0001

1

Exhibit
1192

HJC 2/23/2016

### Article VIII.

The Company shall dissolve only upon the occurrence of the events specified in the Operating Agreement of the Company (the "Dissolution Events"). The Dissolution Events may include less than all of the events listed in T.C.A. Section 48-245-101(a)(5)(A)-(K) or its successor provision.

### Article IX.

The Members shall not have the authority to bind the Company without specific authorization by vote of the members or Board of Governors pursuant to the terms of the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization on this 9th day of December, 1999.

_____
John R. Voigt, Organizer

195606.01   4387-0001

2



Exhibit
1193
RJC 2/23/2016