EXHIBIT  Q

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY    MDL No. 2419
LITIGATION
                Master Dkt:
            1:13-md-02419-RWZ
~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:

All Actions

~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
DAWN RUDOLPH

9:09 a.m.
April 21, 2015

Suite 700
1600 Division Street
Nashville, Tennessee

Blanche J. Dugas, RPR, CCR No. B-2290

---

Page 2

```
 1            APPEARANCES OF COUNSEL
 2   On Behalf of the Plaintiffs:
         MARK P. CHALOS, Esquire
 3       Lieff, Cabraser, Heimann & Bernstein, LLP
         Suite 1650, One Nashville Place
 4       150 Fourth Avenue
         Nashville, Tennessee  37219-2423
 5       (615) 313-9000
         (615) 313-9965 (facsimile)
 6       mchalos@lchb.com
 7       DANIEL L. CLAYTON, Esquire
         Kinnard, Clayton & Beveridge
 8       127 Woodmont Boulevard
         Nashville, Tennessee  37205
 9       (615) 686-2501
         (615) 297-1505 (facsimile)
10       dclayton@kcbattys.com
11       BENJAMIN A. GASTEL, Esquire
         Branstetter, Stranch & Jennings, PLLC
12       Fourth Floor
         227 Second Avenue North
13       Nashville, Tennessee  37201
         (615) 254-8801
14       (615) 250-3937 (facsimile)
         gerards@bsjfirm.com
15
     On Behalf of St. Thomas Outpatient Neurosurgical
16   Center, LLC; Howell Allen, a Professional Corporation;
     John W. Culclasure, M.D.; Debra V. Schamberg, RN:
17       MATTHEW CLINE, Esquire
         Gideon, Cooper & Essary, PLC
18       Suite 1100
         315 Deaderick Street
19       Nashville, Tennessee  37238
         (615) 254-0400
20       (615) 254-0459 (facsimile)
         matt@gideoncooper.com
21
22
23
24
25
```

---

Page 3

```
 1           --- APPEARANCES CONTINUED ---
 2   On Behalf of Saint Thomas Health, Saint Thomas
     Network, Saint Thomas West Hospital f/k/a St. Thomas
 3   Hospital:
         ADAM T. SCHRAMEK, Esquire
 4       Norton, Rose, Fulbright
         Suite 1100
 5       98 San Jacinto Boulevard
         Austin, Texas  78701
 6       (512) 536-5232
         adam.schramek@nortonrosefulbright.com
 7
         AMY D. HAMPTON, Esquire
 8       Bradley, Arant, Boult & Cummings, LLP
         Suite 700, Roundabout Plaza
 9       1600 Division Street
         Nashville, Tennessee  37203
10       (615) 252-2379
         (615) 252-6348 (facsimile)
11       ahampton@babc.com
12   On Behalf of Specialty Surgery Center - Crossville,
     PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
13   M.D., PC:
         JASON A. LEE, Esquire
14       Brewer, Krause, Brooks, Chastain & Burrow, PLLC
         Suite 2600
15       611 Commerce Street
         Nashville, Tennessee  37203
16       (615) 630-7757
         (615) 256-8985 (facsimile)
17       jlee@bkblaw.com
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1        --- ATTORNEYS APPEARING VIA VIDEO STREAM ---
 2   On Behalf of the Plaintiffs:
         SHELLI MEADOR, Esquire
 3       Kinnard, Clayton & Beveridge
         127 Woodmont Boulevard
 4       Nashville, Tennessee  37205
         (615) 686-2501
 5       (615) 297-1505 (facsimile)
         smeador@kcbattys.com
 6
     On Behalf of the Plaintiffs Jocelyn Norris and James
 7   and Michelle Palmer:
         CHRISTOPHER T. CAIN, Esquire
 8       Scott & Cain
         Suite 601
 9       550 West Main Street
         Knoxville, Tennessee  37902
10       (865) 525-2150
         (865) 525-2120 (facsimile)
11       cain@scottandcain.com
12   On Behalf of UniFirst Corporation:
         GENEVIE GOLD, Esquire
13       Goodwin Procter, LLP
         53 State Street, Exchange Place
14       Boston, Massachusetts 02109
         (617) 570-1000
15       (617) 523-1231 (facsimile)
         ggold@goodwinprocter.com
16
     On Behalf of Harris Methodist Hospital Southlake:
17       KYLE ROBY, Esquire
         English, Lucas, Priest & Owsley, LLP
18       1101 College Street
         Bowling Green, Kentucky  42102-0770
19       (270) 782-6500
         (270) 782-7782 (facsimile)
20       kroby@elpolaw.com
21
22
23
24
25
```

Page 29

1    resolved?
2    A.   No.  The timing of his departure had
3    everything to do with the end of the year and his
4    length of service with the company and what felt
5    comfortable for him, and we worked it through with HR
6    and the timing just fell at the end of the year for
7    his -- he had some personal requests and it was fine
8    with us.
9    Q.   So even prior to you being formally
10   appointed to the board of STOPNC, did you exercise the
11   duties of a board member at that time?
12   A.   I attended the meeting.  I'd have to look
13   at the minutes to see if there was any action that was
14   there.  As a new board member, you know, you typically
15   are there to, you know, get up to speed with what's
16   going on.  And so I think I would have to look at the
17   minutes to see if there was a vote or something that
18   would actually exercise any action.
19   Q.   And you think there was only one board
20   meeting between the time that Dr. Batchelor was asked
21   to leave and the time that you became a formal board
22   member of STOPNC?
23   A.   I don't know.  I really don't.  I know he
24   left on December 31st.  I'm not sure when the next
25   board meeting occurred in 2013.  So I'd have to look

Page 30

1    at the minutes.
2    Q.   STOPNC is a joint venture involving St.
3    Thomas?
4    A.   St. Thomas?
5    Q.   That's what I'm asking you.  Is STOPNC a
6    joint venture between St. Thomas and somebody?
7    A.   It's --
8         MR. SCHRAMEK:  Objection, form.
9         You can answer.
10        THE WITNESS:  So I -- the STOPNC is a
11   joint venture with St. Thomas Network.  I
12   mean, I think I want to be clear.  When you
13   say St. Thomas, there is different
14   entities.
15   Q.   (By Mr. Chalos)  Okay.  So it's a joint
16   venture between who and whom?
17   A.   I'm understanding St. Thomas Network and
18   Howell Allen.
19   Q.   Is the St. Thomas Network part of the St.
20   Thomas ministry?
21   A.   The St. Thomas Network employees at the
22   time I would have considered part of the ministry,
23   yes, because they were in our HR, within our HR.  I
24   use HR for a lot of boundaries.  It keeps things
25   clear.

