# EXHIBIT A

Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 2 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 1

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3                    ---oOo---

4

5   IN RE:  NEW ENGLAND
    COMPOUNDING PHARMACY, INC.
6   PRODUCTS LIABILITY LITIGATION,
                                  MDL No. 2419
7                                 Master Dkt:
                                  1:13-md-02419-RWZ
8   ------------------------------
    THIS DOCUMENT RELATES TO:
9

10  All Actions

11  ------------------------------

12

13

14           VIDEOTAPED DEPOSITION OF
                DAVID A. KESSLER, M.D.
15

16                  9:00 a.m.
17               March 4, 2016

18

19

                    Suite 2900
20               275 Battery Street
              San Francisco, California
21

22

23     GINA V. CARBONE, CSR #8249, RMR, CRR, CCRR

24

25



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.  In the report?

2     A.  And if you look at Schedule 3B, which goes on

3  from page 254 to 324, that's all in the report.  That's

4  FDA's documents relating to shortages.

5     Q.  Okay.  And then the last two things in the

6  stack include a definition under 21 U.S.C. 351 of when a

7  drug or device is adulterated.  Page and a line.

8     A.  That's just 350 -- yeah, it's just the part of

9  the statute that deals with old drugs as opposed to new

10  drugs.

11     Q.  Right.

12         And then finally, in the material you just gave

13  me, we have two documents, FDA 428907, 428908, 428909,

14  that reflect email communications between Bruce Ota, and

15  Karen Archdeacon with respect to NECC.

16     A.  That are part of the FDA FOI request that I

17  received that was cited by Dr. Miller.

18     Q.  What I'm going to do, Dr. Kessler, is I'm going

19  to have my assistant here, Kaycee, put an exhibit number

20  on each of these respective stacks while you and I

21  continue to talk, and then we'll identify these as

22  separate exhibits in just a moment.

23     A.  Sure.  And if I could just -- if any of your

24  questions, I need those --

25     Q.  Absolutely.



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 64

1          A.   You know, I don't believe so.   Maybe preventive

2     medicine, other things -- I'm a professor of

3     epidemiology, biostatistics.   I don't know what that

4     grants me.   We'd have to look.

5          Q.   Up to and including, if your estimate is

6     correct, 2007, you came to -- you came to UCSF 2003,

7     didn't you?

8          A.   I did.

9          Q.   Okay.   From 2003 until 2007, did you actually

10    have staff privileges at an outpatient diagnostic

11    center?

12         A.   We'd have to check the bylaws.   As you know,

13    UCSF has many different clinics associated, and I just

14    don't want to use -- I'm pretty sure my privileges would

15    have attached using the specific word outpatient

16    diagnostic center.   Certainly there were outpatient

17    clinics and outpatient ambulatory units, and I'm sure my

18    privileges attached to those.

19         Q.   Well, when I use the term outpatient diagnostic

20    center I'm being more specific than that.   The term I --

21    the meaning I intend to convey with that is an ODC,

22    similar to what's licensed in Tennessee, that will have

23    the capacity to do a CT myelogram, MRI, will have the

24    capacity to infuse Omnipaque for the purposes of

25    diagnostic studies, in some cases they'll do



1   bronchoscopies.

2       A.   Sure.

3       Q.   Did you ever have staff privileges at an

4   outpatient diagnostic center as I have described?

5       A.   So I believe UCSF, my staff privileges

6   accounted -- encumbered all the UCSF clinics.  Have to

7   go back and look at the bylaws.

8       Q.   Okay.

9       A.   And certainly those clinics included those --

10  had those kind of services available.

11      Q.   When you came to UCSF, were you given tenure

12  from the beginning?

13      A.   Yes.

14      Q.   And tenure at UCSF means what?

15      A.   How long do you want it to mean?

16      Q.   Good response.

17          Does tenure mean that you get to hold the

18  faculty position for life if you are tenured?

19      A.   I let others judge what tenure is.

20      Q.   Okay.  Now, your CV represents to me that you

21  were the dean of the UCSF School of Medicine from 2003

22  to 2007, correct?

23      A.   That's correct.

24      Q.   You were fired on December 13th, 2007 as the

25  dean of the UCSF school of medicine?



```
 1        A.  As a dean, but not as the professor of
 2   pediatrics.
 3        Q.  And your termination as dean of the UCSF School
 4   of Medicine was upheld by a hearing committee at UCSF on
 5   January 11th, 2010, correct?
 6        A.  So, again, I was a whistleblower in a matter,
 7   and I will leave it to others to decide what is
 8   confidential.
 9        Q.  Was your termination of December 13th, 2007
10   upheld by a hearing committee on January 11th, 2010?
11        A.  I don't believe -- I believe that there are
12   certain things that are confidential.  I don't believe
13   that that was a matter of public record, but I don't
14   know.
15        Q.  Let's have exhibits -- items 2 and 3.
16            I'm handing you Exhibit 1245, Dr. Kessler.
17            MR. CHALOS:  What happened to the other
18   exhibits?
19            MR. GIDEON:  She's stacking them up.
20            MR. CHALOS:  I'm sorry, you marked the --
21            MS. WEETER:  I marked all those.
22            (Whereupon, Exhibits 1241 through 1245 were
23            marked for identification.)
24            MR. GIDEON:  And we'll cover those sometime in
25   the future.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Q.  Exhibit 1245 is a complaint you filed acting as

2  lawyer for yourself in the United States District Court

3  for the Northern District of California in the

4  San Francisco Division.

5          If you look at page 18 of the complaint, you'll

6  see your signature, correct?

7     A.  I see my signature there.  I believe the

8  Government Accountability Project represented this.

9     Q.  Well, I see only a David Kessler signing the

10 complaint pro se in the complaint filed December 12,

11 2008.

12         Do you see a signature by any other lawyer?

13    A.  No, but as I understand this, I mean, I was

14 represented by the Government Accountability Project.

15    Q.  Okay.  Well, subsequently a summary judgment

16 was granted in favor of the people you sued; isn't that

17 correct?

18    A.  This is with regard to retaliation complaints.

19    Q.  Well, with respect to the entire complaint.

20    A.  But if you read your question, your question

21 was whether my firing was upheld.  This is whether there

22 was retaliation.

23    Q.  Well --

24    A.  Under the civil rights law.

25



```
 1              (Whereupon, Exhibit 1246 was marked for
 2              identification.)
 3              MR. GIDEON:  Q.  I'm handing you
 4   Exhibit 1246, which is the Order Granting
 5   Defendants' Motion for Summary Judgment:  Requiring
 6   Plaintiff's Opposition Papers to be Filed in an
 7   order entered October 5th, 2011 by Phyllis J.
 8   Hamilton, United States District Judge.
 9              This dismissed your complaint, did it not?
10        A.  There was a -- if you read the last opinion of
11   her -- the last paragraph, there was -- what she
12   dismissed, not on the merits, but she dismissed my
13   grievance, which was a retaliation grievance.
14        Q.  Okay.
15        A.  Under the whistleblower, again, the Civil
16   Rights Act.
17        Q.  If you'll look at page 8 of that summary
18   judgment order that's in front of you?
19        A.  Yes.
20        Q.  Focus right there on page 8, you will see the
21   finding by the United States district judge that on
22   January 11th, 2010 --
23        A.  Show me which sentence you are at.
24        Q.  It's the first full paragraph on page 8 of the
25   opinion.  Page 8 of 25.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.   Right.

2      Q.   It states, quote:  On January 11, 2010, the

3  Hearing Committee issued its finding of fact,

4  conclusions and recommendations.

5           And then there's a citation to certain

6  documents.

7      A.   Yes.

8      Q.   And then it says:  The Hearing Committee

9  unanimously concluded that Dr. Kessler's Grievance

10  should be denied in its entirety.

11      A.   The whistleblower -- the retaliation grievance.

12  I was labeled as a whistleblower.  That was agreed to,

13  and they denied retaliation.

14      Q.   Then it says:  The Hearing Committee found that

15  "the reason for Dr. Bishop's decision, in consultation

16  with his superiors, to terminate Dr. Kessler from his

17  Deanship was not retaliation for Dr. Kessler having made

18  protected disclosures.  Rather, Dr. Bishop's decision

19  reflected his view that Dr. Kessler could no longer

20  effectively lead the School of Medicine."

21           I've read that correctly, have I not?

22      A.   You have.

23      Q.   All right.  Wasn't this summary judgment order

24  the termination of the litigation between you and the

25  University of California at SF?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1       A.   This is exactly what this represents.

2       Q.   It is what it is, hah?

3       A.   It is what it is.

4       Q.   Okay.  Have you had any subsequent litigation

5  with UCSF over your relationship with that institution?

6       A.   Again, we'd have to check with the Government

7  Accountability Project, but I don't believe so.

8       Q.   Have you had any other personal litigation

9  against lawyers, doctors, or corporate entities?

10      A.   No.

11      Q.   Have you had any other personal litigation --

12      A.   Excuse me.  At what point in time?

13      Q.   Any time.

14           We found this on Pacer, which you know is the

15  federal court system.  Have you had any other litigation

16  against another medical school --

17      A.   No.

18      Q.   -- during your career?

19      A.   No.

20      Q.   Have you had any litigation against a company

21  or an individual over another dispute during your

22  career?

23      A.   During my career in my professional capacity?

24      Q.   Yes.

25      A.   No.



1       Q.  Have you had any litigation with any law firms

2   over your testimony or your fees?

3       A.  No.

4       Q.  Okay.  I mentioned earlier, when we first

5   started talking, that the FDA website reflects that you

6   were the commissioner of the Food, Drug and Cosmetics

7   Agency from November 8th, 19 --

8       A.  Food and Drug Administration.

9       Q.  Okay.  Food and Drug Administration.

10      A.  Please.

11      Q.  I'll get it.

12      A.  Thank you.

13      Q.  The website reflects your tour of duty was

14  November 8th, 1990 to February 28th, 1997.  Does that

15  sound correct?

16      A.  Again, that sounds correct.  That was

17  probably -- we have to check when I became -- officially

18  it was confirmed.  I probably didn't start until

19  December, I think I mentioned to you.

20      Q.  You did.

21          When did you actually become employed by Yale

22  University?

23      A.  Probably July 1st, 2000 -- I'm guessing July

24  1st, 1997.

