# EXHIBIT 7

Excerpt from Deposition of Terry Grinder

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 2 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 1

```
 1            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   IN RE: NEW ENGLAND          )
     COMPOUNDING PHARMACY,       ) MDL No. 2419
 4   INC. PRODUCTS LIABILITY     ) Master Docket No.:
     LITIGATION                  ) 1:13-md-2419-RWZ
 5                               )
     THIS DOCUMENT RELATES TO:   ) Honorable Rya W. Zobel
 6   All Actions                 )
     _____)
 7

 8

 9

10

11

12

13   VIDEOTAPED DEPOSITION OF:

14   TERRY W. GRINDER, DPH

15   Taken on behalf of the Plaintiffs

16   September 14, 2015

17

18

19
     _____
20
              DISCOVERY LITIGATION SERVICES
21                 100 Mayfair Royal
                  181 14th Street, NE
22              Atlanta, Georgia 30309
                    404-847-0999
23

24

25
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 3 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 16

```
 1    contaminated epidural steroid injections that were
 2    imported into Tennessee from a compounding pharmacy
 3    known as the New England Compounding Center?
 4              MR. WELLS:  Object to form.
 5    BY MR. NOLAN:
 6    Q.        You can go ahead and answer.
 7    A.        I knew about the circumstances.  I didn't know
 8    about the litigation --
 9    Q.        Okay.
10    A.        -- until this was served.
11    Q.        Well, when I ask you questions today, I'm going
12    to be asking you about the pharmacy rules and laws as
13    they existed in Tennessee in 2011 and in 2012, before
14    the fungal meningitis outbreak.
15              Do you understand that?
16    A.        Yes.
17    Q.        Okay.  With that in mind, could you tell us
18    what a compounding pharmacy is.
19    A.        Compounding is defined in state law as the
20    prescribing and the preparation of a patient-specific
21    drug product.
22    Q.        Okay.  And so what is the difference between a
23    compounding pharmacy and a licensed pharmaceutical
24    manufacturer?
25    A.        Manufacturers, of course, would be under FDA
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 4 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                    Page 17

```
 1    jurisdiction, and they would be manufacturing bulk
 2    products; whereas a compounding pharmacy typically would
 3    be compounding a patient-specific product based on a
 4    patient -- a prescriber-patient-pharmacy triad.
 5    Q.      Okay.  And is it fair to understand that --
 6    that licensed pharmaceutical manufacturers that receive
 7    the FDA oversight receive a different degree of
 8    oversight than do compounding pharmacies?
 9            MR. TARDIO:  Object to the form.
10    BY MR. NOLAN:
11    Q.      You can go ahead and answer.
12            (Clarification by the reporter.)
13            MR. NOLAN:  Mr. Tardio.
14    BY MR. NOLAN:
15    Q.      You can go ahead and answer.
16    A.      Yes, manufacturers would be under a different
17    scrutiny than -- than a pharmacy.
18    Q.      Okay.  So are drugs that are produced by
19    licensed manufacturers, such as Pfizer, for example, FDA
20    approved?
21    A.      Yes.  If the -- if they're FDA inspected and
22    approved, then those drugs would be approved.
23    Q.      All right.  And how is that different from
24    drugs that are made by compounding pharmacies pursuant
25    to a patient-specific prescription?
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 5 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015
Page 18

1  A.         They would not be under FDA scrutiny if they
2  were properly compounded by a pharmacy.
3  Q.         And do you know whether the FDA approval
4  process for a company such as Pfizer involves patient
5  safety?
6              MR. WELLS:  Object to form.
7              THE WITNESS:  I'm not sure I understand
8  that one.
9  BY MR. NOLAN:
10 Q.         Well, let me ask you this:  Before the fungal
11 meningitis catastrophe, specifically, what did the law
12 require in terms of how compounding pharmacies were
13 permitted to make and distribute medications in
14 Tennessee?
15             MR. TARDIO:  Object to the form.
16             THE WITNESS:  Okay.  Compounding was
17 defined, and it involved the triad, as we mentioned
18 before, of prescriber-patient-pharmacy.  Typically, it
19 was a patient-specific order that would have not been
20 commercially available, and that also allowed for
21 anticipatory compounding, based on prescribing habits of
22 that prescriber.
23 BY MR. NOLAN:
24 Q.         Okay.  And -- and this triad of prescriber,
25 patient, and pharmacy, is that arrangement set up for



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 6 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                    Page 19

