EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE: NEW ENGLAND
COMPOUNDING PHARMACY,
INC. PRODUCTS LIABILITY      MDL No. 2419
LITIGATION

Master Dkt:
1:13-md-02419-RWZ

~~~~~~~~~~~~~~~~~~~~~
THIS DOCUMENT RELATES
TO:


All Actions


~~~~~~~~~~~~~~~~~~~~~~~~~


30(b)(6) VIDEOTAPED DEPOSITION OF
MARTIN KELVAS


1:07 p.m.
August 26, 2015



Suite 2600
5 Concourse Parkway
Atlanta, Georgia



Blanche J. Dugas, RPR, CCR No. B-2290

```
 1                    APPEARANCES OF COUNSEL

 2
      On Behalf of the Plaintiffs:
 3         GEORGE NOLAN, Esquire
           Leader, Bulso & Nolan, PLC
 4         Suite 1740
           414 Union Street
 5         Nashville, Tennessee  37219
           (615) 780-4114
 6         (615) 780-4122 (facsimile)
           gnolan@leaderbulso.com
 7
           DANIEL L. CLAYTON
 8         Kinnard, Clayton & Beveridge
           127 Woodmont Boulevard
 9         Nashville, Tennessee  37205-2240
           (615) 297-1007
10         (615) 297-1505 (facsimile)
           dclayton@kcbattys.com
11
           J. GERARD STRANCH, IV, Esquire
12         BENJAMIN A. GASTEL, Esquire
           Branstetter, Stranch & Jennings, PLLC
13         223 Rosa L. Parks Avenue, Suite 200
           Nashville, Tennessee  37203
14         (615) 254-8801
           (615) 250-3937 (facsimile)
15         gerards@branstetterlaw.com

16    On Behalf of St. Thomas Health, St. Thomas Network,
      St. Thomas West Hospital f/k/a St. Thomas Hospital:
17         YVONNE K. PUIG, Esquire
           ERIC J. HOFFMAN, Esquire
18         Norton, Rose, Fulbright
           Suite 1100
19         98 San Jacinto Boulevard
           Austin, Texas 78701
20         (512) 536-2450
           (512) 536-4598 (facsimile)
21         yvonne.puig@nortonrosefulbright.com
           eric.hoffman@nortonrosefulbright.com
22

23

24

25
```

1    On Behalf of Saint Thomas Outpatient Neurosurgical
     Center, LLC; Howell Allen, a Professional Corporation;
2    John W. Culclasure, M.D.; Debra V. Schamberg, RN:
          CHRISTOPHER TARDIO, Esquire
3         Gideon, Cooper & Essary, PLC
          Suite 1100
4         315 Deaderick Street
          Nashville, Tennessee 37238
5         (615) 254-0400
          (615) 254-0459 (facsimile)
6         chris@gideoncooper.com

7    On Behalf of Specialty Surgery Center - Crossville,
     PLLC; Kenneth R. Lister, M.D.; Kenneth R. Lister,
8    M.D., PC:
          KENT E. KRAUSE, Esquire
9         Brewer, Krause, Brooks, Chastain & Burrow, PLLC
          Suite 2600
10        611 Commerce Street
          Nashville, Tennessee  37203
11        (615) 630-7755
          (615) 256-8985 (facsimile)
12        kkrause@bkblaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              APPEARANCES VIA VIDEOSTREAM

 2
     On Behalf of Ocean State Pain Management, Inc. and
 3   Abdul Barakat, M.D.:
            THOMAS M. DOLAN, III, Esquire
 4          Capplis, Connors & Carroll, PC
            Suite 330
 5          18 Tremont Street
            Boston, Massachusetts  02108
 6          (617) 227-0722
            (617) 227-0772 (facsimile)
 7          tdolan@capplisconnors.com

 8   On Behalf of Dallas Back Pain Management/Momentum
     Pain Management and Abbeselom Ghermay, M.D.:
 9          HEATHER KANNY, Esquire
            Fraley & Fraley, LLP
10          Suite 6300
            901 Main Street
11          Dallas, Texas 75202-3773
            (214) 761-6468
12          hkanny@fraley-law.com

13   On Behalf of Tim I. Chowdhury, M.D.:
            BARTHOLOMEW T. FREEZE, Esquire
14          Freund, Freeze & Arnold
            Suite 800
15          65 E. State Street
            Columbus, Ohio 43215-4247
16          (614) 255-7567
            (614) 827-7303 (facsimile)
17          bfreeze@ffalaw.com

