UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO:<br><br>All cases concerning Specialty Surgery Center, Kenneth R. Lister, M.D., and Kenneth Lister, M.D., P.C.<br>_____ | MDL No.: 2419<br><br>Judge Rya W. Zobel |

**MEMORANDUM OF LAW IN SUPPORT MOTION FOR PROTECTIVE ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(c)**

Defendants, Specialty Surgery Center, PLLC ("SSC"), Kenneth R. Lister, M.D. ("Dr. Lister"), and Kenneth Lister, M.D., P.C. ("Dr. Lister's Practice") (collectively "the SSC Defendants"), file this Memorandum of Law in support of their Motion for Protective Order pursuant to Federal Rule of Civil Procedure 26(c).

## BACKGROUND

1. **Introduction**

SSC is an ambulatory surgery center in the rural town of Crossville, Tennessee.[1] It was a small practice, employing 15 employees and was owned in part by Dr. Lister.[2] SSC's computer system was managed remotely by a company in California retained at the recommendation of SSC's management company, Calisher & Associates.[3]

---

[1] Crossville has a population of about 10,000 people, as of the 2010 census. QuickFacts Crossville city, Tennessee, US CENSUS BUREAU, http://www.census.gov/quickfacts/table/PST045215/4718540 (last visited May 23, 2016).
[2] Lister Aff. ¶ 2, 4, attached hereto as Exhibit 1.
[3] Lister Aff. ¶ 5.

1

ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

Vials of fungal contaminated methylprednisolone acetate ("MPA") manufactured by the New England Compounding Company, Inc. d/b/a the New England Compounding Center ("NECC") caused this multi-state outbreak of fungal meningitis. NECC sold contaminated methylprednisolone to SSC. Dr. Lister, without knowledge or reason to know of the contamination, and believing that the preservative-free MPA was the best medication for his patients, and those of SSC, administered the MPA to Plaintiffs as part of epidural steroid injections in 2012. On September 26, 2012, SSC received a voluntary product recall notice from NECC, recalling the MPA sold to SSC[4]. Shortly thereafter, SSC retained counsel.[5] Counsel for SSC and SSC's employees communicated via email accounts stored on computers at SSC up to the time of the sale of SSC' assets in 2013.[6]

In 2013, SSC sold its assets to Cumberland Medical Center.[7] Included in the sale were computers used by SSC's staff members to communicate with its attorneys.[8] The computers were apparently sold without being erased. In January 2016, the PSC issued a subpoena for inspection and copying the computers.

SSC files this motion and supporting memorandum to protect any privileged information on the computers. The fact that the computers changed hands from SSC to Cumberland Medical Center as part of the asset sale does not automatically destroy privilege. The information remains privileged, and the PSC should not be allowed free access to attorney-client communications, work product, and peer review or quality

---

[4] Dep. Jean Atkinson, p. 114-115, wherein she testified "Kim, the administrator, got [the recall] off the fax on the 26th at about 3:30, which I was gone for the day so she said she put it on my desk that evening."
[5] Cline Affidavit, ¶ 3, attached as Exhibit 2.
[6] Cline Affidavit, ¶ 5.
[7] Purchase Agreement, Exhibit 3.
[8] Exhibit 3; Lister Aff, ¶ 7-8; Atkinson Aff. ¶ 2 (attached as Exhibit 4).

2

improvement information, solely because SSC sold its computers months after the outbreak. SSC seeks a protective order permitting it the opportunity to review and redact privileged information from the computers before it is produced to the PSC.[9][10][11]

### 2. Sale of SSC's assets to Cumberland Medical Center

On May 3, 2013, SSC entered into an Asset Purchase Agreement with Cumberland Medical Center, Inc. ("CMC").[12] Under that agreement, SSC sold its 1) real property, 2) tangible personal property, 3) medical records, 4) regulatory permits, and 5) goodwill, to CMC.[13] On June 27, 2013, SSC executed a Bill of Sale, selling CMC its personal property, including its computers.[14] Undersigned counsel for SSC in this litigation did not advise SSC on the sale of its assets to CMC.[15]

Prior to the sale of the computers to CMC, counsel for SSC made electronic copies of (1) the email accounts of SSC's employees from the SSC computers, including accounts of the employees involved with the purchases from NECC, and (2) electronic data identified by SSC's staff as related to NECC, to preserve the information for litigation purposes.[16]

---

[9] The PSC recently filed a motion for a protective order relative to information contained on the computers. (Docs 2841 & 2848) It is the understanding of SSC that should that order be entered, following certain protocols, Cumberland Medical Center will begin the process of turning the data over to a third-party, and ultimately into the hands of the PSC after Cumberland Medical Center has had an opportunity to review the documents for its own privilege, work product, and patient protected health information.

