# Purchase Agreement with Cumberland Medical Center
### (with irrelevant financial information redacted)

This coversheet was created by Gideon, Cooper & Essary, PLLC
to assist in document organization.



CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01862

## TABLE OF CONTENTS

1.  Asset Purchase Agreement
2.  Assignment and Assumption Agreement
3.  Ricoh Order Agreement
4.  Non-Compete
5.  CMC Resolution of Board of Directors
6.  SSC Action by Written Consent
7.  Articles of Organization
8.  Seller Settlement Statement
9.  Certificate of Non Foreign Status
10. Warranty Deed
11. Bill of Sale

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01863

**ASSET PURCHASE AGREEMENT**
by and among
**SPECIALTY SURGERY CENTER, PLLC**
and
**CUMBERLAND MEDICAL CENTER, INC.**

Dated May __3__, 2013

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01864

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") dated _____, 2013 (the "Effective Date") by and among **SPECIALTY SURGERY CENTER, PLLC,** a Tennessee professional limited liability company ("Seller"), and **CUMBERLAND MEDICAL CENTER, INC.** a Tennessee nonprofit corporation ("Purchaser").

WHEREAS, Seller wishes to sell, and Purchaser wishes to purchase, substantially all of the operating assets of Seller, subject to the terms and conditions set forth in this Agreement; and

WHEREAS, the Members of Seller and the Directors of Purchaser have agreed it is in the best interest of the parties and the community at large to enter into the transaction contemplated and agreed to hereby.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF THE ASSETS

**Section 1.1  Assets Transferred.**  On the terms and subject to the conditions set forth in this Agreement, except for the Excluded Assets set forth in Section 1.2, Seller will sell, transfer, convey, assign and deliver to Purchaser, and Purchaser will purchase, on the Closing Date (as defined in Section 3.1), all of Seller's right, title and interest in, to and under the following assets, properties and rights of Seller, as the same exist on the Closing Date (collectively, the "Assets"):

(a)  <u>Real Property</u>.  That certain tract or parcel of real property commonly known as  116 Brown Avenue, Crossville, Tennessee 38555, together with all rights, easements and appurtenances pertaining thereto and all improvements (the "Improvements"), trees, bushes, landscaping and foliage thereon as more fully described or depicted in the legal description attached hereto as <u>Exhibit A</u> and incorporated herein by reference (the "Real Property"), subject only to the following matters: (i) real estate taxes and assessments for 2013 that are not yet due and payable, and (ii) the Permitted Encumbrances (hereinafter defined).

(b)  <u>Tangible Personal Property</u>.  All furniture, fixtures, equipment, supplies and inventory and other tangible personal property owned by Seller and used in Seller's operation (the "Tangible Personal Property").

(c)  <u>Charts</u>.  All patient charts and records.

(d)  <u>Permits</u>.  The Certificate of Need and all other permits, licenses, and other governmental certificates, authorizations and approvals (the "Permits").

2

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01865

(e) <u>Goodwill</u>.   All of the goodwill associated with Seller's business (the "Goodwill").

**Section 1.2   <u>Excluded Assets</u>.**   Notwithstanding anything to the contrary in this Agreement, the following assets and properties and rights (the "Excluded Assets") shall be excluded from and shall not constitute Assets transferred to Purchaser: (i) any trade accounts receivable, bank accounts, and/or other assets which are not listed on <u>Exhibit B</u> attached hereto and incorporated herein by reference; (ii) any revenue generated from services performed prior to the Closing Date; (iii) payments made and to be made to Seller, and other rights of the Seller, under this Agreement; (iv) any tax refunds relating to periods prior to the Closing Date; (v) the rights of Seller in, to and under all contracts and agreements of any nature the obligations of Seller under which are not Assumed Liabilities (as defined in Section 1.3); (vi) all claims, rights or causes of action related to any Excluded Asset or Retained Liability (as defined in Section 1.4); and (vii) any non-transferable or non-transferred Permit.

**Section 1.3   <u>Assumed Liabilities</u>.**   In connection with the sale, transfer, conveyance, assignment and delivery of the Assets pursuant to this Agreement, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume on the Closing Date and agrees to pay, perform and discharge when due the following obligations of Seller (the "Assumed Liabilities"), and no others:

<u>Obligations under Contracts and Permits</u>.   All obligations of Seller under the Contracts assumed by Purchaser arising and to be performed only on or after the Closing Date, and excluding any obligations thereunder arising or to be performed prior to the Closing Date.

**Section 1.4   <u>Retained Liabilities</u>.**   Except for the Assumed Liabilities, the Purchaser shall not assume by virtue of this Agreement or the transaction contemplated hereby, and shall have no liability for, any liabilities of Seller of any kind, character or description whatsoever (the "Retained Liabilities").   Without limiting the generality of the foregoing, Purchaser shall not assume the following:

(a)   any liability or obligation of Seller arising out of or in connection with the negotiation and preparation of this Agreement and consummation and performance of the transaction contemplated hereby, including without limitation, legal and accounting fees, brokerage commissions, finder's fees or similar fees or commissions, and income taxes of Seller;

(b)   any liability or obligation of Seller arising from the failure of Seller to perform or discharge any of its agreements contained in this Agreement;

3

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01866

(c)     any liability or obligation of Seller which was required to be disclosed to the Purchaser pursuant to this Agreement and which was not so disclosed;

(d)     any liability or obligation of Seller with respect to any insurance policies;

(e)     any liability or obligation of Seller to any Member;

(f)     any obligation of Seller for Taxes;

(g)     any liability or obligation of Seller to any employees or former employees of Seller except for those obligations to former employees of Seller hired by Purchaser that arise after the Closing Date;

(h)     any claim, cause of action, proceeding or other litigation pending or threatened against Seller on the Closing Date or for which Seller is found liable on claims initiated at any time after the Closing Date;

(i)     any liability or obligation of Seller relating to any Excluded Assets; and

(j)     any liability or obligation of Seller incurred by or accruing to Seller after the Closing Date, except as a result of the non-fulfillment by Purchaser of Assumed Liabilities.

Seller shall discharge in a timely manner or shall make adequate provision for all of the Retained Liabilities, provided that Seller shall have the ability to contest, in good faith, any such claim of liability asserted in respect thereof by any Person.

## ARTICLE II
## EARNEST MONEY AND PURCHASE PRICE

Section 2.1  Earnest Money. Purchaser shall deposit with Seller's attorney in his IOLTA the sum of ████████████████████ as an earnest money deposit (the "Earnest Money") at the time of execution of this Agreement. Purchaser will make the Earnest Money check to Thomas E. Hale, Attorney at Law Trust Account.  All Earnest Money will be credited against the payment of the Purchase Price and will serve as evidence of Purchaser's good faith intent to perform the terms and conditions of this Agreement.  If for any reason (except in the event of default by Seller and the specific condition(s) listed below) the Purchaser shall fail to close and complete the terms of this Agreement the Earnest Money shall be forfeited and be retained by the Seller.  If the Seller defaults the Earnest Money shall be refunded to Purchaser.

Section 2.2  Inspections.  On and before the Closing Date, Purchaser shall have the right to enter the Real Property for the purpose of making non-invasive

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01867

inspections of the Real Property and the Assets.   All such entries shall be at reasonable times during normal business hours, and Purchaser shall take reasonable steps not to disturb Seller's ongoing business operations.   In the event that Purchaser's due diligence inspections reveal a defect with respect to the Assets, Purchaser may elect to terminate this Agreement and receive a refund of the Earnest Money or accept the defects and proceed with Closing.   Purchaser shall have the right to review all contracts of Seller that are assignable.   Except for the Ricoh lease agreement Purchaser shall have no obligation to assume any of Seller's contracts.   Within 10 days of entering into this agreement Purchaser shall notify Seller of the contracts Purchaser intends to assume.

**Section 2.3   Purchase Price.**   Subject to the terms and conditions set forth herein, Seller shall sell and convey the Assets to Purchaser and Purchaser shall purchase the Assets from Seller and pay to Seller the sum of ▮▮▮▮▮▮▮▮▮▮▮▮ (the "Purchase Price"), subject to the credits, debits, prorations and adjustments expressly set forth herein.   Said Purchase Price shall be paid in cash or certified funds at closing or by wire transfer.   The Purchase Price shall be allocated as follows:

| | |
|---|---|
| Real Property and Improvements | ▮▮▮▮▮▮ |
| Tangible Personal Property (Furniture, Fixtures and Equipment) | ▮▮▮▮▮▮ |
| Goodwill | ▮▮▮▮▮▮ |
| Total Purchase Price | ▮▮▮▮▮▮ |

**Section 2.4   Payment of Purchase Price.**

Purchaser shall deliver to Seller at Closing the Purchase Price in certified funds of ▮▮▮▮▮▮▮▮▮▮▮ less the Earnest Money already deposited with Seller's Attorney.

**Section 2.5   Prorations.**   All real property ad valorem taxes shall be prorated (employing a 365-day year) between Seller and Purchaser as of the Closing Date based upon the most recently available property assessment.

**Section 2.6   Closing Costs.**   Seller shall pay the cost of preparation of a general warranty deed.   Purchaser shall pay all title insurance premium costs, all recording and transfer taxes for recording the deed and all costs related to Purchaser's loan documents including recording of the deed of trust and Purchaser's attorneys' fees, appraisal fees and any other professional fees or costs related to this transaction.

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01868

## ARTICLE III
## THE CLOSING

**Section 3.1  Closing.**  The closing of the transaction contemplated by this Agreement (the "Closing") shall be May 31, 2013 (the "Closing Date") and shall be formally consummated on such date at the offices of Thomas E. Hale, Attorney at Law, 14 East St., Crossville, TN 38555 or such other time and place as the parties may agree ("Closing Date").  The Closing Date may be extended for an additional 30 days by request of Purchaser for the purpose of obtaining financing. Purchaser shall make a good faith effort to obtain financing by May 31, 2013.

**Section 3.2  Delivery by Seller at Closing.**  Seller shall deliver, or cause to be delivered, to Purchaser at Closing:

(a)   a copy of Seller's Articles of Organization including all amendments thereto; and

(b)   a copy of resolutions of the Members of Seller authorizing the execution, delivery and performance of this Agreement and the transaction contemplated hereby, certified by an officer of Seller as of the Closing Date; and

(c)   an original General Warranty Deed conveying the Real Property to Purchaser or its affiliate, subject only to the Permitted Encumbrances; and

(d)   an original General Assignment, Bill of Sale and Assumption Agreement attached hereto as Exhibit E and incorporated herein by reference (the "General Assignment") executed by Seller; and

(e)   any and all accessories or items necessary to access the Real Property, including but not limited to, keys, remote key fobs, security codes, safe codes, and warranty information; and

(f)   a Foreign Investment in Real Property Tax Act affidavit; and

(g)   such other instruments of assignment, transfer, conveyance, endorsement, direction or authorization (including evidence of satisfaction and/or termination of any liens against the Assets) as will be sufficient or requisite to vest in Purchaser full, complete, legal and equitable title in and to all of the Assets to be acquired pursuant to this Agreement; and

(h)   a list of all accounts receivable to be collected by Purchaser on behalf of Seller in accordance with Section 6.5,

6

(i)    any additional documents requested or required by Purchaser's lender and/or the Title Company for the consummation of the transaction contemplated by this Agreement; and

(j)    such other instruments or documents as Purchaser may reasonably request.

Section 3.3  <u>Deliveries by Purchaser at Closing</u>.  Purchaser shall deliver, or cause to be delivered, to Seller at Closing:

(a)    a copy of the resolutions of its Directors authorizing the execution, delivery and performance of this Agreement and the transaction contemplated hereby, certified by one of its officers; and

(b)    the cash payments required by Article II above; and

(c)    an original of the General Assignment and Assumption Agreement executed by Purchaser; and

(d)    such other documents as Seller may reasonably request.

<div align="center">

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

</div>

Seller represents and warrants to and with the Purchaser, as follows:

Section 4.1  <u>Execution and Validity of Agreement; Existence and Good Standing.</u>  Seller has the full power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement by Seller and the consummation by Seller of the transaction contemplated hereby have been duly authorized by all required action on behalf of Seller.  This Agreement has been duly and validly executed and delivered by Seller and, assuming due authorization, execution and delivery by the Purchaser, constitutes the legal, valid and binding obligations of Seller and enforceable against it in accordance with its terms.  Seller was duly formed and is in good standing under the laws of Tennessee, with the full power and authority to own its property and to carry on its business all as and in the places where such properties are now owned or operated or such business is now being conducted.

Section 4.2  <u>Financial Statements and No Material Changes.</u>  Any and all financial statements provided by Seller to Purchaser fairly present the financial condition of Seller as of the respective dates thereof and reflect all claims against and all debts and liabilities of Seller, fixed or contingent, as of the respective dates thereof, required to be shown thereon under GAAP.  Since such financial statements were provided by Seller to Purchaser, there have been no material adverse changes in the assets or liabilities, or in

<div align="center">7</div>

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01870

the business or condition, financial or otherwise, or in the results of operations of Seller.

