UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>All Actions Involving Specialty Surgery Center and Dr. Kenneth Lister. | )<br>)<br>)<br>)  MDL No. 1:13-md-2419<br>)<br>)  Judge Rya Zobel<br>)<br>) |

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO THE DEFENDANTS' MOTION FOR PROTECTIVE ORDER [Dkt. No. 2906]**

The Plaintiffs' Steering Committee ("PSC") files this Response in Opposition to the defendants' Motion for Protective Order (Dkt. No. 2906). The defendants, as the party asserting applicable privilege, has the burden to show the applicability of any asserted privilege. Here, defendants' motion is without merit because they failed to carry that burden, and the motion should be denied in all respects.[1]

**OVERVIEW**

As part of an asset purchase sale in 2013, SSC knowingly sold seven computers that may contain privileged information.[2] It did so while represented by current litigation counsel, in anticipation of litigation related to the fungal meningitis catastrophe, and with the knowledge that the computers contained otherwise privileged information. It sold the computers without clearing out any information from them, and placed no conditions whatsoever on the data contained on those computers: no clawback provision, no reservation of rights, no right to re-inspect. At multiple points in this litigation, stemming back at least to the defendants' representations regarding their electronic production, the defendants disclaimed any right to

---

[1] *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. Mich. 1993) ("The burden to establish the applicability of the privilege is upon the [party asserting the privilege]")

[2] The PSC elected not to seek information on the 8th computer, which counsel for the subpoenaed entity indicated was attached to an endoscope and utilized solely to operate the endoscope.

access the materials on those computers for any purpose, specifically taking the position that the computers were beyond their possession, custody, or control. When the PSC served its subpoena to the purchasing party for the computers (nearly three years after sale), the defendants did not raise any objections. When the PSC indicated on March 9, 2016 that it would not permit the defendants to review the materials for any purpose, SSC did not object.

The defendants now claim that none of their actions, including **unconditionally selling the data on the computers for profit**, had any legal consequences on its ability (three years later) to prevent or otherwise control the further disclosure of information on those computers. The reality, as confirmed by relevant case law, is that the defendants voluntarily and unequivocally waived their right to intervene here for any purpose.[3]

## BACKGROUND

I.     **Factual Background**[4]

Until the Summer of 2013, SSC operated a medical facility in Crossville, Tennessee, at which defendant Dr. Kenneth Lister routinely performed surgical procedures, including epidural steroid injections. SSC and Dr. Lister operated a volume-based practice, administering numerous MPA epidural steroid injections per month to patients. Defendant Jean Atkinson, R.N. served as the Director of Nursing for the facility. In July and August 2012, SSC purchased contaminated vials of MPA from NECC, which was not licensed by the FDA as a drug manufacturer.

---

[3] If, however, CMC is a successor in interest to SSC, as arguably it is under the applicable law and facts here, SSC might have arguments that the privilege is preserved. *See e.g.*, *Postorivo v. AG Paintball Holdings, Inc.*, Nos. 2991-VCP, 3111-VCP, 2008 Del. Ch. LEXIS 17, at *17-18 (Ch. Feb. 7, 2008). SSC and CMC have not made those arguments to date related to this issue and therefore the PSC will not address this issue herein.

[4] The factual background relevant to this motion is contained in prior PSC submissions. The PSC will not resubmit all of that evidence here, but directs the Court to Dkt. No. 2495.

Clinicians at SSC, including Dr. Lister, injected those contaminated vials into patients, many of whom contracted fungal meningitis – and some of whom ultimately died as a result.

