```
 1                       UNITED STATES DISTRICT COURT
 2                       DISTRICT OF MASSACHUSETTS

 3

 4
    IN RE:  NEW ENGLAND COMPOUNDING   )  MDL NO. 13-02419-RWZ
 5  PHARMACY CASES LITIGATION         )
                                      )
 6                                    )
                                      )
 7                                    )
                                      )
 8                                    )

 9            BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                       THE HONORABLE JENNIFER C. BOAL
10

11

12                        STATUS CONFERENCE
13

14

15

16          John Joseph Moakley United States Courthouse
                        Courtroom No. 12
17                      One Courthouse Way
                        Boston, MA 02210
18

19                        June 22, 2016
                           2:00 p.m.
20

21

22
                 Catherine A. Handel, RPR-CM, CRR
23                    Official Court Reporter
            John Joseph Moakley United States Courthouse
24               One Courthouse Way, Room 5205
                        Boston, MA 02210
25              E-mail: hhcatherine2@yahoo.com
```

1
   APPEARANCES:

2
   <u>For The Plaintiffs</u>:

3
     Hagens, Berman, Sobol, Shapiro LLP, by THOMAS M. SOBOL,

4
ESQ., and KRISTEN JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301,
Cambridge, Massachusetts 02142;

5
     Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH,

6
IV, ESQ., 227 Second Avenue North, Nashville, Tennessee
37201-1631;

7
     Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac

8
Street, Suite 500, Boston, Massachusetts 02114;

9
     Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York

10
10013-1413;

11
     Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee

12
37219;

13
     Cohen, Placitella & Roth, P.C., by MICHAEL COREN, ESQ., 2
Commerce Square, 2001 Market Street, Suite 2900, Philadelphia,

14
Pennsylvania (Appearing telephonically);

15

16
     The Law Offices of Peter Angelos, by PATRICIA KASPUTYS,
ESQ., 100 North Charles Street, Baltimore, Maryland 21201

17
(Appearing telephonically.)

18

19
   <u>FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
NECP, INC.</u>:

20

21
     Duane Morris LLP by KERI L. WINTLE, ESQ., 100 High Street,
Suite 2400, Boston, Massachusetts 02110-1724;

22

23

24

25
   (Appearances continued on the next page.)

APPEARANCES (Cont'd):


FOR THE DEFENDANTS:


    Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., and
YVONNE K. PUIG, ESQ., 98 San Jacinto Boulevard, Suite 1100,
Austin, Texas 78701;


    Law Offices of Jay Blumberg, by JAY J. BLUMBERG, ESQ., 158
Delaware Street, P.O. Box 68, Woodbury, New Jersey 08096;


    Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and
MATTHEW H. CLINE, ESQ., 315 Deaderick Street, Suite 1100,
Nashville, Tennessee 37238;


    Nutter, McClennen & Fish, LLP, by SARAH P. KELLY, ESQ.,
Seaport West, 155 Seaport Boulevard, Boston, Massachusetts
02210-2604;


    Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
Dulaney Valley Road, Suite 400, Towson, Maryland 21204;


    Wickstrom Morse, LLP, by DEBORAH GRESCO-BLACKBURN, ESQ.,
60 Church Street, Whitinsville, Massachusetts 01588 (Appearing
telephonically);

```
1                    P R O C E E D I N G S

2        (The following proceedings were held in open court before

3   the Honorable Rya W. Zobel, United States District Court Judge,

4   and the Honorable Jennifer C. Boal, Magistrate Judge, United

5   States District Court, District of Massachusetts, at the John J.

6   Moakley United States Courthouse, One Courthouse Way, Boston,

7   Massachusetts, on June 22, 2016.)

8             JUDGE ZOBEL:  Good afternoon.  Please be seated.

9             MS. JOHNSON:  Good afternoon, your Honors.

10            JUDGE ZOBEL:  I note that there are fewer lawyers

11  here, but I understand that we have more than ever on the

12  telephone.

13            MS. JOHNSON:  We do, your Honor.  Out of an abundance

14  of caution, because we had a number of filings in response to

15  the Court's show cause order, the PSC had suggested that

16  attorneys participating by telephone, should the Court want to

17  hear from them -- we understand that the Court may not wish to

18  do so, but at least wanted people to be available if you had

19  questions.

20            JUDGE ZOBEL:  I certainly appreciate your concern

21  about those lawyers, but when has the Court wanted to hear

22  from you?

23            (Laughter.)

24            MR. STRANCH:  But there's 70, your Honor, seven zero.

25            JUDGE ZOBEL:  You're all welcome.  However, we have
```

1    some -- a little bit of business before we get to that, right?

2          MS. JOHNSON:  Yes, your Honor.

3          So, the agenda starts by identifying two Specialty

4    Surgery Center-related discovery motions that were heard this

5    morning before Judge Boal.  Aside from those two motions,

6    there were none for which the parties requested oral argument.

7    So, I think we can move directly to the report to the Court

8    section of the agenda, letter C.

9          JUDGE ZOBEL:  Okay.

10          MS. JOHNSON:  And so, we start with No. 3, which is

11    the status of the bankruptcy, and Ms. Wintle will discuss that

12    for the trustee -- post confirmation officer.

13          JUDGE ZOBEL:  I'm sorry.  Ms. Winslow?

14          MS. WINTLE:  Wintle, W-i-n-t-l-e.

15          JUDGE ZOBEL:  Okay.

16          MS. WINTLE:  Good afternoon.

17          Not a lot to report again on the status of the

18    bankruptcy, not a lot of activity on the bankruptcy docket.

19    The bankruptcy court did enter an order allowing a motion to

20    deem a late-filed claim timely, and I think, as I reported to

21    the Court last status conference, the post confirmation

22    officer has collected the 2014 tax refunds and the 2015

23    returns are processing.

24          JUDGE ZOBEL:  That's it?

25          MS. WINTLE:  That's it, your Honor.

```
1              JUDGE ZOBEL:  Thank you very much.

2              MS. WINTLE:  Thank you.

3              JUDGE ZOBEL:  Is there anyone among the 70 on the

4    telephone who did not clear well enough?

5              (No response.)

6              JUDGE ZOBEL:  That's good.  Okay.

7              MS. JOHNSON:  Mr. Sobol wanted to address the status

8    of the bankruptcy, your Honor.

9              (Discussion off the record.)

10             MR. SOBOL:  I have to be pointed in the right

11   direction by Ms. Johnson own all matters, your Honor.  Good

12   afternoon.

13             There are, I think, three issues I want to bring to

14   your attention that are related to bankruptcy matters.  The

15   first is the timing of payments to claimants.  The second is

16   status of healthcare liens and the --

17             JUDGE ZOBEL:  The Status of?

18             MR. SOBOL:  Of healthcare liens of reimbursements to

19   healthcare --

20             JUDGE ZOBEL:  I don't think your microphone is on.

21             (Discussion off the record.)

22             MR. SOBOL:  And will be the status of healthcare

23   liens, and then the third will be the retirement of Judge

24   Boroff.

25             So, first, turning to the timing of payments.  It's
```

1    important to understand that of the approximate 3,000

2    claimants that there are for the tort trust, that there is a

3    sequence of approvals of the claims.  Currently there are

4    approximately 1200 claimants whose claims have been approved

5    and for whom there is no appeal or dispute.  The remaining, of

6    course, are in some other part of a process of approval or

7    appeal, or what have you.

8         It's also important to understand that there are

9    initial payments that go to any claimant whose claim has been

10   approved, and then there will be later payments to that

11   claimant, essentially, as a true-up, if you will, once all

12   claims have been disposed of.

13        JUDGE ZOBEL:  So, it is anticipated to have two

14   payments?

15        MR. SOBOL:  At least two claimants, depending upon

16   how this administratively works out.

17        JUDGE ZOBEL:  And when is it anticipated that the

18   first payment will be due?

19        MR. SOBOL:  So, the first -- yes, the first 1200

20   claimants we are -- I am driven to get them their payments in

21   August of this year, in a couple of months.  There's a bit

22   more of the process to that that I'll turn to in a moment, but

23   just so that you understand, what I'm going to try to drive

24   the claims administrator and the tort trustee to do -- and

25   everybody has been working very hard on this -- is to have

```
1    initial payments go out in August to the 1200 or so people who
2    have been teed up for them, that whatever number of more
3    claims that can be approved get paid in October, two months
4    later, and then, also, whatever additional claimants are then
5    approved be done in December, essentially, in two-month lots,
6    if you will, to try get as many claims paid this year as
7    possible.
8            JUDGE ZOBEL:  What is causing the delay of -- you
9    said there were about 3,000 all together?
10           MR. SOBOL:  Yes.
11           JUDGE ZOBEL:  So, the 1800 who are still waiting, why
12   are they still waiting?  Just simply because so many could not
13   be processed at one time?
14           MR. SOBOL:  Well, that's a part of it, but then there
15   are differences of opinion as to where they should land in the
16   matrix.  And so, there's a process by which someone might be
17   able to appeal that issue.  Sometimes there are inadequacies
18   in the submission that has been made and the submission needs
19   to be supplemented.
20           I will say that the claims administrator and there
21   are a couple on the PSC and also Mr. Ellis, who is sitting
22   behind me, Rick Ellis, have been quite vigilant on being on
23   top of the claims administrator.  I have no information to
24   suggest that anybody has been in any way dragging their heels
25   or anything at all like that.  It's simply trying to deal with
```

1    the logistics of the situation.

2         Now -- so, essentially, the goal, then, is to try to

3    have as many of the claims approved or denied or resolved this

4    year as possible and have the payments go out in those three

5    lots to as many of the total 3,000 claimants who are entitled

6    to any portion of the money.

7         There is an additional footnote, which is that under

8    the terms of a settlements, there is a supplemental payment

9    that's made for certain tax benefits that the settling

10   defendants have provided to the tort trust that might become

11   available in two or three years.  It's really -- actually,

12   it's quite some period of time, but I didn't want to omit

13   saying that, but just so you understand the overall structure.

14   In order to wait for certain issues of potential claw-back on

15   those tax benefits, that kind of thing, that might happen much

16   later on.  And, of course, this process might take up --

17   essentially, the true-up payments occur in 2017 for the

18   approved claims.  So, that's the timing of the payments.

