```
 1                        UNITED STATES DISTRICT COURT
 2                         DISTRICT OF MASSACHUSETTS

 3

 4
     IN RE:  NEW ENGLAND COMPOUNDING    )  MDL NO. 13-02419-RWZ
 5   PHARMACY CASES LITIGATION          )
                                        )
 6                                      )
                                        )
 7                                      )
                                        )
 8                                      )

 9           BEFORE:  THE HONORABLE RYA W. ZOBEL AND
                      THE HONORABLE JENNIFER C. BOAL
10

11

12                         STATUS CONFERENCE
13

14

15

16            John Joseph Moakley United States Courthouse
                          Courtroom No. 12
17                        One Courthouse Way
                          Boston, MA 02210
18

19                           May 19, 2016
                             2:00 p.m.
20

21

22                 Catherine A. Handel, RPR-CM, CRR
23                      Official Court Reporter
              John Joseph Moakley United States Courthouse
24                 One Courthouse Way, Room 5205
                          Boston, MA 02210
25              E-mail: hhcatherine2@yahoo.com
```

```
 1     APPEARANCES:

 2     For The Plaintiffs:

 3

        Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN A. JOHNSON,
 4     ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts
       02142;
 5
        Janet, Jenner & Suggs, LLC, KIMBERLY A. DOUGHERTY, ESQ., 75
 6     Arlington Street, Suite 500, Boston, Massachusetts  02116;

 7        Ellis & Rapacki LLP, by FREDRIC L. ELLIS, ESQ., 85 Merrimac
       Street, Suite 500, Boston, Massachusetts 02114;
 8
          Lieff Cabraser Heimann & Bernstein, LLP, by ANNIKA K.
 9     MARTIN, ESQ., 250 Hudson Street, 8th Floor, New York, New York
       10013-1413;
10
          Lieff Cabraser Heimann & Bernstein, LLP, by MARK P. CHALOS,
11     ESQ., 150 Fourth Avenue North, Suite 1650, Nashville, Tennessee
       37219;
12

13      FOR PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF
       NECP, INC.:
14

15        Duane Morris LLP by KERI L. WINTLE, ESQ., 100 High Street,
       Suite 2400, Boston, Massachusetts 02110-1724;
16

17
        FOR THE DEFENDANTS:
18
          Fulbright & Jaworski, LLP, by MARCY H. GREER, ESQ., 98 San
19     Jacinto Boulevard, Suite 1100, Austin, Texas 78701;

20        Pessin Katz Law, P.A., by GREGORY K. KIRBY, ESQ., 901
       Dulaney Valley Road, Suite 400, Towson, Maryland 21204;
21
          Morrison Mahoney & Miller LLP, by TORY A. WEIGAND, ESQ.,
22     250 Summer Street, Boston, Massachusetts 02210-1181;

23        Gideon, Cooper & Essary, PLC, by C.J. GIDEON, JR., ESQ.,
       and CHRIS J. TARDIO, ESQ., 315 Deaderick Street, Suite 1100,
24     Nashville, Tennessee 37238.

25
```

```
1                    P R O C E E D I N G S
2         (The following proceedings were held in open court before
3    the Honorable Rya W. Zobel, United States District Court Judge,
4    and the Honorable Jennifer C. Boal, Magistrate Judge, United
5    States District Court, District of Massachusetts, at the John J.
6    Moakley United States Courthouse, One Courthouse Way, Boston,
7    Massachusetts, on May 19, 2016.)
8              JUDGE ZOBEL:  Good afternoon.  Please be seated.
9              MS. JOHNSON:  Good afternoon, your Honor.
10             COURTROOM DEPUTY CLERK URSO:  This is 13-MD-2419, In
11   Re:  New England Compounding.
12             JUDGE ZOBEL:  This is my government-issued foot stool
13   (indicating).
14             All right.  Thank you, as always, for your agenda.
15   Now, with respect to Item A-1, do I need to hear argument?
16             MS. JOHNSON:  No, your Honor.  Items A-1 and 2 were
17   addressed this morning before Judge Boal in the discovery
18   hearing.
19             JUDGE BOAL:  I would just like to add, at the
20   conclusion of the hearing, plaintiffs' counsel and the
21   Tennessee counsel had offered to discuss a resolution of both
22   the Nashville Healthcare Defendants' motion to strike Dr. Lee
23   and the PSC's motion to strike the supplemental Mixon report.
24   I do encourage the parties to try and work it out.
25             I will tell you, quite candidly, that coming into the
```

1    oral argument, I had been inclined to grant both the motions,

2    at least in part.  I will, of course, consider the arguments

3    that were made today and review the pleadings based on them,

4    but I thought that might give you a little more encouragement

5    to try and work it out and, certainly, you would have more

6    control over the issues than if I decide the motions.

7            I would say, though, if there are any more

8    depositions that are agreed to, to resolve the issues, that

9    they really should happen in the next two weeks.

10           MS. JOHNSON:  Thank you, your Honor.

11           JUDGE ZOBEL:  Now, that takes care of (A).  (B)

12   counsel want to argue?

13           MS. JOHNSON:  Yes, your Honor.  Mr. Chalos wishes to

14   address that for the Plaintiffs' Steering Committee.

15           MR. CHALOS:  Right, but I'm fine to waive oral

16   argument.  This is Saint Thomas' motion.  If they want to

17   argue it, then we can argue it, but I don't insist on arguing it.

18           MS. GREER:  Your Honor --

19           JUDGE ZOBEL:  Does Saint Thomas insist?

20           MS. GREER:  Marcy Greer for the Saint Thomas

21   Defendants.

22           We will be very brief, but we would like to address

23   this argument.  It's very important because there are three

24   different theories that are asserted against our clients and,

25   as you know, we have three clients who are in this case, and

1    the summary judgment papers will help really reduce the number

2    of claims, we believe, so that we can prepare the jury charge.

3    Both of these motions -- or at least the combined motion is a

4    partial motion for summary judgment.  We have separately --

5            JUDGE ZOBEL:  These are the agency motions?

6            MS. GREER:  The agency and direct liability, correct,

7    your Honor.  And, frankly, the agency and direct liability

8    theories are alternatives.  They're inconsistent.  One is the

9    theory that we were directly liable to the plaintiffs, that we

10   owed duties directly to the Saint -- the STOPNC plaintiffs to

11   manage STOPNC as to their procurement of pharmaceutical

12   devices -- I mean, pharmaceutical products, excuse me, and

13   that that direct duty -- we're trying to figure out where it

14   arises from because there's no case authority.  There's no

15   legal duty.  There's no factual basis for that duty, and it

16   would really simplify the issues for trial if we didn't have

17   that theory in the mix.  It's unsupported, and they had the

18   chance to develop it, and they can't cite a single case that

19   even comes close to the situation we have, where we had no

20   patient/physician relationship --

21           JUDGE ZOBEL:  Excuse me for interrupting for a

22   moment.

23           When you're talking about direct liability, who is

24   the defendant that you're now addressing?

25           MS. GREER:  The three Saint Thomas Entities, Saint

```
1    Thomas Network --

2            JUDGE ZOBEL:  All three of them?

3            MS. GREER:  Yes.  It's been asserted against all

4    three.

5            Now, of course, each one is a little bit different.

6    Saint Thomas Network is the only investor in STOPNC.  They're

7    50 percent owner.  The other two have no investment interest

8    whatsoever and, frankly, that analysis is really more of

9    apparent agency theory, which we are moving for separately on

10   the basis of the individual Bellwether defendants, but

11   apparent agency is plaintiff specific.  It's the idea that

12   this plaintiff reasonably relied upon.  So, we do not move for

13   that on a global basis.

14           The motion that's before you today is the global

15   motion and it deals only with actual agency, and actual agency

16   means that there was a direct delegation.  Apparent agency

17   issues are irrelevant to actual agency.

18           And then the other theory, which is separate and

19   apart from the agency theory, is this direct liability theory

20   that they have attempted to put forth, that we owed a direct

21   duty to these plaintiffs, and there's really no basis for it

22   whatsoever.

23           There's no showing in any of these corporate

24   documents -- and we put forth everything.  We put it all on

25   the table in front of the Court.  There are operating
```

1    agreements, services agreement.  The operation of STOPNC was

2    delegated by the board of directors to the Howell Allen

3    Clinic.  That's in the paperwork.  It's a supplement to the

4    operating agreement.  And they had the power to do that under

5    the operating agreement, which defines the parties'

6    relationships, and they did.

7            There's no question that Dr. Culclasure and Nurse

8    Schamberg, who are the individual defendants, the ones whose

9    actions are at issue, they were the employees of Howell Allen

10   Clinic.  They were not employees of any of the Saint Thomas

11   Entities.  There is not a shred of evidence that they were

12   authorized by any of the Saint Thomas Entities, only by

13   STOPNC.

14           And what they're trying to do is kind of morph a

15   single-enterprise theory, which is a veil-piercing theory,

16   which the Court has rejected and already decided on the basis

17   of the pleadings does not fly under Tennessee law, very strict

18   standards, but they're trying to move them all together in one

19   place and say, well, they somehow owed a duty because a

20   pharmacist at Saint Thomas Hospital found out about NECC

21   trying to sell to the hospital and called the Board of

22   Pharmacy, and Mr. Grinder of the pharmacy board said you

23   shouldn't be doing that.  And so, he went back to his people

24   in the hospital world and said, maybe we shouldn't be doing

25   this.  There's no evidence that he put out policy or anything

1    like that.  He just talked to a few people.

