# EXHIBIT M

```
1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

3

4
     IN RE: NEW ENGLAND
5    COMPOUNDING PHARMACY,
     INC. PRODUCTS LIABILITY     MDL No. 2419
6    LITIGATION
                                 Master Dkt:
7                                1:13-md-02419-RWZ
     ~~~~~~~~~~~~~~~~~~~~~~
8    THIS DOCUMENT RELATES
     TO:
9

10   All Actions

11
     ~~~~~~~~~~~~~~~~~~~~~~~~~
12

13

14            VIDEOTAPED DEPOSITION OF
                  JEAN ATKINSON
15

16                 9:04 a.m.
                March 10, 2015
17

18                 Suite 1100
              315 Deaderick Street
19            Nashville, Tennessee

20

21      Blanche J. Dugas, RPR, CCR No. B-2290

22

23

24

25
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JEAN ATKINSON on 03/10/2015                    Page 14

1      Q.      Have you gone by any other names during

2    your life?

3      A.      No.

4      Q.      Is there any reason why you can't testify

5    truthfully and accurately today?  For example, have

6    you taken any medicine that may impact your memory or

7    impulse or anything of that nature today?

8      A.      No.

9      Q.      Okay.  Have you consumed any -- any alcohol

10   or drugs or anything else that may affect your ability

11   to answer questions?

12     A.      No.

13     Q.      Okay.  Thank you.  Did you do anything to

14   prepare for this deposition today?

15     A.      I just met with the lawyers of the case,

16   our lawyers.

17     Q.      Who did you meet with specifically?

18     A.      C.J., Chris and Matt and Mr. Parks.

19     Q.      Was that just one meeting?

20     A.      Three, I think.

21     Q.      Three.  Did you meet with anyone besides

22   your attorneys to prepare for this deposition?  Anyone

23   at Specialty Surgery or anyone else?

24     A.      No.

25     Q.      Did you review any documents in preparation



```
 1    for this deposition?

 2         A.      Yes.

 3         Q.      Were these documents all given to you by

 4    your attorney?

 5         A.      Yes.

 6         Q.      Did you review any documents on your own in

 7    preparation for this deposition?

 8         A.      Yes.

 9         Q.      Okay.  What documents did you review on

10    your own for this deposition?

11         A.      Well, I guess it's the same ones that I was

12    given to by the lawyers, the copies that was given to

13    everybody.

14         Q.      When were they given to everyone?

15         A.      When -- just randomly over the last few

16    months when the procedures occurred.  All the -- all

17    documents that I reviewed was given to the lawyers.

18         Q.      Okay.  Can you give me just examples of

19    what these documents were.  Are these, like, order

20    forms from NECC?

21         A.      Yes.

22         Q.      Okay.  What other things?  Were they your

23    notes?

24         A.      All the notes that I took and everything

25    was given to my lawyers.
```



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JEAN ATKINSON on 03/10/2015                    Page 16

1      Q.     Okay.  Did you review those to prepare for

2   the deposition today?

3      A.     Yes.

4      Q.     Okay.  Is there anything else that you

5   looked at to prepare for this deposition on your own?

6      A.     No.

7      Q.     Okay.  Did you have any phone calls to

8   prepare for this deposition with someone besides your

9   attorneys?

10     A.     No.

11     Q.     Did you review any deposition transcripts

12  in preparing for this deposition?

13     A.     I don't know -- deposition -- my --

14     Q.     Any transcripts of any question-and-answer

15  sessions between lawyers and a witness.

16     A.     I just reviewed the stuff that my lawyers

17  give me.

18     Q.     Okay.  Was there a transcript of any

19  interviews in there that you were -- that you

20  reviewed?

21     A.     I'm not real sure what you're saying by

22  transcripts.

23     Q.     Like a typed-up thing that would have like

24  a questioner that would ask questions of someone and

25  they would answer and it would be typed out similar to



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    what the court reporter is doing today.

2        A.      Yes.

3        Q.      Whose depositions were those?

4        A.      The ones I reviewed was my --

5        Q.      Your previous one?

6        A.      Just the previous questions that was asked.

7        Q.      So were these the questions that were asked

8    yesterday?

9        A.      No.

10        Q.      Okay.  Who was the witness in those

11    deposition transcripts?

12        A.      I don't think it was the deposition.  It

13    was just when I met with our lawyers and they asked

14    questions.  It was no deposition.

15        Q.      Okay.  Okay.  Fair enough.  Ms. Atkinson,

16    do you have a criminal record?

17        A.      No.

18        Q.      Have you ever been charged with a crime?

19        A.      No.

20        Q.      Have you ever been involved in any

21    governmental investigations?

22        A.      No.

23        Q.      I'm going to hand you what has been

24    represented to me to be your CV.

25                MR. STRANCH:  I think this is



