# EXHIBIT O

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4
      IN RE: NEW ENGLAND
 5    COMPOUNDING PHARMACY,
      INC. PRODUCTS LIABILITY     MDL No. 2419
 6    LITIGATION
                                  Master Dkt:
 7                                1:13-md-02419-RWZ
      ~~~~~~~~~~~~~~~~~~~~~
 8    THIS DOCUMENT RELATES
      TO:
 9

10    All Actions

11
      ~~~~~~~~~~~~~~~~~~~~~~~
12

13
                VIDEOTAPED DEPOSITION OF
14              KENNETH R. LISTER, M.D.

15
                     9:03 a.m.
16                 March 9, 2015

17

18                   Suite 1100
                315 Deaderick Street
19              Nashville, Tennessee

20

21      Blanche J. Dugas, RPR, CCR No. B-2290

22

23

24

25
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015                  Page 28

```
 1        A.      I presume that was a hospital financial
 2   decision.
 3        Q.      What do you mean by that?
 4        A.      They made a choice to keep me where their
 5   production was best.
 6        Q.      Are they able to receive a higher
 7   reimbursement by having you do that procedure at the
 8   hospital?
 9        A.      I think they do, yes.
10        Q.      Is there a clinic within the hospital that
11   you operate out of when you do those procedures?
12        A.      No.
13        Q.      Do you use a hospital operating room?
14        A.      Yes.
15        Q.      Going back to the time when you were
16   affiliated with Specialty Surgery Center.  Let's talk
17   in particular about 2012.  Was Specialty Surgery
18   Center also paid some money in connection with the
19   epidural steroid injections that you performed?
20        A.      Yes, it was.
21        Q.      How were they paid?
22        A.      I presume they were paid directly from the
23   insurance companies.
24        Q.      Or from Medicare?
25        A.      Or from Medicare, which is an insurance
```



```
 1   company.
 2        Q.      And you were paid also money in connection
 3   with the epidural steroid injections that you
 4   performed at Specialty Surgery Center separate and
 5   apart from the money that was paid to Specialty
 6   Surgery Center?
 7        A.      Yes.
 8        Q.      Did you supply the steroid that was
 9   injected into the patients?
10        A.      No.
11        Q.      Who did?
12        A.      Specialty Surgery Center procured all of my
13   supplies.
14        Q.      Is that part of your agreement with
15   Specialty Surgery Center?
16        A.      Yes.
17        Q.      Did you tell Specialty Surgery Center which
18   supplies you wanted them to procure for you?
19        A.      I told them what supplies that I needed.
20        Q.      How did you communicate that to Specialty
21   Surgery Center in 2012?
22        A.      My communications were usually either
23   directly to Jean Atkinson.
24        Q.      Did you use an e-mail in 2012?
25        A.      Yes.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015                    Page 34

1  when giving steroid injections in 2012?

2      A.      No.

3      Q.      Did Specialty Surgery charge patients for

4  epidural steroid injections in 2012?

5      A.      Are you asking did they charge for supplies

6  or are you asking did they charge for the procedure?

7      Q.      Well, let's break those out.  Did Specialty

8  Surgery Center charge for the procedure in 2012 for

9  epidural steroid injections?

10     A.      Yes, Specialty Surgery Center did charge

11  for the procedure.

12     Q.      And what do you mean when you say the

13  procedure?

14     A.      The charge was an all-inclusive charge for

15  the procedure of performing the epidural steroid

16  injections.

17     Q.      And that charge included the charge for the

18  steroid itself?

19     A.      I presume that the charge for the steroid

20  itself was included in the overall charge for the

21  procedure.

22     Q.      And so what did you charge for?

23     A.      I charged simply for my services of

24  administering the epidural steroid injection.

25     Q.      And Specialty Surgery charged for



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    everything other than your services?

2         A.     Correct.

3         Q.     Part of the money that was paid to

4    Specialty Surgery Center in 2012 was for the epidural

5    steroid itself; is that right?

6         A.     The money was a global payment from the

7    insurance company.

8         Q.     Was the steroid free?

9         A.     The steroid was a cost to the surgery

