UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Master Dkt. 1:13-md-02419-RWZ |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE
TO CERTAIN PLAINTIFFS' MOTIONS TO COMPEL
<u>TORT TRUST DISTRIBUTIONS [ECF NOS. 3019, 3020, 3025]</u>** [1]

No one is more concerned about getting money into the victims' hands than the PSC and Lead Counsel. The PSC, Lead Counsel, and others have worked every day – for many months now – with the Settlement Administrator, the Tort Trustee, and various plaintiffs' constituencies to try to overcome the many speed bumps inherent in the Chapter 11 Plan (and, frankly, in all tort settlements). This includes addressing both public and private liens. We empathize with the frustration voiced by some claimants. But the relief the motions seek – apart from being based on a less-than-full statement of the facts, and ungrounded in the law – would have the counterproductive effect of delaying for many months the distribution of funds to most if not all claimants.

The good news is that, with the exception of things that we cannot control (*e.g.*, the speed with which the DOJ approves the agreement which resolves Medicare's claims and the speed at which some state Medicaid agencies respond to the request for lien data), many claimants will soon receive their initial payments, and others will follow shortly thereafter.

---

[1] *See* Virginia Claimants' Motion to Compel (ECF No. 3019); Tennessee Claimants' Motion to Compel (ECF No. 3020); Indiana/Michigan Claimants' Motion to Compel (ECF No. 3025).

A.     **Overview of Payment and Lien Resolution Efforts**

There are three levels of potential health care liens that the Tort Trustee must address in order to proceed with distribution: Medicare, Medicaid and private payer claims.

*Medicare.* Under the Medicare Secondary Payer Act and the operative provisions of the approved plan in the NECC bankruptcy case, before making payment to *any* claimant, the Tort Trustee must resolve the potential for exposure from CMS for paying over funds without first resolving any potential claim for Medicare payments paid on behalf of a claimant. A potential resolution has been reached, and approval is pending from the DOJ. To expedite matters, the proposed agreement has been submitted to this Court before the government's final agreement of it.

One disturbing thing has come to the attention of the PSC and Lead Counsel. Apparently CMS and DOJ take the position that while the Agreement is in the process of approval, CMS will not process on an individual basis the lien of any person who, for whatever reason, decides that they do not wish to participate in the proposed Agreement with CMS.[2] That agreement does provide for opt outs in any event, and a "hold" of individual requests is not (and never has been) a part of the agreement between CMS and the Tort Trustee, and so we do not know the basis for CMS's refusal to process individual claims in the meanwhile. While the Tort Trustee, Lead Counsel, and this Court may have a power of persuasion to have this "hold" lifted, it is not clear to us that this is the venue by which CMS may be compelled to lift that hold. The PSC (along with plaintiffs' lawyers from Virginia, Tennessee, and Michigan) have told CMS that the victims' right to opt out of the mass resolution is critical, and that CMS's delaying the approval of the settlement agreement while simultaneously refusing to provide information to victims is

---

[2] Presumably advice to claimants about whether to opt out, or not, from the proposed Agreement is based on the assumption that the deal will be accepted as written.

manifestly unjust to those individuals who have already decided to opt out and seek to resolve CMS's claim individually.[3]   Lead Counsel has told CMS that CMS should process claims for those who seek their individual lien information.  No aspect of the proposed Agreement with CMS should hold up a victim's ability to go forward with resolving Medicare's claims

*Medicaid.*  As to Medicaid liens, the PSC and the Tort Trustee retained the Garretson Resolution Group to identify and resolve potential liens as efficiently as possible.  All 50 state Medicaid agencies received the data they needed to identify potential Medicaid liens months ago.  By pulling every string conceivable, we managed to expedite responses back from several key states (including Virginia, Michigan, and Tennessee).  All told, twenty states have responded to date.  We expect additional responses from Indiana, Minnesota, Florida, Ohio, and others before the end of August.  As this data comes in, more claimants will be notified that their payment is available upon return of the certification to the Tort Trustee.

*Private liens*.  As for private liens, the PSC and others have been in ongoing negotiations with large insurers covering lives in states with a number of victims.  We have reached an agreement in principle with a group of insurers (but not all insurers) that is tied to the resolution with CMS.  Once more of the Medicaid data is received, and once CMS has executed the agreement, the claims administrator will send letters to those individuals with Medicare, Medicaid, and private liens of which the Tort Trustee is aware.  The claims administrator will provide instructions on how they can either resolve some of those liens on a global basis (assuming approval of the CMS agreement by DOJ) or handle the liens on their own in order to receive their initial payments from the Tort Trust.[4]

---

[3] See Letter from Thomas Sobol, Lead Counsel for the PSC, to CMS and DOJ dated August 9, 2016 attached hereto as Exhibit A.

[4] The importance of collecting and considering all data prior to sending these letter s and making a subsequent distributions is well illustrated by the example identified in the pleading filed by William Leader, counsel for

3

*Initial payments in August as planned.*  In order to proceed with payments in August for the largest subgroup possible of the 1199 currently approved claims, we have identified the following group of claimants that meet all of the three criteria below.  First, we have identified those of the 1199 who are not defined as "Medicare eligible" in the Agreement; while payment to these "non-Medicare eligible" persons presents some remote risk (given the pendency of formal approval from the DOJ), on balance it seems this remote risk, as compared to the need to distribute funds, makes total sense under the circumstances.[5]  Second, we will include those claimants living in one of the 20 or so states from which we have received Medicaid data (so long as the claimant is not on the Medicaid list).  Third, we will include all claimants for whom the Tort Trustee has not received notice of a lien from a private insurer.  The claims administrator is sending out letters to this subset of the 1199 today.  The notices are attached as Exhibit B.  Upon receipt of the executed certification, the Tort Trustee will issue the check for the initial payment.  If certifications are returned promptly, distributions will occur in August (or as soon thereafter as the certifications are received).  (We acknowledge, however, that most claims remain tied up with the CMS deal, and thus all the more reason to wish that to be wrapped up immediately).

