UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


IN RE:  NEW ENGLAND COMPOUNDING     )   MDL NO. 13-02419-RWZ
PHARMACY CASES LITIGATION           )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )


BEFORE:          THE HONORABLE JENNIFER C. BOAL



**STATUS CONFERENCE**




John Joseph Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, MA 02210


June 22, 2016
11:35 a.m.



Catherine A. Handel, RPR-CM, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 5205
Boston, MA 02210
E-mail: hhcatherine2@yahoo.com

APPEARANCES:

For The Plaintiffs:


    Hagens, Berman, Sobol, Shapiro LLP, by KRISTEN JOHNSON, ESQ., 55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts 02142;


    Branstetter, Stranch & Jennings, PLLC, by J. GERARD STRANCH, IV, ESQ., 227 Second Avenue North, Nashville, Tennessee 37201-1631;


    Dingeman & Dancer, PLC, by ASHLEY WILSON, ESQ., (appearing telephonically), 100 Park Street, Traverse City, Michigan 49684;



FOR THE DEFENDANTS:


    Gideon, Cooper & Essary, PLC, by CHRIS J. TARDIO, ESQ., and MATTHEW H. CLINE, ESQ., 315 Deaderick Street, Suite 1100, Nashville, Tennessee 37238;


    Brewer, Krause, Brooks, Chastain & Burrow, PLLC, by KENT E. KRAUSE, ESQ., (appearing telephonically), 611 Commerce Street, Suite 2600, Nashville, Tennessee 37203;


    Arnett, Draper & Hagood LLP, by RACHEL PARK HURT, ESQ., and PAUL WEHMEIER, ESQ., (appearing telephonically), 800 South Gay Street, Suite 2300, Knoxville, Tennessee 37901.

```
 1                   P R O C E E D I N G S

 2          (The following proceedings were held in open court before

 3   the Honorable Jennifer C. Boal, Magistrate Judge, United States

 4   District Court, District of Massachusetts, at the John J. Moakley

 5   United States Courthouse, One Courthouse Way, Boston,

 6   Massachusetts, on June 22, 2016.)

 7          COURTROOM DEPUTY CLERK YORK:  Will counsel in the

 8   courtroom please identify themselves for the record.

 9          MS. JOHNSON:  Good morning, your Honor.  Kirsten

10   Johnson for the plaintiffs.

11          MR. STRANCH:  Good morning, your Honor.  Gerard

12   Stranch for the PSC.

13          MR. TARDIO:  Chris Tardio and Matt Cline for the

14   Specialty Surgery Center defendants.

15          MR. KRAUSE:  Kent Krause on behalf of the Specialty

16   Surgery Center and Dr. Lister.

17          THE COURT:  Good morning, everyone.  And I think we

18   have some folks on the phone as well.

19          UNIDENTIFIED SPEAKER:  Yes, your Honor.  Good

20   morning.

21          COURTROOM DEPUTY CLERK YORK:  Please identify

22   yourself for the record.

23          MS. HURT:  Rachel Hurt and Paul Wehmeier from my

24   office.

25          COURTROOM DEPUTY CLERK YORK:  And, Ms. Wilson, can
```

 1    you please identify yourself for the record.

 2              (No response.)

 3              COURTROOM DEPUTY YORK:  Hello?

 4              MS. WILSON:  Ashley Wilson from Mark Dancer's office,

 5    your Honor.  I'm sorry, I thought I was on mute.

 6              THE COURT:  Good afternoon, everyone.

 7              So, we have dueling motions.  I'll hear from the

 8    plaintiffs first.

 9              MR. STRANCH:  Thank you, your Honor.  Gerard Stranch

10    on behalf of the Plaintiffs' Steering Committee.

11              THE COURT:  I think you actually have to move the

12    microphone even closer.

13              MR. STRANCH:  Even closer.  Normally I'm a little too

14    loud as opposed to a little too quiet.  So, I apologize.

15              Your Honor, this all surrounds, as we laid out in the

16    papers, the computers that were sold by Specialty Surgery to

17    Cumberland Medical Center.

18              The Court has already ruled on multiple discovery

19    motions in this case compelling certain things to be produced.

20    I'm not going to get into that whole background.  I'm sure the

21    Court is painfully aware of everything that's gone on to this

22    point.

23              And so, what this comes down to is we have agreed

24    with Cumberland Medical Center that we're going to have a

25    third party search the hard drives on these computers and

1    produce the documents to us.  We agreed on a protocol.  We

2    agreed on a review procedure with Cumberland Medical.  There

3    is no dispute that these computers belong to Cumberland

4    Medical Center.

5         And so, what's happened is the Specialty Surgery

6    defendants have filed an objection asking that they be allowed

7    to do a privilege review before we receive the documents as

8    well.

