# EXHIBIT 2-B

# [Group 1 Deficient Complaints]

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

GEORGEANNE HUBBARD,                              )
                                             )
        Plaintiff,                               )
                                             )
v.                                               )
                                             )
AMERIDOSE, LLC, MEDICAL SALES                    )   Civil Action No._____
MANAGEMENT, INC., MEDICAL SALES                  )   **JURY DEMAND**
MANAGEMENT SW, INC., GDC                         )
PROPERTIES MANAGEMENT, LLC, ARL                  )
BIO PHARMA, INC. D/B/A ANALYTICAL                )
RESEARCH LABORATORIES, BARRY J.                  )
CADDEN, GREGORY CONIGLIARO, LISA                 )
CONIGLIARO CADDEN, DOUGLAS                       )
CONIGLIARO, CARLA CONIGLIARO,                    )
GLENN A. CHIN, and SPECIALTY                     )
SURGERY CENTER, PLLC d/b/a                       )
SPECIALTY SURGERY CENTER,                        )
                                             )
        Defendants.                              )
                                             )

## COMPLAINT

The Plaintiff, Georgeanne Hubbard, for her cause of action against the Defendants respectfully states unto the Court as follows:

## INTRODUCTION

1.      This lawsuit arises as a result of a widespread outbreak of fungal meningitis over the past year that has affected people in at least 20 states and caused over 60 deaths. Over 700 people have been diagnosed with meningitis.

2.      The United States Food and Drug Administration ("FDA") and the Centers for Disease Control ("CDC") have identified fungus present in several separate lots of preservative-free injectable steroids, specifically, methylprednisolone acetate (sometimes referred to as

1

"MPA"), that was compounded and distributed by New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") as the cause of the fungal meningitis outbreak and the resulting injuries and deaths.

3.       Many thousands of vials of steroids compounded at NECC have been recalled but this recall was too late for Plaintiff Georgeanne Hubbard, and for many others, who have suffered serious and at times catastrophic injuries.

4.       Upon information and belief, between June 2012 and September 2012, Specialty Surgery Center, PLLC d/b/a Specialty Surgery Center ("Specialty Surgery") purchased hundreds or thousands of vials of MPA from NECC and then sold and administered the MPA to patients including Ms. Hubbard.

5.       On, or about, September 11, 2012, Ms. Hubbard received an epidural steroid injection ("ESI") at Specialty Surgery. During this procedure, Ms. Hubbard was injected with MPA.

6.       Ms. Hubbard's September 11, 2012 injection came from one or more contaminated lots of MPA that were purchased from NECC, which were subsequently recalled by NECC.

7.       Ms. Hubbard's September 11, 2012 injection of MPA caused her personal injury.

## **PARTIES**

8.       Georgeanne Hubbard is a citizen and resident of the State of Tennessee, residing at 44 Inwood Court, Fairfield Glade, Cumberland County, Tennessee 38558.

9.       Defendant Ameridose, LLC ("Ameridose") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with a principal place of business at 205 Flanders Road, Westborough, Massachusetts 01581.

2

The managers of Ameridose are Gregory Conigliaro and Barry Cadden. Ameridose's registered agent is Gregory Conigliaro.

10.    Defendant Medical Sales Management, Inc. ("MSM") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director of MSM. Barry Cadden is the Treasurer and a Director of MSM. Gregory Conigliaro is the Secretary and a Director of MSM. MSM's registered agent is Gregory Conigliaro.

11.    Defendant Medical Sales Management SW, Inc. ("MSMSW") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director, Barry Cadden is the Treasurer and a Director, Gregory Conigliaro is the Secretary and a Director and Lisa Conigliaro.  MSMSW's registered agent is Gregory Conigliaro.

12.    Defendant GDC Properties Management, LLC ("GDC"), is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 701 Waverly Street, Framingham, Massachusetts 01702. GDC's manager and registered agent is Gregory Conigliaro.

13.    Defendant ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories ("ARL") is an Oklahoma corporation organized and domesticated under the laws of the State of Oklahoma with a principal place of business at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma 73104. Thomas C. Kupiec is the Chief Executive Officer and registered agent of ARL.

3

14.     Defendant Barry J. Cadden ("Barry Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093 and a citizen and resident of the Commonwealth of Massachusetts. Barry Cadden is the President of NECC, which is a Massachusetts corporation. At least until October 2012, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Barry Cadden is a founder and Manager of Ameridose and was involved in Ameridose's day to day operations. Barry Cadden is the Treasurer and a Director of MSM and MSMSW.

15.     Defendant Gregory Conigliaro ("Gregory Conigliaro") is an individual residing at 1 Mountain View Drive, Framingham, Massachusetts 01701 and a citizen and resident of the Commonwealth of Massachusetts. Gregory Conigliaro is a principal owner and the general manager of NECC, as well as NECC's Treasurer, Secretary, Vice President, registered agent, and one of its Directors. Gregory Conigliaro provided financial advice, oversaw day to day operations, and regularly appeared in the NECC facility. Gregory Conigliaro is the founder and a Manager of Ameridose and involved in Ameridose's day to day operations. Gregory Conigliaro is Secretary and a Director of MSM and MSMSW.

16.     Defendant Lisa Conigliaro Cadden ("Lisa Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093 and a citizen and resident of the Commonwealth of Massachusetts. Lisa Cadden is a board member, Director and, at least until October 2012, a pharmacist at NECC. Lisa Cadden, upon information and belief, compounded drugs and was involved in the day to day operations of NECC.

17.     Defendant Douglas Conigliaro ("Douglas Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026 and a citizen and resident of the Commonwealth of Massachusetts. Douglas Conigliaro is the President and a Director of MSM and MSMSW.

4

Douglas Conigliaro, upon information and belief, is involved in the day to day operations of NECC, Ameridose, MSM, and MSMSW.

18.     Defendant Carla Conigliaro ("Carla Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026, and a citizen and resident of the Commonwealth of Massachusetts and is a Director of NECC.

19.     Defendant Glenn A. Chin ("Glenn Chin") is an individual residing at 173 Mechanic Street, Canton, Massachusetts 02021 and a citizen and resident of the Commonwealth of Massachusetts. At least until October 2012, Glenn Chin was a pharmacist at NECC. Glen Chin, upon information and belief, compounded drugs at NECC.

20.     Defendant Specialty Surgery Center, PLLC d/b/a Specialty Surgery Center ("Specialty Surgery") is an active for profit limited liability company organized and domesticated under the laws of the State of Tennessee. Specialty Surgery's principal place of business is located at 116 Brown Avenue, Crossville, TN 38555-7703. Specialty Surgery's registered agent for service of process is Donathan M. Ivey, 116 Brown Avenue, Crossville, TN 38555-7703. At all times while providing and selling drug products to Ms. Hubbard at Specialty Surgery, the physicians, nurses, staff, and other personnel were agents, apparent agents, employees or representatives of Specialty Surgery and were acting within the course and scope of their employment, agency, or apparent agency with Specialty Surgery. Accordingly, Specialty Surgery, under the doctrine of *respondeat superior*, is vicariously liable for any negligent acts and omissions of their employees, agents, or representatives committed in the course and scope of their employment or agency while providing and selling drug products to Ms. Hubbard.

21.     The individuals and entities described in paragraphs 9-19 are sometimes collectively referred to as the "NECC Related Defendants."

5

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because this action arises under the laws or treaties of the United States. Specifically this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because as described herein this case is related to a case under title 11.

23.     On December 21, 2012, NECC filed a petition for Bankruptcy protection under Chapter 11 of the Bankruptcy Code: New England Compounding Pharmacy, Inc., Debtor, United States Bankruptcy Court for the District of Massachusetts, Case no. 12:19882-HJB. A United States Trustee was subsequently appointed to administer the Bankruptcy Estate. The Bankruptcy Court has not yet established a deadline for the filing of claims against NECC's bankruptcy estate In re New England Compounding Pharmacy, Inc.

24.     According to NECC's Bankruptcy Trustee, NECC has express contractual indemnification obligations including but not limited to Barry Cadden, Gregory Conigliaro, Lisa Cadden, Carla Conigliaro, Glenn Chin, GDC and MSM. Some if not all of the aforementioned individuals are insureds under NECC's insurance policies. Adversarial cases seeking recovery of damages for the benefit of the bankruptcy estate and its unsecured creditors have been filed in NECC's bankruptcy against each of the NECC Related Defendants.

25.     This case is related to the NECC Bankruptcy because the outcome of the proceeding certainly could have some effect on the bankruptcy estate.

26.     Lawsuits alleging death or injury based on contaminated MPA have been filed around the country. On February 12, 2013, the Judicial Panel on Multidistrict Litigation (MDL No. 2419) issued an order under 28 U.S.C. § 1407 transferring various federal-court proceedings to the United States District Court for the District of Massachusetts for coordinated or consolidated pretrial proceedings. The transferred actions are pending in the United States

6

District Court for the District of Massachusetts in the Multidistrict Litigation action styled: IN RE: New England Compounding Pharmacy, Inc. Products Liability Litigation, United States District Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS. The transferred cases have been assigned to the Honorable F. Dennis Saylor, United States District Judge, for pre-trial proceedings and coordination.

27.     Upon information and belief, Specialty Surgery presently intends to seek, and will seek, relief from the stay in order to pursue contribution or indemnity claims against NECC for all or some portion of the damages sought by this Complaint. In addition or in the alternative, Specialty Surgery presently intends to file, and will file, claims in NECC's bankruptcy proceeding seeking indemnification or contribution for all or some portion of the damages sought by this Complaint.

28.     By Order dated May 31, 2013, Judge Saylor, ruled that the New England Compounding Pharmacy, Inc. Multi District Litigation Court has subject-matter jurisdiction over any cases pending in federal court or state court against entities or individuals "affiliated" with NECC whether or not NECC is named as a defendant. Those NECC affiliated entities and individuals referred to by Judge Saylor in his May 31, 2013 Order include the defendants described in paragraphs 9-19.

29.     In addition, or in the alternative, this Court has subject-matter jurisdiction over all claims against Specialty Surgery pursuant to 28 U.S.C. § 1367 in that all claims are so related to claims in ther action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper and appropriate in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the

events and actions giving rise to the matters asserted in the Complaint occurred in Cumberland County, Tennessee.

31.    At all times relevant the Defendants were engaged in the business of developing, compounding, marketing, distributing, promoting, selecting, purchasing and/or selling or administering either directly, or indirectly steroids in the State of Tennessee from which they derived significant and regular income.

32.    Defendants are subject to the jurisdiction of this Court in that they are generally present in Tennessee, have transacted business within the State of Tennessee, and acting individually and/or through their agents and employees have committed tortious actions and omissions in Cumberland County, Tennessee that have proximately caused the injuries that are the subject of this lawsuit.

33.    The NECC related Defendants are further subject to the jurisdiction of this Court as a result of contracting to supply goods and things in Tennessee, by conducting or soliciting business in Tennessee, by engaging in a persistent course of conduct in Tennessee, and by deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

## STATEMENT OF FACTS

34.    NECC is an entity that has filed for bankruptcy and is protected by the automatic stay provisions of 11 U.S.C. § 362.  Prior to NECC filing for bankruptcy, numerous plaintiffs filed suit against NECC in Tennessee and other states, all of which were eventually removed and transferred to the United States District Court for the District of Massachusetts in the Multidistrict Litigation action styled: IN RE: New England Compounding Pharmacy, Inc. Products Liability Litigation, United States District Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS.

8

35.     NECC was a compounding pharmacy that compounded, distributed and/or sold drugs to purchasers throughout the United States, including Tennessee.

36.     Upon information and belief, NECC was a privately-held company that was owned and controlled by Barry Cadden, Gregory Conigliaro, Douglas Conigliaro, Carla Conigliaro and Lisa Cadden.

37.     Ameridose, GDC, MSM and MSMSW were affiliates of NECC at all relevant times.

38.     At least until October 2012, Gregory Conigliaro was involved in co-managing day-to-day operations of NECC, MSM, MSMSW, Ameridose and GDC.

39.     At least until October 2012, Lisa Cadden was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

40.     At least until October 2012, Glenn Chin was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

41.     At least until October 2012, Barry Cadden was a licensed pharmacist. In addition to being NECC's President, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Upon information and belief, Barry Cadden compounded medications including MPA at NECC.

42.     "Manager of Record or Pharmacist Manager of Record," as defined by 247 CMR 2.00, "means a pharmacist, currently registered by the [Massachusetts] Board [of Registration in Pharmacy] pursuant to 247 CMR 6.07, who is responsible for the operation of a pharmacy or pharmacy department in conformance with all laws and regulations pertinent to the practice of pharmacy and the distribution of drugs."

43.     Ameridose, according to an application signed by Gregory Conigliaro and filed with the Massachusetts Board of Registration in Pharmacy on May 14, 2012, is a "distribution

9

center to entities of common ownership – currently Ameridose and NECC, as well as other Properly Licensed Facilities in the future."

44.     On information and belief, upon the direction of NECC's principals, on April 11, 2011, Ameridose employee Michelle Rivers requested certification for pharmacy technicians employed by NECC for use in an inspection of NECC's facilities by the Massachusetts Board of Registration in Pharmacy.

45.     On or about August 24, 2012, Ameridose posted an employment opportunity for Registered Pharmacists to work for NECC in Framingham, Massachusetts. In the posting, potential applicants were told to contact mlord@medicalesalesmgmt.com. Upon information and belief, there were many other occasions where employees of Ameridose, MSM and/or MSMSW would perform services for NECC at the direction of NECC's principals.

46.     Between 2006 and the present, Ameridose and NECC would often share a booth at conferences and conventions with a single banner listing both company names. During that same time, Ameridose and NECC would hold an annual Christmas party for employees of both companies.

47.     MSM and/or MSMSW printed materials for and marketed both NECC's and Ameridose's products, including MPA. One former employee of MSM and/or MSMSW has stated: "I didn't think there was any difference [between Ameridose and NECC]."

48.     Through September 2012, both NECC and Ameridose used MSM and/or MSMSW for sales and marketing functions. NECC's privacy policy on its website referred to the "Ameridose Privacy Policy." In 2012, NECC salespersons recommended NECC's "sister company," Ameridose, for drug compounds that NECC did not have available.

10

49.     MSM and/or MSMSW shared office space owned by GDC Properties with NECC in Framingham, Massachusetts.

50.     Since it was formed as a limited liability company in 2006, Ameridose has been controlled by NECC.

51.     Both Ameridose and NECC were controlled by Conigliaro and Cadden family members.

## Claims Against the NECC Related Defendants

52.     NECC has a well-known history of adverse events relating to its operation as a compounding pharmacy. According to the Majority Memorandum for the November 14, 2012 Oversight and Investigations Subcommittee Hearing, NECC has been the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP") over the past decade often focusing on unsterile conditions at NECC's facilities. For example, the FDA issued a Warning Letter to NECC in 2006. The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions, compounding copies of commercially available drugs, selling misbranded compounded drugs, and problems with storage and sterility. That warning letter has been available to the public on the FDA's website for years.

53.     Between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the Clean Room used for the production of methylprednisolone acetate. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC knew or should have known of these findings. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to investigate those

11

isolates and made no effort to identify those isolates. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to perform any product assessments for the products made in the Clean Room where the isolates were found. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to take any corrective actions with regards to the isolates that were found. Despite these findings, NECC continued to compound MPA, and Ameridose, MSM and/or MSMSW continued to distribute marketing materials to customers and potential customers touting the cleanliness of the NECC laboratories.

54.    On September 26, 2012 in the wake of dozens of cases of fungal meningitis associated with NECC's injectable steroid MPA, state agents raided NECC's lab in a strip mall on Waverly Street in Framingham, Massachusetts.

55.    NECC's few remaining employees were scrubbing the compounding areas with bleach. Despite this last-ditch effort, the "clean" rooms were filthy. A leaky boiler stood in a pool of stagnant, dirty water. The autoclaves used to sterilize the product were discolored, tarnished, and contained visible moisture. The air intake came from vents located about 100 feet from a mattress recycling facility that released copious amounts of dust and other contaminants into the air. The air vents in the "clean" rooms were covered with dirt and white fuzz. The metal shelf in the "clean" room used to prepare MPA was covered in a reddish-brown, cloudy substance.

56.    Investigators determined that NECC's internal records showed dozens of instances of bacterial and fungal contamination within the NECC facility over at least the past

nine months. NECC ignored these test results. NECC never even attempted to get rid of these microbial contaminants.

57.     Eighty-three out of three-hundred twenty one observed vials from one of three recalled lots of MPA contained a greenish-black substance visible to the human eye. Seventeen other vials contained a white filamentous material. All fifty out of fifty vials tested confirmed the presence of live microbes (whether fungal or bacterial). The CDC and FDA later confirmed the presence of fungus in unopened vials of NECC's MPA. This is the same fungus that the CDC confirmed was present in at least forty fungal meningitis cases.

58.     Inspections of NECC's sister company Ameridose revealed similarly deplorable conditions, including countless instances of visible contamination of the hoods and rooms used to prepare drug products, insect infestations, birds flying through areas where purportedly sterile products were packaged and stored, and tubs being used to collect rain water that poured through the chronically leaky roof above the "clean" rooms. Ameridose, like NECC, persistently ignored and failed to investigate at least fifty-three instances of known microbiological contamination. Ameridose also hid adverse events associated with its products, failing to report them to the FDA as required by law and instead classifying these events as "patient responses" or "non-complaints" and taking no action to address them.

