**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | |

**PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM IN SUPPORT OF
MOTION FOR DISTRIBUTION OF COMMON BENEFIT FEES AND EXPENSES**

## I.    INTRODUCTION

After an exhaustive process, the Plaintiffs' Steering Committee seeks an order from this

Court (i) approving an eight percent (8%) assessment from available funds for common benefit fees

and expenses, (ii) approving the payment of reasonable expenses made in support of common

benefit efforts as recommended by the PSC, and (iii) approving the allocation and payment of

reasonable attorneys' fees to specified firms in amounts recommended by the PSC to be reasonable

and appropriate for common benefit efforts.

Several important general observations:

First, this motion will not be ripe for resolution until near the end of this calendar year.[1]  By

then, initial payments to victims for all or virtually all, non-appealed claims will have been made.

That process is already well underway.  As a result, while we file this motion now, as a practical

matter counsel will not be paid, nor have their expenses reimbursed, until initial the payment

process is concluded (or nearly so).  This ensures that virtually all claimants will have first received

their first payments by the time the Court approves an allocation.

Second, the $14.7 million in cumulative submitted expenses and initial loadstar of all firms,

after review and audit, exceeds the dollar value of an 8% allocation of the available funds (about

---

[1] Objections, if any, are due October 24, 2016.  The PSC's reply is to be filed on November 21, 2016.

$12.4 million).  As a result, the proposals here result in all counsel receiving less than their reported or allocated lodestar and expenses.  No MDL lawyer will get his or her common benefit time reimbursed dollar-for-dollar.  While the results are quite extraordinary, the primary defendant was bankrupt and the total funds available to the tort trust are insufficient to fully compensate claimants given the enormity of the wrongs committed here.  So we believe it appropriate for counsel to sacrifice some compensation.[2]

Third, this process of collecting time and expenses, review submissions, and making recommendations took many months, and many long hours.  None of that work by lawyers was permitted to be included as common benefit time.  After reviewing all of the work, it is clear that the expression "it takes a village" applies; achieving the results in this case required many people doing many different things.  In most situations, the submitted time was for work approved by lead counsel (and the PSC). In most situations, the work was efficiently done and contributed to the common benefit.  In other situations it was not.  We struggled to reach a consensus and to avoid objection.  In most situations consensus was achieved, in others it may not have been.  We understand that some firms may not be happy with our suggestions; these are compromises.  But we have done the best we can to be fair and reasonable and to listen to and consider the concerns of all involved.

## II.    FACTS

### A.    The Outbreak

In 2012, the Centers for Disease Control and Prevention ("CDC") identified a large number of cases of fungal meningitis and other infections associated with exposure to contaminated lots of

---

[2] A summary of the total proposed allocation of fees and expenses, by firm, (the "Recommended Fee Chart") is attached as Exhibit A to the Declaration of Thomas M. Sobol ("Sobol Dec."), filed herewith.  A breakdown of the proposed compensable expenses, by firm, (the "Recommended Expense Chart") is attached as Exhibit B to the Sobol Declaration.

methylprednisolone acetate ("MPA") compounded by the New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") in Framingham, Massachusetts, and purchased by dozens of pain clinics, hospitals, and doctors scattered throughout the country.

According to the CDC's update of October 23, 2013, the outbreak of fungal meningitis and other infections have affected individuals in over 20 states and caused more than 64 deaths.  Over 753 people have been diagnosed with meningitis, fungal infections and/or abscesses, and other injuries.[3]  The United States Food and Drug Administration ("FDA") and CDC have confirmed the presence of fungus in unopened vials of NECC's MPA.  The FDA[4] and CDC[5] also identified bacteria and/or fungus present in lots of NECC preservative-free injectable betamethasone, preservative-free triamcinolone, and cardioplegia solution.   There is no dispute that the contaminated products caused widespread injury and death.

**B.**     **Initial Litigation**

Victims filed hundreds of civil actions in state and federal district courts across the country, naming some combination of NECC, NECC's affiliated companies, NECC's owners, NECC's vendors, and healthcare clinics and providers that purchased and/or administered NECC products. These cases named four categories of defendants:

The "Affiliated Defendants" included NECC and affiliated entities GDC, Medical Sales Management, and Ameridose.

The "Insiders" included NECC's Owners/Shareholders (including Barry Cadden, Lisa Conigliaro Cadden, Greg Conigliaro, and Doug Conigliaro) and pharmacist Glenn Chin.

---

[3] http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html#casecount_table.

[4] http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ORAElectronicReadingRoom/UCM325980.pdf.

[5] http://www.cdc.gov/hai/outbreaks/laboratory/index.html.

The "National Defendants" were NECC's vendors, and would be liable to all victims if they were liable to any victims.  They included UniFirst (the company that cleaned the NECC cleanroom), Victory (the company that installed and maintained the NECC cleanroom HVAC system), Liberty (the company that built the NECC cleanroom), and ARL (the company that conducted sterility testing on NECC's products).

The "Clinic Defendants" or "Provider Defendants" were hospitals, clinics, doctors, and pharmacists that purchased contaminated products from NECC and/or injected contaminated products into victims.  These included Inspira, High Point, Insight, STOPNC, the St. Thomas entities, Specialty Surgery Center, Howell Allan Clinic, Premier, Box Hill, Advanced Pain & Anesthesia Consultants, Cincinnati Pain Management Consultants, OSMC Outpatient Surgery Center, Ambulatory Care Center, BKC Pain Specialists, Encino Outpatient Surgery Center, Ocean State Pain Management, Sunrise Hospital and Medical, Dallas Back Pain Management, Fullerton Orthopaedic Surgery Medical Group, Sequoia Surgery Center, MAPS, Wellspring Pain Solutions Clinic, Dr. O'Connell's Pain Care Center, and PCA Pain Care.[6]

Early on, some plaintiffs moved for leave to inspect the NECC facility.[7]  The Court granted the motion.[8]  This inspection generated photographs, test results, and other information used while mediating with NECC and others.

In December 2012, New England Compounding Pharmacy, Inc. filed for bankruptcy under Chapter 11.[9]  Under the bankruptcy laws, tort victims were then prevented from naming NECC as a

---

[6] The PSC never kept track of the individual doctors, pharmacists, or other clinic employees that were named as defendants.  The Provider Defendants were always grouped, for organizational purposes, by the clinic where they were employed.

[7] Plaintiff's Memorandum in Support of His Request to Inspect Premises of Defendant New England Compounding Pharmacy, Inc., *Erkan v. New England Compounding Pharmacy, Inc.*, 12-cv-12052-FDS (D. Mass. Dec. 4, 2012), ECF No. 72.

[8] Order on Plaintiff's Motion to Adopt State Court Orders Granting Motion to Permit Inspection of Premises of Defendant, *Erkan v. New England Compounding Pharmacy, Inc.*, 12-cv-12052-FDS (D. Mass. Dec. 10, 2012), ECF No. 100.

defendant in civil litigation.  Shortly thereafter, the bankruptcy court appointed a Trustee to oversee NECC's affairs.  The bankruptcy court also appointed an official committee of creditors comprised of eight tort claimants and one trade creditor.  Those claimants, in turn, executed proxies to permit their attorney to act on their behalf; those firms for tort claimants were (i) Hagens Berman Sobol Shapiro LLP, (ii) Lipton Law, (iii) Andrews & Thornton, (iv) Cohen Placitella & Roth PC, (v) Melvin Wright, (vi) Skikos Crawford Skikos, (vii) Fieger Law, and (viii) Michael D. Galligan.

## C.    The JPML Creates the NECC MDL

On February 12, 2013, numerous civil cases were filed in multiple federal jurisdictions naming NECC and others were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the District of Massachusetts for coordinated pretrial proceedings.[10]  As of today, the JPML has transferred a total of 379 civil actions to this district.  A number of civil actions have also been directly filed in this district or removed from Massachusetts Superior Court.

