# EXHIBIT H

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## SUMMARY OF FIRST AND FINAL APPLICATION OF
## PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
## OF NEW ENGLAND COMPOUNDING PHARMACY, INC., FOR FINAL
## ALLOWANCE OF COMMISSION AND REIMBURSEMENT OF EXPENSES

| | |
|---|---|
| Name of Applicant: | Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc. |
| Date of Appointment: | January 25, 2013 |
| Period for which Commission and Reimbursement is Sought: | January 25, 2013 through and including June 4, 2015 |
| Amount of Commission Earned Pursuant to 11 U.S.C. § 326(a): | $5,758,256.97 |
| Amount of Expenses Sought as Actual, Reasonable and Necessary: | $416.52 |
| Total Amount of Commission and Expenses Sought During Chapter 11 Case: | $5,758,673.49 |

This is the Chapter 11 Trustee's first and final application.

Dated: August 3, 2015
       Boston, Massachusetts

Respectfully submitted,

DUANE MORRIS LLP

By: _/s/ Paul D. Moore_____
Paul D. Moore (BBO # 353100)
DUANE MORRIS LLP
100 High Street
Suite 2400
Boston, MA 02110-1724
Phone: (857) 488-4200
Email: pdmoore@duanemorris.com


*Chapter 11 Trustee of New England Compounding
Pharmacy, Inc. d/b/a New England
Compounding Center*

[*Remainder of Page Left Intentionally Blank*]

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|   |   |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING<br>PHARMACY, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

### FIRST AND FINAL APPLICATION OF PAUL D. MOORE, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NEW ENGLAND COMPOUNDING PHARMACY, INC., FOR FINAL ALLOWANCE OF <u>COMMISSION AND REIMBURSEMENT OF EXPENSES</u>

Paul D. Moore (BBO # 353100)
DUANE MORRIS LLP
100 High Street
Suite 2400
Boston, MA 02110-1724
Phone: (857) 488-4200
Email: pdmoore@duanemorris.com

*Chapter 11 Trustee of New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center*

DM3\3367491.30

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND ..................................................................................................1

    A.    Jurisdiction. ........................................................................................ 1

    B.    The Debtor's Bankruptcy Case and Appointment of the Chapter 11
        Trustee. ............................................................................................... 1

        1.    Events Leading to the Debtor's Bankruptcy. ............................ 1

        2.    Appointment of the Chapter 11 Trustee. .................................. 3

        3.    The Debtor's Liquidating Plan of Reorganization. ................... 3

    C.    Overview of the Chapter 11 Trustee's Successful Chapter 11 Plan
        Strategy. ............................................................................................. 4

        1.    Introduction. .............................................................................. 4

        2.    The Transfer Litigation. ............................................................ 6

            a.    The Chapter 11 Trustee's Motion to Transfer Personal
                Injury Tort and Wrongful Death Cases to the MDL Court
                pursuant to 28 U.S.C. §§ 157(b)(5) and 1334. ................6

        3.    The Mediation Program and the Settlements. ........................... 12

            a.    The Insider Settlement. ...................................................12

            b.    The MDL Mediation Program Settlements and Other
                Mediated Settlements. .....................................................16

        4.    The Plan. .................................................................................... 18

            a.    The Third-Party Releases and Injunctions. .....................19

            b.    The Confirmation Hearing. ..............................................19

    D.    Creditor Recoveries Under the Plan. ................................................. 24

        1.    Projected Distributions. ............................................................. 24

        2.    The Settlement Agreements which have funded the Plan. ........ 26

            a.    National Settlement Agreements. ....................................26

i

|  | | b. | Provider Settlement Agreements. | 28 |
|  | | 3. | Settlement Proceeds. | 28 |
|  | | 4. | Collection of Accounts Receivable | 32 |
|  | E. | A Summary of the Chapter 11 Trustee's Role in the Case. | 33 |
| II. | AMOUNTS SOUGHT | | | 33 |
| III. | THE REASONABLENESS OF THE REQUESTED COMPENSATION | | | 37 |
|  | A. | Overview. | | 37 |
|  | B. | Summary. | | 39 |
|  | C. | Narrative Detail of Services Provided by the Chapter 11 Trustee. | | 41 |
|  | | 1. | Asset Analysis and Recovery (T001). | 41 |
|  | | 2. | Asset Disposition (T002). | 43 |
|  | | 3. | Avoidance Actions (T003). | 44 |
|  | | 4. | Case Administration (T004). | 45 |
|  | | 5. | Claims Administration and Objections (T005). | 46 |
|  | | 6. | Official Committee Matters (T006). | 49 |
|  | | 7. | Fee/Employment Applications (T007). | 51 |
|  | | 8. | Insurance (T009). | 52 |
|  | | 9. | Leases/Executory Contracts (T010). | 53 |
|  | | 10. | Litigation (T011). | 55 |
|  | | 11. | Meetings of Creditors (T012). | 56 |
|  | | 12. | Plan and Disclosure Statement (T013). | 56 |
|  | | 13. | Regulatory Matters (T015). | 58 |
|  | | 14. | Tax Issues (T019). | 59 |
|  | | 15. | U.S. Trustee Matters (020) | 60 |
| IV. | THIS COURT SHOULD AWARD THE CHAPTER 11 TRUSTEE A COMMISSION CALCULATED PURSUANT TO 11 U.S.C. § 326(A) | | | 61 |

      A.      The Lodestar Factors...................................................................................... 62

      B.      This Court Should Award the Commission to the Chapter 11 Trustee. ............... 68

V.      EXPENSES...................................................................................................71

# TABLE OF AUTHORITIES

**Cases**

*A.H. Robins Co. v. Piccinin,*
    788 F.2d 994 (4th Cir. 1986) ..................................................................................10

*In re Bank of New Eng. Corp.,*
    484 B.R. 252 (Bankr. D. Mass. 2012) .............................................................. 70-71

*In re Boston Reg'l Med. Ctr.,*
    410 F.3d 100 (1st Cir. 2005)....................................................................................9

*Crawford v. Riley Law Group LLP (In re Wolverine, Proctor & Schwartz, LLC),*
    2015 U.S. Dist. LEXIS 39449 (D. Mass. Mar. 26, 2015)......................................70

*In re Dow Corning Corp.,*
    86 F.3d 48 (6th Cir. 1996) .......................................................................................9

*In re First Software Corp.,*
    79 B.R. 108 (Bankr. D. Mass. 1987) ..............................................................37, 62

*Lone Star Fund V(US), LP v. Barclays Bank PLC,*
    594 F.3d 383 (5th Cir. 2010) ................................................................................10

*In re Mack Properties,*
    381 B.R. 793 (Bankr. M.D. Fla. 2007) ................................................................68

*In re Master Mortgage Inv. Fund,*
    168 B.R. 930 (Bankr. W.D. Mo. 1994).................................................................23

*In re Metabolife International, Inc.,*
    Case No. 05-06040 (Bankr. S.D. Cal. 2005) .............................................. 31-32, 66

*In re N.V.E., Inc.,*
    Case No. 05-35692-NLW (Bankr. D.N.J. 2005) ....................................... 31-32, 66

*In re New Eng. Compounding Pharm., Inc.,*
    2014 U.S. Dist. LEXIS 67213 (D. Mass. May 15, 2014).......................................12

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.,*
    496 B.R. 256 (D. Mass. 2013) ..........................................................................9, 11

*In re Nutraquest, Inc.,*
    Case No. 03-44147-RTL (Bankr. D.N.J. 2003)........................................ 31-32, 66

*In re Owens*,
    2008 Bankr. LEXIS 2427 (Bankr. D. Ore. Sept. 15, 2008) ....................................70

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984)........................................................................... 9-10

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995) ....................................................................19

*In re Rowe*,
    750 F.3d 392 (4th Cir. 2014) ....................................................................69

*In re Salgado-Nava*,
    473 B.R. 911 (B.A.P. 9th Cir. 2012).......................................................70

*In re Scoggins*,
    2014 Bankr. LEXIS 3857 (Bankr. E.D. Cal. Sept. 8, 2014)....................37

*SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g & Surveying)*,
    No. 14-11590, 2015 U.S. App. LEXIS 3831 (11th Cir. Mar. 12, 2015) ....................19

*In re Twin Labs, Inc.*,
    Case No. 03-15564-rdd (Bankr. S.D.N.Y) ............................................ 31-32, 66

*In re W.R. Grace & Co.*,
    591 F.3d 164 (3d Cir. 2009)..........................................................................9

*In re W. Real Estate Fund, Inc.*,
    922 F.2d 592 (10th Cir. 1990) ....................................................................19

*In re Wolverine Proctor & Schwartz, LLC*,
    2012 Bankr. LEXIS 4181 (Bankr. D. Mass. Sept. 10, 2012) ..................70

## Statutes

11 U.S.C. § 101 ...........................................................................................1

11 U.S.C. § 105(a) ....................................................................................19

11 U.S.C. § 326...............................................................................38, 68, 70

11 U.S.C. § 326(a) .............................................................................*Passim*

11 U.S.C. § 330 ..................................................................................*Passim*

11 U.S.C. § 330(a) ..................................................................41, 62, 68, 70

11 U.S.C. § 330(a)(1) .................................................................................................34

11 U.S.C. § 330(a)(3) ............................................................................................*Passim*

11 U.S.C. § 330(a)(3)(A)-(F) ...................................................................................37

11 U.S.C. § 330(a)(7) .........................................................................................34, 70

11 U.S.C. § 341 .........................................................................................................56

11 U.S.C. § 362 ...........................................................................................................7

11 U.S.C. § 524(e) ....................................................................................................19

11 U.S.C. § 721 .........................................................................................................68

11 U.S.C. § 1104(a) .....................................................................................................3

11 U.S.C. § 1108 .......................................................................................................68

11 U.S.C. § 1125 .......................................................................................................31

28 U.S.C. § 157 ...........................................................................................................1

28 U.S.C. § 157(b)(2) .................................................................................................1

28 U.S.C. § 157(b)(5) .............................................................................................6, 8

28 U.S.C. § 1334 .................................................................................................1, 6, 8

28 U.S.C. § 1334(b) ....................................................................................................8

28 U.S.C. § 1334(c)(1) .............................................................................................10

28 U.S.C. § 1334(c)(2) .............................................................................................10

28 U.S.C. § 1408 .........................................................................................................1

28 U.S.C. § 1409 .........................................................................................................1

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 326.02[1][a] ............................................................70

3 COLLIER ON BANKRUPTCY ¶ 330.02[1][a] ............................................................38

3 COLLIER ON BANKRUPTCY ¶ 330.02[1][c] ............................................................69

David J. Molton and Steven B. Smith, *The Ephedra Bankruptcy Cases and the
Twinlab Global Settlement Model* .......................................................................32

Fed. R. Bankr. P. 2007.1 ....................................................................................3

Fed. R. Bankr. P. 2016 ......................................................................................1

Rex A. Littrell, *Lessons from Ephedra: The Twinlab ADR Model* ..............................32

Pursuant to sections 326(a) and 330 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR 2016-1, Paul D. Moore (the "Chapter 11 Trustee"), the Chapter 11 Trustee of New England Compounding Pharmacy, Inc. d/b/a New England Compounding Company (the "Debtor" or "NECC"), hereby submits this first and final application (the "Application") for (i) allowance and payment of a final commission in the total amount of $$5,758,256.97 (the "Commission") and (ii) reimbursement of expenses incurred during the course of the Debtor's bankruptcy case in the amount of $416.52, which the Chapter 11 Trustee incurred from January 25, 2013 through and including June 4, 2015 (the "Application Period"). In support of this Application, the Chapter 11 Trustee respectfully states as follows:

## I.    BACKGROUND

### A.    Jurisdiction.

The United States Bankruptcy Court for the District of Massachusetts (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    The Debtor's Bankruptcy Case and Appointment of the Chapter 11 Trustee.

#### 1.    Events Leading to the Debtor's Bankruptcy.

Prior to the Petition Date (as defined below), NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC. The Massachusetts Department of Public Health ("MDPH") initiated an investigation and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing approximately 18,000 doses of

MPA that NECC had distributed to hospitals, clinics, and doctors' offices, and were administered to approximately 14,000 patients.  The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[1]

In response to the October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its license effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.  The FDA and the CDC thereafter recommended that all healthcare providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an immediate recall of all of its products.  Approximately three months prior to the Petition Date (as defined below), NECC suspended the operation of its business.  NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees.  The MDPH has temporarily barred former pharmacists for NECC from practicing pharmacology.  There remain ongoing proceedings to revoke or otherwise take action against the licenses of NECC's pharmacists.

On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  NECC stated that it initiated this Chapter 11 Case in response to the volume and wide geographic distribution of the nationwide lawsuits in state and federal courts with which it was confronted.

An Official Committee of Unsecured Creditors (the "Official Committee") was appointed on January 18, 2013 [Dkt. No. 67].

---

[1] The CDC has not updated the case counts since October 23, 2013 and has stated that further updates to the case counts are not anticipated.

### 2.     Appointment of the Chapter 11 Trustee.

On January 24, 2013, this Court entered an order [Dkt. No. 92] ordering the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

On January 25, 2013 (the "Appointment Date"), the United States Trustee (sometimes hereinafter referred to as the "UST") filed an *Application for and Certificate of Appointment of Chapter 11 Trustee* [Dkt. No. 98] (the "UST Application") requesting this Court's approval of Paul D. Moore's appointment as chapter 11 trustee.  The UST Application was granted by order of this Court [Dkt. No. 99] entered the same day.  A true and correct copy of the order is attached hereto as Exhibit A.  Thereafter, on February 1, 2013, the Chapter 11 Trustee filed the *Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee* [Dkt. No. 111].

The Chapter 11 Trustee is an attorney at law licensed by and practicing in the Commonwealth of Massachusetts since 1976.  He is a partner in the Business Reorganization and Financial Restructuring group of the Duane Morris LLP ("Duane Morris") law firm.  The Chapter 11 Trustee's biography is attached hereto as Exhibit B.

On February 26, 2013, this Court entered an order [Dkt. No. 131] authorizing the Chapter 11 Trustee to retain Duane Morris as counsel, *nunc pro tunc*, to January 25, 2013.

### 3.     The Debtor's Liquidating Plan of Reorganization.

On December 3, 2014, the Chapter 11 Trustee and the Official Committee filed the *Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1054] (as amended from time to time, the "Plan")[2] and accompanying disclosure statement [Dkt. No. 1053] (as amended from time to time, the "Disclosure Statement").  The Plan is a liquidating plan of

---

[2] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed thereto in the Plan.

reorganization.  The primary objective of the Plan is to compensate those victims that have suffered personal injury and/or death due to allegedly contaminated drugs compounded by NECC.  A detailed summary of the Plan, as well as an explanation of its constituent settlements with various insiders, insurers and healthcare providers, is set forth in the Disclosure Statement and the *Declaration of Chapter 11 Trustee in Support of Confirmation of Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1318].

On March 3, 2015, this Court entered an order [Dkt. No. 1181] approving, among other things, the Disclosure Statement and the solicitation and notice procedures with respect to confirmation of the Plan ("Plan Confirmation").

On May 20, 2015, this Court entered an order [Dkt. No. 1355] (the "Confirmation Order") confirming the Plan.

The Effective Date under the Plan occurred on June 4, 2015 [Dkt. No. 1377].

