# EXHIBIT I

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC.,<br><br>                              Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

**SUMMARY OF FIRST AND FINAL APPLICATION OF DUANE MORRIS LLP, COUNSEL TO PAUL D. MOORE, CHAPTER 11 TRUSTEE OF NEW ENGLAND COMPOUNDING PHARMACY, INC. D/B/A/ NEW ENGLAND COMPOUNDING COMPANY, FOR FINAL ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Name of Applicant:                                        Duane Morris LLP

Professional Services Rendered to:                Chapter 11 Trustee

Date of Retention:                                          February 26, 2013, *nunc pro tunc* to January 25, 2013

Period for Which Compensation is Sought:    January 25, 2013 through and including June 4, 2015

Amount of Compensation Sought as Actual, Reasonable and Necessary:                   $4,298,124.45[1]

Amount of Expenses Sought as Actual, Reasonable and Necessary:                          $63,601.10

Total Amount Sought:                                     $4,361,725.55

        This is Duane Morris LLP's first and final application.

---

[1] This amount includes $30,000.00 of estimated future fees for preparation of this Application and attendance at any Hearing on the approval of this Application.

Dated: August 3, 2015
      Boston, Massachusetts

**DUANE MORRIS LLP**

By: /s/ Michael R. Lastowski
Michael R. Lastowski, Esq.
(admitted *pro hac vice*)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile:  (302) 657-4901
mlastowski@duanemorris.com

*Counsel to the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| NEW ENGLAND COMPOUNDING PHARMACY, INC., | |
| | Case No. 12-19882-HJB |
| Debtor. | |

**FIRST AND FINAL APPLICATION OF DUANE MORRIS LLP, COUNSEL
TO PAUL D. MOORE, CHAPTER 11 TRUSTEE OF NEW ENGLAND
COMPOUNDING PHARMACY, INC. D/B/A/ NEW ENGLAND
COMPOUNDING COMPANY, FOR FINAL ALLOWANCE
OF COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Michael R. Lastowski, Esq.
(admitted *pro hac vice*)
DUANE MORRIS LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone:  (302) 657-4900
Facsimile:  (302) 657-4901
mlastowski@duanemorris.com

*Counsel to the Chapter 11 Trustee*

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND .................................................................................................1

    A.     Jurisdiction. .......................................................................................... 1

    B.     The Debtor's Bankruptcy Case and Appointment of the Chapter 11
           Trustee. ................................................................................................ 2

        1.     Events Leading to the Debtor's Bankruptcy. ............................... 2

        2.     Appointment of the Chapter 11 Trustee. ..................................... 3

        3.     Employment of Duane Morris and Amounts Sought. ................. 3

        4.     The Debtor's Liquidating Plan of Reorganization. ...................... 5

    C.     Overview of Duane Morris' Assistance to the Chapter 11 Trustee's
           Successful Chapter 11 Plan Strategy. ................................................. 6

        1.     Introduction. ................................................................................ 6

        2.     The Transfer Litigation. .............................................................. 8

              a.     The Chapter 11 Trustee's Motion to Transfer Personal
                     Injury Tort and Wrongful Death Cases to the MDL Court
                     pursuant to 28 U.S.C. §§ 157(b)(5) and 1334. ................. 8

        3.     The Mediation Program and the Settlements. ........................... 14

              a.     The Insider Settlement. ................................................... 14

              b.     The MDL Mediation Program Settlements and Other
                     Mediated Settlements. ..................................................... 17

        4.     The Plan. ................................................................................... 19

              a.     The Third-Party Releases and Injunctions. ..................... 19

              b.     The Confirmation Hearing. .............................................. 20

    D.     Creditor Recoveries Under the Plan. ................................................ 22

        1.     Projected Distributions. ............................................................. 22

        2.     The Settlement Agreements which have funded the Plan. ....... 24

|   |   | a. | National Settlement Agreements. | 24 |
|   |   | b. | Provider Settlement Agreements. | 26 |
|   | 3. | | Settlement Proceeds. | 26 |
| II. | | | DESCRIPTION OF DUANE MORRIS LLP | 29 |
| III. | | | NARRATIVE DESCRIPTION OF SERVICES FOR WHICH COMPENSATION IS REQUESTED | 30 |
|   | A. | | Overview. | 30 |
|   | B. | | Narrative Detail of Duane Morris' Services. | 31 |
|   |   | 1. | Asset Analysis and Recovery (T001). | 31 |
|   |   | 2. | Asset Disposition (T002). | 33 |
|   |   | 3. | Avoidance Actions (T003). | 34 |
|   |   | 4. | Case Administration (T004). | 35 |
|   |   | 5. | Claims Administration and Objections (T005). | 37 |
|   |   | 6. | Committee Matters (T006). | 40 |
|   |   | 7. | Fee/Employment Applications (T007). | 41 |
|   |   | 8. | Insurance (T009). | 45 |
|   |   | 9. | Leases/Executory Contracts (T010). | 46 |
|   |   | 10. | Litigation (T011). | 47 |
|   |   | 11. | Plan and Disclosure Statement (T013). | 65 |
|   |   | 12. | Regulatory Matters (T015). | 71 |
|   |   | 13. | Relief from Stay Proceedings (T016). | 73 |
|   |   | 14. | Tax Issues (T019). | 75 |
| IV. | | | LEGAL BASIS FOR ALLOWANCE OF REQUESTED FEES | 76 |
| V. | | | EXPENSES | 80 |

Pursuant to sections 330 and 331 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR 2016-1, Duane Morris LLP ("Duane Morris" or "Applicant"), hereby submits its first and final application ("Application") for final allowance of compensation in the amount of $4,268,124.45, plus an additional $30,000.00 on account of those fees for preparation of this Application which could not be included prior to the August 3, 2015 filing deadline, as well as estimated fees for attendance at any Hearing on the approval of this Application and related preparation, and reimbursement of expenses in the amount of $63,601.10 incurred in its role as counsel to Paul D. Moore, Chapter 11 Trustee of New England Compounding Pharmacy, Inc. d/b/a/ New England Compounding Company (the "Chapter 11 Trustee"). As set forth in greater detail below, this Application covers services rendered to, and expenses incurred on behalf of, the Chapter 11 Trustee from January 25, 2013 through and including June 4, 2015 (the "Application Period").[2] In support of this Application, Duane Morris respectfully states as follows:

## I.    **BACKGROUND**

### A.    **Jurisdiction.**

The United States Bankruptcy Court for the District of Massachusetts (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] As permitted by the Plan (as defined below), this Application also includes fees and expenses (both actual and estimated) incurred after the Effective Date (as defined below) in connection with the preparation of this Application. *See* Plan at Art. 2.02(ii).

B.      **The Debtor's Bankruptcy Case and Appointment of the Chapter 11 Trustee.**

1.      **Events Leading to the Debtor's Bankruptcy.**

Prior to the Petition Date (as defined below), NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC.  The Massachusetts Department of Public Health ("MDPH") initiated an investigation and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing approximately 18,000 doses of MPA that NECC had distributed to hospitals, clinics, and doctors' offices, and were administered to approximately 14,000 patients.  The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[3]

In response to the October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license.  NECC surrendered its license effective at noon on October 3, 2012, and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.  The FDA and the CDC thereafter recommended that all healthcare providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an immediate recall of all of its products.  Approximately three months prior to the Petition Date (as defined below), NECC suspended the operation of its business.  NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees.  The MDPH has temporarily

---

[3] The CDC has not updated the case counts since October 23, 2013 and has stated that further updates to the case counts are not anticipated.

barred former pharmacists for NECC from practicing pharmacology. There remain ongoing proceedings to revoke or otherwise take action against the licenses of NECC's pharmacists.

On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). NECC stated that it initiated this Chapter 11 Case in response to the volume and wide geographic distribution of the nationwide lawsuits in state and federal courts with which it was confronted.

An Official Committee of Unsecured Creditors (the "Official Committee") was appointed on January 18, 2013 [Dkt. No. 67].

### 2. Appointment of the Chapter 11 Trustee.

On January 24, 2013, this Court entered an order [Dkt. No. 92] ordering the appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

On January 25, 2013 (the "Appointment Date"), the United States Trustee (sometimes hereinafter referred to as the "UST") filed an *Application for and Certificate of Appointment of Chapter 11 Trustee* [Dkt. No. 98] (the "UST Application") requesting this Court's approval of Paul D. Moore's appointment as chapter 11 trustee. The UST Application was granted by order of this Court [Dkt. No. 99] entered the same day. Thereafter, on February 1, 2013, the Chapter 11 Trustee filed the *Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee* [Dkt. No. 111].

On February 26, 2013, this Court entered an order [Dkt. No. 131] authorizing the Chapter 11 Trustee to retain Duane Morris as counsel, *nunc pro tunc* to January 25, 2013.

### 3. Employment of Duane Morris and Amounts Sought.

On February 7, 2013, the Chapter 11 Trustee filed the *Application for an Order Authorizing the Retention of Duane Morris LLP as Counsel to the Chapter 11 Trustee, Nunc Pro*

*Tunc to January 25, 2013* [Dkt. No. 118] pursuant to section 327(a) of the Bankruptcy Code,

Rule 2014 of the Bankruptcy Rules, and Local Rule 2014-1 of MLBR.

On February 26, 2013, the Court entered an order [Dkt. No. 131] authorizing the Chapter

11 Trustee to retain Duane Morris as counsel, *nunc pro tunc* to January 25, 2013, a true and

correct copy of which is attached hereto as Exhibit A .

Subject to this Court's approval, Duane Morris seeks payment of compensation on an

hourly basis, at customary rates discounted by 10%, in the amount of $4,268,124.45, plus an

additional $30,000.00 on account of those fees for preparation of this Application which could

not be included prior to the August 3, 2015 filing deadline, as well as estimated fees for

attendance at any Hearing on the approval of this Application and related preparation, plus

reimbursement of actual, necessary expenses incurred by Applicant in the amount of $63,601.10

during the Application Period.

Throughout the more than two and one half years that it has served as the Chapter 11

Trustee's counsel, Duane Morris has not submitted any interim application seeking temporary

allowance and payment of its substantial fees and expenses.  This application is the first and final

application submitted by Duane Morris.

For the Application Period, Applicant has prepared the following charts and tables in

compliance with the *United States Trustee's Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in

Larger Chapter 11 Cases*, effective November 1, 2013 (the "Revised UST Guidelines"), which

are attached hereto as indicated:

> Attachment 1:        Revised UST Guidelines Exhibit A:  Customary and
>                      Comparable Compensation Disclosures with Fee
>                      Applications;

| Attachment 2: | Revised UST Guidelines Exhibit B:  Summary of Timekeepers Included in this Fee Application; |
|---|---|
| Attachment 3: | Revised UST Guidelines Exhibits  D-1 and D-2:  Summary of Compensation Requested by Project Category; |
| Attachment 4: | Revised UST Guildlines Exhibit E:  Summary of Cover Sheet of Fee Application. |

### 4.     The Debtor's Liquidating Plan of Reorganization.

On December 3, 2014, the Chapter 11 Trustee and the Official Committee filed the *Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1054] (as amended from time to time, the "Plan")[4] and accompanying disclosure statement [Dkt. No. 1053] (as amended from time to time, the "Disclosure Statement").   The Plan is a liquidating plan of reorganization.   The primary objective of the Plan is to compensate those victims that have suffered personal injury and/or death due to allegedly contaminated drugs compounded by NECC.  A detailed summary of the Plan, as well as an explanation of its constituent settlements with various insiders, insurers and healthcare providers, is set forth in the Disclosure Statement and the *Declaration of Chapter 11 Trustee in Support of Confirmation of Second Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1318].

Following a hearing on February 24, 2015 (the "Disclosure Statement Hearing"), on March 3, 2015, this Court entered an order [Dkt. No. 1181] approving, among other things, the Disclosure Statement and the solicitation and notice procedures with respect to confirmation of the Plan ("Plan Confirmation").

On May 20, 2015, this Court entered an order [Dkt. No. 1355] (the "Confirmation Order") confirming the Plan.

The Effective Date under the Plan occurred on June 4, 2015 [Dkt. No. 1377].

---

[4] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed thereto in the Plan.

C.    **Overview of Duane Morris' Assistance to the Chapter 11 Trustee's Successful Chapter 11 Plan Strategy.**

1.    **Introduction.**

Duane Morris assisted the Chapter 11 Trustee with respect to his efforts, which included: (a) his acting as Chapter 11 Trustee; and (b) in many instances, serving as his own sole counsel as a member of Duane Morris, in achieving Plan Confirmation, as described in further detail in the accompanying First and Final Fee Application of Paul D. Moore, in his Capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc. for Final Allowance of Commission and Reimbursement of Expenses (the "Chapter 11 Trustee's Application").  At the time of the Chapter 11 Trustee's appointment, the Debtor's situation was dire.  NECC had ceased operations, and there were no remaining employees.  While the Debtor's professionals were cooperative in assisting the Chapter 11 Trustee with transition matters, the Chapter 11 Trustee had little or no access to information concerning the Debtor's affairs, since its principals recognized that they faced serious civil and criminal liability and were understandably concerned with preserving their related rights, privileges, and defenses.  While there was approximately $1.3 million of cash on hand, it was apparent that, absent additional sources of funds, the estate would have little, if anything, available to fund a plan of reorganization.  Indeed, the estate likely would prove administratively insolvent.

An early assessment of the case revealed other impediments to confirmation of a plan. Most of NECC's creditors were personal injury or wrongful death claimants.  Many of these creditors had retained counsel and were pursuing recovery against third parties.  Indeed, some of these claimants were on track to try their cases in  mid-2013 and had no motivation to cease their personal efforts at collection (which efforts might collectively exhaust available insurance

6

coverage to the detriment of others) for the sake of negotiating a plan for the benefit of all creditors.

The task of confirming a plan into which non-debtor parties would contribute settlement and insurance proceeds for the benefit of personal injury or wrongful death claimants was also daunting for an additional reason. Where a third-party (*e.g.*, a clinic or an insurer) faced multiple lawsuits, any contribution to a plan would be conditioned upon approval of a third-party plan release. However, courts have been divided as to the propriety of non-debtor releases, and some circuits, such as the Ninth Circuit, are viewed as generally prohibiting third-party plan releases. There is no controlling decision of the United States Court of Appeals for the First Circuit (the "First Circuit") approving such releases.

The Chapter 11 Trustee, in consultation with his counsel at Duane Morris, developed a strategy to develop a consensus for a liquidating plan of reorganization which would provide an equitable distribution to all of NECC's creditors and avert a race to the courthouse by NECC's numerous creditors. The strategy consisted of four major elements. First, all litigation relating to the Outbreak needed to be consolidated in one forum to prevent third-party defendants' available financial resources and insurance proceeds from being exhausted by those claimants who won the "rush to the courthouse." Second, the Chapter 11 Trustee needed to reach a settlement with NECC's shareholders and related parties (collectively, the "Insiders[5]") which would provide to the Debtor's estate funds sufficient to demonstrate the prospect of a liquidating plan that would yield a meaningful distribution to the Debtor's creditors and garner their support.

---

[5] The term "Insiders," as used herein, generally refers to Barry Cadden, Lisa Cadden, Carla Conigliaro, and Gregory Conigliaro, collectively with their respective spouses, children, parents, and other nuclear family members, all trusts under which such persons are settlers, trustees, or beneficiaries, all Affiliated Entities, and any other entities in which such persons hold a controlling interest, and those entities' successors, assigns, and predecessors. These persons and entities are sometimes collectively referred to in the Plan as the "Shareholder" and "Affiliate Released Parties."

Third, the Chapter 11 Trustee needed to implement a mediation program that would facilitate settlements with third-party defendants.  Finally, the Chapter 11 Trustee needed to negotiate and draft a liquidating plan of reorganization which would gain the "overwhelming support" of these third-party defendants and the Debtor's other constituents (*e.g.*, the Official Committee, the Plaintiffs' Steering Committee [the "PSC"] and NECC's creditors, particularly the thousands of Tort Claimants).  Such support likely would be necessary, at a minimum, to obtain this Court's approval of such a plan in light of the still uncertain state of under applicable law in the First Circuit.

Although this strategy is relatively simple to outline, its implementation was fraught with difficulties and with multiple, and substantial, risks (*e.g.*, that the Debtor's estate would irretrievably slip into administrative insolvency) that hung over the administration of the case from the Appointment Date to the Effective Date.

2.      **The Transfer Litigation.**

a.      **The Chapter 11 Trustee's Motion to Transfer Personal Injury Tort and Wrongful Death Cases to the MDL Court pursuant to 28 U.S.C. §§ 157(b)(5) and 1334.**

NECC stated that it initiated its Chapter 11 Case in response to the volume and wide geographic distribution of the lawsuits with which it was confronted.  The Outbreak resulted in thousands of claims from personal injury claimants against NECC and others.  As of April 27, 2015, approximately 686 separate lawsuits had been joined in a multi-district litigation proceeding (the "MDL Proceeding") pending before the Honorable Rya W. Zobel, United States District Court Judge, in the United States District Court for the District of Massachusetts (the "MDL Court").

Plaintiffs had commenced civil actions against NECC and others (*e.g.*, clinics, healthcare service providers, third-parties which had designed or had contractually agreed to maintain

NECC's compounding facility, *etc*.).  After the Petition Date, plaintiffs focused their litigation against third-parties due to the constraints of the automatic stay, *see* 11 U.S.C. § 362, as well as to attempt to avoid having their cases transferred to the MDL Court with other similar proceedings against NECC.  These lawsuits created the real possibility that, in a "rush to the courthouse," a few plaintiffs would deplete, if not exhaust, available third-party defendants' financial resources and insurance proceeds by way of settlement or judgment.  It was clear to Duane Morris and the Chapter 11 Trustee that the only way to assure that all such available financial resources and insurance settlement proceeds would be available for equitable distribution to all personal injury and wrongful death claimants was to transfer all civil actions to one forum for consolidated proceedings.

Cases filed in various federal courts were being transferred to the MDL Proceeding by the Judicial Panel for Multi District Litigation (the "JPML"), in large part at the initiation of the Chapter 11 Trustee.  However, the Chapter 11 Trustee also required a remedy which would likewise transfer state court litigation against third-parties, including the numerous cases in which NECC was, for strategic reasons, not named as a party in order to avoid any such transfer. There were four (4) categories of cases based on personal injuries or wrongful death arising from the administration of MPA:

   a.  cases pending in other courts awaiting transfer to the MDL Court;

   b.  cases pending in other courts where removal had been initiated, but not completed;

   c.  cases pending in state courts where NECC or its affiliates were named defendants; and

d.      cases pending in state courts where neither NECC nor its affiliates were

named defendants.

