# EXHIBIT J

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>NEW ENGLAND COMPOUNDING PHARMACY, INC.,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 12-19882-HJB |

## PLAINTIFFS' STEERING COMMITTEE'S LIMITED OPPOSITION TO PAUL D. MOORE'S APPLICATION FOR FEES AND EXPENSES IN HIS CAPACITY AS CHAPTER 11 TRUSTEE [ECF NO. 1420]

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND.........................................3

III.    ARGUMENT .....................................................................................................4

      A.     Bankruptcy Code §330 establishes the standard for determining "reasonable compensation" for a Chapter 11 trustee. ...............................4

            1.    A plain reading of the statutory language instructs courts to first determine if a fee is reasonable using the factors enumerated in §330(a)(3), and then ensure the reasonable figure does not exceed the statutory limits described in §326(a). ................................................................................6

            2.    The BAPCPA did not change the determination for calculating fees for a Chapter 11 trustee. .....................................7

            3.    The First Circuit has used and continues to use a "lodestar-style" approach to determine a reasonable fee for Chapter 11 trustees. ..............................................................................8

            4.    The First Circuit and its bankruptcy courts have refused requests for enhancements to lodestar fees even in cases of extraordinary duration and complexity. .......................................8

      B.     Full payment of the Chapter 11 Trustee's reported lodestar is the reasonable compensation in accordance with §330 of the Bankruptcy Code. ..............................................................................10

            1.    The Chapter 11 Trustee's reported lodestar amount satisfies the mandatory factors of §330(a)(3). .......................................11

            2.    The Chapter 11 Trustee told this Court he would be offering his services at a 10% discount. Even at this discounted rate, he will be the highest paid individual in this bankruptcy. ...............................................................13

            3.    The 8% holdback for payment of common benefit fees in the MDL is less than the total common benefit hours claimed. ................................................................................14

      C.     The novelty and difficulty of the questions involved were not so great as to justify an enhancement and were shouldered by multiple parties including the Trustee's counsel, the PSC, the Creditors' Committee and their counsel. ............................................16

            1.    The Chapter 11 Trustee, his counsel, the Creditors' Committee, the PSC, and others worked together to settle claims to compensate NECC's victims. ...................................16

2. The PSC provided the Trustee with comprehensive work product establishing the liability of third-party defendants, and led several mediations resulting in substantial settlement amounts.................................................................18

    a. UniFirst settlement........................................................19

    b. ARL settlement ...........................................................19

    c. Victory settlement.......................................................20

    d. Highpoint settlement...................................................20

    e. Virginia (Insight) settlement.......................................21

    f. Inspira settlement........................................................22

3. Not all creditors have been paid in full, and not all creditors have agreed to pay the Trustee more than his lodestar. ............................23

4. It is an open question whether the excellent outcome achieved through the Chapter 11 Plan bests a theoretical resolution through traditional mass tort channels. ....................................23

D. The Trustee and Duane Morris are allocating time between their respective applications in order to maximize their total recovery. ........................24

E. Proceeding under Chapter 11 was a voluntary and necessary decision by NECC, the Trustee, the Creditors' Committee, the PSC, and this Court.................................................................................25

IV. CONCLUSION.................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Zimmerman*, 73 F.3d 1164 (1st Cir. 1996)............................................................8

*Blum v. Stenson*, 465 U.S. 886 (1984) ..................................................................................8

*Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir. 1985)............................................7, 8

*Connolly v. Harrelson*, 33 F. Supp. 2d 92 (D. Mass. 1999) ................................................8

*In re ASARCO, LLC*, 751 F.3d 291 (5th Cir. 2014)...........................................................8, 9

*In re Bank of New England*, 484 B.R. 252 (D. Mass. 2012)........................................7, 10, 16, 23

*In re Bank of New England Corp.*, 134 B.R. 450 (D. Mass. 1991) ................................7, 8, 10, 16

*In re Borrego Springs Dev. Corp.*, 253 B.R. 271 (S.D. Calif. 2000) ...................................6

*In re C&D Dock Works, Inc.*, 437 B.R. 443 (M.D. Fla. 2010)..........................................6, 7

*In re Claudio*, 459 B.R. 500 (D. Mass. 2011) ......................................................................7

*In re Clemens*, 349 B.R. 725 (D. Utah 2006) .......................................................................7

*In re Coyote Ranch Contractors, LLC*, 400 B.R. 84 (N.D Tex. 2009)..................................6

*In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3d Cir. 2012) .........................................25

*In re Fred Laberge*, 380 B.R. 277 (D. Mass. 2008) ............................................................7

*In re Geoffrey A. Rowe*, 750 F.3d 392 (4th Cir. 2014) .........................................................7

*In re Marlar*, 315 B.R. 81 (Bankr.W.D.Ark. 2004)............................................................7

*In re Miniscribe*, 309 F.3d 1234 (10th Cir. 2002) ...............................................................7

*In re Molten Metal Tech.*, 345 B.R. 26 (D. Mass. 2006) ...............................................9, 16

*In re Narragansett Clothing Company*, 210 B.R. 493 (1st Cir. 1997) ..............................6, 8

*In re Phillips*, 392 B.R. 378 (Bankr. N.D. Ill. 2008) ...........................................................7

*In re Salgado-Nava*, 473 B.R. 911 (9th Cir. 2012)...........................................................6, 7

*In re Scoggins*, 517 B.R. 206 (E.D. Cal. 2014) ...................................................................7

*In re Smuggler's Beach Props., Inc.*, 149 B.R. 740 (D. Mass. 1993)...................................7

*In re Ward*, 418 B.R. 667 (W.D. Pa. 2009) ...................................................................7

*In re Wolverine Proctor & Schwartz, LLC*, 2012 WL 3930360 (Bankr. D. Mass. Sept. 10, 2012) .........................................................................................................................7

*Lipsett v. Blanco*, 975 F.2d 934 (1st Cir. 1992) .......................................................8, 9

*Matter of England*, 153 F.3d 232 (5th Cir 1998) ...........................................................6

*Nilsen v. York Cnty.*, 400 F. Supp. 2d 266 (D. Me. 2005) ............................................8

## FEDERAL: STATUTES

11 U.S.C.A. § 326 ...................................................................................................5, 6, 7

11 U.S.C.A. § 330 .................................................................................................. passim

Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. 109-8 (2005) ....................................................................................................................5, 6, 7

## OTHER AUTHORITIES

Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613 (2008) ...................................................................................... 25

# I.      INTRODUCTION

Paul D. Moore, the Chapter 11 Trustee, provided substantial services within the constraints of the bankruptcy process to enable a successful resolution that will benefit many tort victims.  The Plaintiffs' Steering Committee (PSC)[1] compliments his work and his diligence. The PSC does not object to Mr. Moore receiving his full reported lodestar amount as Trustee – $1,433,191.60, including expenses – consistent with §330 of the Bankruptcy Code and precedent in this circuit.

The PSC does object to Mr. Moore's claim for an award over and above the written contracted fee.  He is not entitled to, and the law does not provide for, a Chapter 11 trustee to receive a commission, nor is he entitled to an enhancement of $2.5 million over his lodestar (as indicated in his modified request).  While Mr. Moore's work has been exemplary, this is not the case to make new law and further reduce the already insufficient amounts available to NECC's victims.  Accordingly the PSC hereby opposes – in limited respects – the Application of Paul D. Moore, in his capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., for Final Allowance of Commission and Reimbursement of Expenses.[2]

More recently, the U.S. Trustee has indicated that his request has been reduced from $5.75 million to $3.75 million through negotiations with Mr. Moore.  For the following reasons, the PSC respectfully objects to this modified figure (presenting the $2.5 million kicker) and believes that reasonable compensation for Mr. Moore is instead his full reported lodestar amount, as trustee, which is approximately $1.433 million, including expenses.

First, Mr. Moore is a Chapter 11 trustee.  The Bankruptcy Code is clear and unambiguous: a court *must* determine compensation for a Chapter 11 trustee using the factors enumerated in

---

[1] The PSC is the court-appointed committee representing victims' interests in the ongoing related multidistrict litigation.  The 322 tort claimants whose interests are so represented are identified in Schedule A hereto.

[2] Dkt. No. 1420 (hereinafter "Moore Application").

§330(a)(3).  In the First Circuit, courts consider these factors to be consistent with a lodestar analysis, *i.e.* paying a trustee for hours spent in benefit to the trust at a reasonable hourly rate.

