# EXHIBIT K

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) | Case No. 12-19882-HJB |
| PHARMACY, INC., | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## <u>MEMORANDUM OF DECISION</u>

Before the Court is the "First and Final Application of Paul D. Moore, in His

Capacity as Chapter 11 Trustee of New England Compounding Pharmacy, Inc., for Final

Allowance of Commission and Reimbursement of Expenses" (the "Fee Application") filed

by Paul D. Moore, the Chapter 11 trustee (the "Trustee") of the debtor, New England

Compounding Pharmacy, Inc. ("NECC").  The Fee Application, as voluntarily reduced,

requests compensation in the total amount of $3,750,000.00 – a sum less than the

maximum commission set by § 326 of the United States Bankruptcy Code,[1] but greater

than the so-called "lodestar amount" (equal to the number of hours the Trustee spent in

the case multiplied by his hourly rate).  No objections were raised to allowance of the

lodestar amount ($1,135,754.85) or reimbursement for expenses ($416.52), and the

Court allowed payment of those amounts by Order dated December 30, 2015.  But

objections *have* been raised to the payment of additional compensation beyond the fees

already allowed.  Accordingly, this Court must determine whether the Trustee is entitled

---

[1] <u>See</u> 11 U.S.C. §§ 101 <u>et seq.</u> (the "Bankruptcy Code" or the "Code").  All references to statutory
sections are to the Bankruptcy Code unless otherwise specified.

to payment of the $2,614,245.15 balance of his request.

What follows are the Court's findings of fact and conclusions of law. However, two caveats are in order. Given the inordinate complexity of this case, the following narrative is necessarily summary in nature, as the Court has endeavored to walk the fine line between presenting important factual detail while also preserving the reader's patience. Additional details on the history and travel of this case can be found in the excellent memoranda written by District Court Judges F. Dennis Saylor and Rya W. Zobel and Magistrate Judge Jennifer C. Boal in the related multi-district litigation proceeding (the "MDL Proceeding") pending in the United States District Court for the District of Massachusetts (the "District Court"), case number 1:13-md-2419-RWZ.[2]

More importantly, the Court must acknowledge that this Memorandum does not do justice to the enormous contributions (including exercises of judicious restraint) that players other than the Trustee have made throughout the pendency of the bankruptcy case and the MDL Proceeding – members of the unsecured creditors' committee (the "Creditors' Committee"), counsel to the Creditors' Committee, the Plaintiffs' Steering Committee (the "PSC")[3], the United States trustee for Region 1 (the "UST"), NECC's creditors – particularly the tort victims and their attorneys – and various third-party,

---

[2] See, e.g., In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2015 WL 178130 (D. Mass. Jan. 13, 2015); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2014 WL 6676061 (D. Mass. Nov. 25, 2014); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2014 WL 4322409 (Bankr. D. Mass. Aug. 29, 2014); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2014 WL 3974077 (D. Mass. Aug. 12, 2014); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2014 WL 2040139 (D. Mass. May 15, 2014); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2013 WL 6058483 (D. Mass. Nov. 13, 2013); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 2013 WL 4456757 (D. Mass. Aug. 15, 2013); In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig., 496 B.R. 256 (D. Mass. 2013).

[3] The PSC was appointed in the MDL Proceeding to streamline the administrative complexities of the proceedings by acting as a representative, for some purposes, of the interests of all plaintiffs.

nondebtor defendants.  It is obvious to the Court that the efforts in this case truly did require "a village."  But the issues before the Court today revolve primarily around the Trustee and his role in these proceedings, and so today, it is *his* story that largely will be told.


I.   FACTS AND POSITIONS OF THE PARTIES

In September 2012, reports suggesting a brewing national tragedy began to surface from several states; a number of patients who had received injections of a compounded drug – preservative-free methylprednisolone acetate ("MPA") – had been diagnosed with a rare form of fungal meningitis that resulted in horrific suffering and, in some cases, death.  And in the following weeks, it became clear that the number of victims was growing at an alarming rate.

By the end of September, the source of the contaminated MPA had been identified as the debtor NECC, located in Framingham, Massachusetts.  NECC issued a voluntary recall of three suspect lots of MPA on September 26, 2012.  By then, however, approximately 14,000 doses of potentially contaminated MPA had been administered to patients at hospitals, clinics, and doctors' offices across the country.  Within a month after the reports of the fungal meningitis outbreak began receiving national attention, the scope of the damage had skyrocketed.  In the last "official" count, the Centers for Disease Control and Prevention (the "CDC") reported that 750 individuals were ill and 64 patients had died as a result of being injected with contaminated compounds (the "Outbreak").[4]

---

[4] These numbers do not reflect the final tally of injury and death caused by contaminated injections, as the CDC stopped updating its data on October 23, 2013 – additional deaths and diagnoses have reportedly occurred since then.

By October 2012, after NECC's central role in this grave situation was identified, NECC had voluntarily surrendered its pharmacy license, ceased operations, laid off all of its employees, and recalled all of its products. NECC pharmacists have been temporarily barred from practicing pharmacology pending the outcome of proceedings to determine whether their licenses should be permanently revoked, and 14 individuals have been criminally indicted in connection with the Outbreak.

Patients and their loved ones understandably sought recompense for the harm caused by NECC's contaminated products, and swiftly began initiating lawsuits against NECC and other potentially liable third parties throughout several states.[5] Given the number of those lawsuits, the Judicial Panel for Multidistrict Litigation subsequently joined the pending federal cases in the MDL Proceeding before the District Court (now the "MDL Court").

