# EXHIBIT 1

```
 1               UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4  IN RE:  NEW ENGLAND

 5  COMPOUNDING PHARMACY, INC.      MDL No. 2419

 6  PRODUCTS LIABILITY LITIGATION   Master Docket

 7                                  1:13-md-02419-RWZ

 8

 9               - - - - - - - - - - -

10

11         VIDEOTAPED DEPOSITION DUCES TECUM

12             OF RITU T. BHAMBHANI, M.D.

13

14

15            Wednesday, February 10, 2016

16

17

18

19

20

21

22

23  Reported by:  Lori J. Goodin, RPR, CLR, CRR,

24              Realtime Systems Administrator

25  Assignment No. 26236
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 2..5

Page 2

```
1
2
3
4        The deposition of RITU T. BHAMBHANI, M.D.,
5    was convened on Wednesday, February 10, 2016,
6    commencing at 10:01 a.m., at the offices of
7
8        PESSIN KATZ LAW
9        Suite 400
10       901 Dulaney Valley Road
11       Towson, Maryland  21204
12
13   before Lori J. Goodin, Registered Professional
14   Reporter, Certified LiveNote Reporter, Certified
15   Realtime Reporter, Realtime Systems
16   Administrator, and Notary Public in and for the
17   State of Maryland.
18
19
20
21
22
23
24
25
```

Page 4

```
1                   APPEARANCES CONTINUED
2
3    For Defendant:
4        GREGORY KIRBY, ESQUIRE
5        CATHERINE W. STEINER, ESQUIRE
6        PESSIN KATZ LAW
7        Suite 400
8        901 Dulaney Valley Road
9        Towson, Maryland  21204
10       410-938-8800
11       gkirby@pklaw.com
12       csteiner@pklaw.com
13
14   ALSO PRESENT:
15       Meeko Goodhill, videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                     APPEARANCES
2
3    For Plaintiffs:
4        HARRY ROTH, ESQUIRE
5        MICHAEL COREN, ESQUIRE
6        COHEN PLACITELLA & ROTH, P.C.
7        2001 Market Street
8        Suite 2900
9        Philadelphia, PA  19103
10       215-567-3500
11       hroth@cprlaw.com
12       mcoren@cprlaw.com
13
14   And Co-counsel:
15       PATRICIA KASPUTYS, ESQUIRE
16       SHARON L. HOUSTON, ESQUIRE
17       LAW OFFICES OF PETER G. ANGELOS
18       One Charles Center
19       100 North Charles Street
20       22nd Floor
21       Baltimore, Maryland  21201
22       410-649-2000
23       pjk@lawpga.com
24       shouston@lawpga.com
25
```

Page 5

```
1                       CONTENTS
2    EXAMINATION BY                              PAGE
3    Mr. Roth                                      8
4
5                       EXHIBITS
6    NO.     DESCRIPTION                         PAGE
7    Exhibit 1051 Answers to PSC's first set of    9
8                 Interrogatories
9    Exhibit 1052 Responses to PSC's request for   9
10                Production of documents
11   Exhibit 1053 Responses to Steering Committee  9
12                Revised subpoena request
13   Exhibit 1054 CV of Dr. Ritu Bhambhani        23
14   Exhibit 1055 Earlier version of CV of        31
15                Dr. Ritu Bhambhani
16   Exhibit 1056 Current Policy and Procedure    46
17                Manual and organizational chart
18   Exhibit 1057 Salesman Andrew Howden's card  118
19   Exhibit 1058 Order form used by Box Hill for 118
20                NECC, Bates 000011
21   Exhibit 1059 NECC prescription order form of 131
22                9/21/2012, Bates 13
23   Exhibit 1060 NECC prescription order form of 137
24                9/24/2012
25   Exhibit 1061 NECC invoice for 9/25 order     140
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                                 Pages 6..9

Page 6

```
1              EXHIBITS CONTINUED
2   NO.      DESCRIPTION                    PAGE
3   Exhibit 1062 Packing list from NECC for    141
4              9/24/2012 order
5   Exhibit 1063 Packing list from NECC for    142
6              8/13/2012, Bates 10
7   Exhibit 1064 Form from Department of Health 157
8              signed by Dr. Bhambhani, 10/6
9   Exhibit 1065 Procedure notes of Dr. Bhambhani 201
10             for Ms. Rozek's procedure at
11             Box Hill Surgery Center, 8/31/2012
12
13
14
15
16
17
18         Original Exhibits attached to the
19  original transcript.)
20
21
22
23
24
25
```

Page 7

```
1              PROCEEDINGS
2         THE VIDEOGRAPHER:  We are now on
3   record.  This is Tape Number 1 to the
4   videotaped deposition of Dr. Ritu Bhambhani
5   taken in the matter of In Re:  New England
6   Compounding Pharmacy, Inc., Products
7   Liability Litigation.
8         This deposition is being held at
9   Pessin Katz Law, located at 901 Dulaney
10  Valley Road, Suite 500, Towson, Maryland,
11  21204, on Wednesday February 10th, 2016, at
12  10:01 a.m.
13        My name is Meeko Goodhill and I am
14  the videographer.  The court reporter is Lori
15  Goodin.
16        Counsel please introduce yourselves
17  for the record, please.
18        MR. ROTH:  My name is Harry Roth.  I
19  am from the firm of Cohen Placitella & Roth,
20  and I represent the estate of Brenda Rozek.
21        MR. COREN:  Michael Coren on behalf
22  of multiple plaintiffs and the estate of
23  Brenda Rozek.
24        MS. HOUSTON:  Sharon Houston on
25  behalf of multiple plaintiffs of the Law
```

Page 8

```
1   Offices of Peter Angelos.
2         MS. KASPUTYS:  Patricia Kasputys,
3   also with the Law Offices of Peter Angelos on
4   behalf of multiple plaintiffs.
5         MS. STEINER:  Catherine Steiner on
6   behalf of Dr. Ritu Bhambhani, Ritu Bhambhani,
7   M.D., LLC, and Box Hill Surgery Center.
8         MR. KIRBY:  Greg Kirby on behalf of
9   same Box Hill defendants.
10        THE VIDEOGRAPHER:  Court reporter
11  please swear in the witness and we can
12  proceed.
13        RITU T. BHAMBHANI, M.D.,
14  a witness called for examination, having been
15  first duly sworn, was examined and testified as
16  follows:
17              EXAMINATION
18  BY MR. ROTH:
19        Q.   Good morning Dr. Bhambhani.  How are
20  you?
21        A.   Good, thank you.
22        Q.   You understand that today I'm going
23  to question you generally about the practice at
24  Box Hill Surgical Center and the use of
25  compounded materials that were manufactured or
```

