# EXHIBIT 3

```
 1                 UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MASSACHUSETTS
 2

 3
     ------------------------------X
 4                                  :
     IN RE:  NEW ENGLAND            :
 5   COMPOUNDING PHARMACY, INC.     :
     PRODUCTS LIABILITY LITIGATION: :  MDL NO. 2419
 6                                  :
     This Documents Relates to:     :  Master Docket
 7                                  :  1:13-md-02419-RWZ
     All Cases against the Box      :
 8   Hill Defendants                :
                                    :
 9   ------------------------------X

10

11              VIDEOTAPED DEPOSITION OF
                    BARBARA WAGNER
12
                    AUGUST 30, 2016
13                    10:32 a.m.

14
                 Peter G. Angelos, P.C.
15                 One Charles Center
                  100 N. Charles Street
16                    20th Floor
                  Baltimore, MD   21201
17

18

19

20

21

22

23

24

25   Before:   Linda Bahur, RPR
```



Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 3 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016                Pages 2..5

Page 2

```
                    A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
     LAW OFFICES OF PETER G. ANGELOS, P.C.
     Patricia J. Kasputys, Esquire
     Sharon L. Houston, Esquire
     100 N. Charles Street
     20th Floor
     Baltimore, MD   21201
     (410) 649-2000
     pkasputys@lawpga.com
     shouston@lawpga.com

     COHEN PLACITELLA & ROTH, P.C.
     Michael Coren, Esquire
     2001 Market Street
     Suite 2900
     Philadelphia, PA   19103
     (215) 567-3500
     mcoren@cprlaw.com

ON BEHALF OF THE WITNESS KIM BROCKMEYER, R.N.;
     ECCLESTON AND WOLF
     R. Scott Krause, Esquire
     Ashley L. Marucci, Esquire
     7240 Parkway Drive
     4th Floor
     Hanover, MD   21076
     (410) 752-6464
     krause@ewmd.com
     marucci@ewmd.com
```

Page 3

```
ON BEHALF OF BOX HILL SURGERY CENTER, RITU BHAMMBHANI,
M.D., RITU BHAMBHANI, M.D., LLC:

     PESSIN KATZ LAW, P.A.
     Catherine W. Steiner, Esquire
     901 Dulaney Valley Road
     Suite 500
     Towson, MD   21204
     (410) 769-6143
     csteiner@pklaw.com
```

Page 4

```
                       I N D E X
Videotaped Deposition of:                              PAGE
BARBARA WAGNER
     Examination by Ms. Kasputys                         6
     Examination by Mr. Coren                           65


                       E X H I B I T S
             (Attached to the transcript)
NO.                                                    PAGE
Exhibit 1602   Notice of Filing Subpoena and             8
               Amended Notice of Deposition to
               Barbara Wagner
Exhibit 1603   E-mail chain between Andrew Howden       39
               and Barbara Wagner, dated 12/16/11

Exhibit 1604   Letter dated 9/26/12 re Voluntary        55
               Product Recall
Exhibit 1605   Fax cover sheet, 10/3/12                 58
Exhibit 1606   Letter dated 10/3/12 re Voluntary        60
               Product Recall

Exhibit 1607   Fax sheet from Kim Merrill re            61
               Voluntary Product Recall Response
               Form, dated 10/1/12

Exhibit 1608   qFax sheet from Barbara Wagner re        63
               Voluntary Product Recall Response
               Form, dated 10/4/12

Exhibit 1104   NECC Prescription Order Form             44
```

Page 5

```
                      P R O C E E D I N G S
          THE VIDEOGRAPHER:  This is tape number one to
the videotape deposition of Barbara Wagner, taken in the
matter of New England Compounding Pharmacy, Inc.,
Product Liability Litigation.  The deposition is being
held at the Law Offices of Peter G. Angelos.  This
deposition is being held on August 30, 2016.  My name is
Marcus Sobczak and I'm the videographer.  The court
reporter is Linda Bahur.
          Counsel, please introduce yourselves for the
record and the court reporter will then swear the
witness in, then we can proceed.
          MS. KASPUTYS:  I'm Patricia Kasputys, Law
Offices of Peter Angelos, and I'm here on behalf of
seven of the plaintiffs who have claims in this matter
against Box Hill Surgery Center and Dr. Ritu T.
Bhambhani.  And the clients whom we represent include
three people who died as a result of receipt of
contaminated injections of methylprednisolone acetate
and four people who are living with fungal meningitis.
          MS. HOUSTON:  My name is Sharon Houston, Law
Offices of Peter Angelos, and I represent multiple
plaintiffs described.
          MR. COREN:  Good day.  Michael Coren.  I
represent one of the plaintiffs in the Box Hill cases.
```


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016                Pages 6..9

Page 6

1   I also represent today other plaintiffs in the
2   multi-district litigation.
3           MS. STEINER:  Catherine Steiner on behalf of
4   Box Hill Surgery Center, Dr. Ritu Bhambhani, and Ritu
5   Bhambhani, M.D., LLC.
6           MS. MARUCCI:  Ashley Marucci with Eccleston
7   and Wolf on behalf of the deponent, Barbara Wagner.
8           MR. KRAUSE:  Scott Krause, also on behalf of
9   the witness.
10  Whereupon,
11                  BARBARA WAGNER
12  having been first duly sworn, was examined and testified
13  as follows:
14          EXAMINATION BY MS. KASPUTYS:
15      Q   Good morning again, Ms. Wagner.  As I've
16  said, I'm Patricia Kasputys, also known as Patty
17  Kasputys, and I'm here, as you know, to take your
18  deposition today to ask you a series of questions, and I
19  would like to begin with asking you whether you have
20  ever been deposed in the past.
21      A   No.
22      Q   So with respect to the general rules of
23  deposition, I'd like to go over -- let me rephrase that.
24          I'd like to go over some of the rules for a
25  deposition.

