# EXHIBIT 1
## Affidavit of Attorney Cline

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION _____ This Document Relates to: Suits Naming Specialty Surgery Center, PLLC | ) ) MDL No. 2419 ) Dkt. No. 1:13-md-2419-RWZ ) ) ) ) ) ) ) ) |

**Affidavit of Matthew H. Cline**

STATE OF TENNESSEE
COUNTY OF DAVIDSON

Matthew H. Cline, after first being duly sworn, states as follows:

1. I am over 18 years of age, have personal knowledge of the facts contained herein, and I am competent to testify.

<u>Joint Representation of the Tennessee Clinic Defendants as Co-Clients</u>

2. I am one of the attorneys jointly representing Specialty Surgery Center, PLLC ("SSC"), Kenneth Lister, MD, Kenneth Lister, MD, PC, Jean Atkinson, RN, Saint Thomas Outpatient Neurosurgical Center, LLC ("STOPNC"), Howell Allen Clinic, a Professional Corporation, and Donald Jones, MD.

3. State Volunteer Mutual Insurance Company retained (and paid) our firm, Gideon, Cooper & Essary ("GCE") to represent SSC, Dr. Lister, Ms. Atkinson, STOPNC, Howell Allen, and Dr. Jones in late September and early October 2012 in matters related to the fungal meningitis outbreak, including:

    a. Investigating the cause of the outbreak and injuries to patients and providing legal assistance related to these functions, such as monitoring and reporting on the status of the government's investigation of the outbreak and other similar activities.

    b. Providing legal assistance related to our response to the outbreak, such as notifying patients, restarting pain management procedures, responding to media inquiries, and other similar activities.

    c. Preparing for and defending litigation associated with the outbreak and providing legal assistance related to these functions, including responding to medical records requests from potential Plaintiffs, responding to subpoenas and requests for information from various government agencies, and preparing for and defending the civil suits against our clients directly, such as developing comparative fault and standard of care defenses and retaining experts.

4. SVMIC retained our firm to represent these health care providers jointly, in part, due to the efficiencies gained by engaging a single firm, rather than a separate firm for each client.

5. Attorneys with our firm routinely exchanged confidential attorney-client communications collectively with SSC, Dr. Lister, Ms. Atkinson, STOPNC, Howell Allen, and Dr. Jones to provide legal assistance in the activities described above. These communications routinely included SSC, Dr. Lister, Ms. Atkinson, and Dr. Jones on confidential reports about important developments in the cases against STOPNC and Howell Allen. These communications routinely included STOPNC, Howell Allen, and Dr. Jones on confidential reports about developments in the cases against SSC and Dr. Lister. And, these confidential communications routinely included STOPNC, Howell Allen, SSC, Dr. Lister, and Ms. Atkinson on confidential reports on important developments in the cases against Dr. Jones. These developments, and the advice provided often applied equally to all of our clients.

6. SSC, Dr. Lister, Ms. Atkinson, STOPNC, Howell Allen, and Dr. Jones were similarly-situated with respect to the fungal meningitis outbreak and ensuing litigation. Through our joint representation, we pursued common objectives in furtherance of our clients' common legal interests. This included routinely submitting briefs to the Court on behalf of all of our clients, arguing issues at hearings on behalf of all of our clients, and conducting discovery on behalf of all of our clients.

SSC Privilege Dispute and Resulting Orders

7. On May 9, 2016, I received confirmation that the computers sold by SSC to Cumberland Medical Center ("CMC") contained communications between SSC and our office. Counsel for CMC was not able to provide any additional information about the attorney-client communications, including the identity of the senders/recipients beyond telling me they were communications with our office.

8. On May 10, 2016, I notified counsel for CMC and the PSC in writing that any privileged information contained on the computers sold to CMC was disclosed inadvertently, and proposed that we be permitted to review any information from the computers before production to the PSC.

9. The PSC took the position that SSC waived privilege when it sold the computers to CMC. At no point in our discussion of the potential waiver of privilege by SSC did the PSC suggest it believed SSC's waiver of privilege would also operate to waive privilege for STOPNC, Howell Allen, or Dr. Jones.

10. We filed a motion for protective order seeking a determination of whether SSC and Ms. Atkinson's privileges were waived when SSC sold its computers to CMC.[1] The Court ultimately ruled SSC waived attorney-client privilege and work product protection but not the quality improvement or peer review privileges, and that Ms. Atkinson had not waived any personal privileges.[2] The Court's order instructed the parties to submit a protocol to govern the review of the materials on the CMC computers.[3] The parties jointly submitted a proposed order which was entered by the Court.[4] Nothing in the motion for protective order or subsequent orders entered by the Court addressed whether STOPNC, Howell Allen, and Dr. Jones could assert privilege over materials on the CMC computers.

