UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions Naming The Saint Thomas Outpatient Neurosurgical Center | |

**MEMORANDUM OF THE PLAINTIFFS' STEERING COMMITTEE IN SUPPORT OF MOTION FOR DISTRIBUTION OF COMMON BENEFIT FEES AND EXPENSES RELATED TO SAINT THOMAS CASES**

**I.      INTRODUCTION**

As the Court is well aware, the Plaintiffs' Steering Committee on behalf of plaintiffs with claims against the Saint Thomas Outpatient Neurosurgical Center, LLC; Howell Allen Clinic, a Professional Corporation; John Culclasure, MD; Debra Schamberg, RN; Saint Thomas West Hospital, formerly known as St. Thomas Hospital; Saint Thomas Network; Saint Thomas Health; Ascension Health; and Ascension Health Alliance (collectively the "Nashville Healthcare Defendants") reached a global settlement involving all cases in September of 2016 (the "Saint Thomas Settlement").

The Plaintiffs' Steering Committee seeks an order from this Court (i) approving an eight percent (8%) assessment from the funds for common benefit fees and expenses from the Saint Thomas Settlement, (ii) approving the payment of reasonable expenses made in support of common benefit efforts as recommended by the PSC from the Saint Thomas Qualified Settlement Fund, and (iii) approving the allocation and payment of reasonable attorneys' fees to specified firms in amounts determined by the PSC to be reasonable and necessary for common benefit efforts.

It should be noted that this motion covers strictly time devoted to litigating the Saint Thomas Cases resolved through the Saint Thomas Settlement.  The PSC asked counsel who worked on Saint

Thomas Cases to submit proposed fee and expense requests for time spent solely in advancing the Saint Thomas Cases to successfully completion. Given that Tennessee lawyers principally drove the Tennessee-specific litigation, Lead Counsel Tom Sobol designated Tennessee State Chair J. Gerard Stranch, IV to coordinate the filing of the present motion and the significant work undertaken to prepare the present submission.

By the time this motion is resolved by the Court, initial payments to the majority of the 114 claimants covered by the Saint Thomas Settlement will have been made. The only remaining claimants who have not received initial payments are still in the process of resolving liens asserted by the Center for Medicare and Medicaid Services ("CMS"). The process of resolving a lien asserted by CMS ultimately falls upon the individual lawyers and claimants and the PSC, apart from facilitating some communications and administration, has little to no ability to accelerate that process for any given claimant.[1] As a result, while this motion is filed at this time, as a practical matter counsel will not be paid, nor reimbursed expenses, until initial payments are made to all those currently eligible to be paid and to the majority of all claimants. If the current rate of CMS lien resolution holds, the PSC reasonably anticipates that all initial payments will be made by no later than September 1, 2017.[2]

Plaintiffs' counsel expended significant time and expense in litigating the Saint Thomas Cases and the cumulative submitted expenses and initial loadstar of all firms, after review and audit of about $**REDACTED** far exceeds the dollar value of an 8% allocation of the available funds of

---

[1] The process of paying funds from the Saint Thomas Settlement will involve a two step process. Initial payments will cover approximately 90% of the funds the PSC reasonably believes will be made available to individual claimants. The 10% reserve will then be paid out after this Court resolves common benefit motions and motions related to fund administration.

[2] As of this writing, 90 (79%) of claimants have received their initial payment. Approximately 70% of total anticipated available funds have been paid to claimants. Currently between 3-5 claimants are clearing CMS liens per week, meaning that at the current rate, all claimants should receive their initial payment by no later than September 1, 2017 (approximately). The second payment will be made available once this Court resolves the present Common Benefit Motion and the previously filed Motion for Disbursement of Administrative Expenses.

about $ **REDACTED**.   As a result, the proposals here result in counsel receiving less than their reported or allocated lodestar.

## II.   FACTS

### A.   The Outbreak

In 2012, the CDC identified a large number of cases of fungal meningitis and other infections associated with exposure to contaminated lots of methylprednisolone acetate ("MPA") compounded by the New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") in Framingham, Massachusetts, and purchased by dozens of pain clinics, hospitals, and doctors scattered throughout the country.

