# Exhibit 11

In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## DEPOSITION OF

## LLOYD R. SABERSKI, M.D.

*January 12, 2017*



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3

 4    IN RE NEW ENGLAND COMPOUNDING       | MDL NO. 02419

 5    PHARMACY, INC. PRODUCTS LIABILITY   | DOCKET NO.

 6    LITIGATION                          | 1:13-MD-2419-RWZ

 7    THIS DOCUMENT RELATES TO:

 8    All Actions

 9

10             Deposition of LLOYD R. SABERSKI, M.D.

11                       Baltimore, Maryland

12                   Thursday, January 12, 2017

13                           10:00 a.m.

14

15

16

17

18

19

20    Reported by:   Angela McKinney, Court Reporter

21

22
```



Case 1:13-md-02419-RWZ   Document 3455-3   Filed 09/18/17   Page 4 of 5

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY    DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                       Pages 162..165

**Page 162**

1  England Compounding Pharmacy. Manager of record is
2  Barry Cadden. At the bottom above daily pharmacy
3  volume, it says compounding sterile and --
4       A   Nonsterile.
5       Q   -- nonsterile. So they go through I guess
6  and do their audit of their inspection. Would you flip
7  to page 3 of 7. It is also Bates stamped BORP9939.
8  It's security, 24/7 security monitoring,
9  licensure/registration, status of pharmacy staff. They
10 are all "yes." Standards for prescription labeling and
11 format, they are all "yes." Do you see that?
12      A   Yes.
13      Q   It says "labels compliant with nature of
14 practice." Do you see that?
15      A   Yes.
16      Q   So the Massachusetts Board of Pharmacy
17 didn't have a problem with their labeling, right?
18          MR. COREN: Objection as to form.
19 BY MR. KIRBY:
20      Q   Prescription labeling format.
21      A   I don't know what that means.
22      Q   This is what the Massachusetts board found.

**Page 163**

1       A   But I don't know how to interpret what this
2  means or what the standards are.
3       Q   Okay.
4       A   Whatever it says, whatever their conclusions
5  were I don't challenge.
6       Q   Page five, continuous quality improvement
7  was all checked "yes." Sanitation was all checked
8  "yes." At then at the bottom on page 7 of 7 it says
9  they service multiple states and licensed in 48 states
10 and two that don't require licensing. Do you see that?
11 So it looks like they were licensed in every state
12 across the country, right?
13      A   I think there are 50 states, correct?
14      Q   I'm sorry. You are right. They sell in 50
15 states. They are licensed in 48 and then the other two
16 don't require licenses. I meant to say that they
17 practice in 50 states.
18      A   Okay.
19      Q   So it looks like the Massachusetts Board of
20 Pharmacy didn't have a problem with NECC, right?
21          MR. COREN: Objection as to the form.
22      A   I don't know how to interpret that form. I

**Page 164**

1  didn't see any problems listed.
2  BY MR. KIRBY:
3       Q   Okay. You would expect that if the
4  Massachusetts Board of Pharmacy was inspecting a
5  facility, that they were doing so in an effort to make
6  sure that they were equipped to properly do their job,
7  right?
8       A   Yes.
9       Q   I think you talked earlier about
10 prescriptions and you said that a patient-specific
11 prescription was required to order drugs from NECC if
12 there was a need?
13      A   Yes.
14      Q   We'll assume that part. Can you provide any
15 evidence whatsoever that any health care providers
16 actually ordered from NECC after submitting
17 patient-specific prescriptions?
18          MR. COREN: Objection as to the form.
19      A   I don't understand the question.
20 BY MR. KIRBY:
21      Q   So all I want to know is do you have any
22 evidence to show me that any customers of NECC actually

**Page 165**

1  ordered their drugs and provided individual
2  patient-specific prescriptions?
3       A   Well, I have evidence.
4       Q   Can you provide -- strike that.
5          MR. KIRBY: Let's go off the record.
6          (Off the record)
7  BY MR. KIRBY:
8       Q   In reading Dr. Bhambhani's deposition and
9  your other review of records in this case, you
10 understand that Dr. Bhambhani and others followed
11 NECC's instructions and used a, quote, prescription
12 order form when ordering from NECC, right?
13      A   Yes.
14      Q   And the Massachusetts Board of Pharmacy
