# Exhibit 10

# In the Matter Of:

## NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

## DEPOSITION OF

## LLOYD R. SABERSKI, M.D.

*January 12, 2017*



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

```
 1           IN THE UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3

 4   IN RE NEW ENGLAND COMPOUNDING      | MDL NO. 02419

 5   PHARMACY, INC. PRODUCTS LIABILITY  | DOCKET NO.

 6   LITIGATION                         | 1:13-MD-2419-RWZ

 7   THIS DOCUMENT RELATES TO:

 8   All Actions

 9

10           Deposition of LLOYD R. SABERSKI, M.D.

11                      Baltimore, Maryland

12                   Thursday, January 12, 2017

13                           10:00 a.m.

14

15

16

17

18

19

20   Reported by:   Angela McKinney, Court Reporter

21

22
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3456-2   Filed 09/18/17   Page 4 of 5

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY                 DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                       Pages 50..53

Page 50

```
1   really adequately trained in interventional cardiology
2   doing stents.
3       Q   Fair enough.  But if they do -- if they
4   regularly do stents and they have experience and
5   training in stents --
6       A   Well, if they have training and they have
7   privileges to do stents, of course.
8       Q   I guess another way of putting it is what
9   doctors in similar situations would reasonably actually
10  do, right?
11      A   Yeah, that sounds fair.
12          (Record read)
13  BY MR. KIRBY:
14      Q   So some of the things that can help shape a
15  standard of care or practice in a particular field --
16  and I'm going to run off a couple of things and you let
17  me know if you agree with this -- formal education?
18      A   Yes.
19      Q   What you were taught?
20      A   Yes.
21      Q   You learned something from mentors?
22      A   Yes.
```

Page 51

```
1       Q   Training?
2       A   Yes.
3       Q   Discussions with others, other physicians?
4       A   Yes.
5       Q   Medical conferences?
6       A   Yes.
7       Q   Interacting -- experience interacting with
8   patients?
9       A   Yes.
10      Q   Continuing medical education?
11      A   Yes.
12      Q   And just plain experience in your practice?
13      A   Yes.
14      Q   Anything else you can think of?
15      A   No.  I think that covers it.
16      Q   And would you agree generally with the
17  principle that sometimes there can be multiple ways to
18  satisfy a standard of care?  Let me give you an
19  example.  For example, one surgeon might in taking out
20  an appendix use a laparoscopic procedure.  They might
21  do it laparoscopically, where someone else does an open
22  procedure.  It doesn't mean that one or the other is
```

Page 52

```
1   necessarily right or wrong, right?  You can have
2   multiple ways --
3       A   I think that was a bad example.  With that
4   said, it really depends on the circumstances.  In the
5   most general of perspectives, yes, of course.  But many
6   cases, often depending on the circumstances, there is
7   really only one way to do it or two ways to do it.
8       Q   Like what?
9       A   Well, you know, things --
10      Q   It depends on the facts, I guess, right?
11      A   Yes.  We have no facts here.  It depends on
12  the facts.  Certainly there could be circumstances, as
13  you laid out, that it could be that way, but I think
14  many circumstances are not so different.
15      Q   For example, you like to use triamcinolone?
16      A   Yes.
17      Q   That doesn't mean that you would say simply
18  because other pain experts prefer something else or
19  don't use triamcinolone that they are breaching the
20  standard of care simply because you like triamcinolone?
21      A   Right, as long as what they are using is an
22  appropriately manufactured supplied FDA-approved
```

Page 53

```
1   product.
2       Q   And you would agree the standard of care is
3   prospective; it is not judged retrospectively in
4   hindsight?
5       A   Yes.
6       Q   So the recalled issue in this case involved
7   three different lots of MPA from NECC, correct?
8       A   Yes.
9       Q   Do you know the lot numbers?
10      A   No.
11      Q   05-21-2012 -- okay.  You don't know one way
12  or the other?
13      A   No.
14      Q   Okay.  Do you know how widespread the
15  distribution was for those lots?
16      A   No.
17      Q   But you would agree it's all across the
18  country?
19      A   It was many different states across the
20  country.  It was not all 50 states.
21      Q   17,000 doses; does that sound about right?
22      A   I've seen that number.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3456-2   Filed 09/18/17   Page 5 of 5

