# Exhibit 11

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
|   | DISTRICT OF MASSACHUSETTS |
| 2 | DOCKET NO. 1:13-MD-2419 (RWZ) |
| 3 | IN RE: NEW ENGLAND COMPOUNDING |
|   | PHARMACY, INC. PRODUCTS |
| 4 | LIABILITY LITIGATION |
| 5 | |
|   | THIS DOCUMENT RELATES TO: |
| 6 | |
|   | ARMETTA, ET AL. V. BOX HILL SURGERY CENTER, |
| 7 | LLC, ET AL. |
|   | NO. 1:14-CV-14022-RWZ |
| 8 | |
|   | BOWMAN, ET AL. V. BOX HILL SURGERY CENTER, |
| 9 | LLC, ET AL. |
|   | NO. 1:14-CV-14028-RWZ |
| 10 | |
|    | DAVIS, ET AL. V. BOX HILL SURGERY CENTER, |
| 11 | LLC, ET AL. |
|    | NO. 1:14-CV-14033-RWZ |
| 12 | |
|    | DREISCH, ET AL. V. BOX HILL SURGERY CENTER, |
| 13 | LLC, ET AL. |
|    | NO. 1:14-CV-14029-RWZ |
| 14 | |
|    | FARTHING, ET AL. V. BOX HILL SURGERY CENTER, |
| 15 | LLC, ET AL. |
|    | NO. 1:14-CV-14036-RWZ |
| 16 | |
|    | KASHI, ET AL. V. BOX HILL SURGERY CENTER, |
| 17 | LLC, ET AL. |
|    | NO. 1:14-CV-14026-RWZ |
| 18 | |
|    | TORBECK, ET AL. BOX HILL SURGERY CENTER, |
| 19 | LLC, ET AL. |
|    | NO. 1:14-CV-14023-RWZ |
| 20 | |
|    | HANDY, ET AL. V. BOX HILL SURGERY CENTER, |
| 21 | LLC, ET AL. |
|    | NO. 1:14-CV-14019-RWZ |
| 22 | |
| 23 | |
| 24 | DEPONENT: LAXMAIAH MANCHIKANTI, M.D. |
|    | DATE:     FEBRUARY 16, 2017 |
| 25 | REPORTER: CHELSEA SEVILLA-LOZADA |

Page 2

```
 1                APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4  JAY D. MILLER
 5  SILVIO TRENTALANGE
 6  LAW OFFICES OF PETER G. ANGELOS, P.C.
 7  100 NORTH CHARLES STREET, 22ND FLOOR
 8  BALTIMORE, MARYLAND 21201
 9  TELEPHONE NO.: (410) 649-2000
10  E-MAIL: JMILLER@LAWPGA.COM
11
12  AND
13
14  HARRY M. ROTH
15  COHEN PLACITELLA & ROTH, P.C.
16  201 MARKET STREET, SUITE 2900
17  PHILADELPHIA, PENNSYLVANIA 19103
18  TELEPHONE NO.: (215) 567-3500
19  E-MAIL: HROTH@CPRLAW.COM
20
21
22
23
24
25
```

Page 3

```
 1           APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANT, BOX HILL SURGERY CENTER:
 4  GREGORY K. KIRBY
 5  PESSIN KATZ LAW, P.A.
 6  901 DULANEY VALLEY ROAD, SUITE 500
 7  TOWSON, MARYLAND 21204
 8  TELEPHONE NO.: (410) 938-8800
 9  E-MAIL: GKIRBY@PKLAW.COM
10
11  ON BEHALF OF THE DEFENDANT, SPECIALTY SURGERY CENTER:
12  ASHLEY GENO
13  BREWE, KRAUSE, BROOKS & CHASTIN, PLLC
14  611 COMMERCE STREET, SUITE 2600
15  NASHVILLE, TENNESSEE 37203
16  TELEPHONE NO.: (615) 256-8787
17  E-MAIL: AGENO@BKBLAW.COM
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   INDEX
 2                              Page
 3  DIRECT EXAMINATION BY MR. MILLER      6
 4  EXAMINATION BY MR. ROTH             113
 5  CROSS EXAMINATION BY MR. KIRBY      177
 6  REEXAMINATION BY MR. ROTH           192
 7
 8
 9                 EXHIBITS
10                              Page
11  34  FDA BRIEFING                     62
12  36  ASSESSMENT OF INFECTION CONTROL 123
13
```

