# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCT LIABILITY LITIGATION | ) ) ) | MDL No. 02419 Docket No. 1:13-md-2419-RWZ |
| ⸻⸻⸻⸻ | ) ) | |
| This document relates to: | ) ) | |
| All of the cases against the Box Hill Defendants[1] | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE THE REPORTS AND TO EXCLUDE TESTIMONY BY STEVEN COHEN, M.D., THOMAS M. LARKIN, M.D., LAXMAIAH MANCHIKANTI, M.D. AND DAVID MAINE, M.D. AS EXPERT WITNESSES FOR THE BOX HILL DEFENDANTS**

Patricia J. Kasputys, Esq. (*Pro Hac Vice*)
Jay D. Miller, Esq. (*Pro Hac Vice*)
Glenn E. Mintzer, Esq. (*Pro Hac Vice*)
Sharon L. Houston, Esq. (*Pro Hac Vice*)
**Law Offices of Peter G. Angelos, P.C.**
One Charles Center
100 North Charles Street
Baltimore, MD  21201
410-649-2000 (Phone)
410-649-2101 (Fax)

*Attorneys for Plaintiffs Armetta, Bowman, Davis, Dreisch, Farthing, Kashi, and Torbeck*

Harry M. Roth, Esq. (*Pro Hac Vice*)
Michael Coren, Esq.
**Cohen, Placitella & Roth, PC**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA  19103
215-567-3500 (Phone)
215-567-6019 (Fax)

*Attorneys for Plaintiff Handy*

---

[1] This document applies to the following cases: Armetta v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14022-RWZ; Bowman v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14028-RWZ; Davis v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14033-RWZ; Dreisch v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14029-RWZ; Farthing v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14036-RWZ; Kashi v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14026-RWZ; Torbeck v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14023-RWZ; Handy v. Box Hill Surgery Center, LLC, et al., No. 1:14-cv-14019-RWZ.

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.  RELEVANT BACKGROUND ........................................................................ 3

III. ARGUMENT ................................................................................................... 6

   A.   Box Hill's Experts' Opinions and Reports Are Plagiarized and Therefore Not
        Reliable............................................................................................................. 6

   B.   Box Hill's Experts' Standard of Care Opinions Contradict Controlling Statutes and
        Regulations...................................................................................................... 14

   C.   Box Hill's Four Experts' Opinions Are Pure *Ipse Dixit* and Inadmissible. .................. 17

   D.   Box Hill's Four Experts' Identical Opinions Are Needlessly Cumulative. .................. 19

IV.  CONCLUSION............................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Alley v. Siepman*, 214 N.W.2d 7 (S.D. 1974) ............................................................................. 15

*Bd. of Educ. v. Howard Cty.*, 413 A.2d 568 (Md. App. 1980) ..................................................... 15

*Bouygues Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722 (E.D.N.C. 2007) ................................... 7

*Cash v. United States,* No. 1:15-cv-00518-JAW, 2016 U.S. Dist. LEXIS 148032
   (D. Me. Oct. 26, 2016) .............................................................................................................. 19

*Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) ............................... 8

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................................... 6

*Deutz Corp. v. City Light & Power, Inc.,* No. 1:05-cv-3113-GET, 2008 U.S. Dist. LEXIS 110202
   (N.D. Ga. Mar. 21, 2008) ........................................................................................................... 7

*Forsythe v. Rosen Med. Grp.*, LLC, No. 11-cv-07676, 2015 U.S. Dist. LEXIS 1686
   (N.D. Ill. Jan. 8, 2015) ............................................................................................................. 19

*Fowler v. United States*, No. 08-216, 2009 U.S. Dist. LEXIS 78805
   (W.D. La. Sep. 1, 2009) .............................................................................................................. 7

*Franklin Office Park Realty Corp. v. Comm'r of the Dep't of Envtl. Prot.*, 995 N.E.2d 785
   (Mass. 2013) .............................................................................................................................. 16

*GE v. Joiner,* 522 U.S. 136 (1997) ............................................................................................... 17

*Hager v. Vertrue, Inc.*, No. 09-11245-GAO, 2011 U.S. Dist. LEXIS 110697
   (D. Mass. Sep. 28, 2011)........................................................................................................... 17

*Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084 (7th Cir. 1999) ............................................. 18

*In re Imperial Credit Indus., Inc. Secs. Litig.*, 252 F.Supp.2d 1005 (C.D. Cal. 2003) .................. 8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................... 6

*Langner v. Caviness*, 28 N.W.2d 421 (Iowa 1947) ..................................................................... 15

*Lawrey v. Kearney Clinic, P.C.*, No. 8:11CV63, 2012 U.S. Dist. LEXIS 126620
   (D. Neb. Sep. 6, 2012) .............................................................................................................. 19

*Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558 (S.D.N.Y. 2007)....................................7

*McGovern v. Brigham & Woman's Hosp.*, 584 F. Supp. 2d 418 (D. Mass. 2008).......................17

*McGuire v. Amrein*, 101 F. Supp. 414 (D. Md. 1951) ..................................................................15

*Member Servs. v. Sec. Mut. Life Ins. Co.*, No. 3:06-cv-1164 (TJM/DEP), 2010 U.S. Dist. LEXIS
    103776 (N.D.N.Y. Sep. 30, 2010) ............................................................................................7

*Milward v. Rust-Oleum Corp.*, 820 F.3d 469 (1st Cir. 2016) .........................................................6

*Moore v. BASF Corp.*, No. 11-1001, 2012 U.S. Dist. LEXIS 170411
    (E.D. La. Nov. 30, 2012) ........................................................................................................8, 9

*Ortega v. Garner*, 218 Cal. App. 2d 823 (1963)..........................................................................14

*Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2016 U.S. Dist. LEXIS 117357
    (M.D. Pa. Aug. 23, 2016)..........................................................................................................19

