```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3

 4   IN RE: NEW ENGLAND              : MDL No. 2419

 5   COMPOUNDING PHARMACY, INC.      : Docket No.:

 6   PRODUCTS LIABILITY LITIGATION:  1:13-md-2419(RWZ)

 7   -----------------------------:

 8   This document relates to:       :

 9                                   :

10   ARNETTA, ET AL v. BOX HILL      :

11   SURGERY CENTER, LLC, ET AL      :

12   No. 1:14-cv-14022-RWZ           :

13                                   :

14   BOWMAN, ET AL v. BOX HILL       :

15   SURGERY CENTER, LLC, ET AL      :

16   No. 1:14-cv-14028-RWZ           :

17                                   :

18   DAVIS, ET AL v. BOX HILL        :

19   SURGERY CENTER, LLC, ET AL      :

20   No. 1:14-cv-14033-RWZ           :

21                                   :
```

Page 2

1  DREISCH, ET AL v. BOX HILL       :
2  SURGERY CENTER, LLC, ET AL       :
3  No. 1:14-cv-14029-RWZ            :
4                                   :
5  FARTHING, ET AL v. BOX HILL      :
6  SURGERY CENTER, LLC, ET AL       :
7  No. 1:14-cv-14036-RWZ            :
8                                   :
9  KASHI, ET AL v. BOX HILL         :
10 SURGERY CENTER, LLC, ET AL       :
11 No. 1:14-cv-14026-RWZ            :
12                                  :
13 TORBECK, ET AL v. BOX HILL       :
14 SURGERY CENTER, LLC, ET AL       :
15 No. 1:14-cv-14023-RWZ            :
16                                  :
17 HANDY, ET AL v. BOX HILL         :
18 SURGERY CENTER, LLC, ET AL       :
19 No. 1:14-cv-14019-RWZ            :
20         --------------------
21

Page 3

1        Deposition of STEVEN PAUL COHEN, M.D.,
2  was taken via Veritext Virtual on Wednesday, March
3  1, 2017, commencing at 10:10 a.m., at Pessin Katz
4  Law, P.A., 10500 Little Patuxent Parkway, Suite
5  650, Columbia, Maryland, before MICHELE D. LAMBIE,
6  Notary Public.
7          --------------------
8
9
10
11
12 ALSO PRESENT;  Ashley E. Geno, Esquire
13       (via telephone)
14 Reported By:
15       Michele D. Lambie, CSR-RPR
16
17
18
19
20
21

Page 4

1  APPEARANCES:
2        ON BEHALF OF PLAINTIFFS ARNETTA, BOWMAN,
3     DAVIS, DREISCH, FARTHING, KASHI, TORBECK
4     AND HANDY:
5  Law Offices of Peter G. Angelos, P.C.
6     GLENN E. MINTZER, ESQUIRE.
7     gmintzer@lawpga.com.
8     SHARON L. HOUSTON, ESQUIRE.
9     100 North Charles Street.
10    Baltimore, Maryland  21201.
11    (410) 649-2000
12
13    ON BEHALF OF PLAINTIFF ROZEK:
14 Cohen, Placitella & Roth, P.C.
15    HARRY M. ROTH, ESQUIRE.
16    hroth@cprlaw.com.
17    SILVIO A. TRENTALANGE, ESQUIRE.
18    strentalange@cprlaw.com.
19    2001 Market Street, Suite 2900.
20    Philadelphia, Pennsylvania  19103.
21    (215) 567-3500

Page 5

1  APPEARANCES CONTINUED:
2        ON BEHALF OF THE DEFENDANTS:
3  Pessin Katz Law, P.A.
4     GREGORY K.  KIRBY, ESQUIRE.
5     gkirby@plaw.com.
6     901 Dulaney Valley Road.
7     Suite 400.
8     Towson, Maryland  21204.
9     (410) 938-8800
10
11
12
13
14
15
16
17
18
19
20
21

