1         UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
3    ------------------------------------
     In Re:  NEW ENGLAND COMPOUNDING   :
4    pharmacy, Inc., Products          : MDL No. 2419
     Liability Litigation,             :
5                                      : Docket No.:
                                       : 1:13-md-2419
6    Box Hill Surgery Center, LLC,     :
     et al.                            :
7    ------------------------------------
8                                    Washington, D.C.
9                                 Friday, March 10, 2017
10   Videoconference Deposition of:
11              THOMAS M. LARKIN, M.D.
12   called for oral examination by counsel for
13   Plaintiffs, pursuant to notice, at Veritext Legal
14   Solutions, 1250 I Street, N.W., Suite 350,
15   Washington, D.C., before Felicia A. Newland, CSR, of
16   Veritext Legal Solutions, a Notary Public in and for
17   the District of Columbia, beginning at 1:15 p.m.,
18   when were present on behalf of the respective
19   parties:
20
21
22

Dr. Thomas M. Larkin
March 10, 2017

Page 2

APPEARANCES
* * * * * * * * *

On behalf of Plaintiffs:
  GLENN E. MINTZER, ESQUIRE (via VTC)
  Law Offices of Peter Angelos, P.C.
  100 North Charles Street, 22nd Floor
  Baltimore, MD 21201
  gmintzer@lawpga.com
  -- and --
  MICHAEL COREN, ESQUIRE (via VTC)
  HARRY M. ROTH, ESQUIRE (via VTC)
  Cohen, Placitella & Roth, P.C.
  2001 Market Street, Suite 2900
  Philadelphia, PA  19103
  mcoren@cprlaw.com

On behalf of Defendants:
  GREGORY K. KIRBY, ESQUIRE
  Pessin Katz Law, P.A.
  901 Dulaney Valley Road, Suite 500
  Towson, MD 21204
  gkirby@pklaw.com

Page 3

CONTENTS

EXAMINATION BY:                              PAGE
  Examination by Mr. Mintzer        5
  Examination by Mr. Coren        199
  Examination by Mr. Mintzer      332
  Examination by Mr. Kirby        336

LARKIN   DEPOSITION EXHIBITS:  *            PAGE
1627-2   CV, Thomas M. Larkin, M.D.          14
1627-3   Expert report by Thomas M.
         Larkin, M.D., October 2016          54
1627-4   Exhibit 2 to Dr. Larkin's report    70
1627-14  Commonwealth of Massachusetts, Board
         of Registration in Medicine, Prescribing
         Practices, Policy and Guidelines,
         Adopted August 1, 1989, Amended
         November 17, 2010                  226
1627-30  LexisNexis, 2012 ALM GL ch.94C, 19  302
1627-43  Standards of Professionalism:
         Expert Witness Guidelines           16
1627-44  Composite exhibit, consisting of
         listing of documents that Dr. Larkin
         reviewed                            79

Page 4

CONTENTS (Cont'd)

LARKIN   DEPOSITION EXHIBITS:  *            PAGE
1627-47  Email from Greg Kirby to Glenn Mintzer
         dated March 6, 2017, Subject: NECC
         Dr. Larkin Deposition               83
1627-57  Copy of Prescription order form
         with attachment, Ritu Bhambhani, LLC  224

(*Exhibits attached to transcript.)

Page 5

WHEREUPON,
         THOMAS M. LARKIN, M.D.
called as a witness, and having been first duly
sworn, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. MINTZER:
    Q   Okay.  Good afternoon, Dr. Larkin.  My
name is Glenn Mintzer.  I'm an attorney at the Law
Office of Peter Angelos in Baltimore.  We're here
to take your deposition today.  Also, you can see
on the screen is Mike Coren, we're co-counsel in
eight cases.  I represent eight Plaintiffs and Mike
represents one Plaintiff.
        We'll probably both be asking you
questions today, I imagine.  I'm going to start
off, so I'm going to be asking the majority of the
questions and then Mike may ask some things that I
may have missed or in particular to his client.
Okay?
    A   Okay.
    Q   And you have been deposed before, I see
from a couple of cases that are listed on your CV.

