```
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
           DOCKET NO. 1:13-MD-2419 (RWZ)
          IN RE: NEW ENGLAND COMPOUNDING
                PHARMACY, INC. PRODUCTS
                  LIABILITY LITIGATION


              THIS DOCUMENT RELATES TO:

      ARMETTA, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14022-RWZ

       BOWMAN, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14028-RWZ

        DAVIS, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14033-RWZ

      DREISCH, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14029-RWZ

     FARTHING, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14036-RWZ

        KASHI, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14026-RWZ

       TORBECK, ET AL. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14023-RWZ

        HANDY, ET AL. V. BOX HILL SURGERY CENTER,
                    LLC, ET AL.
                NO. 1:14-CV-14019-RWZ


DEPONENT:   LAXMAIAH MANCHIKANTI, M.D.
DATE:       FEBRUARY 16, 2017
REPORTER:   CHELSEA SEVILLA-LOZADA
```

Page 2

```
 1              APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4  JAY D. MILLER
 5  SILVIO TRENTALANGE
 6  LAW OFFICES OF PETER G. ANGELOS, P.C.
 7  100 NORTH CHARLES STREET, 22ND FLOOR
 8  BALTIMORE, MARYLAND 21201
 9  TELEPHONE NO.: (410) 649-2000
10  E-MAIL: JMILLER@LAWPGA.COM
11
12  AND
13
14  HARRY M. ROTH
15  COHEN PLACITELLA & ROTH, P.C.
16  201 MARKET STREET, SUITE 2900
17  PHILADELPHIA, PENNSYLVANIA 19103
18  TELEPHONE NO.: (215) 567-3500
19  E-MAIL: HROTH@CPRLAW.COM
20
21
22
23
24
25
```

Page 3

```
 1           APPEARANCES (CONTINUED)
 2
 3  ON BEHALF OF THE DEFENDANT, BOX HILL SURGERY CENTER:
 4  GREGORY K. KIRBY
 5  PESSIN KATZ LAW, P.A.
 6  901 DULANEY VALLEY ROAD, SUITE 500
 7  TOWSON, MARYLAND 21204
 8  TELEPHONE NO.: (410) 938-8800
 9  E-MAIL: GKIRBY@PKLAW.COM
10
11  ON BEHALF OF THE DEFENDANT, SPECIALTY SURGERY CENTER:
12  ASHLEY GENO
13  BREWE, KRAUSE, BROOKS & CHASTIN, PLLC
14  611 COMMERCE STREET, SUITE 2600
15  NASHVILLE, TENNESSEE 37203
16  TELEPHONE NO.: (615) 256-8787
17  E-MAIL: AGENO@BKBLAW.COM
18
19
20
21
22
23
24
25
```

Page 4

```
 1                INDEX
 2                                     Page
 3  DIRECT EXAMINATION BY MR. MILLER      6
 4  EXAMINATION BY MR. ROTH             113
 5  CROSS EXAMINATION BY MR. KIRBY      177
 6  REEXAMINATION BY MR. ROTH           192
 7
 8
 9              EXHIBITS
10                                     Page
11  34  FDA BRIEFING                     62
12  36  ASSESSMENT OF INFECTION CONTROL 123
```

Page 5

```
 1              STIPULATION
 2
 3  The deposition of LAXMAIAH MANCHIKANTI, M.D. taken at
 4  THE PAIN CENTER, 2831 LONE OAK ROAD, PADUCAH, KENTUCKY
 5  42003 on THURSDAY, the 16TH day of FEBRUARY, 2017 at
 6  approximately 10:00 A.M. CST; said deposition was taken
 7  pursuant to the FEDERAL Rules of Civil Procedure. It is
 8  agreed that CHELSEA SEVILLA-LOZADA, being a Notary
 9  Public and Court Reporter for the State of Kentucky, may
10  swear the witness.
```

Page 74

1  Q  And in that book, don't you indicate that it's
2  very important to put down the specific drug that's
3  being used by the doctor?
4  A  That's correct.
5  Q  So that if you're really not using Depo-
6  Medrol, but rather a compounded drug, shouldn't Dr.
7  Bhambhani have indicated that in her patient's charts,
8  rather than writing Depo-Medrol?
9  MR. KIRBY:  Objection.  Go ahead.
10 A  Well, she's -- I'm saying specific drug is
11 that you are using lidocaine, you are using Depo-
12 Medrol.  Those are the issues.  You use
13 methylprednisolone.  I'm not saying that you have to use
14 a generic name or a pharmacological name, or a brand
15 name, so that issue was not an issue at that time, and I
16 have routinely dictated that if I use a Depo-Medrol,
17 even though it was from NECC, or from another
18 compounder, I called it Depo-Medrol, only the difference
19 was that if I use a preservative free, I would say it is
20 preservative free.
21 Q  You issued a 24-page report at your last --
22 A  A 24-page report on what?
23 Q  Your expert report in this case.
24 A  Oh, in this case.  Yes, sir.  I do.  I have
25 that right here.

