```
 1               UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4    IN RE: NEW ENGLAND            : MDL No. 2419

 5    COMPOUNDING PHARMACY, INC.    : Docket No.:

 6    PRODUCTS LIABILITY LITIGATION: 1:13-md-2419(RWZ)

 7    -----------------------------:

 8    This document relates to:     :

 9                                  :

10    ARNETTA, ET AL v. BOX HILL    :

11    SURGERY CENTER, LLC, ET AL    :   DEPOSITION OF

                                        DAVID MAINE, M.D.

12    No. 1:14-cv-14022-RWZ         :

13                                  :

14    BOWMAN, ET AL v. BOX HILL     :

15    SURGERY CENTER, LLC, ET AL    :

16    No. 1:14-cv-14028-RWZ         :

17                                  :

18    DAVIS, ET AL v. BOX HILL      :

19    SURGERY CENTER, LLC, ET AL    :

20    No. 1:14-cv-14033-RWZ         :

21                                  :
```

Page 2

1  DREISCH, ET AL v. BOX HILL      :
2  SURGERY CENTER, LLC, ET AL      :
3  No. 1:14-cv-14029-RWZ           :
4                                  :
5  FARTHING, ET AL v. BOX HILL     :
6  SURGERY CENTER, LLC, ET AL      :
7  No. 1:14-cv-14036-RWZ           :
8                                  :
9  KASHI, ET AL v. BOX HILL        :
10 SURGERY CENTER, LLC, ET AL      :
11 No. 1:14-cv-14026-RWZ           :
12                                 :
13 TORBECK, ET AL v. BOX HILL      :
14 SURGERY CENTER, LLC, ET AL      :
15 No. 1:14-cv-14023-RWZ           :
16                                 :
17 HANDY, ET AL v. BOX HILL        :
18 SURGERY CENTER, LLC, ET AL      :
19 No. 1:14-cv-14019-RWZ           :
20        --------------------
21

Page 3

1        Deposition of DAVID MAINE, M.D., was
2  taken on Wednesday, March 8, 2017, commencing at
3  4:36 p.m., at Mercy Medical Center, 435 St. Paul
4  Place, 4th Floor, Baltimore, Maryland, before
5  MICHELE D. LAMBIE, Notary Public.
6        --------------------
7
8
9
10
11 ALSO PRESENT;  Ashley E. Geno, Esquire
12        (via telephone)
13 Reported By:
14        Michele D. Lambie, CSR-RPR
15
16
17
18
19
20
21

Page 4

1  APPEARANCES:
2        ON BEHALF OF PLAINTIFFS ARNETTA, BOWMAN,
3        DAVIS, DREISCH, FARTHING, KASHI, TORBECK
4        AND HANDY:
5     Law Offices of Peter G. Angelos, P.C.
6        JAY D. MILLER, ESQUIRE.
7        jmiller@lawpga.com.
8        SHARON L. HOUSTON, ESQUIRE.
9        shouston@lawpga.com.
10       100 North Charles Street.
11       Baltimore, Maryland  21201.
12       (410) 649-2000
13
14       ON BEHALF OF PLAINTIFF ROZEK:
15    Cohen, Placitella & Roth, P.C.
16       MCHAEL COREN, ESQUIRE.
17       mcoren@cprlaw.com.
18       2001 Market Street.
19       Suite 2900.
20       Philadelphia, Pennsylvania  19103.
21       (215) 567-3500

Page 5

1   APPEARANCES CONTINUED:
2        ON BEHALF OF THE DEFENDANTS:
3   Pessin Katz Law, P.A.
4       GREGORY K. KIRBY, ESQUIRE.
5       gkirby@plaw.com.
6       901 Dulaney Valley Road.
7       Suite 400.
8       Towson, Maryland  21204.
9       (410) 938-8800
10
11
12
13
14
15
16
17
18
19
20
21

