```
 1            UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4   IN RE: NEW ENGLAND              : MDL No. 2419

 5   COMPOUNDING PHARMACY, INC.      : Docket No.:

 6   PRODUCTS LIABILITY LITIGATION:  1:13-md-2419(RWZ)

 7   -----------------------------:

 8   This document relates to:       :

 9                                   :

10   ARNETTA, ET AL v. BOX HILL      :

11   SURGERY CENTER, LLC, ET AL      :   DEPOSITION OF

                                         DAVID MAINE, M.D.

12   No. 1:14-cv-14022-RWZ           :

13                                   :

14   BOWMAN, ET AL v. BOX HILL       :

15   SURGERY CENTER, LLC, ET AL      :

16   No. 1:14-cv-14028-RWZ           :

17                                   :

18   DAVIS, ET AL v. BOX HILL        :

19   SURGERY CENTER, LLC, ET AL      :

20   No. 1:14-cv-14033-RWZ           :

21                                   :
```

```
 1   DREISCH, ET AL v. BOX HILL      :

 2   SURGERY CENTER, LLC, ET AL      :

 3   No. 1:14-cv-14029-RWZ           :

 4                                   :

 5   FARTHING, ET AL v. BOX HILL     :

 6   SURGERY CENTER, LLC, ET AL      :

 7   No. 1:14-cv-14036-RWZ           :

 8                                   :

 9   KASHI, ET AL v. BOX HILL        :

10   SURGERY CENTER, LLC, ET AL      :

11   No. 1:14-cv-14026-RWZ           :

12                                   :

13   TORBECK, ET AL v. BOX HILL      :

14   SURGERY CENTER, LLC, ET AL      :

15   No. 1:14-cv-14023-RWZ           :

16                                   :

17   HANDY, ET AL v. BOX HILL        :

18   SURGERY CENTER, LLC, ET AL      :

19   No. 1:14-cv-14019-RWZ           :

20                           ---------------------

21
```

1        Deposition of DAVID MAINE, M.D., was
2   taken on Wednesday, March 8, 2017, commencing at
3   4:36 p.m., at Mercy Medical Center, 435 St. Paul
4   Place, 4th Floor, Baltimore, Maryland, before
5   MICHELE D. LAMBIE, Notary Public.
6                    --------------------
7
8
9
10
11  ALSO PRESENT;   Ashley E. Geno, Esquire
12                  (via telephone)
13  Reported By:
14           Michele D. Lambie, CSR-RPR
15
16
17
18
19
20
21

1   country and Mayo and Beth Israel and Mass General

2   and Emory, not having done this inspection, that

3   information was provided to you by Mr. Kirby?  You

4   didn't get that on your own?

5       A.   Right.  It was discussed with Mr. Kirby.

6       Q.   And you didn't -- I mean, you took him at

7   his word, obviously.  You didn't go out and

8   research that to see if he was accurate?

9       A.   That's correct.  I did see the Brigham

10  one, and that's what prompted some conversation.

11      Q.   Doctor, if you could turn to page 9.  You

12  cite in the third paragraph, you say, I have

13  reviewed the materials cited by the plaintiffs as

14  evidence of pre-outbreak reporting on the dangers

15  of compounded medications, and then a list of

16  every, every one of those publications is detailed

17  without me reading it into the record.

18      A.   Um-hum.

19      Q.   Is it your testimony you read each and

20  every one of those?

21      A.   I read a lot of them.  I mean, these

Page 113

1  were -- these were provided to me, and I read or
2  skimmed all of them, but I can't -- it was a
3  long -- this was -- it was over a year ago.  I
4  don't think I -- I think I -- I don't recall the
5  YouTube video, but --
6       Q.   In 2012, did you have an understanding
7  that compounding pharmacies, whether they were
8  required or not required to report adverse events
9  to the FDA?
10      A.   I don't think I thought about it
11 specifically, but I think -- I didn't think about
12 it specifically.
13      Q.   What's your knowledge base today?
14      A.   I think they are.
15      Q.   Do you recall specifically reading the
16 article, the second one that's listed, Potential
17 Risks of Pharmacy Compounding?
18      A.   I don't remember specifically, no.
19      Q.   Let me ask you, There's a statement
20 that's made in here, Unlike FDA approved products,
21 consumers and prescribers cannot assume that

1   compounded drugs were made by validated processes

2   in properly calibrated and cleaned equipment and

3   that the ingredients in the drug were obtained from

4   FDA approved sources.  Do you agree with that?

5           MR. KIRBY:  Hold on a second.  Where are

6   you reading that from?

7           MR. MILLER:  The article that's listed,

8   The Special Risk of Pharmacy Compounding.

9           MR. KIRBY:  Do you have a date on it?

10          MR. MILLER:  The page is page 3.

11          MR. KIRBY:  I'm sorry, the date?

12          MR. MILLER:  Oh.

13          MR. COREN:  May 31, 2007 corresponds to

14  prior marked Exhibit 1358.

15          THE WITNESS:  May I see it?

16  BY MR. MILLER:

17      Q.  Sure.

18              (Document tendered.)

19          MR. COREN:  You have one over there.

20          MR. KIRBY:  Can you show him where you're

21  referring?

