```
 1                 UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MASSACHUSETTS
 2


 3
        ------------------------------X
 4                                     :
        IN RE:  NEW ENGLAND            :
 5      COMPOUNDING PHARMACY, INC.     :
        PRODUCTS LIABILITY LITIGATION: MDL NO. 2419
 6                                     :
        This Documents Relates to:    : Master Docket
 7                                     : 1:13-MD-02419-RWZ
        All Cases against the Box     :
 8      Hill Defendants               :
                                       :
 9      ------------------------------X

10


11                    DEPOSITION OF
                   SHMUEL SHOHAM, M.D.
12


13             THURSDAY, JANUARY 19, 2017
                     10:00 a.m.
14


15         Law Office of Peter G. Angelos
                One Charles Center
16           100 North Charles Street
                  Suite 2200
17            Baltimore, MD  21201

18

19

20

21

22

23

24

25   Before:  Linda Bahur, RPR
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3       LAW OFFICES OF PETER G. ANGELOS, P.C.
         Patricia J. Kasputys, Esquire
 4       100 N. Charles Street
         20th Floor
 5       Baltimore, MD  21201
         (410) 649-2000
 6       pkasputys@lawpga.com
 7
     ON BEHALF OF PLAINTIFF THE ESTATE OF BRENDA ROZEK:
 8
         COHEN PLACITELLA & ROTH, P.C.
 9       Michael Coren, Esquire
         2001 Market Street
10       Suite 2900
         Philadelphia, PA  19103
11       (215) 567-3500
         mcoren@cprlaw.com
12
13   ON BEHALF OF BOX HILL SURGERY CENTER, RITU BHAMBHANI,
     M.D., RITU BHAMBHANI, M.D., LLC:
14
         PESSIN KATZ LAW, P.A.
15       Gregory K. Kirby, Esquire
         Catherine Steiner, Esquire
16       901 Dulaney Valley Road
         Suite 500
17       Towson, MD  21204
         (410) 769-6143
18       gkirby@pklaw.com
19
20
21
22
23
24
25
```

Page 3

```
 1                 I N D E X
 2   Videotaped Deposition of:                    Page
 3   SHMUEL SHOHAM, M.D.
 4       Examination by Mr. Kirby                     4
 5
 6
 7               E X H I B I T S
 8            (Attached to the transcript)
 9   No.                                          Page
10   Exhibit 1612-1  Notice of Deposition            5
11   Exhibit 1612-2  Report of Dr. Shoham            7
12   Exhibit 1612-3  Curriculum vitae, 8/25/16       8
13   Exhibit 1612-4  Trial and Deposition List,     26
                     2011-Present
14
     Exhibit 1612-5  Letter dated 10/20/16 re       29
15                   invoice
16   Exhibit 1612-6  Maryland Board of Pharmacy News 45
                     Newsletter, Fall 2012
17
18                 C I T E D
19   Exhibit 1585-12 New England Compounding Center
                     Customer List since May 21, 2012,
20                   Sorted by State
21   Exhibit 1089    Article, "Spinal and Paraspinal
                     Fungal Infections Associated
22                   with Contaminated
                     Methylprednisolone Injections"
23
     Exhibit 1619-10 Article, "Price of Cost Savings"
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3              SHMUEL SHOHAM, M.D.
 4   having been first duly sworn, was examined and
 5   testified as follows:
 6              EXAMINATION BY MR. KIRBY:
 7       Q    Morning, Dr. Shoham.
 8       A    Morning.
 9       Q    I introduced myself before off the
10   record.  But for the record, I'm Greg Kirby, and this
11   is Catherine Steiner, and we represent Dr. Bhambhani,
12   Dr. Bhambhani's LLC, and Box Hill Surgery Center, LLC.
13            Can you spell your name for the record,
14   state and spell your name for the record?
15       A    The name is Shmuel Shoham.  And it's
16   spelled S-H-M-U-E-L, last name S-H-O-H-A-M.
17       Q    And if I mispronounce it at all, just
18   correct me, okay?  I will do my best.
19            What's your address, your business address?
20       A    1830 East Monument Street, Baltimore,
21   Maryland.
22       Q    Okay.  You're under oath.  You know that,
23   right?  This is my only opportunity to find what your
24   opinions are, so I'm hopeful to get complete answers.
25   To that end, if I ask a question that you don't
```

