In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

---

# DEPOSITION OF

# LLOYD R. SABERSKI, M.D.

*January 12, 2017*

---



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

1          IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4   IN RE NEW ENGLAND COMPOUNDING       | MDL NO. 02419

5   PHARMACY, INC. PRODUCTS LIABILITY | DOCKET NO.

6   LITIGATION                          | 1:13-MD-2419-RWZ

7   THIS DOCUMENT RELATES TO:

8   All Actions

9

10          Deposition of LLOYD R. SABERSKI, M.D.

11               Baltimore, Maryland

12            Thursday, January 12, 2017

13                  10:00 a.m.

14

15

16

17

18

19

20   Reported by:  Angela McKinney, Court Reporter

21

22



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          Deposition of LLOYD R. SABERSKI, M.D., held at

 2    the offices of:

 3

 4

 5          LAW OFFICES OF PETER G. ANGELOS

 6          One Charles Center

 7          100 North Charles Street

 8          Baltimore, Maryland 21201

 9          (410) 649-2000

10

11

12

13       Pursuant to agreement, before Angela McKinney,

14    Professional Court Reporter and Notary Public of the

15    state of Maryland.

16

17

18

19

20

21

22
```



1   dispute that?

2            MR. COREN:  Objection to form.

3        A   Well, that's their customer list.  It's not

4   apropos to this case.  NECC had many customers.  The

5   issues here are steroids.  I think there's only 76

6   providers that got compounded steroids.

7   BY MR. KIRBY:

8        Q   Well, as a matter of fact, it wasn't just

9   MPA that was recalled by the government, right, NECC's

10  MPA?  It was other drugs that NECC produced, right?

11       A   Correct.

12       Q   And part of your opinions involve the

13  standard of care of purchasing medications from a

14  compounding pharmacy, right?

15       A   That is correct.

16       Q   And you have to utilize a particular amount

17  of due diligence or order in a particular way, right?

18       A   Yes.

19       Q   So that's not just for the purchase of MPA?

20       A   That's using a compounding pharmacy.

21       Q   You practice in Connecticut.  Other than

22  those states that you listed that you do expert work



1    A    Yes.  I wrote it down this morning just so

2  that I'd get it right.  The Federal Food, Drug and

3  Cosmetic Act of 1938.

4    Q    Anything else?

5    A    Well, over the years that law evolved and

6  had a number of different codifiers.  It was adjusted

7  over the years, but that was the principal law that was

8  put into place.

9    Q    When did you look up the Federal Food, Drug

10  and Cosmetic Act of 1938?

11    A    A couple years ago.

12    Q    Do you know specifically what you would say

13  they violated with regards to that Federal Food, Drug

14  and Cosmetic Act?

15    A    Almost everything involving compliance.

16    Q    Can we agree that NECC's conduct in these

17  cases caused injury to the patients?

18    A    Well, I think their conduct in conjunction

19  with the misconduct of the physicians caused injury to

20  patients.

21    Q    Fair enough.  At least in part we can

22  agree --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    after being alerted to this, and the risks are just the

2    same with any compounding pharmacy.

3           Q   I know that in medicine a lot of times

4    doctors want to be certain about things and they want

5    to be as concrete as they can.  With regards to your

6    expert testimony, it's just more likely than not is the

7    standard in terms of your opinion.  Are you able to say

8    more likely than not or would you say more likely than

9    not that the patients that we're dealing with here,

10   these eight, would have received contaminated steroids

11   if NECC had been stopped from selling before May 2012?

12          MR. COREN:  Objection to form.

13          A   I think there's another way to clarify it.

14   There are absolutes here.  I mean there is always the

15   possibility that getting your compounded substance from

16   a compounding pharmacy, there are higher risks than

17   getting it from a manufacturer.  But the probability

18   here is if you stopped NECC from delivering its

19   product, you would reduce the risk.

20   BY MR. KIRBY:

21          Q   Right.  But reducing the risk -- and we'll

22   get to that in a little bit.  You are not saying more



1   likely than not they still would have received

2   contaminated product?

3          A    The risk is always higher with compounded

4   steroids.   Always.   If you are getting a compounded

5   steroid from a compounding pharmacy, the risk of

6   infection or adverse event is much higher and therefore

7   you should never do that because, first of all, there

8   is no benefit whatsoever that I can think of that you

9   can get from a compounding pharmacy.   All you get is

10  risk.   So there is never, ever a reason to order a

11  product from a compounding pharmacist or a compounded

12  product from a compounding pharmacist.

13         Q    I understand you keep saying there is

14  increased risk, and we'll talk about that later.   But

15  to answer my question, are you going to say more likely

16  than not these patients still would have gotten

17  contaminated steroids if NECC had been stopped from

18  selling the MPA at issue prior to May 2012?

19              MR. COREN:   Objection to form.

20         A    They certainly wouldn't have got NECC's

21  contaminated steroids.   They would have probably, based

22  on Dr. Bhambhani's testimony, they would have gotten a



1   compounded steroid from another compounding pharmacy of

2   which all compounded steroids from compounding

3   pharmacies have a higher risk of adverse event than a

4   manufacturer.

5         Q   So I'm not -- I don't know if we're on the

6   same page here.  All I'm asking is would they have

7   still received contaminated steroids more likely than

8   that?  I understand you are talking about risk, but are

9   you here to say that even if NECC had been stopped from

10  selling MPA before May 2012 that they still would have

11  gotten contaminated steroids and had the same injury?

12        A   No, they wouldn't have had the same injury,

13  but I just made the point that if you look at the

14  history between 2000 and 2012, there are whole lot of

