**In the Matter Of:**

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY

---

**DEPOSITION OF**

**DAVID CHASON**

*December 21, 2016*

---



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

```
 1    UNITED STATES DISTRICT COURT fOR THE EASTERN DISTRICT
                         OF MASSACHUSETTS
 2


 3
      ----------------------------X
 4                                 :
      IN RE:  NEW ENGLAND          :
 5    COMPOUNDING PHARMACY, INC.   :
      PRODUCTS LIABILITY LITIGATION:  MDL NO. 2419
 6                                 :
                                   :
 7    This Documents Relates to:   :  Master Docket
                                   :  1:13-MD-02419-RWZ
 8    All Cases against the Box    :
      Hill Defendants              :
 9                                 :
      ----------------------------X
10


11
                 DEPOSITION OF DAVID CHASON
12


13              WEDNESDAY, DECEMBER 21, 2016
                       10:00 a.m.
14


15         Law Office of Peter G. Angelos
                 One Charles Center
16             100 North Charles Street
                     Suite 2200
17              Baltimore, MD  21201

18

19

20

21

22

23

24

25    Before:  Linda Bahur, RPR
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              But you'd agree that thousands of other
 2    customers of NECC were ordering drugs in the same way
 3    as Dr. Bhambhani without using patient-specific
 4    prescriptions?
 5              MR. COREN:  Objection to form.
 6         Q    That's what was happening in actuality,
 7    right?
 8         A    What's happening in actuality --
 9              MR. COREN:  Objection to form.
10         Q    Okay.
11              MS. STEINER:  All three of you were
12    talking at the same time.  I know I didn't hear the
13    respective answer, so I'm sure the court reporter is
14    having trouble as well.
15              THE REPORTER:  What was your answer?
16              MR. KIRBY:  He said yes.
17              THE WITNESS:  Yes.  Sorry.
18    BY MR. KIRBY:
19         Q    Is it your opinion that all of those
20    healthcare providers who didn't order drugs from NECC
21    using this patient-specific prescription breached the
22    standard of care?
23              MR. COREN:  Objection to form.  You can
24    respond.
25         A    Yes.  And they put their patients at risk.
```



```
 1        A     No.
 2        Q     Okay.  Let's look at Section B on page 4,
 3   "Compliance with regulations."  You talk about --
 4   well, you tell me what the deviations are here.
 5        A     When she began to use a compounding
 6   pharmacy, it wouldn't have been appropriate for her
 7   to determine whether she was in compliance with
 8   Maryland regulations, which it does not appear from
 9   any documentation that she did.
10        Q     Okay.  Now, are you aware that she had
11   been ordering from NECC, a compounder, for I don't
12   know, several years, a number of years, prior to this
13   in the same way that she's ordering -- that she was
14   ordering from NECC when she got the contaminated
15   drugs?
16        A     She should have done the due diligence
17   when she started to order from NECC, not when the
18   contamination occurred.
19        Q     Okay.  And I think you had said earlier
20   that you did some Internet research, right, on
21   prescription writing or something?  Remember that?
22   And you said you didn't -- I think you said, and
23   correct me if I'm wrong, that you didn't find
24   anything -- eventually I think you got a document
25   from Plaintiffs' counsel that was a World Health
```

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Organization document from Europe or something that

2    talked about it, right?

3         A    Correct.

4         Q    So what is it exactly that Dr. Bhambhani

5    should have done?  Start with that.

6         A    In relation to compliance with

7    regulations?

8         Q    Correct.

9         A    That aspect of it?

10        Q    Correct.

11        A    If she had done any research on her own

12   part or had received training as we offered to our

13   residents in the hospital, she probably would have

14   known that the relationship that she was to establish

15   with a compounding pharmacy was not meeting legal

16   requirements.

17        Q    And so let's -- what do you think she

18   would have -- so that's what she would have found if

19   she did the research?

20        A    Uh-huh.

21        Q    You didn't find that, though, did you,

22   when you did your research?

