In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

---

**VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO**

*June 04, 2015*

---



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - - - - x

 5   IN RE: NEW ENGLAND COMPOUNDING      MDL No. 2419

 6   PHARMACY, INC. PRODUCTS             Master Dkt.
                                         1:13-md-02419-RWZ
 7   LIABILITY LITIGATION

 8   - - - - - - - - - - - - - - - - - x

 9   THIS DOCUMENT RELATES TO ALL SUITS

10   AGAINST THE SAINT THOMAS ENTITIES

11   - - - - - - - - - - - - - - - - - x

12   THIS DOCUMENT RELATES TO

13   ALL CASES

14   - - - - - - - - - - - - - - - - - x

15

16        VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO

17                 Thursday, June 4, 2015

18                      9:04 a.m.

19              Nutter McClennen & Fish LLP

20                     Seaport West

21                 155 Seaport Boulevard

22              Boston, Massachusetts 02210

23

24          Michelle Keegan, Court Reporter
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1         Q.    Looking at the report, or if you have an

2    independent recollection, what was different about what

3    you actually did inside the facility in 2012 versus

4    2008, if anything?

5         A.    I don't recall any differences.

6         Q.    Did you look at documentation in 2012?

7         A.    We did.

8         Q.    Did you review policies and procedures in 2012?

9         A.    We did.

10        Q.    Did you look around the facility in 2012?

11        A.    We did.

12        Q.    Did you look into the clean room, or do you

13   remember?

14        A.    I recall looking into the clean room.

15        Q.    Do you recall going into the clean room?

16        A.    I do not recall going into the clean room.

17        Q.    Generally when you do these vendor audits, do

18   you go into the clean room?

19              MR. ROBERTSON:  I object.  Temporal.  Back then

20   generally did he?

21        Q.    Prior to 2012 when you did these audits, did

22   you go into the clean room?

