```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - - - - - x

 5   IN RE: NEW ENGLAND COMPOUNDING        MDL No. 2419

 6   PHARMACY, INC. PRODUCTS               Master Dkt.
                                           1:13-md-02419-RWZ
 7   LIABILITY LITIGATION

 8   - - - - - - - - - - - - - - - - - - x

 9   THIS DOCUMENT RELATES TO ALL SUITS

10   AGAINST THE SAINT THOMAS ENTITIES

11   - - - - - - - - - - - - - - - - - - x

12   THIS DOCUMENT RELATES TO

13   ALL CASES

14   - - - - - - - - - - - - - - - - - - x

15

16        VIDEOTAPED DEPOSITION OF FRANCIS MCATEER

17                 Wednesday, June 3, 2015

18                        9:10 a.m.

19                 Nutter McClennen & Fish LLP

20                       Seaport West

21                   155 Seaport Boulevard

22                Boston, Massachusetts 02210

23

24             Michelle Keegan, Court Reporter
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1    A P P E A R A N C E S:

 2
              GIDEON, COOPER & ESSARY PLC
 3            By:  Matthew Cline, Esq.
              By:  Christopher Tardio, Esq.
 4            315 Deaderick Street #1100
              Nashville, Tennessee 37238
 5            Phone: (615) 254-0400
              E-mail:  matt@gideoncooper.com
 6            E-mail:  chris@gideoncooper.com
              Counsel for Saint Thomas Outpatient
 7            Neurosurgical Center, LLC; Howell Allen, a
              Professional Corporation; John W. Culclasure,
 8            M.D.; Debra V. Schamberg, RN; Specialty Surgery
              Center; Crossville, PLLC; Kenneth R. Lister,
 9            M.D.; Kenneth R. Lister, M.D., PC;
              Donald E. Jones, M.D.
10

11             NUTTER, MCCLENNEN & FISH LLP
               By:  Sarah P. Kelly, Esq.
12             Seaport West
               155 Seaport Boulevard
13             Boston, Massachusetts 02210
               Phone: (617) 439-2461
14             E-mail:  skelly@nutter.com
               Counsel for Saint Thomas Health; Saint Thomas
15             Network; Saint Thomas West Hospital f/k/a
               Saint Thomas Hospital
16

17            BLUMBERG & WOLK LLC
              By:  Christopher M. Wolk, Esq.
18            158 Delaware Street
              Woodbury, New Jersey 08096
19            Phone: (856) 848-7472
              E-mail:  cwolk@blumberglawoffices.com
20            Counsel for Premier Orthopaedic & Sports
              Medicine Associates of Southern New Jersey,
21            LLC; d/b/a Premier Orthopaedic & Sports
              Associates, LLC; Premier Orthopaedic
22            Associates Surgical Center, LLC; Kimberly
              Yvette Smith, M.D.; Thomas Dwyer, M.D.;
23            Richard C. Diverniero, M.D.; Rhaul Shah, M.D.;
              and Richard Strauss, M.D.
24
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 3 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                    Page 190

1   time we were there.
2           MR. ELLIS:  Exhibit 310.
3           (Exhibit Number 310
4           marked for identification)
5       Q.  This is an e-mail from Mike Cotugno to Barry
6   Cadden, cc Fran McAteer, re NECC visit, dated Thursday,
7   May 3rd, 2012.
8           MR. ELLIS:  For the record, it's BW_118.
9       Q.  So this is the next e-mail we could find in the
10  documents.  So this is Michael, and he says to Barry --
11  Michael Cotugno saying to Barry Cadden, "I just wanted
12  to make sure we are still on for the BWH vendor audit on
13  Friday, May 4th, at 8:30."  Do you see that?
14      A.  Uh-hmm.
15      Q.  This is the day before the site visit is about
16  to occur.  Correct?
17      A.  Yup.
18      Q.  The group from BWH is going to be Cotugno and
19  Fran McAteer.  Correct?
20          MS. ALESSI:  Excuse me.  He doesn't have the
21  page that you're reading from in front of him.
22          MR. ELLIS:  I'm sorry. Did I just switch pages
23  here?
24      A.  I think we just got one.



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 4 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015
Page 199