Page 31

1    Q.   Was -- who asked you to get on the board of
2    STOPNC?
3    A.   You know, I don't recall.  I was kind of
4    told, you know, that we'd like you to take that seat.
5    Q.   Did Dr. Schatzlein tell you that?
6    A.   Well, it was resolved from the board.  So I
7    may have got a notice from Marla.  You know, I just
8    don't recall who exactly told me.  It may have came
9    from Karen at the time.  But they were in the position
10   to make the appointment and have the board endorse it.
11   Q.   Who were those people you're talking about?
12   A.   Dr. Schatzlein is the CEO of St. Thomas
13   Health, and Karen Springer is the chief operating
14   officer today for St. Thomas Health.
15   Q.   And who is Marla?
16   A.   Marla King is the administrative, executive
17   administrative assistant that keeps the meeting
18   minutes for the health board.
19   Q.   She works for St. Thomas Health?
20   A.   Yes.  She reports to Karen.
21   Q.   What was her last name?
22   A.   King.
23   Q.   King.  Whoever it was, it was someone from
24   St. Thomas Health who told you that you would be
25   serving on the board of STOPNC?

Page 32

1    A.   Yes.
2    Q.   And did you consider that at the time part
3    of your job with St. Thomas West Hospital?
4    A.   Yes.  I mean, I -- we are -- we have joint
5    ventures and I had not sat on any of the boards.
6    Being fairly new to the organization, I kind of
7    anticipated that I would be asked to sit on something
8    so I wasn't surprised by it.
9    Q.   It's a heck of the time to get on the
10   STOPNC board; right?
11   A.   That was -- that's what they, you know,
12   asked me to do so...
13   Q.   Were you paid money to sit on the STOPNC
14   board?
15   A.   No.
16   Q.   So that was part of your job duties with
17   St. Thomas Hospital?
18   A.   If asked, I would say it was under that
19   responsibility.
20   Q.   Yes?
21   A.   Yes.
22   Q.   Had you ever attended board meetings of any
23   other St. Thomas joint venture other than your first
24   meeting with STOPNC?
25   A.   No.

Page 41

```
1    familiar with the marketing opportunity.
2        Q.   And what happens if we dial 1-800-doctors?
3        A.   I believe it goes into a referral
4    opportunity if they wanted to get a physician.
5        Q.   Who answers the phone there?
6        A.   I don't know.
7        Q.   Is that phone number affiliated with St.
8    Thomas?
9        A.   I believe so.  I believe we support it.
10   So, you know, by having it available.  I do not know
11   who answers it.
12       Q.   Have you had any discussions with anyone
13   regarding the brand St. Thomas?
14       A.   Discussions with -- well, Rebecca.  I've
15   received some information from Rebecca around the
16   brand as it might relate to awareness.
17       Q.   And has anyone affiliated with St. Thomas,
18   to your knowledge, done any study in the community
19   about what that brand means to folks?
20       A.   Uh-huh.  Yes.  There's been review of
21   Vanderbilt versus St. Thomas versus HCA.  I'll tell
22   you I don't recall the numbers.  I just know that
23   there -- that work is done through the communications
24   office.
25       Q.   Through Ms. Climer?
```

Page 42

```
1        A.   Yes.
2        Q.   And are you aware of any studies by anyone
3    at St. Thomas in the community to understand what
4    attributes are associated with the St. Thomas brand?
5        A.   I'm not aware of any formal study.  I do
6    know that as part of our "One Healing Community," we
7    focused on our values that the sisters brought
8    forward.  So if I think of attributes, I think of
9    those values.
10       Q.   And what are those values?
11       A.   Oh, you really put me on notice here.
12   Creativity, wisdom, integrity, reverence and
13   education.
14       Q.   Are those written down somewhere?
15       A.   Yeah, as part of the "One Healing
16   Community," we did an associate commitment to care
17   that talked about the values and talked about, you
18   know, the daughters' legacy and kind of how they can
19   model those values in their day-to-day work.  So we
20   did some work on that post-rebranding.
21       Q.   And is it reasonable for a member of the
22   community to expect quality healthcare from any St.
23   Thomas entity?
24            MR. SCHRAMEK:  Objection, form.
25            THE WITNESS:  Could you say that one
```

Page 43

```
1    more time.  I'm sorry.
2        Q.   (By Mr. Chalos)  Sure.  Sure.  That's okay.
3    And he -- he'll object from time to time.
4        A.   I know.  I just -- I have not done this
5    before, so I just want to make sure I'm hearing you.
6            MR. SCHRAMEK:  And unless I tell you
7        not to answer or instruct you not to
8        answer, you can answer.  I'm just
9        preserving my objection to the question
10       which is usually vague, ambiguous and/or
11       otherwise inappropriate.
12           THE WITNESS:  Thank you.
13       Q.   (By Mr. Chalos)  He's only kidding.
14           Is it reasonable for a member of the
15   community to expect quality healthcare from any St.
16   Thomas entity?
17           MR. SCHRAMEK:  Objection, form.
18           THE WITNESS:  My -- you know, it is
19       vague because you say any St. Thomas
20       entity.  My -- my history is with St.
21       Thomas Hospital and we strive every day to
22       be, you know, a top 100 hospital.  We have
23       parameters around ensuring quality and
24       motivating our employees to do such.
25           So, you know, my -- my perspective is
```

Page 44

```
1    for St. Thomas Hospital, its people, and
2    they deliver on that promise every day.  So
3    I think, you know, that would be my frame
4    of reference for your question.  Am I
5    answering it?
6        When you say entity, that seems vague
7    to me.  I think of a hospital, a St. Thomas
8    Hospital, and the work that's done there.
9        Q.   (By Mr. Chalos)  Okay.  This St. Thomas
10   name is also a brand; right?
11       A.   Well, St. Thomas is a Catholic saint.  And
12   so I think on its own I -- you know, being Methodist,
13   I am very much aware of the Catholicism.  So St.
14   Thomas without Hospital or West next to it kind of
15   is -- I wouldn't say it was a brand in that manner of
16   just saying St. Thomas.
17       Q.   Right.  Well, I'm not trying to get you in
18   trouble with your intellectual property lawyers here.
19       A.   And, you know, I'm a hospital operator.
20   You know, branding and all that is, you know, not my
21   area of expertise.
22       Q.   Right.  Well, you've heard the term
23   "brand"; right?
24       A.   Sure.
25       Q.   And what --
```