25      Q.  When you left the FDA, did you already have, in



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 72

1   hand, an offer to join Yale?

2        A.  No, I did not.  I deliberately didn't -- I had

3   no contact with Yale prior to FDA.

4        Q.  Do you remember my request at the beginning

5   that I ask succinct questions and you give me a succinct

6   answer?  I'd like to ask it again.

7            When you left the FDA, did you have a job offer

8   in hand from Yale University?

9            MR. ARBITBLIT:  Objection.  Asked and answered,

10  Counsel.

11           THE WITNESS:  If my answer was -- is direct as

12  I could be, was no, I did not.

13           MR. GIDEON:  Good.

14           THE WITNESS:  I mean, it's on the record.

15           MR. GIDEON:  Q.  Okay.  How long did it

16  take you before you found employment after leaving

17  the FDA February 28th, 1997?

18       A.  I think in a matter of days.  I think that

19  weekend, if I'm right.  I don't remember exactly which

20  weekend it was, I recall coming home from the

21  dry-cleaner and my wife saying Rick Levin called and he

22  asked whether you want to be dean of Yale Medical

23  School.

24       Q.  Was Rick Levin the chairman or chancellor of

25  Yale University?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.  He was the president.  So I think it was a
2  matter of very soon thereafter.  That call from Rick was
3  unsolicited.
4    Q.  Okay.  You handed us, and we're going to
5  exhibit them in a few moments, two green binders that
6  reflected correspondence from a lawyer on your behalf to
7  Dr. Miller.
8    A.  And --
9    Q.  And --
10    A.  And a letter from me to Dr. Miller.
11    Q.  Fine.  I haven't had a chance to look at them.
12  I haven't had a chance to read the pages, so I don't
13  know the content.
14    A.  Uh-huh.
15    Q.  But you did mention, when you were describing
16  them, there was some kind of either formal or informal
17  audit document attached to one of the letters.
18       Do you recall that?
19    A.  Yes.
20    Q.  Okay.  Was there an evaluation audit or
21  examination of your billing the FDA for travel-related
22  expenses at the time you left on February 28th, 1997?
23    A.  Can I have those documents?
24    Q.  Sure.
25    A.  So as I -- as I remember --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.  Hold on just a second so I can hand you the

2  documents.

3      A.  Thanks.

4      Q.  I'm going to hand Dr. Kessler two documents

5  right now.  One is entitled Exhibit 1240 that begins

6  with a letter of July 25th, 2003 to Dr. Henry Miller.

7  That's the first page.

8          Then there is a second exhibit, 1239, that has

9  the same letter in this folder.

10          And here are those two back.

11      A.  Thank you, sir.

12      Q.  And the pending question, Dr. Kessler, is

13  whether when you left the FDA, was there an audit

14  underway to determine if you had appropriately accounted

15  for travel expenses?

16      A.  No, I don't think that -- I don't think -- as

17  you phrased the question, the answer would probably be

18  no.  But let's look at this letter because this probably

19  has the information.

20      Q.  In exhibit which number?

21      A.  Well, there is -- if you take Exhibit 1237

22  (verbatim), and if you look at this January 24th, 1997.

23          So let me give you a little more context for

24  your -- to the answer to that, best I can do this.

25          So there is -- there was first a -- we can make



1    this very simple.

2        Q.  Good.

3        A.  I was not involved with -- as this finding

4    shows, I was not involved at all with my travel

5    vouchers.  I didn't -- as this says, I did not

6    personally handle my travel vouchers or imprest fund

7    transactions.  I provided receipts or -- when it was

8    requested, but I wasn't involved in the details

9    reviewing and signing vouchers or transactions.

10            But I was -- but so -- but I did -- I

11   requested, in 1993, if you look, late 1993 or 1994, just

12   as a matter of prudence, the Office of Financial

13   Management reviewed his vouchers to assure compliance

14   with regulations, and a review found them to be in

15   order.

16            So the first time I just -- I voluntarily -- I

17   just said please, just review all my travel, and they

18   did.  And then I think what the history was -- and

19   again, you have to trace this.  But there was some -- I

20   think it's in my book.  There was some 650 FOI requests

21   on me.  And you can trace it through an outside

22   third-party group that requested just, again, hundreds

23   of requests for documents.

24            That, if you look, I think you can -- if you

25   connect the dots, that was -- we were involved in --



Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 16 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 76

1    it's about investigation of the tobacco industry and

2    there were connections to that group with the tobacco

3    industry.

4            I don't know the full -- I've never been privy

5    to the full handoff of that group as a result of the

6    tobacco industry engaging with that group and monitoring

7    things and then handing it off.

8            But then it says in February of 1996, a

9    congressional inquiry into my travel eventually spurred

10   interest in the Associated Press.  The congressional

11   inquiry was limited.  I asked the scope be expanded to a

12   complete audit of his travel documents.  The

13   commissioner asked that the audit be conducted at a

14   level of detail beyond which was normally devoted, and

15   then steps were taken.

16           And then the audit of the six years travel

17   vouchers and imprest funds from 1991 to 1996 -- so this

18   was done before I left -- reveal 275 taxi claims with a

19   total reimbursement of $8,000.  And then it talks about

20   an over-reimbursement of 823.  But that was done at the

21   time.

22           Bottom line, though, is this demonstrates I was

23   not -- I had nothing to do with my travel expense forms

24   whatsoever.

25       Q.  I didn't ask you to admit complicity.  I just



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016

Page 77

1    wondered if there was an audit underway when you left.

2         A.  So the answer is no.  It looks like the audit

3    was complete.

4         Q.  Okay.

5         A.  And there was several audits done, some at my

6    request, as this lays out.

7         Q.  You graduated from law school in what year?

8    Not that long ago.  At least for me it's not that long

9    ago.

10        A.  So I probably -- I graduated, what, I did two

11   years at University of Chicago and a third year at

12   Harvard.  So Harvard was '78.

13        Q.  Okay.  Have you ever been licensed to practice

14   law in any state?

15        A.  Never sat for a bar.  Chose not to take a bar.

16        Q.  So the answer is what?

17        A.  Never took a bar.

18        Q.  So never licensed to practice law anywhere in

19   the United States?

20        A.  Because I never took a bar, yes.  I graduate --

21   have my law degree.

22        Q.  You've never taken a deposition, argued a

23   motion in court under the authority of another lawyer,

24   have you?

25        A.  No, but I've taught law school.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    I feel more comfortable than others --
2            MR. GIDEON:  Q.  Right.
3        A.  -- discussing.  Because -- so just hand me the
4    standards and I'd be happy to tell you which ones I'm
5    comfortable doing.
6        Q.  Okay.  Now, where is there any statement on
7    page 3 of the document that I handed to you, that
8    exhibit that has methylprednisolone acetate at the top,
9    where it says this can only be dispensed with a
10   patient-specific prescription?
11       A.  Well, so this says -- so the answer is this
12   does not say those exact words, as you've stated.  It
13   does say, if you look at three bullets from the bottom,
14   that it is compounded for your patients by pharmacists
15   extensively trained in aseptic compounding.
16           The definition of compounding, right,
17   certainly -- almost every definition of compounding
18   means that the drug is -- if it's compounded, it's
19   available for an individual patient by an individual
20   prescription subject to a physician/patient
21   relationship.  So that's the basis of compounding.
22       Q.  Okay.  Is there a difference between aseptic
23   compounding versus terminal sterilization?
24       A.  I'd want to review that.
25       Q.  Let me ask it differently.  Do you know of any
```



1  difference between aseptic compounding and terminal

2  sterilization?

3       A.  I'd want to look at the various standards

4  before I gave an opinion.

5       Q.  Do you have any information at all whether the

6  terms are synonymous or different, as you and I speak

7  now?  And the terms I'm talking about are aseptic

8  compounding on one hand versus terminal sterilization on

9  the other.

10       A.  Yeah.  So I, obviously, was involved in major

11  sterility issues.  And sterility is part of the Food,

12  Drug and Cosmetic Act.  I'd want to look at the code

13  before I give an opinion.

14       Q.  What is a class 10 microenvironment?

15       A.  I'd have to look that up.

16       Q.  How does a class 10 differ from an ISO 5 or an

17  ISO 7 microenvironment?

18       A.  Happy to look that up.

19       Q.  Don't know without looking?

20       A.  Again, I'd be happy -- those things are easy to

21  answer your question.  Again, happy to do that right now

22  if you would like me to.

23       Q.  What I'm interested in is whether you know

24  without being prompted by looking at something else.

25       A.  Sir, I'm here as an expert.  And again, if you



```
 1    look at my report, I don't go into this.  You are asking

 2    me questions that are beyond my report.  Happy to give

 3    you the answers, but in order to do that as an expert,

 4    I'd want to make sure.  I'm not going to do stuff off

 5    the top of my head.

 6         Q.  Well, let me ask you this, Dr. Kessler:  Can

 7    you tell me, without doing some research in writing,

 8    what the difference between an ISO 5 versus an ISO 7

 9    microenvironment is?

10         A.  I'd have to look that up.  I don't carry that

11    in my head.

12         Q.  All right.  What and how is hyaluronidase used?

13    Perhaps you can pronounce it better than I can.

14         A.  Hyaluronidase.

15         Q.  Yes.  I like your pronunciation.  It's on

16    page 4.

17              How  is that used and what is it used for?

18         A.  So hyaluronidase -- I believe hyaluronidase is

19    usually found in collagen.  I believe it's a by-product,

20    and is an enzyme that would affect collagen.  Happy to

21    look up the biochemistry.

22         Q.  I'm not interested in this cellular action, but

23    in what circumstances would a physician use

24    preservative-free hyaluronidase?