```
 1   the purpose of protecting patient safety?
 2   A.      Yes.
 3   Q.      And how does it promote patient safety?
 4   A.      It would allow a pharmacy to compound a
 5   specific product for a patient that might not be able to
 6   use the next nearest commercially available product, and
 7   it would allow the oversight of the Board of Pharmacy in
 8   that process.
 9   Q.      Okay.  And so where is this -- this law about
10   the circumstances under which compounding is legal?
11   Where is it found?
12   A.      Compounding is defined, I believe, in T.C.A.
13   63-10.  And I don't have a copy with me, but I believe
14   it would be under "Definitions" in that section.
15   Q.      Let me hand you a document that we're going to
16   make Exhibit No. 573.  And for the record, this is
17   T.C.A. 63-10-204.
18                (Exhibit No. 573 was marked.)
19   BY MR. NOLAN:
20   Q.      And let me first ask you whether this is the
21   law that you were mentioning a moment ago.
22   A.      Yes, it is.
23   Q.      Okay.  And so this law defines when
24   it's appropriate to engage in compounding; is that
25   correct?
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 7 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 20

```
 1                   MR. TARDIO:  Object to the form.
 2   BY MR. NOLAN:
 3   Q.       You can go ahead and answer.
 4                   MS. PUIG:  Counsel, this is Yvonne.  May I
 5   interrupt only briefly?  Is he looking at one in force
 6   and effect in 2012 or currently?
 7                   MR. NOLAN:  He's looking at the one that
 8   was in force in 2012 that became effective on August
 9   11th, 2010.
10                   MS. PUIG:  Very good.  Thank you so much.
11   I'm going to pull it up.
12                   MR. NOLAN:  Sure.
13                   MS. PUIG:  Thank you.
14   BY MR. NOLAN:
15   Q.       So let me ask it this way:  What does this law
16   do?
17   A.       It allows a pharmacy to provide a specific
18   medication for patients that might not otherwise be able
19   to use the next nearest commercially available product.
20   Q.       Okay.  And so how many circumstances does it
21   list here in which it's appropriate to compound a
22   medication?
23   A.       (A), (B), and (C); it'd be three.
24   Q.       Okay.  And so let's talk about circumstance
25   (A).  What is that circumstance when it's appropriate to
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 8 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 21

```
 1   compound a drug?
 2   A.      That, again, is the triad as a result of the
 3   prescription order initiative based on the
 4   prescriber-patient-pharmacist relationship in the course
 5   of professional practice.
 6   Q.      Okay.  Now, let's look at circumstance (B), and
 7   I'm going to read that into the record.
 8   A.      Okay.
 9   Q.      It says:  "In anticipation of prescription
10   orders based on routine, regularly observed prescribing
11   patterns."
12           Have I read that correctly?
13   A.      Yes.
14   Q.      Okay.  And is that the circumstance that you
15   mentioned involving anticipatory compounding?
16   A.      Yes.
17   Q.      So am I correct in understanding that if a
18   particular compounding pharmacy has a customer -- say,
19   Dr. Smith, for example -- and they know that Dr. Smith
20   writes ten patient-specific prescriptions for a
21   particular medication each week, it's okay for that
22   pharmacy to, on Monday morning, compound ten vials of
23   that particular medicine anticipating that they will
24   actually receive ten patient-specific orders as is
25   Dr. Smith's custom?
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 9 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 22

```
 1                  MR. TARDIO:  Object to the leading.
 2   BY MR. NOLAN:
 3   Q.        You can go ahead and answer.
 4                  MR. WELLS:  Object to form.
 5                  THE WITNESS:  Yes.
 6   BY MR. NOLAN:
 7   Q.        Okay.  So that -- that type of "in anticipation
 8   of prescription" orders based upon routine, regularly
 9   observed prescribing patterns, does it allow for the
10   making of compounded medications in bulk and sending
11   them to some customer without ever receiving
12   patient-specific prescriptions?
13   A.        That was not the idea when the -- when this
14   particular clause was put in, but I'm not an attorney.
15   I can't --
16   Q.        Okay.  Well, since you've been there, or before
17   the fungal men- -- meningitis outbreak, has this
18   language, "In anticipation of prescription orders based
19   on routine, regularly observed prescribing patterns,"
20   always been in this particular law, to your knowledge?
21                  MR. WELLS:  Object to form.
22                  THE WITNESS:  For as long as I recall,
23   yes.
24   BY MR. NOLAN:
25   Q.        Okay.  And then am I right that the third
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 10 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 23