18   On Behalf of Advanced Pain & Anesthesia Consultants
     PC, BKC Pain Specialists, and Cincinnati Pain
19   Management Consultants, Inc.:
            CAROLINE M. KELLY, Esquire
20          Morrison Mahoney, LLP
            250 Summer Street
21          Boston, Massachusetts  02210
            (617) 737-8885
22          (617) 342-4802 (facsimile)
            ckelly@morrisonmahoney.com

23

24

25
```

Page 5

```
 1    On Behalf of a Defendant Party:
           JOSEPH C. KLAUSING, Esquire
 2         O'Bryan, Brown & Toner, PLLC
           1500 Starks Building
 3         455 South 4th Street
           Louisville, Kentucky  40202
 4         (502) 585-4700
           klausingj@obtlaw.com
 5

 6    Also Present:
      Henry Stewart, videographer
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 64

1           close to 70 hospitals, that was a big deal

2           to get something coordinated at that level,

3           and that's what the committee was busy

4           doing.

5      Q.     (By Mr. Stranch)  And would that filter

6   down, not just to hospitals, but to clinics and other

7   surgery centers and everything within the Ascension

8   umbrella or was this focused on hospitals only?

9           MS. PUIG:  Object to the form.

10     Q.     (By Mr. Stranch)  You can answer.

11           MS. PUIG:  Ask him to restate it.

12           THE WITNESS:  Okay.  If you can

13        restate.

14           MS. PUIG:  Sorry.  Because I'm

15        objecting and you're losing it.  Ask him to

16        restate it.

17           THE WITNESS:  Yeah, if you can

18        restate the question.

19     Q.     (By Mr. Stranch)  Did the pharmacy council

20   only work on behalf of hospitals owned by Ascension or

21   was it for all entities that Ascension owned, clinics,

22   whatever?

23     A.     That's a good question.  I -- it was mostly

24   the hospitals.  I was -- I had no knowledge beyond the

25   hospital practices at all these different sites

1   because it was voluminous.  There was predominantly

2   the pharmacies within the hospitals and whatever they

3   were responsible for for drug distribution.

4        Q.     Okay.

5        A.     Yeah.

6        Q.     So -- but you are aware that Ascension owns

7   more than just hospitals; correct?  They own other

8   medical service facilities, ambulatory surgery

9   centers.  They own clinics and other things of that

10  nature; correct?

11       A.     I was aware that they had diverse

12  businesses that they owned.  I was not -- detailed

13  knowledge of them, nor knowledge of how they bought or

14  sold their drugs or how they administered them.  I was

15  only aware of our ministry in the Nashville area as to

16  what we did and how we purchased and distributed

17  medications.  I wasn't privy to all of -- all of the

18  ministries throughout the United States.  So I really

19  can't answer that question beyond that.

20       Q.     Okay.  So you don't know if the pharmacy

21  council applied to nonhospital entities owned by

22  Ascension or not?

23       A.     No.  Our contracts were basically for the

24  nonprofit side of the business.  As far as any

25  for-profit ventures, that's a whole different class of

1  trade.  We had nothing to do with them.

2      Q.     So anything that was on the nonprofit side,

3  either because it was owned on the nonprofit side or

4  operated by the nonprofit side, would be covered by

5  the pharmaceutical council; correct?  Or the pharmacy

6  council; correct?

7          MS. PUIG:  Would be or would not be?

8          MR. STRANCH:  Would be covered by the

9      pharmacy council.

10         THE WITNESS:  The nonprofit side

11     only.

12     Q.     (By Mr. Stranch)  Yes.  That's correct.

13     A.     Yes.

14     Q.     And St. Thomas Hospital fell within the

15  nonprofit side; correct?

16     A.     Yes.

17     Q.     Okay.  Does that also apply to network and

18  health?  St. Thomas Network and St. Thomas Health also

19  fell within the nonprofit side?

20     A.     The network, yes.  I couldn't tell you -- I

21  didn't have a list.  I only knew what I was dealing

22  with at St. Thomas Hospital.  We had a limited number

23  of clinics that we were told were part of the network.

24  They were considered a cost center of the hospital.

25     Q.     Okay.

1              MR. HOFFMAN:  We need to clarify

2       network.  You mean St. Thomas Network?