[10] SSC will produce a privilege log covering any documents withheld following this privilege review. The PSC can then challenge whether specific privileges apply to specific documents. The Court need not determine the applicability of specific privileges to decide the instant motion.

[11] Alternatively, the Court could include the privilege review procedure requested by SSC in the protective order jointly sought by the PSC and Cumberland Medical Center at Doc. 2848.

[12] Exhibit 3.

[13] Exhibit 3.

[14] Exhibit 3.

[15] Cline Affidavit, ¶ 4.

[16] Cline Affidavit, ¶ 9.

SSC did not erase the data from its computers when they were sold to CMC.[17] Likewise, it appears that CMC has not erased the data from the computers since they were sold in 2013.[18] According to limited discussions with counsel for CMC, some of the computers have been in use by staff members and some have simply been in storage.[19] The computers still likely contain confidential, privileged information from the time of SSC's operation.[20]

### 3. The PSC's subpoena

On January 29, 2016, the Plaintiffs' Steering Committee ("PSC") issued a Subpoena to Produce Documents, Information or Objects to CMC seeking, in pertinent part,

> For forensic inspection and analysis, all computer servers, internal and external hard drives, back-up systems and any other electronic repository device or devices received or acquired from SSC in connection with your acquisition of SSC, including but not limited to all computers sold by SSC to Cumberland as outlined in Exhibit A to the Bill of Sale executed at the closing of the Asset Purchase on June 27, 2013.[21]

This request seeks ESI contained on SSC's computers sold to CMC. The data on the SSC computers (now owned by CMC) likely still includes attorney-client communications, attorney work product, and information protected by the Tennessee Peer Review Law of 1967, Tenn. Code Ann. § 63-6-219 and/or the Tennessee Patient Safety and Quality Improvement Act of 2011, Tenn. Code Ann. §§ 63-1-150, 68-11-272.[22]

---

[17] Lister Aff. ¶ 8.
[18] Krause Aff. ¶ 5 (attached as Ex. 5).
[19] Krause Aff ¶ 2.
[20] Krause Aff. ¶ 5.
[21] Doc. 2617.
[22] Krause Aff. ¶ 5; Atkinson Aff. ¶ 2, 3, 4.

ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

Counsel for SSC has asked counsel for CMC whether privileged communications between SSC's employees and SSC's counsel are on the computers.[23] CMC's counsel reported that communications with SSC counsel are still on the computer, but has not shared that nature or extent of the privileged data on the computers.[24]

### 4. Meet and confer process

The PSC and CMC agreed that, in lieu of making copies of the entire hard drives for the computers, search terms will be used to identify relevant ESI. CMC will then conduct a privilege review of the materials.[25]

The PSC initially agreed SSC should have an opportunity to review the information for privilege before the information is produced to the PSC. In an email dated March 2, 2016, the PSC acknowledged that SSC intended to review the information from the computers prior to production, and the PSC agreed to "work that into the protocols" as to permit SSC "access to those materials first, for the purposes of attorney review (for HIPAA, privilege, etc.)."[26]

Apparently believing it had stumbled into a backdoor to privileged information, the PSC reneged on the agreement.[27] Put simply, even the PSC originally conceded to the propriety of the relief sought by SSC.

---

[23] Krause Aff. ¶ 3, 4
[24] Krause Aff. ¶ 5.
[25] SSC understands that Cumberland Medical Center's privilege review will cover only materials Cumberland Medical Center deems privileged, not information over which SSC holds the privilege. In other words, Cumberland Medical Center will withhold as privileged communications between its employees and counsel, but not communications between SSC's employees and counsel.
[26] (See Ex 6, March 2, 2016 email Orlandi-attorney for PSC to Wehmeier-attorney for Cumberland, cc to Krause-attorney for SSC. Highlighted for relevant part.)
[27] (See Ex. 7, March 9 2016 email Orlandi-attorney for PSC to Krause – attorney for SSC).

ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

**LAW AND ARGUMENT**

1. **Standard of Review**

The Court may issue a protective order "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery of certain matters." Fed. R. Civ. P. 26(c)(1)(D). A party seeking a protective order has the burden of establishing that it is warranted. See Fed. R. Civ. P. 26(c); see also Haemonetics Corp. v. Baxter Healthcare Corp., 593 F. Supp. 2d 298, 301 (D. Mass. 2009) ("[t]he burden of demonstrating good cause rests on the proponent of the protective order").  A protective order should issue to protect privileged information from disclosure. Poliquin v. Garden Way, Inc., 989 F.2d 527, 532 (1st Cir. 1993) (citing Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984) ("[t]he district court has 'broad discretion' to decide 'when a protective order is appropriate and what degree of protection is required'")); see also State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust, 209 S.W.3d 602, 617-18 (Tenn. Ct. App. 2006) ("If it is established that a portion of the requested documents are subject to the attorney-client privilege, a protective order as to those documents is in order).  A party seeking to invoke privilege bears the burden of establishing the existence of the privilege.  Bacchi v. Massachusetts Mut. Life Ins. Co., 110 F. Supp. 3d 270, 274 (D. Mass. 2015).

State privilege law applies in federal court when state law provides the rule of decision. Fed. R. Evid. 501. The Court has already ruled that Tennessee law governs the Tennessee cases. [Doc. No. 2581]. Accordingly, Tennessee privilege law applies.

2. **The peer review and/or quality improvement privileges likely apply to information on the computers and cannot be waived.**

6

As this Court knows from prior briefing, Tennessee has robust peer review and quality improvement privileges, privileges that existed both before and after this outbreak.[28] The Tennessee Patient Safety and Quality Improvement Act and its predecessor the Tennessee Peer Review Law protect from discovery information and documents created during the peer review or quality improvement process. Tenn. Code Ann. §§ 63-1-150 (2016), 68-11-272 (2016), 63-6-219 (2010). These privileges are grounded in a clearly stated Tennessee policy that health care providers should be encouraged to freely discuss and review health care matters, in an effort to improve the quality of health care rendered in the state. See Tenn. Code Ann. §§ 63-1-150 (2016), 68-11-272 (2016).

Of critical importance here, **these privileges cannot be waived by disclosure**. In Powell v. Community Health Systems, 312 S.W.3d 496 (Tenn. 2010), the Tennessee Supreme Court held:

> The peer-review privilege is intended to benefit the entire peer review process, not simply the individuals participating in the process. *See, e.g., Marshall v. Planz,* 145 F.Supp.2d 1258, 1273 (M.D.Ala.2001); *Terre Haute Reg'l Hosp., Inc. v. Basden,* 524 N.E.2d 1306, 1311 (Ind.Ct.App.1988); *State ex rel. St. John's Reg'l Med. Ctr. v. Dally,* 90 S.W.3d 209, 214–15 (Mo.Ct.App.2002). The proper functioning of the peer-review process hinges on the assurance to all persons participating in it - the members of the peer review committees, the persons under peer review, and the persons who provide information and opinions during the peer-review process - that the information and opinions provided and discussed during the proceeding will remain confidential. Any breach in this confidentiality undermines the process. Therefore, we are hesitant to empower persons participating in the process to waive confidentiality unilaterally when the general assembly itself has recognized no exceptions to the confidentiality requirement.
>
> Under Tennessee law, waiver of a statutory privilege should not be permitted if the waiver undermines public policy or impairs the rights of third parties. Permitting participants in a peer review proceeding to waive the privilege - no matter how meritorious the justification - not only undermines the efficacy of the

---

[28] Doc. 2492.

peer-review process but also adversely affects those who provided information or opinions to the peer review committee in reliance on the statutory assurance of confidentiality. Other courts construing peer review statutes similar to Tennessee's that do not contain express waiver provisions have concluded that judicially created waivers are inappropriate. *See, e.g., Armstrong v. Dwyer,* 155 F.3d 211, 221 (3d Cir.1998); *Emory Clinic v. Houston,* 258 Ga. 434, 369 S.E.2d 913, 914 (1988); *Ayash v. Dana–Farber Cancer Inst.,* 443 Mass. 367, 822 N.E.2d 667, 692 n. 28 (2005); *Ollman v. Wis. Health Care Liability Ins. Plan,* 178 Wis.2d 648, 505 N.W.2d 399, 406–07 (Wis.Ct.App.1993). We concur with these decisions.