Section 4.3  **Books and Records.**  All accounts, books, ledgers and other records material to Seller of whatsoever kind have been properly and accurately kept and are complete in all material respects, and there are no material inaccuracies or discrepancies of any kind contained or reflected therein.  Seller does not have any of its records, systems, controls, data or information recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and possession of Seller.

Section 4.4  **Title to Assets; Encumbrances; Warranty.** Seller has good title to all of the Assets, free and clear of all liens or encumbrances of any type or kind.  The Tangible Personal Property and Inventory included in the Assets owned by Seller are being sold AS-IS with all faults. Seller has given Purchaser the opportunity to inspect the Tangible Personal Property and Inventory and to the extent Purchaser wanted to has made such inspection and has brought to the attention of Seller any concerns Purchaser has regarding the Tangible Personal Property and Inventory.

Section 4.5  **Real Property.**

4.5.1  **Owned Real Property.**   Seller shall convey to Cumberland Medical Center, Inc. good and marketable fee simple title to the Real Property, free and clear of all liens, encumbrances and other exceptions to title except for any Permitted Encumbrances. "Good and marketable title" as used herein shall mean ownership which, when acquired by Cumberland Medical Center, Inc. will be insurable by the Title Company chosen by Purchaser.   Seller shall have no obligation to cure any title objection except any financing created by Seller and/or mechanics' liens against the Real Property, both of which Seller hereby agrees to have released at Closing.  Any exceptions to title which are approved by Purchaser are referred to as the "Permitted Encumbrances."  In the event that the title report or survey reveals exceptions to title which are unacceptable to Purchaser, Purchaser may elect to terminate this Agreement and receive a refund of the Earnest Money or elect to proceed to Closing.

4.5.2  **Assessments to Real Property.**  Seller represents and warrants that all assessments that are liens against the Real Property are shown in the official records of Cumberland County, Tennessee, and no improvements (site or area) have been constructed or installed by any public authority, the cost of which may be assessed in whole or in part against any part of the Real Property in the future; and Seller has not been notified of any possible future improvements that might create an assessment against any portion of the Real Property.  Seller has received no notice of, nor has any knowledge of, any pending or threatened taking or condemnation of the Real Property or any portion thereof.  Seller will not sell, convey, assign, pledge, encumber or lease all or

8

CONFIDENTIAL DISCOVERY MATERIAL

any part of the Real Property, nor restrict the use of all or any part of the Real Property, nor take or cause to be taken any action in conflict with this Agreement at any time between the date of execution of this Agreement and (i) Closing or (ii) the earlier termination of this Agreement pursuant to its terms. Seller additionally hereby represents and warrants that no rights of first refusal or similar agreements exist in connection with the Real Property which would in any way interfere with Purchaser's ability to purchase the Real Property as provided herein, or which are in any way in contravention of the spirit and intent of this Agreement.   Seller hereby represents and warrants that: (i) none of the Real Property has been excavated, (ii) no landfill was deposited on, or taken from, the Real Property, and (iii) no toxic wastes or hazardous materials were deposited, disposed of, stored, generated or released on or from the Real Property.

**Section 4.6   Contracts.**   Seller hereby represents and warrants that the Contracts listed on Exhibit C are in full force and effect and that no default exists by Seller or any counter-party to such Contracts.

**Section 4.7   Non-Contravention; Approvals and Consents.**

4.7.1   Non-Contravention. The execution, delivery and performance by Seller of its obligations hereunder and the consummation of the transaction contemplated hereby, will not (a) violate, conflict with or result in the breach of any provision of the Articles of Organization Seller, (b) result in the violation by Seller of any Laws or Orders of any Governmental or Regulatory Authority, applicable to Seller or any of its Assets or properties, or (c) conflict with, result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, or require Seller to obtain any consent, approval or action of, make any filing with or give any notice to, or result in or give to any Person any right of payment or reimbursement, termination, cancellation, modification or acceleration of, or result in the creation or imposition of any lien upon any of the Assets, under any of the terms, conditions or provisions of any contract to which Seller is a party or by which Seller or any of its Assets or properties are bound.

4.7.2   Approvals and Consents. No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or other Person is necessary or required under any of the terms, conditions or provisions of any Law or Order of any Governmental or Regulatory Authority or any Contract to which Seller is a party or by which its assets or properties are bound for the execution and delivery of this Agreement by Seller, the performance by Seller of its obligations hereunder or the consummation of the transaction contemplated hereby.

**Section 4.8   Litigation.**   There is no action, suit, proceeding at law or in equity by any Person, or any arbitration or any administrative or other proceeding by or before (or to the knowledge of Seller, any investigation by) any Governmental or Regulatory Authority, pending or, to the knowledge of Seller, threatened, against Seller with respect to this Agreement or the transaction contemplated hereby, or against or affecting the Seller or

9

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01872

the Assets; and no acts, facts, circumstances, events or conditions occurred or exist which are a basis for any such action, proceeding or investigation. Seller is not subject to any Order entered in any lawsuit or proceeding.

Section 4.9  Taxes. Seller has timely filed, or caused to be filed, taking into account any valid extensions of due dates, completely and accurately, all federal, state, local and foreign tax or information returns (including estimated tax returns) required under the statutes, rules or regulations of such jurisdictions to be filed. The term "Taxes" means taxes, duties, charges or levies of any nature imposed by any taxing or other Governmental or Regulatory Authority, including without limitation income, gains, capital gains, surtax, capital, franchise, capital stock, value-added taxes, taxes required to be deducted from payments made by the payor and accounted for to any tax authority, employees' income withholding, back-up withholding, withholding on payments to foreign Persons, social security, national insurance, unemployment, worker's compensation, payroll, disability, real property, personal property, sales, use, goods and services or other commodity taxes, business, occupancy, excise, customs and import duties, transfer, stamp, and other taxes (including interest, penalties or additions to tax in respect of the foregoing), and includes all taxes payable by Seller pursuant to Treasury Regulations §1.1502-6 or any similar provision of state, local or foreign law. All Taxes shown on said returns to be due and all additional assessments received prior to the date hereof have been paid or are being contested in good faith. Seller has collected all sales, use, goods and services or other commodity Taxes required to be collected and has remitted or will remit the same to the appropriate taxing authority within the prescribed time periods. Seller has withheld all amounts required to be withheld on account of Taxes from amounts paid to employees, former employees, directors, officers, Members, residents and non-residents and remitted or will remit the same to the appropriate taxing authorities within the prescribed time periods. The amount set up as an accrual for Taxes on the Balance Sheet is sufficient for the payment of all unpaid Taxes of Seller, whether or not disputed, for all periods ended on and prior to the date thereof. Since providing Purchaser with financial statements, Seller has not incurred any liabilities for Taxes other than in the ordinary course of business.    No examination of any return of Seller is currently in progress, and Seller has not received notice of any proposed audit or examination.  No deficiency in the payment of Taxes by Seller for any period has been asserted in writing by any taxing authority and remains unsettled at the date of this Agreement.   Seller has not made any agreement, waiver or other arrangement providing for an extension of time with respect to the assessment or collection of any Taxes against it.  Seller has not been a member of an affiliated group filing consolidated Federal income tax returns nor has it been included in any combined, consolidated or unitary state or local income tax return.  Seller has not entered into any Tax sharing or indemnification agreement with any party.

Section 4.10  Liabilities.  Seller does not have any outstanding claims, liabilities or indebtedness of any nature whatsoever (collectively in this Section 4.10, "Liabilities"), whether accrued, absolute or contingent, determined or undetermined, asserted or

10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01873

unasserted, and whether due or to become due, other than (i) Liabilities specifically disclosed to Purchaser and in the financial statements provided by Seller to Purchaser and (ii) Liabilities incurred in the ordinary course of business and consistent with past practice since financial statements were last provided by Seller to Purchaser not involving borrowings by the Seller.

### Section 4.11 Intellectual Properties.

4.11.1 Definitions. For purposes of this Agreement, the following terms have the following definitions:

"Intellectual Property" shall include, without limitation, any and all of the following and all rights associated therewith:  (a) all domestic and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know how, technology, technical data and customer lists, rights of privacy and publicity, and all documentation relating to any of the foregoing; (c) all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto throughout the world; (d) all mask works, mask work registrations and applications therefor; (e) all industrial designs and any registrations and applications therefor; (f) all trade names, logos, common law trademarks and service marks; trademark and service mark registrations and applications therefor and all goodwill associated therewith; and (g) all computer software including all source code, object code, firmware, development tools, files, records and data, all media on which any of the foregoing is recorded, and all documentation related to any of the foregoing.

"Intellectual Property of the Seller" shall mean any Intellectual Property that: (a) is owned by or licensed to Seller, or (b) which is used in the operation of Seller, including the design, manufacture and use of the products of Seller as it currently is operated.

4.11.2 Representations.  To the knowledge of Seller, no Person has any rights to use any of the Intellectual Property of the Seller, (ii) Seller has not granted to any Person, nor authorized any Person to retain, any rights in the Intellectual Property of the Seller, and (iii) Seller owns and has good and exclusive title to each item of Intellectual Property of the Seller, free and clear of any lien or encumbrance of any kind; and Seller owns, or has the right, pursuant to a valid contract to use or operate under, all other Intellectual Property of the Seller.   To the knowledge of Seller, the operation of the business of Seller as it currently is conducted does not infringe the Intellectual Property of any other Person. Seller has not received notice from any Person that the operation of its business infringes the Intellectual Property of any Person.   There are no contracts between Seller and any other Person with respect to the Intellectual Property of the Seller in respect of which there is any dispute known to Seller regarding the scope of such agreement, or performance under such contract, including with respect to any payments to be made or

11

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01874

received by Seller.   To the knowledge of Seller, no Person is infringing or misappropriating any of the Intellectual Property of the Seller.

### Section 4.12 Compliance with Laws; Permits.

4.12.1 Compliance.   Seller is, and its business has been conducted, in compliance with all applicable Laws and Orders, except in each case (other than with respect to compliance with environmental Laws and Orders relating to the regulation or protection of the environment "Environmental Laws and Orders") where the failure to so comply would not reasonably be expected to have a Material Adverse Effect (as defined below), including without limitation: (a) all Laws and Orders promulgated by the Federal Trade Commission or any other Governmental or Regulatory Authority; (b) all Environmental Laws and Orders; and (c) all Laws and Orders relating to labor, civil rights, and occupational safety and health laws, worker's compensation, employment and wages, hours and vacations, or pay equity.  Seller has not been charged with, or, to the knowledge of Seller threatened with or under any investigation with respect to, any charge concerning any violation of any Laws or Orders. For purposes of this Agreement, "Material Adverse Effect" shall mean any material and adverse effect on the financial condition, results of operations, assets, properties, prospects or business of Seller.

4.12.2 Permits. Seller has all Permits required by any Governmental or Regulatory Authority for the operation of its business and the use of the Assets as presently operated or used, except where the failure to have such Permits would not reasonably be expected to have a Material Adverse Effect.  All of the Permits are in full force and effect and no action or claim is pending, nor to the knowledge of Seller is threatened, to revoke or terminate any of such Permits or declare any such Permit invalid in any material respect.

### Section 4.13 Employee Matters.   On the Closing Date, Seller shall terminate the employment of each and every employee of Seller.  Purchaser shall offer employment to those individuals who were Seller's former employees as Purchaser, in its sole discretion, may choose, in such capacity, for such compensation, and upon such other employment terms as established by Purchaser.  Purchaser shall not assume any obligations or liabilities of Seller with respect to any of its employees, including without limitation, any liability or obligation for wages, bonuses, accrued vacation and/or sick days, medical reimbursement, pension or profit sharing benefits, or any other liability or obligation whatsoever of Seller to such employees or third parties arising out of or in connection with their prior employment with Seller or with their termination as employees of Seller.

### Section 4.14 Brokers.   No broker, finder, agent, consultant or similar intermediary has acted on behalf of Seller or the Members in connection with this Agreement or the transaction contemplated hereby, and no brokerage commissions, finder's fees, consulting fees or similar fees or commissions are payable by Seller or the Members in connection therewith based on any agreement, arrangement or understanding with any of them.

12

CONFIDENTIAL DISCOVERY MATERIAL

## ARTICLE V
## REPRESENTATIONS OF THE PURCHASER

Purchaser represents, warrants and agrees to and with Seller as follows:

**Section 5.1 <u>Existence and Good Standing</u>.** Purchaser is a non-profit corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee with full power and authority to own its properties and to carry on its business as and in the places where such properties are now owned or operated or such business is now being conducted.

13

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01876

**Section 5.2** <u>Execution and Validity of Agreement</u>. Purchaser has the full power and authority to make, execute, deliver and perform this Agreement and the transaction contemplated hereby.   The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly authorized by all required company action on behalf of Purchaser, and this Agreement has been duly and validly executed and delivered by Purchaser and, assuming due authorization, execution and delivery by Seller constitutes legal, valid and binding obligations of the Purchaser, enforceable against it in accordance with its terms.