In September 2012, the defendants received notice that NECC's MPA had been linked cases of meningitis. By early October 2012, anticipating potential litigation, the defendants' malpractice carrier hired the law firm of Gideon, Cooper & Essary to defend SSC, Dr. Lister, and Ms. Atkinson.  The defendants admit that they received multiple pre-suit notice letters before May 2013 and were preparing for litigation.  In May 2013, in the midst of preparing for litigation concerning the fungal meningitis catastrophe, SSC agreed to sell all of its assets to CMC through an Asset Purchase Agreement ("APA").  On June 27, 2013, SSC executed a Bill of Sale to consummate the sale.[5]

The sale documents reflect a purportedly arms-length transaction between SSC and CMC, including detailed terms and multiple related agreements – an Assignment and Assumption Agreement, a Non-Compete Agreement, a Board resolution, a settlement statement, and a transfer of deed.  Section 1.1(b) of the APA indicates that SSC would "sell, transfer, convey, assign and deliver" to CMC "all of Seller's right, title, and interest in, to,  and under the following assets, properties and rights of Seller, as the same exist on the Closing Date," and it identifies "all tangible personal property" of SSC as included in the sale. The Bill of Sale indicates that, for consideration, the SSC "bargained and sold" and "does hereby bargain, sell, transfer and convey" "all property" listed in an attached Exhibit A.  The Bill of Sale specifies that the items sold are conveyed in fee simple.  Among the items listed are articles of "Office Equipment" that included eight "Dell Computers" (*See* SSC -01920.)  Neither the APA nor the Bill of Sale attaches any conditions to the sale of those computers or the data contained on them.

---

[5] The APA and Bill of Sale are attached as exhibits to the defendants' motion and will not be reattached here.

The APA contains no clawback provision, no reservation of rights concerning the data, and no provision that SSC could ever again access the computers for any purpose whatsoever. In other words, as of June 27, 2013, the computers were the sole and exclusive property of CMC, subject to the sole and exclusive control of CMC, and have remained so through the present.

The defendants admit that they took <u>no precautions</u> concerning the data on the computers before they were sold in June 2013. No one cleaned out the data. No one added any protections to screen off data generated before the sale. SSC sold them as is, without recourse, and expressly conveyed all "rights" related to the property conveyed.

As to the content of the data on those computers, Dr. Lister and Ms. Atkinson's affidavits are not credible. Dr. Lister, who was a physician owner of SSC in 2012 and 2013, and who was involved in the decision to make the asset sale, exchanged privileged communications with Gideon Cooper from October 2012 on the staff computers. Dr. Lister admits that, to the best of his knowledge, no one wiped any data from those computers. Nevertheless, Dr. Lister claims that he was "not aware" that the computers might contain privileged information. That position, for which he provides no contextual support, defies logic: if the staff was using computers to communicate with attorneys, and if the data on those computers was not cleaned out before the asset sale and were sold "as is," the computers obviously would continue to contain those communications after the sale.

Similarly, Ms. Atkinson indicates that she exchanged privileged communications with Gideon Cooper and sent quality improvement communications on her computer before the sale. Aside from the fact that her computer generally was password-protected, she does not aver that she took any precautions to protect the data on her computer from disclosure later, such as informing SSC to clean out the data or to encrypt it in some fashion. She simply states that she

"did not know that the computers being sold to [CMC] would be sold without removing privileged information," but she provides no testimony as to how she formed that belief, or whether she even discussed the issue with anyone else.[6] Mrs. Atkinson omits another relevant piece of information: in September 2013, soon after the sale, she began working for CMC as a staff nurse, and has worked there since that time.[7] Ms. Atkinson provides no indication that she went back to double-check whether data on her computer had transferred over to CMC (as it necessarily would have) or that any data from her SSC employment, including privileged communications, had been cleared out or was otherwise protected from further disclosure.

## II.  Procedural History

On November 5, 2014, counsel for the defendants sent a letter to the PSC under the ESI Protocol set forth by the Court in Docket No. 1087.[8] In Part of 3 the section styled "Data Sources We Do Not Intend to Search," the defense counsel stated that, prior to the June 2013 asset sale, it asked SSC's staff to pull any files related to the recall before the sale, but indicated that "the local computers were included in the sale of assets to Cumberland Medical Center" and that the hard drives on those computers could not be searched by the defendants because "they are no longer in SSC's possession or control."