19        The timing of the payments, however, also is

20   dependent on resolving any claims that healthcare plan

21   sponsors, healthcare insurers, or the Federal Government, or

22   state governments under Medicaid, might have to all or a

23   portion of the money that's going to the claimants.  So, the

24   PSC and the tort trustee have carved out a role for trying to

25   resolve as many of those liens as they have notice of.

1          So, I'm now going to walk through that and, again,

2     I'm doing this both for the Court, but also for the lawyers

3     who are on the phone and for the lawyers who are here in

4     court.

5          First, there's been an extensive negotiation with the

6     Center for Medicare and Medicaid Services or whatever their

7     current name is, CMS, and including even today.  We have

8     virtually reached an agreement with them.

9          There is one remaining clause to the release that

10    needs to be finalized, if not this afternoon, tomorrow, with

11    CMS to have a proposed resolution with CMS under that proposed

12    resolution, there will be a methodology to resolve those liens

13    with CMS for the vast bulk of the claimants who are Medicare

14    eligible during the time period that we believe that people

15    are receiving medical assistance or medical payments from

16    Medicare.

17         People, lawyers, or claimants who are dissatisfied

18    with that proposed resolution will have the right to opt out

19    of that resolution with Medicare and pursue an individual

20    negotiation with Medicare if they like.

21         JUDGE ZOBEL:  But how does that work with respect to

22    payments?

23         MR. SOBOL:  Right, and you're anticipating my next

24    point.  If someone is Medicare eligible and participating in

25    this plan with Medicare, then the payment will go out, the

1   payment will go out to the claimant and to Medicare as -- in

2   our time period that has joined.  It happens at the same time.

3   There's a percentage depending upon where someone is in the

4   matrix and the checks go out X percentage to the claimant and

5   Y percentage to CMS.

6          JUDGE ZOBEL:  Not one check payable jointly?

7          MR. SOBOL:  No.  There will be two checks that go

8   out.

9          JUDGE ZOBEL:  If the claimant, not the -- if the

10  injured person disagrees with the payment to Medicare, how do

11  they deal?  They have to go to Medicare and ask for it back?

12         MR. SOBOL:  No.  So, then we will find out before the

13  checks go out this -- in July, whether someone, a claimant and

14  their counsel, agree or disagree to have their client

15  participate in the Medicare proposed settlement.  If they

16  agree with it, then when the checks are cut, the percentage

17  goes one to the Medicare-eligible claimant and the other to

18  Medicare.

19         If, on the other hand, they disagree, they don't want

20  to participate in this plan, then the tort trustee will likely

21  hold the money until the time that that tort trustee receives

22  a certificate indicating that there either is a deal in place

23  or it has otherwise been resolved.

24         And so, it would be upon the claimant to act with all

25  dispatch and the lawyer to be dealing with Medicare and to

1    pursue whatever resolutions they want.

2            Given federal laws that, arguably, impose liability

3    upon the tort trustee for the tort trustee disbursing those

4    funds in the absence of a resolution with Medicare, the tort

5    trustee, on my recommendation, is required to withhold that

6    money until that time, simply because of the potential -- I'm

7    not saying that it's real, or whatever, but there's a

8    potential that there's an exposure to the tort trustee under

9    those circumstances.  So, that's one thing we've done with

10   CMS, okay?

11           There are also three groups of insurance companies,

12   healthcare insurers, private healthcare insurers that have

13   raised claims that their clients are entitled to some form of

14   reimbursement, and we are in the process of seeing if those

15   insurers will agree, in form or substance, to a similar, if

16   not identical kind of program that we also have with CMS we

17   are not as far along with them as we are with CMS, but we've

18   been having discussions with them daily over the past several

19   weeks to work out that as well.

20           JUDGE ZOBEL:  Do they operate as a group or

21   individually?

22           MR. SOBOL:  There are -- there's one group of lawyers

23   that represent Blue Cross/Blue Shield of Tennessee.  There's

24   another group that represents Blue Cross/Blue Shield of

25   Michigan.  If you recall, those are two jurisdictions where

1   there are a significant number of claimants.  Then there's a

2   third law firm, Rolands & Associates that represents a large

3   group of the large commercial health insurers in the United

4   States that is negotiating or discussing things as a group.

5          Now, it's important to understand that -- and we're

6   going to also write a letter to all the lawyers about this,

7   too, and it's going to go out Friday or Monday -- that this is

8   the -- that this is the group of private health insurers that

9   we have been speaking with.

10          It needs to be understood that self-insured employers

11   and health plans, there are about 35,000 of them in the United

12   States.  It is literally impossible to negotiate with all of

13   them at any one period of time.  And so, we will -- I indicate

14   to the lawyers for all claimants the identities of the

15   insurers that we are trying to put together a proposal for

16   which they would participate in and if they choose to, they

17   will, and if they choose not, they'll go out on their own,

18   just like they do with CMS, but they aren't negotiating with

19   all hate insurers, and we cannot.  So, if they have reason to

20   think that their client has any private health insurance, they

21   should individually negotiate that so an appreciate

22   certification can go to the tort trustee in a timely manner so

23   that the funds may go out to that claimant as well.  So, we'll

24   be indicating in some correspondence to, you know, counsel of

25   record for the claimants the form of the certification that we

```
1    need for the tort trustee to release the money.
2              JUDGE ZOBEL:  Other than the pro se claimants, are
3    there any with whom you have to deal directly as opposed to
4    their lawyers?
5              MR. SOBOL:  No.  No.
6              JUDGE ZOBEL:  There are only very few pro se's,
7    right?
8              MR. SOBOL:  That's right.
9              (Attorney Sobol's umbrella falls.)
10             JUDGE ZOBEL:  You go ahead.
11             MR. SOBOL:  I just keep on forgetting it in the
12   courtroom.  So I have to keep it close.
13             So, there are none, no others.
14             And the reason I mention this is I got, as an
15   example -- it's a real-world problem -- I got an email the
16   other day some very good lawyers who are diligently
17   representing their clients, people have had some very serious
18   medical illnesses, just -- medical problems by reason of this
19   just by looking at the size of the liens that they have, but
20   they've got liens from three or four different insurers, and
21   some of them -- one of them might be CMS, one of them might be
22   one of the healthcare, you know, insurance companies that
23   we've been dealing with, but then there are a couple of others
24   that are small ones that we don't know and we haven't been
25   negotiating with.  So, in any event, we're going to get this
```

1    notice out to them as promptly as we can.  So, I guess that's

2    where we are with all of that.

3              Then the final thing I wanted to --

4              MR. ELLIS:  Mr. Sobol, can I make one correction?

5              MR. SOBOL:  Yes.

6              MR. ELLIS:  I just don't want the lawyers to kind of

7    misunderstand.

8              MR. SOBOL:  Yes.

9              MR. ELLIS:  There are actually 2350 claimants, not

10   3,000.

11             MR. SOBOL:  There we go.  So, there's fewer than I

12   thought.

13             JUDGE ZOBEL:  Fewer letters.

14             MR. SOBOL:  What's that?

15             JUDGE ZOBEL:  Fewer letters.

16             MR. SOBOL:  Fewer letters, too.

17             (Discussion off the record.)

18             MR. SOBOL:  My understanding is that Judge Boroff,

19   who, obviously, sat on the bankruptcy in this matter and still

20   has a role, is retiring at some point this summer or fall.

21   There are some -- as you are aware, there are some legacy

22   issues that under the agreements and the plan that was put

23   into place, that need to be dealt with by Judge Boroff.  There

24   are either some reporting requirements and there's some other

25   potential other -- relatively administrative matters for the

1    bankruptcy court to address.  And so, simply, as a matter of

2    expediting things -- and I don't know what the answer is to

3    this, but I, with all respect, suggest that if this Court

4    could speak with Judge Boroff and find out what

5    administratively makes the most amount of sense.  Does it make

6    sense to withdraw the reference and have this Court simply be

7    the one place -- one-stop shopping, if you will, or does it

8    make more sense for whoever is going to take over the matter

9    at the bankruptcy court to take it on and get up to speed on

10   things, and I don't make any particular suggestion in that

11   regard because I don't know what else might be involved, but I

12   put that out there for the Court to address if it thinks it's

13   appropriate to.

14            JUDGE ZOBEL:  Do you have a sense as to how much

15   longer the process will take before --

16            MR. SOBOL:  Well, I think, technically, it's going to

17   go on -- their legacy issues will exist for a considerable

18   period of time.  They won't be large.  They won't be often as

19   time goes on, but given the way that the plan is drafted and

20   there are these tax benefits that just, you know, hang around

21   for a long period of time, I think you should just expect that

22   administratively there'll be something to do for two or three

23   years, at least.  Again, not a lot.  No heavy lifting of any

24   kind, I don't think.

25            So, Ms. Johnson also mentioned that maybe I should

1    also address one other thing now that I've got the floor and

2    then I'll -- if that's acceptable, your Honor.

3            JUDGE ZOBEL:  Yes.

4            MR. SOBOL:  You recall, your Honor, that there's also

5    -- one of the things that this Court needs to address is the

6    common benefit fee and expense order and allocation.  So,

7    there is a need to address both whether there should be a

8    common benefit fee.  If so, what the percentage should be.

9    And, also, approve or modify any allocation of those fees and

10   expenses.  That's a matter that needs to be addressed.

11           So, over a period of time, a subcommittee of the

12   Plaintiffs' Steering Committee has requested submissions and

13   has reviewed submissions of firms, both for their time and

14   their expenses.  The PSC is planning on having a meeting in

15   the middle of July to sit down and see if we can come to a

16   joint recommendation regarding the allocation of those fees

17   and expenses, and what I would like to suggest is a process

18   for this Court to consider that submission.

19           So, I'm just going to put out -- throw out some dates

20   and we'll see what happens and we'll see if someone squawks

21   about it, but since the PSC is going to meet in the middle

22   July, I would suggest that the PSC file any proposed

23   recommendation on or before August 1st, that any objections,

24   people would have four weeks to make an objection, which would

25   be August 29th; that the PSC then have about four weeks to

1    respond to that by way of a reply for September 26th --

2              JUDGE ZOBEL:  I'm sorry.  What was the date second

3    date?