2           They're trying to turn that into a duty to reach out

3    to a physician's practice that it is uncontested there was no

4    control over that practice by any of the Saint Thomas

5    Entities, including Mr. Kelvas.  It's absolutely clear from

6    the deposition testimony, both sides, that he had no

7    responsibility for STOPNC's pharmaceutical procurement and, in

8    fact, he didn't even know -- excuse me.  Let me back up.

9           The STOPNC doctor, Dr. Culclasure, who made the

10   decision to purchase did know even know who Marty Kelvas was.

11   Yet, somehow there is some legal duty arising under Tennessee

12   law to know about these patients and to know that STOPNC was

13   procuring from NECC and raised a question.

14          Now, there is absolutely no evidence that anyone on

15   the Saint Thomas Entities' side of the equation knew anything

16   about procuring from a compounding pharmacy, from NECC, from

17   anywhere.  So, there's absolutely no basis for any kind of

18   duty under Tennessee law.

19          They throw out these general negligence duty cases.

20   All of them involve balancing factors and all of them involve

21   some sort of preexisting relationship with the plaintiffs.  We

22   don't have that here.

23          Now, some of these people were treated by Saint

24   Thomas after the fact, very different situation, but that

25   doesn't impute a duty before.  There's just no way that that

```
 1   can happen.
 2             And we've lined out all the cases.  We've given you
 3   the Vanderbilt vs. Choate case, which I think is probably one
 4   of the best examples.  Vanderbilt actually owned the facility
 5   where the clinic was operating, and the Court still found no
 6   duty.  Here, we didn't even own the medical building that
 7   STOPNC was operating in.  It's completely separate from the
 8   hospital.  So, there was no way for these two entities to come
 9   together in a direct liability situation.  And so, we would
10   ask that the Court find that there's no duty under the direct
11   liability theory, as a matter of law.
12             JUDGE ZOBEL:  Thank you.
13             MS. GREER:  And then as to the actual agency, we've
14   lined that out in the papers in great detail.  I'm happy to
15   address any questions about that.
16             JUDGE ZOBEL:  No need.  Anything else?
17             MS. GREER:  I'll let it rest at that.
18             JUDGE ZOBEL:  Mr. Stranch.
19             MR. CHALOS:  Mark Chalos, your Honor, for the
20   plaintiffs.
21             JUDGE ZOBEL:  Oh, I'm sorry.
22             MR. CHALOS:  That's okay.  So, I will be brief.  I
23   want to address just a couple of issues.
24             This motion is directed toward the actual agency
25   claims and the direct liability claim against the Saint Thomas
```

1    Entities.  The actual agency claim arises from their actual

2    control in practice, irrespective of what their documents say.

3              JUDGE ZOBEL:  In control of what?

4              MR. CHALOS:  I'm sorry.  Over the Saint Thomas

5    Clinic, the Saint Thomas Outpatient Neurosurgical Center and--

6              JUDGE ZOBEL:  What's the nature of that control?

7              MR. CHALOS:  It was complete control.  This is an

8    entity that they joined -- now, they're blaming Howell Allen

9    Clinic, their partner, today.  They didn't always do that.

10   They started to do that recently.

11             The clinic is a creation of the Saint Thomas

12   Entities.  It is owned by a holding company.  The board

13   members of the Saint Thomas Clinic come from the Saint Thomas

14   Hospital.  It's either their CEO, their CMO, chief medical

15   officer, their chief financial officer, written into their

16   documents.  Their creation documents says Saint Thomas Health

17   Services has a complete veto over anything that happens here.

18   If there's something that's happening here that we don't like

19   because it's inconsistent with our mission, then we can tell

20   you what to do, when to do it.  We can shut you down if we

21   need to.  It's complete control.

22             The apparent -- I'm sorry.  The actual agency claim

23   doesn't require them exercising day-to-day control.  It

24   requires them having the right to do it, and they did.  And,

25   in fact, they did exercise quite a bit of control, and that's

1    in our papers.  We've spilled a lot of ink on this issue.  So,

2    I don't want to rehash all of that, but they did have actual

3    control.

4            And the Court need to look no further as to when --

5    after this all came to light, you will see that the CEO of

6    Saint Thomas Hospital -- I'm sorry -- of the corporate parent

7    of Saint Thomas Hospital, Dr. Schatzlein, he stepped in and

8    ran the show at the clinic.  He did the PR.  He did the crisis

9    management.  He oversaw the notifications.  He ran the whole

10   operation, and he said right, that was my power to do that.

11   As the CEO of the corporate parent, I can step in whenever I

12   want.  So, there's -- in the documents themselves there are

13   plenty of bases for them to assert actual control, and they

14   did at various times over the entities.

15           The direct liability claims -- now, these are

16   different.  I don't agree they're inconsistent, but they arise

17   not from their role as board members or roles -- their role as

18   controlling this entity, necessarily.

19           The pharmacy director of Saint Thomas Hospital --

20   remember, this clinic, Saint Thomas Clinic, is located in the

21   Saint Thomas Hospital campus.

22           NECC called on this guy, the director of pharmacy for

23   Saint Thomas Hospital, and said, We want to sell you these

24   drugs in bulk, the way they sold it to the Saint Thomas

25   Clinic.  And this guy said, That's illegal.  Called the state

```
 1    Board of Pharmacy.  They confirmed that it's illegal, and then
 2    he put out a notice to the other hospitals, the not-for-profit
 3    side of the Saint Thomas Health System and said, Don't buy
 4    from compounders.  It's illegal.  They are joint venturers.
 5    They have the right to control the Saint Thomas Clinic, which
 6    was a for-profit entity, and somehow or another, they never
 7    told them.
 8         So, the patient walks into Saint Thomas.  They go and
 9    make a right, they're not getting compound medication.  They
10    make a left and go to the 9th Floor, they might get compounded
11    medication.  It turns out, contaminated compound medication.
12         So, the duty there arises not from their paperwork,
13    not from their legal relationships, and the cases they cite
14    deal with creditors, and what have you.  It arises from a
15    simple negligence theory, meaning that they owe a duty of care
16    to anybody who is reasonably foreseeably impacted by their
17    conduct.
18         A patient walking into Saint Thomas has the right to
19    expect that they will be treated as any other patient at Saint
20    Thomas, and they've admitted that.
21         JUDGE ZOBEL:  Does the duty of care arise from the
22    fact that they acted with respect to nonprofit parts of it,
23    but not to the profit piece of it?
24         MR. CHALOS:  Well, I think that's their part of the
25    breach of their duty.  I think their duty arises from the fact
```

1   that they put their name -- and I think this overlaps with the

2   apparent agency claim.  They put their name on the door.  They

3   sell it to the community as the Saint Thomas Entity.  When a

4   patient walks into that entity, they expect that they're going

5   to get treated as any other patient at Saint Thomas and --

6           JUDGE ZOBEL:  But that's an issue of apparent agency,

7   isn't it?

8           MR. CHALOS:  It is.  It is.

9           JUDGE ZOBEL:  It's not actual agency.

10          MR. CHALOS:  Well, that may or may not be actual

11  agency, but what it is those -- it is foreseeable, and we're

12  switching to the negligence sort of analysis, which is who

13  does an actor owe a duty to, and it's anybody foreseeably

14  impacted.

15          JUDGE ZOBEL:  It arises out of the actor's conduct,

16  not necessarily out of the relationship -- the legal

17  relationship of the actor and the subsidiary.

18          MR. CHALOS:  Right.

19          JUDGE ZOBEL:  And here, we're getting it all muddied

20  up now.

21          MR. CHALOS:  Well, I agree with your first point,

22  your Honor, and it may be muddy, and that's actually part of

23  the issue, which is it is muddy.  The relationships between

24  these entities are muddy.

25          JUDGE ZOBEL:  Well, I'm not sure whether that's the

1    case, but certainly at the moment I'm -- I feel muddy -- the

2    issue is muddy because you're talking both about particular

3    conduct --

4              MR. CHALOS:  Right.

5              JUDGE ZOBEL:  -- of the purchasing person, and then

6    you're also talking about a relationship based on things other

7    than conduct, just by virtue of who they are vis-à-vis each

8    other.

9              MR. CHALOS:  Right.  Right.  And I think -- right, I

10   agree with your Honor.  There's certainly overlap, I think,

11   between the legal theories.  The apparent agency --

12             JUDGE ZOBEL:  But which one are you relying on now?

13   I mean, I understood you to rely on the fact that the

14   purchasing person told the for-profit -- the non-profits not

15   to use the compounding product, but failed to do so for the

16   for-profit piece.

17             MR. CHALOS:  Right.  Yes, your Honor.  That is a

18   very --

19             JUDGE ZOBEL:  Therefore?

20             MR. CHALOS:  I'm sorry?

21             JUDGE ZOBEL:  Therefore?

22             MR. CHALOS:  Therefore, they had breached their

23   obligations to the patients of the entire health system.  They

24   fulfilled them, perhaps, with respect to some patients.