```
 1         Exhibit 99.  Is that correct?
 2              MR. GASTEL:  There's a 98, I think.
 3              MR. STRANCH:  There's a 98 on another
 4         one?
 5              MR. DREW:  Her CV was already entered
 6         as an exhibit.
 7              MR. STRANCH:  No.  Not hers.  That
 8         was Listers.  This is Atkinson's CV.
 9              MR. CHALOS:  It was passed out.  The
10         exhibit was only Dr. Lister's.
11              (Exhibit 98 was marked for
12         identification.)
13      Q.    (By Mr. Stranch)  Take a look at that and
14    tell me if you recognize that document.
15              MR. REHNQUIST:  This is 98, Gerard?
16              MR. STRANCH:  Yes, that's correct.
17         I'm marking it 98.  I assume that means it
18         is.
19              MR. REHNQUIST:  It is now.
20              THE WITNESS:  The only thing that has
21         changed on this in 2009, the Calishers &
22         Associates took over the management of the
23         Specialty Surgery Center.  So from 2009 on,
24         where it says Specialty Surgery Center --
25      Q.    (By Mr. Stranch)  Yes.
```



```
 1        A.      -- I did not maintain policy and procedure.
 2   That was Calishers.
 3        Q.      To present or to --
 4        A.      Since 2009 till present.
 5        Q.      So they're still doing the policy and
 6   procedures for y'all?
 7        A.      No, until the center -- the ownership of
 8   the center was dissolved in 2013.  So from 2009 till
 9   around June, I guess, 2013, the manager -- the
10   Calishers maintained policy and procedure, they did
11   employee payroll, payments to vendors.  Otherwise,
12   it's correct.
13        Q.      Did they do selection of vendors as well?
14        A.      Yes.
15        Q.      Before we get into the Calishers, I want to
16   just ask you some questions on your resumé.  I assume
17   this is your resumé --
18        A.      Yes.
19        Q.      -- you do recognize it?
20        A.      Yes.
21             MR. GIDEON:  Jean, you're going to
22        have to let him finish his question before
23        you start to answer.
24             THE WITNESS:  Okay.
25             MR. GIDEON:  I know you think he's
```



1      Q.      Okay.  So if it was already in the center,

2    it was your job to make sure there was enough in the

3    drawer to keep doing the procedures; correct?

4      A.      Correct.

5      Q.      And if a doctor -- and if there was a new

6    medicine, then that doctor would have to come to you

7    and say, "I'd like you to start ordering X instead of

8    Y," or a different type of medicine.  Is that how that

9    would work?

10     A.      Yes.

11     Q.      And was that the way that it worked up

12   until 2009 when Calisher was hired?

13     A.      That --

14     Q.      The ordering of medicine.  The procedures

15   we just went through where you would just check once a

16   week to see what was low and then order more as

17   needed, and then if something new was wanted, then the

18   doctor would come to you and ask for it.  Was that the

19   procedure that was followed up until Calisher was

20   hired?

21     A.      Yes.  All medications up to Calishers was

22   hired was approved by the physician that needed the

23   medication.

24     Q.      Okay.  During this time, how many

25   compounding pharmaceutical companies were you ordering