10   center, but the money was a global payment for the

11   epidural steroid.

12        Q.     You're talking about the money received

13   from either patient or some third-party payor on

14   behalf of the patient?

15        A.     Correct.

16        Q.     Did you receive any money in 2012 for the

17   steroid itself that was injected into the patients?

18        A.     No.

19        Q.     Does Specialty Surgery Center, PLLC exist

20   today?

21        A.     I believe it has been dissolved.

22        Q.     When did that happen?

23        A.     I believe it was finally dissolved at the

24   end of last year.

25        Q.     End of 2014?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015                Page 56

1     A.     Correct.

2     Q.     And have you always kept current with those

3   requirements?

4     A.     Yes, I have.

5     Q.     Did Specialty Surgery Center in 2012

6   subscribe to any medical journals, to your knowledge?

7     A.     Not to my knowledge.

8     Q.     Did you read any other medical journals in

9   2012 on a regular basis?

10     A.     Any other medical journals?

11     Q.     Right.  Other than the American Society of

12   Interventional Pain Physicians journal.

13     A.     No, I did not.

14     Q.     Did you -- maybe I assumed something.  Did

15   you read the journal from the American Society of

16   Interventional Pain Physicians?

17     A.     Yes, I did.

18     Q.     Did you read every issue that came to you?

19     A.     I read the majority of each issue.

20     Q.     Who decided to dissolve Specialty Surgery

21   Center?

22     A.     That was a partnership decision.

23     Q.     Did you agree with it?

24     A.     No.

25     Q.     Why not?



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    Specialty Surgery Center agreed to provide medications
2    for your use in procedures including epidural
3    steroids?
4        A.     No, there was not.
5        Q.     So on what basis did Specialty Surgery
6    Center provide those supplies for your use?
7        A.     I'm not sure of your question.
8        Q.     Well, did you have some agreement with
9    Specialty Surgery Center either in writing or verbally
10   that Specialty Surgery Center would provide
11   medications including epidural steroid injection --
12   epidural steroids for epidural steroid injections?
13       A.     Specialty Surgery Center provided and
14   billed for those services for the epidural steroid
15   injections.
16       Q.     And that included for the epidural steroid
17   itself?
18       A.     They billed for the full service.
19       Q.     Okay.  Well, maybe we're not understanding
20   each other.  Did you have -- how did you know that --
21   when you showed up at Specialty Surgery Center to do
22   an epidural steroid injection, how did you know that
23   you didn't have to bring the steroids with you?
24       A.     Because they supplied all of the
25   medications and supplies needed.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      And then they billed a third party or a

 2   patient for those supplies?

 3        A.      Correct.

 4        Q.      What -- did somebody tell you -- did you

 5   have some conversation with Specialty Surgery where

 6   they said, don't worry, we'll supply the steroids.

 7   You just show up and do your injection?

 8        A.      That is the standard practice of all

 9   medical facilities, whereas they provide equipment,

10   supplies, personnel necessary for procedures.  I have

11   no written agreement with Cumberland Medical Center or

12   any other hospital as well.

13        Q.      When you do procedures at Cumberland

14   Medical Center, Cumberland Medical Center provides the

15   steroids for use in epidural steroid injections?

16        A.      Correct.

17             (Exhibit 80 was marked for

18          identification.)

19        Q.      (By Mr. Chalos)  I'm going to hand you the

20   next numbered exhibit, No. 80.  So we've marked

21   Exhibit No. 80.  It's SSC-01826 through 01832.  So

22   while you're looking at Exhibit No. 80, which is

23   SSC-01826 through 01832 --

24             MS. HOLLABAUGH:  Mark, do you have

25          copies of that?
```



1    Q.      Why were you involved in this phone

2  conference call?

3    A.      I presume the reason I was involved was

4  because the surgery center had a large pain management

5  practice.

6    Q.      So this report here says that -- looking

7  under points of discussion.  You see that?