---

various victims in Tennessee. [Dkt. No. 3020].  Mr. Leader indicates he has a client with a single lien from single insurer and that he has obtained a written payoff amount from that insurer (Blue Cross Blue Shield of Tennessee) and a certification from the state Medicaid agency that they have no claim against his client's recovery.  He complains that even though he provided this information to the Tort Trustee she has not issued payment to his client. [Dkt. No. 3020 at 6-7].  However the Tort Trustee has received data from another health insurer indicating it provided medical coverage to Mr. Leader's client during the relevant time period and asserting a lien over his client's recovery.  The Tort Trustee has recently notified attorney Leader of this information.

[5] Two aspects of the agreement with CMS give rise to risk in making payments prior to approval of the agreement with CMS.  First, the agreement provides that CMS will not pursue claims for those victims who became Medicare eligible after May 31, 2013 – nine months after the initial outbreak.  There is some risk that if the agreement is not approved, CMS might seek reimbursement for medical costs associated with the treatment of victims who became eligible for Medicare after May 31, 2013.  Second, if the agreement is approved, CMS will waive any claim against victims in injury Category VII – who by definition have had no diagnostic medical procedures resulting from their exposure to a NECC product.  If the CMS agreement is not approved, there is some chance CMS may assert a claim against these individuals for whatever related medical services they did receive short of diagnostic tests – presumably one or more doctor's visits.

The claims administrator and the Tort Trustee expect rolling distributions thereafter, particularly once the DOJ formalizes its approval to the proposed Agreement.

**B.      Response to Motions to Compel Distributions**

The PSC understands that lawyers have clients, and that those clients are frustrated. We have clients too. We also understand that lawyers want to tell their clients that they are doing everything they can to move the process along. Being able to tell them that you have filed a "motion to compel distributions" may appease some clients. But it doesn't actually speed up the process of getting victims paid.

The Tort Trustee's ability to distribute funds to claimants is governed by the terms of the court-approved Chapter 11 Plan, which in turn is governed by applicable federal and state laws. Federal law requires that Medicare claims on tort settlements be adequately addressed, or else those distributing funds to tort victims (*e.g.*, the Tort Trustee) may be held liable for multiple damages. Some state Medicaid statutes have similar requirements and attendant liability. The plan, therefore, required that the Tort Trustee try to resolve Medicare's claims for reimbursement on a global basis. And, failing that, to otherwise ensure that Medicare's claims are resolved before distribution of funds to victims. Similarly, the plan requires that the Tort Trustee comply with applicable state Medicaid reporting requirements before distribution. The Tort Trustee, with the PSC and other plaintiffs' attorneys' assistance, has undertaken to satisfy these obligations promptly and efficiently.

Requiring certifications by claimants imposes no significant burden and only serves to protect victims' interests. First, the certification only requires a statement that either there are no other health care cost reimbursement claims (beyond those known to the Tort Trustee) or that any other liens will be addressed – which the law requires claimants and/or their attorneys to do anyway. Second, the certifications serve to ensure that the Tort Trustee has complied with the

relevant laws and the terms of the trust.[6]  This is in tort victims' interests, in that if the Tort Trustee is somehow held liable for failing to comply with laws or the Plan, the Tort Trustee is entitled to be indemnified by the Tort Trust for all expenses, costs, attorneys' fees, judgments, and settlements incurred.  In the worst case scenario, this means funds that would otherwise go to victims would instead be used to satisfy a judgment against the Tort Trustee.

There is no indication that the movants are entitled to the relief they seek.  First, the Tort Trustee is addressing the issue well within her mandate, and there is no indication that she has abused her wide discretion.  Second, terminating the negotiations (but really finalization) with CMS means that *all* claimants have to individually negotiate Medicare claims and private liens, not just those who want to proceed on an individual basis, which will delay distribution to *all* claimants.by many months.  Again, the agreement with CMS provides for opt outs and the PSC has consistently taken the position that CMS should not delay addressing those claims.

The PSC, Lead Counsel, the Tort Trustee, and other plaintiffs' attorneys (including some from Virginia, Michigan, and Tennessee) have acted with all dispatch to ensure that the payment process moves along as quickly as possible while still complying with the governing terms and laws.  We are aware of nothing that can be done to speed up distributions, other than DOJ approving the CMS deal, the remainder of state Medicaid agencies responding, and claimants and/or their attorneys returning their certifications to the Tort Trustee quickly.  None of which is within the PSC's or the Tort Trustee's control.

Dated:  August 12, 2016                                                   Respectfully submitted,

                                                               **/s/ Kristen A. Johnson**
                                                               Thomas M. Sobol (BBO# 471770)

---

[6] The certification also covers known payments for medical care by Medicare Part C plans, because the Tort Trustee may also face potential liability exposure for unresolved claims for health care cost reimbursement from these plans.

Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA 02116
Telephone: (617) 933-1265
kdougherty@myadvocates.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS PLLC
227 Second Avenue North
Nashville, TN 37201

7

Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*

**CERTIFICATE OF SERVICE**

I, Kristen A. Johnson, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: August 12, 2016            **/s/ Kristen A. Johnson**
                                   Kristen A. Johnson, BBO # 667261