9         THE COURT:  And my understanding under the PSC's

10   proposal -- or the joint proposal with Cumberland is that

11   Cumberland would have the ability to do a screening of the

12   materials before they're turned over to the PSC.

13        MR. STRANCH:  That is correct.

14        And so, there's really three things and it's kind of

15   a cascading thing.  So, the first issue that the Court would

16   need to address has not really been briefed by the defendants,

17   which is, is Cumberland Medical Center a successor to

18   Specialty Surgery.  If Cumberland Medical is a successor -- a

19   legal successor to Specialty Surgery, then there is no need to

20   go any further and Specialty Surgery gets the right to do the

21   privilege review.  We've laid that out.

22        Neither Cumberland Medical Center or Specialty

23   Surgery has taken a position on that.  We've asked multiple

24   times.  We believe they may be the successor, but they refuse

25   to say yes or no.  So, unless they want to take a position on

1    that here today, then we'll need to move on to the second

2    issue and leave that decision for later briefing.

3          THE COURT:  I'm sorry.  So, you're saying because we

4    have the stock -- I think it's the stock purchase agreement,

5    and you're correct that at least -- I don't know Tennessee law

6    as well, but under Massachusetts law, it may well have been

7    construed that Cumberland was a successor to Specialty

8    Surgery.

9          MR. STRANCH:  That is correct.  And that is what we

10   believe, and we'll brief that later at the appropriate time if

11   they're not willing to concede or agree to that today.

12         THE COURT:  And then you're saying -- I may have

13   misheard you.  If Cumberland is a successor, you're saying

14   that Specialty Surgery would have the right or would not have

15   the right?

16         MR. STRANCH:  They would have the right.

17         THE COURT:  Would have the right, okay.

18         MR. STRANCH:  In all candor, that would end the

19   negotiation and they would have the right, but they would need

20   to stand up and say that, yes, they are the successor.

21         MS. HURT:  Your Honor, this is Rachel Hurt on behalf

22   of Cumberland Medical Center.

23         THE COURT:  So, Ms. Hurt, what I would ask you to do

24   is just wait.  I will certainly give you the opportunity to

25   speak, but I'll hear from the plaintiffs and SSC and then I

1    will ask for your input at that time.

2         MR. STRANCH:  Your Honor, so the next step that the

3    Court would need to look at is whether there has been a

4    voluntary waiver by selling the computers and the materials to

5    Cumberland Medical Center.

6         So, if we go back to Black Letter Law from law

7    school, where we talk about attorney/client privilege, you'll

8    recall that one of the big things you can't do is share it

9    with third parties not within the attorney/client

10   relationship.  We've read all those cases from law school

11   about a lawyer talking with their client on the bus and

12   waiving the privilege as a result of that, or in a restaurant

13   because other people were able to hear it.

14        So, the question here is:  By selling those computers

15   in fee simple without any rights reserved or withheld, did

16   Specialty Surgery waive the attorney/client privilege?  We

17   believe they did.  The *Stokesbury* and the *Solis* cases are

18   directly on point.  They involve a sale of a computer or

19   computers to a third party that was not involved in the

20   litigation, and that third party, by virtue of receiving it,

21   the courts both times found that there was a complete and

22   unequivocal waiver of the attorney/client and other privileges

23   as a result because it went outside the attorney/client

24   relationship.

25        And in this case it was a fee simple sale.  It was

1    bargained for, subject to much negotiations.  Cumberland

2    Medical Center continued to operate the clinic after this --

3    after the sale.  They needed access to the data on those

4    computers.  They put some of the computers into use and

5    accessed and used them.  And so, it is clear that there has

6    been an absolute and complete waiver of any privilege as a

7    result of that transfer, a voluntary waiver.

8          This was not an inadvertent waiver.  This was not a

9    we didn't realize what we were doing.  These were the only

10   computers in the place.  These were the computers that the

11   emails were contained upon and other documents related to.

12   There was no effort to wipe the computers before the sale.

13   There was no effort to delete any attorney/client privileged

14   information on there.  It was just handed over.

15         THE COURT:  Now, I think the SSC folks would say that

16   it was all password protected.  So, why doesn't that change

17   the calculus?

18         MR. STRANCH:  Well, it doesn't matter for the

19   voluntary waiver because it's given to a third party, but,

20   your Honor, even if they say it's password protected, what

21   they don't say in any of their declarations that were filed

22   last night is that they didn't provide the passwords to

23   Cumberland Medical, because we know those computers were put

24   into service at Cumberland Medical.  They've acknowledged

25   that.

1          And, furthermore, we all know a simple password on a

2     computer with an administrator log-in, you can reset that

3     password and start using and access all the data.  There's no

4     mention of encryption to prevent that from occurring.  There's

5     no mention of any other steps that were taken, but that's

6     really on the inadvertent disclosure side if you find there

7     was no voluntary waiver.