59.     The CDC determined that three lots of 80 mg/ml MPA produced by NECC between May 21 and September 26, 2012 were contaminated with potentially deadly pathogens.

60.     In late September 2012, NECC recalled the following lots of MPA (PF) 80 mg/ml that it had compounded and sold: MPA (PF) 80 mg/ml Injection, Lot #05212012@68, BUD 11/17/2012; MPA (PF) 80 mg/ml Injection, Lot #06292012@26, BUD 12/26/2012; and MPA (PF) 80 mg/ml Injection, Lot #08102012@51, BUD 2/6/2013.

13

61.     NECC identified Specialty Surgery as one of the healthcare providers that received vials of MPA that were part of the September 2012 recall.

62.     On or about October 3, 2012, the Massachusetts Department of Public Health ("DPH") secured the surrender of NECC's license to operate as a compounding pharmacy.

63.     On October 6, 2012, NECC announced that it was recalling "all products currently in circulation that were compounded at and distributed from its facility in Framingham, Massachusetts."

64.     On or about October 8, 2012, at the request of DPH, Barry Cadden and Glenn Chin "voluntarily" ceased their practice as pharmacists. Lisa Cadden also has "voluntarily" ceased her practice as a pharmacist. Upon information and belief, none of them have practiced as a pharmacist since "voluntarily" ceasing their practice.

65.     On or about October 22, 2012, the Massachusetts Board of Registration in Pharmacy authorized DPH to request the "voluntary" permanent surrender of the licenses of Barry Cadden, Glenn Chin, Lisa Cadden and NECC. According to DPH, "[i]f the three pharmacists and NECC do not comply, the Board authorized staff to proceed with permanent revocation."

66.     One of the Massachusetts regulations promulgated by the Massachusetts Board of Registration in Pharmacy pertinent to NECC's operation as a compounding pharmacy mandated that "[t]he premises of the pharmacy or pharmacy department shall at all times be kept in a clean and sanitary manner." 247 CMR 6.02(1).

67.     Over the last ten years, ARL has conducted sterility testing on samples of MPA compounded by NECC, including samples from Lot #05212012@68, BUD 11/17/2012; Lot #06292012@26, BUD 12/26/2012; and Lot #08102012@51, BUD 2/6/2013.

14

68.     From May through August 2012, NECC sent several samples of its MPA to ARL for sterility testing. As one example, on or about May 21, 2012, NECC sent to ARL two 5ml vials of MPA from a batch of 6,528 vials that came from Lot 05212012@68, which had been compounded by NECC on May 21, 2012.

69.     On May 22, 2012, ARL received and tested the two 5ml vials of MPA that NECC sent to ARL on or about May 21, 2012. ARL sent to NECC a Microbiology Report dated May 25, 2012, which stated that the two vials had been tested on May 22, 2012 and that the "preliminary" results from the sterility test using test method USP 71 showed that the two 5ml vials of MPA that NECC sent to ARL on or about May 21, 2012, were "sterile." ARL's report to NECC further noted that the preliminary results were observed "after approximately 72 hours of incubation."

70.     Pursuant to the protocols of test method USP 71, sterility testing on a batch of more than 6,000 vials of MPA should have been conducted on at least 20 vials from the batch.

71.     On or about August 10, 2012, NECC caused one 5ml vial of MPA to be sent to ARL for sterility testing from a batch of several thousand vials that are from Lot #08102012@51, BUD 2/6/2013.

72.     The Microbiology Reports issued by ARL to NECC between May and September 2012 concerning the sterility testing of MPA indicated that the sterility tests performed by ARL were conducted in compliance with USP 71.

73.     During the summer of 2012, MSM and/or MSMSW sales representatives, on behalf of NECC and Ameridose, distributed copies of the May 25, 2012, ARL Microbiology Report concerning the testing of the vials of MPA from Lot 05212012@68 to customers and/or

15

potential customers in a packet of marketing materials intended to highlight the safety and sterility of the MPA compounded by NECC.

74.     ARL was aware of the risks posed by compounding pharmacies, specifically including the risks posed by NECC's compounding practices.

75.     In 2002, ARL found that four samples of a steroid compounded by NECC were contaminated with potentially deadly endotoxins.

76.     ARL allowed compounding pharmacies such as NECC to submit an inadequate number of samples for sterility testing, which practice did not comply with USP 71 requirements.

77.     GDC which is an acronym for "Gregory D. Conigliaro" owns the real property and is responsible for maintenance and structural improvements at 685-705 Waverly Street, Framingham, Massachusetts.

78.     From 1998 until at least October 2012, GDC leased a portion of the premises at Waverly Street to NECC, MSM and MSMSW.

79.     In an on-line posting for a property management position at GDC, which appeared on or before October 25, 2012, GDC stated that it "owns an 88,000 square foot facility on seven acres in downtown Framingham. GDC currently has eight major tenants." GDC described one of the duties and responsibilities of the GDC property manager as follows: "Insure all tenants operate their businesses in accordance with facility, local [and] state . . . rules and regulations."

80.     GDC maintained a high degree of control over the premises leased by NECC.

81.     Until October 2012, NECC, Ameridose, ARL, Barry Cadden, Lisa Cadden, and Glenn Chin compounded, tested, marketed and/or distributed MPA.

16

82.    GDC and Gregory Conigliaro knew that NECC was compounding preservative-free MPA at 697 Waverly Street, and further knew that this medication was injected into humans and was required to be sterile.

## NECC and Risks of Pharmacy Compounding

83.    The serious risks of pharmacy compounding were also the subject of considerable public discussion in the pharmacy community and the medical community before the subject fungal meningitis outbreak. The risks associated with compounded drugs have been known for years.

84.    In 2002, the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections. The report concluded that "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that…follows appropriate measures to ensure that injectable products are free of contamination."

85.    On March 24, 2005, *USA Today* published a front page article with the following headline:   "**Safety concerns grow over pharmacy-mixed drugs**". That article discussed growing concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA approved and are not subject to the same oversight as drugs produced by pharmaceutical companies.

86.    In 2006, the FDA conducted a survey of compounded drug products. They collected thirty-six samples from compounding pharmacies across the United States during unannounced visits. Twelve of the 36 samples (33%) failed analytical testing. The FDA survey concluded "poor quality compounded drugs are a serious public health concern, as improperly compounded products have been linked to grave adverse events, including deaths."

17

87.     In May 2007, the FDA published an article titled "The Special Risks of Pharmacy Compounding." That article highlighted numerous adverse events involving compounded products. It also warned of the emergence of large scale compounding operations that were clearly operating outside the bounds of traditional compounding practice.

88.     In 2010, the FDA posted an educational video on YouTube regarding concerns over the quality of compounded drugs.

89.     On November 5, 2010, the American Society of Anesthesiologists, the American Society of Health-System Pharmacists ("ASHP") and other medical societies published a joint report regarding drug shortages. That report included an article written by the ASHP stating as follows:

> Compounding pharmacies have also pursued the production of drugs that are in short supply. Caution is warranted because preparations from these pharmacies may not meet applicable state or federal standards (e.g., United States Pharmacopeia chapter 797 or FDA labeling requirements). The sources of raw materials used by compounding pharmacies have been questioned, and apparent lapses in quality control have resulted in serious patient injury, including death. Compounding pharmacies may also present patient risks; several deaths have been associated with improperly sterilized compounded products.

90.     In May 2012, the CDC published a report regarding fungal infections arising from medications obtained from a compounding pharmacy. That report advised that "contamination of compounded sterile preparations has caused outbreaks. Since 1990, FDA has learned of approximately 200 adverse events associated with 71 compounded products."

**Fungal Meningitis Outbreak**

91.     In September 2012, health officials identified an outbreak of fungal meningitis which investigators traced back to the MPA compounded by NECC.

92.     According to the CDC, fungal meningitis occurs when the protective membranes covering the brain and spinal cord are infected with a fungus. Fungal meningitis is rare and

18

usually caused by the spread of a fungus through blood to the spinal cord. Fungal meningitis is not transmitted from person to person.

93.    According to the CDC, symptoms of meningitis include the following: new or worsening headache; fever; sensitivity to light; stiff neck; new weakness or numbness in any part of the body; slurred speech; and increased pain, redness or swelling at the injection site. Death may result from meningitis.

94.    According to the CDC, symptoms of fungal meningitis are similar to symptoms of other forms of meningitis; however, they often appear more gradually and can be very mild at first. In addition to typical meningitis symptoms, like headache, fever, nausea, and stiffness of the neck, people with fungal meningitis may also experience confusion, dizziness, and discomfort from bright lights. Patients might just have one or two of these symptoms.

## Ms.Hubbard is injected with MPA from NECC and Suffers Personal Injury

95.    On September 11, 2012, Ms. Hubbard was injected by Dr. Kenneth Lister ("Dr. Lister") at the Specialty Surgery Center with MPA.

96.    Ms. Hubbard's September 11, 2012 injection came from one or more contaminated lots of MPA purchased from NECC. The contaminated lots were subsequently recalled by NECC.

97.    Ms. Hubbard's September 11, 2012 injections of MPA caused her personal injury.

98.    By letter dated October 6, 2012, Ms. Hubbard was notified by Specialty Surgery that the MPA used in three (3) clinics across the State of Tennessee "may not have been sterile."

99.    Ms. Hubbard did not discover, and reasonably could not have discovered, until after October 6, 2012 that she had received contaminated MPA.

100.   On, or about, October 9, 2012, Ms. Hubbard received a phone call from Specialty Surgery notifying her that she needed to submit to invasive diagnostic testing to determine her exposure to contaminated MPA from NECC.

101.   Thereafter, in response to the letter and phone call from Specialty Surgery and contact from the Cumberland County Health Department, Ms. Hubbard presented at Cumberland County Hospital where she underwent a spinal tap, a blood draw, a CT scan, and later an MRI.

102.   On October 25, 2012, Specialty Surgery sent Ms. Hubbard a letter because she had received "an epidural injection ... between July 19th, 2012 and September 18, 2012" wherein she was administered MPA produced by NECC which was "implicated in the multistate outbreak of fungal meningitis and joint infections."

103.   Ms. Hubbard has suffered harm, injury, and damages as a result of her exposure to one or more of the three recalled contaminated lots of MPA.

## CAUSES OF ACTION

### COUNT I - NEGLIGENCE
### (Against NECC Related Defendants)

104.   As the designer, tester, compounder, seller, marketer and/or distributor of consumer products, the NECC related Defendants owed a duty to Ms. Hubbard to comply with existing standards of care, and to exercise due care, in providing a safe and quality product to Ms. Hubbard.

105.   Specifically, but without limitation:

a.   Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin owed Ms. Hubbard a duty to provide MPA that was safe and free of contamination.

b.   ARL owed Ms. Hubbard a duty to properly conduct tests to insure that the MPA was safe and free of contamination.

20

c.   NECC Related Defendants sold MPA in bulk to Specialty Surgery, but they were not authorized to compound and sell MPA in bulk, instead they were only allowed to fill individual prescriptions for individual patients written by appropriately licensed health care providers.

106.   Defendants breached those duties, and were otherwise negligent in their design, compounding, sale, testing, marketing and distribution of the recalled steroid medication, which was administered to Ms. Hubbard. The Defendants failed to exercise due care in accordance with the standard of care and skill required of, and ordinarily exercised by, a designer, compounder, tester, seller, marketer and distributor of steroid medications, as licensed to do so by the Commonwealth of Massachusetts. The Defendants, by and through their supervisors, staff and agents engaged in designing, compounding, storing, testing, selling, marketing and distributing MPA in a negligent manner.

107.   Defendants further breached those duties by failing to properly design, compound, test and distribute MPA so that it would not be contaminated with fungus; by failing to properly maintain its facilities where it compounded its medications in a clean, sanitary manner; by failing to oversee the security and quality control of its compounding and distribution facilities; by allowing contaminated and unsafe compounded medications to reach the stream of commerce for use by Ms. Hubbard; and by failing to hold the components of the recalled MPA.

108.   Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Ms. Hubbard by failing to use reasonable care in designing, compounding, testing, marketing, distributing and/or selling MPA.

109.   The negligence of Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin was a proximate cause of Ms. Hubbard's injuries and damages.

21

## COUNT II - NEGLIGENCE PER SE
(Against all NECC Related Defendants except ARL)

110.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin owed Ms. Hubbard a duty to maintain the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

111.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Ms. Hubbard by failing to use reasonable care in maintaining the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

112.    Defendants also violated Massachusetts' laws and its pharmacy licensing obligations.

113.    The aforementioned actions by Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin were a proximate cause of Ms. Hubbard's injuries and damages.

## COUNT III - NEGLIGENT SUPERVISION
(Against NECC Related Defendants)

114.    Defendants Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin had an obligation and duty to exercise due care, and comply with the then existing standard of care, to investigate and hire professional and competent employees to create, test, package, market and distribute the compounded medications and to maintain the facility and its premises, and to make sure the compounded drugs did not create any harm or risk to Ms. Hubbard and others who received the compounded medication.

22

115.   In breach of those duties, Defendants failed to exercise due care and failed to supervise their employee(s) or agent(s), who were at all times working within the scope of their employment and authority. Specifically, and without limitation:

    a.   The Defendants failed to monitor and test the steroid medication and were otherwise negligent in supervision of their employees.

    b.   Defendants also failed to monitor and supervise the testing of the compounded medications.

    c.   The Defendants were negligent in hiring, training, and supervising their employees.

116.   The Defendants knew, or should have known, that their employee(s) or agent(s) did not follow proper procedures and knew or should have known of the risks created by failing to do so.

117.   As a direct and proximate cause of the breach of those duties, the Defendants permitted the steroid to become contaminated and distributed to patients including Ms. Hubbard.

118.   The aforementioned acts or omissions by Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin were a proximate cause of Ms. Hubbard's injuries and damages.

## COUNT IV - PUBLIC NUISANCE
### (Against Barry Cadden, Gregory Conigliaro and GDC)

119.   At all relevant times, Barry Cadden, Gregory Conigliaro and/or GDC were in control of the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

120.   Barry Cadden, Gregory Conigliaro and GDC owed a duty to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts in a condition that was free from contamination.

121.   Barry Cadden, Gregory Conigliaro and GDC failed to exercise reasonable care in maintaining the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

23

122.   The failure by Barry Cadden, Gregory Conigliaro and GDC to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts was a proximate cause of the multistate epidemic of fungal meningitis and infections caused by the contaminated MPA.

123.   Barry Cadden, Gregory Conigliaro and GDC unreasonably and significantly interfered with the public health and the public safety.

124.   Barry Cadden, Gregory Conigliaro and GDC unreasonably and significantly interfered with the public right expressed in 247 CMR 6.02(1).

125.   The public nuisance created by Barry Cadden, Gregory Conigliaro and GDC was a proximate cause of Ms. Hubbard's injuries and damages.

126.   The public nuisance created by Barry Cadden, Gregory Conigliaro and GDC has caused Ms. Hubbard special injury in that she has sustained injuries to her personal health.

## COUNT V - PRODUCT LIABILITY CLAIMS
### (Against Specialty Surgery)

127.   The MPA injected into Ms. Hubbard on September 11, 2012 was compounded by NECC.

128.   On December 21, 2012, NECC filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, In re: New England Compounding Pharmacy, Inc., No. 12-19882-HJB.

129.   Pursuant to 11 U.S.C. § 362(a)(1) certain actions against NECC are stayed following its bankruptcy petition.

130.   Ms. Hubbard's claims that arose before NECC's petition in bankruptcy are subject to the automatic stay provisions of 11 U.S.C. § 362(a)(1).

24

131.   NECC has ceased operations.

132.   NECC is unable to pay its debts as they fall due.

133.   NECC is unable to pay its debts in the ordinary course of its business.

134.   NECC's liabilities exceed its assets.

135.   NECC is insolvent.

136.   On July 24, 2013, the United States Bankruptcy Court for the District of Massachusetts in <u>In re: New England Compounding Pharmacy, Inc.</u>, No. 12-19882-HJB, ordered that with respect to certain claims, including those asserted here, NECC is presently insolvent and has been insolvent at all times since the petition date.

137.   Specialty Surgery procured the MPA injected into Ms. Hubbard from NECC.

138.   NECC's product was defective and unreasonably dangerous when it left NECC's control because it was contaminated with lethal pathogens, and it was in substantially the same condition at the time that Specialty Surgery injected it into Ms. Hubbard on July 19 and August 21, 2012.

139.   Specialty Surgery charged Ms. Hubbard for epidural steroid injections it administered to her.

140.   Specialty Surgery acted as a seller or distributor of MPA compounded by NECC when it sold and administered epidural steroid injections to patients, including Ms. Hubbard.

141.   Specialty Surgery was engaged in the business of selling MPA compounded by NECC.

142.   Accordingly, Specialty Surgery is a "seller" as defined by Tenn. Code Ann. § 29-28-102(7).

25

143.    Tenn. Code Ann. § 29-28-106(4) and/or (5) authorizes Ms. Hubbard to prosecute product liability claims against Specialty Surgery as the seller of the MPA injected into Ms. Hubbard because the compounder of the product, NECC, cannot be served with process in this state and/or has been or will be judicially declared insolvent.

144.    The MPA that Specialty Surgery injected into Ms. Hubbard was unreasonably dangerous and defective at the time it left its control because it was contaminated with lethal pathogens.

145.    Specifically, the MPA was in a defective condition and unreasonably dangerous at all relevant times because it was unsafe for normal or anticipated handling as defined by Tenn. Code Ann. § 29-28-102(2).