On June 12, 2013, through operation of the bankruptcy code, the MDL Court acquired jurisdiction of almost all cases across the country – whether pending in state or federal court – that named NECC, its affiliated companies, or its insiders.  The Court asserted § 1334 related-to subject matter jurisdiction over "all federal cases against NECC and its affiliates, and all state-court cases against NECC and its affiliates, including cases where the claims are third-party claims for contribution or indemnity."[11]  The Court reasoned that the cases pending elsewhere would have a "substantial effect, on the bankruptcy estate," that tort claims and contribution or indemnity claims

---

[9] Voluntary Petition for Chapter 11 Bankruptcy, *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Dec. 21, 2012), Bankr. ECF No. 1.  On April 9, 2013, then-presiding Judge F. Dennis Saylor appointed two lawyers (Thomas M. Sobol and Kristen A. Johnson) as lead counsel and established the seven-person Plaintiffs' Steering Committee.  MDL Order No. 2, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419-FDS (D. Mass. Apr. 9, 2013), ECF No. 82.

[10] Transfer Order, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, MDL 2419 (J.P.M.L. Feb. 12, 2013), ECF No. 119.

[11] Corrected Memorandum and Order on Trustee's Motion to Transfer Cases and Related Motions, p. 3, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-FDS (D. Mass. June 12, 2013), ECF No. 176.

had making "it difficult or impossible to resolve the entire litigation in an equitable or efficient manner."[12] The MDL Court *did not* exercise jurisdiction over state-court cases that named only clinics or doctors.[13]

## D.   Resolutions through the Chapter 11 Plan

Between December 2012 and May 2014, a series of negotiations and settlement documentation discussions ensued.  Depending on the putative defendant and the time of the negotiation, various lawyers from amongst the following groups participated to varying degrees – (i) the Chapter 11 Trustee, (ii) Duane Morris, the law firm hired by the Trustee, (iii) Brown Rudnick LLP (appointed as counsel by the bankruptcy court to represent the Creditors' Committee), (iv) HBSS (lead counsel for the PSC in the MDL), (v) some members of the PSC, (vi) one or more Creditors' Committee members, and (vii) other plaintiffs' counsel (*e.g.*, Mr. Fredric Ellis).  The goal was, of course, to seek resolutions on behalf of all tort victims.

Lead counsel worked with other lawyers (sometimes called "designated counsel") in the efforts to reach agreements with the NECC Insiders, Ameridose, the NECC insurers and NECC itself.  Among other things, we reviewed all of the NECC and Ameridose documents that had been produced to date to determine whether evidence was available that would support a stronger liability case.  Designated counsel conducted a wide-ranging investigation, extending over several hundred hours, and concluded that the civil liability case against some of the NECC Insiders supported the settlement amount negotiated by the leading efforts of the Chapter 11 Trustee.

---

[12] Corrected Memorandum and Order on Trustee's Motion to Transfer Cases and Related Motions, p. 7, 18, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-FDS (D. Mass. June 12, 2013), ECF No. 176.

[13] On May 15, 2014, this Court reaffirmed its initial finding of related-to subject-matter jurisdiction underscoring the effect of tort claims on the bankruptcy estate.  Memorandum of Decision, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. May 15, 2014), ECF No. 1131.

Beginning in early 2014, while the Chapter 11 Trustee was negotiating with the NECC Insiders and their insurers, the PSC and designated counsel took the lead in convincing the other National Defendants, ARL, Victory, UniFirst and Liberty, to enter into the mediation process as established by this Court.

*ARL.*  ARL, the outside laboratory that tested NECC's products for sterility, was named as a defendant in liability cases as early as October 2012.  The company had only $6 million in potentially available insurance coverage,[14] and that insurance policy was a wasting policy (*i.e.*, defense costs were reducing the amount of coverage available).[15]  As a result, the claims against ARL were moved quickly to mediation by the PSC and its designated counsel.  Designated counsel spent several hundred hours reviewing more than 30,000 ARL documents, and also retained a consulting microbiologist to assist in evaluating the liability case against ARL.  Designated counsel drafted extensive mediation briefs addressing both the strength of the case against ARL (and ARL's defenses) and the amount of insurance coverage available under the terms of ARL's policies.  The ARL mediation took place over two days in early April 2014, at the end of which designated counsel negotiated an agreement in principle for ARL to pay $6.5 million.  It then took several additional months (and more than one hundred additional hours) for designated counsel to draft and finalize the settlement agreement with ARL, its insurers, and the Chapter 11 Trustee.

*Victory*.  Similar efforts were undertaken to assist in achieving a resolution with Victory, including liability workup, preparation for and conducting a mediation, and finalizing (with others, of course) settlement documentation.

---

[14] *See* Ellis Dec. in Support of Chapter 11 Plan, *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Dec. 21, 2012), Bankr. ECF No. 1228.  Even the $6M in insurance was disputed by ARL's insurance company and it filed a declaratory action in Oklahoma attempting to limit its expenses to $3M.  The PSC, through designated counsel, was allowed to intervene in that action and oppose that effort.

[15] *Id.*

*UniFirst*.  The PSC and designated counsel also worked to achieve a settlement with UniFirst, the cleaning company obligated to clean NECC's "cleanrooms" on a monthly basis.  An extensive review of UniFirst's document production and NECC's document production was conducted by the PSC and designated counsel.  In late 2014, UniFirst agreed to enter into mediation, and PSC and designated counsel drafted mediation briefs and participated in mediation.  Early mediation efforts broke down, but after further litigation (including the provision of a draft Amended Complaint) and further negotiations, lead counsel, designated counsel, the Chapter 11 Trustee, and others succeeded in reaching an agreement pursuant to which UniFirst would pay $30.5 million to the National Settlement Fund.

## E.    Plan Confirmation

On May 6, 2014, a motion to approve a proposed plan for reorganization under Chapter 11 was filed.

On May 20, 2015, the Chapter 11 Plan was confirmed by the Bankruptcy Court (Boroff, J.).  On June 4, 2015, the Plan became effective.[16]  The Plan resolved tort victim claims against NECC, the Affiliated Defendants, the Insiders, and the National Defendants,[17] as well as tort victim claims against some clinic-related defendants (including High Point, Inspira, and Insight).[18]

### 1.    Contributions by Non-Debtor Defendants

The following contributions were made to the estate for the benefit for tort victims (after paying fees and expenses):

---

[16] Exhibit C to Sobol Dec., Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-BR-19882-HJB (Bankr. D. Mass. May 20, 2015), ECF No. 1355.

[17] Notice of Filing of Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-BR-19882-HJB (Bankr. D. Mass. May 19, 2015), ECF No. 1352.  These defendants were referred to as the "national defendants" in the MDL.

[18] Notice of Filing of Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-BR-19882-HJB (Bankr. D. Mass. May 19, 2015), ECF No. 1352.

| National Settling Defendant | Expected Contribution |
|---|---|
| NECC Owners/Shareholder Settlement | $47,750,000 – 75,000,000[19] |
| PMIC/Maxum Settlement | $25,200,000 |
| Ameridose Settlement | $10,000,000 |
| GDC Settlement | $3,750,000 |
| ARL Settlement | $6,400,000 |
| Victory Settlement | $5,500,000 |
| UniFirst Settlement | $30,500,000 |
| Liberty Settlement | $1,000,000 |
| *Total Amount* | *$130,100,000 - $157,350,000* |

| Provider Defendant | Contribution |
|---|---|
| High Point Settlement | $3,500,000 |
| Inspira Settlement | $16,000,000 |
| Insight Settlement | $40,000,000 |
| *Total Amount* | *$59,500,000* |

The Chapter 11 Plan resolved the indemnity and contribution claims against NECC. After the effective date, this Court dismissed all claims in the MDL against defendants settling under the Chapter 11 Plan, including all cases against NECC, the Affiliated Defendants, the National Defendants, Insight, Inspira, and High Point.[20]

Settling parties could only obtain a release if they agreed to provide discovery necessary for plaintiffs in the MDL to continue litigating their cases against the remaining defendants. As a

---

[19] The range anticipates tax refunds due to the insiders, some of which have now been paid into the estate.