### C.    Overview of the Chapter 11 Trustee's Successful Chapter 11 Plan Strategy.

#### 1.    Introduction.

At the time of the Chapter 11 Trustee's appointment, the Debtor's situation was dire. NECC had ceased operations, and there were no remaining employees.  While the Debtor's professionals were cooperative in assisting the Chapter 11 Trustee with transition matters, the Chapter 11 Trustee had little or no access to information concerning the Debtor's affairs, since its principals recognized that they faced serious civil and criminal liability and were understandably concerned with preserving their related rights, privileges and defenses.  While there was approximately $1.3 million of cash on hand, it was apparent that, absent additional sources of funds, the estate would have little, if anything, available to fund a plan of reorganization. Indeed, the estate likely would prove administratively insolvent.

An early assessment of the case revealed other impediments to confirmation of a plan. Most of NECC's creditors were personal injury or wrongful death claimants. Many of these creditors had retained counsel and were pursuing recovery against third parties. Indeed, some of these claimants were on track to try their cases in mid-2013 and had no motivation to cease their personal efforts at collection (which efforts might collectively exhaust or significantly deplete available non-debtor third party financial resources and insurance coverage to the detriment of others) for the sake of negotiating a plan for the benefit of all creditors.

The task of confirming a plan into which non-debtor parties would contribute settlement and insurance proceeds for the benefit of personal injury or wrongful death claimants was also daunting for an additional reason. Where a third-party (*e.g.*, a clinic and its insurer(s)) faced multiple lawsuits, any contribution to a plan would be conditioned upon approval of a third-party plan release. However, courts have been divided as to the propriety of non-debtor releases and some circuits, such as the Ninth Circuit, are viewed as generally prohibiting third party plan releases. There is no controlling decision of the United States Court of Appeals for the First Circuit (the "First Circuit") approving such releases.

Eventually, the Chapter 11 Trustee developed a strategy to develop a consensus for a liquidating plan of reorganization which would provide an equitable distribution to all of NECC's creditors and avert a race to the courthouse by NECC's numerous creditors. The strategy consisted of four major elements. First, all litigation relating to the Outbreak needed to be consolidated in one forum to prevent third-party defendants' available financial resources and insurance proceeds from being exhausted by those claimants who won the "rush to the courthouse." Second, the Chapter 11 Trustee needed to reach a settlement with the Debtor's insiders which would provide to the Debtor's estate funds sufficient to demonstrate the prospect

of a liquidating plan that would yield a meaningful distribution to the Debtor's creditors and garner their support.  Third, the Chapter 11 Trustee needed to implement a mediation program that would facilitate settlements with third-party defendants.  Finally, the Chapter 11 Trustee needed to negotiate and draft a liquidating plan of reorganization which would gain the "overwhelming support" of these third-party defendants and the Debtor's other constituents (*e.g.*, the Official Committee, the Plaintiffs' Steering Committee [the "PSC"] and NECC's creditors, particularly the thousands of Tort Claimants).  Such support likely would be necessary, at a minimum, to obtain this Court's approval of such a plan in light of the still uncertain state of applicable law in the First Circuit.

Although this strategy is relatively simple to outline, its implementation was fraught with difficulties and with multiple and substantial risks (*e.g.*, that the Debtor's estate would irretrievably slip into administrative insolvency) that hung over the Chapter 11 Trustee's administration of the case from the Appointment Date to the Effective Date of the Plan.

    **2.**    **The Transfer Litigation.**

        **a.**    **The Chapter 11 Trustee's Motion to Transfer Personal Injury Tort and Wrongful Death Cases to the MDL Court pursuant to 28 U.S.C. §§ 157(b)(5) and 1334.**

NECC stated that it initiated its Chapter 11 Case in response to the volume and wide geographic distribution of the lawsuits with which it was confronted.  The Outbreak resulted in thousands of claims from personal injury claimants against NECC and others.  As of April 27, 2015, approximately 686 separate lawsuits had been joined in a multi-district litigation proceeding (the "MDL Proceeding") pending before the Honorable Rya W. Zobel, United States District Court Judge, in the United States District Court for the District of Massachusetts (the "MDL Court").

Plaintiffs had commenced civil actions against NECC and others (*e.g.*, clinics, healthcare service providers, third-parties which had designed or had contractually agreed to maintain NECC's compounding facility, *etc.*). After the Petition Date, plaintiffs focused their litigation against third-parties due to the constraints of the automatic stay, *see* 11 U.S.C. § 362, as well as to attempt to avoid having their cases transferred to the MDL Court with other similar proceedings against NECC. These lawsuits created the real possibility that, in a "rush to the courthouse," a few plaintiffs would deplete, if not exhaust, non-debtor third parties' available financial resources and insurance proceeds by way of settlement or judgment. It was clear to the Chapter 11 Trustee that the only way to assure that all such available financial resources and insurance settlement proceeds possibly would be available for equitable distribution to all personal injury and wrongful death claimants was to transfer all civil actions to one forum for consolidated proceedings.

Cases filed in various federal courts were being transferred to the MDL Proceeding by the Judicial Panel for Multi District Litigation (the "JPML"), in large part at the initiation of the Chapter 11 Trustee. However, the Chapter 11 Trustee also required a remedy which would likewise transfer state court litigation against third-parties, including the numerous cases in which NECC was, for strategic reasons, not named as a party in order to avoid any such transfer. There were four (4) categories of cases based on personal injuries or wrongful death arising from the administration of MPA:

    a.    cases pending in other courts awaiting transfer to the MDL Court;

    b.    cases pending in other courts where removal had been initiated, but not completed;

    c.        cases pending in state courts where NECC or its affiliates were named defendants; and

    d.        cases pending in state courts where neither NECC nor its affiliates were named defendants.

The Chapter 11 Trustee sought to have all of these cases transferred to the MDL Court, asserting jurisdiction under 28 U.S.C. § 1334[3], and citing 28 U.S.C. § 157(b)(5)[4] as a basis for transfer.  As the MDL Court noted:

> There are likely to be a large number of victim-claimants in this matter, and it appears undisputed that many of them have suffered death or serious personal injury as a result of the administration of contaminated MPA.  It also appears to be undisputed that the pool of available assets to pay claims is likely to be limited; NECC was a fairly small company with relatively few assets, although it appears that there are at least some insurance policies available to cover claims.  The trustee, and counsel representing parties in this litigation, essentially agree that it is highly desirable to maximize the resources available to victims and to keep expenditures reasonably low.  The trustee, and most counsel, also appear to agree that centralized management of the litigation and claim process is desirable to create the largest possible pool of funds for victims and to distribute those funds fairly, equitably, and with a minimum of expense and delay.
>
> . . .

---

[3]  28 U.S.C. § 1334(b) states:

> Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

[4]  28 U.S.C. § 157(b)(5) states:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

> Consolidation of all NECC litigation in this Court is greatly
> complicated by the existence of the parallel state-court cases.
> Some of those cases, particularly those filed after the bankruptcy
> petition and the automatic stay, name only local healthcare
> providers (such as pain clinics and individual physicians), and do
> not name NECC or any affiliates.  Some of those plaintiffs object
> to a centralized proceeding, preferring instead to proceed against
> those defendants in state court.  The trustee, however, contends
> that those cases could ultimately result in huge claims for
> contribution or indemnity against the bankruptcy estate, and that
> such claims could greatly affect or upset the fair administration of
> the estate, in particular preventing the treatment of all victims
> fairly and equitably.

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 496 B.R. 256, 260 (D.

Mass. 2013), the district court found that there was "related to" jurisdiction as to categories (a)

through (c).  *In re Boston Reg'l Med. Ctr.*, 410 F.3d 100, 105 (1st Cir. 2005), "[A] civil

proceeding is related to bankruptcy [if] the outcome of that proceeding could conceivably have

any effect on the [bankruptcy] estate").[5]

The more difficult issue was whether there was "related to" jurisdiction over cases which

did not name NECC or any of its affiliates as a party.  The Chapter 11 Trustee argued that the

defendants in those cases had claims for indemnity (contractual or otherwise) and that these

claims, even if as yet contingent and unasserted, provided a basis for jurisdiction.  *See In re Dow*

*Corning Corp.*, 86 F.3d 48, 494 (6th Cir. 1996)("[a] single possible claim for indemnification or

contribution simply does not represent the same kind of threat to a debtor's reorganization plan

as that posed by the thousands of potential indemnification claims at issue here.");  *compare In re*

---

[5]  The seminal case addressing the scope of "related to" jurisdiction is *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *overruled on other grounds by Things Remembered v. Petrarca*, 516 U.S. 124, 116 S. Ct. 494, 133 L.Ed.2d 461 (1995), where the court held that 'related to' jurisdiction over a civil action exists if outcome of that action could "could conceivably have an effect on the bankruptcy estate."  Notably, in *Pacor*, the Third Circuit held that there was no "related to" jurisdiction over an employee's suit against a distributor of asbestos products, even though it was likely that, in the event of an adverse verdict, the distributor would seek indemnity against the manufacturer (such an action is "mere precursor to the potential third-party claim for indemnification by [the distributor] against [the manufacturer]").  *Id.* at 995.

*W.R. Grace & Co.*, 591 F.3d 164, 169 (3d Cir. 2009) (there is no "related-to" jurisdiction where there would be no impact on the estate until there was: (a) a finding adverse to a defendant in a state court action; (b) the subsequent pursuit of a claim for indemnification).  In the face of a contractual right to indemnity, some courts have found "related to" jurisdiction. *Lone Star Fund V(US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)("related to" jurisdiction arises where there is a contractual right to indemnity); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ("The clear implication of the [*Pacor*] decision is that, if there had been a contract to indemnify, a contrary result would have been in order.").

The MDL Court assumed that it had jurisdiction over claims in category (d).  However, certain parties (the "Virginia Plaintiffs") had objected to their actions (the "Virginia Actions") being transferred and independently moved for permissive abstention under 28 U.S.C. § 1334(c)(1)[6] and mandatory abstention under 28 U.S.C. § 1334(c)(2)[7].  The MDL Court found mandatory abstention inappropriate.  As to category (d) cases, the court noted that the basis for jurisdiction was "unclear at best" and found that, due to the potential harm to "federal-state comity," abstention under section 1334(c)(1) was appropriate.

The MDL Court nevertheless left the door open to a possible renewal of the motion:

---

[6]  28 U.S.C. § 1334(c)(1) states:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

[7]  28 U.S.C. § 1334(c)(2) states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

> [T]he possibility remains that a state-court defendant could make a
> future claim in the bankruptcy case for contribution or indemnity,
> upsetting the effort to make an equitable distribution to the victims
> and other creditors. Indeed, that is the essential basis of the
> trustee's motion: that the Court *must* transfer *all* state-court cases
> to foreclose that very possibility.
>
> The Court is not convinced, at least at this stage, that such a step is
> necessary.  Other possible courses of action might produce the
> desired consolidation and finality, without resolving difficult issues
> of jurisdiction and abstention and without intruding unnecessarily
> into the proceedings of state courts.  For example, if the
> Bankruptcy Court were to set a relatively early bar date for the
> filing of claims against the estate, it would appear that any
> defendant in a state-court action would be effectively forced to
> decide whether it wanted to file a claim for contribution or
> indemnity against the estate.  Such a claim, in turn, would probably
> permit the exercise of federal jurisdiction over the underlying
> matter.  Any defendant who did not file a claim would be barred,
> and the state-court case could proceed to judgment without
> interference from the federal court.  Either way, the desired goals
> would be achieved with a relatively minimal degree of risk or
> intrusion.
>
> In any event, the Court does not need to reach the issue at this
> juncture.  If the balance of factors shifts over time, the Court can
> revisit the issue, and if necessary (and appropriate) can issue
> further orders concerning the exercise of related-to jurisdiction.

496 B.R. at 270.

Taking the MDL Court's cue, the Chapter 11 Trustee promptly proceeded to set a bar

date.  The Chapter 11 Trustee already had been in protracted discussions with the PSC and the

Official Committee with respect to bar date matters, related notice issues and the like and had

experienced significant resistance to the fixing of a bar date at that time.  In light of the MDL

Court's decision, however, the Chapter 11 Trustee expedited the attempt to finally resolve those

discussions.  Although some issues remained, the Trustee proceeded to move this Court to fix a

bar date in order to avoid further delay in his efforts to secure transfer of the remaining cases to

the MDL Court.  This Court entered an order fixing January 15, 2014 as the deadline for filing

proofs of claim.  Despite their earlier assertions that they had no intention of participating in NECC's Chapter 11 Case, the defendant in the Virginia Actions ("Insight"), as well as the 153 Virginia plaintiffs all filed proofs of claim, and the Chapter 11 Trustee filed a renewed and supplemental motion seeking the transfer of all of the Virginia cases to the MDL Court, which the MDL Court granted as to all of those cases.  *See In re New Eng. Compounding Pharm., Inc.*, C.A. No. 13-02419-RWZ, 2014 U.S. Dist. LEXIS 67213 (D. Mass. May 15, 2014).

### 3.     The Mediation Program and the Settlements.

#### a.     The Insider Settlement.

In order to fund a plan and to build support for confirmation of a liquidating plan, the Chapter 11 Trustee pursued settlements with all parties who faced liabilities relating to the "Outbreak."  Absent a substantial fund, NECC's creditors would have little incentive to support a liquidating plan that provided for third-party releases.  To the contrary, they would likely prefer to pursue their own claims.  Potential non-debtor third party contributors to any such fund likewise would have no incentive to contribute or, for that matter, even to participate in related settlement discussions if it appeared unlikely that the Chapter 11 Trustee could secure the overwhelming support of NECC's creditors with respect to a liquidating plan that provided them third-party releases.  Absent such releases, any settlement with the Chapter 11 Trustee and NECC's estate would be of little or no value, since they would remain exposed to hundreds, if not thousands, of claims relating to the Outbreak.

The Chapter 11 Trustee, working closely with the Official Committee and the PSC, which was appointed by the MDL Court, viewed settlements with NECC's shareholders and related parties (collectively, the "Insiders[8]") as among his highest priorities.  It was apparent to

---

[8] The term "Insiders," as used herein, generally refers to Barry Cadden, Lisa Cadden, Carla Conigliaro, and Gregory Conigliaro, collectively with their respective spouses, children, parents, and other nuclear family members, all trusts

the Chapter 11 Trustee from the outset that there were serious impediments to funding the plan

that the Debtor and the Debtor's creditors envisioned at the outset of the case – a plan that would

follow the outline of plans in other mass tort cases, such as the ephedra cases in which many of

the victims' counsel had participated.  The ephedra cases had numerous potential contributors

facing strict product liability.  Moreover, most, if not all, of them had "deep pockets" and

significant available insurance coverage.  By contrast, in NECC's case, recovery under strict

product liability theories was highly unlikely.  Instead, the principal theories of recovery against

potential contributors would be based upon the potential contributors' negligence or wrongful

conduct.  In response to those theories of recovery, potential contributors, other than NECC and

its Insiders, all stridently denied responsibility, asserting that NECC and its Insiders were solely

responsible for the harm caused to the victims.

Meanwhile, NECC had little or no assets available to satisfy creditor claims.  Its available

insurance was surprisingly modest, and the insurers raised numerous policy exclusions, including

among various others, fungal exclusions and exclusions with respect to manufacturing activity

(as opposed to compounding) and actions in violation of applicable law.