Duane Morris assisted the Chapter 11 Trustee with seeking to have all of these cases

transferred to the MDL Court, asserting jurisdiction under 28 U.S.C. § 1334[6], and citing 28

U.S.C. § 157(b)(5)[7] as a basis for transfer.  As the MDL Court noted:

> There are likely to be a large number of victim-claimants in this matter, and it appears undisputed that many of them have suffered death or serious personal injury as a result of the administration of contaminated MPA.  It also appears to be undisputed that the pool of available assets to pay claims is likely to be limited; NECC was a fairly small company with relatively few assets, although it appears that there are at least some insurance policies available to cover claims.  The trustee, and counsel representing parties in this litigation, essentially agree that it is highly desirable to maximize the resources available to victims and to keep expenditures reasonably low.  The trustee, and most counsel, also appear to agree that centralized management of the litigation and claim process is desirable to create the largest possible pool of funds for victims and to distribute those funds fairly, equitably, and with a minimum of expense and delay.
>
> . . .
>
> Consolidation of all NECC litigation in this Court is greatly complicated by the existence of the parallel state-court cases.  Some of those cases, particularly those filed after the bankruptcy petition and the automatic stay, name only local healthcare providers (such as pain clinics and individual physicians), and do

---

[6]  28 U.S.C. § 1334(b) states:

> Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

[7]  28 U.S.C. § 157(b)(5) states:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

> not name NECC or any affiliates.  Some of those plaintiffs object
> to a centralized proceeding, preferring instead to proceed against
> those defendants in state court.  The trustee, however, contends
> that those cases could ultimately result in huge claims for
> contribution or indemnity against the bankruptcy estate, and that
> such claims could greatly affect or upset the fair administration of
> the estate, in particular preventing the treatment of all victims
> fairly and equitably.

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 496 B.R. 256, 260 (D.

Mass. 2013), the district court found that there was "related to" jurisdiction as to categories (a)

through (c).  *In re Boston Reg'l Med. Ctr.*, 410 F.3d 100, 105 (1st Cir. 2005), "[A] civil

proceeding is related to bankruptcy [if] the outcome of that proceeding could conceivably have

any effect on the [bankruptcy] estate").[8]

The more difficult issue was whether there was "related to" jurisdiction over cases which

did not name NECC or its affiliates as a party.  Duane Morris assisted the Chapter 11 Trustee in

arguing that the defendants in those cases had claims for indemnity (contractual or otherwise)

and that these claims, even if as yet unasserted, provided a basis for jurisdiction.  *See In re Dow*

*Corning Corp.*, 86 F.3d 48, 494 (6th Cir. 1996)("[a] single possible claim for indemnification or

contribution simply does not represent the same kind of threat to a debtor's reorganization plan

as that posed by the thousands of potential indemnification claims at issue here.");  *compare In re*

*W.R. Grace & Co.*, 591 F.3d 164, 169 (3d Cir. 2009) (there is no "related-to" jurisdiction where

there would be no impact on the estate until there was: (a) a finding adverse to a defendant in a

state court action; (b) the subsequent pursuit of a claim for indemnification).  In the face of a

---

[8]  The seminal case addressing the scope of "related to" jurisdiction is *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.
1984), *overruled on other grounds by Things Remembered v. Petrarca*, 516 U.S. 124, 116 S. Ct. 494, 133 L.Ed.2d
461 (1995), where the court held that "related to' jurisdiction over a civil action exists if outcome of that action
could "could conceivably have an effect on the bankruptcy estate."  Notably, in *Pacor*, the Third Circuit held that
there was no "related to" jurisdiction over an employee's suit against a distributor of asbestos products, even though
it was likely that, in the event of an adverse verdict, the distributor would seek indemnity against the manufacturer
(such an action is "mere precursor to the potential third-party claim for indemnification by [the distributor] against
[the manufacturer]").  *Id.* at 995.

contractual right to indemnity, some courts have found "related to" jurisdiction. *Lone Star Fund V(US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)("related to" jurisdiction arises where there is a contractual right to indemnity); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ("The clear implication of the [*Pacor*] decision is that, if there had been a contract to indemnify, a contrary result would have been in order.").

The MDL Court assumed that it had jurisdiction over claims in category (d). However, certain parties (the "Virginia Plaintiffs") had objected to their actions (the "Virginia Actions") being transferred and independently moved for permissive abstention under 28 U.S.C. § 1334(c)(1)[9] and mandatory abstention under 28 U.S.C. § 1334(c)(2)[10]. The MDL Court found mandatory abstention inappropriate. As to category (d) cases, the court noted that the basis for jurisdiction was "unclear at best" and found that, due to the potential harm to "federal-state comity," abstention under section 1334(c)(1) was appropriate.

The MDL Court nevertheless left the door open to a possible renewal of the motion:

> [T]he essential basis of the trustee's motion: that the Court *must* transfer *all* state-court cases to foreclose that very possibility.
>
> The Court is not convinced, at least at this stage, that such a step is necessary. Other possible courses of action might produce the

---

[9] 28 U.S.C. § 1334(c)(1) states:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

[10] 28 U.S.C. § 1334(c)(2) states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

> desired consolidation and finality, without resolving difficult issues
> of jurisdiction and abstention and without intruding unnecessarily
> into the proceedings of state courts.   For example, if the
> Bankruptcy Court were to set a relatively early bar date for the
> filing of claims against the estate, it would appear that any
> defendant in a state-court action would be effectively forced to
> decide whether it wanted to file a claim for contribution or
> indemnity against the estate.  Such a claim, in turn, would probably
> permit the exercise of federal jurisdiction over the underlying
> matter.  Any defendant who did not file a claim would be barred,
> and the state-court case could proceed to judgment without
> interference from the federal court.  Either way, the desired goals
> would be achieved with a relatively minimal degree of risk or
> intrusion.
>
> In any event, the Court does not need to reach the issue at this
> juncture.  If the balance of factors shifts over time, the Court can
> revisit the issue, and if necessary (and appropriate) can issue
> further orders concerning the exercise of related-to jurisdiction.

496 B.R. at 270.

Taking the MDL Court's cue, Duane Morris assisted the Chapter 11 Trustee to promptly proceed to set a bar date.  The Chapter 11 Trustee already had been in protracted discussions with the PSC and the Official Committee with respect to bar date matters, related notice issues and the like and had experienced resistance to the fixing of a bar date at that time.  In light of the MDL Court's decision, however, the Chapter 11 Trustee expedited the attempt to finally resolve those discussions.  Although some issues remained, the Trustee proceeded to move this Court to fix a bar date in order to avoid further delay in his efforts to secure removal of the remaining cases to the MDL Court.  This Court entered an order fixing January 15, 2014 as the deadline for filing proofs of claim.  Despite their earlier assertions that they had no intention of participating in NECC's Chapter 11 Case, the defendant in the Virginia Actions ("Insight"), as well as the 153 Virginia plaintiffs all filed proofs of claim, and the Chapter 11 Trustee filed a renewed and supplemental motion seeking the transfer of all of the Virginia cases to the MDL Court, which

the MDL Court granted. *See In re New Eng. Compounding Pharm., Inc.*, C.A. No. 13-02419-
RWZ, 2014 U.S. Dist. Lexis 67213 (D. Mass. May 15, 2014).

### 3.    The Mediation Program and the Settlements.

#### a.    The Insider Settlement.

In order to fund a plan and to build support for confirmation of a plan, Duane Morris
supported the Chapter 11 Trustee in pursuing settlements with all parties who faced liabilities
relating to the "Outbreak."   Absent a substantial fund, NECC's creditors would have little
incentive to support a plan that provided for third-party releases.  To the contrary, they would
likely prefer to pursue their own claims.  Potential contributors to any such fund likewise would
have no incentive to contribute or, for that matter, even to participate in related settlement
discussions if it appeared unlikely that the Chapter 11 Trustee could secure the overwhelming
support of NECC's creditors a plan that provided to them third-party releases.  Absent such
releases, any settlement with the Chapter 11 Trustee and NECC's estate would be of little or no
value, since they would remain exposed to hundreds, if not thousands, of claims relating to the
Outbreak.

Duane Morris and the Chapter 11 Trustee viewed settlements with the Insiders as among
the Chapter 11 Trustee's highest priorities.  It was apparent to the Chapter 11 Trustee, as well as
his counsel, from the outset that there were serious impediments to funding the plan that the
Debtor and the Debtor's creditors envisioned at the outset of the case – a plan that would follow
the outline of plans in other mass tort cases, such as the ephedra cases, in which many of the
victims' counsel had participated.  The ephedra cases had numerous potential contributors facing
strict product liability.  Moreover, most, if not all, of them had "deep pockets" and significant
available insurance coverage.   By contrast, in NECC's case, recovery under strict product
liability theories was highly unlikely.  Instead, the principal theories of recovery against potential

contributors would be based upon the potential contributors' negligence or wrongful conduct.  In response to those theories of recovery, potential contributors, other than NECC and its Insiders, all stridently denied responsibility, asserting that NECC and its Insiders were solely responsible for the harm caused to the victims.

Meanwhile, NECC had little or no assets available to satisfy creditor claims.  Its available insurance was surprisingly modest, and the insurers raised numerous policy exclusions, including among various others, fungal exclusions and exclusions with respect to manufacturing activity (as opposed to compounding) and actions in violation of applicable law.

Based on the foregoing, and recognizing that third-parties were unlikely to engage in discussions as long as NECC's Insiders had not been held accountable, the Chapter 11 Trustee and Duane Morris focused at the outset on NECC's Insiders.  To establish protocols to maintain the confidentiality of information disclosed in the context of settlement negotiations with the Insiders, on April 18, 2013, this Court entered an *Agreed-Upon Order Establishing Protocol for Settlement Negotiations and Communication* [Adv. Pro. Dkt. No. 96, as amended by Adv. Pro. Dkt. No. 99] (the "Protocol Order").  In aid of the Protocol Order and the Chapter 11 Trustee's settlement negotiations, the MDL Court stayed all formal discovery against the Insiders in all matters that were consolidated into the MDL Proceeding, and ordered that the discovery stay continue pending a further order.  *See* Clerk's Notes for Mar. 12, 2013 Status Conference (extending discovery stay to Apr. 10, 2013); Tr. of Apr. 10, 2013 Status Conference at 28:17-24 (extending discovery stay to May 14, 2013); *MDL Order No. 6* [MDL Dkt. No. 209] ("Formal discovery of NECC and the affiliated defendants shall remain temporarily stayed as set forth in this order and the previous orders of the Court."); *MDL Order No. 7* [MDL Dkt. No. 438]

(staying fact discovery of NECC and the NECC Affiliated Defendants "until further order of the Court").

As a result of the Chapter 11 Trustee's protracted settlement negotiations with the Insiders (undertaken with the substantial participation of counsel to the Official Committee and Lead Counsel to the PSC to ensure their support and that of their constituencies, and aided by the discovery stay), the Chapter 11 Trustee and the Official Committee reached settlements in principle with the Insiders, as well as with NECC's primary and excess insurers (collectively, the "Insider and Insurer Settlements").  These negotiations were, however, extraordinarily difficult. Throughout the negotiations, the plaintiffs and their counsel expressed substantial hostility toward the Insiders on account of the Outbreak.  Their numerous demands left little, if any, possibility of a consensual resolution that offered any benefits whatsoever to the Insiders. Meanwhile, the Insiders were concerned that negotiations likely would fail and that the information they provided to the Chapter 11 Trustee regarding their available assets, which the Chapter 11 Trustee ultimately would be required to share with counsel for the Official Committee and the PSC, would provide a roadmap for future attachments or levies.

Also of critical importance, in the Chapter 11 Trustee's view, was achieving an agreement in principle with the Insiders prior to the January 15, 2014 bar date fixed by this Court.  Numerous plaintiffs and defendants attempting to avoid transfer to the MDL Court, and imposition of third party releases against them, had expressed their intention not to participate in NECC's case, including the Virginia defendant and the 153 Virginia plaintiffs.  The Chapter 11 Trustee believed that they would be far less likely to do so if they risked the ability to participate in substantial funds that the Chapter 11 Trustee succeeded in securing by way of settlement. Consequently, as soon as he succeeded in achieving an agreement in principle with the Insiders,

the Official Committee and the PSC, he joined with the Official Committee in issuing press releases on December 24, 2013, announcing the agreement in principle with the Insiders projected to aggregate more than $100 million.  Some three weeks later, by the January 15, 2014 bar date, 3,842 proofs of claim were filed, including 3,542 of which were claims for damages for death or personal injuries resulting from the Outbreak.  Those claimants included the Virginia defendants and all of the 153 Virginia plaintiffs.

This Court preliminarily approved the Insider and Insurer Settlements on July 31, 2014. *See* Dkt. Nos. 712, 713 and 714, subject to approval of the related third-party releases and channeling injunctions in connection with confirmation of the Plan.  Those settlements contributed, or will contribute once projected tax refunds are received, over $100 million to the NECC estate in the form of cash contributions from the Insiders, as well as proceeds from, among other things, NECC's related companies' and individuals' professional liability insurance, tax refunds which will be due to the Insiders as a result of their cash settlement payments, and the sale of one or more related businesses.

### b.    The MDL Mediation Program Settlements and Other Mediated Settlements.

The Chapter 11 Trustee and the Official Committee (the "Plan Proponents") also developed a strategy for facilitating and obtaining substantial settlement contributions for distribution through the Plan from mediations with non-NECC affiliates, such as NECC's commercial vendors and pain clinics and medical care providers that faced potential liability to NECC and tort victims in connection with the Outbreak.  To facilitate the Chapter 11 Trustee's settlement efforts, on August 15, 2013, the MDL Court entered an Order on Mediation [MDL Dkt. No. 394] (the "Mediation Order") establishing mediation protocols (the "MDL Mediation

Program") for non-NECC affiliates. Duane Morris supported and advised the Chapter 11 Trustee throughout this process.

Not unexpectedly, the MDL Program initially secured very little participation by the various plaintiffs and defendants in the MDL Proceeding. As had been anticipated by the Chapter 11 Trustee, these parties were unwilling to participate until NECC's Insiders were held accountable. Likewise, they were not convinced that the Chapter 11 Trustee could secure the substantial funding that would be necessary to secure the overwhelming support of NECC's victims for a plan. They also repeatedly noted the absence of binding First Circuit precedent approving third-party releases. They were reluctant to commit to what might prove to be an unsuccessful, if not entirely futile, plan process. The Chapter 11 Trustee nonetheless persuaded them to undertake the effort, noting that he and his firm, as well as counsel to the Official Committee, had expended extraordinary time and effort to further the case and that their compensation was likewise entirely contingent upon court approval of third-party releases.

However, when the Chapter 11 Trustee reached an agreement in principle with the Insiders and the Insider Settlement secured this Court's initial approval, in an amount that far exceeded expectations, a number of significant defendants in the MDL Proceeding joined the MDL Mediation Program or undertook private mediation proceedings under substantially the same protocols. The MDL Mediation Program, as well as those private mediations, proved to be an unqualified success. Through the following year and one half, the Chapter 11 Trustee (with the material assistance and full support of Duane Morris and of the Official Committee and the PSC and their respective counsel) secured over $100 million in additional settlements from, among others, (i) vendors of NECC itself (*e.g.*, ARL BioPharma, the company that provided testing services to NECC, Liberty Industries, the company that built the so-called "cleanrooms"

where MPA was compounded; Victory Mechanical Services ("Victory"), the company that installed the heating and ventilation systems at NECC; and Unifirst Corporation ("UniFirst"), the company that provided cleaning services to NECC), and (ii) healthcare providers in some of the states hit hardest by the Outbreak (Virginia, New Jersey and North Carolina), including Inspira Health Network, Inc. and Inspira Medical Centers, Inc. (collectively, with their affiliates, as more fully described in the Plan, "Inspira"), and High Point Surgery Center, Surgery Center Associates of High Point, LLC and High Point regional Health (collectively, with their affiliates, "High Point").  As further described below, those settlements were embodied in, and their consummation entirely dependent upon, confirmation of the Plan.

Virtually all of the mediations resulted in settlements.  More often than not, the Chapter 11 Trustee, supported by Duane Morris, was the "last man standing" and secured substantial additional funds beyond the amounts the Official Committee and the PSC were willing to accept. Ultimately, the Chapter 11 Trustee entered into settlement agreements under which payments to the estate will total at least $211,400,000.  Each settlement agreement was conditioned upon the entry of an order confirming a plan of reorganization which included third-party releases and injunctions shielding the non-debtor parties to those settlement agreements from any liability relating to the Debtor and the Debtor's products, including MDPH (the "Third-Party Releases and Injunctions").  In some instances, the settlements (the "Plan Settlements") were incorporated into the Plan (as defined below) and subject to approval at the confirmation hearing.

### 4.    The Plan.

On December 3, 2014, the Plan Proponents filed the Plan and the Disclosure Statement.

### a.    The Third-Party Releases and Injunctions.

The Plan incorporated the Third-Party Releases and Injunctions.  As noted above, no decision of the First Circuit has authorized non-debtor releases or injunctions.  Although other

circuit courts are split on the permissibility of third-party releases in plans of reorganization or liquidation, the substantial majority of circuit courts that have ruled on the issue have found them to be permissible in certain exceptional circumstances where the relief is "essential" to the success and viability of the plan, primarily, as in the case here, in the mass tort context. *Compare SE Prop. Holdings, LLC v. Seaside Eng'g & Surveying (In re Seaside Eng'g & Surveying)*, No. 14-11590, 2015 U.S. App. LEXIS 3831 at \*\*13-14 (11th Cir. Mar. 12, 2015) (bankruptcy courts have the power under Section 105(a) to issue permanent injunctions or third-party releases where appropriate for the plan) with *Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995) (sections 105(a) and 524(e) specifically prohibit the permanent release, discharge, or injunction of non-debtors); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990) (same). Again, there is no controlling precedent in the First Circuit.

### b. The Confirmation Hearing.

During the course of the Chapter 11 Case, the Duane Morris, on behalf of the Chapter 11 Trustee, served notice of the proceedings and, in particular, the Third-Party Releases and Injunctions, on more than 20,000 potential claimants. Duane Morris, on behalf of the Chapter 11 Trustee, also provided publication notice, on three occasions (twice in 61 local newspapers as well as once in the national edition of <u>USA Today</u>). As a result of the Chapter 11 Trustee's and his counsel's exhaustive efforts throughout the Chapter 11 Case to secure the input, support and approval of the PSC, the Official Committee and their various constituents, not a single creditor objected to confirmation of the Plan at the confirmation hearing on May 19, 2015 (the "<u>Confirmation Hearing</u>").[11] Similarly, while numerous MDL Defendants raised various

---

[11] On May 5, 2015, prior to the Confirmation Hearing, a creditor, Katrina Eldreth, filed the *Conditional Support of Katrina Eldreth to Confirmation of the Debtor's Joint Chapter 11 Plan*. [Dkt. No. 1280]. Although characterized

objections throughout the Chapter 11 Case, and eight (8) of them objected to the disclosure statement on various grounds relating to the Third-Party Releases and Injunctions, the Chapter 11 Trustee, with the help of Duane Morris, resolved all such objections consensually prior to the Confirmation Hearing, a result that seemed impossible throughout the case.