Second, Mr. Moore indicated to this court that he and appointed counsel, Duane Morris, LLP, were calculating their billing rate at a 10% discount.  Mr. Moore is now asking for a commission worth two-and-a-half times his reported lodestar as trustee.  His requested billing rate is now $2,162 per hour.  At no time did Mr. Moore or any stakeholder bargain for this sharp increase in billing rate and compensation.

Third, courts rarely give enhancements to a trustee's lodestar and no compelling reason exists to do so here.  While the PSC agrees with Mr. Moore that this case presented difficult circumstances and that the trustee committed substantial hours and effort to compensate victims, no man is an island.  Many shared in this work:  (i) his own law firm, Duane Morris, submitted a separate application for fees and expenses totaling approximately $5 million, of which Mr. Moore billed over $1.4 million; (i)  counsel to the Creditors' Committee, Brown Rudnick, has requested millions of dollars; (iii) members in and outside the PSC established liability against NECC and third-party defendants, and led many of the settlement mediations.  In short, the case needed a village to get resolved.

Finally, Mr. Moore contends that he should be awarded a commission because this case more closely resembles a Chapter 7 bankruptcy.  NECC formally filed this bankruptcy under Chapter 11.  It remained a Chapter 11 case throughout.  As this Court has acknowledged, in order for Mr. Moore to execute settlement agreements with non-debtors, it was necessary to proceed under Chapter 11:  if this bankruptcy had proceeded as a Chapter 7 liquidation, NECC's victims would have been unable to seek compensation for their injuries.  In this circuit, Chapter 7 trustees are not entitled to a per se commission.  The court should not grant Mr. Moore an

additional $2.65 million out of the pockets of victims simply because this case shares some qualities with Chapter 7 bankruptcies.

The Bankruptcy Code and case law are clear:  Mr. Moore is entitled to his lodestar, no more, and nothing in this case or work performed merits a bonus of over 200% – to a billing rate of more than $2,100 an hour.  Scrutiny is especially necessary since NECC's creditors have compromised their claims and most are not receiving the amounts that might have been available had they "rushed to the courthouse" and litigated as individuals.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

NECC formally filed its voluntary Chapter 11 petition ("Petition") on December 21, 2012,[3] following a four-day site inspection ordered by the United States District Court in Boston.[4]

On January 8, 2013, the United States Trustee filed his Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee.[5]  This Court ordered the appointment of a Chapter 11 trustee and on January 25, 2013, appointed Paul D. Moore as Chapter 11 Trustee (the "Trustee" or "Mr. Moore").[6]

On January 18, 2013, the United States Trustee appointed a nine-member Creditors' Committee pursuant to Bankruptcy Code § 1102(a)(1).  Of the nine members of the Committee, eight were tort creditors and each of their attorneys acted as their respective representatives on the Committee.  On January 18, 2013, the Committee hired Brown Rudnick, LLP as its counsel.

---

[3] Dkt. No. 1.

[4] Order On Plaintiff's Motion To Adopt State Court Orders Granting Motion To Permit Inspection Of Premises Of Defendant, *Erkan v. New England Compounding*, 12-cv-12052 (Dec. 10, 2012 M.J. Boal), Dkt. No. 100.

[5] Dkt. No. 41.

[6] Dkt. Nos. 98, 99.

[7]. Brown Rudnick agreed to offer its services at a "steep discount" because of "the great harm (including more than 40 deaths) suffered by the Debtor's creditors and the significant public interest in ensuring that this Committee has available to it the highest quality representation at greatly less than the market rate for such services."[8]

On February 12, 2013, the Judicial Panel on Multidistrict Litigation consolidated all related federal actions nationwide in the United States District Court for the District of Massachusetts.  The MDL Court appointed Lead Counsel to chair the PSC, present the position of plaintiffs in all pretrial proceedings, and to "coordinate and lead discussions with the Court, plaintiffs' counsel and other stakeholders" and any later negotiations regarding resolution of claims are reasonably efficient and productive.[9]  Pursuant to the Court's order, Lead Counsel was involved in all settlement discussions "whether taking place in the MDL or the bankruptcy."[10]  The PSC members' responsibilities, in relevant part, were to "negotiate and propose settlement of cases on behalf of plaintiffs or plaintiff groups, including . . . pursuing all settlement options concerning any claim or portion thereof of any case filed in this litigation."[11]

## III.    ARGUMENT

### A.    Bankruptcy Code §330 establishes the standard for determining "reasonable compensation" for a Chapter 11 trustee.

A court "may award" a Chapter 11 trustee "reasonable compensation" under §330 of the Bankruptcy Code.  To determine what is reasonable, a court "*shall* consider the nature, the extent, and the value of such services" including the following factors:

---

[7] Dkt. No. 121.  On February 22, 2013, this Court approved Brown Rudnick's retention as counsel to the Committee *nunc pro tunc* to January 18, 2013

[8] Application for Authority to Employ and Retain Brown Rudnick LLP as Counsel for the Official Committee of Unsecured Creditors, Dkt. No. 1414-1 at 7.

[9] Order Appointing Lead Counsel and Plaintiffs' Steering Committee, MDL Dkt. No. 82, at 3.

[10] *Id.* at 4.

[11] *Id.* at 7.

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. [12]

After auditing a trustee's lodestar using the §330(a) factors, §330(7) requires compensation to be capped by §326's "Limitation on compensation of trustee."[13]  Section 326(a) caps the compensation as:

*not to exceed* 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and *reasonable compensation not to exceed* 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.[14]

The 2005 Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") amended §330 in two important ways.[15]  First, subsection 7 was added to state, "In determining

---

[12] 11 U.S.C.A. §330(a)(3).

[13] "(7) In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326."

[14] 11 U.S.C.A. §326(a) (emphasis added).

[15] Pub. L. 109-8 (2005). Section 326 was not amended.

the amount of reasonable compensation to be awarded to a trustee, the court shall treat such

compensation as a commission, based on section 326." Second, §330(a)(3) was changed from:

> "In determining the amount of reasonable compensation to be awarded,"

to:

> "In determining the amount of reasonable compensation to be awarded to an examiner, *trustee under chapter 11,* or professional person…" (emphasis added). This change mandates a

court to consider the §330 factors for Chapter 11 trustee compensation and then to determine if

that fee exceeds the ceiling set forth in §326(a).

1. **A plain reading of the statutory language instructs courts to first determine if a fee is reasonable using the factors enumerated in §330(a)(3), and then ensure the figure does not exceed the statutory limits described in §326(a).**

Under the BAPCPA, courts determining proper compensation for a Chapter 11 trustee

"shall consider" the relevant factors of §330(a)(3), and then must ensure that the amount does not

exceed the statutory maximum  established in §326(a).[16] The ordinary language makes clear that

§326(a) is a ceiling, not a presumed entitlement.[17] Construing the statute to mandate an

automatic award of the statutory maximum would lead to an irrational result. First, a court

would utilize the §330 factors, as explicitly instructed by the statute, to determine whether the

Chapter 11 trustee's requested compensation was reasonable. The court would then take that

determination, crumple it into a ball, throw it in the garbage, and grant the trustee a

"presumptive" fee commission.

---

[16] *In re Borrego Springs Dev. Corp.*, 253 B.R. 271, 276 (S.D. Calif. 2000) ("Once reasonable fees are determined according to [section 330(a)], a trustee's fees are cut down, if required, to the statutory maximum stated in section 326(a), which limits the compensation of a Chapter 7 or 11 trustee to a percentage of the money distributed to creditors.").

[17] *In re Salgado-Nava*, 473 B.R. 911, 919 (9th Cir. 2012); *see also In re Narragansett Clothing Company*, 210 B.R. 493, 497 (1st Cir. 1997); *Matter of England*, 153 F.3d 232, 236 (5th Cir 1998); *In re Coyote Ranch Contractors, LLC*, 400 B.R. 84, 94 (N.D Tex. 2009); *In re C&D Dock Works, Inc.*, 437 B.R. 443, 445 (M.D. Fla. 2010) (Section 326(a) constitutes compensation caps and not entitlements.").