### A. The Bankruptcy Filing, Appointment of the Trustee, and Strategy

In response to this avalanche of legal action, on December 21, 2012, NECC filed a voluntary petition under Chapter 11 of the Bankruptcy Code. At the time of filing, NECC, which was no longer operating, had only $1.3 million in its coffers – clearly a paltry sum in comparison to the enormous liability it was facing. Indeed, that amount was unlikely to fully compensate even the professionals tasked with navigating the embroiled NECC through the bankruptcy process. In short, the prospect of any meaningful recovery from NECC for the hundreds or thousands injured was bleak.

Shortly after filing, and before the appointment of the Trustee, the Creditors'

---

[5] Throughout this Memorandum, the Court will refer to defendants other than NECC in cases involving liability for the Outbreak as "third parties," in contrast to NECC, which is the only debtor in the Chapter 11 case before this Court.

Committee commenced an adversary proceeding (the "Adversary Proceeding") against NECC's individual shareholders (Barry J. Cadden, Lisa Conigliaro Cadden, Gregory Conigliaro, and Carla Conigliaro) (the "Shareholders") and affiliated entities also owned and controlled by NECC's Shareholders (Ameridose LLC, GDC Properties Management, LLC, and Medical Sales Management, Inc.) (the "Affiliated Insiders") (together, the "Insiders").[6]   Through the Adversary Proceeding, the plaintiff Creditors' Committee (eventually substituted by the Trustee) sought recovery of millions of dollars from the Insiders on account of alleged fraudulent transfers, preferential transfers, and breaches of fiduciary duty.  While the Adversary Proceeding provided some hope for the recovery of funds to augment the bankruptcy estate's minimal cash reserves, it was clear from the outset that the litigation would be hotly contested and would consume vast estate resources over the months, or even years, that the litigation was likely to drag.

Approximately one month after the bankruptcy case filing, the UST moved for the appointment of a Chapter 11 trustee, to which the debtor acceded.  On January 25, 2013, this Court approved the UST's appointment of Paul D. Moore as Chapter 11 trustee.[7]  The Trustee's initial task was to make the critical decision of which trajectory the case should take.  Given foreboding of the bankruptcy estate's likely administrative insolvency, would the best course of action be to quickly liquidate NECC's existing assets (of which there were few), either through the Chapter 11 process or conversion to Chapter 7, leaving NECC's victims to seek recovery against third parties through the MDL proceeding or

---

[6] The complaint also named Bank of America, N.A., Middlesex Savings Bank, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Charles Schwab & Co. as trustee process defendants.

[7] The Court approved the retention of Duane Morris LLP as counsel to the Trustee on February 26, 2013.

lawsuits in other forums?  Or should the Trustee pursue a more complicated strategy of attempting to provide a greater and more equitable recovery for NECC's victims through the Chapter 11 process?  True, the pending Adversary Proceeding against the Insiders had some potential for bringing additional moneys into NECC's bankruptcy estate, but the prospects for a successful outcome in that proceeding were far from certain and would most certainly result in substantial litigation expenses.  And while NECC did carry some insurance, its insurers were adamant that certain policy exceptions applied and they threatened to deny all coverage in connection with the Outbreak.

Ultimately, the Trustee determined, unlikely though it appeared at the outset, that he could chart a course using the Chapter 11 proceedings that would lead to a meaningful recovery for the victims.  With an eye toward other mass tort bankruptcies, the Trustee decided that the best hope for an equitable recovery for victims lay in attempting to create a pool of funds for ratable distribution by reaching settlements not only with NECC and its Insiders and insurers, but also with third-party defendants.  In consideration for their contributions, however, any third-party contributors would certainly demand that their potential civil liability on account of the Outbreak be released and further litigation against them permanently enjoined.

While such a strategy has been successful in other mass tort cases, those courts which have approved the release of nondebtor third parties from liability have required truly exceptional factual circumstances and have set forth a series of stringent legal requirements.[8]  In addition, the NECC bankruptcy case posed several difficulties not

---

[8] See, e.g., Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d 704, 711-13 (4th Cir. 2011); Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002); In re Master Mortg. Inv. Fund, Inc., 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994).

present to the same degree in other cases where releases had been granted in exchange
for contributions from third parties.  Here, the debtor was no longer operating and would
be unable to make ongoing contributions to any fund established for victims; full payment
of all creditor claims was unlikely even with substantial contributions from other parties;
NECC's insurers appeared to have plausible defenses against covering damages related
to the Outbreak; and the potential liability of third parties was largely based not on strict
liability, but on far more unreliable claims of contributory or other forms of negligence.

Even more uncertain was whether the Court of Appeals for the First Circuit would
approve of third-party releases under these or any set of circumstances.  Some Circuit
Courts have flatly rejected the notion that a bankruptcy court has jurisdiction to grant third-
party releases and enjoin further litigation against third parties in other forums regardless
of the circumstances, unless the releases and injunctions are authorized by § 524(g) of
the Bankruptcy Code (permitting third-party releases in the context of asbestos claims
under certain circumstances).[9]  On the other hand, other Circuit-level courts, as well as
some lower courts in the First Circuit, have upheld third-party releases under very
exceptional circumstances.[10]  But the First Circuit itself has not yet weighed in on the

---

[9] See, e.g., Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber
Co.), 584 F.3d 229, 252 (5th Cir. 2009); Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),
67 F.3d 1394, 1401-02 (9th Cir. 1995); Feld v. Zale (In re Zale Corp.), 62 F.3d 746, 760-61 (5th
Cir. 1995); Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co. of Tulsa (In re W. Real
Estate Fund, Inc.), 922 F.2d 592, 601-02 (10th Cir. 1990), as modified by Abel v. West, 932 F.2d
898 (10th Cir. 1991); American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American
Hardwoods, Inc.), 885 F.2d 621, 624-26 (9th Cir. 1989).