Page 9

```
1   compounded by NECC, correct?
2         A.   Yes.
3         Q.   Before today's deposition, did you
4   review any material?
5         A.   Some of the materials that we have
6   turned in, policies, procedure manuals, I
7   requested to see, this is my first time doing a
8   deposition.  So, I requested to see a couple of
9   depositions to get a sense of what to expect.
10        Q.   Okay.  I had marked before we went
11  on the record Answers to Interrogatories,
12  Responses to Requests for Production of
13  Documents, and Responses to Subpoena Requests.
14             (Exhibit Number 1051
15              marked for identification.)
16             (Exhibit Number 1052
17              marked for identification.)
18             (Exhibit Number 1053
19              marked for identification.)
20  BY MR. ROTH:
21        Q.   Let me show you what I have marked
22  as Exhibit 1051, and this is the answers to the
23  PSC's first set of interrogatories.
24             Did you review these before today's
25  deposition?
```



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016            Pages 22..25

Page 22

1  of just taking some things out or modifying them
2  to make it more relevant to what I intended the
3  practice to be.
4      Q.    Okay.  And, over the course of years
5  from, and I am correct you started Box Hill
6  Surgery Center in 2008, correct?
7      A.    Correct.
8      Q.    And so in the course of years from
9  2008 up until the present time, do you review the
10  Policy and Procedure Manual annually?
11      A.    Yes.  That is part of the licensure
12  process is I am required to review it annually.
13      Q.    Okay.  And you mentioned
14  accreditation.
15          By what entity or entities is Box
16  Hill accredited?
17      A.    So, the accreditation is through, it
18  is the Accreditation Agency For Ambulatory Health
19  Centers.  AAACF (sic), I think I have their full
20  form.
21      Q.    And what is an ambulatory health
22  center?
23      A.    A free-standing facility, which is
24  how they categorize Box Hill Surgery Center.
25      Q.    Let's mark, and I don't have copies

Page 23

1  of this.  We can do that after, this is the CV.
2          MS. STEINER:  Oh, I have extra
3      copies.  I believe I already gave one to the
4      court reporter.
5              (Exhibit Number 1054
6              marked for identification.)
7  BY MR. ROTH:
8      Q.    Your counsel gave us an updated CV
9  that I have asked the court reporter to mark as
10  Exhibit 1054.
11          Can you just walk us through your
12  medical education and postgraduate training,
13  please?
14      A.    Medical education, so, I went to
15  medical school in India.  It is routine over
16  there to take a, I guess the equivalent of a
17  medical college admission test at the end of 12th
18  grade as long as the track has been identified in
19  11th and 12th grade which is considered the
20  premedical track.
21          So, I took that exam and I got
22  admission at the government medical college
23  Amritsar, which is the city where I was born.
24  And I had done part of my schooling there.
25          And then after, medical school over

Page 24

1  there is broken down into what is considered
2  professional years, which are the equivalent of
3  one and a half calendar year.  So, it is three
4  professional years, plus one year of mandatory
5  internship before you get the degree.
6          So, I did my first professional year
7  over there and then transferred to New Delhi to
8  Maulana Azad Medical College where I did my
9  second and third professional years, and then did
10  my internship over there and completed that, got
11  my degree.
12          And then took my USMLE to come here.
13  And started my internship and transitional
14  medicine in Youngstown, Ohio where my brother was
15  at the time.
16      Q.    Uh-huh.
17      A.    And during the internship I applied
18  to the Cleveland Clinic for my anesthesia
19  residency; interviewed there and started my
20  residency, finished my residency there and
21  decided to apply for a fellowship position in
22  pain management at the clinic.
23          And completed that at the clinic.
24  And then came here to Baltimore to start my first
25  job.

Page 25

1      Q.    Okay.  And your first job was at
2  Chesapeake Perioperative Services?
3      A.    Correct.
4      Q.    You are, are you board certified in
5  anesthesia and pain management?
6      A.    I am.
7      Q.    And, typically when we think of
8  anesthesia, we think of somebody sitting in the
9  operating room and delivering anesthesia during
10  surgery or operative procedures.
11          Do you practice that type of
12  anesthesia?
13      A.    I do.
14      Q.    Okay.  And, can you tell me, is
15  there a difference between the practice of that
16  type of anesthesia and pain management?
17      A.    Probably a broad stroke difference
18  would be anesthesia in general is done for
19  patients who are undergoing a procedure.  And the
20  main role of the anesthesiologist is to have the
21  patient undergo it without undue pain, so whether
22  it is sedation or general anesthesia, where they
23  are completely asleep.
24          Pain management on the other hand is
25  where the focus is more in helping diagnose or



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 26

1    manage pain --
2         Q.    Okay.
3         A.    -- unrelated to surgical pain.
4         Q.    Is the, your fellowship in pain
5    management focuses on that latter type of
6    treatment obviously.
7         A.    Well, the fellowship itself, yes,
8    you are right.  The fellowship itself encompassed
9    both acute post-operative pain.  So, still
10   somewhat related to the post-surgical period.
11   That is just the nature of that particular
12   fellowship program.
13        Q.    Uh-huh.
14        A.    But also a bigger emphasis was on
15   non surgery related chronic pain.
16        Q.    When you began your practice at
17   anesthesiology and pain, I'm sorry, Chesapeake
18   Perioperative Services, and if this is not the
19   way to ask the question you will let me know, but
20   how much of your time was spent in the operating
21   room delivering anesthesia to surgical patients
22   versus seeing patients for pain management?
23        A.    So, I was brought on board by,
24   mainly by, it was a group of practicing
25   anesthesiologists and they had one physician who

Page 27

1    was practicing both anesthesia and pain
2    management.
3              And he wanted to continue doing both
4    and the case load for pain management was, I
5    guess, increasing to the point where he felt that
6    the group needed to bring on another physician
7    who could see the chronic pain management
8    patients.
9              So, when I first started, it was a
10   gradual process.  I was there for just a little
11   less than three years.
12             So, when I first started, he himself
13   was doing, I think two, maybe two and a half days
14   of pain, and anesthesia in the operating rooms
15   the rest of the time.
16             I probably, when I started, because
17   it was a matter of then starting off seeing
18   patients and gradually as that part of the
19   practice built up, because there was the ability
20   for us to see patients, more than just the one
21   physician, my interest was still strongly to
22   continue doing both anesthesia and pain
23   management.
24             So, we kind of shared the case load
25   for the pain procedures.  So it probably started