Page 7

1           Initially, you are giving testimony, I think
2   you understand, that it's under oath, correct?
3       A   Yes, I understand.
4       Q   And the court reporter is transcribing what
5   you say and you're here on videotape.  Do you understand
6   that?
7       A   Yes.
8       Q   When you do give responses, I ask, as you're
9   already doing, for you to give verbal responses and not
10  a shake of the head or other gestures so that it's clear
11  for the record what the responses are.  And also I would
12  ask if you do not understand any of my questions, would
13  you please tell me so?
14      A   I will.
15      Q   And if you do not tell me you do not
16  understand, then I will assume that you do.  Do you
17  understand that?
18      A   Yes.
19      Q   And counsel present for the defendants and
20  counsel present for you today may interpose objections
21  from time to time, and regardless of the objections, you
22  are to answer the question unless you are instructed
23  otherwise by counsel.  Do you understand that?
24      A   Yes, I do.
25      Q   And I'd like to start with showing you a copy

Page 8

1   of what we will mark as Deposition Exhibit 1602, which
2   is a notice.  Actually, it's the Notice of Filing
3   Subpoena and Amended Notice of Deposition to Barbara
4   Wagner, and it's in this litigation document number 3014
5   filed 7/28/16, and I'd like to let you take look at it,
6   please.
7           (Exhibit No. 1602 was marked for
8   identification.)
9           MS. KASPUTYS:  Counsel, do you all need
10  copies of the notice of deposition?
11          MS. MARUCCI:  Yes.
12          MS. KASPUTYS:  Catherine?
13          MS. STEINER:  Sure.  We already have a copy.
14          MS. KASPUTYS:  Sure.  Do you want one, Mike?
15          MR. COREN:  No.
16  BY MS. KASPUTYS:
17      Q   Have you seen this document before, Ms.
18  Wagner?
19      A   Yes.
20      Q   And at the end of the document, there is on
21  page, what is listed at the top as page 22 but on the
22  bottom, page 21, there is an endorsement of Third
23  Amended Protective Order of Confidentiality.
24          Have you had the opportunity to review this
25  document, these two pages?

Page 9

1       A   I didn't.  No, I did not.
2       Q   Well, I ask that in light of the fact that
3   you may be shown during this deposition exhibits which
4   have been designated pursuant to the Third Amended
5   Protective Order of Confidentiality in this litigation
6   that you read, and then if you have any questions, you
7   may certainly ask your counsel.
8           But I ask you to take a few moments to read
9   this, and then if you agree to its terms, I'd ask you on
10  page 22, listed as page 23 at the top, to sign and date
11  this document.
12      A   Okay.
13          MS. KASPUTYS:  And do you have anything you'd
14  like to add?
15          MR. KRAUSE:  No.
16  BY MS. KASPUTYS:
17      Q   And if you'd keep this document in front of
18  you, I'd like you to turn to -- I'd like you to turn to
19  page 7.  It's page 7 at the top and it's not numbered at
20  the bottom.  It looks like this.  It's labeled
21  Attachment A, Documents Sought.
22      A   Okay.
23      Q   Now, have you seen this document or this page
24  before?
25      A   No, I didn't look through it.


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

### Page 10

1  Q   Okay.  So when the subpoena asked you to
2  bring with you to this deposition documents on
3  Attachment A, which is this page, this is a page that
4  you have not reviewed?
5  A   I actually -- when I received this, I went
6  through and looked at the discovery.  I had already
7  turned in discoveries.  And when I went through this, I
8  pulled everything that was related to Box Hill.  So I
9  did submit those.  My apologies.
10 Q   When you say you had submitted them,
11 submitted them in response to request for production of
12 documents in this litigation?
13     MR. KRAUSE:  I'll object to the form of the
14 question.  You can answer.
15 A   I'm not sure.  So you're talking about Box
16 Hill, right?
17 Q   I am.
18 A   Anything -- the way I read this, I took
19 everything that was related to anything that we had
20 anything to do with Box Hill is what I turned in.
21 Q   And who did you turn that in to?
22 A   I thought -- did you not get it?  I turned it
23 in to my manager and I thought I made copies.
24     MS. KASPUTYS:  Do you have any documents that
25 Ms. Wagner has turned in that relate to Box Hill Surgery

### Page 11

1  Center?
2      MR. KRAUSE:  As we advised you prior to Ms.
3  Brockmeyer's deposition and this deposition, Ms. Wagner
4  is appearing here today pursuant to a subpoena issued to
5  her individually, not in a corporate capacity.  Ms.
6  Wagner does not individually possess any documents
7  responsive to the request.
8      Certainly if Harford County Surgical Center
9  may possess documents, but it was our position that we
10 were not obligated to produce any records in response to
11 a subpoena issued to Ms. Wagner individually.  She is
12 not here as a corporate designee.
13 BY MS. KASPUTYS:
14 Q   Ms. Wagner, were the documents that you put
15 together and gave to your general manager documents that
16 were in your custody and control at Harford County
17 Ambulatory Surgery Center?
18     MR. KRAUSE:  Object to the form of the
19 question.
20 A   I'm not sure what you mean.
21 Q   With respect to the documents that you pulled
22 together that relate to Box Hill Surgery Center, were
23 those documents that in your capacity as an employee of
24 Harford County Surgery Center were in your custody?
25     MR. KRAUSE:  Object to the form of the