CMC Document Review and Production

11. CMC made the documents available to us for review in three batches totaling more than 200,000 pages. Through a series of agreements with the PSC and a number of hours of work on my end, we were able to narrow the subset of documents to about 70,000 pages. The first two batches of documents did not contain any attorney-client communications. The third and final batch of documents was made available to us on October 21, 2016.

12. Upon reviewing the final batch of documents, we learned, for the first time, that the computers sold to CMC by SSC contained communications between our office, SSC, STOPNC, Howell Allen, and Dr. Jones, as opposed to communications solely between our office and personnel at SSC. Prior to that point, we knew only that the computers sold to CMC contained attorney-client communications with SSC. We did not know whose computers were still in CMC's possession and subject to the PSC's subpoena, what data remained on them, and whether (or what) privileged communications were still left on them.

13. We spent several hours researching and discussing the issue and determined SSC's waiver of privilege would not operate to waive privilege on behalf of STOPNC, Howell Allen, and Dr. Jones, consistent with the Court's ruling that SSC's waiver of privilege did not operate to waive privilege for Ms. Atkinson and consistent with the Restatement and applicable case law, including *Anderson v. Clarksville Montgomery Cty. Sch. Bd. & Sch. Dist.*, 229 F.R.D. 546 (M.D. Tenn. 2005).

---

[1] Doc. 2906.
[2] Doc. 3015.
[3] Doc. 3015.
[4] Doc. 3030.

3

14. Next, we researched and discussed internally (multiple times) whether we needed to file some sort of formal motion to assert privilege over materials on the CMC computers on behalf of STOPNC, Howell Allen, and Dr. Jones and decided not to file a formal motion for a number of reasons.

    a. First, we could not locate any specific requirement that we formally file a motion in order to assert privilege on behalf of STOPNC, Howell Allen, and Dr. Jones. There was no rule, law, order, *etc.* located during our research addressing what to do in this unique circumstance.

    b. Second, we believed the Court had already ruled on the substantive privilege issue in holding that SSC's waiver of privilege did not operate to waive privilege for Ms. Atkinson. In our view, the same principle applied to STOPNC, Howell Allen, and Dr. Jones' assertion of privilege.

    c. Third, we thought it best to avoid burdening the Court with another filing given the extensive briefing on SSC's waiver of privilege.

    d. Finally, filing a motion would have further delayed the completion of review of the CMC documents (which had already been delayed due to the volume of documents). We believed it better to assert privilege in the normal course via a privilege log and resolve any dispute after review of the materials was complete, rather than putting the review on hold to (1) meet and confer with the PSC, (2) brief and argue a motion, and (3) finish reviewing the materials after a decision from the Court. As is, we withheld only a small fraction of the total 70,000+ page production, and the PSC can review the vast majority of the documents while we brief the privilege issue.

15. We completed our review of the final batch of materials and made them available to the PSC on November 17, 2016.

16. We produced a detailed privilege log totaling more than 40 pages four business days later on November 23, 2016. The privilege log was in substantially the same format and provided the substantially the same level of detail as our prior privilege logs, over which we received no objection from the PSC. In the letter enclosing the privilege log, we explained that the log did not identify every single combination of senders and recipients for attorney-client emails because we had already provided the PSC with a privilege log including that information previously for virtually the same set of emails.[5] [6]

---

[5] *See* Doc. 3238-4.
[6] This prior privilege log is attached to our opposition to the PSC's motion for sanctions.

Meet and Confer Efforts About Information Withheld from CMC Production

17. The PSC disputed our assertion of privilege on behalf of Ms. Atkinson, STOPNC, Howell Allen, and Dr. Jones, and complained about our privilege log. I repeatedly asked the PSC to call me to discuss the privilege issues and specifically to discuss the privilege log, but the PSC never called. I attempted to call the PSC to discuss the privilege log and other issues, but they never returned my call, instead opting to reply via email.

18. After the PSC declared an impasse on the privilege dispute, I again reached out in an attempt to narrow the issues, and specifically advised the PSC that I did not believe they had properly complied with their meet and confer obligation with respect to the privilege log. The PSC never explained what they found to be objectionable about our privilege log before filing their motion for sanctions.

*[Signature]*

Sworn to and subscribed by me on this \_\_9th\_\_ day of \_\_January\_\_, 2017.

*[Signature]*
(Notary Public)

My Commission Expires: \_\_07/03/2017\_\_

*[Notary Seal: LINDA DEBAUN, STATE OF TENNESSEE NOTARY PUBLIC, DAVIDSON COUNTY]*
MY COMMISSION EXPIRES
July 3, 2017

6