According to the CDC's update of October 23, 2013, the outbreak of fungal meningitis and other infections have affected individuals in over 20 states and caused more than 64 deaths.  Over 753 people have been diagnosed with meningitis, fungal infections and/or abscesses, and other injuries.[3]  The United States Food and Drug Administration ("FDA") and CDC have confirmed the presence of fungus in unopened vials of NECC's MPA.  The FDA[4] and CDC[5] also identified bacteria and/or fungus present in lots of NECC preservative-free injectable betamethasone, preservative-free triamcinolone, and cardioplegia solution.   There is no dispute that the contaminated products caused widespread injury and death.

The catastrophe struck Tennessee particularly hard.  According to the Tennessee, Tennessee patients contracted 153 cases of confirmed infection and 16 Tennesseans lost their lives.

---

[3] http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html#casecount_table.

[4] http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ORAElectronicReadingRoom/UCM325980.pdf.

[5] http://www.cdc.gov/hai/outbreaks/laboratory/index.html.

B.     **Litigation Against Saint Thomas**

A total of 114 different Saint Thomas Outpatient Neurosurgical Center patients filed suit in state and federal district courts in Nashville, Tennessee. These cases named four categories of defendants:

- The "Affiliated Defendants" included NECC and affiliated entities GDC, Medical Sales Management, and Ameridose;

- The "Insiders" included NECC's Owners/Shareholders (including Barry Cadden, Lisa Conigliaro Cadden, Greg Conigliaro, and Doug Conigliaro) and pharmacist Glenn Chin;

- The "National Defendants" were NECC's vendors, and would be liable to all victims if they were liable to any victims. They included UniFirst (the company that cleaned the NECC cleanroom), Victory (the company that installed and maintained the NECC cleanroom HVAC system), Liberty (the company that built the NECC cleanroom), and ARL (the company that conducted sterility testing on NECC's products); and

- Some combination of The Nashville Healthcare Defendants.

The Saint Thomas Qualified Settlement Fund covers strictly monies received in settlement from the Nashville Healthcare Defendants and does not involve funds contributed by any of the other defendants named in these cases.

C.     **NECC Files For Bankruptcy, The JPML Creates the NECC MDL, And The Resulting Chapter 11 Bankruptcy Plan**

In December 2012, New England Compounding Pharmacy, Inc. filed for bankruptcy under Chapter 11.[6] On February 12, 2013, numerous civil cases were filed in multiple federal jurisdictions naming NECC and others were consolidated by the Judicial Panel on Multidistrict

---

[6] Voluntary Petition for Chapter 11 Bankruptcy, *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Mass. Bankr. Dec. 21, 2012). On April 9, 2013, then-presiding Judge F. Dennis Saylor appointed two lawyers (Thomas M. Sobol and Kristen A. Johnson) as lead counsel and established the seven-person Plaintiffs' Steering Committee. MDL Order No. 2, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419 (D. Mass. Apr. 9, 2013), ECF No. 82.

Litigation and transferred to the District of Massachusetts for coordinated pretrial proceedings.[7] As of today, the JPML has transferred a total of 379 civil actions to this district. A number of civil actions have also been directly filed in this district or removed from Massachusetts Superior Court.

On June 12, 2013, through operation of the bankruptcy code, the MDL Court acquired jurisdiction of almost all cases across the country – whether pending in state or federal court – that named NECC, its affiliated companies, or its insiders. The Court asserted § 1334 related-to subject matter jurisdiction over "all federal cases against NECC and its affiliates, and all state-court cases against NECC and its affiliates, including cases where the claims are third-party claims for contribution or indemnity." The Court reasoned that the cases pending elsewhere would have a "substantial effect, on the bankruptcy estate," that tort claims and contribution or indemnity claims had making "it difficult or impossible to resolve the entire litigation in an equitable and efficient manner."[8] As a result of this ruling, the Court took charge of the Saint Thomas Cases.