15 and/or the FDA were aware of that form and the way in
16 which NECC was sending out drugs, correct?
17         MR. COREN: I want to note my objection to
18 the form.
19      A   I can't speak to what the FDA knew or didn't
20 know, but that would be inappropriate.
21 BY MR. KIRBY:
22      Q   You said that if the FDA and/or the



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 166

1  Massachusetts Board of Pharmacy had information that
2  that's the way that NECC was conducting business that
3  that would be inappropriate, correct?
4       A    Yes.
5       Q    But they didn't stop NECC from selling
6  drugs, did they, until the outbreak?
7            MR. COREN: Objection as to the form.
8       A    Well, they did at the outbreak.
9  BY MR. KIRBY:
10      Q    Prior to the outbreak, they didn't stop
11 them?
12      A    In 2002 I think they were trying to.
13      Q    They didn't prevent NECC from continuing to
14 sell their drugs all across the country, right? Or at
15 least in Maryland? We'll go with that.
16      A    I don't know whose jurisdiction it was for
17 that kind of step, but that's not really my area of
18 expertise.
19      Q    Probably should have been one or the other
20 at least, right?
21      A    Right.
22      Q    Maybe even both?

Page 167

1            MR. COREN: Objection as to form.
2  BY MR. KIRBY:
3       Q    And you are not aware, and if you are, just
4  provide me the information, that anyone at the Maryland
5  Board of Physicians, the Board of Pharmacy, the
6  Massachusetts Board of Pharmacy, the FDA, the CDC, the
7  DEA, et cetera, ever told Dr. Bhambhani or anyone that
8  they were ordering the drugs wrong and that they
9  couldn't do it that way? You don't have any evidence
10 of that, do you?
11      A    Two questions. I have no evidence and I'm
12 not aware of anybody telling her that.
13      Q    Can we at least agree -- so I understand
14 your position, then, that she was violating standards
15 because she should have used patient-specific
16 prescriptions or whatever. Okay. Let's assume that
17 she had a need to use a compounding pharmacy, a
18 justifiable need to use a compounding pharmacy, and
19 that she was submitting individual patient
20 prescriptions. We can at least agree that that had no
21 effect on the patient injuries, correct?
22           MR. COREN: Objection as to the form.

Page 168

1  BY MR. KIRBY:
2       Q    Even if she had done it that way, she still
3  would have gotten back contaminated drugs?
4       A    I think that's basically correct, but there
5  is a small caveat here, and we kind of pounded this to
6  the ground earlier, that she was getting multidose
7  vials without a preservative and by getting shipped a
8  multidose vial without preservative, by accessing it
9  multiple times, if that vial happened to be bad, she's
10 potentially vectoring bad stuff to multiple people.
11      Q    But specific to the prescription issue, that
12 in and of itself didn't have an effect? Didn't change
13 the outcome?
14           MR. COREN: Objection as to the form.
15      A    Probably not. I could probably draw some --
16 we'll just say that.
17 BY MR. KIRBY:
18      Q    Would you agree that Dr. Bhambhani was
19 essentially ordering NECC's MPA and other drugs I guess
20 for office use?
21      A    Well, I don't know what her facility is.
22 Isn't it a surgery center?

Page 169

1       Q    An ambulatory surgery center.
2       A    I think you have to be careful about how you
3  use your words. A surgery center is different than an
4  office. She may very well have been using them in
5  both, but I'm aware of the surgery center stuff.
6       Q    Pardon my incorrect grammar, but when I said
7  office, I was suggesting the surgery center.
8       A    Okay.
9       Q    And if she had ordered from an FDA
10 manufacturer, she wouldn't have needed a prescription,
11 right?
12      A    Right. FDA manufacturers, you are allowed
13 to order a stock.
14      Q    That's essentially what Dr. Bhambhani was
15 doing here, correct?
16      A    Right, which was against the law.
17      Q    I may have asked this before and I can't
18 remember so I'll ask it this time. We can agree the
19 drugs, the MPA that she's ordering is never going in
20 the patient's hands, right? It's always going to be
21 just used by and administered by a skilled professional
22 like Dr. Bhambhani, correct?


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com