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 66..69

Page 66

1  A   Yes. I wrote it down this morning just so
2  that I'd get it right. The Federal Food, Drug and
3  Cosmetic Act of 1938.
4  Q   Anything else?
5  A   Well, over the years that law evolved and
6  had a number of different codifiers. It was adjusted
7  over the years, but that was the principal law that was
8  put into place.
9  Q   When did you look up the Federal Food, Drug
10 and Cosmetic Act of 1938?
11 A   A couple years ago.
12 Q   Do you know specifically what you would say
13 they violated with regards to that Federal Food, Drug
14 and Cosmetic Act?
15 A   Almost everything involving compliance.
16 Q   Can we agree that NECC's conduct in these
17 cases caused injury to the patients?
18 A   Well, I think their conduct in conjunction
19 with the misconduct of the physicians caused injury to
20 patients.
21 Q   Fair enough. At least in part we can
22 agree --

Page 67

1  A   In part, yes.
2  Q   You are not going to defend any of NECC's
3  actions in these cases?
4  A   No. But if these products were never
5  ordered or never administered, these patients would not
6  have a problem.
7  Q   The standard of care did not require
8  Dr. Bhambhani to travel to Boston to NECC's facility to
9  inspect them, did it?
10 A   No.
11 Q   Have you ever heard a reference to UniClean
12 in this litigation?
13 A   No.
14 Q   Are you familiar with ARL's role in testing
15 the NECC's MPA product here?
16 A   That's a name I've seen and I know they have
17 been involved in testing, but I really don't know much.
18 Q   Do you believe that whoever tested the
19 product for NECC fell below the standard in terms of
20 its testing?
21 MR. MILLER: Objection to form.
22 A   No, I'm not an expert in testing.

Page 68

1  BY MR. KIRBY:
2  Q   Do you agree that if proper testing had been
3  done, it likely would have detected the contamination?
4  MR. MILLER: Object to form.
5  A   I think you need to speak to somebody who
6  does the testing.
7  BY MR. KIRBY:
8  Q   Do you agree that because NECC was licensed
9  as a pharmacy in the state of Massachusetts that the
10 Massachusetts Board of Pharmacy had the power and
11 authority to regulate NECC?
12 MR. MILLER: Objection to form.
13 A   Again, that's a legal question. I don't
14 really know the distinction between the federal
15 government and the state government in terms of that
16 particular question.
17 BY MR. KIRBY:
18 Q   Do you agree that the Massachusetts Board of
19 Pharmacy was responsible for enforcing the laws with
20 respect to compounding pharmacies within its borders?
21 A   Again, that's a legal question. I'm a
22 physician. My guess is you would think that's the

Page 69

1  case, but it's a legal question. I can't answer that.
2  Q   I think you answered a similar question in
3  your other Maryland state deposition.
4  Would it be the Massachusetts Board of
5  Pharmacy's responsibility to ensure that a compounding
6  pharmacy obtains an individual prescription for its
7  drugs?
8  MR. MILLER: Objection to form.
9  A   Again, I don't know whose responsibility it
10 would be in terms of that.
11 BY MR. KIRBY:
12 Q   I think you answered affirmatively in your
13 state deposition. If that was the case, would you have
14 any reason to change that opinion now?
15 A   Well, I'm not sure what the basis of my
16 opinion was at that time because I really don't know
17 the law, that aspect of the law.
18 Q   Would you agree as a general concept that
19 it's reasonable for a health care provider in a state
20 to assume that that state regulatory board is actually
21 regulating the licensee that it's responsibile for?
22 MR. MILLER: Objection to form.


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com