Page 5

```
 1               STIPULATION
 2
 3  The deposition of LAXMAIAH MANCHIKANTI, M.D. taken at
 4  THE PAIN CENTER, 2831 LONE OAK ROAD, PADUCAH, KENTUCKY
 5  42003 on THURSDAY, the 16TH day of FEBRUARY, 2017 at
 6  approximately 10:00 A.M. CST; said deposition was taken
 7  pursuant to the FEDERAL Rules of Civil Procedure. It is
 8  agreed that CHELSEA SEVILLA-LOZADA, being a Notary
 9  Public and Court Reporter for the State of Kentucky, may
10  swear the witness.
```

Page 90

1 around, so...
2  Q  Okay. So let me -- I take it, then, you would
3 disagree with this statement. A physician cannot
4 prescribe a non-FDA approved medication without a
5 specific reason for an individual patient? You disagree
6 with that, don't you?
7      MR. KIRBY: Objection to form. Asked and
8   answered a long time ago. Go ahead.
9  A  Again, I think you may have changed the
10 question somewhere there. Without a specific reason, I
11 didn't say that. There should be a specific reason.
12 Specific reason is putting that in the epidural space to
13 manage whatever the problem they have, spinal pain in
14 this case for epidural injection, so that is a specific
15 reason for that specific patient.
16  Q  Okay. So you agree that before you're going
17 to use a non-FDA-approved drug, you have to have a
18 specific reason, or a specific patient?
19      MR. KIRBY: Objection to form. You asked the
20   same question an hour ago. But, go ahead if you can
21   answer it again.
22  A  Well you need a reason to order a drug for
23 anyone whether it is an FDA drug, or FDA-approved drug,
24 or non-FDA-approved drug, or any drug, there should be a
25 specific reason to do so.

Page 91

1 BY MR. MILLER:
2  Q  And is that why there's a regulation requiring
3 individual prescriptions for each individual patient?
4      MR. KIRBY: Objection to form.
5  A  Again, I'm not quite certain if that
6 regulation applies to physicians. I'm not even sure it
7 is a regulation. As I said, we do not see any policies
8 or regulations from Boards of Medical Licensure, and
9 from DEA. The prescription regulations, all of them
10 come from DEA. If DEA makes the recommendations, it
11 gives black box warnings, things like that, but how you
12 do the prescriptions comes from DEA.
13  Q  Do you recall in your report saying that
14 because Dr. Bhambhani had no prior problems with NECC,
15 she was free to continue to order from them without
16 conducting any research?
17  A  Yes. I have said that on multiple occasions
18 during this testimony. That's true.
19  Q  Is it reasonable to expect Dr. Bhambhani to at
20 least conduct a Google search on NECC prior to using it?
21      MR. KIRBY: Objection to form, foundation. You
22   can answer.
23  A  Not necessarily. She already was experienced
24 with this. She could have done that before she started
25 in 2003, I guess you can make a case about that, but she

Page 92

1 already developed significant experience with it, and
2 she had bad experience with other ones, so what she was
3 doing was the right thing, so -- and that is the
4 standard of care. That is what all the physicians do.
5  Q  I thought I had asked you whether or not it
6 was reasonable for her to at least have conducted a
7 Google search.
8  A  Well, that's, again, a hypothetical question.
9 Anybody can conduct a Google search, or may not conduct
10 a Google search, and there is no guarantee that you will
11 find anything, and the Google search would be in 2003,
12 because that is when she started using it. Google
13 searches were not that great in 2003.
14  Q  Well, when she went out on her own, would you
15 have expected it to be reasonable that she, well, let me
16 make sure that NECC is still a reliable safe compounder.
17 How long did it take to hit a search button on the
18 computer?
19      MR. KIRBY: Objection to form, foundation. Go
20   ahead.
21  A  Well, how long it takes to hit such a button
22 depends on each person's typing skills and searching
23 skills, but, again, she can't sit down there and Google
24 search each drug she is using. She is using sodium
25 chloride solution. She is using several other drugs.

Page 93

1 So if she has to look for each and every drug, there was
2 no reason for it. If there were any complaints came to
3 her notice, she was aware of anything, then it would
4 have been reasonable for her or her -- whoever she
5 appointed to look into that. But there was no reason to
6 do that. She already began very comfortable, and that
7 is what the majority of the doctors do with the new
8 practices they start their own practices, they do that.
9 The doctors who left from our surgery center here, they
10 do the same thing. They took materials from here, they
11 took questionnaires, informed consents, and everything,
12 and they start following them, and they're not doing
13 independent searches.
14  Q  Had you seen the FDA warning letter of 2006,
15 NECC?
16  A  I have seen it now, but not before 2012.
17  Q  Do you know if Dr. Bhambhani had done a search
18 in 2007?
19  A  No. She has not done any searches in 2007.
20  Q  If she had never done a search, but if she had
21 done one, you don't know whether or not that letter
22 would've showed up, right?
23      MR. KIRBY: Objection to form, foundation,
24   calls for speculation. Go ahead.
25  A  Well, hypothetically, if she sat down there