*Raymo v. Sec'y of HHS*, No. 11-0654V, 2014 U.S. Claims LEXIS 162
    (Fed. Cl. Feb. 24, 2014) .............................................................................................................7

*Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, No. 1:04-cv-01587-TAB-RLY, 2007
    U.S. Dist. LEXIS 15895 (S.D. Ind. Mar. 5, 2007)......................................................................8

*Republican Pub. Co. v. Am. Newspaper Guild*, 172 F.2d 943 (1st Cir. 1949) ............................15

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) .............................17

*Samson v. State*, 341 A.2d 817 (Md. App. 1975) ........................................................................17

*Sanchez v. J. Barron Rice, Inc.*, 427 P.2d 240 (N.M. 1967)........................................................15

*United States v. Marquardo*, 149 F.3d 36 (1st Cir. 1998) ............................................................16

*United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006) ..................................................6

*United States v. Pires*, 642 F.3d 1 (1st Cir. 2011) .......................................................................19

*United States. v. St. Pierre*, 599 F.3d 19 (1st Cir. 2010) .............................................................19

*Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36 (1st Cir. 1995) ..........................................................6

*Wood v. Melton*, 293 P.2d 252 (Kan. 1956).................................................................................15

**Statutes**

Mass. Gen. Laws Ch. 94C § 19 (2012).................................................................. 4, 16

Mass. Gen. Laws Ch. 94C § 21 (2012)...................................................................... 4

Mass. Gen. Laws Ch. 94C § 22 ......................................................................... 16

Md. Health-General Code Ann. § 12-505 (2012) .................................................. 4, 16

Md. Health-General Code Ann. § 21-221 (2012) .................................................. 4, 16

**Rules**

Fed. R. Evid. 403 ........................................................................................ 19

Fed. R. Evid. 702 .......................................................................................... 6

**Regulations**

21 CFR 1306.04 ........................................................................................ 16

Md. COMAR 10.19.03.07(c)......................................................................... 16

## I.      INTRODUCTION

Defendants Box Hill Surgery Center, LLC ("Box Hill"), Ritu T. Bhambhani, M.D. ("Dr. Bhambhani"), and Ritu T. Bhambhani, M.D., L.L.C. (collectively "Box Hill Defendants" or "Box Hill") submitted the reports of four physicians who will be proffered to offer what are, allegedly, their own opinions that the Box Hill Defendants complied with the standard of care. The four Box Hill Experts are: Steven Cohen, M.D., Thomas M. Larkin, M.D., Laxmaiah Manchikanti, M.D., and David Maine, M.D. Each of the Experts' reports, with the exception of their biographic sections, are essentially identical. So much so that each of the Experts' reports, except for Dr. Maine's report, state "it was reasonable and appropriate for **STOPNC** to purchase compounded MPA . . . ." Ex. A (October 14, 2016 Expert Report of Steven Cohen, M.D.) at 11; Ex. B (October 17, 2016 Expert Report of Thomas Larkin, M.D.) at 12; Ex. C (October 13, 2016 Expert Report of Laxmaiah Manchikanti, M.D.) at 11 (emphasis supplied).[2] When asked in deposition about this mention of STOPNC, Dr. Cohen responded that he did not know what it referred to, and guessed it might be Box Hill but was not certain. Ex. E (March 1, 2017 Deposition of Steven Cohen, M.D.) at 159:4-162:6.

What occurred here, and alone warrants the Court barring these four Box Hill Experts from testifying at trial under Federal Rule of Evidence 702, is that these Experts' reports were actually plagiarized in their entirety from the expert report of Autry Parker, M.D., a physician who submitted an expert report defending another clinic facility in another state, Saint Thomas Outpatient Neurosurgical Center, LLC, or, as it is known, STOPNC,  one of the Tennessee NECC

---

[2] Before it was signed, "Box Hill" was substituted for "STOPNC" in Dr. Maine's report. Other than changing that, the balance of Dr. Maine's report is identical to the other three except for the biography sections. *Compare* Ex. D (October 10, 2016 Expert Report of David Maine, M.D.) *with* Exs. A, B, and C.

cases that was part of this multidistrict litigation.[3] *Compare* Ex. F (January 8, 2016 Expert Report of Autry Parker, M.D.) *with* Exs. A, B, C, and D. Thus, not only did Box Hill's Experts not prepare the reports they claimed held their opinions, they (and again except perhaps Dr. Maine) apparently did not even read them before signing or authorizing their service on Plaintiffs. Because these Experts held the report of another out as their own, it is impossible to know if the proffered opinions are the opinions of the respective Experts. Thus, not only are these opinions unreliable, and thus inadmissible, but Defendants cannot seriously deny that four identical reports are cumulative.[4]

Yet there is more. Each report (repeated four times) contains inadmissible conclusory net opinions premised solely on some Expert's subjective experience, and provide no substantive explanatory analysis upon which the opinions are founded as required by the Federal Rules of Evidence. Moreover, each of the Experts' opinions should also be excluded because they are repugnant to controlling statutes and regulations applicable to health care providers at the time, thereby violating the rule that evidence in conflict with a standard imposed by statute or ordinance is inadmissible. Indeed, these Experts' opinions that certain of Box Hill Defendants' conduct complied with the standard of care are based solely on purported "industry custom" that directly conflicts with Massachusetts, Maryland, and federal statutory and regulatory provisions governing the ordering, prescribing, labeling and distribution of compounded prescription medications.

---

[3] At the risk of stating the obvious, STOPNC is not a defendant in this immediate matter, nor is Dr. Parker named as an expert by Box Hill Defendants.

[4] In that regard, given the opinions were identical, Plaintiffs' counsel sought to learn, before deposing all of the experts, which experts would actually testify. Box Hill's counsel declined to disclose which doctor would testify; so they were all deposed at what was a great waste of time and money.