Page 6

1            EXAMINATION INDEX
2
   STEVEN PAUL COHEN, M.D.
3    BY MR. ROTH                    7
     BY MR. MINTZER                162
4    R BY MR. ROTH                 214
     BY MR. KIRBY                  227
5    R BY MR. ROTH                 247
     R BY MR. MINTZER              252
6    R BY MR. KIRBY                253
7
8              EXHIBIT INDEX
9                     MAR
   STEVEN PAUL COHEN, M.D.
10   3   Expert Report of Steven Cohen, M.D.    7
11   15  Packing Slips                          7
12
13
14
15
16
17
18
19
20
21

Page 7

1           P R O C E E D I N G S
2         (Whereupon, Cohen Deposition Exhibit
3   Number 3, Expert Report of Steven Cohen, M.D.,
4   premarked for identification.)
5         (Whereupon, Cohen Deposition Exhibit
6   Number 15, Packing Slips, premarked for
7   identification.)
8           STEVEN PAUL COHEN, M.D.,
9   the Deponent, called for examination by the
10  Plaintiffs, being first duly sworn to tell the
11  truth, the whole truth, and nothing but the truth,
12  testified as follows:
13             EXAMINATION
14      BY MR. ROTH:
15      Q.  Dr. Cohen, my name is Harry Roth.  I
16  represent one of the Plaintiffs here, the Estate of
17  Brenda Rozek, and I'm going to be asking you some
18  questions as you know.  How are you doing?
19      A.  I'm doing okay.  Thanks for asking.
20      Q.  Thank you for accommodating, and
21  Mr. Kirby, thank you as well, for accommodating my

Page 8

1   request that we do this by video conference.  I
2   appreciate it.  I've been on the run a little bit,
3   and it's nice to be in my office, so I, I thank you
4   for that.
5         Dr. Cohen, you have reviewed the medical
6   records of Brenda Rozek from Dr. Bhambhani's
7   office?
8       A.  I reviewed many of the medical records.
9   I --
10      Q.  Okay.
11      A.  So I can tell you some of them.
12      Q.  Okay.  I think it will be good for us to
13  pause a little bit.  I think I heard the court
14  reporter say something, you know, sometimes it's
15  slow, so I want to make sure that you have answered
16  the question and that also I'm going to ask you to
17  wait to make sure I have completed my question,
18  okay?
19      A.  Okay.
20      Q.  Were you finished answering the question?
21      A.  I have reviewed some of the medical

Page 9

1   records.  I can tell you some of the names.  I
2   can't remember each individual record.
3       Q.  Do you remember reviewing Brenda Rozek's
4   records?
5         MR. KIRBY:  And I'll just object for the
6   record.  To the extent that he's a common-issue
7   expert, I don't know where the questioning is
8   going, but that's -- I'll just object to that.
9   He's not a case-specific expert at this point
10  necessarily.
11        MR. ROTH:  Understood.
12        THE WITNESS:  I believe I reviewed her
13  records several months ago.  In the past two days,
14  I've reviewed about five or six other records, and
15  hers was not one of those.
16  BY MR. ROTH:
17      Q.  Did you see in any of the records that
18  you reviewed, either months ago or in the last
19  couple of days, any indication in Dr. Bhambhani's
20  notes as to a particular medical need of one of her
21  patients that would require a compounded steroid be

3 (Pages 6 - 9)

Page 18

1 actually has the names of the states. Thank you.
2 BY MR. ROTH:
3   Q.  In those cases where you have served as
4 an expert, and not just those where you testified,
5 can you tell us by percentage or otherwise how many
6 times you have expressed an opinion -- well, you've
7 expressed an opinion for the plaintiff versus for
8 the healthcare provider?
9   A.  It's probably 50 to 60 percent for the
10 defendant and 40 to 50 percent for the plaintiff.
11   Q.  Do you work with a service that helps
12 lawyers find expert witnesses?
13   A.  No.
14   Q.  Do you agree that it is important when
15 you are offering an opinion in a, in a, serving as
16 an expert witness that it is important to be
17 independent?
18       MR. KIRBY:  Objection to form.  You can
19 answer.
20       THE WITNESS:  Yes.
21 BY MR. ROTH:

Page 19

1   Q.  Do you agree that when you are serving as
2 an expert witness, it is important to be, you know,
3 intellectually honest when you're expressing
4 opinions to the court and to the jury?
5       MR. KIRBY:  Objection to form.
6       THE WITNESS:  Of course.
7 BY MR. ROTH:
8   Q.  I assume you also would agree that it is
9 important that the opinions that you form be based
10 upon your own research, education, training and
11 experience --
12       MR. KIRBY:  Objection to form.
13 BY MR. ROTH:
14   Q.  -- is that correct?
15   A.  That is correct.
16   Q.  Okay.  And the report that you
17 prepared -- and I have a 23-page report, and your
18 signature line stands alone on the last page, is
19 Exhibit 3?
20       MR. KIRBY:  Hold on.  Can you hold on for
21 one second?  We're going to grab that.

Page 20

1       MR. ROTH:  Sure.  Can we go off the
2 record then?
3       (Recess taken -- 10:25 a.m.)
4       (After recess -- 10:27 a.m.)
5 BY MR. ROTH:
6   Q.  What I was asking about, do you know
7 how --
8       MR. ROTH:  Mr. Kirby, do you have Exhibit
9 2 in front of you?
10       MR. KIRBY:  Exhibit 3.  Yes, Exhibit 3.
11       MR. ROTH:  I'm sorry, it is Exhibit 3.
12 BY MR. ROTH:
13   Q.  Doctor, you prepared this report, and
14 it's signed and dated October 14, 2016; is that
15 correct?
16       MR. KIRBY:  Objection to form.  You can
17 answer.
18       THE WITNESS:  Yes.
19 BY MR. ROTH:
20   Q.  Okay.  And this report contains the
21 summary of your qualifications and the facts which

Page 21

1 you gleaned from reviewing the material and the
2 opinions that you are going to offer at trial; is
3 that correct?
4   A.  Yes.
5   Q.  Okay.  According to information we
6 received yesterday from Mr. Kirby, and that is in
7 the form of a, a drop box of information called Box
8 Hill Bhambhani materials sent to Dr. Cohen, there
9 is information that was updated and put in this box
10 after October 14, 2016.  Now, that may just be
11 because of the software that they use, but did you
12 review material regarding this case after you
13 prepared your expert opinion that is signed October
14 14, 2016?
15   A.  Yes.
16   Q.  And I'll ask this, but I expect I
17 understand what the answer would be.  Can you tell
18 me what information you reviewed after you prepared
19 your report?
20   A.  A variety of, of different depositions,
21 including those of the second deposition of

Page 134

1  every single patient, so they have to be prepared
2  specially.
3     Q.  I'm sorry, I missed that last part of
4  that.  I apologize.
5     A.  So unlike steroids where every patient,
6  you know, basically gets the same preparation,
7  usually the same dose in the same form, for the
8  medications, the few medications that we order from
9  compounding pharmacies, everybody gets a different
10 mixture; therefore, they have to be ordered
11 separately by individual prescriptions.
12    Q.  Are you aware before the outbreak of any
13 rules and regulations that dictate how a physician
14 is to order medications that are compounded by a
15 pharmacy?
16       MR. KIRBY:  Objection to form and
17 foundation.  You can answer.
18       THE WITNESS:  Before this outbreak, I was
19 not aware of, of those regulations.  Those
20 regulations are really directed towards, towards
21 pharmacies, and I have enough --

Page 135

1  BY MR. ROTH:
2     Q.  Well, is that something --
3     A.  Sure.
4     Q.  I'm sorry, Doctor.
5     A.  I was saying I have enough difficulty
6  keeping up with all of the regulations that are
7  directed towards medical doctors.
8     Q.  Would you agree that the standard of care
9  would require a physician who is prescribing
10 medication to know the rules and regulations that
11 would apply to them in, in completing those
12 prescriptions?
13       MR. KIRBY:  Objection to form and
14 foundation.
15       THE WITNESS:  So I would say that that's
16 not standard of care because most people did not
17 know that before 2013.
18       Also, as the, you know, head of the
19 division at Johns Hopkins, we probably have the,
20 the strongest didactic teaching program for any
21 pain medicine fellowship in the world, and as well