2 (Pages 2 - 5)

Page 54

1 next number is.
2     (Larkin Deposition Exhibit Number 1627-3
3     marked for identification.)
4     MR. KIRBY: Glen, for purposes of
5 clarification, can we just use for the exhibit
6 numbers, if you say, "Larkin Exhibit 3," then we'll
7 just say 1627-3?
8     We're not going like 1, 2, 3, 4, 5, 6,
9 whatever you numbered it, we'll just stick with
10 that so that it's not confusing, since it does
11 say Larkin Exhibit 3 on it.
12     Does that make sense?
13     MR. MINTZER: I'm trying best not to run
14 a foul of the MBL numbers, because if there's
15 another deposition after this, I'm going to report
16 back to somebody, probably, this was the last
17 number that we used, so if they have a deposition
18 in a Tennessee case, that they can pick up and it's
19 sequential.
20     MR. KIRBY: And I don't want to belabor
21 the point, but nobody will ever use the 1627 number
22 again. So whether it's -2, or -3, or -40, it

Page 55

1 shouldn't matter.
2     MR. MINTZER: Do you think that complies
3 with whatever the practice is?
4     I'm fine with that. I'm fine with
5 using my own numbers.
6     MR. KIRBY: Okay. Sounds good.
7 BY MR. MINTZER:
8   Q  Okay. So, Doctor, do you have Exhibit 3
9 in front of you?
10   A  Yes, I do.
11   Q  Okay. It looks familiar to you?
12   A  Yes, it does.
13   Q  Okay. Is this what you know to be your
14 final report in this case?
15   A  Yes, this was.
16   Q  Was or is?
17   A  Yeah, it is. It is.
18   Q  Okay. I'm just making sure.
19     Is that a report that you typed yourself?
20   A  No.
21   Q  Did you happen to dictate the information
22 that's in that report and it was typed up by

Page 56

1 somebody else?
2   A  No.
3   Q  Do you have any understanding as to how
4 the words on those pages got there?
5   A  Okay. I have been working with Greg on
6 this, you know, we went over it -- we had several
7 discussions. He had presented with me what they
8 had typed up and had me -- and I reviewed it so
9 that I could see that it agreed with my opinions,
10 and I signed off on it.
11     Now, there were some typos in it that I
12 discovered later, because sometimes when you read
13 through it a couple of times, you miss that, so
14 there were typos that were -- that I saw later.
15 But that's -- this is an amalgam of multiple
16 conversations. And I can say that I -- you know,
17 that -- you know, what is stated here is my
18 opinion.
19   Q  Do you consider that final report to be a
20 product of your work in this case?
21   A  Yes.
22   Q  And that report contains facts that you

Page 57

1 believe are true in this case?
2   A  Yes.
3   Q  And that report contains opinions that
4 you arrived at while analyzing this case that are
5 your own thoughts and conclusions?
6   A  Yeah. Before this report was finished,
7 I -- like I said, I reviewed about 30 hours of
8 material. This is consistent with what I had seen,
9 what I feel.
10   Q  When you reviewed Dr. Cohen's deposition
11 or Dr. Manchikanti's deposition, was it while
12 reading their depositions that you discovered that
13 there were typos in your report?
14   A  I think -- yeah, I think it was when I
15 seen Dr. Manchikanti's. And then I re-read the
16 report again and then I said, "Oh, stop and see,"
17 so I did.
18   Q  Does the name Joseph Alessandrini mean
19 anything to you as it relates to this case?
20   A  One moment.
21   Q  Are you looking through your report,
22 Doctor?

Page 62

1  I -- that I did not put -- you know, type up this
2  letter.
3       This is an amalgam of multiple different
4  people's opinions on the case. If you want to ask
5  me specifically as to my opinion on what
6  Dr. Bhambhani has done, you know, when she came up
7  with her decision process, I think that would be
8  more applicable, if you're going to pick through
9  this and say, "Well, do you remember reading
10 through this, was this exactly your words," I've
11 already told you that I did not type this up, but I
12 agreed with what was written in it.
13     Q   Can you tell me what kind of inspection
14 Dr. Alessandrini did or Mr. Alessandrini?
15     A   No, I can't.
16     Q   Do you know when it was done?
17     A   May 13th, 2016 is when he was deposed.
18        Once again, you're going back to the
19 same -- I've already given you that point, that I
20 did not type that up. All I can tell you is that I
21 may have -- you know, that I most likely looked at
22 it just to make sure it was true before signing off

Page 63

1  on it.
2        And then, once again, how does it pertain
3  specifically to what Dr. Bhambhani did, I'm not
4  sure what you're getting at. You can keep asking
5  me questions along this same line, but the answer
6  is going to be the same.
7      Q   Have you happened to have seen the expert
8  reports from Dr. Manchikanti, Dr. Cohen, and
9  Dr. Maine?
10     A   No. The experts, I read their
11 depositions, I did not see the expert -- well, I
12 mean, this -- yeah. What am I saying?
13        This -- I did not see their expert
14 reports, no.
15     Q   Okay. Do you know the --
16     A   Wait. Wait. Check that. Check that.
17        Because there was -- I think for
18 different litigation, there was an expert report by
19 Dr. Maine that I did -- that I did see. That was
20 included in the materials that I reviewed.
21     Q   So you have seen Dr. Maine's report in
22 this case?