Page 75

1  Q  I've got 24 typed pages that they're first
2  person.  It is my opinion, it is my belief.  It is
3  written in the first person.  Did you, or someone in
4  your office, sit down and type out these 24 pages?
5  MR. KIRBY:  Objection to form.  It's privileged
6  protected information in Rule 26.
7  MR. MILLER:  You can answer.
8  BY MR. MILLER:
9  A  Well, we had both of us, the attorney, Mr.
10 Kirby and I, discussed these issues.  I reviewed the
11 documentation first, and then we discussed with this and
12 jointly we came up with this report.
13 Q  Oh, who typed it?
14 MR. KIRBY:  Objection to form.  Drafting is not
15 discoverable.
16 Q  I didn't ask you who drafted it.  I said who
17 typed it.
18 MR. KIRBY:  Yeah.  Same objection.  If you
19 recall.
20 MR. MILLER:  Why don't you suggest to him that
21 he not recall.
22 BY MR. MILLER:
23 Q  In court, every question is if you can recall,
24 Doctor, if you can remember.  Do you remember typing a
25 24-page report?

Page 76

1  A  I'm not a very good typist.  I'm extremely
2  poor, my technical skills are not very good in typing.
3  I'm a good physician, but not a typist.  I have
4  transcriptionists, they type if I dictate.  Here, we
5  prepared this document together with the discussions, so
6  I believe his office may have typed it.
7  Q  Okay.  So this 28 pages was typed at Mr.
8  Kirby's office and sent to you, and then you signed it?
9  MR. KIRBY:  Objection to form.  Again, it's
10 protected information.  Privileged information.
11 A  No.  As I said, we -- I reviewed the
12 documentation first, then we had a meeting.  This was
13 about two hours or so.  We discussed all these issues.
14 We went one by one, and he started writing down, I'm
15 very bad at shorthand either, so after that, then it was
16 typed and it came to me.  I made corrections, and then
17 the final document was produced.
18 Q  Have you reviewed the reports of any other
19 pain management physicians in this case?
20 A  I have reviewed the report of Dr. Saberski,
21 Saberski or Saberski, whatever.
22 MR. KIRBY:  Saberski.
23 A  Saberski, no, I can't say it.  Saberski.
24 Saberski.
25 Q  Box Hill, you read Dr. Main's (phonetic)

Page 77

1  report?
2  A  No.  Dr. Main, who is that?  Is that in there?
3  I don't recall.
4  Q  He was an expert also hired by Box Hill.
5  A  No.  I have not reviewed any of their expert's
6  reports.  I have only reviewed your expert's reports to
7  the best of my knowledge.
8  Q  But you are -- are you confident that all of
9  the information in here that says that it's my opinion,
10 that they are truly your opinions?
11 A  Yes, sir.  I am.
12 Q  If you could go to page 4?
13 A  Yes.
14 Q  Section B, medication purchasing by the Box
15 Hill defendants.
16 A  Yes.
17 Q  Apparently, Dr. Main has a very -- medication
18 purchased by the Box Hill defendant, as well.
19 A  I didn't understand your prior comment.  I'm
20 looking at page 4, Section B, medication purchasing by
21 the Box Hill defendants, and you made some other comment
22 after that.  I didn't hear that.
23 Q  I said did Dr. Main, another expert in this
24 case, as a Section B with the same exact title, matter
25 of fact, almost the entire report is the same as yours,