Page 6

1            EXAMINATION INDEX
2  DAVID MAINE, M.D.
3    BY MR. MILLER              7
     BY MR. COREN             173
4    R BY MR. MILLER          274
     BY MR. KIRBY             276
5    R BY MR. MILLER          282
6
7             EXHIBIT INDEX
8                              MARKED
   DAVID MAINE, M.D.
9  1626-1 Standards of Professionalism: Expert    24
          Witness Guidelines
10
      1626-2 Report                               24
11
      1626-3 Prescription Order Form             178
12
      1626-4 Transmission Verification Report with 183
13         attachments
14 1626-5 Commonwealth of Massachusetts Board   196
          Of registration in Medicine Prescribing
15        Practices, Policies and Guidelines
16 1626-6 Massachusetts Statutes for Chapter 94 209
17 1626-7 2012 Version of Maryland Health
          Occupations                           226
18
      1626-8 Article                            259
19
20
21

Page 7

1              PROCEEDINGS
2              DAVID MAINE, M.D.,
3  the Deponent, called for examination by the
4  Plaintiffs, being first duly sworn to tell the
5  truth, the whole truth, and nothing but the truth,
6  testified as follows:
7              EXAMINATION
8        BY MR. MILLER:
9    Q.  Full name and address for the record.
10   A.  David Maine.  Work address, I assume?
11 345 St. Paul Place, Baltimore, Maryland 21202.
12   Q.  Dr. Maine, as you know, my name is Jay
13 Miller with the Law Offices of Peter Angelos, and
14 we're here today to take your deposition on issues
15 relating to a number of cases.
16       I've been provided with your CV and a
17 copy of your report.  I'd like to go through that.
18       You've had your deposition taken before?
19   A.  Yes.
20   Q.  You were kind enough to give us a list of
21 cases you have been involved with, so just a couple

Page 8

1  highlights, if I could.
2        MR. KIRBY:  Can you hold on for one
3  second?
4        MR. MILLER:  Sure.
5        (Whereupon, Ms. Houston enters the
6  deposition room.)
7        (Recess taken -- 4:37 p.m.)
8        (After recess -- 4:38 p.m.)
9  BY MR. MILLER:
10   Q.  Just a couple highlights, Doctor.  You
11 finished your residency in '07; is that correct, I
12 mean a fellowship?
13   A.  Yes, I believe that's correct.
14   Q.  Then in that same year, you became
15 director; is that correct, of the --
16   A.  That's correct.
17   Q.  Medical director?
18   A.  That's correct.  Yes.
19   Q.  How do you finish your fellowship and
20 become the head honcho the same day?
21   A.  So this health system did not have a pain

Page 9

1  center at all or any division of that sort, and so
2  I started it with the support, obviously, of the
3  institution.
4    Q.  Now, were you a fellow under Dr. Cohen?
5    A.  I was.
6    Q.  Are you aware that he's also designated
7  as an expert in this case?
8    A.  I am.
9    Q.  Have you had a chance to review any of
10 his testimony?
11   A.  I read through about, I think, the first
12 40 to 49 pages yesterday, and then I zonked out.
13 You guys talked for a while.
14   Q.  The same thing happened to Mike.
15       MR. COREN:  Yeah.  It's a page turner,
16 right?
17       MR. KIRBY:  Keep reading the same page
18 over and over.
19 BY MR. MILLER:
20   Q.  So you read some of it?
21   A.  Yes.

Page 22

1 context, but it seems like a reasonable statement;
2 yes.
3    Q.  Would you agree because of your unbiased
4 nature if you read something or you learn something
5 throughout this case, throughout this deposition or
6 whenever, if it's contrary to the position that you
7 have already indicated, because you're unbiased and
8 you want to comply with the guidelines, you will
9 tell the attorney and indicate that, Hey, my
10 opinion is not what I thought it was?
11    A.  Sure.  I mean, I think, you know, when I,
12 when I take a case, it's fairly clear with counsel
13 that my, my opinion is obviously always subject to
14 change if there's new information provided to me in
15 respect to a case, particularly as it pertains to
16 injuries where sometimes I don't get all of the
17 information at the time of my clinical exam or so
18 on and so forth, so.
19    Q.  Now, you understand that I have not had a
20 chance to talk to you about this case before.  So
21 we have been provided what you have signed as to be

Page 23

1 your report in this case.  I believe your signature
2 appears on page 23?
3    A.  Correct.
4    Q.  It shows me you signed it in October of
5 2016?
6    A.  Um-hum.
7    Q.  And you -- how did you prepare this
8 report?
9    A.  So I first reviewed two giant boxes of
10 information that made my head want to blow up, and
11 then I spent some time synthesizing it.  And then I
12 had numerous telephone conversations with
13 Mr. Kirby, and I think it was solely Mr. Kirby,
14 where he asked me questions, and I articulated my
15 opinion.  We would -- he would -- that's
16 essentially how I did it.
17    Q.  Did you type the pages?
18    A.  No.
19       MR. KIRBY:  I'm just going to object
20 based on protected information of drafting in the
21 process which I consider privileged.