1                MR. MILLER:  Page 3.
2                MR. KIRBY:  It was not marked previously,
3    was it?
4                THE WITNESS:  This is from -- this is
5    from 2013, from Drug, the journal Drug.
6    BY MR. MILLER:
7        Q.   Yes.
8        A.   A current opinion.  So -- and what page
9    are you on?
10       Q.   Page 3.
11       A.   Page 3.
12       Q.   Left column.
13       A.   Page 3, sorry.
14       Q.   Second paragraph, footnote.  Go down
15   where it says, Unlike FDA approved products.
16       A.   Show me where you are.
17       Q.   Right here (indicating).
18       A.   Okay.  I was not on the same paragraph.
19       Q.   Sorry.
20               (Whereupon, there was a pause for
21   document examination.)

1           THE WITNESS:  Yeah.  So, you know, I
2   don't have an opinion on this.  I mean, this is an
3   article -- this is an opinion article that's
4   targeting, I assume, pharmacists or pharmacy
5   students and not really targeting physicians.  So
6   this is, you know, seems like a reasonable opinion,
7   but not one that I can comment on specifically.
8   BY MR. MILLER:
9      Q.   Can you -- you would agree with me,
10  wouldn't you, that the labeling of compounded
11  preparations is neither FDA regulated nor
12  standardized?
13          MR. KIRBY:  Objection to form.
14          THE WITNESS:  The labeling of compounded
15  medications is not FDA regulated or standardized?
16  BY MR. MILLER:
17     Q.   Yes.
18          MR. KIRBY:  Are we talking 2012 or 2016
19  or 2017?
20          MR. MILLER:  2012.
21          THE WITNESS:  I, I don't have an idea.

1           MR. COREN:  I apologize.
2           (Whereupon, there was a pause for
3    document examination.)
4    BY MR. COREN:
5       Q.   Dr. Maine, I have given you copy of
6    what's been previously marked at an earlier
7    deposition as Exhibit 1356.  It is the December 13,
8    2000 MMWR, and it's one of the documents that are
9    listed in your report, okay?
10      A.   Um-hum.
11      Q.   As one of the documents that were out,
12   that were available, okay?
13      A.   (Nodding head yes.)
14      Q.   Do you recall seeing this report in
15   connection with rendering your opinions?
16      A.   I don't recall specifically.
17      Q.   If we look here, it's the Center For
18   Disease Control and Prevention, the CDC, and you
19   would agree with me that's a pretty authoritative
20   body in the United States?
21           MR. KIRBY:  Objection.  You can answer.

1     Q.   I could destroy the English language.
2  But this is -- basically, we're talking about,
3  amongst other things, ESIs?
4     A.   Correct.
5     Q.   And the first case report indicates that
6  there was a woman, age 77, if we drop down to the
7  last, the last full sentence on that first column,
8  it says, The patient's condition continued to
9  deteriorate, and she died 51 days after her
10 hospitalization.  So we have a death here, correct?
11    A.   Correct.
12    Q.   If we go to the continuation of the
13 paragraph at the top, the last sentence says, The
14 injectable methyl, methylprednisolone had been
15 prepared by a compounding pharmacy in South
16 Carolina?
17    A.   Um-hum.
18    Q.   So we have a death here, right?
19    A.   Yes, we have a death.
20    Q.   How come the bells didn't ring within
21 your profession in 2002?

1        MR. KIRBY: Objection.
2        THE WITNESS: So I didn't read this in
3   2002. Certainly, getting the MMWR, that was not
4   part of our common practice. I trained, you know,
5   at a great institution, and we certainly did not
6   talk about this in our morning rounds or our
7   morning conferences, and we didn't have the CDC
8   MMWR really ever presented to us.
9        And in several years thereafter when
10  Dr. Bhambhani was making her decision with NECC, in
11  addition to her experience, there were no such
12  occurrences with NECC of this magnitude that she
13  was aware of.
14       So, you know, I think this is, this is
15  certainly concerning when reading it, but I don't
16  think it was readily available to providers as
17  common form, commonplace. It's not the New England
18  Journal of Medicine.
19  BY MR. COREN:
20     Q. And if we look at -- it's page 1112 of
21  the MMWR.

1       A.   1112?

2       Q.   Yes.

3       A.   Yes, the last page?

4       Q.   Right.

5       A.   Yes.

6       Q.   Above the references for this particular
7  section, some health system pharmacists might not
8  realize they are purchasing injectables prepared
9  through compounding.  Purchasers of pharmaceuticals
10 should determine if supplies are provided by a
11 compounding pharmacy that is licensed in their
12 state and follows appropriate measures to ensure
13 that injectable products are free of contamination.
14          Isn't the CDC saying, Look, Hey, if
15 you're going to be ordering these drugs from
16 compounding pharmacies, you have to do something a
17 little bit more than just accept?
18          MR. KIRBY:  Objection.
19          THE WITNESS:  Yeah, I mean, I think, I
20 think this article suggests that, you know, they
21 don't have to do the same reporting as

1   pharmaceutical manufacturing.

2   BY MR. COREN:

3       Q.   Now --

4            (Whereupon, Maine Deposition Exhibit

5   Number 1626-8, Article, marked for identification.)

6   BY MR. COREN:

7       Q.   Doctor, I apologize for the quality of

8   that particular copy, but this -- I'm only -- I'm

9   going to walk us through this.  I'm not going to

10  have to do the whole thing, but what was it,

11  1626-8, is a copy of an article authored by Lucy

12  Wilson, David Blythe and Joshua Sharfstein.

13           Do any of those names sound familiar to

14  you, by any chance?

15      A.   Dr. Sharfstein.

16      Q.   And Dr. Sharfstein you recognize used to

17  be --

18      A.   The Health Commissioner.

19      Q.   Yes.  He was Health Commissioner of this

20  state --

21      A.   In Baltimore City.