Page 5

```
 1   understand, can you just ask me to repeat it or
 2   rephrase it?
 3       A    Yes.
 4       Q    And if you answer a question, I'll assume
 5   that you understood the question, that you answered it
 6   as completely as you could.  Is that fair?
 7       A    Yes.
 8       Q    Okay.  The court reporter is typing down
 9   everything that we say, and so she can't record nods
10   of the head or uh-hums, uh-uhs, that kind of stuff.
11   So we just need to make sure we say yes or no.
12            It's normal in conversation that we might
13   end up talking over each other.  I'll do my best not
14   to do that, if you can do that as well.
15       A    Yes.
16       Q    And if you need a break at any point, just
17   let me know and we can take a break.  Okay?
18       A    Yes.
19       Q    The plaintiffs' counsel identified you as
20   an expert on behalf of the plaintiffs.  Is that your
21   understanding as to why you are here?
22       A    Yes.
23            (Exhibit No. 1612-1 was marked for
24   identification.)
25       Q    I want to mark -- I'll show you what's been
```



Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY     DEPOSITION OF
SHMUEL SHOHAM, M.D. on 01/19/2017     Pages 42..45

Page 42

1  going to give opinions about -- you were going to give
2  opinions concerning being a medical doctor, in
3  general, not a pain specialist?
4         MS. KASPUTYS:  Objection.
5     A    That's what we talked about.  But they
6  weren't telling me what to do.  They were saying that
7  that is something that I can do.
8     Q    They said it's something you can do?
9     A    As I recall.  I don't recall the specific
10 words.
11    Q    And did that have to do with standard of
12 care or what did it have to do with?
13    A    Standard of care.
14    Q    So why don't you give me your opinions with
15 regards to that, as a medical doctor, and how it
16 relates to a standard of care in this case.
17    A    So my opinions regarding standard of care
18 in this case are in the report.
19    Q    Okay.  But can you point me to where it is?
20    A    Page 3 is a specific example.
21    Q    What part of page 3?
22    A    Third paragraph.
23    Q    Okay.  So let's look at the first
24 paragraph, the first full paragraph on page 3.  It
25 says, "The manner by which the contaminated steroids

Page 43

1  reached patients did not always conform to the
2  standards of care.  A specific example is the method
3  and manner in which PF MPA from NECC was prescribed,
4  ordered, and administered at Box Hill Surgery Center
5  in Maryland."
6         So what do you mean by that?  Like, be more
7  specific.
8     A    So the way that the products were
9  prescribed, according to the testimony that I've read,
10 were that patients who had previously been seen at the
11 surgical center, their names were provided as a list
12 and vials were ordered using those names.
13        And then those vials would come and those
14 vials were sometimes given to patients who were
15 different than the ones that it was prescribed for.
16 And additionally, the single use vials were at times
17 used more than one time for one patient for one
18 procedure.
19    Q    Okay.  You've never purchased drugs for an
20 ambulatory surgery center before, right?
21    A    Not that I recall.
22    Q    Okay.  And you don't generate, manage, and
23 treat chronic pain patients, correct?
24    A    That is correct.
25    Q    Now, it says in here "under Maryland law

Page 44

1  applicable to prescribing prescription medicines," and
2  then describes, I guess, some other opinions in here.
3  But what Maryland law are you referring to?
4     A    I can give you -- the specific newsletter
5  is number 13 on page 5, Board of Pharmacy Newsletter,
6  Fall 2012.
7     Q    Okay.  Do you have a copy of that?
8         MS. KASPUTYS:  That's in the documents that
9  were produced for you.  Third tab.
10        MR. COREN:  Third tab?
11        MR. KIRBY:  I'm not saying you didn't send
12 it out.  I'm just saying I don't see a copy of it.
13        MS. KASPUTYS:  Greg, I'll give you one to
14 look at.
15        MR. KIRBY:  Okay.
16        MS. KASPUTYS:  If I can get it out of the
17 binder.  There you go.
18        MR. KIRBY:  Thanks.
19        MS. KASPUTYS:  Oh, wait a minute.  Let me
20 give you the rest of the pages.  There you go.
21        MR. KIRBY:  I'd like to mark this as an
22 exhibit.  Can we make a copy?
23        MS. KASPUTYS:  Go ahead.  You can use that.
24 Just take it.  I have a stapler if you need one.
25 BY MR. KIRBY:

Page 45

1     Q    Doctor, have you found the newsletter you
2  were referring to in your binders?
3     A    Yes.  It's on page 7 of the newsletter
4  that's called "Maryland Board of Pharmacy News," Fall
5  2012.
6     Q    I'm sorry, can you say that one more time?
7     A    Maryland Board of Pharmacy News, Fall 2012,
8  page 7.
9     Q    Okay.  So we're going to mark this, it's
10 the same thing you have, as 1612-6, for the record.
11        (Exhibit No. 1612-6 was marked for
12 identification.)
13    Q    As a physician, you don't regularly receive
14 newsletters from the Board of Pharmacy, do you?
15    A    I may.  I'm not sure.
16    Q    Okay.  You don't seek out and review
17 newsletters from the Board of Pharmacy, do you?
18    A    In preparation for this case, I reviewed
19 this material.
20    Q    So I mean, in the normal course of your
21 practice.
22    A    I may receive it.
23    Q    You're talking about you receive Maryland
24 Board of Pharmacy newsletters?
25    A    I may.  I'm not sure.



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY                   DEPOSITION OF
SHMUEL SHOHAM, M.D. on 01/19/2017                                                                  Pages 54..57

Page 54

1   said, so...
2   BY MR. KIRBY:
3        Q     What is it specifically about these
4   prescriptions?  What did Dr. Bhambhani need to put on
5   each prescription -- on each prescription that would
6   have been different for patient A versus patient D?
7        A     I think it depends on the patient.  I can
8   speak to an individual patient with an individual
9   prescription.
10       Q     Is it your understanding that Dr. Bhambhani
11  was using the MPA at issue kind of in an office supply
12  situation?
13       A     Yes.
14       Q     And is it your understanding that it didn't
15  matter to her whether she used vial 1 or vial 12, it
16  was going to be the same for each patient?
17            MR. COREN:  Objection to form.
18       A     I don't know that.
19       Q     Okay.  You don't know one way or the other?
20       A     I don't know that.
21       Q     Is there anything else that you have with
22  regards to your opinion about how Dr. Bhambhani
23  breached the standard of care in ordering the drugs?
24            MS. KASPUTYS:  Objection to form of the
25  question.

Page 55

1        A     Can you repeat your question?
2        Q     I'm just trying to exhaust your opinions.
3   Is there anything else that we haven't talked about
4   with regards to how Dr. Bhambhani ordered the drugs at
5   issue that you say was wrong?
6        A     If we can go to her deposition, or one of
7   the depositions mentioned getting medications from
8   another clinic, I believe.
9        Q     Okay.  Feel free to look at her deposition.
10            So feel free to keep looking if you want.
11  But can you recall anything off the top of your head
12  about what you were referring to?
13       A     What I recall off the top of my head was
14  that there were medications that were obtained by the
15  Box Hill center from another surgical center.
16       Q     Okay.  And tell me what you believe was the
17  problem with that.  What's your criticism?
18       A     That if a medication for a specific person
19  that's prescribed should be coming from the
20  manufacturer or from a pharmacy, not from another
21  center.
22       Q     Do you have an understanding of what
23  Dr. Bhambhani's relationship was with that other
24  ambulatory surgery center you just referred to?
25       A     Not a good understanding.

Page 56

1        Q     Okay.  So you're not sure what
2   relationship -- what type of relationship they had?
3        A     I'm not sure.
4        Q     Would you agree that Dr. Bhambhani was
5   ordering the MPA for general use in her ambulatory
6   surgery center?
7            MR. COREN:  Objection as to form.
8        A     It seems that way, but I'm not sure of that
9   because she was using specific patient names.
10       Q     Typically when we think of prescriptions,
11  we think of a patient getting a piece of paper and
12  taking it to CVS or the doctor sending us, you know, a
13  piece of paper to the pharmacy for the drug so that
14  the patient can pick it up and take it home, right?
15       A     No.
16       Q     Okay.  Well, tell me what -- I mean, isn't
17  that generally what people think of when they think
18  about getting a prescription drug?
19            MR. COREN:  Objection as to form.
20       A     I don't know what people think of.
21       Q     Okay.  Regardless, that's not what we're
22  dealing with here, right?  I mean, the patients in
23  these cases never handled the MPA, right?
24       A     I don't know.
25       Q     Is it your understanding that