15  issues with compounding pharmacies.  Not just NECC.  So

16  compounding pharmacies in general have had a lot of

17  problems delivering end product.  So to answer your

18  question here, and I'm not trying to be evasive -- I

19  mean, look, if they didn't get the NECC product, they

20  probably wouldn't have gotten the fungal infection.

21  But if she continued with a compounding pharmacy, there

22  is a higher risk of having an adverse problem.  It's



1  not going to be the problem they had with NECC.

2          Q    I'm just talking about these patients.

3          A    Well, yeah, it's a small -- it's an

4  increased risk using a compounding pharmacist.

5          Q    Other than what you gave me that was in your

6  folder, you showed me what's in your folder, and what's

7  listed in your report, have you reviewed anything else?

8  And maybe the Federal Food, Drug and Cosmetic Act of

9  1973, but anything other than that?

10         A    Yeah, I've shared everything.

11              MR. KIRBY:   Let's take a quick break.

12              (Recess)

13  BY MR. KIRBY:

14         Q    Doctor, we were talking earlier about your

15  expert work.  Would you consider this a medical

16  malpractice case or some other type of case?

17         A    Malpractice.

18         Q    Sterile injected corticosteroids that are

19  used for epidural injections are not something that

20  patients could administer themselves, right?

21         A    No.

22         Q    You'd consider it requires a skilled



1   this case.  And I trust that you are here to opine that

2   Dr. Bhambhani breached standards of care, correct?

3          A    Yes.

4          Q    So why don't you give me that list and then

5   we can get into more detail and go through each one

6   separately.

7          A    If you turn to page four of my written

8   opinion, I think that outlines it fairly concisely, 1

9   through 9.

10         Q    Okay.  Failing to exercise reasonable

11  care -- I'm just going to read it.  Failing to exercise

12  reasonable and prudent care to ensure that the steroid

13  preparations used for injections were sterile, free of

14  contaminants and compounded in accordance with all

15  applicable industry standards, correct?  Did I read

16  that right?

17         A    Yes.

18         Q    So explain that to me.  What do you mean by

19  that and what are the bases for your opinions in that

20  regard?

21         A    The only way this can -- the best way to

22  ensure the safety of the medications you use for



1    injection on your patients is to get an FDA-approved

2    product from a manufacturer.  She did not.

3          Q    And why do you say that?

4          A    Because she did not.

5          Q    What's the basis for saying that the only

6    way you can get a safe product is by going to an FDA

7    manufacturer?

8          A    Well, we have data.  It turns out that if

9    you look at the history of infections pertaining to --

10   any sort of a number of infections pertaining to

11   steroids, I think over the past 50 years there is quite

12   a number of infections that have occurred.  I think 100

13   percent of those infections have been from compounded

14   pharmacies and zero from manufacturers.  There has not

15   been a single manufacturer in the United States who has

16   ever had an infection related to steroids.

17         Q    Do you have any literature or anything to

18   back that up, to support that?

19         A    It's well published.

20         Q    What I mean is can you cite to me any

21   articles or anything that I could find?

22         A    No, but it is well published.  You will find



1   that there is not a single infection from manufactured

2   steroids causing epidural infections.  In fact, in the

3   last tally of the last 12 years, let's say the 12 years

4   before 2012, I think there are 12 cases of infection

5   that have been recorded and there is zero from the

6   manufacturers.  So very compelling overwhelming

7   numbers.

8          Q    Would you agree that a fungal infection in

9   general is a very rare occurrence?

10         A    Yes.

11         Q    When you say -- well, number one, you don't

12  expect or you wouldn't expect a health care provider to

13  actually test the drugs that they get, would you?

14         A    No.  But I would expect them to do what's

15  customary and expected when they use a parenteral

16  injection to make sure they are using a product that

17  has a higher probability of being safe.

18         Q    So like what?

19         A    A manufactured product from an FDA approved

20  manufacturer.

21         Q    Okay.  So there is nothing that they could

22  do -- are you just saying you can't purchase from a



1   compounding pharmacist?

2        A    You can only purchase from a compounding

3   pharmacist if there is actually a need for the

4   compound.  So if the person has a special need -- as

5   you pointed out, they had red hair or they are obese

6   and they have some special need that an FDA product

7   does not provide, sure, they can use a compounding

8   pharmacist as long as they communicate with the

9   compounding pharmacist in an appropriate standard which

10  is a prescription that lays out all the things that are

11  special about your patient.

12       Q    So I've lost you.  How would that situation

13  ensure that they were getting a safe product from that

14  compounder?

15       A    You would only use the compounder on an

16  occasional basis when the need arises.  Compounding

17  agencies are not designed to be a substitute for

18  manufacturers.  They are only available to provide for

19  those patients, and it's been estimated between 1 and 3

20  percent of the patients that need special compounding.

21  Compounders are not available to provide stock.  If you

22  use a compounder for stock, you are going to run into



1   problems because the probability of having a problem

2   with their processes is much higher and a greater risk

3   than that of a manufacturer.

4          Q   So what if a physician typically used a

5   particular drug, and let's just say they typically do

6   the same procedure over and over -- and I'm not

7   relating it to this case -- but that drug wasn't

8   available from an FDA-registered manufacturer.

9   Wouldn't they be using that compounder over and over