23        A    I didn't find it until the WHO.  But I

24   also knew my history from having taught residents

25   told me that that's a critical aspect.  And it was



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   validated by, you know, the chiefs of the various
 2   departments of the hospital.  The chief of medicine,
 3   chief of surgery, all wanted us to focus on good
 4   prescription writing practices.
 5        Q    And I guess where I'm losing you is that
 6   you said you did research and didn't find anything,
 7   right?  So wouldn't it be reasonable to think that if
 8   Dr. Bhambhani did the same research that you did, she
 9   wouldn't have found anything?
10           And by the way, the World Health
11   Organization article that you found you said you got
12   after you drafted your report, so it wasn't even the
13   basis for your report.  So isn't it more reasonable
14   to suggest that Dr. Bhambhani would have had the same
15   outcome as you did --
16           MR. COREN:  Objection as to form.
17        Q    -- if she had done that research?
18        A    I can't know that.
19        Q    You can't know that one way or the other,
20   right?
21        A    Correct.
22        Q    Okay.  And so let's then take another
23   scenario.  Let's say that she did research and found
24   out that she needed to use patient-specific
25   prescriptions when ordering from NECC, and she did
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   administer drugs.
 2        Q    But the nomenclature itself, what she
 3   used -- I know you have an issue with the
 4   nomenclature she used.  But that didn't change the
 5   drug given and make it contaminated, did it?
 6        A    No, of course not.  But it didn't --
 7   didn't lead me to believe that she practiced --
 8   practiced in the most appropriate way.
 9        Q    Understood that that's your position.  But
10   that doesn't mean that the way in which she used --
11   the way in which she identified the drug, that that
12   caused her patients to get sick?
13             MR. MINTZER:  Objection to form.
14        A    I wasn't inferring anything of that
15   nature.
16        Q    I understand.  I just need to know one way
17   or the other.  So if you're not inferring that,
18   that's fine.  So you're not inferring that, correct?
19        A    Correct.
20        Q    Okay.  Unless you have anything else on
21   that topic, let's go to the fourth issue that you
22   had, "Research on compounded products."
23        A    Uh-huh.
24        Q    Can you explain what your issue is on that
25   topic?
```



1        A    From the documentation it indicated to me

2   that Dr. Bhambhani didn't conduct any research to

3   confirm that this company was capable of compounding

4   the product.  And it didn't appear from her responses

5   that she understood the difference between

6   compounding and manufacturing.

7        Q    Okay.  So what exactly was she supposed to

8   have done, specifically?

9        A    My point here was that she was responsible

10  for confirming that the product that she was using

11  was safe and appropriate for her patients, and it

12  didn't appear to me from her documents that she had

13  done this.

14       Q    It was, we can agree, eight years or so,

15  right?  Her use of NECC's MPA for eight years was

16  safe, correct?

17            MR. COREN:  Objection to form.

18       A    She was lucky enough that for an earlier

19  period that she didn't receive contaminated product.

20  But that doesn't remove the idea that she could have

21  done research to determine whether they were

22  appropriate vendors.

23       Q    But you also have to have some luck to

24  not, you know, have an adverse event from a drug that

25  you get from an FDA supplier, too, right?  It's not



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   that just because you're getting it from a compounder

2   means that you can't trust them, right?

3           MR. COREN:  Objection to form.  You can

4   respond.

5       A    When you're bypassing the controls that

6   the FDA places on the production of a product, the

7   physician assumes a higher set of responsibility and

8   there's more risk.  So they need to do more due

9   diligence.

10          Q    But there were entities that did do --

11  that did inspect NECC, right?

12          MR. COREN:  Objection to form.

13      A    I don't know that.

14          Q    So you weren't provided any information

15  about inspections done by Brigham and Women's

16  Hospital?

17      A    That was outside the scope of what I was

18  focused on.  I was focused on her behavior and her

19  actions.

20          Q    Well, you just said, I think, and I could

21  be wrong, correct me if I'm wrong, that if she had

22  done research she would have found out that NECC

23  couldn't provide safe drugs or would provide risky

24  drugs.  Didn't you just say that?

25      A    The opportunity was there for her to do



1   that.

2        Q    Right.   Right.   But if Brigham and Women's

3   did the inspection and came away finding that there

4   was no issue with NECC, and they were permitted to

5   continue to order drugs, then wouldn't that be

6   contrary to what you just said?

7               MR. MINTZER:  Objection.

8               MR. COREN:  Objection to form.  Misstates

9   the record.  Also an incomplete statement of the

10  record.

11       A    I'm sorry I'm laughing, but I'm lost.

12              MS. STEINER:  It's all designed to make

13  you lost.

14       Q    So then I have to ask the question again.

15       A    I know, but this is going on long enough

16  that the answer that I can give you is that she had

17  an obligation.  I don't know what occurred in Brigham

18  and Women's, and I can't speak to that.

19       Q    So if she had done the proper research,

20  what would she have found about NECC?

21       A    I don't know.  But she could have -- the

22  possibility exists she could have found out that they

23  were a subpar producer of product or that she was

24  breaking the standard of care with patient, physician

25  and pharmacist relationships.  And that would have