23        A.    I, on any of the audits, have never gone in

24   physically -- I don't recall on any of these audits
```



1   physically going into a clean room.  Always looking into

2   a clean room.

3        Q.   Has Mr. McAteer accompanied you on every

4   compounding pharmacy vendor audit from '07 to '12, or

5   did he from '07 to '12?

6        A.   Yes.

7        Q.   Do you have any recollection of Mr. McAteer

8   ever being allowed to go into the clean room on one of

9   these vendor audits?

10       A.   I don't recall him going into the clean room

11  either.

12       Q.   Do you know why that is, why -- Well, let me

13  ask this to give it a little foundation and avoid three

14  objections.

15            Have you or Mr. McAteer during any of these

16  vendor audits asked to go in the clean room and the

17  vendor said no, we don't allow that?

18       A.   I don't recall being denied or I don't recall

19  asking either.

20       Q.   Why not?  Why do you-all not go into the clean

21  room during these vendor audits?

22       A.   Usually -- and there were multiple places.

23  Usually we can view into the clean room via a window.

24       Q.   On page 140, which is the third page of the



Case 1:13-md-02419-RWZ   Document 3485-27   Filed 10/16/17   Page 5 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 166

1        A.    That is correct.

2        Q.    You're not sure which visit it was?

3        A.    Correct.

4        Q.    So do you remember if that was in the back of

5    the building or in the middle center of the building?

6        A.    I don't recall.

7        Q.    Okay.  Now, in neither visit did you ever --

8    you or Fran McAteer never entered the clean room area.

9    Correct?

10       A.    That is correct.

11       Q.    You never entered the anteroom where they gown

12   up?

13       A.    Correct.

14       Q.    You never entered the prep room?

15       A.    Correct.

16       Q.    And you never entered the formal cleaning

17   room -- clean room?

18       A.    Correct.

19       Q.    So you never looked at any of the equipment

20   that was in the clean room.  Correct?

21       A.    Only what I could see through the window.

22       Q.    What you could see through a window.  Okay.

23   And we're going to talk more about that window.

24             You never went into the rooms and did any kind



1  of detailed examination of those clean rooms?

2      A.   Correct.

3      Q.   And if I understand it correctly from this

4  report, at least Exhibit 299 says that it was from 10:00

5  to 12:00 o'clock, the whole visit?

6      A.   This is 2008?

7      Q.   Yeah.

8      A.   I don't recall the time frames, but that --

9      Q.   Do you remember the e-mails where Barry says,

10 I'll give you two hours, 10:00 to 12:00?

11     A.   Right.   So we would have been there around that

12 time.

13     Q.   And I'm not holding you to the minute, but

14 approximately.

15          So the whole visit between arriving, having

16 discussions with Mr. Cadden, looking at the documents

17 that you looked at, walking around the facility, that

18 whole visit took approximately two hours.   Correct?

19     A.   I don't know when it ended.

20     Q.   Okay.   Well, do you have any memory that's

21 different than what's on this report?

22          MR. ROBERTSON:   I object to the form.

23     A.   That's what's on the agenda.   I don't recall

24 whether we finished early or stayed late.



1    the higher temperature will encourage more growth.

2    Correct?

3        A.   That's my understanding, yes.

4        Q.   And what, if anything, did you do to follow up

5    on that to see if NECC changed their temperature for

6    that?

7        A.   I don't recall following up on it.

8        Q.   And let's turn back to that -- by the way, the

9    rotating out the sporicidal agents, the reason you

10   rotate sporicidal agents into your cleaning program,

11   that's for the -- it's really for safety reasons.

12   Correct?  To make sure there's no fungal growth.

13   Correct?

14       A.   Correct.

15       Q.   And then let's just look at one other thing

16   from this.  On the narrative on BW_706, the second

17   paragraph, second-to-last sentence, "NECC is moving soon

18   to a new area in the same building complex.  BWH should

19   observe the new operation when completed."  Do you see

20   that?

21       A.   Yes.

22       Q.   Did you follow up to find out when they were

23   moving to the new area?

24       A.   I don't recall asking for a date, a specific



Case 1:13-md-02419-RWZ   Document 3485-27   Filed 10/16/17   Page 8 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 174

1    date or a discussion around an exact date.

2        Q.    Do you remember scheduling an audit so that the

3    new operation could be observed?

4        A.    We did schedule an audit in 2012.

5        Q.    Four years later?

6        A.    Correct.

7        Q.    Between 2008 and 2012, did you receive any type

8    of sterility tests, batch certification reports, on a

9    regular basis from NECC?

10       A.    I don't recall receiving regular reports or

11   actually any reports.

12       Q.    Any equipment validation reports, for example?

13       A.    I don't recall receiving any reports from them.

14       Q.    Did you have a policy where you required your

15   vendors -- your compounding sterile product vendors to

16   report to you if any of their pharmacists or pharmacy

17   techs' licenses were suspended by the board of pharmacy?

18       A.    I don't recall the policy stating about

19   licenses.

20       Q.    So after that 2008 site visit to NECC, did you

21   tell Mr. Churchill, your boss, that you had only been

22   there for approximately two hours?

23       A.    I don't recall a discussion around how long we

24   were there.



Case 1:13-md-02419-RWZ   Document 3485-27   Filed 10/16/17   Page 9 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 178

1    Q.    Okay.   So can you read what you wrote to Barry

2    Cadden in March of 2012, first paragraph.

3    A.    "It has been about four years since we last

4    visited NECC.   Per our internal policy, we are due to

5    come out for another visit.   It is also a hospital joint

6    commission survey year.   We are hearing that the

7    surveyors are asking hospitals to provide information on

8    the sterile compounding facilities/pharmacies they

9    receive product from."

10   Q.    What is the hospital joint commission that

11   you're referring to there?

12   A.    The joint commission is an agency that

13   accredits hospitals for the government with regards to

14   CMS and Medicare, Medicaid, is my understanding.

15   Q.    And do they come in and do a audit of your

16   facility?

17   A.    They do.

18   Q.    How long does that take for them to do that?

19   A.    They are there usually for a week.

20   Q.    A week.   And they audit your pharmacy?

21   A.    Sometimes.

22   Q.    Sometimes.   That sounds like a real audit.

23        MR. TARDIO:   Objection.

24        MR. ROBERTSON:   Wait for a question.



```
 1   went out and did a site visit.  Correct?  And then you

 2   wanted something from NECC that says something about

 3   their quality.  Correct?