```
 1   area which is marked on the blueprint as "shipping and
 2   receiving" and back towards that warehouse area --
 3       A.   Right over here?
 4       Q.   Do you see that?
 5       A.   This area right here.
 6       Q.   And those actually join.  That's open.
 7       A.   Right.
 8       Q.   I don't know if you remember, but the
 9   shipping/receiving area opens into the warehouse area in
10   the back.
11       A.   That's right.  It did do that.  That's some
12   sort of asphalt in there too.
13       Q.   And then the second clean room is in the back.
14       A.   Okay.  Shown right there.
15       Q.   So did you actually, like, look around the
16   boilers and the roof and the walls of the facility?
17       A.   No.  We just did a facility tour to get a
18   general layout and make some observations in the windows
19   to the clean rooms.
20       Q.   So you didn't do an examination where you would
21   have seen discoloration of equipment or spaces in the
22   roof?
23       A.   No, sir.  We would have made -- and probably
24   the warehouse and the shipping/receiving area may have
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 5 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                    Page 200

```
 1   been full of goods or equipment.  We were a little bit
 2   more concerned with segregation, restricted access, and
 3   things of that nature.
 4        Q.   So this really was not to look at the real
 5   condition of that building?
 6        A.   No.  It certainly sends the wrong signal.
 7        Q.   Right.  These photographs don't look great, do
 8   they?
 9             MR. WOLK:  Objection.
10        A.   No.  But they are in noncritical space.
11        Q.   And I'm not saying they're inside the clean
12   room.  They're not.  This is outside the clean room.
13        A.   Yes.
14        Q.   But you didn't see any of what's depicted in
15   these photos?
16        A.   I did not see anything.
17        Q.   And just to be clear, that big clean room in
18   the center of the blueprint that you're looking at, you
19   never went inside that, did you?
20        A.   We did not go inside that.
21        Q.   Now, they have changed their operation
22   completely?
23        A.   Right.
24        Q.   They had moved into this new clean room.
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 6 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015
Page 201

```
 1  There's a freight anteroom that's -- I don't know if
 2  it's ISO -- I can't read that, what it is -- 8.  There's
 3  a prep room that's ISO 7.  There's a personal anteroom,
 4  the gowning room, which ISO 7.  You have a clean room
 5  right in the center.
 6              You hadn't seen that before?
 7       A.   We hadn't been inside the rooms.  We had seen
 8  this layout at Ameridose.
 9       Q.   Right.
10       A.   Yes.
11       Q.   Because Ameridose was building it in 2006.
12       A.   That's right.
13       Q.   So you get there.  Did you ask to go into the
14  clean room?
15       A.   Back then, sir, that just was not something
16  that was allowed.
17       Q.   So my question is, did you ask to go -- In the
18  2012 visit, did you ask Barry Cadden:  Can we go into
19  your clean room?
20       A.   No, we didn't.  It wasn't one of our methods of
21  operation for the audit at those dates.
22              If I can amend, we certainly make that as of
23  the -- after the post meningitis --
24       Q.   So you changed your procedures on these audits
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 7 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                Page 202

```
 1  after the outbreak?
 2       A.   That's correct.  We were, like everyone else,
 3  in a reactive-type mode.
 4            MR. TARDIO:  I didn't hear.
 5            THE WITNESS:  I said, like everyone else, we
 6  were in a reactive mode and we looked to make our
 7  procedures more robust.  Sorry.
 8       Q.   So for instance, you didn't see anything like
 9  this inside the clean room.  Exhibit 314, just this one
10  photo.
11            (Exhibit Number 314
12            marked for identification)
13       Q.   I mean, from the --
14       A.   No.
15       Q.   I said you could look in a little bit from the
16  window, but you can't see a whole lot from looking in
17  that outside window, can you?
18       A.   That's correct.
19       Q.   You really couldn't see the condition of the
20  floors and the walls and the ceilings?
21       A.   Right.
22       Q.   You couldn't see if there were spaces in the
23  tiles in the ceilings, could you?
24            MS. ALESSI:  Objection.
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 8 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                         Page 203