Page 49

1    A.   I would say within healthcare, practice
2  varies, you know.  Each physician has been trained in
3  a certain way.  They have an approach.  I think the
4  definition of quality, especially I've learned as a
5  chief experience officer, is varied patient to
6  patient.  So I think everyone tries to achieve quality
7  in an equal, earnest way.
8    I would tell you that I think the -- even
9  with the standardized approach, you have variation
10  based on patient and their perception of care.  So
11  that would be my answer.
12    Q.   Is there some minimum standard that St.
13  Thomas expects out of all the healthcare practitioners
14  within its ministry and joint ventures?
15    MR. SCHRAMEK:  Objection to form.
16    THE WITNESS:  I think that the only
17    one I would be aware of that I could feel
18    confident saying is that, you know,
19    understanding that we are a -- you know, we
20    follow the Catholic teaching and we have
21    ethical and religious directives.
22    I think anyone that is in a
23    relationship with us in any sort of
24    business or legal way would be aware of
25    that and that would be expressed.  But

Page 50

1    beyond that, I think that would be to me
2    the minimum standard that they're aware of
3    that -- that desire that they follow the
4    ERDs.
5    Q.   (By Mr. Chalos)  What are ERDs?
6    A.   Ethical and religious directives.
7    Q.   Are those written somewhere?
8    A.   Yes.  Uh-huh (affirmative).
9    Q.   Where are those written?
10    A.   They are written by the -- my understanding
11  is it was Catholic social teachings and that they're
12  housed, you know, within -- almost every contract they
13  reference the ethical and religious directives.
14    Q.   Where can I find -- I'm sorry.  I'll let
15  you finish.
16    A.   You might want to check our website.  I
17  don't know that I would have it handy for you.  But I
18  am aware that it's pretty standard in Catholic
19  healthcare.
20    Q.   And STOPNC was required to follow the
21  ethical and religious directives of St. Thomas; right?
22    A.   Yes.  I would -- I would believe they would
23  be as -- if they're in a joint venture.  That would be
24  a minimum requirement.
25    Q.   Okay.  Have you ever heard the term

Page 51

1  "quality" in reference to healthcare?
2    A.   Quality in reference to healthcare?
3    Q.   Yes, ma'am.
4    A.   As defined by?  Yes I -- you know, we speak
5  about quality every day.
6    Q.   And have you ever heard the term "standard
7  of care" in reference to healthcare?
8    A.   Uh-huh (affirmative).  Yes, I have.
9    Q.   What does that mean?
10    A.   Well, standard of care, what it means to me
11  is that it's typically a peer-review process and the
12  clinical review of an outcome and whether or not it
13  meets the standard of care based on knowledge of the
14  case.
15    Q.   Does St. Thomas expect that all of the
16  healthcare practitioners within its ministry and joint
17  ventures will meet the applicable standards of care?
18    MR. SCHRAMEK:  Objection to form.
19    THE WITNESS:  Could you repeat the
20    question.
21    Q.   (By Mr. Chalos)  Sure.  Does St. Thomas
22  expect that all of the healthcare practitioners within
23  its ministry and joint ventures will meet the
24  applicable standard of care?
25    MR. SCHRAMEK:  Same objection.

Page 52

1    THE WITNESS:  From my frame of
2    reference as the hospital CEO, I would
3    expect that we have the ability to review
4    for standard of care and that there would
5    be processes in place to review and
6    sanction should standard of care not be
7    met.  Outside of that, I would -- I
8    wouldn't be able to speak to that.
9    Q.   (By Mr. Chalos)  When you were a board
10  member of STOPNC, did you expect that STOPNC would
11  meet the applicable standard of care?
12    A.   I do know that they had a -- I would have
13  thought that there was a medical director, a medical
14  advisory committee and that that would be the body
15  that would convene to approve the standard of care.
16    Q.   And that's something that -- what did you
17  call it, the medical review committee?
18    A.   Yeah, typically it's a group of the medical
19  staff within an entity that is responsible for that
20  type of quality review.
21    Q.   Did you as a board member of STOPNC expect
22  that STOPNC would meet the applicable standard of
23  care?
24    A.   That STOPNC would meet the applicable
25  standard of care?  I would -- I would have -- I would

13  (Pages 49 to 52)

Page 125

1  Q.   And at that time -- this is September of
2  2012 -- the chief operating officer of St. Thomas
3  Hospital was Don King?
4  A.   Yes.
5  Q.   That's not the boxing promoter Don King, is
6  it?
7  A.   No.
8  Q.   Too bad.  Was that true for the entirety of
9  2012?
10  A.   Yes.
11  Q.   And the chief medical officer, at least as
12  of September 2012, was Dale Batchelor, I believe;
13  right?
14  A.   Yes.
15  Q.   And that remained true for all of 2012 up
16  to the end of the year?
17  A.   Yes.
18  Q.   Did anything about his duties change after
19  your discussion with him in October of 2012?
20  A.   No.
21  Q.   So he remained in the same job with the
22  same duties until the end of the career?
23  A.   Yes.
24  Q.   And the chief financial officer at that
25  time was Pam Hess?

Page 126

1  A.   Yes.
2  Q.   Is she still in that role?
3  A.   Yes.  Uh-huh (affirmative).  Actually, she
4  has an expanded role.  She's the chief financial
5  officer for St. Thomas Midtown and West.
6  Q.   Did all of the leadership between the --
7  did all of the leadership positions merge between St.
8  Thomas Midtown and St. Thomas West?
9  A.   Yes.  And Don King is in the role of
10  chief -- chief operating officer for Midtown and West.
11  Q.   And if you flip back to Page 2, it says in
12  the top, "St. Thomas Health is a ministry of Ascension
13  Health and a family of healthcare providers in Middle
14  Tennessee including hospitals, physicians and
15  outpatient centers"; is that true?
16  A.   Uh-huh (affirmative).
17  Q.   You see that?
18  A.   I do see that.
19  Q.   Was that true in 2012?
20  A.   According to this document, yes.
21  Q.   Yeah.  Was that true according to what you
22  knew?
23  A.   Yes.  Uh-huh (affirmative).
24  Q.   And Dr. Schatzlein was the president and
25  CEO of STHS?