25         A.  So I would want to look at the label for
```



1    hyaluronidase.  If you have it, give it to me.  And the

2    way we would determine that is look at the label for

3    hyaluronidase and see what it would be indicated for.

4    Again, I don't carry it in my head.

5         Q.  Don't know?

6         A.  I'd want to see what -- it's very easy to get

7    the answer.  We'd look at a label and see what the

8    indications for use would be.

9         Q.  Okay.  Now, looking at the advertisement by

10   NECC, page 4, the one we were just looking at, is there

11   any statement that these products are only available

12   with a patient-specific prescription?

13        A.  Again, as I stated on the prior page, certainly

14   any -- it says these are compounded.

15        Q.  Right.  But my question is specific.  Is there

16   a statement these products are only available with a

17   patient-specific prescription?  It's a yes or no.

18        A.  So --

19             MR. ARBITBLIT:  Objection.  Objection.  You

20   interrupted his answer.

21             MR. GIDEON:  Yeah.

22             MR. ARBITBLIT:  It's not necessarily yes or no.

23   So object to the question being misleading.

24             THE WITNESS:  So if the definition of

25   compounding includes patient-specific prescriptions as



1   it does, if drugs are available for compounding by

2   patient -- I mean, compounding is done for

3   patient-specific prescriptions.  So those things are --

4   certainly compounding includes patient-specific

5   prescriptions.

6           So I would certainly say that anybody looking

7   at this, if you know it's compounded and if you're -- if

8   you're a professional, you should know that it's a

9   patient-specific prescription.

10          MR. GIDEON:  Q.  I see.  Is the language

11  anywhere on this page where it says this product is

12  only available with a patient-specific prescription,

13  question mark?

14      A.  On this page, it says it's compounded.

15      Q.  Yeah.

16      A.  Doesn't say -- have that language.  I believe

17  that if you look several pages later, it's there.  But

18  it's not -- it says it's compounded, which means

19  patient-specific prescription.

20      Q.  Right.  Next page, page 5, starts off with

21  Trouble Finding Preservative-Free Kenalog.

22          Do you see that?

23      A.  Yeah, I do.  It's triamcinolone, right?

24      Q.  Right.  It also states here, as it did on each

25  one of the prior pages, USP 797 compliant, correct?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   document which begins on page 9 with General --
 2           MR. ARBITBLIT:  I was just about to do that.
 3           MR. GIDEON:  -- General Overview of Policies &
 4   Procedures for Compounding Sterile Products at NECC.
 5           MR. ARBITBLIT:  Fair enough.  That's just what
 6   I was about to do, Counsel.
 7           Starting at page 9 of the document, General
 8   Overview of Policies & Procedures for Compounding
 9   Sterile Products includes paragraph G on the following
10   page.  Quote:  Product is dispensed by patient-specific
11   prescription only.  There must be a specific
12   practitioner-patient-pharmacist relationship to dispense
13   to an individual patient or facility, end of quote.
14           MR. GIDEON:  Okay.  Now are you going to read
15   the rest of pages 9 and 10?
16           MR. ARBITBLIT:  I've read what I wanted to
17   read.  If you want to read more, you are welcome to do
18   that.
19           MR. GIDEON:  Okay.  So the rule of completeness
20   is not requiring you to spend your time going on the
21   entire content of the document.
22           MR. ARBITBLIT:  The rule of completeness does
23   not mean that either of us has to read 33 pages into the
24   record, Counsel, and you know that quite well.
25           MR. GIDEON:  You got it.  I agree.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 110

1    Mr. Arbitblit to you in the summer of '14 the first time
2    you had worked with him?
3         A.   No, I don't believe so.
4         Q.   Let's take a look at Exhibit B to your
5    report --
6         A.   Sure.
7         Q.   -- which is a listing of litigation-related
8    involvements.
9         A.   If you want to just see, it is --
10        Q.   I'm going to hand you one.  Don't worry about
11   it.
12        A.   Thanks.
13        Q.   We're going to hand you one.
14             And for the purposes of efficiency, I'm going
15   to refer to the firm you are working with today as Lieff
16   Cabraser.  There may have been name changes over the
17   years, but that's the firm I'm referring to.
18             Mr. Arbitblit is a member of Lieff Cabraser,
19   correct?
20        A.   Yes.
21             (Whereupon, Exhibit 1248 was marked for
22             identification.)
23             MR. GIDEON:  Q.  Okay.  This is
24   Exhibit 1248, and it's Exhibit B to your testimony?
25        A.   Yes.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.   The first thing I want to do is for you to tell

2   us on the bullet points in which of those cases were you

3   employed, contacted to participate in the case, by

4   Mr. Arbitblit or one of his colleagues at Lieff

5   Cabraser?

6      A.   Give me a second to go through this list to

7   find that.

8      Q.   Sure.

9           MR. CHALOS:   Object to the form.

10          MR. GIDEON:   What's wrong with the question?

11          MR. CHALOS:   It's compound.   It says in which

12   of those cases were you employed, contacted to

13   participate in the case.   I think those are two

14   different concepts.

15          MR. GIDEON:   Well, we'll see if we can bridge

16   that gap.

17          MR. CHALOS:   That's a good idea.

18          MR. GIDEON:   Q.   Ready?

19      A.   Yeah.   Thank you.

20      Q.   In which of the cases were you contacted to

21   participate by Lieff Cabraser or one of the lawyers in

22   that office?

23      A.   My recollection is that I was contacted in the

24   Yaz case by Mr. Arbitblit.

25      Q.   Okay.   This is six bullet points down, the Yaz



1  and Yasmin Marketing Sales Practices & Products

2  Liability Litigation?

3       A.  Yes.  My recollection is I was contacted by

4  him.

5       Q.  Did you end up working with him in that

6  litigation or did you work principally with someone

7  else?

8       A.  There were multiple attorneys involved in that

9  case.

10      Q.  Okay.

11      A.  That case settled.

12      Q.  Any others?

13      A.  So the answer is -- I just want to be complete.

14  I'm going to go a little beyond your question, if I may,

15  okay, I mean, so you have the full -- so I don't

16  misspeak here, right?

17          I believe the -- there's two other cases that

18  come to mind where Mr. Arbitblit may have been involved

19  in, but I don't believe he contacted me.

20      Q.  Okay.

21      A.  But again, of one I'm sure he didn't contact me

22  because it was the attorney general of Louisiana where I

23  was retained on, but I believe Mr. Arbitblit worked on

24  that.  And there may have been -- and --

25      Q.  Which one was that on this list?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.  So there was -- it was State v. -- if you go
 2   down, State v. Merck, that's the attorney general of
 3   Louisiana.
 4        Q.  And Mr. Arbitblit, according to your
 5   recollection, worked on State versus Merck & Company?
 6        A.  Yes, that's my recollection.
 7        Q.  Okay.  And is there another one where you think
 8   you worked with Mr. Arbitblit?
 9        A.  Yeah.  Again, I don't remember who -- I mean,
10   that one I know Mr. Arbitblit did not contact me on.
11        Q.  Okay.
12        A.  I can recall.  But I believe Mr. Arbitblit was
13   involved in Actos, but I don't recall who contacted me.
14        Q.  Which bullet corresponds with that reference?
15   The one that's near -- two-thirds down?
16        A.  Yes, sir.
17        Q.  Okay.  In the Western District of Louisiana,
18   filed 12/29/11?
19        A.  Yes, sir.
20        Q.  Okay.  Now, I didn't mean to limit my question
21   to Mr. Arbitblit.  I intended to expand it to all the
22   members of his law office, Lieff Cabraser, irrespective
23   of which office it may be.  Are there any other cases
24   where Lieff Cabraser worked with you on this Appendix B?
25        A.  Let me look.  Those are the ones that I see
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   sitting here.

2        Q.  Okay.

3        A.  That's the ones -- that's what comes to mind.

4        Q.  Now, I just want to take them item by item so

5   we get a snapshot of what the case was about from your

6   view.

7             On the Zoloft Product Liability Litigation that

8   was filed April 17th, 2012, were you testifying on

9   behalf of the people suing the manufacturer of Zoloft?

10       A.  Yes.

11       Q.  And who was the manufacturer of Zoloft that you

12  were offering opinions about?

13       A.  I'd have to -- I believe it was Pfizer.

14       Q.  Okay.  And at the time that Pfizer developed

15  Zoloft, was Pfizer an FDA-registered manufacturer?

16       A.  Certainly.

17       Q.  Did you express the opinion that Pfizer, as an

18  FDA-registered manufacturer, had acted improperly?

19       A.  We'd have to pull that.  You would have to look

20  at that.

21       Q.  You don't recall what the critique was?

22       A.  I --

23       Q.  Sir?  You don't recall --

24       A.  I'm just double-checking that it's Pfizer.

25  Just to be -- just so that I have my head -- just give



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   me one second.

2           That case had to do with birth defects and what

3   the label said about -- and whether it was appropriately

4   categorized as a category D drug, whether there was

5   human evidence.  And there was human evidence, and I

6   said that.

7       Q.  And the essence of the critique was that the

8   manufacturer of Zoloft had not shared with the FDA the

9   data reflecting that the product could be harmful to the

10  unborn, correct?

11      A.  No.  I don't think that was what the critique

12  was.

13      Q.  Well, what was it, then?

14      A.  So I -- well, we'd have to pull the actual

15  opinions, and I don't have that with me.

16          I think that the critique was that the -- that

17  the human evidence of risk to the fetus was not

18  disclosed to patients and physicians in the label.  Not

19  to -- not as you said.

20      Q.  All right.  The second bullet point, In re

21  Risperdal -- Risperdal.  Excuse me.  Risperdal is

22  manufactured by Johnson & Johnson, isn't it?

23      A.  Janssen Pharmaceutica is owned by Johnson &

24  Johnson.

25      Q.  What was the critique of the division of



```
 1   Johnson & Johnson in re Risperdal?
 2        A.   This had to do with boys growing breasts and
 3   the issue of both the -- as you know, there was a --
 4   there was a criminal trial with off-label prosecution
 5   for Janssen.  I believe an off-label promotion.
 6             So it had to do with both the off-label
 7   promotion, that illegal activity, as well as whether
 8   Janssen failed to disclose data in the scientific -- I
 9   mean, in its studies.
10        Q.   Uh-huh.  You offered opinions critical of the
11   division of Johnson & Johnson in that case, didn't you?
12        A.   I offered the opinions, the facts supported.
13        Q.   I am not -- I am not asking you whether you
14   felt your opinions were justified or somebody didn't.
15   I'm just trying to determine which side of the
16   litigation you were on, Dr. Kessler.
17             Were you testifying on behalf of a patient
18   suing Janssen or were you testifying on behalf of
19   Janssen?
20        A.   On behalf of the patient.
21        Q.   All right.  Let's go to the third bullet point,
22   Wells versus Allergan, Drake versus Allergan, two cases
23   listed together.  What was the essence?  What was the
24   issue in these cases?
25        A.   So the issue was children getting botulism from
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 31 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 117

1    Botox.

2         Q.  Were you testifying on behalf of a family suing

3    Allergan or were you testifying on behalf of Allergan?

4         A.  I was testifying on behalf of the families

5    where the children got botulism.