```
 1   circumstance listed here, does that involve research or
 2   testing or -- or analysis-type endeavors?
 3   A.      It does.
 4   Q.      Is that -- what is that, like clinical trials?
 5   Or what sort of circumstance does that come up in?
 6   A.      It could be the drug researches or teaching
 7   purposes or for chemical analysis, but it's not subject
 8   to sale or dispensing.
 9   Q.      And does the individual prescription rule, as
10   found in this statute, allow for the making of -- of
11   bulk medications by compounders for distribution without
12   individual prescriptions?
13           MR. TARDIO:  Object to the form.
14           MR. WELLS:  Object to form.
15           MR. TARDIO:  Asked and answered.
16   BY MR. NOLAN:
17   Q.      You can go ahead.
18   A.      Back to the triad analogy, if any of the three
19   are missing, it would not be typical compounding.
20   Q.      Could I give you a piece of paper, if I could,
21   and ask you to just maybe draw for us kind of a
22   conceptual representation of this triad that you're
23   mentioning (tendering).
24   A.      Sure (drawing).
25           MR. WELLS:  Is that an extra copy, George?
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 11 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015          Page 24

```
 1                MR. NOLAN:  Of the statute?
 2                MR. KRAUSE:  Do you not have one?  We've
 3   got one here.
 4                MR. NOLAN:  We've got one.
 5                THE WITNESS:  There is your (tendering)...
 6                MR. WELLS:  Thank you.
 7   BY MR. NOLAN:
 8   Q.      Could you hold that up to the camera and just
 9   explain --
10   A.      Sure.
11   Q.      -- this to us, what this means.
12   A.      As the patient sees the prescriber, proper
13   treatment is determined, an order is sent to the
14   pharmacy specific for that patient, and the pharmacy
15   dispenses it to the patient.
16   Q.      I see.  Let me make that Exhibit No. 574.
17                (Exhibit No. 574 was marked.)
18                MS. HAMPTON:  I'm sorry; may I see that?
19                MR. NOLAN:  Yes, you can.
20   BY MR. NOLAN:
21   Q.      Let me hand you a document that we're going to
22   make 575.
23                (Exhibit No. 575 was marked.)
24   BY MR. NOLAN:
25   Q.      And, sir, I'm going to represent to you that
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   this is a -- this is a document that has been produced
 2   in the context of this litigation to us, and it's
 3   labeled "Prescription Order Form" at the top.  And you
 4   see NECC's logo there.  And the date is July 24th of
 5   2012.
 6           Now, as you look at this document, do you see
 7   that it appears to be placing an order for two drugs,
 8   one of which is called methylprednisolone?  Do you see
 9   that?
10   A.      Yes.
11   Q.      Okay.  And how many units of this drug are
12   being requested apparently by this order form?
13   A.      It says 500 units.
14   Q.      Okay.  And you see where there is a column for
15   the names of patients?
16   A.      Yes.
17   Q.      And so how many patient names do you see listed
18   on that column?
19   A.      None.
20   Q.      Okay.  Does this order form comply with
21   Tennessee law as far as you're concerned?
22               MR. TARDIO:  Object to the form.
23               MR. WELLS:  Object to form.
24               MR. TARDIO:  Object to the undisclosed
25   expert testimony and legal conclusions.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 13 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                           Page 26