3              MR. STRANCH:  That's correct.

4              THE WITNESS:  I'm not -- I don't know

5       the exact definition of the network.  We

6       called the network was the nonprofit side.

7       It would be those cost centers that were

8       within the hospital that we were told yes,

9       this is a cost center of the hospital.  We

10      can work with them and order some

11      medications for them, but anybody on the

12      for-profit side that were not part of the

13      network, we could not go there.  We could

14      not have any talks or discussions with them

15      in regards to drug purchases or sales.

16      Q.    (By Mr. Stranch)  Do you know what was on

17   the nonprofit side, what entities those were?

18      A.    We had a list.

19      Q.    I mean, are they 12 entities there, 20

20   entities there?

21      A.    I don't remember.  It's probably changed

22   since I've been there.  It was very small.  There were

23   maybe four or five.  That was about it.

24      Q.    Was STOPNC on that list?

25      A.    No.

1      A.      That's all.

2      Q.      Okay.  Good.

3              MR. GASTEL:  I'm confused by Yvonne's

4       objections, too.

5              MS. PUIG:  I'm going to object to

6       your objection.

7              THE WITNESS:  I think I'm walking

8       home.

9              MR. STRANCH:  We'll give you a ride.

10      Don't worry.

11              MS. PUIG:  That would be quite awry.

12       I want to be the hood ornament for that car

13       ride.

14      Q.      (By Mr. Stranch)  Okay.  So I want to try

15   to talk about this conversation with Terry Grinder.

16   My understanding of your -- and I may be putting words

17   into your mouth, and so if I do, please correct me.

18   I'm not trying to.

19              My understanding is that Mr. Grinder told

20   you that you could not purchase from -- as a hospital,

21   you could not purchase from a compounding pharmacy in

22   bulk and then hold it and resell it; is that correct?

23      A.      He went a step further.  He said you can't

24   buy any product from them and resell it.  It had, you

25   know, this relationship of one prescription, one drug.

1    He gave me the illustration of a triangle.  You have

2    the physician, the patient and the pharmacy.  You're

3    now putting a second pharmacy in this triangle.

4    Doesn't belong there.  That's the problem.  It was a

5    great illustration.

6              So having two pharmacies, it's -- your one

7    pharmacy is compounding for the other pharmacy, and

8    it's selling to one and then the pharmacy is selling

9    again to the patient.  He said that -- that, in his

10   interpretation was not legal.

11       Q.    Okay.

12       A.    That's the problem.

13       Q.    But this -- your understanding is this

14   would have been okay if the second compounding

15   pharmacy had held a manufacturer's license; correct?

16       A.    That is correct.

17       Q.    Okay.

18       A.    Because now it's not a pharmacy.  It's a

19   manufacturer.  That's a different entity, a different

20   licensure.  They're licensed in the State of Tennessee

21   as a manufacturer or they're -- they're licensed

22   somewhere as a manufacturer and inspected by the FDA.

23       Q.    Okay.

24       A.    So you can do that.  That's the model that

25   works.

Page 98

1       Q.      Okay.

2       A.      Yeah.

3       Q.      And so within this triangle that you just

4    described, who within that triangle of patient,

5    doctor, pharmacy is responsible for patient safety?

6       A.      They all are, including the patient.

7       Q.      Okay.

8       A.      Everyone has a responsibility.

9               I mean, we could spend the rest of the

10   afternoon talking about patient safety.  I'm trying to

11   answer your questions and be specific.

12      Q.      I appreciate that.

13      A.      Yeah.

14      Q.      And that's why I'm asking.

15              So within the triangle, for the patient

16   safety, the -- what would be the pharmacy's

17   responsibility as it relates to patient safety?

18      A.      Patient safety starts with receiving the

19   order from the physician.  So that you do due

20   diligence to reviewing the order to make sure it's the

21   right drug for the right patient, the right dose.

22   There's no contraindications.  No drug-drug

23   interactions, so on and so forth.

24              And then the preparation of the product,

25   whatever that is, if there is preparation involved.

1   Repackaging, compounding, whatever.  So that's a safe

2   product and labeling that product in a hospital

3   setting so that the nurse can administer it.

4              It's different than retail.  So we won't go

5   to retail discussion right now.

6      Q.      But the situation in which -- okay.  So

7   that would be the pharmacy's responsibility as to

8   patient safety in the traditional three triangle

9   without the pharmacy being a retail pharmacy; correct?