Powell, 312 S.W.3d at 513.

\* \* \* \* \* \* \*

To the extent the SSC computers contain information subject to the peer review or quality improvement privileges, the sale of the computers to SSC did not (and could not) waive these privileges. Without access to the computers, SSC is unable to determine whether they, in fact, contain any information subject to these privileges, but it is likely that they do.[29] If they contain data similar to that covered by the parties' previous ESI searches and production, there will almost certainly be information covered by these privileges on the computers.[30] SSC must be permitted to review the data from its computers for information subject to the peer review and quality improvement privileges before production to the PSC.

**3. Work product protection likely applies to information on the computers and was not waived by the sale of the computers to CMC.**

The work product doctrine protects from discovery documents or tangible things prepared by or for a party or its attorneys in anticipation of litigation or trial. Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 221 (Tenn. Ct. App. 2002); Fed. R. Civ. P. 26(b)(2). "[The work product doctrine] prevents litigants from taking a free ride on the

---

[29] Atkinson Aff. ¶ 2, 4.
[30] See SSC's Privilege Log from initial production attached as Exhibit 8 (showing multiple entries for the peer review and quality improvement privileges).

8

research and thinking of their adversary's lawyer." Boyd, 88 S.W.3d at 219. "Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial." Hickman v. Taylor, 329 U.S. 495, 511 (1947).

Importantly, work-product protection is not automatically waived by disclosure to a third party. Boyd, 88 S.W.3d at 226 n. 35. Disclosure results in waiver where the party attempts to "selectively disclose a protected document to prove a point and then invoke the work product doctrine to prevent their opponent from challenging their assertion." Id. at 226 (internal citations omitted).

\* \* \* \* \* \* \*

The computers sold to CMC likely contain information protected by the work product doctrine. In late 2012 and early 2013, SSC received presuit notices from several patients asserting potential claims related to the meningitis outbreak.[31] Prior to the sale of the computers, counsel for SSC was actively engaged in preparing for litigation.[32] Documents were prepared in anticipation of litigation and shared with SSC via email.[33] Those documents are likely still contained on the computers sold to CMC.

Inadvertent disclosure of the materials covered by the work product doctrine to CMC does not waive the protection under Tennessee law. SSC did not disclose the documents to prove a point, or to use the privileged documents "as a sword in this litigation." Boyd, 88 S.W.3d at 226 n. 35, 227. Likewise, there is no prejudice to the PSC

---

[31] Lister Affidavit, ¶ 9.
[32] Cline Affidavit ¶ 6.
[33] Cline Affidavit ¶ 7.

9

that would result from prohibiting further disclosure. See Arnold v. City of Chattanooga, 19 S.W.3d 779, 787 (Tenn. Ct. App. 1999) ("The scope of the waiver by disclosure is defined by the 'fairness doctrine,' which aims to prevent the prejudice and distortion that may be caused by one party's selective disclose [sic] of otherwise protected information.").

Accordingly, SSC must be permitted to review any information from the computers for work product protected material before it is produced to the PSC.

### 4. The computers likely contain communications covered by attorney-client privilege, which was not waived by inadvertent disclosure to CMC.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981). "The attorney-client privilege 'belongs' to the client." Boyd, 88 S.W.3d at 213. The client may waive the privilege by *voluntarily* disclosing privileged information to a third party. Id. Under both Tennessee and federal rules, inadvertent disclosure of privileged information does not automatically waive privilege. Fed. R. Evid. 502(b); Fed. R. Civ. P. 26(b)(2)(B); Tenn. R. Civ. P. 26.02(5); Tenn. R. Evid. 502.