**Section 5.3** <u>No Restrictions</u>. There is no suit, action, claim, investigation or inquiry by any Governmental or Regulatory Authority, and no legal, administrative or arbitration proceeding pending or, to Purchaser's knowledge, threatened against the Purchaser with respect to the execution, delivery and performance of this Agreement or the contemplated hereby.

**Section 5.4** <u>Non-Contravention; Approvals and Consents</u>.

**5.4.1** <u>Non-Contravention</u>. The execution, delivery and performance by Purchaser of its obligations hereunder and the consummation of the transaction contemplated hereby will not (a) violate, conflict with or result in the breach of any provision of the Articles of Organization or Operating Agreement of Purchaser, or (b) result in the violation by Purchaser of any Laws or Orders of any Governmental or Regulatory Authority applicable to Purchaser or any of its assets or properties, or (c) result in a violation or breach of, constitute (with or without notice or lapse of time or both) a default under, or require Purchaser to obtain any consent, approval or action of, make any filing with or give any notice to, or result in or give to any Person any right of payment or reimbursement, termination, cancellation, modification or acceleration of, or result in the creation or imposition of any lien upon any of the assets or properties of Purchaser, under any of the terms, conditions or provisions of any contract to which Purchaser is a party or by which the Purchaser or any of its assets or properties are bound.

**5.4.2**     <u>Approvals and Consents</u>.   No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority or other public or private third party is necessary or required under any of the terms, conditions or provisions of any Law or Order of any Governmental or Regulatory Authority or any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound for Purchaser's execution and delivery of this Agreement, the performance by Purchaser of its obligations hereunder or Purchaser's consummation of the transaction contemplated hereby.

**Section 5.5** <u>Litigation</u>. There is no action, suit, proceeding at law or in equity by any Person, or any arbitration or any administrative or other proceeding by or before (or to the knowledge of Purchaser, any investigation by), any Governmental or Regulatory Authority pending or, to the knowledge of the Purchaser, threatened against Purchaser or

14

CONFIDENTIAL DISCOVERY MATERIAL

any of its properties or rights with respect to this Agreement or the transaction contemplated hereby.

Section 5.6   **Financial Statements and No Material Changes.** Any and all financial statements provided by Purchaser to Seller fairly present the financial condition of Purchaser as of the respective dates thereof and reflect all claims against and all debts and liabilities of Purchaser, fixed or contingent, as of the respective dates thereof, required to be shown thereon under modified GAAP. Since such financial statements were provided by Purchaser to Seller, there have been no material adverse changes in the assets or liabilities, or in the business or condition, financial or otherwise, or in the results of operations of Purchaser. Purchaser shall provide to Seller financial statements of Purchaser annually or in more frequent intervals as Seller may request.

## ARTICLE VI
## OTHER AGREEMENTS

Section 6.1   **Conditions Precedent.** Seller acknowledges that Purchaser shall have no obligation to close the transaction contemplated hereunder until the following conditions precedent to Closing have been satisfied:

(a)   all of Seller's representations and warranties contained herein shall be true and correct in all material respects as of the date of the Agreement and the Closing Date.

In the event that one or more of the foregoing conditions precedent to Closing is not met, Purchaser may: (i) elect to terminate this Agreement and neither party shall have any further obligation hereunder; or (ii) Purchaser may elect to waive such condition(s) precedent and proceed to Closing.

(b)   all of Purchaser's representations and warranties contained herein be true and correct in all material respects as of the date of this Agreement and the Closing Date and thereafter.

In the event that one or more of the foregoing conditions precedent to Closing is not met, Seller may: (i) elect to terminate this Agreement and neither party shall have any further obligation  hereunder or (ii) Seller may elect to waive such condition(s) precedent and proceed to Closing.

Section 6.2   **Agreements Regarding Employees After Closing.** In the event any employee of Seller shall be deemed to have been terminated solely by reason of the consummation of this Agreement, all liability for severance benefits or damages shall be borne by Seller. Purchaser shall be the sole judge of the number, identity and qualifications of employees necessary for the conduct of its business operations and reserves the right to take any personnel action it deems necessary or desirable. For

15

notices, benefits and payments related to events occurring on or prior to the Closing Date, Seller and its ERISA Affiliates shall be responsible for any notices required to be given to employees of Seller pursuant to the Worker Adjustment and Retraining Notification Act, Section 4980B of the Code and/or Section 402(f) of the Code, and for any payments or benefits required pursuant to such laws or on account of violation of any requirement of such laws.

Section 6.3  <u>Tax Liability</u>.  To the extent that the transfer of any Assets to Purchaser gives rise to sales tax liability or other transfer, purchase or recordation documentary tax and fees (collectively, "Sales Taxes"), Purchaser shall promptly pay such Sales Taxes to the appropriate tax authorities.

Section 6.4  <u>Successor Employer</u>.  If applicable, Purchaser agrees that it shall elect treatment as a "successor employer" for withholding tax purposes with respect to calendar year 2013.

Section  6.5  <u>Accounts Receivable Collection.</u>  The accounts receivable of Seller as of the Closing Date is not being sold to Purchaser. For convenience and continuity Purchaser agrees to collect Sellers accounts receivable and pay said collections to the Member designated to receive such payments within 5 days of receipt of such payments.  Seller agrees to pay Purchaser Five percent (5%) of all collected accounts receivable as compensation for Purchaser's collecting Seller's accounts receivable. Said payment shall be withheld from the payment due Seller at the time Purchaser pays Seller's designee.

Section 6.6.  <u>Non-compete Agreements</u>. The Members of Seller agree to enter into a non-compete agreement with Purchaser restricting the Member from creating, practicing in, being employed by, becoming an owner, officer or investor in an ambulatory surgery center in Cumberland County, Tennessee in the form set out in  (Exhibit F). The non-compete shall be for a period of Two years from the date of closing and include only Cumberland County, Tennessee. However, the non-compete shall not prohibit any Member from performing any service or procedure a Member has performed in the Member's office prior to the Closing Date.  Dr. Lister will not be required to enter into a non-compete or be bound by any non-compete agreement unless his ability to practice is assured or continues once he has signed the non-compete.

Section 6.7  <u>Case Scheduling.</u>  Purchaser agrees to use the current accepted method of Cumberland Medical Center to schedule cases at the Specialty Surgery Center current facility.

16

## ARTICLE VII
## SURVIVAL; INDEMNITY

**Section 7.1  Survival.**  Notwithstanding any right of any party hereto to fully investigate the affairs of any other party, and notwithstanding any knowledge of facts determined or determinable pursuant to such investigation or right of investigation, each party hereto shall have the right to rely fully upon the representations, warranties, covenants and agreements of the other parties contained in this Agreement and the Exhibits attached hereto, if any, furnished by any other party pursuant to this Agreement, or in any certificate delivered at the Closing by any other party.  The respective representations, warranties, covenants and agreements of Seller and Purchaser contained in this Agreement shall survive the Closing.

**Section 7.2  Obligation of Seller to Indemnify.**

7.2.1  General Indemnity. Seller hereby agrees to indemnify Purchaser and its affiliates, stockholders, officers, directors, employees, agents, representatives and successors, permitted assignees of the Purchaser and their affiliates (individually a "Purchaser Indemnified Party" and collectively, the "Purchaser Indemnified Parties") against, and to protect, save and keep harmless the Purchaser Indemnified Parties from, and to pay on behalf of or reimburse the Purchaser Indemnified Parties as and when incurred for, any and all liabilities (including liabilities for Taxes), obligations, losses, damages, penalties, demands, claims, actions, suits, judgments, settlements, penalties, interest, out-of-pocket costs, expenses and disbursements (including reasonable costs of investigation, and reasonable attorneys', accountants' and expert witnesses' fees) of whatever kind and nature (collectively, "Losses"), that may be imposed on or incurred by any Purchaser Indemnified Party as a consequence of, in connection with, incident to, resulting from or arising out of or in any way related to or by virtue of: (a) any misrepresentation, inaccuracy or breach of any warranty or representation contained herein or in any certificate delivered by Seller at the Closing; (b) any action, demand, proceeding, investigation or claim by any third party (including any Governmental or Regulatory Authority) against or affecting any Purchaser Indemnified Party which may give rise to or evidence the existence of or relate to a misrepresentation or breach of any of the representations and warranties of Seller contained herein or in any certificate delivered by Seller at the Closing; (c) any breach or failure by Seller to comply with, perform or discharge any obligation, agreement or covenant by Seller contained in this Agreement; and (d) any liability or obligation or any assertion against any Purchaser Indemnified Party, arising out of or relating, directly or indirectly, to any Retained Liability.

7.2.2  "Losses".  The term "Losses" as used in this Agreement is not limited to matters asserted by third parties against a Purchaser Indemnified Party, but includes Losses incurred or sustained by a Purchaser Indemnified Party in the absence of third party claims.

17

CONFIDENTIAL DISCOVERY MATERIAL          SSC - 01880

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1  Expenses.** Except as otherwise specifically provided in this Agreement, each of the parties hereto shall pay its or his/her own expenses relating to the transaction contemplated by this Agreement, including, without limitation, the fees and expenses of its respective counsel, financial advisors appraisers and accountants.

**Section 8.2  Governing Law.** The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of the State of Tennessee without regard to any conflicts or choice of law provisions of the State of Tennessee that would result in the application of the law of any other jurisdiction.

**Section 8.3  "Person" Defined.** "Person" shall mean and include an individual, a seller, a joint venture, a corporation (including any non-profit corporation), an estate, an association, a trust, a general or limited partnership, a limited liability company, a limited liability partnership, an unincorporated organization and a government or other department or agency thereof.

**Section 8.4  "Affiliate" Defined.** As used in this Agreement, an "affiliate" of any Person shall mean any Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

**Section 8.5  Captions.** The Article and Section captions used herein are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

**Section 8.6  Publicity.** Purchaser shall control any and all publicity regarding the transaction contemplated hereunder. Seller shall ensure that no representative of Seller shall, issue any press release or other public document or make any public statement relating to this Agreement or the matters contained herein without obtaining the prior approval of Purchaser.

**Section 8.7  Notices.** Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to any other party shall be in writing and shall be deemed to have been given (a) upon personal delivery, if delivered by hand or courier, (b) three days after the date of deposit in the mails, postage prepaid, or (c) the next business day if sent by electronic mail or facsimile transmission (if receipt is electronically confirmed) or by a prepaid overnight courier service, and in each case at the respective addresses or numbers set forth below or such other address or number as such party may have fixed by notice:

18

CONFIDENTIAL DISCOVERY MATERIAL                   SSC - 01881

If to the Purchaser, addressed to:

    Cumberland Medical Center
    c/o Larry Moore
    421 South Main Street
    Crossville, Tennessee 38555

    <u>with a copy to</u>:

    Eric Chamberlin, Attorney at Law
    421 South Main Street
    Crossville, Tennessee   38555

If to the Seller addressed to:

    Jon Simpson
    118 Brown Avenue Suite 103
    Crossville, Tennessee 38555

    <u>with a copy to</u>:
    Thomas E. Hale, Attorney at Law
    P. O. Box 922
    Crossville, Tennessee 38555

    **Section 8.8** <u>**Parties in Interest**</u>.  This Agreement may not be transferred, assigned, pledged or hypothecated by any party hereto, other than by operation of law. Any purported such transfer, assignment, pledge, or hypothecation (other than by operation of law) shall be void and ineffective.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

    **Section 8.9** <u>**Severability**</u>.  In the event any provision of this Agreement is found to be void and unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same effect as though the void or unenforceable part had been severed and deleted.

    **Section 8.10** <u>**Counterparts**</u>.  This Agreement may be executed in two or more counterparts or by electronic mail or facsimile transmission, all of which taken together shall constitute one instrument.

    **Section 8.11** <u>**Entire   Agreement**</u>.  This Agreement, including the other documents referred to herein and the Exhibits hereto which form a part hereof, contains the entire understanding of the parties hereto with respect to the subject matter contained

<p style="text-align:center">19</p>

herein and therein.   This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

Section 8.12 <u>Amendments</u>.   This Agreement may not be amended, supplemented or modified orally, but only by an agreement in writing signed by each of the parties hereto.

Section 8.13 <u>Third Party Beneficiaries</u>.   Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto and their respective successors and assigns as permitted under Section 8.8.

Section 8.14 <u>No Strict Construction</u>.   The language used in this Agreement shall be deemed to be the language chosen by Seller and Purchaser to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.

Section 8.15 <u>Use of Terms</u>.   Whenever the context so requires or permits, all references to the masculine herein shall include the feminine and neuter, all references to the neuter herein shall include the masculine and feminine, all references to the plural shall include the singular and all references to the singular shall include the plural.

Section 8.16 <u>No Payments for Referrals</u>   Seller and Purchaser acknowledge and agree that the Purchase Price has been determined to be consistent with the fair market value of the Acquired Assets and that no portion of the Purchase Price or any other benefit granted to any Party under this Agreement is conditioned on any requirement that Seller make referrals to, be in a position to make or influence referrals to, or otherwise generate business for, Purchaser.