On July 8, 2015, the PSC took the Rule 30(b)(6) Deposition of CMC via its corporate representative Larry Moore, who testified about the asset purchase. Among other things, Mr. Moore confirmed that SSC sold to CMC all "tangible personal property" under APA § 1.1 and

---

[6] Ms. Atkinson also claims that quality improvement information "may be on one or more of the computers sold to Cumberland Medical Center." She does not specify why that information would be on anyone's computer other than her own, and she does not even identify who the other computers belonged to. Her averment is therefore speculative and cannot be relied upon.
[7] See Declaration of Benjamin A. Gastel ("Gastel Declaration"), Exhibit 1, Excerpt from Atkinson Deposition.
[8] See Ex. 2 to Gastel Declaration, 11/5/14 Letter from Chris Tardio to J. Gerard Stranch, IV.

that the items subject to that transfer section were listed in Exhibit A to the Bill of Sale, including the page referencing the computers at issue here.[9]

On January 29, 2016, the PSC served a subpoena on CMC seeking to examine the computers in CMC's possession. On February 12, 2016, the PSC and CMC filed a Stipulation that extended CMC's deadline to file objections.[10] On March 7, 2016, CMC filed its objections.[11]

On March 9, 2016, in the context of an email discussion concerning the CMC computers subject to the subpoena, the PSC informed the defendants it was not aware of any legal basis on which SSC could intervene to review information on those computers, and therefore took the position that SSC would not be permitted to review the data before it was provided the PSC.[12] The PSC stated that if the defendants were aware of any contrary authority, the defendants should bring that authority to the PSC's attention. The defendants did not respond to that aspect of the email. Instead, on March 11, 2016, in response to the March 9, 2016 email, counsel for the defendants specifically reiterated (by reference to the November 2014 letter from Mr. Tardio to the PSC) that SSC could not search the staff computers because "[w]e don't have their computers."[13] The PSC heard nothing further from the defendants on this issue until the PSC and CMC filed a joint motion to enter a qualified protective order related to the review of information on those computers.[14]

The defendants were aware that the PSC and CMC continued to negotiate review protocols that did not involve the defendants. The defendants raised no objection following the

---

[9] *See* Ex. 3 to Gastel Declaration, Excerpt from Deposition of Larry Moore on behalf of CMC.
[10] Dkt. No. 2617.
[11] Dkt. No. 2719.
[12] *See* Ex. 4 to Gastel Declaration, Email String.
[13] *Id.*
[14] Dkt. No. 2841.

March 9, 2016 email from the PSC, the defendants expressly (once again) disclaimed any interest in the computers even after being informed of the PSC's final position that the defendants had no right to access the computers for any purpose, and the PSC therefore considered the matter to be settled.

### III.     Asserted "Precautions"

The defendants assert that the SSC computers were "password-protected," but the only basis for this statement is Jean Atkinson's testimony that her computer was password-protected. There is no indication that any other computer was password-protected, nor is there any indication that SSC imposed password-protection to prevent access to the information following the sale. Indeed, affidavits supporting the defendants' motion indicate that (1) several of the computers were placed into operation by CMC following the sale, indicating that they were not "protected" by a password or otherwise, and (2) even now, CMC has been able to access the data on those computers, including otherwise privileged communications.

More generally, it defies logic that the SSC would have sold the computers to CMC while at the same precluding CMC from utilizing them in any fashion. Indeed, several of the computers were placed into operation after the sale, including during the time frame from September 2013 forward in which Ms. Atkinson has worked for CMC.

## ANALYSIS

The defendants identify three categories of privileged information that is "likely" on the computers: (1) attorney-client privileged communications; (2) attorney work product, and (3) information protected by the Tennessee Quality Improvement Committee Privilege ("QICP").

As a threshold matter, the defendants have not sufficiently established that each computer at issue (or any of them) actually contain each of these categories of information. In some ways,

that is the point: they relinquished possession, custody, and control of the computers years ago, took no precautions (practical or contractual) to protect the contents of those computers, and did such a reckless job that they do not even know what information is on the computers, whether the computers are password protected, who the computers belonged to, or how much information on them (if not all) is accessible.  All of their arguments are therefore largely speculative and should be denied on that basis alone.  However, only for purposes of argument, the PSC will address each category of privilege under the assumption that some of the computers contain one or more of those types of privileged information.