4              MR. SOBOL:  August 29th --

5              JUDGE ZOBEL:  Okay.

6              MR. SOBOL:  -- for any objections; that there then be

7    a reply by the PSC on September 26th, 2016; and that the Court

8    conduct a hearing, whether in October or November, depending

9    upon what -- you know, how much time it wants to have between

10   when it has all the submissions and when it wants to have a

11   hearing.

12             And what I would also say is that the timing of this

13   -- the reason I'm putting this timing out is so that any

14   resolution on the common benefit fee will be happening at a

15   point in time such that there will never be an entitlement of

16   the lawyers to receive fees and expenses until the clients are

17   getting the money.  So, just to make sure that there's an

18   appropriate timing of things.

19             JUDGE ZOBEL:  Is it contemplated that the PSC

20   proposal be preceded by an attempt to get resolution among all

21   of you?

22             MR. SOBOL:  That's a good question.  So, it's

23   assumed, although not necessarily clear, that even the PSC

24   will have its own view.  If what you're suggesting -- and this

25   might be helpful -- is that we build into the process that the

```
1    PSC send to all the lawyers a proposed -- just to the lawyers
2    our proposed recommendation, and see what they come back with,
3    and then we revisit our recommendations before it's brought to
4    the Court, then I suggest that I will -- that we move these
5    dates, and the PSC will make its proposed recommendation,
6    therefore, on September 26th, 2016, because then we will have
7    made our recommendation to everybody.
8         JUDGE ZOBEL:  We're moving the schedule back from
9    August 1 to September 26?
10        MR. SOBOL:  Correct.  Right.  Because what I would
11   do, your Honor -- I'm not trying to make this complicated, but
12   the PSC will still make the recommendation, but will make it
13   only to the lawyers on August 1st, and then we'll finish our
14   negotiations or our discussions with the lawyers by August
15   29th, such that we -- I guess we file our proposed
16   recommendation September 26th, and then four weeks thereafter
17   that get formal objections to the Court.
18        JUDGE ZOBEL:  And objections you previously had at
19   about four weeks later?
20        MR. SOBOL:  Yes.
21        JUDGE ZOBEL:  So, this would again be four weeks
22   later?
23        MR. SOBOL:  Correct.
24        JUDGE ZOBEL:  That would make it around October 20 or
25   thereabouts, right?
```

```
 1              (Discussion off the record.)
 2         MR. SOBOL:  Yes.  I'm trying to -- four weeks after
 3    September 26th, your Honor.  I don't have my calendar in front
 4    of me, I'm sorry.
 5         JUDGE ZOBEL:  You're about to find out.
 6         MR. SOBOL:  Here we go.
 7         COURTROOM DEPUTY CLERK YORK:  24.
 8         JUDGE ZOBEL:  October 24?
 9         COURTROOM DEPUTY CLERK YORK:  Yes.
10         JUDGE ZOBEL:  And then the reply --
11         MR. SOBOL:  Then the reply would be November 21st.
12    So, you would be making your decision --
13         JUDGE ZOBEL:  Then we would have a hearing at the
14    December --
15         MR. SOBOL:  Yes.
16         JUDGE ZOBEL:  -- at the December meeting.
17         MR. SOBOL:  Yes.  If it's agreed, I guess the lawyers
18    will get paid this year.
19         JUDGE ZOBEL:  Assuming I act quickly.
20         Now, the lawyers will get paid out of the same trust
21    fund, right?
22         MR. SOBOL:  Yes.
23         JUDGE ZOBEL:  Is there an understanding at this point
24    as to what portion, what percentage of the trust fund is going
25    to go to lawyers?
```

1          MR. SOBOL:  Yes.  The preliminary -- the pretrial

2     orders in this Court indicated that as much as eight percent

3     of the gross of the funds that would be available would go to

4     the common benefit fee and expenses.  I think that the

5     reported lodestar and expenses by all firms exceeds the eight

6     percent.  I'm not going to prejudge things, but I think that

7     the recommendation of the PSC will be that it comes in at

8     eight percent for the fees and expenses.  So, you can see that

9     the recommendation is really one of an allocation among the

10    lawyers of an amount of money that's less than what their time

11    and expenses indicates.

12         JUDGE ZOBEL:  Okay.  Well, it sounds like a

13    reasonable way to go.  All right.

14         MS. JOHNSON:  That brings us to No. 4, your Honor,

15    the status of the insurance declaratory judgment actions.

16         MR. STRANCH:  Good afternoon, your Honor.  Gerard

17    Stranch on behalf of the PSC.

18         Since the last time we spoke on the declaratory

19    judgment action, Judge Sharp has certified a question to the

20    Tennessee Supreme Court.

21         JUDGE ZOBEL:  Are they as slow as the SJC?

22         MR. STRANCH:  It's finally moving, at least.  So, now

23    we start through the process of briefing and determining

24    whether the Tennessee Supreme Court is going to take the

25    question or not, and that process -- we went through it about

```
1    a year ago and it took about nine months to get a ruling.

2              JUDGE ZOBEL:  What is the impact of these insurance

3    coverage cases on this case?

4              MR. STRANCH:  This insurance declaratory judgment

5    action is for an insurance policy that, as I understand it,

6    would only provide coverage if we're allowed to bring a

7    products liability case.  So, the question being presented to

8    the Tennessee Supreme Court is:  Are we allowed to bring a

9    products liability case?

10             JUDGE ZOBEL:  Is that the question or whether what

11   you have brought is a product liability case?

12             MR. STRANCH:  Well, your Honor, it's actually a

13   little bit more nuisanced.  There's both questions, the one

14   that I presented and the one that she did, are contained

15   within the paragraph this long (indicating) question.

16             JUDGE ZOBEL:  It will be interesting.

17             MR. STRANCH:  We'll see.

18             And this applies only to the Specialty Surgery Center

19   defendants that are still in front of the Court also in

20   Tennessee and have approximately 24, 25 cases.

21             JUDGE ZOBEL:  All right.  Discovery:  No status.

22             MS. JOHNSON:  There's an unfortunate typo there, your

23   Honor.  The agenda suggests that no discovery has been done.

24   I assure you that is not true, but if we look to 5(a), we have

25   had rulings from the Court since the last time granting the
```

```
1    motion to quash the Emory Clinic and Vanderbilt subpoenas.
2            That then brings us to Item 6, status of the
3    litigation track, and Mr. Stranch will address the Saint
4    Thomas.
5            JUDGE ZOBEL:  Now, the Saint Thomas docket number is
6    2921, is it not?  It's the subsequent order, not the first
7    one.
8            MS. JOHNSON:  That's correct.
9            MR. STRANCH:  That's correct, your Honor.
10           JUDGE ZOBEL:  Okay.
11           MR. STRANCH:  And to update the Court on where we
12   are, we have a written MOU where we've agreed upon all the
13   material terms with Saint Thomas and the Saint Thomas
14   Entities.  We are still wordsmithing a couple of concepts that
15   we were all generally in agreement of for two sections.  We
16   anticipate resolving that in the next day or two because we've
17   exchanged a couple of different drafts on that, and hope that
18   by next week we'll be sending out the documents for signatures
19   by the various clients so that we can move forward on
20   resolving that aspect of the litigation.
21           JUDGE ZOBEL:  How many plaintiffs are there in this
22   -- in that piece of the litigation?
23           MR. STRANCH:  I believe there are -- well, I believe
24   there are 116 plaintiffs, but there are fewer cases because
25   some of the cases contain multiple plaintiffs.
```

```
 1              JUDGE ZOBEL:  Okay.  So, that's both pieces of 6(a)?
 2              MR. STRANCH:  Yes.
 3              MS. JOHNSON:  Then, your Honor, that brings us to
 4    6(b), which is the responses to the show cause order.
 5              My office filed earlier today a chart that endeavored
 6    to summarize those responses.  I do have extra copies if the
 7    Court or the clerks would like.
 8              JUDGE ZOBEL:  Well, actually, my problem is that the
 9    -- I have to find the papers.  Here it is.
10              One of the documents pertaining to this is the
11    corrected order to show cause, and that has a list of cases.
12              MR. STRANCH:  Yes, your Honor.
13              JUDGE ZOBEL:  I have some difficulty correlating that
14    order, that list, with the order -- with the summary that you
15    have given me.
16              MS. JOHNSON:  Well, let me see if I can help the
17    Court with that a bit.
18              This list that we filed today grew from the list that
19    we provided in the corrected show cause order.  So, the list
20    in front of the Court is -- builds on the previous charts and
21    then it added some information in the bottom columns.  So, it
22    doesn't perfectly track.
23              You'll notice, for example, your Honor, if you turn
24    all the way to the end, we added columns to reflect filings by
25    the Box Hill plaintiffs and defendants, the Premier plaintiffs
```

1    and defendants, and a motion to remand filed by Specialty

2    Surgery Center.  So, in that sense, this chart is more

3    comprehensive.

4            I think, with the Court's permission, I'd like to

5    make some observations about what's happened with those

6    filings, and also some observations about the number of cases

7    that would be affected, if I may.

8            JUDGE ZOBEL:  Let me just ask you doing while we're

9    doing this...

10           (Pause.)

11           JUDGE ZOBEL:  Well, go ahead.  I'll find it.

12           MS. JOHNSON:  Thank you, your Honor.

13           So, I'll first observe that the PSC's suggestion to

14   the Court that initiated this process was that remand may be

15   appropriate for some groups of cases so long as the plaintiffs

16   and the defendants in those matters did not object.

17           The Court then issued a show cause order that

18   required plaintiffs in the remaining clinic cases to file

19   objections if they objected.  The Court's order also gave the

20   Box Hill and then Premier groups, both plaintiffs and

21   defendants, an opportunity to indicate what they would prefer.