25   Meaning, the not-for-profit side patients, but with respect to

```
1    the for-profit side patients, they were never told -- their

2    purchasing people were never told, don't buy from compounders.

3    We know -- it's not just in the abstract.  They were reacting

4    to an NECC salesperson walking into the Saint Thomas campus

5    selling compounded medication, and that's exactly what

6    happened in the Saint Thomas Clinic as well.  One side, you

7    know, a couple of hundred yards away says this is illegal,

8    nobody do it, and then, you know, on the 9th Floor they said,

9    let's do it.  We're going to make some money -- or save some

10   money by doing it.  The person who knew, the director of

11   pharmacy, had an obligation by virtue of his knowledge and the

12   foreseeability that people are walking into that campus

13   expecting to be treated by Saint Thomas, expecting a certain

14   level of safety and a certain standard of care that would be

15   applied to them.

16            JUDGE ZOBEL:  Okay.  Thank you.  Anything else, Ms.

17   Greer?

18            MS. GREER:  Yes, your Honor, just very briefly.

19            JUDGE ZOBEL:  When you say, "very briefly," what do

20   you mean?

21            MS. GREER:  I think I've been pretty brief.  I

22   usually get twenty minutes in oral judgment.

23            JUDGE ZOBEL:  Do you?

24            MS. GREER:  At the Court of Appeals.

25            JUDGE ZOBEL:  But we're not at the Court of Appeals.
```

1          MS. GREER:  Going to this point about total control,

2     this is a joint venture agreement.  Saint Thomas Network owned

3     50 percent and Howell Allen owned the other 50 percent.  They

4     had the right each to appoint two board members.

5          The complete control, the veto provision that he's

6     talking about is Section 6.10.  It's called, "Member

7     approval," and without either party's written consent, you

8     can't do things that fundamentally affect the organization,

9     like amend the agreement, basically dissolve the agreement,

10    merge the company, sell or otherwise transfer all or

11    substantially all of the assets.  These are standard

12    provisions in any -- just about every operating agreement I've

13    ever seen.  This has nothing to do with whether or not the

14    Saint Thomas Network, who had the right to appoint two board

15    members, was controlling pharmaceutical policy.  This point

16    about the profit and nonprofit, I think that divides the

17    lines.

18         The point was that Marty Kelvas had authority and

19    responsibility for the hospital side of the practices.  He is

20    a hospital pharmacist, and what -- his conversation with the

21    board -- with the pharmacy board was in the context of

22    providing hospital care.

23         Hospitals have their own in-house compounding

24    abilities, and they have very different rules from a

25    physician's practice.  Hospitals do not tell physicians how to

1   practice medicine or the other way around.  In fact, Tennessee

2   has a corporate practice of medicine prohibition that we've

3   raised in the context of actual agency, not apparent agency,

4   different issue, but in the context of actual agency, and we

5   cited to you the *Thomas* case where they said, "Hospitals in

6   Tennessee are legally precluded from controlling the means and

7   methods by which physicians render medical care and treatment

8   to the hospital patients," citing this provision in the

9   Tennessee code that we have cited.

10          So, we cannot be liable for anything that Dr.

11   Culclasure did in any way, shape or form under an actual

12   agency theory.  It's just not possible.

13          The suggestion that people turn right or left and go

14   one place or the other, I mean, all that goes back to the

15   apparent agency and expectations and foreseeability.  The

16   Court is exactly right.  They're different issues, but there's

17   nothing in this record that shows that the Saint Thomas

18   Entities actually -- exercised actual control.

19          I do want to say one point about Dr. Schatzlein's

20   comments and his activities.  That was after a meningitis

21   outbreak of critical proportions that this Court is well

22   familiar with.  The Saint Thomas Entities came and rendered

23   aid because STOPNC did not have the public relations, the

24   patient relations capabilities to deal with this and they

25   called for help, and Saint Thomas was happy to provide it.  In

```
1    fact, Dr. Schatzlein was very clear in the next sentence after
2    the one that they quote, he said, "Remember, now, this is
3    after all the harm had been done and what we're doing now is,
4    again, all hands on deck to try and help these patients."
5    That was what it was about.  That was not showing that there
6    was an exercise of control beforehand or that a duty was owed
7    beforehand.  None of that was in play and, as a matter of law,
8    those claims should be dismissed on summary judgment.
9            JUDGE ZOBEL:  Thank you.  I will take the papers on
10   that motion.
11           Now, we go to status of bankruptcy.  Ms. Johnson --
12   or no.  Who will take care of this?
13           MS. JOHNSON:  Ms. Wintle will address that today,
14   your Honor.
15           MS. WINTLE:  Good afternoon, your Honor.  Keri
16   Wintle --
17           JUDGE ZOBEL:  Please remain seated because we need to
18   use the microphones for the people who are listening from
19   afar.
20           MS. WINTLE:  Understood.  I apologize.
21           JUDGE ZOBEL:  You can pull it over to you.  Thank
22   you.  Can you tell me your name again, please.
23           MS. WINTLE:  Keri Wintle.
24           JUDGE ZOBEL:  Wintle?
25           MS. WINTLE:  Wintle.
```

1              JUDGE ZOBEL:  Thank you.

2              MS. WINTLE:  Appearing for the post confirmation

3    officer, Paul Moore.

4              Since the last status conference in April, there's

5    not a whole lot to report out of the bankruptcy court.  There

6    have been a few motions that have been filed by claimants

7    seeking either to have their late claims deemed timely or to

8    file late claims.

9              Based on the circumstances of those motions, the post

10   confirmation officer has given his assent to the relief

11   requested thereunder.

12             The post confirmation officer continues to work with

13   the Insiders to facilitate the payment of their tax refunds to

14   the bankruptcy estate in accordance with their settlement

15   agreements entered into.

16             The 2014 refunds have been received and currently the

17   2015 refunds are being processed, and at this point that is

18   all I have to provide to the Court with respect to the status

19   of the bankruptcy court.

20             JUDGE ZOBEL:  What is the status of -- maybe it isn't

21   your brief, but what is the status of the distribution of the

22   settlement, the tort trust?

23             MS. WINTLE:  Sorry.

24             MR. ELLIS:  Your Honor, this is Rick Ellis.

25             So, we have been negotiating with Medicare for

months.  We anticipate in the next week to know whether we're

going to have a deal with Medicare or not, but in either

event, we think that the first payment should be able to go

out probably by the beginning of July.  We've got about 1200

payments ready to go.  They're running them through the

Medicare rolls now.  So, at least some payment should be able

to go, whether we've reached an agreement or not.

JUDGE ZOBEL:  Are these payments partial payments --

understood to be partial payments due to any claimants?

MR. ELLIS:  Yes, these are initial payments.  There

will be a final payment down the road.

JUDGE ZOBEL:  So, everybody will get paid twice?

MR. ELLIS:  That is what is -- yes, that's correct.

JUDGE ZOBEL:  Thank you.

MR. ELLIS:  You're welcome.

JUDGE ZOBEL:  Ms. Johnson.

MS. JOHNSON:  We will -- just to follow up on that,

your Honor, we will advise the Court when payments are going

out, and we will keep the Court apprised at the status

conferences going forward as to how that practice is

unfolding.

JUDGE ZOBEL:  Thank you.  The insurance declaratory

actions.

MS. JOHNSON:  Mr. Gastel will address that, your

Honor.

```
1              MR. GASTEL:  As has been the last several months,

2     there's no update there, your Honor.  It continues to sit on

3     the judge's desk down in Tennessee.

4              MS. JOHNSON:  Brings us to No. 6, the status of

5     discovery.  The Emory and Vanderbilt motions to quash were

6     addressed this morning.  So, I don't think they need to

7     address those here.

8              That brings us, then, to the Court rulings update.

9     There is an amended scheduling order addressing the Tennessee

10    cases, and I believe Mr. Gastel wanted to address that as well.

11             MR. GASTEL:  This actually really dovetails with 8-A

12    and 8-C, your Honor.  I believe in that order you had asked

13    the parties to meet and confer on a proposed schedule for the

14    remaining Bellwether cases.  The parties, I believe, are

15    prepared to offer October 11th and November 7th as the dates

16    for the next two Bellwether trials.

17             JUDGE ZOBEL:  I'm sorry.  Give me those dates.

18             MR. GASTEL:  October 11th and November 7th.  If you

19    recall, your Honor, you set the first Bellwether trial for

20    August 22nd.

21             JUDGE ZOBEL:  Right, I remember that one.

22             MS. GREER:  And, your Honor, on behalf of the Saint

23    Thomas Entities, we are agreeing to trial schedules based on

24    our objections that are pending in the omnibus motion about

25    venue and jurisdiction.
```

1          JUDGE ZOBEL:  Okay.  And each of these is likely to

2     take, I think you said, six to eight days to try or eight to

3     ten days?  I can't remember.

4          MR. GASTEL:  Your Honor, I think that we're still

5     trying to decide about how long the trials will take.

6     Obviously, that will be dependent upon some pending rulings of

7     the Court.  Mr. Chalos can probably speak more directly to how

8     long he thinks at least the first trial will take.