```
 1    from?
 2        A.     None.
 3        Q.     Were you only -- were you only ordering
 4    during this time through FDA approved pharmacy -- FDA
 5    approved and overseen pharmaceutical companies?
 6        A.     Yes.
 7        Q.     Okay.  Were any additional job
 8    responsibilities put on you after 2001 when you became
 9    the director of nursing, or did those responsibilities
10    stay pretty consistent through the end of your tenure
11    with Specialty Surgery?
12        A.     Say that again.
13        Q.     Okay.  So you've listed your job
14    responsibilities in 2001 when you became director of
15    nursing.
16        A.     Uh-huh (affirmative).
17        Q.     Was there a time after that in which you
18    either received more job responsibilities or were any
19    job responsibilities taken away from you?
20        A.     No.
21        Q.     We discussed that in 2009 when Calisher was
22    hired certain responsibilities were taken off of you.
23        A.     Yes.
24        Q.     That's the maintain policy and procedures,
25    employee payroll, payments to vendor, overseeing
```



1   correct?

2       A.      The only difference is it doesn't have a

3   preservative in it.

4       Q.      But that's a difference, isn't it?

5       A.      That's a difference.  It's still the same

6   drug.

7       Q.      So did you go to Calister [sic] before

8   ordering MPA from NECC?

9       A.      Yes.

10      Q.      And why did you go to Calisher before

11  ordering MPA?

12      A.      It was a new vendor and they had asked for

13  patient names.

14      Q.      So what was it that triggered your review

15  by Calister?  Was it because there was a new vendor or

16  was it -- was that solely the reason why?

17      A.      Like I said, it was a new vendor and NEC

18  had asked for patient names.

19      Q.      Okay.  And what about asking for patient

20  names triggered a warning in your head?

21      A.      I had never been asked for patient names by

22  another vendor.

23      Q.      Okay.  And if Calister had told you when

24  you contacted them about NECC being a new vendor and

25  the patient names, if they had said, no, don't order



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JEAN ATKINSON on 03/10/2015                    Page 39

 1    from them, would you have ordered from NECC?

 2         A.      No, sir.

 3         Q.      So even if NECC hadn't asked you for the

 4    new names, if Calister had said, "We've done our due

 5    diligence and we don't think you should order from

 6    them," you would not have ordered from them; correct?

 7         A.      No.

 8         Q.      And Calisher must approve all new vendors;

 9    correct?

10         A.      Correct.

11         Q.      Did you rely upon Calisher to do due

12    diligence into whether NECC was a reputable supplier?

13         A.      Say that --

14         Q.      Did you rely upon Calisher to do due

15    diligence to determine whether NECC was a reputable

16    supplier?

17         A.      I'm still not getting your question.  I'm

18    sorry.

19         Q.      Let me try by making a little bit of a

20    statement and maybe that'll help explain --

21         A.      Okay.

22         Q.      -- what I'm doing.

23                 In doing procurement, no matter what,

24    there's some vendors that are reliable --

25         A.      Uh-huh (affirmative).



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   pharmacy company U.S. Compounding come through and I
 2   discussed with them.
 3       Q.     When -- so you were looking at two separate
 4   compounding pharmacy companies --
 5       A.     No.
 6       Q.     -- at the same time?
 7       A.     I was looking -- NECC had give me the
 8   information.  U.S. Compounding just come through that
 9   day to leave a card so...
10       Q.     Okay.  And so any further investigation
11   beyond what you detailed here would have been done by
12   the Calishers; correct?
13       A.     Yes.
14       Q.     So you didn't look into whether NECC had
15   had any regulatory actions taken against them because
16   of previous problems, did you?
17       A.     No.
18       Q.     You didn't look into whether NECC had a
19   prior history of producing contaminated products?
20       A.     No.
21       Q.     You didn't go to any federal or state
22   agencies to determine whether they had any complaints
23   or taken any actions against NECC, did you?
24       A.     No.
25       Q.     Okay.  And did you rely upon the Calishers
```



1      Q.      And during the times in which you ordered

2   with -- from CuraScript and Besse, I understand there

3   were some occasions when the Depo-Medrol was on

4   backorder; is that correct?

5      A.      Yes.

6      Q.      Did you eventually receive the Depo-Medrol

7   that you ordered each time?

8      A.      Yes.

9      Q.      Were any surgical procedures canceled as a

10  result of not having sufficient supply of Depo-Medrol

11  during this time?

12     A.      Not that I can recall.

13     Q.      So what was the third -- it was CuraScript,

14  Besse, and what was the third pharmaceutical company?

15     A.      Physician Sales.  We never ordered from

16  those.  It was just a company that Calishers had asked

17  me to contact.

18     Q.      Okay.  Is that company also known as PSS?

19     A.      I think so.

20     Q.      And why did you never place an order with

21  PSS?

22     A.      They didn't have the preservative-free

23  Depo-Medrol.

24     Q.      And that was the only reason you were going

25  to do business with them was the preservative-free



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Depo-Medrol?

2         A.     Yes.

3               (Exhibit 99 was marked for

4         identification.)