8    A.      Uh-huh (affirmative).

9    Q.      It says, "Relying on our management reports

10 from January 2012 to September 30th of 2012,

11 approximately 35 percent of our procedure volume is

12 through pain management services."

13            Was that true?

14    A.      That was true according to this surgery

15 center records, correct.

16    Q.      Where are the surgery center records today,

17 financial records?

18    A.      I believe they're in Dr. Simpson's office.

19    Q.      Then it goes on to say, "Looking at our

20 other management reports, this is somewhere around 85

21 to 90 cases per month."

22            Does that sound right?

23    A.      That sounds reasonable.

24    Q.      Then, "Our average reimbursement for those

25 cases is approximately" -- and then it's blacked out



1    there.  That's a dollar amount, I assume that's

2    blacked out?

3         A.    Must be.

4         Q.    Then says, "This reflects Dr. Lister's work

5    almost exclusively"?

6         A.    Yes.

7         Q.    And of those -- we talked earlier, you said

8    you did you think about 20 to 30 procedures per week

9    about half of which were epidural steroid injections?

10        A.    I believe that's a reasonable estimate.

11        Q.    So do you think using their numbers here,

12   85 to 90 cases per month of pain management services,

13   do you think about half of those were epidural steroid

14   injections?

15        A.    I suspect that's correct.

16        Q.    And you were the only doctor at that time

17   at Specialty Surgery Center who was doing pain

18   management?

19        A.    At that time, I was the only one actually

20   doing pain management.

21        Q.    In 2012, what other services were being

22   done at Specialty Surgery Center?