8          We believe that it is very clear that there was a

9     voluntary waiver, and in support of that, CMC has stated that

10    in their review of the computers, they have found some

11    documents that, arguably, could be attorney/client privileged,

12    which means whatever protections they put in place were

13    insufficient to stop a lawyer from being able to access them

14    and see what's there.  So, that privilege has clearly and

15    unequivocally been raised, as is mentioned in the *Stokesbury*

16    and the *Solis* cases.

17         We also within our brief cite to numerous other court

18    cases across the country under similar circumstances where it

19    was found to be a complete voluntary waiver.

20         The defendants push to the Court a concept of

21    inadvertent disclosure, claiming that it was inadvertent.

22    First of all, inadvertent disclosure as a rule applies to when

23    an attorney accidentally turns over something.  For example,

24    you grab a stack of documents to produce in discovery and you

25    accidentally grab one that was attorney/client privileged, you

know, or you accidentally attach the wrong document when

you're sending an email to opposing counsel.  That's what

inadvertent disclosure is intended to encompass, not an

intentional bargained-for sale that took place over a number

of years of bargaining and ceases between bargaining, then

bargaining again and a sale.  That is not an inadvertent

disclosure.  That is a client making a calculated decision to

sell all their product, including their attorney/client

privileged documents, to a third party.

But even if we go into the inadvertent disclosures,

what we see here is the only thing that they attach any

significance to -- and this is, again, their burden to prove

it wasn't a voluntary disclosure.  It wasn't an inadvertent

disclosure, their burden.  The only thing they point to is

this idea that there were passwords on the computers.

Well, we all have log-ins that you have to have to

access your computer.  That is not a great protection.

There's no encryption that they used, and they don't deny that

they provided the passwords to CMC, and if they didn't provide

the passwords to CMC, they should have said that, because it's

their burden to carry to prove that they didn't inadvertently

disclose.

But if we think about this from a logical point of

view, your Honor, why would CMC bargain for and buy a computer

that they wouldn't be allowed to use because a password is on

1  it?  That would be wasted money.  They bought it because they

2  intended to use it and because they needed the historical

3  records on there if certain issues arose.

4          It was important to Cumberland Medical Center to have

5  that, to have the continuity of care for the client -- for the

6  patients that they were viewing and also the historical

7  knowledge about what happened prior to their purchase.

8          So, there can be no inadvertent disclosure under --

9  there can be no inadvertent disclosure under these facts.  You

10  know, we know that they can access the documents now and have

11  seen that there are certain emails that could arguably be said

12  to be attorney/client privileged.  And so, because of that,

13  they clearly have not taken the steps to stop it.

14          And, finally, your Honor, if you look at the timeline

15  here, this subpoena was served in January.  This sale took

16  place three years ago.  This is not something that arose at

17  the spur of the moment and people suddenly realized what

18  happened.  This is well-known.

19          And I do want to be clear, because there seems to be

20  some confusion that the claim is that the Gideon firm did

21  something wrong that caused the waiver here.  This was not the

22  Gideon firm.  That was Specialty Surgery, the client, making

23  the decision to waive the privilege by selling it and not

24  protecting it during the sale process.  That was the client's

25  decision, not the lawyer's decision, and the client can and

1    has waived the privilege here.

2            If the Court has any questions, I'm happy to address

3    them.

4            THE COURT:  So, I had a question about the Tennessee

5    peer review privilege.  So, the language in the *Powell* case

6    from the Tennessee Supreme Court seems quite strong that at

7    least that court, an authority on Tennessee law, concluded

8    that the proper course was to defer to the general assembly as

9    the author of the peer review privilege to determine if and

10   under what circumstances the privilege may be waived.  So, why

11   should I as a district court in Massachusetts disturb that

12   decision by the Tennessee Supreme Court?  Or you think I don't

13   have to?

14           MR. STRANCH:  I don't think you have to.  I mean, the

15   conceptual idea that's being pushed on the Court is that there

16   can be no waiver.  We know that's not true.  I can have a

17   document that's peer review privileged clearly and I can take

18   out a billboard and put it on it for the whole world to see

19   because I want to brag about how hard we're working to make

20   patient safety better.  That's a clear waiver.  Everyone can

21   see it, you know.

22           So, the question that the Court has to approach here

23   is --

24           THE COURT:  But that's different than a court finding

25   a waiver.

1          MR. STRANCH:  Well, you know -- and what we would say

2   is by giving the documents to third parties when they knew

3   that they would be potentially subject to discovery, they have

4   already waived it, and they're now attempting to retroactively

5   assert.  We think that that is inappropriate.  We think that

6   that does not meet the standards of *Powell* because it's a

7   different fact pattern.