146.    The MPA sold and distributed by Specialty Surgery was neither merchantable nor fit for the purpose for which it was produced and sold. Accordingly, Specialty Surgery breached its warranties, both express and implied, as stated in Tenn. Code Ann. §§ 47-2-313, 47-2-314 and 47-2-315, including its warranty of fitness for a particular purpose.

147.    Specialty Surgery is strictly liable for the injuries and losses caused by the unreasonably dangerous and defective steroids injected into Ms. Hubbard.

## DAMAGES

148.    As a direct and proximate result of the Defendants' wrongful conduct as described above, Ms. Hubbard has suffered physical injuries, physical and mental pain and suffering, mental anguish, and loss of enjoyment of life.

149.    The long term effects of Ms. Hubbard's condition are unknown, as is the incubation period of the fungal contaminants of the MPA compounded by NECC.

26

150.    Ms. Hubbard remains concerned that she has been exposed to contaminated MPA and that she could develop fungal infection.

## PUNITIVE DAMAGES

151.    The above described acts and omissions on the part of the Defendants were reckless and intentional. Defendants were aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that their disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. Ms. Hubbard is therefore are entitled to an award of punitive damages against the Defendants.

## CAPS FOUND IN TENN. CODE ANN. § 29-39-102 AND § 29-39-104 ARE UNCONSTITUTIONAL AND VOID *AB INITIO*

152.    On October 1, 2011, the Tennessee Civil Justice Act went into effect, enacting "caps" in all Tennessee personal injury cases for non-economic damages and punitive damages. Tenn. Code Ann. § 29-39-102; and Tenn. Code Ann. § 29-39-104. Under that Act, Ms. Hubbard's non-economic damages are purportedly capped at $750,000, and her ability to recover punitive damages is capped at twice the compensatory damages up to a maximum of $500,000.

153.    Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are unconstitutional deprivations of Ms. Hubbard's constitutionally protected right to trial by jury. Those provisions violate Article I, Section 6 of the Constitution of the State of Tennessee, which provides that the right of trial by jury shall remain inviolate. In addition, the subject statutory caps violate Article I, Section 17 of the Tennessee Constitution which states that all courts shall be open, and every man shall have a remedy for injury done by due course of law and without denial or delay. The subject statutory caps usurp the powers of the Judicial Branch in violation of Article II, Sections 1 & 2 of the Tennessee Constitution. In addition, the subject statutory caps violate Article XI, Section 16 of the Tennessee Constitution which indicates that the rights of

27

citizens articulated in Tennessee's Bill of Rights "shall never be violated on any pretense whatever . . . and shall forever remain inviolate." Therefore, Ms. Hubbard requests a declaration, pursuant to Tenn. Code Ann. § 29-14-103, that the statutory caps are void *ab initio* and of no force and effect.

154.    Pursuant to Tenn. Code Ann. § 29-14-107, a copy of this Complaint is being served on the Attorney General of the State of Tennessee, notifying the State of Tennessee Attorney General that Ms. Hubbard is challenging the constitutionality of Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Georgeanne Hubbard, requests the following relief:

A.     A judgment for compensatory damages in an amount to be determined by the trier of fact;

B.     A judgment for punitive damages in an amount to be determined by the trier of fact;

C.     A jury to determine all disputed factual issues;

D.     For costs of this cause; and

E.     For such further relief as the Court may deem just and proper.

Respectfully submitted,

Sidney Gilreath (BPR # 2000)
Timothy A. Housholder (BPR # 020792)
**GILREATH & ASSOCIATES**
550 W. Main Street, Suite 600
Knoxville, Tennessee 37902
(865) 637-2442
(865) 971-4116 fax
thousholder@sidgilreath.com
*Attorneys for Plaintiff*

28

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **GEORGEANNE HUBBARD** | : | **CIVIL ACTION NO. 1:13-cv-12922-FDS** |
| | : | |
| **Plaintiff,** | : | **MDL No. 2419** |
| | : | **Master Docket No. 1:13-md-2419-FDS** |
| **v.** | : | |
| | : | **Honorable F. Dennis Saylor** |
| **UNIFIRST CORPORATION, D/B/A** | : | |
| **UNICLEAN CLEANROOM** | : | |
| **SERVICES,** and **SPECIALTY** | : | **DEMAND FOR JURY TRIAL** |
| **SURGERY CENTER, PLLC D/B/A** | : | |
| **SPECIALTY SURGERY CENTER,** | : | |
| | : | |
| **Defendants.** | : | |

## SHORT FORM COMPLAINT
## AGAINST UNAFFILIATED DEFENDANTS

Plaintiff Georgeanne Hubbard, complaining against Defendants, alleges as follows:

## FIRST COUNT

1.      Pursuant to MDL Order No. 7, entered in In Re: New England Compounding Pharmacy, Inc. Products liability Litigation, Master Docket No. 1:13-md-2419-FDS, the undersigned counsel hereby submit this Short Form Complaint and Jury Demand against Defendants, and adopt and incorporate by reference the allegations in Plaintiffs' Master Complaint, with attachments, and any and all amendments thereto.

2.      Plaintiff Georgeanne Hubbard is a resident of the State of Tennessee.

3.      Plaintiff Georgeanne Hubbard brings this action:

☒ On behalf of herself.

☐ As the representative of _____, who is a living person.

☐ As the Administrator, Administrator <u>ad Prosequendum</u>, or other representative of the Estate of

_____ (hereinafter "Decedent"), who died on _____.

     4.     **<u>Intentionally Omitted.</u>**

     5.     Plaintiff asserts she was administered New England Compounding Pharmacy, Inc. ("NECC") drug methylprednisolone acetate (hereinafter referred to as "NECC drug"), causing injuries and damages.

     6.     The aforesaid administration of the NECC drug occurred on September 11, 2012, by Kenneth Lister, M.D. at Defendant Specialty Surgery Center, PLLC d/b/a Specialty Surgery Center ("Clinic Related Defendant"), located in Crossville, Tennessee.

     7.     **<u>Intentionally Omitted.</u>**

     8.     Plaintiff adopts and incorporates by reference the following Causes of Action asserted against Defendants in the Master Complaint:

          ☒     COUNT II: NEGLIGENCE AND GROSS NEGLIGENCE (Against UniFirst)

          ☒     COUNT III: NEGLIGENCE AMD GROSS NEGLIGENCE (Against Clinic Related Defendant)

          ☐     COUNT IV: VIOLATION OF CONSUMER PROTECTION STATUTES (Against Clinic Related Defendants)

               Plaintiff(s) allege violation of the following consumer protection statute(s):  [List statutes.  Note that N.J.S.A. 56:8-1 *et seq.* was inadvertently omitted from the Master Complaint]

          ☐     COUNT VI: VIOLATION OF M.G.L. C. 93A (Against UniFirst)

          ☐     COUNT VII: BATTERY (Against Clinic Related Defendants)

          ☒     COUNT VIII: FAILURE TO WARN (Against Clinic Related Defendant)

☒ COUNT IX: TENNESSEE PRODUCT LIABILITY CLAIMS (Against Clinic Related Defendant)

☐ COUNT X: AGENCY (Against Clinic Related Defendants)

☐ COUNT XI: CIVIL CONSPIRACY (Against Clinic Related Defendants)

☐ COUNT XII: WRONGFUL DEATH PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendants)

☐ COUNT XIII: LOSS OF CONSORTIUM (Against UniFirst and Clinic Related Defendant)

☒ COUNT XIV: PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendant)

9. **Intentionally Omitted.**

10. On or about September 10, 2013, Plaintiff gave pre-suit notice of her potential medical malpractice claim to Clinic Related Defendants and, in doing so, extended Tennessee's one (1) year medical malpractice statute of limitations by 120 days to at least January 8, 2014, or as late as February 4, 2014, pursuant to application of the discovery rule under Tennessee law. Accordingly, Plaintiff expressly reserves her rights to amend her Complaint to add allegations of medical malpractice under and in conformity with Tennessee's medical malpractice act, Tenn. Code Ann. § 29-26-101, et seq.   On or about December 19, 2013, Plaintiff sent or served pre-suit notice or demand requirements necessary under M.G.L.C. 93A  to bring a claim for violation of M.G.L.C. 93A (as set forth in Count VI of the Master Complaint) and will seek leave to assert such claim promptly after the time period for giving notice has expired.

11. Plaintiff Georgeanne Hubbard has suffered and continues to suffer physical injuries (including multiple invasive, painful medical tests including spinal taps and MRIs), physical and mental pain and suffering, mental anguish, loss of enjoyment of life, and loss of

opportunity to be treated for back pain management with steroidal injections as a result of the Defendants' negligent misconduct, acts, and omissions.

12.     Plaintiff Georgeanne Hubbard suffered and continues to suffer the following damages as a result of the administration of NECC's drug(s): pain and suffering, mental anguish, emotional distress, past and future medical care and treatment, loss of enjoyment of life,  and medical expenses, both past and future.

13.     **Intentionally Omitted.**

Plaintiff reserves the right to amend this Complaint to add allegations and claims against individuals or entities currently omitted (in light of the Court's order permitting a Master Complaint naming defendants affiliated with NECC and currently participating in mediation by December 20) and to add or amend allegations against Defendants named herein based, in part, on further discovery.

WHEREFORE, Plaintiffs demands Judgment against Defendants awarding compensatory damages, punitive damages, attorneys' fees, interest, costs of suit, and such further relief as the Court deems equitable and just.  Pursuant to Tenn. Code Ann. § 29-28-107, Plaintiff prays for damages in an amount not to exceed $1,000,000.00.

## SECOND COUNT

14.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if set forth at length herein.

15.     Plaintiffs incorporate all allegations and counts contained in Plaintiffs' Original Complaint found at Docket No. 1, in the litigation styled <u>Georgeanne Hubbard v. Ameridose LLC, et al.</u>; United States District Court, District of Massachusetts, 1:13-cv-12922, (MDL No.

4

1:13-md-2419-FDS) together with all prayers for relief stated therein.

16.     Plaintiff Georgeanne Hubbard has suffered and continues to suffer injuries as set forth in Paragraph 11 herein.

17.     Plaintiff Georgeanne Hubbard has suffered and continues to suffer damages as set forth in Paragraph 12 herein.

18.     **Intentionally Omitted.**

WHEREFORE, Plaintiff demands Judgment against Defendants awarding compensatory damages, punitive damages, attorneys' fees, interest, costs of suit, and such further relief as the Court deems equitable and just.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted, this 20th day of December, 2013.

> _____/s/ Timothy Housholder
> Timothy Housholder (BPR # 020792)
> GILREATH & ASSOCIATES
> 550 W. Main Avenue, Suite 600
> Knoxville, TN 37902
> (865) 637-2442
> (865) 971-4116 fx.
> thousholder@sidgilreath.com
> *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2013, a true and exact copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


                                                       _____/s/ Timothy Housholder

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| LINDA JACKSON,        ) | |
|      ) | |
|      Plaintiff,      ) | |
|      ) | |
| v.      ) | |
|      ) | |
| AMERIDOSE, LLC, MEDICAL SALES   ) | Civil Action No._____ |
| MANAGEMENT, INC., MEDICAL SALES   ) | **JURY DEMAND** |
| MANAGEMENT SW, INC., GDC   ) | |
| PROPERTIES MANAGEMENT, LLC, ARL   ) | |
| BIO PHARMA, INC. D/B/A ANALYTICAL   ) | |
| RESEARCH LABORATORIES, BARRY J.   ) | |
| CADDEN, GREGORY CONIGLIARO, LISA   ) | |
| CONIGLIARO CADDEN, DOUGLAS   ) | |
| CONIGLIARO, CARLA CONIGLIARO,   ) | |
| GLENN A. CHIN, and SPECIALTY   ) | |
| SURGERY CENTER, PLLC d/b/a   ) | |
| SPECIALTY SURGERY CENTER,   ) | |
|      ) | |
|      Defendants.      ) | |
|      ) | |

**COMPLAINT**

The Plaintiff, Linda Jackson, for her cause of action against the Defendants respectfully

states unto the Court as follows:

**INTRODUCTION**

1.       This lawsuit arises as a result of a widespread outbreak of fungal meningitis over

the past year that has affected people in at least 20 states and caused over 60 deaths. Over 700

people have been diagnosed with meningitis.

2.       The United States Food and Drug Administration ("FDA") and the Centers for

Disease Control ("CDC") have identified fungus present in several separate lots of preservative-

free injectable steroids, specifically, methylprednisolone acetate (sometimes referred to as

1

"MPA"), that was compounded and distributed by New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") as the cause of the fungal meningitis outbreak and the resulting injuries and deaths.

3.     Many thousands of vials of steroids compounded at NECC have been recalled but this recall was too late for Plaintiff Linda Jackson, and for many others, who have suffered serious and at times catastrophic injuries.

4.     Upon information and belief, between June 2012 and September 2012, Specialty Surgery Center, PLLC d/b/a Specialty Surgery Center ("Specialty Surgery") purchased hundreds or thousands of vials of MPA from NECC and then sold and administered the MPA to patients including Ms. Jackson.

5.     On, or about, July 19 and August 21, 2012, Ms. Jackson received epidural steroid injections ("ESI") at Specialty Surgery. During these procedures, Ms. Jackson was injected with MPA.

6.     Ms. Jackson's July 19, 2012 injection and/or her August 21, 2012 injection came from one or more contaminated lots of MPA that were purchased from NECC, which were subsequently recalled by NECC.

7.     Ms. Jackson's July 19, 2012 injection and/or August 21, 2012 injection of MPA caused her personal injury.

## PARTIES

8.     Linda Jackson is a citizen and resident of the State of Tennessee, residing at 294 Creekway Drive, Crossville, Cumberland County, Tennessee 38555.

9.     Defendant Ameridose, LLC ("Ameridose") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with a principal place of business at 205 Flanders Road, Westborough, Massachusetts 01581.

2

The managers of Ameridose are Gregory Conigliaro and Barry Cadden. Ameridose's registered agent is Gregory Conigliaro.

10.    Defendant Medical Sales Management, Inc. ("MSM") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director of MSM. Barry Cadden is the Treasurer and a Director of MSM. Gregory Conigliaro is the Secretary and a Director of MSM. MSM's registered agent is Gregory Conigliaro.

11.    Defendant Medical Sales Management SW, Inc. ("MSMSW") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts 01702. Douglas Conigliaro is the President and a Director, Barry Cadden is the Treasurer and a Director, Gregory Conigliaro is the Secretary and a Director and Lisa Conigliaro.  MSMSW's registered agent is Gregory Conigliaro.

12.    Defendant GDC Properties Management, LLC ("GDC"), is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 701 Waverly Street, Framingham, Massachusetts 01702. GDC's manager and registered agent is Gregory Conigliaro.

13.    Defendant ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories ("ARL") is an Oklahoma corporation organized and domesticated under the laws of the State of Oklahoma with a principal place of business at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma 73104. Thomas C. Kupiec is the Chief Executive Officer and registered agent of ARL.

3

14.     Defendant Barry J. Cadden ("Barry Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093 and a citizen and resident of the Commonwealth of Massachusetts. Barry Cadden is the President of NECC, which is a Massachusetts corporation. At least until October 2012, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Barry Cadden is a founder and Manager of Ameridose and was involved in Ameridose's day to day operations. Barry Cadden is the Treasurer and a Director of MSM and MSMSW.

15.     Defendant Gregory Conigliaro ("Gregory Conigliaro") is an individual residing at 1 Mountain View Drive, Framingham, Massachusetts 01701 and a citizen and resident of the Commonwealth of Massachusetts. Gregory Conigliaro is a principal owner and the general manager of NECC, as well as NECC's Treasurer, Secretary, Vice President, registered agent, and one of its Directors. Gregory Conigliaro provided financial advice, oversaw day to day operations, and regularly appeared in the NECC facility. Gregory Conigliaro is the founder and a Manager of Ameridose and involved in Ameridose's day to day operations. Gregory Conigliaro is Secretary and a Director of MSM and MSMSW.

16.     Defendant Lisa Conigliaro Cadden ("Lisa Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts 02093 and a citizen and resident of the Commonwealth of Massachusetts. Lisa Cadden is a board member, Director and, at least until October 2012, a pharmacist at NECC. Lisa Cadden, upon information and belief, compounded drugs and was involved in the day to day operations of NECC.

17.     Defendant Douglas Conigliaro ("Douglas Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026 and a citizen and resident of the Commonwealth of Massachusetts. Douglas Conigliaro is the President and a Director of MSM and MSMSW.

4

Douglas Conigliaro, upon information and belief, is involved in the day to day operations of NECC, Ameridose, MSM, and MSMSW.

18.     Defendant Carla Conigliaro ("Carla Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts 02026, and a citizen and resident of the Commonwealth of Massachusetts and is a Director of NECC.

19.     Defendant Glenn A. Chin ("Glenn Chin") is an individual residing at 173 Mechanic Street, Canton, Massachusetts 02021 and a citizen and resident of the Commonwealth of Massachusetts. At least until October 2012, Glenn Chin was a pharmacist at NECC. Glen Chin, upon information and belief, compounded drugs at NECC.

20.     Defendant Specialty Surgery Center, PLLC d/b/a Specialty Surgery Center ("Specialty Surgery") is an active for profit limited liability company organized and domesticated under the laws of the State of Tennessee. Specialty Surgery's principal place of business is located at 116 Brown Avenue, Crossville, TN 38555-7703. Specialty Surgery's registered agent for service of process is Donathan M. Ivey, Brown Avenue, Crossville, TN 38555-7703. At all times while providing and selling drug products to Ms. Jackson at Specialty Surgery, the physicians, nurses, staff, and other personnel were agents, apparent agents, employees or representatives of Specialty Surgery and were acting within the course and scope of their employment, agency, or apparent agency with Specialty Surgery. Accordingly, Specialty Surgery, under the doctrine of *respondeat superior*, is vicariously liable for any negligent acts and omissions of their employees, agents, or representatives committed in the course and scope of their employment or agency while providing and selling drug products to Ms. Jackson.