[20] Order Dismissing Claims Against Settling Defendants, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. Aug. 25, 2015), ECF No. 2193.

result, discovery concerning NECC and the national defendants has concluded and those documents and materials obtained in discovery are available in a central online repository.[21]  The PSC has committed to retaining copies of all discovery produced in the MDL for the benefit of parties continuing to litigate cases involving NECC for a reasonable amount of time (at least 4 years).

F.    **The National Settlement Claim Procedures and Allocation Matrix**

Back in the spring of 2014, with agreements reached in principle with several defendants, the PSC and designated counsel developed a National Settlement Program to distribute the National Settlement Funds to victims.  The PSC appointed a Settlement Matrix Committee[22] to develop Claim Procedures to address how Claimants would make a claim, what supporting proof would be required, how the claims would be valued, what opportunities would be afforded to cure deficiencies in a claim, and what appeal rights would follow from an administrator's determination. Almost two years had passed already since the outbreak, and it was anticipated that it could take up to an additional year to finalize all the settlements, obtain approval of a Chapter 11 Plan, and begin the claims process.  Under these circumstances, victims and their attorneys understandably wanted to receive payments as soon as possible.  As the costs of settlement administration were going to be paid from the settlement fund itself (thereby reducing the victims' individual recoveries), it was imperative to develop a claims process that was efficient to administer.  Further complicating matters, the medical care expenses for the vast majority of claimants had been covered by Medicare, Medicaid, or other insurance plans and it became clear that a lien resolution program would be required in order to facilitate expeditious payments to those claimants whose claims were approved. And it was imperative to get sweeping acceptance of the plans by claimants and their lawyers; many

---

[21] *See* MDL Order No. 6: Case Management Order, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. June 28, 2013), ECF No. 209.

[22] The Matrix Committee consisted of designated counsel Fredric Ellis, PSC and OCC member Marc Lipton, and OCC member Harry Roth.

would need to be involved.  These considerations made the design of the Settlement Matrix and the Claim Procedures a difficult undertaking requiring many hundreds of hours.

The Matrix Committee first reviewed the publicly-available literature on the outbreak and retained two consulting physicians who had personally treated hundreds of patients injured by the outbreak.  Using this information, the Matrix Committee designed a settlement matrix that distinguished, in a rational, efficient, and objective manner, the more serious cases from the less serious cases by the creation of injury categories for assigning points to each Claimant whose claim was approved.  Due to the limited funds that were anticipated to be available for distribution, a primary goal in developing both the Settlement Matrix and the Claims Procedures was balancing the need to compensate differently situated Claimants differently, while also minimizing the administrative expenses of reviewing and approving claims.  The draft Settlement Matrix was tested against more than 100 actual cases and, after months of work, distributed to all Plaintiffs' Counsel. No settlement matrix can be 100% perfect when applied to approximately 2,000 individual cases with individual circumstances and so, as expected, some counsel felt that the matrix should be revised in certain respects.  The Matrix Committee then reviewed all of the comments received, worked with the attorneys involved, and in certain respects, modified the matrix.

Lead counsel and designated counsel addressed many of the procedural issues of claims administration by developing a twenty-five page claim form to be submitted by Claimants.[23]  They drafted a twenty-five page instructional booklet for completing the claim form and submitting the necessary accompanying documentary proof required,[24] developed extensive Frequently Asked Questions (and answers) for publication on the settlement website,[25] drafted a Request For

---

[23] http://www.neccsettlement.com/Content/Documents/Claim%20Form.pdf.

[24] http://www.neccsettlement.com/Content/Documents/Claim%20Form%20Instructions.pdf.

[25] http://www.neccsettlement.com/Content/Documents/FAQs.pdf.

Proposals for purposes of retaining a settlement administrator, reviewed the several bids submitted by potential settlement administrators, and selected a settlement administrator.  To expedite payments to victims, the Matrix Committee also designed a payment process by which victims whose claims were approved would be issued Initial Payments from the National Settlement Fund without having to wait for all claims to be processed and finalized.[26]

After the Chapter 11 Plan was approved and took effect in June 2015, and the Claims Deadline for the National Settlement was set for October 2, 2015, lead counsel and designated counsel worked with the National Settlement Administrator to distribute approximately 2,500 claim forms and instructional booklets to victims.  Approximately 2,350 claims were filed with the National Settlement Administrator who, with the assistance of the Tort Trustee Advisory Board,[27] began processing claims.  To date, approximately 1,950 claims have been approved in full or in part.

Before the Initial Payments could be issued to Claimants, the claims of Medicare,[28] Medicaid and other insurers for healthcare cost reimbursement had to be resolved.  This was especially important for Medicare, as it was estimated that approximately half of the claimants had received some medical treatment that had been paid for by Medicare.[29]  Anticipating this, the PSC

---

[26] The final amounts that will be paid to victims cannot be determined until it is known 1) exactly how much of the National Settlement Fund will be available, after administrative expenses, for final distribution, and 2) the total amount of points each Claimant is finally awarded, after all appeals are resolved.

[27] A Tort Trust Advisory Board, consisting of designated counsel Rick Ellis, OCC member Harry Roth, and PSC member Kim Dougherty was established by the Chapter 11 Plan documents to provide assistance to the National Settlement Administrator and the Appeal Administrator if either requested it.  Under the Plan documents, the fees of the Tort Trust Advisory Board are to be paid from the Common Benefit Fund. Tort Trust Agreement, 6.02.

[28] The Chapter 11 Plan provides that the Tort Trustee is responsible for all reimbursement and reporting obligations imposed by the Medicare Act (*see* 42 U.S.C, §1395y(b)) for reporting of any NECC-related conditional payments made by CMS (*see* Chapter 11 Plan at 28-29).  The Plan specifically provides that the Tort Trustee shall attempt to enter into a global resolution with CMS to reimburse or otherwise resolve all Medicare claims for healthcare cost reimbursement as required by the federal statute.  *Id.*

[29] The median age of the victims at the time of the outbreak was 64.  Medicare eligibility begins, *inter alia*, when one turns 65.

appointed a Lien Committee[30] to negotiate on behalf of the Tort Trustee with the Centers for

Medicare and Medicaid Services ("CMS") and the Department of Justice ("DOJ").  The goal of

these negotiations, which began November 2015, was to reach an agreement to develop a Medicare

Claim Resolution Program that would use a simple and easily administered formula to resolve

Medicare's claims in an expedited manner so that Initial Payments could be issued to those

Claimants whose medical expenses had been covered in whole or in part covered by Medicare.

During these negotiations, the Lien Committee worked with the National Settlement Administrator

to respond to CMS' numerous data requests concerning the claims made, the claims approved, the

points claimed, the points allowed, the number of Claimants who had lengthy hospitalization stays

and lengthy anti-fungal treatment,[31] estimates of the amounts of Initial Payments from the National

Settlement, estimates of the amounts of Final Payments from the National Settlement, estimates of

the Final Payments from the Insight Settlement, Inspira Settlement, High Point Settlement and MPS

Settlement, among many others.  Compiling this data for and negotiating an agreement with CMS

took months of work.  Finally, in July 2016, an agreement in principle was struck, pending final

DOJ approval. After two hearings with the court,[32]  the agreement was finalized, approved, and it

has been implemented.

    Medicare was not the only entity seeking healthcare cost reimbursements from the

Claimants' payments from the National Settlement Fund and the four other clinic settlement funds.

Thus, lead counsel and designated counsel worked with the Tort Trustee to comply with the

reporting obligations imposed under various state Medicaid agencies to determine those Claimants

---

[30] The Lien Committee first consisted of lead counsel, designated counsel Rick Ellis, PSC member Mark Lipton, and OCC Member Melvin Wright.  It was later expanded to include PSC member Patrick Fennell.  Others also participated.