Based on the foregoing, and recognizing that third-parties were unlikely to engage in

discussions as long as NECC's Insiders had not been held accountable, the Chapter 11 Trustee

focused at the outset on NECC's Insiders.  To establish protocols to maintain the confidentiality

of information disclosed in the context of settlement negotiations with the Insiders, on April 18,

2013, this Court on motion of the Chapter 11 Trustee entered an *Agreed-Upon Order*

*Establishing Protocol for Settlement Negotiations and Communication* [Adv. Pro. Dkt. No. 96,

---

under which such persons are settlers, trustees, or beneficiaries, all Affiliated Entities, and any other entities in
which such persons hold a controlling interest, and those entities' successors, assigns, and predecessors. These
persons and entities are sometimes collectively referred to in the Plan as the "Shareholder" and "Affiliate Released
Parties."

as amended by Adv. Pro. Dkt. No. 99] (the "Protocol Order").  To facilitate such settlement negotiations, and avoid interference with the progress of such negotiations and depletion of funds that otherwise could be devoted to settlement rather than unabated continuing litigation, the Chapter 11 Trustee also viewed it necessary, if not essential, to secure a stay of discovery against the Insiders while settlement negotiations were proceeding.  After considering the most appropriate, cost effective and expeditious means of securing such a stay, the Chapter 11 Trustee determined that proceeding before the MDL Court was preferable.  Otherwise, the Chapter 11 Trustee would have been required to commence an adversary proceeding in this Court against each of the innumerable parties he sought to be subjected to the stay and face the related expense, burden and delay of a protracted dispute.  Instead, the Chapter 11 Trustee instructed his counsel to proceed on his behalf to seek the stay in the MDL in which all, or most of, such third parties were already subject to the MDL Court's jurisdiction.  The MDL Court granted the Chapter 11 Trustee's motion and stayed all formal discovery against the Insiders in all matters that were consolidated into the MDL Proceeding, and ordered that the discovery stay continue pending further order of the MDL Court.  *See* Clerk's Notes for Mar. 12, 2013 Status Conference (extending discovery stay to Apr. 10, 2013); Tr. of Apr. 10, 2013 Status Conference at 28:17-24 (extending discovery stay to May 14, 2013); *MDL Order No. 6* [MDL Dkt. No. 209] ("Formal discovery of NECC and the affiliated defendants shall remain temporarily stayed as set forth in this order and the previous orders of the Court."); *MDL Order No. 7* [MDL Dkt. No. 438] (staying fact discovery of NECC and the NECC Affiliated Defendants "until further order of the Court").

As a result of the Chapter 11 Trustee's protracted settlement negotiations with the Insiders (undertaken with the substantial participation of counsel to the Official Committee and

Lead Counsel to the PSC to ensure their support and that of their constituencies, and aided by the discovery stay), the Chapter 11 Trustee reached settlements in principle with the Insiders, as well as with NECC's primary and excess insurers (collectively, the "Insider and Insurer Settlements").  These negotiations were, however, extraordinarily difficult.  Throughout the negotiations, the plaintiffs and their counsel expressed substantial hostility toward the Insiders on account of the Outbreak.  Their numerous demands left little, if any, possibility of a consensual resolution that offered any benefits whatsoever to the Insiders.  Meanwhile, the Insiders were concerned that negotiations likely would fail and that the information they provided to the Chapter 11 Trustee regarding their available assets, which the Chapter 11 Trustee ultimately would be required to share with counsel for the Official Committee and Lead counsel to the PSC, would provide a roadmap for future attachments or levies.  In light of the foregoing, the Chapter 11 Trustee truly served as the mediator in his settlement negotiations with the Insiders, under extraordinarily difficult and emotionally charged circumstances, to attempt to secure a resolution between the Insiders and numerous plaintiffs and their counsel, in the face of the victims' understandable demands for retribution and the demands of many of them that the Insiders get nothing.

Also, of critical importance, in the Chapter 11 Trustee's view, was achieving an agreement in principle with the Insiders prior to the January 15, 2014 bar date fixed by this Court.  Numerous plaintiffs and defendants, including the Virginia defendants and the 153 Virginia plaintiffs, who were attempting to avoid transfer to the MDL Court and the imposition of third party releases against them, had expressed their intention not to participate in NECC's case, stating, among other things, that it appeared unlikely any dividend would be significant. The Chapter 11 Trustee believed that they would be far less likely to do so if they risked

forfeiting the ability to participate in the distribution of substantial funds that the Chapter 11 Trustee succeeded in securing by way of settlement.  Consequently, as soon as he succeeded in achieving an agreement in principle with the Insiders, the Official Committee and the PSC, the Chapter 11 Trustee joined with the Official Committee in issuing press releases on December 24, 2013, announcing the agreement in principle with the Insiders and that the settlement was projected to aggregate more than $100 million.  Some three weeks later, by the January 15, 2014 bar date, 3,842 proofs of claim were filed, including 3,542 of which were claims for damages for death or personal injuries resulting from the Outbreak.  Those claimants included the Virginia defendant and all of the 153 Virginia plaintiffs.

This Court preliminarily approved the Insider and Insurer Settlements on July 31, 2014. *See* Dkt. Nos. 712, 713 and 714, subject to approval of the related third-party releases and channeling injunctions in connection with confirmation of the Plan.  Those settlements contributed, or will contribute once projected tax refunds are received, over $100 million to the NECC estate in the form of cash contributions from the Insiders, as well as proceeds from, among other things, NECC's related companies' and individuals' professional liability insurance, tax refunds which will be due to the Insiders as a result of their cash settlement payments, and the sale of one or more related businesses.

### b.    The MDL Mediation Program Settlements and Other Mediated Settlements.

The Chapter 11 Trustee and the Official Committee (the "Plan Proponents") also developed a strategy for facilitating and obtaining substantial settlement contributions for distribution through the Plan from mediations with non-NECC affiliates, such as NECC's commercial vendors and pain clinics and medical care providers that faced potential liability to NECC and tort victims in connection with the Outbreak.  To facilitate the Chapter 11 Trustee's

settlement efforts, the MDL Court on August 15, 2013, entered an Order on Mediation [MDL Dkt. No. 394] (the "Mediation Order") establishing mediation protocols (the "MDL Mediation Program") for non-NECC affiliates.

Not unexpectedly, the MDL Program initially secured very little participation by the various plaintiffs and defendants in the MDL Proceedings. As had been anticipated by the Chapter 11 Trustee, these parties were unwilling to participate until NECC's Insiders were held accountable. Likewise, they were not convinced that the Chapter 11 Trustee could secure the substantial funding that would be necessary to secure the overwhelming support of NECC's victims for a plan. They also repeatedly noted the absence of binding First Circuit precedent approving third-party releases. Therefore, they were reluctant to commit to what might prove to be an unsuccessful, if not entirely futile, plan process. The Chapter 11 Trustee nonetheless persuaded them to undertake the effort, noting that he and his firm, as well as counsel to the Official Committee, had expended extraordinary time and effort to further the case and that their compensation was likewise entirely contingent upon court approval of third-party releases and, while he, his firm and counsel to the Official Committee were "investing" in that effort on an ongoing process throughout the case, non-debtor third parties would only have to contribute to the fund if, as and when a liquidating plan was confirmed that provided them third-party releases.

However, when the Chapter 11 Trustee reached an agreement in principle with the Insiders and the Insider Settlement secured this Court's initial approval in an amount that far exceeded expectations, a number of significant defendants in the MDL Proceedings joined the MDL Mediation Program or undertook private mediation proceedings under substantially the same protocols. The MDL Mediation Program, as well as those private mediations, proved to be

17

an unqualified success.  Through the following year and one-half, the Chapter 11 Trustee (with the material assistance and full support of Duane Morris, the Official Committee and the PSC and their respective counsel) secured over $100 million dollars in additional settlements from, among others, (i) vendors of NECC itself (*e.g.*, ARL BioPharma, the company that provided testing services to NECC, Liberty Industries, the company that built the so-called "cleanrooms" where MPA was compounded; Victory Mechanical Services, the company that installed ventilation systems at NECC; and Unifirst Corporation, the company that provided cleaning services to NECC), and (ii) healthcare providers in some of the states hit hardest by the Outbreak (Virginia, New Jersey and North Carolina).  As further described below, those settlements were embodied in, and their consummation entirely depended upon, confirmation of the liquidating Plan.

Virtually all of the mediations resulted in settlements.  More often than not, the Chapter 11 Trustee was the "last man standing" and secured substantial additional funds beyond the amounts the Official Committee and the PSC were willing to accept.  Ultimately, the Chapter 11 Trustee entered into settlement agreements under which payments to the estate will total at least $211,400,000.  Each settlement agreement was conditioned upon the entry of an order confirming a liquidating plan of reorganization which included third-party releases and injunctions shielding the non-debtor parties to those settlement agreements from any liability relating to the Debtor and the Debtor's products, including MDPH (the "Third-Party Releases and Injunctions").  In some instances, the settlements (the "Plan Settlements") were incorporated into the Plan (as defined below) and subject to approval at the Confirmation Hearing.

    **4.**    **The Plan.**

On December 3, 2014, the Plan Proponents filed the liquidating Plan and the Disclosure Statement.

#### a.     The Third-Party Releases and Injunctions.

The Plan incorporated the Third-Party Releases and Injunctions.  As noted above, no decision of the First Circuit has authorized non-debtor releases or injunctions.  Although other circuit courts are split on the permissibility of third-party releases in plans of reorganization or liquidation, the substantial majority of circuit courts that have ruled on the issue have found them to be permissible in certain exceptional circumstances where the relief is "essential" to the success and viability of the plan, primarily, as in the case here, in the mass tort context. *Compare SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g & Surveying)*, No. 14-11590, 2015 U.S. App. LEXIS 3831 at **13-14 (11th Cir. Mar. 12, 2015) (bankruptcy courts have the power under Section 105(a) to issue permanent injunctions or third-party releases where appropriate for the plan) with *Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) (sections 105(a) and 524(e) specifically prohibit the permanent release, discharge, or injunction of non-debtors); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990) (same).  Again, there is no controlling precedent in the First Circuit.

#### b.     The Confirmation Hearing.

During the course of the Chapter 11 Case, the Chapter 11 Trustee served notice of the proceedings and, in particular, the Third-Party Releases and Injunctions, on more than 20,000 potential claimants.  He also provided publication notice, on three occasions (twice in some 61 local newspapers as well as once in the national edition of <u>USA Today</u>).[9]  As a result of the Chapter 11 Trustee's exhaustive efforts throughout the Chapter 11 Case to secure the input, support and approval of the PSC, the Official Committee and their various constituents, not a

---

[9] In connection with his settlement with UniFirst, UniFirst agreed to the Chapter 11 Trustee's condition that it bear the expense of the nationwide publication.

single creditor objected to confirmation of the Plan at the confirmation hearing on May 19, 2015

(the "Confirmation Hearing").[10]  Similarly, while numerous MDL Defendants raised various

objections throughout the Chapter 11 Case, and eight (8) of them objected to the disclosure

statement on various grounds relating to the Third-Party Releases and Injunctions, the Chapter

11 Trustee resolved all such objections consensually prior to the Confirmation Hearing, a result

that seemed impossible throughout the case.

Certain creditors (specifically, clinics and healthcare providers that are now or may in the

future become defendants in actions arising from their administration of NECC products to

patients) advised the Chapter 11 Trustee that, although these creditors did not object generally to

the Third-Party Releases and Injunctions, they would object to confirmation of the Plan to the

extent that these provisions might preclude them from allocating fault or comparative fault

among these creditors and the Released Parties in connection with lawsuits pending against those

creditors relating to NECC.  After lengthy negotiations initiated by the Chapter 11 Trustee and

pursued with counsel to some 35 creditors seeking to preserve their ability to assert comparative

fault allocation, the Plan Proponents and those creditors executed Stipulations and Agreed

Orders (the "Comparative Fault Stipulations") resolving these issues on the terms that the

Chapter 11 Trustee had proposed.  In order to do so, the Chapter 11 Trustee had to involve most,

if not all, of the parties to settlements with him and their insurers in the negotiations to ensure

that the resolution would not modify the Third Party Releases and Injunctions in a manner that

would impair the settlements.

---

[10] On May 5, 2015, prior to the Confirmation Hearing, a creditor, Katrina Eldreth, filed the *Conditional Support of Katrina Eldreth to Confirmation of the Debtor's Joint Chapter 11 Plan*.  [Dkt. 1280].  Although characterized as a "Conditional Support," this document contained a limited objection to confirmation.  Ms. Eldreth withdrew this limited objection on May 6, 2015.  *See Withdrawal of Conditional Support of Katrina Eldreth to Confirmation of the Debtor's Joint Chapter 11 Plan* [Dkt. 1286].

The Comparative Fault Stipulations provided that the Plan Proponents would modify the Plan in a way that, on the one hand, would allow other parties to the Comparative Fault Stipulations, to name the Debtor and/or Tort Trust, as successor in interest to the Debtor and/or applicable Non-Insurer Contributing Party, as parties to a civil action, solely for purposes of preserving defenses and allocation of liability based upon fault or comparative fault, but that, on the other hand, would provide that neither the Chapter 11 Trustee, the Post-Confirmation Officer, any Non-Insurer Contributing Party nor the Tort Trustee shall (a) be named a party in any underlying civil action; (b) be required to enter an appearance in any such action; or (c) be subject to entry of an adverse judgment in any such action. In return, the parties to the Stipulation agreed to waive any and all claims against the estate, including all claims for contribution and indemnification, as of the Effective Date of the Plan. As a result, the estate was relieved of many millions of dollars in such claims without incurring the expense of contested matters to disallow them.

The Plan Proponents filed the Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for Approval of Stipulations and Orders Relating to Preservation of Certain Parties' Rights to Seek Comparative Fault Allocations Under the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Request for Ex Parte or Expedited Determination and Limitation of Notice [Dkt. No. 1289], filed May 8, 2015 (the "Motion to Approve Comparative Fault Stipulations").

Both the Comparative Fault Stipulations and the Liberty settlement required that the Plan be amended. The Plan Proponents did not believe that these amendments required re-solicitation and therefore, on May 12, 2015, filed the Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order approving Non-Material Modifications to the

First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Request for Expedited Determination and Limitation of Notice [Dkt. No. 1311] (the "Motion to Approve Non-Material Plan Modifications").

Prior to the Confirmation Hearing, the Chapter 11 Trustee and Duane Morris supervised DRC's implementation of the solicitation procedures and responded to creditor inquiries relating to the Plan and the Disclosure Statement. They also worked with counsel to the Official Committee in drafting and filing a confirmation brief, which, among other things, addressed the principal legal issues raised during the case concerning the Plan. *See* Plan Proponents' Memorandum of Law in Support of Confirmation of the First Amended 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1240]. Duane Morris and counsel to the Official Committee also prepared, and the Chapter 11 Trustee reviewed and revised, a Reply Memorandum of Law (i) in Response to Objection to Confirmation of the First Amended 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1310].

The Chapter 11 Trustee also participated in continuing discussions with counsel to the Official Committee and Lead Counsel to the PSC relating to the selection of the Tort Trustee and attempted to resolve their impasse in making a selection. When that failed, he ensured that they timely moved the MDL Court to make the selection prior to the Confirmation Hearing.