At the Confirmation Hearing, only the UST objected to confirmation.  The UST consented to the entry into evidence at the Confirmation Hearing of declarations from the Chapter 11 Trustee and non-debtor settling parties in support of confirmation.  Prior to the Confirmation Hearing, twenty-seven (27) declarations were filed in support of confirmation, many of which provided the factual bases underlying the criteria for the approval of third-party releases as outlined in *In re Master Mortgage Inv. Fund*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)[12].  There were no live witnesses.

At the Confirmation Hearing, this Court heard the arguments of counsel relating to the Third-Party Releases and Injunctions and overruled the UST's objection.  This Court held that

---

as a "Conditional Support," this document contained a limited objection to confirmation. Ms. Eldreth withdrew this limited objection on May 6, 2015.  *See Withdrawal of Conditional Support of Katrina Eldreth to Confirmation of the Debtor's Joint Chapter 11 Plan* [Dkt. No. 1286].

[12] In *Master Mortgage*, the court held that the following criteria were essential to approval of third-party releases:

    a.    There is an identity of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

    b.    The non-debtor has contributed substantial assets to the reorganization;

    c.    The injunction is essential to reorganization.  Without it, there is little likelihood of success;

    d.    A substantial majority of the creditors agree to such injunction. Specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment; and

    e.    The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*See Master Mortgage*, 168 B.R. at 934-35.

approval of the Third-Party Releases and Injunctions was appropriate in light of the "extraordinary circumstances" of the case. Indeed, this Court noted, among other things, as follows:

> … I think that this plan and its associated trust agreements are the best that could have been achieved for the hundreds of people for whom there could be no full compensation. And that is, in my view, the highest and best use of the Bankruptcy Code… .

Transcript of Hearing of May 19, 2015 at 40.

The Plan was confirmed on May 20, 2015 and became effective on June 4, 2015. The UST did not file a notice of appeal and, accordingly, the Plan's Effective Date was June 4, 2015. Of particular significance was the fact that confirmation was almost entirely consensual, and there were no appeals. As a result, the Tort Trustee is projecting that distributions to the numerous Tort Claimants, who have been desperately awaiting compensation for more than two and one-half years, can commence prior to this year end, rather than await the resolution of appeals.

**D.    Creditor Recoveries Under the Plan.**

**1.    Projected Distributions.**

The Plan has been funded in substantial part by contributions from NECC's shareholders, affiliated entities, clinics, healthcare providers, parties that provided goods and services to NECC and various of their respective insurers and other parties in interest, as described in Section 3.4 of the Disclosure Statement and identified in Schedules 1.127 and 1.173 to the Plan (collectively referred to as the "Contributing Parties"). In exchange for such contributions, claims against the Contributing Parties are released, and future claims enjoined, pursuant to the Plan and in accordance with the terms of the settlement agreements entered into by the Chapter 11 Trustee

(more fully described below).[13]  The amount of each distribution to a holder of an Allowed Claim will depend on which Class the Allowed Claim is in and the treatment afforded to that Class under the Plan.

Pursuant to the Plan, assets of the Debtor will be converted into Cash, which has, in substantial part, already happened.  The monetized assets of the Debtor will satisfy in full all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims (Class A) and Miscellaneous Secured Claims (Class B).

Allowed claims in Class C (General Unsecured Claims) are projected to aggregate approximately $900,000.  Holders of Class C Claims will receive distributions equal to 90% of the amount of their Allowed General Unsecured Claims.  In its Schedules and Statement of Financial Affairs, the Debtor scheduled such Class C Claims in the amount of $885,514.19, some $200,000 of which was allegedly payable to an affiliate of the Debtor, Medical Sales Management.  Class C Proofs of Claim thereafter filed by NECC creditors significantly increased that amount to an aggregate of $7.85 million.  The increase, however, is largely the result of two claims, aggregating $6.83 million, which are, upon information and belief, subject to disallowance, in whole or substantial part or reclassification as subordinated claims.  If those claims are disallowed, the scheduled and filed Class C Claims would aggregate $1,025,500.

Holders of claims in Class D (Tort Claims) will receive shares of a beneficial interest in the Tort Trust.  All claims that holders of Class D Claims have against the Contributing Parties are being channeled into the Tort Trust, where they will be satisfied from the net proceeds of the

---

[13] These settlements are described in Section 3.4 of the Disclosure Statement and are included in the Notice of Filing of Plan Supplement to the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1123] filed 2/13/2015; Exhibit 6 to Plan Supplement – Inspira Settlement Agreement [Dkt. No. 1141] filed 2/19/2015; Supplement to Plan Supplement – UniFirst Settlement and Release Agreement [Dkt. No. 1167] filed 2/23/2015; and Notice of Filing of Supplements to the Plan Supplement to the Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. [Dkt. No. 1288] filed 5/7/2015.

settlements (the "Settlement Proceeds") reached between the Chapter 11 Trustee and the Contributing Parties in accordance with the terms of the Plan, the Tort Trust Documents, and the "Claims Resolution Facility Procedure" and, if applicable, the "Provider Claims Resolution Facility Procedures."  It is estimated that, in total, the Tort Trust will have an aggregate of more than $160 million to $190 million available for distribution to Tort Claimants who timely filed proofs of claim or other documents supporting their claim, or were deemed to have done so by order of this Court.  As of July 13, 2015, $133,802,063.10 has already been disbursed from escrow to the Tort Trust, with an additional $55,818,887.84 disbursed to the Post-Confirmation Officer, for payment of other allowed claims and expenses, and payment thereafter of any remaining balance to the Tort Trust.  In exchange for a share of the beneficial interest in the Tort Trust, all claims the Tort Trust Beneficiaries may hold against any and all of the Contributing Parties (other than Ameridose) have been released, and Tort Trust Beneficiaries are forever barred, estopped and enjoined from asserting those claims against the Contributing Parties.

### 2.    The Settlement Agreements which have funded the Plan.

The Plan is built upon numerous settlements with various entities, including settlements with the Insiders, insurers, vendors, and healthcare providers.  Some of these settlements were approved prior to Plan Confirmation, although conditioned upon Plan Confirmation.  Approval of the remaining settlements occurred as part of Plan Confirmation.

### a.    National Settlement Agreements.

Duane Morris assisted the Chapter 11 Trustee with entering into settlement agreements with certain "National Defendants" (*i.e.*, individuals or entities against whom every Tort Claimant may have a claim, such as NECC's owners or the company that provided sterility testing services for NECC products).  Prior to Plan Confirmation, this Court had already

approved the following settlements with National Defendants by orders dated July 31, 2014
[Dkt. Nos. 970, 971 and 972](the "Settlement Approvals"), respectively:

    a.    the Plan Support and Funding Agreement by and among the Chapter 11
Trustee and the Shareholders;

    b.    the Plan Support and Settlement Agreement by and among the Chapter 11
Trustee and NECC's primary and excess liability insurance carriers, PMIC
and Maxum, and the Individual NECC Insureds covered under the
PMIC/Maxum Policies; and

    c.    the GDC Insurance Settlement and Release Agreement by and among the
Chapter 11 Trustee and GDC, Preferred Mutual, and the Individual GDC
Insureds.

The following settlements with National Defendants were approved through this Court's
confirmation of the Plan:

    a.    the Ameridose, LLC Insurance Settlement, Release and Injunction
Agreement by and among the Chapter 11 Trustee, Ameridose, and
Ameridose's primary and first excess liability insurance carrier, PMIC;

    b.    the Settlement and Release Agreement by and among the Chapter 11
Trustee, ARL and Landmark;

    c.    the Settlement and Release Agreement by and among the Chapter 11
Trustee, Victory, Netherlands Insurance, and Peerless Insurance;

    d.    the Settlement and Release Agreement by and among the Chapter 11
Trustee, UniFirst, National Union and North American Elite; and

      e.     the Settlement and Release Agreement  by and among the Chapter 11 Trustee, Liberty Industries, Inc. ("<u>Liberty</u>") and Great American E&S Insurance Company ("<u>Great American</u>").

    **b.**      **Provider Settlement Agreements.**

In addition to the settlements with National Defendants, Duane Morris assisted the Chapter 11 Trustee with entering into settlement agreements with certain clinics and other healthcare providers that allegedly administered tainted NECC drugs (the so-called "<u>Provider Defendants</u>"), which were approved upon Plan Confirmation:

      a.     the Settlement and Release Agreement by and among the Chapter 11 Trustee, High Point, and Ironshore;

      b.     the Settlement and Release Agreement by and among the Chapter 11 Trustee, Insight, Lexington, Darwin, IGPM, the Doctors (as defined therein), the Virginia Plaintiffs (as defined therein), and Medical Mutual; and

      c.     the Settlement and Release Agreement by and among the Chapter 11 Trustee, Inspira, Lexington, and Ironshore.

    **3.**      **Settlement Proceeds.**

In sum, upon Plan Confirmation, the following settlements were approved in the following amounts:

| Contributing Party | | Amount |
|---|---|---|
| Shareholders | Cash payment | **$47,750,000** |
| | Potential anticipated tax refunds | **$21,800,000** |
| Insight Settling Parties and Insurers | | **$40,000,000** |

| Contributing Party | Amount |
|---|---|
| UniFirst and Insurers | $30,500,000 |
| NECC Insurers | $25,200,000 |
| Inspira and Insurers | $16,000,000 |
| Ameridose Insurer | $10,000,000 |
| ARL and Insurer | $6,400,000 |
| Victory and Insurers | $5,500,000 |
| GDC and Insurer | $3,750,000 |
| High Point and Insurer | $3,500,000 |
| Liberty and Insurer | $1,000,000 |
| **Total** | **$211,400,000**[14] |

Pursuant to the Plan: (a) the bulk of these settlement proceeds has been delivered and paid into the Tort Trust, where such proceeds have been segregated in separate accounts; (b) all NECC related tort claims against each Provider Defendant have been channeled into that Provider Defendant's respective account; and (c) all Tort Claimants who received injections of NECC product from the settling provider and who have filed a timely-filed proof of claim (or a late-filed proof of claim that this Court has determined should be excused from the Bar Date Order), will have a right and opportunity under the Plan to seek distribution and payment from such segregated and separate funds. The remainder of those settlement funds have been released to the Post-Confirmation Officer for distribution to other creditors under the Plan and for payment of the costs and expenses of administration of the Chapter 11 Case, with any remaining balance to be further disbursed to the Tort Trust for payment to Tort Claimants.

---

[14] As noted above, as of July 13, 2015, $133,802,063.10 has already been disbursed from escrow to the Tort Trustee and $55,818,887.84 has been disbursed to the Post-Confirmation Officer, with an additional $21,800,000 of anticipated tax benefits to be received.

Personal injury claimants by far hold the majority of claims in NECC's Chapter 11 Case. As the largest block of creditors anticipated to hold Allowed Claims, personal injury claimants (through the Tort Trust) will receive the largest portion of NECC's assets, including the bulk of the proceeds of the settlements with the Contributing Parties.

It is by no means certain that NECC's tort creditors would have been able to realize through litigation the significant sum that the Contributing Parties have contributed to the NECC estate. To the contrary, they almost undisputedly would not. According to the Chapter 11 Trustee, each of the settlement amounts includes a substantial premium on account of the otherwise unavailable ability under non-bankruptcy law the Contributing Parties achieved to resolve all claims against them through a negotiated settlement which afforded them third-party releases, without the burden, delay and expense of years of litigation in hundreds, if not thousands, of suits in state and federal courts throughout the United States. They certainly would not be able to realize any recovery whatsoever from the Contributing Parties without incurring the delay, expense and risks of litigation (including the risk that one or more significant judgments in favor of a tort claimant would significantly deplete, or exhaust, the amounts available to pay others).

The Plan provides an exceptional outcome for creditors and NECC's estate. As noted above, unlike mass tort bankruptcy cases in which many of the plaintiffs' counsel who served as PSC members or counsel to members of the Official Committee or the Official Committee itself had been previously involved, the parties who potentially could contribute to any settlement did not have substantial assets to contribute and proved to have surprisingly modest amounts of insurance available to them. Moreover, unlike those other mass tort cases, where potential contributors faced strict product liability, NECC parties were, in whole or substantial part, only

28

liable under standards relating to their own negligence or culpability. Virtually all of them vigorously disclaimed liability and insisted that NECC and its representatives were wholly responsible.

Nevertheless, after extraordinary effort over an extended period of time, the Chapter 11 Trustee, supported by Duane Morris, succeeded in securing funding for the Plan that should exceed $200 million, without the costs, complexity and delay of litigation, none of which NECC's estate easily could have afforded, if at all. The vast majority of the NECC assets, including the proceeds of the settlements set forth in the Plan, will inure to the benefit of personal injury claimants holding allowed claims. The accumulation of such a large sum of money largely for personal injury claimants in this time frame and in such a large and difficult nationally-significant mass tort case is unprecedented and clearly far exceeded anyone's expectations.

## II.    DESCRIPTION OF DUANE MORRIS LLP

Duane Morris is a full-service law firm comprised of some 650 lawyers, with significant experience in all facets of debtor and creditor rights, bankruptcy and litigation. The firm maintains offices for the practice of law in Boston, Massachusetts; Wilmington, Delaware; Philadelphia and Pittsburgh, Pennsylvania; Princeton, Newark and Cherry Hill, New Jersey; Chicago, Illinois; New York, New York; Washington, D.C.; Baltimore, Maryland; Houston, Texas; Miami and Boca Raton, Florida; Los Angeles, San Francisco, San Diego, Palo Alto, and Lake Tahoe, California; Las Vegas, Nevada; Atlanta, Georgia; Bangor, Maine; London, United Kingdom; Hanoi and Ho Chi Minh City, Vietnam; Shanghai, China; Muscat, Oman; Yangon, Myanmar; and Singapore. Attached hereto as Exhibit B is a listing setting forth the brief biographies of each Duane Morris lawyer who rendered legal services to the Chapter 11 Trustee

in the this case during the Application Period and who are included in this Application for compensation.

A chart setting forth the attorneys performing services, the hourly rates charged by each person, the total amount of fees for each person, as well as all other pertinent information, is included with each detailed description of the services rendered in each of the categories described more fully below.

III.    **NARRATIVE DESCRIPTION OF SERVICES FOR WHICH COMPENSATION IS REQUESTED**

A.    **Overview.**

For the purposes of this Application, and pursuant to MLBR 2016-1(d)(2), the services rendered by Applicant have been categorized into fourteen (14) categories, as set forth below:

| Category | Hours | Fees |
|---|---|---|
| Asset Analysis and Recovery (T001) | 64.3 | $21,940.65 |
| Asset Disposition (T002) | 12.6 | $5,718.60 |
| Avoidance Actions (T003) | 157.5 | $91,821.60 |
| Case Administration (T004) | 241.5 | $109,778.85 |
| Claims Administration and Objections (T005) | 893.9 | $449,709.75 |
| Committee Matters (T006) | 48.8 | $30,656.70 |
| Fee/Employment Applications (T007) | 417.1 | $229,068.00 |
| Insurance (T009) | 529.3 | $295,894.35 |
| Leases/Executory Contracts (T010) | 179.3 | $71,300.70 |
| Litigation (T011) | 3635.7 | $2,093,334.30 |
| Plan and Disclosure Statement (T013) | 1107.3 | $682,558.65 |
| Regulatory Matters (T015) | 242.9 | $135,711.00 |
| Relief from Stay Proceedings (T016) | 78.6 | $37,664.10 |
| Tax Issues (T019) | 21.0 | $12,967.20 |
| **Subtotal** | **7629.8** | **$4,268,124.45** |
| Plus estimated future fees for preparation of this Application and attendance at any Hearing on the approval of this Application | | $30,000.00 |
| **TOTAL** | **7629.8** | **$4,298,124.45** |

**B.      Narrative Detail of Duane Morris' Services.**

To accomplish the Chapter 11 Trustee's objectives during the Application Period, Applicant regularly conducted numerous investigative, research and counseling activities.  In accordance with the Local Rules, computerized printouts of the Applicant's itemized records and disbursements necessarily incurred in the performance of Applicant's duties as counsel to the Chapter 11 Trustee. The time records are organized into various categories in accordance with the guidelines issued by the UST.  A chart setting forth the attorneys performing services, the hourly rates charged by each person, the total amount of fees for each person, as well as all other pertinent information is included with each detailed description of serviced rendered in each of the categories more described more fully below.

**1.      Asset Analysis and Recovery (T001).**

This category includes all matters related to analysis of the assets of the Debtor's bankruptcy estate, and matters pertaining to the recovery of such assets for the benefit of the estate and its creditors.

During the Application Period, Duane Morris retrieved the Debtor's books and records from professionals retained by the Debtor when the Debtor was a debtor in possession.  In addition, Applicant assisted the Chapter 11 Trustee in the collection and reconciliation of the Debtor's accounts receivable.  There had been a recall of the NECC's products, and during the Application Period, Applicant participated in the recall and in coordinating the return of certain of NECC's products by third-parties.  Applicant filed proofs of claim in the bankruptcy proceedings of certain of the customers of the Debtor.  Applicant also sought the turnover of payments that were received from NECC customers by certain processors that provided credit card payment services to NECC, including Sovereign Merchant Services, American Express and Intuit.  These processors were withholding these payments in order to satisfy chargebacks

resulting from potential claims by the customers. Applicant sought to recover potential claims of the Debtor in a VISA/Mastercard class action. Duane Morris performed on-line asset searches. Finally, Applicant assisted the Chapter 11 Trustee in gathering the Debtor's customer lists for a possible sale, ultimately concluding that such a sale would not be feasible.