2. **The BAPCPA did not change the determination for calculating fees for a Chapter 11 trustee.**

Before the BAPCPA, some courts wrestled with the interplay between §326 and §330 when determining the compensation for Chapter 7 and 11 trustees.[18]

Since the BAPCPA, while some courts have held that §326(a) is a presumptive fee commission for *Chapter 7, 12, and 13* trustees,[19] no court has interpreted §326 to create a presumptive fee for a Chapter 11 trustee. All courts have recognized that in a Chapter 11 bankruptcy, a lodestar analysis utilizing the §330(a)(3) factors remains operative.[20] This includes courts that hold §326 creates a presumptive fee for Chapter 7 trustees.[21] In this district, courts have held that even for Chapter 7 and Chapter 13 trustees, the lodestar approach is still the correct method to use.[22]

---

[18] A majority of courts, including the First Circuit, employed the lodestar approach because it was functionally similar to the §330(a)(3) factors. *See Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir. 1985); *In re Bank of New England Corp.*, 134 B.R. 450 (D. Mass. 1991); *In re Smuggler's Beach Props., Inc.*, 149 B.R. 740 (D. Mass. 1993). Other courts, believing that the lodestar approach might undercompensate exceptional trustees, granted awards based on a percentage "fee analogous to a common fund recovery, measured by the maximum permitted under 11 U.S.C. §326." *In re Clemens*, 349 B.R. 725, 730 (D. Utah 2006) (citing *In re Marlar*, 315 B.R. 81, 84 (Bankr.W.D.Ark. 2004)); *see also In re Miniscribe*, 309 F.3d 1234, 1241-1242 (10th Cir. 2002) (citing Am. Bankr.Inst., *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases*, 206 (G.R. Warner rep. 1991)).

[19] *Id.* at 921; *see also In re Geoffrey A. Rowe*, 750 F.3d 392, 396-97 (4th Cir. 2014) (noting that §330(a)(3) factors apply to Chapter 11 trustees and holding "we can rightly assume that Congress said what it meant and meant what it said when it chose to include the term "shall" in §330(a)(7)"); *In re Ward*, 418 B.R. 667, 674-75 (W.D. Pa. 2009); *In re Scoggins*, 517 B.R. 206, 212 (E.D. Cal. 2014). The First Circuit and this district court have consistently held that compensation for Chapter 7, 12, and 13 trustees is still subject to the §330(a)(3) factors and a statutory commission is not per se reasonable. See *Wolverine, Proctor & Schwartz, LLC*, 2012 WL 3930360 at *4 ("the court still must determine the reasonableness of the Chapter 7 trustee's commission, considering numerous factors relating to the work performed and value of services as well as consideration of the formula."); In re Clemens, 349 B.R. 725 (D. Utah 2006) ("the plain meaning of §330(a)(7) requires the Court to consider the provisions of §326 as a part of its reasonableness inquiry. In essence, the addition of §330(a)(7) to the Code serves to now supplement the Court's Lodestar analysis."); *In re C&D Dock Works, Inc.*, 437 B.R. 443 (M.D. Fla. 2010) ("[A] Chapter 7 trustee's compensation is to be held to a reasonableness standard pursuant to the plain, unambiguous language of these statutes. The commission calculations of Section 326(a) constitute compensation caps and not entitlements.").

[20] *Id.; see also In re Phillips*, 392 B.R. 378, 384 (Bankr. N.D. Ill. 2008)(quoting Eugene R. Wedoff, *Major Consumer Bankruptcy Effects of BAPCPA*, 1 U. Ill. L. Rev. 31, 58 (2007) ("Although new paragraph (a)(7) is not limited by its terms to chapter 7 trustees, chapter 11 trustees are expressly included in the list of professionals subject to §330(a)(3), and so it is doubtful the new paragraph applies to chapter 11 trustees.").

[21] *See Salgado-Nava*, 437 B. R. at 921 ("In the case of a chapter 11 trustee, this determination necessarily requires consideration of the § 330(a)(3) factors, and also ordinarily includes a lodestar analysis.").

[22] *In re Fred Laberge*, 380 B.R. 277, 281-82 (D. Mass. 2008) (Boroff, J.); *In re Claudio*, 459 B.R. 500, 511-13 (D. Mass. 2011); Bank of New England Corp, 484 B.R. 252, 283 (D. Mass. 2012) ("The statute is clear that the 3% is not an entitlement, nor is it presumed to be reasonable. It is a statutory cap that the court is to consider as part of its reasonableness inquiry. The proper starting point is the lodestar.").

3. **The First Circuit has used and continues to use a "lodestar-style" approach to determine a reasonable fee for Chapter 11 trustees.**

In the First Circuit, the reasonableness of a Chapter 11 trustee's fee request is determined by utilizing the "lodestar approach, which expands upon the criteria of §330(a)(1) . . . [and] requires the court to determine a reasonable hourly rate and apply it to the time reasonably expended, and then perhaps adjust by various factors."[23] Trustees are not prohibited from seeking a premium or multiplier in excess of the lodestar, but "such enhancements will be rare."[24] The burden is on the fee requester to establish that the rates they are charging are reasonable given the complexity of the action and the market trustee rate.[25] There is no presumption that a trustee is entitled to the amount he or she requests.[26]

4. **The First Circuit and its bankruptcy courts have refused requests for enhancements to lodestar fees even in cases of extraordinary duration and complexity.**

The First Circuit is famously strict in its approach to requests for lodestar enhancements.[27] Reiterating that "enhancements will be rare," the court has emphasized that "[t]he exception is a tiny one," and it will not be permitted "to eclipse the rule."[28]

---

[23] *In re Bank of New England Corp.*, 134 B.R. 450 (D. Mass. 1991) (citing *Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir. 1985); *see also Narragansett Clothing Co.*, 210 B.R. at 497-98.

[24] *Lipsett v. Blanco*, 975 F.2d 934, 942 (1st Cir. 1992). *Cf. Blum v. Stenson*, 465 U.S. 886, 899 (1984) (finding lodestar enhancement under fee-shifting statutes permissible only in a "rare" case).

[25] *Narragansett Clothing Co.*, 210 B.R. at 497-98 ("The Trustee bore the burden of proving that his $250 hourly fee was reasonable.").

[26] *Id.* at 499.

[27] *Nilsen v. York Cnty.*, 400 F. Supp. 2d 266, 272 (D. Me. 2005) ("The First Circuit is emphatic in rejecting multipliers to enhance the lodestar . . . the unenhanced lodestar figure is strongly presumed to be the reasonable attorney fee that the losing defendant should pay in a fee-shifting case."); *see also Adams v. Zimmerman*, 73 F.3d 1164, 1178 (1st Cir. 1996) (rejecting both a contingency enhancement and a results enhancement where lodestar rate was not inappropriate to the skills reflected and results obtained); *Connolly v. Harrelson*, 33 F. Supp. 2d 92, 98 (D. Mass. 1999), *aff'd* 201 F.3d 426 (1st Cir. 1999) ("The practice of multiplying the lodestar figure by an enhancement factor is seldom entertained in this Circuit.")

[28] *Lipsett*, 975 F.2d at 942; *see also In re ASARCO, LLC*, 751 F.3d 291 (5th Cir. 2014), *aff'd Baker Botts L.L.P v. ASARCO LLC*, 135 S. Ct. 2158 (2015). The *ASARCO* court approved 10-20% percent fee enhancements to counsel, but only for the work they performed on a particular piece of litigation (rather than, as requested, on the entire bankruptcy case). The court's calculation was based on "rare and exceptional" performance, including "a seven billion dollar judgment, which saves a company, and funds a 100% recovery for all concerned." *ASARCO, LLC*, 751 F.3d at 296.

8

Even where an applicant has performed well and the case's outcome is both substantial and unexpected, courts view the appropriate fee to be the lodestar itself.  In *In re Molten Metal Technology, Inc.*, Judge Somma acknowledged that the applicant law firm's performance was "at a high level of skill."   He went on to write, however, that the firm's experience and capabilities were the basis for its engagement and the justification for its rates.[29]  Despite that firm's unusual success, therefore, he ruled that "the rare and limited circumstances in which an upward adjustment is warranted are not here present."[30]

In *Lipsett*, the First Circuit overturned a district court's enhancement in a discrimination suit described – by the reviewing court – as a "stunning victory" for the plaintiff in a "long safari of a case" against an adversary who mounted a "Stalingrad defense."[31]  While recognizing "the strength of the attorneys' performance [and] the magnitude of their triumph," the court held that "an enhancement cannot be justified on the grounds of exceptional service and results," concluding:

> [W]e see nothing in the record that indicates that the services and
> results overshadowed, or somehow dwarfed, the lodestar.  In short,
> the lodestar fee, unembellished, represented the reasonable
> attorneys' fee. [32]

Thus, even in cases deemed exceptionally difficult, with results deemed "superb," the First Circuit holds that lodestar calculation, "unembellished" and unenhanced, yields the fair and reasonable fee.