[10] See, e.g., Behrmann, 663 F.3d at 710; Dow Corning Corp., 280 F.3d at 658; Menard-Sanford
v. Mabey (In re A.H. Robins Co., Inc.), 880 F.2d 694, 702 (4th Cir. 1989); In re Chicago Invs.,
LLC, 470 B.R. 32, 95 (Bankr. D. Mass. 2012); In re M.J.H. Leasing, Inc., 328 B.R. 363 (Bankr. D.
Mass. 2005); In re Mahoney Hawkes, LLP, 289 B.R. 285, 299-300 (Bankr. D. Mass. 2002); In re
Johns-Manville Corp., 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986), aff'd Kane v. Johns-Manville
Corp. (In re Johns-Manville Corp.), 843 F.2d 636 (2d Cir. 1988).

question of whether such third-party releases are ever permissible (and, if so, under what circumstances), casting a shadow of doubt as to whether, if appealed, a confirmation order approving such releases would be upheld.

Given these uncertainties, the Trustee's success depended not only on navigating uncharted legal waters, but also on orchestrating myriad moving parts to reach a global consensus with all the various constituents – a daunting task indeed.  And this consensus needed to be reached quickly, before the proposal and confirmation of a Chapter 11 plan, so that parties would come to the table and negotiate the settlements that would form the body of the plan itself.  Thus, the Trustee's path toward confirming a Chapter 11 plan was akin to building a working Rube Goldberg machine piecemeal and out of order, hoping that everything would click into place at the end.  One vocal dissent could derail his strategy by threatening a drawn-out appeals process with an uncertain outcome.

### B.      Consolidation of Litigation

In order to garner support for a global resolution, the Trustee first needed to corral all relevant parties and encourage them to come to the negotiation table before their resources were depleted by litigation in other forums.  In order to achieve that interim step, the Trustee sought an order from the MDL Court that would require the transfer of all Outbreak-related cases to the MDL Proceeding.  Federal cases had already been transferred or were in the transfer process.  But cases filed in state courts posed a complication.  Judge Saylor agreed that the District Court had "related to" jurisdiction over state court cases where NECC or its affiliates had been named as defendants and ordered the transfer of those cases, but he declined to order transfer of state court cases filed only against third parties.  See In re New England Compounding Pharmacy, Inc.

<u>Prods. Liab. Litig.</u>, 496 B.R. 256 (D. Mass. 2013). With regard to the state court cases against non-NECC defendants, Judge Saylor found that jurisdiction was "unclear at best," and opted to abstain. <u>Id.</u> at 270. However, Judge Saylor did indicate that, in the event a third-party defendant asserted a claim in the bankruptcy case for indemnity or contribution against NECC or its affiliates, the filing of that claim would provide the jurisdictional hook necessary for transfer to the MDL court. <u>Id.</u>

The next logical step then, was for the Trustee to ask this Court to set a bar date by which all entities would be required to assert their claims against NECC – thereby forcing third parties with dormant claims for contribution or indemnity to assert them or be barred from recovery from the bankruptcy estate.[11] The Court established January 15, 2014 as the bar date for filing claims against NECC (the "Bar Date"); and by that date more than 3,800 claims had been filed, approximately 3,500 of which related to damages for death and personal injury caused by the Outbreak.

The establishment of the Bar Date had the intended effect of forcing third-party defendants to file their contribution and indemnity claims against NECC, and the Trustee was successful in his second attempt to have the remaining state court cases transferred to the MDL Court. Having funneled the Outbreak-related cases and claims into one

---

[11] In most Chapter 11 cases, setting a bar date for claims is a non-controversial step. However, here, even this basic task resulted in contests that highlight the difficulties facing the Trustee at various times throughout this case. For example, when the Trustee asked health care providers for lists of patients that had received potentially contaminated injections so that he could identify potential creditors, some providers declined. And even after resolving a majority of the objections and obtaining an order from this Court requiring the information to be provided to the Trustee, some entities continued to refuse to comply, forcing the Trustee to file contempt motions with this Court. Other entities appealed the order requiring them to turn over the patient lists. While that subset of disputes was eventually resolved, the push-back the Trustee received in merely attempting to fulfill his basic statutory duty to provide constitutionally-adequate notice to potential creditors reflects the inordinate difficulties with which the Trustee was forced to contend, even in the early stages of the case.

forum, it was then important to focus the various parties away from the mindset of litigation and toward the negotiating table. To that end, the Trustee obtained orders from the MDL Court temporarily staying litigation and discovery in the cases before that court and establishing mediation protocols to facilitate resolutions through settlement.

### C. The Settlements

#### 1. The Insider and Insurer Settlements

Despite the consolidation of most, if not all, relevant claims into one forum and the establishment of court-ordered protocols to facilitate mediation and settlement negotiations, many third-party defendants and other potentially liable parties were reluctant to commit to alternative dispute resolution vehicles so long as the individuals considered to be largely at fault for the Outbreak – NECC's Shareholders – had not yet agreed to provide some remuneration for their role in the tragedy. Accordingly, the Trustee determined that reaching a significant and meaningful settlement with NECC's Shareholders and Affiliated Insiders was of paramount importance.

The negotiations with the Insiders proved to be exceedingly complicated. While the victims of the Outbreak rightly demanded retribution from those they felt were at fault, the Shareholders, in turn, were reticent to provide the Trustee with information regarding their assets and their ability to make substantial contributions to a Chapter 11 plan for fear that the information would be used by plaintiffs in seeking attachments on account of their tort claims. So before negotiations with the Shareholders could even get underway, the Trustee first had to secure an order from this Court establishing settlement protocols that would allow the Trustee to effectively evaluate the significance of any settlement offer, but would also protect information regarding the Insiders' assets from public

dissemination.