Page 28

1    off where I was seeing maybe half a day of pain
2    patients and just gradually grew a little bit
3    more.
4              By the time I left there I was
5    probably doing that anywhere from one to two days
6    a week.
7         Q.    Doing that being?
8         A.    Pain management.  And then doing
9    anesthesia.
10             I was still taking calls for the
11   anesthesia part, which was overnight call at the
12   hospital, the same as any other member in the
13   group, and then doing anesthesia in the ORs, the
14   days I wasn't doing pain management during the
15   daytime.
16        Q.    Okay.  And you stayed there for a
17   little less than three years according to your CV.
18        A.    Uh-huh.
19        Q.    And moved on to Harford County
20   Ambulatory Surgery Center.
21             Were you the Director of
22   Anesthesiology and Pain Management the entire
23   time you were at Harford County?
24        A.    Actually, no.  When they hired me at
25   Harford County Ambulatory Surgery Center it was

Page 29

1    to replace an anesthesiologist who was, who had
2    retired and they had an interim anesthesiologist
3    who also was close to retiring, so they needed
4    someone to do anesthesia there.
5              When they hired me to do anesthesia,
6    I am not sure that they were aware that I was
7    pain-fellowship trained.
8              And, so that was a, that is
9    something that evolved a little bit after I had
10   already joined or started working for them.
11             And as far as the director, I was
12   the only anesthesiologist there full-time, which
13   kind of made me director by default.
14        Q.    Okay.
15        A.    But the pain management part
16   happened later.
17        Q.    So, can you tell me when it was that
18   you became the director of pain management at
19   Harford County?
20        A.    I couldn't say.  I'm not sure if
21   somewhere in there, I don't know, any kind of
22   paperwork or something if they have that as
23   formally identified that I was made director of,
24   I mean, it started off where they hired me mainly
25   to be their anesthesiologist.  They have two



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 30..33

Page 30

1    operating rooms and I was covering those.
2              And, once they realized I had done a
3    pain fellowship, asked if I had an interest in
4    seeing pain patients, and I said sure.
5              So, it was my practice eventually
6    became a little bit similar to what I had done at
7    Franklin Square Hospital, where I was doing
8    anesthesia some days and pain other days.  Again
9    started gradually.
10             And then by the time I think I left
11   them, I was doing about the same, maybe two days
12   of, two, two a half days of pain management, and
13   two and a half to three days of anesthesia.
14        Q.   Okay.  According to your CV you left
15   there in June of 2008.  And that is, and started
16   Box Hill Surgery Center in July of 2008.
17        A.   So, I started my practice in July of
18   2008.
19             Box Hill Surgery Center --
20        Q.   I asked a bad question so let me try
21   a different thing.
22             You left Harford in June of 2008.
23        A.   Yes.
24        Q.   Is that correct?
25        A.   Yes.

Page 31

1         Q.   In July of 2008, your CV says you
2    went into private practice, and was Box Hill
3    Surgery Center an existing entity at that time?
4         A.   No.
5         Q.   And did you start Box Hill Surgery
6    Center?
7         A.   I did.
8         Q.   And from 2008 to 2012, what was the
9    business, if you will, of Box Hill Surgery
10   Center?
11        A.   Just Box Hill Surgery Center was
12   where I was doing, it functioned as a
13   free-standing ambulatory surgery center where I
14   was doing probably most of my chronic pain
15   procedures.
16        Q.   Okay.  I want to mark as
17   Exhibit 1055.
18             (Exhibit Number 1055
19             marked for identification.)
20   BY MR. ROTH:
21        Q.   And this has been produced to us, it
22   has Bates number BHSC 000260.
23             MS. STEINER:  Which is the earlier
24        version of the CV.
25   BY MR. ROTH:

Page 32

1         Q.   The version, this is a version of
2    your CV that was produced to us before today.
3              Between 2008 and 2012, and I mean
4    the end of 2012, how much of your practice was
5    pain management versus, were you doing any
6    delivery of anesthesia in the operating rooms?
7         A.   I have continued to do anesthesia
8    the entire time.
9              Probably varied a little bit over
10   time when I first started my practice.
11             I picked up more anesthesia time at
12   local surgery centers as an independent
13   contractor.
14             As the pain practice got more
15   established, oh, and I was doing anesthesia for
16   Harford County Ambulatory Surgical Center
17   part-time also.  And then for a period of time it
18   was fairly steady where I was doing one day of
19   anesthesia at Harford County Ambulatory Surgical
20   Center, seeing office patients three, three and a
21   half days a week and then doing procedures
22   usually a half to one day a week.
23        Q.   The reason why I showed you the
24   earlier version of your CV is, it does not have a
25   section where it says current privileges active

Page 33

1    as the one that was provided today does.
2              So, there was no mention today of
3    active privileges anywhere other than Box Hill.
4    And on the CV you provided today which was 1054,
5    you list Harford County Ambulatory Surgical
6    Center and Surgical Center of White Marsh as
7    active privilege -- places where you have active
8    privileges in addition to Box Hill.
9              Did you, before, between 2008 and
10   the end of 2012, have active privileges for
11   Harford County Ambulatory Surgical Center and the
12   Surgical Center of White March?
13        A.   Harford County Ambulatory Surgery
14   Center, yes.  Surgical Center of White Marsh was
15   not open in 2008.
16             Gosh, I'm not sure I remember
17   exactly when they opened, but I have been going
18   there, here and there, for at least the last,
19   off-and-on, the last year or two.  They were
20   not --
21        Q.   The last year or two would take us
22   back to 2014.
23        A.   Correct.  I don't know if they
24   existed.  Definitely not in 2008 and I'm not sure
25   if they existed even in 2012.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 34..37

Page 34

1   Q.   And you have a courtesy privilege
2  listed in your current CV at the University of
3  Maryland Upper Chesapeake Medical Center and
4  MedStar Franklin Square Hospital.
5       What does that mean?
6   A.   Courtesy privileges is where they
7  have changed the definitions a little bit over
8  time, the hospitals have.
9       Currently what that is is I can go
10  in, have access to a patient record, but I'm not
11  actively, I don't have privileges to actively
12  take care of a patient.
13   Q.   Okay.  Between 2008 and 20, the end
14  of 2012, were you seeing patients at Harford
15  County Ambulatory Surgery Center for pain
16  management.
17   A.   I did, for approximately a year.
18  Because I started the pain practice, I actually
19  got active privileges at Upper Chesapeake, to be
20  able to, I needed a place to do the procedures.
21  The office setup was not set up to be able to do
22  x-ray guided procedures.
23       So, I requested privileges at Upper
24  Chesapeake and requested to continue privileges
25  at Harford County Ambulatory Surgery Center for