### Page 12

1  question.
2  A   They were in the office.  They weren't per se
3  my documents.
4  Q   And you do have access to those documents,
5  correct?
6  A   Yes.  They're copied.
7      MS. KASPUTYS:  I would ask that Counsel
8  produce those documents.  They're relevant to the
9  subpoena and there was, as you know, filed by you a
10 motion first to quash the deposition of Ms. Wagner and
11 then a motion for protective order filed, and that was
12 ruled on by Judge Boal.  And the documents that were
13 narrowed from the original request should have been
14 produced today.  And I'm going to ask that this
15 deposition be kept open so that we can continue to
16 pursue the documents that we believe that we're
17 rightfully entitled to pursuant to the subpoena directed
18 to this witness.
19     MR. KRAUSE:  Counsel, I disagree with your
20 position from a legal perspective.  Our motion for a
21 protective order was with respect to the scope of what
22 we believed should be permissible during the course of
23 this deposition.
24     MS. KASPUTYS:  Go ahead.  If you may.  Go
25 ahead, Mike.

### Page 13

1      MR. COREN:  Just so we put a finer point on
2  the pencil, Mr. Krause, are you refusing to turn over
3  the documents which were gathered by Ms. Wagner and
4  tendered to your office?
5      MR. KRAUSE:  Yes, but for the reason I
6  stated.  The subpoena directed to Ms. Wagner was not
7  directed to Ms. Wagner in a corporate capacity with
8  Harford County.  It was directed to her individually and
9  she does not individually possess any such documents.
10 Just because Counsel has asked our client, Harford
11 County, in the course of other cases that we are
12 defending to pull documents, that that may ultimately be
13 relevant to our defense of those claims, Ms. Mocht does
14 not make those documents responsive to a subpoena issued
15 to Ms. Wagner individually.
16     MR. COREN:  And you consider documents that
17 were gathered that were specific Box Hill, as the
18 witness described, part of the Harford defense?
19     MR. KRAUSE:  It may very well be.
20     MR. COREN:  Or you don't know?
21     MR. KRAUSE:  I think that's protected by
22 attorney work product.  I don't think I owe you an
23 explanation as to how I view documents that we gathered.
24     MR. COREN:  No, but I do believe you now owe
25 Judge Boal an explanation, so I'm trying to get your



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016   Pages 14..17

### Page 14

1  explanation there so that when we pursue a motion for
2  sanctions, that your side is there. So now's the
3  time.
4          MR. KRAUSE: I believe my position's been
5  conveyed clearly.
6          MR. COREN: There's nothing further you want
7  to add to Judge Boal at this time?
8          MR. KRAUSE: I'm speaking to you, not to
9  Judge Boal at this time, but I made my position clear.
10         MR. COREN: Well, just so we're clear, I'm
11 offering an opportunity to address Judge Boal directly
12 because we intend to make a motion.
13         MR. KRAUSE: And I'll be happy to be heard
14 when Judge Boal asks me to speak.
15         MR. COREN: Perhaps, considering now is the
16 time we're asking because it seems a little bit of game
17 playing is being done here. I yield.
18         MS. KASPUTYS: Thank you.
19 BY MS. KASPUTYS:
20     Q    And I'm specifically, as we're looking at
21 Attachment A, number 5, any and all documents relating
22 to the exchange of medications purchased from NECC
23 between HCASC and Box Hill Surgery Center. Were there
24 documents that were responsive to this request that you
25 put together and gave to your general manager?

### Page 15

1      A    What do you mean by exchange?
2      Q    Well, actually -- well, we'll get to that a
3  little further in the deposition.
4           But what I am speaking of, I'll tell you now,
5  if there were medications, i.e., methylprednisolone
6  acetate preservative-free that was transferred from the
7  inventory at Harford County Ambulatory Surgery Center to
8  Box Hill, were there document related to such an
9  exchange of medication?
10     A    Yes.
11     Q    And those documents are among those that you
12 turned over to the general manager --
13     A    Yes.
14     Q    -- at Harford County Surgery Center?
15     A    Nurse administrator.
16     Q    The nurse administrator. Who is the nurse
17 administrator?
18     A    Kim Merrill.
19     Q    I'd like to ask you a few questions regarding
20 what you did to prepare for today's deposition. Did you
21 meet with anyone in advance of today's deposition? And
22 I'm not asking you to tell me of the content of
23 conversations that you had with counsel. But I'm asking
24 you whether you met with counsel.
25     A    Yes, I have.