Between December 2012 and May 2014, a series of negotiations and settlement documentation discussions ensued. Beginning in early 2014, while the Chapter 11 Trustee was negotiating with the NECC Insiders and their insurers, the PSC and certain designated counsel took the lead in convincing the other National Defendants, ARL, Victory, UniFirst and Liberty, to enter into the mediation process as established by this Court.

These efforts culminated in a May 6, 2014 motion to approve a proposed plan for reorganization under Chapter 11 was filed. On May 20, 2015, the Bankruptcy Court (Boroff, J.) confirmed the Chapter 11 Plan, which effectively resolved claims against NECC, the Insiders, NECC's affiliated companies, and the National Defendants.

---

[7] Transfer Order, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419 (J.P.M.L. Feb. 12, 2013), ECF No. 119.

[8] Corrected Memorandum and Order on Trustee's Motion to Transfer Cases and Related Motions, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-FDS (D. Mass. June 12, 2013), ECF No. 176.

With regard to the Saint Thomas Cases, this left only the claims of plaintiffs against the clinic-related defendants to be pursued, although these defendants continued to pursue comparative fault defenses against those entities covered by the confirmed Chapter 11 Plan.

**D.     Efforts Expended On Litigating The St. Thomas Cases**

Through its jurisdiction under the bankruptcy code, the MDL Court chose to retain jurisdiction over the group of cases naming the Nashville Healthcare Defendants, even after the Chapter 11 Plan went into effect.  As a result, this Court not only coordinated the pre-trial proceedings to prepare these cases for trial, but had set a schedule to actually try the first bellwether cases here in Boston.[9]

Although the MDL consisted of hundreds of cases against other clinic defendants, the Court, upon the PSC's urging, allowed the Saint Thomas Cases to proceed first through the bellwether schedule and the Saint Thomas Cases were the first set to be tried in the MDL, until the parties ultimately reached the global settlement that forms the basis of the present motion.[10]

Nevertheless, lawyers pursuing these cases against the Nashville Healthcare Defendants on behalf of the full 114 cases filed against them performed significant work that undoubtedly led to the global settlement of all claims.  That work included, but is not limited to:

1. Responding to several motions to dismiss;
2. Preparing written discovery requests and responses;
3. Reviewing the tens of thousands of pages of documents produced specifically for the Saint Thomas Cases;
4. Reviewing the tens of thousands of pages of documents produced by the National Defendants, NECC, the NECC related companies and the National Defendants;
5. Filing various motions to compel and/or opposing motions for protective orders;

---

[9] Dkt. Nos. 2309 and 2596.

[10] Dkt. No. 2596 and 2898.

6. Filing various motions related to trial venue and defending against St. Thomas' attempts to remand these cases back to Tennessee federal court;

7. Taking or defending over 35 fact witness depositions;

8. Locating, interviewing, and consulting with both consulting and testifying experts;

9. Taking or defending over 25 expert witness depositions;

10. Reviewing and selecting cases for inclusion in bellwether process and ushering cases through the bellwether selection process ordered by the Court;

11. Filing motions for summary judgment;

12. Opposing motions for summary judgment;

13. Preparing motions in limine;

This work was hardly limited to Tennessee.  To complete this work required significant travel time and expense to not only Boston, Massachusetts but to numerous other cities throughout the Eastern United States.

Moreover, because the parties went through not only common expert disclosures but expert disclosures in individual cases, significant expense was also incurred in expert discovery.  Experts were called upon in the following fields:

- Medical standard of care;
- Medical ethics;
- Medical billing
- Clean room construction, maintenance, and care
- Pharmacy compounding;
- Sterility testing;
- The regulation of compounding pharmacists; and
- Marketing and advertising and patient experience;

These expert reports and expert rebuttal reports took significant time and expense in putting together and played an important role in bringing about the global settlement to resolve all cases involving the Nashville Healthcare Defendants

### III.   ARGUMENT

**A.   The Court should order an eight percent (8%) assessment for the common benefit fund.**

The PSC requests that the Court enter an order approving the assessment of eight percent (8%) on the available Saint Thomas funds, for a total of $**REDACTED** to cover both the fees and expenses expended in pursuing claims in the Saint Thomas Cases.