24 (Pages 90 - 93)

Page 102

1  this objection.
2      MR. KIRBY: Okay. Thank you. I'll call him
3  back in. By the way, while he's out, what's the --
4  how much longer do you think you have, Jay, because
5  I know then Harry probably has some questions, too.
6      MR. MILLER: I've got to stop probably at
7  around quarter of 3:00.
8      MR. MILLER: Meaning the deposition has to be
9  done by then?
10     MR. MILLER: No. I'm going to -- I'll let --
11 I'll stop questioning, Glenn will take over and let
12 Harry do his questioning, but we'll be done our part
13 by quarter of 3:00.
14     MR. KIRBY: Okay. Harry, do you think -- do
15 you think with your questioning, I don't know how
16 much you have, that we could be done by 4:30? Wait,
17 wait, wait. So we're on -- we're in separate time -
18 - this can be off the record, by the way.
19     (OFF THE RECORD)
20 BY MR. MILLER:
21  Q  Doctor, I want to clarify this paragraph that
22 begins "If or when she obtained materials from NECC, she
23 saw or would have seen representations by NECC," and
24 then there's about seven lines of different
25 representations. Isn't it true that you now know that

Page 103

1  Dr. Bhambhani didn't see any representations from NECC,
2  correct?
3   A  That's correct.
4   Q  So his opinion, then, really isn't applicable
5  anymore. I mean, there was no reassurance from any
6  representation, because we know she didn't get any,
7  correct?
8      MR. KIRBY: Objection to form.
9   A  Yes. That's correct, she has not seen any of
10 this.
11  Q  Okay. Is your opinion that Dr. Bhambhani had
12 no inclination to do any investigation, however limited,
13 of NECC prior to using them at Box Hill based in part
14 because she had had this prior experience with NECC at
15 her prior employer?
16     MR. KIRBY: Objection to form. You can answer.
17  A  Well, not in part. She had the prior
18 experience of her own, and that doesn't have anything to
19 do with the prior employer. The prior employer was the
20 one who initiated -- in any case, she was practicing on
21 her own, whether she was employed by someone else or
22 that -- that suffices to make orders from the same
23 entity where you are getting them from. That is
24 satisfactory. That is standard of practice.
25  Q  Well, continuing with that propriety we were

Page 104

1  just talking about, at the very end reinforces the
2  propriety of Box Hill's due diligence prior to
3  purchasing from NECC.
4   A  Which one is that?
5      MR. KIRBY: What's the question?
6   A  What page are we talking about?
7   Q  Page 8, the same paragraph we were just
8  talking about, the very last line of that paragraph.
9   A  Oh, okay.
10  Q  Reinforces the propriety of Box Hill's due
11 diligence prior to purchasing from NECC. Due -- what
12 due diligence did Dr. Bhambhani exercise?
13     MR. KIRBY: Objection to form, foundation, and
14 the commentary before the question.
15  A  Well, if you are reading -- if I'm reading
16 that sentence that is related to your question, there
17 were no guidelines from any major medical associations,
18 that is true, there were no guidelines for her to do a
19 due diligence, or for -- by her surgery center prior to
20 purchasing medication compounded such as NECC.
21  Q  My question is what due diligence did Dr.
22 Bhambhani do? She did nothing, right?
23     MR. KIRBY: Objection. Asked and answered.
24  A  Well, her own experience is the due diligence
25 to a great extent. Then she did not do any additional

Page 105

1  due diligence and that is what we are saying. I am
2  saying, that there are no guidelines to do such thing,
3  for example, we did not do any due diligence either
4  afterwards, or before, so that is the standard practice
5  among surgery centers, and offices, and by physician
6  practices.
7   Q  So if we take away her prior employment
8  experience, I want you to assume hypothetically that Dr.
9  Bhambhani started practice on her own in 2007, has never
10 heard of NECC, and says "I've got to purchase a
11 compounded drug," opens a phone book up and picks NECC,
12 do your testimony and your opinions that's all she's
13 required to do, if they're a licensed compounding
14 pharmacy, she's met the standard of care?
15     MR. KIRBY: Objection to form, foundation, the
16 hypothetical nature, and facts not in evidence. You
17 can answer.
18  A  Well, as you said, it is completely
19 hypothetical, but if that situation arises, if she opens
20 the telephone book, she will not find NECC there. The
21 way she will find where to get these drugs is, again,
22 she has to go back to her previous employer or where she
23 was trained, or a senior or a friend, or somebody else
24 and find out about the information, and then if she is
25 not satisfied with that information, then she may check

27 (Pages 102 - 105)