In the event this Court finds the Experts' opinions admissible, then, in the alternative, the Court should limit the Box Hill Defendants to the presentation of one expert witness on the issue of compliance with the standard of care, especially as each of its purported Experts has expressed identical opinions in their purported reports. Because the Experts' reports are all plagiarized and copied from the same report of another physician, the Experts' opinions are unnecessarily cumulative. Further, all of the proffered Experts are of the same clinical discipline (anesthesiologist/pain management specialist), and cannot provide a diverse perspective or background. Presentation of multiple expert witnesses testifying to the same opinion would needlessly prolong this litigation and cause Plaintiffs and this Court to incur gratuitous costs.

## II.   RELEVANT BACKGROUND

Movants are the plaintiffs in eight separate captioned cases with claims for damages against the Box Hill Defendants, the sole remaining defendants in their suits. Each case arises from bodily injuries, some fatal, sustained in the national outbreak of fungal meningitis and other fungal infections caused by the administration of contaminated, preservative-free, methyl-prednisone acetate (hereinafter "MPA"), compounded, sold, and dispensed in the spring and summer of 2012 by the New England Compounding Center ("NECC"). Formerly located in Framingham, Massachusetts, the now defunct NECC compounding pharmacy was licensed and regulated by the Massachusetts Board of Registration in Pharmacy. In these cases, NECC combined and mixed ingredients to create specific formulations of pharmaceutical products. In the fall of 2012, health officials connected a number of cases of fungal meningitis to injections of MPA that had been manufactured by NECC and sold to health care facilities across the nation, including Defendant Box Hill Surgery Center, LLC.

As a state regulated compounding pharmacy, and not a U.S. Food & Drug Administration ("FDA") registered drug manufacturer, NECC was not legally authorized and able under Massachusetts law to compound, sell, and dispense prescription drugs such as MPA both within and outside the Commonwealth of Massachusetts without patient specific prescriptions.[5]

Defendant Box Hill Surgery Center, LLC, is an ambulatory surgical center located in Harford County, Maryland, which is outside of Baltimore. Box Hill is owned and operated by co-Defendant Dr. Bhambhani, an anesthesia/pain medicine specialist. In the summer and early fall of 2012, Dr. Bhambhani administered fungal tainted preservative-free MPA to, among others, the eight patients whose injuries or deaths are before the Court. As a result of being injected with fungal tainted preservative-free MPA, all eight of these patients suffered serious injuries (fungal infections) and four died after their infections progressed to meningitis. Maryland pharmacy laws are the same as Massachusetts' on this issue, requiring patient specific prescriptions when compounded medication such as MPA is dispensed.[6] Plaintiffs (on behalf of themselves or their decedents) filed complaints against a number of defendants alleging negligence, lack of informed consent, violation of Massachusetts consumer protection laws, and loss of consortium. Plaintiffs further alleged that this fungal tainted preservative-free MPA was obtained from NECC by mail

---

[5] In 2012, Massachusetts prescription law required compounded prescription medication such as MPA be dispensed by Massachusetts pharmacies only pursuant to patient specific prescriptions and when dispensed labeled with the name of the patient the medication was prescribed for. Mass. Gen. Laws Ch. 94C §§ 19, 21 (2012). There is no conflict of law presented here as Maryland law is the same. Md. Health-General Code Ann. § 21-221 (2012) (stating that a drug that is dispensed under a prescription shall bear a label that, if stated in the prescription, states the name of the patient, and any cautionary statements); *see also* Md. Health-General Code Ann. § 12-505 (2012)). Moreover, because the dispensing pharmacy, NECC, was located here in Massachusetts, Massachusetts' statute requires adherence to Massachusetts prescribing law.

[6] Md. Health-General Code Ann. § 21-221 (2012); Md. Health-General Code Ann. § 12-505 (2012)).

4

in violation of Massachusetts' pharmacy laws, which as noted, required patient specific prescriptions.

During discovery, pursuant to the Court's scheduling order Box Hill identified four common liability medical doctor experts (the Experts identified above) as well as two pharmacy experts. Each of the four medical doctor experts is an anesthesiologist and interventional pain management physician. All four are offered as an expert on the same issue of whether the Box Hill Defendants complied with the standard of care regarding Box Hill's prescribing, ordering and administering preservative-free MPA from NECC. With the exception of the description of their training and experience, the Experts provided four identical reports (Exs. A, B, C, and D) and repeated their cumulative opinions at their respective depositions (Exs. E, G (March 10, 2017 Deposition of Thomas M. Larkin, M.D.), H (February 16, 2017 Deposition of Laxmaiah Manchikanti, M.D.), I (March 8, 2017 Deposition of David Maine, M.D.)). Plaintiffs now file this motion to strike the Experts' reports and exclude their testimony at trial. Each doctor during deposition was forced to admit they did not prepare their reports and that they signed the reports prepared for them by the Box Hill Defendants' defense attorneys. *See infra* at 10-13.

## III.     ARGUMENT

### A.     Box Hill's Experts' Opinions and Reports Are Plagiarized and Therefore Not Reliable.

Federal Rule of Evidence 702 governs the admission of expert-opinion testimony. Fed. R. Evid. 702.[7] "In applying Rule 702, the district court serves as the gatekeeper for expert testimony by 'ensuring that [it] . . . both *rests on a reliable foundation* and is relevant to the task at hand.'" *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016) (emphasis added) (alteration and ellipses in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). "Expert-opinion testimony is reliable if it has 'a reliable basis in the knowledge and experience of [the pertinent] discipline.'" *Id*. at 479 (Thompson, J., dissenting) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). "[T]he Court must determine whether all proffered expert testimony is sufficiently reliable to be admitted, whether 'scientific' or not." *United States v. Monteiro*, 407 F. Supp. 2d 351, 356-57 (D. Mass. 2006) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). Unreliable expert-opinion testimony is inadmissible. *See, e.g., Vadala v. Teledyne Indus., Inc.,* 44 F.3d 36, 38 (1st Cir. 1995) (excluding proffered expert testimony as unreliable because the expert had no idea whether an assumption on which his opinion hinged was valid).