Page 136

1  as, you know, at Walter Reed.  That information is
2  not, is never included in any lectures nor are
3  there any lectures at conferences.
4       It's not -- before 2013, it was not
5  mentioned in articles or textbooks, so I would say
6  that it was not standard of care at that time, and
7  it may not be even standard of care at this time.
8  BY MR. ROTH:
9     Q.  How did you learn how to write
10 prescriptions?
11    A.  I learned back in probably, you know,
12 internship from another doctor, maybe from a
13 resident.
14    Q.  Did you come to learn from reading
15 materials in this case how it is that Dr. Bhambhani
16 would order steroids from NECC?
17    A.  Yes.
18    Q.  What did you learn?
19    A.  That she sent NECC, because of their
20 requirements per the Federal Food Drug, Food, Drug,
21 and Cosmetic Act of 1938, because of NECC's

Page 137

1  requirements, she gave them past patient lists of
2  patients that she anticipated would have epidural
3  steroid injections.  She sent those to the, to the
4  pharmacy, and they, in turn, sent back medications,
5  and all of the medications were the same.
6     Q.  Where did you -- I'm sorry.  I thought
7  you were finished.
8     A.  I was just saying, and that she ordered
9  some 1 cc and 5 cc's vials and 40 and 80 milligrams
10 per cc, but aside from those minor differences, all
11 of the medications that she used were the same.
12 And I learned about her practices from, you know,
13 from actually reviewing the records.
14    Q.  Do you -- I'm sorry.  Every time I'm
15 about to ask you a question, it sounds like you're
16 going to add something.
17    A.  No.  No.  No.  Ask.
18    Q.  Where did you learn that the requirement
19 that she provide a patient list came from the FDA?
20    A.  I think I had been reading material
21 pertaining to this case.  It might have been a

Page 154

1  with minimizing risks. And if you read -- and
2  actually, this is, you know, Manchikanti's
3  infection --
4      Q.  I don't think you've answered my
5  question.
6          MR. KIRBY:  Hold on.  Hold on.
7  BY MR. ROTH:
8      Q.  Sorry.
9          MR. KIRBY:  You can't talk over him.  The
10 court reporter is typing it down.
11         MR. ROTH:  I can, I can if it's not
12 answering my question.
13         MR. KIRBY:  Well, just finish your answer
14 and then you can ask him --
15 BY MR. ROTH:
16     Q.  My question --
17         MR. KIRBY:  Just finish your answer.
18         MR. ROTH:  Well, it's not responsive to
19 my question.
20         THE WITNESS:  Well, you asked me if I was
21 responsible for the policy, and so --

Page 155

1  BY MR. ROTH:
2      Q.  No, I did not ask that.
3      A.  -- the policy --
4      Q.  I did not ask that.  I asked whether you
5  were one of the doctors who was following the
6  directives of the Hopkins pharmacy folks when there
7  was this shortage?
8      A.  Yes.
9      Q.  That was the question.
10     A.  I decide whether to implement this.
11     Q.  Okay.  I think you explained the policy,
12 and I understood it.  That's why I was talking over
13 you because I didn't think you were responding to
14 my, to the question that I asked.
15         In those circumstances where you decided
16 whether or not you were going to reuse a vial, you
17 knew, did you not, whether the vial was a
18 single-use or multi-use vial?
19         MR. KIRBY:  Objection to form.  You can
20 answer.
21 BY MR. ROTH:

Page 156

1      Q.  Correct?
2      A.  Yes, I knew.
3      Q.  All right.  Am I correct -- well, I
4  shouldn't say it this way.  Would the standard of
5  care before this outbreak require that a physician
6  know whether or not a vial they are using for
7  multiple patients is a single or multi-use vial?
8      A.  I think that's something that most
9  physicians would know.
10     Q.  Because if it's a single-use vial that
11 you're going to reuse, there are certain
12 precautions that should be taken to maintain
13 sterility and reduce the risk of infection for the
14 next patient, do I understand that correctly?
15     A.  Yes.
16     Q.  Doctor, who prepared your report that you
17 signed and it was dated October 16th, October
18 14th --
19         MR. KIRBY:  Objection.
20 BY MR. ROTH:
21     Q.  -- 2016?