Page 64

1      A   Not in this case. I think it was in
2  reference to a different case.
3         MR. KIRBY: Glenn, he may be referring to
4  the certificate of qualified expert.
5         MR. MINTZER: Okay.
6  BY MR. MINTZER
7      Q   Doctor, did you know, aside from the
8  section about qualifications, that the expert
9  reports of Dr. Manchikanti, Dr. Cohen, and
10 Dr. Maine are identical to yours?
11     A   I'm sorry. Repeat the question.
12     Q   Did you know that the expert reports of
13 Dr. Manchikanti, Dr. Cohen, and Dr. Maine, except
14 for the beginning about qualifications, for which
15 all of you obviously are different, but the
16 remainder of the report is identical?
17     A   Yes, I was aware of that. And that's
18 what I'm saying, that this is an amalgam of
19 different opinions and different inputs to come up
20 with this -- with this note.
21        You can make it align to writing a paper,
22 not necessarily everything on that paper is written

Page 65

1  by the same person, but it is a group of opinions
2  that were put together.
3      Q   What is it that you gained your
4  understanding that your report was identical to
5  Dr. Manchikanti, Cohen, and Maine?
6      A   I'm sorry. Repeat the question.
7      Q   When did you first understand or find out
8  that Dr. Manchikanti, Dr. Cohen, and Dr. Maine's
9  reports were identical to yours?
10     A   I became aware of it after -- after
11 reading Dr. Manchikanti's deposition.
12     Q   Okay. So you didn't know that when you
13 signed your report, did you?
14     A   When I signed the report, I was signing
15 something, that I agreed with the -- with what it
16 said in the report. Now, if you're going to go
17 back and ask me every little line, there may have
18 been some things that I overlooked.
19        But I read through each line, "The
20 standard of care did not require investigation and
21 product liability suits against NECC," I agree with
22 that. I read what it said about that, and I agree

Page 66

1   with that.
2           And then it goes down, each point, yes, I
3   looked at it, I read it, I agree with it. And then
4   I looked down to the next one, read it, agree with
5   it. This is how I came about it.
6           Did I know that Dr. Manchikanti also
7   wrote that -- or had the same thing, and Dr. Cohen
8   had the same letter, no, I didn't know, but I don't
9   see how it applies to my expert -- you know, to --
10  I -- how it -- how it changes how I feel about the
11  decision-making process, how Dr. Bhambhani made her
12  decisions.
13      Q   Doctor, do you know a physician by the
14  name of Autry Parker by any chance?
15      A   No.
16      Q   I'm going to represent to you that
17  Dr. Parker is an expert in a case against a
18  different clinic and a different doctor in the
19  state of Tennessee regarding their use of
20  preservative-free MPA from NECC.
21          My question is: Did you know that that
22  doctor's report, to a large extent, is also

Page 67

1   identical to your report and was signed by that
2   doctor eight months before you signed your report?
3           Did you know that?
4       A   Was I aware of that? No.
5       Q   Does it concern you that you signed a
6   report that's virtually identical to a doctor's
7   report that was submitted eight months earlier
8   regarding a different clinic and a different doctor
9   and a different state?
10          MR. KIRBY: Objection to form.
11          THE WITNESS: Once again, I signed this
12  paper because I agreed with the opinions in it. It
13  is not surprising that you could go through the
14  same points with another plaintiff in a different
15  state, because the same things apply.
16  BY MR. MINTZER
17      Q   Could I -- does that mean that that --
18  that doesn't concern you?
19          MR. KIRBY: Objection to form. I think
20  he answered it.
21          Go ahead.
22          MR. MINTZER: I don't think he did.