Page 78

1 but we'll get to that.
2     MR. KIRBY: Move to strike. No question. Go
3 ahead.
4  A   Oh, well --
5     MR. KIRBY: There's no question. Just wait.
6  A   Next question.
7  Q   Go down to the second paragraph that begins
8 "Box Hill ordered." Do you see that?
9  A   Yes.
10 Q   This is a prescription order form provided by
11 NECC. Have you actually reviewed the actual
12 prescription order forms that Dr. Bhambhani used in this
13 case?
14 A   Yes. I have.
15 Q   And are you aware that she was sending names
16 that were simply on a schedule that she had seen. Did
17 you see that?
18    MR. KIRBY: Objection to form. You can answer.
19 A   Yeah. I saw that she sent the schedules. I
20 don't understand what the question is. I saw that she
21 was sending the schedules, and some of them had the
22 names, but sometimes she just sent the see attached, the
23 schedule.
24 Q   Right. But the schedule she is sending is a
25 schedule of patients that she has already treated, so

Page 79

1 you would treat 12 patients on October 12th, October the
2 13th, she filled out a prescription order form and
3 attaches that sheet, which is merely a list of names of
4 patients she saw the previous day.
5     MR. KIRBY: Objection to form. Is there a
6 question?
7     MR. MILLER: I'm getting to it.
8     MR. KIRBY: Okay.
9 BY MR. MILLER:
10 Q   Is it your opinion that that's appropriate?
11 A   Well, if she is going to use the -- if she's
12 going to inject the steroids in the same patients again,
13 Yes. It is appropriate.
14 Q   Okay. If she's not, then it would not be
15 appropriate, correct?
16    MR. KIRBY: Objection to form.
17 A   At least she was under the belief that they
18 were coming back for the injections, that's why they
19 were on the list, and that is the reason she provided
20 the list. That is my interpretation of what I
21 understood from her deposition, as well as looking at
22 the forms.
23 Q   Are you familiar with the regulation that
24 requires single prescriptions for individual patients?
25    MR. KIRBY: Objection. Where is it -- what are

Page 80

1 you talking about? States, federal, I don't know,
2 what are you talking about?
3 BY MR. MILLER:
4  Q   Well, I can give you a list of them. Are you
5 familiar with the Maryland Law co-wire (phonetic) that
6 requires single prescriptions for individual patients?
7  A   Yes. I have seen that, but that is meant for
8 the pharmacist and it is -- it did not come from
9 Maryland Board of Medical Licensure. Also, it is for
10 controlled substances. You just stated controlled
11 substances. So this is not a controlled substance.
12 Q   Well, under Massachusetts definition, all
13 drugs are controlled substances, are they not?
14    MR. KIRBY: Objection.
15 A   I'm not aware of that.
16 Q   Are you aware of the Massachusetts statute
17 that requires single prescription -- individual
18 prescription for individual patients?
19    MR. KIRBY: Objection to form.
20 A   Again, I have seen that several places in this
21 documentation when I was going through, but these are
22 all pharmacy directions. None of them is related from
23 the Board of Medical Licensure. It is not controlling
24 the practice of medicine. If that is the case, many of
25 the doctors are not using that regulation as you call

Page 81

1 it. I'm not sure if it is a regulation, or guideline,
2 or policy. In any case, we have done the same thing and
3 the majority of physicians I know of who have ordered
4 from NECC, uses the same format. In the beginning, we
5 didn't even give patient's names, and later on, they
6 asked us to give us the names of the patients we will be
7 using, so we will just routinely send the schedules and
8 or we send the names of the patients. We -- of course,
9 we send only the patients where they will be receiving
10 the epidural injections, or that will be receiving the
11 steroids.
12 Q   Can you go to page -- I mean Exhibit number
13 13? It's a few pages in, Exhibit 13. It's a
14 prescription order form.
15    MR. KIRBY: We're working on it. Hold on one
16 second. He has it in front of him if you -- just so
17 you know.
18 BY MR. MILLER:
19 Q   Okay. So in the first column where it says
20 "Name of patient," and it says "see attachment of
21 patient names." Do you see that?
22 A   Yes.
23 Q   The next one says "One patient five vials." Do
24 you see that?
25 A   Yes.