Page 24

1       MR. MILLER:  I'm not asking about the
2 drafting, just his final report.
3 BY MR. MILLER:
4    Q.  This final version, you didn't type any
5 of this?
6    A.  If I had to type this, I would still be
7 typing right now.
8       MR. COREN:  Objection.  Just so we're
9 clear on the record, could we give it an exhibit
10 number?
11       MR. MILLER:  Sure.
12       (Whereupon, Maine Deposition Exhibit
13 Number 1626-1, Standards of Professionalism: Expert
14 Witness Guidelines, marked for identification.)
15       (Whereupon, Maine Deposition Exhibit
16 Number 1626-2, Report, marked for identification.)
17 BY MR. MILLER:
18    Q.  You can use yours.  I just want to sit
19 this here.
20    A.  That's fine.
21    Q.  So the 23 pages was arrived at to a

Page 25

1 series of questions and answers with Mr. Kirby, and
2 then ultimately after a number of conversations
3 just with Mr. Kirby, you telling him information,
4 he put together a typed 23-page report.  You
5 received this, and I take it you reviewed it before
6 you signed it?
7    A.  Of course, yes.  I, I made some changes
8 here and there, but that's correct.
9    Q.  And then so this 23-page report contains
10 the entirety of your opinions in this case?
11    A.  It's a good summary.
12    Q.  Do you have any changes you want to make
13 before we move on?
14       MR. KIRBY:  Objection to form and the
15 broad nature of the question.  You can answer.
16       THE WITNESS:  Not specifically.
17 BY MR. MILLER:
18    Q.  Have you reviewed any of the reports that
19 Dr. Cohen filed in this case?
20    A.  No.
21    Q.  How about the report of Dr. Larkin?

Page 26

1  A. No.
2  Q. Have you seen the report of
3 Dr. Manchikanti?
4  A. No. I read his deposition.
5  Q. Have you read your report prior to today?
6  A. I read it, I think, in September of 2016
7 and maybe in August of 2016 when it was being
8 prepared.
9  Q. Is it fair to say at the time you read
10 it, when you signed it, you were confident that
11 your opinions were truthful, unbiased and
12 scientifically sound?
13  A. These are my opinions.
14  Q. Well, they're obviously truthful?
15  A. So they're truthful, yes.
16  Q. And unbiased?
17  A. Yes, they're my opinions. These are my
18 opinions.
19  Q. Okay. No other doctor's? They're yours?
20  A. No. I mean, they're only biased by my
21 experience in clinical practice.

Page 27

1  Q. You wouldn't copy anybody else's opinion.
2 These are your own personal opinions that you
3 reached, right?
4      MR. KIRBY: Object to the form.
5      THE WITNESS: Yeah. These are, these are
6 my opinions. Now, it's not to say that others
7 cannot have the same opinions, but they're my
8 opinions.
9 BY MR. MILLER:
10  Q. If you could turn to page 3, at the top
11 you say that these opinions contained herein are
12 generally relied on your education, training,
13 experience and then the materials you reviewed,
14 correct?
15  A. Correct.
16  Q. Down at the bottom of page 3 where your
17 report states that, Box Hill Surgery Center has a
18 nurse administrator, Andrew Vickers, and you say,
19 Mr. Vickers works part time with Dr. Bhambhani to
20 assist her when performing pain injections --
21  A. Um-hum.