Page 57

1   Dr. Bhambhani -- well, tell me how you think she was
2   ordering the drug from NECC.
3        A     Well, what I think that she was doing was
4   sending in lists of patients for whom the drug may or
5   may not be given and ordering the drug for those
6   patients and then using it either for those patients
7   or for other patients.
8        Q     And what's your basis for saying that?
9        A     The deposition of Dr. Bhambhani and of
10  Nurse Vickers and the exhibits of the deposition.
11       Q     Okay.  So it's your understanding that she
12  was ordering drugs -- is it your understanding that
13  she was ordering drugs per the instructions of NECC?
14            MR. COREN:  Objection as to form.  You can
15  answer.
16       A     I believe that it was a combination of the
17  instructions from NECC and the advice that she had
18  received from the nurse she was working with then from
19  the other center that she had worked with.
20       Q     Okay.  And she was ordering, using
21  something that said -- a one sheet of paper that said
22  "Prescription Order Form" at the top.  Are you aware
23  of that?
24       A     Yes.
25       Q     Okay.  And you're saying she was listing



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 102

```
 1   spine -- okay.  So let me step back.
 2           A lot of these patients may have already
 3   had irritation or inflammation around the nerves of
 4   the spine.  That's what brought them to a healthcare
 5   provider to get injections.  Fair enough?
 6           MR. COREN:  Objection to form.
 7       A   I don't agree.
 8       Q   Okay.  What don't you agree with?
 9       A   I don't know the specifics of what brought
10   patients to the spinal -- to the pain specialist?  Is
11   that --
12       Q   Correct.
13       A   Irritation could be one cause, but there
14   could be many reasons why patients end up seeing a
15   pain specialist.
16       Q   Okay.  In an average everyday person who is
17   not suffering from back pain, is there some
18   anticipated number of white cells that they may have
19   in their cerebrospinal fluid if you were to test them?
20       A   Less than 5 cells per cubic milliliter.
21       Q   So that could just be the average person
22   that's not suffering any back problems?
23       A   That is a normal -- the expectation from a
24   noninflamed, noninfected person.
25       Q   You wouldn't be concerned or -- you
```

Page 103

```
 1   wouldn't concerned if you got that lab result, right?
 2   Less than 5 white blood cells?
 3       A   I would not be concerned by that particular
 4   number in general.  There are patients where I would
 5   be very concerned.
 6       Q   Let's assume that a patient does have
 7   inflammation around the spine, or irritation.  They
 8   don't have -- let's assume they don't have meningitis,
 9   okay?  They're just a patient who has inflammation
10   around the spine and they get a tap.  They get a
11   lumbar puncture.  Is there an anticipated level of
12   white blood cells that person could have in their CSF?
13       A   So this is a patient that does not have
14   meningitis?
15       Q   Correct.
16       A   Less than 5 cells.
17       Q   Okay.
18       A   Part of the definition of meningitis is
19   more than 5 cells.
20       Q   I guess what I'm trying to find out is does
21   the fact that somebody who doesn't have meningitis,
22   already has inflammation in the nerves around the
23   spine, and you could have a response from white blood
24   cells to inflammation, right?  Would you expect that
25   there might already be some white blood cells in the
```

Page 104

```
 1   CSF as result of nonmeningitis inflammation around the
 2   spine?
 3       A   If the spinal fluid and the meninges are
 4   inflamed, that is meningitis.  The definition of
 5   meningitis is inflammation of the meninges.
 6       Q   Okay.
 7       A   For whatever cause.
 8       Q   Would an epidural injection itself lead to
 9   a recruitment of white blood cells to the area?
10       A   Potentially.
11       Q   When you say potentially, is there a
12   percentage of patients that you would expect that?
13       A   I don't know.
14       Q   Might you have a recruitment of white cells
15   that's greater than 5 after just a regular epidural
16   injection with no sequelae?
17       A   It's possible.
18       Q   Okay.  As we all sit here today, we're
19   breathing in mold spores, right?
20       A   Potentially.
21       Q   I mean, they're generally all around us?
22       A   Potentially.
23       Q   Almost done.  Famous last words.
24           Can we agree that the contamination of the
25   MPA with exserohilum rostratum, or fungus, was caused
```