10  and over again?  It wouldn't be very rarely?

11         A   They would have to write a prescription for

12  that patient specific with that patient's need to get

13  that compounded product to be in accordance to the law.

14         Q   But we can agree that that wouldn't make

15  that drug that they got from the compounder any safer,

16  would it?

17         A   No, but it would decrease the risk to other

18  patients.  You would only get it when necessary.

19         Q   So what if a physician continually used a

20  compounder, and let's say they did it for every patient

21  that had a specific need and they sent in a

22  patient-specific individualized prescription all the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    time, that's what they did, and got their drugs from a

2    compounder.  That wouldn't change the safety issue,

3    would it?

4          A    No.  In fact, the safety issue would be

5    exactly the same.  Compounding pharmacies are at higher

6    risk of having infection than manufacturers.  So that

7    is a given.  The literature is rock solid on that.

8    There is absolutely no benefit in going with a

9    manufacturer for your general patients -- excuse me, no

10   benefit in going with a compounder for general

11   patients.  All you add is risk, the risk of infection.

12   Obviously a manufacturer does not have those risks.

13   Certainly the risk is there, but the probability of

14   having a problem with a manufacturer is far less than

15   with a compounder.

16         Q    You have cited 12 cases I think you said in

17   which compounders have had infection events, correct?

18         A    Correct.

19         Q    Out of how many?  Out of how many units?

20   That's 12 out of how many?  What percentage of drugs

21   would that be?

22              MR. MILLER:  If you know.



1      A    It would be a much higher risk than using a

2   manufacturer.

3      Q    I get that, but that's not very helpful.

4      A    It's very helpful because when it comes to

5   decision making, it's not an issue of numbers.  It's an

6   issue of putting your patient at risk.  Every decision

7   a doctor makes is putting the patient at less risk.

8   Even if the difference was rather small, you are always

9   going to choose that which provides the patient less

10  risk.

11            Here's a case where compounders provide zero

12  benefit.  There is not a single shred of evidence

13  anywhere ever published that shows that compounding

14  provides any benefit, but there is an awful lot of data

15  out there that shows that it provides risk.

16      Q    But you can't give us the percentage?

17      A    Nobody can give you the numbers because

18  nobody has really collected the numbers.

19      Q    Is it less than 1 percent?  When you say an

20  increased risk, I don't know if you are talking 50

21  percent risk or 25 percent risk or what.

22            MR. COREN:  Objection to form.



1  use, you consider the risk to the patient and I guess

2  the percentage risk.  But when you are considering the

3  risk -- hold on.  Let me finish.  If it's a difference

4  of .02 percent risk versus .3 percent risk or

5  something, it's an increased -- it might be an

6  increased risk, but it's insignificant, isn't it?

7  Don't you have to consider that?

8          A    No.  You are making a mistake here.  Before

9  you consider the risk benefit profile or the risk

10 profile, you have to see is there benefit.

11         Q    So you have to know the numbers, don't you?

12         A    Before you get there, you have to decide if

13 I'm going to use this product, is there a benefit.

14 Once you have established that there is a benefit, then

15 you can start conjugating on the numbers.  But here in

16 this case, there is no benefit.  There has never been a

17 benefit.  There is no reason to use this product.  So

18 nobody who is rationally thinking of this can find an

19 arguable reason to offer the product.

20         Now, if there is a reason for doing it,

21 let's say the patient has some weird allergy or some

22 weird intolerance or something weird and they go to the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    compounding pharmacist, they can make something up

2    that's appropriate for that patient.  At that point, we

3    can talk about the appropriateness of the risk.  But

4    you can never manufacture products at a compounding

5    pharmacy.  If you start manufacturing it -- first of

6    all, it's against the law.  They can't do that.

7         Q    So you are saying that there is absolutely

8    no benefit to compounding pharmacies; it's just an

9    increased risk?

10        A    For injectable deposit steroids, yes.

11        Q    And you read Dr. Bhambhani's deposition,

12   right?

13        A    I have.

14        Q    Okay.  And you read that she believed there

15   was a benefit in this case to using the drugs from

16   NECC, right?

17        A    Not only was she wrong, she was wrong by

18   more than a decade.

19        Q    Well, let me step back.  You saw her

20   discussion, I hope, about using her experience using

21   triamcinolone and betamethasone.  Do you recall that?

22        A    Oh, I do, very much so.  She is confused



1   because the problem she associated with triamcinolone

2   and betamethasone have nothing to do with

3   preservatives; had everything to do with the

4   mineralocorticoid and glucocorticoid activities of the

5   drugs they inject.  It had nothing to do with

6   preservatives, so her argument made no sense

7   scientifically.

8           Yes, she had a concern.  She had some

9   problems with betamethasone and triamcinolone.  She was

10  open to using a different product.  It was mentioned to

11  her by one of her colleagues.  She went ahead and

12  ordered it.  No due diligence.

13      Q   And in her mind, there was a benefit and a

14  different therapeutic effect by using NECC's drugs

15  compared to betamethasone and triamcinolone, right?

16      A   Well, I don't recall that.  But even if

17  there was, it's not substantiated in the literature.

18  All three products, Depo-Medrol, triamcinolone and

19  betamethasone, the outcomes are thought to be

20  clinically the same.

21      Q   Would you agree that there was some

22  contingent of respected pain physicians who believed