```
 1    led her to make some other decisions.
 2          Q    So I understand, theoretically, if she had
 3    done that, she may theoretically have found out that
 4    NECC wasn't a safe supplier of drugs, right?  It's
 5    possible that she could have done that.  But sitting
 6    here today you can't tell us one way or the other
 7    that she would have found that out?
 8               MR. COREN:  Objection as to form.
 9          A    Theoretically, I could be sitting on that
10    side of the table, too, and ask your question.  But
11    the question doesn't make sense to me.
12          Q    I'm just trying to find out what your
13    opinion is.
14          A    It's circular.
15          Q    And I think that you said it's possible
16    she may have found out --
17          A    And we can't know what would have
18    occurred.
19          Q    Okay.  That's all I need to me.  We just
20    can't say one way or the other.
21          A    Okay.
22          Q    Okay.  We're getting good at this.
23          A    We're getting good at this.  That's what
24    worries me the most.
25          Q    If other entities had inspected or done
```



```
1              MR. COREN:  Objection to form.

2              MR. MINTZER:  Objection.

3         A    I am not saying that.

4         Q    Let's move onto the Box Hill Surgery

5    Center.  You listed in here, "Development of surgery

6    center policies and procedures."

7              Can you explain what you think the issues

8    are in this topic?

9         A    The policies and procedures are, in any

10   healthcare setting, a critical component of making

11   sure that the organization meets the standards that

12   it has set.  And the policies and procedures were

13   provided by a vendor in a template form.  And based

14   on the responses and my review of them, they were not

15   tailored to the Box Hill Surgery Center in such a way

16   as to be as functional as they should be.

17        Q    Okay.  Bear with me for a second.

18        A    After this question I'd like to stop for a

19   minute.

20        Q    Sure.  Sure.

21             MR. KIRBY:  Why don't we take a break now?

22             THE WITNESS:  Okay.

23             (Break taken from 3:42 to 3:47 p.m.)

24   BY MR. KIRBY:

25        Q    So Mr. Chason, I think before we left, you
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   were giving me your criticisms with regards to this

2   topic A, and you suggested something about it was

3   inappropriate for getting a template, I think,

4   provided by a business management vendor and that

5   Dr. Bhambhani, while it was a good starting point,

6   she should have refined and customized that template

7   to meet the needs of the particular organization.

8   Remember saying that?

9        A    Correct.

10       Q    And my confusion is, because I thought I

11  read in her deposition, and you may have seen it

12  also, but I thought that she had testified in her

13  deposition that although she got a template, that she

14  actually went back and changed it.  And as a matter

15  of fact, she reviewed it and made changes every year.

16            Do you recall seeing that in her

17  deposition?

18       A    Yes, I saw that.  And yet she didn't make

19  changes in it and she didn't follow it in regards to

20  some of the standardized information provided in it.

21  So I believe she made that statement that she did

22  review it, but she didn't make substantiative changes

23  that would have improved it.