 4       A.   Correct.

 5       Q.   Just in case the joint commission asked for it,

 6   you'd have it.  Correct?

 7       A.   Correct.

 8       Q.   And then read the second line of that paragraph

 9   that you wrote to Barry Cadden in March of 2012.

10   "They," the second line of Paragraph 2.

11       A.   "They are expecting that BWH do this and review

12   this information to ensure our patient safety."

13       Q.   And the "they" in that sentence is again the

14   joint commission?

15       A.   Correct.

16       Q.   And Brigham and Women's -- BWH is Brigham and

17   Women's Hospital.  Correct?

18       A.   Correct.

19       Q.   And then you give him some dates and times.  Do

20   you see that?  To set up the visit.

21       A.   Correct.

22       Q.   And do you say, "I would like to try to start

23   at 8:00 a.m. and finish no later than 1:00 p.m."?

24       A.   Correct.
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   So you're looking for five hours for the site

2  visit.  Correct?

3    A.   Correct.

4    Q.   And then you say in the next paragraph, "I have

5  a pharmacy resident with me that I would like to bring

6  along."  What was that referring to?

7    A.   We trained pharmacy residents.  These are

8  people who have graduated pharmacy school, so they're

9  not pharmacy interns.  And then they do a year residency

10 at the hospital.

11   Q.   Okay.  Did you send him an audit form for

12 completion -- audit survey form for completion with that

13 e-mail?

14   A.   Yes.

15   Q.   With this e-mail?

16   A.   Oh, I don't recall.  I don't see that there's

17 one of those little things --

18   Q.   It doesn't show an attachment?

19   A.    It doesn't show an attachment.  So I would say

20 it wasn't on this one because it's not there.

21   Q.   You didn't send him that.  And you didn't send

22 him a proposed agenda for the site visit, nor did you

23 ask him for any specific records to be compiled for

24 review at the site visit, did you?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1              MS. KELLY:  Objection.

 2        A.    Not in that e-mail.

 3        Q.    Okay.  So let's move to Exhibit 310, which is

 4   the next e-mail that we could find concerning this.  And

 5   can you identify Exhibit 310, please?

 6        A.    It is an e-mail from me to Barry Cadden, with

 7   Fran McAteer cc'd, about the NECC site visit.

 8        Q.    What's the date of this?

 9        A.    The date of the -- well, the date of the top

10   e-mail is May 3rd, 2012.

11        Q.    And the first sentence says, "I just" -- "Hi,

12   Barry.  I just want to make sure we're still on for the

13   BWH vendor audit on Friday, May 4th, at 8:30."  Correct?

14        A.    Correct.

15        Q.    So this is a day before you're about to go out

16   on your 2012 site visit.  Correct?

17        A.    Correct.

18        Q.    And now you do attach something, don't you?

19        A.    I don't recall.

20        Q.    Look at the attachments.  Look at the front of

21   the e-mail.  Look at the attachments.

22        A.    Where would I --

23        Q.    Right under "Subject matter" there's a line

24   called "Attachments."
```



1    in the front, but I don't recall at the time making any

2    note of what those businesses were or whether they would

3    have said "recycling."

4            And now -- I would then be mixing my knowledge

5    of what I know now of a recycling facility and of what

6    it might have said then didn't register as recycling.

7    Now I do know that because of current events.

8        Q.   Did you make any inquiry of Mr. Cadden during

9    either the 2008 or 2012 visits as to what other

10   businesses were operating at that site?

11       A.   I don't recall asking him that.

12       Q.   So you were asked some questions on direct

13   examination about whether you asked -- whether you asked

14   Cadden during any of these visits whether they had ever

15   had a lawsuit or settled a lawsuit.  And I think you

16   said you don't remember asking that question.

17           Did you ask him whether any of his -- the drugs

18   that had been compounded by NECC had ever killed

19   someone?

20       A.   No, I never asked that question.

21       Q.   Do you know what the Pharmacy Compounding

22   Accreditation Board is?

23       A.   I have heard of it before.

24       Q.   Did you know what it was in 2008, 2012?



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.    It's PCAB, right?

2        Q.    PCAB.

3        A.    I would have known.

4        Q.    Did you ask Barry Cadden whether they were

5   accredited by PCAB at either the 2008 or 2012

6   inspections?

7        A.    I don't recall if we asked him that.

8        Q.    Did you take any surface samples for testing at

9   either visit?

10       A.    No.

11       Q.    By the way, when -- we saw a couple order forms

12  before for drugs that Brigham and Women's submitted to

13  NECC.  When NECC -- when Brigham and Women's submitted

14  scripts or order forms for drugs from NECC, did they

15  supply the patient weights, maximum dosage per hour, and

16  route of administration for each of the drugs that were

17  ordered?  You can see it on the form.

18       A.    It's not on those order forms, no.

19       Q.    Do you have any knowledge that Brigham and

20  Women's ever supplied any of that information to NECC?

21       A.    We sent them prescriptions for some items,

22  individual patient prescriptions for items.  I'm not

23  aware that weight was on it.

24       Q.    Or maximum dosage per hour.  You know what that



Case 1:13-md-02419-RWZ Document 3485-27 Filed 10/16/17 Page 15 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                 Page 193