```
 1      A.    We were probably at least amenable to that
 2  first part to be able to get a little bit more of that
 3  detail.
 4      Q.    But you certainly couldn't see it all
 5  throughout the whole clean room?
 6      A.    That's correct.
 7      Q.    So when you testified that the materials of use
 8  in the clean room -- when you testified on direct that
 9  the materials seemed adequate, you didn't see dirt, you
10  didn't see discoloration, well, you didn't go into the
11  key area.  Correct?
12      A.    That's correct.
13            MR. TARDIO:  I object to the form.
14      Q.    This is the clean room that the contaminated
15  drugs were made in.
16            MS. KELLY:  Objection.
17            MR. WOLK:  Objection.
18      A.    I would have been happy to go in, but --
19            MS. ALESSI:  There's no question.
20      Q.    He wouldn't let you in, would he?
21      A.    That's correct.
22      Q.    He was not going to let you in no matter what.
23            MS. KELLY:  Objection.
24            MR. WOLK:  Objection.
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 9 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                    Page 221

```
 1   compliance with 797 or not.  Correct?
 2        A.   It's certainly an internal quality procedure
 3   that NECC could have utilized.
 4        Q.   Well, you could have utilized it too.  There
 5   are gaps analysis tools.  Correct?
 6             MR. TARDIO:  Objection to form.
 7        A.   I would utilize that for my clients.
 8        Q.   Right.  You do it for Brigham and Women's
 9   internal pharmacy.  Correct?
10             MS. ALESSI:  Objection.
11        A.   Yes.
12        Q.   You didn't do it for NECC during the 2012 site
13   visit?
14        A.   It would have been beyond the scope of this.
15        Q.   You never could have done that in 3 hours,
16   could you?
17             MR. WOLK:  Objection.  You got to let the
18   witness answer the question.
19        A.   That's correct.  I wouldn't be able to.
20             MR. WOLK:  He needs to finish the answer.
21             MR. ELLIS:  I apologize.
22        Q.   You did not do a gap analysis of NECC's USP 797
23   compliance during the 2012 site visit to NECC, did you?
24        A.   A gap analysis was not done on NECC because it
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 10 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                    Page 222

```
 1   was not in the scope of the audit or our responsibility.
 2        Q.   But you did do it for Brigham and Women's
 3   internal pharmacy.  Correct?
 4             MS. ALESSI:  Objection.
 5        A.   That's correct.
 6        Q.   You did not take any surface samples for
 7   testing and bring back to Microbiology Research
 8   Associates where you could have tested some samples, did
 9   you?
10        A.   That again was beyond the scope of the audit
11   and would be an NEC contractual agreement with MRA.
12        Q.   You did not review test results for viable
13   particles, did you?
14             MS. ALESSI:  Objection.
15        A.   I saw environmental monitoring reports.
16        Q.   But you didn't actually look for the test --
17   the primary test results for viable particles, did you?
18        A.   What NECC produced is what I saw.
19        Q.   You did not observe the aseptic processing
20   occurring in the clean room, did you?
21        A.   Right.  It may have been that at the time we
22   were doing the walk-through there was no dynamic
23   conditions ongoing.
24        Q.   You did not -- Do you know when Brigham and
```



Case 1:13-md-02419-RWZ   Document 3485-28   Filed 10/16/17   Page 11 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF FRANCIS MCATEER on 06/03/2015                    Page 267

```
 1            "And any vendor that wants your business
 2       should be willing to allow you to talk to their
 3       staff.  We also are going to do an exhaustive
 4       record review.  And that's going to take some
 5       time as well.
 6            "And we're going to use a comprehensive
 7       audit tool to document everything that we see
 8       so that we can assure consistency in each site
 9       visit that we do so that we're auditing each of
10       the vendors in the very same fashion and
11       looking for the very same information.
12            "I'm Bill Churchill" --
13       (End of recording)
14  BY MR. ELLIS:
15       Q.   Mr. McAteer, when you did the site visits to
16  NECC in 2008 or 2012, did you ask to talk to the staff
17  at the facility in private without their boss sitting
18  there next to them?
19       A.   No.
20            MS. KELLY:  Objection.
21       Q.   Did you have a conversation with Mr. Churchill
22  about that's really the way to really get to some real
23  information?
24            MS. KELLY:  Objection.
```