Page 127

1  A.   Uh-huh (affirmative).  Yes.
2  Q.   Is that -- is it STHS the same as St.
3  Thomas Health?
4  A.   In my mind, yes.
5  Q.   And then at that time, in -- and that was
6  true for all of 2012?
7  A.   Yes.
8  Q.   And chief strategy officer, president and
9  CEO STHS affiliates was Wes Littrell at that time?
10  A.   Yes.
11  Q.   What is STHS affiliates?
12  A.   I really don't know.  I mean, I understood
13  it to be the joint ventures and other business
14  entities within St. Thomas.
15  Q.   So in 2012, Mr. Littrell was the president
16  and CEO of St. Thomas Health service affiliates, did
17  that include, to your knowledge, the joint venture
18  STOPNC?
19  A.   Gosh, I just wasn't involved with the
20  STOPNC at all.  So if it was an affiliation of any
21  type, I would have assumed it involved Wes at some
22  level.
23  Q.   And STOPNC in 2012 was affiliated with St.
24  Thomas Health; right?
25       MR. SCHRAMEK:  Objection to the form.

Page 128

1       THE WITNESS:  I'm -- I understand
2  there was a relationship with St. Thomas
3  Health.  Beyond that, I wasn't intimately
4  involved in the structure.
5  Q.   (By Mr. Chalos) Did you understand that to
6  be an affiliate of St. Thomas?
7  A.   I understood that we had a relationship
8  with the STOPNC as we did with other business
9  entities.  I did not pursue any more specific depth or
10  knowledge around it.
11  Q.   Did you, in 2012, believe that STOPNC was
12  unaffiliated with St. Thomas Health?
13  A.   I believed that the STOPNC was unaffiliated
14  with my hospital operations.  I knew there was a
15  relationship with St. Thomas through a business
16  structure, but I couldn't have even told you the
17  ownership of it.
18  Q.   In 2012?
19  A.   Right.  Uh-huh (affirmative).
20  Q.   When did you first become aware that St.
21  Thomas Network was an owner of STOPNC?
22  A.   I believe in and around the time they were
23  talking about the board seats and that we had
24  ownership interest, and that's when those discussions
25  came up.

```
                                            Page 129
 1      Q.   And St. Thomas Health owns St. Thomas
 2  Hospital; right?
 3      A.   Yes. Uh-huh (affirmative).
 4      Q.   St. Thomas Health -- that was true in 2012?
 5      A.   Yes.
 6      Q.   St. Thomas Health owned St. Thomas Network
 7  in 2012; right?
 8      A.   You know, I -- I don't know.
 9      Q.   You learned that at some point?
10      A.   Yes, at some point there -- I knew there
11  was a relationship there. So because Wes was the, you
12  know, chief strategy officer, president and CEO of the
13  affiliates, and my, you know, kind of understanding of
14  the organization is that those were the joint
15  ventures.
16      Q.   Including STOPNC?
17      A.   Yes.
18      Q.   Did you ever tell a news reporter that
19  STOPNC was unaffiliated with St. Thomas Hospital?
20      A.   I did.
21      Q.   Who did you tell that to?
22      A.   I only gave one interview, and it was with
23  HealthLeaders Magazine. Well, I think I had an
24  interview with maybe two, but that one was pretty
25  close to the event, and I did say that it was
```

```
                                            Page 130
 1  unaffiliated with St. Thomas Hospital.
 2      Q.   Is that true?
 3      A.   Yes.
 4      Q.   As you sit here today, you believe that to
 5  be true?
 6      A.   Well, the context of the interview was
 7  about the response to the event. And so my -- my
 8  characterization was that the hospital -- and I do
 9  this because the hospital -- I had oversight of the
10  hospital operations, which were completely separate
11  from the operations or unaffiliated with the
12  operations of the STOPNC. And that was an incredibly
13  important point to make when giving the news coverage
14  at the time.
15      Q.   Did you tell the reporter that the chief
16  medical officer of St. Thomas Hospital sat on the
17  board of STOPNC?
18      A.   I don't think that ever came up as a part
19  of the dialogue. I was -- my quote had to do with the
20  operations and the day-to-day work that was going on
21  in the hospital was separate from and unaffiliated
22  with the day-to-day work that was going on in the
23  STOPNC.
24      Q.   So when you said unaffiliated, you didn't
25  mean an ownership --
```

```
                                            Page 131
 1      A.   Right. I'm a hospital operator. I was --
 2  given the news coverage, everything was St. Thomas
 3  Hospital. And I said this happened -- this event
 4  happened, the injections were in a separate,
 5  unaffiliated spot. And so "unaffiliated" meant no
 6  legal or anything else. It was unaffiliated with our
 7  day-to-day operations.
 8      Q.   And you've come to learn that in terms of
 9  ownership there was an affiliation between St. Thomas
10  Hospital and STOPNC?
11      A.   Yeah, I mean, I'm not an attorney. So I
12  know there's a relationship there. I know there's a
13  financial interest. But in my mind at that time, it
14  was unaffiliated with our day-to-day operation.
15      Q.   Did you tell the reporter that you were
16  going to be a board member of STOPNC in the near
17  future?
18      A.   No, nor was I asked about that. So I -- it
19  wasn't relevant at the time.
20           MR. CHALOS:  Why don't we go another
21      ten minutes or so and then we'll take
22      lunch.
23      Q.   (By Mr. Chalos) Did you tell any reporter
24  ever that the chief medical officer of St. Thomas
25  Hospital was a board member of STOPNC?
```

```
                                            Page 132
 1      A.   I think you asked me that already and I
 2  said no.
 3      Q.   I asked you about a specific reporter. My
 4  question now is more broad. Any reporter.
 5      A.   Oh, I apologize. Yeah. No.
 6      Q.   Did you ever tell any reporter that you
 7  were soon to be a board member of STOPNC?
 8      A.   No.
 9      Q.   Do you know whether anyone affiliated with
10  St. Thomas Hospital ever told a reporter that St.
11  Thomas Hospital's chief medical officer sat on the
12  board of STOPNC?
13      A.   I don't recall that ever happening.
14      Q.   Do you know whether anyone affiliated with
15  St. Thomas Health ever told any reporter that its
16  chief financial officer was a board member of STOPNC?
17      A.   I don't recall that, no.
18      Q.   It's a never ending struggle to stay
19  organized in these depositions.
20           I'm going to hand you a backwards statement
21  document. We can straighten it out on a break. It's
22  Exhibit 220. And it is an October 17th, 2012 article
23  from the Nashville Tennessean. And the headline is
24  "Worried callers take priority at St. Thomas clinic."
25  And then the sub headline is "Clinic doesn't know
```

Page 221

1  period, 2012 related to business?
2      A.   No.
3          (Exhibit 231 was marked for
4      identification.)
5      Q.   (By Mr. Chalos)  I've marked as Exhibit 231
6  STE_MDL_005358.  It's a series of e-mails.  The first
7  e-mail is from Scott Butler, Thursday, September 27th,
8  2012, 11:11 a.m. to you and Dr. Batchelor, subject:
9  STOPNC.  The e-mail says, "After discussions with the
10  state and Culclasure, we will remain closed through
11  next Wednesday, October 3rd."
12          Do you see that?
13      A.   Yes.
14      Q.   And Dr. Batchelor responded, copying in
15  you, responding to you and you copied in Craig Polkow
16  saying, "That's a good target date.  I do think the
17  boards need to okay the final decision to reopen after
18  we see what the situation is closer to that date."
19          Do you see that?
20      A.   Yes.
21      Q.   And then you forwarded that to Rebecca
22  Climer; is that right?
23      A.   Yes.
24      Q.   Why were you copied on Dr. -- I'm sorry --
25  Mr. Butler's e-mail?