6         Q.  And at the time Allergan made the products in

7    question, Allergan was an FDA-registered manufacturer,

8    correct?

9         A.  Yes.

10        Q.  Let's go to the fourth item, fourth bullet

11   point, C.R. Bard, Inc., Pelvic Repair System Products

12   Liability Litigation.  Did this deal with the pelvic

13   sling?

14        A.  Pelvic mesh.

15        Q.  And in that case were you testifying on behalf

16   of patients suing C.R. Bard?

17        A.  Yes.

18        Q.  And at the time C.R. Bard made the pelvic mesh,

19   was C.R. Bard an FDA-registered manufacturer?

20        A.  I'm sure.

21        Q.  Okay.  Then the next bullet point is SB versus

22   Ortho-McNeil-Janssen Pharmaceuticals, Risperdal.  Ortho,

23   McNeil and Janssen are all wholly-owned subsidiaries of

24   J&J, aren't they?

25        A.  Yes.



1      Q.   Were you testifying on behalf of patients suing

2  Ortho, McNeil and Janssen?

3      A.   Yes.

4      Q.   Ortho, McNeil and Janssen were all

5  FDA-registered manufacturers, correct?

6      A.   Yes.

7      Q.   In re Yaz & Yasmin Marketing Sales Practice &

8  Products Liability Litigation.  Yaz and Yasmin were

9  contraceptives, weren't they?

10      A.   Drospirenone.  Yes, sir.

11      Q.   And who was the company that made those

12  products?

13      A.   I'm just double-checking so I can get -- my

14  recollection is it's Bayer.  Let me just double-check

15  that for the record.

16           Yes, it's Bayer HealthCare Pharmaceuticals.

17      Q.   Was Bayer HealthCare Pharmaceuticals an

18  FDA-registered manufacturer when Yaz and Yasmin were

19  made?

20      A.   Yes.

21      Q.   And what was your critique of Yaz and Yasmin?

22      A.   Again, I think it had to do with off-label

23  activity as well as disclosure of -- the failure to

24  disclose data that the company had.

25      Q.   Failure to disclose data the company had before



```
 1   seeking approval?
 2        A.  We'd have to pull the report.  I don't want to
 3   misspeak here.
 4        Q.  All right.  In re Flonase Antitrust Litigation,
 5   who engaged you in that case?  Which side of the
 6   litigation?
 7        A.  There were corporate entities that engaged me.
 8   These were payers who paid for drugs.  This was
 9   antitrust litigation.
10        Q.  And your role was to support people who were
11   opposing a merger?
12        A.  No.  This was complicated citizens' petition
13   language, generic -- generic drugs, et cetera.  I was
14   testifying on a pretty narrow issue.
15        Q.  And what was the narrow issue?
16        A.  Again, about FDA citizens' petition, the
17   regulation of generic drugs.
18        Q.  I see.  Okay.
19             Well, did you offer substantive testimony
20   regarding the scope of FDA regulation of generic drugs
21   in that case?
22        A.  I think that would be probably fair.  We'd have
23   to go back and look at the testimony.
24        Q.  That was the Eastern District of Pennsylvania?
25        A.  Right.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.   Okay.   Is Pharmathene versus Siga Techs, Inc. a

2   commercial case?

3        A.   Yes.

4        Q.   Does that also deal with market share,

5   antitrust considerations?

6        A.   No.   I believe it had to do with patent.   I was

7   hired by Siga Technologies, the -- I was hired by the

8   drug manufacturer.

9        Q.   Commonwealth versus Merck & Company, Kentucky

10   Circuit Court, September 28, 2009 and Utah; what product

11   was at issue in that litigation?

12        A.   That was I was retained by the attorney general

13   of the state.   And that was Vioxx.

14        Q.   Vioxx.   Okay.

15            And you were testifying on behalf of

16   individuals suing Merck & Company?

17        A.   No.

18        Q.   No?

19        A.   I was testifying on behalf of the attorney

20   general.

21        Q.   And the testimony you offered at the request of

22   the attorney general was what?

23        A.   I mean, it had to do with the science

24   underlying Vioxx.

25        Q.   Did it have to do with the risk of myocardial



1  infarction in individuals taking Vioxx?

2      A.  Yes.

3      Q.  And did you offer the opinion that Merck &

4  Company had not acted appropriately with respect to the

5  risk of myocardial infarction?

6      A.  There was specific -- I'd want to look at that

7  report, but there were specific representations of the

8  company that were in question.

9      Q.  Your testimony was critical of Merck & Company?

10     A.  My testimony dealt with that science.  And

11 again, happy to come back and tell you what those

12 opinions were.  I believe that case settled, so I don't

13 know what's public record or not.

14     Q.  Merck & Company was an FDA-registered

15 manufacturer at the time that it's -- that it developed

16 and obtained permission to market Vioxx in the

17 United States, wasn't it?

18     A.  Yes.

19     Q.  Okay.  Next one is Commonwealth Care Alliance

20 versus AstraZeneca Pharm, L.P.  Is this a commercial

21 dispute over insurance payments or market share?

22     A.  I believe this is -- this is also -- I'd want

23 to go back.  I believe this was an antitrust case.

24     Q.  Smith & Nephew, Inc. versus N.H. Insurance

25 Company in the Western District of Tennessee.  What was



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   the issue there?

 2         A.  I was retained by counsel for the defendants.

 3   Again, it had to do with legality of conduct.

 4         Q.  The legality of Smith & Nephew, Inc.'s conduct?

 5         A.  Yes.

 6         Q.  Was there a contention by N.H. Insurance

 7   Company that they shouldn't have to pay for something

 8   because Smith & Nephew had done something

 9   inappropriately?

10         A.  Again, I want to be a little careful.  I don't

11   know what is confidential there and what's not.  So we'd

12   want to check with counsel before I answer.

13         Q.  Who was the attorney that engaged you in the

14   Smith & Nephew case?

15         A.  Frost, Todd, Brown.

16         Q.  In Kentucky?

17         A.  Yes.

18         Q.  Who in particular at Frost Todd engaged you?

19         A.  Laurie Hammond.

20         Q.  Say it one more time.

21         A.  I believe Laurie Hammond.

22         Q.  And who was the attorney for Smith & Nephew,

23   Inc.?

24         A.  I don't recall.

25         Q.  Okay.  In re Neurontin Marketing, Sales
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 37 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 123

1  Practices & Products Liability Litigation, the District
2  Court of Massachusetts.
3      A.  Again, legality of conduct, off-label promotion
4  by Pfizer, certain corporate entities suing Pfizer for
5  that off-label conduct.
6      Q.  Right.  And Pfizer, again, was FDA registered
7  at the time they carried out the conduct in question,
8  weren't they?
9      A.  Yes.
10     Q.  Did you work with Lieff Cabraser in the
11 Neurontin Marketing Sales Practices & Products Liability
12 Litigation?
13     A.  That does not come to mind, no.
14     Q.  Brown versus American Brands, is that a tobacco
15 case?
16     A.  That is.
17     Q.  In re Actos, who was the manufacturer of Actos?
18     A.  I believe it was Takeda.
19     Q.  Takeda.  Japanese pharmaceutical firm?
20     A.  Yes.
21     Q.  And the contention is that Actos triggered an
22 unacceptable incidence of bladder cancer; isn't that
23 right?
24     A.  There was a statistically significant increase
25 in bladder cancer if you did the analysis beginning in



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 124

1    2002, and that was never reported by -- that was never

2    reported by the company.

3         Q.  Was Takeda an FDA-registered manufacturer when

4    they developed Actos and obtained permission to market

5    that product in the United States?

6         A.  Again, I would assume so.  That company was

7    acquired, I believe.  I just have to go back and look.

8    I believe that's correct.

9         Q.  All right.  The -- this is one of the cases

10   where you said that you worked with or were contacted by

11   Mr. Arbitblit.

12        A.  Arbitblit.

13           MR. GIDEON:  I'm sorry, it's hard for me to

14   pronounce and I don't know why.  Arbitblit.  I've got it

15   down now.

16           MR. ARBITBLIT:  You are not the first.

17           MR. GIDEON:  Q.  Did you testify on behalf

18   of patients who were suing Takeda in that case?

19        A.  Yes.  There was a $7 billion verdict.

20        Q.  Mr. Arbitblit did very well in that case,

21   didn't they?  Did he share any of those proceeds with

22   you after you delivered a $7 billion verdict?

23           MR. CHALOS:  Object to form.

24           THE WITNESS:  It was a $6 billion verdict, and

25   no.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 125

1                MR. GIDEON:  Q.  Next, Brown versus
2    RJ Reynolds Tobacco.   Tobacco case?
3          A.  Yeah, I believe -- yes, it's a tobacco case.
4          Q.  I'm going to go down to Cabana versus Stryker.
5    Were you testifying on behalf of someone suing the
6    device manufacturing company Stryker?
7          A.  Yes.
8          Q.  And what was your critique of Stryker?
9          A.  Again, I don't know whether that is public or
10   not.  You'd -- I would want to -- I'd want you to
11   contact the counsel.  I believe that case settled, so I
12   don't know what is public, sir.
13         Q.  You represent -- you articulated the interest
14   of the plaintiff or the defendant in that case?
15         A.  I represented the interests of me, in that I
16   told what the science was.
17         Q.  Who engaged you, plaintiff or defendant?
18         A.  Plaintiffs.   Thank you.
19         Q.  Who paid you, plaintiff or defendant?
20         A.  It was a plaintiff in that case.
21         Q.  Who was the lawyer, then, that engaged you so I
22   can check with him and see if it's okay to talk to you
23   about what you did in that case?
24         A.  I'll get you the name.  It's --
25         Q.  Just make yourself a note, and when it comes to



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   you --
 2        A.  Yeah, it's -- it's Estephan -- it's -- first
 3   name is Estephan.  Cynthia Garber was also, I think,
 4   involved.  But it was Estephan.  I'd be happy to get you
 5   the name.
 6        Q.  Sure.  That's fine.  Then the next one down is
 7   re Fosamax litigation.
 8        A.  That was a narrow issue about preemption.
 9   And -- in Fosamax.  But it was whether, in fact, certain
10   actions were preempted under a statute.
11        Q.  Were you offering testimony on behalf of a
12   patient suing the manufacturer of Fosamax claiming that
13   the state law claims were not preempted by federal law?
14        A.  Yes.  It was under preemption.  And, again, the
15   nature of those claims.
16        Q.  And you were engaged by the plaintiff in that
17   case?
18        A.  Yes.
19        Q.  In any -- has there been any personal injury
20   case in the last six years where you testified on behalf
21   of a defendant?
22        A.  Personal injury, no.  But other cases I've
23   testified on behalf of defendants.
24        Q.  Well, now let's look at the affidavits here.
25   The DePuy --
```



1     A.   That's actually not true.

2     Q.   Which one of these, where there's a claim of

3  personal injury, death, physical suffering, where you

4  testified on behalf of a defendant?