```
 1   BY MR. NOLAN:
 2   Q.        You can go ahead and answer.
 3   A.        This wouldn't meet several of our requirements
 4   for a prescription order.
 5   Q.        Could you tell us what requirements that does
 6   not meet for a prescription order.
 7   A.        Number one would be the name of the patient.
 8   Q.        Okay.
 9   A.        Directions for use.
10   Q.        Okay.
11   A.        And that's -- that'd be the main thing to make
12   it more compliant with a prescription order.
13   Q.        Okay.  Now, I'm going to represent to you that,
14   in addition to using order forms like the one you have
15   in front of you, one of the parties in this case, at the
16   request of NECC, occasionally sent lists of patient
17   names to NECC that did not necessarily correspond with
18   who would receive the drug.
19             So they didn't send a list every time they used
20   an order form like that.  And the few times that they
21   did send a list, the names on the list did not mean that
22   the patients would actually receive that particular
23   medication.  Okay?
24             From a regulatory standpoint in Tennessee, does
25   that arrangement comply with the pharmacy rules as you
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 14 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 27

```
 1   understand them?
 2                MR. TARDIO:  Object to the form.
 3                MR. WELLS:  Object to form.
 4                MR. TARDIO:  Object to the opinion
 5   testimony and legal conclusions.
 6   BY MR. NOLAN:
 7   Q.       You can go ahead and answer.
 8   A.       Can we clarify exactly what you're asking?
 9   Q.       Sure.  What I'm saying is that at some point --
10   I'm saying that one of the parties in this case, a
11   party called Saint Thomas Outpatient Neurosurgical
12   Center, began buying vials of what we call MPA,
13   methylprednisolone acetate, using order forms like this
14   that didn't have patient names on them.
15   A.       Okay.
16   Q.       And that at some point in time, one of the
17   sales reps for NECC asked the facility to send lists of
18   patients.  And the facility explained, Well, we really
19   can't do that.  We have lists we can print out, but that
20   doesn't necessarily correspond with who's going to
21   receive these particular shots.  And the sales rep said,
22   That's okay; just send the list anyway.
23             And then the local facility, the Saint Thomas
24   Outpatient Neurosurgical Center, sent some patient
25   lists, even though they didn't necessarily match up with
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 15 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 28

```
 1   who would receive MPA from that particular pharmacy.
 2            Do you understand so far what I've explained?
 3   A.       Yes.
 4   Q.       Does that comply with the Tennessee rules and
 5   laws as you understand them?
 6                MR. TARDIO:  Same objections.
 7                THE WITNESS:  That would not meet the
 8   requirement for compounding.
 9   BY MR. NOLAN:
10   Q.       Do you know why in the world a compounding
11   pharmacy would ask a customer to send a random list of
12   patient names?
13                MR. TARDIO:  Object to the form.
14                MR. WELLS:  Object to form.
15                THE WITNESS:  Any -- any answer I would
16   have would only be speculation and...
17   BY MR. NOLAN:
18   Q.       Okay.  So if a -- if a company planned to sell
19   medications in Tennessee in bulk without individual
20   patient-specific prescriptions, what type of license
21   would the company need?
22   A.       A manufacturer's license.
23   Q.       Okay.  And so is that the type of license that
24   would be required to sell FDA-approved drugs such as
25   Depo-Medrol made by Pfizer, for example?
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 16 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                                Page 29

```
 1   A.       That would be either a manufacturer or a
 2   wholesaler license.
 3   Q.       Okay.  And what type of license did NECC have?
 4   A.       A pharmacy license.
 5   Q.       All right.  So was NECC authorized to sell
 6   medications in bulk in Tennessee without
 7   patient-specific prescriptions?
 8   A.       They were not properly licensed to do so.
 9   Q.       Now, has -- has your job ever included
10   answering phone calls from healthcare providers who have
11   questions about pharmacy laws?
12   A.       Very much so.
13   Q.       All right.  And do you remember receiving a
14   phone call from a pharmacist named Martin Kelvas, who
15   was the Director of Pharmacy Services at Saint Thomas
16   Hospital in early 2011?
17   A.       I don't recall that specific call or, you know,
18   any specific conversation.
19   Q.       All right.  So does that mean that no such call
20   occurred, or does it mean maybe there was a call and you
21   talk to a lot of people and you don't remember every
22   single call that you --
23   A.       We have lots of calls daily from lots of
24   different people, and I just can't recall the specifics.
25   Q.       All right.  Well, I'll represent to you that
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 17 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015          Page 30