10     A.      In a hospital setting.

11     Q.      In a hospital setting?

12     A.      Yeah.

13     Q.      Would that also apply to in a clinical

14  setting, like an ambulatory surgery center?

15             MR. KRAUSE:  Object to the form.

16     Q.      (By Mr. Stranch)  You can answer the

17  question.

18     A.      It's a different scenario.  In a clinic

19  setting, there's no pharmacy.  Again, we can talk all

20  afternoon about how I feel about that, but that's my

21  philosophy and that's a whole different discussion.

22  The triangle is different, if you will.  The

23  relationship, you have the patient and the doctor and

24  the clinic.  There's no pharmacy necessarily in that

25  equation.  The clinic, the physician is allowed to buy

1    and purchase pharmaceuticals.  Now we're talking about

2    a different class of trade now.  There's no pharmacy

3    in that equation.  Do I agree with that?  Well, that's

4    my own -- I have my own opinion.  I'm not going to go

5    there right now.

6              But you have a physician and a patient

7    relationship that is protected, and the physician can

8    purchase drugs.  They're allowed to do that.  They're

9    licensed to do so, and they can administer it to the

10   patient.  There's no pharmacy involved in that

11   equation.  We're out of the loop.

12      Q.     Briefly, what is your -- what is your

13   concern with that setup?

14              MR. TARDIO:  Object to the form.

15              THE WITNESS:  Yeah.  I mean, my

16        opinion has maybe no bearing on this

17        because the law allows it and it's

18        considered legal, and the physician is

19        assuming the responsibility to whatever

20        they buy, it's a good product, reliable and

21        meets all the requirements before the drug

22        is utilized and administered to the

23        patient.  The nurse may administer it so

24        the doctor usually does -- well, sometimes

25        the doctor, but it depends on the

```
 1                     DISCLOSURE

 2
             Pursuant to Article 10.B of the Rules
 3    and Regulations of the Board of Court
      Reporting of the Judicial Council of
 4    Georgia which states:  "Each court reporter
      shall tender a disclosure form at the time
 5    of the taking of the deposition stating the
      arrangements made for the reporting
 6    services of the certified court reporter,
      by the certified court reporter, the court
 7    reporter's employer or the referral source
      for the deposition, with any party to the
 8    litigation, counsel to the parties, or
      other entity.  Such form shall be attached
 9    to the deposition transcript," I make the
      following disclosure:

10
             I am a Georgia Certified Court
11    Reporter.  I am here as a representative of
      Discovery Litigation Services, LLC.
12    Discovery Litigation Services, LLC was
      contacted to provide court reporting
13    services for the deposition.  Discovery
      Litigation Services, LLC will not be taking
14    this deposition under any contract that is
      prohibited by O.C.G.A. 9-11-28(c).

15
             Discovery Litigation Services, LLC
16    has no contract/agreement to provide
      reporting services with any party to the
17    case, any counsel in the case, or any
      reporter or reporting agency from whom a
18    referral might have been made to cover this
      deposition.

19
             Discovery Litigation Services, LLC
20    will charge its usual and customary rates
      to all parties in the case, and a financial
21    discount will not be given to any party to
      this litigation.

22

23
                         Blanche J. Dugas
24                       CCR No. B-2290

25
```

Page 240

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4            I hereby certify that the foregoing

5        transcript was reported, as stated in the

6        caption, and the questions and answers

7        thereto were reduced to typewriting under

8        my direction; that the foregoing pages

9        represent a true, complete, and correct

10       transcript of the evidence given upon said

11       hearing, and I further certify that I am

12       not of kin or counsel to the parties in the

13       case; am not in the employ of counsel for

14       any of said parties; nor am I in any way

15       interested in the result of said case.

16

17

18

19

20            BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

Page 241

1                        CAPTION

2

3            The Deposition of MARTIN KELVAS, taken in

4    the matter, on the date, and at the time and place set

5    out on the title page hereof.

6            It was requested that the deposition be

7    taken by the reporter and that same be reduced to

8    typewritten form.

9            It was agreed by and between counsel and

10   the parties that the Deponent will read and sign the

11   transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 242

1                        CERTIFICATE

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4              Before me, this day, personally appeared,

5    MARTIN KELVAS, who, being duly sworn, states that the

6    foregoing transcript of his deposition, taken in the

7    matter, on the date, and at the time and place set out

8    on the title page hereof, constitutes a true and

9    accurate transcript of said deposition.