In determining whether an inadvertent disclosure waives privilege, the court must consider several factors: (1) reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) the promptness of measures taken to rectify the disclosure; and (5) whether the overriding interest of

justice would or would not be served by relieving the party of its error. <u>Edwards v. Whitaker</u>, 868 F. Supp. 226, 229 (M.D. Tenn. 1994).

\* \* \* \* \* \* \*

At the outset, it must be noted that there are potentially two categories of privileged attorney-client communications on the computers sold to CMC. First, there are likely communications between SSC and its counsel that are covered by attorney-client privilege.[34] Second, there are likely communications between Jean Atkinson, RN and counsel that implicate her independent attorney-client privilege.[35] The latter category of communications would involve communications that are strictly between Ms. Atkinson and counsel, and that do not copy the other employees of SSC, or SSC's owners.

For the first category, the attached affidavit of Kenneth Lister, MD establishes that any disclosure of attorney-client privileged information by SSC was inadvertent.[36] Dr. Lister, as an owner of the company, was completely unaware that the computers being sold to CMC contained privileged information, or that CMC would be able to access that privileged information.[37] There is simply no basis to conclude that SSC sought to <u>voluntarily</u> waive privilege by selling the computers to CMC. <u>See Boyd</u>, 88 S.W.3d at 213.

For the second category, Ms. Atkinson's affidavit presents an even stronger case for finding that there was no voluntary disclosure.[38] Ms. Atkinson had no role in the

---

[34] Cline Aff ¶ 5; Lister Aff ¶ 7; Krause Aff. ¶ 5.
[35] Cline Aff ¶ 5; Atkinson Aff ¶ 2; Krause Aff. ¶ 5.
[36] Lister Aff. ¶ 11, 12, 13.
[37] Lister Aff. 11.
[38] Atkinson Aff.

decision to sell the computers to CMC and was not involved in those discussions.[39] Additionally, the computer containing her privileged emails was password protected.[40]

At most, the sale of the computers without wiping the hard drives was an inadvertent disclosure of attorney-client communications. The factors set forth in the Edwards case weigh, overwhelmingly in favor of finding that no waiver of privilege occurred.[41]

Reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production.

SSC's computers were password protected.[42] To date, it is unclear how, if at all, CMC would be able to access the privileged information without bypassing these security measures.

With respect to Ms. Atkinson's individual privilege, she had no ability to control the sale of the computers.[43]

Additionally, counsel for SSC took affirmative steps to copy relevant data from the computers prior to the sale, for use during this litigation.[44] This data was subject to a robust privilege review.[45] The parties also negotiated a clawback provision in the ESI protocol to deal with inadvertent disclosure of privileged information.[46]

Comparing the disclosure to the overall "production," the computers were an exceedingly small portion of the overall sale of SSC's assets. The purchase included:

---

[39] Atkinson Aff. ¶ 5.
[40] Atkinson Aff. ¶ 3.
[41] This same analysis applies to inadvertent disclosure of the other privileged information. However, as set forth above, Tennessee law does not permit waiver of the work-product, peer review, or quality improvement privileges under these circumstances.
[42] See, e.g., Atkinson Aff. ¶ 3.
[43] Atkinson Aff. ¶ 5.
[44] Cline Aff. ¶ 9.
[45] Cline Aff ¶ 10.; SSC Privilege Log.
[46] Doc. 1087 at 6-7.

12

(a) <u>Real Property</u>.   That certain tract or parcel of real property commonly known as 116 Brown Avenue, Crossville, Tennessee 3855, together with all rights, easements and appurtenances pertaining thereto and all improvements (the "Improvements"), trees, bushes, landscaping and foliage thereon as more fully described or depicted in the legal description attached hereto as <u>Exhibit A</u> and incorporated herein by reference (the "Real Property"), subject only to the following matters: (i) real estate taxes and assessments for 2013 that are not yet due and payable, and (ii) the Permitted Encumbrances (hereinafter defined).

(b) <u>Tangible Personal Property</u>.   All furniture, fixtures, equipment, supplies and inventory and other tangible personal property owned by Seller and used in Seller's operation (the "Tangible Personal Property").

(c) <u>Charts</u>.   All patient charts and records.

(d) <u>Permits</u>.   The Certificate of Need and all other permits, licenses, and other governmental certificates, authorizations and approvals (the "Permits").