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

PURCHASER:

CUMBERLAND MEDICAL CENTER
a Tennessee nonprofit corporation

By: _____

Larry Moore
Its:   President and Chief Executive Officer

20

CONFIDENTIAL DISCOVERY MATERIAL                SSC - 01883

SELLER:

**SPECIALTY SURGERY CENTER, PLLC**
a Tennessee professional limited liability company

By: _____

Jon Simpson
Its: Managing Member

EXHIBIT A

REAL PROPERTY LEGAL DESCRIPTION

[To be provided by Seller prior to Closing]

21

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01884

**EXHIBIT B**

PERSONAL PROPERTY

[To be provided by Seller prior to Closing]

22

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01885

**EXHIBIT C**

CONTRACTS

[To be provided by Seller prior to Closing]

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01886

**EXHIBIT D**

ACCOUNTS RECEIVABLE

[To be provided by Seller prior to Closing]

24

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01887

**EXHIBIT E**
**GENERAL ASSIGNMENT**

25

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01888

This instrument prepared by: Thomas E. Hale
Attorney at Law
P.O. Box 922
Crossville, TN 38557

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("AGREEMENT") EFFECTIVE AS OF JUNE 27, 2013 by and between SPECIALTY SURGERY CENTER, PLLC, a Tennessee professional limited liability company ("SSC"), and CUMBERLAND MEDICAL CENTER, INC., a Tennessee nonprofit corporation ("CMC").

NOW, THEREFORE, in consideration of the preliminary statements and of the mutual covenants and other terms and conditions contained herein, the parties hereto agree as follows:

1.   **Assignment and Assumption.**  SSC hereby conveys, transfers and assigns to CMC all of its right, title and interest in the Contracts set out on Exhibit "A" and all documents related thereto (collectively, the "Assigned Contracts").  In consideration of such assignment (which assignment CMC hereby accepts) and subject to the terms, conditions, representations and warranties contained herein, CMC hereby assumes all of the obligations of SSC under the Assigned Contracts and hereby agrees to be bound by all covenants and agreements of SSC set forth in the Assigned Contracts and to comply with all other terms and conditions of the Assigned Contracts.

2.   **Representations Warranties and Covenants of SSC.**  SSC represents, warrants and covenants to CMC as follows:

(a) SSC is a Tennessee professional limited liability company duly formed and validly existing under the laws of the State of Tennessee.  SSC has the requisite power and authority to own and operate its business and to carry on its business as now being conducted.

(b) The execution and delivery of this Agreement and performance of the transactions contemplated hereby have been duly authorized by SSC and will not result in a breach by it or constitute a default by it under any agreement, instrument or order to which it is a party or by which it is bound, and will not be in conflict with or constitute a default under or violation of any provision of its limited liability company agreement.

(c) This Agreement and all other instruments required hereby to be executed and delivered to CMC are, or when delivered will be, legal and binding instruments enforceable in accordance with their terms.

(d) The Assigned Contracts are assignable by SSC to CMC hereunder.

(e) SSC has complied with all provisions of the Assigned Contracts and neither SSC nor any other parties to the Assigned Contracts is in default under any thereof.

(f) SSC has not, directly or indirectly, in any Assigned Contract guaranteed performance or payment by any other corporation or person of any obligation or liability.

CONFIDENTIAL DISCOVERY MATERIAL

(g) SSC agrees to promptly furnish each of the other parties to the Assigned Contracts with notice of the assignment hereunder of the Assigned Contracts to CMC and agrees to promptly give CMC notice of any notice or communication hereafter received by SSC with respect to the Assigned Contracts.

3. **Representations, Warranties and Covenants of CMC.**

(a) CMC is a corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee. CMC has the corporate power to own and operate its business and to carry on its business is now being conducted.

(b) The execution and delivery of this Agreement and performance of the transactions contemplated hereby have been duly authorized by CMC and will not result in a breach by it or constitute a default by it under any agreement, instrument or order to which it is a party or by which it is bound, and will not be in conflict with or constitute a default under or violation of any provision of its Articles of Incorporations or By-Laws.

(c) This Agreement and all other instruments required hereby to be executed and delivered to SSC are, or when delivered will be, legal and binding instruments enforceable in accordance with their terms.

4. **Further Instruments.** SSC hereby agrees to duly execute and deliver to CMC such other and further instruments of conveyance, transfer and assignment and to take such other action as CMC may reasonably deem necessary to more effectively convey and transfer to CMC the Assigned Contracts transferred or intended to be transferred hereby. CMC agrees to duly execute and deliver to SSC all such other and further instruments of assumption and take such other action as may reasonably be required by SSC to effect the full and complete assumption by CMC of the obligations of SSC assumed or intended to be assumed hereunder.

5. **Indemnification.** CMC hereby agrees to indemnify and hold SSC harmless from and against all actions, claims, demands and expenses, including attorneys' fees, in respect of the obligations assumed hereunder other than any actions, claims demands and expenses arising from or in connection with any misrepresentation or breach of warranty or covenant by SSC hereunder. SSC hereby agrees to indemnify and hold CMC harmless from and against all actions, claims, damages and expenses, including attorneys' fees, arising from or in connection with any misrepresentation or breach of warranty or covenant by SSC hereunder.

6. **Notices.** Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be delivered in person to such party or mailed by first class mail, postage prepaid, addressed as follows:

If to CMC, addressed to:

Cumberland Medical Center.
c/o Ed Anderson
421 South Main Street
Crossville, Tennessee 38555

with a copy to:

Eric Chamberlin, Attorney at Law
421 South Main Street
Crossville, Tennessee  38555

If to SSC addressed to:

Jon Simpson
118 Brown Avenue
Crossville, Tennessee 38555

with a copy to:
Thomas E. Hale, Attorney at Law
P. O. Box 922
Crossville, Tennessee 38555

or to such other address with respect to a party as such party shall notify the other party
in writing as provided above.

7. **Complete Agreement.**   This Agreement contains a complete agreement
between the parties hereto with respect to the assignment of the Assigned
Contracts, assumption of obligations and other transactions contemplated hereby
and supersedes all prior agreements and understanding between the parties
hereto with respect thereto.

8. **Successors and Assigns.**   This Agreement shall inure to the benefit of and
shall bind the successors, heirs, executors and assigns of the parties hereto.

9. **Governing Law.**   This Agreement shall be construed and enforced in
accordance with the laws of the State of Tennessee.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be
effective as of the 27th day of June, 2013.

By: _____
Ed Anderson
Its:  President and Chief Executive Officer

**ASSIGNOR:**

**SPECIALTY SURGERY CENTER, PLLC**
a Tennessee professional limited liability company

By: _____
Jon Simpson
Its: Chief Manager

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01891

EXHIBIT "A"

Contracts

Ricoh Copier Contract Number  25071700

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01892

25011.100

# RICOH

Quote: 675885

## ORDER AGREEMENT
### RICOH BUSINESS SOLUTIONS

25071700

| DATE: 8/25/2010 | TYPE OF SALE: used/LSIS1 |
|---|---|

AGREEMENT CONSISTS OF THIS PAGE AND THE TERMS AND CONDITIONS ATTACHED

| SHIP TO | | BILL TO | |
|---|---|---|---|
| Salesrep Name and Number: Kacey Thompson 6000026977 | | Salesrep Name and Number: Kacey Thompson 6000026977 | |
| Install Branch Number: 763 - Knoxville | Install Branch Name: 763 - Knoxville | Order Taking Branch Number: 763 - Knoxville | Order Taking Branch Name: 763 - Knoxville |
| Account Number: | | Account Number: | |
| Customer Name: Specialty Surgery Center | | Customer Name: Specialty Surgery Center | |
| Address Line1: 116 Brown Avenue | | Address Line1: 116 Brown Avenue | |
| Address Line2: | | Address Line2: | |
| City: Crossville | | City: Crossville | |
| County: | ST/ZIP: TN / 38555 | County: | ST/ZIP: TN / 38555 |
| Contact: Erin Patton | | Contact: Erin Patton | |
| Phone/Fax: 931-484-2500 / | | Phone/Fax: 931-484-2500 / | |
| email: erin@surgerycentercumberland.com | | email: erin@surgerycentercumberland.com | |

### BILLING INFORMATION

| Lease Approval #: | Party #: | NAT/USA Contact # COMMERCIAL | Tax Exempt # | | | |
|---|---|---|---|---|---|---|
| Billing Method Arrears | | Bill Start Date | P.O.# | PO Limit $0.00 | | PO Expire Date |

### SERVICE INFORMATION

| Meter Collection Method @ Remote | Service Location 763 - Knoxville | Service Term 60 | Service Zone 03 | |
|---|---|---|---|---|
| Meter Frequency Quarterly | Bill Frequency Monthly | Lease Service Included in Lease | Monthly Minimum Meter 0 | |

| Product ID | Description | Quantity |
|---|---|---|
| 414377 | Aficio MP 4000SPF - M5595801014-used meter 84 | 1 |
| 412730 | SR790 1,000 Sheet Finisher** - J1058001331 | 1 |
| SVC-BRONZE | Labor, Parts, Black Toner  Toner Included: Inclusive BLACK AND WHITE COPY CHARGE OF $0.0082 IN EXCESS OF 0 PER QUARTER COLOR COPY CHARGE OF $0.0 IN EXCESS OF 0 PER QUARTER. | |
| 414377 | Aficio MP 4000SPF - M5595003100-used meter 49,923 | 1 |
| 412730 | SR790 1,000 Sheet Finisher** - J109760018 | 1 |
| SVC-BRONZE | Labor, Parts, Black Toner  Toner Included: Inclusive BLACK AND WHITE COPY CHARGE OF $0.0082 IN EXCESS OF 0 PER QUARTER COLOR COPY CHARGE OF $0.0 IN EXCESS OF 0 PER QUARTER. | |
| 414847 | Aficio MP 171SPF - M408705903-USED-meter 6234 | 1 |
| 9908012 | Network Connectivity | 1 |
| SVC-BRONZE | Labor, Parts, Black Toner  Toner Included: Inclusive BLACK AND WHITE COPY CHARGE OF $0.01 IN EXCESS OF 0 PER QUARTER COLOR COPY CHARGE OF $0.0 IN EXCESS OF 0 PER QUARTER. | 1 |
| SHIPPING & HANDLING | Shipping/Handling | |

1 Customer Copy

Rev. 06/10

**CONFIDENTIAL DISCOVERY MATERIAL**

SSC - 01893

# RICOH

Quote: 675865

## ORDER AGREEMENT
### RICOH BUSINESS SOLUTIONS

| Message | | | | Sales Sub Total $0.00 | Service Sub Total $0.00 |
|---|---|---|---|---|---|
| Sub Total $0.00 | Taxes $0.00 | | Order Total $0.00 | Less Down Payment $0.00 | Amount Due $0.00 |

If no amount of taxes is shown above, applicable tax amounts will be determined and reflected on each invoice. In addition, any taxes shown above are estimated. Actual tax amounts, which may differ from the amounts stated above, will be determined and reflected on the invoice.

2 Customer Copy.

Rev. 06/10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01894

2301/100

# RICOH

Quote: 676865

## ORDER AGREEMENT
### RICOH BUSINESS SOLUTIONS

### LEASE PAYMENT SCHEDULE

| | | | |
|---|---|---|---|
| | | .00 | Payment Frequency | Monthly |
| Number of Payments | | $240 | Contract Term | 60 |
| Payment Amount | | $0.00 | | |
| Plus Tax | | $240 | End of Lease Option | LS1$1 |
| Total Payment Amount | | $0.00 | | |
| Advance Payment Amount | | | | |

IMPORTANT READ BEFORE SIGNING. THE CONTRACT TERMS AND CONDITIONS AND MAINTENANCE TERMS AND CONDITIONS OF THE ORDER AGREEMENT AND THE TERMS AND CONDITIONS OF THE LEASE ARE RELEVANT...

| Accepted: | Customer Name: |
|---|---|
| RICOH AMERICAS CORPORATION | Specialty Surgery Center |
| 5 DEDRICK PLACE | |
| WEST CALDWELL, NJ 02005 | By: _____ Title: Administrator |
| By: _____ Title: Contract Admin | Print Name: Kevin L. Patton |
| Date Accepted: 11/9/10 | Date Signed: 9/11/10 |

Customer acknowledges that it has received copies of the Terms and Conditions of Sale of Lease Agreement and Maintenance Agreement, as applicable to this Order Agreement and acknowledges that such Terms and Conditions are incorporated into this Order Agreement.