### I.     Attorney-Client Privilege

The attorney-client privilege belongs to the client, and only the client may waive it.[15] The client may waive the privilege by voluntarily disclosing confidential information to third parties.[16]  The client can also waive the privilege by inadvertently disclosing records, "when caused by the disclosing party's inadequate precautions to maintain the confidentiality of the privileged communication."[17]  Here, the defendants focus only on the "inadvertent disclosure" doctrine, but that doctrine is not even applicable here because the defendants <u>voluntarily disclosed</u> the information at issue by selling it.

####    A.  The Defendants Voluntarily Disclosed the Communications at Issue by Selling the Computers to CMC Without Recourse

---

[15] *Smith Cnty. Educ. Assoc.*, 676 S.W.2d 328, 333 (Tenn. 1984).
[16] *Id.*; *see also In Re: Grand Jury Proceedings October 12, 195,*, 78 F.3d 251, 254 (6th Cir. 1996) (stating that the "attorney-client privileged is waived by voluntary disclosure of private communications by an individual or corporation to third parties."); *Boyd v. Comdata Network*, 88 S.W.3d 203, 213 (Tenn. Ct. App. 2002) ("A client may waive the privilege . . . by voluntarily divulging the communication to third parties.")
[17] *Local 851 of the Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight*, 36 F. Supp. 2d 127, 130 (E.D.N.Y. 1998).

The voluntary disclosure of confidential records by a party constitutes waiver.[18] It is hard to conceive of a disclosure that is more "voluntary" than, in the context of a structured transaction, selling the records in fee simple to another party without any reservation of rights. Indeed, as a general matter, courts have found that a sale of assets, including computers, to a third-party thereby waives the seller's right to protect any of the information on those devices under circumstances similar to those presented here.

For example, in *Stooksbury v. Ross*, a district court considered whether the defendants could maintain privilege protections over information on computers that they had sold to a third party.[19] The Court found that it was not even a close question:

> The privilege has been **unequivocally waived** via the selling of these devices to American Harper Corporation, a third party.  Mr. Ross and Ross Entities' decision to sell a vessel containing privileged communications with counsel to a third party must certainly be interpreted **as voluntarily revealing those communications to the third party**.  The contents of the devices have been conveyed to third-parties, and therefore, the Court finds this conveyance **effectively waives the protected afforded to the contents of the devices, including the communications contained therein, under the attorney-client privilege**.[20]

The *Stooksbury* Court did not even address the issue of "inadvertent disclosure," presumably because it found **unequivocal voluntary waiver** of confidentiality by the selling party.

Other district courts have reached similar holdings.[21] For example, in *Solis v. Bruister* (also discussed in the next section below), the Court stated held that "a sale and transfer of

---

[18] *Boyd*, 88 S.W.3d at 213.

[19] *Stooksbury v. Ross*, No. 3:09-CV-498,  2012 U.S. Dist. LEXIS 124148 (E.D. Tenn. Aug. 31, 2012).

[20] *Id.* at *12.

[21] *See In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) ("[Where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying assets, the privilege is waived as to those communications"); *Solis v. Bruister*, Civil Action No. 4:10-cv-95-DPJ-FKB, 2013 U.S. Dist. LEXIS 29108, at *7-*9 (S.D. Miss. Jan. 22, 2013) (finding that "a sale and transfer of assets, including allegedly privileged information, waives the attorney-client and work product privileges")

assets, including allegedly privileged information, **waives the attorney-client and work product privileges**."[22]  There, the defendant sold its assets, including computers, to DirecTV. The plaintiff subpoenaed DirecTV, after which the defendant sought to intervene to prevent the disclosure of work product and attorney-client privileged information on one of the computers it had sold to DirecTV.  The district court held that the attorney-client privilege (as well work product protection) was voluntarily waived by the sale of transfer of assets, including the computer, to DirecTV.[23]

The reasoning in *Stooksbury* and *Solis* is sound and applies here with equal force. Indeed, for their part, the defendants have cited no caselaw authority showing that the sale and transfer of assets, including computers, does not constitute voluntary waiver of the attorney-client privilege by the seller.  The defendants do not even cite any caselaw (Tennessee or otherwise) that involves the issue of the voluntary disclosure of privileged information by a party, which is what actually occurred here.