22   So, they're positioned a little bit differently in the Court's

23   order.  So, if we're to start with what we were referring to

24   as the remaining clinic cases, I'll make the following

25   observations:

```
1              There are nine clinics for which no objection to
2       remand was filed.  Those include Cincinnati Pain, OSMC,
3       Ambulatory Care Center, BKC, Sunrise, Dallas Back Pain,
4       Sequoia, Wellspring and PCA.  In total, that addresses 17
5       individual civil actions.
6              JUDGE ZOBEL:  So that means that those cases would go
7       back to multi-district or to the transfer courts.
8              MS. JOHNSON:  That's correct, your Honor.
9              So, procedurally, the PSC's suggestion would be that
10      we would prepare for the Court a proposed suggestion of remand
11      that the Court could then sign on to and file with the panel,
12      such that those cases would then be transferred back to the
13      federal district in which they were transferred from.
14             JUDGE ZOBEL:  I'm sorry.  Can you give me the list
15      again?  Started with Cincinnati.
16             MS. JOHNSON:  Cincinnati Pain.
17             JUDGE ZOBEL:  Yes.
18             MS. JOHNSON:  OSMC.
19             JUDGE ZOBEL:  I'm sorry, what was the next one?
20             MS. JOHNSON:  OSMC.
21             JUDGE ZOBEL:  Okay.  Got it.
22             MS. JOHNSON:  Ambulatory Care Center, BKC, which I'll
23      return to in a minute, your Honor.  Sunrise, Dallas Back Pain,
24      Sequoia, Wellspring and PCA.
25             JUDGE ZOBEL:  Okay.
```

1          MS. JOHNSON:  So, again, the --

2          JUDGE ZOBEL:  As to those, you will give me an order

3    to remand?

4          MS. JOHNSON:  Correct, your Honor.  Actually, it will

5    be styled as a proposed suggestion of remand, a paper that the

6    Court traditionally files with the JML as a suggestion of

7    remand, but functionally it's an order for remand, correct.

8    So, as to those, that would mean 17 cases would be transferred

9    back to the district in which they came from.

10         We then had objections to remand filed in five cases.

11   That's APAC, A-P-A-C, and Encino, Ocean State, Fullerton.

12         JUDGE ZOBEL:  Wait a minute.

13         (Pause.)

14         JUDGE ZOBEL:  Oh, I see Encino.  What happened after

15   Encino, Ocean State?

16         MS. JOHNSON:  Ocean State, Fullerton, and MAPS is the

17   final.  In total, that's nine civil actions included in those,

18   your Honor.

19         JUDGE ZOBEL:  And as to those, you propose to file

20   some additional document?

21         MS. JOHNSON:  As to those, we would like the Court's

22   suggestion as to how you would like to proceed.  In each of

23   those instances, the plaintiffs filed an objection to remand.

24   In two of them, Ocean State and Fullerton, the defendants have

25   already filed papers indicating that they want to be remanded.

```
 1    I believe that counsel for the plaintiffs and defendants in

 2    all of those actions are on the telephone.  We had at least

 3    suggested that they may dial in, in case the Court may wish to

 4    ask them questions.  And so, from there we really would take

 5    the Court's queue as to what the Court would like in order to

 6    resolve these apparent disputes.

 7              JUDGE ZOBEL:  These are all entities who have only

 8    one or two or three plaintiffs, right?

 9              MS. JOHNSON:  APAC has four, your Honor.  The rest

10    have one or two.

11              JUDGE ZOBEL:  So, four is the maximum number of

12    plaintiffs?

13              MS. JOHNSON:  Maximum number of civil actions.  I

14    actually don't have the number of plaintiffs, your Honor.

15              JUDGE ZOBEL:  But most of them have one group -- a

16    group that belongs together?

17              MS. JOHNSON:  Correct.  Yes.

18              JUDGE ZOBEL:  And then the question is whether they

19    should go back for trial or stay here for trial.  I mean,

20    that's what we're now talking about.

21              MS. JOHNSON:  Well, your Honor, I think it's

22    actually -- it's a step before trial, because, as the Court

23    may recall, you had issued an order requiring everyone to file

24    lexicon certifications either waiving or not waiving the right

25    to trial in their home district, and only one defendant had
```

1    agreed to waive lexicon to have their cases tried here.

2           So, I think what the Court is actually -- and that

3    defendant was Insight, who has long since settled.  So, it

4    wasn't relevant for today's purposes.  So, functionally, at

5    least as it stands for those cases, they would ultimately be

6    tried in the district from which they originated.  So, I think

7    --

8           JUDGE ZOBEL:  Right.  So, the question is whether

9    they're at the point of discovery or whatever is necessary to

10   get them toward trial or whether they need to be here.  I

11   think Judge Boal should think about that, too.

12          JUDGE BOAL:  I had a question as well.  On both sets

13   of -- both categories here, the nine clinics and the five

14   clinics, there are cases that the transfer order was the

15   District of Massachusetts.

16          MS. JOHNSON:  Yes, that is correct, your Honor.

17          JUDGE BOAL:  So, it potentially with -- in the nine

18   cases with the suggestion of remand, they would just be coming

19   back here?

20          MS. JOHNSON:  That is true.  At least, I think it's

21   -- forgive me.  I think it's two, at least two would stay

22   here.

23          JUDGE BOAL:  Some stated in state court?

24          MS. JOHNSON:  Yes.

25          JUDGE BOAL:  Some started in federal court?

```
1              MS. JOHNSON:  Yes.  Correct.

2              JUDGE BOAL:  And the same is true with the five

3    group?

4              MS. JOHNSON:  That's correct, your Honor, and I did

5    not break that out in my report to the Court just now, but the

6    chart that we filed earlier does make that -- provides that

7    information for the Court.

8              JUDGE BOAL:  So, they may be ours for discovery,

9    anyway?

10             MS. JOHNSON:  They may be.

11             JUDGE ZOBEL:  But, in general, the objection to

12   remand has to do with the assertion that the case isn't quite

13   ripe for remand, not that it should stay here?

14             MS. JOHNSON:  No, your Honor.  I think the objection

15   in APAC, Encino, Fullerton, MAPS and Ocean State, so I guess

16   all of them, is that it should stay here at least for pretrial

17   purposes, and I have to -- I want to speak with counsel again

18   and read those more closely.  I think at least one of those

19   may suggest that trial here may be appropriate.

20             JUDGE ZOBEL:  Well, it -- so, pretrial purposes I

21   understand is essentially the close of discovery, including

22   maybe expert discovery, but not individualized discovery,

23   right?

24             MS. JOHNSON:  Yes, your Honor.

25             JUDGE ZOBEL:  So, the remand -- you would not object
```

1    to remand as soon as the discovery piece of it is done?

2            MS. JOHNSON:  I don't know that, your Honor.  I would

3    expect that to be true, but not having spoken with Ms.

4    Dougherty or Mr. Wickstrom, who filed these objections, it's

5    not clear to me what their position is.  They may be on the

6    phone.

7            I do know that -- I'll mention this is -- the Ocean

8    State case seems to me to be a little bit differently

9    positioned, because the Ocean State case involves a Rhode

10   Island clinic, over which the Court has personal jurisdiction.

11   It was originally filed in Massachusetts.  So, it may be that

12   the trial of the Ocean State case is appropriate and, as Judge

13   Boal has pointed out, there were other cases amongst these

14   group that were filed in the District of Massachusetts, which

15   also may color where trial occurs.

16           JUDGE ZOBEL:  But for the majority of these cases,

17   where there are objections, the objection really has to do

18   simply with the timing of remand?

19           MS. JOHNSON:  I believe that to be true, your Honor.

20   Out of an abundance of caution, I would want the counsel that

21   filed them to be able to comment on that, but I believe that

22   to be true based on the filings made so far.

23           JUDGE ZOBEL:  Because, as I understood it, where we

24   had larger groups, we would have -- continue with the

25   Bellwether system.  So, it's whether the groups are small

```
1   enough so that they should go back, and then the only other
2   question is when --
3          MS. JOHNSON:  That is correct, your Honor.
4          JUDGE ZOBEL:  -- at the appropriate time now.
5          Would it be helpful, Jenny, to have the plaintiffs
6   and the defendants tell us on timing what they think?
7          JUDGE BOAL:  Yes.
8          JUDGE ZOBEL:  You know, maybe you could -- we're just
9   now beginning to look at this, but maybe you could give some
10  guidance as to what you think is the best time for remand for
11  those that are not going to go through the Bellwether process.
12         MS. JOHNSON:  We can certainly do that, your Honor.
13  My understanding --
14         JUDGE ZOBEL:  After consulting with counsel in the
15  individual cases.
16         MS. JOHNSON:  Yes, your Honor.
17         My understanding, just to be clear, what the Court is
18  asking for is timing as to those where objections were filed.
19         JUDGE ZOBEL:  Right.
20         MS. JOHNSON:  Correct.
21         JUDGE ZOBEL:  Right.  Because at some point they're
22  going to go back unless you're going to try them here.  I'm
23  not so concerned about the Massachusetts and Rhode Island
24  cases, but the bunch of others that are desperate to go home.
25         MS. JOHNSON:  Yes, your Honor.  So, we will speak
```

1   with counsel, both plaintiffs and defense counsel, in those

2   actions and endeavor to put before some thoughts on timing

3   before the next status conference.

4            JUDGE ZOBEL:  Let me ask you, in conjunction with

5   Ocean State, there is the Simas case, in which I have a motion

6   for summary judgment.  Does that need to be decided now or is

7   that case different from the other Ocean State cases?

8            MS. JOHNSON:  I would defer to Ms. Gresco-Blackburn,

9   Blackburn, who I believe is on the phone.

10           MS. GRESCO-BLACKBURN:  I am on the phone.

11           JUDGE ZOBEL:  Okay.

12           MS. GRESCO-BLACKBURN:  I represent the Simases, your

13   Honor.

14           JUDGE ZOBEL:  Well, is that case different from the

15   other plaintiffs?

16           MS. GRESCO-BLACKBURN:  Yes, it is, your Honor.

17           JUDGE ZOBEL:  In what way?

18           MS. GRESCO-BLACKBURN:  We have Simas and separate --

19   the other case is Ocean State vs. Hanson, which is a separate

20   case.