9          MR. CHALOS:  Well, I can speak to the plaintiffs'

10    case.  I think we could do our case in probably four to five

11    days.  We have a motion, your Honor, on the issue of whether

12    the various regulatory agencies and what they did or what they

13    didn't do would be part of the proof in the case.  They're not

14    parties and they will not --

15         JUDGE ZOBEL:  Not part of what we're coming to.

16    There are some motions and motions for leave to file summary

17    judgment motions that deal with that.

18         MR. CHALOS:  Right.  And so, that ruling will, in

19    part, dictate on how long our proof will be.

20         JUDGE ZOBEL:  Okay.

21         MS. JOHNSON:  I think we can then jump to the B-iv,

22    your Honor, which is just to acknowledge that the Court has

23    also issued an order setting discovery deadlines in the

24    Premier and Box Hill cases.  I don't think there's anything

25    further to address there, unless defense counsel feels

1    otherwise.

2            MR. WOLK:  Nothing.

3            MS. JOHNSON:  I think that brings us, then, to No. 7.

4    No. 7 is actually marked up as a notice of a letter, but since

5    we've issued that letter and notice, Plaintiffs' Steering

6    Committee filed earlier today a status report that gave an

7    overview of the remaining cases against clinic defendants in

8    the MDL.

9            We observe that the cases against the Tennessee

10   clinics, Box Hill and Premier, were ongoing and being actively

11   litigated according to schedules, and the Court had asked us,

12   I think at the last status conference, what the PSC's view of

13   what should be done with the remaining cases.

14           So, since the last status conference, we've gone back

15   to update our census of cases, and we've realized a couple of

16   things.  First and foremost, a number of the cases that had

17   been listed on the PSC's census had, in fact, been dismissed

18   or, in a few instances, even though a dismissal had not been

19   filed, plaintiffs' counsel believed that they had functionally

20   been resolved and, therefore, dismissed.  So, there's a little

21   bit of cleanup where I expect some plaintiffs' counsel to file

22   a couple of stipulations within the next week or so just to

23   clarify on those cases.

24           We also -- if you turn to Page 2 of --

25           JUDGE ZOBEL:  I'm sorry.  These are not PSC

```
1    dismissals.  They're dismissals by the original counsel in the

2    original jurisdictions?

3              MS. JOHNSON:  That's correct, your Honor.

4              JUDGE ZOBEL:  And will they let you know when they do

5    that?

6              MS. JOHNSON:  Well, they do and they don't.  They try

7    very hard, but, as you know, it's large number of cases and

8    sometimes I think things, unfortunately, slip through the

9    cracks.

10             One of the things that PSC did this time around to

11   try and make sure that wasn't happening, was we actually

12   updated our census and then personally called each plaintiff's

13   attorney in the cases to advise the plaintiff's attorney that

14   the PSC's position was that it was probably appropriate for

15   these cases to be remanded, given the small number of cases on

16   file in the MDL, and that from the PSC's perspective, we

17   didn't see a lot of efficiencies to be gained.  There were no

18   logical groupings of cases, for example, from the PSC's

19   perspective, but we made clear to each plaintiff's counsel

20   that we wanted to hear their views and understand what their

21   is preferences were.  So, the --

22             JUDGE ZOBEL:  These are the cases that have gone

23   away, they're finished?

24             MS. JOHNSON:  No, your Honor.  I'm now speaking of

25   the existing cases against clinics other than --
```

1          JUDGE ZOBEL:  Okay.  Let me go back for a moment to

2     those that have been done.  Are you making any progress -- I

3     notice Ms. Gioia is here and she's been working, I think, with

4     you on dealing with the cases that are finished.  Are we

5     making any progress in that regard?

6          MS. JOHNSON:  Yes, your Honor.  I think we're making

7     tremendous progress.

8          JUDGE ZOBEL:  And you will include in that the cases

9     that are settling as we go along that you learn about sort of

10    by the way?

11         MS. JOHNSON:  Yes.  We will work with Ms. Gioia to

12    inform her about those cases and to ensure that the dockets

13    are, again, correctly reflecting dismissal.

14         JUDGE ZOBEL:  Thank you.

15         MS. JOHNSON:  So, speaking of the existing cases.

16    So, the cases against pain clinics other than the Tennessee

17    defendants, Box Hill and Premier.  If you turn to the status

18    report -- I can actually hand up copies, your Honor.

19         JUDGE ZOBEL:  I don't have it.

20         MR. KIRBY:  Do you have extra copies?

21         (Attorney Johnson hands document to the Court.)

22         (Discussion off the record.)

23         MS. JOHNSON:  So, if you turn to Page 2, your Honor,

24    that chart is an effort to summarize the cases against

25    clinics, the remaining clinics in the MDL, and I'll make just

```
1    a couple of quick observations about that.

2              The total number of cases, now that we've done this

3    and realized there have been some dismissals, has dropped to

4    27.  The two largest clinics are APAC and Cincinnati Pain

5    Management, which each have four cases against them.  The

6    large number of cases on this list have only a single case

7    against them.  As a result of those --

8              JUDGE ZOBEL:  How are we going to deal with all of

9    those?

10             MS. JOHNSON:  Excuse me?

11             JUDGE ZOBEL:  How are we going to deal with those?

12             MS. JOHNSON:  Well, I have an excellent suggestion,

13   your Honor.

14             So, if you turn to Page 5, this is then our chart

15   that reflects our -- the PSC's conversations with individual

16   plaintiff's counsel in those actions.  The majority of

17   plaintiff's counsel, so speaking to individual attorneys,

18   indicated that they did not object to their case being either

19   remanded or transferred back to the district from which it

20   came.  Some attorneys, in speaking with them, indicated that

21   their cases were dismissed.  So, we moved those to the

22   appropriate bucket.  And some attorneys indicated that they

23   wanted a bit more time to decide what their view was as to

24   whether the case should continue in the MDL through discovery

25   and have a schedule set or whether the case should be
```

1       appropriately remanded or transferred back to state court.

2               JUDGE ZOBEL:  Is the multi-district piece of it done

3       as to those cases?  Has discovery been completed?

4               MS. JOHNSON:  No, they have not been, your Honor.

5       The PSC -- well, let me observe -- yes and no.  I hate to give

6       that answer to a judge, but yes and no.

7               The discovery of the primary defendants here, meaning

8       the New England Compounding Company, the national defendants,

9       all of those defendants that were defendants in all of the

10      cases across the MDL, that is done and has been done for some

11      time.  Those materials are all available in a repository that

12      all plaintiffs' counsel have access to.  If plaintiffs'

13      counsel would like access and does not have it, they are free

14      to contact me and we can make sure that they get that access,

15      but those materials --

16              JUDGE ZOBEL:  So, specific discovery, that's not

17      done?

18              MS. JOHNSON:  So, the notion -- the MDL has proceeded

19      with common discovery in many cases.  The notion here from the

20      PSC's view is that there's not much, if any, common discovery

21      to be done in these remaining clinic cases, and that's because

22      there's simply too few cases.  At most, we have four civil

23      actions pending against a single defendant.  So, in the PSC's

24      view, that's probably not an efficient use of the MDL's

25      resources.  That's the kind of thing that could be done back

1    in the home court appropriately.

2          Now, again, I'm glad to express the PSC's view and we

3    have thought about it.  We've talked to everyone.  I would not

4    want to give individual plaintiff's counsel -- I'm sorry.  I

5    would not want to deprive individual plaintiff's counsel of

6    their opportunity to comment and weigh in on this.

7          So, the PSC's proposal -- and it's only that -- will

8    be that the Court issue an order to show cause as to why cases

9    on this list should not be remanded or transferred back, and

10   then give plaintiffs' attorneys two weeks, maybe three weeks

11   to respond to that in order to have this matter teed up for

12   the next status conference.

13         If that's something that the Court would consider,

14   the PSC would be happy to draft a proposed order that would

15   spell out a process by which that could be done.

16         JUDGE ZOBEL:  A number of these people indicate no

17   objection to remand and some of them are still thinking about

18   it.  Would it make sense to -- well, maybe if we order --

19   issue the show cause now would allow them to have a decision

20   by the next time around, that's probably a good thing, isn't it?

21         MS. JOHNSON:  I think that's right, your Honor.

22         Our suggestion would be that if the Court issued an

23   order to show cause that asked plaintiffs' counsel who

24   objected to remand or being transferred back to their original

25   federal court district, that responses be due by June 16th.

```
 1    That would be a week before the next status conference, such
 2    that if there were any issues that arose or if the Court
 3    wanted to address or speak with those individual plaintiffs'
 4    attorneys, that could be done at the next status conference.
 5            JUDGE ZOBEL:  And I assume there are some who may
 6    have difficulty getting hold of their clients or, for whatever
 7    reason, can't make a decision by then, they can let you know
 8    that.
 9            MS. JOHNSON:  Yes, your Honor.
10            MS. DOUGHERTY:  Your Honor, if I may.  Kim Dougherty,
11    not in the Plaintiffs' Steering Committee role, but as counsel
12    of record for about a third of these cases, 10 of the 27 --
13            JUDGE ZOBEL:  Excuse me.  Why don't you sit down and
14    pull the microphone toward you.
15            MS. DOUGHERTY:  It won't reach.  Perhaps I could
16    switch seats.  This one is not working.
17            (Discussion off the record.)
18            MS. DOUGHERTY:  Now it's working.  Magic touch.
19            Your Honor, Kim Dougherty, counsel of record for
20    about 10 of the 27 cases that are on file.
21            We are the ones who are listed as conferring.  We've
22    been meeting with and discussing with defense counsel who
23    actually represents the majority of the cases that are here as
24    well, Tony Abeln -- he represents BKC, CPN and APAC -- on
25    whether or not it does make sense to continue to move forward
```

with discovery here as opposed to remanding the case, given

the efficiencies that could result from your Honor's knowledge

of this case and all of the discovery that's already been done

here and could be available to both plaintiffs and the

defendants.