5         Q.     (By Mr. Stranch)  I'm going to hand you a

6    document that I'm going to mark as Exhibit 99.  I

7    believe it will be Exhibit 99.  This is a collection

8    of documents.  I'd ask that you scan through this

9    quickly and tell me if you recognize this collection

10   of documents.

11              MR. GIDEON:  Irrespective of him

12         saying go through it quickly, take your

13         time to recognize what you're looking at.

14              MR. GASTEL:  They're the CuraScript

15         orders organized chronologically from 2011

16         through 2012.  So the Bates numbers are not

17         sequential, but the chronology is correct.

18              MR. REHNQUIST:  Ben, I'm sorry, can

19         you repeat that.

20              MR. GASTEL:  So the exhibit is a

21         collective exhibit of the CuraScript order

22         invoices and they're organized

23         chronologically, not necessarily in the

24         numerical order of the Bates stamps.

25              MR. REHNQUIST:  Thank you.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.       (By Mr. Stranch)  Ms. Atkinson, the

 2   question that I'm going to ask you when you finish

 3   your review is:  Do you recognize these documents?

 4        A.       Okay.  Yes.

 5        Q.       You do recognize these documents?

 6        A.       Yes.

 7        Q.       And are these the e-mail confirmations and

 8   attached invoice showing what you had ordered from

 9   CuraScript?

10        A.       I can't remember if they're all there or

11   not, but, yes, they look like the ones that I placed.

12        Q.       Whether they're all there or not, that's

13   what all these documents are; correct?

14        A.       Yes.

15        Q.       And you maintained these in the normal

16   course of business at Specialty Surgery?