23        A.    Dr. Simpson did orthopaedic cases.  Dr.

24   Pick did orthopaedic cases.  Dr. Nichols did GI

25   scopes.  Dr. Lee did GI scopes.  Dr. Fox did general



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MR. GIDEON:  Objection to the form.
 2       Q.      (By Mr. Chalos)  Would you bill separately
 3   for the post-procedure visit?
 4       A.      Yes.
 5       Q.      Did you ever see the bills that Specialty
 6   Surgery Center sent to the patient and/or patient's
 7   insurance company for the epidural steroid injection?
 8       A.      Not that I recall.
 9       Q.      Have you ever -- as you sit here today,
10   have you ever seen any of their bills?
11       A.      I have probably seen some, but I, again,
12   don't recall.
13       Q.      Was your lease agreement with Specialty
14   Surgery Center ever revised to reflect the new
15   arrangement in 2012?
16       A.      I believe it must have been, but I --
17   again, I don't recall.
18       Q.      You say it must have been.  Why?
19       A.      Because it states so in the board minutes
20   there.
21       Q.      Do you know whether the reimbursement to
22   Specialty Surgery Center for epidural steroid
23   injections changed depending on how much Specialty
24   Surgery Center paid for the steroid itself?
25       A.      No.
```



1      Q.      No, you don't know or, no, it didn't
2   change?
3      A.      It didn't change.
4      Q.      Okay.  So however much Specialty Surgery
5   Center paid for the steroid itself, the reimbursement
6   from the insurance companies was always the same?
7      A.      Correct.
8      Q.      So if the amount that Specialty Surgery
9   Center paid for a steroid product were less, then
10  Specialty Surgery Center would be able to put more of
11  the reimbursement to its bottom line?
12     A.      I guess that's an assumption, yes.
13     Q.      Is that an accurate assumption?
14     A.      It would seem reasonable.
15     Q.      You disagree with that?
16     A.      Yes.
17     Q.      Why do you disagree?
18     A.      I don't disagree.  I think that's a
19  reasonable assumption.
20     Q.      Is it correct?
21     A.      It's correct.
22     Q.      Thank you.  I don't mean to quibble with
23  you.  We just got to make sure this record makes
24  sense.
25             MR. CHALOS:  We're probably at a good



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1       A.      I don't recall.

 2       Q.      What was said during that meeting, to the

 3  best of your recollection?

 4       A.      To the best of my recollection, they asked

 5  the -- they asked many questions regarding our

 6  procurement of medications from NECC.

 7       Q.      Do you recall any of the specific questions

 8  they asked you?

 9       A.      No.

10       Q.      Do you recall any of the answers that you

11  gave?

12       A.      No specific answers, no.

13       Q.      Was there anybody else there from Specialty

14  Surgery Center?

15       A.      Not that I recall.

16       Q.      Was Ms. Atkinson there?

17       A.      I believe they interviewed her separately.

18       Q.      Did you discuss with any of the patients

19  into whom you injected NECC's MPA that the MPA came

20  from a compounding pharmacy?

21       A.      No, I did not.

22       Q.      Did you tell any of the patients into whom

23  you injected NECC's MPA that the product had no

24  preservatives in it?

25       A.      No, I did not.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015          Page 128

1      Q.      Since this outbreak, have you ever used MPA

2   without preservatives?

3      A.      I don't believe MPA is available without

4   preservative at this point in time.

5      Q.      Have you -- since this outbreak, have you

6   ever used any steroid for epidural injections without

7   preservatives?

8      A.      No.

9      Q.      So the one and only time in your career

10   that you recall using a steroid for epidural

11   injections without preservatives was when you used the

12   MPA from NECC?

13      A.      Yes.

14      Q.      What role did you play in choosing to buy

15   steroids from NECC before injection into patients?

16      A.      I requested from Jean to search for

17   companies that might be able to provide

18   methylprednisolone acetate preservative-free.

19      Q.      Why did you do that?

20      A.      I was concerned with the long-term effects

21   of picolinium ac -- picolinium as causing the

22   potential problem of severe arachnoiditis in my

23   patients.

24      Q.      And what raised that concern with you?

25      A.      There had been multiple case reports of



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.      I believe there was a significant shortage

2   of MPA in the marketplace.

3      Q.      Why do you believe that?

4      A.      One of the major pharmaceutical companies

5   had cut down on its production.

6      Q.      Which one?

7      A.      I believe it was TEVA.

8      Q.      And how do you know that?

9      A.      I know it from discussions with my

10  attorneys.

11     Q.      When did you learn that?

12     A.      I learned of the shortage in 2012 because

13  we were having trouble obtaining the medication.

14     Q.      Who told you in 2012 that there was a

15  shortage of MPA?

16     A.      Diane Austin would do the majority of the

17  ordering at the facility.  And Diane, who is one of