8          And the key here, your Honor, is this is a true third

9   party.  This isn't giving it to a related party.  This was an

10  adversarial business that they were in competition with who

11  bought them out, and they have their own peer review

12  committee.  They have their own methodology of handling these

13  documents.  They have their own system that they followed for

14  protecting patient safety that is separate and distinct from

15  Specialty Surgery's.  And so, Cumberland Medical Center no

16  longer -- has no interest in protecting what Specialty Surgery

17  did.

18          And, additionally, your Honor, the thing that's kind

19  of been forgotten here is the defendants have taken the

20  position throughout that Specialty Surgery no longer exists,

21  that they've dissolved it.  So, how can Specialty Surgery

22  assert its privilege if it doesn't exist?

23          THE COURT:  All right.  Thank you.

24          Who is going to speak on behalf of the defendants?

25          MR. TARDIO:  Good morning, your Honor.  Chris Tardio

1    for the SSC defendants.  Let me start by addressing a few

2    points that were raised in Mr. Stranch's argument.

3            And the Court asked, I think at the beginning of the

4    discussion, whether Cumberland Medical Center under the

5    protocol in place would be able to review the documents for

6    privilege before producing them to the plaintiff, and that is

7    true under the joint proposal, but I want to make clear that

8    the joint proposal doesn't include -- they would not be

9    reviewing them --

10           THE COURT:  For you?

11           MR. TARDIO:  Exactly, or for a privilege that we

12   hold.  So, it would not catch any of the documents that we're

13   really concerned about.

14           I think in the discussions so far, we've either

15   intentionally or unintentionally conflated the three separate

16   privileges that we are talking about.  Attorney/client --

17           THE COURT:  I'm clear it's three separate ones and

18   that there are separate standards for waiver.

19           MR. TARDIO:  Attorney/client, I candidly agree, is a

20   close call.  I think --

21           THE COURT:  I'm sorry, what?

22           MR. TARDIO:  It's a close call on whether we waived

23   attorney/client --

24           THE COURT:  Attorney/client, okay.

25           MR. TARDIO:  I do think that under 502(b), the

1    elements of inadvertent disclosure have been met, and if you

2    look at the caselaw and the movement with 502(b) and the

3    caselaw that kind of was the precursor to 502(b), there's been

4    a movement toward -- or, really, a movement away from the idea

5    that once it's disclosed to a third party, that's an automatic

6    waiver, no matter the circumstances.

7            THE COURT:  So, Mr. Tardio, what I don't understand

8    is why were these computers sold to Cumberland Medical?

9            MR. TARDIO:  Well, as part of the asset sale,

10   because --

11           THE COURT:  Right.  But were they selling them in

12   terms of the hardware or the software?  It's a little bit

13   confusing to me.

14           MR. TARDIO:  My understanding is that they were sold

15   -- the hardware was sold because once they were put into use

16   -- and maybe counsel for Cumberland can shed some light on

17   this, but once -- there are seven computers at issue.  My

18   understanding is that four remain in storage and have not been

19   touched until this process started.  Three of them were put

20   into use at Cumberland Medical Center, but were re-imaged or

21   wiped before being put into use, and that is my understanding.

22   So, that would indicate to me that the sale was for the

23   hardware, not for the software, because Cumberland Medical

24   Center uses their own medical records, EMR system.

25           To answer your question, I believe it was because the

| | |
|---|---|
| 1 | hardware is sold as part of the assets, but with -- |
| 2 | THE COURT:  But then, you know, with the argument |
| 3 | that you've made about password protected, it did seem from |
| 4 | the materials that -- I guess it's Cumberland Medical was able |
| 5 | to image the -- I guess it's a subset of the computer and to |
| 6 | run searches on them. |
| 7 | MR. TARDIO:  I agree.  I understand that, and that |
| 8 | gets to maybe even a more granular analysis.  What can we -- |
| 9 | THE COURT:  And I am no computer expert, but that |
| 10 | sounded to me like the password didn't really serve its |
| 11 | purpose. |
| 12 | MR. TARDIO:  Well, I don't think it would ever serve |
| 13 | its purpose in this setting to forever protect the data of the |
| 14 | -- think about it this way.  We all have computers in our |
| 15 | office that are password protected.  If I walk into Mr. |
| 16 | Krause's office and I take his computer, it's still password |
| 17 | protected, but if I take the hard drive out of it and hire a |
| 18 | third-party vendor, they're going to be able to access the |
| 19 | data.  It's not -- the password is there.  It's not -- I'm not |
| 20 | arguing that the password would forever protect the data from |
| 21 | being accessed. |
| 22 | We've all heard about the phone with the terrorists |
| 23 | and the criminals in California and Apple.  Those phones, I'm |
| 24 | sure, were password protected, but people were still able to |
| 25 | access the data, but I think the reason the password is |

1    important is because one of the elements or factors for

2    determining whether it was an inadvertent waiver is -- or

3    inadvertent disclosure is the reasonableness of the actions

4    taken on the front end to protect the data or protect the

5    privileged communications, and I think by placing a password

6    on the computer and on the account, basically, the email

7    account --

8        THE COURT:  But if I understand correctly, the data

9    that was on these computers was searched, perhaps by your law

10   firm, to pull out material that you felt was relevant for

11   these lawsuits, but nothing else was done -- and, again, I'm

12   not being critical of anyone here, this is where we are -- to

13   otherwise remove any privilege or protected material.