21.     The individuals and entities described in paragraphs 9-19 are sometimes collectively referred to as the "NECC Related Defendants."

5

**JURISDICTION AND VENUE**

22.    This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because this action arises under the laws or treaties of the United States. Specifically this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because as described herein this case is related to a case under title 11.

23.    On December 21, 2012, NECC filed a petition for Bankruptcy protection under Chapter 11 of the Bankruptcy Code: New England Compounding Pharmacy, Inc., Debtor, United States Bankruptcy Court for the District of Massachusetts, Case no. 12:19882-HJB. A United States Trustee was subsequently appointed to administer the Bankruptcy Estate. The Bankruptcy Court has not yet established a deadline for the filing of claims against NECC's bankruptcy estate In re New England Compounding Pharmacy, Inc.

24.    According to NECC's Bankruptcy Trustee, NECC has express contractual indemnification obligations including but not limited to Barry Cadden, Gregory Conigliaro, Lisa Cadden, Carla Conigliaro, Glenn Chin, GDC and MSM. Some if not all of the aforementioned individuals are insureds under NECC's insurance policies.  Adversarial cases seeking recovery of damages for the benefit of the bankruptcy estate and its unsecured creditors have been filed in NECC's bankruptcy against each of the NECC Related Defendants.

25.    This case is related to the NECC Bankruptcy because the outcome of the proceeding certainly could have some effect on the bankruptcy estate.

26.    Lawsuits alleging death or injury based on contaminated MPA have been filed around the country. On February 12, 2013, the Judicial Panel on Multidistrict Litigation (MDL No. 2419) issued an order under 28 U.S.C. § 1407 transferring various federal-court proceedings to the United States District Court for the District of Massachusetts for coordinated or consolidated pretrial proceedings. The transferred actions are pending in the United States

6

District Court for the District of Massachusetts in the Multidistrict Litigation action styled: IN RE: New England Compounding Pharmacy, Inc. Products Liability Litigation, United States District Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS. The transferred cases have been assigned to the Honorable F. Dennis Saylor, United States District Judge, for pre-trial proceedings and coordination.

27.     Upon information and belief, Specialty Surgery presently intends to seek, and will seek, relief from the stay in order to pursue contribution or indemnity claims against NECC for all or some portion of the damages sought by this Complaint. In addition or in the alternative, Specialty Surgery presently intends to file, and will file, claims in NECC's bankruptcy proceeding seeking indemnification or contribution for all or some portion of the damages sought by this Complaint.

28.     By Order dated May 31, 2013, Judge Saylor, ruled that the New England Compounding Pharmacy, Inc. Multi District Litigation Court has subject-matter jurisdiction over any cases pending in federal court or state court against entities or individuals "affiliated" with NECC whether or not NECC is named as a defendant. Those NECC affiliated entities and individuals referred to by Judge Saylor in her May 31, 2013 Order include the defendants described in paragraphs 9-19.

29.     In addition, or in the alternative, this Court has subject-matter jurisdiction over all claims against Specialty Surgery pursuant to 28 U.S.C. § 1367 in that all claims are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper and appropriate in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the

events and actions giving rise to the matters asserted in the Complaint occurred in Cumberland County, Tennessee.

31.     At all times relevant the Defendants were engaged in the business of developing, compounding, marketing, distributing, promoting, selecting, purchasing and/or selling or administering either directly, or indirectly steroids in the State of Tennessee from which they derived significant and regular income.

32.     Defendants are subject to the jurisdiction of this Court in that they are generally present in Tennessee, have transacted business within the State of Tennessee, and acting individually and/or through their agents and employees have committed tortious actions and omissions in Cumberland County, Tennessee that have proximately caused the injuries that are the subject of this lawsuit.

33.     The NECC related Defendants are further subject to the jurisdiction of this Court as a result of contracting to supply goods and things in Tennessee, by conducting or soliciting business in Tennessee, by engaging in a persistent course of conduct in Tennessee, and by deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

## STATEMENT OF FACTS

34.     NECC is an entity that has filed for bankruptcy and is protected by the automatic stay provisions of 11 U.S.C. § 362.  Prior to NECC filing for bankruptcy, numerous plaintiffs filed suit against NECC in Tennessee and other states, all of which were eventually removed and transferred to the United States District Court for the District of Massachusetts in the Multidistrict Litigation action styled: IN RE: New England Compounding Pharmacy, Inc. Products Liability Litigation, United States District Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS.

8

35.     NECC was a compounding pharmacy that compounded, distributed and/or sold drugs to purchasers throughout the United States, including Tennessee.

36.     Upon information and belief, NECC was a privately-held company that was owned and controlled by Barry Cadden, Gregory Conigliaro, Douglas Conigliaro, Carla Conigliaro and Lisa Cadden.

37.     Ameridose, GDC, MSM and MSMSW were affiliates of NECC at all relevant times.

38.     At least until October 2012, Gregory Conigliaro was involved in co-managing day-to-day operations of NECC, MSM, MSMSW, Ameridose and GDC.

39.     At least until October 2012, Lisa Cadden was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

40.     At least until October 2012, Glenn Chin was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

41.     At least until October 2012, Barry Cadden was a licensed pharmacist. In addition to being NECC's President, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Upon information and belief, Barry Cadden compounded medications including MPA at NECC.

42.     "Manager of Record or Pharmacist Manager of Record," as defined by 247 CMR 2.00, "means a pharmacist, currently registered by the [Massachusetts] Board [of Registration in Pharmacy] pursuant to 247 CMR 6.07, who is responsible for the operation of a pharmacy or pharmacy department in conformance with all laws and regulations pertinent to the practice of pharmacy and the distribution of drugs."

43.     Ameridose, according to an application signed by Gregory Conigliaro and filed with the Massachusetts Board of Registration in Pharmacy on May 14, 2012, is a "distribution

9

center to entities of common ownership – currently Ameridose and NECC, as well as other Properly Licensed Facilities in the future."

44.     On information and belief, upon the direction of NECC's principals, on April 11, 2011, Ameridose employee Michelle Rivers requested certification for pharmacy technicians employed by NECC for use in an inspection of NECC's facilities by the Massachusetts Board of Registration in Pharmacy.

45.     On or about August 24, 2012, Ameridose posted an employment opportunity for Registered Pharmacists to work for NECC in Framingham, Massachusetts. In the posting, potential applicants were told to contact mlord@medicalsalesmgmt.com. Upon information and belief, there were many other occasions where employees of Ameridose, MSM and/or MSMSW would perform services for NECC at the direction of NECC's principals.

46.     Between 2006 and the present, Ameridose and NECC would often share a booth at conferences and conventions with a single banner listing both company names. During that same time, Ameridose and NECC would hold an annual Christmas party for employees of both companies.

47.     MSM and/or MSMSW printed materials for and marketed both NECC's and Ameridose's products, including MPA. One former employee of MSM and/or MSMSW has stated: "I didn't think there was any difference [between Ameridose and NECC]."

48.     Through September 2012, both NECC and Ameridose used MSM and/or MSMSW for sales and marketing functions. NECC's privacy policy on its website referred to the "Ameridose Privacy Policy." In 2012, NECC salespersons recommended NECC's "sister company," Ameridose, for drug compounds that NECC did not have available.

10

49.     MSM and/or MSMSW shared office space owned by GDC Properties with NECC in Framingham, Massachusetts.

50.     Since it was formed as a limited liability company in 2006, Ameridose has been controlled by NECC.

51.     Both Ameridose and NECC were controlled by Conigliaro and Cadden family members.

### Claims against the NECC Related Defendants

52.     NECC has a well-known history of adverse events relating to its operation as a compounding pharmacy. According to the Majority Memorandum for the November 14, 2012 Oversight and Investigations Subcommittee Hearing, NECC has been the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP") over the past decade often focusing on unsterile conditions at NECC's facilities. For example, the FDA issued a Warning Letter to NECC in 2006. The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions, compounding copies of commercially available drugs, selling misbranded compounded drugs, and problems with storage and sterility. That warning letter has been available to the public on the FDA's website for years.

53.     Between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the Clean Room used for the production of methylprednisolone acetate. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC knew or should have known of these findings. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to investigate those

11

isolates and made no effort to identify those isolates. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to perform any product assessments for the products made in the Clean Room where the isolates were found. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW and GDC failed to take any corrective actions with regards to the isolates that were found. Despite these findings, NECC continued to compound MPA, and Ameridose, MSM and/or MSMSW continued to distribute marketing materials to customers and potential customers touting the cleanliness of the NECC laboratories.

54.     On September 26, 2012 in the wake of dozens of cases of fungal meningitis associated with NECC's injectable steroid MPA, state agents raided NECC's lab in a strip mall on Waverly Street in Framingham, Massachusetts.

55.     NECC's few remaining employees were scrubbing the compounding areas with bleach. Despite this last-ditch effort, the "clean" rooms were filthy. A leaky boiler stood in a pool of stagnant, dirty water. The autoclaves used to sterilize the product were discolored, tarnished, and contained visible moisture. The air intake came from vents located about 100 feet from a mattress recycling facility that released copious amounts of dust and other contaminants into the air. The air vents in the "clean" rooms were covered with dirt and white fuzz. The metal shelf in the "clean" room used to prepare MPA was covered in a reddish-brown, cloudy substance.

56.     Investigators determined that NECC's internal records showed dozens of instances of bacterial and fungal contamination within the NECC facility over at least the past

nine months. NECC ignored these test results. NECC never even attempted to get rid of these microbial contaminants.

57.     Eighty-three out of three-hundred twenty one observed vials from one of three recalled lots of MPA contained a greenish-black substance visible to the human eye. Seventeen other vials contained a white filamentous material. All fifty out of fifty vials tested confirmed the presence of live microbes (whether fungal or bacterial). The CDC and FDA later confirmed the presence of fungus in unopened vials of NECC's MPA. This is the same fungus that the CDC confirmed was present in at least forty fungal meningitis cases.

58.     Inspections of NECC's sister company Ameridose revealed similarly deplorable conditions, including countless instances of visible contamination of the hoods and rooms used to prepare drug products, insect infestations, birds flying through areas where purportedly sterile products were packaged and stored, and tubs being used to collect rain water that poured through the chronically leaky roof above the "clean" rooms. Ameridose, like NECC, persistently ignored and failed to investigate at least fifty-three instances of known microbiological contamination. Ameridose also hid adverse events associated with its products, failing to report them to the FDA as required by law and instead classifying these events as "patient responses" or "non-complaints" and taking no action to address them.

59.     The CDC determined that three lots of 80 mg/ml MPA produced by NECC between May 21 and September 26, 2012 were contaminated with potentially deadly pathogens.

60.     In late September 2012, NECC recalled the following lots of MPA (PF) 80 mg/ml that it had compounded and sold: MPA (PF) 80 mg/ml Injection, Lot #05212012@68, BUD 11/17/2012; MPA (PF) 80 mg/ml Injection, Lot #06292012@26, BUD 12/26/2012; and MPA (PF) 80 mg/ml Injection, Lot #08102012@51, BUD 2/6/2013.

13

61.     NECC identified Specialty Surgery as one of the healthcare providers that received vials of MPA that were part of the September 2012 recall.

62.     On or about October 3, 2012, the Massachusetts Department of Public Health ("DPH") secured the surrender of NECC's license to operate as a compounding pharmacy.

63.     On October 6, 2012, NECC announced that it was recalling "all products currently in circulation that were compounded at and distributed from its facility in Framingham, Massachusetts."

64.     On or about October 8, 2012, at the request of DPH, Barry Cadden and Glenn Chin "voluntarily" ceased their practice as pharmacists. Lisa Cadden also has "voluntarily" ceased her practice as a pharmacist. Upon information and belief, none of them have practiced as a pharmacist since "voluntarily" ceasing their practice.

65.     On or about October 22, 2012, the Massachusetts Board of Registration in Pharmacy authorized DPH to request the "voluntary" permanent surrender of the licenses of Barry Cadden, Glenn Chin, Lisa Cadden and NECC. According to DPH, "[i]f the three pharmacists and NECC do not comply, the Board authorized staff to proceed with permanent revocation."

66.     One of the Massachusetts regulations promulgated by the Massachusetts Board of Registration in Pharmacy pertinent to NECC's operation as a compounding pharmacy mandated that "[t]he premises of the pharmacy or pharmacy department shall at all times be kept in a clean and sanitary manner." 247 CMR 6.02(1).

67.     Over the last ten years, ARL has conducted sterility testing on samples of MPA compounded by NECC, including samples from Lot #05212012@68, BUD 11/17/2012; Lot #06292012@26, BUD 12/26/2012; and Lot #08102012@51, BUD 2/6/2013.

14

68.     From May through August 2012, NECC sent several samples of its MPA to ARL for sterility testing. As one example, on or about May 21, 2012, NECC sent to ARL two 5ml vials of MPA from a batch of 6,528 vials that came from Lot 05212012@68, which had been compounded by NECC on May 21, 2012.

69.     On May 22, 2012, ARL received and tested the two 5ml vials of MPA that NECC sent to ARL on or about May 21, 2012. ARL sent to NECC a Microbiology Report dated May 25, 2012, which stated that the two vials had been tested on May 22, 2012 and that the "preliminary" results from the sterility test using test method USP 71 showed that the two 5ml vials of MPA that NECC sent to ARL on or about May 21, 2012, were "sterile." ARL's report to NECC further noted that the preliminary results were observed "after approximately 72 hours of incubation."

70.     Pursuant to the protocols of test method USP 71, sterility testing on a batch of more than 6,000 vials of MPA should have been conducted on at least 20 vials from the batch.

71.     On or about August 10, 2012, NECC caused one 5ml vial of MPA to be sent to ARL for sterility testing from a batch of several thousand vials that are from Lot #08102012@51, BUD 2/6/2013.

72.     The Microbiology Reports issued by ARL to NECC between May and September 2012 concerning the sterility testing of MPA indicated that the sterility tests performed by ARL were conducted in compliance with USP 71.

73.     During the summer of 2012, MSM and/or MSMSW sales representatives, on behalf of NECC and Ameridose, distributed copies of the May 25, 2012, ARL Microbiology Report concerning the testing of the vials of MPA from Lot 05212012@68 to customers and/or

15

potential customers in a packet of marketing materials intended to highlight the safety and sterility of the MPA compounded by NECC.

74.     ARL was aware of the risks posed by compounding pharmacies, specifically including the risks posed by NECC's compounding practices.

75.     In 2002, ARL found that four samples of a steroid compounded by NECC were contaminated with potentially deadly endotoxins.

76.     ARL allowed compounding pharmacies such as NECC to submit an inadequate number of samples for sterility testing, which practice did not comply with USP 71 requirements.

77.     GDC which is an acronym for "Gregory D. Conigliaro" owns the real property and is responsible for maintenance and structural improvements at 685-705 Waverly Street, Framingham, Massachusetts.

78.     From 1998 until at least October 2012, GDC leased a portion of the premises at Waverly Street to NECC, MSM and MSMSW.

79.     In an on-line posting for a property management position at GDC, which appeared on or before October 25, 2012, GDC stated that it "owns an 88,000 square foot facility on seven acres in downtown Framingham. GDC currently has eight major tenants." GDC described one of the duties and responsibilities of the GDC property manager as follows: "Insure all tenants operate their businesses in accordance with facility, local [and] state . . . rules and regulations."

80.     GDC maintained a high degree of control over the premises leased by NECC.

81.     Until October 2012, NECC, Ameridose, ARL, Barry Cadden, Lisa Cadden, and Glenn Chin compounded, tested, marketed and/or distributed MPA.

16

82.   GDC and Gregory Conigliaro knew that NECC was compounding preservative-free MPA at 697 Waverly Street, and further knew that this medication was injected into humans and was required to be sterile.

## NECC and Risks of Pharmacy Compounding

83.   The serious risks of pharmacy compounding were also the subject of considerable public discussion in the pharmacy community and the medical community before the subject fungal meningitis outbreak. The risks associated with compounded drugs have been known for years.

84.   In 2002, the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections. The report concluded that "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that…follows appropriate measures to ensure that injectable products are free of contamination."

85.   On March 24, 2005, *USA Today* published a front page article with the following headline:   "**Safety concerns grow over pharmacy-mixed drugs**". That article discussed growing concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA approved and are not subject to the same oversight as drugs produced by pharmaceutical companies.

86.   In 2006, the FDA conducted a survey of compounded drug products. They collected thirty-six samples from compounding pharmacies across the United States during unannounced visits. Twelve of the 36 samples (33%) failed analytical testing. The FDA survey concluded "poor quality compounded drugs are a serious public health concern, as improperly compounded products have been linked to grave adverse events, including deaths."

17

87.     In May 2007, the FDA published an article titled "The Special Risks of Pharmacy Compounding." That article highlighted numerous adverse events involving compounded products. It also warned of the emergence of large scale compounding operations that were clearly operating outside the bounds of traditional compounding practice.