[31] Lengthy hospitalization and lengthy anti-fungal treatments were closely associated with higher medical costs.

[32] *See* Lead Counsel's Motion for Approval of Agreement between the Tort Trustee and the Centers for Medicare and Medicaid Services Regarding Resolution of Claims for Reimbursement of Health Care Costs, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419 (D. Mass. Aug. 4, 2016), ECF No. 3023.

who had potential claims by Medicaid agencies.  During the spring and summer of 2016, lead counsel and designated counsel, on behalf of the Tort Trustee, also negotiated separate lien resolution programs with the two largest private lienholders, BCBS of Michigan, and BCBS of Tennessee,[33] and an arrangement with another large insurer block representing some of the largest health insurance carriers in the country.

**G.     PSC positions regarding fees in the bankruptcy court.**

On August 3, 2015, individual counsel representing five members of the OCC ("Five OCC lawyers") filed an Omnibus Application for Allowance and Payment of Administrative Expense Claims in the Bankruptcy Court[34] seeking a total amount of $3,055,121.02 in attorneys' fees and expenses.[35]  On September 1, 2015, an amendment to the application of one of the Individual Counsel reduced the Omnibus Application to $2,108,978.32.[36]  If the application had been allowed, this amount would have been deducted from the National Settlement Fund and not been available for distribution to the victims.

After reviewing the Omnibus Application and all of the supporting time and expense entries, the PSC and designated counsel believed that the attorneys' fees and expenses claimed by the Five OCC lawyer firms were not legally compensable under applicable bankruptcy law.  The PSC

---

[33] The agreement with BCBS Michigan and BCBS Tennessee has been signed and executed.

[34] Exhibit D to Sobol Dec., Omnibus Application by Certain Professionals and Their Constituents for Allowance and Payment of Administrative Expense Claims, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Aug. 3, 2015), Bankr. ECF No. 1415.  As noted in the Sobol Declaration, all bankruptcy fee applications submitted as exhibits thereto are excerpted for the convenience of the Court.

[35] This fee application was separate and apart from the fee application of Brown Rudnick, counsel to the OCC, which was eventually allowed in the amount of $3,687,705.68 by the Bankruptcy Court.  *See* Order re Brown Rudnick LLP's Fee Application, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Oct. 6, 2015), Bankr. ECF No. 1570, (granting amount requested of $3,693,086.25 less $5,380.57).  *See also* Exhibit E to Sobol Dec., Brown Rudnick LLP's First and Final Application Seeking Approval of Compensation for Fees and Reimbursement of Expenses (for the Period January 18, 2013 through June 4, 2015), *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Aug. 3, 2015), Bankr. ECF No. 1414.

[36] Exhibit F to Sobol Dec., Notice of Amendment to Omnibus Application by Certain Professionals and Their Constituents for Allowance and Payment of Administrative Expense Claims, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Sept. 1, 2015), Bankr. ECF No. 1530.

drafted a detailed twenty-eight page opposition.  On October 19, 2015, the Five OCC law firms withdrew their application.[37]

In 2015, the Chapter 11 Trustee filed an Application for Fees and Expenses in his Capacity as Chapter 11 Trustee[38] in the total amount of approximately $5.75M.[39]  In September 2015, lead counsel and designated counsel researched, drafted, and filed a thirty-seven page limited opposition to the application, arguing that the Chapter 11 Trustee had done significant (and at times extraordinary) work, but that under the circumstances should be awarded his full lodestar but no further multiplier (*i.e.*, that he be awarded approximately $1.4 million, the amount of his lodestar).[40]  The U.S. Trustee also opposed the request, but prior to the hearing, the Trustee reduced the size of his request to $3.75 million (about a three times multiplier), and the U.S. Trustee withdrew its objection.  The PSC pressed its objection.  Eventually, the bankruptcy court allowed the Trustee's lodestar along with only a two times multiplier bringing the Trustee's total compensation to $2,271,509.70.[41]  As a result, the total size of the fee was significant, but substantially less than both the original, and modified requests.

---

[37] Exhibit G to Sobol Dec., Motion (I) to Allow Withdrawal, with Reservation of Rights, of Omnibus Application by Certain Professionals and Their Constituents for Allowance and Payment of Administrative Expense Claims, and (II) for Cancellation of Hearing, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Oct. 19, 2015), Bankr. ECF No. 1607.

[38] Exhibit H to Sobol Dec., Summary of First and Final Application of Paul D. Moore, in His Capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., for Final Allowance of Commission and Reimbursement of Expenses, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Aug. 3, 2015), Bankr. ECF No. 1420.

[39] This fee application was separate and apart from the Chapter 11 Trustee's law firm's (Duane Morris) application for fees and expenses in the amount of $4,361,725.55.  *See* Exhibit I to Sobol Dec., Summary of First and Final Application of Duane Morris LLP, Counsel to Paul D. Moore, Chapter 11 Trustee of New England Compounding Pharmacy, Inc. d/b/a New England Compounding Company, for Final Allowance of Compensation and Reimbursement of Expenses, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Aug. 3, 2015), Bankr. ECF No. 1413 (Bankr. ECF. 1571-1).

[40] Exhibit J to Sobol Dec., Plaintiffs' Steering Committee's Limited Opposition to Paul D. Moore's Application for Fees and Expenses in His Capacity as Chapter 11 Trustee [ECF No. 1420], *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Sept. 22, 2015), Bankr. ECF No. 1560.

[41] Exhibit K to Sobol Dec., Memorandum of Decision regarding Trustee compensation, *In Re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Bankr. D. Mass. Jan. 15, 2016), Bankr. ECF No. 1674.

**H.    Continued Litigation against Provider Defendants in the MDL**

In the summer of 2015, knowing that the vast majority of cases in the MDL would be resolved by the Chapter 11 Plan, the MDL Court sought to understand what work was left to be done in the MDL.  On July 9, 2015, the MDL Court ordered parties to actions that were not originally filed in Massachusetts to tell the Court whether they would consent to a trial before the MDL Court.  The Court required parties to execute either a *Lexecon* waiver (consenting to trial in this district) or a certification that the party will not waive its *Lexecon* rights (and wants to be sent back to where the case was filed).[42]  On July 31, 2015, the PSC filed a report to the Court regarding *Lexecon* elections, noting that only one defendant (Insight) waived *Lexecon*.[43]

**1.    St. Thomas Cases**

Cases against the STOPNC defendants and St. Thomas entities – located in Tennessee – have been actively litigated in the MDL.  Through a quirk of the bankruptcy code, the MDL Court chose to retain jurisdiction over this group of cases, and the first bellwether STOPNC case was set for trial in the MDL in August.  It appears that the parties to these Tennessee cases are now close to a resolution, and have filed a motion for an extension of time until September 16, 2016 to complete their settlement agreement.[44]

**2.    Specialty Surgery Cases**

Cases against other Tennessee clinics (including Specialty Surgery Center and the Howell Allen Clinic, but excepting PCA Pain) are likewise being litigated pursuant to Court-ordered pretrial schedules.  There are 24 civil actions against Specialty Surgery Center in the MDL.

---

[42] *Lexecon* is a decision that held MDL courts do not have the ability to try cases unless the parties waive their rights to be transferred back to the district court where the action was filed or remanded to state court (as appropriate).

[43] Plaintiffs' Steering Committee's Report to the Court Regarding *Lexecon* Election Forms, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. July 31, 2015), ECF No. 2128.

[44] Assented to Motion for Extension of Time to September 16, 2016 to Complete Settlement Agreement by Saint Thomas Health, Saint Thomas Hospital West f/k/a Saint Thomas Hospital, Saint Thomas Network, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. Sept. 9, 2016), ECF No. 3085.