The Chapter 11 Trustee and Duane Morris reviewed and assisted in the preparation of each of the twenty-seven (27) declarations in support of confirmation. The Chapter 11 Trustee also prepared for and attended the Confirmation Hearing on May 19, 2015, at which this Court entered orders confirming the Plan, approving the Liberty Settlement Motion, approving the Motion to Approve Comparative Fault Stipulations and approving the Motion to Approve Non-Material Plan Modifications.

At the Confirmation Hearing, only the UST objected to confirmation. The UST consented to the entry into evidence at the Confirmation Hearing of declarations from the Chapter 11 Trustee and non-debtor settling parties in support of confirmation. Prior to the Confirmation Hearing, twenty-seven (27) declarations were filed in support of confirmation, many of which provided the factual bases underlying the criteria for the approval of third-party releases as outlined in *In re Master Mortgage Inv. Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)[11]. There were no live witnesses.

At the Confirmation Hearing, this Court heard the arguments of counsel relating to the Third-Party Releases and Injunctions and overruled the UST's objection. This Court held that approval of the Third-Party Releases and Injunctions was appropriate in light of the "extraordinary circumstances" of the case. Indeed, this Court noted, among other things, as follows:

> … I think that this plan and its associated trust agreements are the best that could have been achieved for the hundreds of people for whom there could be no full compensation. And that is, in my view, the highest and best use of the Bankruptcy Code… .

---

[11] In *Master Mortgage*, the court held that the following criteria were essential to approval of third-party releases:

    a.    There is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

    b.    The non-debtor has contributed substantial assets to the reorganization;

    c.    The injunction is essential to reorganization. Without it, there is little likelihood of success;

    d.    A substantial majority of the creditors agree to such injunction. Specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and

    e.    The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*See Master Mortgage*, 168 B.R. at 934-35.

Transcript of Hearing of May 19, 2015 at 40.

The Plan was confirmed on May 20, 2015 and became effective on June 4, 2015. The UST did not file a notice of appeal and, accordingly, the Plan's Effective Date was June 4, 2015. Of particular significance was the fact that confirmation was almost entirely consensual, and there were no appeals. As a result, the Tort Trustee is projecting that distributions to the numerous Tort Claimants, who have been desperately awaiting compensation for more than two and one-half years, can commence prior to this year end, rather than await the resolution of appeals.

### D.    Creditor Recoveries Under the Plan.

### 1.    Projected Distributions.

The Plan has been funded in substantial part by contributions from NECC's shareholders, affiliated entities, clinics, healthcare providers, parties that provided goods and services to NECC and various of their respective insurers and other parties in interest, as described in Section 3.4 of the Disclosure Statement and identified in Schedules 1.127 and 1.173 to the Plan (collectively referred to as the "Contributing Parties"). In exchange for such contributions, claims against the Contributing Parties are released, and future claims enjoined, pursuant to the Plan and in accordance with the terms of the settlement agreements entered into by the Chapter 11 Trustee (more fully described below).[12]   The amount of each distribution to a holder of an Allowed Claim will depend on which Class the Allowed Claim is in and the treatment afforded to that Class under the Plan.

---

[12] These settlements are described in Section 3.4 of the Disclosure Statement and are included in the Notice of Filing of Plan Supplement to the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1123] filed 2/13/2015; Exhibit 6 to Plan Supplement – Inspira Settlement Agreement [Dkt. No. 1141] filed 2/19/2015; Supplement to Plan Supplement – UniFirst Settlement and Release Agreement [Dkt. No. 1167] filed 2/23/2015; and Notice of Filing of Supplements to the Plan Supplement to the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1288] filed 5/7/2015.

Pursuant to the Plan, assets of the Debtor will be converted into Cash; in substantial part they already have been by the Chapter 11 Trustee. The monetized assets of the Debtor will satisfy in full all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims (Class A) and Miscellaneous Secured Claims (Class B).

Allowed claims in Class C (General Unsecured Claims) are projected to aggregate approximately $900,000. Holders of Class C Claims will receive distributions equal to 90% of the amount of their Allowed General Unsecured Claims. In its Schedules and Statement of Financial Affairs, the Debtor scheduled such Class C Claims in the amount of $885,514.19, some $200,000 of which was allegedly payable to an affiliate of the Debtor, Medical Sales Management. Class C Proofs of Claim thereafter filed by NECC creditors significantly increased that amount to an aggregate of $7.85 million. The increase, however, is largely the result of two claims, aggregating $6.83 million, which are, upon information and belief, subject to disallowance, in whole or substantial part or reclassification as subordinated claims. If those claims are disallowed, the scheduled and filed Class C Claims would aggregate $1,025,500.

Holders of claims in Class D (Tort Claims) will receive shares of a beneficial interest in the Tort Trust. All claims that holders of Class D Claims have against the Contributing Parties have been channeled into the Tort Trust, where they will be satisfied from the net proceeds of the settlements (the "Settlement Proceeds") reached between the Chapter 11 Trustee and the Contributing Parties in accordance with the terms of the Plan, the Tort Trust Documents, and the "Claims Resolution Facility Procedure" and, if applicable, the "Provider Claims Resolution Facility Procedures." It is estimated that, in total, the Tort Trust will have an aggregate of more than $160 million to $190 million available for distribution to Tort Claimants who timely filed proofs of claim or other documents supporting their claim, or were deemed to have done so by

order of this Court.  As of July 13, 2015, $133,802,063.10 has already been disbursed from escrow to the Tort Trust, with an additional $55,818,887.84 disbursed to the Post-Confirmation Officer, for payment of other allowed claims and expenses, and payment thereafter of any remaining balance to the Tort Trust.  In exchange for a share of the beneficial interest in the Tort Trust, all claims the Tort Trust Beneficiaries may hold against any and all of the Contributing Parties (other than Ameridose) have been released, and Tort Trust Beneficiaries are forever barred, estopped and enjoined from asserting those claims against the Contributing Parties.

### 2.    The Settlement Agreements which have funded the Plan.

As discussed above, after the Appointment Date, the Chapter 11 Trustee viewed settlement negotiations as among his highest priorities.  Numerous lawsuits had been commenced against the Insiders in federal and state courts throughout the country, hundreds of which were subsequently joined in the MDL Proceedings.  Absent a prompt, global resolution of those numerous competing claims, any amounts available to compensate those who suffered the consequences of the Outbreak likely would have been exhausted in a race to the courthouse by those competing claimants.  In contrast, a prompt global resolution through the NECC estate would ensure that available proceeds were equitably distributed among those who were injured or died as a result of the Outbreak.

The liquidating Plan is built upon numerous settlements with various entities, including settlements with the Insiders, insurers, vendors, and healthcare providers.  Some of these settlements were approved prior to Plan Confirmation, although conditioned upon Plan Confirmation.  Approval of the remaining settlements occurred as part of Plan Confirmation.

### a.    National Settlement Agreements.

The Chapter 11 Trustee entered into settlement agreements with certain "National Defendants" (*i.e.*, individuals or entities against whom every Tort Claimant may have had a

claim, such as NECC's owners or the company that provided sterility testing services for NECC products).  Prior to Plan Confirmation this Court had already approved the following settlements with National Defendants by orders dated July 31, 2014 [Dkt. Nos. 970, 971 and 972], respectively:

   a.    the Plan Support and Funding Agreement by and among the Chapter 11 Trustee and the Shareholders;

   b.    the Plan Support and Settlement Agreement by and among the Chapter 11 Trustee and NECC's primary and excess liability insurance carriers, PMIC and Maxum, and the Individual NECC Insureds covered under the PMIC/Maxum Policies; and

   c.    the GDC Insurance Settlement and Release Agreement by and among the Chapter 11 Trustee and GDC, Preferred Mutual, and the Individual GDC Insureds.

The following settlements with National Defendants were approved through this Court's confirmation of the Plan:

   a.    the Ameridose, LLC Insurance Settlement, Release and Injunction Agreement by and among the Chapter 11 Trustee, Ameridose, and Ameridose's primary and first excess liability insurance carrier, PMIC;

   b.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, ARL and Landmark;

   c.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, Victory, Netherlands Insurance, and Peerless Insurance;

     d.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, UniFirst, National Union and North American Elite; and

     e.    the Settlement and Release Agreement  by and among the Chapter 11 Trustee, Liberty Industries, Inc. ("Liberty") and Great American E&S Insurance Company ("Great American").

    **b.**    **Provider Settlement Agreements.**

In addition to the settlements with National Defendants, the Chapter 11 Trustee entered into settlement agreements with certain clinics and other healthcare providers that allegedly administered tainted NECC drugs (the so-called "Provider Defendants"), which were approved upon Plan Confirmation:

     a.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, High Point, and Ironshore;

     b.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, Insight, Lexington, Darwin, IGPM, the Doctors (as defined therein), the Virginia Plaintiffs (as defined therein), and Medical Mutual; and

     c.    the Settlement and Release Agreement by and among the Chapter 11 Trustee, Inspira, Lexington, and Ironshore.

    **3.**    **Settlement Proceeds.**

In sum, upon Plan Confirmation, the following settlements were approved in the following amounts:

| Contributing Party | | Amount |
|---|---|---|
| Shareholders | Cash payment | **$47,750,000** |
| | Potential anticipated tax | **$21,800,000** |

| Contributing Party | | Amount |
|---|---|---|
| | refunds | |
| Insight Settling Parties and Insurers | | **$40,000,000** |
| UniFirst and Insurers | | **$30,500,000** |
| NECC Insurers | | **$25,200,000** |
| Inspira and Insurers | | **$16,000,000** |
| Ameridose Insurer | | **$10,000,000** |
| ARL and Insurer | | **$6,400,000** |
| Victory and Insurers | | **$5,500,000** |
| GDC and Insurer | | **$3,750,000** |
| High Point and Insurer | | **$3,500,000** |
| Liberty and Insurer | | **$1,000,000** |
| **Total** | | **$211,400,000**[13] |

Pursuant to the Plan: (a) the bulk of these settlement proceeds has been delivered and paid into the Tort Trust, where such proceeds have been segregated in separate accounts; (b) all NECC related tort claims against each Provider Defendant have been channeled into that Provider Defendant's respective account; and (c) all Tort Claimants who received injections of NECC product from the settling provider and who have filed a timely-filed proof of claim (or a late-filed proof of claim that this Court has determined should be excused from the Bar Date Order), will have a right and opportunity under the Plan to seek distribution and payment from such segregated and separate funds. The remainder of those settlement funds have been released to the Post-Confirmation Officer for distribution to other creditors under the Plan and for

---

[13] As noted above, as of July 13, 2015, $133,802,063.10 has already been disbursed from escrow to the Tort Trustee and $55,818,887.84 has been disbursed to the Post-Confirmation Officer, with an additional $21,800,000 of anticipated tax benefits to be received.

payment of the costs and expenses of administration of the Chapter 11 Case, with any remaining balance to be further disbursed to the Tort Trust for payment to Tort Claimants.

Personal injury claimants by far hold the majority of claims in NECC's Chapter 11 Case. As the largest block of creditors anticipated to hold Allowed Claims, personal injury claimants (through the Tort Trust) will receive the largest portion of NECC's assets, including the bulk of the proceeds of the settlements with the Contributing Parties.

It is by no means certain that NECC's tort creditors would have been able to realize through litigation the significant sum that the Contributing Parties have contributed to the NECC estate.  To the contrary, they almost undisputedly would not.  The Chapter 11 Trustee believes that each of the settlement amounts includes a substantial premium on account of the ability, otherwise unavailable under non-bankruptcy law, the Contributing Parties achieved to resolve all claims against them through a negotiated settlement which afforded them third-party releases, without the burden, delay and expense of years of litigation in hundreds, if not thousands, of suits in state and federal courts throughout the United States.  Tort Creditors certainly would not be able to realize any recovery whatsoever from the Contributing Parties without incurring the delay, expense and risks of litigation (including the risk that one or more significant judgments in favor of one or more competing tort claimants would significantly deplete, or exhaust, the amounts available to pay others).

The Plan provides an exceptional outcome for NECC's estate and its creditors.  As noted above, unlike mass tort bankruptcy cases in which many of the plaintiffs' counsel who served as PSC members or counsel to members of the Official Committee or the Official Committee itself had been previously involved, the parties who potentially could contribute to any settlement did not have substantial assets to contribute and proved to have surprisingly modest amounts of

insurance available to them. Moreover, unlike those other mass tort cases where potential contributors faced strict product liability, NECC parties were, in whole or substantial part, only liable under standards relating to their own negligence or culpability. Virtually all of them vigorously disclaimed liability and insisted that NECC and its representatives were wholly responsible.

Nevertheless, after extraordinary effort over an extended period of time, the Chapter 11 Trustee succeeded in securing funding for the Plan that should exceed $200 million, without the costs, complexity and delay of litigation, none of which NECC's estate easily could have afforded, if at all. The vast majority of the NECC estate's assets, including the proceeds of the settlements set forth in the Plan, will inure to the benefit of personal injury and wrongful death claimants holding allowed claims. The accumulation of such a large sum of money principally for personal injury and wrongful death claimants in this time frame and in such a large, difficult and complex mass tort case of national significance is unprecedented and clearly far exceeded anyone's expectations. For example, in the various Ephedra cases, creditor distributions were significantly less. In *In re Metabolife International, Inc.*, creditor distribution was only $56 million. *See* Amended Disclosure Statement Describing Amended Joint Plan of Liquidation of MII Liquidation, Inc. and AHP Liquidation, LLC Under Chapter 11 of the Bankruptcy Code Dated May 14, 2007 (as Modified), Case No. 05-06040 (Bankr. S.D. Cal. 2005), Dkt. 1329 at 39. In *In re N.V.E., Inc.*, creditor distribution totaled just over $21 million. *See* First Modified Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization Filed Pursuant to Section 1125 of the Bankruptcy Code, Case No. 05-35692-NLW (Bankr. D.N.J. 2005), Dkt. 1012 at 5. In *In re Nutraquest, Inc.*, Case No. 03-44147-RTL (Bankr. D.N.J. 2003), and *In re Twin Labs, Inc.*, Case No. 03-15564-rdd (Bankr. S.D.N.Y), creditor recoveries totaled only $34.4 million and

$19.7 million, respectively.[14] In sum, the distributions in this case (which will exceed $200 million) will dwarf the collective distributions in *all* the Ephedra cases, which collectively totaled approximately $131 million.

### 4.     Collection of Accounts Receivable.

The beginning accounts receivable balance was $2,281,280.70.  While the Debtor's and the Chapter 11 Trustee's own financial advisors suggested that collection efforts with respect to the accounts receivable might not prove successful or cost effective, and, therefore, that it might be preferable to write them off, the Chapter 11 Trustee believed it appropriate to pursue them in an effort to exhaust all bases of recovery for the benefit of NECC's creditors.  Despite the fact that the various account receivable balances for the various account debtors were relatively small, and certainly would not warrant commencing suit to collect them, and that account debtors invariably attempted to disclaim liability by reason of NECC's shutdown and recall of all remaining product, the Chapter 11 Trustee, through two rounds of demand letters to 969 customers, collected $976,104 of the $2,281,280.70 accounts receivable outstanding as of the Chapter 11 Trustee's Appointment Date.  Moreover, he did so without commencing a single suit or incurring the expense of involving any of his counsel.  From the Appointment Date to May 31, 2015, the Chapter 11 Trustee collected $939,049 in accounts receivable.   An additional $37,055 was collected in June 2015, bringing the total to $976,104.