The Applicant seeks payment in the amount of $21,940.65, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Asset Analysis and Recovery. A detailed description of all of the services rendered in connection with Asset Analysis and Recovery is attached hereto as <u>Exhibit C</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:[15]

| (i) ASSET ANALYSIS AND RECOVERY (T001) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Jeffrey D. Sternklar | Partner | 2013 | 2.80 | $657.00 | $1,839.60 |
| Jeffrey D. Sternklar | Partner | 2014 | 0.10 | $670.50 | $67.05 |
| Paul D. Moore | Partner | 2013 | 0.90 | $625.50 | $562.95[16] |
| Paul D. Moore | Partner | 2015 | 1.50 | $675.00 | $1,012.50 |
| Michael R. Gottfried | Partner | 2015 | 0.20 | $697.50 | $139.50 |
| Patricia H. Heer | Associate | 2013 | 7.80 | $369.00 | $2,878.20 |
| Jennifer L. Mikels | Associate | 2013 | 1.80 | $283.50 | $510.30 |
| Stephen E. Johnson | Associate | 2013 | 9.80 | $355.50 | $3,483.90 |
| Stephen E. Johnson | Associate | 2014 | 3.50 | $369.00 | $1,291.50 |
| Stephen E. Johnson | Associate | 2015 | 0.40 | $387.00 | $154.80 |
| Jarret P. Hitchings | Associate | 2015 | 0.30 | $369.00 | $110.70 |
| Katherine A. Angelo | Paralegal | 2013 | 29.70 | $283.50 | $8,419.95 |

---

[15] Duane Morris LLP's hourly rates are subject to periodic adjustment (usually on January 1) to reflect economic and other conditions. Accordingly, the task category charts that follow include columns for services rendered in 2013, 2014, and 2015 so as to indicate hourly rate adjustments, which continue, however, to reflect the agreed ten percent (10%) discount.

[16] As noted in the accompanying Chapter 11 Trustee Application, the Chapter 11 Trustee included in that application all services rendered by him in the performance of duties generally performed by a trustee without the assistance of an attorney or an accountant for the estate. Other services with respect to which the Chapter 11 Trustee acted as his own counsel in lieu of other Duane Morris attorneys are included in this Application, with the hourly rates discounted by ten percent (10%).

| Katherine A. Angelo | Paralegal | 2014 | 0.30 | $297.00 | $89.10 |
| Alison T. Rosenblum | Law Clerk | 2014 | 5.20 | $265.50 | $1,380.60 |
| **TOTAL** | | | **64.3** | | **$21,940.65** |

### 2.    Asset Disposition (T002).

This category includes all matters related to the disposition of the assets of the Debtor's bankruptcy estates.

During the Application Period, Duane  Morris identified assets of the Debtor's bankruptcy estates for possible sale.  However, the Chapter 11 Trustee ultimately concluded that the sale of any of the Debtor's assets was not feasible during the period leading to the Effective Date.  Throughout the Chapter 11 Case until shortly before confirmation, "preservation orders" issued in connection with pending litigation prevented the Chapter 11 Trustee from disposing of all or substantially all of the Debtor's existing assets.  While the settlement agreement with the Debtor's Insiders provided that the Debtor's estate would receive 75% of the net proceeds of the sale of the interests of the Debtor's Insiders in certain affiliates of the Debtor, final approval of that settlement agreement did not occur until the Effective Date.

The Applicant seeks payment in the amount of $5,718.60, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Asset Disposition.  A detailed description of all of the services rendered in connection with Asset Disposition is attached hereto as Exhibit D. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (ii) ASSET DISPOSITION (T002) | | | | | |
|---|---|---|---|---|---|
| **Timekeeper** | **Title** | **Year** | **Hours** | **Hourly Rate** | **Total Fees** |
| Jeffrey D. Sternklar | Partner | 2013 | 0.20 | $657.00 | $131.40 |
| Paul D. Moore | Partner | 2013 | 0.80 | $625.50 | $500.40 |
| Paul D. Moore | Partner | 2014 | 1.40 | $652.50 | $913.50 |
| Michael R. Gottfried | Partner | 2014 | 0.60 | $661.50 | $396.90 |
| Michael R. Gottfried | Partner | 2015 | 0.60 | $697.50 | $418.50 |

| Michael R. Lastowski | Partner | 2015 | 0.10 | $751.50 | $75.15 |
|---|---|---|---|---|---|
| Jennifer L. Mikels | Associate | 2013 | 0.10 | $283.50 | $28.35 |
| Stephen E. Johnson | Associate | 2014 | 7.90 | $369.00 | $2,915.10 |
| Stephen E. Johnson | Associate | 2015 | 0.40 | $387.00 | $154.80 |
| Jarret P. Hitchings | Associate | 2015 | 0.50 | $369.00 | $184.50 |
| **TOTAL** | | | **12.6** | | **$5,718.60** |

### 3.  Avoidance Actions (T003).

This category includes all matters related to analysis of potential avoidance actions. During the Application Period, the Applicant investigated potential avoidance actions, including avoidance actions against the Debtor's Insiders and affiliates.  The Official Committee commenced an avoidance action against the Debtors' Insiders and affiliates (the "Insider Avoidance Action").  Febraury 22, 2013, the Chapter 11 Trustee, pursuant to a stipulation, substituted into the Insider Avoidance Action as the plaintiff.  Following this substitution, the Chapter 11 Trustee and the Applicant negotiated multiple extensions of time for the insiders to respond to the complaint and several stays of the Insider Avoidance Action to facilitate settlement.  Ultimately, the Debtor's Insiders agreed to a global settlement which which included, not only the claims set forth in the Insider Avoidance Action, but also all claims relating to the Outbreak.  The settlement with the Debtor's Insiders and affiliates resulted in a cash settlement of $47,750,000 and anticipated tax refunds in the amount of $21,800,000.

In addition, Applicant reviewed other potential preference and fraudulent conveyance actions, and, where necessary, entered into tolling agreements during this due diligence period. Prior to the Outbreak, however, the Debtor was highly profitable and current on its obligations. Duane Morris ultimately advised the Chapter 11 Trustee not to pursue other preference or fraudulent conveyance actions.

The Applicant seeks payment in the amount of $91,821.60, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with

Avoidance Actions.  A detailed description of all of the services rendered in connection with Avoidance Actions is attached hereto as <u>Exhibit E</u>.  The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (iii)  AVOIDANCE ACTIONS (T003) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 0.70 | $711.00 | $497.70 |
| Jeffrey D. Sternklar | Partner | 2013 | 6.90 | $657.00 | $4,533.30 |
| Jeffrey D. Sternklar | Partner | 2014 | 4.70 | $670.50 | $3,151.35 |
| Michael R. Gottfried | Partner | 2013 | 45.80 | $630.00 | $28,854.00 |
| Paul D. Moore | Partner | 2013 | 64.90 | $625.50 | $40,594.95 |
| Paul D. Moore | Partner | 2014 | 3.10 | $652.50 | $2,022.75 |
| Paul D. Moore | Partner | 2015 | 0.50 | $675.00 | $337.50 |
| Michael R. Lastowski | Partner | 2015 | 1.20 | $751.50 | $901.80 |
| Jennifer L. Mikels | Associate | 2013 | 0.80 | $283.50 | $226.80 |
| Jarret P. Hitchings | Associate | 2013 | 0.90 | $310.50 | $279.45 |
| Jarret P. Hitchings | Associate | 2015 | 1.90 | $369.00 | $701.10 |
| Stephen E. Johnson | Associate | 2014 | 21.10 | $369.00 | $7,785.90 |
| Stephen E. Johnson | Associate | 2015 | 5.00 | $387.00 | $1,935.00 |
| **TOTAL** | | | **157.5** | | **$91,821.60** |

### 4.      Case Administration (T004).

This category includes all matters related to the general administration of the Chapter 11 Case, including maintenance of the case calendar, communication regarding proposed pleadings to be filed with the Court, coordination of filing of pleadings with the Court, communication and research regarding service issues for various pleadings.

During the Application Period, Applicant's services relating to the general administration of the estate included obtaining background information from the Debtor's prepetition professionals, obtaining access to various automated data storage services provided by third parties to Debtor, reviewing the Debtor's books and records, reviewing the Debtor's personnel files, identifying insurance policies of which the Debtor was a beneficiary, monitoring the MDL Proceeding, monitoring the website for the Centers for Disease Control, identifying outstanding

litigation against the Debtor and coordinating the filing of suggestions of bankruptcy and transfer and/or removal notices, responding to third-party requests for access to the Debtor's books and records (including discovery requests), supervising site visits by counsel to parties to litigation relating to the Outbreak, supervising professionals retained by the Trustees, coordinating the process for service of pleadings with the claims agent and special litigation counsel, reviewing issues related to patient confidentiality; reviewing accounts payable, responding to creditor inquiries and payment demands, monitoring criminal proceedings against the Debtor's Insiders, and analyzing issues relating to the attorney-client privilege and joint defense privileges.

The Applicant seeks payment in the amount of $109,778.85, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Case Administration. A detailed description of all of the services rendered in connection with Case Administration is attached hereto as Exhibit F. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (iv) CASE ADMINISTRATION (T004) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 0.40 | $711.00 | $284.40 |
| Jeffrey D. Sternklar | Partner | 2013 | 12.90 | $657.00 | $8,475.30 |
| Jeffrey D. Sternklar | Partner | 2014 | 24.60 | $670.50 | $16,494.30 |
| Michael R. Gottfried | Partner | 2013 | 0.20 | $630.00 | $126.00 |
| Paul D. Moore | Partner | 2013 | 35.30 | $625.50 | $22,080.15 |
| Michael R. Lastowski | Partner | 2013 | 6.70 | $715.50 | $4,793.85 |
| Michael R. Lastowski | Partner | 2015 | 1.00 | $751.50 | $751.50 |
| Patricia H. Heer | Associate | 2013 | 67.70 | $369.00 | $24,981.30 |
| Jennifer L. Mikels | Associate | 2013 | 0.60 | $283.50 | $170.10 |
| Jarret P. Hitchings | Associate | 2013 | 7.90 | $310.50 | $2,452.95 |
| Stephen E. Johnson | Associate | 2013 | 58.80 | $355.50 | $20,903.40 |
| Stephen E. Johnson | Associate | 2014 | 10.50 | $369.00 | $3,874.50 |
| Stephen E. Johnson | Associate | 2015 | 2.20 | $387.00 | $851.40 |
| Katherine A. Angelo | Paralegal | 2013 | 7.80 | $283.50 | $2,211.30 |
| Katherine A. Angelo | Paralegal | 2014 | 2.10 | $297.00 | $623.70 |
| Katherine A. Angelo | Paralegal | 2015 | 0.30 | $315.00 | $94.50 |
| Virginia L. Weeks | Paralegal | 2013 | 1.00 | $283.50 | $283.50 |

| | | | | | |
|---|---|---|---|---|---|
| Gail H. Reinig | Paralegal | 2013 | 1.30 | $225.00 | $292.50 |
| Ana Venissa Fernandez | Legal Assistant | 2013 | 0.20 | $171.00 | $34.20 |
| **TOTAL** | | | **241.5** | | **$109,778.85** |

### 5. Claims Administration and Objections (T005).

This category includes all matters related to the administration of claims against the Debtor's bankruptcy estate.

In connection with establishing a bar date, Duane Morris engaged in extensive negotiations with the Official Committee and the PSC concerning the format of the proof of claim forms and of the confidential Personal Injury or Wrongful Death Claim Information Form (the "PITWD Addendum") to be submitted by creditors asserting wrongful death or personal injury claims against the Debtor's estate. There were extensive discussions devoted to developing procedures that would assure adequate notice to all creditors. Duane Morris also reviewed issues relating to patient privacy under the federal Health Insurance Portability and Accountability Act ("HIPPA") in connection with drafting claims procedures that provided necessary information while at the same time recognized and accommodated the important privacy rights of NECC victims.

Eventually, Duane Morris prepared and filed the *Chapter 11 Trustee's Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Claim; (II) Approving Certain Additional Documentation Requirements and Procedures for Personal Injury Tort and Wrongful Death Claims; (III) Approving the Form and Manner of Notice Thereof; and (IV) Granting Additional Related Relief dated June 28, 2013* [Dkt. No. 263] (the "Bar Date Motion").

On July 29, 2013, this Court entered its *Interim Order Regarding Chapter 11 Trustee's Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and for Related Relief Concerning Noticing by Notice Intermediaries*, dated July 29, 2013 [Docket No. 412] (the

"Interim Bar Date Order"), which, among other things, required healthcare providers to provide patient information so that the Chapter 11 Trustee could assure that those patients received actual notice of the Bar Date, rather than simply publication notice as unknown claimants. Numerous healthcare providers refused to comply with these provisions of the Interim Bar Date Order. As a result, Duane Morris and counsel to the Official Committee filed the *Emergency Motion of the Chapter 11 Trustee and the Official Committee for a finding of Civil Contempt*, dated August 21, 2013 [Dkt. No. 506] (the "Contempt Motion") to compel their compliance with this Court's order to ensure that they received actual notice.

In the meantime, twenty-one (21) parties had objected to the Bar Date Motion. Certain of these healthcare providers filed notices of appeal from the entry of the Interim Bar Date Order [Dkt. No. 458] and from this Court's denial of a various motion to reconsider, alter or amend the Interim Bar Date Order. [Dkt. Nos. 441, 443, 444 and 445]. These appealing parties also sought a stay of the Interim Bar Date Order [Dkt. 476], which this Court denied. [Dkt. 441]. They also filed an emergent motion with the district court seeking a stay of the Interim Bar Date Order pending their appeal. [Case No. 13-11956-FDS (D. Mass) Dkt. No. 2]. Duane Morris prepared and filed the Chapter 11 Trustee's objection to this emergent stay motion. [*Id.* at Dkt. 14]. After extensive negotiations by the Chapter 11 Trustee and Duane Morris with the parties the objected to and/or appealed the Interim Bar Date Order, Duane Morris prepared and filed a revised form of order for the Bar Date Motion. *See Notice of Submission by Chapter 11 Trustee of Revised Bar Date Notices and Proposed Order* [Dkt. No. 496].

Eventually, the Chapter 11 Trustee succeeded in further negotiating a resolution of the issues underlying the appeal and the Contempt Motion, and Duane Morris and counsel to the Official Committee filed the *Joint Motion of the Chapter 11 Trustee and the Official Committee*

of Unsecured Creditors for Expedited Determination for an Order Approving Stipulation with

Notice Intermediaries [Dkt. No. 548] (the "Bar Date Notice Stipulation").   Duane Morris

submitted a further revised order. *See Notice of Submission by Chapter 11 Trustee of Revised

Proposed Bar Date Order and Exhibits* [Dkt. No. 568].  At a hearing on September 23, 2103, the

Chapter 11 Trustee and the Official Committee withdrew the Contempt Motion [Dkt. No. 576][17]

and the Court entered an order approving the Bar Date Notice Stipulation [Dkt. No. 577].

This Court thereafter entered its *Order (I) Establishing Deadline for Submitting Proofs of

Claim, (II) Approving Certain Additional Requirements and Procedures for Personal Injury Tort

and Wrongful Death Claims and (III) Approving Form and Manner of Notice Thereof* dated

September 27, 2013, together with all exhibits thereto [Dkt. No. 582] (the "Bar Date Order").

The Bar Date Order established January 15, 2014 at 4:00 p.m as the Bar Date. The appeal of the

Interim Bar Date Order was thereafter dismissed. [Case No. 13-11956-FDS (D. Mass) Dkt. No.

40].

Later, the Chapter 11 Trustee discovered that, due to an oversight by DRC, certain

creditors had not received timely notice of the Bar Date.  As a result, Duane Morris prepared and

filed the *Chapter 11 Trustee's Assented-To Motion for Entry of a Supplemental Order

Establishing a Bar Date for Filing Proofs of Claim and Request to Limited Notice* [Dkt. No. 697]

(the "Supplemental Bar Date Motion").   On February 24, 2014, this Court entered an order

granting the Supplemental Bar Date Motion and establishing the Supplemental Bar Date of May

5, 2014 [Dkt. No. 699].  The Applicant also responded to creditor inquiries related to the claims

process and established a protocol for responding to such inquiries, supervised the work of the

---

[17] Although approximately thirty-six entities initially refused to comply with the provisions of the Bar Date Order
requiring the disclosure of patient information, all of those entities ultimately agreed to comply.  As a result,
approximately 15,000 patient names were provided to the Chapter 11 Trustee for the purpose of serving notice of the
Bar Date.

claims agent, DRC (particularly the preparation of notice lists, creditor matrices, and schedules) and determined whether to object to late-filed claims.

The Applicant seeks payment in the amount of $449,709.75, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Claims Administration and Objections. A detailed description of all of the services rendered in connection with Claims Administration and Objections is attached hereto as <u>Exhibit G</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (v) CLAIMS ADMINISTRATION AND OBJECTIONS (T005) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 4.9 | $711.00 | $3,483.90 |
| Jeffrey D. Sternklar | Partner | 2013 | 201.0 | $657.00 | $132,057.00 |
| Jeffrey D. Sternklar | Partner | 2014 | 45.1 | $670.50 | $30,239.55 |
| Michael R. Gottfried | Partner | 2013 | 0.8 | $630.00 | $504.00 |
| Paul D. Moore | Partner | 2013 | 150.8 | $625.50 | $94,325.40 |
| Paul D. Moore | Partner | 2014 | 3.2 | $652.50 | $2,088.00 |
| Paul D. Moore | Partner | 2015 | 8.9 | $675.00 | $6,007.50 |
| Michael R. Lastowski | Partner | 2013 | 0.2 | $715.50 | $143.10 |
| Michael R. Lastowski | Partner | 2014 | 0.1 | $715.50 | $71.55 |
| Michael R. Lastowski | Partner | 2015 | 23.1 | $751.50 | $17,359.65 |
| Bronwyn L. Roberts | Partner | 2013 | 0.9 | $441.00 | $396.90 |
| Patricia H. Heer | Associate | 2013 | 18.0 | $369.00 | $6,642.00 |
| Jarret P. Hitchings | Associate | 2015 | 13.5 | $369.00 | $4,981.50 |
| Stephen E. Johnson | Associate | 2013 | 308.6 | $355.50 | $109,707.30 |
| Stephen E. Johnson | Associate | 2014 | 101.6 | $369.00 | $37,490.40 |
| Stephen E. Johnson | Associate | 2015 | 6.0 | $387.00 | $2,322.00 |
| Stephanie Lenkiewicz | Paralegal | 2015 | 2.20 | $193.50 | $425.70 |
| Katherine A. Angelo | Paralegal | 2013 | 4.2 | $283.50 | $1,190.70 |
| Michael Lee | Senior Analyst | 2015 | 0.8 | $342.00 | $273.60 |
| **TOTAL** | | | **893.9** | | **$449,709.75** |

## 6. Committee Matters (T006).

This category includes all matters related to the various committees formed in regard to the Chapter 11 Case, including the Official Committee and the PSC.

During the Application Period, the Applicant coordinated its efforts with both of the committees, which included reviewing open matters at the time of the Chapter 11 Trustee's appointment, records assembly and retention, protocols for access to the Debtor's premises coordinating the establishment of and payment for a committee web site, developing a joint prosecution agreement, and negotiating the terms of committee access to claims information. The Official Committee was a Plan Proponent and the support of the PSC was essential for confirmation of the Plan. Therefore, Applicant worked closely with both groups of constituents.