In the *Bank of New England* matter, Judge Hillman noted that at the time the case was filed, it was the third largest bankruptcy in U.S. history and "remains unique in this district for

---

[29] 345 B.R. 26, 29 (D. Mass. 2006).

[30] *Id.*  The court denied the Trustee's counsel's request for an enhancement at least in part because "[r]esponsibility for the outcome is surely attributable to the team and not just one player."  *Id.*

[31] 975 F.2d at 942-43.

[32] *Id.* at 942-43.

both its size and complexity."[33]  At its conclusion in 2012, counsel to the Chapter 7 trustee

requested a 10% enhancement on its lodestar fees for a part of the litigation.  The enhancement

request was rejected.  The court noted the inappropriateness of considering factors that are

already built into the lodestar analysis – including the complexity or novelty of issues involved

and the quality of the services rendered.  The court noted that since  provision of "extremely high

value" to the estate was the reason the firm had been retained in the first place, "their lodestar

should be sufficient compensation."[34]

 Having rejected the trustee's counsel's request for a 10% enhancement in the *Bank of
New England* case, the court approved a small enhancement to the lodestar fee of the Chapter 7

trustee.[35]  However, the fact that the trustee's services were "of the highest quality and beneficial

to the estate," was not the justification for the enhancement since, "[t]hat is precisely why he was

elected."[36]  Rather, the court granted the enhancement because of the "substantial delay in

receipt."  In light of the delayed compensation, the enhancement addressed the value of money

over time, akin to a payment of interest on fees long deferred.[37]

**B. Full payment of the Chapter 11 Trustee's reported lodestar is the reasonable
compensation in accordance with §330 of the Bankruptcy Code.**

 If the Court awards the Trustee his full reported lodestar (~$1.433 million) and awards

the Trustee's firm its full reported lodestar (~$4.3 million), Mr. Moore and Duane Morris will

receive a total of ~$5.733 million and will be among the highest paid attorneys and firms

representing victims' interests in the NECC litigation.

---

[33] *Bank of New England Corp.*, 484 B.R. at 257.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 283.

[37] *Id.* at 283.

This is as it should be: the Trustee did an admirable job to maximize the benefit to NECC's victims. He used lawyers from his own firm leanly and kept a vigilant eye on costs across the board. The PSC, and the 322 claimants whom PSC counsel personally represent, do not object to the lodestar of the Trustee or his counsel. But the Trustee's request for an enhancement is not supportable under the circumstances or controlling First Circuit law.

1. **The Chapter 11 Trustee's reported lodestar amount satisfies the mandatory factors of §330(a)(3).**

In accordance with the Settlement Plan and §330, the Trustee's reported lodestar of $1,433,191.60 is reasonable compensation given the nature, extent, and value of his services. Anything above that figure would constitute an enhancement, which is not granted by the First Circuit absent extreme circumstances. No such circumstance exists here.

*330(a)(3)(A) time spent on such services*. The PSC does not object to the Chapter 11 Trustee's request for compensation for all his reported time. As described in his application, all of the Chapter 11 Trustee's hours are accounted for. The Trustee presented this court with detailed time records that "were prepared contemporaneously and reflect the date of such service, a description of the service, [and] the amount of time spent providing the service."[38]

*§330(a)(3)(B) rates charged for such services*. The Trustee states in his application that he wanted to increase the total recovery of NECC's victims by instituting cost-saving measures. This includes being solely responsible for some tasks to avoid duplication of effort,[39] attending meetings without counsel,[40] limiting expenses,[41] and offering his services and the services of his

---

[38] Moore Application at 38.

[39] Moore Application at 62 ("[H]is personal commitment to every aspect of this case eliminated the need for multiple attorneys to participate in the same tasks . . . .").

[40] Moore Application at 39 ("[T]his Application includes services in which the Chapter 11 Trustee acted in both capacities, as the Chapter 11 Trustee and Chapter 11 Trustee's counsel, without including any of this other counsel in assisting him.").

[41] *Id.* ("The relative expense to the estate . . . [is] remarkably modest.").

law firm at a discounted rate.[42]  The Trustee's discounted hourly rate is between $625.50 in 2013 and $675.00 in 2015.  The PSC is not objecting to these rates.  But if the Trustee is awarded a commission of $3,750,000, his hourly rate would be approximately $2,162 per hour:[43] more than three times his "discounted" hourly rate.

*§330(a)(3)(C): whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of [the case].* The PSC commends the Trustee and does not question the merits of the work completed by him.

*§330(a)(3)(D): whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed.* As all interested parties have acknowledged, settling the third-party suits quickly was of the utmost importance.  The PSC agrees that Mr. Moore was efficient with his time.

*§330(a)(3)(E): with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field:* The PSC agrees that the Trustee has demonstrated skill and experience.

*§330(a)(3)(F): whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title:* The PSC believes that the rates charged by Mr. Moore and his firm are reasonable.

---

[42] Moore Application at 38 n. 25. ("At the outset of this case, the Chapter 11 Trustee, and his firm acting as his counsel, offered a 10% discount on the hourly rates otherwise charged by them.").

[43] $3,750,000.00 / 1734.4 reported hours = $2,162.13.  Mr. Moore's requested compensation would be over two-and-a-half  times his lodestar ($3,750,000/$1,433,191.60 ~ 2.64).

2. **The Chapter 11 Trustee told this Court he would be offering his services at a 10% discount. Even at this discounted rate, he will be the highest paid individual in this bankruptcy.**

At the beginning of their engagement, Mr. Moore and his firm offered a 10% discount to their preferred hourly rate.[44] Even with that discount, Mr. Moore's blended rate is still nearly 40% higher than rates being charged by other similarly-situated professionals in this case.[45] The PSC does not object to this higher billing rate. The Chapter 11 Trustee and his firm are skilled professionals in the area of bankruptcy law. Mr. Moore's (and his firm's) experience is precisely the reason the Court approved his appointment as Chapter 11 Trustee, and their skill and experience are ingrained in their hourly rate.

The Chapter 11 Trustee's application shows a total of 1734.4 hours. The total lodestar claimed, excluding expenses, is $1,105,754.85. As a result, the Trustee's blended rate is $637.54 per hour. The Duane Morris ("DM") application shows a total of 7,624.6 hours. The total lodestar claimed is $4,298,124.45. As a result, the DM blended rate is $563.71.[46]

A comparison of the Trustee's hourly rate to that of other professionals in this matter shows that he is being handsomely compensated under the lodestar calculation. For example, the blended hourly rate for counsel to the Creditors' Committee, Brown Rudnick ("BR"), is $407.20.[47] The Trustee's blended rate is 56% higher than BR's blended rate, and his average rate of $651/hour (the average of his three rates over three years) is 56% higher than that of BR ($415/hour). As another example, the MDL court-appointed Tort Trustee, Lynne Riley, charges

---

[44] Moore Application at 38 n.25.

[45] *See* discussion *infra*, describing blended rates of Duane Morris, Brown Rudnick and Tort Trustee.

[46] The difference in blended rates is because the Trustee's time is primarily Mr. Moore's own time, while the DM submission contains time recorded by legal professionals at all levels.

[47] Summary of First and Final Application of Duane Morris LLP, Counsel to Paul D. Moore, Chapter 11 Trustee of New England Compounding Pharmacy, Inc. D/B/A New England Compounding Company, for Final Allowance of Compensation and Reimbursement of Expenses, Dkt. No. 1413, at 32.

a blended rate for herself and her colleagues of $350/hour.[48]  The Trustee's compensated blended

rate would be 82% higher than the blended rate charged by Ms. Riley and her colleagues, and the

DM compensated blended rate would be 61% higher.  If one compares Mr. Moore's average rate

to Ms. Riley's personal rate ($420/hour), then Mr. Moore's average rate of $651/hour (again, the

average of his three rates over three years) is 55% higher than Ms. Riley's personal rate.  Further,

special counsel representing NECC prior to this bankruptcy and later retained by Mr. Moore,[49]

Harris Beach, PLLC, submitted its interim fee disclosure statement on June 8, 2015, reporting a

blended rate of approximately $241.[50]

In effect, Mr. Moore's fee application seeks an inherent increase, depending on approach,

of over 50% above competitively derived trustee rates, and DM's firm application seeks an

inherent increase of more than a third above competitive rates.