The Trustee successfully navigated those procedural hurdles and entered into protracted settlement negotiations with the Insiders. By the end of December 2013, a little more than a year from the date of the bankruptcy filing, the Trustee announced that he had reached a settlement agreement in principle with the Shareholders, the Affiliated Insiders and NECC's primary and excess insurers that would result in a contribution of over $100 million in compensation for NECC's victims and creditors (the "Insider and Insurer Settlements").[12] In return for those contributions, the Trustee would seek confirmation of a Chapter 11 plan that released the Insiders and their insurers from civil liability for the Outbreak.[13] On July 31, 2014, this Court approved the Insider and Insurer Settlements, final consummation of which was subject to the approval of their respective releases in connection with the confirmation of a Chapter 11 plan.

2.    Additional Settlements

With the Insider and Insurer Settlements in hand, the Trustee had substantially more leverage to encourage other potentially liable third parties to contribute to a common pool of funds to compensate NECC's victims in exchange for a release of liability. As the size of the settlement funds grew, the likelihood that victims and other creditors would consent to a Chapter 11 plan that included third-party releases encouraged additional

---

[12] The funds provided under the Insider and Insurer Settlements are comprised of cash contributions from the Insiders, proceeds from company and individual professional liability insurance policies, projected tax refunds, and the sale of one or more affiliated companies.

[13] In addition to the individual Shareholders and Affiliated Insiders mentioned earlier, the Insider Settlements also required the release of the Shareholders' respective spouses, children, parents, and other nuclear family members, all trusts associated with the Shareholders and all entities affiliated with NECC or in which the Shareholders hold a controlling interest and those entities' successors, assigns, and predecessors.

parties to negotiate with the Trustee. Over the next 18 months, the Trustee, with the assistance of the Creditors' Committee and the PSC, reached settlements with various parties that would provide over $100 million of additional funds for NECC's creditors. Each of the settlements was conditioned upon the confirmation of a Chapter 11 plan that released the settling parties from further liability and enjoined future litigation against them in connection with the Outbreak.[14]

In addition to the funding settlements, the Trustee also entered into several settlements with third parties that would further increase the funds available for distribution to victims by reducing other claims against the estate. For instance, in a settlement reached between the Trustee, Barry Cadden, the Division of Health Related Boards of the Tennessee Department of Health and the Tennessee Board of Pharmacy (the "Tennessee Entities"), approved by the Court on July 31, 2014, the Tennessee entities agreed to subordinate a $5,000,000 claim for fines and penalties against NECC and Cadden to claims held by NECC's tort victims. And under settlements with some 35 third-party defendants which preserved those creditors' rights to assert defenses and allocation of liability based on NECC's fault or comparative fault, the Trustee obtained releases of millions of dollars of claims asserted by those parties.

### D. Confirmation of the Chapter 11 Plan

Just 2 years from the date NECC filed its bankruptcy case, the Trustee and the

---

[14] Several of the settlements were reached with entities potentially liable to all tort victims for the harms caused by the Outbreak based on the entities' allegedly culpable actions. Those entities include ARL BioPharma (which provided testing services to NECC), Liberty Industries (which built the "cleanrooms" where MPA was compounded), Victory Mechanical Services (which installed NECC's ventilation systems), and Unifirst Corporation (which provided cleaning services to NECC). Other settlements were reached with health care providers alleged to have liability toward individual patients who received injections at their facilities.

Creditors' Committee were able to file a Chapter 11 plan (the "Plan") funded by over $210 million to be paid to the estate pursuant to settlements reached by the Trustee.  The Plan provides for payment in full of all administrative, priority, and secured claims, an approximate 90% distribution to general unsecured non-tort creditors, and the payment of approximately $160 to $190 million into a trust for the benefit of NECC's tort victims (the "Tort Trust").[15]

Perhaps most significantly, over 99% of tort victims voted in favor of the Plan and, by the time of the hearing on confirmation (the "Confirmation Hearing") only one objection remained.  The sole remaining objection to confirmation was that raised by the UST, who questioned whether the Trustee had adequately established a factual justification for approval of the third-party releases contained in the Plan.  But at the conclusion of the Confirmation Hearing, having reviewed some 27 declarations submitted into evidence in support of the Plan and employed by the Trustee to demonstrate a sufficient factual predicate for his assertion that approval of the third-party releases was warranted, counsel to the UST, to her credit and to the credit of the UST and the UST program, stated on the record that the UST believed that the Trustee had ultimately met his burden.

For its part, this Court agreed that the case met the extraordinary and rare qualifications for approval of the third-party releases and injunctions contained in the Plan, and issued an order confirming the Plan on May 20, 2015.  No appeals were taken.

### E.    The Trustee's Fee Application

In accordance with the terms of the confirmed Plan, all professionals employed in

---

[15] Under the Plan, administration of the Tort Trust and distributions to tort claimants will be made in accordance with the "Tort Trust Documents," "Claims Resolution Facility Procedures," and "Provider Claims Resolution Facility Procedures" incorporated into the Plan.

this case, including the Trustee, promptly filed their final requests for compensation.  Each request, with the exception of the Trustee's Fee Application, was allowed without objection.

As initially filed, the Trustee's Fee Application requested the maximum commission allowed a Chapter 11 trustee under § 326 of the Bankruptcy Code – $5,758,256.97.  By the time of the hearing on the Fee Application, and following discussions with counsel for the UST, the Trustee had reduced his requested compensation to $3,750,000.00.  Two objections to the Trustee's Fee Application were filed, one by certain tort creditors who served as members of the Creditors' Committee and one by the PSC.