Page 35

1  pain procedures.
2       I continued going to Harford County
3  Ambulatory Surgery Center even after Box Hill was
4  open for pain procedures, because even though, I
5  guess, doors were opened, the licensure process,
6  the accreditation, insurance contracts, they took
7  time.
8       So, for that initial, I'm not sure
9  exactly dates, but, probably almost a year I was
10  still doing some of my procedures at Harford
11  County Ambulatory Surgery Center.
12   Q.   Okay.  And, not holding you to a
13  precise time, would it be fair to say that after
14  July of 2009, say, you were not delivering pain,
15  I'm sorry, you were not seeing pain management
16  patients at Harford County?
17   A.   Not on a regular basis.
18   Q.   Okay.  Well then let me, I just want
19  to be clear.
20       Were there times after that first
21  year, up to the end of 2012, when you would treat
22  patients, pain management patients, at Harford
23  County Ambulatory Center?
24   A.   I'm not sure about 2012.  But,
25  somewhere between 2009 and 2012 could I have done

Page 36

1  a pain procedure, possible.
2       If, since I was still doing
3  anesthesia there, if there was, I guess, the best
4  example that comes to mind off the top of my head
5  right now is there was a physician who had seen
6  me at Harford County Ambulatory Surgery Center as
7  a patient, and he knew I worked at Harford
8  County's Ambulatory Surgery Center for
9  anesthesia, and I remember him calling me one
10  time when I was doing anesthesia there to see if
11  I could see him for his pain, for a procedure.
12       And do it over there because of some
13  insurance reason, I'm not sure what it was.  But
14  it was easier for him to get it done at Harford
15  County, and I said yes.
16       So, I know I still had privileges
17  there, but I wasn't routinely going there a
18  certain day of the week or routinely doing
19  procedures there.
20   Q.   When you would see patients at
21  Harford County, and again if I'm asking this the
22  wrong way, you will let me know; I'm sure your
23  lawyers will.
24       But what I'm trying to find out is
25  were these patients, were these Harford County

Page 37

1  patients or Box Hill patients?
2   A.   That is easy to answer.  They were
3  Ritu Bhambhani patients.
4   Q.   Okay.  Tell me about that.
5   A.   So, the pain practice, once I left
6  Harford County Ambulatory Surgery Center,
7  patients that I saw were Ritu Bhambhani's chronic
8  pain patients.
9   Q.   Okay.
10   A.   A certain percentage of those
11  patients, if they needed a procedure, had the
12  option to have it done at Box Hill Surgery
13  Center, had the option to get it done at Upper
14  Chesapeake, had the option to get it done at
15  Harford County Ambulatory Surgery Center, because
16  I had privileges at all of those places.
17       So any patient that I might have
18  injected at Harford County Ambulatory Surgery
19  Center after July of 2008 would have been Ritu
20  Bhambhani's patient going to Harford County
21  Ambulatory Surgery Center where they are the
22  places where it is being done, so there is a
23  facility where it is being done.
24       But, the provider, the physician
25  would be Ritu Bhambhani.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 58

1  supplies from was fairly straightforward.
2        I essentially asked the person who
3  was responsible for acquiring supplies at Harford
4  County and reached out to pretty much the same
5  people, be it a rep or a vendor or a supplier,
6  and decided we were, that is where we were going
7  to get our products from.
8        Q.   When you started Box Hill, had you
9  ever -- I think you told me you had never run a
10 free-standing ambulatory center before.
11       A.   Correct, I had not.
12       Q.   You mention that you spoke with a
13 lawyer who gave you a form of the Policy and
14 Procedure Manual to review.  Right?
15       A.   Correct.
16       Q.   Did you work with any other
17 consultant to figure out how to open and run a
18 ambulatory center?
19       A.   The lawyer was the consultant.  His
20 role was to help set up, go through the initial
21 licensure process.  Did I use any other
22 consultant?
23       Q.   Sure.  Yes.
24       A.   Not that I remember.
25       Q.   Did the lawyer provide you with any

Page 59

1  information about, you know, the equipment that
2  you would need, the medications you would need,
3  you know, the stuff you need to run an ambulatory
4  pain management center?
5        A.   Since the purpose of Box Hill was
6  mainly to do procedures for my patients, and I
7  have been doing those already at the time for
8  almost eight years, I didn't necessarily ask of
9  what I would need.
10       In terms of the question of where,
11 like I said, I had been using these things at
12 Harford County, I was still actively providing
13 care there.  So it was fairly simple to ask them.
14       That is a multi-specialty surgery
15 center providing other services.  I was mainly
16 asking about what I was requiring for my pain
17 procedures, because I was intending to do similar
18 procedures as I was there already for years, to
19 ask where they were getting the supplies from and
20 I just continued the same.
21       Q.   And do you remember who it is that
22 you spoke to at Harford to get that information?
23       A.   For supplies mainly?
24       Q.   I'm really thinking now about
25 medications.

Page 60

1        A.   Okay.  For medications, mainly, it
2  would either be Barbara Wagner who does most of
3  their ordering, or it would be their nurse
4  manager, Kim Marrow.
5        Q.   And is Barbara Wagner a physician?
6        A.   No, she does their ordering; she is
7  a surgical tech who is, does most of their
8  ordering.
9        Q.   Okay.  Along the course of your
10 training in anesthesia and pain management, is
11 one of the things you learn, you know, about the
12 actual medications, the agents that provide pain
13 relief?
14       MS. STEINER:  Objection as to form.
15 You can answer.
16       THE WITNESS:  I'm not sure I
17 understand.
18 BY MR. ROTH:
19       Q.   Sure.  I mean, did you receive
20 training in what types of medications or
21 compounds worked to provide pain relief?
22       A.   Where I did my residency and
23 fellowship?
24       The best that I remember for almost
25 the entire time, at least during the fellowship,

Page 61

1  for the most part the agents were pretty much the
2  same.
3        So, if there were any discussions
4  as, you know, part of a didactic session, I don't
5  remember exactly, but, it was, was there a
6  lecture on?  Is that the question?  On
7  medications?
8        Q.   I guess what I'm trying to
9  understand is, was it your responsibility as the
10 Medical Director of Box Hill, or as a physician
11 administering agents to your patients, is it your
12 responsibility to understand the benefits and
13 risks of the medications that you are
14 administering?
15       MS. STEINER:  Let me just object to
16 the question because you are, you are
17 switching between present tense, past tense,
18 and training.  And I'm not sure.
19       MR. ROTH:  Fair enough.
20       MS. STEINER:  I'm not sure which
21 question she is supposed to answer right now.
22       MR. ROTH:  I thought she answered
23 with respect to training so I just want to
24 jump to it a little bit.
25       I mean, you know, and I don't know