### Page 16

1      Q    How many times?
2      A    Just once.
3      Q    And when was that?
4      A    Last week.
5      Q    And have you read anything to prepare for
6  your deposition today?
7           MR. KRAUSE: Ms. Wagner, I want you to make
8  sure you limit your response to anything you read
9  independently and not your meeting with counsel.
10     A    Correct. I just kind of reviewed what would
11 be expected of me at a deposition. Just basically what
12 you went over.
13     Q    Where would you have read that material?
14     A    It was like a "witness how to" kind of thing.
15 It was just instructions.
16     Q    Did you find that on the Internet?
17     A    A little bit on the Internet and then just
18 how counsel talked to me.
19     Q    Okay.
20     A    But I can't --
21     Q    So there may have been documents that were
22 given to you by counsel to help prepare you --
23     A    Not really.
24     Q    -- how to answer questions?
25     A    Oh, yeah. But general stuff.

### Page 17

1      Q    Have you read or been shown any depositions
2  --
3      A    No.
4      Q    -- that were taken of other parties or
5  witnesses in this case?
6      A    No.
7      Q    Have you met with or consulted with Kenneth
8  Vickers prior to this deposition --
9      A    No.
10     Q    -- regarding your being deposed?
11          MS. STEINER: Who is Kenneth Vickers?
12     A    Yeah.
13          MR. COREN: Andrew.
14     Q    I'm so sorry. I've done that before. I
15 don't know why, who I'm thinking of. Must be somebody
16 different. I'm sorry.
17          Do you know Andrew Vickers?
18     A    I do.
19     Q    And do work with Mr. Vickers?
20     A    On occasion.
21     Q    And have you met or consulted with him to
22 prepare for this deposition?
23     A    No, I have not.
24     Q    Have you met or consulted with Dr. Ritu
25 Bhambhani to prepare for this deposition?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 7 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016                Pages 46..49

Page 46

1  A   Yes.
2  Q   Were you using this in 2012?
3  A   Yes.
4  Q   And what was your title in 2012 at Harford
5  County Ambulatory Surgical Center?
6  A   CST.
7  Q   Did you have any other title or -- let me ask
8  you that. Did you have any other title?
9  A   I'm like an inventory manager. At that time,
10 it's still just CST. They still -- Certified Surgical
11 Technologist.
12 Q   Do you ever recall having the title Materials
13 Manager?
14 A   Uh-huh.
15 Q   Okay. And when is --
16 A   I mean, that kind of goes hand in hand.
17 Q   Goes hand in hand with what?
18 A   That on my signature on my, on my signature
19 page, I do materials manager -- I sign it as materials
20 manager on my signature page on my e-mail.
21 Q   Okay. And as materials manager, was one your
22 duties and responsibilities to order medications such as
23 you ordered from NECC using this form?
24 A   Yes, and I was not the prescribing physician.
25 Q   Okay. So when you wrote in the names, as you

Page 47

1  just described, of upcoming patients who were to undergo
2  procedures, who gave you that list of patients?
3  A   The schedules. It was on the schedule.
4  Q   Okay. And the name of the medication -- this
5  is for compounded medications, correct?
6  A   Correct.
7  Q   The name of the medication for each patient,
8  was that written in by you?
9  A   Uh-huh.
10 Q   And that was based on instructions by a
11 physician?
12 A   No. It says name on medication to be
13 compounded. The preference, the physician preference
14 was the methylprednisolone acetate.
15 Q   And do you recall the strength for the --
16 third column?
17 A   At times it was 40 milligrams or 80
18 milligrams. It depended on what their preference was.
19 Q   Also, do you recall the unit size?
20 A   It was always 1 mL.
21 Q   Okay. And the number of units, do you recall
22 for each patient how many units you would put in this
23 column?
24     MR. KRAUSE: Objection. Foundation.
25 Q   I'll rephrase the question. When you filled

Page 48

1  out this form for, let's say, patient's name in the
2  first row is -- I'll make up a name, Mary Brown -- and
3  you write in name of medication to be compounded, assume
4  it's methylprednisolone acetate. Then let's assume
5  strength is 80 milligrams per mL and let's assume it's
6  written in preservative-free and the unit size is -- it
7  would write in 1 mL in that column, correct?
8  A   New England -- New England had it where I
9  would attach the list and they would have you put a
10 quantity and they would let you put in a big volume. So
11 it was never like a list where it was 1, 1, 1, 1, 1. It
12 was the total quantity that you wanted and then you just
13 attached your patients' names. Like they just asked you
14 to attach the patients' names, but it was always
15 patients that were having injections.
16 Q   If there were 10 patients on this list that
17 you had filled out, what would be a typical number of
18 units that you would order for 10 patients?
19     MR. KRAUSE: Objection to form and
20 foundation.
21 Q   Let me rephrase the question, please.
22     When you completed this form to send an order
23 for compounded methylprednisolone acetate
24 preservative-free to NECC, if you had, let's say --
25 there are how many lines on here? You would attach a

Page 49

1  list?
2  A   Uh-huh.
3  Q   But let's say it was 10 patients. What would
4  be the typical number of units that you put on this
5  form?
6      MR. KRAUSE: Objection to form and
7  foundation.
8  A   What they would -- New England would allow 5
9  units per patient name.
10 Q   Okay. So if there were 10 patients on your
11 attached list --
12 A   It would be 50 vials.
13 Q   You would get 50 vials?
14 A   Uh-huh.
15 Q   And there were 50 sink single-dose vials?
16 A   50 1 mL single dose vials.
17 Q   But there were 5 mLs per patient?
18 A   That's how their list went. That's how Dave
19 said to do the list.
20 Q   When the order -- after the order was placed,
21 did you get a confirmation of the order?
22 A   They usually called.
23 Q   Did they call you or someone else at Harford
24 County?
25 A   They called the facility and if they didn't