On August 13, 2014, this Court ordered a prospective, eight percent (8%) assessment on each "Actually Received Recovery."[11]  There is little debate that the Saint Thomas Settlement Fund provides $**REDACTED** of actual recovery in the Saint Thomas Cases.

The August order also indicated that this Court "may alter the percentage amount of the assessment, as future circumstances may require" and the order left open to the PSC the ability to "request an allocation of assessment between fees and expenses as circumstances may warrant."[12]

For several reasons the PSC is of the view that an assessment from the current funds[13] received in the Saint Thomas Fund – no higher an assessment, nor lower – is warranted under the circumstances.

First, the eight percent assessment has been the level of reasonable expectation of counsel and the claimants from the earliest stages of this MDL.  As the level has previously been proposed

---

[11] Dkt. No. 1333.

[12] *Id*.

[13] Additional sums are expected to be received into the tort trust, and there may also be non-tort trust administered other settlements that would fall within the Court's assessment orders.  This motion only applies to the current funds in the trust.

by the PSC and accepted by the Court, it appears to be fair and reasonable from an *ex ante* perspective.

Second, the PSC and the counsel involved in providing common work to the Saint Thomas Cases do not request an assessment over the original eight percent is not warranted, even though the level of approved lodestar for pursuing claims strictly involved in the Saint Thomas Cases plus approved expenses is in excess of $**REDACTED**.  That amount exceeds the eight percent assessment by over **REDACTED** %.  Nevertheless, the Master Settlement Agreement makes clear that the amounts made available to claimants would be subject to a common benefit assessment by this Court and at the time claimants and their counsel were reviewing the Master Settlement Agreement and executing individual releases, the PSC had already submitted its first Motion for Distribution of Common Benefit Fees and Expenses related to monies obtained via the National Tort Trust.[14]  In other words, Lead counsel and the PSC indicated at the very time individual claimants were making a decision to accept the terms of the Master Settlement Agreement that an 8% common benefit fee and expense assessment would apply to funds obtained in this MDL, and wavering from that number now would be inappropriate, especially without a compelling reason to change, even though the amount of accumulated approved lodestar and expenses far exceeds the funds available through an 8% assessment.

Finally, decreasing the assessment below the eight percent is not warranted.  Significant, good work was performed by many lawyers in pursuing claims asserted in the Saint Thomas Cases. The results of the recoveries are significant, and the enormous work to fairly and accurately allocate and administer the distributions was quite substantial.  By comparison, recoveries of professional fees and expenses in the bankruptcy court were awarded at levels that were either at, or exceeded

---

[14] Dkt. No. 3105, filed on September 26, 2016, the same month that the Master Settlement Agreement was executed.  Individual releases were then obtained following the execution and most individuals had submitted their individual release and agreement by November of 2016.

(in the case of the Chapter 11 Trustee) the reported lodestar levels; those professionals received payment more than a year ago, and in full or greater than reported lodestar. So while the PSC is of the view that the assessment should not be raised to meet the approved lodestar, by the same token the eight percent level should not be reduced. Thus, all Saint Thomas common benefit recipients will have a pro rata reduction on their approved lodestar.

**B.     The Court should allocate from the fund the reasonable expenses of counsel.**

The PSC requests that the Court enter an order (i) approving a total of $**REDACTED** in expenses, and (ii) approving the allocation of those expenses as indicated on Exhibit A.

Lead Tennessee counsel solicited from all plaintiffs' counsel that had performed work in the Saint Thomas Cases to submit, or resubmit, fee and expense reports so that a full itemization would be available. Lead Tennessee counsel then collected each firms submission, categorized the submission, and all counsel who had submitted fees and/or expenses met and discussed the method of review, accounting, and submissions of the requested fees and expenses.