---

[7] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Plagiarism renders a putative expert untrustworthy and unreliable. Over time it has become a black letter law principle that an expert's opinions are inadmissible under Fed. R. Evid. 702 when the opinions expressed in the expert's report are not his or her own opinions, and especially so when the expert's report is not his or her own work. *See Bouygues Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722, 729 (E.D.N.C. 2007) (granting motion to exclude expert reports that had incorporated the reports of withdrawn experts verbatim, stating "the wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed. R. Evid. 702."); *see also Raymo v. Sec'y of HHS*, No. 11-0654V, 2014 U.S. Claims LEXIS 162, at *46-*50 (Fed. Cl. Feb. 24, 2014) (precluding the expert doctor's report and testimony after concluding that the doctor provided misleading testimony regarding his report drafting process, and that he plagiarized significant portions of his report from the report of a doctor involved in a similar case).

In addition, rulings by district courts across several circuits addressing plagiarized reports, such as those present here, reason that "[w]hile Rule 703 permits an expert to rely on 'facts or data' that are not otherwise admissible into evidence in forming their opinion, it does not permit an expert to simply parrot the opinions of other experts." *Deutz Corp. v. City Light & Power, Inc.,* No. 1:05-cv-3113-GET, 2008 U.S. Dist. LEXIS 110202, at *16 (N.D. Ga. Mar. 21, 2008); *see also Member Servs. v. Sec. Mut. Life Ins. Co*., No. 3:06-cv-1164 (TJM/DEP), 2010 U.S. Dist. LEXIS 103776, at *91 (N.D.N.Y. Sep. 30, 2010) ("While an expert may rely upon another expert to form an opinion under Rule 703, an expert may not merely recite another expert's opinion as his own."); *Fowler v. United States*, No. 08-216, 2009 U.S. Dist. LEXIS 78805, at *26 n.59 (W.D. La. Sep. 1, 2009) ("It is well settled that an expert . . . may not simply parrot the work actually done by another expert . . . ."); *Malletier v. Dooney & Bourke, Inc*., 525 F.Supp.2d 558, 664 (S.D.N.Y. 2007) (observing that although Rule 703 allows experts to rely on opinions of others, "the expert witness

must in the end be giving his own opinion. He cannot simply be a conduit for the opinion of an unproduced expert."); *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, No. 1:04-cv-01587-TAB-RLY, 2007 U.S. Dist. LEXIS 15895, at *11 (S.D. Ind. Mar. 5, 2007) ("What an expert may not do is act as a 'mouthpiece' for another undisclosed expert."); *In re Imperial Credit Indus., Inc. Secs. Litig.*, 252 F.Supp.2d 1005, 1012 (C.D. Cal. 2003) ("The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation.").

Instructive here is the case of *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012), which involved a remarkably similar situation of rank plagiarism by an expert. There a district court excluded an expert's declaration in support of class certification under the *Daubert* standards where the expert's report "cut and pasted . . . almost an exact copy" of another expert's report. *Id.* at 546. The *Cholakyan* court found that plaintiff's expert failed to "exercise independent judgment," but rather took the other expert's conclusions, "engaged in little, if any, evaluation of their merits, and reproduced [them] . . . wholesale (*including its typographical errors*) as his own work." *Id.* (emphasis in original). The *Cholakyan* court observed that while the credibility of "shaky" expert testimony is ordinarily a subject for cross-examination, the testimony proffered was "not merely shaky: it is unreliable." *Id.* at 547.

*Moore v. BASF Corp.,* No. 11-1001, 2012 U.S. Dist. LEXIS 170411 (E.D. La. Nov. 30, 2012), likewise is on point and with similar outcome. There, an Eastern District of Louisiana court granted defendant's motion *in limine* after deeming the plaintiff's expert doctor's report and testimony unreliable and inadmissible at trial when the defendant submitted evidence that the expert doctor's conclusions were copied verbatim from the report of another expert. *Id.* at *22-*23. The *Moore* court noted that, "[t]he likelihood that substantial portions of Dr. Kura's report do not reflect his original work is yet another reason the Court finds that Dr. Kura's opinions in

8

general are unreliable. The Court therefore deems Dr. Kura's report and testimony to be inadmissible at trial in their entirety." *Id*. at *23.

On the same basis and for the same reasons Box Hill's Experts opinions concerning the Box Hill Defendants' compliance with the standard of care are unreliable and should be excluded. Neither the Experts' reports nor the opinions expressed by them are any of the four Experts' original work or actual opinions they developed. Rather, what their reports state are word for word the opinions and reasoning of another expert in another case involving a clinic from a different state. Significant parts of the Experts' reports[8] were copied, for the most part verbatim (including errors), from a report produced first in time in support of defendant STOPNC in the NECC multidistrict litigation by Autry Parker, M.D.[9] *Compare* Ex. F, *with* Exs. A, B, C, and D. Consequently, all of the Box Hill Defendants' Experts' reports are essentially identical to each other, and, in turn, identical to Dr. Parker's. As exhibited throughout the below footnoted report