Page 157

1          MR. KIRBY:  Objection.
2          THE WITNESS:  So I read the, you know,
3  the information, and we discussed this.  And I said
4  these are the important things that, that I want to
5  be included in the report, in the report, so it was
6  a back-and-forth, you know, process between, you
7  know, between the editing.  It went back and forth
8  probably a half dozen times before I agreed that,
9  before we both agreed that this was a good report.
10 BY MR. ROTH:
11     Q.  You testified you did not read the report
12 of Dr. Manchikanti, correct?
13     A.  Yes.
14     Q.  Did you read the report of Dr. Larkin?
15     A.  No.
16     Q.  We've talked about the need to be
17 independent as an expert, and you agree with that,
18 right?
19     A.  I agree.
20     Q.  And to do your own work?
21         MR. KIRBY:  Objection.  I don't even know

Page 158

1 what that means, but if you know, Doctor.
2 BY MR. ROTH:
3  Q. That you agreed, I thought, that as an
4 expert coming into court, testifying under oath,
5 expressing your opinion that you should be doing
6 your own work. They should be your opinions,
7 correct?
8      MR. KIRBY: Well, objection to form.
9 Whether they're his opinions or whether he did his
10 own work, whatever that means I think is different,
11 but if you can answer.
12      MR. ROTH: Well, let --
13 BY MR. ROTH:
14  Q. Well, Dr. Cohen, do you understand -- do
15 you understand what it means to do your own work?
16      MR. KIRBY: Objection to form and
17 foundation. You can answer.
18      THE WITNESS: Yes.
19 BY MR. ROTH:
20  Q. You understood when you signed this
21 report that it was going to go to lawyers like me

Page 159

1 who were going to review it and then ask you a
2 bunch of questions about it, right?
3  A. That's right.
4  Q. Doctor, would it surprise you to learn
5 that there are pages of your report that contain
6 the exact same language as the report that was
7 submitted by Dr. Manchikanti?
8  A. Since I read his deposition, it would
9 not.
10  Q. Would it surprise you, Doctor, that it's
11 not only the exact same language, but it also
12 includes the same typographical errors?
13  A. I didn't know that.
14  Q. Do you know what STOPNC is?
15  A. No.
16  Q. Well, do you have your report before you?
17  A. Yeah.
18  Q. Turn to page 11. The last sentence on
19 page 11 reads, All of these factors support the
20 conclusion that it was reasonable and appropriate
21 for STOPNC to purchase compounded MPA, which is a

Page 160

1 reasonable equivalent to Depo-Medrol.
2      Now, on this report that you signed,
3 Doctor, can you tell us please who STOPNC is?
4      MR. KIRBY: Yeah, and I'm just going to
5 object.
6      MR. ROTH: Excuse me, Mr. Kirby.
7      MR. KIRBY: No, no.
8      MR. ROTH: You can allow the witness to
9 answer the question.
10      MR. KIRBY: I'm perfectly within my
11 right --
12 BY MR. ROTH:
13  Q. Do you know --
14      MR. KIRBY: I'm perfectly within --
15 BY MR. ROTH:
16  Q. Do you know --
17      MR. KIRBY: Wait.
18      MR. ROTH: Mr. Kirby, please don't --
19      MR. KIRBY: Go ahead. Go ahead and
20 answer the question.
21      MR. ROTH: Please don't answer.