Page 68

1           THE WITNESS: What is the question then?
2   BY MR. MINTZER
3       Q   The question I asked was: Does it
4   concern you that you signed a report that is
5   virtually identical to a doctor that's testifying
6   in a different case in a different state that was
7   drafted eight months before yours?
8           MR. KIRBY: Objection to form.
9           THE WITNESS: If I agree with what is
10  written here and I -- and you've got to understand,
11  I signed this without knowing that.
12          And it doesn't matter, because the
13  points are the same. Whether or not that
14  happened by not even by coincidence, whether or
15  not the same supporting points were pertinent to
16  another case or whether they're in
17  Dr. Bhambhani's case, I think it's irrelevant.
18          What I was signing was, each point, did
19  I look at it, did I agree about what was said,
20  and I did. And you can ask me in detail on each
21  thing, and I will -- you know, I'll tell you,
22  I've already told you before, this stuff, I read

Page 69

1   through it, you know, I looked at it, I thought
2   it made the point very well.
3           I was actually very impressed. I
4   remember reading this and going, "Man, this is
5   perfect. This really fits kind of how I'm
6   thinking about it as well."
7           I don't really -- I made a -- I made a
8   few minor changes to it, but I didn't really see
9   something that I needed to change drastically
10  with it. It seemed like, hey, this is great.
11  BY MR. MINTZER
12      Q   Can you tell me one of the changes you
13  made?
14          MR. KIRBY: Objection to form.
15          THE WITNESS: No, I can't recall.
16  Remember, I don't take notes on this, and so I
17  don't know. I may have had an old copy that I put
18  a couple of things in, but there wasn't a lot of
19  changes that I made to it. And it would have been
20  minor, most likely having to do with my biography.
21  BY MR. MINTZER
22      Q   You didn't catch the typo, though, did

Page 70

1  you?
2      MR. KIRBY:  Objection.
3      THE WITNESS:  No, I didn't catch the
4  typo.
5  BY MR. MINTZER
6   Q   As part of your report, there is an
7  Exhibit 2, and Exhibit 2 lists a bunch of
8  materials.  And we've been referring generically in
9  this case that you reviewed a lot of materials.
10     Is that the list of material that you
11  reviewed?
12     MR. KIRBY:  So is this a separate exhibit
13  that you gave us?
14     MR. MINTZER:  It is a separate exhibit.
15  I think it's also part of Exhibit 3 --
16     MR. KIRBY:  Okay.  Let me --
17     MR. MINTZER:  -- but if you have it as
18  Exhibit 4, but that it's just solely Exhibit 2, I
19  don't think we have to use it.
20     MR. KIRBY:  Let me just see here.
21     It's not a part of Exhibit 3, so I will
22  pull Exhibit 4.

Page 71

1      MR. MINTZER:  All right.
2      (Larkin Deposition Exhibit Number 1627-4
3      marked for identification.)
4  BY MR. MINTZER
5   Q   What you have before you, Doctor, should
6  be Exhibit 4, which is was Exhibit 2 to your
7  report.  Do you recognize that list?
8   A   Yes, I do.
9   Q   Are those the documents that you reviewed
10  at arriving at your opinions in this case?
11  A   I will say this, believe it or not, I
12  looked at almost all of these, and there are some
13  here that I can't even tell you, but I went through
14  a lot of these really quickly.
15     Okay.  YuZon Wu, "What is he talking
16  about?"  And I'd start reading the deposition, if
17  it was applicable, okay, move on to the next one,
18  deposition of Alexander.
19     That's why I say, I went through these, I
20  looked at them closely, and if it looked like it
21  was pertinent to the case, I would keep reading.
22  You know, if -- or if it had a particular interest

Page 72

1  to me, I would keep reading.  But I did not read in
2  detail all of these, no.
3      And also --
4   Q   The --
5   A   Wait.  Let me finish.
6      Things like the --
7   Q   Go ahead.
8   A   -- video, "A disk contained an audio from
9  Barry Cadden's Training for Sales Personnel," I
10  mean, this is hours and hours, so I listened to it
11  a little while, I'm not going to be able to spend
12  20, 30 hours to his audios.  So I would listen to
13  it, know what it was and then move on.
14     And then some of these things -- you
15  know, this was all of the things in the Dropbox.  I
16  tried to get through everything in the Dropbox.
17  Q   Okay.  So --
18  A   So if you're going to quiz me on details
19  from each thing, I can't tell you.  Certain things
20  I looked at a lot more closely.  Like the
21  congressional memo, I read that thing from start to
22  finish.  Some of these things, I did very detailed