|  | Page 162 |
|---|---|
| 1 | way to anybody or any agency? |
| 2 | A   No, sir.  No, I have not. |
| 3 | Q   I want to ask you to turn to page 11 of your |
| 4 | report. |
| 5 |     MR. KIRBY:  Page 11. |
| 6 | A   Yes, sir.  I'm there. |
| 7 | Q   And under sub-part 3, the last sentence reads, |
| 8 | "All of these factors support the conclusion that it was |
| 9 | reasonable and appropriate for STOPNC to purchase |
| 10 | compounded MPA, which is a reasonable equivalent to |
| 11 | Depo- Medrol."  What is STOPNC? |
| 12 | A   I think it is the facility name in Tennessee. |
| 13 | I think it is St. Thomas Outpatient Neuro-surgery |
| 14 | Center, if I'm not wrong. |
| 15 | Q   And what does STOPNC have to do with anything, |
| 16 | with Dr. Bhambhani's practice or Box Hill Pain Center? |
| 17 | A   Oh, they were the first ones involved in this |
| 18 | issue, and they had many of the documents.  Their names |
| 19 | were mentioned everywhere in the documents I was |
| 20 | reading. I think I even reviewed some of the depositions |
| 21 | taken by them. |
| 22 | Q   Are you expressing any opinion about SSTOPNC |
| 23 | in these cases? |
| 24 |     MR. KIRBY:  I think he said he just had STOPNC |
| 25 |   on the brain after reviewing those cases, that other |

Page 163
1  stuff, but if you know different?
2     A   Well, I have --
3  BY MR. ROTH:
4     Q   But --
5     A   -- reviewed those, and then that it just says
6  that they also protested them, and the factors -- the
7  people who gave the depositions said that it was
8  reasonable and appropriate for them to purchase
9  compounded MPA.
10    Q   Okay.  But Dr. Bhambhani never relied on
11 anybody from STOPNC in making a decision to purchase
12 from NECC, did she?
13    A   No, she did not.  She relied on her own
14 experience, and also her former colleagues, their
15 experience, one or two people's experience.  She was not
16 involved in this.  We were just -- we were just making a
17 case about using alternate to Depo-Medrol -- alternate
18 to Depo-Medrol.
19        MR. KIRBY:  Harry, I think it's just a typo,
20   but I mean, you can ask whatever questions you want,
21   but this is just a typo.
22 BY MR. ROTH:
23    Q   Let me -- let me shift gears for you a little
24 bit -- with you a little bit, Doctor.  One of the things
25 you've talked about is that Dr. Bhambhani's used any --

Page 164
1  or actually preservative-free MPA because of a concern
2  for potential adverse events.  My first question is do
3  you know -- does -- are there any preservatives --
4  excuse me -- were there any preservatives in NECC's
5  compounded steroid?
6     A   Yes, I think they have polyethylene glycol.  I
7  don't know what else they have.  They just don't have
8  the alcohol in it.
9     Q   Okay.  And does polyethylene glycol cause or
10 pose any risks to patients?
11    A   If you exceed 30 percent of the volume, the 30
12 percent does.  So it can suppress the nerve conductions,
13 but it has not been shown to cause any permanent damage
14 or neural tissue damage.
15    Q   Okay.  And so then, the presence of
16 polyethylene glycol as a preservative means that it's
17 not really preservative-free; is that right?
18        MR. KIRBY:  Objection to form.  Foundation. You
19   can answer.
20    A   Yeah, that's correct.  As you asked the
21 question, I'm just realizing that it is a misnomer to
22 call it "preservative-free."  I never thought about
23 that.
24    Q   And there is data that suggests that
25 polyethylene glycol as preservative can be neurotoxic?

Page 165
1     A   Well, it can suppress the nerve conduction at
2  30 percent level or 40 percent level, one of the higher
3  concentrations.  In Depo-Medrol, it was only 33 percent
4  when we -- when you buy from Pfizer or Upjohn, I don't
5  know exact concentration at NECC.
6     Q   Okay.  That would be important to know in
7  terms of a physician's interest in buying something that
8  is preservative-free; wouldn't it?
9         MR. KIRBY:  Objection.
10    Q   How much preservative is actually in the drug?
11    A   She was focusing mostly on alcohol, plus the
12 side-effects she experienced with the other drugs.  So
13 polyethylene glycol generally was not considered as a
14 neurotoxic.  I understand there is some level to which
15 it does suppress neuro fibers, but there is no
16 significate literature to state that.  There is more
17 literature in reference to alcohol, and many people did
18 not blame polyethylene glycol for any arachnoiditis
19 cases.
20    Q   The reason I'm asking that, and I'm again, I'm
21 trying to frame it in a fair way, there is because in
22 your text, which cites other literature, you have
23 written that there is not really, I'm sorry, more
24 specifically, what you have written is that "Other
25 authors have concluded that despite what has been