Page 28

1  Q. -- and to help with administrative
2 functions, such as addressing inventory and
3 ensuring that medications and other supplies are
4 fully stocked. Where did you get that information?
5  A. I don't recall specifically.
6  Q. Do you have some specific recollection of
7 reading something that led you to the conclusion
8 that Mr. Vickers helps with addressing inventory
9 and ensuring that stock is kept up to date?
10  A. It might, it might have been
11 Dr. Bhambhani's deposition. I just don't recall
12 specifically.
13  Q. All right. The next paragraph,
14 Dr. Maine, under B, Medication Purchasing, the
15 fourth line down, it says, She -- you're referring
16 to Dr. Bhambhani -- continued to use it -- and
17 we're talking about MPA, correct?
18  A. Correct.
19  Q. Continued to use it out of a concern for
20 potential adverse events due to preservatives. I
21 want to stop right there.

Page 29

1  A. Sure.
2  Q. What specific facts did you rely on to
3 conclude that Dr. Bhambhani used MPA because she
4 was concerned about adverse events due to
5 preservatives?
6  A. Well, Dr. Bhambhani's deposition spoke to
7 that, so that was the primary part of the medical
8 record that I used to garner that, that opinion.
9      I think she spoke to specifically that
10 she had worked with another provider who had used
11 NECC. I think she might have been
12 working -- she has worked for several years using
13 it uneventfully.
14      She had some negative experiences with
15 other steroids, and I think it was shaping those
16 experiences, both positive and negative, that
17 ultimately resulted in her reason of using the
18 preservative-free MPA, that she had a very positive
19 experience with.
20  Q. So it's your belief that Dr. Bhambhani
21 specifically used preservative free or the MPA

Page 46

1  A.  I mean, I think that's reasonable.  She
2  used it thousands of times, had no problems and
3  decided to use it.  Just like I used, what I have
4  used at Hopkins, I decided to use it.  It's kind of
5  the same logic.
6  Q.  Her prior boss used it, so she's going to
7  use it?
8      MR. KIRBY:  Objection to form.
9      THE WITNESS:  I think, I think we're
10 saying the same thing.
11 BY MR. MILLER:
12 Q.  Right.
13 A.  She had a good experience.  She used it
14 at her prior employer, and she decided to use it in
15 her solo practice.
16 Q.  And despite the way this is worded, I
17 mean, really isn't that the extent of her basis for
18 using it --
19     MR. KIRBY:  Objection to form.
20 BY MR. MILLER:
21 Q.  -- the lack of any prior problems?

Page 47

1  A.  When you say it like that, it means that
2  it -- it comes off as you're saying that that is
3  not a very reasonable reason.
4  Q.  But that's my job.  You can still agree
5  with it.
6  A.  I understand, but, actually, I think that
7  is a, that is perfectly sufficient and reasonable
8  to make a decision.
9      Patients have a good therapeutic effect,
10 you have a good experience, no negative effects.
11 Negative effects shape what we do, just like this
12 is shaping what we do, so I -- yes.
13 Q.  Okay.  Fair enough.  Let's go down a
14 quarter of the way on that page, and then it says,
15 NECC was Box Hill's sole supplier of MPA prior to
16 the issues at hand.
17     And then you say, At some point in 2012,
18 Box Hill was informed by NECC that NECC needed a
19 list of patient names from Box Hill for patients
20 who had or would be receiving a steroid injection.
21 Dr. Bhambhani complied by sending a list of names

Page 48

1  appearing on the schedule or sometimes the schedule
2  itself.  NECC led Box Hill to believe that doing it
3  that way would comply with NECC's requirements.
4      Do you believe that at the time
5  Dr. Bhambhani was doing this in 2012 that that way
6  of ordering prescription medication from a
7  compounding lab complied with Massachusetts's law
8  in NECC's country and Maryland law?
9      MR. KIRBY:  Objection to form and
10 foundation.
11 BY MR. MILLER:
12 Q.  Sending a schedule just showing patient
13 name and ordering medication?
14     MR. KIRBY:  Objection to form.  He's not
15 going to be a regulatory expert.  Go ahead.
16     THE WITNESS:  So I'll say this:  I mean,
17 I can't speak to the Massachusetts's law.  I can
18 tell you that it was certainly standard practice at
19 the time.
20 BY MR. MILLER:
21 Q.  You now know that that's not, it wasn't