Page 105

```
 1   by NECC?  If you don't know, then that's fine, too.
 2       A   Ask the question again.
 3       Q   Can we agree that the fact that the MPA was
 4   contaminated with E. rostratum or some other microbe,
 5   that that was caused by NECC?
 6           MS. KASPUTYS:  Objection to form.
 7       Q   So let me start that over just for
 8   foundation.
 9           If we know that E. rostratum was the cause
10   of many or most, I guess, of the infections in this
11   case, right?
12       A   We know that it caused some of the
13   infections.
14       Q   So can we agree that NECC caused the
15   contamination?
16       A   We know that the contamination was present
17   in the vials that were unopened that were present at
18   NECC.
19       Q   Okay.  That's a good answer.
20           You mentioned earlier, and I had skipped
21   over it, but regards to your opinions, you said that
22   you thought that Dr. Bhambhani breached standards of
23   practice by the use of the vial multiple times, I
24   think.  Do you recall that?
25       A   So use of a single-use vial multiple times
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 106

1  for multiple patients or for multiple procedures in
2  the same patient is not standard of care.
3      Q    Okay.  And are you familiar with any
4  literature that suggests that, I guess, "single-dose
5  dose vials can be used on multiple patients under
6  certain circumstances with certain precautions that
7  are taken"?
8      A    I have seen a reference that is an opinion
9  by some people.
10     Q    Okay.  So you wouldn't disagree that some
11 in medicine accept the practice of using single-dose
12 vials multiple times as long as they follow certain
13 precautions?
14     A    That is an opinion.  That is not what the
15 CDC recommends.  The CDC recommends against it.
16     Q    All right.  If other reasonably prudent
17 practitioners believe that it's okay to do it as long
18 as there are certain precautions taken, isn't that the
19 definition of standard practice?
20         MR. COREN:  Objection as to form.
21         MS. KASPUTYS:  Object to form.
22     Q    Maybe not everyone agrees.  You have one.
23 Someone else has a different opinion.  But that
24 doesn't mean that just because it's different than
25 your opinion that it's wrong, correct?

Page 107

1      A    You said a lot of things there.
2      Q    I did, didn't I?  There's not always one
3  way to satisfy the standard of care, right?  There's
4  sometimes more than one standard practice, right?
5      A    As a general statement?
6      Q    As general statement, right.
7      A    There are different ways to do things.
8      Q    And I want to just hand you what's been
9  previously marked as 1619-10.  It's an article.  At
10 the top, just for the record, that says it's titled
11 "The Price of Cost Savings," Ray M. Baker, in the
12 Clinical Journal of Pain, June of 2008.
13         And did you review in Dr. Bhambhani's
14 deposition her description of the process and how she
15 administers the injection and what precautions she
16 takes?
17     A    Yes.
18     Q    Okay.  So if you look at the second page of
19 this article, page 382, if you look at the right
20 column, the second paragraph up from the bottom, it
21 starts off "If a practitioner chooses."
22     A    Yes.
23     Q    And actually if you look a few lines up
24 from that, it says, "Given the reduced reimbursements
25 for interventional pain procedures."  Do you see?

Page 108

1      A    Yes.
2      Q    "And the push for cost-efficient care, a
3  case can made for safely reusing a single-dose
4  medication."  See that?
5      A    I see that.
6      Q    And then under there, it's a description of
7  -- I'm just going to read it.  You can follow along.
8  It says, "If a practitioner chooses to reuse a
9  single-dose medication, there must be strict
10 safeguards in place that minimize the risk of
11 infection.  These include using the medication for a
12 limited number of patients and for a single day only,
13 cleansing the stopper thoroughly between uses with
14 isopropyl alcohol or another suitable antimicrobial.
15 Refrigeration of vial between cases if there is a time
16 gap between consecutive cases and discarding the vial
17 if any breach or sterility is suspected."
18         And then it goes on to say, of course, you
19 only, you know, use a needle, one needle per patient,
20 et cetera.
21         If that is the process by which Dr.
22 Bhambhani administers the drug and "reuses the
23 single-dose vial," she follows those precautions,
24 would you agree that according to this article, she's
25 complying with an accepted standard of practice?

Page 109

1          MR. STEINER:  Objection as to form.  You
2  can answer.
3      A    According to the CDC, in which I place more
4  credence than this opinion, a single vial, a
5  single-dose vial should not be reused.  And I don't
6  know why this clinician opined as he did.  But even in
7  2012, I would not say that this was a reasonable
8  opinion based on the history of multiple outbreaks
9  related with reusing of single-dose vials.
10     Q    Do you know Dr. Baker?
11     A    No.
12     Q    Are you familiar with this journal?
13     A    I've heard of it.
14     Q    Do you have an opinion, one way or the
15 other, whether this journal is a reasonably reliable
16 journal?
17         MR. COREN:  Objection as to form.
18     A    I don't.
19     Q    And so you would disregard the expressions
20 made here this literature?
21     A    I do not think that the statement of given
22 the reduced reimbursements for interventional pain
23 procedures and the push for cost-efficient care, a
24 case can be made for safely reusing a single-dose
25 medication, and that this is something that could be



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com