```
 1   wanted it out.  It doesn't make any sense.

 2        Q    How is the benzyl alcohol protecting the

 3   patient?

 4        A    Well, it makes sure if you are using a

 5   multidose vial that you do not introduce -- if you

 6   introduce bugs, they are less likely to grow and

 7   proliferate.

 8        Q    So that's right.  So that's not for purposes

 9   of -- that would do nothing with -- it's not for

10   contamination that's introduced in the manufacturing

11   process, right?

12        A    No.  When the manufacturing process is so

13   far afield from being proper, the amount of

14   bacteriostasis that you have probably wouldn't

15   overwhelm it.

16        Q    So what is the added benefit of the benzyl

17   alcohol in this case?

18        A    Well, benzyl alcohol has to be placed in

19   multidose vials.  There is no such thing as a multidose

20   vial without benzyl alcohol.  It's a deviation from

21   acceptable medical practice to have a bottle with 5

22   milliliters of fluid and to stick a needle into it five
```



1   separate times to extract fluid five separate times to

2   distribute to five patients.  That is an egregious

3   deviation from how we practice aseptic technique.

4           Now, if you want to do that technique, you

5   know, use a multidose vial, the product has to have

6   benzyl alcohol or some equivalent of benzyl alcohol in

7   there to cause bacteriostasis.

8           So in this case we have methylparaben --

9   methylprednisolone that's benzyl alcohol-free in

10  multidose vials without benzyl alcohol.  And the

11  problem here is that by entering the needle multiple

12  times, she is actually -- by using that same bottle for

13  multiple different patients, she is actually

14  potentially introducing that infection to multiple

15  patients.

16      Q   You are not suggesting that that was the

17  case here, are you?

18      A   Yes.

19      Q   So then what's your opinion in that regard?

20      A   Well, there is a high probability that, I

21  can't say for sure, but on August 21, two patients who

22  are involved in this case here got injections on the



1    same day.  And we know from Dr. Bhambhani's testimony

2    that she uses the bottle over and over again until it's

3    empty.  And at the end of the day, if there is any left

4    over, they throw those bottles out.  So there is a

5    reasonable degree of possibility that Torbeck and Rozek

6    on August 31 got injections from the same bottle.

7         Now, the issue here is if she was using

8    single dose -- if she wanted to have something that had

9    less benzyl alcohol, there are single-dose vials.  And

10   if she used a single-dose vial, she would not have had

11   this situation of introducing potentially infection

12   from one bottle to multiple people.

13        Q    So tell me exactly your understanding of

14   Dr. Bhambhani's technique when she is doing epidural

15   steroid injections, and in this case with regards to

16   multiple patients.

17        A    Well, the issue pertains to the steroids.

18   She has 5 milliliter bottles of methylprednisolone

19   benzyl alcohol-free.  There is no such -- that is an

20   oxymoron.  There is no such thing as a multidose benzyl

21   alcohol-free bottle.  So what she did is she used -- I

22   should take that back.  I suppose if she used all 5



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    cc's for one patient, that could be a potential

2    legitimate use, but there is no possibility --

3    generally in clinical practice, we don't use that much

4    for one patient.  She said in her deposition she will

5    enter those bottles three to five times to withdraw

6    medication for her patients.

7            Q    With different syringes each time?

8            A    Irrelevant.  Irrelevant.

9            Q    Are you aware of any literature that allows

10   for the safe use of a multidose vial in a way that

11   Dr. Bhambhani did?

12           A    It's not supposed to be done that way.

13           Q    Says you?

14           A    Aseptic technique.  Let me be very clear

15   here.  The only thing that made it a multidose vial is

16   it had a stopper.  The preparation was not the

17   appropriate preparation for a multidose vial.  Aseptic

18   technique:  When you are using this product that was

19   not designed as a product to have repetitive needles

20   inserted, it can only be used once.

21           Q    So if there is literature out there that

22   supports the technique in the way that Dr. Bhambhani



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                                    Page 111

1   acted in this case with regards to using that vial

2   multiple times, you would disagree with that?

3           A   Well, I don't believe there is any

4   literature.  I have specifically looked at that and

5   basically what the literature says in circumstances

6   where you are stuck in the situation, you have to take

7   an extra amount of time to safely prepare the

8   materials.  So the point is you are not supposed to be

9   in this situation.  I mean, if the situation develops,

10  then there are steps that you can take to ameliorate or

11  minimize your risk, but obviously you never want to be

12  introducing a needle into a vial multiple times that

13  has no way of protecting the solution.  Obviously the

14  concern here is if they are using a contaminated

15  bottle, that contamination could be spread to multiple

16  people.

17          Q   So it's your position that no other

18  reasonably prudent physician would act in the way that

19  Dr. Bhambhani did with regards to using the multidose

20  vial that way?

21          A   Yes.

22          Q   And if it was in literature, then that would



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   be completely incorrect?

2             MR. MILLER:  Objection.  Asked and answered.

3        A   Well, it's not in the literature.  As I

4   said, there is a caveat here that you can prepare it in

5   special circumstances.  But when you have a multidose

6   vial, it has to have some kind of bacteriostatic

7   substance in there to protect the patient.

8   BY MR. KIRBY:

9        Q   I know you said a second ago that you think

10  it's possible that Dr. Bhambhani introduced the

11  contamination.  You are not saying that she introduced

12  fungal contamination into the vial, are you?

13       A   No, but I'm saying that she vectored it from

14  the vial to two different patients.  And if the vial

15  was thrown out after use -- when you have a vial that

16  does not have preservative in it, after you use it you

17  are supposed to throw it out.  But she didn't do that.

18  She used it for the next patient.  My whole point here

19  is these vials were contaminated sort of like a Russian

20  roulette; some were badly contaminated and others

21  weren't.  So she happened to have had a bad vial.

22  Unfortunately, because of her practices, she was able



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    to spread that bad vial with all its badness to other

2    people, and potentially five people if she used it five

3    times.  If she stuck to the standard of care, she would

4    have thrown that vial out and there would not have been

5    four other opportunities for people to get that bad

6    drug.

7          Q   So how can you say -- do you have any

8    evidence to show me that if she had thrown the bottle

9    out then the next bottle she used that's part of that

10   recalled lot wouldn't also have contaminated steroid?

11         A   Well, you're right, I don't have that, but

12   we know that not every single bottle was contaminated.

13   It was Russian roulette.  And there is a reason for

14   that.  Because in compounding, which differs from

15   manufacturing, the steps are done by hand.  Whenever

16   you do things by hand, there is more of a chance of

17   having error.  That's why compounding has a higher risk

18   of having problems like infection.  So in all