24       Q    And I think, in fact, in her deposition

25  she testified right there after that she had modified



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY          DEPOSITION OF
DAVID CHASON on 12/21/2016                                                        Page 195

```
 1    policies and procedures for her Medicare and State

 2    survey.

 3              Do you remember seeing that?

 4        A    I don't remember seeing that specifically.

 5        Q    Assuming that's in there, are you familiar

 6    with the Medicare and/or State survey?

 7        A    No.

 8        Q    So you wouldn't know one way or the other

 9    what they do to audit an ambulatory surgery center,

10    correct?

11        A    Correct.

12        Q    And actually, in your opinion near the

13    bottom of that section A, I think you say, "The

14    services provided in a surgery center do not come

15    under the purview of the Maryland Board of Pharmacy."

16              Do you see that?

17        A    Correct.

18        Q    And so are you saying that even though

19    you're offering these opinions, you know, this is an

20    ambulatory surgery, it's not a pharmacy?

21              MR. COREN:  Objection.

22        A    No, that's another reference.  In that

23    issue she was calling herself the -- by one of the

24    titles she assumed was, like, pharmaceutical care

25    manager or something of that nature.  And my
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   reference was that that's an incorrect title to
 2   provide herself, and there wasn't anything in
 3   Maryland law that permitted that or that sanctioned
 4   it.
 5          Q     Okay.  And were you aware that Box Hill
 6   Surgery Center was accredited with the AAAHC?
 7          A     I believe I saw that in the documentation,
 8   yes.
 9          Q     Okay.  Do you know what AAAHC is?
10          A     No.
11          Q     So you wouldn't know the process by
12   which --
13          A     Correct.
14          Q     And let me just finish my question for the
15   record.
16                But you wouldn't know --
17          A     Let's see, 10 of 4:00.  I'm starting to
18   give your answers before you ask them.  I
19   apologize.
20          Q     You wouldn't know the process that the
21   AAAHC -- and by the way, it's the Accreditation
22   Agency for Ambulatory Health Centers.  That doesn't
23   refresh your memory about AAAHC?
24          A     No.
25          Q     So you wouldn't know what AAAHC does when
```



1    they come in to audit an Ambulatory Surgery Center,

2    would you?

3         A    Correct.

4         Q    And so you wouldn't know whether they

5    evaluate an ambulatory surgery center's policies and

6    procedures, correct?

7         A    I do not know what they do.

8         Q    Okay.  And to the extent -- did you also

9    see that Dr. Bhambhani was AAAHC-certified not only

10   before the meningitis outbreak, but then she got

11   reaccredited by them, it was a certain number of year

12   process.  It was routine, but that she got

13   reaccredited immediately after the meningitis

14   outbreak?

15             MR. MINTZER:  Objection to form.

16             MR. COREN:  Objection to form.

17        A    I am not aware of that.

18        Q    So as far as you know, then, AAAHC could

19   have audited Dr. Bhambhani, evaluated her policies

20   and procedures and said that they were fine?

21             MR. COREN:  Objection to form.

22        Q    Correct?

23        A    I have no knowledge of what they

24   evaluated.