```
 1   is.  Correct?

 2        A.   Yes.  Not that exact term.

 3        Q.   Or route of administration?

 4        A.   I don't recall seeing that on any of them.

 5        Q.   Okay.  You know what maximum valid dilution is,

 6   or is that beyond your --

 7        A.   I've heard the term, but I wouldn't credit

 8   myself with knowing what that definition is and how it's

 9   applied.

10        Q.   Okay.  So let's just take another look at this

11   audit report from 2012, Exhibit 316.  Keep the 2008

12   audit report just in front of you but 299 too.  I just

13   want to go through one other comparison with both of

14   those reports.

15             On page BW_138 of Exhibit 316, the 2012 report,

16   under "General," do you see the sentence, "All

17   documentation seemed adequate and compliant to GMP"?  Do

18   you see that?

19        A.   I do.

20        Q.   What is GMP?

21        A.   Good Manufacturing Practices.

22        Q.   Okay.  So what did you understand Mr. McAteer

23   telling you when he wrote that?

24        A.   Well, Good Manufacturing Practices is something
```



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 194

1    manufacturers through the FDA comply with.  That's their

2    regulations, guidelines.

3        Q.    So what did you understand that Mr. McAteer was

4    telling you in his report?

5             MR. ROBERTSON:  I object.

6        A.    I don't recall what I would have thought at the

7    time.  I know what it means reading it now.

8        Q.    Okay.  Do you think you knew what GMP was back

9    in 2012?

10       A.    I did.

11       Q.    GMP is a little stricter than USP 797.  Is that

12   correct?

13       A.    Yes.

14       Q.    Did you think that NECC was GMP compliant?

15            MR. ROBERTSON:  I object.

16       A.    No.

17       Q.    Did you ask Mr. McAteer, Why are you saying

18   they're compliant with GMP?

19       A.    I did not.

20       Q.    Do you know why you didn't ask that?

21       A.    I don't recall.

22       Q.    Did you read the report before you signed it?

23       A.    I did read the report.

24       Q.    Would you have liked NECC to be GMP compliant



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    back in 2012?

2            MR. ROBERTSON:  I'm going to object.

3        A.   GMP is a higher standard.  GMP would be

4    preferred over USP.

5        Q.   It's a good thing.  Right?

6        A.   It's a good thing.

7        Q.   Okay.  So there were three recommendations by

8    Mr. McAteer after the 2012 site visit.  One was

9    "Establish USP 797 action limits for viable air

10   sampling."  And it says that "Action limits are in

11   place; however, the action limits for viable air are

12   greater than 2 CFU/M3, which are not aligned with

13   current USP 797 action levels of greater than 1 CFU/M3."

14           Do you see that?

15       A.   I do.

16       Q.   So what he's saying there was that was not

17   compliant with USP 797.  Correct?

18       A.   That's what that says.

19       Q.   Okay.  That conflicts with the statement on the

20   first page -- second page of the report, BW_137, where

21   Mr. McAteer said, "Overall, NECC is compliant for

22   USP 797 regulations."  Correct?

23           MR. ROBERTSON:  I will object.  And I think

24   we've established he doesn't know the foundation of 797



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 196

1    to make such a fine distinction.

2            MR. ELLIS:  This is not a distinction.

3        Q.   You said you understood from Recommendation

4    Number 1 that they were not compliant with USP 797.

5    Correct?

6        A.   (No verbal response)

7        Q.   You understood from reading Recommendation

8    Number 1 on the action limits for viable air sampling

9    that Mr. McAteer was telling you they're not compliant

10   with USP 797 on this.  Correct?

11           MR. ROBERTSON:  I object.

12       A.   That's what is in the report.

13       Q.   I'm not asking you whether you know it's true,

14   whether you completely understand it.  What he's telling

15   you there is that at least with respect to this, they're