Page 222

1      A.   I think you would have to ask Scott.
2  However, I would -- was probably copied because we
3  were seeing patients in my hospital and there's a
4  communication chain with the overall medical staff to
5  be informed of the situation.  I wanted to know what
6  was going on.
7      Q.   Why would it matter to patient care whether
8  the clinic reopened or stayed closed?
9      A.   I think it -- what mattered to me about
10  patient care was the fact that we were starting to see
11  patients come in through the ER.  It was an evolving
12  situation.  These people were very sick on the medical
13  units.  And so the idea is what is happening so that
14  we can have clearer communication with whatever
15  audience needed to be informed.
16      Q.   Why would the hospital need to know whether
17  the clinic was open or closed?
18      A.   I think it was just to, you know, be aware
19  of the facts of the situation.  There was a lot of
20  speculation at that time.  There was news reports
21  going out.  There was -- you know, to the best of my
22  ability, it was to keep facts circulating that were
23  true .
24      Q.   I'll hand you what we've marked as
25  Exhibit 190.  This is a series of e-mails.  Take as

Page 223

1  much time as you need to read these.
2      A.   Okay.
3      Q.   This is a discussion about how the center,
4  meaning STOPNC, would be described in documents;
5  right?
6      A.   Right.
7      Q.   And you were included in this discussion
8  about the St. Thomas Health communications person,
9  Rebecca Climer?
10      A.   Yes.
11      Q.   Board members of STOPNC and a lawyer for
12  one or more of the organizations, Berry Holt; is that
13  right?
14      A.   Yes.
15          MR. SCHRAMEK:  Objection to the form.
16      Q.   (By Mr. Chalos)  Do you know who Berry Holt
17  represented in this e-mail -- at this time?
18      A.   I would -- no, I don't.
19      Q.   Did you know he was a lawyer?
20      A.   Yes, I do.
21      Q.   And the discussion is about how to describe
22  STOPNC in terms of its connection with other St.
23  Thomas entities?
24      A.   Yes.  It was a decision on the description
25  of the center for concise and clear comment.

Page 224

1      Q.   Do you know what documents they're
2  concerned about in this e-mail chain?
3      A.   I don't.
4      Q.   I'll hand you what we've marked as
5  Exhibit 191.  You can read as much of this as you
6  need, but what I want to point you to is the first
7  paragraph, last sentence.  It says, "The center" --
8  meaning STOPNC -- "is an ambulatory neurosurgical
9  surgery center licensed by the state of Tennessee and
10  housed on the St. Thomas Hospital campus."
11          Do you see that?
12      A.   Uh-huh (affirmative).  Yes.
13      Q.   And is that the same as the language in 190
14  that was agreed upon by the STOPNC board, the St.
15  Thomas Health communications person, you as CEO of St.
16  Thomas and a lawyer from the Bradley Arant law firm?
17      A.   Yes, it's the same language.
18      Q.   And this was Exhibit 191 a press release
19  that was sent out to the media in October of 2012?
20      A.   Yes.
21          (Exhibit 232 was marked for
22      identification.)
23      Q.   (By Mr. Chalos)  I'll hand you what we've
24  marked as Exhibit 232.  Have you had a chance to
25  review this document?

Page 225

1    A.   Yes.
2    Q.   So what we've marked as Exhibit 232 is
3  STE_MDL_019140. It's a memorandum dated October
4  the 2nd of 2012 from somebody named Cindy Williams.
5  Do you see that?
6    A.   Yes.
7    Q.   Do you know who Cindy Williams is?
8    A.   No.
9    Q.   She has at this time an e-mail address
10  cwilliam@stthomas.org.  Does that tell you anything
11  about where she worked?
12    A.   Yes. She must work under the managed care
13  department.
14    Q.   Of which organization?  St. Thomas Hospital
15  or St. Thomas Health?
16    A.   That wouldn't -- the e-mail address
17  wouldn't tell me. The managed care department is --
18  today is a system department. So it would be under
19  St. Thomas Health.
20    Q.   And the letterhead here says "St. Thomas
21  Health. With you. For life." Right?
22    A.   Yes.
23    Q.   Is that -- was that the St. Thomas Health
24  logo at that time?
25    A.   Yes, appears to be.

Page 226

1    Q.   And she sent this memo to the managed care
2  payor. Do you see that?
3    A.   Yes.
4    Q.   What does that mean?
5    A.   A managed care payor is a contracted payor
6  with a Health entity. So it would be a payor that St.
7  Thomas Health would have a -- a relationship with.
8    Q.   Okay. And she -- the "re" line here is St.
9  Thomas Outpatient Neurosurgery Center and she says in
10  the text of this memo, "Please find the attached press
11  release for St. Thomas Outpatient Neurosurgery Center,
12  LLC (STOPNC)," and there's a tax ID number.  "STOPNC
13  is an ambulatory surgery center that falls under the
14  St. Thomas Health system of managed care contracts."
15    A.   Okay.
16    Q.   Do you see that?
17    A.   Yes.
18    Q.   What does that mean that STOPNC is an
19  ambulatory surgery center that falls under the St.
20  Thomas Health system of managed care contracts?
21    A.   I could only infer. I don't -- I don't
22  know. I mean, I -- I'm not a managed care expert. I
23  would say that she's stating that there's managed care
24  contracts that involve the STOPNC that she's
25  communicating about this event through the press