5     A.   The second one.

6     Q.   The Risperdal?

7     A.   I'm sorry.  I apologize.  I'm looking at the

8  bottom three, sir.

9     Q.   Well, the bottom three are just affidavits or

10  sworn expert statements.

11     A.   They're sworn statements, but that was on

12  behalf of the defendant, in that -- where the defendant

13  was being sued.

14     Q.   Which case?

15     A.   The Cordero v. Endoscopy.  I was testifying on

16  behalf of the endoscopy center.

17     Q.   What testimony were you offering?  What was the

18  subject matter of your opinion testimony in that case?

19     A.   Adverse events.  Adverse event reporting.

20     Q.   Okay.  Under the MedWatch system?

21     A.   Exactly.

22     Q.   Were you offering any testimony regarding how

23  to perform an endoscopic procedure?  On the techniques

24  of endoscopy?

25     A.   Not that I recall.



Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 42 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 128

```
1        Q.  On the first affidavit, the ASR Hip System
2   Cases, were you offering opinions critical of that
3   subsidiary of Johnson & Johnson?
4        A.  There was an issue there, I believe, about
5   public disclosure of whether certain documents in the
6   public interest should be disclosed or not.  I think
7   that was the matter.
8        Q.  Did this --
9        A.  I don't recall that.
10       Q.  Did this particular hip system case deal with
11  petrochemical -- a failure to clean off petrochemical
12  substances on the acetabular cup?
13       A.  No, I don't believe so.
14       Q.  And what was the issue in Jenkins versus
15  Medtronic?
16       A.  I apologize.  I don't remember.
17       Q.  It's also in the Western District of Tennessee?
18       A.  Yes.
19       Q.  Were you engaged by Frost Todd in that case
20  too?
21       A.  I don't believe that was the case.  And I
22  apologize, I don't remember that.
23       Q.  Are there any other cases that constitute
24  affidavits or sworn statements or testimony at trial or
25  by deposition other than what we've just covered in this
```



1    exhibit?

2         A.  This is what comes to mind.  Actually, hold on

3    one second.  Let me just think of something.

4              So there may be a case subsequent to this

5    report that I may have testified in.

6         Q.  This report was sent to us in December of 2015.

7    Have you testified in the last 90 days?

8         A.  I believe I may have one case, I believe.

9         Q.  Where?

10        A.  In deposition.

11        Q.  In San Francisco, but where was the case

12   pending?

13        A.  I believe it's St. Louis.

14        Q.  What was the style of the case?  The who sued

15   whom?

16        A.  It's a plaintiff -- it's a joint -- it's a

17   bellwether case on Depakote.

18        Q.  And who is the manufacturer of Depakote?

19        A.  Give me a second so I can get it.

20        Q.  Are you referring to Google again?

21        A.  Well, yeah.  I just want to make sure I get it

22   exactly right.  Just give me a second.  I have it in my

23   head, but I just -- let me -- I'll be happy to do that

24   at the next break and give it to you.

25        Q.  All right.  Did you testify on behalf of the



1    manufacturer of Depakote or on behalf of people suing

2    Depakote?

3         A.  It was on behalf of the plaintiffs.

4         Q.  And who engaged you?

5         A.  There is a -- I mean, there's -- I believe

6    there's an MDL that Janet Arbitblit and Williams Keker

7    (phonetic).

8              MR. ARBITBLIT:  Sorry --

9              MR. GIDEON:  Q.  Is that -- Janet

10   Arbitblit, is that Don Arbitblit's wife?

11        A.  No, no, no.

12             MR. ARBITBLIT:  Janet Abaray --

13             THE WITNESS:  Janet Abaray.  I'm sorry.  Now

14   you have me confused.

15             MR. ARBITBLIT:  My wife would not be happy to

16   hear that there's a Janet Arbitblit.

17             THE WITNESS:  Yes, I'm sorry.  I apologize.

18   Now you have me --

19             MR. GIDEON:  Q.  Putting aside the humor

20   now, who was it that asked you to be involved in

21   that case?

22        A.  I think it's Janet Abaray.

23        Q.  Could you spell the last name for us.

24             MR. ARBITBLIT:  A-B-A-R-A-Y.

25             MR. GIDEON:  Q.  And where does she



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   practice?
 2        A.  I believe somewhere in Ohio, if I'm right.
 3        Q.  And is there, as you said, an MDL on damages
 4   associated with the use of Depakote?
 5        A.  There is -- this -- again, this is birth
 6   defects.  This is a well-known teratogen.
 7        Q.  And you offered opinions in that deposition
 8   that were critical of the manufacturer of Depakote?
 9        A.  I offered an opinion of -- based on the
10   scientific evidence that the congenital risks -- total
11   congenital malformations was known as of a certain date.
12        Q.  And that the --
13        A.  And that there was also illegal -- again, there
14   was illegal conduct.  There was a consent decree against
15   the pharmaceutical company for off-label marketing.
16        Q.  And was this -- was this manufacturing company
17   an FDA-registered manufacturer that carried out this
18   illegal activity?
19        A.  Yes.
20        Q.  FDA registration, then, does not assure that
21   the public will receive safe, uncontaminated products,
22   does it?
23        A.  No.  There is no guarantee here.  Right?  It's
24   a system of regulation.  But as we all know, it is
25   the -- there are no guarantees.  My predecessor, Don
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    prohibited it or was contraindicated or something like

2    that.

3        Q.  Physicians are free to use medications beyond

4    the labeled authorized uses, correct?

5        A.  So FDA's position, okay, is as you state.

6    Okay.  There are other constraints on physicians to use

7    drugs off-label beyond FDA regulations.

8        Q.  There's an explicit provision, 21 U.S.C 396.

9    Give me that.

10           (Whereupon, Exhibit 1249 was marked for

11           identification.)

12           MR. GIDEON:  Q.  This is Exhibit No. 1249.

13   You are familiar with that --

14       A.  Let me just.

15       Q.  -- provision of the United States Code, are you

16   not?

17       A.  Let me just take a look at it.

18       Q.  Sure.

19       A.  What's your question?

20       Q.  Doesn't this recite the fact that nothing about

21   the law pertinent to the Food and Drug Administration

22   has any impact on the prerogative, the discretion, of a

23   healthcare practitioner to prescribe or use a drug or

24   device?