```
 1   Dr. Kelvas has already given some testimony in this case
 2   and that during that testimony, he explained that in
 3   March of 2011, a New England Compounding Center sales
 4   representative came and met with him and solicited the
 5   hospital's business and tried to sell the hospital
 6   compounded medications.
 7             And he didn't think that that arrangement was
 8   appropriate or legal, so he called the Tennessee Board
 9   of Pharmacy, and he talked with you.  And according to
10   him, you basically explained two things:  First, that
11   medications could only be procured from a compounding
12   pharmacy pursuant to a patient-specific prescription
13   involving the three-way relationship that you've
14   explained.
15   A.        Uh-huh.
16   Q.        And secondly, that medications can only be
17   purchased without prescriptions from someone with a
18   manufacturer's license.
19             Is that -- is Mr. Kelvas's description in that
20   regard consistent with what you would typically tell
21   people back in the 2011 time frame?
22             MR. TARDIO:  Object to the form.
23             MR. WELLS:  Object to form.
24   BY MR. NOLAN:
25   Q.        You can go ahead and answer.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 18 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                 Page 31

```
 1   A.      Yes.
 2   Q.      Okay.
 3           MS. PUIG:  Mr. Nolan, could you repeat the
 4   question.  At the middle of it, your voice trailed off.
 5           MR. NOLAN:  I think it would be best if we
 6   had the court reporter read back the question.
 7           MS. PUIG:  Very good.  Thank you so much.
 8           (Requested portion read.)
 9           MR. NOLAN:  And could you go ahead and
10   read the answer.
11           COURT REPORTER:  The answer was "yes."
12   BY MR. NOLAN:
13   Q.      So when -- back in the 2011 time frame, if
14   someone called with a question about buying medications
15   from a compounding pharmacy, what would you typically
16   tell them?
17   A.      We would have told them that a compounding
18   pharmacy could only dispense products that's prepared
19   under the triad definition of compounding, and it had to
20   be patient specific.
21   Q.      And is that the explanation that you would give
22   to anyone who would call with a question like that?
23   A.      Yes, it is.
24   Q.      Okay.  So would that mean you would give the
25   same answer, whether the person calling is a hospital
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 19 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                Page 32

```
 1   pharmacist or the manager or director of an ambulatory
 2   surgery center?
 3                MR. TARDIO:  Object to the form.
 4   BY MR. NOLAN:
 5   Q.      You can go ahead and answer.
 6   A.      Yes.
 7   Q.      Let me hand you a -- a document that we've
 8   already made Exhibit No. 526 in this litigation.  And,
 9   Dr. Grinder, I'm going to represent to you that this is
10   a document that was produced to us by the Saint Thomas
11   Outpatient Neurosurgical Center, and it consists of some
12   of the written information that the New England
13   Compounding Center provided to that particular clinic.
14   Okay?
15           And if we look on the second page, you see
16   paragraph G, which reads "Dispensing"?
17   A.      Yes.
18   Q.      Okay.  And I want to read it into the record.
19   It says, "Product is dispensed by patient-specific
20   prescription only.  There must be a specific
21   practitioner-patient-pharmacist relationship to dispense
22   to an individual patient or facility."
23           Have I read that correctly?
24   A.      Yes.
25   Q.      And is that statement consistent with or
```



Case 1:13-md-02419-RWZ   Document 2845-7   Filed 05/03/16   Page 20 of 20

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF TERRY W. GRINDER, DPH on 09/14/2015                              Page 33

```
 1   similar to what you would tell people if they called
 2   your office with questions about how compounding
 3   pharmacies were supposed to work?
 4   A.       It would be.
 5   Q.       Now, I'd like to talk with you for a moment, if
 6   I could, about the rules that apply to the -- the
 7   labeling of compounded medications.
 8            Are you generally familiar with those rules?
 9   A.       Yes.
10   Q.       And could you tell us basically how compounded
11   medications were supposed to be labeled if they were
12   being distributed to patients in Tennessee.
13   A.       A prescription label should include at least
14   the patient's name, drug name and strength, and
15   directions for use, as well as the date it was
16   dispensed.
17   Q.       And have you brought with you today a vial of
18   methylprednisolone acetate that the Tennessee Board of
19   Pharmacy procured during its inspection of the Saint
20   Thomas Outpatient Neurosurgical Center?
21   A.       Actually, it was procured, I think, by the
22   Department of Health --
23   Q.       Okay.
24   A.       -- not the Board of Pharmacy.  But, yes, I do
25   have a vial.
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com