10

11   _____

12   MARTIN KELVAS

13

14             SUBSCRIBED and SWORN to before me this

15   _____day of_____, 20____ in the

16   jurisdiction aforesaid.

17

18   _____        _____

19   My Commission Expires        Notary Public

20

21   *If no changes need to be made on the following two

22   pages, place a check here _____, and return only this

23   signed page.*

24

25

Page 243

```
 1              DEPOSITION ERRATA SHEET

 2

 3  DLS Assignment No.  23352

 4  Case Caption:  In Re.  New England Compounding Company

 5              Products Liability Litigation

 6

 7  Witness:  MARTIN KELVAS - 08/26/2015

 8

 9          DECLARATION UNDER PENALTY OF PERJURY

10  I declare under penalty of perjury that I have read

11  the entire transcript of my deposition taken in the

12  captioned matter or the same has been read to me, and

13  The same is true and accurate, save and except for

14  changes and/or corrections, if any, as indicated by me

15  on the DEPOSITION ERRATA SHEET hereof, with the

16  understanding that I offer these changes as if still

17  under oath.

18

19  Signed on the _____ day of

20  _____, 20____.

21

22  _____

23  MARTIN KELVAS

24

25
```

Page 243

1                    DEPOSITION ERRATA SHEET

2

3    DLS Assignment No.  23352

4    Case Caption:  In Re.  New England Compounding Company

5                    Products Liability Litigation

6

7    Witness:  MARTIN KELVAS - 08/26/2015

8

9            DECLARATION UNDER PENALTY OF PERJURY

10   I declare under penalty of perjury that I have read

11   the entire transcript of my deposition taken in the

12   captioned matter or the same has been read to me, and

13   The same is true and accurate, save and except for

14   changes and/or corrections, if any, as indicated by me

15   on the DEPOSITION ERRATA SHEET hereof, with the

16   understanding that I offer these changes as if still

17   under oath.

18

19   Signed on the _19th_ day of

20   _October_, 20_15_.

21

22   _____

23   MARTIN KELVAS

24

25

## DEPOSITION ERRATA SHEET

| Page and line | Change to | Reason for change |
|---|---|---|
| GLOBAL | "St. Thomas Health" should be "Saint Thomas Health" | Transcription error |
| GLOBAL | "St. Thomas Network" should be "Saint Thomas Network" | Transcription error |
| GLOBAL | "St. Thomas Entities" should be "Saint Thomas Entities" | Transcription error |
| GLOBAL | "Beckom" should be "Beckham" | Transcription error |
| 1 | Remove reference to "30(b)(6)" | Transcription error |
| 15/16 | Change "them" to "him" | Transcription error or misspoke |
| 23/7 | "stopped" should be "started" | Transcription error or misspoke |
| 25/24 | Change "Carmichael" to "Carmen" | Misspoke |
| 26/12 | Change "of it" to "the severance letter" | Clarification |
| 27/25 | Change "Ebel" to "Boal" | Transcription error |
| 32/11 | Change "direct report" to "supervisor" | Misspoke |
| 43/18 | Change "upstanding" to "standing" | Transcription error |
| 45/13 | Change "law" to "log" | Transcription error |
| 45/14 | Change "Ebel's" to "Boal's" | Transcription error |
| 52/10 | Change "Tagatzs" to "Tagatz" | Transcription error |
| 61/12 | Change "PT and T" to "P and T" | Transcription error or misspoke |
| 66/23 | Insert "non-profit" before "clinics" | Clarification |
| 67/5 | Insert "What" before "we" | Transcription error or misspoke |
| 68/3 | Change to "That's what I was led to believe, if by Ascension Entities you're referring to Saint Thomas Health" | Clarification |
| 71/21 | Change "antirooms" to "anterooms" | Transcription error |
| 82/23 | Change "Ebel's" to "Boal's" | Transcription error |
| 98/20 | Change "reviewing" to "review" | Transcription error or misspoke |
| 104/19 | Insert "a" after "had" | Transcription error or misspoke |
| 120/13 | Change "an inference" to "a reference" | Transcription error or misspoke |
| 160/16 | Change "now" to "not" | Transcription error |
| 166/9 | Change "Giomi" to "Giamei" | Transcription error |
| 167/19 | Insert "non-profit" before "clinics" | Clarification |
| 184/5 | Change "you're" to "your" | Transcription error |

SIGNATURE: _____   DATE: _10-19-15_