(e) <u>Goodwill</u>.   All of the goodwill associated with Seller's business (the "Goodwill").[47]

As far as the personal property was concerned, the purchase included:

Bovie Machine System 7550, Sony TV Monitor, Linvatec Light Source, Linvatec Camera Box, Linvatec Insufflator, Linvatec Power Source, Sony Printer, Wolf ESU, Sony TV Monitor, Cardio Cap Monitor, Anesthesia Machine Ventilator, Anesthesia Machine Monitor, Anesthesia Soda Lime Absorber x2, Stor2 Flex. Scope Anesthesia, Supply Cart, Stryker T.P.S. Power Source, Smith/Nephew Tourniquet , Amsco OR Table, Anesthesia Propofol Machine, Colon Scope x 5, Gastroscope x3, Xerox Printer, Bovie Machine, Fujinon Processor, Custom Ultrasonic Machine, Steris Autoclave, Ritter Table Top Autoclave Stryker, Steris Incubator, Criticare Model 8100EP x8, Gendron Model 890 x7, Blanket/Fluid Warmer, EKG Machine, Doppler, Defibrillator, Nerve Stimulator, Safe, Hemocue HB, Epidural Table, R F Machine, C-ARM Monitor, C-ARM Machine, X-ray Box, Printer,  Monitor Encloser, Ventilator, TV Monitor, Stryker Power Source, Stryker Light Source, Stryker Cart, Bovie, Tourniquet, OR Table, Hemocue Glucose, Printers x8, Office Desk x7, Lobby Chairs x20, TV/Cabinet in Lobby, TV in Breakroom, Love Seat, End Tables x3, Frig – PACU Model W8TXngmwqol, Kitchen Model CTF 2123 AR SN 10737431SH, Pre Reg – Frigidaire Model ERT867 two SN BAF 4805526, Microwave Model R – 209KKK-W SN 88682, Kitchen 90 Model We

---

[47] Exhibit 3.

13

ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

S1450DMIDD SN 916557, Washer GE Model WPRe6100glwr SN 79976g, Dryer GE Model DPSR610eg4WT SN FR747135A

in addition to the eight computers.[48] The computers were a small part of the transaction.

The number of inadvertent disclosures.

The inadvertent disclosure is limited to a single instance, the sale of the computers. The sale was a one-time event, and all the computers were sold through one sale.[49] The number is therefore quite limited.

The extent of the disclosure.

The extent of the disclosure is unknown, but it appears to be limited. There is no indication that the content of any privileged information has even been disclosed.[50] The majority of the information is likely contained in the email accounts of former SSC employees stored on the computers.[51] It is not clear whether CMC's employees even have access to those accounts given that they are password protected. And, even if they have bypassed the password protection, there is no indication that they have taken the time to review the emails contained in the accounts. According to CMC's counsel, some of the computers were in storage and may not have even been used by CMC.[52] There has certainly been no disclosure to the PSC.

At present, the only confirmed disclosure has been through a cursory review conducted by counsel for CMC to evaluate them in order to prepare objections to the subpoena. In the course of doing so, it apparently was determined the computers do

---

[48] Exhibit 3.
[49] Lister Aff. ¶ 10.
[50] Krause Aff. ¶ 5.
[51] See, e.g., Atkinson ¶ 2; Cline ¶ 4.
[52] Krause Aff. ¶ 2.

14

indeed contain communications between SSC and its attorneys.[53] Thus, the extent of any disclosure appears to be minimal and only related to CMC's objections to the subpoena.

<u>The promptness of measures taken to rectify the disclosure.</u>

SSC's actions in attempting to rectify the disclosure have been prompt. The subpoena to Cumberland was issued on January 29, 2016. By February 2, 2016 counsel for SSC was in touch with counsel for CMC to determine whether CMC still had possession of the computers and whether they had been wiped clean of information.[54] In subsequent conversations counsel for CMC made clear it still had the computers but declined to investigate the contents of the computers further due to concerns of corrupting the computers' data.[55] It was not until Monday, May 9, 2016 that counsel for CMC confirmed communications between SSC and its counsel are contained on the computers.[56] The very next day, counsel for SSC notified CMC and the PSC of the inadvertent disclosure.[57]