### UNCONDITIONAL GUARANTY

| Personal: | Personal: |
|---|---|
| By: _____ (Individually) | By: _____ (Individually) |
| Address: _____ | Address: _____ |
| Social Security Number: _____ | Social Security Number: _____ |
| Witness: _____ | Witness: _____ |

3 | Customer Copy

Rev. 08/10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01895

# RICOH

Quote: 675865

## ORDER AGREEMENT
### RICOH BUSINESS SOLUTIONS

#### GENERAL TERMS AND CONDITIONS

1. Orders. Customer may acquire products and maintenance services from Ricoh-Americas Corporation ("Ricoh") by executing and delivering to Ricoh an Order Form for acceptance. If Customer has elected to execute a Lease Agreement, Customer shall be deemed to have consented to the assignment of the Lease Agreement and the Equipment by Ricoh to a third party Lessor and to enter into the Lease Agreement with such Lessor. These General Terms and Conditions shall be incorporated by reference into any Order Form, Lease Agreement or Maintenance Agreement provided, however, that, in the event of any conflict between the terms of the Lease Agreement is subject to a third party General Terms and Conditions, the Terms of the Lease Agreement shall control and provided further that in the event that the Lease Agreement is subject to a third party Lessor, the Lessor shall not be obligated to perform any of Ricoh's obligations under the General Terms and Conditions or Maintenance Terms and Conditions.

2. Priority and Charges/Payment Terms. Prices for Maintenance Services may be satisfied by Ricoh on or after each one-year anniversary of the effective date of the Maintenance Agreement in an amount not to exceed twelve percent (12%). Unless otherwise specified in any Order Form, payment to Ricoh for products shall be due thirty (30) days from date of invoice. Customer shall pay Ricoh interest on any past due payment at the highest rate permitted by applicable law, not to exceed 1.5% per month.

3. Taxes. Customer shall pay all taxes and use taxes, personal property taxes and all other taxes and charges relating to the purchase, ownership, delivery, lease, possession or use of the Equipment or the provision of Maintenance Services, with the exception of any taxes on or measured by Ricoh's and/or Lessor's net income.

4. Limited Warranties. Ricoh warrants, to Customer that Maintenance Services shall be performed by Ricoh in a workmanlike manner and in accordance with industry standards. Ricoh further warrants that, at the time of delivery and for a period of ninety (90) days thereafter the Equipment will be in good working order and will be free from any defects in material and workmanship. Ricoh's obligations under this warranty are limited solely to the repair or replacement (at Ricoh's option) of parts proven to be defective upon inspection. The foregoing warranty shall not apply (a) if the Equipment is installed, used, modified, added to, moved or otherwise serviced in any place where Ricoh services are not available; CUSTOMER ACKNOWLEDGES THAT THE LIMITED WARRANTY CONTAINED HEREIN DOES NOT ASSURE UNINTERRUPTED OPERATION AND USE OF THE EQUIPMENT. THE WARRANTIES EXPRESSED HEREIN ARE EXCLUSIVE AND RICOH HEREBY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.

5. Limitation of Liability. NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER OR TO ANY PERSON OR ENTITY CLAIMING THROUGH SUCH PARTY FOR LOST PROFITS, LOSS OF REVENUE, OR FOR SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR IN ANY MANNER CONNECTED WITH THIS AGREEMENT OR ANY ORDER, OR THE SUBJECT MATTER HEREOF, REGARDLESS OF THE FORM OF ACTION AND WHETHER OR NOT SUCH PARTY HAS BEEN INFORMED OF, OR OTHERWISE MIGHT HAVE ANTICIPATED, THE POSSIBILITY OF SUCH DAMAGES. THE AMOUNT OF ANY LIABILITY OF RICOH TO CUSTOMER OR ANY THIRD PARTY, FOR ONE OR MORE CLAIMS ARISING FROM OR RELATING TO THIS AGREEMENT, SHALL NOT EXCEED, IN THE AGGREGATE, THE AMOUNT PAID TO RICOH FOR THE PROVISION OF PRODUCTS AND THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT DURING THE ONE-YEAR PERIOD PRECEDING THE DATE ON WHICH THE CLAIM AROSE.

6. Governing Law. These General Terms and Conditions and the Maintenance Terms and Conditions below shall be construed in accordance with and governed by the substantive laws of the State of New Jersey, without regard to its conflict of laws principles.

7. Entire Agreement. These General Terms and Conditions and the Maintenance Terms and Conditions below constitute the entire agreement between the parties with respect to the subject matter and supersedes all proposals, oral or written, and all other communications between the parties in relation to the Equipment. Customer agrees and acknowledges that it has not relied on any representations, warranty or provision not explicitly contained in these General Terms and Conditions and any Order Form, Lease Agreement and/or Maintenance Agreement, whether in writing, electronically communicated or in oral form. Any and all representations, promises, warranties, or statements by any Ricoh agent, employee or representative that differ in any way from the terms of these General Terms and Conditions and any Order Form, Lease Agreement and/or Maintenance Agreement shall be given no force or effect.

#### MAINTENANCE TERMS AND CONDITIONS

1. Maintenance Service. Ricoh agrees to provide to Customer, during Ricoh's normal business hours, the maintenance service necessary to keep the Equipment in, or restore the Equipment to good working order in accordance with Ricoh's policies then in effect. This maintenance service includes maintenance based upon the specific needs of individual Equipment, as determined by Ricoh, and unscheduled, expert remedial maintenance. For each unscheduled service call requested by the Customer, Ricoh shall have a reasonable time within which to respond. Maintenance will include lubrication, adjustments, and replacement of maintenance parts deemed necessary by Ricoh. Maintenance parts will be furnished on an exchange basis, and the replaced parts shall become the property of Ricoh. Maintenance service provided under this Agreement does not assure uninterrupted operation of the Equipment. If available, maintenance service requested and performed outside Ricoh's normal business hours will be charged to the Customer at Ricoh's applicable time-and material rates and terms then in effect, unless Ricoh and Customer have a written agreement providing for afterhours maintenance service. This Agreement does not cover charges for installation of equipment or deinstallation of equipment (i.e. moving). For purposes of these Maintenance Terms and Conditions, Equipment excludes any software and documentation described on the Order Form and/or incorporated or integrated in the Equipment.

2. Exclusions to Maintenance Service. Maintenance service provided by Ricoh under this Agreement does not include: (a) Repair of damage or losses to Equipment caused by failure of Customer to provide continually a suitable installation environment with all facilities prescribed by Ricoh, including, but not limited to, service time caused by failure of Customer to provide equipment for proper operation or humidity-control (b) Repair of damage or increases in service time caused by: the failure to provide, or the failure of adequate electrical power, air-conditioning or humidity control (c) Repair of damage or losses to Equipment caused by transient; abuse or physical accident, disaster, which shall include but not be limited to fire, flood, water, wind, and lightning; and earthquake; neglect; power transients; or other casualty (d) Failure of, or damage to other Ricoh's published operating instructions; and unauthorized modifications or repair of Equipment by persons other than authorized representatives of Ricoh (e) Repair of damage or increase in service time caused by use of the Equipment for purposes other than those for which designed (f) Replacement of parts which are consumed in normal Equipment operation, unless specifically included (g) Furnishing supplies or accessories, painting or refinishing the Equipment or furnishing the material therefore, inspecting other Equipment, performing services connected with relocation of Equipment or adding or removing accessories, attachments or other devices (h) Repair of damage, replacement of parts caused by other than normal wear or repetitive service calls caused by use of incompatible supplies (i) Complete joint replacement or refurbishment of the Equipment (j) Electrical work external to the Equipment or maintenance of accessories, attachments, or other devices not furnished by Ricoh; (k) Increase in service time caused by Customer denial and not free access to the Equipment or denial or departure from Customer's site. The foregoing excluded items, if performed by Ricoh, shall be charged to Customer at Ricoh's applicable time and material rates then in effect.

3. Invoicing. Charges for maintenance service hereunder will consist of a Basic Maintenance Charge, and, if applicable, Meter Charges as stated below in this Agreement. In addition, Customer shall be responsible for paying all shipping and handling charges for toner, even if this Agreement is a toner inclusive, contract as set forth in the Ricoh Order Form, in accordance with the terms stated on the invoice. The Basic Maintenance Charge may be invoiced in advance. The Meter Charge (if applicable) or other maintenance charges will be invoiced periodically in arrears. The Basic Maintenance and Meter Charges for a particular service will be prorated on the basis of a thirty (30) day month. Payment is required within the period stated on the invoice.

4. Engineering Changes. Engineering changes, determined applicable by Ricoh, will be controlled and installed by Ricoh. Engineering changes which provide additional capabilities to the Equipment covered herein will be made at Customer's request at Ricoh's applicable time and material rates and terms then in effect.

5. Indemnification. Except as otherwise provided in Section 6 of the General Terms and Conditions, Ricoh agrees to indemnify and hold Customer harmless from and against any loss, cost, damage, injury, expense, or liability as a result of injury or death of any person or damage to any personal property of Customer which such personal injury or damage arises out of or in connection with the sole negligence of Ricoh or its employees in the performance of this Agreement, provided Ricoh receives prompt written notice of such personal injury or damage, and provided further that Ricoh shall have the sole control of the defense of any such action and all negotiations for a settlement or compromise.

6. Term and Termination. This maintenance agreement shall extend for a period of one (1) year from the commencement date and shall automatically renew for additional one (1) year period unless notice of nonrenewal is provided by either party within thirty (30) days of the initial or any renewal term. Notwithstanding the above, either party may terminate a maintenance agreement for failure of the other to comply with any of its terms and conditions in the event such noncompliance is

‖Customer Copy

Rev. 06/10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01896

# RICOH

Quote: 675865

## ORDER AGREEMENT
### RICOH BUSINESS SOLUTIONS

not cured within thirty (30) days after the provision of notice of such noncompliance. Maintenance service performed by Ricoh after the termination of a maintenance agreement shall be charged to Customer at Ricoh's applicable time and material rates and terms then in effect. Ricoh may suspend performance under any maintenance agreement if Customer is in default or in arrears in payments to Ricoh under that or any other agreement.

**7. Meter Charges.** If applicable, Customer also shall pay the monthly meter charges fixed on the Order Form for each copy made on Equipment subject to this Agreement. The initial quarter following installation will include the first partial month (if applicable) and meter charges for such partial month will be prorated. Meter readings shall be provided on a periodic basis by Customer at the request of Ricoh.

**8. Supplies.** If supplies are included in the service provided under this Agreement, Ricoh will supply black toner, ink and developer, unless otherwise stated in this Agreement. If Customer's usage of the supplies exceeds the normal yields for the equipment being serviced, Ricoh will invoice and Customer agrees to pay, for the excess supplies at Ricoh's current retail prices then in effect.

**9. @Remote Services.** Ricoh may, at its discretion and dependent upon device capability provide remote meter reading and equipment monitoring service utilizing its @ Remote solution. This may allow for the automation the meter reading and information process, automatically place low toner alerts, automatically place service calls in the event of a critical device failure and to enable firmware upgrades. The meter count and other information collected by @ Remote ("Data") is sent on the internet to remote servers, some of which may be located outside the U.S. @Remote cannot and does not collect your document content or user information. Ricoh uses reasonably available technology to maintain the security of the Data; however, you acknowledge that no one can guaranty security of information maintained on computers and on the internet. Ricoh retains full rights to the Data for its normal business purposes including product development and marketing research; parties may use to service your equipment. Ricoh may also use the Data for its normal business purposes. If you provide personal data or information that personally identifies you, Ricoh may dispose of the Data at any time and without notice. The @Remote technology is the confidential and proprietary information of Ricoh and/or its licensors protected by copyright, trade secret and other laws and treaties. Ricoh retains full title, ownership and all intellectual property rights in and to @Remote.

**10. Customer Obligations.** Customer shall provide a proper place for the Equipment in accordance with the environmental specifications of the manufacturer. Customer shall provide Ricoh degree* service* access to the Equipment subject to Customer's usual security procedures and shall use the Equipment in accordance with the instructions of the manufacturers.

**11. Use of Ricoh Recommended Supplies.** Ricoh products are designed to provide optimal performance with Ricoh recommended supplies including toner, developer and other oils. In the event Customer uses other than Ricoh recommended supplies, and if such supplies are defective or not acceptable for use with the Equipment and cause abnormally frequent service calls or service problems, Ricoh may, at its option assess a surcharge or terminate any maintenance obligations. If so terminated, Customer will be offered service on a time and materials basis at Ricoh's then prevailing rates. It is not a condition that Customer use only Ricoh brand supplies.

**12. Data Management Services.** Notwithstanding anything to the contrary set forth in this Agreement, the parties acknowledge and agree that Ricoh shall have no obligation to remove, delete, preserve, maintain or otherwise safeguard any information, images or content retained by or resident in any Products serviced and maintained by Ricoh, whether through a digital storage device, hard drive or other electronic medium ("Data Management Services"). If desired, Customer may engage Ricoh to perform Data Management Services at then-prevailing rates. Customer acknowledges that Customer is responsible for ensuring its own compliance with legal requirements in connection with Data retention and protection and that Ricoh does not provide legal advice or represent that the Products and Services will guarantee compliance with such requirements. The selection, use and design of any Data Management Services, and any decisions which with respect to the deletion or storage of data, as well as the loss of any data resulting therefrom, shall be the sole and exclusive responsibility of Customer.