Here, the Court should reach the same result as articulated by other district courts: in selling and transferring the computers to a third party, the defendants unequivocally and voluntarily waived any privilege they held over attorney-client communications on those devices.  As the *Stooksbury* district court observed, this is "unequivocal" voluntary waiver. Indeed, the terms of the sale documents were unequivocal: the computers were conveyed in fee simple, and SSC expressly conveyed all "rights" and "interest" in the computers – interests that would have included any right to protect data on those computers from further disclosure.

The situation is no different with respect to Ms. Atkinson, who was privy to the sale, has not indicated that she undertook any measures (such as asking SSC's owners) to clean out

---

[22] *Solis v. Bruister*, 2013 U.S. Dist. LEXIS 29108, at *8 (S.D. Miss. Jan. 22, 2013).
[23] *Id.* at *8-9.

privileged data from her staff computer before the sale, and took no corrective measures post-sale while employed by CMC.

### B. Inadvertent Disclosure

As discussed in the previous section, the voluntary waiver doctrine governs the facts presented and compels a finding of voluntary waiver of the attorney-client privilege by the defendants. The defendants do not even cite any Tennessee caselaw regarding the "inadvertent disclosure" doctrine, relying only upon a single district court case, *Edwards v. Whitaker*, which relates to the disclosure by counsel of otherwise privileged records as part of a production of 2000 documents, and which actually found that the disclosure amounted to waiver because of the defendants' "carelessness" with respect to the records at issue.[24] Indeed, the doctrine generally acts to protect the party from inadvertent mistakes **by its counsel** in the course of discovery, **not from voluntary disclosures by the party itself outside the litigation**.[25] The defendants are attempted to graft a doctrine onto facts to which the doctrine does not apply.

Regardless, even if the Court were to analyze this case under the "inadvertent disclosure" doctrine, the doctrine compels the conclusions that privilege has been waived.

In general, courts balance several factors to determine whether a disclosure waives privilege: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the number of inadvertent disclosures, (3) the extent of the disclosure, (4) any delay and

---

[24] *See* 868 F. Supp. 226, 229 (M.D. Tenn. 1994).
[25] *See, e.g.*, *Fleet Nat'l Bank v. Tonnesson & Co.*, 150 F.R.D. 10 (D. Mass. 1993) (analyzing whether plaintiffs' counsel took adequate precautions to avoid inadvertent disclosure of records within a 50,000-document production); *Laethem Equip. Co. v. Deere & Co.*, 2008 U.S. Dist. LEXIS 107635 (E.D. Mich. Nov. 21, 2008) (analyzing whether plaintiffs' counsel inadvertently disclosed certain privileged disks of information as part of a production of electronically stored records to the defendant); *Compulit v. Banctec, Inc.*, 177 F.R.D. 410, 412 (W.D. Mich. Nov. 7, 1997) (stating that "the privilege rests with the client" and that "a law firm cannot waive the attorney-client privilege by inadvertent disclosure to opposing counsel").

measures taken to rectify the disclosures; and (5) whether the overriding interest of justice would or would not be served by relieving the party of its error.[26] More generally, "[c]ommunications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant."[27]

Here, the factors overwhelmingly indicate that the defendants waived the attorney-client privilege as to materials on the computers.

Generally, a party resisting waiver will seek to show that it used some type of system to segregate privileged material from non-privileged material, and will make some argument about the magnitude of the disclosure relative to an overall production.[28] Here, SSC does not describe <u>any precautions</u> taken to ensure that privileged materials were not disclosed. In the context of a structured transaction between two sophisticated parties, it did not clean out the data, it did not create any screening procedures to protect or remove otherwise privileged emails, and it did not enter into any clawback provision or reservation of rights related to that data it sold. Similarly, Ms. Atkinson was in a position to take precautions as well, and to rectify any oversights during her subsequent employment at CMC, but failed to do so. Indeed, she does not indicate that she was unable to suggest or implement precautions before the sale – she simply did not act to protect the date on her computer. The defendants also take the position that the Court should find that the magnitude of the issue was small relative to number of items transferred in the sale,