21           JUDGE ZOBEL:  I know, but the issue that is raised in

22   the motion to dismiss or summary judgment -- I can't -- some

23   dispositive motion, is that different for the different

24   defendants in the Ocean State -- the different plaintiffs in

25   the Ocean State case?

```
 1              MS. GRESCO-BLACKBURN:  Well, we objected to it and
 2    the other plaintiffs did not, your Honor.  So, it's been fully
 3    briefed as far as the Simases are concerned.
 4              JUDGE ZOBEL:  So, as far as you're concerned, it
 5    should be decided?
 6              MS. GRESCO-BLACKBURN:  Yes.
 7              JUDGE ZOBEL:  Okay.  We'll just decide it, then.
 8              MS. GRESCO-BLACKBURN:  Thank you.
 9              JUDGE ZOBEL:  Now, there was one other -- I just saw
10    it somewhere.  There are too many charts.  The estate of Alice
11    Thompson.  There was a motion for more time to object or not.
12              MS. JOHNSON:  Yes, your Honor, and that was my firm's
13    motion.  We are in the process of speaking with the personal
14    representative and counsel for the estate who had requested a
15    bit more time to decide on whether they wished to be remanded
16    or to stay before this Court.
17              JUDGE ZOBEL:  So, I'll allow that motion.
18              MS. JOHNSON:  Thank you, your Honor.
19              JUDGE ZOBEL:  And then depending on what comes out of
20    it, you will tell me which of the categories it belongs to.
21              MS. JOHNSON:  Correct, we will do that.
22              JUDGE ZOBEL:  Okay.
23              MS. JOHNSON:  I think that then brings us, your
24    Honor, to the filings made by Box Hill and Premier in response
25    to the show cause order, and I will endeavor to just simply
```

```
 1    state the parties' positions, but leave any argument to the
 2    individual counsel involved.
 3              JUDGE ZOBEL:  Hold it one second.
 4              (Pause.)
 5              JUDGE ZOBEL:  I have Box Hill.  I have Premier.
 6    Specialty Surgery was part of the list you already covered?
 7              MS. JOHNSON:  It's not, but Mr. Stranch will address
 8    Specialty Surgery next, your Honor, if that's all right.
 9              JUDGE ZOBEL:  And Edwards was the case in which you
10    wanted more time?
11              MS. JOHNSON:  Thompson -- Gilliam and Thompson was
12    the case in which we wanted more time, your Honor.
13              JUDGE ZOBEL:  There's one more --
14              MR. STRANCH:  In Edwards there was an objection to
15    remand filed by the plaintiff.  That's the MAPS case.
16              JUDGE ZOBEL:  For extension of time to respond to
17    order to show cause by you, but it says, "Edwards."
18              MS. JOHNSON:  Oh, it should not.  It should say
19    Gilliam or Thompson, which the plaintiff's names.
20              JUDGE ZOBEL:  That's Alice Thompson?
21              MS. JOHNSON:  Yes.  We've dealt with that one, your
22    Honor.
23              JUDGE ZOBEL:  So, that's allowed.
24              All right.  And then we have Specialty Surgery and
25    the Premier defendants and Box Hill.
```

1          MS. JOHNSON:  That's correct, your Honor.  I'll do

2     those in reverse order, if you'll permit me.

3          As to Box Hill, you recall there's a group of eight

4     cases against Box Hill and some individual doctors that's been

5     pending in the MDL for a while.  They have been litigated

6     actively pursuant to a discovery schedule set by the Court.

7     There is no trial date or Bellwether process yet in place for

8     those, but they have been -- that was the anticipation before

9     the Court's show cause order, I think.

10          The plaintiffs have filed papers indicating that they

11     oppose remand.  The defendants have filed papers indicating

12     that they would prefer remand.  I leave it to the Court,

13     obviously, whether you would like to hear from either.

14          JUDGE ZOBEL:  I don't think so because we have been

15     working all along towards Bellwether trials now that the

16     Tennessee cases are gone and STOPNC, whatever they're called,

17     cases are gone.  Now, that was the next one in line.  My

18     anticipation is that based on what Judge Boal tells me will be

19     the time needed for the discovery, that that will be tried in

20     about a year.

21          MR. KIRBY:  Your Honor, if I may.  Greg Kirby on

22     behalf of Box Hill.  Just briefly -- I'll respect that you

23     don't want to hear from me in general in terms of the whole

24     argument, but I do want to --

25          JUDGE ZOBEL:  I do want to hear from you, but

1   briefly.

2           MR. KIRBY:  I do want to point out a very important

3   procedural -- the procedural background here.  There are eight

4   cases that were filed in Maryland state court that were then

5   removed to the federal court by Ameridose, a former

6   co-defendant that's now settled out, is no longer around, and

7   then we're brought to this MDL and we've been dealing with

8   them for a while.

9           Shortly thereafter, 26 other cases or there about

10  were filed -- other cases against Box Hill Surgery Center were

11  filed by patient plaintiffs, and I shouldn't say "cases."

12  There are -- 26 patient plaintiffs filed suit against Box Hill

13  in the same Maryland state court.  They're still in Maryland

14  state court, in Harvard County, Circuit Court for Harvard

15  County, and then --

16          JUDGE ZOBEL:  Do they want to come Here?

17          MR. KIRBY:  I'm sorry?

18          JUDGE ZOBEL:  Do they want to come here?

19          MR. KIRBY:  I would prefer that they stay there.

20          However, that gets me to my next argument.  The

21  plaintiffs have not expressed in an interest in bringing them

22  here either.

23          There is also about 50 plus other patient plaintiffs

24  who have filed suit against about 17 additional healthcare

25  providers in Maryland.  They're not my clients.  They're just

1    completely separate actions, and they are all in the same

2    place -- well, they're slit up between two circuit courts.

3           The plaintiffs down there in the state court who are

4    similar attorneys to here that -- there's a PSC -- a member of

5    the PSC's firm who is driving that, and also another attorney

6    from the Angeles firm who is involved in this MDL and the

7    state court action, and they propose a mini-MDL, if you will,

8    in Maryland, in the Maryland state court.  As a matter of

9    fact, several of those actions already have all been

10   consolidated into one action for purposes of pretrial -- you

11   know, pretrial discovery.  The same --

12          JUDGE ZOBEL:  Are these all pending in the Maryland

13   state court?

14          MR. KIRBY:  Correct.  So, there's about 80 -- more

15   than 80 cases against about 20 healthcare providers in

16   Maryland, and then there's -- including the Box Hill

17   defendants, and then there's the same Box Hill defendants that

18   have eight cases pending against it here.  You've got four --

19   you've got the issue we talked about earlier with the

20   healthcare providers and the MDL with only four cases against

21   it.  We feel like we're more in line with that situation.

22   There's also -- it's my understanding -- and I don't want to

23   speak for Mr. Blumberg, but that the Premier defendants who

24   we've been lockstep with for a while, they used to be kind of

25   ahead of us in the schedule, if you will.  Those plaintiffs

1    and defendants have all agreed that remand would be more

2    efficient to get back to New Jersey, and they have 52 cases, I

3    think, here in the MDL currently and none in the state court

4    of New Jersey, and I would proffer that, you know, we're in

5    that situation where we have only eight cases in the MDL.  We

6    have 26 cases in the state court where this mini MDL process

7    here -- there's already a process that's been bandied about,

8    to push those towards trial and to set up an MDL, if you will,

9    mini MDL there, that we're more akin to that situation and

10   fighting us on two fronts.  The same plaintiffs attorneys, the

11   same defense attorneys, the same exact defendants, you know,

12   more in the state court than here.  And so, in terms of the

13   discovery that has to be done, it would just make much more

14   sense in terms of efficiency to be in the Maryland state

15   court.  Maryland plaintiffs, Maryland defendants, injury in

16   Maryland, the subsequent treatment in Maryland.  When you talk

17   about -- and MDL law would apply.

18           When you talk about the convenience to the parties

19   and the witnesses, you have all Maryland plaintiffs, all

20   Maryland defendants.  You know, to come here and litigate

21   here, you have all of those -- all of those people who would

22   have to spend -- expend great sums of money to come up here,

23   you know, for -- and live up here for a month to try just one

24   case.

25           JUDGE ZOBEL:  It's going to take a month to try the

```
1    case?

2              MR. KIRBY:  Well, to prepare the trial.

3              And in addition to those -- so, put that aside.

4              You've got all these, quote, "innocent" witnesses,

5    the witnesses that have no involvement and didn't ask to be

6    involved.  The treating physicians, you know, the other

7    witnesses, the other fact witnesses to this case, they would

8    also have to come up here.

9              Now, I think what the plaintiffs said in their

10   filing, they talked about that that's not a big deal.  Don't

11   worry about the inconvenience to those people, but they were

12   more concerned about the inconvenience to a few potential

13   witnesses, those being, I think, the national settling

14   defendant witnesses, to which discovery has already occurred.

15   And so, they would only have to deal with the trial aspect,

16   and there's also issues of whether they have fault here, you

17   know, in terms of the causation argument.  So, they put

18   themselves in that situation versus these other witnesses.  I

19   mean, the treating physicians, you know, for these patients

20   would have to, you know, travel up here and close down their

21   practices for the day or more to do that.

22             So, we feel that in terms of the convenience, it's

23   much more -- any minimal convenience to the settling defendant

24   witness is -- it outweighs, you know, putting their -- putting

25   these others Maryland witnesses out to have to come up here.
```

```
 1              They also mention -- I think this is important.  I
 2     think one of the plaintiffs' arguments is that, Oh, well, now
 3     there's this issue of -- I think they have to -- the
 4     plaintiffs have to indemnify, or whatever the settlement
 5     agreement says, you know, the settling defendants.  So, if
 6     they have to come down to Maryland to testify, that would
 7     incur additional costs and --
 8              JUDGE ZOBEL:  What settling defendants are you
 9     talking about?
10              MR. KIRBY:  Well, what I'm talking about are the
11     national defendants.  So, to the extent that Liberty and
12     Unifirst -- so, there were --
13              JUDGE ZOBEL:  You mean in connection with the
14     comparative fault?
15              MR. KIRBY:  Right.  Maryland doesn't comparative
16     fault, but we have the Uniform -- we have UCATA.  It's a
17     statute that's allows joint tortfeasor status and then there's
18     a -- to put it simply, a discount or setoff for any joint
19     tortfeasors who are involved.
20              There's no additional costs.  There's no additional
21     moneys that the settling defendants -- the national settling
22     defendants would have to pay or incur.  They wouldn't have --
23     they, you know, wouldn't have to deal with anything.  It's
24     just that Box Hill would get -- would get a setoff or a
25     discount for them being joint tortfeasors.
```

1          So, the plaintiff said, well, if they have to come

2     down to trial and defend themselves, that would be an

3     additional cost.  We tried to remedy that early on by asking

4     the plaintiffs' attorneys to agree and to classify these other

5     national settling defendants, Liberty and UniFirst and Victor

6     and ARL, to suggest that they be labeled as joint tortfeasors

7     for purposes of this, and that would eliminate a lot of -- a

8     lot of the trial, a lot of the issues.  It would have been to

9     be discussed, and it would eliminate the cost to those

10    entities to be involved, and the plaintiffs refused.