So, we are -- I just want the Court to know that at

least a third of these cases we are still considering a

discovery schedule and not remand, and if we have the

opportunity, we'll provide the Court whatever the consensus

that we reach with defense counsel is.  I would presume we

could do that by the next conference.

JUDGE ZOBEL:  But you don't object to an order to

show cause that would give you the option of objecting?

MS. DOUGHERTY:  Not at all.  I just didn't want the

Court to be under the understanding that this -- that

everybody was agreeing to remand because, in fact, in a third

of the cases we're considering discovery here.

JUDGE ZOBEL:  Okay.

MS. DOUGHERTY:  Thank you.

JUDGE ZOBEL:  Did you want to add something?

MR. WEIGAND:  Your Honor, Tory Weigand.  I represent

the majority on the defense side.

I don't have a lot to add to that, but I heard Ms.

Dougherty's comments and I just wanted to say a few words.

So, again, Tory Weigand.  I represent APAC, the same cases as

1    Ms. Dougherty on defense side.

2              We had some initial discussions, but I can tell,

3    plainly, it will be our position that these cases should be

4    remanded back to their original jurisdictions.

5              JUDGE ZOBEL:  The question is when, should it be now

6    or after some additional discovery?

7              MR. WEIGAND:  Well, that issue deserves a little more

8    attention and discussion with Ms. Dougherty, whether there's

9    anything else to be done, which is a fair statement.  I think

10   most things are sufficiently done now, that those cases can be

11   remanded and that would be the most efficient thing.  The

12   MDL's course has run for purposes of serving these cases.  So,

13   I think it's the right move to do at this time.  So, that's my

14   two cents.

15             JUDGE ZOBEL:  Okay.

16             MR. KIRBY:  Your Honor, Greg Kirby.  I just wanted to

17   let you know -- Greg Kirby on behalf of the Box Hill

18   defendants.

19             I'm just seeing this now for the first time.  I think

20   it was filed during discovery hearing before and I was in

21   court for that.  So, I'm not 100 percent sure exactly what it

22   says.  It's my understanding that it says something to the

23   effect of any defendant that has four cases or less -- you

24   have a mandatory cutoff below five -- gets remanded back and

25   then it's more efficient to do that, and I'm not sure the best

```
 1   way to respond.  Like I said, I haven't read through it, but,
 2   you know, Box Hill has eight cases in the MDL here.
 3          JUDGE ZOBEL:  Do you want to go back or do you want
 4   to stay here?
 5          MR. KIRBY:  I want to go back.  We have 26 or so,
 6   around that number, plus or minus, in state court in Maryland.
 7   They're all, except for I think one, you know, the fear cases,
 8   the so-called fear cases.  So, I'm not quite sure, you know,
 9   why it's -- I'm not taking a position on whether the others
10   should go back or not.  I'm just saying that if it's more
11   efficient for a defendant with four cases to get sent back to
12   various federal or state courts throughout the country, I'm
13   not sure why it doesn't make sense to send Box Hill defendants
14   back, when we only have eight cases.  We have three more cases
15   than the mandatory cutoff.  So, I just wanted to throw that
16   out there.
17          JUDGE ZOBEL:  Okay.  Anything else, Ms. Johnson, on
18   this issue?
19          MS. JOHNSON:  Nothing on this issue.
20          JUDGE ZOBEL:  Oh, I'm sorry.  Another comment.
21          MR. GIDEON:  Judge Zobel, C.J. Gideon.
22          There is a third --
23          JUDGE ZOBEL:  Whom do you represent?
24          MR. GIDEON:  I represent Saint Thomas Outpatient
25   Neurosurgery Center, Howell Allen, and Dr. Culclasure and
```

1   Debbie Schamberg.

2         JUDGE ZOBEL:  You're not in this particular -- you're

3   not about to be sent for lack of numbers?

4         MS. JOHNSON:  He sort of might be, your Honor, and

5   I'm --

6         MR. GIDEON:  I did not want to sit quietly because

7   there's been a general reference to the Tennessee defendants.

8   There is another entity I represent and it's PCA Pain Care

9   Center and a Dr. Jones...

10        (Discussion off the record.)

11        MR. GIDEON:  Well, Dr. Jones.  There are three cases

12  total involving Dr. Jones, two under the Seiber name, two

13  different docket numbers, and one under the Daugherty name.

14  And, Ms. Johnson, there was an email to you about this

15  earlier, but this would constitute three cases.  Two of those

16  cases are filed by Ms. Daugherty, and one of them filed by

17  Brian Chadwick Rickman, who we've heard nothing from at any

18  time since the case was filed.

19        On behalf of Dr. Jones, we think those three should

20  be returned to Tennessee.  I understand the Seiber or *Seiber*

21  case is -- has an impending dismissal.  Is that not correct?

22        MS. DOUGHERTY:  That's correct.  The Seiber case is

23  subject to a dismissal.

24        MR. GIDEON:  Okay.  We just don't know anything about

25  the Daugherty case, Docket No. 1-14-CV-10430.  That should be

1   sent back to Tennessee.

2          JUDGE ZOBEL:  Well, let me suggest that any cases

3   that are not on this most recent status report that Ms.

4   Johnson just filed today should let Ms. Johnson know that they

5   wish to be included on this list and why, and then she will

6   make a judgment.  If you don't like her judgment, then you can

7   bring it to Court at the next meeting.  If she agrees that you

8   should participate in this objecting or not to remand, then,

9   you know, we'll do it and we'll deal with it, but I think it

10  should go through the PSC in order -- because she knows more

11  about the individual cases than I do, and ever will know, but

12  I think if we include in your proposal that anybody who is not

13  on the list who thinks they should be on the list, let you

14  know, maybe by the beginning of next week.  Then we can

15  proceed from that, and that includes anybody on the telephone

16  who is not here in the courtroom who fits that category.

17         MS. JOHNSON:  And I should say, your Honor, PCA Pain

18  Care was unintentionally omitted from this list.  They do

19  belong on this list.  So, there's no substantive disagreement

20  there.

21         JUDGE ZOBEL:  Okay.  Thank you.

22         MR. GIDEON:  You also asked are there any other cases

23  that have not been dismissed yet.  There is one where there is

24  a stipulation of dismissal signed by all the attorneys, Tyree

25  case, and no order has been entered.

1          JUDGE ZOBEL:  Well, let Ms. Johnson know about that

2     one as well.  What we're trying to do, in addition to all the

3     other things, is to make a clean docket.  So that the cases

4     that are gone are reflected as gone, and we've had trouble

5     doing that, for a whole host of reasons, not the least of

6     which is the way we keep the docket here -- two dockets.  That

7     is, two sets of dockets.  Okay.

8          MS. JOHNSON:  I think that brings us to No. 8, your

9     Honor.  We've addressed 8-A, the update on Bellwether trial

10    cases already.  So, I think we can turn to 8-B, and I know Mr.

11    Gastel wanted to address that, unless the defendants wish to

12    say something first.

13         JUDGE ZOBEL:  Who is doing this?  You are?

14         MR. GASTEL:  Your Honor, this motion, I believe, was

15    filed last Friday.  Your Honor had previously considered --

16    well, the defendants had previously filed a motion for

17    dismissal for failure to comply with the Healthcare Liability

18    Act at the outset of this litigation.  That docket number was

19    770.

20         Your Honor back in August of 2014 issued Order No.

21    1360, kicking those issues down to what I believe you styled

22    as the case-specific phase of this case, and this motion that

23    was just recently filed, Docket No. 2874, raises many of the

24    issues that were sort of punted by this Court in 1360.

25         So, we're just looking for a little guidance as to

1    whether or not you believe that we should be dealing with

2    individual dismissals of cases for reported failures to comply

3    with the Healthcare Liability Act now or at some point in the

4    future.

5         The PSC's position is that to the extent that these

6    cases do not touch upon cases that are in the Bellwether pool,

7    that these really are not ripe for decision at this time, and

8    if you could provide some guidance on that or if you want some

9    briefing on that, it would be helpful whether or not we should

10   be subsequently responding to those motions at this phase of

11   this litigation.

12        MR. GIDEON:  We respectfully disagree with that, your

13   Honor.

14        JUDGE ZOBEL:  I'm sorry?

15        MR. GIDEON:  We respectfully disagree with the

16   position Mr. Gastel took, and I would like to be heard on

17   that, too.

18        Your October 29, 2014 order addressed the fact that

19   we had raised the failure of the plaintiffs to comply with

20   Section 121 and 122 of the Healthcare Liability Act, and that

21   order specifically says that those will be addressed later.