17        A.       Yes.

18        Q.       Okay.  And let's turn to the first page,

19   SSC-02970.  It's the top page right there.

20        A.       Okay.

21        Q.       This is an example of an e-mail that you

22   would receive when you placed an order with

23   CuraScript; correct?

24        A.       Yes.

25        Q.       Okay.  So the way the process would work
```



1   was you would log in, you would enter what you wanted

2   to order; correct?

3        A.      Correct.

4        Q.      And then when you completed that and sent

5   the order, they would sent you this e-mail that would

6   let you know that they received your order; correct?

7        A.      Correct.

8        Q.      And then attached to that e-mail would be,

9   if you turn over to the next page, SSC-02971; correct?

10       A.      Yes.

11       Q.      Okay.  And this second page, 2971 of the

12  collective, is a confirmation of what you had ordered;

13  correct?

14       A.      Yes.

15       Q.      Okay.  Let's turn over to SSC-02995.  It's

16  kind of cut off on the copy on the bottom so maybe

17  look for 994.  If you take a look at the ordered on

18  date, it's July 22nd, 2011.  And these are in

19  chronological order if that helps.

20       A.      July.

21            MR. REHNQUIST:  What's the date of

22      the invoice, Gerard?

23            MR. STRANCH:  July 22nd, 2011.

24            THE WITNESS:  Okay.

25       Q.      (By Mr. Stranch)  Do you see the order



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    confirmation there?

2         A.    Yes.

3         Q.    Okay.  Under Depo-Medrol, 80 milligrams/mL,

4    that's your order for Depo-Medrol; correct?

5         A.    Correct.

6         Q.    This is a standing order that you renewed

7    monthly, approximately once a month or so; correct?

8         A.    It varied on how our supply was with the --

9    how much we had on hand, how much I ordered.

10        Q.    But between every three and six weeks,

11   you'd have to place another order; correct?

12        A.    Correct.

13        Q.    Okay.  And this is a value pack of 25

14   single dose vials; correct?

15        A.    Yes.

16        Q.    And you ordered three of those at this

17   point?

18        A.    Yes.

19        Q.    So a total of 75 vials; correct?

20        A.    Yes.

21        Q.    Was this preservative-free Depo-Medrol?

22        A.    No.

23        Q.    And it says it's on backorder here;

24   correct?

25        A.    Correct.



1    Q.    And it says the approximate release date is

2   August 19th, 2011; correct?

3    A.    Yes.

4    Q.    And so what that meant was they think they

5   would be able to send it to you on approximately

6   August 19th, 2011; correct?

7    A.    Correct.

8    Q.    Okay.  Now let's turn back to the second

9   page, 2971, second from the bottom, Diprivan.  And I

10  apologize if I've butchered the pronunciations again.

11   A.    Correct.

12   Q.    It says backorder, four, and it says

13  approximate release currently unknown; correct?

14   A.    Correct.

15   Q.    When it says that, that means they're not

16  sure when they're going to be able to fulfill it;

17  correct?

18   A.    Correct.

19   Q.    And you previously testified that with the

20  Depo-Medrol, even if it was on backorder, you would

21  eventually receive it; correct?

22   A.    Correct.

23   Q.    Was there ever a time with CuraScript or

24  Besse in which you ordered Depo-Medrol that was on

25  backorder and you did not receive it?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.       Not that I recall.

 2        Q.       Okay.  I'm going to hand you another

 3   collection of documents here.  I'm going to represent

 4   to you that these are web order confirmations from

 5   Besse Medical and ask that you take a look at these.

 6   I'm going to mark these as Exhibit 100 and I'll be

 7   asking you the same questions that I did at the start

 8   of the CuraScript ones, whether you recognize and

 9   whether these are maintained in the normal course of

10   business and whatnot.

11             (Exhibit 100 was marked for

12        identification.)

13             MR. GASTEL:  And the same thing on

14        these, they're not numerical order by Bates

15        stamped.  They're chronological by date.

16             THE WITNESS:  Okay.

17        Q.    (By Mr. Stranch)  Okay.  Do you recognize

18   these documents?

19        A.       Yes.

20        Q.       Are these the web order confirmations from

21   Besse Medical?

22        A.       They appear so.

23        Q.       Well, let's look at SSC-02701.  Is this an

24   example of a web order confirmation from Besse

25   Medical?  That's the first document.
```



```
 1        A.     Yes.
 2        Q.     Okay.  And are these documents that you
 3   maintained in the normal course of business at
 4   Specialty Surgery?
 5        A.     Yes.
 6        Q.     Okay.  And these reflect what you had
 7   ordered through a web portal at Besse Medical;
 8   correct?
 9        A.     Yes.
10        Q.     And so on this first one, it shows
11   Depo-Medrol 80 milligrams/mL, 25 times one milliliter,
12   two pack.  So you're ordering 50 single dose vials of
13   Depo-Medrol; correct?
14        A.     Yes.
15        Q.     Okay.  And why would you order from Besse
16   Medical or CuraScript?  Would you play one against the
17   other on price?
18        A.     No.  If I ordered from one, like
19   CuraScript, it was on backorder, then I would go to
20   Besse.
21        Q.     Okay.  And did you ask Besse or CuraScript
22   whether they could supply Depo-Medrol
23   preservative-free at any point?
24        A.     Yes.
25        Q.     And what did they say?
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.        No.

2        Q.        Did they say no because they couldn't get a

3   supply or did they say no because they don't believe

4   it existed?

5        A.        I don't recall.

6        Q.        Are you aware that Pfizer manufactures a

7   preservative-free Depo-Medrol?

8        A.        Not to my knowledge.

9        Q.        Did you order Depo-Medrol from any entities

10  other than Besse Medical, CuraScript -- or CuraScript?

11       A.        No.