18  our scrub techs, came to me and said, I'll order two

19  boxes of the methyl -- of the Depo-Medrol and I'll

20  only get one.

21     Q.      Was there ever a time in 2012 before this

22  outbreak that Specialty Surgery Center was unable to

23  obtain any MPA?

24     A.      I don't believe there was any time that we

25  were unable to obtain any MPA.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.      So the person who told you about a shortage

2   in 2012 was Diane Austin; is that right?

3      A.      Correct.

4      Q.      And did she tell you what steps she had

5   taken to try to locate sources for MPA?

6      A.      Usually she would refer that back to Jean.

7      Q.      So did you tell either Ms. Austin or

8   Ms. Atkinson that they should look for other sources

9   of MPA other than whoever was supplying at the time in

10  2012?

11     A.      No.

12     Q.      Who was the supplier of MPA for Specialty

13  Surgery Center prior to NECC?

14     A.      I believe it was Besse or CuraScript.

15     Q.      And when did you learn that?  Did you know

16  it at the time or did you learn that since then?

17     A.      I knew those names just off the top of my

18  head, but I don't know when I learned it.

19     Q.      And the steroid that Specialty Surgery

20  Center was using prior to buying from NECC was a

21  branded Pfizer product; is that right?

22     A.      I don't believe it was always a branded

23  Pfizer product.  It may have been a generic product at

24  times.

25     Q.      Was -- at any time before buying from NECC,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  did Specialty Surgery Center buy steroids for epidural

2  use that were made by compounders?

3       A.     While we had bought from compounders

4  before, I don't believe we had bought steroids.

5       Q.     At any time after the fungal infection

6  outbreak, did Specialty Surgery Center purchase

7  steroids for epidural injection that were made by a

8  compounder?

9       A.     No.

10      Q.     So the one and only time that Specialty

11 Surgery Center bought steroids for epidural injection

12 made by a compounder is when they bought from NECC?

13      A.     Correct.

14      Q.     When did you learn that Specialty Surgery

15 Center was considering purchasing MPA

16 preservative-free from NECC?

17      A.     It would have been early in July.

18      Q.     And from whom did you learn that?

19      A.     Jean Atkinson.

20      Q.     Atkinson.  Okay.  What did she tell you?

21      A.     Jean came to me and said, I have found a

22 source of Omnipaque in smaller vials.  And I said,

23 that's good.  We don't want to waste Omnipaque.  She

24 said, they also have preservative-free Depo-Medrol.

25 And I said, that's good too.  We can go with that



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1          Q.      Okay.  When you injected your patients with

2     NECC's MPA, did you know that that MPA was compounded

3     by NECC?

4          A.      No.

5          Q.      When did you learn that the MPA that you

6     injected into your patients was actually compounded by

7     NECC?

8          A.      After the meningitis outbreak.

9          Q.      Did you do any research into NECC prior to

10    Specialty Surgery Center purchasing MPA from NECC?

11         A.      No.

12         Q.      Did you rely on Ms. Atkinson to do that

13    research?

14         A.      Yes.

15         Q.      Did you rely on Calisher & Associates to do

16    research before they approved the purchase of MPA from

17    NECC?

18         A.      Yes.

19         Q.      What is arachnoiditis?

20         A.      Arachnoiditis is a severe chronic,

21    debilitating inflammation of the interior meninges

22    that causes bladder and bowel disturbance, severe gait

23    disturbance and chronic severe pain.

24         Q.      Have any of the patients that you injected

25    with NECC's MPA developed arachnoiditis?
```



```
 1        A.     Not as far as I know.
 2        Q.     Did -- prior to purchasing MPA from NECC,
 3   did you discuss -- prior to Specialty Surgery Center
 4   purchasing -- let me start over.
 5               Prior to NE -- start again.
 6               Prior to Specialty Surgery Center
 7   purchasing MPA from NECC, did you discuss with
 8   Ms. Atkinson or anyone else other options for sourcing
 9   the MPA at that time?
10        A.     At that point in time, no.
11        Q.     Do you know whether Ms. Atkinson considered
12   any other sources for the preservative-free MPA at
13   that time?
14        A.     I do not know.
15        Q.     Have you ever heard of the Pharmacy
16   Compounding Accreditation Board?
17        A.     No.
18        Q.     Sometimes abbreviated PK -- PCAB?
19        A.     No.
20        Q.     Have you ever -- prior to purchasing from
21   NECC, had you ever seen any information published by
22   the Food and Drug Administration about the dangers --
23   potential dangers of compounded drugs?
24        A.     No.
25        Q.     Had you seen in any media articles prior to
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015          Page 138

1    purchasing from NECC any discussion of the potential

2    dangers of compounded drugs?

3         A.    No.

4         Q.    Have you seen any medical literature prior

5    to purchasing from NECC regarding the potential

6    dangers of compounded drugs?

7         A.    No.