14       MR. TARDIO:  I'm not sure if I understand the Court's

15   question, but what I can tell the Court is that in April of

16   2013, before the asset sale happened -- and, again, as Mr.

17   Stranch referenced, we weren't involved in negotiating the

18   sale or drafting the documents for anything like that, but

19   before the asset sale happened, we went and captured the data,

20   knowing that it may be lost forever and knowing what our

21   preservation obligations are.  So, that's the data we've been

22   searching.  We haven't gone and searched these computers each

23   and every time we had to respond to discovery.  We searched

24   the data -- or the drives that we imaged -- or the accounts

25   that we imaged in 2013.

1          So, we've talked about attorney/client privilege, and

2     I think based on the unrebutted affidavits we've submitted, it

3     was an inadvertent disclosure under 502(b).  The factors, we

4     believe, weigh in favor of finding an inadvertent disclosure.

5          And the last factor, although it's not mentioned in

6     the text of the rule, it's mentioned in all the caselaw, is

7     whether the overriding interest of justice would or would not

8     be served by relieving the party of its error.

9          And I would ask the Court rhetorically, what

10    purpose -- what policy purpose is served in this case by

11    destroying a sacred privilege where some, frankly,

12    unsophisticated business people sold their assets.  We are

13    going to destroy the attorney/client privilege when on the

14    Friday when these communications were sent with the

15    expectation of confidentiality, and we're going to punish the

16    client with a severe -- a severe sanction, or whatever you

17    want to call it, a severe finding, and I would think,

18    respectfully, that the interests of justice weigh in favor of

19    preserving the privilege and finding that this was an

20    inadvertent disclosure when all the factors are assessed and

21    the affidavit testimony is considered.

22          Now, respectfully, I don't think that work product is

23    a close call.  That has not been waived.  All of the caselaw

24    that I have looked at in preparing for this hearing, both from

25    the District of Massachusetts and beyond, is clear that

1  attorney work product protection is not waived nearly as

2  easily as attorney/client privilege.  It is waived only when

3  the material is disclosed to an adversary or disclosed in a

4  way that it would be expected to get to an adversary.  Here,

5  that did not happen.  Some of the language that I've seen is,

6  "disclosed to an adversary or a conduit to an adversary."

7          THE COURT:  Or inconsistent with keeping it from an

8  adversary.

9          MR. TARDIO:  Exactly.  This was -- if we assumed that

10 this was an intentional disclosure of attorney work product to

11 Cumberland Medical Center, it was not done to an adversary or

12 with the expectation that it would end up via subpoena power

13 three years later in this case's adversary's hands.  So, I

14 don't believe that, frankly, it's even a close call that work

15 product protection has been waived.

16         The third separate privilege -- separate analysis is

17 the quality improvement privilege.  I think the Court picked

18 up on the fairly plain language of the *Powell* case that says

19 you can't waive it.  The policy that the legislature has set

20 out in this statute and underlying the protection is so

21 important and so powerful, that we're not going to let it be

22 waived with a judicial determination that it's been waived.

23         THE COURT:  But at some point it starts to become a

24 little bit ridiculous.  I certainly respect what the Tennessee

25 Supreme Court said here and, you know, they found it to be

1    appropriate in that case, but at some point -- and they did

2    acknowledge it could enable some parties to engage in

3    strategic behavior.  I don't think that's what went on here,

4    but at some point it can become silly.

5         MR. TARDIO:  I agree, but I don't think we're

6    anywhere near that point.  If quality improvement information

7    was used as a sword, so to speak, or to benefit the party and

8    then the privilege was asserted in such a way that the

9    opposite party couldn't challenge that sword, then that would

10   be an inappropriate use and that may be an instance where

11   waiver could be found or if there were truly an explicit

12   intentional waiver of the privilege, that may be an instance

13   where even the *Powell* court would say, okay, this is silly.

14   They explicitly intentionally waived it.  That's not what

15   happened here.  It's not.

16        The plaintiffs are asking the Court to make a finding

17   that all these privileges have been implicitly waived by the

18   act of selling the computer.  There has been no offensive use

19   of this information.  There has been no explicit intentional

20   waiver where we have represented for our client or our client

21   represented on its own that we affirmatively waive the

22   privilege.  The plaintiffs are asking the Court to find that

23   it's been implicitly waived by this voluntary sale of the

24   computers.  So, I understand the Court's point about *Powell*.