88.     In 2010, the FDA posted an educational video on YouTube regarding concerns over the quality of compounded drugs.

89.     On November 5, 2010, the American Society of Anesthesiologists, the American Society of Health-System Pharmacists ("ASHP") and other medical societies published a joint report regarding drug shortages. That report included an article written by the ASHP stating as follows:

> Compounding pharmacies have also pursued the production of drugs that are in short supply. Caution is warranted because preparations from these pharmacies may not meet applicable state or federal standards (e.g., United States Pharmacopeia chapter 797 or FDA labeling requirements). The sources of raw materials used by compounding pharmacies have been questioned, and apparent lapses in quality control have resulted in serious patient injury, including death. Compounding pharmacies may also present patient risks; several deaths have been associated with improperly sterilized compounded products.

90.     In May 2012, the CDC published a report regarding fungal infections arising from medications obtained from a compounding pharmacy. That report advised that "contamination of compounded sterile preparations has caused outbreaks. Since 1990, FDA has learned of approximately 200 adverse events associated with 71 compounded products."

**Fungal Meningitis Outbreak**

91.     In September 2012, health officials identified an outbreak of fungal meningitis which investigators traced back to the MPA compounded by NECC.

92.     According to the CDC, fungal meningitis occurs when the protective membranes covering the brain and spinal cord are infected with a fungus. Fungal meningitis is rare and

18

usually caused by the spread of a fungus through blood to the spinal cord. Fungal meningitis is not transmitted from person to person.

93.     According to the CDC, symptoms of meningitis include the following: new or worsening headache; fever; sensitivity to light; stiff neck; new weakness or numbness in any part of the body; slurred speech; and increased pain, redness or swelling at the injection site. Death may result from meningitis.

94.     According to the CDC, symptoms of fungal meningitis are similar to symptoms of other forms of meningitis; however, they often appear more gradually and can be very mild at first. In addition to typical meningitis symptoms, like headache, fever, nausea, and stiffness of the neck, people with fungal meningitis may also experience confusion, dizziness, and discomfort from bright lights. Patients might just have one or two of these symptoms.

### Ms. Jackson is injected with MPA from NECC and Suffers Personal Injury

95.     On July 19 and August 21, 2012, Ms. Jackson was injected by Dr. Kenneth Lister ("Dr. Lister") at the Specialty Surgery Center with MPA.

96.     Ms. Jackson's July 19 and/or August 21, 2012 injections came from one or more contaminated lots of MPA purchased from NECC. The contaminated lots were subsequently recalled by NECC.

97.     Ms. Jackson's July 19 and/or August 21, 2012 injections of MPA caused her personal injury.

98.     By letter dated October 6, 2012, Ms. Jackson was notified by Specialty Surgery that the MPA used in three (3) clinics across the State of Tennessee "may not have been sterile."

99.     Ms. Jackson did not discover, and reasonably could not have discovered, until after October 6, 2012 that she had received contaminated MPA.

19

100.    Ms. Jackson began experiencing symptoms on, or about, October 9, 2012, including severe headache, neck pain and light sensitivity.

101.    Thereafter, in response to the letter from Specialty Surgery and based on her symptoms, Ms. Jackson underwent a spinal tap and later an MRI to rule out an abscess. Ms. Jackson was informed that her spinal tap was positive for fungal growth and she was prescribed the oral anti-fungal medication Voriconazole, which caused her severe side-effects, including vision disturbance, and the effects of which are unknown in the long-term.

102.    On October 25, 2012, Specialty Surgery sent Ms. Jackson a letter because she had received "an epidural injection ... between July 19th, 2012 and September 18, 2012" wherein she was administered MPA produced by NECC which was "implicated in the multistate outbreak of fungal meningitis and joint infections."

103.    Ms. Jackson has suffered and continues to suffer harm, injury, and damages as a result of her exposure to one or more of the three recalled contaminated lots of MPA.

### CAUSES OF ACTION

### COUNT I - NEGLIGENCE
### (Against NECC Related Defendants)

104.    As the designer, tester, compounder, seller, marketer and/or distributor of consumer products, the NECC related Defendants owed a duty to Ms. Jackson to comply with existing standards of care, and to exercise due care, in providing a safe and quality product to Ms. Jackson.

105.    Specifically, but without limitation:

   a.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin owed Ms. Jackson a duty to provide MPA that was safe and free of contamination.

20

    b.     ARL owed Ms. Jackson a duty to properly conduct tests to insure that the MPA was safe and free of contamination.

    c.     NECC Related Defendants sold MPA in bulk to Specialty Surgery, but they were not authorized to compound and sell MPA in bulk, instead they were only allowed to fill individual prescriptions for individual patients written by appropriately licensed health care providers.

106.    Defendants breached those duties, and were otherwise negligent in their design, compounding, sale, testing, marketing and distribution of the recalled steroid medication, which was administered to Ms. Jackson. The Defendants failed to exercise due care in accordance with the standard of care and skill required of, and ordinarily exercised by, a designer, compounder, tester, seller, marketer and distributor of steroid medications, as licensed to do so by the Commonwealth of Massachusetts. The Defendants, by and through their supervisors, staff and agents engaged in designing, compounding, storing, testing, selling, marketing and distributing MPA in a negligent manner.

107.    Defendants further breached those duties by failing to properly design, compound, test and distribute MPA so that it would not be contaminated with fungus; by failing to properly maintain its facilities where it compounded its medications in a clean, sanitary manner; by failing to oversee the security and quality control of its compounding and distribution facilities; by allowing contaminated and unsafe compounded medications to reach the stream of commerce for use by Ms. Jackson; and by failing to hold the components of the recalled MPA.

108.    Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Ms. Jackson by failing to use reasonable care in designing, compounding, testing, marketing, distributing and/or selling MPA.

21

109.    The negligence of Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin was a proximate cause of Ms. Jackson's injuries and damages.

## COUNT II - NEGLIGENCE PER SE
(Against all NECC Related Defendants except ARL)

110.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin owed Ms. Jackson a duty to maintain the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

111.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Ms. Jackson by failing to use reasonable care in maintaining the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

112.    Defendants also violated Massachusetts' laws and its pharmacy licensing obligations.

113.    The aforementioned actions by Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin were a proximate cause of Ms. Jackson's injuries and damages.

## COUNT III - NEGLIGENT SUPERVISION
(Against NECC Related Defendants)

114.    Defendants Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin had an obligation and duty to exercise due care, and comply with the then existing standard of care, to investigate and hire professional and competent employees to create, test, package, market and distribute the compounded medications and to maintain the facility and its premises, and to make

22

sure the compounded drugs did not create any harm or risk to Ms. Jackson and others who received the compounded medication.

115.    In breach of those duties, Defendants failed to exercise due care and failed to supervise their employee(s) or agent(s), who were at all times working within the scope of their employment and authority. Specifically, and without limitation:

   a.    The Defendants failed to monitor and test the steroid medication and were otherwise negligent in supervision of their employees.

   b.    Defendants also failed to monitor and supervise the testing of the compounded medications.

   c.    The Defendants were negligent in hiring, training, and supervising their employees.

116.    The Defendants knew, or should have known, that their employee(s) or agent(s) did not follow proper procedures and knew or should have known of the risks created by failing to do so.

117.    As a direct and proximate cause of the breach of those duties, the Defendants permitted the steroid to become contaminated and distributed to patients including Ms. Jackson.

118.    The aforementioned acts or omissions by Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin were a proximate cause of Ms. Jackson's injuries and damages.

## COUNT IV - PUBLIC NUISANCE
### (Against Barry Cadden, Gregory Conigliaro and GDC)

119.    At all relevant times, Barry Cadden, Gregory Conigliaro and/or GDC were in control of the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

120.    Barry Cadden, Gregory Conigliaro and GDC owed a duty to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts in a condition that was free from contamination.

23

121.    Barry Cadden, Gregory Conigliaro and GDC failed to exercise reasonable care in maintaining the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

122.    The failure by Barry Cadden, Gregory Conigliaro and GDC to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts was a proximate cause of the multistate epidemic of fungal meningitis and infections caused by the contaminated MPA.

123.    Barry Cadden, Gregory Conigliaro and GDC unreasonably and significantly interfered with the public health and the public safety.

124.    Barry Cadden, Gregory Conigliaro and GDC unreasonably and significantly interfered with the public right expressed in 247 CMR 6.02(1).

125.    The public nuisance created by Barry Cadden, Gregory Conigliaro and GDC was a proximate cause of Ms. Jackson's injuries and damages.

126.    The public nuisance created by Barry Cadden, Gregory Conigliaro and GDC has caused Ms. Jackson special injury in that she has sustained injuries to her personal health.

## COUNT V - PRODUCT LIABILITY CLAIMS
### (Against Specialty Surgery)

127.    The MPA injected into Ms. Jackson on July 19 and August 21, 2012 was compounded by NECC.

128.    On December 21, 2012, NECC filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, In re: New England Compounding Pharmacy, Inc., No. 12-19882-HJB.

129.    Pursuant to 11 U.S.C. § 362(a) (1) certain actions against NECC are stayed following its bankruptcy petition.

24

130.    Ms. Jackson's claims that arose before NECC's petition in bankruptcy are subject to the automatic stay provisions of 11 U.S.C. § 362(a) (1).

131.    NECC has ceased operations.

132.    NECC is unable to pay its debts as they fall due.

133.    NECC is unable to pay its debts in the ordinary course of its business.

134.    NECC's liabilities exceed its assets.

135.    NECC is insolvent.

136.    On July 24, 2013, the United States Bankruptcy Court for the District of Massachusetts in In re: New England Compounding Pharmacy, Inc., No. 12-19882-HJB, ordered that with respect to certain claims, including those asserted here, NECC is presently insolvent and has been insolvent at all times since the petition date.

137.    Specialty Surgery procured the MPA injected into Ms. Jackson from NECC.

138.    NECC's product was defective and unreasonably dangerous when it left NECC's control because it was contaminated with lethal pathogens, and it was in substantially the same condition at the time that Specialty Surgery injected it into Ms. Jackson on July 19 and August 21, 2012.

139.    Specialty Surgery charged Ms. Jackson for epidural steroid injections it administered to her.

140.    Specialty Surgery acted as a seller or distributor of MPA compounded by NECC when it sold and administered epidural steroid injections to patients, including Ms. Jackson.

141.    Specialty Surgery was engaged in the business of selling MPA compounded by NECC.

25

142.    Accordingly, Specialty Surgery is a "seller" as defined by Tenn. Code Ann. § 29-28-102(7).

143.    Tenn. Code Ann. § 29-28-106(4) and/or (5) authorizes Ms. Jackson to prosecute product liability claims against Specialty Surgery as the seller of the MPA injected into Ms. Jackson because the compounder of the product, NECC, cannot be served with process in this state and/or has been or will be judicially declared insolvent.

144.    The MPA that Specialty Surgery injected into Ms. Jackson was unreasonably dangerous and defective at the time it left its control because it was contaminated with lethal pathogens.

145.    Specifically, the MPA was in a defective condition and unreasonably dangerous at all relevant times because it was unsafe for normal or anticipated handling as defined by Tenn. Code Ann. § 29-28-102(2).

146.    The MPA sold and distributed by Specialty Surgery was neither merchantable nor fit for the purpose for which it was produced and sold. Accordingly, Specialty Surgery breached its warranties, both express and implied, as stated in Tenn. Code Ann. §§ 47-2-313, 47-2-314 and 47-2-315, including its warranty of fitness for a particular purpose.

147.    Specialty Surgery is strictly liable for the injuries and losses caused by the unreasonably dangerous and defective steroids injected into Ms. Jackson.

## DAMAGES

148.    As a direct and proximate result of the Defendants' wrongful conduct as described above, Ms. Jackson has suffered physical injuries, physical and mental pain and suffering, mental anguish,  loss of enjoyment of life, and loss of earning capacity.

149.    The long term effects of Ms. Jackson's condition are unknown.

26

150.     Ms. Jackson remains under the care of physicians and has incurred and will continue to incur medical and other expenses.

## PUNITIVE DAMAGES

151.     The above described acts and omissions on the part of the Defendants were reckless and intentional. Defendants were aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that their disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. Ms. Jackson is therefore are entitled to an award of punitive damages against the Defendants.

## CAPS FOUND IN TENN. CODE ANN. § 29-39-102 AND § 29-39-104 ARE UNCONSTITUTIONAL AND VOID *AB INITIO*

152.     On October 1, 2011, the Tennessee Civil Justice Act went into effect, enacting "caps" in all Tennessee personal injury cases for non-economic damages and punitive damages. Tenn. Code Ann. § 29-39-102; and Tenn. Code Ann. § 29-39-104. Under that Act, Ms. Jackson's non-economic damages are purportedly capped at $750,000, and her ability to recover punitive damages is capped at twice the compensatory damages up to a maximum of $500,000.

153.     Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are unconstitutional deprivations of Ms. Jackson's constitutionally protected right to trial by jury. Those provisions violate Article I, Section 6 of the Constitution of the State of Tennessee, which provides that the right of trial by jury shall remain inviolate. In addition, the subject statutory caps violate Article I, Section 17 of the Tennessee Constitution which states that all courts shall be open, and every man shall have a remedy for injury done by due course of law and without denial or delay. The subject statutory caps usurp the powers of the Judicial Branch in violation of Article II, Sections 1 & 2 of the Tennessee Constitution. In addition, the subject statutory caps violate Article XI, Section 16 of the Tennessee Constitution which indicates that the rights of

27

citizens articulated in Tennessee's Bill of Rights "shall never be violated on any pretense whatever . . . and shall forever remain inviolate." Therefore, Ms. Jackson requests a declaration, pursuant to Tenn. Code Ann. § 29-14-103, that the statutory caps are void *ab initio* and of no force and effect.

154.   Pursuant to Tenn. Code Ann. § 29-14-107, a copy of this Complaint is being served on the Attorney General of the State of Tennessee, notifying the State of Tennessee Attorney General that Ms. Jackson is challenging the constitutionality of Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Linda Jackson, requests the following relief:

A.   A judgment for compensatory damages in an amount to be determined by the trier of fact;

B.   A judgment for punitive damages in an amount to be determined by the trier of fact;

C.   A jury to determine all disputed factual issues;

D.   For costs of this cause; and

E.   For such further relief as the Court may deem just and proper.

Respectfully submitted,

Sidney Gilreath (BPR # 2000)
Timothy A. Housholder (BPR # 020792)
**GILREATH & ASSOCIATES**
550 W. Main Street, Suite 600
Knoxville, Tennessee 37902
(865) 637-2442
(865) 971-4116 fax
thousholder@sidgilreath.com
*Attorneys for Plaintiff*

28

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **LINDA JACKSON** | : | **CIVIL ACTION NO. 1:13-cv-12923-FDS** |
| | : | |
| **Plaintiff,** | : | **MDL No. 2419** |
| | : | **Master Docket No. 1:13-md-2419-FDS** |
| **v.** | : | |
| | : | **Honorable F. Dennis Saylor** |
| **UNIFIRST CORPORATION, D/B/A** | : | |
| **UNICLEAN CLEANROOM** | : | |
| **SERVICES,** and **SPECIALTY** | : | **DEMAND FOR JURY TRIAL** |
| **SURGERY CENTER, PLLC D/B/A** | : | |
| **SPECIALTY SURGERY CENTER,** | : | |
| | : | |
| **Defendants.** | : | |

## SHORT FORM COMPLAINT
## AGAINST UNAFFILIATED DEFENDANTS

Plaintiff Linda Jackson, complaining against Defendants, alleges as follows:

### FIRST COUNT

1.      Pursuant to MDL Order No. 7, entered in In Re: New England Compounding Pharmacy, Inc. Products liability Litigation, Master Docket No. 1:13-md-2419-FDS, the undersigned counsel hereby submit this Short Form Complaint and Jury Demand against Defendants, and adopt and incorporate by reference the allegations in Plaintiffs' Master Complaint, with attachments, and any and all amendments thereto.

2.      Plaintiff Linda Jackson is a resident of the State of Tennessee.

3.      Plaintiff Linda Jackson brings this action:

☒ On behalf of herself.

☐ As the representative of _____, who is a living person.

1

☐ As the Administrator, Administrator <u>ad Prosequendum</u>, or other representative of the Estate

of _____ (hereinafter "Decedent"), who died on _____.

   4.    **<u>Intentionally Omitted.</u>**

   5.    Plaintiff asserts she was administered New England Compounding Pharmacy, Inc.

("NECC") drug methylprednisolone acetate (hereinafter referred to as "NECC drug"), causing

injuries and damages.

   6.    The aforesaid administration of the NECC drug occurred on July 19 and August

21, 2012, by Kenneth Lister, M.D. at Defendant Specialty Surgery Center, PLLC d/b/a Specialty

Surgery Center ("Clinic Related Defendant"), located in Crossville, Tennessee.