Bellwether trial picks were exchanged on August 29, 2016.  The parties have asked the Court to extend the deadline for common fact discovery until October 26, 2016.  And it appears that the Specialty Surgery Center cases will be trial ready by Spring 2017.

### 3.     Box Hill Cases

Cases against the Box Hill defendants are proceeding according to the discovery schedule set by the Court.[45]  The Court denied Box Hill's motion for remand.[46]  There are eight cases against Box Hill in the MDL.  Common fact discovery closed on August 30, 2016.  Bellwether trial picks are due on December 1, 2016.  It appears that the Box Hill cases will be trial ready by the summer of 2017.   The plaintiffs' cases are being litigated by Sharon Houston and Patricia Kasputys of the Law Offices of Peter G. Angelos, P.C.

### 4.     Other Provider Cases and Order to Show Cause

No other cases against Provider Defendants have been actively litigated in the MDL.  This Court entered a stay of discovery governing all other defendants (the "remaining clinic defendants"), all of whom have four or fewer cases naming them as defendants in the MDL through September 1, 2016.[47]

---

[45] *See* Amended Scheduling Order on Tennessee Actions, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ  (D. Mass. Apr. 25, 2016), ECF No. 2827; Order Setting Discovery Deadlines in Premier and Box Hill Cases, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. May 5, 2016), ECF No. 2851.  The stay was extended during the May 19, 2016 status conference.

[46] Electronic Order Denying Motion to Remand, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. Aug. 25, 2016), ECF No. 3075.

[47] Electronic Order Granting Stay of Discovery, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-RWZ (D. Mass. Jan. 4, 2016), ECF No. 2254.

## III.   ARGUMENT

**A.    The Court should order an eight percent (8%) assessment for the common benefit fund.**

The PSC requests that the Court enter an order approving the assessment of eight percent (8%) on the available tort trust funds, for a total of twelve million four hundred forty nine thousand four hundred forty three dollars and sixty three cents ($12,449,443.63).

On August 13, 2014, this Court ordered a prospective, eight percent (8%) holdback on each "Actually Received Recovery." That term of art is used because the 8% is applied to dollars received by the tort trust, *i.e.*, *after* the payment of non-tort bankruptcy claims and bankruptcy administrative expenses (which includes professional fees of the Chapter 11 Trustee, lawyers for that trustee, the court-appointed law firm for the Creditors' Committee, and other professionals).

The August 2014 order also indicated that this Court "may alter the percentage amount of the assessment, as future circumstances may require" and the order left open to the PSC the ability to "request an allocation of assessment between fees and expenses as circumstances may warrant."

For several reasons the PSC is of the view that an assessment from the current funds[48] received by the tort trustee of eight percent – no higher an assessment, nor lower – is warranted under the circumstances.

First, the eight percent assessment has been the level of reasonable expectation of counsel and the claimants from the earliest stages of this MDL. As the level has previously been proposed by the PSC and accepted by the Court, it appears to be fair and reasonable from an *ex ante* perspective.

---

[48] Additional sums are expected to be received into the tort trust, and there may also be non-tort trust administered other settlements that would fall within the Court's assessment orders. This motion only applies to the current funds in the trust.

Second, the level of PSC-approved lodestar (after eliminating what, in the view of the PSC, was time that should not be used toward common benefit award and after making the uniform billing rates) plus PSC-approved expenses is $14.7 million.  That amount exceeds the eight percent assessment by about $2.3 million, *i.e.*, the common benefit fund will be about 16% less than the approved lodestar and expenses.  It appears therefore that the eight percent level is reasonably close from an *ex post* perspective.

Third, increasing the assessment over the original eight percent is not warranted.  Lead counsel and the PSC have indicated from the earliest stages that this is likely a case where full recovery of lodestar is unlikely given the circumstances of the injuries and the bankruptcy of the primary defendant.  We do not see a compelling reason to change that.

Finally, decreasing the assessment below eight percent is not warranted.  Significant, good work was performed by many lawyers (called "designated counsel" under the rubric of the operative case management orders).  The results of the recoveries are significant, and the enormous work to fairly and accurately allocate and administer the distributions was substantial.  By comparison, recoveries of professional fees and expenses in the bankruptcy court were awarded at levels that were either at, or exceeded (in the case of the Chapter 11 Trustee) the reported lodestar levels there; those professionals received payment more than a year ago, and in full or greater than reported lodestar.  So while the PSC is of the view that the assessment should *not* be raised to meet the approved lodestar, by the same token we are of the thought that the eight percent level should not be reduced.  Thus, all common benefit recipients will have a pro rata reduction on their approved lodestar.

**B.      The Court should allocate from the fund the reasonable expenses of counsel.**

The PSC requests that the Court enter an order (i) approving a total of $898,900.31 in expenses, to be paid as the first dollars out from the common benefit fund, and (ii) approving the allocation of those expenses as indicated on Exhibit B.

Lead counsel asked all plaintiffs' counsel seeking reimbursement of common benefit expenses to submit, or resubmit, those expenses so that a full itemization would be available.  To ensure that charges were uniform and reasonable, the expense statements were then provided to an outside accounting firm.  That firm, in turn, collated the expenses into a single work sheet, and then reviewed those expenses in accordance with standard, reasonable rates for each cost item.  Where the rate was in excess of a reasonable rate, the accounting firm made a reduction in the amount claimed.  The accounting firm was not asked to review expenses for the purpose of determining if the cost item was toward a common benefit purpose or not (*e.g.*, whether it was common benefit or claimant specific) nor did it review the expense to determine if it was necessary (*e.g.*, unnecessary or unrequested attendance at a hearing).

After the accounting firm's review, lead counsel reviewed the expense items.  Three comments are in order.

First, not many deletions were made for expense items, both because most are toward common benefit matters, and because the amounts are "hard" costs incurred out-of-pocket by the firm.

Second, for a few firms there were deletions made in the professional fees category – it appears that some firms were under the misapprehension that case-specific expert expenses were compensable.

Third, some travel items were deducted – these were made only where it appeared that the cost was incurred to attend a function that was clearly unrelated to a specific, agreed common benefit matter that the lawyer needed to attend.

The spreadsheet appearing as Exhibit B reflects (i) the submitted expenses, (ii) the results of the accounting firm review, and (iii) the changes made by lead counsel.  The totals for each firm, as reflected on the sheet, would be the first funds paid out of the common benefit fund.

## C.   The Court should allocate from the fund the reasonable attorneys' fees as recommended by the PSC.

The PSC requests that the Court enter an order approving the allocation of common benefit fees amongst the law firms as indicated on Exhibit A, at column E ("Total Pro-Rata Compensable Lodestar").  The PSC is of the view that this represents a fair allocation.  While we do not describe all the details of the making of this sausage, we articulate the process and basis for the allocation below.

### 1.   Guidelines and general issues.

The PSC guided its review of the common benefit issues on several principles.

First, this Court issued orders structuring the sharing and funding of discovery and pretrial expenses and costs for the common benefit of the litigation, and establishing a process for tracking and seeking reimbursement for expended common benefit time and expenses.[49]   In MDL Order No. 3, the Court ordered the PSC to be responsible for funding common discovery and pretrial costs and proposing a reasonable prospective contingent assessment upon recoveries on the claims.[50]  It further set forth "standards and procedure…to be utilized by any counsel seeking fees and/or

---

[49] *See* Exhibit L to Sobol Dec., MDL Order No. 3 [ECF No. 85] and Exhibit M to Sobol Dec., MDL Order No. 8 [ECF No. 1333].