---

[14] Publically available information regarding the amount of creditor distributions in these cases is limited, and, given the age of many of these cases, docket items are no longer electronically accessible through PACER. The chapter 11 Trustee therefore refers the Court to David J. Molton and Steven B. Smith, *The Ephedra Bankruptcy Cases and the Twinlab Global Settlement Model*, 25 Law Journal Newsletters 1 (Jan. 2008) (summarizing creditor distributions in *Nutraquest* and *Twin Labs*, as well as *Metabolife* and *N.V.E.*), a copy of which is attached hereto as <u>Attachment 5</u>. Notably, one of the authors of this article, Mr. Molton, represented the Official Committee in this case.  *See also* Rex A. Littrell, *Lessons from Ephedra: The Twinlab ADR Model*, 1 ADR Choices 9 (Defense Research Institute, April 20, 2009).

E.       **A Summary of the Chapter 11 Trustee's Role in the Case.**

The foregoing provides a general overview of various key events and the extraordinary results achieved by the Chapter 11 Trustee during the two and one half years the Chapter 11 Case was pending.   Of necessity, however, it is by no means exhaustive.   The narrative summaries of the Chapter 11 Trustee's related services, as set forth in the Duane Morris invoices, alone comprise 510 pages.   Suffice it to say that the Chapter 11 Trustee throughout that time was actively engaged in and responsible for each and every aspect of this Chapter 11 Case and the estate's related efforts in the MDL Court and its dealings with various state and federal agencies and licensing authorities, as well as the protracted efforts throughout to forge a consensus among all of the competing constituencies that was in the best interests of NECC's creditors and its estate.   Those efforts were critical to the results achieved, which indisputably far exceeded anyone's expectations at the outset of the Chapter 11 Case.   And no one imagined that that could be achieved without a single objection by any of NECC's creditors or any of the numerous defendants in the hundreds, if not thousands, of cases pending in the MDL Court and other state and federal courts nationwide, the overwhelming support of all creditor classes and no appeals whatsoever of the Confirmation Order.

## II.   <u>AMOUNTS SOUGHT</u>

The Chapter 11 Trustee seeks allowance and payment of the Commission in the amount of $5,758,256.97 and reimbursement of expenses in the amount of $416.52, for a total amount of $5,758,673.49.

During the course of the Chapter 11 Case through the Effective Date of the Plan, the Debtor's bankruptcy estate received a total amount of $191,886,821.62.   That includes the $1,310,717.62 in cash on hand as of the Appointment Date, the $976,104.00 in collected

accounts receivable, and the $189,600,000 of settlements secured by the Chapter 11 Trustee, in

the aggregate, as of the Effective Date not including the $21.8 million of tax refunds anticipated

in the future.

During the Chapter 11 Case, the Chapter 11 Trustee has disbursed $191,166,899.83.

That amount includes $1,545,948.89 disbursed by the Chapter 11 Trustee during the Chapter 11

case in payment of various administrative expenses, as well as the proceeds of the Plan

settlements disbursed from escrow to the Chapter 11 Trustee, $133,802,063.10 of which has

been further disbursed to the Tort Trust as of July 13, 2015, $55,818,887.84 has been likewise

disbursed to the Post-Confirmation Officer for payment of other allowed claims and expenses,

and payment thereafter of any remaining balance to the Tort Trust.

The Court may allow reasonable compensation under section 330 of the Bankruptcy

Code for the Chapter 11 Trustee's services.    11 U.S.C. § 330(a)(1).    Such reasonable

compensation awarded pursuant to section 330 of the Bankruptcy Code is treated as a

commission under section 326(a). *Id.* at § 330(a)(7). Pursuant to Section 326(a) of the

Bankruptcy Code, the Court may allow a commission in an amount not to exceed certain

statutory percentages of the amount of disbursements made during the bankruptcy case.   11

U.S.C. § 326(a).[15] Accordingly, the maximum compensation for which the Chapter 11 Trustee

may apply for the Application Period is computed as:

---

[15] Section 326(a) provides, in relevant part:

> In a case under chapter 7 or 11, the court may allow reasonable compensation
> under section 330 of this title of the trustee for the trustee's services, payable
> after the trustee renders such services, not to exceed 25 percent on the first
> $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess
> of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of
> $1,000,000, and reasonable compensation not to exceed 3% of such moneys in
> excess of $1,000,000, upon all moneys disbursed or turned over in the case by
> the trustee to parties in interest, excluding the debtor, but including holders of
> secured claims.

$(0.25 \times \$5,000)^{16} + (0.10 \times \$45,000)^{17} + (0.05 \times \$950,000)^{18} + (0.03 \times \$190,166,899.83^{19})^{20} = \$5,758,256.97.^{21}$

If the requested compensation and other administrative expenses are allowed in the amounts requested, creditors are expected to receive over ninety-two percent (92%) of funds distributed in this Chapter 11 Case.[22]

Subject to this Court's approval, and consistent with the terms of the liquidating Plan, and the Confirmation Order, the Chapter 11 Trustee seeks final allowance of the Commission earned

---

In this case, the total disbursements made by the Chapter 11 Trustee exceed $1,000,000. Therefore, the Chapter 11 Trustee may receive a commission of up to three percent (3%) of the total amount of disbursements.

[16] $1,250.00.

[17] $4,500.00.

[18] $47,500.00.

[19] This number represents the total amount of disbursements in excess of $1,000,000.

[20] $5,705,006.97.

[21] $1,250.00 + $4,500.00 + $47,500.00 + $5,705,006.97 = $5,758,256.97.

[22] Set forth below is an itemization of professional fees and expenses requested in this case, together with the requested Chapter 11 Trustee Commission.  Estimates were recently provided by Mesirow Financial Consulting LLC and Brown Rudnick LLP.  The fees and expenses of Perkins Coie, LLP, Murtha Cullina LLP and Verdolino & Lowery, P.C. were set forth in the Disclosure Statement as a total of actual fees and expenses to date plus projected fees and expenses through the Effective Date.

| Firm/Professional | Fees & Expenses |
| --- | --- |
| Duane Morris LLP | $   4,331,687 |
| Chapter 11 Trustee's Commission | $   5,758,257 |
| Mesirow Financial Consulting, LLC | $   499,985 |
| Brown Rudnick LLP | $   3,694,854 |
| Perkins Coie, LLP | $   100,000 |
| Murtha Cullina LLP | $   196,500 |
| Verdolino & Lowery, P.C. | $   131,000 |
| Total Amount Requested | $   14,712,283 |

The Chapter 11 Trustee has disbursed $191,166,899.83.  The estimated amount to be distributed to professionals is $14,712,283, which is 7.696% of $191,166,899.83.  If the requested compensation is allowed in the amounts set forth above, creditors will receive 92.3% of funds distributed in this Chapter 11 Case.

during the Application Period in connection with the Chapter 11 Case, as well as a final award of reimbursement for his expenses incurred in connection with the Chapter 11 Case during the Application Period.

Specifically, the Chapter 11 Trustee seeks final allowance and payment of his Commission under section 326(a) of the Bankruptcy Code in the amount of $5,758,256.97 and final allowance and reimbursement of actual and necessary expenses in the amount of $416.52.

During the more than two and one-half years since the Appointment Date, the Chapter 11 Trustee has not submitted any interim applications seeking interim allowance and payment of commissions and expenses.  This Application is the first and final application submitted by the Chapter 11 Trustee.  When the Chapter 11 Trustee was initially appointed, the Debtor's motion to approve monthly payment of fees and expenses was pending. While the estate had some $1.3 million of cash on hand, it was apparent to the Chapter 11 Trustee that those funds would be quickly exhausted by interim payments to the Chapter 11 Trustee and the various estate professionals.  Accordingly, the Chapter 11 Trustee immediately withdrew the motion to ensure that the estate did not prove to be administratively insolvent before successfully confirming a plan maximizing the recoveries by NECC's various creditors.[23]  As a result, the Chapter 11 Trustee and his counsel have received no compensation whatsoever since January 2013, and any recovery by them has been wholly dependent on confirmation of a liquidating plan that incorporated the third-party releases and channeling injunctions that were the central and unconditional requirements of all of the settlements.  As such, for all intents and purposes, NECC's case was, as noted by this Court during the course of this Chapter 11 Case, effectively a

---

[23] Indeed, even without paying any professional fees and expenses, the estate incurred and the Chapter 11 Trustee paid $1,545,948.89 in expenses during the Chapter 11 Case.  But for the Chapter 11 Trustee's accounts receivable collections, the estate would in fact have been administratively insolvent.

Chapter 7 case, with extraordinary demands upon the Chapter 11 Trustee and the various estate professionals coupled with equally extraordinary risks of loss.

## III.   THE REASONABLENESS OF THE REQUESTED COMPENSATION

### A.   Overview.

A chapter 11 trustee is compensated through payment of a commission pursuant to section 326(a) of the Bankruptcy Code.  11 U.S.C. § 326(a).  This commission is not based upon a "lodestar" (*i.e.*, a calculation of hours expended multiplied by a billable rate).  However, the reasonableness of the commission is determined, in part, by examining the factors set forth in 11 U.S.C. § 330(a)(3)(A)-(F).[24]  *See In re Scoggins*, 2014 Bankr. LEXIS 3857 at \*\*12-13 (Bankr. E.D. Cal. Sept. 8, 2014) (noting that all trustees are subject to § 326(a), "but chapter 11 trustees

---

[24] That section states:

> **Bankruptcy Code § 330.  Compensation of Officers.**
>
> (3)   In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)   the time spent on such services;
>
> (B)   the rates charged for such services;
>
> (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;
>
> (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

One court has stated that the factors which determine reasonableness include: (i) the time and labor required; (ii) the novelty and difficulty of the questions involved; (iii) the skill necessary to properly perform the legal services; (iv) the preclusion of other employment by the attorney or firm due to acceptance of the case; (v) the customary fees charged; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the court or the client; (viii) the amount of money involved in the case and the results obtained; (ix) the experience, reputation, and ability of the attorney; and (x) fee awards in similar cases. *See In re First Software Corp.*, 79 B.R. 108, 112-113 (Bankr. D. Mass. 1987).

are also subject to the lodestar-type scrutiny dictated by § 330(a)(3)"); *see also* 3 COLLIER ON BANKRUPTCY ¶ 330.02[1][a] (noting that "although the compensation of a chapter 11 trustee is, as the case with other trustees, treated as a 'commission, based on section 326,' the [2005 amendments to the Bankruptcy Code] also leave in place the mandatory application of the [factors listed in § 330(a)(3)] in assessing the reasonableness of that compensation.").

For the Application Period, the Chapter 11 Trustee has prepared the following charts and tables in compliance with the *United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases*, effective November 1, 2013 (the "Revised UST Guidelines"), which are attached hereto as indicated:

| | |
|---|---|
| Attachment 1: | Revised UST Guidelines Exhibit A: Customary and Comparable Compensation Disclosures with Fee Applications; |
| Attachment 2: | Revised UST Guidelines Exhibit B: Summary of Timekeepers Included in this Fee Application; |
| Attachment 3: | Revised UST Guidelines Exhibits D-1 and D-2: Summary of Compensation Requested by Project Category; |
| Attachment 4: | Revised UST Guildlines Exhibit E: Summary of Cover Sheet of Fee Application. |

The Chapter 11 Trustee maintained daily time records detailing services rendered during the course of this Chapter 11 Case. These times records were prepared contemporaneously and reflect the date of such service, a description of the service, the amount of time spent providing the service, and the amount typically charged for such service based on the Chapter 11 Trustee's billing rate.[25] A chart setting forth the attorneys performing services, the hourly rates charged by

---

[25] At the outset of this case, the Chapter 11 Trustee, and his firm acting as his counsel, offered a 10% discount on the hourly rates otherwise charged by them.

each person, the total amount of fees for each person, as well as all other pertinent information, is included with each detailed description of the services rendered in each of the categories described more fully below.

This Application includes all services by the Chapter 11 Trustee for the performance of duties generally performed by a trustee without the assistance of an attorney or accountant for the estate.  Other services with respect to which the Chapter 11 Trustee acted as his own counsel in lieu of other Duane Morris professionals are included in the accompanying fee application of Duane Morris LLP.  In many instances, particularly with respect to all of the settlements which were the foundation of the Plan, this Application includes services in which the Chapter 11 Trustee acted in both capacities, as the Chapter 11 Trustee and Chapter 11 Trustee's counsel, without including any of his other counsel in assisting him or including the Chapter 11 Trustee's charges in Duane Morris' fee application.  In the case of virtually every settlement, related mediations, meetings and extensive negotiations, the Chapter 11 Trustee acted alone on his own behalf while various other participants were represented by multiple counsel.  As a result, the relative expense to the estate in securing more than $200 million in settlements proved to be remarkably modest.  Indeed, if the Chapter 11 Trustee is awarded his Commission as requested, it would be far less than the "common fund" assessment of up to 8% that the MDL Court approved, at the PSC's request, to compensate those counsel who provided services with respect to the settlements that are deemed beneficial to the various plaintiffs in the MDL Proceedings, much less the one-third or more contingent fee typically charged by plaintiffs' counsel with respect to any recovery by them.

### B.     Summary.

In accordance with this MLBR 2016-1(d), the services rendered by the Chapter 11 Trustee have been coded into 18 (eighteen) project categories. The total time expended by the

39

Chapter 11 Trustee in connection with this case, divided into these project categories, is 1734.4

hours, as set forth below:

| Category | Hours | Fees |
|---|---|---|
| Asset Analysis and Recovery (T001) | 64.3 | $40,770.00 |
| Asset Disposition (T002) | 0.1 | $66.25 |
| Avoidance Actions (T003) | 5.9 | $3,858.75 |
| Case Administration (T004) | 151.2 | $96,814.35 |
| Claims Administration and Objections (T005) | 69.8 | $45,515.70 |
| Committee Matters (T006) | 83.7 | $52,984.35 |
| Fee/Employment Applications (T007) | 143.30 | $73,834.20 |
| Insurance (T009) | 16.6 | $10,635.30 |
| Leases/Executory Contracts (T010) | 3.0 | $1,930.95 |
| Litigation (T011) | 987.6 | $641,354.85 |
| Meeting of Creditors (T012) | 5.1 | $3,190.05 |
| Plan and Disclosure Statement (T013) | 133.0 | $89,248.50 |
| Regulatory Matters (T015) | 12.8 | $8,285.85 |
| Tax Issues (T019) | 23.9 | 15,439.50 |
| U.S. Trustee Matters (T020) | 34.0 | $21,827.25 |
| **Subtotal** | 1734.4 | $1,105,754.85 |
| Plus estimated fees for preparation of this Application and attendance at any Hearing on the approval of this Application | | $30,000.00 |
| **TOTAL** | **1734.4** | **$1,135,754.85** |

C.     **Narrative Detail of Services Provided by the Chapter 11 Trustee.**

To accomplish his objectives during the Application Period, the Chapter 11 Trustee sought to maximize the estate for the benefit of the Debtor's unsecured creditors, including personal injury and wrongful death tort victims.  The Chapter 11 Trustee's efforts included pursuing and compromising claims against the Insiders.  In addition, the Chapter 11 Trustee negotiated with the Contributing Parties and obtained settlements, under which payments to the NECC estate will exceed $200 million.

Set forth below and in the attached exhibits is a detailed explanation of the tasks undertaken by Chapter 11 Trustee.  The following narrative, together with the underlying detailed time records, demonstrate that the Chapter 11 Trustee's Commission is reasonable under the criteria set forth in 11 U.S.C. § 330(a).