The Applicant seeks payment in the amount of $30,656.70, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Committee Matters. A detailed description of all of the services rendered in connection with Committee Matters is attached hereto as <u>Exhibit H</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (vi) COMMITTEE MATTERS (T006) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 12.0 | $711.00 | $8,532.00 |
| Jeffrey D. Sternklar | Partner | 2013 | 4.2 | $657.00 | $2,759.40 |
| Paul D. Moore | Partner | 2013 | 28.6 | $625.50 | $17,889.30 |
| Patricia H. Heer | Associate | 2013 | 4.0 | $369.00 | $1,476.00 |
| **TOTAL** | | | **48.8** | | **$30,656.70** |

### 7. Fee/Employment Applications (T007).

This category includes all matters related to the preparation, review, filing, and service of fee applications, including review and verification of compliance with local rules and applicable guidelines of the UST.

After the Appointment Date, Duane Morris reviewed the status of the Debtor's proposed retention of all estate professionals. The Debtor had filed the following retention applications, which were outstanding as of the Appointment Date:

a. Motion filed by Debtor New England Compounding Pharmacy, Inc. To Employ Verdolino & Lowey, P.C. As Accountants and Financial Advisors to Debtor [Dkt. No. 3] (the "Verdolino & Lowey Application");

b. Application filed by Debtor New England Compounding Pharmacy, Inc. to Employ Harris Beach PLLC as Special Counsel [Dkt. No. 36];

c. Application filed by Debtor New England Compounding Pharmacy, Inc. to Employ Collora LLP as Special Counsel [Dkt. No. 37]; and

d. Application filed by Debtor New England Compounding Pharmacy, Inc. to Employ Akin Gump Strauss Hauer & Feld LLP as Special Counsel [Dkt. No. 49].

The Chapter 11 Trustee reviewed these applications and made an independent determination as to whether to seek to retain each professional.

Harris Beach PLLC ("Harris Beach") is the defense counsel designated by NECC's insurer. The Chapter 11 Trustee determined that the retention of Harris Beach was in the best interests of the Debtor's estate. Accordingly, Duane Morris prepared and filed the *Amended Application of the Chapter 11 Trustee for an Order Approving Employment and Retention of Harris Beach PLLC as Special Counsel* [Dkt. No. 166] (the "Harris Beach Application") on April 15, 2013. This Court granted the Harris Beach Application on August 22, 2013 [Dkt. No. 523].

The Debtor had sought to retain Collora LLP ("Collora") as special regulatory counsel. The Chapter 11 Trustee had determined that the retention of Collora was in the best interests of the Debtor's estate. Accordingly, Duane Morris prepared and filed the *Amended Application of the Chapter 11 Trustee for an Order Approving Employment and Retention of Collora LLP as Special Counsel* [Dkt. No. 163] on January 4, 2013. The UST objected to the application on April 29, 2013 [Dkt. No. 201]. Subsequently, Duane Morris prepared and filed the *Second Amended Application of the Chapter 11 Trustee for an Order Approving Employment and*

*Retention of Collora LLP as Special Counsel* [Dkt. No. 225] (the "<u>Collora Application</u>") on May 14, 2013. This Court Denied the Collora Application on May 15, 2014 [Dkt. No. 234].

The Debtor had sought to retain Akin Gump Strauss Hauer & Feld LLP ("<u>Akin Gump</u>") as special counsel for government affairs. The Chapter 11 Trustee had determined that the retention of Akin Gump was in the best interests of the Debtor's estate. Accordingly, Duane Morris prepared and filed *Amended Application of the Chapter 11 Trustee for an Order Approving Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Special Counsel* [Dkt. No. 164] (the "<u>Akin Gump Application</u>") on April 15, 2013. The UST objected to this application on April 29, 2013 [Dkt. No. 201]. The application was withdrawn on May 13, 2013 [Dkt. No. 221].

The Chapter 11 Trustee determined that in light of the issues raised concerning its retention, it was not in the best interests of the Debtor's estate to retain Verdolino & Lowey, P.C. as accountants and financial advisors to the Debtor. The Verdolino & Lowey Application was continued generally by order entered on February 5, 2013 [Dkt. No. 116]. The disposition of this application was presented to this Court as the *Request from Daniel C. Cohn Debtor New England Compounding Pharmacy, Inc. For Entry of Agreed Form of Order Concerning Debtor's Retention of Verdolino & Lowey, P.C.* [Dkt. No. 1401] filed on July 10, 2015, which this Court granted on July 28, 2015 [Dkt. No. 1409].

At the request of the Official Committee and its counsel, the Chapter 11 Trustee determined that it was in the best interests of the Debtor's estate to retain Deloitte Financial Advisory Services LLP ("<u>Deloitte</u>") , and Duane Morris prepared and filed the *Application for an Order Authorizing the Retention of Deloitte Financial Advisory Services LLP Nunc Pro Tunc to February 1, 2013* on February 16, 2103 [Dkt. 125] (the "<u>Deloitte Application</u>"). Despite

extensive related negotiations, the retention of Deloitte proved to be impractical. The Deloitte Application was withdrawn in open court on April 3, 2013.

Ultimately, the Chapter 11 Trustee decided that the retention of Mesirow Financial Consulting, LLC was in the best interests of the Debtor's estate and Duane Morris filed the Trustee's Application to Employ Mesirow Financial Consulting, LLC ("MFC") as his Financial Advisor [Dkt. No. 160] (the "Mesirow FAS Application"). This Court entered an order approving the Mesirow FAS Application on April 11, 2013 [Dkt No. 160].

Mr. Steven Darr, while a Senior Managing Director of MFC, was primarily responsible for MFC's engagement. Mr. Darr resigned from MFC, and, on April 13, 2015, joined Huron Consulting Services, LLC ("Huron"). After joining Huron, Mr. Darr agreed to continue to perform limited services for the Debtor's estate. Duane Morris therefore prepared and filed the *Application of Chapter 11 Trustee for Entry of an Order Authorizing the Post Facto Retention and Employment of Stephen B. Darr of Huron Consulting Services, LLC as an Advisor to the Trustee, Retroactive to May 15, 2015* [Dkt. No. 1362] on May 29, 2015. On July 14, 2015, this Court granted the application [Dkt. No. 1407].

During the Application Period, the Applicant prepared its own retention application and prepared this final fee application.

The Applicant seeks payment in the amount of $229,068.00, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Fee/Employment Applications. A detailed description of all of the services rendered in connection with Fee/Employment Applications is attached hereto as Exhibit I. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (vii) FEE/EMPLOYMENT APPLICATIONS (T007) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Jeffrey D. Sternklar | Partner | 2013 | 155.4 | $657.00 | $102,097.80 |
| Jeffrey D. Sternklar | Partner | 2014 | 10.5 | $670.50 | $7,040.25 |
| Michael R. Gottfried | Partner | 2015 | 4.2 | $697.50 | $2,929.50 |
| Paul D. Moore | Partner | 2013 | 53.9 | $625.50 | $33,714.45 |
| Paul D. Moore | Partner | 2014 | 0.4 | $652.50 | $261.00 |
| Paul D. Moore | Partner | 2015 | 2.0 | $675.00 | $1,350.00 |
| Michael R. Lastowski | Partner | 2013 | 0.3 | $715.50 | $214.65 |
| Michael R. Lastowski | Partner | 2015 | 51.5 | $751.50 | $38,702.25 |
| Patricia H. Heer | Associate | 2013 | 7.8 | $369.00 | $2,878.20 |
| Patricia H. Heer | Associate | 2015 | 2.8 | $432.00 | $1,209.60 |
| Jennifer L. Mikels | Associate | 2015 | 24.0 | $337.50 | $8,100.00 |
| Jarret P. Hitchings | Associate | 2013 | 16.4 | $310.50 | $5,092.20 |
| Jarret P. Hitchings | Associate | 2014 | 4.5 | $337.50 | $1,518.75 |
| Jarret P. Hitchings | Associate | 2015 | 21.5 | $369.00 | $7,933.50 |
| Stephen E. Johnson | Associate | 2013 | 15.2 | $355.50 | $5,403.60 |
| Stephen E. Johnson | Associate | 2014 | 8.1 | $369.00 | $2,988.90 |
| Stephen E. Johnson | Associate | 2015 | .3 | $387.00 | $116.10 |
| Stephanie Lenkiewicz | Paralegal | 2015 | 36.9 | $193.50 | $7,140.15 |
| Katherine A. Angelo | Paralegal | 2013 | 1.2 | $283.50 | $340.20 |
| Allison B. Kelly | Paralegal | 2013 | 0.2 | $184.50 | $36.90 |
| TOTAL | | | 417.1 | | $229,068.00 |

8.  **Insurance (T009).**

This category includes all matters related to insurance.

During the Application Period, the Applicant analyzed the Debtor's insurance policies. Applicant reviewed and analyzed insurers' reservation of rights and potential defenses to coverage. Applicant advised the Chapter 11 Trustee as to the scope of the duties the insured owed to the insurers. Applicant monitored declaratory judgment actions filed by certain insurers. In addition, the Applicant analyzed COBRA issues. Applicant also reviewed indemnification requests made by parties alleged to be other insured parties under Debtor's insurance policies. Applicant negotiated settlements with the Debtors' insurers. Finally, the Applicant analyzed various issues relating to the Chapter 11 Trustee's renewal of the Debtor's commercial property and general liability insurance after analyzing different proposals.

45

The Applicant seeks payment in the amount of $295,894.35, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Insurance. A detailed description of all of the services rendered in connection with Insurance is attached hereto as <u>Exhibit J</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (viii)  INSURANCE (T009) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Lauren E. DeBruicker | Partner | 2013 | 178.7 | $517.50 | $92,477.25 |
| Lauren E. DeBruicker | Partner | 2014 | 14.1 | $544.50 | $7,677.45 |
| Jeffrey D. Sternklar | Partner | 2013 | 32.2 | $657.00 | $21,155.40 |
| Jeffrey D. Sternklar | Partner | 2014 | 17.5 | $670.50 | $11,733.75 |
| Michael R. Gottfried | Partner | 2013 | 0.4 | $630.00 | $252.00 |
| Michael R. Gottfried | Partner | 2015 | 0.5 | $697.50 | $348.75 |
| Paul D. Moore | Partner | 2013 | 106.5 | $625.50 | $66,615.75 |
| Paul D. Moore | Partner | 2014 | 99.3 | $652.50 | $64,793.25 |
| C. Mitchell Goldman | Partner | 2014 | 9.9 | $616.50 | $6,103.35 |
| Michael R. Lastowski | Partner | 2013 | 2.3 | $715.50 | $1,645.65 |
| Patricia H. Heer | Associate | 2013 | 3.4 | $369.00 | $1,254.60 |
| Jessica A. Bohl | Associate | 2013 | 45.9 | $360.00 | $16,524.00 |
| Jarret P. Hitchings | Associate | 2013 | 5.4 | $310.50 | $1,676.70 |
| Stephen E. Johnson | Associate | 2013 | 1.10 | $355.50 | $391.05 |
| Stephen E. Johnson | Associate | 2014 | 0.2 | $369.00 | $73.80 |
| Stephen E. Johnson | Associate | 2015 | 0.8 | $387.00 | $309.60 |
| Denice Yee | Paralegal | 2013 | 5.1 | $270.00 | $1,377.00 |
| Ryan Merola | Law Clerk | 2013 | 6.0 | $247.50 | $1,485.00 |
| **TOTAL** | | | **529.3** | | **$295,894.35** |

## 9.    Leases/Executory Contracts (T010).

This category includes all matters related to the assumption, assignment, or rejection of leases and executory contracts.

During the Application Period, the Applicant identified all existing leases and executory contracts and advised the Chapter 11 Trustee with respect to related determinations as to assumption and rejection. The Applicant also successfully pursued motions for relief from the "preservation" orders in order to be able to return certain leased personalty because of

46

preservation orders applicable to NECC's premises and property. The Applicant, in connection with the Plan Confirmation process, reviewed and revised forms of notices of assumption and rejection. Applicant also negotiated and successfully entered into a number of termination and rejection stipulations regarding leased equipment which significantly reduced claims against the estate. In connection therewith, Applicant arranged for the return of certain leased equipment.

The Applicant seeks payment in the amount of $71,300.70, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Leases/Executory Contracts. A detailed description of all of the services rendered in connection with Leases/Executory Contracts is attached hereto as <u>Exhibit K</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (ix) LEASES/EXECUTORY CONTRACTS (T010) | | | | | |
|---|---|---|---|---|---|
| **Timekeeper** | **Title** | **Year** | **Hours** | **Hourly Rate** | **Total Fees** |
| Jeffrey D. Sternklar | Partner | 2013 | 2.5 | $657.00 | $1,642.50 |
| Michael R. Gottfried | Partner | 2013 | 1.3 | $630.00 | $819.00 |
| Michael R. Gottfried | Partner | 2014 | 0.2 | $661.50 | $132.30 |
| Paul D. Moore | Partner | 2013 | 13.7 | $625.50 | $8,569.35 |
| Michael R. Lastowski | Partner | 2013 | 0.1 | $715.50 | $71.55 |
| Michael R. Lastowski | Partner | 2015 | 3.9 | $751.50 | $2,930.85 |
| Patricia H. Heer | Associate | 2013 | 140.8 | $369.00 | $51,955.20 |
| Stephen E. Johnson | Associate | 2013 | 8.1 | $355.50 | $2,879.55 |
| Stephen E. Johnson | Associate | 2014 | 2.9 | $369.00 | $1,070.10 |
| Stephanie Lenkiewicz | Paralegal | 2015 | 4.6 | $193.50 | $890.10 |
| Katherine A. Angelo | Paralegal | 2013 | 1.2 | $283.50 | $340.20 |
| **TOTAL** | | | **179.3** | | **$71,300.70** |

10. **Litigation (T011).**

This category includes all matters related to the MDL, adversary proceedings in this Court, and other non-avoidance action litigation initiated in connection with the Chapter 11 Case.

### The Transfer Litigation

As set forth more fully above, shortly after the Appointment Date, the Chapter 11 Trustee initiated a strategy to transfer all litigation relating to the Outbreak to the MDL Court. To start, Applicant prepared and filed motions extending the deadlines for filing motions to transfer or notices of removal. Then Duane Morris prepared and filed the *Chapter 11 Trustee's Motion to Transfer Personal Injury Tort and Wrongful Death Cases to the MDL Court pursuant to 28 U.S.C. § § 157(b) and 1334*, together with a supporting memorandum of law [MDL Dkt. Nos. 200 & 201]. In response, certain parties filed a *Motion for Mandatory or Permissive Abstention Under 28 U.S.C. § 1334(c)(2)*. [MDL Dkt. No. 209], which the Chapter 11 Trustee opposed. [MDL Dkt. No. 220]. The MDL Court granted the transfer motion as to all cases, except those cases where neither the plaintiffs nor the defendants had filed proofs of claim. After this Court entered an order establishing a Bar Date and certain of those plaintiffs and defendants filed proofs of claim, Duane Morris prepared and filed the *Chapter 11 Trustee and Official Committee's Renewed and Supplemental Motion to Transfer Additional Personal Injury Tort and Wrongful Death Cases to this Court pursuant to 28 U.S.C. § § 157(b) and 1334* (the "Renewed Motion to Transfer"), together with a supporting memorandum of law. In response, certain parties filed a *Renewed Motion for Mandatory or Permissive Abstention Under 28 U.S.C. § 1334(c)(2)*. [MDL Dkt. No. 763], which the Chapter 11 Trustee opposed. [MDL Dkt. No. 861]. The MDL Court entered an order granting the Renewed Motion to Transfer, from which certain parties appealed to the First Circuit. *See In re: New England Compounding Pharmacy, Inc. Products Liability Litigation,* United States Court of Appeals to the First Circuit, No. 13-2007. Duane Morris worked with the Official Committee in preparing a brief of Appellees. In light of the Plan Settlements, the appeal was stayed and will ultimately be dismissed.

**The MDL Proceeding**

Throughout the Application Period, Applicant actively participated in the MDL Proceeding by, among other things, taking a lead role at monthly status conferences wherein Applicant briefed the MDL Court on the status of the Chapter 11 Trustee's settlement efforts, the Bankruptcy Proceedings (including the Chapter 11 Trustee's efforts to finalize the Plan and gain Plan Support), and the Chapter 11 Trustee's work in providing extensive informal discovery to the various parties in the case in order to facilitate mediations and settlements.  Prior to every status conference, the Applicant participated with the Chapter 11 Trustee, the Chapter 11 Trustee's counsel, Rick Fern, counsel to the Official Committee and Official Committee representatives, and, at times, PSC representatives to coordinate efforts and discuss common issues.  The Applicant and Chapter 11 Trustee also reviewed and commented on the MDL agenda for each status conference proposed by the PSC.  Additionally, as more fully described herein, Applicant actively engaged in litigation before the MDL Court regarding matters of importance to the estate.  Applicant actively consulted with parties to the MDL in an effort to narrow the issues before the MDL Court and, where, possible, to develop a consensus concerning pretrial procedures.

**Discovery**

At the outset of the Chapter 11 Case and MDL Proceeding, the Chapter 11 Trustee encountered an issue, which gave rise to several hard-fought battles throughout the course of these proceedings.

Early on, the Chapter 11 Trustee viewed settlements with the Insiders as among his highest priorities; however, it became clear, that such settlements would be increasingly difficult, if not impossible, without achieving a stay of discovery and ultimate limitation of exposure to

discovery for the Insiders. Accordingly, the Applicant sought and obtained a critical stay of discovery with respect to NECC and the Insiders from the MDL Court. *See e.g.* Clerk's Notes for Mar. 12, 2013 Status Conference (extending discovery stay to Apr. 10, 2013); Tr. of Apr. 10, 2013 Status Conference at 28:17-24 (extending discovery stay to May 14, 2013); *MDL Order No. 6* [MDL Dkt. No. 209] ("Formal discovery of NECC and the affiliated defendants shall remain temporarily stayed as set forth in this order and the previous orders of the Court."); *MDL Order No. 7* [MDL Dkt. No. 438] (staying fact discovery of NECC and the NECC Affiliated Defendants "until further order of the Court"). Moreover, in furtherance of the Chapter 11 Trustee's efforts to settle with non-NECC affiliated entities, the Applicant assisted the Chapter 11 Trustee in obtaining additional protection from discovery for non-NECC affiliated entities who elected to engage in settlement efforts. On June 28, 2013, following briefing by multiple parties to the MDL Proceedings, the MDL Court issued a case management order, which held, in part, that unaffiliated defendants or non-parties who elected to participate in mediation were exempt from discovery, except as required to facilitate participation in mediation. *MDL Order No. 6* [MDL Dkt. No. 209] ("proposed mediation order shall provide that any unaffiliated defendant or non-party who elects to participate in mediation shall, among other things: 1. be exempt from discovery except as required to facilitate participation in mediation . . .").