### 3.    The 8% holdback for payment of common benefit fees in the MDL is less than the total common benefit hours claimed.

The Trustee contends that a $3.75 million commission is reasonable because it is less

than the MDL Court-approved 8% "common fund" for the compensation of plaintiffs' counsel.

This analogy is inappropriate.

In MDL Order No. 8, the Honorable Rya W. Zobel ordered 8% of actual recoveries

(including settlement amounts) received by participating parties (defined to include all lawyers

who represent plaintiffs in the MDL and excluding Mr. Moore) to be held back for a future

potential award to attorneys who performed work for the common benefit of all MDL plaintiffs.

---

[48] Plaintiffs' Steering Committee's Cross Motion to Appoint Lynne F. Riley Tort Trustee and Opposition to the Creditors' Committee's Motion to Appoint David J. Molton Tort Trustee, MDL Dkt. No. 1798, Exhibit 1.

[49] Application of Debtor for Order Approving Employment of Harris Beach PLLC as Special Counsel, Dkt. No. 36.

[50] Harris Beach PLLC Interim Fee Disclosure Statement for the Period of January 1, 2015 to March 31, 2015, Dkt. No. 1376.

The 8% holdback applies to settlement funds only *after* they have been deposited into the Tort Trust.[51]

First, the 8% is a Court-ordered holdback, not an award.  The PSC may ask for, and the Court may award, less than 8%, as Judge Zobel made clear in MDL Order No. 8: "At its discretion, this court may alter the percentage amount of the assessment, as future circumstances may require."[52]  Should the MDL court allocate the full 8% set aside for payment of common benefit fee claims, those fees will likely be allocated among dozens of law firms.  As of the filing of this motion, more than 21 firms have reported more than 32,000 hours in as-yet-unaudited common-benefit time.

Additionally, while the Trustee's requested fee is more than three times his lodestar, attorneys sharing in the MDL common-benefit fee will likely receive substantially *less* than their lodestars.  The reported lodestar of those firms seeking a common-benefit award in the MDL (before auditing, which is not complete) well exceeds the potential size of an 8% pot.  So far, the Trustee has disbursed $133,802,063.10 to the Tort Trust; 8% of that is $10.7 million.  The total, unaudited, common-benefit lodestar claimed to date is well in excess of $12 million.  As a result, it is likely that the awarded MDL common-benefit fees will be less than the lodestar presented to the MDL court.  This reality comports with the PSC's unwavering position – supported by the MDL court – that attorneys representing victims' interests should not expect record-breaking attorneys' fees in this case.

Finally, the analogy to the 8% common-benefit set aside also fails because mass tort common-benefit fees are allocated among all lawyers earning a fee, not to a single person.  Since

---

[51] The Trustee approved the language in the Order (originally proposed by the PSC) describing how and when the 8% holdback applied to settlement funds generated as part of the Chapter 11 Plan of reorganization.  There is no dispute between the PSC and the Trustee as to the amount or procedure for implementing the holdback.

[52] MDL Order No. 8 at 5.

Mr. Moore proposes his trustee and law firm fees be paid separately, as provided by the Code

under §330, those are the provisions that apply.

**C.     The novelty and difficulty of the questions involved were not so great as to justify an enhancement and were shouldered by multiple parties including the Trustee's counsel, the PSC, the Creditors' Committee and their counsel.**

As pointed out by Judge Hillman in *In re Bank of New England Corp.*, the presumption

that the lodestar is reasonable cannot be overcome by generalized rhetoric of "success" and

"value" but "only by a specific showing of exceptional activity without which the estate would

not have achieved the results obtained by other specialists of like background and rates, or

exceptional activity beyond that reasonably contemplated at the time of the original retention."[53]

It took a village to reach this resolution.  As the Trustee repeatedly acknowledged in his

submission, Duane Morris and the PSC contributed substantially.  In circumstances where "the

outcome is surely attributable to the team and not just one player," even a small enhancement to

a Chapter 11 trustee's lodestar is not reasonable.[54]

**1.     The Chapter 11 Trustee, his counsel, the Creditors' Committee, the PSC, and others worked together to settle claims to compensate NECC's victims.**

At the inception of this bankruptcy, NECC faced civil and criminal liability for its

actions.[55]  Nearly all of NECC's "creditors" were innocent people across the country hurt or

killed by contaminated products.[56]  NECC closed its doors and laid off all of its employees.[57]

NECC's limited assets were woefully insufficient to make whole those people whose lives were

ended or dramatically changed for the worse.  The chosen vehicle to compensate these thousands

of potential victims was for NECC, as a Chapter 11 debtor, to negotiate settlements with its

---

[53] *In re Bank of New England*, 484 B.R. at 280.

[54] *In re Molten Metal Tech.*, 345 B.R. 26, 29 (D. Mass. 2006).

[55] Moore Application at 4.

[56] *Id.* at 5.

[57] *Id.* at 4.

insurers, owners and other companies that played a role in harming these people.  The interested parties sought compromise.  Though the PSC was ready and willing to litigate its claims against each and every defendant, the outcome of these litigations were uncertain, potentially millions of dollars would need to be expended to effectively litigate, and victims could have been waiting years for compensation that might never materialize.

By order dated August 15, 2013, the MDL Court created a mediation program to facilitate and encourage settlements of tort claims with those defendants willing to participate. For nearly two years, multiple mediations were undertaken with third-party defendants, resulting in the settlements incorporated in the proposed Plan (the "Settlements").[58]  After a substantial expenditure of time and effort by the PSC, the Trustee, and counsel, the Plan netted a total of about $211,400,000.

Mr. Moore acknowledges that prosecution of this bankruptcy was a joint effort, stating that "*the Joint Plan is the product of two years of hard work by all of us.*"[59]  The settlements were accomplished by multiple players devoting thousands of hours of work, not by Mr. Moore alone.  For example, Duane Morris, the Chapter 11 Trustee's counsel, has submitted an application for fees that details 7,629.8 hours ($4,298,124.45).[60]  The narrative descriptions of work accomplished by Duane Morris closely tracks the Chapter 11 Trustee's including:  1) the motion to transfer personal injury claims to the MDL court,[61] 2) participating in mediations and

---

[58] Order on Mediation Program, MDL Dkt. No. 394.

[59] Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc., Dkt. No. 1352, Exhibit 4-A at 1 (emphasis added).

[60] DM Application at 30.

[61] *Compare* DM Application at 8-14 *with* Moore Application at 6-12.

acquiring settlement agreements with NECC and third-party defendants[62] and 3) drafting and garnering assent for the approval of the Settlement Plan.[63]

Members and appointees of the PSC also contributed substantial hours and effort to create the Settlement Plan. Duane Morris recognizes that, "as part of its effort to control costs and facilitate settlement by working with the PSC to obtain the information necessary to successfully mediate with the national and provider defendant the Chapter 11 Trustee engaged in informal discovery with the PSC."[64] The PSC spent thousands of hours establishing the liability of third parties and negotiating settlements, and significantly contributed to the Plan's adoption.

Establishing liability (or potential liability) is key to achieving a settlement. The Chapter 11 Trustee relied on the PSC, plaintiffs' attorneys with years of experience in these matters, to discover and draft the potential liability of each of the defendants. Many lawyers marshaled the liability evidence, took deposition testimony, formulated discovery, prepared, issued and served subpoenas, drafted complaints, reviewed thousands of pages of documents, drafted and presented mediation briefs, fought motions to dismiss and motions for summary judgment, and hired consultants with special expertise. No settlements would have been possible without these efforts.

**2. The PSC provided the Trustee with comprehensive work product establishing the liability of third-party defendants, and led several mediations resulting in substantial settlement amounts.**

Although Mr. Moore and his counsel took the lead role in settlement negotiations with the insiders, others played lead roles in the establishment of liability of NECC and also took the

---

[62] *Compare* DM Application at 14-19 *with* Moore Application at 12-18.

[63] *Compare* DM Application at 19-22 *with* Moore Application at 18-24.

[64] Moore Application at 50.

lead in developing the liability cases against other various national and provider defendants resulting in significant settlements.