Simply put, both objections quarrel with the Trustee's request for compensation insofar as it exceeds the lodestar amount of $1,135,754.85 – derived from multiplying the Trustee's hourly rate by the 1,734.4 hours the Trustee reported spending on the case (and including an additional estimated amount of fees for preparation of the Fee Application and attendance at the hearing).  Noting that case law is universally consistent in holding that the commission amount calculated under § 326 is merely a cap on a Chapter 11 trustee's compensation and not presumed to be a reasonable fee, the objectors further assert that an enhancement over the lodestar amount is not appropriate in this case.  Recognizing that the Trustee's efforts were indeed exceptional and the outcome largely positive, the objectors nevertheless argue that, at the end of the day, the results obtained required the efforts of many professionals, each of whom worked arduously and to an exceptionally high standard.  For this reason, they maintain that the lodestar amount represents reasonable and sufficient compensation for the Trustee's work.  The objectors further argue that, given that tort claimants will not receive full

payment on their claims, their distribution should not be further reduced by awarding any additional compensation to the Trustee.

The Trustee responds that the amount of compensation requested does not represent an "enhancement." Rather, he maintains that he seeks a commission in an amount permitted by the Bankruptcy Code. Turning to the various factors considered by courts in determining the reasonableness of a trustee's requested compensation, the Trustee says that analyzing his work in light of each relevant factor compels the conclusion that his requested fee is reasonable.

As no party had objected to the award of the lodestar amount or to reimbursement of the Trustee's expenses, this Court allowed those amounts on December 30, 2015. However, the Court specifically reserved under advisement the question of whether the balance of the Trustee's fee request ($2,614,245.15) should be allowed.[16]

## II.    DISCUSSION

Chapter 11 trustees are entitled to receive "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses," subject to the maximum commission amount calculated under § 326(a).  11 U.S.C. §§ 330(a)(1), 326(a).[17]  It is well settled in this Circuit that the amount calculated under

---

[16] At the conclusion of the nonevidentiary hearing on the Fee Application, all parties agreed that the Court had sufficient information on the record to make a determination without taking additional evidence.

[17] Section 330(a)(1) provides:

(a)(1)   After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a

§ 326(a) is merely a cap on the amount of compensation that may be awarded a trustee, and is not presumed to be a reasonable fee.  See, e.g., In re Bank of New England Corp., 484 B.R. 252, 283 (Bankr. D. Mass. 2012).[18]  Accordingly, "a court awarding trustee fees

---

professional person employed under section 327 or 1103–

    (A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

    (B)    reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

Section 326(a), in turn, sets forth the maximum amount a trustee may be paid; that section provides:

    (a)    In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a).

[18] See also In re Wolverine, Proctor & Schwartz, LLC, 527 B.R. 809, 820 (D. Mass. 2015); Garb v. Marshall (In re Narragansett Clothing Co.), 210 B.R. 493, 497 (B.A.P. 1st Cir. 1997) (citing In re Stoecker, 118 B.R. 596, 601 (Bankr. N.D. Ill. 1990)).  As one bankruptcy court has noted, the legislative history of § 326(a) supports this interpretation:

The legislative history to § 326 discusses the interaction of the "reasonable compensation" standard of § 330 and the maximum compensation imposed under § 326:

This section [§ 326] is derived in part from section 48c of the [former Bankruptcy Act].  It must be emphasized that this section [§ 326] does not authorize compensation of trustees.  This section simply fixes the maximum compensation of a trustee.  Proposed 11 U.S.C. § 330 authorizes and fixes the standard of compensation.  Under section 48c of [the former] law, the maximum limits have tended to become minimums in many cases.  This section [§ 326] is not intended to be so interpreted.  The limits in this section, together

16

must begin by assessing reasonableness under § 330(a) *before* applying the percentage-based cap under § 326(a)." In re Miniscribe Corp., 309 F.3d 1234, 1241 (10th Cir. 2002) (emphasis supplied).[19]

In the First Circuit, calculation of a reasonable fee typically begins with the lodestar approach, in which the "lodestar is calculated by multiplying the number of hours reasonably incurred by the applicant by a reasonable hourly rate." Narragansett, 210 B.R. at 497 (citing Furtado v. Bishop, 635 F.2d 915, 920 (1st Cir. 1980)). Of course, this statement begs the question as to what constitutes a "reasonable" number of hours incurred and what constitutes a "reasonable hourly rate." Generally speaking, a determination of reasonableness regarding the time spent in the case and the hourly fee charged is guided by the factors enumerated in § 330(a)(3) of the Bankruptcy Code,[20]

---

> with the limitations found in section 330, are to be applied as outer limits and not as grants or entitlements to the maximum fees specified.

H.R. Rep. No. 95-595 at 327 (1977), U.S. Code Cong. & Admin. News 1978, 5963, 6238; S.Rep. No. 95-989 at 37 (1978), U.S. Code Cong. & Admin. News 1978, 5787, 5823.

In re Pilon, 300 B.R. 559, 561 (Bankr. D. Conn. 2003).

[19] See also Wolverine, 527 B.R. at 820.

[20] In evaluating the reasonableness of professional fees, § 330(a)(3) directs the court to consider:

> . . . the nature, the extent, and the value of such services, taking into account all relevant factors, including–
>
> (A)  the time spent on such services;
>
> (B)  the rates charged for such services;
>
> (C)  whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)  whether the services were performed within a reasonable amount of time

often supplemented by reference to the factors set forth in <u>Johnson v. Georgia Highway Express</u>, 488 F.2d 714, 717-19 (5th Cir. 1974) (the "*Johnson* factors").[21]

This Court has already determined that the Trustee's reported hours and hourly rate are reasonable and awarded the lodestar amount on December 30, 2015.  The remaining issue, then, is whether the Trustee is entitled to compensation in excess of the fees previously awarded.

The First Circuit has indicated that the "lodestar can . . . be adjusted up or down to reflect a variety of factors."  <u>Boston & Maine</u>, 776 F.2d at 7.  But the lodestar amount is presumed to represent a fair and reasonable fee,[22] generally not warranting further

---

commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)  with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)  whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

[21] Courts considering reasonableness of a fee request with reference to the *Johnson* factors look to:

1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill necessary to properly perform the legal services; 4) the preclusion of other employment by the attorney or firm due to acceptance of the case; 5) the customary fees charged; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the court or the client; 8) the amount of money involved in the case and the results obtained; 9) the experience, reputation, and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship between the attorneys or firm and the client; and 12) fee awards in similar cases.