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 78..81

Page 78

1  don't recall making a differentiation at the
2  time.
3       Q.    Okay.  Have you, since using,
4  starting using preservative-free MPA, can you
5  tell me approximately when that was?
6       A.    Sometime when I started doing pain
7  at Harford County Ambulatory Surgical Center.
8            I would have to guess I started
9  there in mid-2008.  So, sometime around --
10           MS. STEINER:  I think you are off.
11           THE WITNESS:  Oh, I'm sorry, 2003.
12  So, somewhere between that and 2004.
13  BY MR. ROTH:
14       Q.    Okay.  And again I was really just
15  looking for an approximation.
16       A.    Right, right, right.
17       Q.    Because I wanted to know, since you
18  began using preservative-free MPA, and by the way
19  was that always, that was always compounded?  The
20  preservative-free MPA?
21           MS. STEINER:  Objection as to
22      foundation.
23  BY MR. ROTH:
24       Q.    Well, was the preservative-free MPA
25  that you began using a compounded steroid?

Page 79

1       A.    At Harford County Ambulatory Surgery
2  Center?
3       Q.    Yes.
4       A.    I know they were getting it from
5  NECC because that is more so not so much
6  initially when they first started getting, like I
7  said I wasn't involved with the process of
8  getting the medication.
9            But, more so finding out where they
10  were getting it from as I was getting ready to
11  start my practice when, you know --
12       Q.    Understood.  So, I was looking back
13  after your conversation with, I think her name
14  was Barbara.
15       A.    Yes.
16       Q.    You learned they got their MPA from
17  NECC?
18       A.    Correct.
19       Q.    And you learned that that was a
20  compounding pharmacy?
21       A.    Most likely, yes.
22       Q.    Okay.  In any event, since you began
23  using preservative-free MPA, did you do any
24  research or personal investigation to determine
25  whether or not steroids that had preservatives in

Page 80

1  them, that the preservatives in steroids made,
2  created risks for patients?
3            MS. STEINER:  Can you give a time
4       frame on that?
5  BY MR. ROTH:
6       Q.    I want to know from approximately
7  2004?
8            MS. STEINER:  Four.
9  BY MR. ROTH:
10       Q.    Until the recall, did you ever look
11  at the issue of whether preservatives in steroids
12  carried a risk to patients?
13       A.    Other than the discussion with
14  Dr. Dickson when he suggested that I try it and
15  the reason that he gave, I don't remember reading
16  a specific article about that.
17       Q.    Okay.  And was there any discussion
18  with Dr. Dickman about whether or not there were
19  other -- well, there were different manufacturers
20  of preservative-free MPA.
21            MS. STEINER:  Objection as to form
22      and foundation.
23            THE WITNESS:  I had no, I guess,
24      reason to ask about manufacturers.  Just
25      like, you know, when I was at Franklin

Page 81

1  Square, he was there.  These were the
2  steroids available, this is what I used,
3  okay.
4            Over here, I was not involved in the
5  ordering process.  So, I don't remember
6  asking about the actual source at the time
7  when he first -- it probably would have been
8  more a discussion between him and the person
9  ordering, or their nurse manager there at the
10  time.
11  BY MR. ROTH:
12       Q.    In 2008 when you became the person
13  responsible for deciding what medications to
14  purchase for Box Hill and for your patients --
15       A.    Uh-huh.
16       Q.    -- until the recall, did you
17  investigate whether or not there were other
18  manufacturers of preservative-free MPA than NECC?
19       A.    No.
20       Q.    Are you aware or were you aware of
21  whether or not there were any preservative-free
22  steroids available other than the MPA, I'm sorry,
23  and let me set my time frame.
24            After you became responsible for
25  purchasing, for deciding what steroids would be

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 82..85

Page 82

1   purchased for Box Hill, until the recall, did you
2   know whether or not there was available
3   preservative-free steroids other than what you
4   were purchasing from NECC?
5         A.    I had no reason to, or at least the
6   best that I remember, I don't remember having to
7   look for another source.  I mentioned earlier it
8   was something that I used for years prior, so it
9   was a, not just this one thing but most of the
10  supplies that I got was a simple, kind of thing
11  to say, okay, this is where they got it from, I
12  have used this before, I was fine with it and
13  this is what I'm going to continue using.
14        If I used, like I said anything
15  other than this, I don't remember having to
16  either ask Andy or my nurse or me personally
17  thinking of let me look for an alternative.
18        Q.    Okay.  And again you say you don't
19  remember doing it.
20        But, between 2008 and the time of
21  the recall, was NECC your sole source for
22  injectable steroids at Box Hill?
23        A.    For the most part.  The only part I
24  don't remember, I know somewhere in there, there
25  were case reports of particulate steroid causing

Page 83

1   problems in cervical injections.
2         What I don't remember is if I had
3   that discussion with the nurse at Box Hill or
4   Harford County where I wanted to try a
5   nonparticulate steroid, and there is only a
6   couple of different options there that I would
7   have used that.
8         But as far as the preservative-free
9   MPA, the best I know NECC was pretty much our
10  source the entire time.
11        Q.    Okay.  Let me turn a little bit
12  about the decision to use NECC.
13        You said you spoke with Barbara
14  Wagner at Harford.  What do you recall about your
15  conversation about using NECC?
16        A.    I wouldn't recall a conversation
17  from 2008.
18        The general sense of the time was
19  getting a list of, you know, okay, she says, you
20  know, these are the gloves you used to use, this
21  is the local anesthetic that you have used for
22  the last five years, this is the skin prep you
23  have used for the last five years, this is the
24  steroid you have used, this is the pointers you
25  use, and getting that list and seeing where she

Page 84

1   was getting them from, and, reaching out to the
2   same providers of the different supplies and
3   either, you know, me myself, if I had time or
4   giving it to the nurse and saying research and
5   I'm going with that.
6         Q.    When you first became responsible
7   for ordering the steroids at Box Hill, other than
8   saying, asking, I mean, is it basically Barbara,
9   where did we get the steroids from and she told
10  you it was NECC and gave you contact information?
11        A.    More than likely that is how I would
12  have, like I said, not just the steroid, that
13  would have been for pretty much --
14        Q.    For everything?
15        A.    -- for most supplies that I would
16  use for the pain procedures.
17        Q.    Okay.  And when she gave you
18  information, first of all, when you were at
19  Harford, had you had any contact with anybody
20  from NECC?
21        A.    Not, to the best of my recollection.
22        Q.    Had any, anybody ever talked to you
23  at all, had you even heard the name NECC before
24  you asked Barbara where do we get the steroid
25  from?