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 8 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016    Pages 50..53

### Page 50

1   speak to me, they would leave a message or talk, talk to
2   the receptionist at the front desk or to my nurse
3   manager.
4       Q   And, again, your nurse manager in 2012 was?
5       A   Kim Merrill.
6       Q   Did Kim Merrill also order compounded
7   medications from NECC?
8       A   Probably occasionally, but I'm not sure if
9   she -- I don't remember.
10      Q   But was this --
11      A   This would be the form. If it was NECC, this
12  would be the form.
13      Q   And when you ordered -- let me strike that.
14          When you used this form for a particular
15  group of patients coming up on the schedule, was there
16  anyone else who signed off on this?
17      A   The medical director had his signature and
18  DEA number on here or -- I mean, it was always a
19  physician.
20      Q   Okay. Who was the medical director at that
21  time?
22      A   In 2012?
23      Q   Correct.
24      A   Constantine Misoul.
25      Q   Okay. And if the list -- strike that

### Page 51

1   question.
2           Do you know whether Box Hill Surgery Center
3   ever obtained any medications from Harford County
4   Ambulatory Surgical Center for use at Box Hill Surgery
5   Center?
6       A   Yes.
7       Q   Do you know what medications Box Hill Surgery
8   Center obtained from Harford County Ambulatory Surgery
9   Center -- Surgical Center?
10      A   Yes. It was a variety. Some of it was
11  lidocaine and Omnipaque and the MPA. It was when they
12  were short or needed medications that they didn't
13  have.
14      Q   You said that it included the MPA. That
15  means the MPA --
16      A   At times it did.
17      Q   -- preservative-free. Was that MPA
18  preservative-free obtained from New England Compounding
19  Pharmacy?
20      A   Yes.
21      Q   Do you know who made the arrangements to give
22  the medication to Box Hill Surgery Center when they had
23  a shortage?
24      A   The surgery centers -- it was more like a
25  business courtesy, that it wasn't something that like my

### Page 52

1   manager would say we were helping each other out or
2   helping them out when they needed it. Dr. Bhambhani had
3   established relationship with us. She wasn't a
4   stranger. She was one our physicians for a long time.
5   She was an anesthesiologist. She did pain management.
6   She even had an office next door to us.
7       Q   Do you recall in 2012 Dr. Bhambhani obtaining
8   for Box Hill methylprednisolone acetate
9   preservative-free lot number 0521? And I have to get
10  the rest of the numbers. But do you recall? Let's back
11  that up a second.
12          Do you recall Dr. Bhambhani obtaining before
13  the recall in September of 2012 methylprednisolone
14  acetate preservative-free for use at Box Hill patients
15  -- at Box Hill Surgery Center from Harford County
16  Ambulatory Surgical Center?
17          MS. STEINER: Objection to form.
18      A   Dr. Bhambhani did not obtain it.
19      Q   Who did?
20      A   Mr. Vickers.
21      Q   Now, you mentioned it was a courtesy. When
22  Mr. Vickers obtained the MPA PF for use at Box Hill
23  Surgery Center, can you narrow down the time?
24      A   I can. I actually remember that.
25      Q   When was that?

### Page 53

1       A   It was towards the end of August. His order
2   from New England Compounding did not come in. He was
3   worried he was going to run out by probably
4   mid-September and he just needed -- he just asked if we
5   could supply him, if they could purchase on behalf of
6   Box Hill, purchase the MPA to carry them through. I
7   hadn't given them any orders of MPA that whole year.
8   That was the first time that year that I recall that he
9   asked for help.
10      Q   And I believe you just said that the MPA was
11  purchased by Mr. Vickers. Did they --
12      A   It was purchased by Box Hill. Mr. Vickers
13  did their ordering.
14      Q   Understood.
15      A   Okay.
16      Q   Now, when the Harford County Ambulatory
17  Surgical Center, as courtesy, gave MPA PF to Mr.
18  Vickers, was it for -- was it a transaction --
19      A   Yes.
20      Q   -- that involved cash?
21      A   No.
22      Q   Or a check or some kind of payment?
23      A   It was invoiced.
24      Q   It was invoiced?
25      A   Dr. Bhambhani wrote a check. Yes.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 9 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016         Pages 54..57

### Page 54

1  Q   Did Mr. Vickers -- as you said, you recall
2  him being the representative from Box Hill Surgery
3  Center who asked for the MPA at the end of August of
4  2012. Was that a phone call to you?
5  A   I don't remember the exact -- I don't
6  remember if it was a phone call or if he was working at
7  our facility and mentioned it. I don't remember. But I
8  know in person we had -- you know, when he picked it up,
9  he had mentioned that they were having ordering, the
10 order was delayed from New England Compounding.
11 Q   Do you know how many vials Mr. Vickers, how
12 many vials of MPA PF from New England Compounding
13 Pharmacy Mr. Vickers picked up from Harford County
14 Ambulatory Surgical Center at the end of August of 2012?
15 A   Yes. It was 35.
16 Q   Now, I believe you said earlier that you
17 became of aware of NECC recall of the MPA PF in
18 September, at the end of September; is that correct
19 this?
20 A   Correct.
21 Q   Or early October?
22     MR. KRAUSE: Objection. Asked and
23 answered.
24 Q   2012?
25     MR. KRAUSE: Objection. Asked and answered.