After this review was conducted, Lead Tennessee Counsel reviewed the expense items. Not many deletions were made for expense items, both because most are toward common benefit matters, and because the amounts are "hard" costs incurred out-of-pocket by the firm. In other words, the expenses sought to be reimbursed are expenses that were clearly incurred in pursuit of the Saint Thomas Cases and constituted an expense that for many firms and many large expenses, many firms have had to wait years for reimbursement.

The spreadsheet appearing as Exhibit 1 reflects the submitted and approved expenses for each firm seeking reimbursement of expenses through the Saint Thomas common benefit fund.

C.  **The Court should allocate from the fund the reasonable attorneys' fees as recommended by the PSC.**

The PSC requests that the Court enter an order approving the allocation of common benefit fees amongst the law firms as indicated on Exhibit A. The PSC is of the view that this represents a fair allocation.

1.  **Guidelines and general issues.**

The PSC guided its review of the common benefit issues on several principles.

First, this Court issued orders structuring the sharing and funding of discovery and pretrial expenses and costs for the common benefit of the litigation, and establishing a process for tracking and seeking reimbursement for expended common benefit time and expenses. *See* MDL Order Nos. 3 [Dkt. No. 85] and 8 [Dkt. No. 1333]. In MDL Order No. 3, the Court ordered the PSC to be responsible for funding common discovery and pretrial costs and proposing a reasonable prospective contingent assessment upon recoveries on the claims. MDL Order No. 3, ¶ 1. It further set forth "standards and procedure…to be utilized by any counsel seeking fees and/or expense reimbursement." *Id.* at ¶ 2. The Court ordered that any "claimants' counsel who seeks reimbursement or compensation for common-benefit time and expenses (including any state-court counsel) shall comply with these guidelines and any submission by such counsel shall be in accordance with this order." *Id.* at ¶ 2.A.1. The Court provided the following instructions to counsel seeking reimbursement for common benefit time and expenses:

Common benefit time is defined as "[o]nly time spent on matters common to all claimants in this litigation…[n]o time spent on developing or processing any case for an individual claimant should be submitted, unless the case is specifically determined by the PSC or the Court to be a 'common-benefit case.'" *Id.* at 2.B.1. Similarly, common benefit costs or expenses are defined as those "incurred for the common benefit of the MDL plaintiffs as a whole" or "for the global benefit

of the MDL plaintiffs," with no individual client-related costs being considered "unless the case is determined by the PSC to the Court to be a 'common-benefit case.'" *Id.* at ¶ ¶ 2.C.1. and 2.E.1.

The Court also ordered the PSC to propose expense limitations and guidelines for use by all plaintiffs' counsel and for Lead Counsel to establish forms and procedures to implement and carry out the time and expense submissions required by the Court. *Id.* at ¶ 2.E.2.

In MDL Order No. 8, the Court ordered a contingent eight percent (8%) assessment on recoveries received in all cases. [ECF No. 1333]. The Court ordered that "[n]o common benefit fees and/or expenses may be paid out of the Common Benefit Fund except by formal motion, with reasonable notice and opportunity to be heard," hence the impetus for this motion. MDL Order No. 8, p. 3. The Court attached a Participation Agreement as Exhibit A to MDL Order No. 8, which reiterated

> the amounts deposited in the Common Benefit Fund will be available for distribution to attorneys who have performed professional services or incurred expenses for the benefit of the plaintiffs in MDL 2419 pursuant to written authorization from Plaintiffs' Lead Counsel. Such sums will be distributed only upon an Order of the Court in MDL 2419, which will be issued in accordance with applicable law governing the award of fees and costs in cases involving the creation of a common benefit. Appropriate consideration will be given to the experience, talent, and contribution made by all of those authorized to perform activities for the common benefit, including the Participating Attorneys.

MDL Order No. 8, Ex A, ¶ 3. It also set forth the applicability of the orders and agreement to "each and every claim or action (whether state or federal, filed or unfiled) relating to the clients listed on the attached Exhibit(s) and arising from the use of NECC product(s) in which the Participating Attorneys have a right or claim to a fee recovery beginning from April 9, 2013." *Id.* at ¶ 10.