---

[8] *See* Exs. A, B, C, and D sub-sections: b. Discussion and Explanation of Medication Purchasing Decisions; c. Compliance with the Standard of Care: i. The Box Hill Defendants Exercised Appropriate Due Diligence in Purchasing from NECC; ii. Box Hill Surgery Center, Ritu Bhambhani, M.D., and Ritu T. Bhambhani, M.D., LLC, complied with the Standard of Care by Purchasing from a Compounding Pharmacy; iii. NECC's MPA Was a Reasonable Alternative to Depo-Medrol; iv. The Standard of Care Did Not Require Dr. Bhambhani to be Aware of the FDA and Massachusetts Board of Pharmacy Inspections of NECC; v. The Standard of Care Did not Require Dr. Bhambhani and Box Hill to be Aware of the FDA Warning Letter Issued to NECC; vi. It was Appropriate and in Compliance with the Standard of Care for Box Hill to Rely on the FDA, the Massachusetts Board of Registration in Pharmacy, and/or the Maryland Board of Pharmacy to Regulate NECC; vii. The Standard of Care Did Not Require That Box Hill Purchase MPA from an FDA-registered and/or PCAB-accredited supplier; viii. The Standard of Care Did Not Require a Site Visit to NECC; ix. The Standard of Care did not Require Investigation into Product Liability Suits against NECC; x. The Standard of Care did not Require Dr. Bhambhani to Consult with a Pharmacist; xi. The Box Hill Defendants Appropriately Considered Medication Supply When Ordering NECC's MPA; xii. Dr. Bhambhani and the Box Hill Defendants Were Qualified to Make Medication Purchasing Decisions; xiii. The Standard of Care did not Require Additional Policies and Procedures Regarding Medication Purchasing; xiv. The Standard of Care did not Require Informing Patients of the use of Compounded MPA; xv. NECC's Customer List Demonstrates Purchasing from NECC Complied with the Standard of Care; xvi. Dr. Bhambhani's Uneventful Use of NECC's Compounded MPA Prior to the Outbreak Reinforces the Propriety of the Decision to Purchase from NECC; and xvii. The Standard of Care did not Require Individual Patient Specific Prescriptions.

[9] As previously noted, STOPNC is not a defendant in this immediate matter, nor is Dr. Parker an expert in any of the captioned cases.

sections, the Experts' reports copied Dr. Parker's report from the STOPNC matter and merely changed "STOPNC" to "Dr. Bhambhani" or "Box Hill Defendants." Remarkably, some of the Experts' reports did not switch out the STOPNC name every time as Drs. Cohen's, Larkin's and Manchikanti's reports erroneously reference STOPNC in each report's "Section C.iii." under the caption "NECC's MPA Was a Reasonable Alternative to Depo-Medrol," each of these Experts' reports identically states:

> All of these factors support the conclusion that it was reasonable and appropriate for *STOPNC* to purchase compounded MPA, which is a reasonable equivalent to Depo-Medrol.

Ex. A at 11, Ex. B at 12, and Ex. C at 11. That language is identical to the last sentence of Section "C.iii. - STOPNC's Formulary Did Not Preclude the Purchase of Compounded MPA," of Dr. Parker's expert report. *See* Ex. F at 19.

Making the plagiarism more troubling is the misleading testimony the Experts provided regarding their drafting and review process. None of the Experts were aware their reports were identical to each other's until either being questioned about it at their deposition, or reading the first Expert's (Dr. Manchikanti) deposition. Nor is it clear any Expert knew it was copied from Dr. Parker. The unrecognized similarity is because the Experts did not draft their reports, nor did they review their reports as closely as they claim.

Dr. Manchikanti, who was the first expert to testify at a deposition on February 16, 2017,[10] could not say he or his office typed his report. Ex. H at 75:1-77:11. Although Dr. Manchikanti claims he never typed the report, he (as well as Box Hill Defendants' attorney attending the

---

[10] Plaintiffs did not become aware of Dr. Parker's expert report being the origin report until after deposing Drs. Manchikanti and Cohen, and therefore did not inquire about their awareness or knowledge of Dr. Parker's report.

deposition) was quick to describe the report's incorrect STOPNC reference as a trivial typographical error:

> Q:     And under sub-part 3, the last sentence reads, "All of these factors support the conclusion that it was reasonable and appropriate for STOPNC to purchase compounded MPA, which is a reasonable equivalent to Depo-Medrol." What is STOPNC?
>
> A:     I think it is the facility in Tennessee. I think it is St. Thomas Outpatient Neuro-surgery Center, if I'm not wrong.
>
> Q:     And what does STOPNC have to do with anything, with Dr. Bhambhani's practice or Box Hill Pain Center?
>
> A:     Oh, they were the first ones involved in this issue, and they had many of the documents. Their names were mentioned everywhere in the documents I was reading. I think I even reviewed some of the depositions taken by them.
>
> Q:     Are you expressing any opinion about STOPNC in these cases?
>
> MR. KIRBY: I think he said he just had STOPNC on the brain after reviewing those cases, that other stuff, but if you know different?
>
> *       *       *
>
> A:     Well, I have . . . reviewed those, and then that it just says that they also protested them, and the factors -- the people who gave the depositions said that it was reasonable and appropriate for them to purchase compounded MPA.
>
> Q:     Okay. But Dr. Bhambhani never relied on anybody from STOPNC in making a decision to purchase from NECC, did she?
>
> A:     No, she did not. She relied on her own experience, and also her former colleagues, their experience, one or two people's experience. She was not involved in this. We were just -- we were just making a case about using alternate to Depo-Medrol -- alternate to Depo-Medrol.
>
> MR. KIRBY: Harry, I think it's just a typo, but I mean, you can ask whatever questions you want, but this is just a typo.

*Id.* at 162:15-163:21.

These are specious explanations at best; efforts at misdirection at worst. If Dr. Manchikanti did not draft his expert report how could his having "STOPNC on the brain" manifest in the report? It simply cannot. The erroneous reference to STOPNC appears because whoever drafted his purported report simply wholly copied and pasted text from Dr. Parker's report; not just with

11

regard to the improper STOPNC reference, but also with regard to the substance and reasoning behind Dr. Manchikanti's purported expert opinions. *Compare* Ex. C *with* Ex. F. Further, if Dr. Manchikanti had reviewed his report as intently as he claims (Ex. H at 76:7-17) he surely would have noticed the obvious STOPNC error and edited it.