Page 161

1      MR. KIRBY: I'm perfectly within my right
2 to object, so go ahead and ask.
3      MR. ROTH: You can object, but you don't
4 need to make a speaking objection.
5      MR. KIRBY: I can object and state my
6 reason. Go ahead.
7 BY MR. ROTH:
8  Q. Who is STOPNC?
9      MR. KIRBY: Right, and I'm objecting on
10 the basis of Rule 26 and the privilege of
11 protections of the drafting process. I've said
12 before it was a typo in previous depositions. If
13 you know who STOPNC is, then you can say.
14      MR. ROTH: That's great. Thank you,
15 Mr. Kirby.
16 BY MR. ROTH:
17  Q. Doctor, do you know --
18      MR. KIRBY: Doctor, he can still answer
19 the question as to whether he knows who STOPNC is.
20 I don't know if he does or not.
21      THE WITNESS: Box Hill Pharmacy.

Page 162

1  BY MR. ROTH:
2  Q. Do you know who STOPNC is? I'm sorry?
3  A. Box Hill Pharmacy.
4  Q. STOPNC is Box Hill Pharmacy, is that your
5  testimony?
6  A. I don't know for sure.
7  Q. Have you seen that STOPNC anywhere in
8  their records?
9  A. I have not.
10  Q. Have you seen that anywhere or read that
11  anywhere in the testimony of Dr. Bhambhani,
12  Mr. Vickers or any other witness in this case?
13  A. I have not.
14      MR. ROTH: Doctor, right now I don't have
15  any other questions. Rather than have us wait any
16  more, I'll let Mr. Mintzer ask questions, if he has
17  any, and I can check my notes while he does that.
18          EXAMINATION
19      BY MR. MINTZER:
20  Q. Hi, Doctor. How are you?
21  A. Good. How are you?

Page 163

1  Q. Are you ready? Are you okay to continue
2  right now, or do you want to take a five-minute
3  break and get started, or are you ready to go?
4  A. I'm okay.
5      THE COURT REPORTER: Actually, can I take
6  a quick bathroom break?
7      MR. MINTZER: Sure.
8      (Recess taken -- 2:38 p.m.)
9      (After recess -- 2:46 p.m.)
10  BY MR. MINTZER:
11  Q. Dr. Cohen, my name is Glenn Mintzer. I
12  represent some of the other Plaintiffs in the case,
13  and I'm going to be asking some follow-up
14  questions.
15      I'm going to tell you right now that it
16  is not my intent to confuse you at all, but not to
17  tread over ground that's already been asked to a
18  large extent, I'm going to sort of hop around a
19  bit. It's more likely I'll confuse myself than
20  confuse you, but if I do, please stop me as you
21  have through the deposition, ask me to clarify,

Page 164

1  whatever it takes to, for me to help you understand
2  the question that I'm asking you if you can, okay?
3  A. Yes.
4  Q. Can you tell me now how much time you
5  spend in your administrative roles as opposed to
6  treating patients?
7  A. So there is a, a lot of overlap
8  because -- so I have -- you know, my clinical
9  trials are research, but I see regular patients,
10  you know, who might have back pain. Most of them
11  are not eligible for a clinical trial, so I
12  continue to treat them but at the same time, I'm
13  screening patients. So more than half of my time
14  is spent doing clinical work rather than, you know,
15  administrative work or clinical research.
16  Q. For how long going back has that been the
17  case?
18  A. I've always spent the majority of my time
19  seeing patients.
20  Q. Now, you described it as more than 50
21  percent. Has it always been that way, more than

Page 165

1  50, but not quite 60 or 70? And if you don't know,
2  that's fine. I'm just trying to get as best an
3  answer as I can.
4  A. It's always ranged between more than 50
5  percent. Usually between 60 and 80 percent.
6  Q. During what time in your career was it 80
7  percent where you were more clinical as compared to
8  your research activities?
9  A. Well, I guess when I was a fellow and I
10  was in the Army, even when I had been, you know,
11  chief of anesthesia and operative services in Korea
12  and in Germany, I still spent, I probably spent, I
13  spent over 80 percent of my time clinically, and
14  then when I first arrived at Johns Hopkins in 2004,
15  it was probably 70 to 80 percent clinical, and then
16  it's trended down a little bit since then.
17  Q. So you make a disparity between clinical
18  and research. Is there also time that you spend on
19  administrative activities, or do you lump that into
20  the research number?
21  A. You know, it's separate, and it's very