Page 73

1  reviews, and some, I just kind of skimmed over.
2   Q   Okay.  Are you done?
3   A   Yeah.
4   Q   Can we agree that within this list of
5  Exhibit 2 --
6   A   Okay.
7   Q   -- of the documents that you referred to
8  in some form or fashion as you described in
9  arriving at your agreement with the opinions that
10  are in the report that you signed?
11  A   I'm sorry.  Repeat that question again.
12  Q   Can we agree that what is listed on
13  Exhibit 2, you reviewed in some form or fashion, as
14  you previously described, in arriving at your
15  opinions that are reflected in the report that you
16  signed?
17  A   Okay.  If this -- I will go in again, if
18  this was in -- there are so many things on here, if
19  this was in the Dropbox, I tried to -- I -- I, at
20  least, quickly looked over to what it was in each
21  of the items in the Dropbox.  If this was not in
22  the Dropbox that I saw, then I can't say for sure.

Page 310

1  law?
2      MR. KIRBY: Object to the form.
3      THE WITNESS: So that's a loaded
4  question. Look, there's some laws, which are
5  basically regulations, I may be violating and not
6  knowing it. I don't think there's a lot, I
7  think -- you know, I think we try to keep abreast.
8  But this would be a small one that you wouldn't
9  necessarily know, obviously not.
10     Like I said, I looked through a lot of
11 depositions and nobody brings this up. You would
12 have thought that if it was such common knowledge
13 and people should have known that they were
14 breaking the law, why didn't any of these other
15 older depositions, did they bring it up?
16 BY MR. COREN:
17   Q  Seeing that law and seeing the way that
18 New England Compounding was having the doctors,
19 like at Box Hill and those other 70 pharmacies
20 in -- excuse me, some of these other surgery
21 centers that had gone with them in Maryland filling
22 out this, using old patient names, don't you think

Page 311

1  now you say, well, gee, this is basically being
2  complicit with NECC in violating Massachusetts law?
3      MR. KIRBY: Objection to form, talking
4  about the standard of care in 2012.
5      THE WITNESS: Yeah. I -- I mean, once
6  again, I'm talking about -- I'm referring to
7  standard of care, too. I am sure if Dr. Bhambhani
8  thought that she was doing anything untoward, she
9  wouldn't have done it. She's a caring physician.
10 You can see that in her notes. You can see that
11 other doctors send their parents to her.
12     I mean, she's detailed oriented, she's
13 not -- she doesn't seem -- I don't get the idea
14 that she's lazy. This is, you know, about these
15 kind of things. I think this is just such a
16 small thing, that we're going to miss it.
17     And I could be missing it, too, and I'd
18 like to think that I -- that I try to keep on top
19 of things.
20 BY MR. COREN:
21   Q  I just need to put a finer point on
22 this --

Page 312

1   A  Okay.
2   Q  -- so I understand when we meet again,
3  should we meet again in court, is your opinion --
4  is it your opinion that the -- that the law that
5  governs prescriptions is not the standard of care
6  upon doctors?
7      MR. KIRBY: Objection to form and
8  foundation.
9      THE WITNESS: There are a lot of
10 regulations out there that we may or may not be
11 aware that -- that as a Maryland physician in
12 regards to Massachusetts law, because she's getting
13 a prescription filled by a Massachusetts pharmacy,
14 and that pharmacy is -- it's their responsibility
15 because they're in that state to let her know that,
16 and they didn't do that.
17     And now you're asking me to say, oh,
18 does the law matter? Of course, the law matters.
19 But you're -- you're drawing out something that
20 somebody typically wouldn't do. And no, it
21 wouldn't be the standard of care for her to know
22 the laws in Massachusetts. Especially, if the

Page 313

1  pharmacy that is -- that is domiciled in
2  Massachusetts, doesn't tell them that. "Okay.
3  This is the law, you need to do this." They
4  weren't telling them that, they were giving them
5  the opposite information.
6  BY MR. COREN:
7   Q  So taking a whole patient list, putting
8  it down on a prescription order form, putting your
9  doctor's signature, putting your doctor's DEA
10 number, no bells went off that this might be not
11 kosher?
12     MR. KIRBY: Objection to form and
13 foundation. Asked and answered several times.
14     THE WITNESS: Yeah, I think I've -- I
15 think I have answered this quite a few times.
16 BY MR. COREN:
17   Q  Okay. So just I can simplify things; the
18 law is below the standard of care in the hierarchy
19 of things that doctors must do. Do I have that
20 right?
21     MR. KIRBY: Objection to form and
22 foundation. Asked and answered.