Page 49

1  appropriate, don't you?
2      MR. KIRBY:  Objection to form.
3      THE WITNESS:  Well, I mean, I would say
4  certainly now that it is not appropriate, but at
5  the time, it was absolutely standard practice.
6  And, you know, I'm -- whether it's appropriate or
7  not is a different question, but --
8  BY MR. MILLER:
9  Q.  I didn't mean to cut you off by sighing
10 like that, so you go ahead if you want to finish.
11 A.  -- but at the time, that was standard
12 practice in terms of ordering medications.
13 Q.  When you say standard practice, are you
14 referring to doctors that you work with?
15 A.  Well, like I said, I am a partner in a
16 surgery center, and we use a compounding pharmacy
17 there.  Some providers prefer MPA.  It's used for
18 eye cases.  I think it's used for some other
19 peripheral cases that I'm not involved in, and that
20 was common, commonplace to order it that way.
21     You could order three, four, five vials

Page 50

1 under a single patient's name. You would get the
2 vials, and then when you administered the
3 medication, even though that medication may have
4 been going to a different patient, you would write
5 the lot number and record it, obviously, for that
6 patient. But in terms of ordering, this is what
7 the pharmacies expressed was necessary, and it was
8 done that way, so I considered it standard
9 practice.
10   Q.  Since the NECC meningitis outbreak, is it
11 fair to say you've learned that that was, it may
12 have been standard practice, but it certainly did
13 not comply with the law?
14       MR. KIRBY:  Objection to form.  Again,
15 he's not a regulatory expert.
16 BY MR. MILLER:
17   Q.  You can answer.
18   A.  I mean, I think our knowledge and
19 understanding of these issues has certainly come to
20 the forefront after the NECC outbreak, so I think
21 our understanding of that is much clearer, and, and

Page 51

1 I will say that.
2   Q.  What's your understanding now of what the
3 law requires when ordering a prescription --
4       MR. KIRBY:  Objection to form.
5 BY MR. MILLER:
6   Q.  -- from a compounding pharmacy?
7   A.  I think you need -- I think you need a
8 prescription or a specific prescription for a
9 patient for a specific quantity for that patient.
10 The details in terms of ordering and certifications
11 I can't speak to.
12   Q.  And you learned that that's not a new
13 law.  That was in existence in 2012?
14       MR. KIRBY:  Objection to form.
15       THE WITNESS:  Again, I wasn't familiar
16 with the law in 2012 --
17 BY MR. MILLER:
18   Q.  I understand.
19   A.  -- or 2010.  I'm, I'm really marginally
20 familiar with it now, other than there seems to be
21 quite a bit more regulatory oversight.

Page 52

1   Q.  So your opinion that she complied with
2 the standard of care in 2012 by ordering it the way
3 she did by using the schedule is based on your
4 belief that the standard of care was what everybody
5 was doing --
6   A.  Well --
7   Q.  -- regardless of what the law said?
8       MR. KIRBY:  Objection to form and
9 foundation.
10       THE WITNESS:  Well, I mean, when
11 I -- when I say the word standard practice,
12 standard practice or standard of care, I'm thinking
13 what any reasonably appropriate physician would do
14 in the same situation --
15 BY MR. MILLER:
16   Q.  Understood.
17   A.  -- and that's what was being done.  I
18 remember talking about it at conferences.  Everyone
19 was starting up their practices.  People were
20 talking about where they were ordering medications
21 and how they were doing it, so this was

Page 53

1 commonplace.
2       You know, I mean, I, I can't speak to
3 what the pharmacy regulations were.  I mean, that's
4 on pharmacies, but, you know, for physicians, that
5 was commonplace, and I, I would call standard
6 practice.
7   Q.  I'll ask you to turn to page 5 for me.
8 When you make a statement at the top like this
9 where it says, Each of the patients in the instant
10 actions treated by Bhambhani presented, in most
11 cases, as a referral from another physician, what's
12 your source of that?  Where do you get that
13 information?
14   A.  I don't recall specifically, but
15 Dr. Bhambhani implied in her deposition that she
16 used these medications for treating patients with
17 back, neck pain, so on and so forth, so.
18   Q.  Do you think it's fair for me to make the
19 assumption that a statement like that where you
20 really don't recall the source is likely a
21 statement made by the attorney in the report, that