19   likelihood, some of the vials got compounded in a way

20   that was much more deleterious than others.

21         Q   You can't say, though, that if let's say two

22   vials were used on August 31, for example, that the



1  that diminished over time.  And as I said, the

2  literature strongly supported no risk by the late '90s.

3          Q    And based on her testimony, she had a

4  good-faith belief that using the MPA from NECC was

5  reducing the risk to her patients; do you remember

6  seeing that?

7              MR. COREN:  Objection to form.

8          A    And obviously she was wrong and naive

9  because the very product she was using increased the

10  risk.  How could she possibly think that a multidose

11  vial with no preservative was safer?  I mean, that's

12  inconsistent with everything we teach with aseptic

13  technique.

14  BY MR. KIRBY:

15          Q    Other than the eight years that she used it

16  with no incident?

17          A    Hey, there is a standard of practice here.

18  Just because she got away with it doesn't mean she was

19  okay.  It's always wrong and you are not going to get a

20  physician in here to say that that was appropriate.

21          Q    Well, she wouldn't have been the only one

22  who, quote, got away with it, would you?



1  steroids, manufactured steroids, cause a problem.

2  Zero.  That was a discussion at one time, but that is

3  no longer the case.

4        Q    But that's as of the late '90s, it's

5  debunked?

6        A    Yes.

7        Q    So you wouldn't believe that -- that wasn't

8  common in a portion of your field within pain medicine

9  in 2012?

10        A    Definitely not.  If somebody was talking

11  about it and had some opinion about it, it was

12  certainly in the minority because there is a vast

13  copious reservoir of literature that says they are

14  wrong.  In fact, almost every society that involves

15  themselves with epidural injections like ASIPP that you

16  mentioned has no documentation that there is a risk

17  with these injections in the epidural space with

18  manufactured product.

19        Q    So let's just be clear because initially I

20  think you said it's absolutely debunked or absolutely

21  no one would think that or absolutely if anyone did,

22  they'd all be wrong and then you just said there might



1   be a minority of people.  So can we agree that there

2   may be some, whether it's a minority or 50 percent or

3   what, but there would be some people that have that

4   belief?

5          A    Let me clarify.  Anybody who thinks that

6   there is some benefit in preservative-free, that would

7   be inconsistent with the published literature and they

8   would be operating on the basis of speculation and

9   opinion that is not held by science.

10         Q    So if someone didn't like triamcinolone for

11  some reason or another, would you say that they don't

12  know what they're talking about?

13         A    No.

14         Q    Doctors are entitled to their opinions.

15  They all have training and things like that, right?  So

16  some doctors do believe differently than other doctors,

17  right?

18         A    Okay.

19         Q    Do you not agree with that?

20         A    No, that's fine.  I said okay.  But

21  triamcinolone is a manufactured product.  If they want

22  to use betamethasone, that's a manufactured product.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  opinions wouldn't change from then until now, right?

2      A    Probably not.  I don't know what I said.

3      Q    Well, if the issue was debunked and was a

4  non-issue in the late '90s, why would anyone need to

5  come out in 2015 as a consensus and say it's not a

6  problem?

7      A    I can answer that question.  Because

8  physicians all around the country, like Dr. Bhambhani,

9  were misguided and felt like, oh, I need to use

10 preservative-free.  That's why they came out.  There

11 were other physicians besides Dr. Bhambhani that were

12 misguided.

13     Q    So anyone that used preservative-free drugs

14 because of a concern for arachnoiditis or some other

15 irritation, they would be misguided?

16     A    That's correct.  From clinical a

17 perspective, absolutely.

18     Q    But, in fact, there are certain

19 circumstances where you still can use preservative-free

20 drugs, right?

21     A    Well, the doctor would have to write a

22 prescription specific to that patient, laying out the

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  foundation and why he was doing it and then he would

2  have to go ahead and get it.

3          Here is one of the interesting ironies of

4  this case:  Those drugs that were benzyl alcohol-free

5  were available from manufacturers.  Upjohn made a

6  product and so did Alcon.  So the whole point here is

7  Dr. Bhambhani was of the impression that having no

8  benzyl alcohol was better for her patients, yet there

9  were manufactured versions of injectable steroids that

10  were benzyl alcohol-free.  But she chose to go to a

11  compounding pharmacist that couldn't possibly be

12  anywhere near the equivalent standard of a legitimate

13  manufacturer.  Besides, it was against the law for her

14  to do that anyway.

15          Q    She and other health care providers in 23

16  states, right, just to be clear?

17          A    Being ignorant of your responsibility as a

18  physician and deviating from the standard of care, no

19  matter how many you put on board, is still a deviation

20  of the standard of care.  These guys deviated from the

21  standard of care.

22          Q    Anyone who did that is unreasonable,



1    correct?  Is that your position?

2          A    No.  I just laid out there is no basis for

3    using it.  The number one basis for using a compounding

4    pharmacist is you have to have a reason.  You have no

5    reason.  But on top of that, even if you thought you

6    had a reason, manufacturers made a product without

7    benzyl alcohol so there was no reason to ever consider

8    to go to a compounding pharmacist.

9          Q    No reasonably prudent physician would go to

10   a compounding pharmacist for preservative-free MPA?

11         A    Not at that time because there were products

12   available in the United States manufactured to an

13   appropriate standard that could be used.

14         Q    But yet physicians in hospitals in 23 states

15   did so, correct?

16         A    You know, it's interesting.  If you go to a

17   flee market and you see some people getting some

18   rip-off Rolex watches, lots of people are going over

19   there and getting Rolex watches and they are happy with

20   the Rolex watches and think they are great.  They might

21   be happy with the Rolex watches, but the probability of

22   that Rolex that you are getting from the flee market



1   for 20 bucks is probably not going to be the same

2   quality as getting a Rolex from a certified jeweler.

3         Q    Dr. Bhambhani wasn't trying to buy a ripped

4   off Rolex watch, was she?

5         A    No, but Dr. Bhambhani was misguided and so

6   were a number of other physicians that you are claiming

7   here that did the same thing.  It doesn't make a

8   difference that there were a lot of them that did it.

9   They were all misguided.  They all made the mistake.

10  Their decisions are not supported in science and there

11  is no one in here who can come in here and say there is

12  a scientific basis for that.  In fact, David Main, who

13  wrote an opinion on this case, didn't even touch that.

14  That's the hot third rail.  He wrote in his note,

15  Dr. Bhambhani, she wished to use preservative-free.  He

16  did not even attempt to address the issue that, one,

17  there was no basis for it and, number two, it's against

18  the law.

19        Q    Well, she provided the basis for why she

20  used it, didn't she, in her deposition?

21        A    It's irrelevant what her opinion is because

22  it's not consistent with the practice of medicine and