25        Q    So if the testimony in Dr. Bhambhani's



```
 1   deposition was that AAAHC -- I'm paraphrasing --
 2   leaves no stone unturned, they come in, they check
 3   the policies and procedures, they open up the
 4   medicine cabinets, look at the medicine, they
 5   evaluate everything about the ambulatory surgery
 6   center before certifying them, you wouldn't have any
 7   reason to dispute that, would you?
 8              MR. MINTZER:  Objection.
 9              MR. COREN:  Objection to form.
10      Q    You wouldn't have any reason to dispute
11   that, would you?
12              MR. MINTZER:  Same objection.
13              MR. COREN:  Same objection.
14      A    I can't comment on something that I
15   haven't evaluated their standards.  So it's not
16   something that I would be able to venture a guess
17   about, make a statement about.
18      Q    Pardon me.  So I understand that you say
19   you can't venture a guess, but that you also don't
20   have any reason to dispute that?
21              MR. COREN:  Objection to the form.
22              MR. MINTZER:  Objection to the form.
23      Q    The testimony that was in her deposition.
24              MR. MINTZER:  Same objection.
25      Q    Correct?
```



```
 1                    MR. MINTZER:  Same objection.
 2                    MR. COREN:  Same objection.
 3          A    I don't think I can answer that question
 4    because I don't know what their standards are and I
 5    don't know how strictly they adhere to the kind of
 6    practices that would have provided some patient
 7    safety.
 8          Q    Being provided -- you were provided with
 9    her deposition by Plaintiffs' counsel, correct?  You
10    reviewed Dr. Bhambhani's deposition, correct?
11          A    Yes.
12          Q    You would have seen in her deposition that
13    she was certified by AAAHC, correct?
14                    MR. COREN:  Objection to form.
15                    MS. STEINER:  That's a yes?
16          A    That's a yes.
17                    MS. STEINER:  You're nodding, he's
18    coughing.  I heard no answer, so that's my job.
19          A    Being the police officer is tough, I see.
20                    MS. STEINER:  That's why I'm wearing the
21    black and white.
22          Q    But yet if you're saying you're not
23    familiar with AAAHC, you didn't ask the Plaintiffs'
24    attorneys for any information to support your
25    opinions with regards to the policies and procedures
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    and that kind of stuff, right?

2            MR. MINTZER:  Objection to form.

3        A    I conducted my review of the policies and

4    procedures in the light of the way a pharmacist would

5    develop the policies and procedures in the hospital

6    setting that would be compliant with joint commission

7    accreditation rules.  And to me they didn't meet that

8    standard.

9        Q    Understood.  But what a pharmacy would do

10   or a hospital pharmacy would do under the joint

11   commission standards, not standards of an ambulatory

12   surgery center?

13       A    Everyone has their own standards, but

14   there are things that are similar in them, like the

15   use of multidose vials.  And relative to that, I

16   didn't think this was a well-done -- well-maintained

17   policy.

18       Q    Is there anything else about section A

19   that you've talked about that we haven't discussed?

20   Any opinion that you have that we haven't

21   discussed?

22       A    Other than the one reference that their

23   infection control procedures contain references to

24   entities that did not exist in a single practice

25   center.  So that is one indication to me that they



NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY          DEPOSITION OF
DAVID CHASON on 12/21/2016                                                        Page 201

1   were still using a packaged product that they hadn't

2   tailored to their needs.

3        Q    Okay.  And all of the basis for your

4   opinions in this section are included here in your

5   report or we've discussed them, correct?

6        A    Correct.

7        Q    Let's look at the vendor review process in

8   section B, bottom of page 5.  What are your opinions

9   in regards to this topic?

10       A    It's a very pointed, succinct statement I

11  tried to make here regarding whether there was

12  actually any process that the surgery center used to

13  evaluate all vendors, not just pharmaceutical

14  vendors.  And I didn't see what I thought was an

15  ongoing and thorough monitoring process for all

16  products, all -- not just products, but personnel, et

17  cetera.

18       Q    Okay.

19       A    That's why that's there.  It's referred to

20  in her deposition.  It refers to her deposition.

21       Q    Let me make sure I understand.  So you're

22  criticizing Dr. Bhambhani because she didn't have a

23  review process in place for other supplies or

24  employees or things like that?

25       A    In this case, vendors.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          Q     Okay.  Are you referring to vendors for

 2    drugs, suppliers of drugs?

 3          A     Med-surg supplies.  Anything that she used

 4    in her practice that was a -- well, let's call it a

 5    reuse -- not a reusable product, but all of the

 6    supplies that she used.  I didn't see any controls

 7    that I thought were appropriate.

 8          Q     Okay.  Could Dr. Bhambhani rely on a

 9    wholesaler to vet suppliers -- or to vet vendors for

10    supplies?

11          A     If she had a vendor -- my take on it was

12    she was using multiple vendors and, therefore, the

13    responsibility fell on her.

14          Q     For example, McKesson --

15          A     That's one.

16          Q     -- would that be appropriate?

17          A     Right.

18          Q     And I think you said, correct me if I'm

19    wrong, a while back, that Good Samaritan Hospital

20    relied on wholesaler distributors to vet suppliers --

21    to vet vendors for supplies?

22                MR. COREN:   Objection to form.

23          Q     Okay.

24          A     But there's also, you know, manufacturers

25    that the wholesaler distributes that she should make
```



1      A     That's not a conclusion I can reach.

2      Q     You just can't say one way or the other?

3      A     That's not a conclusion I can reach.

4      Q     Okay.  Is there anything else about this

5   topic that we haven't discussed?

6      A     No.

7      Q     Okay.  I think we're on to storage and

8   refrigeration practices.

9            Can you tell any what your criticisms are

10  here?

11     A     There are a couple of components there.

12  One was that products that are stored should be away

13  from patient care areas during storage because the

14  potential for contamination is greater when they're

15  not separated.  You don't necessarily store your

16  drugs -- it's like storing your food and other things

17  in the same room.  It's a good practice not to do

18  that.

19           In addition, there were compounded

20  products that I'm believe should have been

21  refrigerated and weren't.  There were vials that had

22  been opened to be used a second time, and they should

23  have been refrigerated.