16   not in compliance with USP 797?

17       A.   Yes, that's what he's telling me.

18       Q.   But on the page before the report, Mr. McAteer

19   had written, "Overall, NECC is compliant for USP 797

20   regulations."

21       A.   That's what he wrote on the -- yes.

22       Q.   Well, did you think, well, maybe there's some

23   inconsistencies there?

24           MR. ROBERTSON:  I object.  Did he have that



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   thought in 2012?

2          MR. ELLIS:  When he read the report before he

3   signed it.

4       Q.   Did you say maybe this isn't quite accurate?

5       A.   To be honest --

6       Q.   Yes.  I'm asking you to be very honest here

7   today.

8       A.   Sorry.  I do recall the CFU limit registering

9   in my mind.  I actually believe I took out my copy of

10  USP to look at that.  That rings a bell to me of when I

11  saw it I said:  Gee, I wonder what -- that doesn't -- I

12  didn't know that -- I was confused by that statement at

13  the time.

14      Q.   Okay.  By the way, did you do anything to

15  follow up after this report with NECC to see if they'd

16  come into compliance with USP 797 on their action limits

17  for viable air sampling?

18      A.   I don't recall any followup discussions with

19  NECC after this.

20      Q.   Did you send this report to NECC after the site

21  visit?

22      A.   I don't recall.  And I don't know if that

23  was -- if we did that with all the vendors.  We may have

24  done that with some of the vendors, but I don't recall



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3485-27   Filed 10/16/17   Page 20 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 219

1   person was working.

2         Q.    But you didn't answer my question.  Did you

3   see --

4              MR. ROBERTSON:  Whoa, whoa, whoa.

5         Q.    Did you see then gowning, hand washing, and

6   whether they were complying with aseptic technique?

7         A.    I don't recall what they were doing.

8         Q.    And what about Slide Number 30?  Does that look

9   familiar, the one entitled "Facility tour goals.

10  Observe actual compounding process in action"?

11        A.    Whether it was this exact slide or similar-type

12  slides, there is wording in here that I recognize.

13        Q.    Okay.  And what this was about was, when you're

14  doing one of these vendor audits of a compounding

15  pharmacy who's supplying sterile products to a

16  healthcare provider, that you should observe actual

17  compounding process in action.

18              Look for compliance with established SOPs,

19  meaning that -- not just that they have procedures, but

20  they're actually following the procedures in action.

21  Look for system double-checks.  Look for use of

22  medication safety technology.  Look for the pharmacist's

23  role in product preparation and validation.  Observe

24  them during the documentation processes.  Check for



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    documentation and calibration of any automated devices

 2    that may be in use.

 3              Did you do any of that when you were at NECC in

 4    either 2008 or 2012, sir?

 5        A.   During the tour, there were people working.  I

 6    don't recall exactly what pieces of that -- I couldn't

 7    say exactly which pieces -- recall which pieces they

 8    were doing.

 9        Q.   Okay.  But you never went into the clean room

10    on either visit?

11              MR. TARDIO:  Objection.

12        A.   We did not go in the clean room.

13              MR. ELLIS:  I'm going to mark this as

14    Exhibit 344.

15              (Exhibit Number 344

16              marked for identification)

17        Q.   Do you recognize what I've marked as

18    Exhibit 344?

19        A.   Correct.  I do.

20        Q.   What is this, sir?

21        A.   It's a presentation on implementing sterile

22    product services.

23        Q.   Okay.  And did you give this at a -- the South

24    Carolina Society of Health-System Pharmacists on
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com