Page 227

1  release.
2    Q.   And she goes on to say, "In compliance with
3  our agreement with our managed care payors, please
4  allow this press release to serve as our official
5  notice regarding this adverse reaction."
6        Do you see that?
7    A.   Yes.
8    Q.   She said "our agreement." Who is she
9  referring to there where she says "our"?
10        MR. SCHRAMEK:  Object to the form to
11    of the question.
12    Q.   (By Mr. Chalos) Yeah, if you know.
13    A.   I don't know. The subject line says St.
14  Thomas Outpatient Neurosurgery Center.
15    Q.   Okay. And do you know whether the press
16  release she's referring to is the press release we
17  marked as Exhibit 191?
18    A.   I couldn't say that for certain.
19    Q.   Did you have any communications with anyone
20  from Ascension following the -- following the time
21  where you learned of the meningitis catastrophe?
22    A.   Yes.
23    Q.   Who did you speak with at Ascension or
24  communicate with?
25    A.   I recall speaking with Ann Hendrich, who

Page 228

1  was vice president of care excellence. We discussed a
2  need of -- any staffing needs.
3    Q.   Who else?
4        MR. SCHRAMEK:  Can I ask the
5    relevance of this line of questioning.
6    Q.   (By Mr. Chalos) I'm asking who else you
7    spoke with.
8        MR. SCHRAMEK:  And I'm asking for the
9    relevance of the line of inquiry,
10    discussions at Ascension. Your claims have
11    been dismissed against Ascension. So
12    what's the relevance to the remaining
13    pending claims in the lawsuit?
14        MR. CHALOS:  It goes to the
15    interaction between the various entities.
16        MR. SCHRAMEK:  What entities?
17        MR. CHALOS:  Entities I'm asking
18    about.
19        MR. SCHRAMEK:  I'm not going to allow
20    that line of question. The claims against
21    Ascension have been dismissed. If you
22    can't give me a better basis for relevance
23    than that, I'm going to instruct the
24    witness not to answer.
25    Q.   (By Mr. Chalos) Are you going to follow

Page 261

1    and the time is 4:30 p.m.
2        (A recess was taken.)
3        VIDEOGRAPHER:  We're back on the
4    record and the time is 4:32 p.m.
5    Q.   (By Mr. Chalos)  Okay.  The first e-mail in
6    Exhibit 160 is on the page that ends in 995.  It's
7    from Dr. Lanford to you and Dr. Schatzlein --
8    Schatzlein; right?
9    A.   Oh, I didn't see the backside.  I
10   apologize.  I only read the front side.
11   Q.   That's okay.  No problem.
12   A.   Can I just have one second?
13   Q.   Absolutely.  Take as much time as you need.
14   A.   Okay.
15   Q.   Okay.  So the first e-mail, Exhibit 160, is
16   an e-mail from Dr. Lanford to you.
17   A.   Uh-huh (affirmative).
18   Q.   And he sent it also to Dr. Schatzlein; is
19   that right?
20   A.   Yes.
21   Q.   The subject line is "Concerns"?
22   A.   Yes.
23   Q.   Okay.  And he said, looking at the third
24   line there -- I'm sorry -- third sentence.  "In our
25   STOPNC emergency board meeting at St. Thomas, you made

Page 262

1    it very clear that you wanted to, quote, be the
2    buffalo, end quote, in this event and brave the storms
3    ahead together."  You see that?
4    A.   Yes.
5    Q.   Do you know what he's talking about there?
6    A.   I don't recall that.  I read that twice and
7    I was like -- you wanted to be the buffalo in this
8    event.  It had to, you know, have some relevant
9    reference at the time.
10   Q.   Okay.  Do you recall attending a STOPNC
11   emergency board meeting at St. Thomas?
12   A.   Yeah, I believe that would have been the
13   one near -- on that first week when the STOPNC was
14   closed and they were convening next steps, it would
15   have been in and around that time.
16   Q.   And do you know where that meeting took
17   place?
18   A.   If it wasn't via the phone, most of the
19   meetings happened in the St. Thomas Hospital board
20   room.
21   Q.   Okay.  He goes on -- this is Dr. Lanford,
22   first paragraph -- first sentence of the next
23   paragraph.  "However, over the last couple of weeks,
24   it has become evident that your goal is to separate
25   yourself from our group and that the joint venture by

Page 263

1    informing all media that the surgery center was
2    independent and unaffiliated with St. Thomas
3    Hospital."
4        Do you see that?
5    A.   Yes.
6    Q.   And he says, "In the Tennessean, writer
7    Josh Rogers e-mailed us and said, quote, St. Thomas is
8    trying to distance themselves from you by saying they
9    are independent even though their name is on the
10   corporation documents," closed quote.  Do you see
11   that?
12   A.   Yes.
13   Q.   Is Josh Rogers the Tennessean reporter you
14   spoke with?
15   A.   I don't recall who I spoke with at the
16   Tennessean.  The quote, St. Thomas is trying to
17   distance, you know, I represented St. Thomas Hospital,
18   and I think that is important.  So I -- this -- I'm
19   trying to recall this series of events, but I -- you
20   know, I'm happy to answer your questions.  I'm not
21   exactly sure what you're asking.
22   Q.   My question was:  Was Josh Rogers the
23   reporter you spoke with?
24   A.   No.  I don't recall.
25   Q.   Okay.  He goes on to say, "In fact, most of

Page 264

1    us have seen" -- no.  I'm sorry.  Let me back up.
2        "In HealthLeaders magazine, it was stated
3    that STOPNC was, quote, not affiliated with the
4    hospital, closed quote, an, open quote, unaffiliated
5    clinic, closed quote, and a, quote, similarly named
6    but unaffiliated clinic," closed quote.  Do you see
7    that?
8    A.   Yes.
9    Q.   And that's a reference to the article that
10   you forwarded in the exhibit we looked at a little
11   while ago?
12   A.   Yes.
13   Q.   He goes on to say, "In fact, most of us
14   have seen articles from around the country that all
15   use the same description for our relationship:
16   Unaffiliated."  Do you see that?
17   A.   Yes.
18   Q.   He goes on to say, "Our group has never
19   considered this joint venture to be anything other
20   than a partnership between St. Thomas Hospital and
21   Howell Allen Clinic.  That's how it began and that's
22   how it has functioned over the last 13 years.  The
23   management of the facility has shared responsibilities
24   between our group and your hospital."
25       Do you see that?