25       A.  No, that's not --



```
1              MR. CHALOS:  Object to the form.
2              THE WITNESS:  That's not what that states.
3              MR. GIDEON:  Q.  What does this state then,
4    Dr. Kessler?
5         A.  So this applies, as I read this, only to
6    devices.
7         Q.  Okay.  Have you ever researched that issue?
8         A.  I've written extensively on the issue of
9    off-label promotion, and I implemented the law when I
10   was FDA commissioner.
11             But this has nothing -- you see the word drug
12   here?  You handed me that saying that was drugs.
13        Q.  Right.
14        A.  Do you see anything about drugs there?
15        Q.  I've gotten your interpretation.
16        A.  No, no, no.  That's not my question.  There's
17   no interpretation.  My question is, doesn't say the word
18   drug there, it says device.
19        Q.  I see.  Is the FDA's position that a physician
20   may use a device for an off-label purpose --
21             MR. CHALOS:  Object to the form.
22             MR. GIDEON:  Q.  -- as well as a drug?
23        A.  That's a complicated question.
24        Q.  So there's not a straight answer to it?
25        A.  No.  I mean, I've written about this.  Let me
```



```
 1   question.
 2            THE WITNESS:  I'll wait for a question.
 3            MR. GIDEON:  Q.  Isn't it true, also, that
 4   any time a pharmaceutical company has reason to know
 5   that the risks of a drug may result in adverse
 6   events, that pharmaceutical company has a
 7   responsibility to inform physicians and healthcare
 8   providers?
 9        A.  Certainly under 505.
10            MR. ARBITBLIT:  Let's take a lunch break.
11            THE WITNESS:  Certainly under new drug
12   provisions.
13            MR. GIDEON:  Q.  Take a look at
14   paragraph 326 of your --
15            MR. ARBITBLIT:  Counsel, are you reneging on
16   your offer to take a break whenever we wanted?
17            MR. GIDEON:  No, I'm not.  But he said under
18   505, and there's no such qualification on his prior
19   testimony.
20        Q.  Isn't it correct --
21            And then we'll take a break.
22            MR. ARBITBLIT:  Okay.
23            MR. GIDEON:  Q.  -- that paragraph 326 of
24   your affidavit says precisely what I suggested with
25   no such qualifications?
```



```
 1              (Whereupon, Exhibit 1250 was marked for

 2              identification.)

 3              MR. CHALOS:  What exhibit are we looking at

 4     here?

 5              MR. GIDEON:  He's got it in front of him.

 6              MR. CHALOS:  What's the number on that?

 7              MS. WEETER:  1250.

 8              MR. CHALOS:  1250?

 9              MS. WEETER:  Uh-huh.

10              MR. ARBITBLIT:  And what paragraph?

11              MR. GIDEON:  326.

12              THE WITNESS:  So what you are missing,

13     Counselor --

14              MR. GIDEON:  Q.  I didn't ask you what I'm

15     missing.

16         A.  I'm answering your question.

17         Q.  Is there any such qualification in

18     paragraph 326 of the affidavit --

19         A.  I'm answering your question.

20         Q.  -- is the question.

21              MR. CHALOS:  Object to the form.

22     Argumentative.

23              THE WITNESS:  The -- this has to do with

24     adverse events on the drug's labeling.  Those

25     requirements are set out, right, by 505, which applies
```



```
 1   to new drugs.
 2             MR. GIDEON:  Q.  Uh-huh.  Is there any
 3   reference to section 505 of the Food, Drug and
 4   Cosmetic Act in paragraph 326 --
 5        A.  No, but I'm --
 6        Q.  -- of that lengthy statement?
 7        A.  No, but I'm sure the whole report is predicated
 8   on a 505 drug -- and section 505 is, I'm sure, cited in
 9   this report.
10             MR. ARBITBLIT:  And for completeness, the
11   paragraph just before what you read, Counsel, refers
12   specifically to the Food, Drug and Cosmetic Act.
13             (Reporter clarification.)
14             MR. ARBITBLIT:  Paragraph 325 of the document
15   from which counsel read refers to the Food, Drug and
16   Cosmetic Act in its entirety.  And so to read 326 in
17   isolation is incomplete.  Pursuant to Rule 106, rule of
18   completeness, that's appropriate to add.
19             Let's take a lunch break.
20             MR. GIDEON:  We're going to take a lunch break.
21   It's -- it is 12:35 locally.
22             MR. ARBITBLIT:  2:35 Nashville time.
23             MR. GIDEON:  12:35 locally.  And we'll take,
24   what, one hour?
25             MR. ARBITBLIT:  If you need it.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    then you should not be a compounder.

2           The essential definition of compounding has to

3    have -- I mean, I assume it's on the first page of the

4    compliance policy guide.  The first beginning.  It's all

5    about patient-specific prescriptions.

6        Q.  Okay.  Well, what's the definition of a

7    manufacturer?

8           MR. CHALOS:  Object to the form.

9           THE WITNESS:  Under what purposes?  For what

10   purposes?

11          MR. GIDEON:  Q.  What is the definition of

12   a manufacturer to making large volumes of drugs?

13          MR. CHALOS:  Object to the form.

14          MR. GIDEON:  Q.  What are the criteria that

15   would allow any reasonable person to say they are

16   manufacturing?

17          MR. CHALOS:  Object to the form.

18          THE WITNESS:  So, I mean, our entire -- our

19   entire legitimate drug supply, I mean, in this country

20   is, you know, Pfizer and Abbott.  Those are

21   manufacturers.  They don't need physician --

22   patient-specific practices.  They are introducing a drug

23   in interstate commerce, right, for sale, and they are

24   subject to 505, right?  They are clearly manufacturers.

25          MR. GIDEON:  Q.  Okay.  I know that Pfizer



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   is a manufacturer and I know Abbott is a

2   manufacturer.  What I want you to do, though, is

3   tell us what is the definition of a manufacturer.

4   Don't just tell me a company name.  That's not

5   helpful.  Tell me what the definition is.

6           MR. CHALOS:  Object to the form.

7           THE WITNESS:  So a -- under which law?

8           MR. GIDEON:  Q.  The --

9       A.  Under FDAMA or not under FDAMA?

10      Q.  The Food, Drug and Cosmetic Act of 1938, as

11  amended, up to and including but not including the 1997

12  FDAMA.

13      A.  Not including --

14      Q.  Not including FDAMA.

15          MR. CHALOS:  Object to the form.

16          THE WITNESS:  So if you wanted to do that,

17  that's what I wrote specifically in the -- that's what

18  we wrote specifically in the 1992, 1994 compliance

19  policy guide.

20          MR. GIDEON:  Q.  What is it?

21      A.  Okay.  And it gave certain -- that gave certain

22  criteria, okay, that if you were engaged in -- they were

23  not -- they were, I don't know, seven, eight, nine

24  criteria that were part of that policy guide whereby

25  even if you were a retail pharmacy, the agency would not



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016          Page 198

```
1    grant enforcement discretion.
2         Q.  Okay.  I'm going to ask again.  What is the
3    definition of a manufacturer?  Please give me some
4    substance to your answer instead of just telling me
5    about things I might find somewhere else at another
6    time.
7              MR. CHALOS:  Object to the form.  Object to the
8    commentary.
9              MR. GIDEON:  Q.  And if you honestly can't
10   answer --
11        A.  No, I --
12        Q.  If you can't answer the question, just say so.
13        A.  I can answer this very -- I mean -- and I think
14   I just did, right?
15        Q.  No, you didn't.
16        A.  Yes, I did.  Well, I think I did.
17              If you turn to page S0338 in my report, just
18   turn there.
19        Q.  Okay.  Why don't you read it to us.
20        A.  Okay.
21        Q.  What is the definition of a manufacturer?
22        A.  So FDA -- this is where FDA -- FDA may, in the
23   exercise of its enforcement discretion, initiate federal
24   enforcement actions against entities, okay, and
25   responsible persons when the scope and nature of a
```



```
 1    the compounder?

 2         A.   Entitled?

 3         Q.   Yeah --

 4              MR. CHALOS:  Objection.

 5              THE WITNESS:  Entitled is a matter of law.

 6              MR. GIDEON:  Q.  Well, let's start there.

 7         A.   Entitled is a matter of law.  I see nothing in

 8    the statute that says you can't rely on a statement.

 9         Q.   You can or cannot?

10         A.   You cannot.  I see nothing that says, in the

11    statute, if you make a statement to me, I mean, in

12    writing, which is subject to -- what is it --

13    18 U.S.C. 1001, that's a statement to a federal

14    official.

15         Q.   Right.

16         A.   Federal officials are allowed to rely on

17    statements made to them.  Of course you are.

18         Q.   Okay.

19         A.   Let me finish the answer.

20              At the same time as you see in the documents,

21    right, there was a -- there was a decision, right, that

22    at that time, that they -- that NECC was engaged in a

23    compounding role.  And therefore, the decision was made

24    to let the state of Massachusetts take the lead.

25              In fact, you know, most of the time, I have
```



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 207

```
1              MR. GIDEON:  Q.   Okay.   Now, with respect
2     to all of the material that you have looked at from
3     2002, did any of the FDA employees take the step to
4     see if any of these products were covered by a valid
5     state prescription?
6              A.   I don't -- I don't see that.   What FDA did was
7     what you would expect FDA to do, which was, I mean, at
8     the time there was a concern about the safety of certain
9     products.   FDA focused on the issue, and I think acted
10    very appropriately, made sure that product was recalled.
11    Right?
12             Because understand at this moment in time --
13             Q.   What question are you answering?
14             A.   I'm -- you are asking me about whether -- what
15    FDA's role was.
16             Q.   No, I didn't.
17             A.   Yes, you did.
18             Q.   I didn't ask that question at all.   I said did
19    they check to see whether or not there were valid
20    prescriptions.   You answered that and said there's no
21    evidence that they did, and then you just started
22    talking.
23             A.   No, I didn't start talking.
24             MR. CHALOS:   Object to the form.   There's not a
25    question.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              Excuse me.  Object to the form.
 2              MR. GIDEON:  That's true.  There is no
 3    question, but he is just extolling something, sharing
 4    with us at a thousand bucks an hour.  And I really must
 5    insist on you answering my questions.
 6              MR. CHALOS:  Don't answer.  Object to the form.
 7    That's not a question.  Object to the admonition.
 8              Hang on.  Let him ask a question, please.
 9              MR. GIDEON:  Q.  Yeah.  Now that we know
10    they didn't check, why didn't they, if that's so
11    important?
12              MR. ARBITBLIT:  Object to form.
13              MR. CHALOS:  Object to the form.
14              MR. GIDEON:  Q.  Why didn't they take the
15    time to check and see if this volume of product was
16    covered by patient-specific prescriptions?
17              MR. ARBITBLIT:  Object to form.
18              THE WITNESS:  Exactly the answer I gave you
19    before when you cut me off.  I gave you an answer.
20              MR. GIDEON:  Q.  I --
21        A.  Yes, you did.
22        Q.  Okay.  What is the answer, then?
23        A.  Read back what my answer was.  What I said was
24    the reason -- what FDA was doing at this time, right,
25    was what FDA should have been focused on, which was
```



1    about.  It's at schedule 5 of his report, sub (e), FDA

2    Investigation Report, October 24, 2002 to February 10,

3    2003, at page 14, which is also marked as S0476.

4              Question No. 2 of the FDA investigation:  Does

5    the NECC continue to fill patient-specific prescriptions

6    for each compounded product dispensed?

7              Answer:  NECC dispenses and prepares products

8    in bulk for administration to individualized patients

9    pursuant to a receipt of a valid prescription from a

10   prescriber, end quote.

11             MR. GIDEON:  Q.  Do you know if that

12   representation by NECC was intentionally false or

13   not?

14        A.  I don't believe I've seen the prescription

15   databases and the prescriptions that NECC had at the

16   time, so I don't know that.  I know it was false later

17   on.  It would have been false later on.

18        Q.  And when did it first become false?  When did

19   the representations by NECC about getting

20   patient-specific prescriptions first, to your knowledge,

21   become just an utter lie.

22             MR. CHALOS:  Object to the form.

23             THE WITNESS:  So on -- based on the --

24             MR. GIDEON:  Q.  The question is when.

25        A.  I understand exactly.



```
 1              MR. CHALOS:  Object to the form.
 2              THE WITNESS:  So based on the record that I
 3      have seen, okay?
 4              MR. GIDEON:  Q.  I'm directing it to you as
 5      the witness, not a record somebody else has seen.
 6      So that's implicit.
 7              MR. CHALOS:  Object to the commentary.  There's
 8      not a question pending at this point.
 9              MR. GIDEON:  Q.  When?  When did their
10      representations about receiving patient-specific
11      prescriptions become an utter lie?
12              MR. CHALOS:  Object to the form.  Misstates the
13      record.
14              THE WITNESS:  So the record that I have seen --
15              MR. GIDEON:  Q.  Okay.  The record you've
16      seen.  We've got that.
17         A.  But -- but --
18              MR. CHALOS:  Object to the commentary.  There's
19      not a question pending, sir.
20              THE WITNESS:  Hold on.  I -- what I'm trying to
21      help you get -- I mean, because the record --
22              MR. GIDEON:  Q.  Doctor, you are not
23      helping anybody because you are --
24         A.  I'm trying to answer your question.
25         Q.  -- you are not answering anything.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MR. CHALOS:  Objection.  Argumentative.
 2              MR. GIDEON:  Q.  Every response --
 3              MR. ARBITBLIT:  Let's take a break.
 4              MR. GIDEON:  Q.  -- you provide, there's a
 5     long windup, and then a lot of words, and very
 6     seldom an answer.
 7              MR. CHALOS:  Objection to the form.
 8              C.J., quit whining.  Let's take a break.
 9              MS. MARTINEZ:  There's a question pending.
10     Hold on.
11              MR. CHALOS:  There is no question pending --
12              MR. ARBITBLIT:  He stopped his question with a
13     diatribe.
14              MR. CHALOS:  There's no question pending.
15     Let's take a break.
16              MR. GIDEON:  We're going to get an answer to
17     the question.  The witness says he wants to answer the
18     question --
19              THE WITNESS:  I would like to answer the
20     question.
21              MR. GIDEON:  -- so let's get an answer.
22              MR. ARBITBLIT:  Well, then reask the question
23     and don't interrupt him when he's giving you --
24              MR. GIDEON:  You are interrupting --
25              MR. ARBITBLIT:  There's no question pending,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 60 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 252

1    acceptable formulary under an ambulatory surgery center?