<u>Whether the overriding interest of justice would or would not be served by relieving the party of its error.</u>

Finding waiver of privilege under these circumstances would be an injustice. SSC took steps to preserve relevant ESI for litigation purposes prior to any suits being filed.[58] Once discovery commenced, SSC engaged in substantial ESI review and production in this litigation, including extensive privilege review.[59] SSC has complied in good faith with

---

[53] Krause Aff. ¶ 5.
[54] (<u>See</u> Ex. 9, email Krause-attorney for SSC to Fitzpatrick-attorney for Cumberland-highlighted for relevant part)
[55] Krause Aff. ¶ 3.
[56] Krause Aff. ¶ 5.
[57] <u>See</u> email attached as Ex. 10.
[58] Cline Aff. ¶ 10.
[59] Cline Aff. ¶ 10.; SSC Privilege Log.

15
ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

the rules and the Court's orders governing assertion of privilege. SSC is not attempting to use the privilege as both a sword and a shield. Nor is this an instance where all parties other than the PSC have had the opportunity to review the privileged information. Indeed, it is not clear that even CMC has viewed the content of the privileged communications. The horse is not yet out of the barn. Finding waiver based on an inadvertent, extrajudicial disclosure of information to a third party, would be manifestly unjust.

* * * * * * *

To reiterate, there is no basis for the Court to conclude that SSC intended to voluntarily waive attorney-client privilege by selling its computers to CMC as part of a comprehensive asset sale.[60] Any such claim is even weaker with respect to Ms. Atkinson's personal attorney-client privilege, as she had no role in the sale of the assets.[61] Thus, assuming there was a disclosure of attorney-client communications, it was inadvertent. SSC respectfully requests that the Court find that the inadvertent disclosure of attorney-client privileged communications to a third party did not waive the privilege.

## **CONCLUSION**

The SSC Defendants respectfully request a protective order permitting it to conduct a privilege review of any information from the computers sold to CMC prior to production to the PSC, for the following reasons:

1. The peer review and quality improvement privileges were not waived by the sale of the computers to CMC because the privileges cannot be waived.

---

[60] Lister Aff. ¶ 11, 12, 13.
[61] Atkinson Aff. ¶ 5.

ST Specialty Sx Ctr Johnson Mot Prot Ord Mem

2. Work-product protection was not waived by production to CMC because there has been no attempt by SSC to use the protected material offensively as a sword.

3. Any disclosure of information covered by attorney-client privilege was inadvertent and did not waive privilege.[62]

> Respectfully submitted,
>
> _/s/_ Kent E. Krause
> **PARKS T. CHASTAIN**[*]
> **KENT E. KRAUSE**[*]
> **ASHLEY E. GENO**[*]
> Attorneys for Defendants, Specialty Surgery Center, PLLC and Kenneth R. Lister, M.D.
>
> **BREWER, KRAUSE, BROOKS & CHASTAIN, PLLC**
> P. O. Box 23890
> Nashville, TN  37202-3890
> (615) 256-8787 (PTC)
> (615) 256-8985 (fax)
> pchastain@bkblaw.com
> kkrause@bkblaw.com
> ageno@bkblaw.com
>
> **GIDEON, COOPER & ESSARY, PLC**
>
> /s/ Chris J. Tardio
> **C.J. Gideon, Jr.**[**]
> **Chris J. Tardio**[**]
> **Alan S. Bean**[***]
> **Matthew H. Cline**[**]
> 315 Deaderick Street, Suite 1100
> Nashville, TN  37238
> Ph: (615) 254-0400
> Fax: (515) 254-0459

---

[62] Alternatively, the Court could include the privilege review procedure requested by SSC in the protective order jointly sought by the PSC and Cumberland Medical Center at Doc. 2848.
[*] Admitted *pro hac vice*
[**]Admitted pursuant to MDL Order No. 1
[***]Admitted *pro hac vice*

chris@gideoncooper.com

*Attorneys for the SSC Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be served electronically to the registered participants identified on the Notice of Electronic Filing and copies will be served via electronic mail or regular US mail to those participants identified as unregistered this the 23 day of May, 2016.

/s/ Kent E. Krause
**KENT E. KRAUSE**