Rev. 06/10

5 | Customer Copy

---

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01897

RICOH

Quote: 875865

# LEASE AGREEMENT

## RICOH BUSINESS SOLUTIONS

TO OUR VALUED CUSTOMER: This Lease Agreement ("Lease") has been written in "Plain English." When we use the words you and your in this Lease, we mean you, our customer, which is the Lessee in this Agreement indicated at the bottom below. When we use the words we, us, and our in this Lease, we mean the Lessor, Ricoh Americas Corporation or a third party Lessor, as assignee, as agreed in Section 5 below.

1. LEASE. This Lease establishes the general terms and conditions under which we lease to you the equipment described in the Order Agreement dated 8/26/2010

2. TERM AND LEASE. This Lease Agreement shall become effective upon acceptance and execution by Lessor and shall remain effective at least until the expiration of the Term of the Order Agreement hereunder.

This Lease is effective on the date that it is accepted and signed by Lessor, and the term of this Lease begins on that date or any later date that Lessor designates (the "Commencement Date") and continues for the term stated in the Order Agreement. You authorize us to insert or correct missing information in the Order Agreement, including your proper legal name, serial numbers and any other information describing the Equipment. You further authorize us to adjust the Lease Payments by not more than 15% to reflect any reconfiguration of the Equipment or adjustments to reflect applicable taxes. As Customer will have possession of the Equipment from the date of its delivery, if Lessor accepts and signs the Order Agreement, Customer will pay Lessor interim rent for the period from the date the Equipment is delivered to Customer and the Commencement Date, as reasonably calculated by Lessor based on the Lease Payment, the number of days in that period, and a month of 30 days.

Lease Payments will be due as invoiced until the balance of the Lease Payments and any additional Lease Payments or expenses chargeable to Customer under the Order Agreement are paid in full. THIS LEASE AGREEMENT AND ALL ORDER AGREEMENTS ARE NON-CANCELLABLE BY CUSTOMER. CUSTOMER'S OBLIGATION TO PAY THE LEASE PAYMENTS IS ABSOLUTE AND UNCONDITIONAL AND IS NOT SUBJECT TO CANCELLATION, REDUCTION, SETOFF OR COUNTERCLAIM. All payments shall be made to Lessor at the address indicated by Lessor in writing.

3. REPAIR AND MAINTENANCE. If the Order Agreement includes repair and maintenance services, such services shall be provided pursuant to the General Terms and Conditions and the Maintenance Terms and Conditions as set forth in the Order Agreement between Customer and Ricoh.

4. TITLE, PERSONAL PROPERTY, LOCATION AND INSPECTION. Unless Customer has been granted a $1.00 purchase option, Lessor owns the Equipment. Customer has the right to lease the Equipment for the full Lease Term provided the Customer complies with the terms and conditions of the Order Agreement and this Lease Agreement. For all purposes under the Order Agreement and this Lease Agreement, the Equipment is and shall remain personal property, even though the Equipment may become attached to any real estate. Customer agrees not to permit a lien to be placed upon the Equipment or to remove the Equipment from its place of installation without Lessor's prior written consent, which consent shall not be unreasonably withheld. If Lessor deems it reasonably necessary, Customer agrees to provide Lessor with waivers of interest or liens, from anyone claiming any interest in the real estate on which any item of Equipment is located. Lessor also has the right, at reasonable times, to inspect the Equipment.

5. ASSIGNMENT. WITHOUT OUR PRIOR WRITTEN CONSENT, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD WITH US ACTING AS A COMMERCIALLY REASONABLE AND PRUDENT LESSOR GIVEN ALL OF THE FACTS AND CIRCUMSTANCES THEN KNOWN TO US, CUSTOMER SHALL NOT (i) ASSIGN, TRANSFER, PLEDGE OR HYPOTHECATE THIS LEASE AGREEMENT OR ANY ORDER AGREEMENT, THE EQUIPMENT OR ANY PART THEREOF OR ANY INTEREST THEREIN OR (ii) SUBLET OR LEND THE EQUIPMENT OR PERMIT IT TO BE USED BY ANYONE OTHER THAN CUSTOMER AND CUSTOMER'S EMPLOYEES. We may assign this Lease Agreement or any Order Agreement and the Equipment and our rights, remedies and entitlements thereunder (but not Ricoh's obligations), at any time in whole or in part, without notice to the Customer. Customer shall not assert against any assignee any claim or defense it may have against Ricoh, but rather shall assert the same only against Ricoh. No assignment of this Lease Agreement or any Order Agreement shall release Lessor from any obligations Lessor may have to Customer. In the event this Lease Agreement or any Order Agreement is assigned by Ricoh to a Lessor, sections 5(a), 5(b) and 5(c) shall apply. (a) Selection of Equipment/Disclaimer of Warranties. Customer has selected the Equipment and the supplier from whom Lessor agrees to purchase the Equipment at Customer's request. Lessor is not the manufacturer of the Equipment and Lessor is leasing the Equipment to Customer "AS-IS". Customer has selected the Equipment and Lessor MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Lessor transfers to Customer for the term of a Order Agreement all warranties, if any, made by Ricoh. CUSTOMER ALSO ACKNOWLEDGES THAT NO ONE IS AUTHORIZED TO WAIVE OR CHANGE ANY TERM, PROVISION OR CONDITION OF THIS LEASE AGREEMENT OR ANY ORDER AGREEMENT AND, EXCEPT FOR THE RICOH WARRANTIES, MAKE ANY REPRESENTATION OR WARRANTY ABOUT AN ORDER AGREEMENT OR THE EQUIPMENT. LESSOR SHALL NOT BE LIABLE FOR ANY DELAYS IN MAKING DELIVERIES OR REPAIRS NOR IN ANY EVENT FOR SPECIAL, RESULTING OR CONSEQUENTIAL DAMAGES OR LOSS OF PROFIT OCCASIONED BY ANY BREACH OF WARRANTY OR REPRESENTATION OR RESULTING FROM THE USE OR PERFORMANCE OF THE EQUIPMENT. CUSTOMER'S OBLIGATION TO PAY IN FULL ANY AMOUNT DUE UNDER A ORDER AGREEMENT WILL NOT BE AFFECTED BY ANY DISPUTE, CLAIM, COUNTERCLAIM, DEFENSE OR OTHER RIGHT WHICH CUSTOMER MAY HAVE OR ASSERT AGAINST RICOH.

IN THE EVENT THE PERIODIC PAYMENTS UNDER AN ORDER AGREEMENT INCLUDES THE COST OF MAINTENANCE AND/OR SERVICE BEING PROVIDED BY RICOH, CUSTOMER ACKNOWLEDGES THAT, IF THAT ORDER AGREEMENT IS ASSIGNED, THE ASSIGNEE/LESSOR IS NOT RESPONSIBLE FOR PROVIDING SUCH MAINTENANCE AND/OR SERVICE FOR THE EQUIPMENT. CUSTOMER WILL MAKE ALL CLAIMS FOR MAINTENANCE AND/OR SERVICE SOLELY AGAINST RICOH AND SUCH CLAIMS WILL NOT AFFECT CUSTOMER'S OBLIGATION TO MAKE ALL PERIODIC PAYMENTS UNDER SUCH ORDER AGREEMENT TO THE ASSIGNEE LESSOR.

(b) Use, Maintenance and Repair. Customer is required, at its own cost and expense, to arrange to keep the Equipment in good repair, condition and working order, except for ordinary wear and tear. All replacement parts used or installed and repairs made to the Equipment will become Lessor's property. Customer may, with Lessor's prior written consent, make modifications to the Equipment, provided such modifications do not reduce the value or usefulness of the Equipment or result in the loss of any warranty or any certification necessary for the maintenance of the Equipment and such modifications must be easily removable without causing damage to the Equipment. Before returning the Equipment, Customer agrees to remove such modifications and restore the Equipment to its original condition. If Customer fails to remove such modifications, Lessor is deemed the owner of such modifications.

(c) Maintenance and Additional Copy Charge Administration. Customer acknowledges that Lessor, purely as an administrative convenience to Customer and Ricoh, may bill, collect and otherwise administer Maintenance Payments on Ricoh's behalf and agrees that Lessor has no liability or responsibility for the performance thereof.

(d) These Terms and Conditions of Lease are the only terms and conditions governing the Lease of the Equipment by Customer and no other agreements between Ricoh and Customer will have any effect upon, or otherwise affect, the terms and conditions of this Lease Agreement.

6. REDELIVERY AND RENEWAL. Upon at least sixty (60) days and not more than one hundred twenty (120) days written notice to Lessor prior to the expiration of the initial Term or any Renewal Term of the applicable Order Agreement, Customer at its option may (i) renew the Order Agreement for an additional term of at least twelve (12) months; (ii) exercise any applicable purchase option as specified in the applicable Order Agreement, or (iii) return the Equipment, freight and insurance prepaid, to Lessor in good repair, condition and working order, ordinary wear and tear excepted, in a manner and to a location designated by Lessor. If Customer fails to notify Lessor, or having notified Lessor, Customer fails to return the Equipment or exercise one of its other options provided herein, the applicable Order Agreement shall renew for consecutive sixty (60) day periods with Lease Payments in effect at the expiration of the initial Term of the Order Agreement.

7. LOSS OR DAMAGE. Customer is responsible for the risk of loss or destruction of, or damage to the Equipment. No such loss or damage relieves Customer from any obligation under an Order Agreement. Customer agrees to promptly notify Lessor in writing of any loss, destruction or damage to the Equipment and Customer will, at Lessor's option, (i) repair the Equipment to good condition and working order, (ii) replace the Equipment with like equipment in good repair, condition and working order, acceptable to Lessor and transfer clear title to such replacement equipment to Lessor, and such Equipment shall be subject to the Order Agreement and be deemed the Equipment, or (iii) pay to Lessor the present value of the total of all unpaid Lease Payments for the full Order Agreement term, plus either the fair market value of the Equipment at the end of the Order Agreement term as reasonably determined by Lessor or any End of Order Agreement Option price stated on the Order Agreement, whichever is greater (the "FMV"), with the accelerated Lease Payments and the FMV discounted at 0% per annum, plus reasonable costs of collection and attorneys' fees, whereupon the applicable portion of the Order Agreement shall terminate. All proceeds of insurance received by Lessor as a result of such loss or damage will be applied, where applicable, toward the replacement or repair of the Equipment or the payment of Customer's obligations. As between Lessor and Customer, Lessor is not responsible for any losses or injuries caused by the Equipment and Customer will defend and indemnify such Lessor from any claims arising out of or related to the Equipment. This indemnity will continue even after termination of this Lease.

CONFIDENTIAL DISCOVERY MATERIAL

Quote: 875865

# RICOH

## LEASE AGREEMENT
RICOH BUSINESS SOLUTIONS

Rev. 06/10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01899

# RICOH

Quote: 676855

## LEASE AGREEMENT
### RICOH BUSINESS SOLUTIONS

*(body text too faded/illegible to transcribe reliably)*

Lessor: Ricoh Americas Corporation

Lessee: Specialty Supply Center

11/9/10

Federal ID#: 62-1690714

Rev. 08/10

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01900

Customer's/Lessee's Authorized
Signature: _Erin L. Patton_    Print Name: _Erin L. Patton_    Delivery Date of Goods: _10/13/10_

Rev. 06/08

2

CONFIDENTIAL DISCOVERY MATERIAL    SSC - 01901

# RICOH

## ORDER AGREEMENT
RICOH BUSINESS SOLUTIONS

Quote:
Order 28258071,
28258117, 28258144

### DELIVERY AND ACCEPTANCE CERTIFICATE

Customer (Lessee):

SPECIALTY SURGERY CENTER

Lease Agreement Dated:

9-/01/10

The above Customer hereby unconditionally represents and certifies to Ricoh Americas Corporation ("Ricoh"), and agrees, that:

1. The following equipment, other personal property and software, if any, leased or otherwise provided to Customer or otherwise constituting collateral relating to the above lease, contract or schedule (the "Goods"), has been fully delivered and installed at Customer's place of business, has been inspected and tested by Customer and is operating in good working order to Customer's complete satisfaction, meets all of Customer's requirements and specifications, and is hereby irrevocably accepted by Customer:

| Qty | Make or Other Description | Model Name (if any) | Serial # (if any) | Meter Reading (if any) | Meter Contract email required for each maintenance machine |
|-----|---------------------------|---------------------|-------------------|------------------------|-----------------------------------------------------------|
| | | MP4000SP/40SP/9040 SP | M5595601014 Pre Reg | | |
| | | SR790 FINISHER | S8001331-479133 3 | | |
| | | MP4000SP/40SP/9040 SP | 85002180-0414378 Front Desk | | M5585002180 |
| | | MP 171SPF/117SPF/917SPF F | V440870590B PACU | | |

2. There are no side agreements between Customer and any third party relating to the subject matter of the Contract, and no cancellation rights have been granted to Customer by Ricoh or any third party.