---

[26] *FDIC v. Ernst & Whinney*, 137 F.R.D. 14, 17 (E.D. Tenn. 1991). It is worth nothing that the defendants do not cite any Tennessee cases that adopt this five-factor test, although it appears to be utilized by courts in other jurisdictions. The PSC does not concede that the Tennessee Supreme Court necessarily would adopt this test. However, for purposes of argument only, the PSC will analyze how the five factors apply here.
[27] *In Re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).
[28] *See, e.g.*, *Nilavar v. Mercy Health Sys.*, Case No. 3:99cv612, 2004 U.S. Dist. LEXIS 30531, at *14 (S.D. Ohio Mar. 22, 2004).

as if there were some reasonable probability that a supply cart, desk chairs, a microwave, and a tourniquet might contain attorney-client privileged information. To the contrary, the defendants have not identified any items transferred that would have contained privileged material <u>other</u> than the computers.

The extent of the disclosures is currently unknown, but it necessarily must be significant. The defendants are left to speculate about where on the computers the information is located, and how it might have been accessed. Whatever the answer, every privileged communication on those computers was transferred to CMC. In other words, it is not as if CMC happens to have access to a single file that slipped through some earlier screening process – instead, it appears that CMC has had unfettered access to most if not all of the information for years.

As to timing, the defendants have waited <u>three years</u> from the date of sale to address their disclosure of information to CMC through the computers. They represented in November 2014 that they did not possess or control the computers. The issue came up at a July 2015 deposition, and they still raised no issue. Even after the PSC served the subpoena to CMC in January 2016, the defendants still took no affirmative steps to intervene or, apparently, to check the institutional memory of Dr. Lister and Ms. Atkinson concerning these computers. Whatever window of time they had to address this issue has long closed, and it should have been apparent to them years ago. Indeed, they do not reference any information that they could not have gleaned <u>before</u> the PSC issued its subpoena to CMC.

As to justice, the defendants have not even demonstrated that they have standing to exert control over computers that are no longer their property. It is apparent that counsel for CMC has access to those emails and in fact has reviewed at least some of them. CMC owns the computers and the data on them, and SSC reportedly has no right to control the disposition of those assets.

If SSC had wanted to retain any rights relative to those computers, it could have bargained for it, but did not do so. To the contrary, it expressly conveyed (for consideration) all its "rights" and "interest" in those computers. It is unreasonable for SSC to renege on the benefit of that bargain years later to suit its litigation interests.

## II. <u>Work Product</u>

Under Tennessee law, waiver of work product can occur in <u>multiple ways</u>, not just through a "partial" waiver or "sword/shield" waiver. For example, an attorney can voluntarily waive work product protection by voluntarily relinquishing the work product material to another party.[29] Although there is limited Tennessee authority on this issue, many courts agree that "the standard for waiving the work product doctrine is no more stringent that the standard for waiving the attorney-client privilege – once the privilege is waived, waiver is complete and final."[30] Indeed, "[b]oth the attorney-client privilege and the work-product doctrine are waived by voluntary disclosure of private communications to third parties."[31] A voluntary waiver occurs when a party discloses protected information to a third party who is not bound to maintain its confidence.[32]

---

[29] *Campbell Cnty. Bd. of Educ. v. Brownlee-Kesterson, Inc.*, 677 S.W.2d 457, 463 (Tenn. Ct. App. 1984) (finding that work product had been waived by voluntary disclosure of the record at issue).

[30] *Tenn. Laborers Health & Welfare Fund v. Columbia/Hca Healthcare Corp.*, 293 F.3d 289, 306-307 (6th Cir. 2002) (collecting cases).

[31] *New Phoenix Sunrise Corp. & Subsidiaries Comm'r*, 408 F. App'x 908, 918 (6th Cir. 2010); *Great Am. Assur. Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084 (N.D. Cal. 2009) (finding voluntary waiver where one party handed over work product to a third party).

[32] *Great American*, 669 F. Supp. 2d at 1092 (indicating that, where voluntary disclosure a third party increases the possibility that an opposing party could obtain that information, the policy underlying the work product doctrine is defeated and the same analysis for waiver of the attorney-client privilege applies).