11         It's their right, but the problem with that is that,

12    you know, when -- they simply -- the plaintiffs wanted to

13    double dip.  I mean, they want this settlement money, nearly

14    $50 million and -- I don't know what it is exactly.  So, they

15    get that settlement money from these entities, but in the same

16    breath, if there's a judgment of damages -- so, the total

17    damages incurred for these plaintiffs -- for these patient

18    plaintiffs, they want to get -- they want to get all of that

19    money from Box Hill, regardless of whether these other

20    entities had some fault in there.

21         And I bring this up because it's an important point.

22    When the litigation started, the plaintiffs sued these other

23    entities or at least blamed them and said Liberty had a faulty

24    design clean room.  Unifirst didn't clean right, and ARL

25    didn't test the stuff right, and Victory didn't keep up the

1    HVAC unit.  So, they screamed to the high heavens that these

2    entities had fault.

3          But then when they settled with these entities for

4    about $50 million in total, they then changed their tune and

5    ever since have wanted to disavow any responsibility for these

6    other entities and that's because they want to double dip in

7    the damages and the money awarded.

8          So, any inconvenience for these -- for these settling

9    defendants is far less and, frankly, their fault compared to

10   the Maryland witnesses who are all mostly down there already,

11   you know, live and work in Maryland not from the far from the

12   courthouses --

13         JUDGE ZOBEL:  When do the Maryland cases in Maryland

14   going to trial?

15         MR. KIRBY:  So, I don't have an exact date, and I

16   apologize.  I don't have a scheduling order with me, but there

17   are a whole slew of the Maryland cases that are scheduled I

18   think sometime in -- I think it's the end of 2017 or

19   thereabouts.  The cases against Box Hill are in Hartford

20   County Circuit Court.  The plaintiffs in that case, which

21   involved members of the plaintiff's steer committee's firm,

22   had suggested that we put all of the Maryland cases

23   together -- they're in neighboring counties -- put all of them

24   together and go with the same scheduling order and have

25   everything together so that we have consistent rulings.

1          We agreed to that.  Box Hill defendants agreed with

2     that.  There have been several other defendants who have maybe

3     had a different opinion, and I think we're going to have a

4     scheduling conference at some point with the judge to discuss

5     that.

6          JUDGE ZOBEL:  Okay.  Is there anyone on the telephone

7     who desperately needs to add anything?

8          MR. COREN:  Your Honor, there are two counsel, I

9     believe, for the plaintiffs are.  On the phone speaking is

10    Michael Coren.  I appeared before your Honor.  I was co-chair

11    of the creditors committee a number of times, and you may

12    remember me.  And then Patty Kasputys from Peter Angelo's

13    office is also on the line, I believe.  If I may ask Patty if

14    she wants me to first speak or if she wants to speak first.

15         MS. KASPUTYS:  I would be glad to speak first.  This

16    is Patty Kasputys, and I would like to, if I could, point out

17    a number of inaccurate statements that were just represented

18    to the Court by defense counsel and --

19         JUDGE ZOBEL:  I'm sorry.  Whom do you represent?

20         MS. KASPUTYS:  We represent seven of the plaintiffs

21    in the MDL who have filed cases against Box Hill Surgery

22    Center, what was two Bonnie LLC.  So, Mr. Coren represents one

23    of the other plaintiffs in these cases.

24         MR. COREN:  Your Honor, that would be Megan Handy.

25    Megan Handy is the executrix of the Estate of Brenda Rozeck,

1    R-o-z-e-c-k.  Brenda Rozeck is one of the two murder victims

2    that are -- will be before the Court in the trial of the case

3    of Cadden, et al., on The criminal matter.  She is one of the,

4    as I said, two murder cases that are in the MDL.

5            JUDGE ZOBEL:  Well, if you want to add anything to

6    what counsel have said so far, please do it quickly.

7            MR. COREN:  Patty?

8            MS. KASPUTYS:  Yes.  First -- I'm sorry.  Do you want

9    Mr. Coren to go first, your Honor.

10           JUDGE ZOBEL:  I just want somebody to talk, but very

11   briefly.

12           MR. COREN:  Patty, you go.

13           MS. KASPUTYS:  Okay.  I would like to say at the

14   outset that this is, in fact, an order that was entered on May

15   5th, Document No. 2851, that provides in both the Box Hill and

16   the Premier cases for discovery that goes beyond the common

17   fact discovery deadlines, which we've been adhering to since

18   the case first came to this Court in late 2014, and this does,

19   indeed, provide for the Bellwether process and case-specific

20   expert report and the completion of case-specific expert

21   deposition in July of 2017.  Mr. Kirby represented that there

22   is a trial date in the Baltimore County circuit court cases.

23           I might add, there is where a scheduling order has

24   been entered by the state court for common issues discovery,

25   but it expressly excludes the eight cases that Mr. Coren and

1    my firm represent that are before your Honor, and we have a

2    strong position that the cases should continue to proceed

3    before this Court, as there has been discovery that has been

4    proceeding.  There has also been motion practice before your

5    Honor where, in fact, significantly, the defendant made

6    expressed representations that it intends before the Court to

7    advise the plaintiffs of notice that it intends to present

8    evidence of the liability of the national and national

9    affiliated defendants and unaffiliated defendants.  The

10   approximately 50 cases that are pending in the circuit court

11   for Baltimore County is, again, not against Box Hill.  They're

12   not, as Mr. Kirby said, the same exact defendants.  There are

13   none of the same defendants in that court.  The cases -- this

14   firm respects twelve cases against -- plaintiffs in twelve

15   cases against Box Hill in the circuit court for Hartford

16   County Maryland where there are no scheduling orders in place,

17   and, your Honor, just to be brief, I just want to make it

18   clear that --

19             JUDGE ZOBEL:  I'm laughing because "to be brief" at

20   the end of a long narrative.

21             MS. KASPUTYS:  I apologize.  I'll finish, your Honor,

22   but we didn't put the indemnity issue and claim that anybody

23   has to come to Maryland to have those issues tried.  In fact,

24   we've opposed the defendants proceeding on any cross-claims or

25   third-party claims, and that's -- I'll conclude with that

1    remark, your Honor.

2            JUDGE ZOBEL:  Thank you very much.

3            MS. KASPUTYS:  Thank you.

4            MS. JOHNSON:  The PSC's view, your Honor, is that it

5    makes sense for the Box Hill cases to remain here and to

6    continue according to the established schedule.

7            JUDGE ZOBEL:  Okay.  So that one I'll have to decide.

8            MS. JOHNSON:  That brings us, then, to Premier, your

9    Honor, and I believe there's no decision needed here.   In

10   Premier, you'll recall that there are about 40 cases pending

11   in the MDL.  The defendants want -- or asked this Court to

12   remand, and none of the plaintiff's attorneys have objected to

13   that.

14           JUDGE ZOBEL:  So that should be allowed without

15   objection?

16           MS. JOHNSON:  Yes, your Honor.

17           MR. BLUMBERG:  Judge, if I could, this is Jay

18   Blumberg representing Premier.

19           Just to complete the record to make certain that

20   there's no confusion, two things:

21           One is, the attorney for two additional defendants,

22   Dr. Perkins and Dr. Bhagat, who traditionally are included in

23   the Premier cases, would join in a request for remand, and

24   there has been no objection that I have seen from the

25   plaintiffs.

```
1            And the one thing I want to -- I would be remiss -- I

2   did receive an email from one of the cases, the Over Street

3   case, which is represented -- I think the plaintiff is

4   represented by Ms. Dougherty, that did object, and it really

5   creates an interesting issue.

6            She directly filed in the District of Massachusetts

7   instead of filing in New Jersey at a point in time when she

8   was entitled to do that because of the MDL, and we would ask

9   that all of the cases, including that one, get transferred

10  back to New Jersey.  It doesn't make any sense to keep one

11  case up here in the state of Massachusetts.

12           JUDGE ZOBEL:  I'm sorry, what's the number of that

13  case or the name of it?

14           MR. BLUMBERG:  It's Overstreet, John Overstreet.  I

15  don't have the number, your Honor.

16           JUDGE ZOBEL:  Okay.

17           MS. JOHNSON:  As a procedural matter, I don't believe

18  the Court can, pursuant to a suggestion for remand, send that

19  case back under 1404.  I think there has to be a separate

20  motion for transfer.

21           JUDGE ZOBEL:  Es.

22           MR. BLUMBERG:  I'll file the appropriate motion, your

23  Honor.

24           JUDGE ZOBEL:  Okay.

25           MS. JOHNSON:  And then that brings us, finally, your
```

1   Honor, to Specialty Surgery Center, which Mr. Stranch will

2   address.

3           JUDGE BOAL:  Can I just ask, since Premier and Box

4   Hill are together for purposes of scheduling at this point, if

5   the Premier cases are no longer here -- and, obviously, Judge

6   Zobel needs to decide whether the Box Hill cases that are here

7   will remain here -- is there an opportunity to shrink the

8   schedule?

9           MS. JOHNSON:  I would defer to Ms. Kasputys for her

10  views on that.

11          MS. KASPUTYS:  Absolutely.  I think we can certainly

12  discuss that, your Honor.

13          JUDGE BOAL:  I understand you may dispute that, but,

14  obviously, it's up to Judge Zobel what she's going to go with

15  the Box Hill cases, but if they still here, I would certainly

16  ask the parties to consider that.

17          MR. KIRBY:  Well, let me just add my two cents in

18  response.  And that is, I think when the deadlines were set,

19  it took into consideration the timing of which, you know, it

20  takes to designate experts and do deposition discovery, and

21  the like.  And so, I think that it wasn't that the Box Hill

22  schedule was set based on having another -- having Premier

23  here already.  I think -- you know, that would be maybe down

24  the road with the trial schedule.

25          JUDGE BOAL:  We would be talking eight versus 60

1    plaintiffs, right?  And I don't know what experts the

2    plaintiffs would be using for common issue or if there's

3    overlap with what's already been done with Tennessee, so that

4    that might be able to be shortened in this trial.