22        Now, we have completed -- all but completed common

23   discovery and we have now addressed those.  Section 121 is

24   simple.  You have to provide 60 days written notice before you

25   file suit and you have to provide certain things in the

1    notice.  Section 122 is equally simple.  You have to file a

2    certificate of good faith with the original complaint.

3         So, when you look at the motions, I think you will be

4    pleased.  They are succinct and to the point.  Here's the list

5    of cases that did not comply with Section 121.  Here's the

6    list of those that did not comply with one or both.

7         JUDGE ZOBEL:  You're talking about this motion,

8    Docket No. 2874?

9         MR. GIDEON:  Yes, your Honor, I am.

10        JUDGE ZOBEL:  Okay.

11        MR. GIDEON:  So, it's a relatively simple matter.

12   There was nothing in your August 29, 2014 memorandum opinion

13   that in any way said we will limit these particular grounds

14   for dismissal to the Bellwether cases I later select, which

15   you hadn't selected at the time.

16        JUDGE ZOBEL:  Let me have a look at it, and I will

17   deal with it.  I'm not exactly sure all you're talking about

18   because I haven't looked at this before we got here.

19        MR. GIDEON:  All right.

20        JUDGE ZOBEL:  So, I will do that and one way or the

21   other, I will decide whether it is case specific and it should

22   stay or whether it's not case specific and it should,

23   therefore, be decided and whether it has any impact on the

24   Bellwether or not.

25        MR. GIDEON:  All right.  Thank you.

```
1              MR. GASTEL:  And, your Honor, sort of dovetailing
2    with that, our response to that motion is technically due a
3    week from Friday.  To the extent that you want to look at this
4    issue, obviously, that's fine, but could we get some relief
5    from that deadline until you tell the parties how you want to
6    handle the substantive response to that motion?
7              JUDGE ZOBEL:  So, why don't I decide how to deal with
8    it and then give you time to file a response if I decide to
9    deal with it, and if I don't decide to deal with it, I guess
10   you don't need to file a response.
11             MR. GASTEL:  That's perfect, your Honor.  Thank you.
12             JUDGE ZOBEL:  Okay.  Ms. Greer.
13             MS. GREER:  Your Honor, briefly.  We filed a similar
14   motion yesterday.  It's Docket No. 2879.  So, I think all of
15   them should be considered together.
16             MR. GASTEL:  The PSC would not object to that, your
17   Honor.
18             JUDGE ZOBEL:  No objection?
19             MR. GASTEL:  That's correct, your Honor.
20             JUDGE ZOBEL:  Okay.
21             MS. JOHNSON:  I think that brings us to No. 9, the
22   report from the pro se liaison.
23             MS. MARTIN:  Very quick update, your Honor.
24             As I discussed last time, the bankruptcy court
25   allowed some late-filed claims.  We helped about three pro se
```

1    claimants who wanted our help with getting those filed and

2    those were due by May 13th and they were all in prior to that,

3    and we've had a couple of calls from people regarding their

4    letters from the bankruptcy claims administrator, and we

5    helped them out.

6            JUDGE ZOBEL:  Are people still waking up to the fact

7    that they may have claims for which they need to give some

8    kind of notice?

9            MS. MARTIN:  No, your Honor, other than those nine

10   pro se's that we dealt with with Judge Neiman and then who had

11   either late-filed claims that were allowed or who had not

12   filed for claims.  Other than those, there have not been

13   people that are really coming out of the woodwork unaware.

14           MR. ELLIS:  This is Rick Ellis.

15           There's actually three claims -- there's actually

16   three late claims for compensation that have been filed that I

17   believe have been denied and may be appealed to Judge Neiman.

18           MS. MARTIN:  They have not come to me yet, but if

19   they do, I will help them.

20           JUDGE ZOBEL:  Thank you.

21           MR. GASTEL:  Your Honor, I'm sorry, could we back up

22   to one other issue, I think, that's sort of under 8-A or 8-C

23   regarding the current Bellwether trial schedule?

24           I think the parties have agreed -- and the defendants

25   can correct me if I'm wrong.  The parties have agreed that the

1    fact discovery cutoff for both fact and expert discovery in

2    the first four Bellwether cases is set for June 10th, 2016.

3              JUDGE ZOBEL:  That's for you.

4              JUDGE BOAL:  I thought I issued an order on April

5    25th saying May 6th.

6              MR. GASTEL:  There were a handful of issues that sort

7    of remained outstanding, particularly with subpoenas to third

8    parties, and the parties have agreed to sort of wrap all of

9    that up by June 10th.

10             JUDGE ZOBEL:  Well, she's got to agree, too.

11             MR. GASTEL:  And I guess to the extent that the Court

12   needs to agree, we would -- I think the parties would jointly

13   move to move that deadline to June 10th.

14             JUDGE ZOBEL:  She'll think about it.

15             JUDGE BOAL:  Right.  I mean, these are orders.

16   They're not advisory guidelines, and it's not up to the

17   parties to decide unilaterally, except -- I mean, if you have

18   an issue and you brought a motion to me and it was after the

19   deadline, I would certainly take that into consideration into

20   whether or not the relief should be granted.

21             MR. GASTEL:  Your Honor, I think that we can all sort

22   of jointly agree to file a joint motion to the extent that you

23   want one.

24             JUDGE BOAL:  Right now the order was that all the

25   case-specific fact and expert discovery shall be completed by

1  May 6th.

2        JUDGE ZOBEL:  Do they have leave to file a motion?

3        JUDGE BOAL:  Yes, they can file a motion.

4        MR. GASTEL:  We will do so probably tomorrow, your

5  Honor.  Thank you.

6        MS. JOHNSON:  I believe that brings us to No. 10, the

7  status for future status conferences and discovery hearings --

8  I'm sorry -- the schedule for future status conferences and

9  discovery hearings.

10        The Court has already set both the discovery hearing

11  and the status conference for June 23rd.  We had talked about

12  forgoing a July status conference.  We weren't sure there was

13  much to do there.  It does seem appropriate, though, to set a

14  July pretrial conference, now that the trial date for the

15  first Bellwether is moved to August.  The parties had been

16  discussing July 28th.

17        JUDGE ZOBEL:  Is that okay for us?

18        COURTROOM DEPUTY CLERK URSO:  Yes, Judge.  That would

19  be the 28th, at 2:00 for us.

20        JUDGE BOAL:  Yes.

21        COURTROOM DEPUTY CLERK URSO:  So, July 28th, at 2:00.

22        JUDGE ZOBEL:  That will be a pretrial conference with

23  respect to the August 22 trial.

24        MS. JOHNSON:  Yes, your Honor.  And I suppose --

25        JUDGE ZOBEL:  Do we anticipate to have the same

1      number of counsel participating in that as participate in the

2      regular status conferences?

3              MS. JOHNSON:  I would not expect so.  I would expect

4      it to be a smaller group, your Honor.

5              JUDGE ZOBEL:  Let me explain to you what I would like

6      to do at the pretrial conference.  You know, we send out these

7      notices and the prior lots of filing of paper, but the essence

8      of it is to decide how many jurors we have, how long the case

9      will take to try, how many peremptories each side will get,

10     and the most important, I want to decide precisely what the

11     issues are that we're going to try, and that will govern the

12     charge to the jury in the end as well as being very important

13     in making evidentiary rulings also.

14              I would like to review with you who the witnesses

15     will be.  I hope that you will be able to agree on the

16     exhibits, for the most part, and then the only other thing I

17     would request of you -- well, with respect to witnesses, if

18     there is anybody who appears by deposition, I will discuss

19     with you what -- how we want to proceed with that, and I would

20     like then to have your requests for instruction and the

21     questions to the jury on special verdict maybe by the -- no.

22     By around the time that the trial begins.  Don't need it much

23     earlier than that.

24              So that, in sum, is what I would like to discuss with

25     you at the pretrial conference, and then make some decisions

```
1    about some of these pretrial issues that can come up.
2            MS. GREER:  And, your Honor, as to the jury
3    instructions, would you prefer that -- I mean, obviously,
4    we'll be efiling or submitting them to you -- well, actually,
5    how would you prefer that they be submitted?
6            JUDGE ZOBEL:  Just file them the way you normally
7    file things.
8            MS. GREER:  Okay.  You don't need a Word version or
9    Word Perfect or --
10           JUDGE ZOBEL:  No.
11           MS. GREER:  Okay.  Thank you.
12           JUDGE ZOBEL:  But, anyway, that's for working out at
13   the pretrial conference in July.  I just wanted to give you a
14   heads-up.
15           JUDGE BOAL:  If I might just add, since I'm not
16   available anymore on June 23rd, I still remain available to
17   the parties in June if there is a discovery dispute that you
18   all feel needs to be resolved, and if there's a motion that
19   comes in on discovery, if you all would -- and you are welcome
20   to call Mr. York and get an oral argument date.  I can take it
21   by phone or in person some other day, but I don't want to hold
22   up the rest of the case just because I'm not available on June
23   23rd.  I mean, I don't know if everyone else has schedules on
24   June 23rd.
25           JUDGE ZOBEL:  Is that the only day you can?
```

```
 1              JUDGE BOAL:  I'm not available that Thursday through

 2     Friday morning.

 3              JUDGE ZOBEL:  Do you want to move the date back to

 4     Wednesday, for example, or is that --

 5              MS. JOHNSON:  That would work for the Plaintiffs'

 6     Steering Committee, your Honor.

 7              JUDGE ZOBEL:  I'm sorry?

 8              MS. JOHNSON:  That would work for the Plaintiffs'

 9     Steering Committee.

10              JUDGE ZOBEL:  Would it work for other counsel?

11              MR. KIRBY:  It would not work for Box Hill.  It

12     wouldn't work for Box Hill Surgery Center.

13              MR. GIDEON:  We will make it work.  June 21?

14              JUDGE BOAL:  22nd.

15              COURTROOM DEPUTY CLERK URSO:  No.  June 22nd.

16              MR. GIDEON:  We'll make that work.

17              JUDGE ZOBEL:  So, is everybody, except Box Hill,

18     agreeable to June 22?

19              MR. KIRBY:  We'll make it work, too, your Honor.

20              JUDGE ZOBEL:  Okay.  Thank you.

21              COURTROOM DEPUTY CLERK URSO:  I'm sorry, Judge.  Ours

22     is also on June 22nd?

23              JUDGE ZOBEL:  Yes.

24              COURTROOM DEPUTY CLERK URSO:  So, June 22nd, at 2:00

25     for us.  We just have one status conference.  So, I'll move it.
```