12       Q.        Did you price out Depo-Medrol from any

13  entities other than Besse Medical or CuraScript?

14       A.        No.

15       Q.        And for preservative-free MPA, you only

16  consulted with NECC about purchasing that; correct?

17       A.        Correct.

18       Q.        Did you ask Calisher for a list of vendors

19  that you should contact to find preservative-free

20  Depo-Medrol?

21       A.        No.

22       Q.        Why not?

23       A.        I don't know.

24       Q.        You don't know.  You just didn't do it or

25  you can't remember why you didn't do it?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JEAN ATKINSON on 03/10/2015                    Page 58

1   conversation around the coffee pot or the water -- or

2   water fountain or --

3       A.    I don't know where it was.  It was just at

4   the desk probably in the PACU.

5       Q.    Okay.  So as I understand it, at some point

6   in 2012 -- can you remember approximately when in

7   2012?

8       A.    Probably June, July, somewhere in there.

9       Q.    Okay.  So approximately June, maybe July of

10  2012, Dr. Lister approached you and said he had read

11  about concerns of adverse reactions to the

12  preservative in Depo-Medrol; correct?

13      A.    Yes.

14      Q.    And he asked you at that time to

15  investigate whether you could obtain preservative-free

16  MPA; is that correct?

17      A.    Yes.

18      Q.    Okay.  Did he instruct you at that time to

19  start ordering preservative-free MPA?

20      A.    He instructed me to see if I could find if

21  it was available.

22      Q.    Okay.  And so what did you do next?

23      A.    I told him I had went to a FASCA conference

24  and there was a vendor there, NECC, that we had used

25  previously, and that they were advertising that they



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.      And what materials did he give you at that

2    time?

3    A.      He give me NECC's pamphlet on the company,

4    what medications was available and what stipulations

5    they had to produce drugs.

6    Q.      Okay.  Describe to me what you mean by

7    stipulations.

8    A.      Okay.  They said they followed the USP 797

9    compliance.  They had pharmacists that was highly

10   qualified in compounding medication under sterile

11   conditions.  They had a Tennessee license.  That's

12   about all I remember.

13   Q.      Okay.  I'm going to hand you documents

14   collectively that I'm going to mark as Exhibit 101.

15   I'm going to ask you to look through these and my

16   question is:  Do you recognize these documents?

17           (Exhibit 101 was marked for

18      identification.)

19           THE WITNESS:  They're out of order,

20      but, yes, I do.

21   Q.      (By Mr. Stranch)  Okay.  Can you tell me

22   what these documents are.

23   A.      This is the information that Mario left me

24   when he come by that day about the NEC Compounding

25   Company.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.     Okay.  When you say NEC, it's actually
2    NECC; correct?
3    A.     Yes.
4    Q.     Okay.  Just want to make sure we're talking
5    about the same company.
6          If you'll turn over to SSC-00014, please,
7    these are their materials on Depo-Medrol; correct?
8    A.     Yes.
9    Q.     What did you do with these materials when
10   you received them?
11   A.     I told Mario at that time that I would have
12   to review this with Dr. Lister and the Calishers and
13   get back to him.
14   Q.     Okay.  And did you usher him out of the
15   room then?
16   A.     To my knowledge, he just left.
17   Q.     Y'all didn't go out to lunch or do anything
18   like that?
19   A.     No.
20   Q.     Okay.  And when did you then speak to Dr.
21   Lister or the Calishers about these materials?
22   A.     It might -- I don't remember.  Maybe the
23   next day I showed Dr. Lister the pamphlet.
24   Q.     Okay.
25   A.     And that was it.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      At that time did Dr. Lister instruct you to
 2   go ahead and order the preservative-free MPA?
 3        A.      No.  He wanted me to make sure that the
 4   company had a license.
 5        Q.      Okay.
 6        A.      And to follow up with the Calishers and
 7   that's what I did.
 8        Q.      Okay.  Do you remember approximately on
 9   what day it was that Mario came by and dropped these
10   off?
11        A.      July the 10th or 11th, one of them.  I'm
12   not sure.
13        Q.      Okay.  And when did you conduct your
14   investigation into whether NECC had a license and the
15   other issues that Dr. Lister asked you to look into?
16        A.      I reviewed the pamphlet.  Ask that question
17   again.
18        Q.      Okay.  Let me back up real quick.
19               When you said that Mario came and dropped
20   these off on July 10th or 11th, that's 2012; correct?
21        A.      Correct.
22        Q.      And after you met with Mr. -- with Dr.
23   Lister, which would have been the next day, you
24   believe; correct?
25        A.      Uh-huh (affirmative).  I think so.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      Dr. Lister instructed you to do an

 2   investigation into whether they were licensed in

 3   Tennessee; correct?

 4        A.      Yes.

 5        Q.      Did he ask you to look into anything else

 6   on NECC other than whether they were licensed in

 7   Tennessee?

 8        A.      Like I say, he asked me if they was

 9   licensed and to review the information and talk to the

10   Calishers.

11        Q.      Okay.  And so if we assume that Mario came

12   to see you on July 10th, you would have met with Dr.

13   Lister on the 11th; correct?

14        A.      Best to my knowledge.  I don't remember

15   exactly.

16        Q.      And would you then on the 11th have

17   conducted the investigation into whether they're

18   licensed and all that?

19        A.      When I reviewed the pamphlet, I just went

20   down their -- where it says company overview, I went

21   down that list.

22             MR. GIDEON:  Jean, give him that

23        number.

24        Q.      (By Mr. Stranch)  What's the Bates number?

25        A.      0008.
```