8         Q.    Have you had any discussions, either in

9    person, on the telephone or in writing or e-mail or

10   otherwise, with anyone affiliated with NECC?

11        A.    No.

12        Q.    Did you have any role in deciding how the

13   NECC compounded MPA would be stored at the Specialty

14   Surgery Center facility?

15        A.    No.

16        Q.    How were the vials of MPA from NECC stored

17   at the Specialty Surgery Center facility?

18        A.    They were stored at room temperature.

19        Q.    In what type of structure?

20        A.    In the medicine cabinet, pharmaceutical

21   cabinet.

22        Q.    Is there a sterile storage area at

23   Specialty Surgery Center or was there?

24        A.    A sterile storage area?

25        Q.    Yes, sir.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.      Was it in that -- was it in the first of
 2   the three conversations that you asked her to find out
 3   if NECC was licensed?
 4        A.      Yes.
 5        Q.      And what kind of a license were you
 6   thinking of when you asked her that?
 7        A.      I was thinking of a license to produce
 8   medications.
 9        Q.      Did you ask her to find out if NECC was
10   accredited?
11        A.      I asked her to find out if they were
12   licensed.
13        Q.      Not accredited?
14        A.      I don't know what accredited means.
15        Q.      Why was the fact of the license important
16   to you?
17        A.      A company that's not licensed would not be
18   a legal company and, therefore, it would not be a safe
19   company for my patients.
20        Q.      And did Ms. Atkinson have the green light
21   to order drugs from NECC after she found out whether
22   or not they were licensed?
23        A.      No, she did not have the green light.
24        Q.      Tell me everything you remember about the
25   first conversation you had with Ms. Atkinson.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF KENNETH R. LISTER, M.D. on 03/09/2015                    Page 191

1        A.      I asked her if they were licensed.  I asked

2   her if she had checked with the Calishers to see if

3   they considered it appropriate to buy from NECC.  I

4   asked her to -- I asked her to review their

5   literature.

6        Q.      Did Ms. Atkinson follow up and tell you

7   that she determined that NECC was licensed?

8        A.      Yes.

9        Q.      And did she show you a copy of the license?

10       A.      Yes, she did.

11       Q.      Did you ask her to do any other

12   investigation of NECC besides -- the literature -- I'm

13   sorry.  Withdraw.

14           Did you look at the literature that she

15   received from the NECC salesperson?

16       A.      No, I did not.

17       Q.      Did you ask if she -- if you could look at

18   it?

19       A.      No, I did not.

20       Q.      Do you know if any of the Calishers

21   reviewed the literature?

22       A.      I do not know.

23       Q.      Did you ask Ms. Atkinson to make sure the

24   literature goes to the Calishers so they could review

25   it?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    pursuant to prescriptions, were they?

2         A.    I'm not sure of your question.

3         Q.    I mean, did NECC have any patient

4    prescriptions or did they make any patient

5    prescriptions?

6         A.    Again, I'm not sure of your question.

7         Q.    Well, were you and SSC ordering

8    prescriptions from NECC?

9         A.    We were told that because NECC was licensed

10   as a pharmacy that they needed prescription names for

11   this order.

12        Q.    They didn't need actual prescriptions.

13   They just needed names; correct?

14        A.    Correct.

15        Q.    Was that a red flag at all to you?

16        A.    No, it was not.

17        Q.    Why not?

18        A.    I've been in medicine 38 years.  A lot of

19   things have changed in 38 years.  In 38 years we've

20   seen many, many, many changes and I thought this was

21   just another change in medicine.

22        Q.    Are you aware of any other instance where

23   SSC had to give patient names to order medications?

24        A.    I'm not aware of any.

25        Q.    Did you personally review the Tennessee



1    how much time one took and how soon the next one could

2    be -- I'm sorry, let me withdraw the question.

3              If you had a busy day at SSC, how many

4    steroid injections would you do in a busy day?

5        A.     Generally the maximum number would be 14.

6        Q.     And were they scheduled a half hour apart?

7        A.     Correct.

8        Q.     Was there a reason for that?

9        A.     That's my time schedule.

10       Q.     And why did -- why do you allot 30 minutes

11   for an ESI?

12       A.     That's because it's my comfortable time

13   schedule.

14       Q.     How long does it take to tell if a steroid

15   injection is effective on the patient?

16       A.     Typically one to two weeks.

17       Q.     Do you have a practice for how often you

18   schedule steroid injections?  For example, if someone

19   needs a second one, do they typically wait a certain

20   amount of time before they get the second one?

21       A.     Yes, they do.

22       Q.     And what is that time period?

23       A.     Anywhere from three weeks to two and a half

24   months.

25       Q.     Do they come in to see you in the office