25   I don't think we're anywhere near the silly stage, so to speak.

```
1          THE COURT:  So -- and this had been discussed
2    earlier.  There would be an easier road for you all if you had
3    argued that Cumberland -- potentially easier road for
4    Cumberland becoming a successor to Specialty Surgery, but am I
5    to understand you're not making that argument for purposes of
6    this motion?
7          MR. TARDIO:  For purposes of this motion, we haven't
8    made that argument.  I have not even analyzed that, and I
9    suspect that Cumberland Medical Center will likely not
10   voluntarily become our successor in interest or concede that
11   point, but I'll let them address that.
12         Let me make one last point.  The *Solis* or *Solis*
13   case -- I think it's important for the Court to look at the
14   *Solis* case, because what the Court actually did in *Solis* or
15   *Solis*, however it's pronounced, is put in place a protocol or
16   a process like we've proposed which is to allow the party
17   asserting the privilege to review the material before it ends
18   up in the opposite party's hands and to lay out in a privilege
19   log any documents that they are withholding on grounds of the
20   privilege.
21         So, the *Solis* court did do what we're asking the
22   Court to do, and if you read the *Solis* opinion, the order from
23   the Court, it finds, as I read it, first, that the waiver
24   happened because the privilege log was insufficient or
25   inappropriate after multiple chances.  These lawyers and this
```

```
1    party got to do a privilege log.  Then the Court says -- and
2    we haven't heard anything from the party that says it hasn't
3    been waived by the sale.  So, I don't know that the Solis case
4    doesn't cut both ways.  In fact, it does cut both ways.
5          So, we would propose that the Court put in place a
6    process that allows us to review the documents after
7    Cumberland Medical Center does their review, any documents
8    that -- I think, practically speaking, how we propose this
9    happening is Cumberland Medical Center runs the agreed-upon
10   search terms that they will agree on with the plaintiffs.
11   They have a stack of documents that come back from the
12   searches.  They review them for their own privilege
13   considerations and if they see a document that on its face
14   appears to be privileged or may be privileged, our privilege,
15   for instance, communication between us and Specialty Surgery
16   Center, goes into one stack and we review that stack and do a
17   privilege log, and if we need to come back about specific
18   documents, then we can, but we submit that that is the fairest
19   way to handle this issue at this point.
20         THE COURT:  Now, with respect to Ms. Atkinson, did I
21   read your papers to be asserting a personal privilege on
22   behalf of her?
23         MR. TARDIO:  I think she does.  She was noticed in --
24   although she was not sued individually, she was noticed
25   individually.  She was put on notice of an intent to sue her
```

```
1    individually, and we've represented her individually.
2            THE COURT:  Has the statute of limitations expired
3    with respect to her?
4            MR. TARDIO:  The statute of limitations is one year.
5    So, it's expired, and the statute of repose has expired.
6            THE COURT:  Okay.
7            MR. TARDIO:  I understand the Court's question, but
8    we have represented her individually, including in her
9    deposition.
10           THE COURT:  So, I guess my -- with respect to -- I
11   understood that she was asserting a personal privilege, and I
12   was just wondering whether I had enough information to make
13   that call in the sense of don't I need to know whether or not
14   there was an email policy at SSC and what that said?
15           MR. TARDIO:  I don't know that an email policy would
16   help, and I'm not sure I understand what the --
17           THE COURT:  There are often cases that come before me
18   for individuals at corporations that assert an individual
19   right to assert a privilege, and a lot of that comes down to
20   what were their expectations with respect to using the
21   company's email.
22           MR. TARDIO:  I'm told there was not an email policy.
23           THE COURT:  Okay.
24           MR. TARDIO:  So, if that is an important factor in
25   the Court's decision, we can get that fact into the record.
```

1          THE COURT:  I'll accept your representation on that.

2     It would be more difficult if there was a policy.  Then,

3     obviously, I would need to see it.

4          MR. TARDIO:  I understand.  And I think the Court can

5     reasonably conclude, if the Court accepts that there's no

6     policy, that the reasonable expectation in sending an email is

7     that -- it says "confidential" at the top and it's to your

8     lawyer, that it's going to remain confidential, particularly

9     in this case when it's under a password-protected account or

10    computer.

11         THE COURT:  And what about the -- the claim that you

12    haven't told me that you -- whether or not you gave them the

13    actual passwords?

14         MR. TARDIO:  I don't know the answer to that.

15         THE COURT:  Okay.

16         MR. TARDIO:  I know that when -- maybe Cumberland

17    Medical Center can answer this.  My understanding -- and,

18    again, this is just my understanding.  They may say it's

19    different -- is that when they access the accounts to look for

20    -- because we went to them and said, Hey, have these computers

21    been wiped?  Is there any residual information on here that

22    may be privileged?  They sent them to the vendor and I don't

23    think that the vendor used a password to access the materials.