   7.    **<u>Intentionally Omitted.</u>**

   8.    Plaintiff adopts and incorporates by reference the following Causes of Action

asserted against Defendants in the Master Complaint:

    ☒    COUNT II: NEGLIGENCE AND GROSS NEGLIGENCE (Against UniFirst)

    ☒    COUNT III: NEGLIGENCE AMD GROSS NEGLIGENCE (Against Clinic Related Defendant)

    ☐    COUNT IV: VIOLATION OF CONSUMER PROTECTION STATUTES (Against Clinic Related Defendants)

          Plaintiff(s) allege violation of the following consumer protection statute(s): [List statutes. Note that N.J.S.A. 56:8-1 *et seq.* was inadvertently omitted from the Master Complaint]

    ☐    COUNT VI: VIOLATION OF M.G.L. C. 93A (Against UniFirst)

    ☐    COUNT VII: BATTERY (Against Clinic Related Defendants)

    ☒    COUNT VIII: FAILURE TO WARN (Against Clinic Related Defendant)

☒ COUNT IX: TENNESSEE PRODUCT LIABILITY CLAIMS (Against Clinic Related Defendant)

☐ COUNT X: AGENCY (Against Clinic Related Defendants)

☐ COUNT XI: CIVIL CONSPIRACY (Against Clinic Related Defendants)

☐ COUNT XII: WRONGFUL DEATH PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendants)

☐ COUNT XIII: LOSS OF CONSORTIUM (Against UniFirst and Clinic Related Defendant)

☒ COUNT XIV: PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendant)

9. **Intentionally Omitted.**

10. On or about July 17, 2013, Plaintiff gave pre-suit notice of her potential medical malpractice claim to Clinic Related Defendants and, in doing so, extended Tennessee's one (1) year medical malpractice statute of limitations by 120 days to at least December 21, 2013, or as late as February 4, 2014, pursuant to application of the discovery rule under Tennessee law. Accordingly, Plaintiff expressly reserves her rights to amend her Complaint to add allegations of medical malpractice under and in conformity with Tennessee's medical malpractice act, Tenn. Code Ann. § 29-26-101, et seq. On or about December 19, 2013, Plaintiff sent or served pre-suit notice or demand requirements necessary under M.G.L.C. 93A to bring a claim for violation of M.G.L.C. 93A (as set forth in Count VI of the Master Complaint) and will seek leave to assert such claim promptly after the time period for giving notice has expired.

11. Plaintiff Linda Jackson has suffered and continues to suffer physical injuries (including multiple spinal taps, severe headaches, neck pain and stiffness, extreme vision disturbance and light sensitivity), physical and mental pain and suffering, mental anguish, loss of enjoyment of life, loss of earning capacity, and loss of opportunity to be treated for back/neck

pain management with steroidal injections as a result of the Defendants' negligent misconduct, acts, and omissions.

12. Plaintiff Linda Jackson suffered and continues to suffer the following damages as a result of the administration of NECC's drug(s): pain and suffering, mental anguish, emotional distress, past and future medical care and treatment, loss of enjoyment of life, and medical expenses, both past and future.

13. **Intentionally Omitted.**

Plaintiff reserves the right to amend this Complaint to add allegations and claims against individuals or entities currently omitted (in light of the Court's order permitting a Master Complaint naming defendants affiliated with NECC and currently participating in mediation by December 20) and to add or amend allegations against Defendants named herein based, in part, on further discovery.

WHEREFORE, Plaintiffs demands Judgment against Defendants awarding compensatory damages, punitive damages, attorneys' fees, interest, costs of suit, and such further relief as the Court deems equitable and just. Pursuant to Tenn. Code Ann. § 29-28-107, Plaintiff prays for damages in an amount not to exceed $1,000,000.00.

## SECOND COUNT

14. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as if set forth at length herein.

15. Plaintiffs incorporate all allegations and counts contained in Plaintiffs' Original Complaint found at Docket No. 1, in the litigation styled <u>Linda Jackson v. Ameridose LLC, et al.</u>; United States District Court, District of Massachusetts, 1:13-cv-12923, (MDL No. 1:13-md-

2419-FDS) together with all prayers for relief stated therein.

16.   Plaintiff Linda Jackson has suffered and continues to suffer injuries as set forth in Paragraph 11 herein.

17.   Plaintiff Linda Jackson has suffered and continues to suffer damages as set forth in Paragraph 12 herein.

18.   **Intentionally Omitted.**

WHEREFORE, Plaintiff demands Judgment against Defendants awarding compensatory damages, punitive damages, attorneys' fees, interest, costs of suit, and such further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted, this 20th day of December, 2013.

        /s/ Timothy Housholder
Timothy Housholder (BPR # 020792)
GILREATH & ASSOCIATES
550 W. Main Avenue, Suite 600
Knoxville, TN 37902
(865) 637-2442
(865) 971-4116 fx.
thousholder@sidgilreath.com

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 20, 2013, a true and exact copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


                                                    /s/ Timothy Housholder

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN JOHNSON,<br><br>     Plaintiff,<br><br>vs.<br><br>AMERIDOSE, LLC, MEDICAL SALES MANAGEMENT, INC., MEDICAL SALES MANAGEMENT SW, INC., GDC PROPERTIES MANAGEMENT, LLC, ARL BIO PHARMA, INC. d/b/a ANALYTICAL RESEARCH LABORATORIES, BARRY J. CADDEN, GREGORY CONIGLIARO, LISA CONIGLIARO CADDEN, DOUGLAS CONIGLIARO, CARLA CONIGLIARO, GLENN A. CHIN, and SPECIALTY SURGERY CENTER, PLLC<br><br>     Defendants. | CASE NO. _____<br>JURY DEMAND |

## COMPLAINT

Plaintiff, John Johnson, for his cause of action against Defendants respectfully states to the Court as follows:

### INTRODUCTION

1.    This lawsuit arises as a result of a widespread outbreak of fungal meningitis over the past year that has affected people in at least 20 states and caused over 60 deaths. Over 700 people have been diagnosed with meningitis and/or fungal infections.

2.    The United States Food and Drug Administration ("FDA") and the Centers for Disease Control ("CDC") have identified fungus present in several separate lots of preservative-free injectable steroids, specifically methylprednisolone acetate (sometimes referred to as "MPA"), that was compounded and distributed by New England Compounding Pharmacy, Inc.,

d/b/a New England Compounding Center ("NECC") as the cause of the fungal meningitis and infection outbreak and the resulting injuries and deaths.

3.      Multiple vials of steroids compounded at NECC have been recalled but the recall was too late for Plaintiff John Johnson and for many others who have suffered serious and at times catastrophic injuries.

4.      From approximately May 2012 through September 2012, Specialty Surgery Center, LLC, ("Specialty Surgery") purchased vials of MPA from NECC and then sold and administered the MPA to patients including Plaintiff John Johnson.

5.      In September 2012, John Johnson received a steroid injection at Specialty Surgery.  During this procedure the physician injected MPA into Mr. Johnson's lower back.

6.      John Johnson's epidural steroid injection came from contaminated lots of MPA that were purchased from NECC.  The contaminated lots were subsequently recalled by NECC.

7.      John Johnson's injection of MPA caused him to experience symptoms of fungal meningitis, including but not limited to neck stiffness, headache, and nausea.  As a result, Mr. Johnson was required to undergo a painful lumbar puncture procedure.

## PARTIES

8.      Plaintiff John Johnson is a citizen and resident of Tennessee and resides at 4321 Glade Creek Road, Sparta, TN  38583.

9.      Defendant Ameridose, LLC, ("Ameridose") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with a principal place of business at 205 Flanders Road, Westborough, Massachusetts, 01581. The managers of Ameridose are Gregory Conigliaro and Barry Cadden.  Ameridose's registered agent, is Gregory Conigliaro.

10. Defendant Medical Sales Management, Inc., ("MSM") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts, 01702. Douglas Conigliaro is the President and a Director of MSM. Barry Cadden is the Treasurer and a Director of MSM. Gregory Conigliaro is the Secretary and a Director of MSM. MSM's registered agent is Gregory Conigliaro.

11. Defendant Medical Sales Management SW, Inc., ("MSMSW") is a Massachusetts corporation organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 697 Waverly Street, Framingham, Massachusetts, 01702. Douglas Conigliaro is the President and a Director, Barry Cadden is the Treasurer and a Director, Gregory Conigliaro is the Secretary and a Director and Lisa Conigliaro Cadden is a Director. MSMSW's registered agent is Gregory Conigliaro.

12. Defendant GDC Properties Management, LLC, ("GDC") is a Massachusetts limited liability company organized and domesticated under the laws of the Commonwealth of Massachusetts with its principal place of business at 701 Waverly Street, Framingham, Massachusetts, 01702. GDC's manager and registered agent is Gregory Conigliaro.

13. Defendant ARL Bio Pharma, Inc. d/b/a Analytical Research Laboratories ("ARL") is an Oklahoma corporation organized and domesticated under the laws of the State of Oklahoma with a principal place of business at 840 Research Parkway, Suite 546, Oklahoma City, Oklahoma, 73104. Thomas C. Kupiec is the Chief Executive Officer and registered agent of ARL.

14. Defendant Barry J. Cadden ("Barry Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts, 02093, and a citizen and resident of the

Commonwealth of Massachusetts. Barry Cadden is the President of New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center ("NECC"), which is a Massachusetts corporation. At least until October 2012, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Barry Cadden is a founder and Manager of Ameridose and was involved in Ameridose's day to day operations. Barry Cadden is the Treasurer and Director of MSM and MSMSW.

15.     Defendant Gregory Conigliaro ("Gregory Conigliaro") is an individual residing at 1 Mountain View Drive, Framingham, Massachusetts, 01701, and a citizen and resident of the Commonwealth of Massachusetts. Gregory Conigliaro is a principal owner and the general manager of NECC, as well as NECC's Treasurer, Secretary, Vice President, registered agent, and one of its Directors. Gregory Conigliaro provided financial advice, oversaw day to day operations, and regularly appeared in the NECC facility. Gregory Conigliaro is the founder and a Manager of Ameridose and involved in Ameridose's day to day operations. Gregory Conigliaro is Secretary and Director of MSM and MSMSW.

16.     Defendant Lisa Conigliaro Cadden ("Lisa Cadden") is an individual residing at 13 Manchester Drive, Wrentham, Massachusetts, 02093, and a citizen and resident of the Commonwealth of Massachusetts. Lisa Cadden is a board member, Director and, at least until October 2012, a pharmacist at NECC. Lisa Cadden, upon information and belief, compounded drugs and was involved in the day to day operations of NECC.

17.     Defendant Douglas Conigliaro ("Douglas Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts, 02026, and a citizen and resident of the Commonwealth of Massachusetts. Douglas Conigliaro is the President and a Director of MSM and MSMSW.

-4-

Douglas Conigliaro, upon information and belief, is involved in the day to day operations of NECC, Ameridose, MSM, and MSMSW.

18.     Defendant Carla Conigliaro ("Carla Conigliaro") is an individual residing at 15 Hale Drive, Dedham, Massachusetts, 02026, and a citizen and resident of the Commonwealth of Massachusetts and is a Director of NECC.

19.     Defendant Glenn A. Chin ("Glenn Chin") is an individual residing at 173 Mechanic Street, Canton, Massachusetts, 02021, and a citizen and resident of the Commonwealth of Massachusetts. At least until October 2012, Glenn Chin was a pharmacist at NECC. Glen Chin, upon information and belief, compounded drugs at NECC.

20.     Defendant Specialty Surgery Center, PLLC, ("Specialty Surgery") is, upon information and belief, a Tennessee for-profit limited liability company organized and domesticated under the laws of the State of Tennessee. Specialty Surgery's principal place of business is located 116 Brown Avenue, Cumberland County, Tennessee, 38555.

21.     Pursuant to the doctrine of *respondeat superior*, Specialty Surgery is vicariously liable for any negligent acts and omissions of their employees, agents, or representatives committed in the course and scope of their employment or agency while treating Plaintiff.

22.     The individuals and entities described in paragraphs 11-19 are sometimes collectively referred to as the "NECC Related Defendants."

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1334(b) because as described herein each claim asserted herein is related to a case under title 11.

24.     This case is related to the NECC Bankruptcy because the outcome of the proceeding certainly could have some effect on the bankruptcy estate.

25.     On December 21, 2012, NECC filed a petition for Bankruptcy protection under
Chapter 11 of the Bankruptcy Code: In re: New England Compounding Pharmacy, Inc., Debtor,
United States Bankruptcy Court for the District of Massachusetts Case no. 12:19882 HJB.  A
United States Trustee was subsequently appointed to administer the Bankruptcy Estate.

26.     NECC has express contractual indemnification obligations to among others, Barry
Cadden, Gregory Conigliaro, Lisa Cadden, Carla Conigliaro, Glenn Chin, GDC, and MSM.
Some if not all of the aforementioned individuals are insureds under NECC's insurance policies.

27.     Lawsuits alleging death or injury based on contaminated MPA have been filed
around the country.  On February 12, 2013, the Judicial Panel on Multidistrict Litigation (MDL
No. 2419) issued an order under 28 U.S.C. § 1407 transferring various federal-court proceedings
to the United States District Court for the District of Massachusetts for coordinated or
consolidated pretrial proceedings.  The transferred actions are pending in the United States
District Court for the District of Massachusetts in the Multidistrict Litigation action styled: In re:
*New England Compounding Pharmacy, Inc. Products Liability Litigation*, United States District
Court, District of Massachusetts, MDL No. 1:13-md-2419-FDS.  The transferred cases have been
assigned to the Honorable F. Dennis Saylor, United States District Judge, for pre-trial
proceedings and coordination.

28.     The Bankruptcy Court for the District of Massachusetts has recently established a
deadline for the filing of claims against NECC's bankruptcy estate in *In re: New England
Compounding Pharmacy, Inc.*

29.     By Order dated May 31, 2013, Judge Saylor, ruled that the New England
Compounding Pharmacy, Inc., Multi District Litigation Court has subject-matter jurisdiction
over any cases pending in federal court or state court against entities or individuals "affiliated"

with NECC whether or not NECC is named as a defendant. Those NECC affiliated entities and individuals referred to by Judge Saylor in his May 31, 2013 Order include the defendants described in paragraphs 11–19.

30.     In addition or in the alternative to the bases for jurisdiction already asserted, this Court has subject-matter jurisdiction over all claims against the Specialty Surgery pursuant to 28 U.S.C. § 1367 in that all such claims are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

31.     Venue is proper and appropriate in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) in that all or a substantial part of the events and actions giving rise to the matters asserted in the Complaint occurred in Cumberland County, Tennessee.

32.     At all times relevant the Defendants were engaged in the business of developing, compounding, marketing, distributing, promoting, selecting, purchasing, and/or selling or administering, either directly or indirectly, steroids in the State of Tennessee from which they derived significant and regular income.

33.     Defendants are subject to the jurisdiction of this Court in that they are generally present in Tennessee, have transacted business within the State of Tennessee, and acting individually and/or through their agents and employees have committed tortious actions and omissions in Cumberland County, Tennessee, that have proximately caused the injuries that are the subject of this lawsuit.

34.     The NECC Related Defendants described in paragraphs 11–19 are further subject to the jurisdiction of this Court as a result of contracting to supply goods and things in

-7-

Tennessee, by conducting or soliciting business in Tennessee, by engaging in a persistent course of conduct in Tennessee, and by deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

## STATEMENT OF FACTS

### I.   RELEVANT BACKGROUND

35.   NECC is an entity that has filed for bankruptcy and is protected by the automatic stay provisions of 11 U.S.C. § 362.

36.   NECC was a compounding pharmacy that compounded, distributed, and/or sold drugs to purchasers throughout the United States, including Tennessee.

37.   Upon information and belief, NECC was a privately held company that was owned and controlled by Barry Cadden, Gregory Conigliaro, Douglas Conigliaro, Carla Conigliaro and Lisa Cadden.

38.   Ameridose, GDC, MSM, and MSMSW were affiliates of NECC at all relevant times.

39.   At least until October 2012, Gregory Conigliaro was involved in co-managing day-to-day operations of NECC, MSM, MSMSW, Ameridose, and GDC.

40.   At least until October 2012, Lisa Cadden was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

41.   At least until October 2012, Glenn Chinn was a licensed pharmacist who, upon information and belief, compounded medications including MPA at NECC.

42.   At least until October 2012, Barry Cadden was a licensed pharmacist.  In addition to being NECC's President, Barry Cadden was NECC's licensed Pharmacist Manager of Record. Upon information and belief, Barry Cadden compounded medications including MPA at NECC.

43. "Manager of Record or Pharmacist Manager of Record," as defined by 247 CMR 2.00, "means a pharmacist, currently registered by the [Massachusetts] Board [of Registration in Pharmacy] pursuant to 247 CMR 6.07, who is responsible for the operation of a pharmacy or pharmacy department in conformance with all laws and regulations pertinent to the practice of pharmacy and the distribution of drugs."

44. Ameridose, according to an application signed by Gregory Conigliaro and filed with the Massachusetts Board of Registration in Pharmacy on May 14, 2012, is a "distribution center to entities of common ownership — currently Ameridose and NECC, as well as other Properly Licensed Facilities in the future."

45. On information and belief and upon the direction of NECC's principals, on April 11, 2011, Ameridose employee Michelle Rivers requested certification for pharmacy technicians employed by NECC for use in an inspection of NECC's facilities by the Massachusetts Board of Registration in Pharmacy.

46. On or about August 24, 2012, Ameridose posted an employment opportunity for Registered Pharmacists to work for NECC in Framingham, Massachusetts. In the posting, potential applicants were told to contact mlord@medicalesalesmgmt.com. Upon information and belief, there were many other occasions where employees of Ameridose, MSM. and/or MSMSW would perform services for NECC at the direction of NECC's principals.

47. Between 2006 and the present, Ameridose and NECC would often share a booth at conferences and conventions with a single banner listing both company names. During that same time, Ameridose and NECC would hold an annual Christmas party for employees of both companies.

48.     MSM and/or MSMSW printed materials for and marketed both NECC's and Ameridose's products, including methylprednisolone acetate.  One former employee of MSM and/or MSMSW has stated: "I didn't think there was any difference [between Ameridose and NECC]."