[50] Exhibit L to Sobol Dec., MDL Order No. 3, ¶ 1.

expense reimbursement."[51]  The Court ordered that any "claimants' counsel who seeks reimbursement or compensation for common-benefit time and expenses (including any state-court counsel) shall comply with these guidelines and any submission by such counsel shall be in accordance with this order."[52]  The Court provided the following instructions to counsel seeking reimbursement for common benefit time and expenses:

1.   All claims for time and expenses submitted must be incurred only for work authorized in advance by the lead counsel;[53]

2.   Counsel who intends to seek reimbursement shall submit time and expense reports to lead counsel monthly;[54]

3.   These reports should include both time and expenses and should summarize, with back-up detail, the submissions of all firms;[55]

4.   All time should be records on a daily basis. The failure to maintain such records, as well as insufficient description of activity, may result in the loss of fees;[56]

5.   All Shared Costs (costs incurred for the common benefit of the MDL plaintiffs as a whole) must be approved by lead counsel prior to being incurred and prior to payment;[57]

6.   Request for payment shall include sufficient information to allow lead counsel to account properly for costs and to provide adequate detail to the Court. All requests shall be subject to review and approval by lead counsel;[58] and

7.   Held costs for the global benefit of the MDL plaintiffs shall be submitted for consideration by the PSC and the Court for future reimbursement.[59]

---

[51] *Id.* at ¶ 2.

[52] *Id.* at ¶ 2.A.1.

[53] *Id.* at ¶ 2.A.2.

[54] *Id.* at ¶ 2.A.3.

[55] *Id.* at ¶ 2.A.3.

[56] *Id.* at ¶ 2.B.2.

[57] *Id.* at ¶ 2.D.1.

[58] *Id.* at ¶ 2.D.2.

[59] *Id.* at ¶ 2.E.1.

Common benefit time is defined as "[o]nly time spent on matters common to all claimants in this litigation…[n]o time spent on developing or processing any case for an individual claimant should be submitted, unless the case is specifically determined by the PSC or the Court to be a 'common-benefit case.'"[60]  Similarly, common benefit costs or expenses are defined as those "incurred for the common benefit of the MDL plaintiffs as a whole" or "for the global benefit of the MDL plaintiffs," with no individual client-related costs being considered "unless the case is determined by the PSC to the Court to be a 'common-benefit case.'"[61]

The Court also ordered the PSC to propose expense limitations and guidelines for use by all plaintiffs' counsel and for lead counsel to establish forms and procedures to implement and carry out the time and expense submissions required by the Court.[62]

In MDL Order No. 8, the Court ordered a contingent eight percent (8%) assessment on recoveries received in all cases.[63]  The Court ordered that "[n]o common benefit fees and/or expenses may be paid out of the Common Benefit Fund except by formal motion, with reasonable notice and opportunity to be heard."[64]  The Court attached a Participation Agreement as Exhibit A to MDL Order No. 8, which reiterated

> the amounts deposited in the Common Benefit Fund will be available for distribution to attorneys who have performed professional services or incurred expenses for the benefit of the plaintiffs in MDL 2419 pursuant to written authorization from Plaintiffs' Lead Counsel.  Such sums will be distributed only upon an Order of the Court in MDL 2419, which will be issued in accordance with applicable law governing the award of fees and costs in cases involving the creation of a common benefit.  Appropriate consideration will be given to the experience, talent, and contribution made by all of those authorized to

---

[60] *Id.* at ¶ 2.B.1.

[61] *Id.* at ¶ ¶ 2.C.1. and 2.E.1.

[62] *Id.* at ¶ 2.E.2.

[63] Exhibit M to Sobol Dec., MDL Order No. 8.

[64] *Id.* at 3.

perform activities for the common benefit, including the Participating
Attorneys.[65]

It also set forth the applicability of the orders and agreement to "each and every claim or action
(whether state or federal, filed or unfiled) relating to the clients listed on the attached Exhibit(s) and
arising from the use of NECC product(s) in which the Participating Attorneys have a right or claim
to a fee recovery beginning from April 9, 2013."[66]

Second, we were guided by trying to reach fair results, and not stand on formalities. While
these orders could be strictly applied to forfeit time and expenses submitted in an untimely or
inaccurate way, lead counsel and the PSC chose not to do so. Instead, last year we permitted all
plaintiff law firms to submit, or resubmit, time and expenses for claimed common benefit efforts.
This was done to ensure that those firms that had truly contributed to the common benefit were
afforded an opportunity to receive an award, rather than stand on formal compliance.

Third, we were guided by the law of common benefit awards.

Finally, we are guided by the important principle that lawyers ought to avoid asking courts
to resolve disputes about fees. A corollary to this is that leaders need to be "less fair" to themselves
than to those they lead, particularly when making decisions about common benefit matters.

## 2.    Process Undertaken

The PSC and others have spent hundreds of hours reviewing detailed time entries, speaking
with firms, discussing universal and firm-specific issues, formulating guidelines and applying those
criteria. Lead counsel and the Common Benefit Fee Committee ("CBFC")[67] addressed obligations
of counsel seeking reimbursement of common benefit time and expenses. In a letter to all plaintiffs'

---

[65] *Id.* at Ex. A, ¶ 3.

[66] *Id.* at ¶ 10.

[67] Lead counsel appointed and oversaw a Common Benefit Fee Committee ("CBFC") of three PSC members,
Kimberly Dougherty, Patrick Fennel, and Mark Zamora, to facilitate the collection and organization of the common
benefit time and expenses submissions.

counsel on April 24, 2013 and consistent with MDL Order No. 3, lead counsel reiterated the Court's expectation regarding common benefit work.  The letter highlighted the need for pre-authorization by lead counsel for work to qualify as common benefit.  The letter addressed time and expense reporting and, as set forth in MDL Order No. 3, indicated that "[t]ime spent on matters specific to an individual plaintiff, for another committee, for client outreach, for a legal association work, etc. should not be included."  It also noted that some pre-MDL time might be reimbursable retroactively if, after submission and evaluation by lead counsel, it was deemed to have resulted in common benefit work product of general assistance.

Earlier last year as the Chapter 11 Plan process was coming to a close and pursuant to MDL Order No. 3, lead counsel set forth a process for submitting common benefit time and expenses in a letter dated April 23, 2015.  The letter was based upon the Court's earlier orders and included those orders as an attachment for all plaintiffs' counsel.  In the letter, lead counsel required "*every firm that has undertaken common benefit work* to submit a full statement of all common benefit time and expenses incurred through April 15, 2015 that you assert should be considered by CBF treatment."  A spreadsheet, with instructions to provide "daily records of time with a description of the tasks performed," was also included.  Lead counsel reminded counsel that "review of time and expenses will be rigorous, and the impact of redundant efforts should fall on counsel rather than increasing the total of the CBF incurred by the claimants."  With respect to the expenses for which counsel sought reimbursement, lead counsel noted "all expenses should be documented to the degree required by IRS regulations (*e.g.*, you need to submit copies of receipts)."  All submissions for time and expense reimbursement were due on May 15, 2015.

The CBFC gathered all the time and expense submissions received and began to organize them to review and provide a process for evaluation of the submissions under the oversight of lead counsel.  Although some firms did not timely make their submissions, we forgave that.  Others

25

submitted information in the incorrect form; we forgave that too.  In January 2016, lead counsel

advised all plaintiffs' lawyers that a review panel would be appointed to review their submissions

and

> will provide an opportunity to meet with each applicant to review the
> application, provide any additional information in support of their
> application that the applicant requests be considered, and afford the
> applicant an opportunity to answer any questions the subcommittee
> may have about the application.  The interviews shall cover the usual
> considerations considered by a court for the reasonableness of a
> common benefit fee.  If the task/project was covered by more than
> one lawyer and/or paralegal, then the factual reasons for duplication
> of effort shall be included in the interview.