1.     **Asset Analysis and Recovery (T001)[26].**

This category includes all matters related to analysis of the assets of the Debtor's bankruptcy estate, and matters pertaining to the recovery of such assets for the benefit of the estate and its creditors.

During the Application Period, the Chapter 11 Trustee retrieved the Debtor's books and records from professionals retained by the Debtor when the Debtor was a debtor in possession. In addition, the Chapter 11 Trustee reconciled the Debtor's accounts receivable and sought to collect those receivables.  There had been a recall of all of NECC's products, and throughout the Application Period, the Chapter 11 Trustee participated in the recall and coordinated the return of certain of NECC's products by third-parties and their delivery to federal authorities.  The

---

[26] The three digit number after each task is the number assigned to each "task code" to provide easy reference to specific tasks performed, as set forth in detail under each "task code" number on the attached detailed billing statements.

Outbreak and the nationwide recall that it precipitated greatly complicated the Chapter 11 Trustee's efforts to collect outstanding accounts receivable. As described above, despite these difficulties, rather than simply writing off the remaining balance, the Chapter 11 Trustee undertook an initial, as well as a follow-up, round of accounts receivable collection in which he sent letters to 969 of the Debtor's customers. This initial effort resulted in the collection of $804,574. In a second effort, 230 letters were sent to customers with balances over $1,000 starting in March 2015. As a result of this second collection effort, the Chapter 11 Trustee collected $134,475 in April, May, June and the first day of July 2015. These efforts resulted in the collection of $939,049 of the $2,281,280.70 in accounts receivable as of the Appointment Date. The Chapter 11 Trustee pursued these collections without incurring any related fees of counsel or commencing any suits. Finally, the Chapter 11 Trustee gathered the Debtor's customer lists for a possible sale, ultimately concluding that such a sale would not be feasible.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Asset Analysis and Recovery totals $40,770.00. A detailed description of all of the services rendered in connection with Asset Analysis and Recovery is attached hereto as <u>Exhibit C</u>. The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:[27]

---

[27] The Chapter 11 Trustee's hourly rate as a partner in Duane Morris is subject to periodic adjustment (usually on January 1) to reflect economic and other conditions. Because the Chapter 11 Trustee's hourly rate was adjusted during the Application Period, the task category charts that follow include columns for services rendered in 2013, 2014, and 2015 so as to indicate the then applicable rates, as reduced by the hourly rate adjustment.

| (i) ASSET ANALYSIS AND RECOVERY (T001) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 52 | $625.50 | $32,526.00 |
| | **2014** | 2.6 | $652.50 | $1,696.50 |
| | **2015** | 9.7 | $675.00 | $6,547.50 |
| **TOTAL** | | **64.3** | | **$40,770.00** |

2.      **Asset Disposition (T002).**

This category includes all matters related to the disposition of the assets of the Debtor's bankruptcy estates.

During the Application Period, the Chapter 11 Trustee identified assets of the Debtor's bankruptcy estate for possible sale.  Throughout the Chapter 11 Case and until shortly before confirmation, "preservation orders" issued in connection with pending litigation precluded the Chapter 11 Trustee from moving or otherwise disposing of all or substantially all of the Debtor's existing assets.  Further, while the settlement agreement with the Debtor's Insiders provided that the Debtor's estate would receive 75% of the net proceeds of the sale of the interests of the Debtor's Insiders in certain affiliates of the Debtor, final approval of that settlement agreement did not occur until the Effective Date.  As a result, the disposition of such assets will be undertaken by the Chapter 11 Trustee, in his role as Post-Confirmation Officer, after the Effective Date of the Plan.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Asset Disposition totals $65.25.  A detailed description of all of the services rendered in connection with Asset Disposition is attached hereto as Exhibit D.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

43

| (ii) ASSET DISPOSITION (T002) | | | | |
|---|---|---|---|---|
| Chapter 11 Trustee | Year | Hours | Hourly Rates | Fees (Combined) |
| Paul D. Moore | 2014 | 0.1 | $652.50 | $62.25 |
| TOTAL | | 0.1 | | $62.25 |

3.  **Avoidance Actions (T003).**

These categories include all matters related to analysis of potential avoidance actions, including all matters related to analysis and recovery of potential and actual preferential transfers and fraudulent conveyances.

During the Application Period, the Chapter 11 Trustee investigated potential avoidance actions, including the avoidance actions against the Debtor's Insiders initially commenced by the Official Committee.  Ultimately, the settlement with the Debtor's Insiders of those claims and all of the estate's claims against them relating to the Outbreak resulted in a cash settlement of $47,750,000 and anticipated tax refunds in the amount of $21,800,000.  In consultation with his counsel, the Chapter 11 Trustee also reviewed all other potential preference and avoidance actions that might be available to the estate and, where necessary, entered into tolling agreements during this due diligence period to facilitate further analysis of such potential actions.  The Debtor's pre-petition financial condition prior to the Outbreak, however, demonstrated that the Debtor was highly profitable and, therefore, current on all of its obligations.  Therefore, there were no other potential preference or avoidance actions.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Avoidance Actions and Preferences/Fraudulent Conveyances totals $3,858.75.   A detailed description of all of the services rendered in connection with Avoidance Actions is attached hereto as <u>Exhibit E</u>.  The following chart is a

summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter

11 Trustee in this category:

| (iii)  AVOIDANCE ACTIONS (T003) | | | | |
|---|---|---|---|---|
| Chapter 11 Trustee | Year | Hours | Hourly Rates | Fees (Combined) |
| Paul D. Moore | 2014 | 5.5 | $652.50 | $3,588.75 |
|  | 2015 | 0.4 | $675.00 | $270.00 |
| TOTAL |  | 5.9 |  | $3,858.75 |

### 4.      Case Administration (T004).

This category includes all matters related to the general administration of the Chapter 11

Case, including maintenance of the case calendar, communication regarding proposed pleadings

to be filed with this Court, coordination of filing of pleadings with this Court, providing input

and instructions to the Chapter 11 Trustee's various professional advisors and communication

and research regarding service issues for various pleadings.

During the Application Period, the Chapter 11 Trustee's general administration of the

estate included obtaining background information from the Debtor's pre-petition professionals,

obtaining access to various automated data storage services provided by third parties to Debtor,

reviewing the Debtor's books and records, reviewing the Debtor's personnel files, identifying

insurance policies of which the Debtor was a beneficiary, monitoring the MDL Proceedings,

monitoring the website for the CDC, identifying outstanding litigation against the Debtor and

coordinating the filing of suggestions of bankruptcy and transfer and/or removal notices,

responding to third-party requests for access to the Debtor's books and records (including

discovery requests), supervising site visits by counsel to parties to litigation relating to the

Outbreak, supervising professionals retained by the Chapter 11 Trustee, coordinating the process

for service of pleadings with the claims agent and special litigation counsel, reviewing accounts

payable and attending to payment of the ongoing administrative expenses in the case, reviewing daily correspondence, securing the Debtor's premises, responding to creditor inquiries and payment demands, responding to press inquiries, monitoring criminal proceedings against the Debtor's Insiders, establishing and maintaining bank accounts for the Debtor's estate and analyzing issues relating to the attorney client privilege and joint defense privileges.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Case Administration totals $96,814.35. A detailed description of all of the services rendered in connection with Case Administration is attached hereto as <u>Exhibit E</u>. The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (iv) CASE ADMINISTRATION (T004) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 84.2 | $625.50 | $52,667.10 |
| | **2014** | 47.9 | $652.50 | $31,254.75 |
| | **2015** | 19.1 | $675.00 | $12,892.50 |
| **TOTAL** | | **151.2** | | **$96,814.35** |

## 5.     Claims Administration and Objections (T005).

This category includes all matters related to the administration of claims against the Debtor's bankruptcy estate.

The Chapter 11 Trustee also worked extensively with the Official Committee and the PSC to establish a bar date and to develop proof of claim forms and procedures to assure that notice was provided to all known creditors and to resolve their various differences with respect to numerous aspects of the claims process. After resolving them, the Chapter 11 Trustee filed a *Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Claim; (II) Approving*

*Certain Additional Documentation Requirements and Procedures for Personal Injury Tort and Wrongful Death Claims; (III) Approving the Form and Manner of Notice Thereof; and (IV) Granting Additional Related Relief,* dated June 28, 2013 [Dkt. No. 263] (the "Bar Date Motion").

On July 24, 2013, this Court entered its *Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for Related Relief Concerning Noticing by Notice Intermediaries,* dated July 29, 2013 [Dkt. No. 412] (the "Interim Bar Date Order"), which, among other things, required healthcare providers to provide patient information so that the Chapter 11 Trustee could assure that those patients received actual notice of the Bar Date, rather than simply publication notice as unknown claimants.  Numerous healthcare providers refused to comply with these provisions of the Interim Bar Date Order.  As a result, the Chapter 11 Trustee and the Official  Committee filed the *Emergency Motion of the Chapter 11 Trustee and the Official Committee for a finding of Civil Contempt*, dated August 21, 2013  [Dkt. No. 506] (the "Contempt Motion") to compel their compliance with this Court's order to ensure that they received actual notice.

Meanwhile, certain of these healthcare providers filed notices of appeal from the entry of the Interim Bar Date Order [Dkt. No. 458] and from this Court's denial of various motions to reconsider, alter or amend the Interim Bar Date Order.  [Dkt. Nos. 441, 443, 444 and 445]. Eventually, the Chapter 11 Trustee succeeded in negotiating a resolution of the issues underlying this appeal and the Contempt Motion, and thereafter filed, along with the Official Committee, the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for Expedited Determination for an Order Approving Stipulation with Notice Intermediaries* [Dkt. No. 548] (the "Bar Date Notice Stipulation").  At a hearing on September 23, 2103, the Chapter

11 Trustee and the Official Committee withdrew the Contempt Motion [Dkt. No. 576], and this

Court entered an order approving the Bar Date Notice Stipulation [Dkt. No. 577].

Although approximately thirty-six entities initially refused to comply with the provisions

of the Bar Date Order requiring the disclosure of patient information, all of those entities

ultimately agreed to comply. As a result, approximately 15,000 patient names were provided to

the Chapter 11 Trustee for the purpose of serving actual notice of the Bar Date, rather than

treating them as unknown claimants entitled only to publication notice.

Prior to the entry of a final bar date order, twenty-one (21) parties objected to the Bar

Date Motion. The Chapter 11 Trustee negotiated extensively with these objecting parties and

ultimately secured a consensual resolution. The Chapter 11 Trustee thereafter supervised his

counsel in preparing and filing a revised form of order for the Bar Date Motion. *See Notice of*

*Submission by Chapter 11 Trustee of Revised Bar Date Notices and Proposed Order* [Dkt. No.

496]. Continuing negotiations resulted in the submission of a further revised order. *See Notice*

*of Submission by Chapter 11 Trustee of Revised Proposed Bar Date Order and Exhibits* [Dkt.

No. 568]. This Court thereafter entered its *Order (I) Establishing Deadline for Submitting*

*Proofs of Claim, (II) Approving Certain Additional Requirements and Procedures for Personal*

*Injury Tort and Wrongful Death Claims and (III) Approving Form and Manner of Notice Thereof*

dated September 27, 2013, together with all exhibits thereto [Dkt. No. 582] (the "Bar Date

Order"). The Bar Date Order established January 15, 2014 at 4:00 p.m. as the Bar Date.

Later, the Chapter 11 Trustee discovered that, due to an oversight by DRC, certain

creditors had not received timely notice of the Bar Date. As a result, the Chapter 11 Trustee

directed his counsel to prepare and file the *Chapter 11 Trustee's Assented-To Motion for Entry of*

*a Supplemental Order Establishing a Bar Date for Filing Proofs of Claim and Request to*

*Limited Notice* [Dkt. No. 697] (the "Supplemental Bar Date Motion").  On February 24, 2014, this Court entered an order granting the Supplemental Bar Date Motion and establishing the Supplemental Bar Date of May 5, 2014 [Dkt. No. 699].

In addition, the Chapter 11 Trustee supervised publication notice in 61 local newspapers. The  Chapter 11 Trustee also responded to creditor inquiries related to the claims process, supervised the work of his claims agent Donlin, Recano & Company, Inc. ("DRC") and determined whether to object to late-filed claims.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Claims Administration and Objections totals $45,515.70.  A detailed description of all of the services rendered in connection with Claims Administration and Objections is attached hereto as Exhibit G.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (v) CLAIMS ADMINISTRATION AND OBJECTIONS (T005) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 14.9 | $625.50 | $9,319.95 |
| | **2014** | 38.3 | $652.50 | $24,990.75 |
| | **2015** | 16.6 | $675.00 | $11,205.00 |
| **TOTAL** | | **69.8** | | **$45,515.70** |

**6.     Official Committee Matters (T006).**

This category includes all matters related to the various committees formed in regard to the Chapter 11 Case, including the Official Committee and the PSC.

During the Application Period, the Chapter 11 Trustee coordinated his efforts with both of the committees, which included reviewing open matters at the time of the Chapter 11

Trustee's appointment, records assembly and retention, developing protocols for access to the Debtor's premises, developing strategies for asset monetization, review of potential avoidance actions, monitoring of the MDL proceedings, developing proof of claim forms, coordinating the establishment of a web site for the Official Committee, developing a joint prosecution agreement, negotiating the terms of the Official Committee's access to claims information, developing mediation strategies, analyzing third-party settlements, negotiating and drafting the terms of a plan of reorganization and seeking confirmation of the Plan.  The PSC and Official Committee representatives consisted almost entirely of attorneys who participated actively in the Chapter 11 Case and raised numerous issues and concerns, and took conflicting positions on many matters, throughout the case.  The Chapter 11 Trustee devoted substantial time and effort to address and resolve those issues and concerns consensually in order to ensure that, ultimately, the Plan would be approved by an overwhelming majority of the Tort Claimants.  The Plan secured the approval of both the PSC and the Official Committee, as well as the Tort Claimants and all other creditors, with no creditor objection whatsoever to confirmation of the Plan and the releases and channeling injunctions it provided.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Official Committee Matters totals $52,984.35.  A detailed description of all of the services rendered in connection with Official Committee Matters is attached hereto as Exhibit H.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (vi) OFFICIAL COMMITTEE MATTERS (T006) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 60.7 | $625.50 | $37,967.85 |
| | **2014** | 22.6 | $652.50 | $14,746.50 |
| | **2015** | 0.4 | $675.00 | $270.00 |
| **TOTAL** | | **83.7** | | **$52,984.35** |

### 7.    Fee/Employment Applications (T007).

This category includes all matters related to the preparation, review, filing, and service of fee applications, including review and verification of compliance with local rules and applicable guidelines of the UST.

During the Application Period, the Chapter 11 Trustee sought his own retention and reviewed the retention application of his counsel, Duane Morris.  He also undertook significant efforts to seek and secure the assistance of all other counsel and financial advisors.  Those efforts related to Harris Beach, defense counsel designated to defend the estate by NECC's insurer, as well as regulatory counsel who previously represented the Debtor, Collora LLP and Akin Gump Strauss Hauer & Feld LLP.  The Chapter 11 Trustee also devoted a significant amount of time to the proposed retention of Deloitte Financial Advisory Services, LLP ("Deloitte"), as the Chapter 11 Trustee's financial advisors.  When that proposed retention ultimately proved problematic in light of the terms Deloitte sought to impose and certain proposed limitations on its services, the Chapter 11 Trustee secured the retention of Mesirow Financial Consulting, LLC to serve in that role.