**Informal Discovery**

In lieu of formal discovery, and as part of its effort to control costs and facilitate settlements by working with the PSC to obtain the information necessary to successfully mediate with the national and provider defendants beginning in April 2013, the Chapter 11 Trustee and the Applicant engaged in "informal" discovery with the PSC. The PSC's initial request for informal discovery sought extensive and very broad discovery. The Applicant engaged in

lengthy negotiations with the PSC to appropriately refine and limit the discovery sought from the Chapter 11 Trustee, as well as to protect the confidentiality of the information provided. These negotiations were ultimately successful, and the Applicant worked with special-counsel Harris Beach to provide appropriate, "informal" discovery to the PSC and non-affiliated defendants through twelve separate productions, encompassing over 5,100 documents and nearly 40,000 pages. Applicant further negotiated with the PSC with respect to numerous additional requests for documents, and expended time and resources to respond to such requests, as appropriate. Additionally, in an effort to facilitate fruitful mediations, the Applicant engaged in extensive discovery negotiations with mediating parties, and, at the appropriate time, agreed to release the provided discovery to all parties in the MDL. Hearing Transcript at 30-31, August 7, 2014, *In re New England Compounding Pharmacy Cases Litigation* (MDL No. 13-02419) ("I think it was three months ago we agreed that all of the informal discovery that we had provided to the PSC, some 44,000 pages, could be made available to all the parties to the case. . . . That was discovery that was produced initially in response to a document request from the PSC and then, as I understand it, there were as many as 21 separate original requests the [Chapter 11] trustee responded to in a variety of different contexts, whether they were requests to facilitate mediation or otherwise."). In addition to paper discovery, the Chapter 11 Trustee, with the assistance and counsel of the Applicant, worked with the PSC to make video and still photographs of the NECC Framingham facility available through informal discovery.

**Discovery Litigation**

On October 28, 2013, the PSC filed a *Motion to Partially Lift Discovery Stay* [MDL Dkt. No. 534], through which the PSC sought relief from the MDL Court's order staying discovery so that the PSC could initiate discovery of the NECC-affiliated defendants. In addition, several

other attempts were made to lift the stay, including but not limited to an attempt made by Liberty [MDL Dkt. No. 1229]. As a result of these motions, as well as additional pressures from the PSC, the Applicant actively worked with special-counsel Harris Beach to develop strategies to continue to provide appropriate informal discovery while preserving the stay and facilitating the Insider settlements negotiations, participated in oral arguments during monthly status conferences and related pre-conference meetings with the Chapter 11 Trustee, counsel to the Official Committee, Mr. Fern, the Chapter 11 Trustee's special defense counsel, and others, and engaged in briefing as to why the stay should remain in place. *See e.g.* MDL Dkt. Nos. 1065, 1263; Hearing Transcript at 17-19, June 19, 2014, *In re New England Compounding Pharmacy Cases Litigation* (MDL Dkt. No. 13-02419) ("The [Chapter 11] Trustee's position has been and continues to be that lifting the discovery stay is premature . . . the appropriate time to take this up is after Judge Boroff has either approved the settlement or not approved the settlement"). As a result of these efforts, the discovery stay remained in place throughout the period of time during which the Chapter 11 Trustee negotiated with the Insiders, and ultimately, as more fully described herein, the Chapter 11 Trustee was able to successfully settle with the Insiders, bringing approximately $100 million of assets and cash in funds into the estate. This Court preliminarily approved the Insider Settlements on July 31, 2014. *See Settlement Approvals* [Dkt Nos. 790-792].

On August 14, 2014, in accordance with the provisions of the Insider Settlement Agreements, the Applicant filed the Chapter 11 Trustee's Motion for Entry of An Order Limiting Discovery and Staying These Proceedings with Respect to NECC Insiders and Related Settling Parties [MDL Dkt. No. 1342]. The Chapter 11 Trustee sought to (i) prohibit any party to the MDL from seeking dispositive relief against the Settling Parties; (ii) prohibit any party to the

MDL from seeking any form of prejudgment security from or against the Insider Settling Parties
or their assets; and, (iii) open discovery against the Insider Settling Parties and certain Estate
Parties, but only to the extent discovery is relevant to the prosecution, or defense, of claims
against defendants other than the Insider Settling Parties and Estate Parties. Id. On September
18, 2014, the Applicant engaged in detailed oral arguments before the MDL Court on this
motion. After hearing and consideration, the MDL Court granted the Chapter 11 Trustee's
Motion and limited discovery as against the Insider Settling Parties and Estate Parties, as
requested. [MDL Dkt. Nos. 1481 and 1482]. Prevailing on this motion triggered the obligation
of the settling parties to fund the settlements, which contributed into escrow for the benefit of the
estate, approximately $50 million. Moreover, by limiting the discovery available to remaining
parties as against Insiders and Estate Parties, the Applicant significantly reduced the burden and
expense which will be incurred by the estate in connection with any outstanding litigation.

Following the order limiting discovery, the Tennessee Clinic Defendants served the
Chapter 11 Trustee with a Rule 30(b)(6) deposition notice seeking testimony as well as the
production of documents. In response, the Applicant filed a *Motion for a Protective Order
Pursuant to Fed. R. Civ. P. 26(c) and 45(c) Precluding the Tennessee Clinic Defendants from
Conducting a Deposition of New England Compounding Pharmacy, Inc. Pursuant to Fed. R.
Civ. P. 30(b)(6)*. [MDL Dkt. Nos. 1810-1811]. On May 28, 2015, Applicant engaged in oral
arguments before Magistrate Judge Boal regarding this motion, which presently remains under
advisement.

### **Mediation and Settlement Negotiations**

#### NECC Insider Settlement

Following his appointment, the Chapter 11 Trustee viewed settlement negotiations with
the Insiders as among his highest priorities in order to avoid protracted and costly litigation.

Understanding that settlement negotiations likely would require them to reveal detailed information about their respective assets and liabilities, the Insiders were concerned that such information might be used against them if the settlement negotiations proved unsuccessful or if such information were disclosed to non-participating third parties. The Insiders therefore were reluctant, and initially unwilling, to provide any information about their assets. Meaningful settlement negotiations could not occur unless the parties believed such information would be treated as strictly confidential and used solely to facilitate settlement negotiations and enhance the likelihood of a successful resolution.

To that end, the Chapter 11 Trustee and the Insiders painstakingly negotiated the Protocol Order. The purpose of the Protocol Order was to maintain and ensure the confidentiality of the settlement discussions so as to encourage a full, frank and free discussion among the parties. The Insider Settlement Protocol also served to maximize the likelihood of a settlement and avoid the burden, expense and delay of protracted litigation, while at the same time ensuring the confidentiality of all "Settlement Communications" in connection with such efforts. The Applicant facilitated the approval and implementation of the Protocol Order, which was agreed to by the Chapter 11 Trustee and the Insiders, incorporated into the final Protocol Order [Adv. Dkt. No. 96, as amended by 99], and was entered by this Court, after hearing, on April 18, 2013.

Applicant assisted and counseled the Chapter 11 Trustee in connection with his extensive negotiations with the Insiders, which spanned many months and focused on a variety of complex issues and legal theories. Ultimately, the Chapter 11 Trustee, in consultation with Applicant, the Committee and the PSC, entered into a Plan Support and Funding Agreement to resolve the claims and potential claims between and among the Insiders and the NECC estate. Applicant additionally worked to gain this Court's Approval of the Plan Support and Funding Agreement,

which was preliminarily approved by order of this Court dated July 31, 2014, subject to approval

of the related third-party releases and channeling injunctions in connection with confirmation of

the Plan. *See Settlement Approvals* [Dkt. Nos. 790-792]. This Court confirmed the *Third*

*Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* on May 20, 2015

[Dkt. No. 1355]. These Insider Settlements ultimately contributed over $100 million to the

NECC estate, with $55,818,887.84 already disbursed from escrow to the Post-Confirmation

Officer.

MDL Mediations and Settlements

Separate and apart from the Chapter 11 Trustee's Insider Settlement Protocol efforts in

the Adversary Proceeding, the Chapter 11 Trustee, along with the PSC and the Official

Committee, worked in the MDL Proceeding, with the assistance of the Applicant, to develop a

plan for facilitating and obtaining settlement contributions from non-NECC affiliates including,

but not limited to, NECC's commercial vendors, which are several of the "National Defendants",

and the Provider Defendants, such as pain clinics and other healthcare providers, and their

respective insurers, which faced potential liability to NECC and tort victims in connection with

the Outbreak. On August 5, 2013, after months of extensive negotiations, the Plan Proponents

submitted the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured*

*Creditors for Order Approving Mediation Program* [MDL Dkt. No. 374]. Later that day, the

PSC filed a revised proposed order regarding a mediation protocol highlighting its disagreements

with the Plan Proponent's original submission. [MDL Dkt. No. 375]. In relevant part, the PSC

and Chapter 11 Trustee materially disagreed over key points in the mediation protocol including,

but not limited to discovery requirements and who would hear disputes under the protocol. The

Chapter 11 Trustee was concerned that the PSC proposals would deter mediation participation if

the Court adopted the PSC's discovery requirements.  With the assistance of the Applicant, the Chapter 11 Trustee advocated for the mediation protocol advocated by the Chapter 11 Trustee.

On August 9, 2013, Applicant appeared before the MDL Court at a status conference and discussed, in part, the proposed mediation protocols.  At the request of the MDL Court, the Chapter 11 Trustee, advised and assisted by Applicant, and the Official Committee negotiated and submitted, a revised procedural order relating to the proposed mediation program [MDL Dkt. No. 388, Exhibit A].  On August 15, 2013, over the objection of several parties [MDL Dkt. No. 392], the MDL Court entered the Mediation Order establishing the MDL Mediation Program for non-NECC affiliates [MDL Dkt. No. 394].

### **National Defendants**

### ARL Bio Pharma

On September 20, 2013, ARL Bio Pharma, the company that provided testing services to NECC with respect to MPA and other products, filed a notice of participation in the MDL Mediation Program [MDL Dkt. No. 442].  On April 1 and 2, 2014, the Chapter 11 Trustee, representatives of ARL and its insurer, counsel for the Official Committee and an individual member of the Official Committee, and the PSC, though counsel, attended in-person mediation sessions in Boston supervised by Carmen Reiss of Resolutions LLC (which firm was appointed as mediator under the MDL Mediation Program).  The April 2, 2014 mediation session concluded successfully, with the parties reaching an agreement on the essential financial terms of a settlement, pursuant to which ARL Bio Pharma and its insurer would contribute $6.4 million to the settlement fund.  Despite reaching an agreement in principle on the financial terms, however, the parties continued to negotiate for many months over other material settlement terms.  The

ARL Bio Pharma settlement agreement was finalized and executed on December 4, 2014, more than eight months after the parties had reached an agreement in principle.

<u>Victory</u>

On September 23, 2013, Victory, the company that installed the heating and ventilation systems at NECC, filed a notice of participation in the MDL Mediation Program. [MDL Dkt. No. 445]. On July 21 and July 23, 2014, the Chapter 11 Trustee, representatives of Victory and its insurers, the Official Committee and the PSC, attended in-person mediation sessions in Boston, MA supervised by Carmen Reiss of Resolutions LLC. The July 23, 2014 mediation day concluded successfully with the parties reaching an agreement on the essential financial terms of a settlement, pursuant to which Victory and its insurers would contribute $5.5 million to the NECC settlement fund.

In ongoing negotiations, which lasted several months, the Chapter 11 Trustee, supported by Applicant, worked to finalize the additional terms and wording of the Victory Settlement Agreement, which agreement was finalized and executed on November 11, 2014.

<u>Liberty</u>

On November 18, 2013, Liberty, the entity charged with design, manufacture and installation of the "cleanrooms" in which NECC's products were compounded, filed a notice of participation in the MDL Mediation Program. [MDL Dkt. No. 580]. On May 28, 2014, the Chapter 11 Trustee, representatives of Liberty, Great American (Liberty's Insurer), the Official Committee and the PSC attended an in-person mediation session supervised by Carmen Reiss of Resolutions LLC.

Although the parties were unable to reach an agreement on that day (and indeed, on June 13, 2014, Liberty formally withdrew from the MDL Mediation Program [MDL Dkt. No. 1196]),

negotiations and litigation activities with Liberty, supported by the Applicant, continued intermittently. Indeed, on September 24, 2014, the Chapter 11 Trustee participated in a conference call with Judge Rya Zobel of the MDL Court in a further effort to reach a settlement with Liberty. That conference, however, was also unsuccessful.

Despite their lack of success in formal mediation, the Chapter 11 Trustee at Liberty's last minute request, agreed to renew his settlement efforts with Liberty by phone and email until a settlement in principle was reached in late March of 2015. Additional ongoing negotiations resulted in the parties' agreement to the terms of the Liberty Settlement Agreement whereby Liberty and Great American would contribute $1 million to the Chapter 11 Trustee for use in making distributions under the Plan, including, but not limited to distributions pursuant to the Tort Trust.

On April 20, 2015, the Chapter 11 Trustee and Official Committee filed the Liberty Settlement Motion [Dkt. No. 1219]. This Court approved that settlement on May 19, 2015. [Dkt. No. 1349], at the Confirmation Hearing.

UniFirst

In early 2014, Unifirst, the company that provided cleaning services to NECC, including with respect to the clean room in which the MPA was prepared, the PSC, Official Committee, and the Chapter 11 Trustee began the possibility of resolving claims against UniFirst through mediation. In June and July of 2014, the PSC and UniFirst, with the participation of the Chapter 11 Trustee as a party, agreed to mediate privately, outside of the MDL Mediation Program. As the parties agreed to private mediation, Applicant engaged in negotiations in an effort to reach an agreed mediation protocol under which David Geronemus of JAMS Arbitration, Mediation, and ADR Services would serve as the mediator. In the late summer and early fall of 2014, the

Chapter 11 Trustee, with assistance and counsel from the Applicant, reviewed and commented on mediation briefing prepared by the PSC, supporting its positions on legal claims, injuries and defenses, and reviewed all of the mediation briefs and materials submitted to the mediator in preparation for the mediation.

On October 7, 2014, the Chapter 11 Trustee participated in a day-long in-person mediation session. Though limited progress was made, no resolution was reached during this mediation. Following this mediation session, the parties continued to engage in extensive negotiations through discussions with the mediator, both separately and together, to seek resolution. On February 22, 2015, the parties executed a settlement agreement in which UniFirst agreed to contribute $30.5 million to the NECC estate. The Chapter 11 Trustee notified this Court of the UniFirst settlement on February 23, 2015.

### Provider Defendants

Inspira

During the second half of 2013, Inspira agreed to participate in a private mediation program with the Official Committee, PSC and the Chapter 11 Trustee before Professor Eric Green, who had been designated by the MDL Court as the lead mediator in the MDL's Mediation Program. However, because the parties agreed to private mediation, Applicant engaged in substantial negotiations in an effort to reach an agreed mediation protocol with respect to that mediation.

Beginning in the fall of 2013 and continuing through June 2014, the Chapter 11 Trustee, represented by the Applicant, members of the Official Committee, Counsel for the Official Committee, members of the PSC and members of the NJ-PSC Subcommittee engaged in numerous pre-mediation conference calls with Professor Green, in which the parties engaged in

the good-faith exchange of information in preparation for mediation. In addition, the Applicant
reviewed and commented on mediation briefing prepared by the PSC, supporting its positions on
legal claims, injuries and defenses.

After reviewing all of the mediation briefs and materials and engaging in pre-mediation
calls with representatives of the PSC and Official Committee who participated in the mediation,
on July 2 and July 24, 2014, Applicant actively participated in lengthy, contentious in-person
mediation sessions on behalf of the Chapter 11 Trustee in New York City. The July 24, 2014
mediation session concluded successfully, with the parties reaching an agreement on the
essential financial terms pursuant to which Inspira and its insurers would contribute $16 million
to the settlement fund. Following the successful mediation, the Chapter 11 Trustee, supported by
the Applicant, negotiated the terms of a written settlement agreement. On February 13, 2015, the
Inspira Settlement Agreement was presented to this Court as part of the Plan Supplement filing.
[Dkt. No. 1123].

### The Virginia Mediation

From August 2014 through February 2015, the Chapter 11 Trustee, represented and
supported by the Applicant, along with counsel for the Virginia plaintiffs, counsel for the
Virginia defendants, Lead Counsel in the MDL Proceeding, representatives from Insight Health
Corporation, the PSC and the Official Committee, agreed to participate in private mediation. As
this mediation did not fall within the parameters of the MDL Mediation Program, the parties
negotiated extensively to reach an agreed-to mediation protocol. Upon reaching an agreement,
the parties actively participated in a prolonged, extensive mediation program. The Virginia
mediation included approximately eleven full days of "in-person" mediation sessions with two
mediators held in Boston and Virginia and a settlement conference in the MDL Court with the

direct involvement of the Hon. Rya W. Zobel and Hon. Jennifer C. Boal.  The parties additionally participated in lengthy settlement calls and written communications outside the presence of the mediators in an attempt to reach an agreement.

After the foregoing extensive, and often exhaustive, negotiations, the Virginia mediation resulted in a Settlement and Release Agreement in February 2015, whereby the Virginia defendants and Insight would pay $40 million for the benefit of the Virginia claimants (the "Insight Settlement Agreement").  The Insight Settlement Agreement was presented to this Court as part of the Plan Supplement filing on February 13, 2015. [Dkt. No. 1123].

### **High Point**

On September 3, 2014, High Point filed a notice of participation in the MDL Mediation Program. [MDL Dkt. No. 1393].  Prior to engaging in mediation, the Chapter 11 Trustee, with assistance and counsel of the Applicant, reviewed and commented on mediation briefing prepared by the PSC, supporting its positions on legal claims, injuries and defenses.

After reviewing all of the mediation briefs and submissions and consulting in advance with the PSC and Official Committee representatives participating in the mediation, the Chapter 11 Trustee participated in a lengthy in-person mediation session on September 16, 2014, in Boston, Massachusetts supervised by Carmen Reiss of Resolutions LLC, which concluded late in the evening.  The High Point mediation session concluded successfully and resulted in an agreement on essential financial terms pursuant to which High Point would contribute $3.5 million to the settlement fund.

In the months following the mediation, the Chapter 11 Trustee, counseled by the Applicant, engaged in extensive negotiations to finalize the terms and wording of a settlement

agreement. The High Point settlement agreement was finalized and executed on December 3, 2014.