### a.      UniFirst settlement

UniFirst, a cleaning company that provided services to NECC, settled for $30,500,00 on February 22, 2015.[65]  This settlement was spearheaded by many lawyers other than Mr. Moore who discovered, litigated, and argued UniFirst's liability.  On May 15, 2014, the PSC served UniFirst with a comprehensive discovery request regarding their cleaning of NECC's facilities.[66] The PSC and UniFirst, with agreement from the Trustee, mediated privately in October of 2014.[67]  The Chapter 11 Trustee and his counsel performed limited roles in this negotiation.[68] The PSC prepared comprehensive mediation briefs for this conference, but little headway was made.[69]  The PSC and UniFirst continued to have multiple discussions through the fall of 2014 leading to the $30.5 million settlement in February of 2015.[70]

### b.      ARL settlement

ARL Bio Pharma, a company that performed testing services for NECC, agreed to participate in the MDL Mediation Program in September, 2013.  The liability case against ARL was built by lawyers other than Mr. Moore.[71]  Through state-court discovery requests, thousands

---

[65] *Id.* at 29.

[66] Declaration of Thomas M. Sobol in Support of Approval of the UniFirst Settlement and in Support of Approval of the First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. ("Sobol Declaration"), Dkt. No. 1231, at 5.

[67] Sobol Declaration at 5.

[68] *See* Summary of First and Final Application of Duane Morris LLP, Counsel to Paul D. Moore, Chapter 11 Trustee of New England Compounding Pharmacy, Inc. D/B/A/ New England Compounding Company, for Final Allowance of Compensation and Reimbursement of Expenses, ("DM Application") at 58, Dkt. No. 1413. ("In the late summer and early fall of 2014, the Chapter 11 Trustee, with assistance and counsel from Applicant, reviewed and commented on mediation briefing prepared by the PSC, supporting its positions on legal claims, injuries and defenses, and reviewed all of the mediation briefs and materials…").

[69] *Id.* at 6.

[70] *Id.* at 7.

[71] Mr. Ellis is not a member of the PSC but was designated and empowered by the PSC to negotiate a settlement with ARL.

of pages of ARL documents were produced and reviewed by plaintiffs' attorneys.[72]  ARL and its insurer took the position that there was, at most, only $3 million in insurance coverage (which would be reduced by defense costs).[73]  Lawyers other than Mr. Moore committed significant hours preparing a comprehensive mediation brief that laid out the liability of ARL, which it strongly contested, and its insurance issues.[74]  A two-day mediation session occurred in April 2014 and concluded with an agreement that ARL would contribute $6.4 million to the Tort Trust.[75]

### c.      Victory settlement

Victory Mechanical Services, Inc. designed and installed HVAC systems in NECC facilities where MPA was compounded.[76]  Lawyers other than Mr. Moore reviewed numerous documents, consulted with engineering experts, and prepared the mediation brief establishing Victory's liability.[77]  The mediation sessions with Victory in July 2014, were prepared and conducted by many lawyers other than Mr. Moore and lead to a $5.5 million settlement.[78]

### d.      Highpoint settlement

The settlement negotiations with High Point, a North Carolina health-care provider that purchased MPA products, were also spearheaded by lawyers other than Mr. Moore. [79]  Other lawyers reviewed numerous documents produced by High Point and drafted a mediation brief

---

[72] Declaration of Frederic L. Ellis in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of ARL Settlement, Dkt. No. 1228, at 3.

[73] *Id.* at 4.

[74] *Id.* at 5.

[75] *Id.*; *see also* Moore Application at 29.

[76] Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan on New England Compounding Pharmacy, Inc. and for Approval of the Victory Settlement, Dkt. No. 1227, at 3.

[77] *Id.*

[78] *Id.* at 4-5.

[79] Declaration of Kimberly A. Dougherty in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of the High Point Settlement, Dkt. No. 1226, at 3.

and several mediation statements.[80]  The Chapter 11 Trustee and his firm played only a limited

role in the High Point mediation.[81]  On September 16, 2014, plaintiffs' lawyers engaged in a

mediation session with High Point's (and related entities) counsel, leading to a settlement

agreement of $3,500,000.[82]

### e.       Virginia (Insight) settlement

Lawyers other than Mr. Moore also led negotiations with Insight Health Corp., a Virginia

clinic. [83]  Insight, along with affiliated doctors, contributed a total of $40 million to the settlement

pot.  Before the mediation began, Insight had already settled with the estate of Mr. Douglas

Wingate, who died from an infection after receiving an MPA injection, for $4.5 million.[84]  The

decision was made that an uncoordinated resolution of individual claims against Insight and

other Virginia defendants would lead to a "rush to the courthouse" and many victims would be

left uncompensated.[85]  These other lawyers utilized the evidence formed in the *Wingate* action

and engaged the Virginia defendants in multiple mediation sessions, including eight days in

person.[86]  The Trustee had no role in the preparation of the evidence and liability case in the

*Wingate* action.  These mediation sessions included the Trustee, his counsel, representatives of

the PSC and the Creditors' Committee.  The mediation sessions resulted in a Settlement

---

[80] *Id.* at 3-4.

[81] Moore Application at 61 ("[T]he Chapter 11 Trustee, with assistance and counsel of the Applicant, reviewed and commented on mediation briefing prepared by the PSC, supporting its positions on legal claims, injuries and defenses").

[82] *Id.* at 4; *see also* Moore Application at 29.

[83] Declaration of Patrick T. Fennell in Support of Confirmation of First Amended Joint Chapter 11 Plan O[f] New England Compounding Pharmacy, Inc. and for Approval of Insight Settlement, Dkt. No. 1229, at 2.  Many other Virginia plaintiffs' lawyers participated and contributed to this result.

[84] *Id.* at 1-2.

[85] *Id.*

[86] *Id.*

Agreement with the Virginia defendants totaling $40 million.  Insight contributed $38.5 million

of this total, $7 million in excess of its stated insurance coverage.[87]

### f.      Inspira settlement

Inspira is a New Jersey health-care facility that injected several individuals with

contaminated MPA compounded by NECC.[88]  Lawyers other than Mr. Moore investigated

Inspira's liability and mediated a settlement.[89]  The Chapter 11 Trustee and his counsel had a

limited role in the Inspira mediation.[90]  These other lawyers dedicated substantial time and effort

to reviewing documents obtained from NECC and Inspira and consulting with various experts.[91]

Inspira agreed to mediate privately and members of the PSC, members of the Creditors'

Committee, as well as the Trustee and his counsel, engaged in mediation efforts from the fall

2013 until June 2014.[92]  The mediation culminated in a two-day session in July of 2014 resulting

in a $16 million settlement agreement.[93]  A group of lawyers continued to work with Inspira to

finalize settlement documents after the mediation.[94] [95]

---

[87] *Id.*

[88] Declaration of Michael F. Barrett, Esq. in Support of Confirmation of First Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. and for Approval of Inspira Settlement. Dkt. No. 1225, at 2-3.

[89] *Id.* at 3.

[90] *See* Moore Application at 59 ("[T]he Applicant reviewed and commented on mediation briefing prepared by the PSC.").

[91] *Id.*

[92] *Id.* at 4-5.

[93] *Id.* at 6.

[94] *Id.* at 6-7.

[95] In addition to the above referenced settlements, the PSC also established the liability evidence against Liberty including retaining experts and opposing summary judgment briefing.  Only after that briefing, did the Chapter 11 Trustee negotiate a settlement.

3. **Not all creditors have been paid in full, and not all creditors have agreed to pay the Trustee more than his lodestar.**

When determining whether to award a *Chapter 7* trustee more or less than his or her lodestar, some courts consider (1) whether all creditors have been paid in full and (2) whether the party paying for the fee agreed to it.[96]  Neither applies here.

Here, creditors have not been paid in full.  While at times during this bankruptcy there has been a necessary fiction that creditors will be paid in full, the reality is that all creditors have compromised.  There can also be no question that the parties who would functionally pay an enhancement to the Trustee's lodestar – the tort victims – have not agreed to any additional fee.

4. **It is an open question whether the excellent outcome achieved through the Chapter 11 Plan bests a theoretical resolution through traditional mass tort channels.**

To be very clear, and as described in our filings in support of plan confirmation, the PSC fully supports both the specific contributions from the debtor, insiders, and other non-debtors as well as the chosen vehicle for reaching resolution:  non-debtor releases in exchange for significant contributions that benefit tort victims.  The chosen path, though, did require some significant compromises and, functionally, shaving the corners off a square peg so that it fit into a round hole.