<u>In re First Software, Corp.</u>, 79 B.R. 108, 112-13 (Bankr. D. Mass. 1987) (citing <u>Boston & Maine v. Moore</u>, 776 F.2d 2, 7 (1st Cir. 1985); <u>Johnson</u>, 488 F.2d 714; <u>In re Fleeman</u>, 73 B.R. 579 (Bankr. M.D. Ga. 1987)).

[22] Because the lodestar amount is presumed to be a reasonable fee, the Court has adopted the

adjustment, since "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorneys' fee." Lipsett v. Blanco, 975 F.2d 934, 942 (1st Cir. 1992) (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 566 (1986)).[23]

For this reason, the mantra in bankruptcy fee enhancement cases is consistent in its refrain that enhancements are appropriate only in the "rare and exceptional" case where "the surrounding factors of the case are such that, even after having arrived at an appropriate lodestar, a court would still be constrained by the facts to conclude that the resulting [amount] is *still* too low to fairly compensate the professional." In re El Paso Refinery, L.P., 257 B.R. 809, 837 (Bankr. W.D. Tex. 2000) (emphasis in original).

Simple rhetoric describing a trustee's or professional's efforts with catch phrases such as "exceptional," "unprecedented," "extraordinary," and the like are insufficient, standing alone, to justify a fee enhancement. See, e.g., Public Service Co., 160 B.R. at 420. But when those laudations are accompanied by a "specific showing of exceptional activity," bankruptcy courts have been persuaded that the objectively-calculated lodestar amount is unreasonable inasmuch as it fails to adequately compensate the trustee or the professional for work in a particular case. Id.[24]

---

PSC's characterization of any additional compensation to be paid as an "enhancement" to the Trustee's fee.

[23] See also Asarco, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re Asarco, L.L.C.), 751 F.3d 291, 295 (4th Cir. 2014) ("Because the four *Johnson* factors related to attorney skill and legal complexity are presumably fully reflected in the lodestar, those four factors can only form the basis for a fee enhancement in 'rare and exceptional' circumstances."), aff'd on other grounds Baker Botts L.L.P. v. Asarco LLC, -- U.S. --, 135 S.Ct. 2158 (2015); In re Public Service Co. of New Hampshire, 160 B.R. 404, 414 (Bankr. D.N.H. 1993) (presumptive reasonableness of the lodestar amount "rests on the reality that many of the *Johnson* factors are applied in determining the lodestar hourly rate").
[24] See also Bank of New England, 484 B.R. at 280; In re First Am. Health Care of Ga., Inc., 212 B.R. 408, 414-16 (Bankr. S.D. Ga. 1997).

A multitude of factors have been cited by courts in concluding that a trustee or professional is (or is not) deserving of a fee enhancement over the lodestar amount. Those factors have included a delay in payment or risk of non-payment;[25] a comparison between the fee requested and the maximum compensation allowed by the Bankruptcy Code;[26] payment of creditors in full;[27] the efficient resolution of complex legal issues;[28] and results that surpass parties' reasonable expectations at the start of the case or representation.[29]

But one overarching theme *can* be gleaned from the case law.  In the majority of

---

[25] See, e.g., Grant v. George Schumann Tire & Battery Co., 908 F.2d 874, 880 (11th Cir. 1990); Lawler v. Teofan (In re Lawler), 807 F.2d 1207, 1213 (5th Cir. 1987); Bank of New England, 484 B.R. at 283; Globe Distribs., Inc. v. Adolph Coors Co. (In re Globe Distribs., Inc.), 145 B.R. 728, 736 (Bankr. D.N.H. 1992); In re Southern Merch. Distribs, Inc., 117 B.R. 725, 729 (Bankr. S.D. Fla. 1990); In re Elmendorf Bd. Corp., 57 B.R. 580, 587 (Bankr. D.N.H. 1986).

[26] See, e.g., In re Clemens, 349 B.R. 725 (Bankr. D. Utah 2006).  The Clemens court was called upon to interpret § 330(a)(7), which was added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  That newly-added section provides that "[i]n determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326."  11 U.S.C. § 330(a)(7).  The Clemens court construed this provision as requiring a court "to consider the provisions of § 326 *as a part of* its reasonableness inquiry," i.e., "to determine reasonableness with an eye on the statutory cap."  Id. at 731 (emphasis in original).  While this Court does not, and need not in this case, rule on whether it agrees with the Clemens court's interpretation of § 330(a)(7), even absent the presence of § 330(a)(7), it is not unreasonable to consider the maximum compensation available under § 326 as a factor in evaluating a trustee's requested fees.

[27] See, e.g., CRG Partners Grp., L.L.C. v. Neary (In re Pilgrim's Pride Corp.), 690 F.3d 650, 653 (5th Cir. 2012); In re Mirant Corp., 354 B.R. 113, 121 (Bankr. N.D. Tex. 2006); In re Nucentrix Broadband Networks, Inc., 314 B.R. 574, 579 (Bankr. N.D. Tex. 2004); In re Gencor Indus., Inc., 286 B.R. 170, 180 (Bankr. M.D. Fla. 2002); El Paso Refinery, 257 B.R. at 813; In re Farah, 141 B.R. 920, 922 (Bankr. W.D. Tex. 1992); In re the Morris Plan Co. of Iowa, 100 B.R. 451, 454 (Bankr. N.D. Iowa 1989).

[28] See e.g., Gencor, 286 B.R. at 175, 180; In re Baldwin-United Corp., D.H., 79 B.R. 321, 352 (Bankr. S.D. Ohio); Elmendorf, 57 B.R. at 586.