Page 85

1         A.    I mean, if I had, you know, in the
2   general course of being there five days a week as
3   their anesthesiologist, but I don't remember
4   anything out of the ordinary.
5         Q.    Okay.  Did you ever get any --
6   strike that.
7         In 2008, when you became responsible
8   for purchasing your medications and steroids and
9   Barbara tells you okay, we got this stuff from
10  NECC, did you talk to, did you find out any
11  information about how NECC, you know, did its
12  work?  Made its compounds?
13        MS. STEINER:  Objection as to form
14  and foundation.
15        THE WITNESS:  How they made their
16  compounds?
17  BY MR. ROTH:
18        Q.    Sure.
19        A.    I was ordering something I had used
20  before.  I have no reason to ask that particular
21  question of any of the suppliers of any of the
22  products I was getting at the time because I
23  wasn't really, in my mind at least I wasn't
24  changing anything of what I had done at an
25  established center.  They were Medicare certified



Page 86

1   state licensed, AAAC accredited, I had done it
2   for years over there.  I was not consciously
3   making a particular change to look into anything
4   further about these specific companies, I guess.
5          Q.   Okay.
6          A.   Process.
7          Q.   And, so, all of those things you
8   were mentioning about they were Medicare
9   approved, they were AAA, you know, rated, that
10  related to Harford, right?
11         A.   Uh-huh.
12             MS. STEINER:  That is a yes?
13             THE WITNESS:  Yes, sorry.
14  BY MR. ROTH:
15         Q.   So, in a, do I understand then
16  because they were relying on this, on these
17  providers, whether it was NECC or others, that
18  was a good enough reference for you to use those
19  providers as well when you started your own shop?
20         A.   I mean, I had used those things
21  before.
22             So, the fact that I was at a place
23  that I had worked at and I had used those
24  products before for every single thing that I
25  needed to continue doing pain management, it

Page 87

1   seemed like a reasonable thing to continue using
2   the same.
3          Q.   What is a compounding pharmacy?  I
4   mean, do you know what a compounding pharmacy is?
5          A.   If they have like a legal
6   definition, I'm not sure.
7              But, my best understanding is it is
8   a pharmacy that can put together a medication in
9   a form that a, I guess a regular manufacturing
10  company does not.
11         Q.   Okay.  And, do you, did you, between
12  2008 and the time of the recall, know whether or
13  not compounding pharmacies were subject to FDA
14  oversight?
15         A.   Since the day I came to the country
16  I assumed every medicine is under FDA oversight.
17  So I have to admit I don't recall ever
18  specifically thinking about, the oversight over
19  compounding pharmacies specifically.
20         Q.   Okay.  So, I take it then you were
21  not aware that compounded drugs don't have FDA
22  findings of safety, efficacy and manufacturing
23  quality.
24             MS. STEINER:  Objection as to form
25      and foundation.

Page 88

1              THE WITNESS:  I'm sorry, say that
2       again.
3   BY MR. ROTH:
4          Q.   I take it then that you were not
5   aware that compounded drugs lack FDA findings of
6   safety, efficacy, manufacturing quality.
7              MS. STEINER:  Objection as to form
8       and foundation.
9              THE WITNESS:  I do not know about
10      the FDA's thing other than back then and even
11      now I work under what I think is a reasonable
12      assumption that the FDA has oversight over
13      any medication, prescription or
14      over-the-counter.
15  BY MR. ROTH:
16         Q.   Well, sitting here today, if you
17  were to learn that compounding pharmacies do not
18  have FDA oversight, would that affect your
19  thinking about whether or not you would prescribe
20  compounds for your patients?
21             MS. STEINER:  Objection as to form
22      and foundation.
23             THE WITNESS:  Still sitting here
24      today, I find it hard to believe that FDA
25      does not have oversight over a medication.

Page 89

1   BY MR. ROTH:
2          Q.   Okay.  So I want you to assume for a
3   moment that the FDA did not have oversight over
4   compounded pharmacies.
5              Would that affect your decision
6   about whether or not to prescribe or use
7   compounds for your patients?
8              MS. STEINER:  Let me just object to
9       the hypothetical, because you are asking her
10      to assume something prior to the 2012 time
11      frame and asking her to make a decision now
12      based upon it.
13  BY MR. ROTH:
14         Q.   Well, I'm actually asking her now.
15  I'm sorry if I got my tenses screwed up.
16             Were you to learn that the FDA does
17  not have oversight over compounded pharmacies,
18  would that affect your decision about whether or
19  not to prescribe or use compounds for your
20  patients?
21             MS. STEINER:  Objection.  Same
22      objection.
23             THE WITNESS:  I have to admit I
24      would find it very hard to envision the FDA
25      not having oversight over a medication.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 158..161

Page 158

```
 1   BY MR. ROTH:
 2        Q.    Correct.  All right.  Here is the
 3   back page.  Thank you.
 4             Doctor, whose handwriting was on
 5   this form?
 6        A.    Mine.
 7        Q.    And what is this form?
 8        A.    This was a form sent to me by the
 9   physician at the Department of Health.  I want to
10   say at the time it was Dr. Maria Saeed.
11        Q.    Okay.
12        A.    Who was my contact person at the
13   Department of Health as of October 1st on.  When
14   I was first contacted by them.
15             And, I, oh, October 6th.
16             So, they were, I'm trying to
17   remember.  Because this was sent to us via
18   e-mail.  I don't remember whether it was
19   individually addressed to me, because a lot of
20   the e-mails are being sent as group e-mails to a
21   lot of the Maryland facilities to collect this
22   kind of data where they needed to know the
23   information that they were collecting on us.
24        Q.    Okay.  And, so, this form came to
25   you, obviously, after the problem was identified
```

Page 159

```
 1   and you say the Department of Health, that is the
 2   Maryland State Department of Health, right?
 3        A.    Correct.
 4        Q.    And, the, what did you do to get the
 5   information to respond to this form?
 6        A.    To the best of my recollection the
 7   0810 was the most straightforward.  That
 8   particular large shipment had not even been put
 9   away in the medicine cabinet when the recall
10   notice came.  So, that was already separated out.
11   So it was easy to do that part.  As far as the
12   0629 lot, it was a matter of that is what we had
13   on hand, so we could identify clearly that we had
14   that on hand.
15             We knew the shipment date.  And, we
16   essentially, since we essentially then said that
17   from the time we had received that medication
18   potentially any procedures done from that date
19   until the date of the, that we had last used that
20   lot, those were the patients exposed to that one.
21             And then for the 0521, I'm not
22   100 percent --
23        Q.    I'm sorry, just to be clear it is
24   0512.
25        A.    Oh, this is 0521.
```