### Page 55

1  A   Yes. It was the end of September and I
2  believe it was between the 25th and 27th, or 25th and
3  29th.
4      MS. KASPUTYS: I'm going to mark as the next
5  exhibit -- I believe it's 1604, a document I'll hand to
6  the witness and counsel.
7      (Exhibit No. 1604 was marked for
8  identification.)
9      MS. KASPUTYS: Sorry. My reach is terrible.
10     MR. KRAUSE: That's okay.
11 BY MS. KASPUTYS:
12 Q   You know, I gave you the wrong -- I put the
13 sticker on the top that's highlighted. I want to change
14 that because that's my copy.
15 A   All right.
16 Q   Thank you.
17 A   Thank you.
18 Q   And I can take this away from you.
19     Now, I'd ask you to take a look at the
20 document that's been marked as Exhibit 1604. Tell me,
21 have you seen this document before?
22 A   Yes.
23 Q   Do you recall when you received this
24 document? Let me ask you, rephrase the question.
25     Who would have been the person who first

### Page 56

1  received this at Harford County Ambulatory Surgical
2  Center?
3      MR. KRAUSE: Objection. Foundation. You may
4  answer.
5  A   Well, I'm not sure which fax it came to. I
6  don't -- I wouldn't know which fax. I don't have a fax
7  personally, that we have open fax machines.
8  Q   Okay. When did you first see this document?
9  A   Probably the 27th.
10 Q   And did you do anything in response to this
11 document?
12 A   Yes. So my nurse administrator was aware. I
13 think I was in the OR. But what our team did was we
14 immediately isolated the medication and followed the
15 directions as typical recalls happen quite frequently.
16 This was just another recall where you isolate the
17 product. You notify -- you notify -- you let the
18 company know that if you have any product and isolate it
19 and basically just follow the directions.
20 Q   Okay. And with respect to the lot number
21 listed on this document describing "Product description
22 states Methylprednisolone Acetate (PF), 80 milligrams
23 per mL injection, lot number 05212012 @ 68, quantity
24 150," do you recall whether or not this lot number was
25 the same lot number of the 35 vials that were purchased

### Page 57

1  by Box Hill Surgery Center from Harford County
2  Ambulatory Surgical Center?
3      MR. KRAUSE: Objection. Foundation.
4  A   Yes. Upon receiving when you saw this urgent
5  voluntary product recall, did you take any steps to
6  contact Mr. Vickers or anyone else at Box Hill Surgery
7  Center to notify them that you had received, that
8  Harford County Ambulatory Surgical Center had received
9  this urgent voluntary recall?
10     MR. KRAUSE: Referring to her individually,
11 Patty?
12     MS. KASPUTYS: I am. Yes.
13     MR. KRAUSE: Thank you.
14 A   I had spoken with my nurse administrator and
15 I did -- I can't remember if Dr. Bhambhani or Mr.
16 Vickers were present at the facility or if I talked to
17 them on the phone, but they were notified immediately.
18 I just can't remember if it was in person or on phone.
19 Q   Do you recall whether you asked them to
20 return to Harford County Ambulatory Surgical Center any
21 remaining vials that they may have from the 35 vials
22 they had purchased earlier or late August?
23 A   I did not ask them to return anything. I
24 left that up to them because they had received the same
25 recall and I let them follow through with whether they



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 10 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016                Pages 78..81

Page 78

1   NECC?
2   A   Yes, but we had to supply patient names.
3   This would eliminate.
4   Q   Well, as I understood it, you were taking a
5   patient list, filling out the form and stapling or
6   attaching, however, --
7   A   Yes.
8   Q   -- a patient name. Obviously, not stapling
9   because you were faxing these to NECC, correct?
10  A   Yes.
11  Q   So how much more effort was it to do the
12  patient list the way you were describing versus ordered
13  from NECC?
14      MR. KRAUSE: Objection to form of the
15  question.
16  A   JCB only requires a phone call to order the
17  meds now. I can just give them a PO and be invoiced and
18  have the packing slip the same way that NECC sent it. I
19  have the same thing with JCB except I don't have to turn
20  in any patient names. I'm not a pharmacist. I don't
21  need -- I don't save patient information.
22  Q   Now, other than the administrative ease of
23  ordering that you just described, were there any other
24  pros and cons as best that you can recollect of changing
25  from JCB to NECC?

Page 79

1       MR. KRAUSE: Objection. Asked and answered
2   at least three, if not more, times. Don't answer that
3   question again. Move on.
4       MR. COREN: Excuse me, but I have a right to
5   see if the recollection of a witness is exhausted, and
6   we will bring this witness back if we do not get the
7   answer, so it's your choice, Counselor.
8       MR. KRAUSE: Counsel, you didn't get to ask
9   the witness the same question multiple times. You've
10  asked the same question at least three, if not, four
11  times. You don't get to keep asking until you get an
12  answer that you want.
13      She's already told you from her perspective
14  of what she recalls from the conversation and told you
15  repeatedly that she does not recall the substance of
16  other discussions.
17      MR. COREN: No, that's not what she said,
18  Counselor. She said she doesn't have a verbatim
19  recollection; okay? That's what she said. Now we can
20  go on to find out as best she can recollect what the
21  tenor is. That's all we're asking. And once that's
22  exhausted, then we'll move onto the next.
23      But are you instructing her to cloture this
24  portion of our examination?
25      MR. KRAUSE: I am.