Second, we were guided by the law of common benefit awards and specifically the significant work the Court and counsel have already performed in setting up an approved Motion for Common Benefit already in this MDL.

Finally, we are guided by the important principle that lawyers ought to avoid disputes about fees and Lead Tennessee Counsel sought input throughout the stages of this process both from the lawyers seeking common benefit fees and expenses and lawyers representing clients effected by the present request.

2. **Process Undertaken**

Earlier this year Lead Tennessee Counsel solicited requests from Lead Counsel, the PSC, and Tennessee lawyers that performed work in the Saint Thomas Cases to submit time and expenses for inclusion in a proposed common benefit request to be made to this Court.  Approximately 5 firms submitted for reimbursement of common benefit time and expenses.

Over the course of the following month counsel reviewed records and pulled time related to the Saint Thomas Cases.  Lead Tennessee Counsel, or attorneys in his firm, then reviewed the time submitted, formatted the entries for universal formatting, and shared with all such counsel each firm's fee and expense submission so that each firm could review each other's submission. Thereafter a meeting with all Tennessee counsel that had submitted time was held to discuss areas of concern, methods of accounting and allocation, and to reviewing firm-specific issues that appeared in the submissions.

Following this meeting, on June 26, 2016 Lead Tennessee Counsel submitted a final version of the present motion along with exhibits for final comment from all Tennessee counsel involved in the Saint Thomas Settlement and indicated it was the intent of Lead Tennessee Counsel to file the present motion by no later than June 30, 2017.

The recommendations set forth below are a culmination of this process.  Every firm was given an opportunity to discuss their submission.  We are of the view that the result is a fair result. We request the Court allocate common benefit fees as determined by the Tennessee counsel and

reflected in Exhibit A that performed common benefit work in achieving successful completion of the Saint Thomas Cases.

   3.   **Recommendations**

*Hagens Berman Sobol Shapiro LLP*.  Hagen Berman was appointed by the MDL Court as lead counsel and a member of the PSC.  Work was primarily undertaken by Thomas Sobol, Kristen Johnson, and Edward Notargiacomo.  Given the lead role and liaison functions, significant office work by paralegal Mike Barker was provided to the MDL generally.  Given Lead Counsel's overall work, it was difficult to determine how much of this overall work performed by Lead Counsel could be allocated as specific to the Saint Thomas Cases.  In a letter dated April 21, 2017 and sent to Lead Tennessee Counsel, Mr. Sobol acknowledged this issue and simply requested that the overall contributions made by the firm, and its work in covering some limited Saint Thomas-specific depositions be considered in allocating a common benefit request to Lead Counsel's firm.  This was discussed amongst those firms submitting time for the Saint Thomas Cases and it was agreed that Hagens Berman should receive $**REDACTED** for their efforts.  This is by no means to be seen as fully compensating Hagens Berman for its significant contributions to this litigation as a whole and the Saint Thomas Cases specifically.  But as made clear above, no firm will receive full dollar-for-dollar compensation for efforts expended in pursuing claims involved in the Saint Thomas Cases, and the Tennessee counsel involved in this decision believe this would be an appropriate amount given the economic realities of the present common benefit request.

***Branstetter Stranch & Jennings, PLLC**.*  Branstetter was appointed by the MDL Court as a member of the PSC.  Mr. Gerard Stranch is the Tennessee State Chair that coordinated litigation in the Saint Thomas Cases.  Work was primarily undertaken by Gerard Stranch and Ben Gastel.  Given Branstetter's lead role in assisting the preparation of Tennessee cases, others in the firm did important work.  The firm was heavily involved in many aspects of the Saint Thomas Cases

including: 1) managing discovery and document review; 2) drafting and/or filing many of the motions filed with the Court related to the Saint Thomas Cases; 3) organizing, taking, and defending depositions; and 4) coordinating the bellwether selection process.