A similar situation unfolded at Dr. Cohen's deposition on March 1, 2017. There, Dr. Cohen first agreed that when offering an expert opinion it is important to be independent, intellectually honest, and to base the opinion on one's own research and experience. Ex. E at 18:14-19:15. Dr. Cohen further stated that he prepared his expert report dated October 14, 2016. *Id*. at 20:13-21:4. Yet, when asked who prepared his expert report later in the deposition, Dr. Cohen gave the following meandering response:

> Q:     Doctor, who prepared your report that you signed and it was dated October 16th, October 14th --
>
> *               *               *
>
> Q:     -- 2016?
>
> A:     So I read the, you know, the information, and we discussed this. And I said these are the important things that, that I want to be included in the report, in the report, so it was a back-and-forth, you know, process between, you know, between the editing. It went back and forth probably a half dozen times before I agreed that, before we both agreed that this was a good report.

*Id*. at 156:16-157:9. Dr. Cohen then again agreed that as an expert it is important to be independent and to do your own work (*id*. at 157:16-158:18), but then expressed bewilderment as to why his report possessed the same STOPNC error as his fellow expert Dr. Manchikanti's report, and testified that he believed STOPNC may actually be Box Hill Pharmacy, LLC. *Id*. at 159:4-162:13. Dr. Cohen could not explain the identical STOPNC error, and incorrectly identified STOPNC as the Box Hill Defendants because Dr. Cohen did not prepare his report, nor earnestly review it. In all likelihood, Dr. Cohen was presented a report which he may have quickly reviewed, signed and

dated. This process does not sufficiently establish an expert's independent opinion as required by Fed. R. Evid. 702, 703, or *Daubert*.

Likewise, Dr. Maine, who testified on March 8, 2017, and produced his report on October 10, 2016, admitted that he or his office did not type any of his expert report. Ex. I at 23:17-18; 24:4-7. Instead, Dr. Maine said that he articulated some opinions to Mr. Kirby, via phone calls, and in turn Mr. Kirby presented Dr. Maine a report to review and sign. *Id.* at 23:7-16; 24:21-25:8. Dr. Maine stated he would never copy anybody else's opinion. *Id.* at 27:1-8. Nevertheless, his report is almost a complete replica of both Dr. Parker's expert report in the STOPNC case (*compare* Ex. D *with* Ex. F) and his co-Experts in this case. *Compare* Ex. D *with* Exs. A, B, and C. It strains credibility for two doctors to have expressed their opinions to the lawyer that hired them in identical words, let alone the identical words of an expert in a different case defending a completely different clinic.

It is one thing for experts to hold similar opinions. It is quite another however to hold out the work of one expert as that of his or her own. That is plagiarism. Such opinions are therefore not the independent work of the Experts, but, rather, are opinions conceived and offered by Dr. Parker, who is not an expert in this case. Indeed, if the Box Hill Defendants would like to present the expert opinions of Dr. Parker, then they should have named Dr. Parker as an expert witness and produced his report under his name.

Turning to Box Hill's fourth medical doctor standard of care expert, Dr. Larkin testified during his March 10, 2017 deposition that he too did not draft his report, but instead discussed the case with Box Hill's attorneys and, eventually, he reviewed a report presented by them which he read and signed off on. Ex. G at 55:18-56:10. According to Dr. Larkin, he read through each line of the report to determine whether he agreed with the opinions it contained. *Id.* at 65:12-66:12. It

is therefore puzzling that Dr. Larkin failed to notice, perhaps question, and ultimately correct the report's erroneous reference to "STOPNC," despite claiming he intently studied each line of the report. *Id*. 69:22-70:4. It is also puzzling—or a truly remarkable coincidence—that his opinions are expressed in the precise language of four other experts he did not confer or collaborate with in connection with his engagement as an expert for Box Hill. *Compare* Ex. B *with* Exs. A, C, and D.

That three of the Defendants' expert witness' failed to notice and edit the same obvious error referencing an unrelated party reflects the certainty that these purported reports are not these four experts' own work or opinion despite their signatures on them. In sum, the Experts' reports do not represent the individual thoughtful opinions of each expert. Because of the extensive copying of Dr. Parker's report, and the Experts' questionable review of their reports, the Experts' opinions as to the Box Hill Defendants' compliance with the standard of care are unreliable and should be excluded.

**B.      Box Hill's Experts' Standard of Care Opinions Contradict Controlling Statutes and Regulations.**

Evidence of an industry or other custom repugnant to a governing statute is typically excluded. In *Ortega v. Garner*, plaintiff and the defendant were in a motor vehicle accident as the plaintiff drifted onto the double-line while encountering a tight curve on his motorcycle. 218 Cal. App. 2d 823, 825 (1963). On appeal, the plaintiff challenged the trial court's sustaining of objections excluding evidence that it was motorcycle custom to ride along a double-line when encountering a tight curve in order to maintain equilibrium, despite the conduct violating California statute. *Id*. The California appellate court affirmed the trial court's exclusion of custom evidence noting that:

> While custom has been held admissible in negligence cases to aid a jury in
> determining whether particular conduct measures up to the applicable legal
> standard, it is not admissible to establish a standard of care which conflicts with a
> standard fixed by statute. Here the standard of care was established by Vehicle
> Code section 21460. Evidence of custom was not admissible to contravene this
> statutory duty of care.

*Id.* at 827; *see also Republican Pub. Co. v. Am. Newspaper Guild*, 172 F.2d 943, 946 (1st Cir.