```
 1   what we know as doctors.

 2        Q    So Dr. Bhambhani, who also has a medical

 3   degree, she's well trained, she's been doing epidural

 4   steroid injections for however many years, but yet her

 5   opinion in terms of the care of her patients doesn't

 6   matter?

 7        A    Well, in this one particular niche, she is

 8   inadequately trained.  Period.

 9        Q    It's not against the law to use

10   preservative-free drugs, right?

11        A    Yes, it is, in terms of the laws that

12   regulate -- in this particular case, yes, because as a

13   physician you are not allowed to use a compounded

14   product if there is a commercially manufactured product

15   available.  So that is a deviation from acceptable

16   medical practice to use a compounder if you actually

17   have a product that's available.

18             Number two, you are never supposed to use a

19   compounder as a manufacturer.  You are only supposed to

20   use a compounder when you have a specific reason to use

21   it.  So if you had a single patient who had special

22   needs, by all means use the compounder, but you cannot
```



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
LLOYD R. SABERSKI, M.D. on 01/12/2017

DEPOSITION OF
Page 137

```
1    use a compounder to make all your methylprednisolone

2    that you'll need that coming month.

3         Q   You said that there were other products

4    available.  I know that you touched on it a little

5    earlier, but I want to make sure I have them all down.

6    What are all that you said?  Upjohn had a product?

7         A   Yes, Upjohn has a product.

8         Q   Is that now Pfizer?

9         A   It's Upjohn Pfizer.

10        Q   So that's the Depo-Medrol?

11        A   Yes.  They are single-dose vials of

12   Depo-Medrol and do not have benzyl alcohol.

13        Q   You are saying there were no shortages of

14   Depo-Medrol at that time?

15        A   There were no shortages of -- there were

16   shortages from time to time, but never at any time was

17   there shortages of all the medication.  So there was

18   always one.  No one has ever determined that one is

19   better than the other.  So if there wasn't enough

20   Depo-Medrol, you could you triamcinolone, and if there

21   was not enough triamcinolone, you could use

22   betamethasone, all from certified manufacturers.
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          Q    Right.  So what you are saying is then the

2     physicians don't have the choice?  If they don't like

3     triamcinolone or betamethasone and don't want to use it

4     and there is a drug shortage, they have to use those

5     other products anyway?

6          A    Well, yeah.  If the product they need for

7     their patient is not available for whatever reason,

8     then they can write an appropriate prescription to have

9     for that patient a product made.

10         Q    Anything else other than the Depo-Medrol

11    from Pfizer?

12         A    Well, there's Triesence, T-R-I-E-S-E-N-C-E.

13         Q    Who makes that?

14         A    Alcon.

15         Q    And that is preservative-free?

16         A    Yes.  That's triamcinolone.

17         Q    What other MPA was there available?

18         A    This is triamcinolone, depo steroids.

19         Q    When you said there was other product

20    available, what I'm talking about --

21         A    For benzyl alcohol-free products, you had

22    the triamcinolone product and you had the Pfizer



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                                      Page 139

1    product.

2         Q    Is there any other MPA version of the

3    product?

4         A    That's the only one, the Pfizer Upjohn.

5         Q    And as you sit here today, you can't say

6    whether there was a shortage or not at that time?

7         A    I don't believe there was.

8         Q    What evidence do you have that there wasn't

9    a shortage?

10        A    I can't present any evidence, but I don't

11   believe there was at that time.

12        Q    And what's the basis for that?

13        A    I think the only shortage was back in 2007,

14   but I would have to go research that.  My point was not

15   at any given time were all three of the major depo

16   steroids not available.

17        Q    I want to show you a couple of things.  Do

18   you agree that NECC held themselves out to the

19   community and its customers as being a reliable

20   organization?