24           So it was my conclusion that storing

25  product under refrigeration would have reduced the



```
 1   potential for those contamination to be as

 2   significant.  The best thing to grow bacteria and

 3   fungi is to leave them unrefrigerated.

 4              Now, their statement, I believe -- in

 5   here, I think is contradicted.  I don't believe that

 6   to be the case.  But she also used vials more than

 7   once and didn't store them in refrigeration.  That is

 8   really a failure.

 9        Q    We'll talk about that in one second.  You

10   referred just a second ago to 1619-6, this marketing

11   material that you reviewed with regards to NECC's

12   representation about their products, correct?

13        A    Uh-huh.

14        Q    And what does it say in the middle of the

15   page under storage?  It says "room temperature,"

16   doesn't it?

17        A    Uh-huh.

18             MS. STEINER:  That a "yes"?

19        A    That's correct, it says that.  I don't

20   believe that to be a correct statement.

21        Q    Okay.  Well, NECC is representing to their

22   customers that proper storage for the MPA is room

23   temperature, aren't they?

24        A    In this document, yes.

25        Q    So you as a pharmacist don't believe that
```



```
1    have determined whether accepting that statement is

2    valid.  That would have been something I would have

3    thought she might look into.

4          Q    And Dr. Bhambhani testified on this issue.

5    I think she was questioned extensively by Plaintiffs'

6    counsel, and she testified in detail in her

7    deposition as to the actual practice that she used,

8    didn't she?  Did you see that in there?

9          A    I reviewed her testimony, yes.

10         Q    And we can look at it if you want, but I

11   believe that she testified that she may have used it

12   on a limited number of patients if they were coming

13   in in a short time after.  If she had took long

14   breaks or there weren't patients coming in for a

15   while or it was the end of the day, that she got rid

16   of it, correct?  Can we agree that she didn't use it

17   over multiple days?

18         A    But that's still a breach of protocol.

19         Q    Okay.

20         A    She should not have drawn fluid out of it

21   twice.

22         Q    Okay.  And I think she also testified as

23   to her aseptic technique, that she always used a new

24   needle; that if she had to go back to the vial, she

25   would get a new needle.  If she dropped that needle
```



```
 1    that she'd already drawn up solution in on the floor,

 2    she threw the vial away and got a new vial.  And that

 3    in between sticks with the syringe, that it was

 4    swabbed with alcohol.

 5            Do you remember seeing that?

 6        A    Yes.

 7        Q    Okay.  But it's your opinion that

 8    Dr. Bhambhani shouldn't have been using it this way,

 9    that that was breach of the standard of care?

10        A    Yes.

11        Q    Okay.  I want to refer you to an article

12    that was, I think, provided by Plaintiffs' counsel to

13    me yesterday.

14            (Exhibit No. 1619-10 was marked for

15    identification.)

16            MR. KIRBY:  And we will mark it as

17    1619-10?

18            MS. STEINER:  Yes.

19            THE WITNESS:  Also a gate-keeper.

20            MS. STEINER:  I serve many roles.

21    BY MR. KIRBY:

22        Q    And for the record, can you identify what

23    this is?

24        A    It's an editorial addressing the issue of

25    the price of cost savings, written in June 2008.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1          A     Correct.

 2          Q     And it's not your opinion -- just so I'm

 3     clear.  I understand you're saying there's an

 4     increased growth of organisms.  You're not suggesting

 5     that if Dr. Bhambhani had followed this procedure

 6     that you say is the standard, that that would have

 7     negated any contamination that was in the vials, are

 8     you?

 9          A     No.

10          Q     Let's look at section D, "Errors and

11     documentation of product use."  Describe for me your

12     opinions and the basis for your opinions in this

13     section.

14          A     One of the preprinted forms that were used

15     that Dr. Bhambhani would then complete sections of in

16     her handwriting had errors in the -- first of all,

17     they said they were Depo-Medrol 80mg, which they

18     weren't.  And then in that blank space she would

19     insert the volume of product.  And sometimes she

20     would insert incorrect information that in one

21     example she put in 40, which I'm sure she meant was

22     40mg.  But she was not using her own terminology

23     correctly that her document called for.

24               So there was several cases where I saw

25     that she had written -- handwritten in preprinted
```



```
 1   form information that was incorrect.

 2        Q    Can we at least agree up front that the

 3   documentation in Dr. Bhambhani's medical records

 4   didn't cause the MPA to become contaminated at NECC

 5   and didn't cause her patients to get meningitis or

 6   some other infliction?

 7        A    Yes.

 8        Q    Okay.  Does that provide the basis for all

 9   your opinions for that section?

10        A    Yes.

11        Q    Let's look at section E, "Tracking of

12   patient-specific drug lot numbers and expiration

13   dates."

14             What's the basis for your opinions there?

15   What's your criticisms first?

16        A    Well, because there was no direct triad of

17   patient/physician/pharmacy linkage, she could not

18   tell the actual identity of the vial used on any

19   individual patient, and as a result, she didn't have

20   good documentation of who had received which

21   contaminated vials.

22             Now, it became obvious when the disease

23   state hit and they reacted.  But she would have been

24   able to more quickly respond with knowledge of what

25   vials had been used for which patients.
```



1          This practice is a common practice to

2    identify the lot number and expiration date on

3    patient records, when appropriate, or have a way of

4    tracking it if you can.