Page 265

```
 1        A.   Yes.
 2        Q.   And he goes on to say, "Until your arrival,
 3   the administrator at St. Thomas Hospital has always
 4   been on the board at STOPNC."  Do you see that?
 5        A.   Yes.
 6        Q.   Is that last sentence true?
 7        A.   I -- I wouldn't know.
 8        Q.   Next paragraph, he says, "The Howell Allen
 9   Clinic has had a very long and successful partnership
10   with St. Thomas Hospital"; is that true?
11        A.   I believe the Howell Allen Clinic, the
12   physicians have had a very long and successful
13   partnership with the hospital with regard to care,
14   care of our patients and programming that has gone on.
15   So, yes, I believe that to be true.
16        Q.   And Dr. Lanford goes on to say, "We have
17   been disappointed at your insistence that we are a,
18   quote, unaffiliated clinic with no connections or
19   history.  Your time here has been brief, but we can
20   guarantee you that the medical staff at St. Thomas
21   doesn't feel like we are a, quote, unaffiliated
22   partner."
23             Do you see that?
24        A.   Yes.
25        Q.   Was his statement that the medical staff at
```

Page 266

```
 1   St. Thomas doesn't feel like we're an unaffiliated
 2   partner untrue?
 3             MR. SCHRAMEK:  Objection to the form.
 4             THE WITNESS:  I wouldn't know.
 5        Q.   (By Mr. Chalos)  Okay.  You then e-mailed
 6   Dr. Schatzlein privately and said, "Let's talk today.
 7   I'm switching my three with you tomorrow for Lewis and
 8   will be for my one-on-one at three today."  Do you see
 9   that?
10        A.   Yes.
11        Q.   What does that all mean?
12        A.   It just means that Mike had -- Mike and I
13   had routine one-on-one meetings and that I was
14   switching to talk about this today as opposed to the
15   three tomorrow.
16        Q.   And then you did have a discussion with
17   him?
18        A.   I would believe that to be true.  Yeah.
19        Q.   Okay.  And then Dr. Schatzlein responded to
20   Dr. Lanford and copied you and Ms. Climer on there as
21   well; right?
22        A.   Yes, uh-huh (affirmative).
23        Q.   And Dr. Schatzlein said, "Hi Greg.  Dawn
24   forwarded this to me and I felt like I should respond
25   to you since I have been working with Rebecca Climer
```

Page 267

```
 1   and with the Ascension communication folks on media
 2   relations."
 3             You see that?
 4        A.   Yes.
 5        Q.   Is that true?
 6        Q.   Is that true?
 7        Q.   Yeah.  Was -- was Dr. Schatzlein working
 8   with Rebecca Climer and with the Ascension
 9   communication folks on media relations?
10        A.   I --
11             MR. SCHRAMEK:  Object to the form.  I
12        mean, if you know.
13             THE WITNESS:  Yeah, I don't know.
14        Q.   (By Mr. Chalos)  You can say you don't
15   know.
16        A.   Yeah, I don't know.
17        Q.   Well, communication between you and
18   Dr. Schatzlein during this time period was very
19   important; right?
20        A.   Yes.
21        Q.   And you're telling me as you sit here today
22   you don't know whether he was working with Ascension
23   communication folks on media relations?
24        A.   I'm sitting here today -- you asked me if
25   that was true, and I'm saying that I -- my
```

Page 268

```
 1   communication chain of command was to Mike.  That he
 2   states that he has been working with Rebecca Climer
 3   and the Ascension communications folks.  I have to
 4   only believe that to be true based on what Mike has
 5   written in this note.  I wasn't part of any meetings
 6   or discussions with him working with them.  So I -- I
 7   believe Mike to be true.  If he put this in his
 8   letter, I would, you know, agree with that statement.
 9   I wouldn't know what else to say.  So -- but I
10   wasn't -- I couldn't verify that there had been
11   ongoing discussions for you.  I would believe it to be
12   true.
13        Q.   Okay.  He -- Dr. Schatzlein goes on to say,
14   "I'm extremely disappointed with some of the media
15   coverage of the meningitis event, especially the
16   Tennessean and the inaccuracies about unaffiliated and
17   distances are another example of this."
18             You see that?
19        A.   Yes.
20        Q.   You have any idea what he was talking about
21   here?
22        A.   I think we all felt pretty disappointed
23   with the media coverage of the event, and I think he
24   was just expressing that disappointment.
25        Q.   Do you know what he meant when he said "the
```







The Seton Lodge offers overnight accommodations at a reduced rate. Call 615.222.2111 for more information, including availability and rates.



SUITE 901

SAINT THOMAS
OUTPATIENT
NEUROSURGICAL
CENTER

EXHIBIT
219
Rudolph 46/11/16

| | |
|---|---|
| **From:** | AJ Buse(ajbuse@stthomas.org) |
| **To:** | Mandy Lauer; Joe Hagan; Rebecca Cilmer; Ridgway, Corey; Donna Nave; 'Tank, Trese' |
| **CC:** | |
| **BCC:** | |
| **Subject:** | HG Ctr for Spinal Srgry physician directory |
| **Sent:** | 12/29/2009 01:59:33 PM -0600 (CST) |
| **Attachments:** | Burrus, Daniel.jpg; Hopp, Stanley.jpg; Mackey, Edward.jpg; Stahlman, Gray.jpg; OShaughnessy, Brian.jpg; |

Mandy,

Thanks for the info.
Below is a list of the Center for Spinal Surgery physicians we would like to sponsor so their profiles are free to view on the HealthGrades site.
I have also attached all of the physicians' headshots to go with their profiles.
Please let me know if there is anything else you need from me.

Spine surgeons from the Howell-Allen Clinic:
Dr. Everette Howell
Dr. Vaughan Allen
Dr. Timothy Schoettle
Dr. Gregory Lanford
Dr. Steven Abram
Dr. Scott Standard
Dr. Carl Hampf
Dr. Jason Hubbard
Dr. Paul McCombs
Dr. John Spooner
Dr. Brian O'Shaughnessy

Spine surgeons from Tennessee Orthopaedic Alliance:
Daniel S. Burrus, M.D.
Stanley G. Hopp, M.D.
Edward S. Mackey, M.D.
Gray C. Stahlman, M.D.

Please let me know when these profiles are ready and available as free for consumers to view.

THANKS!

**A.J. Busé**
STHS Marketing Specialist
Neurosciences and Orthopedics
p: 615/284-8216  |  c: 615/414-3940
e: ajbuse@stthomas.org

---

**From:** Mandy Lauer <mlauer@healthgrades.com>
**Date:** Mon, 28 Dec 2009 13:34:11 -0700
**To:** "A.J. Buse" <ajbuse@stthomas.org>
**Subject:** RE: Updated physician directory... A few other things

A.J.

Click on this link and you will find many Saint Thomas physicians that are currently sponsored.  You can click on their names to view their profiles.
http://www.healthgrades.com/consumer/index.cfm?