2        A.   Usually -- no, usually medical staffs do that.

3        Q.   Did Tennessee law permit substitution for

4    prescriptions in calendar years 2010 through 2012?

5            MR. CHALOS:  Object to the form.

6            THE WITNESS:  I would assume so, but I would

7    want to pull the statute.

8            MR. GIDEON:  Give me No. 13.

9            THE WITNESS:  Thank you, Don.

10           MR. GIDEON:  This is Exhibit 1256.

11           (Whereupon, Exhibit 1256 was marked for

12           identification.)

13           MR. GIDEON:  And this comes from PCCA075 to

14   078.  Documents produced by Pharmacy Compounding Centers

15   of America, PCCA, produced to the PSC before we got

16   involved in the litigation.

17       Q.   I want you to take a moment and look at it, but

18   I want to tell you what my specific question is.

19       A.   Sure.

20       Q.   And that is if NECC had complied with this

21   policy to crimp and seal individual vials and then

22   autoclave those individual vials for 20 minutes at

23   121 degrees centigrade, 15 pounds per square inch, would

24   that have prevented the fungal outbreak?

25       A.   I'm not going to opine on that.  An infectious



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    disease expert can do that.

2        Q.  Do you know whether complying with this

3    procedure would have killed the fungi in the vials in

4    question?

5        A.  I have not studied that question, sir.

6        Q.  So you do not know?

7        A.  I have no opinion on that.

8        Q.  You told me earlier that you knew the

9    difference between terminal sterilization and aseptic

10   processing.

11            MR. ARBITBLIT:  Object to form.

12   Mischaracterizes.

13            MR. GIDEON:  Q.  How does that

14   mischaracterize what you said?

15       A.  I said I can look that up pretty quickly.  I

16   didn't have it in my head.

17       Q.  Okay.  Well, the document that's in front of

18   you right now, you have enough experience to know that

19   what it advocates doing is terminal sterilization,

20   correct?

21       A.  I mean, the final stage of the product, that's

22   what terminal means, yes.

23       Q.  Correct.  So if your ultimate production are

24   individual vials, and those individual vials are subject

25   to being autoclaved, that is terminal sterilization,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    action, the agency will consider nine factors.  You and

2    I talked about that.

3           And I don't see what you're reading as one of

4    the factors that FDA said it would consider.  Am I

5    wrong?

6       Q.  So from the standpoint of this self-proclaimed

7    expert in drug regulation, volume by a compounder was

8    irrelevant to the FDA?

9           MR. CHALOS:  Object to the form.

10          MR. ARBITBLIT:  Object to the form.

11   Argumentative.

12          THE WITNESS:  So, again, I was confirmed by the

13   United States Senate, appointed by one president,

14   reconfirmed -- I mean, kept on by a second president,

15   right?  And I ran the agency for seven years.

16          So, again --

17          MR. GIDEON:  Q.  Is volume relevant or

18   irrelevant?

19      A.  I'm taking issue.  You felt it necessary to

20   talk about self-proclaimed.

21      Q.  Yeah.

22      A.  Right?  You didn't need to do that.  Okay?

23          Now let's talk about volume.

24      Q.  Is volume relevant or not relevant?

25      A.  I believe that volume is relevant.  If you read
```



1  was sent to the New England District Office of the FDA?

2       A.  I do know it was in receipt -- yes.

3       Q.  You also know that the New England District

4  Office of the FDA did not send that cease and desist

5  order to the Massachusetts Board of Registration and

6  Pharmacy, don't you?

7       A.  I've read Dr. Hamburg's testimony on that.  In

8  fact, I have the exact language.  Let me tell you what I

9  know.  Dr. Hamburg testified she wished there was better

10 communication.  The Massachusetts Board of Pharmacy said

11 they became aware of it in the -- in 2012.

12      Q.  '12?

13      A.  Right.  I think Dr. Smith testified to that, if

14 my recollection is right.

15      Q.  The interim commissioner, Lauren Smith, of the

16 Massachusetts Board of Pharmacy?

17      A.  She said the executive -- there was something I

18 didn't quite understand.  I have the testimony, let me

19 just get it.

20      Q.  You are free to do it if you wish, but I can

21 tell you that the Penta deposition establishes as well

22 that the Massachusetts Board of Registration and

23 Pharmacy did not get the May 2011 cease and desist order

24 until June or July of 2012.

25      A.  I believe Dr. Hamburg -- and I want to check



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    or safety issue.

 2             And what I'm trying to determine, and there's

 3    other pages of testimony, whether -- that I thought I

 4    read where FDA said to the -- said to Colorado, share

 5    this with Massachusetts.  That's -- again, this

 6    testimony is the extent of my knowledge.

 7         Q.  So how does it answer the question then?

 8         A.  It --

 9         Q.  It doesn't.

10         A.  It tells -- well, she was asked about those

11    questions.  This is the record that I have.

12         Q.  Well, let's look at it -- I assume it's the

13    best you can do in answering my question of whether they

14    did or didn't share the information?  They, being the

15    FDA with the --

16         A.  Well --

17         Q.  Excuse me.

18             -- the Massachusetts Board of Registration and

19    Pharmacy?

20             MR. CHALOS:  Object to the form.

21             THE WITNESS:  Actually, there's more here.

22    This is Dr. Smith:  Just to be clear, while the

23    executive director of the Board of Pharmacy did receive

24    notification from the Colorado Board of Pharmacy

25    regarding the cease and desist, that was done in
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    on the record.

2          MR. GIDEON:  She asked you to be quiet and you

3    didn't.

4          MR. ARBITBLIT:  Counsel, she asked you both

5    equally.

6          MR. GIDEON:  She's looking right at Dr. Kessler

7    who just keeps talking no matter what anybody says.

8          MR. ARBITBLIT:  That's uncalled for.

9          MR. GIDEON:  Q.  Now, one thing, in the

10   limited amount of time you and I have together

11   today, but I do think there will be another

12   opportunity, is for you and I to please speak one at

13   a time so that we can both be kind to the court

14   reporter.  Will you agree to do that?

15       A.  I'd be happy to do that.

16       Q.  All right.  Now, I can't stop you from making a

17   speech about the documents, so will you please do it and

18   get it over with so I can ask a question.

19       A.  You have added to this document on the last

20   page information about the office of the chief counsel

21   at FDA whose -- again, I don't want to characterize it

22   as legal advice, but you've been advised not to go near

23   attorney-client privilege.

24          I think when you are talking about the office

25   of the chief counsel is not doing something, I'll leave

1   wouldn't want to walk into a firm where there's a legal

2   dispute if I were an FDA investigator.  That's not fair

3   to the FDA investigator until they knew whether the

4   office of the chief counsel was going to support them.

5              And again, I think we are very close to

6   deliberative process here.

7         Q.  Now, in October of the same year, pulling

8   FDA 426106 to 107, the same month as this statement that

9   they're not going to go back until there is a reply to

10  the response?

11        A.  That's not what this says.  You

12  mischaracterized that.  It says:  CDER is going to try

13  to set up a conference call with Kevin Fanin and others

14  at the office of the chief counsel next week to try and

15  resolve this.

16             Somebody wants -- I mean, Regina and I were

17  insistent that some sort of letter has to go out before

18  we reinspect.  They're trying to resolve this with their

19  colleagues.

20             (Whereupon, Exhibit 1262 was marked for

21             identification.)

22             MR. GIDEON:  Q.  The same month we have the

23  underlying documents that reflect an outbreak of

24  klebsiella pneumonia on multiple patients in this

25  email that is FDA 426106 to 107 in the city of



1    New York.  Correct?

2            At least 5 and up to 17 individuals exposed to

3    klebsiella pneumonia.  Three hospitalized, two with

4    positive blood cultures, nine have been interviewed

5    without symptoms.  Symptoms -- or the exposure occurred

6    between October 13th and 14th.  The patients received an

7    intravenous version of the drug triamcinolone, brand

8    name Kenalog, made by NECC.

9         A.  Could you kindly pull NECC_FDA 08550, and then

10   zero -- 03476 on October 28th?  What's the date of

11   these?

12           If you can give me the October 28th documents.

13   Go ask your question, but let's pull those documents.

14   Ask your question.

15           MS. WEETER:  What was the first number you

16   said?

17           THE WITNESS:  NECC_FDA 08550.  Then I think it

18   is 03476, but I could be wrong.  But you should have it.

19   One is an October 30th document, and one is an October

20   28th document.

21           But go ahead, ask your question.

22           MR. GIDEON:  Q.  Well, doesn't this

23   document establish that there was a product made by

24   NECC that was used on multiple patients?  Question.

25        A.  That's correct.



Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 68 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                Page 318

```
 1        Q.  Yeah.
 2        A.  But that's not -- I mean, but please do the
 3   full record here.  I believe FDA went to the pain clinic
 4   and decided the pain clinic -- let's find the documents,
 5   but let me have them in front of me.
 6            I believe FDA went and inspected the pain
 7   clinic and found the pain clinic did not have proper
 8   infectious control practices and the problem was at the
 9   pain clinic.  But please pull those documents so we can
10   have those on the record.
11        Q.  Isn't this correct, though, you had a number of
12   people sick, FDA knew that there was product being made
13   and sold by NECC without patient-specific prescriptions,
14   as confirmed by the documents that are right in front of
15   you.
16        A.  So, again --
17        Q.  Simple question.  Is that true or not?
18        A.  So let's just -- so just give me the line.  I
19   haven't read this.  Tell me where it says that.  I'm
20   sure you are right, but just give me the line where it
21   says that.
22        Q.  Well, bullet point one:  At least five and
23   possibly up to 17 individuals exposed to klebsiella
24   pneumonia.
25        A.  Yes.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        Q.   Bullet point four, it was made by NECC.