Customer agrees that (i) Ricoh may insert the Contract or Lease number above and the Delivery Date below if either is missing following the Customer's signature below and (ii) a facsimile of this document containing a facsimile of the Customer's signature shall be considered as valid and binding as the original for all purposes.

Rev. 05/08

Contract Details

Page 1 of 1

**ORACLE** Customer Self-Service Center

Diagnostics  Home  Logout  Preferences

RICOH AMERICAS CORP

## Contract 25071700: General Information

(Cancel)  (Apply)

**Contract Number** 25071700
**MasterLease Number**
**Status** Active

### Customer Information
**Party Name** SPECIALTY SURGERY CENTER
**Account Number** 375223
**Legal Address** 116 BROWN AVE CROSSVILLE CUMBERLAND TN 38555-7703 United States

**Purchase Order Number**

### Rental Period
**Contractual Term** 60 month(s)
**Lease Effective Date** 10.15.2010

### Asset Summary

| Asset Description | Make | Model | Serial Number | Install Date | Install Location |
|---|---|---|---|---|---|
| RICOH COPIER | RICOH | MP4000 | M5585002180 | 10.13.2010 | 116 BROWN AVE CROSSVILLE CUMBERLAND TN 38555-7703 United States |
| RICOH COPIER | RICOH | MP4000 | M5595601014 | 10.13.2010 | 116 BROWN AVE CROSSVILLE CUMBERLAND TN 38555-7703 United States |
| RICOH COPIER | RICOH | MP171 | V4408705908 | 10.13.2010 | 116 BROWN AVE CROSSVILLE CUMBERLAND TN 38555-7703 United States |

(Cancel)  (Apply)

Diagnostics | Home | Logout | Preferences

Copyright (c) 2006, Oracle. All rights reserved.
About this Page

Privacy Statement

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01903

r.

‡ ‡ ‡ Communication Result Report ( Jul. 31. 2012 10:17AM ) ‡  ‡  ‡
1) Specialty Surgery Center
2) 931 456 7659

Date/Time: Jul. 31. 2012 10:17AM

Page
Not Sent

File
No. Mode          Destination                              Pg(s)     Result
                                                            P.  2       OK
-------------------------------------------------------------------------------
3504 Memory TX      19315282420

Reason for error
E. 1) Hang up or line fail          E. 2) Busy
E. 3) No answer                     E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

SPECIALTY SURGERY CENTER
333 BROWN AVE
CROSSVILLE, TN 31555
PHONE:  (931) 484-3580
FAX:    (931) 456-7659

FACSIMILE TRANSMITTAL SHEET

TO                                      FROM
                                        Kim Bowen  Ext 125
SnowLtr                                 DATE
                                        07.31.12
COMPANY                                 TOTAL NO. OF PAGES INCLUDING COVER
                                        1
FAX NUMBER
931-528-2420
SUBJECT

COMMENTS  List of Rhode acay machines at strlength w/$5.00 buy out at end of 60 mo.
Lease

CONFIDENTIAL
This message is intended only for the use of the individual or entity to which it is addressed, and may
contain information that is privileged, confidential, and exempt from disclosure under applicable law. If
the reader of this message is not the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by telephone. Thank you.

SPECIALTY SURGERY CENTER
333 BROWN AVENUE
CROSSVILLE, TN 33555

**EXHIBIT F**

**NON-COMPETE AGREEMENT**

26

SSC - 01905

NON-COMPETE AGREEMENT BETWEEN CUMBERLAND MEDICAL CENTER, INC. AND THE MEMBERS OF
SPECIALTY SURGERY CENTER, PLLC

This Non-compete Agreement (the "Non-compete") dated ___June  27, 2013___,
2013 (the "Effective Date") is entered into in conjunction with an Asset Purchase Agreement by and
between CUMBERLAND MEDICAL CENTER, INC., a Tennessee nonprofit corporation ("Hospital"), and the
members of SPECIALTY SURGERY CENTER, PLLC, a Tennessee professional limited liability company
("Physicians").

WHEREAS, Hospital and Physicians are parties to that certain Asset Purchase Agreement, dated
May 3, 2013, pursuant to which Hospital agrees to buy and Physicians agree to sell an Ambulatory
Surgery Center located in Crossville, Tennessee; and

WHEREAS, Physicians agree to enter into this Non-Compete agreement with Hospital in
consideration of the above referenced Asset Purchase Agreement.

NOW, THEREFORE, for and in consideration of the recitals above and the mutual covenants and
conditions contained herein, each of Hospital and Physician agrees as follows:

1. **Restrictions.** During the term of this Non-Compete agreement, Physicians agree that they will
   not create, practice in, be employed by, nor become an owner, officer or investor in an
   ambulatory surgery center in Cumberland County, Tennessee. This Agreement does not restrict
   the Physicians from performing procedures and services customarily performed or provided in
   their respective offices. There is no restriction placed on the Physicians to practice medicine of
   any nature outside of Cumberland County, Tennessee.
2. **Geographic Restriction.** The restrictions contained in this Agreement are limited to the County
   of Cumberland in the State of Tennessee. There is no restriction placed on the Physicians to
   practice medicine of any nature outside of Cumberland County, Tennessee.
3. **Term.** This Non-Compete agreement shall be effective for a period of two years commencing
   upon the Effective Date.
4. **Counterparts.** This Non-Compete agreement may be executed in counterparts, each of which
   shall be deemed to be an original, but all of which together shall constitute one and the same
   instrument.

5. **Governing Law.** This Non-Compete agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

6. **Default.** If Hospital breaches or defaults on any provision of the Asset Purchase Agreement or any obligations resulting from said Agreement this Non-compete agreement shall become null and void from the date of such breach or default.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CUMBERLAND MEDICAL CENTER, INC.

By:

Its:

PHYSICIANS

Jon Simpson

Mark Fox

Robert N. Nichols

Mark Lee

Susan Pick

Donathan M. Ivey

Kenneth Lister

CONFIDENTIAL DISCOVERY MATERIAL



## Cumberland
### MEDICAL CENTER

## Resolution of Board of Directors

WHEREAS, Cumberland Medical Center, Inc., through its Board of Directors, reaffirms its commitment to its mission of providing quality care to the patients in our community; and

WHEREAS, CMC has committed to the purchase of the Specialty Surgery Center, LLC.

NOW, THEREFORE, BE IT RESOLVED, that Cumberland Medical Center, Inc. is hereby authorized to purchase the Specialty Surgery Center, LLC, located at 116 Brown Avenue, Crossville, Tennessee; and

BE IT RESOLVED, that the Corporation authorizes its Chief Executive Officer, Edwin S. Anderson and/or its Chief Financial Officer, Larry Moore, to execute and deliver all documents necessary to complete the aforementioned transaction and all documents necessary and appropriate for said transaction, and to do all such other acts and things necessary and proper to carry out the transaction contemplated by this Resolution and to effect the closing of the contemplated transaction.

Adopted by the Cumberland Medical Center, Inc., Board of Directors this 24th day of June, 2013.

_____
Chairman of the Board of Directors

Attest:

_____
Secretary of the Board of Directors

ACTION BY WRITTEN CONSENT OF THE MEMBERS OF
SPECIALTY SURGERY CENTER, PLLC

We, the undersigned, being all of the members of Specialty Surgery Center, PLLC, LLC who would be entitled to vote upon the resolutions hereinafter set forth at a formal meeting of the members of said PLLC held for the purpose of acting upon such resolutions, pursuant to T.C.A. § 48-223-101, do hereby consent to the adoption of the following resolution to the same extent and to have the same force and effect as if adopted at a formal meeting of the members of said PLLC. The undersigned hereby waive any requirement of notice and requirement of a meeting to take the following action.

RESOLVED, that Jon Simpson as Managing Member is authorized to execute any and all documents on behalf of Specialty Surgery Center, PLLC, to enter into that certain Asset Purchase Agreement between Cumberland Medical Center, Inc. and Specialty Surgery Center, PLLC and to deliver any and all documents properly executed to Cumberland Medical Center, Inc. to carry out all the provisions of said Asset Purchase Agreement and all related agreements.

IN WITNESS WHEREOF, we have executed and adopted this resolution on the 1st day of May, 2013.

_____
Jon Simpson

_____
Mark Fox

_____
Robert N. Nichols

_____
Mark Lee

_____
Susan Pick

_____
Donathan M. Ivey

_____
Kenneth Lister

CONFIDENTIAL DISCOVERY MATERIAL

FILED

**ARTICLES OF ORGANIZATION
FOR SPECIALTY SURGICAL CENTER, PLLC**

05 JUL -1 AM 9:54

RILEY DARNELL   The undersigned person adopts the following Articles of
SECRETARY OF STATE
Organization pursuant to the Tennessee Limited Liability
Company Act:

1.   The name of the professional limited liability
company is Specialty Surgical Center, PLLC.

2.   The street address and zip code of the initial
registered office of the PLLC is Rt. 14, Box 417, Crossville,
TN 38555, in the County of Cumberland, State of Tennessee.

3.   The name of the initial registered agent at the
office named in Paragraph 2 is Donathan M. Ivey.

4.   The name and address of the organizer is Susan Pick,
1007 South Main Street, Crossville, TN 38555.

5.   At the date and time of formation of this PLLC there
are two or more members and all Members are qualified persons
eligible to be a Member pursuant to T.C.A. Section 48-248-401.

6.   The PLLC will be member-managed.

7.   The number of members at the date of filing of the
Articles is 5.

8.   The existence of the PLLC shall begin at the date of
filing these Articles.

9.   The street address and zip code of the principal
executive office of the PLLC is Rt. 14, Box 417, Crossville,
TN 38555, in the County of Cumberland, State of Tennessee.

10.   The PLLC shall have the power to expel a member.

BOOK H528   PAGE   534

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01910

11.  Upon the death, retirement, withdrawal or bankruptcy of any member, the professional limited liability company shall be dissolved, unless, within 90 days of such terminating event, all the remaining members, by unanimous consent, vote to continue the professional limited liability company.

12.  The purpose for which the PLLC is formed is to render the practice of medicine to the public, which shall consist of the actual diagnosing, curing, or relieving in any degree, or professing or attempting to diagnose, treat, cure or relieve, any human disease, ailment, defect, or complaint, whether of physical or mental origin, by attendance or by advice, or by prescribing or furnishing any drug, medicine, appliance, manipulation or method, or by any therapeutic agent whatsoever. This professional limited liability company shall exist and function in compliance with the Tennessee Limited Liability Company Act and is a PLLC pursuant to T.C.A. Sections 48-248-101, et seq. of said Act and in order to properly prosecute the objects and purposes above set forth, the PLLC shall have full power and authority to purchase, lease and otherwise acquire, hold, mortgage, convey and otherwise dispose of all kinds of property, both real and personal, necessary for the rendering of the service of the practice of medicine.                         BOOK M528    PAGE    535

13.  The members shall not have preemptive rights.

Date: 6/27/96

Susan N Pick MD
Susan Pick / Organizer/Member

State of Tennessee, County of CUMBERLAND
Received for record the 25 day of
JULY 1996 at 3:23 PM. (RECD 169402)
Recorded in official records MISC.
Book M528   Page 534- 535

Control # 9  Page 464
State Tax $    .00 Clerks Fee $   .00,
Recording $  5.00, Total $    5.00.
Register of Deeds JUDY GRAHAM SWALLOWS
Deputy Register MARGARET HADEWELL

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01911

SELLER SETTLEMENT STATEMENT

CUMBERLAND MEDICAL CENTER, INC. PURCHASE OF SPECIALTY SURGERY CENTER, PLLC

JUNE 27, 2013

Sale Price                                      ███████████

Total due from Purchaser                        ███████████

Less Charges

    Attorney Fees                               ███████████

    Proration of Property taxes                 ███████████

NET DUE TO SELLER                               ███████████

CONFIDENTIAL DISCOVERY MATERIAL                    SSC - 01912

<u>CERTIFICATE OF NON FOREIGN STATUS</u>

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. To inform Cumberland Medical Center, Inc _____
(the "Transferee") that withholding of tax is not required upon the disposition of a U.S. real property interest by Special Surgery Center, PLLC _____
(the "Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

1. That the Transferor is the owner of the following described property, to wit:

    Block: _____   Lot: _____   County: _____

    Premises: 116 Brown Ave. Crossville, TN  Map 113B  Parcel 15.01 _____

2. The Transferor is not a non-resident alien for purposes of the U.S. income taxation (as such term is defined in the Internal Revenue Code and Income Tax Regulations).

3. The Transferor's U.S. taxpayer identification number (Social Security Number) is
62-1680714 _____

4. The Transferor's address is
116 Brown Avenue _____
Crossville, TN 38555 _____

5. The Transferor understands that this certification be disclosed to the Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS CERTIFICATION AND TO THE BEST OF MY KNOWLEDGE AND BELIEF IT IS TRUE, CORRECT AND COMPLETE, AND I FURTHER DECLARE THAT I HAVE AUTHORITY TO SIGN THIS DOCUMENT ON BEHALF OF THE TRANSFEROR.