For these reasons, "a sale and transfer of assets, including allegedly privileged information, **waives the attorney-client and work product privileges**."[33]  For example, as discussed above, in *Solis v. Bruister*, the defendant sold its assets, including computers, to DirecTV.  The plaintiff subpoenaed DirecTV, after which the defendant sought to intervene to prevent the disclosure of work product and attorney-client privileged information on one of the sold computers.  The district court held that **both** the attorney-client privilege **and** work product protections were waived by the sale of transfer of assets, including the computer, to DirecTV.[34]  Here, the situation is analogous and should be treated similarly, particularly where SSC and Ms. Atkinson took no precautions with respect to the data at issue.

### III. Quality Improvement Committee Privilege

The defendants cannot intervene with respect to the QICP for at least three reasons.

First, the defendants did not assert timely objections to the subpoena.  Rule 45(d)(3)(A) requires a "timely motion" to consider a motion to quash or for a modification to a subpoena..  Here, the defendants did not file a timely motion – they had sufficient information to raise this issue a long time ago, but failed to do so, and therefore have waived their right to intervene on this issue.

Second, the defendants lack standing to assert the QICP privilege in the first place.  They have relinquished possession, custody, and control of those computers, along any with any "right" and "interest" in those computers, evidently giving them no more power over those computers than they have over anyone else's.  They have not cited any authority showing that a party under the QICP or some other analogous law has a special right to intervene in a manner that trumps a third-party's rights and the express contractual terms of a sale.

---

[33] *Solis v. Bruister*, 2013 U.S. Dist. LEXIS 29108, at *8 (S.D. Miss. Jan. 22, 2013).
[34] *Id.* at *8-9.

Second, except perhaps with respect to Ms. Atkinson's computer, the defendants have failed to establish that any of the other computers contain (or would likely contain) information protected by QICP. Ms. Atkinson claims she likely sent some communications on her computer in her role as the head of the practice's QIC. The defendants have not substantiated that any computer other than Ms. Atkinson's would contain QICP material. Absent a factual predicate, the defendants are not entitled to access any computers other than (at most) Ms. Atkinson's to conduct a QICP review.

## CONCLUSION

For the reasons stated herein, the Motion for Protective Order should be denied. In the alternative, and at most, the Court should find that the defendants may be granted access only to Ms. Atkinson's computer for the lone purpose of identify QICP information, but that the defendants have otherwise waived work product, attorney-client privilege, and the right to review for QICP material with respect to all remaining content on those computers.

Date:  June 6, 2016                     Respectfully submitted:

**/s/ Benjamin A. Gastel**
J. Gerard Stranch, IV
Benjamin A. Gastel
Anthony A. Orlandi
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Telephone:  615/254-8801
Facsimile:  615/255-5419
gerards@bsjfirm.com
beng@bsjfirm.com
aorlandi@bsjfirm.com
*Plaintiffs' Steering Committee and TN Chair*

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: 617/482-3700
Facsimile: 617/482-3003
tom@hbsslaw.com
kristenjp@hbsslaw.com

*Plaintiffs' Lead Counsel*

Annika K. Martin
Mark P. Chalos
LIEFF CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212/355-9500
Facsimile: 212/355-9592
akmartin@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Telephone: 248/557-1688
Facsimile: 248/557-6344
marc@liptonlaw.com

Kimberly A. Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA 02116
Telephone: 617/933-1265
kdougherty@myadvocates.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Telephone: 404/451-7781
Facsimile: 404/506-9223
mark@markzamora.com

Patrick T. Fennell (VSB 40393)
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA 24016
Telephone: 540/342-2000
Facsimile: 540/400-0616
pfennell@crandalllaw.com

*Plaintiffs' Steering Committee*

Patrick T. Fennell (VSB 40393)
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA 24016
Telephone: 540/342-2000
Facsimile: 540/400-0616
pfennell@crandalllaw.com

*Plaintiffs' Steering Committee*

**CERTIFICATE OF SERVICE**

I, Benjamin A. Gastel, hereby certify that I caused a copy of the foregoing document to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Date:   June 6, 2016

/s/ Benjamin A. Gastel
Benjamin A. Gastel