5        MR. KIRBY:  Let me just add one more, if I may -- one

6    more point, if I may, and that's with regards to consistency

7    and efficiency.

8        There are depositions that we would take in the

9    common-issue phase of the MDL for our eight cases.  That would

10   include, for example, the Maryland Board of Pharmacy,

11   representatives of the Maryland Board of Pharmacy, Maryland

12   Department of Health, but the same thing would happen in the

13   state court cases, and I don't really just mean mine, the Box

14   Hill cases.  As a matter of fact, I think yesterday one of the

15   other clinic defendants that is unrelated to me in the state

16   court cases served a notice or a subpoena for a deposition on

17   the Maryland Board of Pharmacy and the Maryland Department of

18   Health.

19       So, my point is, if we're back in Maryland -- or our

20   case is back and join the other 80 in Maryland, it would

21   streamline the process.  So that the -- it can happen once.

22       JUDGE ZOBEL:  I don't understand that.  If you

23   respect the Box Hill defendants, why can't you all agree that

24   whatever discovery is taken in one jurisdiction applies to the

25   other jurisdiction?  You're going to have the same experts and

1    the same -- substantially the same part -- same witnesses.

2           MR. KIRBY:  Well, I'm represented by different

3    counsel.  I mean, I don't --

4           JUDGE ZOBEL:  So?

5           MR. KIRBY:  There's another example with fact

6    witnesses and there are fact witnesses who -- one used to be

7    employed by Box Hill, but is now employed at one of the other

8    clinic defendants who is being sued, and it's walking a tight

9    rope because the plaintiffs want to take the deposition for

10   purposes of the MDL, but the concern is -- and it's not --

11          JUDGE ZOBEL:  Which MDL, the ones you've manufactured

12   in Maryland or the one that's here?

13          MR. KIRBY:  These eight MDL cases.  The other 26 were

14   never in the MDL.  They were in --

15          JUDGE ZOBEL:  But You called it like the MDL.  You

16   said you --

17          MR. KIRBY:  I'm sorry.

18          So, Ms. Kasputys is on the phone, noted the

19   deposition of these two employees for purposes of this MDL,

20   but they're certainly employees of another healthcare provider

21   clinic defendant in the state court cases, and the concern is

22   that their testimony could -- and some of the questions are

23   geared towards, Well, what does this other ambulatory surgery

24   center do, you know, in terms of its processes, and stuff, and

25   the concern is that those questions would have an implication

1    on the state court cases.  Whereas, it's only noted in the MDL

2    for purposes of the Box Hill case, and that just goes to my

3    point about having everything together.

4               JUDGE ZOBEL:  Well, that witness might be deposed by

5    the Box Hill plaintiffs in Maryland.

6               MR. KIRBY:  Well -- and if that were to happen, maybe

7    it would happen once for all of the cases and not two or three

8    times.  There's also the question of disparate rulings.  I

9    mean, this Court has ruled certain ways on certain things and

10   the state court judge can -- could rule differently -- you

11   know, different ways on the same thing.

12              JUDGE ZOBEL:  But they haven't yet.

13              MR. KIRBY:  It's not for lack of trying.  I don't

14   think the judges, but the plaintiffs are -- you know, we had

15   asked the plaintiffs to drop certain claims that were

16   disallowed in this Court and, you know -- but we filed a

17   motion to dismiss, and they refused to do it.  So, they're

18   still pursuing it.  So, there's the chance that there will be

19   competing appeals to different courts.  So, just wanted to

20   bring that up.

21              JUDGE ZOBEL:  All right.

22              MS. JOHNSON:  On that note, your Honor, I'll just

23   remind the Court that Ms. Martin was appointed the federal

24   state liaison to liaise in this exactly this type of

25   situation.  So, to the extent there's any liaising that needs

1    to be done as a result this, she was happy to do so.

2          JUDGE ZOBEL:  Okay.  You know her, do you not?  So

3    you can talk with her about making sure that there's no

4    duplication.

5          MR. KIRBY:  We'll see what happens.

6          JUDGE ZOBEL:  Thank you.

7          All right.  Now we go to Specialty Surgery.

8          MR. STRANCH:  Yes, your Honor.  Specialty Surgery was

9    not subject to the show cause order.  They were -- they were

10   one -- they were the other big clinic in Tennessee that has

11   over 20 cases against them.

12         Now that we've reached our agreement principle with

13   all of the Saint Thomas cases, Specialty Surgery is next, and

14   one of the things we were going to be asking the Court for was

15   that we go ahead and set a Bellwether schedule for Specialty

16   Surgery.

17         Common discovery is almost completed at this point.

18   We're waiting on a ruling from Judge Boal that was argued

19   today that will -- once it's ruled upon, will lead to the last

20   couple of depositions and then we'll ready to move into the

21   next phase.

22         JUDGE BOAL:  So, I'm a little bit confused about the

23   schedule based on the order that I had issued in February.

24   So, the close of common fact discovery was 30 days after the

25   Court's ruling on the motion to compel, which I think has been

```
 1   done for the Court's ruling on the 12(b) motion by Culclasure
 2   & Associates.
 3           MR. STRANCH:  Culclasure, yes.  Culclasure opted not
 4   to file a motion to dismiss and they filed answers last week,
 5   your Honor.
 6           JUDGE BOAL:  So, when is the close of common fact
 7   discovery?
 8           MR. STRANCH:  We're not sure.  I would assume it
 9   would be 30 days after that.  That's why I was suggesting we
10   need to go ahead --
11           JUDGE BOAL:  30 days after what?
12           MR. STRANCH:  After the answer, I guess.
13           JUDGE BOAL:  I see.  So, did they file the answer?
14           MR. STRANCH:  They filed the answer last week, but I
15   would suggest to the Court that what we need to do is we need
16   to go ahead and enter a Bellwether schedule with hard stop
17   dates on common discovery, experts, a process to pick the
18   Bellwether cases that would proceed to trial, because once we
19   get the ruling from Judge Boal that was argued today, we'll be
20   able to do the last two or three depositions and review those
21   documents, and we'll be ready to move on.
22           JUDGE ZOBEL:  Are you operating with the committee,
23   the PSC?
24           MR. STRANCH:  Yes, your Honor.  I'm a member of the
25   Plaintiffs' Steering Committee.
```

```
1              JUDGE ZOBEL:  That's what I thought.  So, I thought
2    we had agreed at one point that following the Tennessee
3    Bellwether trial, that the next would be Box Hill, I thought.
4              MR. STRANCH:  Well, what we originally discussed,
5    your Honor, was that Tennessee would have all the Bellwethers
6    and it would be Saint Thomas and Specialty Surgery.  We then
7    had a discovery issue in Specialty Surgery and those cases
8    dropped behind.  I think we were actually ahead of Box Hill
9    and Premier.
10             JUDGE ZOBEL:  Why don't you when you give us your
11   next report, give the next report to Judge Boal.  Include in
12   it your proposal for Bellwether trials.
13             MR. STRANCH:  Be happy to do it, your Honor.
14             JUDGE ZOBEL:  And keep in mind that it may be that,
15   depending on who the defendant -- the group of defendants is,
16   that it may be not necessary to have another year of
17   discovery.
18             MR. STRANCH:  I don't believe we need another year of
19   discovery, your Honor.
20             JUDGE BOAL:  Because there's a schedule already in
21   place.  So that the -- if it's 30 days from yesterday, so then
22   there's a deadline based on that last week for the common
23   expert reports, rebuttal common reports, and expert
24   depositions.  So, those should all be proceeding without
25   further order of the Court.  So, what you're asking for is the
```

1    steps after that, but from what you're saying, the steps after

2    that would still come in ahead of the Box Hill and Premier

3    defendants.

4            MR. STRANCH:  I believe so, your Honor.

5            JUDGE BOAL:  So, those cases could be tried in the

6    spring potentially.

7            MR. STRANCH:  Yes, your Honor.

8            JUDGE ZOBEL:  So, what you're suggesting is these

9    Specialty Surgery cases are first.

10           MR. STRANCH:  That's correct, your Honor.

11           JUDGE ZOBEL:  Okay.  I mean, if that's what you --

12   makes no difference to me.

13           MR. STRANCH:  We'll meet and confer with the

14   defendants' counsel and see if we can't work up a schedule

15   that works for everyone, and we'll hope to -- we'll present it

16   to the Court for competing proposals before --

17           JUDGE ZOBEL:  I hope so.  Let me know who the

18   defendants -- which defendants are going to go in what order

19   for the Bellwether trials.

20           MR. STRANCH:  Yes, your Honor, we'll do that.

21           MR. TARDIO:  Your Honor, Chris Tardio --

22           JUDGE ZOBEL:  Also, the Maryland cases, who knows,

23   may end up by the wayside or in Maryland.

24           MR. STRANCH:  Yes, your Honor.

25           MR. KIRBY:  That would be preferred.

```
 1              JUDGE ZOBEL:  I know.  And you do get the last word

 2      on it.

 3              MR. COREN:  Your Honor, just for Box Hill, to be

 4      clear, and miss enhanced our desire is to --

 5              JUDGE ZOBEL:  Excuse me.  Who is speaking, please?

 6      Wait a minute.  The reporter needs to know -- I need to know

 7      who is speaking.

 8              MS. COREN:  Mike Coren, your Honor, Ms. Handy's

 9      client.

10              I think in terms of working out -- obviously, we have

11      a good relationship with the Tennessee plaintiffs and we'll

12      work out, you know, the schedule that could satisfy the

13      Court's needs as well as the litigants' needs.

14              JUDGE ZOBEL:  I will give you a very quick decision

15      on whether Box Hill is here or there, and then you can include

16      that in the total picture that you're going to present about

17      Bellwether trials.

18              MR. COREN:  Thank you, your Honor.

19              JUDGE ZOBEL:  And I guess the Massachusetts cases are

20      in Bellwether.  I think I have jurisdiction to do that.  So,

21      they should be fitted in there somewhere, too.  Anybody else?

22              MR. TARDIO:  Your Honor, Chris Tardio.  I represent

23      Specialty Surgery Center.  I need to note two important

24      points:

25              One is -- maybe directed more to Judge Boal because
```

```
1    of the scheduling order.  The reason I think that the
2    scheduling order hinged on the ruling or the resolution of the
3    motion to dismiss was to determine whether or not the
4    Culclasures were going to be in the case because that will
5    impact discovery and also expert witnesses.
6            My understanding is that they will file -- I'm
7    assuming they will file a motion.  Maybe it's not a motion to
8    dismiss, but I assume they will file a dispositive motion.
9            So, what I'm afraid of is our expect deadline will
10   come and we will have to incur expense and time disclosing
11   experts, taking Culclasure discovery, when they have a -- it
12   doesn't matter what I think, but a good faith statute of
13   limitations defense and may not end up in the case.  So,
14   that's --
15           JUDGE BOAL:  But they haven't raised it right now as
16   a Rule 12(b).  So, they've made that decision, right?  So
17   they're going forward.  I know you're not their counsel.
18           MR. TARDIO:  I understand.  I understand.
19           The second point to the remand issue, we had filed
20   yesterday a motion -- we were left out of the show cause
21   order.  Specialty Surgery is kind of isolated as a separate
22   group of cases.  We filed a separate motion for suggestion of
23   remand yesterday and for ultimate transfer back to Tennessee
24   at the conclusion of common discovery.  That's our position.
25           The timing of the motion was because these issues
```

1    were going on now, we thought it most efficient to handle our

2    issues, too.  So, I would note that one would need to be

3    decided, hopefully, along with all these other clinics.