1          JUDGE ZOBEL:  So, June 22, at 2:00?

2          COURTROOM DEPUTY CLERK URSO:  Yes, at 2:00.

3          JUDGE ZOBEL:  And are you planning to having morning

4    hearings then or post --

5          JUDGE BOAL:  Yes.  I'll make it work as well.  I know

6    you all prefer 11:30, if I can do that.

7          MR. GIDEON:  That's fine.

8          JUDGE BOAL:  And then in terms of July, I suppose --

9    perhaps this is more directed at Box Hill and Premier.  Do you

10   think that we should schedule a tentative discovery conference

11   for that?

12         MR. WOLK:  Judge, my suggestion would be maybe when

13   we're here in June, we can set a date in July, because I --

14   right now I can't anticipate that there would be any problems

15   that would have to be addressed in July.  So, that's probably

16   better addressed in June.

17         MR. KIRBY:  Agreed.

18         JUDGE BOAL:  All right.

19         JUDGE ZOBEL:  Okay.  Now we come to Part D.

20         MS. JOHNSON:  Just before we do that, your Honor, I

21   realized that the clinic -- the cases against the remaining

22   clinics that we were discussing earlier, technically those

23   have been stayed through June 1st.  I think, given where we

24   are with the scheduling the other status conferences, the ones

25   going forward this summer, I would ask that that deadline be

1    extended until September 1.  That will just carry us through

2    to the July and potentially August time period.

3            JUDGE ZOBEL:  Is there any objection?

4            MR. GIDEON:  No.

5            JUDGE ZOBEL:  So that will happen, the stay goes on

6    until September 1.

7            MS. JOHNSON:  Thank you, your Honor.

8            That then brings us to fully-briefed motions, the

9    series of discovery-related motions.  The Dr. Kessler issue,

10   No. 11, I believe was addressed this morning.  Also the

11   issues -- same issue raised in No. 12 and 13.

12           On the dispositive motions, counsel for both the

13   plaintiffs and the defendants in the Barakat, Ocean State

14   case -- the motion for summary judgment is addressed here --

15   have agreed to hold off on asking the Court for oral argument

16   on that motion, partly, if not entirely, in light of the

17   plaintiffs' questions about whether those cases may be

18   appropriately remanded.

19           JUDGE ZOBEL:  Well, that answers my question as to

20   whether we should deal with a specific case dispositive

21   motions now or just wait.

22           MS. JOHNSON:  And in at least this particular

23   instance, because I've spoken with counsel, they would prefer

24   that the Court wait.

25           JUDGE ZOBEL:  We wait.  And, in general, if there are

1    other such cases, you will advise.

2         MS. JOHNSON:  Yes, your Honor.  I believe that's the

3    only currently completely -- completed briefing that would

4    affect any of those cases.

5         That brings us to briefing in progress.  I believe

6    Saint Thomas made a motion to some of the motions to dismiss

7    that were filed recently.  Those are not completely briefed,

8    but they will be ready for the next status conference.

9         JUDGE ZOBEL:  Now, other motions.  Is there any

10   objection to No. 16, the Plaintiff Jones' motion for

11   substitution of party?  I assume that it's an administrator or

12   executor or something of the sort?

13        MS. JOHNSON:  I believe that's true, your Honor.  I

14   didn't actually pull it before this conference.  I'm not

15   certain, though, whether the time to respond to that has

16   formally run.  I suggest that it has not because, otherwise,

17   we would have automatically promoted it to fully-briefed

18   motions.

19        JUDGE ZOBEL:  Who are the defendants in this case?

20   You don't know?

21        MS. JOHNSON:  I don't know.  I apologize, your Honor.

22        JUDGE ZOBEL:  All right.  Well, if there is no

23   objection, let me know that and we'll just allow it without

24   opposition.

25        MS. JOHNSON:  Certainly.  We will do that.

```
 1              JUDGE ZOBEL:  Okay.

 2              MS. JOHNSON:  And I think that's it.

 3              JUDGE ZOBEL:  And then there are some dispositive

 4    motions listed here.

 5              MS. JOHNSON:  There are, your Honor.  Both the PSC

 6    and the STOPNC defendants have filed dispositive motions.

 7    None of those are fully briefed at this point.

 8              JUDGE ZOBEL:  So, the motions for leave to file

 9    partial summary judgment on -- concerning governmental

10    entities, is that contested?

11              MR. GASTEL:  It is -- well, I don't think that the

12    motion for leave is contested, your Honor.

13              JUDGE ZOBEL:  Well, the motion for leave is allowed.

14    And you anticipate opposition?

15              MR. GASTEL:  I anticipate an opposition, yes, your

16    Honor.

17              JUDGE ZOBEL:  Okay.  So, the motion for leave is

18    allowed, and we'll wait for the merits until later.

19              MR. GIDEON:  Yes.

20              MS. JOHNSON:  I believe 18, 19 and 20 -- I'm sorry --

21    18 and -- 18 also is a motion for leave to file.

22              MR. GIDEON:  Your Honor, we submitted a four- or

23    five-page motion for leave to submit motion for summary

24    judgment on specific subject categories that are reflected in

25    Document No. 2867, consistent with the Court's prior order.
```

```
 1              JUDGE ZOBEL:  Right.

 2              MR. GASTEL:  Your Honor, the PSC does not object to

 3    the motion for leave for 2867.

 4              JUDGE ZOBEL:  Okay.  So, it's allowed.

 5              Now, what does that motion deal with?

 6              MR. GIDEON:  It deals with a number of legal issues.

 7    For example, application of the Tennessee doctrine of

 8    independent superseding cause.  It deals with just a series of

 9    specific points that we think we can brief relatively

10    efficiently.

11              JUDGE ZOBEL:  How do these motions listed on Nos. 18,

12    19 and 20 differ from each other?

13              MR. GIDEON:  Well, 19 and 20 are something we touched

14    on a few moments ago.  No. 19 deals with the failure to

15    provide advanced written notice.

16              JUDGE ZOBEL:  Okay.

17              MR. GIDEON:  No. 20 is separate.  It is the failure

18    to provide a certificate of good faith with the complaint.

19    And No. 18 is the omnibus identification of the topics upon

20    which we sought your permission to submit a motion for summary

21    judgment.

22              JUDGE ZOBEL:  Okay.  I think -- I will have to look

23    at all these motions.  I mean, No. 18 appears to have

24    something like motion for leave to file eight different

25    summary judgment motions.
```

1          MR. GIDEON:  Yes, I think the subject categories are

2    six or seven total.

3          JUDGE ZOBEL:  Well, the motion itself had eight.

4          MR. GIDEON:  Okay.  Well --

5          JUDGE ZOBEL:  I'm not sure all of them should go.

6    So, I will look at that.  I will -- even though there is an

7    admission by plaintiffs that they don't object to the filing

8    of the motions, I guess you can file the motions, but I think

9    they won't all go forward.

10          MR. GIDEON:  Well, we would hope they would all be

11    granted, which would thoroughly shorten the trial.

12          JUDGE ZOBEL:  Okay.  Well, I will give you a fast

13    decision, but we're not -- I don't believe that we will go

14    forward on all of these specific issues one through eight.

15          MR. GIDEON:  May I have your permission, however, to

16    submit motions on each of those points so that you, at least,

17    know the reasoning we have submitted?

18          JUDGE ZOBEL:  You may do that.

19          MR. GIDEON:  Thank you.

20          MR. GASTEL:  Your Honor, on 17 and 18, now that

21    you've allowed those motions, do you want to set a deadline

22    for when they're going to be filed?

23          JUDGE ZOBEL:  You tell me.

24          MR. GASTEL:  17 we can file tomorrow, your Honor.

25          JUDGE ZOBEL:  Tomorrow is the 20th.  Okay.  Is that

1    the only one?

2          MR. GASTEL:  Well, 18 is not my motion, your Honor.

3    I think that Mr. Gideon would probably -- I would say

4    tomorrow, but Mr. Gideon might want some more time.