 1      Q.      Okay.  Thank you.  Where are we here?
 2      A.      On 0008 and 0009, I went over the overview,
 3  equipment, the personnel, then commitment to quality.
 4  And when I seen USP 797 compliant, I went online, I
 5  pulled that information.  Then I called Mario back,
 6  asked him if he had a license and he delivered the
 7  license -- well, he come by -- seems like he come by
 8  the next day and left the license and stuff with
 9  Diane.  I was circulating a case that day so I did not
10  get to see him.
11      Q.      Okay.  And so in doing the due diligence
12  that Dr. Lister asked you to perform, you reviewed
13  their sales materials and asked Mario to give you a
14  copy of their license to do business in the state of
15  Tennessee; correct?
16      A.      Yes, correct.
17      Q.      Did you go to the Tennessee Department of
18  Health with any questions about NECC?
19      A.      No.
20      Q.      Did you go to the board of pharmacy and ask
21  any questions about NECC?
22      A.      No.
23      Q.      Did you do any Google searching on NECC?
24      A.      No.
25      Q.      So after you completed review of their



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              VIDEOGRAPHER:  Here begins Tape No. 2
 2         in the deposition of Jean Atkinson.  We're
 3         back on the record and the time is
 4         10:43 a.m.
 5         Q.     (By Mr. Stranch)  Okay, Ms. Atkinson,
 6    before the break, we were discussing Specialty
 7    Surgery's order of preservative-free MPA from NECC;
 8    correct?
 9         A.     Correct.
10         Q.     You testified that you had discussions with
11    Mario about that purchase and NECC's qualifications;
12    correct?
13         A.     Yes.
14         Q.     Did you have discussions with anyone else
15    at NECC at any point?
16         A.     Not that I can remember.
17         Q.     Did you meet anyone else from NECC at any
18    point?
19         A.     No.
20         Q.     Did you ever go to Massachusetts to view
21    their go facilities?
22         A.     No.
23         Q.     Did you e-mail with anyone else at NECC
24    other than Mario?
25         A.     Not that I remember.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.      Yes.

 2        Q.      And who is Kim Bowlin?

 3        A.      She was our -- I'm not sure Kim's title.  I

 4   think she was the administrator at that time.

 5        Q.      Okay.  And what was your title in July of

 6   2012?

 7        A.      Director of nursing.

 8        Q.      Okay.  And did Kim do any investigation of

 9   NECC before placing an order with them?

10        A.      No.

11        Q.      Would that have been your job

12   responsibility at Specialty Surgery?

13        A.      What?

14        Q.      Any investigation of NECC, would that have

15   been -- would you have been the only person at

16   Specialty Surgery who would have been tasked with

17   investigating NECC before placing an order with them?

18        A.      I initially started it and then consulted

19   the Calishers.

20        Q.      Okay.  And no one else at -- scratch that.

21                No other employees of SC -- of Specialty

22   Surgery would be tasked with undertaking that

23   investigation through their normal job duties;

24   correct?

25        A.      Yes.
```



```
 1    did you?
 2         A.      They could have.  They could not.
 3         Q.      But you didn't know of anyone that did.
 4    Can you identify one person that was scheduled at the
 5    time you filled this out to receive five shots?
 6         A.      No.
 7         Q.      Okay.  So did you order five units for each
 8    one of these people so that you could get the amount
 9    of MPA that you needed into the facility?
10         A.      Yes.
11         Q.      So it wasn't because these people were
12    definitively going to get five shots.  It's because
13    that's the amount the facility needed; correct?
14         A.      That is hard to predict, I mean, really and
15    truly.  Probably every patient would not have got all
16    five -- all five Depo-Medrols.
17         Q.      Okay.
18         A.      But they could have.
19         Q.      And so the purpose in writing prescriptions
20    for all five was not because each one of these
21    patients would need all five, but instead was because
22    the facility needed that amount of Depo-Medrol;
23    correct?
24         A.      Yes.
25         Q.      Okay.  Was any of the -- was any of the MPA
```



1    used from NECC on these two order forms Exhibit 93 and

2    94 injected into patients whose names do not appear on

3    these order forms?

4        A.    I cannot say that unless I review the

5    charts.

6        Q.    How many -- approximately how many patients

7    of Specialty Surgery were injected with NECC MPA?

8        A.    I think around 170.

9        Q.    And there's not 170 people on these two

10   order forms, are there?

11       A.    Correct.

12       Q.    So there are definitely people not on the

13   order forms who received shots of MPA from NECC;

14   correct?

15       A.    Some of these patients did receive two to

16   three shots of the preservative-free steroid.

17       Q.    Ms. Atkinson, I'd like you to pay attention

18   to my question because I think we're talking past each

19   other.

20            There are approximately 170 people who

21   received shots of MPA from NECC at Specialty Surgery;

22   correct?

23       A.    Yes.

24       Q.    There are not 170 patient names on

25   Exhibit 93 and 94, are there?