24         THE COURT:  That is not how the declaration is read,

25    in any event.  It --

1          MR. TARDIO:  Okay.

2          THE COURT:  So, Ms. Hurt, did you want to comment on

3   anything?

4          MS. HURT:  Yes, your Honor.  Good morning.

5          Just quickly -- and I apologize for interrupting.  On

6   this end the phone cuts in and out.  So, if I cut in and out,

7   please just let me know.

8          First, regarding the legal successor in interest

9   argument, we do not acquiesce to that point and, in fact,

10  state that we are under Tennessee law not a successor in

11  interest in this case.  I don't think that's really an issue

12  for this Court today, but I'm happy to articulate any points

13  on that, if needed, but if not, I'll just clarify some of the

14  statements that were made regarding these computers.

15         After the asset purchase agreement, this business did

16  not continue to operate and, therefore, the equipment that was

17  purchased was reallocated to other parts of our hospital

18  facility and, therefore, as a result, some of the computers

19  were used and placed in other parts of the hospital -- or

20  placed, I'm sorry, in our hospital, and as part of that

21  process, those were reallocated to have our business

22  information, our clients' HIPAA information, et cetera.

23         So, when we received the subpoena, our concern was,

24  one, that we were complying with HIPAA; and, two, that we

25  weren't being required to produce, now that these computers

1    were in use, our own work product, our own confidential

2    proprietary information.

3         The computers that we have looked at, we did not send

4    to a vendor.  We have an IT department and that IT person was

5    able to do -- and I don't profess to be a computer person at

6    all.  That's why Paul is in on this call with me.  We just did

7    basically a word search for the attorneys' firms, for SSC or

8    buzz words that we thought might be something that could

9    potentially be privileged and protected.  We had returns on

10   those buzz-word searches, and that's all we did.  We have not

11   personally reviewed a single document for its content.  We

12   only know that there are documents out there that contain

13   certain words that may or may not be applicable to this case,

14   your Honor.

15        As for password protected, I actually don't know the

16   answer to that.  I know that our IT personnel were able to

17   image these computers and they did so, but the actual -- the

18   details of how they did that, I cannot say, your Honor.

19        Other than those points, the only thing that -- and

20   the only reason we're here on this phone, your Honor, is just

21   to make sure -- and the reason we worked so diligently with

22   SSC on this protective order is we want to make sure that

23   we're complying with HIPAA, and that's really the only concern

24   that we have, and we're willing to do whatever we need to, but

25   we needed some guidance from the Court.

1        And with that, your Honor, unless you have questions,

2   I don't think I have anything else to say.

3        THE COURT:  So, Ms. Hurt, it sounds like from your

4   perspective with respect to the computers, that the purchase

5   was more about the hardware than the software.  It doesn't

6   sound like you, so for example, were transferring patient

7   information that you were using.  Or do I misunderstand?

8        MS. HURT:  Yes, your Honor.  If I may, I'm going to

9   defer to Paul, who is more familiar with the computers

10  themselves.

11       MR. WEHMEIER:  Your Honor, Paul Wehmeier for

12  Cumberland Medical Center.

13       I would just note that the three computers that were

14  put back into service were re-imaged, and I think that would

15  go to the issue of whether or not we really were that

16  concerned about what was on the hardware before we received

17  it.  We re-imaged those machines.

18       Now, I can't say that that imaging wiped those

19  machines.  I've heard that representation made.  I can't go

20  that far, but I can say that they were imaged such that we

21  could put them into use in our business applications as

22  opposed to just placing them back into service in the way we

23  received them.

24       MS. HURT:  And, your Honor, I think maybe to clarify

25  the way you're using -- or the way I understand the term

1    "software," the Surgery Center had a different software than

2    what our hospital uses.  So, to the extent that we purchased

3    those computers, it was for the hardware because our own

4    software had to be placed on them.

5            THE COURT:  All right.  And I -- you know, I'm not a

6    computer person either.  So, it could be the software or the

7    information that was contained on the computers?

8            MS. HURT:  Okay.  Yes, your Honor.  The information

9    -- the patients of the Surgery Center, when they -- or if they

10   became patients of the hospital, we did want to have access

11   for continuity of care to have those records available, is my

12   understanding, beyond those medical records of patients who

13   may become patients of the hospital.  I don't know that any

14   other information was really part of the agreement.  It was

15   the hardware and medical records, yes, your Honor.

16           THE COURT:  All right.  Thank you.

17           Anything further from the PSC?

18           MR. STRANCH:  Yes, your Honor, I would like to

19   address a couple of points here quickly.

20           You just heard an important thing, which it is the

21   data on the computers that was important, not the software.

22   The hardware was useful --

23           THE COURT:  And I may have confused it by saying

24   "software."