49.     Through September 2012, both NECC and Ameridose used MSM and/or MSMSW for sales and marketing functions.  NECC's privacy policy on its website referred to the "Ameridose Privacy Policy." In 2012, NECC salespersons recommended NECC's "sister company," Ameridose, for drug compounds that NECC did not have available.

50.     MSM and/or MSMSW shared office space owned by GDC Properties with NECC in Framingham, Massachusetts.

51.     Since it was formed as a limited liability company in 2006, Ameridose has been controlled by NECC.

52.     Both Ameridose and NECC were controlled by Conigliaro and Cadden family members.

## II.     CLAIMS AGAINST THE NECC-RELATED DEFENDANTS

53.     NECC has a history well-known to the medical and pharmacy community of adverse events relating to its operation as a compounding pharmacy.  According to the Majority Memorandum for the November 14, 2012, Oversight and Investigations Subcommittee Hearing, NECC has been the subject of multiple complaints to and investigations by the FDA and the Massachusetts Board of Registration in Pharmacy ("MBP") over the past decade often focusing on unsterile conditions at NECC's facilities.  For example, the FDA issued a Warning Letter to NECC in 2006.  The FDA letter details numerous problems at NECC including the sale of compounded drugs without patient-specific prescriptions, compounding copies of commercially

available drugs, selling misbranded compounded drugs, and problems with storage and sterility. That warning letter has been available to the public on the FDA's website for years.

54.     Between January 2012 and August 2012, NECC's environmental monitoring program for its compounding facility yielded numerous microbiological isolates (bacteria and mold) within the Clean Room used for the production of methylprednisolone acetate. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC knew or should have known of these findings. NECC, Barry 'Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to investigate those isolates and made no effort to identify those isolates. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to perform any product assessments for the products made in the Clean Room where the isolates were found. NECC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, Glenn Chin, Ameridose, MSM and/or MSMSW, and GDC failed to take any corrective actions with regards to the isolates that were found. Despite these findings, NECC continued to compound methylprednisolone acetate, and Ameridose, MSM, and/or MSMSW continued to distribute marketing materials to customers and potential customers touting the cleanliness of the NECC laboratories.

55.     On September 26, 2012, in the wake of dozens of cases of fungal meningitis and other infections associated with NECC's injectable steroid MPA, state agents raided NECC's lab on Waverly Street in Framingham, Massachusetts.

56.     NECC's few remaining employees were scrubbing the compounding areas with bleach. Despite this last-ditch effort, the "clean" rooms were filthy. A leaky boiler stood in a

pool of stagnant, dirty water. The autoclaves used to sterilize the product were discolored, tarnished, and contained visible moisture. The air intake came from vents located about 100 feet from a mattress recycling facility that released copious amounts of dust and other contaminants into the air. The air vents in the "clean" rooms were covered with dirt and white fuzz. The metal shelf in the "clean" room used to prepare methylprednisolone acetate was covered in a reddish-brown, cloudy substance.

57.     Investigators determined that NECC's internal records showed dozens of instances of bacterial and fungal contamination within the NECC facility over at least the past nine months. NECC ignored these test results. NECC never even attempted to get rid of these microbial contaminants.

58.     Eighty-three out of three hundred twenty-one observed vials from one of three recalled lots of MPA contained a greenish-black substance visible to the human eye. Seventeen other vials contained a white filamentous material. All fifty out of fifty vials tested confirmed the presence of live microbes (whether fungal or bacterial). The CDC and FDA later confirmed the presence of fungus in unopened vials of NECC's methylprednisolone acetate. This is the same fungus that the CDC confirmed was present in at least forty fungal meningitis cases.

59.     Inspections of NECC's sister company Ameridose revealed similarly deplorable conditions, including countless instances of visible contamination of the hoods and rooms used to prepare drug products, insect infestations, birds flying through areas where purportedly sterile products were packaged and stored, and tubs being used to collect rain water that poured through the chronically leaky roof above the "clean" rooms. Ameridose, like NECC, persistently ignored and failed to investigate at least fifty-three instances of known microbiological contamination. Ameridose also hid adverse events associated with its products, failing to report them to the FDA

as required by law and instead classifying these events as "patient responses" or "non-complaints" and taking no action to address them.

60.     The CDC determined that three lots of 80 mg/ml MPA produced by NECC between May 21 and September 26, 2012, were contaminated with potentially deadly pathogens.

61.     In late September 2012, NECC recalled the following lots of methylprednisolone acetate (PF) 80 mg/ml that it had compounded and sold: Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #05212012@68, BUD 11/17/2012; Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #06292012@26, BUD 12/26/2012; and Methylprednisolone Acetate (PF) 80 mg/ml Injection, Lot #08102012@51, BUD 2/6/2013.

62.     NECC identified Specialty Surgery Center in Crossville, Tennessee, as one of the healthcare providers that received vials of methylprednisolone acetate that were part of the September 2012 recall.

63.     On or about October 3, 2012, the Massachusetts Department of Public Health ("DPH") secured the surrender of NECC's license to operate as a compounding pharmacy.

64.     On October 6, 2012, NECC announced that it was recalling "all products currently in circulation that were compounded at and distributed from its facility in Framingham, Massachusetts."

65.     On or about October 8, 2012, at the request of DPH, Barry Cadden and Glenn Chin voluntarily ceased their practice as pharmacists. Lisa Cadden also has voluntarily ceased her practice as a pharmacist. Upon information and belief, none of them have practiced as a pharmacist since voluntarily ceasing their practice.

66.     On or about October 22, 2012, the Massachusetts Board of Registration in Pharmacy authorized DPH to request the voluntary permanent surrender of the licenses of Barry

Cadden, Glenn Chin, Lisa Cadden, and NECC. According to DPH, "[i]f the three pharmacists and NECC do not comply, the Board authorized staff to proceed with permanent revocation."

67. One of the Massachusetts regulations promulgated by the Massachusetts Board of Registration in Pharmacy pertinent to NECC's operation as a compounding pharmacy mandated that "[t]he premises of the pharmacy or pharmacy department shall at all times be kept in a clean and sanitary manner " 247 CMR 6.02(1).

68. Over the last ten years, ARL has conducted sterility testing on samples of methylprednisolone acetate compounded by NECC, including samples from Lot #05212012@68, BUD 11/17/2012; Lot #06292012@26, BUD 12/26/2012; and Lot #08102012@51, BUD 2/6/2013.

69. From May through August 2012, NECC sent several samples of its MPA to ARL for sterility testing. As one example, on or about May 21, 2012, NECC sent to ARL two 5ml vials of methylprednisolone acetate from a batch of 6,528 vials that came from Lot 05212012@68, which had been compounded by NECC on May 21, 2012.

70. On May 22, 2012, ARL received and tested the two 5ml vials of methylprednisolone acetate that NECC sent to ARL on or about May 21, 2012. ARL sent to NECC a Microbiology Report dated May 25, 2012, which stated that the two vials had been tested on May 22, 2012.

71. ARL's May 25, 2012, Microbiology Report to NECC stated that the "preliminary" results from the sterility test using test method USP 71 showed that the two 5ml vials of methylprednisolone acetate that NECC sent to ARL on or about May 21, 2012, were "sterile." ARL's report to NECC further noted that the preliminary results were observed "after approximately 72 hours of incubation."

72.    Pursuant to the protocols of test method USP 71, sterility testing on a batch of
more than 6,000 vials of methylprednisolone acetate should have been conducted on at least 20
vials from the batch.

73.    On or about August 10, 2012, NECC caused one 5ml vial of methylprednisolone
acetate to be sent to ARL for sterility testing from a batch of several thousand vials that are from
Lot #08102012@51, BUD 2/6/2013.

74.    The Microbiology Reports issued by ARL to NECC between May and September
2012 concerning the sterility testing of methylprednisolone acetate indicated that the sterility
tests performed by ARL were conducted in compliance with USP 71.

75.    During the summer of 2012, MSM and/or MSMSW sales representatives, on
behalf of NECC and Ameridose, distributed copies of the May 25, 2012, ARL Microbiology
Report concerning the testing of the vials of methylprednisolone acetate from Lot 05212012@68
to customers and/or potential customers in a packet of marketing materials intended to highlight
the safety and sterility of the methylprednisolone acetate compounded by NECC.

76.    ARL was aware of the risks posed by compounding pharmacies, specifically
including the risks posed by NECC's compounding practices.

77.    In 2002, ARL found that four samples of a steroid compounded by NECC were
contaminated with potentially deadly endotoxins.

78.    ARL allowed compounding pharmacies such as NECC to submit an inadequate
number of samples for sterility testing, which practice did not comply with USP 71 requirements.

79.    GDC which is an acronym for "Gregory D. Conigliaro" owns the real property
and is responsible for maintenance and structural improvements at 685-705 Waverly Street,
Framingham, Massachusetts.

80.     From 1998 until at least October 2012, GDC leased a portion of the premises at Waverly Street to NECC, MSM and MSMSW.

81.     In an on-line posting for a property management position at GDC, which appeared on or before October 25, 2012, GDC stated that it "owns an 88,000 square foot facility on seven acres in downtown Framingham.  GDC currently has eight major tenants." GDC described one of the duties and responsibilities of the GDC property manager as follows: "Insure all tenants operate their businesses in accordance with facility, local [and] state . . . rules and regulations."

82.     GDC maintained a high degree of control over the premises leased by NECC.

83.     Until October 2012, NECC, Ameridose, ARL, Barry Cadden, Lisa Cadden, and Glenn Chin compounded, tested, marketed and/or distributed methylprednisolone acetate.

84.     GDC and Gregory Conigliaro knew that NECC was compounding preservative-free methylprednisolone acetate at 697 Waverly Street, and further knew that this medication was injected into humans and was required to be sterile.

## III.    NECC AND THE RISKS OF PHARMACY COMPOUNDING

85.     The serious risks of pharmacy compounding were also the subject of considerable discussion in the pharmacy community and the medical community before the subject fungal infection outbreak.  The risks associated with compounded drugs have been known for years in the pharmacy and medical community.

86.     In 2002, the CDC published a report regarding at least two cases of fungal meningitis arising from contaminated medication used in epidural injections.  The report concluded that "purchasers of pharmaceuticals should determine if supplies are provided from a compounding pharmacy that . . . follows appropriate measures to ensure that injectable products are free of contamination."

87.     On March 24, 2005, USA Today published a front page article with the following
headline: "*Safety concerns grow over pharmacy-mixed drugs.*" That article discussed growing
concern over the fact that drugs produced in bulk by compounding pharmacies are not FDA
approved and are not subject to the same oversight as drugs produced by pharmaceutical
companies.

88.     In 2006, the FDA conducted a survey of compounded drug products. They
collected thirty-six samples from compounding pharmacies across the United States during
unannounced visits. Twelve of the 36 samples (33%) failed analytical testing. The FDA survey
concluded "poor quality compounded drugs are a serious public health concern, as improperly
compounded products have been linked to grave adverse events, including deaths."

89.     In May 2007, the FDA published an article titled "The Special Risks of Pharmacy
Compounding." That article highlighted numerous adverse events involving compounded
products. It also warned of the emergence of large scale compounding operations that were
clearly operating outside of the bounds of traditional compounding practice.

90.     In 2010, the FDA posted an educational video on YouTube regarding concerns
over the quality of compounded drugs.

91.     On November 5, 2010, the American Society of Anesthesiologists, the American
Society of Health-System Pharmacists ("ASHP") and other medical societies published a joint
report regarding drug shortages. That report included an article written by the ASHP stating as
follows:

> Compounding pharmacies have also pursued the production of
> drugs that are in short supply. Caution is warranted because
> preparations from these pharmacies may not meet applicable state
> or federal standards (e.g., United States Pharmacopeia chapter 797
> or FDA labeling requirements). The sources of raw materials used
> by compounding pharmacies have been questioned, and apparent

-17-

> lapses in quality control have resulted in serious patient injury,
> including death.
>
> * * *
>
> Compounding pharmacies may also present patient risks; several
> deaths have been associated with improperly sterilized
> compounded products.

92.     In May 2012, the CDC published a report regarding fungal infections arising from

medications obtained from a compounding pharmacy.  That report advised that "contamination

of compounded sterile preparations has caused outbreaks.  Since 1990, FDA has learned of

approximately 200 adverse events associated with 71 compounded products."

## IV.     THE FUNGAL MENINGITIS OUTBREAK

93.     In September 2012, health officials identified an outbreak of fungal meningitis

and other fungal infections.  Investigators traced the outbreak to MPA compounded by NECC.

94.

95.     According to the CDC, fungal meningitis occurs when the protective membranes

covering the brain and spinal cord are infected with a fungus.  Fungal meningitis is rare and

usually caused by the spread of a fungus through blood to the spinal cord.  Fungal meningitis is

not transmitted from person to person.

96.     According to the CDC, symptoms of meningitis include the following: new or

worsening headache; fever; sensitivity to light; stiff neck; new weakness or numbness in any part

of the body; slurred speech; and increased pain, redness, or swelling at the injection site.  Death

may result from meningitis.

97.     According to the CDC, symptoms of fungal meningitis are similar to symptoms of

other forms of meningitis; however, they often appear more gradually and can be very mild at

first.  In addition to typical meningitis symptoms, like headache, fever, nausea, and stiffness of

the neck, people with fungal meningitis may also experience confusion, dizziness, and discomfort from bright lights. Patients might just have one or two of these symptoms.

## V.    SPECIALTY SURGERY'S PURCHASE OF MPA FROM NECC

98.    Specialty Surgery its agents and employees, knew or should have known of the dangers of using compounded drugs and specifically products compounded by NECC. These defendants failed to undertake any appropriate due diligence to ascertain the safety and quality of NECC's products.

99.    Specialty Surgery made the decision to purchase MPA in bulk from NECC because it was the cheapest steroid.

100.    The primary motivation for Specialty Surgery to purchase steroids in bulk from NECC was price.

101.    Specialty Surgery did not conduct appropriate due diligence or investigation into NECC before deciding to purchase and administer NECC compounded steroids to their patients. Specialty Surgery placed their own profits over patient safety.

102.    NECC was not authorized to compound and sell MPA in bulk to Specialty Surgery.

103.    NECC was only allowed to fill individual prescriptions for individual patients written by appropriately licensed healthcare providers.

104.    Upon information and belief, Specialty Surgery did not use patient-specific individual prescriptions when buying MPA from NECC in bulk.

105.    Specialty Surgery could have purchased MPA for use in epidural steroid injections ("ESI") from a compounder other than NECC.

106.    Specialty Surgery could have purchased MPA for use in ESI's from a traditional,

FDA-regulated pharmaceutical manufacturer, e.g., Pfizer.

107.    At the time of the relevant conduct, Tennessee law also imposed a patient safety

rule that prohibited the sale and use of compounded medications except pursuant to a valid

patient prescription.  The conduct of NECC, aided and abetted by Specialty Surgery, would have

also violated this patient safety rule.  Specialty Surgery knew or should have known of this

patient safety rule at the time it aided and abetted NECC in violating the applicable patient safety

rules.

## VI.    PLAINTIFF JOHN JOHNSON IS INJECTED WITH MPA FROM NECC AND DEVELOPS SYMPTOMS OF FUNGAL MENINGITIS

108.    On September 11, 2012, John Johnson received an epidural  steroid injection at

Specialty Surgery to help treat lower back pain.  During that medical procedure, MPA was

injected into John Johnson's lower back.

109.    Prior to being sold the injections, John Johnson was never informed that he was

being injected with medication compounded by NECC.

110.    The injection into John Johnson lower back came from contaminated lots of MPA

purchased from NECC.  The contaminated lots were subsequently recalled by NECC.

111.    John Johnson's injection of MPA caused him symptoms of fungal meningitis.

112.    On or about October 18, 2012, Plaintiff presented to Crossville Medical Group

and complained of increasing neck pain, head aches and some nausea.  He had been

asymptomatic on October 3, 2012.

113.    On October 18, 2013, physicians ordered a CT of the head and a lumbar puncture

and   He was subsequently referred for a MRI of the cervical spine and an MRI of the brain.

114.    The MPA injected into John Johnson's lower back joint came from one or more of the three recalled contaminated lots.

115.    As a direct and proximate result of the contaminated epidural steroid injections, John Johnson became very ill, developed symptoms of meningitis, and was required to undergo a painful lumbar puncture procedure.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(Against NECC-Related Defendants)

116.    As the designer, tester, compounder, seller, marketer and/or distributor of consumer products, the NECC Related Defendants owed a duty to Plaintiff to comply with existing standards of care, and to exercise due care, in providing a safe and quality product to Plaintiff.

117.    Specifically, but without limitation:

a.      Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin owed Plaintiff a duty to provide methylprednisolone acetate that was safe and free of contamination.

b.      ARL owed Plaintiff a duty to properly conduct tests to insure that the methylprednisolone acetate was safe and free of contamination.

118.    Defendants breached those duties, and were otherwise negligent in their design, compounding, sale, testing, marketing, and distribution of the recalled steroid medication, which was administered to the Plaintiff. The Defendants failed to exercise due care in accordance with the standard of care and skill required of, and ordinarily exercised by, a designer, compounder, tester, seller, marketer, and distributor of steroid medications, as licensed to do so by the Commonwealth of Massachusetts. The Defendants, by and through their supervisors, staff and

agents engaged in designing, compounding, storing, testing, selling, marketing and distributing MPA in a negligent manner.

119.    Defendants further breached those duties by failing to hold the components of the recalled medications; by failing to properly design, compound, test and distribute MPA so that it would not be contaminated with fungus; by failing to properly maintain its facilities where it compounded its medications in a clean, sanitary manner; by failing to oversee the security and quality control of its compounding and distribution facilities; and by allowing contaminated and unsafe compounded medications to reach the stream of commerce for use by Plaintiff.