The correspondence from lead counsel went on to describe the review process by the PSC of

all of the panel summaries of each firms' submissions.  It also set forth the process of making final

recommendations to the firms that made submissions, with an effort to reach consensus before

moving the Court.  The review panels followed this process over the next several months, beginning

with the CBFC creating review panels, alerting the panels to their assignments, providing panels

with their responsibilities for coding review of the submissions, engaging in the extensive review of

the submissions and providing an interview process with each firm.[68]

On March 18, 2016, lead counsel circulated the review panels assigned to each firm that

submitted time and expenses and reminded firms of his open door policy to discuss any issues that

arise.  In mid-June 2016, lead counsel advised counsel that an independent accountant would review

the expense submissions to audit and review and, again, provided additional time to firms to submit

such expenses and back up materials.  The CBFC organized all expenses and back-up materials and

---

[68] As set forth in the January 2016 correspondence, "[e]ach panel will be responsible for reviewing common benefit time and expense submissions from a particular law firm, coding the submissions and meeting or communicating with representatives from that law firm to seek input and discuss results of the review. Representatives from the law firm whose time is being reviewed will have the opportunity to meet with the review panel, either in person or remotely, to discuss and resolve any issues the panel may have. Each panel will then make reports to the PSC, which the PSC will use to formulate its proposal to the Court for final approval and reimbursement of common benefit time and expenses from the Common Benefit Fund."

again recommended submitting firms to provide backup materials for the independent consultant to review when auditing.

Over the next several months, the panels reviewed the submissions and made recommendations to the PSC.  The PSC met on multiple occasions, including in April and July 2016, and have held many conference calls to discuss the review panels' observations, summaries of interviews with each submitting firm and recommendations to evaluate the panels' information, and reach a consensus on the recommendations post-interview with each firm.

The recommendations set forth below are a culmination of this long, flexible process.  The PSC involved lawyers from outside the PSC.  Every firm was given an opportunity to discuss their submission.  And we heard and considered each firm's comments and concerns.  We are of the view that the result is a fair result.  We request the Court allocate common benefit fees as recommended by the PSC.

### 3.    Substantive observations and issues

There are only a few substantive, cross-cutting issues.

*Rate structures*.  Hourly rates differed greatly.  The PSC was of the view that there should be an effort at assuring that there are reasonable rate caps used for purposes of determining lodestar amounts.  After researching other matters, the following rate structure caps were used:

> Partner for 10 or more years (senior): $550
> Partner for less than 10 (junior): $450
> Associate for 5 or more years (senior): $350
> Associate for less than 5 years (junior): $275
> Paralegal: $150[69]

---

[69] The PSC is of the view that these rates are fair and reasonable under the circumstances of this case.  As one comparison, the rates are at least no more than, and usually far less than, those charged by professions in the related bankruptcy proceedings, either when tested against rates of similar professionals or when blended (as were some fees in the bankruptcy proceedings).

Some firms have rate structures markedly higher (and as a result had lodestar significantly reduced to the cap rates); others had only minor impact; a few firms with lower rates did not have the rates adjusted upwards to the cap.

*PSC/OCC dual role*.  Two firms had the dual roles of (i) being on the PSC, and (ii) representing a member on the Official Creditors' Committee.[70]  Under bankruptcy law, members of a creditor's committee and their counsel are not entitled to compensation for their committee work. As a result, each of these two firms did not submit lodestar for work performed on the Creditor's Committee even though it might be argued that such effort was for the common benefit.

*OCC-sponsored lodestar*.  The most problematic issue in reaching unanimity amongst all counsel was whether to accept, and if so how, lodestar submitted by lawyers whose work was not performed under the direction of lead counsel or the PSC as contemplated by this Court's case management orders (and therefore often duplicative of work done by or at the direction of Lead Counsel and the PSC).  The circumstances require a bit of explanation.

As previously described, this Court appointed lead counsel and a seven member PSC.  The case management orders spell out the process by which work should be undertaken, and eventually paid for if appropriate.  One of the purposes of those case management orders was to ensure work was performed efficiently and without duplication of effort.

In the bankruptcy proceedings, there were numerous professionals.  The U.S. Trustee appointed a Chapter 11 Trustee to handle and wind up the affairs of NECC.  The Chapter 11 Trustee, in turn, hired Duane Morris (his law firm) to handle work on his behalf; each was involved in settlement negotiations, documentation and plan matters.  The U.S. Trustee also appointed an eight member Official Creditor's Committee ("OCC") which in turn hired the law firm of Brown Rudnick LLP to represent it; Brown Rudnick, too, was involved in settlement negotiations,

---

[70] These firms were Hagens Berman Sobol Shapiro LLP and Lipton Law.

documentation and plan matters.  Each of these professionals was entitled to bill for, and did bill and get paid for, their time and expenses.  They were paid from the assets (otherwise available to victims) out of the bankruptcy estate under the Chapter 11 plan.

In addition, of the eight members on the OCC, seven were tort claimants; those seven claimants each had their own lawyers.  Under bankruptcy law, neither OCC members nor their lawyers can charge the bankruptcy estate fees (although the OCC members, but not their lawyers, can receive reimbursement for expenses).  Nevertheless, the view of some of the lawyers for OCC members was that they should undertake legal work at their own direction (and not at the direction of the PSC or lead counsel in the MDL).  They saw an independent duty to perform work of behalf of the OCC (in addition to the legal work being provided to that committee by their counsel, Brown Rudnick), and that their work should be done in parallel with the PSC on many activities.  As a result, for a considerable period of time during the NECC efforts (early 2013 through much of 2015) there was considerable duplicative work performed, and redundant attendance at mediations, hearings, and other events; some of their efforts were clearly not redundant, some certainly benefitted the overall effort.

The firms who undertook these efforts first filed a request for fees in the bankruptcy court, then withdrew it.  They have now filed substantial requests for compensation for these efforts to be paid out of the common benefit fund.  The question is what to do with those requests.

If the answer meant a reduction of net assets available to the claimants the answer would be easy – it would not be compensated.  Work undertaken not in compliance with the MDL orders would not reduce the victims' fund.

But the circumstances here are arguably more complicated.  Given the large cumulative lodestar of the firms (even without inclusion of this additional work), the lodestar already exceeds the eight percent assessment.  As a result, the practical consequence of including some of this

lodestar "only" reduces the recovery of other firms; it does not impact the net available to claimants. Should the analysis thus differ, since the "only" question is allocation amongst lawyers?

On the one hand, many argued that all non-approved, OCC-directed time should be excluded. Bankruptcy law does not permit compensation for OCC members, let alone their lawyers. The U.S. Trustee had made clear from the outset that OCC lawyers would neither be compensated for their time nor reimbursed their expenses; as a result, the work that was done was knowingly volunteered, without reasonable expectation of compensation. The OCC already had hired a law firm to be paid to represent it and who would be paid from the proceeds of the bankruptcy estate; there was no need for further lawyering. The fact that the five OCC firms first filed a request for compensation for exceptional contributions (filing declarations that there time had been in the OCC role, not as part of the MDL) but then later withdrew that application arguably conceded a lack of entitlement to the funds under bankruptcy law. And there is the argument that the MDL orders should have had strict compliance; these lawyers had been denied an order from the MDL Court permitting them to get compensated for work undertaken at their own direction. The point had always been to run the NECC efforts efficiently. Why should those lawyers who complied with the rules have their compensation reduced by those who did not and whose work, in many instances, but not all, was duplicative of work by or at the request of the PSC?

On the other hand, the firms seeking to have OCC-directed lodestar compensated by the MDL common benefit process argue that, in substance, their work was of very substantial value to the overall effort. They point both to specifics of their efforts, and to generalities, to make passionate arguments for their contributions. Shouldn't the PSC (and this Court) award the substance of their efforts, and not place form over substance?

In fairness, the dialogue is not all this binary. The PSC's initial recommendations recognized that there was work done by all of the firms that, even if undertaken by a lawyer wearing

his or her OCC hat, contributed in a non-duplicative, meaningful way, and therefore should be compensated even if not pre-approved by the PSC or lead counsel.  And all lawyers had some work undertaken within the ambits of the case management orders.  But while there is some common perceptions, that fact remained that there were wide differences of opinion.