The Chapter 11 Trustee also reviewed each of the quarterly fee reports of Harris Beach and participated in the drafting and related review of its retention application.

51

During the Application Period, the Chapter 11 Trustee reviewed the retention of DRC and sought and analyzed proposals from other noticing and claims agents.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Fee/Employment Applications and Retention of Professionals totals $73,834.20.   A detailed description of all of the services rendered in connection with Fee/Employment Applications and Retention of Professionals is attached hereto as <u>Exhibit I</u>.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (vii) FEE/EMPLOYMENT APPLICATIONS AND RETENTION OF PROFESSIONALS (T007) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 14.2 | $625.50 | $8,882.10 |
| | **2014** | 8.2 | $652.50 | $5,350.50 |
| | **2015** | 41.1 | $675.00 | $27,742.50 |
| **Michael R. Lastowski** | **2015** | 26.4 | $751.50 | $19,839.60 |
| **Jarret P. Hitchings** | **2015** | 9.5 | $369.00 | $3,505.50 |
| **Stephanie Lenkiewicz** | **2015** | 44.0 | $193.50 | $8,514.00 |
| **Subtotal** | | **143.4** | | **$73,834.20** |
| Plus estimated future fees for preparation of this Application and attendance at any Hearing on the approval of this Application | | | | $30,000.00 |
| **TOTAL** | | **143.4** | | **$103,834.20** |

## 8.      Insurance (T009).

This category includes all matters related to insurance.

During the Application Period, the Chapter 11 Trustee analyzed the Debtor's insurance policies and negotiated settlements with certain of the Debtor's and Insiders' insurers.  As is the

case with most insurance policies, they were all quite complex and contained numerous exceptions and exclusions. Virtually all of the insurers vigorously disputed coverage on a wide range of bases, including, among other things, specific fungal exclusions, exclusion of coverage for manufacturing activities as opposed to compounding, and actions in violation of applicable law. In addition, the Chapter 11 Trustee analyzed COBRA issues. Finally, the Chapter 11 Trustee renewed the Debtor's commercial property and general liability insurance after analyzing different proposals.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Insurance totals $10,635.30. A detailed description of all of the services rendered in connection with Insurance is attached hereto as <u>Exhibit J</u>. The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (viii) INSURANCE (T009) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 8.6 | $625.50 | $5,379.30 |
| | **2014** | 6.4 | $652.50 | $4,176.00 |
| | **2015** | 1.6 | $675.00 | $1,080.00 |
| **TOTAL** | | **16.6** | | **$10,635.30** |

### 9.    Leases/Executory Contracts (T010).

This category includes all matters related to the assumption, assignment, or rejection of leases and executory contracts.

During the Application Period, the Chapter 11 Trustee identified, reviewed and analyzed all existing leases and executory contracts and made related determinations as to assumption and rejection. The Chapter 11 Trustee, in connection with the Plan Confirmation process, reviewed

forms of notices of assumption and rejection. The Chapter 11 Trustee also arranged for the return of certain leased equipment. Perhaps the most substantial lease or executory contract, and ongoing expense during the Chapter 11 Case, involved the Debtor's lease with GDC with respect to the premises in Framingham. Although the Debtor had ceased operations prior to the Chapter 11 Trustee's appointment, the preservation orders precluded the Chapter 11 Trustee from vacating the premises. As such, the estate was exposed indefinitely to the monthly rent obligation of $20,917.00. The Chapter 11 Trustee immediately negotiated a fifty percent reduction, to $10,458.50, and enlisted GDC in joining him in seeking to modify or lift the preservation orders so that the premises could be vacated, or the space utilized by the estate could be reduced and GDC could attempt to secure a new tenant. When multiple efforts in the MDL Court failed to secure the relief that the Chapter 11 Trustee sought, the Chapter 11 Trustee ceased all payments as of October, 2013, and insisted that a resolution of any and all claims relating to the lease be resolved in the context of his settlement negotiations with GDC and the Insiders who were the owners of GDC. All remaining claims with respect to that lease were in fact released in connection with the settlements, thereby relieving the estate from any occupancy expense since October, 2013, as well as any claim for rejection of the lease.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Leases/Executory Contracts totals $1,930.95. A detailed description of all of the services rendered in connection with Lease/Executory Contracts is attached hereto as Exhibit K. The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (ix)  LEASES/EXECUTORY CONTRACTS (T010) | | | | |
|---|---|---|---|---|
| Chapter 11 Trustee | Year | Hours | Hourly Rates | Fees (Combined) |
| Paul D. Moore | 2013 | 1.4 | $625.50 | $875.70 |
| | 2014 | 1.1 | $652.50 | $717.75 |
| | 2015 | 0.5 | $675.00 | $337.50 |
| TOTAL | | 3.0 | | $1,930.95 |

### 10.    Litigation (T011).

This category includes all matters related to adversary proceedings or other non-avoidance action litigation initiated in connection with the Chapter 11 Case.

During the Application Period, the Chapter 11 Trustee participated in the resolution of an adversary proceeding which the Official Committee initiated against the Debtor's Insiders together with the estate's claims against Debtor's Insiders, their affiliates and their insurers relating to the Outbreak.  The insider negotiation resulted in a settlement with a cash payment of $47,750,000, with a potential value of $69,550,000 once anticipated tax refunds are received. The negotiation with their affiliates and NECC's and the affiliates' insurers resulted in settlements aggregating an additional $38,950,000.  In addition, the Chapter 11 Trustee assumed the leading role in mediations with third-parties who were potentially liable to the personal injury victims, resulting in additional settlements totaling $102,900,000, as set forth above.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Litigation totals $641,354.85.  A detailed description of all of the services rendered in connection with Asset Analysis and Recovery is attached hereto as Exhibit L.   The following chart is a summary of the time expended, at the otherwise applicable otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (x) LITIGATION (T011) | | | | |
|---|---|---|---|---|
| Chapter 11 Trustee | Year | Hours | Hourly Rates | Fees (Combined) |
| Paul D. Moore | 2013 | 212.7 | $625.50 | $133,043.85 |
| | 2014 | 655.4 | $652.50 | $427,648.50 |
| | 2015 | 119.5 | $675.00 | $80,662.50 |
| TOTAL | | 987.6 | | $641,354.85 |

## 11.    Meetings of Creditors (T012).

This category includes all matters related to communication with members of the Official Committee, the PSC, tort claimants, and other general unsecured creditors.

During the Application Period, the Chapter 11 Trustee reviewed the Debtor's books and records, including the Debtor's Statements and Schedules, to prepare for and attend a first meeting of creditors pursuant to 11 U.S.C. § 341.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Meetings of Creditors totals $3,190.05.  A detailed description of all of the services rendered in connection with Meetings of Creditors is attached hereto as Exhibit M.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (xi) MEETINGS OF CREDITORS (T012) | | | | |
|---|---|---|---|---|
| Chapter 11 Trustee | Year | Hours | Hourly Rates | Fees (Combined) |
| Paul D. Moore | 2013 | 5.1 | $625.50 | $3,190.05 |
| TOTAL | | 5.1 | | $3,190.05 |

## 12.    Plan and Disclosure Statement (T013).

This category includes all matters related to the preparation, review, analysis, and negotiation of, and any objection to the Plan and Disclosure Statement.

56

During the Application Period, the Chapter 11 Trustee participated extensively in the negotiation and drafting of the Plan, the Disclosure Statement and related solicitation procedures. His participation included extensive related negotiations with the Official Committee and its counsel, Lead Counsel for the PSC and its members, Ms. Hertz on behalf of the UST, and virtually all of the settling parties, whose settlements were conditioned upon the Plan Confirmation and the Third-Party Releases and Injunctions which were central to the Plan, as well as counsel to their insurers. The Chapter 11 Trustee prepared for and attended the Disclosure Statement Hearing and the Confirmation Hearing. He reviewed all twenty-seven (27) declarations in support of confirmation, provided his input and submitted his own declaration in support of confirmation. Through the Chapter 11 Trustee's extensive efforts, the numerous issues and objections raised by various plaintiff and defendant constituencies to the initial plan and disclosure statement, including eight of them which raised various issues concerning the plan releases and thirty-five (35) of them which did so prior to confirmation with respect to comparative fault defenses, all were successfully resolved on a consensual basis, with no objection to confirmation whatsoever, other than that of the UST. The Chapter 11 Trustee initiated negotiations with each of them and secured a consensual resolution of their issues through a stipulation he proposed preserving their comparative fault defenses, while, at the same time, not impairing the settling defendants' rights under their settlements to Third Party Releases and Injunctions. In addition, the Chapter 11 Trustee, in exchange, for reaching the comparative fault issues, secured the objecting parties release of all claims against NECC's estate, including many millions of dollars of claims for contribution or indemnity. More importantly, confirmation proceeded expeditiously, with no appeals which would have significantly delayed

distribution to NECC's creditors, including Tort Claimants who have been, in many instances, desperately awaiting necessary compensation for some two and one-half years.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Plan and Disclosure Statement totals $89,248.50. A detailed description of all of the services rendered in connection with Plan and Disclosure Statement is attached hereto as Exhibit N. The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (xii) PLAN AND DISCLOSURE STATEMENT (T013) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 0.5 | $625.50 | $312.75 |
| | **2014** | 22.3 | $652.50 | $14,550.75 |
| | **2015** | 110.2 | $675.00 | $74,385.00 |
| **TOTAL** | | **133.0** | | **$89,248.50** |

## 13. Regulatory Matters (T015).

This category includes all matters related to regulatory issues, including compliance with applicable regulations by or reporting to applicable regulatory authorities and responding to various investigations and proceedings with respect to NECC's various licenses and proposed fines and penalties against NECC and its estate.

During the Application Period, the Chapter 11 Trustee negotiated the Debtor's voluntary surrender of its pharmacy licenses with the State of Tennessee, the State of New Mexico, the State of Ohio, the State of Vermont and the State of North Carolina. In some instances, regulatory authorities had sought to terminate the Debtor's license and to impose fines. In each instance, the Chapter 11 Trustee was able to negotiate a voluntary surrender of the Debtor's

license and a waiver of any penalties of fines or, in the case of Tennessee, participated in related mediation proceedings and was able to negotiate a resolution pursuant to which he secured a subordination of any such claim in favor of all other creditors of the estate and release of its competing claims against Barry Cadden.  In virtually all instances, the Chapter 11 Trustee acted alone on his own behalf, without the participation, and related time charges, of any of his counsel.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Regulatory Matters totals $8,285.85.   A detailed description of all of the services rendered in connection with Regulatory Matters is attached hereto as Exhibit O.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (xiii) REGULATORY MATTERS (T015) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 2.7 | $625.50 | $1,688.85 |
| | **2014** | 9.8 | $652.50 | $6,394.50 |
| | **2015** | 0.3 | $675.00 | $202.50 |
| **TOTAL** | | **12.8** | | **$8,285.85** |

### 14.     Tax Issues (T019).

This category includes all matters related to issues involving federal, state, or local taxation.

During the Application Period, the Chapter 11 Trustee assisted in the preparation of federal, state and local tax returns.  In addition, the Chapter 11 Trustee, where appropriate, sought and obtained extensions of time in which to file tax returns.  Finally, the Chapter 11 Trustee and his advisors analyzed the complex tax issues relating the Chapter 11 Trustee's

settlement with the Debtor's Insiders.  That settlement includes a tax refund in the anticipated amount of $21,800,000.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with Tax Issues totals $15,439.50.  A detailed description of all of the services rendered in connection with Tax Issues is attached hereto as <u>Exhibit P</u>.  The following chart is a summary of the time expended, at the otherwise applicable hourly rates indicated, by the Chapter 11 Trustee in this category:

| (xiv)  TAX ISSUES (T019) | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 8.0 | $625.50 | $5,004.00 |
| | **2014** | 13.2 | $652.50 | $8,613.00 |
| | **2015** | 2.7 | $675.00 | $1,822.50 |
| **TOTAL** | | **23.9** | | **$15,439.50** |

### 15. U.S. Trustee Matters (020).

This category includes all matters regarding the UST.  During the Application Period, the Chapter 11 Trustee regularly communicated with the UST to advise them of the status of the Chapter 11 Case.  The Chapter 11 Trustee also discussed with the UST their objections to both the Plan and the Disclosure Statement in an effort to narrow or resolve those objections.  Finally, the Chapter 11 Trustee reviewed, approved and executed monthly operating reports which were submitted to the UST.

The Chapter 11 Trustee's time calculated at a discounted rate for work performed during the Application Period in connection with U.S. Trustee Matters totals $21,827.25.  A detailed description of all of the services rendered in connection with U.S. Trustee Matters is attached

hereto as Exhibit Q.  The following chart is a summary of the time expended, calculated at the

hourly rates indicated, by the Chapter 11 Trustee in this category:

| (xx)  U.S. TRUSTEE MATTERS | | | | |
|---|---|---|---|---|
| **Chapter 11 Trustee** | **Year** | **Hours** | **Hourly Rates** | **Fees (Combined)** |
| **Paul D. Moore** | **2013** | 16.5 | $625.50 | $10,320.75 |
| | **2014** | 13.6 | $652.50 | $8,874.00 |
| | **2015** | 3.9 | $675.00 | $2,632.50 |
| **TOTAL** | | **34.0** | | **$21,827.25** |

## IV.     THIS COURT SHOULD AWARD THE CHAPTER 11 TRUSTEE A COMMISSION CALCULATED PURSUANT TO 11 U.S.C. § 326(A)

The Chapter 11 Trustee is entitled to a commission, calculated pursuant to 11 U.S.C.

§ 326(a), so long as the commission is "reasonable," taking into consideration, among other

things, the factors set forth in 11 U.S.C. § 330(a)(3).

Administration of the Debtor's chapter 11 estate required the Chapter 11 Trustee to

devote considerable time and labor to the estate for more than 30 months, effectively precluding

him from engaging in most other work.  The novelty and difficulty of the issues he had to resolve

to bring the case to a successful conclusion were extraordinary.  When the Chapter 11 Trustee

was appointed, the Debtor's estate had little prospect of any meaningful distribution to creditors

and appeared more likely to prove administratively insolvent.  In effect, the Chapter 11 Trustee

and his counsel undertook a highly "contingent" engagement, where the estate had few, if any,

assets to fund any litigation and where creation of a settlement fund was entirely contingent upon

the negotiation, drafting and confirmation of a plan which implicated novel issues of law, as to

which there is no controlling First Circuit precedent.  Payment of the Chapter 11 Trustee's

Commission and related expenses, as well as the fees and expenses of his firm, Duane Morris,

accrued over a period of more than two and one-half years, was entirely contingent on confirmation of such a plan.  These factors support a finding that the Commission is reasonable under the criteria set forth in 11 U.S.C. § 330(a).