### Additional Mediation Efforts

In addition to the successful mediation efforts described above, the Chapter 11 Trustee and Applicant engaged in additional efforts at reaching settlements through negotiations and telephone conference calls with non-affiliated defendants in Florida and Michigan. Those efforts were not successful. However, the Chapter 11 Trustee correctly recognized at the outset that those mediations were likely to prove unsuccessful and, accordingly, did not commit significant time and effort with respect to them.

### Litigation Concerning Preservation and Disposal of NECC Property

On December 13, 2012, the District Court for the District of Massachusetts entered its *Order as to the Preservation of Potential Evidence by New England Compounding Pharmacy, Inc.* [Dkt. No. 110 in D. Mass. Case No. 12-12052] (the "Preservation Order"), which required the preservation of all potential evidence within the possession, custody and/or control of NECC. In an effort to minimize the costs incurred to the estate in preserving that property and all of NECC's related premises in Framingham indefinitely and maximize the amount of funds available to creditors (particularly the personal injury tort and wrongful death claimants), the Chapter 11 Trustee, with the assistance of Applicant, engaged in litigation to seek relief, in whole or in part, from the Preservation Order.

In May 2013, Applicant led the Chapter 11 Trustee's efforts to obtain relief from the Preservation Order to allow the Chapter 11 Trustee to reject leases, return leased equipment, and reduce the portion of leased premises remaining in NECC's possession. [MDL Dkt. Nos. 147-148]. In response, the USAO filed a statement of interest in which the USAO did not object to

the relief sought by the Chapter 11 Trustee, but proposed the imposition of certain notice procedures in the event relief were to be granted to alleviate concerns regarding spoliation of evidence. [MDL Dkt. No. 149]. Following a hearing in the MDL Court in connection with the *Trustee's Motion for Entry of An Order Granting Limited Relief From the Preservation Order* [MDL Dkt. Nos. 147-148], Applicant engaged in extensive negotiations with the USAO to create a protocol to facilitate future modifications of the Preservation Order should the Chapter 11 Trustee subsequently seek to dispose of additional NECC property that was subject to the Preservation Order. The USAO and the Chapter 11 Trustee ultimately submitted a joint proposed order [MDL Dkt. No. 173], which was entered by the MDL Court [MDL Dkt. No. 177] (the "Modifying Order"). Following the entry of the Modifying Order, Applicant engaged in briefing and argument regarding certain requests for preservation initiated by various parties [MDL Dkt. Nos. 234, 264, 289, 315, 319, 330 and 340].

In June 2014, the Chapter 11 Trustee determined that it was in the best interests of the NECC estate and its creditors to sell or otherwise dispose of all remaining NECC property and to vacate, in whole or in part, the Framingham premises leased by NECC. Accordingly, Applicant initiated the previously negotiated notice protocols to further modify the Preservation Order. [MDL Dkt. No. 1174]. Applicant then received and responded to the preservation requests of three parties. [MDL Dkt. Nos. 1214, 1215, 1219 and 1308]. Applicant additionally engaged in preservation discussions with two additional parties, which did not file preservation requests.

On August 12, 2014, after hearing, the MDL Court ordered, among other things, that the Chapter 11 Trustee, prior to any further modification of the Preservation Order, allow access to the Framingham facility for three days in August 2014 to any counsel who wished to inspect the facility and any items remaining at the facility. [MDL Dkt. No. 1332]. In accordance with the

MDL Court's Order, Applicant facilitated site visits on August 20-22, 2014, and on September 18, 2014, the Chapter 11 Trustee filed his *Report Regarding Status of Preservation Issues* [MDL Dkt. No. 1433]. Following the filing of the *Report Regarding Status of Preservation Issues* [MDL Dkt. No. 1433], several parties continued to seek the preservation of certain items of NECC property. Accordingly, Applicant engaged in extensive negotiations with the parties seeking continued preservation and ultimately reached an agreement with those entities, which proposed agreement was accepted by the MDL Court in November, 2014. [MDL Dkt. Nos. 1527, 1538]. Entry of the November 2014 *Agreed Order Granting Relief from Preservation Order to Permit Chapter 11 Trustee To Sell or Otherwise Dispose of Remaining NECC Property*, granted the Chapter 11 Trustee the relief from the Preservation Order necessary to continue his efforts to liquidate the NECC estate assets in an effort to maximize the funds available to creditors of the estate.

The Applicant seeks payment in the amount of $2,093,334.30, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Litigation. A detailed description of all of the services rendered in connection with Litigation is attached hereto as <u>Exhibit L</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (x) LITIGATION (T011) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 33.5 | $711.00 | $23,818.50 |
| Jeffrey D. Sternklar | Partner | 2013 | 71.1 | $657.00 | $46,712.70 |
| Jeffrey D. Sternklar | Partner | 2014 | 205.0 | $670.50 | $137,452.50 |
| Michael R. Gottfried | Partner | 2013 | 360.8 | $630.00 | $227,304.00 |
| Michael R. Gottfried | Partner | 2014 | 427.8 | $661.50 | $282,989.70 |
| Michael R. Gottfried | Partner | 2015 | 85.7 | $697.50 | $59,775.75 |
| C. Mitchell Goldman | Partner | 2014 | 2.5 | $616.50 | $1,541.25 |
| Paul D. Moore | Partner | 2013 | 411.8 | $625.50 | $257,580.90 |
| Paul D. Moore | Partner | 2014 | 637.6 | $652.50 | $416,034.00 |

| Paul D. Moore | Partner | 2015 | 136.2 | $675.00 | $91,935.00 |
|---|---|---|---|---|---|
| Michael R. Lastowski | Partner | 2013 | 119.3 | $715.50 | $85,359.15 |
| Michael R. Lastowski | Partner | 2014 | 113.5 | $715.50 | $81,209.25 |
| Michael R. Lastowski | Partner | 2015 | 59.7 | $751.50 | $44,864.55 |
| Michael B. Donahue | Partner | 2015 | 6.2 | $495.00 | $3,069.00 |
| Stephen Johnson | Associate | 2014 | 361.1 | $369.00 | $133,245.90 |
| Stephen Johnson | Associate | 2015 | 3.4 | $387.00 | $1,315.80 |
| Patricia H. Heer | Associate | 2013 | 213.1 | $369.00 | $78,633.90 |
| Jennifer L. Mikels | Associate | 2013 | 14.2 | $283.50 | $4,025.70 |
| Jennifer L. Mikels | Associate | 2014 | 11.2 | $306.00 | $3,427.20 |
| Jennifer L. Mikels | Associate | 2015 | 5.5 | $337.50 | $1,856.25 |
| Jarret P. Hitchings | Associate | 2013 | 90.5 | $310.50 | $28,100.25 |
| Jarret P. Hitchings | Associate | 2014 | 32.1 | $337.50 | $10,833.75 |
| Jarret P. Hitchings | Associate | 2015 | 5.0 | $369.00 | $1,845.00 |
| Stephen E. Johnson | Associate | 2013 | 92.7 | $355.50 | $32,954.85 |
| Stephanie Lenkiewicz | Paralegal | 2013 | 7.1 | $175.50 | $1,246.05 |
| Stephanie Lenkiewicz | Paralegal | 2014 | 1.5 | $184.50 | $276.75 |
| Stephanie Lenkiewicz | Paralegal | 2015 | 1.1 | $193.50 | $212.85 |
| Katherine A. Angelo | Paralegal | 2013 | 39.8 | $283.50 | $11,283.30 |
| Katherine A. Angelo | Paralegal | 2014 | 21.8 | $297.00 | $6,474.60 |
| Katherine A. Angelo | Paralegal | 2015 | 0.2 | $315.00 | $63.00 |
| Virginia L. Weeks | Paralegal | 2013 | 51.4 | $283.50 | $14,571.90 |
| Mai P. Zaymaris | Law Clerk | 2015 | 7.3 | $247.50 | $1,806.75 |
| Shannon K. Miller | Research Specialist | 2015 | 0.4 | $243.00 | $97.20 |
| Shannon Thompson | Practice Support | 2013 | 4.3 | $252.00 | $1,083.60 |
| Justin Fields | Practice Support | 2014 | 1.3 | $256.50 | $333.45 |
| **TOTAL** | | | 3635.7 | | $2,093,334.30 |

## 11.  Plan and Disclosure Statement (T013).

This category includes all matters related to the preparation, review, analysis, and negotiation of, and any objection to the Plan and Disclosure Statement.

### The Negotiation and Drafting of the Plan and Disclosure Statement

During the Application Period, the Applicant participated in the extensive, and protracted, negotiation and drafting of the Plan, the Disclosure Statement and related solicitation procedures.  These negotiations included counsel to the Official Committee and Lead Counsel to the PSC, as well as counsel to the Contributing Parties and counsel to the Insiders.  Each of the

Contributing Parties and the Insiders wanted to ensure that the Plan and Disclosure Statement were consistent with their settlement agreements, especially with respect to the scope and enforceability of the Third-Party Release and Injunctions.  Duane Morris had to balance the interests of those parties in being protected under the Plan against the limits which applicable law imposes upon the scope of plan releases and injunctions.  Duane Morris researched the related confirmation issues (*e.g.*, classification of creditors, the scope of permissible Plan releases, subordination of claims for contribution and indemnity, the availability of third-party releases in liquidating Chapter 11 cases, *etc.*)

Plan drafting also required consideration of the sophisticated tax issues that underlay the Insider Settlement.  Duane Morris also negotiated the terms of the Tort Trust Agreement and related procedures for the resolution of personal injury claims.

### The Disclosure Statement Hearing

The Plan Proponents' efforts culminated in the filing of the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for Order (I) Approving the Plan Proponents' Disclosure Statement, (II) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Plan Proponents' Joint Plan of Reorganization, (III) Approving the form of Various Ballots and Notices in Connection therewith, (IV) Scheduling Certain Dates with Respect thereto, and (v) Granting Related Relief* [Dkt. No. 1055] on December 3, 2014.  Although, at the time of the filing of the Disclosure Statement, the Plan had broad support, several creditors filed objections to the Disclosure Statement: (1) the *Limited Objection of the Tennessee Plaintiffs to the Disclosure Statement* [Dkt. No. 1117]; (2) the *Response and Objection to the Joint Motion of the Chapter 11 Plan Proponents and the Official Committee of Unsecured Creditors for Order approving the Plan Proponents' Disclosure Statement*, filed by

Premier Orthopaedic Associates and others [Dkt. No. 1118]; (3) the *United States Trustee's Objection and Reservation of Rights with Respect to the Corrected Disclosure Statement for Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1119]; (4) *Objection of Liberty Industries, Inc. to the Corrected Disclosure Statement for Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1128]; (5) *ARL Biopharma, Inc. d/b/a Analytical Research Laboratories' Comments in Support of the Approval of the Disclosure Statement and Noticing Procedures* [Dkt. No. 1129][18]; (6) the *Tennessee Clinic Creditors' Limited Objection to Corrected Disclosure Statement* [Dkt. No. 1130]; (7) *Nazareth Hospital and Mercy Health Systems Objection to the Disclosure Statement* [Dkt. No. 1131]; and (8) *The Objection of Rothman Institute and William Anderson to the Disclosure Statement* [Dkt. No. 1132]. All of these objections were resolved consensually prior to or during the Disclosure Statement Hearing, with the exception of the objection of the UST, which was overruled. In response to some objections, Duane Morris amended the Plan and Disclosure Statement prior to solicitation. Finally, in response to certain inquiries of this Court at the Disclosure Statement Hearing, Duane Morris and counsel to the Official Committee filed the *Memorandum of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors Submitting Certain Authorities in Support of the Plan Proponents' Joint Motion to Approve the Disclosure Statement*. [Dkt. No. 1178]

---

[18] Although this document was couched as a "Statement in Support" and ARL Biopharma, Inc.("ARL") stated no "objection" to approval of the Disclosure Statement, ARL had requested service on certain parties beyond that which was proposed in the Chapter 11 Trustee and the Official Committee's solicitation and noticing procedures and Duane Morris cooperated in accommodating ARL through and beyond the date of the Disclosure Statement Hearing, and the Chapter 11 Trustee ultimately negotiated a resolution with ARL pursuant to which it engaged DRC, at its expense, to provide the additional notice ARL had requested.

<u>**Events leading up to the Confirmation Hearing**</u>

After the Disclosure Statement Hearing, the Chapter 11 Trustee continued to negotiate a possible settlement with Liberty Industries.  As set forth above, these negotiations were successful.  The Plan Proponents therefore filed the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order Approving Plan Support and Settlement Agreement with Liberty Industries, Inc.* [Dkt. No. 1219] (the "<u>Liberty Settlement Motion</u>").

Certain creditors (specifically, clinics and healthcare providers that are now or may in the future become defendants in actions arising from their administration of NECC products to patients) advised the Plan Proponents that, although these creditors did not object generally to the Third-Party Releases and Injunctions, they would object to confirmation of the Plan to the extent that these provisions might preclude them from allocating fault or comparative fault among these creditors and the Released Parties in connection with lawsuits pending against those creditors relating to NECC.  After lengthy negotiations initiated by the Chapter 11 Trustee and pursued with counsel to some 35 creditors seeking to preserve their ability to assert comparative fault allocation, the Plan Proponents and those creditors executed Stipulations and Agreed Orders (the "<u>Comparative Fault Stipulations</u>") resolving these issues on the terms that the Chapter 11 Trustee had proposed.

The Comparative Fault Stipulations provided that the Plan Proponents would modify the Plan in a way that, on the one hand, would allow other parties to the Comparative Fault Stipulations, to name the Debtor and/or Tort Trust, as successor in interest to the Debtor and/or applicable Non-Insurer Contributing Party, as parties to a civil action, solely for purposes of preserving defenses and allocation of liability based upon fault or comparative fault, but that, on

the other hand, would provide that neither the Chapter 11 Trustee, the Post-Confirmation Officer, any Non-Insurer Contributing Party nor the Tort Trustee shall (a) be named a party in any underlying civil action; (b) be required to enter an appearance in any such action; or (c) be subject to entry of an adverse judgment in any such action.  In return, the parties to the Stipulation agreed to waive any and all claims against the estate, including all of their multi-million dollar claims for contribution and indemnification, as of the Effective Date of the Plan. As a result, the estate was relieved of millions in such claims without incurring the expense of contested matters to disallow them.

The Plan Proponents filed *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for Approval of Stipulations and Orders Relating to Preservation of Certain Parties' Rights to Seek Comparative Fault Allocations Under the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Request for Ex Parte or Expedited Determination and Limitation of Notice* [Dkt. No. 1289], filed May 8, 2015 (the "Motion to Approve Comparative Fault Stipulations").

Both the Comparative Fault Stipulations and the Liberty settlement required that the Plan be amended.  The Plan Proponents did not believe that these amendments required re-solicitation and therefore, on May 12, 2015,  filed  the *Joint Motion of the Chapter 11 Trustee and the Official Committee of Unsecured Creditors for an Order approving Non-Material Modifications to the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and Request for Expedited Determination and Limitation of Notice* [Dkt. No. 1311] (the "Motion to Approve Non-Material Plan Modifications").

Prior to the Confirmation Hearing Duane Morris supervised DRC's implementation of the solicitation procedures and responded to creditor inquiries relating to the Plan and the

Disclosure Statement. Duane Morris and counsel to the Official Committee also prepared a confirmation brief, which, among other things, addressed the principal legal issues raised during the case concerning the Plan. *See Plan Proponents' Memorandum of Law in Support of Confirmation of the First Amended 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1240]. Duane Morris and counsel to the Official Committee also prepared a *Reply Memorandum of Law (i) in Response to Objection to Confirmation of the First Amended 11 Plan of New England Compounding Pharmacy, Inc.* [Dkt. No. 1310].

Duane Morris also participated in continuing discussions with counsel to the Official Committee and lead counsel to the PSC relating to the selection of the Tort Trustee.

The Chapter 11 Trustee and the Applicant reviewed and assisted in the preparation of declarations in support of confirmation. Duane Morris prepared for and attended the Confirmation Hearing on May 19, 2015, at which this Court entered orders confirming the Plan, approving the Liberty Settlement Motion, approving the Motion to Approve Comparative Fault Stipulations and approving the Motion to Approve Non-Material Plan Modifications.

The Applicant seeks payment in the amount of $682,558.65, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with the Plan and Disclosure Statement. A detailed description of all of the services rendered in connection with Plan and Disclosure Statement is attached hereto as Exhibit M. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (xi) PLAN AND DISCLOSURE STATEMENT (T013) | | | | | |
|---|---|---|---|---|---|
| **Timekeeper** | **Title** | **Year** | **Hours** | **Hourly Rate** | **Total Fees** |
| Jeffrey D. Sternklar | Partner | 2013 | 0.8 | $657.00 | $525.60 |
| Jeffrey D. Sternklar | Partner | 2014 | 167.9 | $670.50 | $112,576.95 |
| Michael R. Gottfried | Partner | 2015 | 1.0 | $697.50 | $697.50 |

| Paul D. Moore | Partner | 2013 | 5.0 | $625.50 | $3,127.50 |
|---|---|---|---|---|---|
| Paul D. Moore | Partner | 2014 | 149.2 | $652.50 | $97,353.00 |
| Paul D. Moore | Partner | 2015 | 215.2 | $675.00 | $145,260.00 |
| Michael R. Lastowski | Partner | 2014 | 11.5 | $715.50 | $8,228.25 |
| Michael R. Lastowski | Partner | 2015 | 297.4 | $751.50 | $223,496.10 |
| William Heuer | Partner | 2014 | 0.7 | $639.00 | $447.30 |
| Jarret P. Hitchings | Associate | 2015 | 153.0 | $369.00 | $56,457.00 |
| Stephen Johnson | Associate | 2014 | 49.2 | $369.00 | $18,154.80 |
| Stephen Johnson | Associate | 2015 | 27.5 | $387.00 | $10,642.50 |
| Stephanie Lenkiewicz | Paralegal | 2015 | 28.9 | $193.50 | $5,592.15 |
| **TOTAL** | | | 1107.3 | | $682,558.65 |

## 12. Regulatory Matters (T015).

This category includes all matters related to regulatory issues, including compliance with applicable regulations and investigation by or reporting to applicable regulatory authorities, including the United States Attorney's Office (the "USAO").

During the Application Period, the Applicant and the Chapter 11 Trustee negotiated the Debtor's voluntary surrender of its pharmacy licenses with the State of Tennessee, the State of New Mexico, the State of Ohio, the State of Vermont and the State of North Carolina. In some instances, regulatory authorities had sought to terminate the Debtor's license and to impose fines. With regard to New Mexico, Ohio, Vermont and North Carolina, the Applicant was able to negotiate a voluntary surrender of the Debtor's license and a waiver of any penalties or fines. With regard to Tennessee, Applicant negotiated a voluntary surrender of the Debtor's license pursuant to a stipulation which granted to Tennessee an allowed claim in the amount of $5 million, subordinate for purposes of distribution and voting, to the claims of tort claimants and other general unsecured creditors of NECC. [Dkt. 792-2, approved at Dkt. 973].