In an ordinary global mass tort resolution, victims' interests are represented by a court-appointed plaintiffs' steering committee and/or lead counsel.  The PSC sets procedures at the get-go for common-benefit work, often requiring written authorization and contemporaneous time reporting.  After a settlement has been reached, the court appoints a settlement administrator.  Here, the chosen form of resolution required involving the Trustee, the Trustee's counsel, counsel for the Creditors' Committee, and various other professionals to help the

---

[96] *In re Bank of New England Corp.*, 484 B.R. 252, 280-81 (D. Mass. 2012).

Trustee, in addition to a PSC, lead counsel, and multiple settlement administrators across the NECC and clinic settlements. While retention of these additional professionals was by and large appropriate, doing so added additional layers of complexity and likely expense to the traditional mass tort resolution framework.

In any event, a decision was made to pursue resolution through a Chapter 11 plan of reorganization and channeling injunctions for non-debtors and the record does not establish, one way or the other, whether the outcome here is necessarily better than it would have been through more conventional mass tort channels.

### D. The Trustee and Duane Morris are allocating time between their respective applications in order to maximize their total recovery.

Without attacking either the Trustee's or Duane Morris's reported itemized time, we make the following observations:

The Duane Morris application includes $1.43 million in time that Mr. Moore ostensibly spent lawyering (as opposed to executing the duties of a trustee). It is unclear to the PSC how distinctions were made in Mr. Moore's time reported because it appears that time spent on traditional trustee activities was billed by Duane Morris, including collections of sums owed, cancelling leases, communicating with counsel for the Creditors' Committee, overseeing his specially retained counsel, and attendance at mediations.[97] But the result is that the compensation requested for the Trustee is over and above the time his firm is also requesting.

Every additional hour of Mr. Moore's time that is counted in the Duane Morris column leads to additional dollars for the Trustee and his firm. At the same time, because the Trustee

---

[97] *See*, *e.g.*, DM Application at Exhibit C, p. 14 of 14 ("Draft demand letter re accounts receivable"); *id.* at Exhibit D, p. 3 of 6 ("Exchange emails with Irving Wiesen, Esq. re proposed purchase of customer list and related sales information."); *id.* at Exhibit F, p. 5 of 41 ("Call from Mr. Baldiga and discuss issues re Committee information, Motion re same… rejection of contracts and leases"); *id.* at Exhibit G, p. 3 of 152 ("Brief review of updated case list from Harris Beach re 481 suits/claims"), p. 4 of 152 ("Review Lawrence Watson notice of claim and related email to P. Heer and to Rick Fern re: request to notify carrier").

requested a fixed $3.75 million for his Trustee services, his requested award is never diminished by any hours shifted out of the Trustee column and added to the Duane Morris column.

## E.    Proceeding under Chapter 11 was a voluntary and necessary decision by NECC, the Trustee, the Creditors' Committee, the PSC, and this Court.

The Chapter 11 Trustee claims he should receive a $3.75 million commission because the present case is closer to a Chapter 7 bankruptcy than a Chapter 11.  Since inception, this case proceeded under Chapter 11 of the Bankruptcy Code including the United States Trustee's appointment of a Chapter 11 Trustee[98] and the Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc. ("the Chapter 11 Plan").[99]  This was not an accident. Chapter 11 bankruptcy has proven an attractive alternative to the tort system for corporations because it permits a global resolution and discharge of current and future liability, while claimants' interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably.[100]

But bankruptcy cases involving mass-tort claims face numerous difficulties, including the management of dispersed claims, an ever-expanding roster of potential defendants, lack of coordination among claimants' counsel, and alternative avenues and theories of liability.[101] Treating claimants fairly is a key purpose of the bankruptcy laws.  The continued existence of a defendant entity against which victims' claims can be adjudicated and settled is essential.  That goal cannot be accomplished in a Chapter 7 context, where the entity is liquidated as of a particular date and thereafter ceases to exist.  Even where the bankrupt company may never

---

[98] Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee, Dkt. No. 41.

[99] Dkt. No. 1352.

[100] *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) (citing S. Elizabeth Gibson, Fed. Judicial Ctr., Judicial Management of Mass Tort Bankruptcy Cases 1–2 (2005)).

[101] *See* Douglas G. Smith, *Resolution of Mass Tort Claims in the Bankruptcy System*, 41 U.C. Davis L. Rev. 1613 (2008).

actually reorganize and reemerge as a viable business, Chapter 11 allows for disposition of tort claims that occur pre-bankruptcy but manifest post-petition.

Early in this case, the interested parties made clear that "[i]n mass tort cases such as this one, where insurance will likely prove insufficient, the leading models for securing recoveries involve obtaining (often through mediation procedures and protocols) voluntary contributions from potentially liable parties in exchange for third-party releases.  Such a model can be accomplished *only* by confirmation of a Chapter 11 plan (it would be difficult if not impossible in a Chapter 7 liquidation), and can only be accomplished with a fiduciary that is incentivized to obtain the highest contributions possible from all third parties."[102]  This Court rejected the idea of converting this case into a Chapter 7 bankruptcy.  The present action is and has always been a Chapter 11 reorganization, and the Chapter 11 Trustee's fee must be awarded accordingly.

## IV.    CONCLUSION

For these reasons, the Court should apply the bankruptcy code and First Circuit law and award the Trustee and his firm their respective lodestars, without enhancement.

Dated: September 22, 2015                    Respectfully submitted,

                                             **/s/ Thomas M. Sobol**
                                             Thomas M. Sobol
                                             Kristen A. Johnson
                                             Jessica R. MacAuley
                                             HAGENS BERMAN SOBOL SHAPIRO LLP
                                             55 Cambridge Parkway, Suite 301
                                             Cambridge, MA  02142
                                             Telephone:  (617) 482-3700
                                             Facsimile:  (617) 482-3003
                                             tom@hbsslaw.com
                                             kristenj@hbsslaw.com

---

[102] Statement of the Official Committee of Unsecured Creditors in Support of the Motion of the United States Trustee for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee. Dkt. No. 79 at 6. (The Creditors' Committee continued "the appointment of a chapter 11 trustee, as opposed to a conversion to chapter 7 and appointment of a chapter 7 trustee, is also crucial here where the most promising potential path to maximum recoveries for unsecured creditors may depend upon the ability of a trustee and the Committee to confirm a chapter 11 plan."); *id.* at 1-2 (emphasis added).

jessicam@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
Annika K. Martin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2417
Telephone:  615.313.9000
Facsimile:  615.313.9965
ecabraser@lchb.com
mchalos@lchb.com
akmartin@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI  48075
Telephone:  (248) 557-1688
Facsimile:  (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, VA  24016
Telephone:  (540) 342-2000
pfennell@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Way, 22nd Floor
Atlanta, GA  30328
Telephone:  (404) 451-7781
Facsimile:  (404) 506-9223
marc@markzamora.com

J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH & JENNINGS
PLLC
227 Second Avenue North
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 255-5419
gerards@branstetterlaw.com
beng@branstetterlaw.com

*Plaintiffs' Steering Committee, on behalf of the
322 victims identified in Schedule A.*

## CERTIFICATE OF SERVICE

This will certify that a true and accurate copy of the foregoing was served on all parties

hereto by virtue of the Court's electronic filing system on September 22, 2015.

/s/ Thomas M. Sobol
Thomas M. Sobol (BBO# 471770)

*In re: New England Compounding Pharmacy, Inc., Case No. 12-19882-HJB*
**Tort Claimants represented by Plaintiffs' Steering Committee**
**Schedule A**