[29] See, e.g., Public Service Co., 160 B.R .at 420; Farah, 141 B.R. at 925; Baldwin-United, 79 B.R. at 352; Elmendorf, 57 B.R. at 585-86.

cases, courts rely heavily on the outcome of a case (generally measured by the funds available for creditors) in deciding whether an enhancement is warranted.[30]   Whether discussed in the context of the "results obtained," "value of services rendered," or "benefits received by the bankruptcy estate," the fundamental inquiry is the same – have the trustee's or professional's actions in this case benefited the bankruptcy estate to such an admirable degree that a mere multiplication of the hours expended by the hourly rate fails to adequately compensate the individual for the work they have done?   While this focus on the importance of case outcomes in determining the propriety of fee enhancements seems elementary, its application is not so simple.   A variety of considerations can inform the conclusion that the results in a particular case so surpass the norm or initial expectations that a fee enhancement is warranted; there is no one formula or set of facts subject to rote application in defining the truly "exceptional" case.[31]

---

[30] See, e.g., Nucentrix, 314 B.R. at 578; Gencor, 286 B.R. at 175; Public Service Co., 160 B.R .at 420; In re Cardinal Indus., Inc., 151 B.R. 843, 848 (Bankr. S.D. Ohio 1993); First Software, 79 B.R. at 123; Elmendorf, 57 B.R. at 585-86.

[31] The fact-intensive nature of determining appropriate fees in a particular case was thoughtfully elucidated by the bankruptcy court in In re Draina:

> [I]n determining the benefit to the estate a court must consider not only the amount of funds to be disbursed but also other factors surrounding the work done by the trustee in accumulating such funds.  For example, a trustee who simply becomes the custodian of an unencumbered bank account of sizeable amount should not necessarily be compensated for the minimal effort expended in taking control of that substantial asset for the estate at the same level as a trustee which expends considerable skill and effort in investigating, recovering and successfully liquidating assets which were not readily available or readily marketable.  In the first instance, while there would be a substantial disbursement, it could not be said that the trustee's efforts have substantially benefitted the estate. In the second instance, it would be clear that the trustee would in all likelihood have conferred a significant benefit to the estate.

191 B.R. 646, 648 (Bankr. D. Md. 1995).

In evaluating the Trustee's request for fees in excess of the lodestar amount, it helps to begin with those factors the Court believes are *not* particularly relevant in the particular circumstances of this case.  The Court does not find persuasive the PSC's assertion that an enhancement is not warranted here because the parties that are "paying for it" – the tort claimants – did not "agree" to bear the cost of a fee enhancement.  See, e.g., First American, 212 B.R. at 416 (agreement of party bearing the cost of the fee enhancement may be a factor in some cases).  While dilution of the dividend for creditors may, in some circumstances, inform a court's decision whether or not to grant a fee enhancement, the Court is mindful that in every non-surplus case, each dollar paid to a trustee or estate professional is one unavailable for distribution to creditors.  This is not, in and of itself, a reason to deny appropriate compensation.

Nor does the Court believe that payment of all creditors in full is a prerequisite to the award of a fee enhancement in the otherwise appropriate case.  In cases where creditors *are* paid in full, courts have understandably emphasized that fact in elaborating on the propriety of a fee enhancement, see, supra, fn. 27.  But the outcome of some cases, particularly those which initially appear administratively insolvent, can be characterized as exceptional and surpassing expectations even where creditors receive less than full payment.[32]

 Finally, the Court cannot accept the PSC's assertion that fee enhancements are unwarranted where the results obtained were the product of a cooperative effort.

---

[32] See, e.g., In re The 1031 Tax Grp., LLC, 2009 WL 4806199, *3 (Bankr. S.D.N.Y. Dec. 9, 2009) (fee enhancement awarded to Chapter 11 trustee who took administratively insolvent case and provided a 34% dividend to unsecured creditors); In re Wright Air Lines, Inc., 147 B.R. 20, 22 (Bankr. N.D. Ohio) (enhancement awarded without full payment to creditors where Chapter 7 trustee took a seemingly "no-asset" case and was able to provide a "respectable" dividend to unsecured creditors).

Admittedly, some courts declining to award fee enhancements have indicated that results
obtained through joint efforts do not justify a fee enhancement for any one individual.[33]
But this Court adopts instead the reasoning explicated by the bankruptcy court in El Paso
Refinery.  In rejecting the argument that "when 'results obtained' are attributable to the
joint efforts of more than one professional, no single professional is entitled to an
enhancement," the court stated:

> While appreciating the force of the logic behind the Fee Examiner's position
> (a given professional should not be able to take credit for a result that it
> cannot prove it "caused"), a court ought to be especially careful about
> announcing a rule on a matter as sensitive as fees that would in effect
> *discourage* professionals in a bankruptcy case from cooperating with one
> another.    Experienced  bankruptcy  professionals  understand  that
> cooperation is usually *essential* to the success of most reorganizations and
> liquidations.   Compensation rules that encourage competition instead of
> cooperation (in order to be able to take credit for good results at the end of
> the case) are likely to generate a raft of cases with *bad* results.  A better
> rule, the one adopted here, is that cooperation is not *ipso facto* grounds for
> denying a request for fee enhancement, though a court must be ever
> mindful of the potential for abuse.