Page 160

```
 1        Q.    0521.  You are 100 percent right.
 2   Just to be clear, I got it wrong.
 3        A.    And the 0521 lot again that was
 4   simple.  We had only used it one day and for one
 5   other patient.  So, again that was
 6   straightforward.
 7        Q.    When was the lot 0521 purchased?
 8        A.    Not purchased from NECC.
 9             After I had been contacted by
10   Mr. Rozek about Mrs. Rozek's passing away, he
11   had, I think called me on my phone to let me know
12   that she had passed away.
13             Right around the same time, I am not
14   sure of the exact dates, again I could look in
15   charts and be more certain on those.  Right
16   around the same time I had received a call from
17   Ms. Dreisch that she had been to the hospital a
18   couple of times.  We had done an internal, we is
19   Andy and I, had sat down and looked at our
20   internal process.  The two patients had presented
21   at different hospitals, very different
22   presentations.
23             I had already spoken, when Ms. Rozek
24   passed away, I had already spoken with a
25   physician at Johns Hopkins, which was not the
```

Page 161

```
 1   initial hospital where she had been admitted, who
 2   had asked questions about her procedure, whether
 3   there had been anything untoward during the
 4   procedure.
 5             I had already looked at my images
 6   that I had saved from her procedure.  We usually
 7   save an image, usually when I inject the dye to
 8   confirm needle placement.
 9             Just trying to see if there was any
10   correlation.
11             They, at the time were not sure what
12   had led to her illness, either her initial
13   hospital where she was admitted based on what
14   Mr. Rozek told me or Johns Hopkins, I think I
15   spoke to the intensivist there.
16             And they were just looking at all
17   different aspects I guess, of her health prior
18   to that.  And since the injection was something
19   that had happened a couple of weeks prior to her
20   being sick.
21             And then on the other side was
22   Ms. Dreisch, very different presentation,
23   different hospital, being treated for a very
24   different kind of symptom complex.
25             We just said because those were two
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 162..165

Page 162

1  patients who had had injections, Andy and I sat
2  down and just did an internal kind of thorough
3  review of our process to see was there anything
4  that we could identify that could tie those two
5  patients to their procedures.
6          And, not being able to explain,
7  based on anything that Ms. Dreisch had told me or
8  Mr. Rozek or the intensivist, we just sat down
9  and just kind of reviewed our process from the
10  time the patient walks in the door until the time
11  they leave. Everything that happens to them, who
12  all takes care of them, and we just decided we
13  were just going to maybe look at, is there
14  something else that we can do.
15          We could not figure out at that
16  point any correlation with the procedure. At
17  least we didn't have an explanation, none of the
18  other providers seemed to.
19          We decided, you know, if it was
20  somehow related to something that happened here,
21  is there anything else we could do? And the one
22  thing that came to mind was, well as we order
23  supplies, not knowing what it was, I told Andy,
24  let's reorder all of our injectables and anything
25  that is sterile, you know, gloves, their skin

Page 163

1  prep, what have you, and make sure no one had
2  been sick on our staff recently.
3          Because one of the things that
4  Ms. Dreisch's initial working diagnosis that she
5  was being treated for, that she had told us was a
6  viral meningitis, which is usually community
7  acquired.
8          So, I couldn't come up with anything
9  there.
10          So, thinking of that kind of a
11  transmission, I started asking all of my staff to
12  start wearing a mask if they were going to be in
13  the operating room. Prior to that I used to wear
14  a mask. I started saying well everyone wear a
15  mask.
16          So, coming to the 0521, it wasn't
17  ordered from NECC. I found out about Ms. Dreisch's
18  passing away, whatever day. Andy said okay, I
19  will place a new order, then came back and said
20  well they are not going to be able to get it to
21  us prior to a certain date. You have a procedure
22  day before that. So, I reached out to Harford
23  County Ambulatory Surgery Center where I was
24  still doing anesthesia, and asked if we could
25  borrow medication from them.

Page 164

1          I borrowed that 35 vials off that
2  lot number and used it for, I think, 24 patients
3  one day and one other patient another day while
4  we placed our own order, the 21st. So, the
5  procedure is done on the 21st were done using
6  this medication, the 0521 lot that was borrowed
7  from Harford County.
8      Q.    That procedure was done on
9  September 21st?
10     A.    Correct.
11     Q.    Were done using 0521 2012.
12     A.    Right. And even earlier in that
13  week, if I remember, there might have been one
14  procedure on a day. Because, that was a few days
15  after the 17th. On the 17th already, the 17th is
16  when I found out about her passing away. I
17  talked to Andy probably right away or the next
18  day and said let's figure something out. Let's
19  sit down and go over everything. I'm going to
20  say that it was probably later that day on the
21  17th.
22          And, when we started talking about,
23  okay, what are the different things we are going
24  to do, and we decided we are going to order the
25  21st was a regular procedure day.

Page 165

1          So, by the 18th, 19th, he is like,
2  okay, well, we will order the next lot in the
3  meantime let's use, if we can borrow it from
4  Harford County, so that is what we borrowed from
5  them.
6      Q.    Okay. The, did you know when you
7  contacted Harford that the MPA, the preservative-
8  free, you asked for preservative-free MPA?
9      A.    That is what they were using at the
10  time. So I asked for it.
11     Q.    So, you were, you knew that you were
12  using NECC provided MPA?
13     A.    Yes.
14     Q.    Okay. Did you call NECC after your
15  November, September 17th when you had this
16  meeting with Andy and before you got the notice
17  of recall?
18     A.    I didn't call NECC or any of the
19  others. Like I said, at the time it was more
20  just trying to come up with any way to correlate
21  or to explain what those two patients were going
22  through or had gone through.
23          And, figuring out was there anything
24  in our process, not just a medicine, not an
25  injection, but just our whole, like I was even



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 182..185

Page 182

1  country, that that is a worry I should have.
2       Q.   And, have you since the recall
3  learned of ways you as a physician can find out
4  about the, how a compounding pharmacy carries out
5  their tasks?
6            MS. STEINER:  I'm sorry, you are
7       going to have to repeat that, because I lost
8       you somewhere along the way.
9            MR. ROTH:  It seems to be the day.
10      I'm sorry.
11 BY MR. ROTH:
12      Q.   Have you since the recall found out
13 ways that you as a physician can, you know, learn
14 how a compounding pharmacy, you know, makes sure
15 its stuff is sterile.
16           MS. STEINER:  Objection as to form
17      and foundation.
18           THE WITNESS:  Generally speaking,
19      when the recall happened, or maybe more
20      important -- give me a minute.
21 BY MR. ROTH:
22      Q.   Yes, sure, let's go off the record
23 for a second.