Page 80

1       MR. COREN: Okay. Then it's at your client's
2   risk that we're going to be bringing her back and asking
3   for sanctions.
4   BY MR. COREN:
5   Q   Now, let's talk now about this event where
6   inventory of MPA on hand was transferred or sold to Box
7   Hill. Okay. Do you recall your testimony on that?
8   A   Yes.
9   Q   Okay. Now, you indicated that it was a sale
10  of the MPA that you on hand to Box Hill, correct?
11  A   Yes.
12  Q   And this -- at the time that this sale was
13  made, as I understand your testimony, the decision to
14  change from JCB to NECC had already been made, correct?
15  A   Yes.
16  Q   At the time that you spoke with -- who is it
17  that you spoke with about transferring the materials?
18  Dr. Bhambhani or Miss --
19      MR. KRAUSE: Objection. Asked and answered.
20  A   Mr. Vickers had requested help.
21  Q   Okay. And at the time that Mr. Vickers
22  called upon you for assistance in providing them with
23  the NECC MPA, did you tell Mr. Vickers that, you know,
24  we are not using this -- we're not buying this anymore
25  from NECC?

Page 81

1   A   I don't remember.
2   Q   You say an invoice was given. Did you
3   prepare the invoice?
4   A   Yes.
5   Q   Is the invoice one of the documents that you
6   gathered up on Box Hill that you gave to counsel?
7   A   I don't know if you guys received it. I know
8   that it was prepared.
9   Q   Was it you amongst the materials that you
10  gathered up?
11  A   Yes.
12  Q   And you had indicated that the doctors have a
13  preferred list of medications?
14  A   Yes.
15  Q   The doctors at Harford County Community --
16  Harford County Ambulatory Center.
17  A   Any surgeon I work with has a preference.
18  Q   Did Dr. Bhambhani have a preference list for
19  the drug sheet used at Harford County?
20  A   Yes.
21      MS. STEINER: Can I get you to clarify? What
22  do you mean? As a surgeon or as an anesthesiologist?
23  Q   Are the lists different between -- I like
24  Counsel's question. I'll adopt it. Thank you.
25      Are the -- is there two lists for Dr.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 11 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016              Pages 82..85

Page 82

1  Bhambhani or one list?
2     A    I don't understand your question now.
3     Q    Sure. Okay. Counsel for Dr. Bhambhani
4  wanted a clarification, which I have agreed to adopt,
5  and that is that is there a difference between the lists
6  of medication for Dr. Bhambhani when she's serving in
7  her capacity as an anesthesiologist at Harford County
8  and when she was, is or was acting as a pain doctor at
9  Harford County?
10    A    Yes. There's a difference.
11    Q    Is there two lists?
12    A    No.
13    Q    So there's only one list?
14    A    Anesthesia is different. Anesthesia -- I'm
15 not the anesthesiologist. I know they have a par level
16 in their cart. I order medications for the whole
17 facility. It's in bulk. It's always in bulk.
18    Q    Understood. Now, with reference to Dr.
19 Bhambhani, I'm just trying to have an understanding --
20    A    Okay.
21    Q    -- of her patient list. Excuse me, her
22 preference list.
23    A    Okay.
24    Q    This list, is it writing of some sort or a
25 computer list? What is it?

Page 83

1     A    For surgery -- if she's doing -- if she's
2  performing a procedure.
3     Q    Okay.
4     A    Okay. Anesthesia is its own. Anesthesia is
5  divided by the type of anesthesia, not by the -- it's
6  the type of anesthesia. As a surgeon, if she's
7  performing a procedure on a patient, not anesthesia,
8  then she has preference cards.
9     Q    Okay. And the card, C-A-R-D-S you're saying?
10    A    Yes.
11    Q    Okay. Thank you. Is there in existence a
12 preference list, a preference card, rather, for Dr.
13 Bhambhani as a surgeon or as a pain specialist at
14 Harford County Ambulatory Center?
15         MS. STEINER: At what point?
16    Q    At any point in time.
17    A    I don't know how our programs work in leaving
18 stuff that's old in there. But at the time that she was
19 doing pain management, our facility, she had a
20 preference card that would give you the patient
21 position, the patient prep. It would list all her
22 med-surg supplies, which included medications.
23    Q    Amongst the documents that you gathered up
24 and provided to counsel, was Dr. Bhambhani's preference
25 card a document that was among those materials?

Page 84

1         MR. KRAUSE: Objection to foundation.
2     A    Not that I know of. Anything that was
3  related to Box Hill, I know she's been gone for a long
4  time, so I only did the stuff that I knew was related to
5  Box Hill which was the items that were sold to Box Hill.
6     Q    Does the Box Hill materials contain anything
7  other than materials that were sold or transferred to
8  Box Hill?
9         MR. KRAUSE: Objection to form.
10    A    I don't know what you mean. What else --
11    Q    What don't you just tell us. What are the
12 Box Hill materials? Can you describe them for us?
13        MR. KRAUSE: Objection to form of the
14 question.
15    A    If they needed -- if Mr. Vickers was short on
16 ordering something or it was infrequent and it would be
17 small individual supplies. It might be a Tegaderm. It
18 might be two half sheets. It might be a couple surgical
19 gowns. They didn't have to order the whole case that
20 you normally have to order. They would do certain
21 procedures and it would just be a few items here and
22 there. It wasn't often. It wasn't -- it wasn't
23 monthly. It wasn't -- it was just occasionally. And it
24 was more occasional in the beginning when she first
25 started her business than it was as she got established.