**Lieff Cabraser Heimann & Bernstein**.  LCHB was appointed by the MDL Court as a member of the PSC.  Work was primarily undertaken by Mark Chalos, Annika Martin and others of this firm; they were heavily involved in most aspects of the MDL.  The firm was heavily involved in many aspects of the Saint Thomas Cases including: 1) reviewing documents and preparing discovery requests and responses; 2) drafting and/or filing many of the motions filed with the Court related to the Saint Thomas Cases; 3) taking and defending depositions; and 4) preparing bellwether cases for trial.

**Ellis & Rapacki LLP**  Work was primarily undertaken by Rick Ellis and a paralegal Jennifer Gaman.  Given their lead role in assisting the preparation of cases against the National Defendants, Mr. Ellis became instrumental in covering and taking many of the expert depositions related to the comparative fault defenses advanced by the Nashville Healthcare Defendants.

**Kinnard, Clayton & Beveridge** Work was undertaken by Randy Kinnard and Daniel Clayton, and they were involved in many aspects of the Saint Thomas Cases.  Mr. Kinnard took the deposition of Dr. John Culclasure, one of the key depositions of any defendant in this MDL, and was intricately involved in the mediation of the Saint Thomas Cases.  Mr. Clayton provided significant support with expert discovery working with many of the appointed standard of care experts and taking and defending numerous expert depositions.[15]

---

[15] Kinnard Clayton did not submit for paralegal time as many of the other firms requesting a common benefit award did.  Paralegal time represented between 4-12% of a firm's total submission.  As a result, Kinnard Clayton received a special adjustment of 8% on their time to compensate for the fact that they had paralegals who provided substantial support to the common advancement of the Saint Thomas Cases but did not keep track of their individual hours.

**Leader, Bulso & Nolan, PLC**  Work was primarily undertaken by Bill Leader and George Nolan and others of this firm; they were heavily involved in most aspects of the MDL. The firm was heavily involved in many aspects of the Saint Thomas Cases including: 1) reviewing documents and preparing discovery requests and responses; 2) drafting and/or filing motions filed with the Court related to the Saint Thomas Cases; 3) taking and defending depositions; and 4) preparing bellwether cases for trial.[16]

The foregoing firms do not object to the allocation of the proposed common benefit assessment as more fully detailed in the attached Exhibit A.

### IV.   CONCLUSION

As a result of the foregoing, the PSC respectfully request that the Court (i) approve an eight percent (8%) assessment from the funds for common benefit fees and expenses from the Saint Thomas Settlement, (ii) approve the payment of reasonable expenses made in support of common benefit efforts as recommended by the PSC from the Saint Thomas Qualified Settlement Fund and reflected in Exhibit A, and (iii) approve the allocation and payment of reasonable attorneys' fees to specified firms in amounts determined by the PSC to be reasonable and necessary for common benefit efforts and reflected in Exhibit A.

Dated: June 30, 2017                                         Respectfully submitted,

                                                             **/s/ J. Gerard Stranch, IV**
                                                             J. Gerard Stranch, IV
                                                             Benjamin A. Gastel
                                                             BRANSETTER, STRANCH &

---

[16] Leader, Bulso submitted for approximately 3,847.1 hours of compensable time, but a substantial portion of this time was also submitted for compensation in the previous PSC common benefit time. Because of an accounting and clerical error with this submission, it was not entirely clear which hours were compensated from the previous submission. As a result, an accounting adjustment was made here to reflect the monies received by Leader Bulso from the previous common benefit order (Dkt. No. 3239) and Leader Bulso also received a special adjustment to compensate for receiving payment for this time months after it might otherwise had been paid.

JENNINGS PLLC
223 Rosa Parks Ave., Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com
beng@bsjfirm.com

Thomas M. Sobol (BBO# 471770)
Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA 02116
Telephone: (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Phone:  (540) 342-2000
pfennell@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I, J. Gerard Stranch, IV hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: June 30, 2017                    **/s/ J. Gerard Stranch, IV**
                                        J. Gerard Stranch, IV