1949) (Fair Labor Standard Act case concerning the appropriate calculation of work hours, and

rejecting the newspaper industry's customary calculation stating, "the statute overrides any custom

or understanding to the contrary."); *McGuire v. Amrein*, 101 F. Supp. 414, 419 (D. Md. 1951)

("[I]t may be said in general that the law is clear enough that one may not establish a custom

contrary to law . . . ."); *Alley v. Siepman*, 214 N.W.2d 7, 11 (S.D. 1974) (noting that, "evidence is

not admissible to show a custom which is in conflict with a statute or ordinance," and that "[a]bsent

a recognized legal excuse, the violator is held to the standard fixed by the statute. We do not regard

the showing of a custom or practice of violating the law as a legal excuse not to follow the law.");

*Sanchez v. J. Barron Rice, Inc.,* 427 P.2d 240, 243, 245 (N.M. 1967) ("[E]vidence is not admissible

to show a custom in conflict with the standard imposed by statute or ordinance."); *Wood v. Melton*,

293 P.2d 252, 255 (Kan. 1956) (affirming trial court's decision to preclude a defense based on

custom when the custom violated law, noting that "the alleged custom, practice, and usage which

is contrary to existing law cannot be used either to establish or defeat an action and evidence

thereof cannot be received."); *Langner v. Caviness*, 28 N.W.2d 421, 424 (Iowa 1947) ("It is

generally held, however, that a custom which conflicts with a statutory provision will not be

enforced. Where there is such conflict, the statute must control."); *Bd. of Educ. v. Howard Cty*.,

413 A.2d 568, 575 (Md. App. 1980) ("[T]he requirements of statutes cannot be avoided by custom

or private understandings to the contrary.")

The Experts posit that the Box Hill Defendants failure to provide NECC patient specific names for prescriptions, failure to individually label the MPA vials, or dispensing multiple MPA dosages out of the same vial did not violate the standard of care. *See generally* Exs. A, B, C, and D. These opinions are based on industry customs that are repugnant to Massachusetts, Maryland, and federal health statutes and regulations.[11] The opinions should therefore be excluded from admission into evidence.

Further, the Experts assert that the Box Hill Defendants' had no obligation to know the governing laws or regulatory guidelines in Massachusetts concerning the ordering or distribution of non-preservative MPA, and therefore the unintentional violation of those statutes did not breach the standard of care. Ex. E at 135:8-136:7; Ex. G at 312:2-313:5; Ex. H at 80:4-81:11; Ex. I at 47:13-53:6. This opinion is wrong and contradicts Massachusetts, Maryland, and federal law. Courts have time and again found that ignorance of the law is no excuse. *See United States v. Marquardo*, 149 F.3d 36, 42 (1st Cir. 1998) ("[I]gnorance of the law is not a defense to its violation."); *Franklin Office Park Realty Corp. v. Comm'r of the Dep't of Envtl. Prot.*, 995 N.E.2d 785, 794 (Mass. 2013) ("We agree that, when statutes impose punishment out of considerations of public policy, lack of knowledge of the law or of the fact that the law has been violated does not exonerate the person who may have unwittingly violated the statute. In such instances, the old

---

[11] *See* (1) Mass. Gen. Laws Ch. 94C, § 19(b) (concerning the restrictions on issuance of prescriptions and stating that "no prescription shall be issued in order for a practitioner to obtain controlled substances for supplying the practitioner for the purpose of general dispensing to patients."); (2) Mass. Gen. Laws Ch. 94C, § 22(a) (noting that a practitioner who dispenses a controlled substance by issuing a written prescription shall state the prescription's name, and the patient's name and address on the  prescription); (3) Md. Health-General Code Ann. § 21-221 (2012) (stating that a drug that is dispensed under a prescription shall bear a label that, if stated in the prescription, states the name of the patient, and any cautionary statements (*see also* Md. Health-General Code Ann. § 12-505 (2012)); and (4) Md. COMAR 10.19.03.07(c)(1) (noting that a controlled dangerous substance must be issued for a legitimate medical purpose in the usual course of the individual practitioner's professional practice (citing 21 CFR 1306.04), and (c)(2), stating that a prescription may not be issued for an individual practitioner to obtain controlled dangerous substances for supplying the individual practitioner for the purpose of general dispensing to patients).

chestnut applies that ignorance of the law is no excuse.") (internal quotations omitted); *see also Samson v. State*, 341 A.2d 817, 823 (Md. App. 1975) ("[A]ll are presumed to know the law regardless of conscious knowledge or lack thereof, and are presumed to intend the necessary and legitimate consequences of their actions in its light. Without that presumption one could escape the consequence of the law merely by denying prior knowledge of its existence and one's ignorance would become paramount to the law. Ignorance of the law, which every man is bound to know, excuses no man, is as well a maxim of our own law, as it was of the Romans.") (internal citations and quotations omitted).

### C.     Box Hill's Four Experts' Opinions Are Pure *Ipse Dixit* and Inadmissible.

In an *ipse dixit* opinion, an expert asserts a "bottom line" conclusion, but lacks any articulable facts or authority to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion. Such *ipse dixit* (sometime called net) conclusions and opinions are inadmissible. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) ("'But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'") (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Hager v. Vertrue, Inc.*, No. 09-11245-GAO, 2011 U.S. Dist. LEXIS 110697, at *2 (D. Mass. Sep. 28, 2011) (excluding an expert's opinion and stating that the opinion, "is in effect an 'I know it when I see it' opinion, the sort of *ipse dixit* the Supreme Court has said is inadmissible under Federal Rule of Evidence 702.") (quoting *Joiner*, 522 U.S. at 146). Further, as the district court in *McGovern v. Brigham & Woman's Hosp*. noted, "[w]hile an expert may . . . testify solely on the basis of experience, he must explain how that experience leads to the conclusion reached,

17

why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." 584 F. Supp. 2d 418, 426 (D. Mass. 2008); *see also Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("[A]n expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.") (internal citations omitted).