21             MR. COREN:  Objection as to the form.

22        A    I can only talk about my personal experience



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A    No.

2        Q    But you would agree that the conclusion

3   drawn was that Brigham and Women's was -- hold on.  Let

4   me find it.  That they were approved for sterile

5   compounding preparations for Brigham and Women's

6   Hospital?

7            MR. COREN:  Objection to form.

8        A    I would have to look at the actual sentence,

9   but I do know that Brigham and Women's did continue to

10  do business with NECC.

11  BY MR. KIRBY:

12       Q    So you are kind of drawing the conclusion?

13       A    Yes.

14       Q    For the record, that's Exhibit 302.

15            When we talked earlier, you don't think that

16  Dr. Bhambhani needed -- or anybody for that matter had

17  to go and inspect NECC themselves, right?

18            MR. COREN:  Objection as to form.

19  BY MR. KIRBY:

20       Q    Before using them?

21       A    No.

22       Q    Let me cut to the chase.  Is there any



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   amount of due diligence that Dr. Bhambhani or other

2   health care providers could have done in your mind to

3   make NECC a supplier of preservative-free MPA?

4           MR. COREN:  Objection to form.

5       A   Yes.  The first order of business is they

6   have to establish whether there is a need for having

7   it.  So if she would have done due diligence, she would

8   have found there was no need and therefore would have

9   quickly saved her patients' complications by never

10  using NECC.  So that's -- and we know she did no due

11  diligence because she admitted it in her deposition.

12  BY MR. KIRBY:

13      Q   But you can't say if she had done due

14  diligence whether she would have found there was a drug

15  shortage or not?

16          MR. COREN:  Objection to the form.

17      A   She would have found that to need a

18  compounding pharmacy, you have to have a special need

19  that's specific enough to write a prescription

20  specific.

21  BY MR. KIRBY:

22      Q   You said I think before that if there was a



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    need, meaning there wasn't a commercially -- well, two

2    things:  That if there wasn't a commercially available

3    product of methylprednisolone acetate

4    preservative-free, then she could get it from a

5    compounding pharmacy, right?

6          A    No.  There were other products that were

7    equally as good that would substitute.  Nobody has ever

8    demonstrated any improvement of Depo-Medrol or

9    methylprednisolone over the triamcinolone and

10   betamethasone.  And as I mentioned earlier, there is

11   data accruing now that Depo-Medrol may have more of a

12   hazard in terms of a gluten issue and emboli.

13         Q    And that's your opinion?

14         A    No.  That's been published.

15         Q    But you are not foreclosing that other

16   reasonably prudent and trained physicians might have a

17   different opinion?

18         A    About what?

19         Q    That methylprednisolone acetate is better or

20   that there is a reason not to use triamcinolone or

21   betamethasone.

22         A    Nobody has that opinion -- well, I don't



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   want to do absolute certainty.  There is no scientific

2   literature published that supports that there is

3   benefit of one product over another.  Period.  There

4   are publications now that suggest that there is

5   increased risk in terms of emboli when you get into a

6   blood vessel with Depo-Medrol over the other smaller

7   particles.

8          Q   So are there different lengths of

9   therapeutic effect when you compare triamcinolone,

10  betamethasone and methylprednisolone?

11         A   Generally not.  There are a lot of variables

12  to look at here.  For depo steroids, they can have

13  their antiinflammatory effect in situ for maybe four to

14  six weeks.  They all seem to be about the same.  But

15  when you look at a cross-section of the population who

16  has gotten epidural steroids, whatever variety of depo

17  steroids, they all seem to do about the same.  Nobody

18  has ever specifically found depo or triamcinolone or

19  betamethasone better than one of the other.

20         Q   So triamcinolone is particle free?

21         A   No.  It's smaller particles.  The largest

22  particles are Depo-Medrol, then triamcinolone is much



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                                Page 153

1      A    I do not.

2      Q    You do not.  Okay.

3           So other than finding out whether she was

4  allowed to use a compounder I guess, is there anything

5  else that you are saying that Dr. Bhambhani needed to

6  do as some sort of due diligence?

7      A    So she would have found out that compounders

8  are only supposed to be used when you have a reason and

9  then she would have found out if she did due diligence

10 that the only way you can communicate to a compounder

11 is that you have to write a patient-specific

12 prescription for that patient's need and it has to be

13 written specific.

14     Q    So other than those two things, and we'll

15 touch on those two things, you are not saying that she

16 needed to submit a FOIA request or public information

17 request to the FDA or anything, are you?

18     A    No.  She's a physician.  She's expected to

19 operate along the standard of care of all physicians.

20 And the use of a compounding pharmacist is something

21 that we've all used in our practices and there are set

22 rules of engagement on how to use a compounding



1  pharmacy.  We call them the standard of practice, and

2  she violated the standard of practice.

3       Q   You said she's required to follow the

4  standard of practice that all physicians use, right?

5  You meant reasonably prudent physicians, correct?  You

6  are not saying that every physician always has the same

7  standard of practice?

8       A   No, they all have the same.  This is the

9  law.  This is the law that operates in the

10  United States.  She and all other physicians are

11  required to do this.  And if they don't do it, even if

12  there are 100 of them, they are all wrong.  The law

13  stipulates what you have to do.  It's in the Cosmetic

14  Act of 1938 and it's followed up with the 1992

15  revision.

16       Q   So you are saying that Dr. Bhambhani broke

17  the law?

18       A   Yes.

19       Q   Can you give me any example of any

20  physicians across the country who ordered the same way

21  that Dr. Bhambhani did who were ever prosecuted or

22  charged or reprimanded or anything for ordering the



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  drugs the way they did?