5          Q    And you're saying the standard requires

6    putting down the lot number and --

7          A    I'll use the example if one of your

8    children received a vaccine tomorrow, and this

9    practice was before this, if you looked at the

10   physician's records it would have either a preprinted

11   label or a handwritten lot and expiration date on the

12   child's medical record indicating that that lot

13   number and expiration date were administered to that

14   child.

15         Q    And you'd agree with me, wouldn't you,

16   that there has been an extreme level of increased

17   scrutiny over compounding practices and ordering

18   practices since the NECC meningitis outbreak, right?

19              MR. COREN:  Objection to form.  Go ahead.

20         A    That practice was one that was in effect

21   before this occurred, and has become, as you said

22   correctly, has become much bigger of an issue in

23   recent years.  But it still existed before that.

24         Q    And do you recall in your review of

25   Dr. Bhambhani's deposition that Dr. Bhambhani



```
 1        Q    And is it your opinion -- or you'd agree
 2   that that didn't cause harm?  Her documenting in the
 3   medical records didn't cause the MPA to become
 4   contaminated at NECC, and it didn't cause her
 5   patients to develop meningitis or die, did it?
 6             MR. COREN:  Objection to form.
 7        A    I'd like to say how many times can you ask
 8   that same question and still expect me to give you a
 9   different answer?  I think we've done that like --
10   I'm up to like 40 times that you've asked that
11   question that way.  And I would just like to protest
12   that I think that that's badgering me.
13        Q    In fairness -- and I'm not intending to
14   badger you, Mr. Chason, trust me.  In fairness, it's
15   a different question with regards to each of the
16   criticisms you have.  I keep asking you about that
17   aspect, too.  And I say specific to this.
18             And so if your answer is the same as the
19   others, then that's fine.  You know, you can just say
20   no, it didn't cause harm and I'm perfectly fine with
21   that.
22        A    Okay.
23             MR. MINTZER:  Objection to form.
24        Q    So just so the record is clear, was that a
25   "no," this specific issue with documenting in the
```



1    medical records didn't itself cause the contamination

2    or cause meningitis?

3                MR. COREN:  Objection to form.

4         A    Every one of her processes that I

5    delineated in this document I believe contributed to

6    her not providing an adequate level of care.  No one

7    was a causative factor.  And if NECC hadn't been in

8    the mix, maybe none of this would have occurred.

9         Q    So she documents in her medical records

10   after she performs the care, right?

11        A    That's the typical process, yes.

12        Q    Right.  So her documenting the procedures

13   that she did in her medical records didn't in and of

14   itself affect the patient that she gave the

15   injection, did it?

16        A    It's depending on the time lapse between

17   doing things, because physicians can forget what they

18   did or -- you know, and there were a number in the

19   medical records, there are a number of steps that

20   were shown that she went through in documentation

21   after the fact.  So those were ticklers and reminders

22   to help her do that.  So I guess the answer to your

23   question is "yes."

24                MR. KIRBY:  Off the record.

25                   (Record read by the reporter.)



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   STATE OF MARYLAND )

2   COUNTY OF HARFORD )

3

4

5           I, Linda Bahur, a Notary Public of the

6   State of Maryland, do hereby certify that the

7   deposition of DAVID CHASON took place before me at

8   the time and place herein set out.

9           I further certify that the proceeding was

10  recorded stenographically by me and this transcript

11  is a true record of the proceedings.

12          I further certify that I am not of counsel

13  to any of the parties, nor an employee of counsel,

14  nor related to any of the parties, nor in any way

15  interested in the outcome of this action.

16

17

18

19          _____

20          Linda M. Bahur

21          Linda M. Bahur

22          My commission expires 8/27/2019

23

24

25  Dated:  January 5, 2017



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com