EXHIBIT
226
Endolph 4/21/15

CONFIDENTIAL

STE_MDL_019229

fuseaction=mod&modtype=prc&modact=prc_search_results&radius=25&specialty=7&state=tn&city=nashville&viewallipac=1

In order to activate a physician I need their first and last name, their specialty and their office/practice location. If the list is less than 50 physicians than you can send the list to me by email, a Word or Excel doc. The additional info in the profile can be added or updated later. The highest value of this program is making the profiles free so that patients easily find them online.

We bill once per quarter. If I activate the new docs before January you won't get billed until April.

Let me know if you have more questions.
Thanks,
Mandy

**From:** AJ Buse [mailto:ajbuse@stthomas.org]
**Sent:** Monday, December 28, 2009 12:49 PM
**To:** Mandy Lauer
**Subject:** Re: Updated physician directory... A few other things

Cool.

Is there a "free" doc on your web site now that I can see so I know what information to include?
Or do you have a specific format I should follow for that information?
Is email the best way for me to submit this to you?
What is the process for billing?

THANKS!

**A.J. Busé**
STHS Marketing Specialist
Neurosciences and Orthopedics
p: 615/284-8216 | c: 615/414-3940
e: ajbuse@stthomas.org

---

**From:** Mandy Lauer <mlauer@healthgrades.com>
**Date:** Mon, 28 Dec 2009 12:16:33 -0700
**To:** "A.J. Buse" <ajbuse@stthomas.org>
**Cc:** 'Joe Hagan' <jshagan@stthomas.org>
**Subject:** RE: Updated physician directory... A few other things

A.J.

The cost to sponsor is $182.00 per doc/per year. Sponsorship means that the physician's information will go from a "buy" report (12.95 for consumer) to "free."

I'll just wait until I get the list from you.

Thanks,
Mandy

---

**From:** Mandy Lauer <mlauer@healthgrades.com>

CONFIDENTIAL

STE_MDL_019230

STE_MDL_019230

**Date:** Mon, 28 Dec 2009 11:46:18 -0700
**To:** "A.J. Buse" <ajbuse@stthomas.org>
**Subject:** FW: Updated physician directory... A few other things

Hi A.J.,

I can help you with activating your Spinal Surgery physicians so that they have free profiles on our website.  Are the physicians that you would like to sponsor listed in the PDF that Joe sent?  How many physicians would you like to sponsor?  I can activate them today so that they are free tomorrow.

Thanks,
Mandy

CONFIDENTIAL

STE_MDL_019231

STE_MDL_019231

| From: | Rudolph, Dawn(/O=APPTIXHEALTH/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DRUDOL01) |
|---|---|
| To: | Scott Butler |
| CC: | |
| BCC: | dawn.rudolph@stthomas.org |
| Subject: | RE: Board meeting |
| Sent: | 09/24/2012 04:13:00 PM -0500 (CDT) |
| Attachments: | |

Please provide me a detailed listing of activities on your end leading up to our call today.  Thanks

**Dawn Rudolph**
President & CEO | Saint Thomas Hospital  | 4220 Harding Road | Nashville, TN 37205
Office: 615 222-6590 | Cell: 615 479-5055

**From:** Scott Butler [mailto:sbutler@howellallen.com]
**Sent:** Monday, September 24, 2012 3:25 PM
**To:** Batchelor, Dr. Dale; Rudolph, Dawn
**Cc:** Gregory Lanford, Dr.
**Subject:** Board meeting

We need to have a STOPNC board meeting to discuss the next steps.  Dr. Lanford can do a conference call at 7 AM tomorrow or a meeting at St Thomas at 4 PM tomorrow.  Let me know what works best for both of you.


EXHIBIT
230
Rudolph 4/21/15

CONFIDENTIAL

From:        dawn.rudolph@stthomas.org(dawn.rudolph@stthomas.org)
To:          Schatzlein, Mike
CC:
BCC:
Subject:     Re: STOPNC
Sent:        10/08/2012 04:20:59 AM -0500 (CDT)
Attachments:

Got it

Dawn Rudolph
Saint Thomas Hospital

On Oct 7, 2012, at 11:47 PM, "Schatzlein, Mike"
<Mike.Schatzlein@stthomas.org> wrote:

> We have some direction from the meeting last evening.
>
> I said I thought we could get the other STOPNC board members to do what
some of the AH folks want. If not, let me know.
>
> John Glaudemans and Ziad Haydar would like to see the logs and scripts and
letters from all of our patient contact.
>
> We are to call all patients again to see how they are, express our
concern, convey the latest from CDC, and convey info regarding where they
can get the latest on the evolving situation (i.e. CDC web site). We should
know whether they have been to our ERs when we call. We should use a script.
that should be approved by Chris McCoy. We should log and record these
calls, and keep trying until we get 100 percent. Anybody who hasn't been
seen and is not completely healthy should be urged to go to nearest ER. We
should ask and note what, if any, follow up each patient has had for a
spreadsheet Ziad is maintaining. If STOPNC doesn't have people available and
qualified to make these calls, we should provide some. The theory here is
that we have a moral obligation to see that each patient has the latest
information, and encourage them to follow up.
>
> We should send return receipt letters to every patient with the same info
as above. Chris should approve these, too.
>
> Jon wants to know who the CDC epidemiologist is and what he/she is doing.
We may inform the epidemiologist about our calls and letters.
>
> Might be a good idea for Dr. Latham to call Ziad.
>
> I'm just using email to avoid waking you up. We can talk tomorrow.
>
> Mike Schatzlein, M.D.
> President and CEO, Saint Thomas Health
> Nashville/Birmingham Ministry Market Leader,
> Ascension Health
> Mobile: 615-788-2000
>

EXHIBIT
233
Rudolph 4/21/15

CONFIDENTIAL

STE_MDL_014363

| | |
|---|---|
| **From:** | Rudolph, Dawn(dawn.rudolph@stthomas.org) |
| **To:** | Climer, Rebecca |
| **CC:** | Anness, Nancy; Pope, Greg |
| **BCC:** | |
| **Subject:** | Anti-fungal Medication Costs |
| **Sent:** | 11/17/2012 07:20:35 AM -0600 (CST) |
| **Attachments:** | |

Good morning,

We have need an effort to coordinate an ask to Pfizer or Sandoz for relief in these antifungals. Who can help me with this? Between Michigan and Tennessee, I would project a million dollars in these drugs. Just for our inpatients, we have costs of 500K.

Can we find contacts? Thanks.

**Dawn Rudolph**
President & CEO | Saint Thomas Hospital | 4220 Harding Road | Nashville, TN 37205
Office: 615 222-6590 | Cell: 615 479-3955



CONFIDENTIAL

STE_MDL_005459