2   Triamcinolone, also known as Kenalog.

3        A.   Right.

4        Q.   Correct?

5        A.   Again, I think there's some question about the

6   NECC product in the subsequent documents, but I'm not

7   going to -- you know, I need those documents in front of

8   me before testifying.

9        Q.   Doesn't establish that there were not

10   patient-specific prescriptions --

11        A.   Show me where --

12        Q.   -- covering --

13        A.   -- says that --

14        Q.   -- the product used on multiple patients?

15             MR. CHALOS:   Object to form.

16             THE WITNESS:   I'm sorry.   Show me where it says

17   that, please.

18             MR. GIDEON:   Q.   The bottom of the first

19   page.

20        A.   The triamcinolone was provided in a 10

21   multi-vial -- right?   The envelope had on it a

22   prescription --

23        Q.   No, no, no.   Don't skip it.   Read it very

24   carefully.   The envelope reportedly had on it --

25        A.   Reportedly had on it --



1          (Reporter requests one speaker at a time.)

2          MR. GIDEON:  I'll read it.  Quote:  The

3   envelope reportedly had on it a "prescription" for a

4   single patient being seen at the clinic.

5          The clinic drew multiple doses from this

6   single-patient-specific-vial and used this for several

7   patients.

8          Doesn't that establish there were not

9   patient-specific prescriptions for each administration

10   of the NECC product?

11       A.  This certainly seems to be exactly what it

12   says.  It seems to be -- there was a vial with a

13   prescription, okay, I mean, on it, for one patient.  And

14   it looks like somebody reused this for multiple

15   patients.

16          And to be honest with you, I think you have

17   your answer on the klebsiella.  Because why is somebody

18   using a single unit for multiple patients.  So somebody

19   at the pain clinic obviously doesn't know basic

20   infection control, but let's take a look those

21   documents.

22       Q.  Well, the vial doesn't have a prescription on

23   it.  The vial doesn't say anything about being for a

24   specific patient.

25       A.  The envelope did.



```
 1           Q.  The envelope reportedly had on it a

 2     prescription.

 3           A.  It says exactly what it says.

 4           Q.  Correct.  Which is why I asked the question.

 5     Doesn't this make it clear, didn't FDA know that NECC

 6     was selling product that was not being used for specific

 7     patients?

 8               MR. CHALOS:  Object to the --

 9               MR. GIDEON:  Q.  And not being subject to

10     patient-specific prescriptions?

11               MR. CHALOS:  Object to the form.  Misstates the

12     document.

13               MR. GIDEON:  Argumentative.

14               Go ahead.

15               THE WITNESS:  This --

16               MR. CHALOS:  Object to the commentary.

17               THE WITNESS:  And can I see my documents that I

18     requested, please, if you can help me?

19               MS. WEETER:  They're on my computer.  I can

20     read them.  Do we need to read those or do we want to

21     move on?

22               MR. GIDEON:  Q.  I'm going to give

23     Dr. Kessler the opportunity to explain why you need

24     the documents.  And if you can tell us why we should

25     spend time on it we'll do it for you.  But just to
```



1   request the documents to talk about them isn't

2   really pertinent.

3       A.   So you don't -- you're not asking -- you didn't

4   ask what -- whether FDA acted appropriately on this?

5       Q.   No.  I've already asked you some questions --

6       A.   And I --

7       Q.   I'm certain you're going to say that FDA acted

8   in the highest standards of regulatory oversight.  I

9   expect that.

10          MR. CHALOS:  Objection.  Argumentative.

11          MR. ARBITBLIT:  For completeness, I'll read

12  from the document that the witness referred to, which is

13  an October 30, 2000 email from Robert Durkin to Samia

14  Nasr saying:  It seems it was lack of aseptic technique

15  at the clinic level with subsequent contamination of the

16  Visipaque --

17          (Reporter clarification.)

18          MR. ARBITBLIT:  -- Visipaque -- capital

19  V-I-S-I-P-A-Q-U-E -- manufactured by GE Healthcare, end

20  of quote.

21          And the page number of that -- and that's

22  responding to a question from Nasr to Durkin on the same

23  date.  And the question is, quote:  It looks like they

24  ruled out that the problem was from NECC, triple

25  question mark, end of quote.



```
 1              So your attempts are --
 2              MR. GIDEON:  Q.  We'll make that the next
 3   exhibit.  Does that reflect --
 4              MR. ARBITBLIT:  Hold on.
 5              MR. GIDEON:  -- the presence --
 6              MR. ARBITBLIT:  I'll read the number so you can
 7   find it.  It's NECC_FDA 08550, which is part of an
 8   11-page document.
 9              MR. GIDEON:  Q.  Does that reflect the
10   presence of testing on the vial?
11         A.  I have to see the -- you have to give me the
12   document.
13         Q.  Does it reflect testing on the vial?
14         A.  Sounds like it's not an NECC product.
15              MS. WEETER:  It is an NECC --
16              THE WITNESS:  What?
17              MS. WEETER:  They received an NECC product.
18              THE WITNESS:  I'm sorry?
19              MR. GIDEON:  Q.  Does it reflect testing on
20   the vial?
21              THE WITNESS:  Could someone print that?
22              MR. ARBITBLIT:  Object to form.  What vial?
23              MR. GIDEON:  The vial that we've spent five
24   minutes talking about.  The multi-use vial with
25   triamcinolone in it made by NECC.
```



```
 1             I'm just asking --
 2             THE WITNESS:  Can I see that document?
 3             MR. CHALOS:  It's on the screen.
 4             MR. GIDEON:  I'm just asking, Kaycee, does it
 5   reflect testing on the vial?
 6             MS. WEETER:  It looks like they requested
 7   samples or reports from the New York NYC DHMH, and
 8   there's no evidence in here that they had results from
 9   those --
10             MR. GIDEON:  Hmm.
11             MS. WEETER:  -- samples that were --
12             THE WITNESS:  It does say these have been sent
13   to the department's labs.
14             MR. GIDEON:  Q.  Is there anything in there
15   reflecting that what you told me earlier should
16   occur, which is, you go ahead and you look at this
17   material, you get the laboratory data and determine
18   what's in the product to see if it relates to the
19   illness of the patient?  Do you find any reflection
20   of testing of the vial?
21        A.  Yes.  You see it says here, these have been
22   sent to the department's labs.
23        Q.  What's the result?
24        A.  I'm sorry, you have to give me the record if
25   you want me --
```



1      Q.  Well, I suspected, since you asked for the

2   documents earlier, you would have looked yourself to see

3   if the vial was tested.

4      A.  Hold on one second.

5      Q.  And that's the pending question:  Was the vial

6   tested to see if it was contaminated?

7      A.  Let me just read this.

8          MR. ARBITBLIT:  Counsel, I think we're at the

9   end of seven hours.  In the spirit of cooperation, if

10  the witness is willing, we'd like you to have an

11  additional 15 minutes.  You probably aren't going to

12  think that's sufficient, I'm guessing, because we never

13  seem to agree on that.  But that's what we're offering.

14  If you would like to continue with the questioning for

15  an additional 15 minutes, we're willing to stay for

16  that.

17         MR. GIDEON:  Well, I'm happy to take the

18  additional 15 minutes, but it won't be sufficient to

19  complete what I intend to do today.  So if -- I'll take

20  the 15, but not with the agreement that that's it.

21         MR. ARBITBLIT:  I wasn't asking for your

22  agreement.  I wasn't expecting it.

23         MR. GIDEON:  What I want to understand is can I

24  go ahead and take the extra 15, then seek permission

25  from the magistrate to complete this deposition, or is



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2825-1   Filed 04/22/16   Page 76 of 77

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF DAVID A. KESSLER, M.D. on 03/04/2016                    Page 326

```
1    the 15 a "if you take this you have agreed that that's
2    it"?
3              MR. ARBITBLIT:  No, I was not suggesting 15
4    minutes and you are forever barred.  You can seek what
5    you want and we'll oppose it, and we think we're being
6    reasonable.
7              MR. GIDEON:  I appreciate the 15 minutes.  Very
8    gracious.
9              MR. CHALOS:  Would 30 minutes obviate your
10   concern?
11             MR. GIDEON:  No.  I think Dr. Kessler's lack of
12   response to literally every question today has made it
13   such that I've really had just a couple hours to
14   actually ask him questions.  It has been a long time
15   since I've seen a witness this unresponsive, so I will
16   be seeking additional time.  And we'll use examples from
17   today's deposition to attempt to convince the judge to
18   let us have that time.
19             MR. ARBITBLIT:  I expect that you will.  And
20   we'll probably use examples of your improper questioning
21   in response.
22             MR. GIDEON:  Sure.  Well, I don't know what
23   we're doing right now.  He's looking at something, I
24   don't know why, I don't know what he intends to do.
25             THE WITNESS:  You have a question pending, sir.
```



1        MR. GIDEON:  Q.  Well, I asked you did they

2   ever test the vials, which you told us was the gold

3   standard for a response by the regulator.

4        MR. CHALOS:  Object to the form.

5        MR. ARBITBLIT:  Object to form.

6        MR. GIDEON:  Q.  What is the answer to that

7   question?

8      A.  Yes, this was tested.  I'm just trying -- this

9   was tested and I'm just trying to understand.

10     Q.  What were the results, then?

11     A.  I don't have the results in this document, but

12  this was sent for testing.

13     Q.  I know --

14     A.  And it was concluded that there were improper

15  infection control practices at the clinic.

16     Q.  Okay.

17        MR. ARBITBLIT:  May I have the computer back

18  now?

19        THE WITNESS:  Thank you.

20        MR. GIDEON:  Q.  Now, take a look at the

21  exhibit that reflects the materials produced by FDA.

22  The larger document that has the time line, the

23  chronology that's typed.

24     A.  Yes, sir.

25     Q.  Can you give me the exhibit number on that