DATED: ____6/27/13____

                     BY: _____
                       Jon Simpson, Chief Manager

                     BY: _____

                     BY: _____

                     BY: _____

CONFIDENTIAL DISCOVERY MATERIAL                      SSC - 01913

This instrument was prepared by:      Thomas E. Hale, Attorney at Law
P.O. Box 922
Crossville, TN 38557

13007430
3 PGS : AL - DEED
SUE BATCH: 71488
06/27/2013 - 11:29:28 AM
VALUE
MORTGAGE TAX
TRANSFER TAX
RECORDING FEE
DP FEE
REGISTER'S FEE
TOTAL AMOUNT
STATE OF TENNESSEE, CUMBERLAND COUNTY
JUDY GRAHAM SWALLOWS
REGISTER OF DEEDS

## WARRANTY DEED

For and in consideration of the sum of One Dollar ($1.00), cash in hand paid, and

other good and valuable considerations not herein mentioned, receipt of all of which is

hereby acknowledged, SPECIALTY SURGERY CENTER, PLLC, a Tennessee

professional limited liability company has this day bargained and sold and by these

presents does hereby bargain, sell, transfer and convey unto CUMBERLAND MEDICAL

CENTER, INC., a Tennessee nonprofit corporation, all of its right, title and interest in the

following described tracts or parcels of land, lying and being in the FIRST CIVIL

DISTRICT of Cumberland County, Tennessee, bounded and described as follows:

Map 113B, Group L, Parcel 015.01
Beginning on an iron pin on the west right-of-way of Brown Avenue, said pin the
Northeast corner of the parent tract and the Northeast corner of the tract herein
described; thence along the right-of-way of Brown Avenue, S 27° 07' 14" E a
distance of 145.00 feet to an iron pin set for this survey; thence S 60° 14' 24" W a
distance of 210.00 feet to an iron pin set for this survey; thence N 27° 07' 14" W a
distance of 145.00 feet to an iron pin set in the south boundary of Brock Hill (Deed
Book 124, page 390); thence N 60° 14' 24" E a distance of 210.00 feet to the point
of beginning, containing 0.70 acre according to a survey made May 15, 1997 by
Michael V. Stump, RLS No. 784.



Being the same property conveyed to Specialty Surgery Center, PLLC, by virtue
of a deed dated July 8, 1997, from Jon A. Simpson and wife, Catherine B.
Simpson, of record in Deed Book 1000, Page 2129, Register's Office,
Cumberland County, Tennessee.

TO HAVE AND TO HOLD the above described tract or parcel of property to the

Grantee herein named, its successors and assigns, in fee simple, forever.

Grantor covenants with the Grantee herein named, its successors and assigns,

that it is lawfully seized and possessed of said property and has good and lawful right to

convey the same, that it is free and unencumbered; and, that Grantor will forever warrant

CONFIDENTIAL DISCOVERY MATERIAL

and defend the title thereto against the lawful claims of all persons whomsoever, and Grantor binds its successors and assigns by the above covenants.

Preparer of this instrument makes no representation to the validity of the title contained herein.   This instrument was prepared from information furnished by the parties herein for which the preparer assumes no responsibility.

IN WITNESS WHEREOF, the Grantor has caused this instrument to be executed on this 27th day of June, 2013.

SPECIALTY SURGERY CENTER, PLLC

By: _____

Its: _____

STATE OF TENNESSEE          )
COUNTY OF CUMBERLAND     )

Personally appeared before me, the undersigned authority, a Notary Public in and for said County and State, Jon A. Simpson, Chief Manager of Specialty Surgery Center, PLLC, a Tennessee professional limited liability company, the within named Grantor with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who acknowledged that he executed the within and foregoing instrument for the purposes therein contained.

Witness my signature and seal of office this 27th day of June, 2013.

_____
Notary Public

My commission expires: __11/5/13__

Address of New Owner and
SEND TAX BILLS TO:         Cumberland Medical Center, Inc.
                            421 South Main Street
                            Crossville, TN   38555

THOMAS E. HALE
NOTARY
PUBLIC
AT
LARGE
CUMBERLAND COUNTY, TN

STATE OF TENNESSEE      )

COUNTY OF CUMBERLAND    )

     I hereby swear or affirm that the actual consideration for this transfer, or value of the property or interest in the property transferred, whichever is greater is ▬▬▬▬▬▬▬, which amount is equal to or greater than the amount which the property or interest in property transferred would command at a fair voluntary sale.

_____
Affiant

Subscribed and sworn to before me this _27th_ day of June, 2013.

_____
Notary Public

My commission expires: ___9/7/14___

TRANSFERRED ON
RECORD BOOK
CUMBERLAND COUNTY

JUL 01 2013

ASSESSOR OF PROPERTY

CONFIDENTIAL DISCOVERY MATERIAL    SSC - 01916

BILL OF SALE

For and in consideration of the sum of One ($1.00) Dollar, cash in hand paid, together with other good and valuable consideration not herein mentioned, receipt of all of which is hereby acknowledged, Specialty Surgery Center, PLLC a Tennessee professional limited liability company, has this day bargained and sold and by these presents does hereby bargain, sell, transfer and convey unto Cumberland Medical Center, Inc., a Tennessee nonprofit corporation, its successors and assigns, the following described personal property:

All property listed on Exhibit A attached hereto and made a part hereof.

To have and to hold the above described property unto the Grantee herein named, its successors and assigns, in fee simple.   The undersigned Seller hereby warrants that it has good and marketable title to said interest as described above in that the same is unencumbered as of the date hereof.

EXECUTED, this 27th day of June, 2013.

Specialty Surgery Center, PLLC
By Jon A. Simpson, Chief Manager

STATE OF TENNESSEE        )
COUNTY OF CUMBERLAND      )

Personally appeared before me, the undersigned authority, a Notary Public in and for said County and State, Jon A. Simpson, Chief Manager of Specialty Surgery Center, PLLC, a Tennessee professional limited liability company, the within named Grantor with whom I am personally acquainted, or proved to me on the basis of satisfactory evidence, and who acknowledged that he executed the within and foregoing instrument for the purposes therein contained.

Witness my signature and seal of office this 27th day of June, 2013.

Notary Public

My commission expires: ___11/5/13___

THOMAS E. HALE
NOTARY
PUBLIC
AT
LARGE
CUMBERLAND COUNTY, TN

CONFIDENTIAL DISCOVERY MATERIAL

OR #1

| | |
|---|---|
| BOVIE MACHINE SY.YSTEM 7550 | SN 09HGV009 |
| SONY TV MONITOR | SN 2023132 |
| LINVATEC LIGHT SOURCE | SN 38849 |
| LINVATEC CAMERA BOX | SN 39980 |
| LINVATEC INSUFFLATOR | SN 17381JNB |
| LINVATEC POWER SOURCE | SN BBB16811 |
| SONY PRINTER | SN 15274 |
| WOLF ESU | SN 01A1653 |
| SONY TV MONITOR | SN 2002460 |
| CARDIO CAP MONITOR | SN 6240369 |
| ANESTHESIA MACHINE VENTILATOR | SN CAAT0682 |
| ANESTHESIA MACHINE MONITOR | SN AMCS00559 |
| ANESTHESIA SODA LIME ABSORBER | SN ACLL102590 |
| STORZ FLEX. SCOPE  ANESTHESIA | SN 2056226 |
| SUPPLY CART         STRYKER | SN 98010134C95 |
| STRYKER T.P.S. POWER SOURCE | SN 010211A3 |
| SMITH/NEPHEW TOURNIQUET | SN 9802205 |
| AMSCO OR TABLE | SN 0401687028 |
| ANESTHESIA PROPOFOL MACHINE | SN B44411 |

ENDOSCOPY ROOM

| | |
|---|---|
| COLON SCOPE | SN 6621001 |
| COLON SCOPE | SN 1C297A030 |
| COLON SCOPE | SN 1C297A029 |
| COLON SCOPE | SN 1C297A013 |
| COLON SCOPE | SN 1C286.A003 |
| GASTROSCOPE | SN 6G197A126 |
| GASTROSCOPE | SN 1G202A001 |
| GASTROSCOPE | SN 1G202A012 |
| XEROX PRINTER | SN FBT253006 |
| BOVIE MACHINE | SN 023GS025 |
| FUJINON PROCESSOR | SN 1V338A103 |

CLEANING ROOM AND AUTOCLAVE ROOM

| | |
|---|---|
| CUSTOM ULTRASCONIC MACH. | SN 111302 |
| STERIS AUTOCLAVE | SN 0315307-03 |
| RITTER TABLE TOP AUTOCLAV.STRYKER. | SN 38849 |
| STERIS INCUBATOR | SN 07104643 |

EXHIBIT A

CONFIDENTIAL DISCOVERY MATERIAL

PACU EQUIPMENT

| | | | |
|---|---|---|---|
| CRITICARE | MODEL | 8100EP | SN 410252609 |
| CRITICARE | MODEL | 8100EP | SN 410252728 |
| CRITICARE | MODEL | 8100EP | SN 410252927 |
| CRITICARE | MODEL | 8100EP | SN 410252937 |
| CRITICARE | MODEL | 8100EP | SN 310044419 |
| CRITICARE | MODEL | 8100EP | SN 310044422 |
| CRITICARE | MODEL | 8100EP | SN 310044423 |
| CRITICARE | MODEL | 8100EP | SN 310044426 |

| | | | |
|---|---|---|---|
| GENDRON | MODEL | 890 | SN 034486-1-1-1 |
| GENDRON | MODEL | 890 | SN 034486-1-1-2 |
| GENDRON | MODEL | 890 | SN 034486-1-1-3 |
| GENDRON | MODEL | 890 | SN 034486-1-1-4 |
| GENDRON | MODEL | 890 | SN 034484-1-1-1 |
| GENDRON | MODEL | 890 | SN 034484-1-1-2 |
| GENDRON | MODEL | 890 | SN 034486-1-1-5 |

| | |
|---|---|
| BLANKET / FLUID WARMER | SN SZ5624G99 |
| EKG MACHINE | SN 00026 |
| DOPPLER | SN NGA0111 |
| DEFIBEILLATOR | SN 3301A04044 |
| NERVE STIMULATOR | SN OK2360091 |
| SAFE | SN VP6526 |
| HEMOCUE HB | SN 1135013652 |

EXHIBIT A

CONFIDENTIAL DISCOVERY MATERIAL

OR 2

| | |
|---|---|
| EPIDURAL TABLE | SN T009B1 |
| R F MACHINE | SN LES4014 |
| C-ARM MONITOR | SN 49-0495 |
| C-ARM MACHINE | SN 9102030B |
| X- RAY BOX | SN 1689 |
| PRINTER | SN 14225 |
| SODA LIME ABSORBER | SN ACLX02540 |
| MONITOR ENCLOSER | SN AMCR00791 |
| VENTILATOR | SN CAASO2376 |
| TV MONITOR | SN 2002786 |
| STRYKER POWER SOURCE | SN 98010324 |
| STRYKER INSUFFLATOR | SN 9709CC285 |
| STRYKER LIGHT SOURCE | SN 98021044QS |
| STRYKER T P S | SN 98021603 |
| SUPPLY CART | SN 9801024C95 |
| BOVIE | SN 97LGR009 |
| TOURNIQUET | SN LR42982 |
| OR TABLE | SN M013A034 |

HEMOCUE GLUCOSE                                           SN 0323-114-127

OFFICE EQUIPMENT

| | | |
|---|---|---|
| DELL COMPUTERS | | X 8 |
| PRINTERS | | X 8 |
| OFFICE DESK | | X 7 |
| LOBBY CHAIRS | | X 20 |
| TV / CABINET | LOBBY | X 1 |
| TV | BREAKROOM | X 1 |
| LOVE SEAT | PRE REG | X 1 |
| END TABLES | | X 3 |

EXHIBIT A

CONFIDENTIAL DISCOVERY MATERIAL

DR FOX

DR FOX HAS 4 PICTURES AT THE CENTER THAT HE WANTS
CUMBERLAND MEDICAL CENTER TO BE AWARE OF.

.UNIVERSITY OF TENNESSEE / PAYRON MANNING X X3

TEAM PICTURE OF HIS SON'S BALL TEAM

EXHIBIT A

CONFIDENTIAL DISCOVERY MATERIAL

Frig — PACU
Model W8TXngmwqol
SN

Kitchen
Model CTF 2123 AR
SN 10737431SH

Pre Reg — frigidaire
Model ERT867 two
SN BAF 4805526

Microwave
Pre-Reg — Sharp
Model R - 209KKK-W
SN 88682

Kitchen 90
Model We S1450DMIDD
SN 916557

Washer GE
Model WPRe6100glwr
SN 79976g

Dryer GE
Model DPSR610eg4WT
SN FR747135A

Exhibit   A

CONFIDENTIAL DISCOVERY MATERIAL

SSC - 01922