4              JUDGE ZOBEL:  Okay.  So, it's Box Hill and Specialty.

5    All right.

6              MR. KIRBY:  Your Honor, Greg Kirby for Box Hill.

7              I don't have any other business, I don't believe, and

8    I'm trying to catch a plane.  May I be excused?

9              JUDGE ZOBEL:  You go right ahead.

10             MR. KIRBY:  I'm sure you're happy to get rid of me.

11             JUDGE ZOBEL:  That's not true at all.

12             MR. KIRBY:  Thank you, your Honor.

13             (Attorney Kirby is excused from the courtroom.)

14             MR. STRANCH:  Your Honor, this is Gerard Stranch for

15   the PSC on the Specialty Surgery motion to remand and transfer

16   back to Tennessee.

17             If the Court is going to consider that motion, then

18   we would like to have an opportunity to file a response to it.

19   And so, we just need to know when the Court would like to have

20   our response on that, because we don't think the cases should

21   be remanded and transferred.  The Court considered this in the

22   Saint Thomas cases and denied the same request.  And so, we're

23   not sure what --

24             JUDGE ZOBEL:  You can have faith.

25             MR. STRANCH:  We have faith.  I have faith in you,

```
 1   your Honor.

 2            JUDGE ZOBEL:  I'm sorry?

 3            MR. STRANCH:  I have faith in you, your Honor.

 4   You're doing great so far.

 5            JUDGE ZOBEL:  How much time do we -- when do you want

 6   to file this?

 7            MR. STRANCH:  Two weeks, 14 days.

 8            JUDGE ZOBEL:  Did we tell Specialty Surgery -- their

 9   motion is pending.

10            MR. STRANCH:  They filed it yesterday.

11            JUDGE ZOBEL:  Yes.  Okay.  So, you want two weeks to

12   file an opposition?

13            MR. STRANCH:  That would be fine.

14            JUDGE ZOBEL:  You go right ahead.

15            MR. STRANCH:  Thank you, your Honor.

16            JUDGE ZOBEL:  That's Docket No. 2939 that you're

17   talking about, right?

18            MS. JOHNSON:  Yes, I believe so, your Honor, yes.

19            MR. STRANCH:  Yes.

20            JUDGE ZOBEL:  All right.  Now, back to the -- I think

21   we had finished with the remand, correct.

22            MS. JOHNSON:  Yes, your Honor.

23            JUDGE ZOBEL:  And now we go back to the agenda.

24            MR. STRANCH:  Your Honor, the next thing on the

25   agenda is the Specialty Surgery defendant's motion for summary
```

1    judgment.  They did not file pursuant to the Court's order a

2    request for leave to file the summary judgment.  We have not

3    opposed their request to file it yet, but they filed a notice

4    saying that we've -- that we've not opposed their motion for

5    summary judgment.  Whenever the briefing is due on that, we do

6    intend to oppose that.  I just want to make sure that is

7    clear.

8            JUDGE ZOBEL:  Do they still have time to file an

9    objection, an opposition?

10           MR. STRANCH:  Your Honor --

11           JUDGE ZOBEL:  They haven't filed their motion.

12           MR. STRANCH:  They filed -- they didn't follow the

13   procedure the Court set out in the MDL order back in July of

14   2015 that required that before you file a motion for summary

15   judgment, you seek leave of the Court to do so.  They just

16   filed the motion for summary judgment.

17           MR. TARDIO:  That's because the order requiring leave

18   only applied to the STOPNC cases, as I understood it.

19           MR. STRANCH:  That is not correct.

20           MR. TARDIO:  Well, if it's not correct, then we will

21   go through the proper procedure, but all the motion is asking

22   for is the Court apply the same Tennessee legal ruling that

23   the Court entered in the STOPNC cases to the SSC cases.  I

24   don't know what the opposition would be.

25           JUDGE ZOBEL:  Is there any reason why we can't allow

```
 1    this motion to stand and you oppose it if you want?

 2              MR. STRANCH:  We're happy to do oppose it, your

 3    Honor.

 4              JUDGE ZOBEL:  So, we'll deal with it as properly

 5    filed.  And you'll oppose it when?

 6              MR. STRANCH:  21 days from today.

 7              JUDGE ZOBEL:  Okay.  That would be --

 8              COURTROOM DEPUTY CLERK YORK:  That would be the 13th,

 9    Judge.

10              JUDGE ZOBEL:  The 13th?

11              COURTROOM DEPUTY CLERK YORK:  Yes.

12              JUDGE ZOBEL:  July 13th.

13              COURTROOM DEPUTY CLERK YORK:  Yes.

14              MS. JOHNSON:  That brings us to Item 7, your Honor,

15    which would be the schedule for future status conferences.

16              JUDGE ZOBEL:  Does August, September mean August or

17    September or both?

18              MS. JOHNSON:  Sadly, it means August, September and

19    July.  So, the Court will recall that July 28th we had set a

20    pretrial conference --

21              JUDGE ZOBEL:  And you want to turn that into a

22    regular --

23              MS. JOHNSON:  Exactly, your Honor.  We suggest

24    converting that to the status conference on July 28th.

25              JUDGE ZOBEL:  And then when do you want -- August,
```

```
 1   September?

 2           MS. JOHNSON:  Yes, August 18th we were proposing or,

 3   perhaps, the 24th would work for the plaintiffs.

 4           JUDGE ZOBEL:  Why don't we do August 24th.

 5           COURTROOM DEPUTY CLERK YORK:  The 24th?  Okay.

 6   August 24th, at 2:00?

 7           JUDGE ZOBEL:  Yes.

 8           COURTROOM DEPUTY CLERK YORK:  Okay.

 9           JUDGE ZOBEL:  And September we don't need to worry

10   about yet, right?

11           MR. STRANCH:  We suggest that we do set that, your

12   Honor, only because with school resuming, the travel can be

13   difficult.

14           JUDGE ZOBEL:  When in September?

15           MR. STRANCH:  We are suggesting the 29th or, perhaps,

16   the 22nd.

17           JUDGE ZOBEL:  29th is fine.

18           COURTROOM DEPUTY CLERK YORK:  29th, at 2:00, okay.

19           MS. JOHNSON:  And just one second, your Honor, if I

20   may.

21           (Discussion off the record.)

22           MR. SOBOL:  Your Honor, given the scheduling

23   commitments that Ms. Johnson has on July 28th, would be okay

24   if Ms. Martin and Mr. Ellis were here instead of either she or

25   I?
```

1          JUDGE ZOBEL:  I don't have a problem, but if you want
2     to change it to the 22nd, we'll do it on the 22nd.  It's up to
3     you.
4          MR. SOBOL:  It's up to you.
5          MS. JOHNSON:  No.  We're fine, your Honor, with Ms.
6     Martin and Mr. Ellis say handling that conference.  Thank you.
7          MS. GREER:  Your Honor, could we just confirm those
8     dates real quickly?  Because I've been hearing different --
9          JUDGE ZOBEL:  I'm sorry?
10         MS. GREER:  Could we just confirm those dates because
11    I'm not sure --
12         JUDGE ZOBEL:  Yes.  July 28th, August 24, and
13    September 29.
14         MS. GREER:  Thank you.
15         JUDGE ZOBEL:  Now, did we -- I think we finished with
16    Abdul Barakat and we decided that I need to decide, right?
17         MS. JOHNSON:  Correct, your Honor.
18         That brings us to briefing in progress.  There's only
19    one item there, which is Massachusetts Board of Pharmacy's
20    motion to withdraw.
21         JUDGE ZOBEL:  I endorsed that, Lisa, somewhere.  So
22    I'll give it to you.
23         COURTROOM DEPUTY CLERK YORK:  Okay.
24         MS. JOHNSON:  That brings us to F, which is just to
25    itemize for the Court's reference the motions that have been

1    stayed as a result of the Court's order addressing Saint

2    Thomas.

3            JUDGE ZOBEL:  It's quite a list.

4            MS. JOHNSON:  I know, it's quite a number, isn't it?

5    So, that's actually Items 10 through 25.

6            JUDGE ZOBEL:  All right.

7            MS. JOHNSON:  And I believe that brings us to the end

8    of the agenda, your Honor.

9            JUDGE ZOBEL:  Is there any other business that we

10   need to take care of by counsel who are here or by counsel on

11   the phone?

12           (No response.)

13           JUDGE ZOBEL:  In that case, we're adjourned.  Thank

14   you again.

15           MS. JOHNSON:  Thank you.

16           MR. STRANCH:  Thank you, your Honor.

17           MR. SOBOL:  Have a nice summer.

18           JUDGE ZOBEL:  I'm going to be here at least two

19   months of the summer.

20           (Adjourned, 3:21 p.m.)

21

22

23

24

25

```
1                    C E R T I F I C A T E

2         I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 65, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Multidistrict

7    Litigation No. 13-02419-RWZ, In Re: New England Compounding

8    Pharmacy Cases Litigation.

9

10

11   June 25, 2016       /s/Catherine A. Handel
     Date                Catherine A. Handel, RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```