5          MR. GIDEON:  Yes.

6          JUDGE ZOBEL:  He's done them all.  He's already filed

7    them.

8          MR. GIDEON:  They're a work in progress, but they

9    have to be perfect before they're submitted to you.

10         JUDGE ZOBEL:  How long will it take you to get

11   perfection?

12         MR. GIDEON:  Ten days.

13         JUDGE ZOBEL:  Ten days?

14         MR. GIDEON:  Yes.

15         JUDGE ZOBEL:  These pertain to the trial, don't they?

16         MR. GIDEON:  Well, the trial is in August, and I know

17   that the Court will be very prompt in looking at these

18   carefully and ruling on them.  May I have ten days?

19         JUDGE ZOBEL:  That would take us to the 29th?

20         MR. GIDEON:  Takes us to the 29th of May.

21         JUDGE ZOBEL:  That would be a Sunday.  How about the

22   27th so that you won't have to work over the weekend.

23         MR. GIDEON:  That's fine.  Thank you.

24         MS. GREER:  Your Honor, the Saint Thomas Entities

25   have also joined in that motion and we filed that yesterday.

```
1    So, it was after the status conference.  That document number
2    is 2880.
3            And I also wanted to advise the Court -- I touched on
4    this earlier -- that we have filed a motion for leave to file
5    a motion for partial summary judgment on the apparent agency
6    claims of the Bellwether plaintiffs.  That's 2878, also filed
7    yesterday.  And, finally, we have filed a --
8            JUDGE ZOBEL:  Isn't that already dealt with?
9            MS. GREER:  On apparent agency, not actual.
10           JUDGE ZOBEL:  Oh.
11           MS. GREER:  It's limited to -- as you recall, we said
12   we would only move for apparent agency once we had deposed the
13   individuals.  So, that pertains simply to the Bellwether
14   plaintiffs.
15           JUDGE ZOBEL:  Okay.  So, when are you going to file
16   that?
17           MS. GREER:  Could we also have until the 27th?
18           MR. GASTEL:  Your Honor, just to be clear, we are not
19   conceding to the motions that were filed yesterday.  We are
20   continuing to review those, and I am certain that we are going
21   to object to the Saint Thomas Entities also getting to brief
22   the issues that are raised in 2867.
23           MS. JOHNSON:  Put differently, your Honor, there are
24   already eight motions for summary judgment coming from STOPNC.
25           JUDGE ZOBEL:  I know.
```

1          MS. JOHNSON:  Now we have additional Saint Thomas

2     Entities that appear, at least at first glance, to be raising

3     many of the same issues.  From the PSC's perspective where we

4     have to respond quickly to these, given the trial date, it

5     does seem a bit much.

6          MS. GREER:  Again, your Honor, we've joined in the

7     STOPNC motion as to those particular issues.

8          JUDGE ZOBEL:  Why don't you file a joint motion?  You

9     have the same issues.

10          MS. GREER:  And we probably will.  We're not going to

11     -- we're not going to --

12          JUDGE ZOBEL:  Well, not "probably."  Why don't you do

13     that?  By the 27th you file whatever you want that you seek

14     leave to file under 2867.

15          MS. GREER:  Okay.  I was -- for the 27th, I was --

16     pertaining to the apparent agency motion.  That's not specific

17     to us.  STOPNC does not have that same motion.  That's a

18     completely -- that deals with the relationship between the

19     Saint Thomas Entities and STOPNC and the vicarious liability.

20          MR. GASTEL:  And we're not conceding to the motion

21     for leave at this time, your Honor.  We're continuing to

22     review that.  It was just filed yesterday when I was --

23          JUDGE ZOBEL:  The motion for leave to file is on and

24     they have time to respond and then I'll deal with it.

25          MR. GASTEL:  And, you know, our response that to is

1    due, I believe, next Wednesday.

2           JUDGE ZOBEL:  That's fine.

3           MS. GREER:  And, likewise, your Honor, we have a

4    similar motion to STOPNC's on the dismissal under the

5    Tennessee Healthcare Liability Act for the 60-day notice

6    violations --

7           JUDGE ZOBEL:  That's the one that you argued at the

8    beginning of this hearing, isn't it?

9           MS. GREER:  Well, then you deferred ruling on those

10   particular issues until this point.  We're in the same --

11   we're in the same situation as STOPNC, although the issues are

12   a little bit different because like on some of ours do not

13   match exactly theirs, but it's not a question of what the

14   Court will have to decide.  It's just a question of when the

15   Court decides whether or not the failure to give 60 days

16   notice is fatal.  Then that is just a matter of applying it to

17   the cases.  Our cases don't match up to theirs exactly just

18   because of the way that --

19          JUDGE ZOBEL:  Well, until that happens, there's

20   nothing to do, right?  Until I rule on the -- the matter now

21   before me, you don't have to worry about application, do you?

22          MS. GREER:  Well, we had the -- the 18th was the

23   deadline for motions for leave, and it's not clear whether it

24   has to be submitted in this Court as a motion to dismiss or a

25   motion for summary judgment.  So, we filed a motion for leave

1    to address those issues.

2            JUDGE ZOBEL:  And those were just filed yesterday?

3            MS. GREER:  Correct.

4            JUDGE ZOBEL:  So, I haven't even seen them.

5            MS. GREER:  Okay.  I just wanted the Court to be

6    aware that we do have a similar motion pending on that.

7            JUDGE ZOBEL:  Okay.  Thank you.

8            MS. GREER:  Thank you.

9            JUDGE ZOBEL:  That is the end of the agenda.

10           Is there anything else that anybody wishes to raise?

11   Yes.

12           MR. GIDEON:  One of the comments the Court made was

13   at the status conference you wanted to know who is going to

14   testify in person as compared to deposition.

15           JUDGE ZOBEL:  That is for the pretrial conference.

16           MR. GIDEON:  Yes.  Yes.  May I ask you to direct us

17   to identify who is going to testify by deposition well in

18   advance of that pretrial conference so we, at least, can have

19   objections to you before the pretrial conference or perhaps to

20   Judge Boal so there can be a ruling on that --

21           JUDGE ZOBEL:  On what?

22           MR. GIDEON:  On whether the objections to the

23   deposition testimony are well-taken.  I've heard a lot of

24   comments about the trial coming up close --

25           JUDGE ZOBEL:  No.  What I meant to say -- are you

1    talking about whether you object to a witness appearing by

2    deposition rather than in person?

3           MR. GIDEON:  No.  What I'm more specifically

4    addressing is, if there is somebody who someone intends to

5    call by deposition, there's no real issue about whether they

6    can or cannot come by deposition.  I would think the Court

7    would want to know the components of that deposition testimony

8    that are objected to in advance of the pretrial conference.

9           JUDGE ZOBEL:  No.

10          MR. GIDEON:  Okay.

11          JUDGE ZOBEL:  I don't see any reason for that.  The

12   way I would normally do it -- and to some extent, it depends

13   on how many of these people are not going to be here in

14   person.  Heavens, I hope that doesn't happen.  What I would

15   normally ask is counsel to designate on the transcript what

16   portions they're offering and whether there are objections,

17   and I will rule on the transcript --

18          MR. GIDEON:  Okay.

19          JUDGE ZOBEL:  -- whether the question is

20   objectionable or not.

21          MR. GIDEON:  But you don't expect that at the

22   pretrial conference itself?

23          JUDGE ZOBEL:  I do not.

24          MR. GIDEON:  Okay.

25          JUDGE ZOBEL:  We will -- you know, I prefaced my

```
1    remarks by saying that I don't believe in a whole lot of
2    giving you orders on how to do it and then get 100-page
3    pretrial memorandum.  That doesn't make sense to me.  I want
4    to talk with you.  I want to deal with -- I want to work out
5    with you how we're going to conduct the trial in the way that
6    makes the most sense for everybody and that, hopefully,
7    reduces the cost to everybody.
8              MR. GIDEON:  Okay.
9              JUDGE ZOBEL:  I want to be practical about this.  So,
10   I don't want huge amounts of paper, but it will be complicated
11   to -- if lots of people testify by deposition, we will need to
12   have a mechanism for how we deal with objections to particular
13   designations, and that's all I meant.
14             MR. GIDEON:  Thank you.
15             JUDGE ZOBEL:  Anybody else?
16             (No response.)
17             JUDGE ZOBEL:  All right.  I thank you, as always, and
18   look forward to seeing you in June.
19             MS. JOHNSON:  Thank you, your Honor.
20             MR. TARDIO:  Thank you, your Honor.
21             MR. GIDEON:  Thank you, your Honor.
22             (Adjourned, 3:11 p.m.)
23
24
25                        C E R T I F I C A T E
```

1        I, Catherine A. Handel, Official Court Reporter of the

2   United States District Court, do hereby certify that the

3   foregoing transcript, from Page 1 to Page 57, constitutes to the

4   best of my skill and ability a true and accurate transcription of

5   my stenotype notes taken in the matter of Multidistrict

6   Litigation No. 13-02419-RWZ, In Re: New England Compounding

7   Pharmacy Cases Litigation.

8

9

    July 10, 2016        /s/Catherine A. Handel
10  Date                 Catherine A. Handel, RPR-CM, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25