```
 1       A.      Correct.

 2       Q.      So there are people who received shots of

 3  MPA from NECC at Specialty Surgery who did not --

 4  whose names do not appear on these forms; correct?

 5       A.      That's possible.

 6       Q.      It is correct, isn't it?

 7       A.      It's possible.

 8               MR. GIDEON:  She just answered the

 9        question.

10       Q.      (By Mr. Stranch)  Let's turn to SSC-00030.

11  This is the invoice confirming this prescription list

12  for 120 units of MPA preservative-free; correct?

13       A.      Yes.

14       Q.      And SSC-00031 is a packing slip; correct?

15       A.      Yes.

16       Q.      And you received a packing slip like this

17  with both orders from NECC; correct?

18       A.      Yes.

19               MR. STRANCH:  Let me have just

20        30 seconds real quick.

21       Q.      (By Mr. Stranch)  I want to talk with you a

22  little bit about the division of your job

23  responsibilities between you and Calisher to make sure

24  that we're very clear on what you consider to be your

25  responsibility and what you consider to be Calisher's
```



1   responsibility; okay?

2       A.     Yes.

3       Q.     What did you consider to be Calisher's

4   responsibility as it relates to pharmaceutical -- to

5   new vendors?

6       A.     To -- for -- they -- we would find a

7   vendor.  We would go to Calishers, tell them the

8   vendor's name, what we needed to order and they would

9   decide whether we ordered from them or not.

10      Q.     Okay.  And so you would provide your due

11  diligence materials in picking the vendor to Calisher

12  and then Calisher would do their own separate

13  investigation before allowing the new vendor; correct?

14      A.     Yes.

15      Q.     And did Calisher also do continuing

16  investigation of current vendors to make sure that

17  they're still up to the requirements of Specialty

18  Surgery for use as a vendor?

19      A.     I have no idea.

20      Q.     Did you view that as being your

21  responsibility?

22      A.     No.

23      Q.     No.  Did you think that Calisher was taking

24  care of that?

25             MR. GIDEON:  She just answered it as



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF JEAN ATKINSON on 03/10/2015                    Page 108

```
 1          I have no idea.  I object to the
 2       repetition.
 3               MR. STRANCH:   Okay.
 4       Q.     (By Mr. Stranch)  Who did you think was
 5    doing that?
 6       A.      The management.
 7       Q.      And who is the management?
 8       A.      Calisher & Associates.
 9       Q.      Okay.  If there was a payroll problem,
10    would that be an issue you would deal with or would
11    that be dealt with by Calisher?
12       A.      Calishers.
13       Q.      Would someone come to you -- would one of
14    your nurses come to you with it and you would forward
15    it on to Calisher or would they be instructed to go
16    directly to Calisher?
17       A.      If there was a payroll issue, they would go
18    to Kim Bowlin.
19       Q.      Okay.  And when someone went to Kim, that
20    was the same thing as going to Calishers; correct?
21       A.      Yes.
22       Q.      Did you have a written document that you
23    were given that outlined when you were to send stuff
24    to Calishers and then when you were to handle it on
25    your own?
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1         Q.      So would -- and if you look again at
2    Exhibit 94, it says in the directions, steroid
3    epidural; correct?
4         A.      Yes.
5         Q.      So are you aware of a single person in the
6    time you've worked at NECC if we reviewed the accurate
7    medical records you're requried to maintain by law
8    that would have received five epidural steroid
9    injections of MPA in a 180-day time frame?
10        A.      No.
11               MR. STRANCH:  We're going to break
12        for lunch now.
13               MR. GIDEON:  Five minutes, ten, an
14        hour, what do you want?
15               MR. STRANCH:  My size, you need more
16        than five minutes.
17               MR. GIDEON:  Just tell us what time
18        to be back.
19               MR. STRANCH:  Why don't we just say
20        an hour, 12:45.
21               VIDEOGRAPHER:  We're off the record.
22        This is the end of Tape No. 2.  The time is
23        11:44 a.m.
24               (A lunch recess was taken at 11:44
25        a.m. and the deposition reconvened at 12:50
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com