25           MR. STRANCH:  It's fine.  It's the data that they

1     need, and it's the data that we want searched so that we can

2     receive the documents.

3             You know, one of the problems we have here, your

4     Honor, is the imaging that Specialty Surgery did was in April

5     of 2013.  The formulary modifications that are the subject of

6     this discovery occurred in April 2013.  The sale occurred in

7     June of 2013.  There's no image in June of 2013.

8             So, we have this window of time in which all the

9     documents were sold and all the data was sold to Cumberland

10    Medical and Specialty Surgery can't search during that period

11    of time to get that information for us.

12            And so -- I mean, point-blank, that appears to be a

13    violation of the Federal Rules on ESI because they've put it

14    beyond our control.  It is concerning that three of the

15    computers have been re-imaged and we may have lost that data

16    forever.  So, we may never be able to get to the bottom of

17    what happened with this formulary modification, but that's

18    what we're here about.

19            One thing that I would suggest to the Court about the

20    data and the importance, if I as a lawyer shut down my

21    practice and sell my computers and I don't wipe them first, I

22    can lose my law license for turning over that privileged

23    information.  If they turned over HIPAA information that

24    they're not allowed to turn over, they could be subject to

25    civil and criminal penalties for doing so.

1          This was an intentional sale of the data, because you

2     heard the lawyer for Cumberland Medical say they needed the

3     data along with the computers, and there was -- and the burden

4     of establishing that they attempted to -- if you're going to

5     go the inadvertent disclosure route, establishing that they

6     attempted to remove all attorney/client privileged information

7     falls upon the defendant, and the defendant has offered

8     nothing to the Court to show that they attempted to remove the

9     attorney/client privileged information.

10          We believe it is all a pointless exercise to discuss

11     inadvertent disclosure because there's an unequivocal

12     voluntary waiver.  If you take a look at the *Solis* case that

13     the defendants said here's what happened --

14          THE COURT:  I've read the case.

15          MR. STRANCH:  Okay.  All right.

16          Well, the last thing that I would say is that we

17     believe that this is a voluntary waiver.  It's very clear-cut.

18     If the Court has any concerns of whether it was a voluntary

19     waiver and whether we should receive the documents based upon

20     the reply and the affidavits that were filed late last night,

21     we would ask for an opportunity to respond to that.  Any

22     specific questions --

23          THE COURT:  I think I have more than enough briefing

24     on this case -- on this issue, anyway.

25          MR. STRANCH:  Okay.  Yes.

```
1          THE COURT:  Mr. Tardio, anything else?

2          MR. TARDIO:  I would be remiss if I didn't mention

3     the -- I hope that this is not too convoluted in the

4     discussion today.  The local computers that were sold, the

5     seven computers, I think the record establishes that the

6     intent of that sale was to transfer the hardware, not the data

7     on there.

8          THE COURT:  So, what about Ms. Hurt's -- it would

9     seem to me in the transfer of assets that the information from

10    SSC was important to Cumberland Medical and whether that

11    information was contained in paper files or electronic files,

12    it would make sense to me that that was part of the sale.

13         MR. TARDIO:  It was part of the sale, but not these

14    seven computers.  They separately sold the medical records

15    server and the hard copies of the medical records.  The

16    medical records -- my understanding -- and I'm virtually

17    certain of this -- the medical records were not contained

18    locally on these computers, on the hard drives.

19         THE COURT:  All right.  Ms. Hurt or Mr. -- I'm sorry.

20    Is it Wehmeier?  Do you have a different understanding?

21         MS. HURT:  No, your Honor.  And I wasn't trying to

22    confuse the issue.  I was just trying to explain that we

23    bought the hardware, the computers.  Any information that we

24    obtained about a patient's health was only after that patient

25    became -- well, a patient of the hospital, not of the Surgery
```

1    Center, but came to us as a patient.  We went through the

2    channels to get their past medical records.  I didn't mean to

3    imply that we got them off of those computers.  I just know

4    that we had access to the records of Specialty for the

5    purposes of continuity of care.

6          THE COURT:  Okay.  Thank you.  All right.  I will

7    take it under advisement.

8          COURTROOM DEPUTY CLERK YORK:  All rise.  The Court is

9    in recess.

10          (Adjourned, 12:18 p.m.)

11

12                    C E R T I F I C A T E

13          I, Catherine A. Handel, Official Court Reporter of the

14   United States District Court, do hereby certify that the

15   foregoing transcript, from Page 1 to Page 32, constitutes to the

16   best of my skill and ability a true and accurate transcription of

17   my stenotype notes taken in the matter of No. 13-md-2419-RWZ, In

18   Re: New England Compounding Pharmacy, Inc., Products Liability

19   Litigation.

20

21   August 11, 2016        /s/Catherine A. Handel
     Date                   Catherine A. Handel RPR-CM, CRR
22

23

24

25