120.    Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to Plaintiff by failing to use reasonable care in designing, compounding, testing, marketing, distributing and/or selling methylprednisolone acetate.

121.    The negligence of Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin was a proximate cause of Plaintiff's injuries.

122.    Plaintiff was exposed to infectious fungi through NECC's contaminated steroid that was injected into Plaintiff in 2012.

## COUNT II
### NEGLIGENCE PER SE
(Against all NECC-Related Defendants except ARL)

123.    Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin owed Plaintiff a duty to maintain the premises of the pharmacy "in a clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

124.     Ameridose, MSM/MSMSW, GDC, Barry Cadden, Gregory Conigliaro, Lisa
Cadden, Douglas Conigliaro, Carla Conigliaro and Glenn Chin breached the duties owed to
Plaintiff by failing to use reasonable care in maintaining the premises of the pharmacy "in a
clean and sanitary manner[,]" 247 CMR 6.02(1), and free from contamination.

125.     Defendants also violated Massachusetts' laws and its pharmacy licensing
obligations.

126.     The aforementioned actions by Ameridose, MSM/MSMSW, GDC, Barry Cadden,
Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin were a
proximate cause of Plaintiff's injuries.

## COUNT III
## NEGLIGENT SUPERVISION
### (Against NECC-Related Defendants)

127.     Defendants Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory
Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin had an
obligation and duty to exercise due care, and comply with the then existing standard of care, to
investigate and hire professional and competent employees to create, test, package, market, and
distribute the compounded medications and to maintain the facility and its premises, and to make
sure the compounded drugs did not create any harm or risk to the Plaintiff and others who
received the compounded medication.

128.     In breach of those duties, Defendants failed to exercise due care and failed to
supervise their employee(s) or agent(s), who were at all times working within the scope of their
employment and authority.  Specifically, and without limitation:

a.     The Defendants failed to monitor and test the steroid medication and were
otherwise negligent in supervision of their employees.

b.    Defendants also failed to monitor and supervise the testing of the compounded medications.

c.    The Defendants were negligent in hiring, training, and supervising their employees.

129.   The Defendants knew, or should have known, that their employee(s) or agent(s) did not follow proper procedures and knew or should have known of the risks created by failing to do so.

130.   As a direct and proximate cause of the breach of those duties, the Defendants permitted the steroid to become contaminated and distributed to patients including the Plaintiff.

131.   The aforementioned actions by Ameridose, MSM/MSMSW, GDC, ARL, Barry Cadden, Gregory Conigliaro, Lisa Cadden, Douglas Conigliaro, Carla Conigliaro, and Glenn Chin were a proximate cause of Plaintiff's injuries.

## COUNT IV
## PUBLIC NUISANCE
(Against Barry Cadden, Gregory Conigliaro and GDC)

132.   At all relevant times, Barry Cadden, Gregory Conigliaro, and/or GDC were in control of the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

133.   Barry Cadden, Gregory Conigliaro, and GDC owed a duty to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts, in a condition that was free from contamination.

134.   Barry Cadden, Gregory Conigliaro, and GDC failed to exercise reasonable care in maintaining the property and improvements at 697 Waverly Street, Framingham, Massachusetts.

135.   The failure by Barry Cadden, Gregory Conigliaro, and GDC to maintain the property and improvements at 697 Waverly Street, Framingham, Massachusetts, was a proximate

cause of the multistate epidemic of fungal meningitis and infections caused by the contaminated methylprednisolone acetate.

136.    Barry Cadden, Gregory Conigliaro, and GDC unreasonably and significantly interfered with the public health and the public safety.

137.    Barry Cadden, Gregory Conigliaro, and GDC unreasonably and significantly interfered with the public right expressed in 247 CMR 6.02(1).

138.    The public nuisance created by Barry Cadden, Gregory Conigliaro, and GDC was a proximate cause of Plaintiff's injuries.

139.    The public nuisance created by Barry Cadden, Gregory Conigliaro, and GDC has caused Plaintiff John Johnson special injury in that Plaintiff has sustained injuries to his personal health.

COUNT V
PRODUCT LIABILITY CLAIMS
(Against Specialty Surgery)

140.    The MPA injected into Plaintiff's lumbar spine in 2012 was compounded by NECC.

141.    On December 21, 2012, NECC filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts, *In re: New England Compounding Pharmacy, Inc.*, case no. 12-19882-HJB.

142.    Pursuant to 11 U.S.C. § 362(a)(1) certain actions against NECC are stayed following its bankruptcy petition.

143.    Plaintiff could have commenced an action in this court seeking to recover on a claim and seeking a judgment against NECC before December 21, 2012.

-25-
113391.  Case 2:13-cv-00099   Document 1   Filed 09/30/13   Page 25 of 30 PageID #: 25

144.   Plaintiff's claims that arose before NECC's petition in bankruptcy are subject to the automatic stay provisions of 11 U.S.C. § 362(a)(1).

145.   NECC has ceased operations.

146.   NECC is unable to pay its debts as they fall due.

147.   NECC is unable to pay its debts in the ordinary course of its business.

148.   NECC's liabilities exceed its assets.

149.   NECC is insolvent.

150.   On July 24, 2013, The United States Bankruptcy Court for the District of Massachusetts in *In re: New England Compounding Pharmacy, Inc.*, Case no. 12-19882-HJB, ordered that with respect to certain claims, including those asserted by Plaintiff in this lawsuit, NECC is presently insolvent and has been insolvent at all times since the petition date.

151.   Specialty Surgery procured from NECC the MPA injected into Plaintiff.

152.   NECC's product was defective and unreasonably dangerous when it left NECC's control because it was contaminated with lethal pathogens, and it was in substantially the same condition at the time that Specialty Surgery injected it into Plaintiff in 2012.

153.   Specialty Surgery charged Plaintiff for epidural steroid injections administered to Plaintiff.

154.   Specialty Surgery acted as a seller or distributor of MPA compounded by NECC when it sold and administered epidural steroid injections to patients, including Plaintiff.

155.   Specialty Surgery were engaged in the business of selling MPA compounded by NECC.

156.   Accordingly, Specialty Surgery is a "seller" as defined by Tenn. Code Ann. § 29-28-102(7).

157.    Tenn. Code Ann. § 29-28-106(4) authorizes Plaintiff to prosecute product liability claims against Specialty Surgery as the seller of the MPA injected into Plaintiff because the compounder of the product, NECC, cannot be served with process in this state.

158.    Tenn. Code Ann. § 29-28-106(5) authorizes Plaintiff to prosecute product liability claims against Specialty Surgery as the seller of the MPA injected into Plaintiff because the compounder of the product, NECC, has been judicially declared insolvent.

159.    The MPA that Defendant Specialty Surgery injected into Plaintiff was unreasonably dangerous and defective at the time it left their control because it was contaminated with lethal pathogens.

160.    Specifically, the MPA was in a defective condition and unreasonably dangerous at all relevant times because it was unsafe for normal or anticipated handling as defined by Tenn. Code Ann. § 29-28-102(2).

161.    The MPA sold and distributed by Specialty Surgery was neither merchantable nor fit for the purpose for which it was produced and sold.  Accordingly, Specialty Surgery breached their warranties, both express and implied, as stated in Tenn. Code Ann. §§ 47-2-313, 47-2-314, and 47-2-315, including their warranty of fitness for a particular purpose.

162.    Specialty Surgery is strictly liable for the injuries and losses caused by the unreasonably dangerous and defective steroids injected into Plaintiff.

## DAMAGES

163.    As a direct and proximate result of the Defendants' wrongful conduct as described above, Plaintiff has suffered physical injuries, physical and mental pain and suffering, mental anguish, loss of enjoyment of life and loss of earning capacity.

164.    The long term effects of Plaintiff's illness are unknown.

165. Plaintiff remains under the care of physicians. Plaintiff has incurred and continue to incur medical and other expenses.

## PUNITIVE DAMAGES

166. The above described acts and omissions on the part of the Defendants were reckless and intentional. Defendants were aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that their disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. Plaintiff therefore is entitled to an award of punitive damages against the Defendants.

## CAPS FOUND IN TENN. CODE ANN. § 29-39-102 AND § 29-39-104 ARE UNCONSTITUTIONAL AND VOID *AB INITIO*

167. Plaintiff seeks a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the caps on personal injury and punitive damages set forth in Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are an unconstitutional deprivation of the right to trial by jury set forth in Article I, Section 6, of the Constitution of the State of Tennessee, which provides that the right of trial by jury shall remain inviolate, and violate the provisions of Article XI, Section 16, of the Constitution of the State of Tennessee which absolutely precludes the Legislature from exercising any legislative power to remove or restrict the right of juries in civil cases to determine damages.

168. On October 1, 2011, the Tennessee Civil Justice Act went into effect, enacting "caps" in all Tennessee personal injury cases for non-economic damages and punitive damages. Tenn. Code Ann. § 29-39-102; Tenn. Code Ann. § 29-39-104. Under that Act, Plaintiff's non-economic damages are purportedly capped at $750,000, and their ability to recover punitive damages is capped at twice the compensatory damages up to a maximum of $500,000.

169.    Tenn. Code Ann. § 29-39-102 and Tenn. Code Ann. § 29-39-104 are

unconstitutional deprivations of Plaintiff's constitutionally protected right to trial by jury. Those

provisions violate Article I, Section 6, of the Constitution of the State of Tennessee, which

provides that the right of trial by jury shall remain inviolate. In addition, the subject statutory

caps violate Article I, Section 17, of the Tennessee Constitution, which states that all courts shall

be open, and every man shall have a remedy for injury done by due course of law and without

denial or delay. The subject statutory caps usurp the powers of the Judicial Branch in violation

of Article II, Sections 1 & 2 of the Tennessee Constitution. In addition, the subject statutory

caps violate Article XI, Section 16, of the Tennessee Constitution which indicates that the rights

of citizens articulated in Tennessee's Bill of Rights "shall never be violated on any pretense

whatever . . . and shall forever remain inviolate."

170.    Therefore, Plaintiff requests a declaration that the statutory caps are
unconstitutional, void *ab initio*, and of no force and effect.

## **PLAINTIFF'S COMPLIANCE WITH TENN. CODE ANN. §§ 29-26-121 AND 29-26-122**

171.    Out of an abundance of caution, neither this claim, nor any other claim or count

asserted in this action, is meant to allege a claim arising under or otherwise covered by the

Tennessee Medical Malpractice Act (the "TMMA"), T.C.A. § 29-26-101, *et. seq*. Plaintiff has

served notice letters, as required by the TMMA, on September 4, 2013, but sixty days have not

yet passed since service of those letters. Plaintiff files this action to preserve his products

liability action, and will amend this complaint to add, in the alternative, and out of an abundance

of caution, claims under the TMMA at the appropriate time.

172.    With regard to Defendant Specialty Surgery, Plaintiff complied with the

requirements of Term Code Ann. § 29-26-121(a) by sending notice of the claim via certified

mail, return receipt requested, to Specialty Surgery's current business address. As set forth in the

Affidavit, the notice was sent to Specialty Surgery on September 4, 2013, by certified mail, return receipt requested. Attached as **Exhibit A** is a copy of the notice and enclosures along with the certificate of mailing from the United States Postal Service attached to the Affidavit.

173.    The requirements of Tenn. Code Ann. § 29-26-121 have been satisfied.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1.    A judgment to plaintiff for compensatory damages in excess of $75,000;

2.    A judgment for punitive damages in an amount to be determined by the trier of

fact;

3.    A jury be empanelled to try this cause;

4.    For costs of this cause; and

5.    For such further relief as the Court may deem just and proper.

Dated: September 30, 2013                    Respectfully submitted,

Mark P. Chalos (TN BPR #19328)
Lieff Cabraser Heimann & Bernstein, LLP
One Nashville Place  Suite 1650
150 Fourth Avenue North
Nashville, TN 37219-2423
615-313-9000
mchalos@lchb.com

Richard M. Golomb
Steven D. Resnick
Golomb & Honik
1515 Market Street, Suite 1100
Philadelphia, PA 19102
215-985-9177
rgolomb@golombhonik.com
sresnick@golombhonik.com

COUNSEL FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | | |
|---|---|---|
| **JOHN JOHNSON** | : | |
| | : | |
| **Plaintiff(s),** | : | **MDL No. 2419** |
| | : | **Master Docket No. 1:13-md-2419-FDS** |
| **v.** | : | |
| | : | **Honorable F. Dennis Saylor** |
| | : | |
| **UNIFIRST CORPORATION, A/D/B/A** | : | |
| **UNICLEAN CLEANROOM** | : | |
| **SERVICES, SPECIALTY SURGERY** | : | |
| **CENTER, PLLC** | : | |
| **Defendants.** | : | |

## CORRECTED SHORT FORM COMPLAINT
## AGAINST UNAFFILIATED DEFENDANTS

Plaintiff(s), John Johnson complaining against the Defendants, allege(s) as follows:

### FIRST COUNT

1.      Pursuant to MDL Order No. 7, entered in *In Re: New England Compounding Pharmacy, Inc. Products Liability Litigation*, Master Docket No. 1:13-md-2419-FDS, the undersigned counsel hereby submit this Short Form Complaint and Jury Demand against the Defendants, and adopt and incorporate by reference the allegations in the Plaintiffs' Master Complaint, with attachments, and any and all amendments thereto.

2.      Plaintiff is a resident of the State of Tennessee.

3.      Plaintiff brings this action [Check the applicable designation]:

☒  On behalf of herself/himself.

☐  As the representative of _____, who is a living person.

1

☐   As the Administrator, Administrator ad Prosequendum, or other representative of the Estate

of _____ (hereinafter "Decedent"), who died on _____.

4.     Plaintiff asserts that he was administered the New England Compounding

Pharmacy, Inc. ("NECC") drug Methylprednisolone Acetate (hereinafter referred to as "NECC

drug"), causing injuries and damages.

5.     The aforesaid administration of the NECC drug occurred on: September 11, 2012

at Specialty Surgery Center, PLLC, which located in Crossville, Tennessee. The injection was

administered by Dr. Kenneth R. Lister.

6.     Specialty Surgery Center, PLLC is hereinafter referred to as "Clinic Related

Defendant."

7.     Plaintiff(s) adopt(s) and incorporate(s) by reference the following Causes of

Action asserted against the Defendants in the Master Complaint:

        ☒     COUNT II: NEGLIGENCE AND GROSS NEGLIGENCE (Against UniFirst)

        ☒     COUNT III: NEGLIGENCE AMD GROSS NEGLIGENCE (Against Clinic Related Defendant)

        ☒     COUNT IV: VIOLATION OF CONSUMER PROTECTION STATUTES (Against Clinic Related Defendant)

            Plaintiff(s) allege violation of the following consumer protection statute(s): T.C.A. § 47-18-101, *et seq*.

        ☒     COUNT VI: VIOLATION OF M.G.L. C. 93A (Against UniFirst)

        ☒     COUNT VII: BATTERY (Against Clinic Related Defendant)

        ☒     COUNT VIII: FAILURE TO WARN (Against Clinic Related Defendant)

        ☒     COUNT IX: TENNESSEE PRODUCT LIABILITY CLAIMS (Against Tennessee Clinic Related Defendant)

☒    COUNT X: AGENCY (Against Clinic Related Defendants)

☒    COUNT XI: CIVIL CONSPIRACY (Against Clinic Related Defendants)

☐    COUNT XII: WRONGFUL DEATH PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendants)

☐    COUNT XIII: LOSS OF CONSORTIUM (Against UniFirst and Clinic Related Defendants)

☒    COUNT XIV: PUNITIVE DAMAGES (Against UniFirst and Clinic Related Defendants)

8.     Plaintiff(s) have sent or served the pre-suit notice or demand requirements necessary to bring the claims set forth below, as required under Tenn. Code Ann. §§ 29-26-121 and 29-26-122.

9.     Plaintiff John Johnson claims to have suffered the following injuries as a result of the administration of NECC's drug: exposure to contaminated steroid; various symptoms of fungal meningitis including but not limited to: nausea, neck stiffness, headache and fever, all of which necessitated a painful lumbar puncture procedure, as well as emotional distress.

WHEREFORE, Plaintiff(s) demand(s) Judgment against the Defendants awarding compensatory damages, punitive damages, attorneys' fees, interest, costs of suit, and such further relief as the Court deems equitable and just.

Plaintiff(s) reserve the right to amend this Complaint to add allegations and claims against individuals or entities currently omitted (in light of the Court's order permitting a Master Complaint naming defendants affiliated with NECC and currently participating in mediation by December 20) and to add or amend allegations against Defendants named herein based, in part, on further discovery.

[

## JURY DEMAND

Plaintiff(s) hereby demand(s) a trial by jury.

Respectfully submitted,

**GOLOMB & HONIK, P.C.**

*/s/ Kevin W. Fay*

Richard M. Golomb, Esquire
Steven D. Resnick, Esquire
Kevin Fay, Esquire
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel:     (215) 985-9177
Fax:     (215) 985-4169
Email: rgolomb@golombhonik.com
          sresnick@golombhonik.com
          kfay@golombhonik.com

*Attorneys for Plaintiffs*

**Date:** <u>**December 19, 2013**</u>

## CERTIFICATE OF SERVICE

I, Kevin W. Fay, hereby certify that on this 19th day of December 2013, I caused a copy of the above Short Form Complaint to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

/s/  Kevin W. Fay
Kevin W. Fay