*Final observation*.  In the end, lead counsel and the PSC have agreed to make recommendations that allocate many hundreds of thousands of dollars more to some firms in the spirit or resolution and compromise.  Our hope is that by doing so, we will fulfill the duty in allocations amongst counsel to prioritize consensual resolution rather than dispute.  We hope to avoid substantive objections.  But the PSC as a whole, and each of the PSC members, has reserved the right to articulate, and seek, lower compensation to any firm that disputes the allocations.  Doing so is fair and consistent with the notion that these recommendations ought not be seen by any firm as a floor; they are, in reality, a balance amongst many interests, and affecting any one award might impact other decisions.

Approximately 30 firms submitted for reimbursement of common benefit time and expenses.  After engaging in the detailed, lengthy process set forth above, the majority of those firms agree with the recommendations of the PSC.  If there is dissent, it will be only by a few firms.

### 4.    Recommendations

The PSC's recommendations are summarized in Ex. A to the Declaration of Thomas M. Sobol.

### a.    PSC firms

The first seven recommendations relate to the PSC firms.

*Hagens Berman Sobol Shapiro LLP*.  Hagens Berman was appointed by the MDL Court as lead counsel and a member of the PSC.  Work was primarily undertaken by Thomas M. Sobol, Kristen A. Johnson, and Edward Notargiacomo.  Given the lead role and liaison functions, paralegal

Mike Barker provided significant office, paralegal, and administrative work.  All work was approved.  The firm carved out its OCC-only time.  The firm was heavily involved in all aspects of the MDL, and was involved in many aspects of the bankruptcy proceedings.

After review, the PSC reduced Hagens Berman's reported time from about 9,015 hours to about 8,645.  Due to the rate cap used by the PSC and the reduction of hours, Hagens Berman's reported lodestar was reduced by about $1.2 million.  This reflects the largest dollar reduction from reported lodestar of any firm in the case.  Hagens Berman does not dispute the PSC decision.

*Branstetter Stranch & Jennings, PLLC.*  Branstetter was appointed by the MDL Court as a member of the PSC.  Work was primarily undertaken by Gerard Stranch and Ben Gastel.  All work was approved.  The firm played a lead role in the Tennessee cases (including the St. Thomas and Specialty Surgery Center cases), and the firm was heavily involved in many aspects of the MDL.

After review, the PSC reduced reported time from about 4,047 hours to about 3,899.  Given the reductions, the recommendation is about $180,000 less than the reported lodestar.  Branstetter does not dispute the PSC decision.

*Crandall & Katt.*  Crandell was appointed by the MDL Court as a member of the PSC.  Work was primarily undertaken by Patrick Fennell, who played a lead role in the Virginia Insight litigation and settlement was involved in many aspects of the MDL.  All work was approved.

After review, the PSC reduced reported time from about 1,869 hours to 1,760 hours.  Given the reductions and rate caps, the recommendation is about $200,000 less than the reported lodestar.  Crandall does not dispute the PSC decision.

*Janet, Jenner & Suggs, LLC.*  Janet, Jenner was appointed by the MDL Court as a member of the PSC.  Work was primarily undertaken by Kimberly Dougherty.  The firm played a lead role in, among other things, the NECC site inspection process, some of the national settlements and some clinic settlements and litigations.  All work was approved.

After review, the PSC reduced reported time somewhat.  Given the reductions and rate caps, the recommendation is about $40,000 less than the reported lodestar.  Janet, Jenner does not dispute the PSC decision.

*Lieff Cabraser Heimann & Bernstein.*  LCHB was appointed by the MDL Court as a member of the PSC.  Mark Chalos of the firm was appointed as liaison to state cases, and Annika Martin as the *pro se* liaison.  The firm also helped lead Tennessee efforts and was involved in many aspects of the MDL.  All work was approved.

After review, the PSC reduced reported time somewhat.  Given the reductions and rate caps, the recommendation is over $430,000 less than the reported lodestar.  Lieff Cabraser does not dispute the PSC's recommendation.

*Lipton Law.*  Lipton Law was appointed by the MDL Court as a member of the PSC.  Marc Lipton played a significant role in the Liberty settlement and many aspects of the MDL.  All work was approved.

After review, the PSC reduced reported time somewhat.  Given the reductions and rate caps, the recommendation is about $135,000 less than the reported lodestar.  Lipton Law does not dispute the PSC's recommendation.

*Orlando Firm, PLLC.*  The Orlando firm was appointed by the MDL Court as a member of the PSC.  Mark Zamora of the firm was involved in many aspects of the MDL, including the Unifirst matters.  All work was approved.

After review, the PSC reduced reported time somewhat.  Given the reductions and other adjustments, the recommendation is about $340,000 less than the reported lodestar.  The Orlando firm does not dispute the PSC's recommendation.

### b.     Non-PSC firms.

The following are the non-PSC firms for whom a brief comment is made.  We do not list all firms here.

*Andrews & Thornton*.  A client of Andrews and Thornton was appointed as a member of the OCC, and Anne Andrews of the firm was co-chair of the OCC.  Among many other things, Ms. Andrew led efforts of the OCC at all times, was active in several mediations, and helped achieve the unanimity amongst claimants and counsel for the Chapter 11 plan.  Others from the firm, including John Thornton, also participated.

After review, the consensus of the PSC was to accept most of the common benefit time submitted (about $515,000); the recommendation is about $250,000 less than the reported lodestar.

*Cohen, Placitella & Roth, P.C.*  A client of Cohen, Placitella was appointed as a member of the OCC, and Harry Roth and Michael Coren served with Ms. Andrews as co-chairs of the OCC.  Among many other things, Mr. Roth and Mr. Coren led efforts of the OCC at all times, worked to achieve consensus amongst groups often, helped mediate several of the national and clinic resolutions, assisted in lien resolution matters, and worked on the allocation matrix.

After review, the consensus of the PSC was to accept most of the common benefit time submitted (about $500,000); the recommendation is about $250,000 less than the reported lodestar.

*Ellis & Rapacki LLP*.  Fredric Ellis, among others of this firm, made significant contributions to many aspects of the MDL, including, *inter alia*, discovery, liability issues as to multiple defendants, mediations, the allocation matrix, the Bankruptcy Plan, and establishment of the Tort Trust and Claims Facility for the administration of claims.

After review, the PSC reduced the reported time.  While the amount of the reduction for time and the application hourly caps reduces the lodestar by about $850,000, the total award to Mr.

Ellis and his firm remains as the second largest award (*i.e.*, second only to the award to lead counsel).

## IV.    CONCLUSION

For the foregoing reasons, the Plaintiffs' Steering Committee asks this Court to enter an order (i) approving an eight percent (8%) assessment from available funds for common benefit fees and expenses, (ii) approving the payment of reasonable expenses made in support of common benefit efforts as recommended by the PSC, and (iii) approving the allocation and payment of reasonable attorneys' fees to specified firms in amounts.


Dated: September 27, 2016                         Respectfully submitted,

                                                  **/s/ Thomas M. Sobol**
                                                  Thomas M. Sobol (BBO# 471770)
                                                  Kristen A. Johnson (BBO# 667261)
                                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                                  55 Cambridge Parkway, Suite 301
                                                  Cambridge, MA 02142
                                                  Phone: (617) 482-3700
                                                  Fax: (617) 482-3003
                                                  tom@hbsslaw.com
                                                  kristenj@hbsslaw.com

                                                  *Plaintiffs' Lead Counsel*

                                                  Elizabeth J. Cabraser
                                                  Mark P. Chalos
                                                  LIEFF CABRASER HEIMANN &
                                                  BERNSTEIN, LLP
                                                  275 Battery Street, 29th Floor
                                                  San Francisco, CA  94111
                                                  Phone: (415) 956-1000
                                                  Fax: (415) 956-1008
                                                  ecabraser@lchb.com
                                                  mchalos@lchb.com

                                                  *Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Phone:  (540) 342-2000
pfennell@crandalllaw.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH &
JENNINGS PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN  37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: September 27, 2016

**/s/ Thomas M. Sobol**
Thomas M. Sobol, BBO # 471770