### A.     The Lodestar Factors.

The Commission is reasonable in light of the lodestar factors under section 330(a)(3). One court has stated that the following factors should be considered in evaluating the lodestar. *See In re First Software Corp.*, 79 B.R. 108, 112-113 (Bankr. D. Mass. 1987)(identifying criteria).  An examination of these factors supports an award of the Commission:

a.     The time and labor required.   The time that the Chapter 11 Trustee devoted to the case was absolutely necessary in light of the need to negotiate, draft and confirm a plan of reorganization in a complex, highly contentious mass tort case involving thousands of alleged victims, as quickly as possible in order to provide timely compensation to victims of the Outbreak.  Throughout the more than two and one-half years since the Appointment Date, the Chapter 11 Trustee has been fully engaged in this case to the exclusion of any significant competing demands and personally involved in each and every aspect of this Chapter 11 Case.  Among other things, his personal commitment to every aspect of this case eliminated the need for multiple attorneys to participate in the same tasks or attend the same meeting and to share written updates and reports with multiple colleagues or meet and confer with them at a significant increase in related fees and expenses throughout the more than two and one-half years the Chapter 11 Case was pending.

b.      The novelty and difficulty of the questions involved.  As set forth above, this case presented novel and difficult legal issues, including the fundamental issues relating to: (a) the authority of a bankruptcy court to approve Third-Party Releases and Injunctions; and (b) the authority of the MDL Court to transfer state court cases against non-debtor parties.  The case also presented daunting issues during the plan negotiation process, where confirmation was dependent upon securing the necessary overwhelming support from numerous constituents with widely divergent interests and where all constituents were well aware of the uncertainty with respect to third-party releases in the First Circuit.

c.      The skill necessary to properly perform the legal services.  In light of the novelty and difficulty of the issues and the substantial opposition that the Chapter 11 Trustee initially faced from counsel to personal injury and wrongful death plaintiffs as well as the numerous non-debtor third parties in interest, the Chapter 11 Trustee needed to demonstrate the highest skill in order to achieve the extraordinary results in this case. Given the numerous obstacles the Chapter 11 Trustee faced confirming a liquidating plan incorporating the Third-Party Releases and Injunctions, none of them would have participated if they viewed the Chapter 11 Trustee as likely to fail. To the contrary, they would have invested even greater effort at pursuing their own self-interests at the expense of the many competing creditors. The Chapter 11 Trustee's extensive experience with respect to all aspects of the case from a bankruptcy perspective as well as from

substantial litigation experience, rendered him uniquely qualified to perform the difficult tasks at hand and to reach consensual resolution of difficult and hotly contested matters with parties with widely differing demands and expectations. Rather than delegating many of the issues that arose to a plethora of other counsel, resulting in substantial duplication of effort, office conferences and the like, the Chapter 11 Trustee, more often than not, personally handled matters, or took the lead role, including with respect to issues regarding insurance coverage and exclusions, third party plan releases, plan classification, notice issues, bankruptcy jurisdiction issues, multi district litigation issues and the competing jurisdictional issues between the bankruptcy court and the MDL Court and any number of other issues that arose in the Chapter 11 Case.

d.      The preclusion of other employment by the attorney or firm due to acceptance of the case. As many of the parties in interest, both friend and foe of the Chapter 11 Trustee, have advised this Court throughout the Chapter 11 Case, this case occupied almost all of the Chapter 11 Trustee's time from the Appointment Date to the Effective Date, frequently including nights and weekends throughout the more than two and one-half years of his involvement. He clearly fulfilled his commitment, at the outset of this case, that, if appointed, he personally would do everything possible to achieve the best result possible, as soon as possible, for all those who suffered so much as a result of the Outbreak.

e.   The customary fees charged.  The Chapter 11 Trustee is seeking allowance of his fees on a commission basis, under § 326(a) and its "cap" of three percent (3%).  As noted above, that is far less than the "common fund" assessment of up to 8% approved by the MDL Court, as well as the one-third or more contingent fee typically charged by plaintiffs' counsel in matters far less complex and risky.  By far, the Chapter 11 Trustee expended extraordinarily more time and effort than all of them in securing the result obtained and, indeed, took a lead role in doing so.

f.   Whether the fee is fixed or contingent.  Although the Chapter 11 Trustee was not retained to administer the case on a "contingent" basis, his compensation, from the outset and until the Confirmation Order was secured and the Effective Date occurred, was "*de facto*" entirely contingent upon the confirmation of a plan of liquidation and required an extraordinary commitment of time and expense over more than two and one-half years with equally extraordinary risks of non-payment.  Failure to secure confirmation of the Plan would have resulted in a complete, multi-million loss by the Chapter 11 Trustee and his firm with respect to the commitment of thousands of hours over a period of two and one-half years.

g.   Time limitations.  The circumstances of the case imposed extraordinary time limitations upon the Chapter 11 Trustee.  The limited cash on hand rendered it essential that the Chapter 11 Case be resolved as quickly as possible to avoid administrative insolvency, with little or no recovery.

Moreover, absent a prompt transfer of cases to the MDL Court, third-party non-debtor defendants' available financial resources and insurance coverage might have been exhausted or severely depleted by a few early verdicts and settlements. In addition, the victims of the Outbreak would not be compensated until the confirmation of a plan, and it was important to commence those distributions as soon as possible. Many of the victims of the Outbreak and their families were regularly reported to be suffering substantial personal and financial hardships that increased with the passage of time. Some victims were unable to pay the costs of continuing medical treatment and necessary prescriptions. Some were no longer able to work and pay their living expenses and lost their homes. It was critical for settlement efforts to proceed simultaneously on multiple fronts to secure a global resolution as quickly as possible.

h.   The amount of money involved in the case and the results obtained. The amount of money involved in the case and the results obtained were extraordinary and far exceeded anyone's expectations under the circumstances faced by the Chapter 11 Trustee. The total distribution to unsecured creditors in this case on account of PITWD claims is projected to total approximately $200 million. By contrast, in the Ephedra cases of *In re Metabolife International, Inc.*, Case No. 05-06040 (Bankr. S.D. Cal. 2005), *In re N.V.E., Inc.*, Case No. 05-35692-NLW (Bankr. D.N.J. 2005), *In re Nutraquest, Inc.*, Case No. 03-44147-RTL (Bankr. D.N.J. 2003), and *In re Twin Labs, Inc.*, Case No. 03-15564-rdd (Bankr. S.D.N.Y) over a

period of more than four years, four major ephedra manufacturer bankruptcies resulted in an aggregate recovery of $131 million.

i.  The experience, reputation, and ability of the attorney.  On information and belief, Mr. Moore was chosen, from amongst a significant number of other candidates, as Chapter 11 Trustee due to his vast experience and strong reputation, as well as his substantial litigation and bankruptcy skills and history of securing substantial success in difficult, hotly contested matters, many in which his compensation was entirely dependent on the results of his efforts, as to which he never hesitated to see them to conclusion despite the substantial risks of non-payment.

j.  The undesirability of the case.  Throughout the more than two and one-half years this case was pending, it presented very great challenges, with a correspondingly daunting risk of nonpayment of extraordinary fees and expenses.  The Chapter 11 Trustee never hesitated to do anything and everything necessary to achieve the best result possible irrespective of any such risk or expense.

k.  The nature and length of the professional relationship between the attorneys or firm and the client.  This factor is not relevant to this case.

l.  Fee awards in similar cases.  As set forth above, the Chapter 11 Trustee's Commission, capped at the three percent (3%) maximum, is reasonable and far less than the MDL "common fund" assessment of up to 8% and the contingent fee of one-third or more customarily charged by plaintiffs' counsel.  The results achieved by the Chapter 11 Trustee over such a

relatively short time without any litigation whatsoever were extraordinary and clearly were achieved at a cost that would have been dwarfed if litigation proved necessary.

**B.      This Court Should Award the Commission to the Chapter 11 Trustee.**

Notably, before the BAPCA amendments, the commissions of both chapter 7 and chapter 11 trustees were reviewed for reasonableness under Section 330(a).  However, for cases filed after October 16, 2005, Section 330(a)(3) applies only to chapter 11 trustees.[28]  As COLLIER explains:

> The 2005 amendments to section 330 treat chapter 11 trustees somewhat differently.   As described above, amended section 330(a)(3) provides that the five listed factors used to determine reasonable compensation will no longer expressly apply to trustees, except for chapter 11 trustees.   Therefore, although the compensation of a chapter 11 trustee is, as is the case with other trustees, treated as a "commission, based on section 326," the 2005 changes also leaves in place the mandatory application of the listed factors in assessing the reasonableness of that compensation.
>
> The legislative history does not address the reason for treating chapter 11 trustees differently from other trustees.   It is likely, however, that the difference reflects the possibility that the amount of moneys disbursed may be considerably higher in chapter 11 cases where the trustee is operating the debtor.   In an operating case, the ordinary course of payment of expenses associated with the operation such as payroll, rent, raw materials and the like are all technically "disbursements" that determine the amount of a trustee's commission fee.
>
> Section 1108 of the Bankruptcy Code creates a presumption that the chapter 11 "trustee may operate the debtor's business" unless the court orders otherwise.   In contrast, section 721 of the Code provides that the chapter 7 trustee is not authorized to operate the business absent court authorization to do so, and then only for "a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."

---

[28] Some courts continue to review chapter 7 commissions for reasonableness.  *See e.g.*, *In re Mack Properties*, 381 B.R. 793 (Bankr. M.D. Fla. 2007).

> Accordingly in chapter 11 cases, it will be necessary for the court
> to consider the five listed factors in assessing a trustee's request for
> an award of compensation.

3 COLLIER ON BANKRUPTCY ¶ 330.02[1][c].    NECC ceased all operations prior to the commencement of the Chapter 11 Case and the Chapter 11 Trustee's Appointment Date.  The Chapter 11 Case proceeded as such in name only; in all respects it was, in effect, a Chapter 7 proceeding.  As such, none of the disbursements upon which the Chapter 11 Trustee seeks his Commission were generated by operations.  All of them were generated by the Chapter 11 Trustee's extraordinary and highly successful efforts over a period of more than two and one-half years to secure as much compensation, as soon as possible, for the numerous victims who suffered so greatly.

As such, the circumstances of the instant case are far more similar, if not identical, to a chapter 7 case than to most chapter 11 cases, as noted by this Court during the course of the Chapter 11 Case.  As of the Appointment Date, the Debtor was not operating, and there were no remaining employees.  The prospect of confirmation of a plan was a remote possibility.  Plan confirmation was achieved only after some two and one-half years of litigation and negotiations, during which time the Chapter 11 Trustee was paid no compensation and the possibility of compensation was entirely contingent upon confirmation of the Plan and the risks of non-payment dwarfed those normally experienced in chapter 7 cases.  As such, it is entirely appropriate that the Chapter 11 Trustee be awarded his Commission as determined under Section 326(a).

As described above, the compensation payable to a chapter 7 trustee is a commission based upon a percentage of moneys disbursed in the case. *See* 11 U.S.C. §§ 326(a) (setting forth statutory formula for compensation). Absent extraordinary circumstances, a chapter 7 trustee's commission should equal the amount prescribed by the section 326(a) formula. *See In re Rowe,*

750 F.3d 392 (4th Cir. 2014) (holding that as a general rule, the fee for Chapter 7 trustees must be determined on a commission basis as set forth in § 326(a), but may be reduced only in extraordinary circumstances); *In re Salgado-Nava*, 473 B.R. 911, 921 (B.A.P. 9th Cir. 2012) ("absent extraordinary circumstances, chapter 7, 12 and 13 trustee fees should be presumed reasonable if they are requested at the statutory rate. Congress would not have set commission rates for bankruptcy trustees in §§ 326 and 330(a)(7), and taken them out of the considerations set forth in § 330(a)(3), unless it considered them reasonable in most instances."); *see also In re Wolverine Proctor & Schwartz, LLC*, 2012 Bankr. LEXIS 4181, 12-14 (Bankr. D. Mass. Sept. 10, 2012) (holding that a trustee's request for compensation may be reduced or denied if the services expended were not in the interests of the estate); *In re Owens*, 2008 Bankr. LEXIS 2427 (Bankr. D. Ore. Sept. 15, 2008) (trustee's sale of real estate generated a broker's commission and increased trustee's commission, while reducing amount payable to unsecured creditors). A trustee is to receive the maximum commission set forth in section 326(a) except where and objecting party can establish extraordinary circumstances warranting a downward departure from the commission amount.  3 COLLIER ON BANKRUPTCY ¶ 326.02[1][a] (noting that courts have increasingly found "that the presumption of the reasonableness of the statutory commission shifts the burden to the objecting party to show extraordinary circumstances warranting a downward departure from the commission amount.").

Some courts in this district have interpreted section 330(a)'s reasonableness criteria to require that a chapter 7 trustee is not *per se* entitled to the total amount of the commission calculated using the statutory formula. *See, e.g., Crawford v. Riley Law Group LLP (In re Wolverine, Proctor & Schwartz, LLC),* 2015 U.S. Dist. LEXIS 39449, 17-18 (D. Mass. Mar. 26, 2015)*; In re Bank of New Eng. Corp.*("Bank of New England")*,* 484 B.R. 252 (Bankr. D. Mass.

2012) (Hillman, J.). However, in both such cases, the chapter 7 trustee was in fact awarded the maximum commission provided under section 326(a).  In doing so, in *Bank of New England*, Judge Hillman held that the chapter 7 trustee was entitled to the statutory commission because, among other things, the size and complexity of the case, the trustee's services "have been of the highest quality and beneficial to the estate," and the trustee received only irregular payments over the course of the case. *Bank of New Eng.,* 484 B.R. at 257, 283. All such factors apply here; indeed, the Chapter 11 Trustee received no payments whatsoever during this case.

## V.   <u>EXPENSES</u>

The Chapter 11 Trustee incurred actual, necessary expenses in the amount of $416.52 during the Application Period for which he seeks reimbursement.   A detailed and itemized description of the actual and necessary expenses incurred by the Chapter 11 Trustee in this case is set forth in <u>Exhibit R</u> attached hereto.   All of the expenses set forth in <u>Exhibit R</u> were actual and necessary and are reimbursable in light of the demands of this case.

Case 1:13-md-02419-RWZ Document 1810E-10 Filed 09/25/16 Page 83 of 84

**Summary of Total Expenses Incurred During the Application Period**

| DESCRIPTION | TOTAL |
|---|---|
| Color Printing & Duplicating (Internal | $12.15 |
| Meeting Expense | $17.08 |
| Messenger Service | $7.00 |
| Overnight Mail | $98.71 |
| Pacer Federal Court Docket Costs | $4.60 |
| Postage | $14.36 |
| Printing & Duplicating | $105.90 |
| Travel Away from Home | $54.29 |
| Travel Local | $102.43 |
| **TOTAL** | **$ 416.52** |

*[Remainder of Page Left Intentionally Blank]*

WHEREFORE, the Chapter 11 Trustee respectfully requests that this Court enter an order:

      (a)      Allowing this Application;

      (b)      Awarding the Chapter 11 Trustee a commission in the amount of $5,758,256.97 in connection with his services as Chapter 11 Trustee and authorizing and approving an award of $416.52 on account of his related expenses;

      (c)      Authorizing final payment to the Chapter 11 Trustee of the Commission and reimbursement of expenses in the aggregate amount of $416.52; and

      (d)      Awarding the Chapter 11 Trustee such other and further relief as this Court deems just and proper.

Dated: August 3, 2015
      Boston, Massachusetts

Respectfully submitted,

**DUANE MORRIS LLP**

By: */s/ Paul D. Moore*
Paul D. Moore (BBO # 353100)
DUANE MORRIS LLP
100 High Street
Suite 2400
Boston, MA 02110-1724
Phone: (857) 488-4200
Email: pdmoore@duanemorris.com

*Chapter 11 Trustee of New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center*