During the Application Period, the Applicant responded to several grand jury subpoenas served by the USAO in connection with pending criminal matters, which resulted in two site

visits and sealed motion practice in the District of Massachusetts and in this Court.[1]  Applicant

also engaged in discussions with the FDA concerning the recall of NECC's products and

provided to the FDA access to NECC's lock box in order to permit the FDA to collect the

recalled products.

The Applicant seeks payment in the amount of $135,711.00, which reflects Applicant's

discounted rates, for work performed during the Application Period in connection with

Regulatory Matters.  A detailed description of all of the services rendered in connection with

Regulatory Matters is attached hereto as Exhibit N.  The following chart is a summary of the

time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (xii) REGULATORY MATTERS (T015) | | | | | |
|---|---|---|---|---|---|
| Timekeeper | Title | Year | Hours | Hourly Rate | Total Fees |
| Thomas B.K. Ringe | Partner | 2013 | 0.2 | $711.00 | $142.20 |
| Jeffrey D. Sternklar | Partner | 2013 | 2.5 | $657.00 | $1,642.50 |
| Jeffrey D. Sternklar | Partner | 2014 | 16.1 | $670.50 | $10,795.05 |
| Michael R. Gottfried | Partner | 2013 | 44.6 | $630.00 | $29,502.90 |
| Michael R. Gottfried | Partner | 2015 | 2.2 | $697.50 | $1,534.50 |
| Paul D. Moore | Partner | 2013 | 69.8 | $625.50 | $43,659.90 |
| Paul D. Moore | Partner | 2014 | 8.3 | $652.50 | $5,415.75 |
| Paul D. Moore | Partner | 2015 | 0.4 | $675.00 | $270.00 |
| Frederick R. Ball | Partner | 2013 | 4.6 | $544.50 | $2,504.70 |
| Frederick R. Ball | Partner | 2014 | 7.2 | $571.50 | $4,114.80 |
| Michael R. Lastowski | Partner | 2013 | 8.9 | $715.50 | $6,367.95 |
| Michael R. Lastowski | Partner | 2014 | 4.9 | $715.50 | $3,505.95 |
| Michael R. Lastowski | Partner | 2015 | 0.4 | $751.50 | $300.60 |
| Patricia H. Heer | Associate | 2013 | 0.1 | $369.00 | $36.90 |
| Jennifer L. Mikels | Associate | 2014 | 10.5 | $306.00 | $3,213.00 |
| Stephen E. Johnson | Associate | 2013 | 18.6 | $355.50 | $6,612.30 |
| Stephen E. Johnson | Associate | 2014 | 43.4 | $369.00 | $16,014.60 |
| Stephen E. Johnson | Associate | 2015 | 0.2 | $387.00 | $77.40 |
| TOTAL | | | 242.9 | | $135,711.00 |

---

[1] At the request of the Court, the Applicant will provide a further description of the work in connection with the matter for *in camera* review.  The Applicant refrains from providing a detailed description of these filings, as all litigation described herein was conducted under seal.

### 13. Relief from Stay Proceedings (T016).

This category includes all matters related to the imposition of the automatic stay, and efforts to seek relief therefrom.

During the Application Period, a number of creditors had either commenced or intended to commence litigation in state court filed motions seeking relief from the stay to pursue their claims. They argued that they should be granted relief from the stay in order to proceed against NECC's insurers only (*i.e.,* not against NECC directly). These motions for relief from stay included:

*Motion of Margaret Hanson for Relief from Stay Re: Civil Case #M1CV2012-04645* [Dkt. No. 147] (the "Hanson Lift Stay Motion");

*Motion for Relief from Stay Re: MDL2419 1:13cv-1063-FDS* [Dkt. No. 630] (the "Fusco Lift Stay Motion") and *Memorandum in Support of the Motion for Relief from Stay Re: MDL2419 1:13cv-1063-FDS* [Dkt. No. 631];

*Motion for Relief from Stay Re: MDL 1:13cv-10626-FDS* [Dkt. No. 632] (the "York Lift Stay Motion");

*Motion of Plaintiffs Irene and Joseph Phillips, Norman Montague, and Ronald and Tammy Driscoll for Relief from Stay Re: Claim MDL 2419* [Dkt. No. 663] (the "Phillips Lift Stay Motion");

*Motion of Liberty Industries, Inc. to Modify the Automatic Stay* [Dkt. No. 870] (the "Liberty Lift Stay Motion");

*Motion of Saint Thomas Entities and Ascension Parties Pursuant to 11 U.S.C. § 362 for Relief from the Automatic Stay* (the "St. Thomas Lift Stay Motion") [Dkt. No. 991]; and

*Motion by Premier Orthopaedic to Modify the Automatic Stay* (the "Premier Lift Stay Motion") [Dkt. No. 996].

Because such suits, nevertheless, ran the risk of depleting estate assets, the Applicant opposed these motions for relief (or partial relief) from the automatic stay. The Applicant prepared and filed the following objections to motions seeking relief from stay:

*Objection to the Motion of Margaret Hanson for Relief from Stay* [Dkt. No. 159]

73

*Objection of the Chapter 11 Trustee to Liberty Industries, Inc.'s Motion to Modify the Automatic Stay* [Dkt. No. 937].

*Objection to Motion of Saint Thomas Entities and Ascension Parties Pursuant to 11 U.S.C. Chapter 362 for Relief from Automatic Stay* [Dkt. No. 998].

*Objection to the Motion by Premier Orthopaedic to Modify the Automatic Stay* [Dkt. No. 1008].

The lift-stay motions were resolved as follows:

Margaret Hanson filed a *Motion to Withdraw* the Hanson Lift Stay Motion [Dkt. No. 203], which was granted;

The court entered orders granting the York Lift Stay Motion [Dkt. No. 634], the Phillips Lift Stay Motion [Dkt. No. 694]; and the Liberty Lift Stay Motion [Dkt. No. 969].

The court entered agreed-to orders resolving the Saint Thomas Lift Stay Motion [Dkt. No. 1032] and the Premier Lift Stay Motion [Dkt. No. 1029].

The Applicant seeks payment in the amount of $37,664.10, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Relief from Stay Proceedings.  A detailed description of all of the services rendered in connection with Relief from Stay Proceedings is attached hereto as <u>Exhibit O</u>.  The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (xiii)  RELIEF FROM STAY PROCEEDINGS (T016) | | | | | |
|---|---|---|---|---|---|
| **Timekeeper** | **Title** | **Year** | **Hours** | **Hourly Rate** | **Total Fees** |
| Jeffrey D. Sternklar | Partner | 2013 | 12.2 | $657.00 | $8,015.40 |
| Jeffrey D. Sternklar | Partner | 2014 | 9.7 | $670.50 | $6,503.85 |
| Michael R. Gottfried | Partner | 2013 | 0.3 | $630.00 | $189.00 |
| Paul D. Moore | Partner | 2013 | 1.6 | $625.50 | $1,000.80 |
| Paul D. Moore | Partner | 2014 | 2.5 | $652.50 | $1,631.25 |
| Paul D. Moore | Partner | 2015 | 0.5 | $675.00 | $337.50 |
| Michael R. Lastowski | Partner | 2015 | 2.2 | $751.50 | $1,653.30 |
| Patricia H. Heer | Associate | 2013 | 28.6 | $369.00 | $10,553.40 |
| Jarret P. Hitchings | Associate | 2015 | 0.2 | $369.00 | $73.80 |
| Stephen E. Johnson | Associate | 2014 | 19.1 | $369.00 | $7,047.90 |
| Stephen E. Johnson | Associate | 2015 | 1.7 | $387.00 | $657.90 |
| **TOTAL** | | | **78.6** | | **$37,664.10** |

74

### 14.    Tax Issues (T019).

This category includes all matters related to issues involving federal, state, or local taxation.

During the Application Period, the Applicant worked with the Chapter 11 Trustee's advisors with respect to the preparation and filing of federal, state and local tax returns. In addition, Applicant, where appropriate, assisted the Chapter 11 Trustee in seeking and obtaining extensions of time in which to file tax returns. Finally, Applicant analyzed the complex tax issues relating the Chapter 11 Trustee's settlement with the Debtor's Insiders. That settlement includes a tax refund in the anticipated amount of $21,800,000.

The Applicant seeks payment in the amount of $12,967.20, which reflects Applicant's discounted rates, for work performed during the Application Period in connection with Tax Issues. A detailed description of all of the services rendered in connection with Tax Issues is attached hereto as <u>Exhibit P</u>. The following chart is a summary of the time expended, at the discounted hourly rates indicated, by the Applicant in this category:

| (xiv)  TAX ISSUES (T019) | | | | | |
|---|---|---|---|---|---|
| **Timekeeper** | **Title** | **Year** | **Hours** | **Hourly Rate** | **Total Fees** |
| Jeffrey D. Sternklar | Partner | 2013 | 0.1 | $657.00 | $65.70 |
| Jeffrey D. Sternklar | Partner | 2014 | 8.7 | $670.50 | $5,833.35 |
| Paul D. Moore | Partner | 2013 | 5.1 | $625.50 | $3,190.05 |
| Paul D. Moore | Partner | 2014 | 4.1 | $652.50 | $2,675.25 |
| Paul D. Moore | Partner | 2015 | 0.2 | $675.00 | $135.00 |
| Michael R. Lastowski | Partner | 2013 | 0.1 | $715.50 | $71.55 |
| Stephen E. Johnson | Associate | 2014 | 2.7 | $369.00 | $996.30 |
| **TOTAL** | | | 21.0 | | $12,967.20 |

## IV.     LEGAL BASIS FOR ALLOWANCE OF REQUESTED FEES

The requirements for the approval of professional fees and related expenses all set forth

in *In re Boston & Maine Corp.*, 776 F.2d 2 (1st Cir. 1985) and in *In re Bank of New England

Corp.*, 134 B.R. 450 (Bankr. D. Mass. 1991).  Requested compensation must be reasonable and

for actual and necessary services in compliance with 11 U.S.C. § 330(a)(1).  *Boston & Maine

Corp.*, 776 F.2d at 7.

The First Circuit has stated that it will determine the reasonableness of requested fees by

utilizing the lodestar analysis.  *Id.* at 6-7.  *See also Grendel's Den, Inc. v. Larkin*, 749 F.2d 945,

950 (1st Cir. 1984).  Under the lodestar analysis, a threshold point of reference or "lodestar" is

established.  That is the number of hours reasonably spent by each attorney multiplied by his

reasonable hourly rate.  The lodestar can then be adjusted up or down to reflect a variety of

factors.  *Boston & Maine Corp.*, 776 F.2d at 7.  The strict principle of economy, whereby

attorneys in bankruptcy cases were expected to be paid less than attorneys practicing in other

specialties, has been abandoned under 11 U.S.C. § 330.  *See*  3 Collier on Bankruptcy, ¶330.05 at

330-33 and 330-34 (15th ed. 1990).

One court has identified the factors to be examined in reviewing the reasonableness of the

lodestar. *See In re First Software Corp.*, 79 B.R. 108, 112-113 (Bankr. D. Mass. 1987). These

factors include the following:

> (a)     The time and labor required.  The time that Duane Morris devoted to the
> case was absolutely necessary in light of the need to negotiate, draft and
> confirm a plan of reorganization as quickly as possible in order to provide
> timely compensation to thousands of victims of the Outbreak.
> Confirmation issues were complex and contentious and the negotiations
> with all of the various constituents and their counsel with often conflicting

views and concerns to secure overwhelming support for the Plan were extraordinarily complex and protracted.

(b)    The novelty and difficulty of the questions involved.  As set forth above, this case presented novel and difficult issues, including, amongst many others, the fundamental issues relating to the availability of essential third party releases and the authority of the MDL Court to transfer state court cases against non-debtor parties.  These novel and difficult questions made resolution of confirmation issues especially challenging in the absence of controlling authority.

(c)    The skill necessary to properly perform the legal services.  In light of the novelty and difficulty of the issues and the substantial opposition that the Chapter 11 Trustee initially faced from counsel to personal injury and wrongful death plaintiffs,  Duane Morris needed to demonstrate the highest skill in order to achieve the extraordinary results in this case. Initially, many constituents were not interested in cooperating to confirm a plan of reorganization.  Instead, many wanted to pursue piecemeal litigation that threatened to deplete the potential recoveries of other creditors.  Averting all of the efforts of individual plaintiffs to pursue their own claims to the detriment of competing ones, bringing them all under the jurisdiction of a single court and then forging consensus required a high level legal skill and negotiating prowess.

(d)    The preclusion of other employment by the attorney or firm due to acceptance of the case.  The Chapter 11 Trustee is a member of Duane

77

Morris. This case occupied almost all of Mr. Moore's time, from the Appointment Date to the Effective Date, frequently including nights and weekends throughout the more than two and one-half years of his involvement.

(e)     The customary fees charged. Duane Morris is charging the Debtor's estate its customary fees, discounted by ten percent throughout the case. The discount with respect to the $4,298,124.45 requested aggregates to $429,812.45.

(f)     Whether the fee is fixed or contingent. Although Duane Morris was not retained to administer the case entirely on a "contingent" basis, the firm's compensation was *de facto* contingent upon the confirmation of a plan of liquidation. Failure to secure confirmation of the Plan would have resulted in a complete, multi-million dollar loss by the Chapter 11 Trustee and his firm with respect to the commitment of thousands of hours over a period of two and one-half years.

(g)     Time limitations imposed by the court or the client. The circumstances of the case imposed extraordinary time limitations upon the Chapter 11 Trustee. For example, absent a prompt transfer of cases to the MDL Court, available insurance coverage might have been exhausted or severely depleted by a few early verdicts and settlements. In addition, the thousands of victims of the Outbreak would not be compensated until the confirmation of a plan, and it was important to commence those distributions as soon as possible. Many of the victims of the Outbreak and

their families were regularly reported to be suffering substantial personal and financial hardship with the passage of time, unable to pay the costs of continuing medical treatment and necessary prescriptions, and no longer able to work and pay their living expenses, as such settlement efforts proceeded simultaneously on multiple fronts to secure a resolution as quickly as possible.

(h)     The amount of money involved in the case and the results obtained.  As set forth above, over $200 million will be paid to creditors in the case. The results obtained were extraordinary and far exceeded anyone's expectations under the circumstances faced by the Chapter 11 Trustee.

(i)     The experience, reputation, and ability of the attorney.  As set forth in the biographies attached hereto as Exhibit G, the discounted rates charged by the Duane Morris attorneys who performed services for the Chapter 11 Trustee are well-supported by their experience, reputation and ability;

(j)     The undesirability of the case.  Throughout the more than two and one-half years this case was pending, it presented very great challenges, with a correspondingly daunting risk of nonpayment of extraordinary fees and expenses.

A review of these factors thus demonstrates that this Court should grant this Application.

Duane Morris respectfully submits that the lodestar should be set at the agreed discounted hourly rates charged by Duane Morris, and that the number of hours spent and the hourly rates are reasonable and consistent with the customary charges of law firms in the Boston metropolitan area for the services of attorneys of equivalent experience and expertise both in bankruptcy cases

and non-bankruptcy cases.  The hourly rates charged by Duane Morris for the services of its attorneys, paralegals and legal assistants are its regular and customary national standard hourly rates, all discounted throughout the Chapter 11 Case by ten percent.  In this case, the blended hourly rate for which Duane Morris seeks allowance and payment is $334.65.

The services rendered by Duane Morris were necessary to the performance of its duties and the performance of the Chapter 11 Trustee's responsibilities.  Duane Morris believes that the compensation requested herein is reasonable in light of the size and complexity of this case, the results obtained, the demands for prompt action, the efficiency with which the services were performed and the uncertainties and risks of the engagement.

Based on the foregoing evaluation of the standards used to determine the reasonableness of the requested fees, Duane Morris submits that its fees are reasonable, and submits that the lodestar should be set at Duane Morris' ordinary and customary national standard hourly rates, discounted as set forth above.

## V.    **EXPENSES**

Duane Morris incurred actual, necessary expenses in the amount of $63,599.64 during the Application Period for which they seek reimbursement as counsel to the Chapter 11 Trustee.  All of the expenses were actual and necessary and are reimbursable in light of the demands of this case.  A copy of the expenses during the Application Period is attached hereto as Exhibit Q.

### Summary of Total Expenses Incurred During the Application Period

| DESCRIPTION | TOTAL |
|---|---|
| Air Travel | $6,325.38 |
| Car Rental | $275.31 |
| Color Printing & Duplicating - Internal | $297.75 |
| Court Costs | $1,595.69 |
| Deposition Transcript | $1,285.55 |
| Dinner | $121.91 |
| Document Retrieval | $461.08 |

| Filing Fees | $546.00 |
|---|---|
| Lexis Legal Research | $24,273.78 |
| Meeting Expense | $6,839.24 |
| Messenger Service | $404.77 |
| Miscellaneous | $96.80 |
| Other Professionals | $32.40 |
| Overnight Mail | $772.59 |
| Overtime Related Costs | $396.32 |
| Pacer Federal Docket Costs | $4,181.10 |
| Postage | $1,165.49 |
| Printing & Duplicating | $6,180.15 |
| Professional Services | $369.00 |
| Taxi Fares | $413.13 |
| Telephone | $117.59 |
| Travel Away from Home | $3,101.25 |
| Travel Local | $1,046.26 |
| Travel Other | $8.26 |
| Trial Transcripts | $390.30 |
| Westlaw Legal Research | $2,904.00 |
| **TOTAL** | **$63,601.10** |

**WHEREFORE,** Duane Morris respectfully requests this Court enter an order:

(a)      Allowing this Application;

(b)      Awarding Duane Morris authorizing final fees in the amount of $4,268,124.45 and final expenses in the amount of $63,601.10 in connection with its services as counsel to the Chapter 11 Trustee, plus an additional $30,000.00 on account of those fees for preparation of this Application which could not be included prior to the August 3, 2015 filing deadline, as well as estimated fees for attendance at any Hearing on the approval of this Application and related preparation; and

Case 1:13-md-02419-RWZ   Document 1810-11   Filed 09/23/15   Page 88 of 88

        (c)      Awarding Duane Morris such other and further relief as this Court deems just and proper.

Dated: August 3, 2015
      Boston, Massachusetts

**DUANE MORRIS LLP**

By: /s/ Michael R. Lastowski
Michael R. Lastowski, Esq.
(admitted *pro hac vice*)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
mlastowski@duanemorris.com

*Counsel to the Chapter 11 Trustee*