| | | |
|---|---|---|
| Adair, Anna | Clark, Robert E. | Fairchild, Jessica |
| Adari, Eliezer | Clemons, Michael D. | Farrow, William, (deceased) |
| Adari, Linda | Clodfelter, Rebecca | Fennelly, Mary |
| Agnew, Lisa A. | Cohen, Harriet | Ferguson, Harvey |
| Aldridge, John | Colburn, Jeanne | Figueredo, Eduardo S. |
| Aldridge, Rene | Collins, Carol S. | Filipowicz, Daniel |
| Alitabi, Hussein Ali Kazem | Collins, John D., Sr. | Filipowicz, Theresa C. |
| Allen, Hilda | Comeau, Brian | Flanagan, Deborah |
| Andrews, Tosha (deceased) | Comeau, Lisa | Fleming, Frances |
| Asadoorian, Martha | Congersky, Roni | Ford, Linda |
| Bansale, Brenda | Conner, Edward L. | Forry, Girard S. |
| Barley, David A., Jr., | Conrad, Brenda | Foster, Bobby |
| Barrash, Michael | Conrad, Godfrey | Foster, Delores |
| Beach, Jack | Cook, Bonita | Fralin, Christy A. |
| Belenski, Marabeth (deceased) | Cook, Geneava Y. (deceased) | Frazier, Alisa |
| Bell, Alta | Cook, Gregory | Galarneau, Amanda J. |
| Bell, Craig | Cooley, Kathleen | Gallinar, Susan |
| Bell, Terri | Cooper, Brandy | Gallivan, Loren (deceased) |
| Benson, Laura | Cooper, David | Garcia, Jojayra |
| Berger, Virginia L. | Cooper, Leon | Garden, Debra |
| Bertozzi, Noemi | Cooper, Pamela (deceased) | Gaskins, Atlas L. |
| Bertozzi, Paulo | Craggett, Oscar J. | Geathers, Julissa (deceased) |
| Blatt, Dennis | Crawford, Donald G. | Geddis, LeRoy |
| Blomgren, Susan | Creager, Rebecca | Gibbons, Pamela |
| Bondar, Helaine | Creasy, Sydney M. (deceased) | Giberson, David |
| Bondar, Joseph | Cunningham, Ronald | Gladding, Michael |
| Bowling, Viola Mills | Cuthbert, Joyce | Glenn, Lorenzo |
| Boyd, Anna D. | Cuthbert, Kenneth | Godlewski, Elaine |
| Brady, Joseph | D'Angelo, Cathy | Goldman, Emma |
| Brady, Rebecca | Dargan, Nancy | Goldman, Evan M |
| Brewster, Brenda G. | Davenport, Brenda J. | Goldman, Jack |
| Brooks, Rosanne | Davenport, Jerry | Goldman, Payton |
| Broom, Vonda K. | Demeniuk, Thomas | Gough, Zerita T. |
| Brown, Ann D. | Denson, Bobbie | Hall, Kenneth E. |
| Brown, Martha | Denton, Joy | Hall, Linda |
| Brown, Maurice | Devine, Willie Mae Toney | Hannabass, Robin A. |
| Brown, Sybil A. | Diehl, Katherine | Harrell, Lisa |
| Brumfield, Wilma | Dison, Walter | Harrell, Tom L. |
| Bushaw, James M. (deceased) | Dodds, Barbara | Harris, Allen |
| Carey, James (Jim) | Dombi, Roza | Harris, Ilene H. |
| Carter, Lawrence | Dorman, William | Havard, Thomas |
| Carter, Wilma S. | Edwards, Susan M. | Helm, Stanley |
| Carter-Geddis, Deborah | English, Harry M. | Hill, Shaun |
| Clark, Marvin J. | Esau, Annette | Howell, Charmion |

*In re: New England Compounding Pharmacy, Inc., Case No. 12-19882-HJB*
**Tort Claimants represented by Plaintiffs' Steering Committee**
Schedule A

| Clients | | |
|---|---|---|
| Hughey, Brian | Major, Cory | Patel, Gokulbhai Maganbhai |
| Jackson, John A. | Martin, Anne | (deceased) |
| Jacobs, Doris | Matthews, James W. | Peckham, Judith (deceased) |
| Jacobs, Leonard | McDavid, Donald | Perdue, Charles P. ,Sr. |
| Jarmon, Ina | McDavid, Sherry | Petchell, Linda |
| Jarrett, Anthony J. | McDow, Raymond | Pettit, Jeff |
| Jazanoski, Henry | McKay, James T. | Pettit, Sally |
| Jeffries, John E. (deceased) | McKay, Kara | Pew, Allison |
| Johnson, Geraldine | Meszaros, Brian | Phillips, Nancy F. |
| Johnson, Jane | Michelini, Jeanne | Pickett, John |
| Johnson, LaDonna | Miller, Virginia C. | Piggot, Norma |
| Jones, Charles | Mitchell, Patricia A. | Powell, Michelle H. |
| Jones, David A. | Monroe, Donald | Przydzial, Alan |
| Jones, Denise B. | Montee, Donna | Quattlander, Todd |
| Jones, Lori | Moore, Devena | Queen, Alma L. |
| Jordan, Jessica | Moore, Raeanne | Ramsey, Frederick |
| Juntila, Delores | Morrow, Betty | Ramsey, Janet |
| Jusufi, Pam | Morton, Gale | Randolph, Robert |
| Katzenberger, Joe | Mosher, Julie | Reed, Sonya M. |
| Kelly, Joy Alaine | Munch, Genevieve | Reilly, Jaime |
| Kennedy, Barbara | Muse, Gregory | Reilly, Timothy H. |
| Kennedy, Brian | Musselwhite, Leslie | Richards, Dianne |
| Kennedy, Michael R. | Nash, Vertel I. | Rindfusz, Stuart |
| Kidd, Pamela | Nemirovsky, Inna | Rinn, Geoffrey F. |
| Knihtila, James | Nemirovsky, Simon | Rinn, Michele |
| Knihtila, Laverne | Newton, Jerry | Roberge, John |
| Kolman, Alice | Nicely, Danny K. | Roberson, Pamela |
| Kolman, Lloyd | Nicely, John D. | Rogers, Marion |
| Kotarides, Jonathan | Nipper, Sharon G. | Rombro, Allan |
| Kotarides, Rebecca | Norman, Stephen | Ross, Cleon |
| Krol, Rose (deceased) | Norman, Susan | Rousselle, Lynn A. |
| Kulchinski, Melinda | Norwood, Jerry | Ryterman, Arthur |
| Lavallee, Marc | Norwood, Marjorie | Ryterman, Esther |
| Lazenby, Kathleen | Nowak, Marilyn | Sabin, Linda |
| Lee, Linda | Nowicki, Dwayne V. | Schmitzer, Richard |
| Lehman, Dorothy | O'Brien, Diane | Schneider, Christina |
| Lester, Theron L. | Osborn, Ronald | Sciascia, Joseph |
| Lomax, William | Ostrowski, Beatrice | Sciascia, Rosemarie |
| Lomax, Yvette | Overstreet, JoAnn | Scott, Vicki G. |
| Lugar, Bobby S. | Overstreet, John | Seiber, Jason |
| Luttman, James | Paquette, Kelly | Seiber, Tessa |
| Macer-Pinder, Patrice | Paquette, Ronnie | Seigle, Eliisa |
| Mackey, Anja | Parker, Elisheva | Sellers, Harold |
| Madouse, Ruth (Deceased) | Parsons, Jean H.D. (Deceased) | Sellers, Patricia |

*In re: New England Compounding Pharmacy, Inc., Case No. 12-19882-HJB*

**Tort Claimants represented by Plaintiffs' Steering Committee**

Schedule A

| Clients | | |
|---|---|---|
| Sherrill, Christopher | West, Donna M. | |
| Shrewsbury, James S | Whitehead, Jesse | |
| Sinclair, Kathy W. (deceased) | Whitehead, Sylvia | |
| Sloan, Windy | Whittaker, Barbara | |
| Smelkinson, Carl | Williams, Cheryl D. | |
| Smelkinson, Sheila | Williams, Debra A. | |
| Smith, Darin | Wood, Darlene S. | |
| Smith, Karen | Woody, Beverly B. | |
| Smith, Lloyd | Wray, Gerald | |
| Smith, Louis | Wray, Jane | |
| Smith, Margaret | Wynstock, Selwyn (deceased) | |
| Smith, Tony | Yowell, Louis | |
| Smith, Warren L. | Yowell, Teresa | |
| Spencer, Joseph | Ziegler, Adam | |
| Staley, Joe | Ziegler, Sarah | |
| Staley, Rita | | |
| Stevens, Jackie L. | | |
| Stover, David | | |
| Stratton, Glenda | | |
| Stuart, Kathleen | | |
| Sultage, Carole | | |
| Sultage, John | | |
| Szegda, Debra | | |
| Taylor, Johnny, Sr. | | |
| Thistlethwaite, Larry | | |
| Thomas, William | | |
| Thomson, Nancy | | |
| Tober, Chester L. | | |
| Tober, Dawn | | |
| Todd, Emma (deceased) | | |
| Trammell, Sheri Lynn | | |
| Turner, Daniel A. | | |
| Underwood, David | | |
| Underwood, Tina | | |
| Velez, Luz E. | | |
| Verdi-Spanske, Joy Lynne | | |
| Vore, Richard | | |
| Wachter, Jeanne | | |
| Walker, Sandra | | |
| Walker, William | | |
| Ward, Lori | | |
| Warren, Miriam (deceased) | | |
| Werner, Marilyn | | |