257 B.R. at 829, 830.  The cooperative effort of the professionals in this case should be
commended; it should not be used to conclude that a particular fee request is
unreasonable.  The *only* fees before the Court at this juncture are those to be paid to the
Trustee.  Allowing fees in an amount greater than the lodestar amount reflects only the
Court's determination that the lodestar amount does not represent a reasonable fee for
the work the *Trustee* has done.  It does not denigrate the substantial benefits to the estate

---

[33] See, e.g., In re Molten Metal Tech., Inc., 345 B.R. 26, 29 (Bankr. D. Mass. 2006) (court declined
to provide an enhancement over the lodestar amount reasoning, *inter alia*, that the applicant "did
not achieve the notable outcome all by itself . . . [r]esponsibility for the outcome is surely
attributable to the team and not just one player"); Public Service Co., 160 B.R. at 424 ("[T]he Court
concludes that *everybody involved* brought the increased value to the estate.  Stated negatively,
no one particular party brought the 'swing in asset values' through any exceptional activity . . . .")
(emphasis in original).

conferred by the cooperative efforts of others. And it should not be interpreted as suggesting that the results obtained should be credited to the Trustee alone.

The Trustee's work in this case has been exemplary. Under his watch, what began as a case likely to be hopelessly administratively insolvent has been transformed into a vehicle by which the hundreds (if not thousands) of NECC's victims will receive *some* compensation for their suffering from a pool of funds the size of which could not possibly have been seriously projected at the outset of this case. Moreover, this fine result was achieved in an extraordinarily short amount of time given the number of parties involved, the need for the Trustee to coordinate his efforts in both this Court and the MDL Court, the complex and novel legal issues that required successful navigation, and the, at times, difficult relationships between and among some of the many players in this case. And the Trustee did not achieve these results quickly through litigation (although he was clearly willing to litigate, if necessary). Instead, he managed to deftly maneuver this case to a successful outcome "with little contested litigation but with much finesse and negotiation." Gencor, 286 B.R. at 175. "Attorneys should be rewarded for facilitating consensual resolutions, particularly when the results achieved are extraordinary." Id. at 180. Given that the Trustee resolved this highly troublesome case swiftly through consensual resolution and, at the end, with virtually unanimous creditor support, the Court finds that the lodestar amount simply does not reflect the benefit the Trustee's services have conferred not only on NECC's creditors and tort victims, but on other parties, such as the many settling third parties, as well.

"Unfortunately, there is no uniform standard by which to arrive at a fee enhancement figure. Fee calculation is not an exact science." Farah, 141 B.R. at 926.

However, a review of bankruptcy cases from this Circuit, as well as from other jurisdictions, reflects that fee enhancements generally fall in the range of 1.1 to 2 times the lodestar amount.[34]  Given the exceptional results in this case, and the efficiency and speed with which the Trustee was able to accomplish far more than could reasonably have been anticipated at the beginning, the Court finds that a reasonable fee is equal to 2 times the lodestar amount.   Accordingly, for all the reasons discussed in this Memorandum, the Court will ALLOW the Trustee's Fee Application, exclusive of the reimbursement of expenses already previously allowed, in the total amount of $2,271,509.70, of which the sum of $1,135,754.85 has already been paid under this Court's Order of December 30, 2015.

---

[34] Courts characterize fee enhancements in different terms, i.e. some describe the enhancement in terms of a percentage of the lodestar fee, some describe it as a lodestar multiplier, and others simply award an additional sum of money without calculating the percentage of the fee or lodestar multiplier.  In an effort to compare apples to apples, the following citations contain this Court's conversion of the amounts awarded to a lodestar multiplier.  See, e.g., Asarco, 751 F.3d 291 (1.2 and 1.1 multipliers for debtor's counsel firms); Pilgrim's Pride, 690 F.3d 650 (1.167 multiplier for debtor's professional); Bank of New England, 484 B.R. 252 (1.137 multiplier for Chapter 11 examiner); 1031 Tax Grp., 2009 WL 4806199 (2.0 multiplier for trustee); Mirant, 354 B.R. 113 (1.1 multiplier for equity committee counsel and counsel to examiner); Nucentrix, 314 B.R. 574 (1.1 multiplier for debtor's counsel); Gencor, 286 B.R. 170 (1.27 multiplier for debtor's counsel); El Paso Refinery, 257 B.R. 809 (1.72 multiplier for trustee's counsel); Draina, 191 B.R. 646 (1.86 multiplier for trustee); Public Service Co., 160 B.R. 404 (1.75 multiplier for Chapter 11 examiner); Wright Air Lines, 147 B.R. 20 (1.255 multiplier for trustee's attorney); Farah, 141 B.R. 920 (2.0 multiplier for debtor's counsel); Morris Plan Co., 100 B.R. 451 (1.1 multiplier for debtors' counsel); Baldwin-United, 79 B.R. 321 (1.16, 1.148, and 1.1 multipliers for various professionals); First Software, 79 B.R. 108 (approximately 1.1 multiplier for creditors' committee counsel); Elmendorf, 57 B.R. 580 (1.75 and 1.5 multipliers for trustee's counsel and creditors' committee counsel, respectively).

    The Court also identified one case in which that an enhancement equal to a 2.57 multiplier of the lodestar amount was awarded to a Chapter 7 trustee.  See Miniscribe Corp., 309 F.3d at 1245.  That multiplier, however, appears to lie outside the range of most awards.  Indeed, in a special concurrence, Circuit Judge Hartz disagreed with the majority's statement that the bankruptcy court did not err in using a 2.57 multiplier, stating that the "assertion is both unnecessary and questionable."  Id.

III.  <u>CONCLUSION</u>

Given the magnitude of the harm inflicted on hundreds of individuals across the nation, the Court cannot say that the outcome achieved in this case was a "good" one. No matter the recovery for victims and their families, the only *good* outcome would be one that restored the lives and the health of those so grievously injured by NECC's contaminated products.  The Court *can* say with certainty, however, that given the enormous logistical, legal, economic, and emotional difficulties which besieged all parties to this case, the outcome here is the *best* that could be achieved, and far exceeded any hope or expectation many of those involved, including this Court, initially dared to contemplate.

DATED: January 15, 2016                    By the Court,

                                           _____
                                           Henry J. Boroff
                                           United States Bankruptcy Judge