24           THE VIDEOGRAPHER:  Off the record at
25      2:53.

Page 183

1            (Recess taken -- 2:53 p.m.)
2            (After recess -- 2:59 p.m.)
3            THE VIDEOGRAPHER:  Back on at 2:59.
4            MR. ROTH:  So could you read back my
5       last question please?
6            (Whereupon, the record was read by
7       the reporter as requested.)
8            MS. STEINER:  Objection as to form
9       and foundation.
10 BY MR. ROTH:
11      Q.   Yes, so let me try to rephrase the
12 question so it is a little less glib.
13           But, since the recall, have you
14 learned ways that you as a physician can, you
15 know, verify whether or not a compounding
16 pharmacy is utilizing good manufacturing
17 processes?
18           MS. STEINER:  Objection as to form
19      and foundation.
20           THE WITNESS:  Generally speaking,
21      right after the recall which happened on the
22      26th or the 27th of September, incidentally I
23      used to do anesthesia on Wednesday at Harford
24      County Ambulatory Surgical Center.
25           The room that I was doing anesthesia

Page 184

1  in, I think had the surgical tech who orders
2  medications there, had mentioned, I had not
3  seen the recall notice at this point, this
4  was a Wednesday during the day, had mentioned
5  that they were planning on switching, getting
6  preservative-free MPA from another pharmacy.
7            So, when the recall notice first
8  came, besides other things, but the decision
9  to get the steroid from another place at the
10 time of the recall, and not still getting any
11 indication from NECC based on my call to them
12 when I saw the recall notice, whether there
13 had been any problems.
14           I was still with the thought
15 preservative-free was the best steroid to use
16 for patients for their spinal injections.  So
17 I had still intentions to continue using
18 preservative, obviously they were not
19 supplying it.
20           And since I had just the previous
21 day spoken with the person at Harford County
22 that they were switching, I said, oh, this is
23 a coincidence.  Otherwise I would have no
24 idea, since the recall, since I have never
25 ordered from anywhere else, that it did make

Page 185

1  it easier for me to actually have another
2  resource already, that I could just call her
3  and get the information on who they were
4  going with.
5            I hadn't really paid that much
6  attention the day before when she said they
7  were switching, because I had no thoughts of
8  switching until that recall notice came.
9            So, I asked her to give me the name
10 of the contact person for the new pharmacy
11 they were going with.
12           And, I don't remember if I
13 personally called or if Andy called
14 requesting that an account be set us for us
15 to be able to order from them.
16           I saw the recall notice on a
17 Thursday; I still had procedures to do that
18 Friday.  I could not use what I had on hand
19 from the 0629, since I had already decided
20 not to use that and had borrowed the 0521
21 from Harford County which was also on the
22 recall notice, so I couldn't use that.
23           The 0810 that had been shipped by
24 then was on the recall notice; I couldn't use
25 that.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 186..189

Page 186

1          So, again, I don't remember if I
2     called or I asked Andy to call, you know,
3     Barbara had mentioned they were switching,
4     had they switched already and do they have
5     something else on hand.
6          They happen to have JCB's
7     preservative-free MPA.
8     BY MR. ROTH:
9          Q.   Whose was it?
10         A.   Harford County, JCB Labs, they
11    happened to have that already on hand, so we
12    borrowed that to get through my procedures on the
13    28th.
14         There was the weekend, October 1st
15    is when I got the call from the Department of
16    Health.
17         Still not understanding the extent
18    of NECC's problem, I said okay, while we started
19    to do what the Department of Health wanted us to
20    do, still under the impression it was an isolated
21    NECC problem not a, some sort of a bigger
22    compounding pharmacy's kind of an issue.  As we
23    were doing what they needed us to do with these
24    patients --
25         Q.   And that is the calling and

Page 187

1     notifying?
2          A.   Exactly.  Calling, notifying, giving
3     them information until they told us that we could
4     start calling or sending letters.
5          To come back to your question, did I
6     know any different on what to ask?  So I again
7     reached back to Barb.
8          At the time she had informed me that
9     they had a pharmacy consultant that they could
10    reach out to as needed.
11         And I said, hey, as he suggested,
12    there is something I should be asking this new
13    place now that I'm getting this medication from.
14         And I think she gave me a list,
15    either of questions to ask or asking for their
16    license.
17         So, whatever I must have asked based
18    on that pharmacist suggesting to Barb, Barb
19    passing that information to me, I asked all of
20    that of JCB.  Kept it, I have a JCB folder, all
21    of that stuff will be in there.
22         However, what changed my mind in
23    thinking there was anything I could do to confirm
24    that what they were giving me was sterile and
25    what I expected it to be, changed over the

Page 188

1     subsequent months as I saw either news or other
2     recall reports from other compounding pharmacies
3     having contamination in their products.
4          So, within those first few months, I
5     did use the JCB product that we initially
6     ordered.
7          But as I continued to see the news
8     reports of the other, in other states compounding
9     pharmacies having issues, at the time I had
10    decided since there is no way for me to ensure or
11    oversee or check what they were doing is right.
12    And clearly the people who are supposed to be
13    making sure what they were doing they are doing
14    right, I have no control of either, that my then
15    safest option at the time was to use steroid with
16    preservative.
17         And I switched to using preservative
18    methylprednisolone.
19         Q.   Do you remember the name of the
20    consultant that Barb suggested you speak with?
21         MS. STEINER:  Objection as to
22    foundation.
23         THE WITNESS:  I'm sorry, she did not
24    suggest I speak, that is a resource that they
25    had that she had already spoken with.

Page 189

1     BY MR. ROTH:
2          Q.   Sorry, I understood.
3          A.   And he had suggested asking the
4     pharmacy these questions.  And I said, okay, I
5     will do that.  I do not know that person's name.
6          Q.   I missed a step there.  I apologize.
7          Barb gave you the questions that her
8     resource gave to her.
9          A.   Correct.
10         Q.   Okay.  And then you asked those of
11    JCB.
12         A.   Correct.  Whether there were
13    questions to ask or asking them, you know, like
14    the first time around like I said NECC to get
15    stuff from them was a very, in my mind, just as
16    simple as ordering any of the other products.
17         I had used it before, this is where
18    they were getting it from, this was the first
19    time I was having to look elsewhere, and, try and
20    figure something out.  And, so she made those
21    suggestions and I followed those, asking for
22    their license, or whatever you asked for.
23         Like I said, it would be in that
24    folder.
25         Q.   Right.  And that is the first time



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com