Page 85

1     Q    When the -- you had indicated the 35 vials in
2  some time prior to the recall --
3     A    Yes.
4     Q    -- were obtained by Box Hill from Harford
5  County. At the time that -- how was -- what was
6  actually transferred? Were they the foil pouches
7  transferred? Were the labels transferred? What was
8  transferred in addition to the vials?
9     A    I don't recall the exact transfer, how they
10 were sent. It was -- I don't recall. Like I know that
11 he took the vials but I don't know if they were in a
12 foil pack or not.
13    Q    Did Mr. Vickers or Dr. Bhambhani or somebody
14 from Box Hill provide patient names of their procedures
15 to you for those medications?
16    A    No.
17    Q    About how many -- about on the average, about
18 how many vials would you order at one time from NECC?
19 And I'm referring to the MPA.
20    A    Usually it was between a hundred to 250
21 vials.
22    Q    Did you recall having any discussion with Dr.
23 Bhambhani about the recall?
24    A    I think I gave her our copy of the recall
25 just because I didn't know if she had it or not, but I


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3123-3   Filed 10/07/16   Page 12 of 12

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF BARBARA WAGNER on 08/30/2016                    Pages 86..89

## Page 86

1  can't remember if I spoke with her or if Kim Merrill
2  spoke with her. My nurse administrator.
3     Q   Were you involved in notifying the patients
4  of Harford County?
5     A   No. I was only involved by helping compile
6  the list of names that, of people that had the
7  injections.
8     Q   But you didn't make any of the calls?
9     A   No.
10    Q   Did you at that time ask Dr. Bhambhani who
11 was administered the 25 vials that were not returned to
12 you?
13    A   No. They were taking care of their own
14 recall.
15    Q   Was anything done to assure Harford County
16 that the people who had the medication that they
17 provided to Box Hill were notified?
18        MR. KRAUSE: Objection. Foundation.
19    A   I won't know that answer.
20    Q   Was anything ever done to learn the fate of
21 the 25 people who were administered the medication that
22 was transferred from Harford County to Box Hill in or
23 around September --
24    A   No.
25    Q   -- 2012?

## Page 87

1         MR. KRAUSE: Objection. Foundation.
2         MS. STEINER: Objection. Foundation.
3     Q   Do you know whether the -- do you know what
4  happened to the 25 vials that were not returned?
5     A   No.
6     Q   Did you ever ask?
7     A   I don't recall asking.
8     Q   Was it your assumption that they were
9  administered?
10        MR. KRAUSE: Objection to foundation.
11        MS. STEINER: Objection. Foundation.
12    A   I don't know.
13    Q   Never wondered what happened to them?
14        MR. KRAUSE: Objection.
15        MS. STEINER: Objection as to form.
16    A   When I -- when we talked about the recall, in
17 the beginning of the recall and we had -- like I said, I
18 can't remember if it was a phone call or if it was in
19 person, Box Hill addressed that they would take care of
20 their own patients and report to the CDC. Like do
21 everything that the CDC and the New England required.
22 Everything that was required, so.
23    Q   Do you know if there was anything done to, by
24 Harford County Ambulatory Center to determine the
25 abilities and credentials of NECC to provide the

## Page 88

1  medication you were ordering?
2         MR. KRAUSE: Object to form.
3     A   I was not involved in any of that. NECC, I
4  believe, was established before I started. That wasn't
5  established by me.
6     Q   You indicated microbiology reports.
7     A   Uh-huh.
8     Q   Do you recall referring them, making
9  reference to that?
10    A   Yes. Yes, I do.
11    Q   What were you referring to, ma'am?
12    A   Every order came with a packing slip and
13 invoice and microbiology report from the Analytical
14 Research Company or some research company. In the past,
15 I remember, like, prior to New England, there was a
16 company that was using a Dynalabs. I think JCB used the
17 same research company in the beginning, the Analytical
18 Research Company, and I don't know who they use now.
19    Q   In your discussions with JCB when they were
20 soliciting your business regarding certain drugs, did
21 they ever discuss NECC's qualities or abilities or
22 issues with them?
23    A   No.
24    Q   In connection with NECC, was any effort made
25 to check with any board of pharmacy, be it Maryland's or

## Page 89

1  Massachusetts or wherever?
2         MR. KRAUSE: Objection. Foundation.
3     A   I wasn't involved in setting up the account
4  and I'm not a pharmacist or a doctor to know what the
5  processes are.
6     Q   Were you on -- you indicated it was a
7  committee decision to switch from NECC to JCB,
8  correct?
9     A   Yes.
10    Q   Was as part of that discussion, committee
11 discussion, did the committee discuss anything about
12 vetting JCB as a supplier of these drugs to you?
13        MR. KRAUSE: Objection. Foundation.
14    A   I don't remember the exact conversation.
15    Q   And you had indicated this went from your
16 group to some management committee at the center?
17    A   We have a governing board that usually I'm
18 involved in as well. It's our medical director and our
19 owner and our nurse administrator and usually infection
20 control nurse and whoever else. I don't know all the
21 titles that everybody that gets involved.
22    Q   And what was the reasons given to that
23 committee for the change from NECC to JCB as the
24 supplier of MPA?
25        MR. KRAUSE: Objection. Asked and answered



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com