In their reports, the Experts assert several conclusory opinions premised on an "*it is because I say it is*" explanation not supported by sufficient analysis.[12] For example, in the Experts' reports (Exs. A, B, C, and D) section c.x – The Standard of Care did not Require Dr. Bhambhani to Consult with a Pharmacist, the Experts merely conclude the standard of care does not require consultation with a pharmacist prior to purchasing compounded medications because in their experience such consultation is not typical among health care providers. Likewise, in section c.xii – Dr. Bhambhani and the Box Hill Defendants Were Qualified to Make Medication Purchasing Decisions, the Experts contend that specific training for medication purchasing is not necessary to meet the standard of care because they had never heard of such required training during their years of practice. These sections, just like the other footnoted sections, provide no substantive analysis as to why the Expert's opinion was reached, only that it was reached because that was the Experts' subjective experience. What is more, the Experts failed to cure these deficiencies through presentation of supplemental information during their depositions. Such opinions are classic *ipse dixit* opinions that are unreliable and insufficient under Fed. R. Evid. 702.

---

[12] *See* Exs. A, B, C, and D sections: c.iii – NECC's MPA Was a Reasonable Alternative to Depo-Medrol; c.viii – The Standard of Care Did Not Require a Site Visit to NECC; c.x – The Standard of Care did not Require Dr. Bhambhani to Consult with a Pharmacist; c.xi – The Box Hill Defendants Appropriately Considered Medication Supply When Ordering NECC's MPA; c.xii – Dr. Bhambhani and the Box Hill Defendants Were Qualified to Make Medication Purchasing Decisions; c.xiii – The Standard of Care did not Require Additional Policies and Procedures Regarding Medication Purchasing; c.xiv – The Standard of Care did not Require Informing Patients of the use of Compounded MPA; and c.xvii – The Standard of Care did not Require Individual Patient Specific Prescriptions.

### D.  Box Hill's Four Experts' Identical Opinions Are Needlessly Cumulative.

Fed. R. Evid. 403 permits a court to exclude evidence if its probative value is outweighed by it being needlessly cumulative. Fed. R. Evid. 403. Expert testimony is subject to exclusion pursuant to Rule 403. *United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011). In ruling to exclude evidence based on Rule 403, the trial court has wide latitude to apply the Rule to the facts of the case. *United States. v. St. Pierre*, 599 F.3d 19, 22 (1st Cir. 2010).

Courts will exclude cumulative expert testimony when presentation of the testimony would result in a protracted litigation with the attendant increase in cost with no benefit to the factfinder. *See Cash v. United States,* No. 1:15-cv-00518-JAW, 2016 U.S. Dist. LEXIS 148032, at *12 (D. Me. Oct. 26, 2016). The *Cash* court further observed that as a matter of practice, parties are generally limited to calling one expert for each issue, and that allowing for otherwise "would invite parties to designate multiple expert witnesses for each issue thereby potentially resulting in trials based on an assessment of not only the quality of the respective experts' testimony, but on the quantity of experts testifying on each issue." *Id.*; *see also Forsythe v. Rosen Med. Grp.*, LLC, No. 11-cv-07676, 2015 U.S. Dist. LEXIS 1686, at *16 (N.D. Ill. Jan. 8, 2015) (precluding defendant's expert from testifying on whether defendant surgeon violated the standard of care when expert's testimony was alleged to be the same opinion as another defense expert), *cf. Lawrey v. Kearney Clinic, P.C.*, No. 8:11CV63, 2012 U.S. Dist. LEXIS 126620, at *5 (D. Neb. Sep. 6, 2012) (noting that some overlap of experts' reports is not a sufficient reason to limit expert testimony); *Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2016 U.S. Dist. LEXIS 117357, at *11 (M.D. Pa. Aug. 23, 2016) (permitting multiple expert opinions on the same issue because the experts were of diverse clinical backgrounds).

19

Here, the Experts' reports do not present "some overlap," rather, because the reports were all copied from Dr. Parker's original report, the reports are identical, absent the sections concerning the individual Expert's education and professional experience. *Compare* Ex. F *with* Exs. A, B, C, and D. Further, unlike the doctors in *Ponzini*, all of the Experts come from the same clinical discipline (anesthesiologist and interventional pain management specialist), and offer a uniform perspective on the Box Hill Defendants' compliance with the standard of care. Allowing the Box Hill Defendants to introduce four experts who will submit indistinguishable opinions will unnecessarily prolong the trial and cause Plaintiffs and the Court to incur avoidable costs. In the event this Court finds an Experts' report and testimony admissible, the Box Hill Defendants should be limited to the introduction of only one Expert as to the issue of the Box Hill Defendants compliance with the standard of care.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion to Strike the Reports and to Exclude the Testimony of Drs. Cohen, Larkin, Manchikanti, and Maine as Expert Witnesses for the Box Hill Defendants.

Respectfully submitted,

/s/      *Patricia J. Kasputys*
Patricia J. Kasputys, Esq. (*Pro Hac Vice*)
Jay D. Miller, Esq. (*Pro Hac Vice*)
Glenn E. Mintzer, Esq. (*Pro Hac Vice*)
Sharon L. Houston, Esq. (*Pro Hac Vice*)
**Law Offices of Peter G. Angelos, P.C.**
One Charles Center
100 North Charles Street
Baltimore, MD  21201
410-649-2000 (Phone)
410-649-2101 (Fax)
*Attorneys for Plaintiffs Armetta, Bowman,*
*Davis, Dreisch, Farthing, Kashi, and Torbeck*

/s/      *Michael Coren*
Harry M. Roth, Esq. (*Pro Hac Vice*)
Michael Coren, Esq.
**Cohen, Placitella & Roth, PC**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA  19103
215-567-3500 (Phone)
215-567-6019 (Fax)
*Attorneys for Plaintiff Handy*

20