2          A   It's a deviation from the standard of care.

3  Doctors don't have those kinds of charges.  They get

4  malpractice cases like we are here.

5          Q   You had made the distinction that it was a

6  law and she broke the law.  That is why I followed up

7  with that.

8              So you can't tell me that anyone was

9  actually reprimanded or charged or anything with

10  regards to the way they ordered the drugs from NECC?

11          A   No -- well, that's not true.  The way that's

12  handled at the physician level is through civil

13  litigation and a lawsuit like this.  She is now getting

14  reprimanded through this litigation.

15          Q   But you are talking -- you tell me.  What

16  laws are you talking about?  What laws did she break?

17          A   She violated the Federal Food, Drug and

18  Cosmetic Act of 1938.

19          Q   Anything else?

20          A   That's it.  That's the main act.  And then

21  they modified it in 1992.  So obviously the law

22  requires that there be a prescription specific to the



1      A    Yes.

2      Q    Let's assume she bought the MPA from an FDA

3    registered manufacturer.  You can't foreclose the idea

4    that that FDA manufacturer isn't experiencing some sort

5    of contamination event or other adverse production

6    issue, can you?

7      A    No, but -- well, we have a history of 50

8    years that they have had no infections and we also have

9    a history of multiple different callbacks for various

10    violations let's say in the protocols.  But none of

11    those actually amounted to being an infection.  So the

12    industry, the manufacturing industry, has a hairpin

13    trigger.  They are constantly doing callbacks because

14    they are looking at small violations and calling back

15    product just to be safe.  We don't have that with

16    compounders.  It just goes out and they do end-product

17    testing.

18      Q    I understand your answer, but my simple

19    question is that just because she orders from an FDA

20    registered manufacturer doesn't mean that there is no

21    chance that there could be a problem.

22          MR. COREN:  Objection as to the form.



1   BY MR. KIRBY:

2        Q   I understand the caveat that you added, but

3   my premise is also correct, right?

4        A   Nothing rules out 100 percent.  But in terms

5   of the probability of having a problem, you are more

6   likely to have a problem with a compounding pharmacist

7   because they don't achieve the same standards as

8   manufacturers.  But is it absolute zero?  No, it's

9   never zero.  But the probability of having a problem is

10  higher with compounding and hence we have a dozen

11  outbreaks for compounders and zero for manufacturers.

12       Q   But again we can't say how much higher or

13  how many people were injured with the compounding drugs

14  than the --

15       A   Oh, yeah, I can do that.  Zero for

16  manufacturers.  So if you were to work out the numbers,

17  those numbers alone, since we're using zero,

18  compounders are infinitely more dangerous and have a

19  higher risk, infinite, because manufacturers have zero.

20       Q   So what were all the injuries in these 12

21  outbreaks using compounding pharmacy drugs?  What was

22  the injury sustained?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q    Did you also have an opinion with regard to

2  informed consent?

3      A    Yes.

4      Q    What's your opinion with regard to informed

5  consent?

6      A    Informed consent is only appropriate and

7  considered informed consent when the physician complies

8  with the standard of care.  Informed consent, a patient

9  just assumes their doctor is going to do everything to

10 the appropriate standard of care and in the event that

11 something happens, they have an understanding that

12 things happen when you stick to the standard of care.

13 In this particular case, Dr. Bhambhani deviated from

14 the standard of care at multiple different levels and

15 the patients were not aware of that.  The patients did

16 not know that she was providing them with a compounded

17 substance when they had access to a manufactured

18 substance that was essentially with less risk, maybe

19 even no risk, in terms of infection compared to the

20 compounded substance.

21     Q    What exactly was Dr. Bhambhani required to

22 tell her patients to be in accordance with the standard



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  of care as to obtaining informed consent?

2          MR. COREN:  Objection as to the form.

3      A   Well, if you are going to be using a non FDA

4  certified product over an available product, you need

5  to tell them why.

6  BY MR. KIRBY:

7      Q   And that would be true if it was dye as

8  well?  It's not just steroids, right?

9      A   If you are using a product that is

10 compounded and there is an FDA manufactured product

11 that's exactly the same, you better tell them because

12 that would be a deviation from acceptable medical

13 practice.  You only can use compounded products if

14 there is a reason for it and if there is not an FDA

15 manufactured product that suits your needs.

16     Q   So anytime you use a compounded drug, if

17 there is an FDA registered manufactured product

18 available, you have to tell them about that?  I'm not

19 questioning you.  I'm just asking you to confirm.

20     A   Well, the answer is sort of yes.  If there

21 is a manufactured product, you use that product.

22 That's the standard of care.  If you don't use that



1    product, you are deviating from the standard of care.

2    There is no place on earth that says the standard of

3    care is to use a compounded substance when you have an

4    equivalent substance that comes from a manufacturer.

5    Nobody can say that the standard of care says it's okay

6    to use compounded substances when there is a

7    manufactured FDA approved substance.

8         Q    I'm just focussing on informed consent and

9    what Dr. Bhambhani had to say to her patients.

10        A    She needed to tell them that she was going

11   outside the protective system for patients.  She was no

12   longer working inside the protections that the FDA

13   provided.  She was working outside the system.  And at

14   this point, it's her decision making.  There is no FDA

15   to help her.

16        Q    Do they then have to explain the FDA

17   regulatory process and how that works and how the

18   product obtains FDA approval and how it was tested and

19   things like that?

20        A    Well, Dr. Bhambhani doesn't know the

21   difference between --

22        Q    Well, that wasn't my question, if you are



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com