In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

---

# DEPOSITION OF

# LLOYD R. SABERSKI, M.D.

*January 12, 2017*

---



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

1          IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4   IN RE NEW ENGLAND COMPOUNDING      | MDL NO. 02419

5   PHARMACY, INC. PRODUCTS LIABILITY | DOCKET NO.

6   LITIGATION                        | 1:13-MD-2419-RWZ

7   THIS DOCUMENT RELATES TO:

8   All Actions

9

10          Deposition of LLOYD R. SABERSKI, M.D.

11              Baltimore, Maryland

12            Thursday, January 12, 2017

13                  10:00 a.m.

14

15

16

17

18

19

20   Reported by:  Angela McKinney, Court Reporter

21

22



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                     Pages 2..5

Page 2

```
 1          Deposition of LLOYD R. SABERSKI, M.D., held at
 2    the offices of:
 3
 4
 5          LAW OFFICES OF PETER G. ANGELOS
 6          One Charles Center
 7          100 North Charles Street
 8          Baltimore, Maryland 21201
 9          (410) 649-2000
10
11
12
13      Pursuant to agreement, before Angela McKinney,
14    Professional Court Reporter and Notary Public of the
15    state of Maryland.
16
17
18
19
20
21
22
```

Page 4

```
 1              C O N T E N T S
 2    EXAMINATION OF LLOYD R. SABERSKI, M.D.        PAGE
 3      By Mr. Kirby                                   5
 4
 5
 6
 7
 8              E X H I B I T S
 9          (Attached)
10    DEPOSITION EXHIBIT                            PAGE
11    Ex. 1611-1   Amended deposition notice          8
12    Ex. 1611-2   Dr. Saberski's billing            8
13    Ex. 1611-3   Expert report                      9
14    Ex. 1611-4   CV                                10
15    Ex. 1611-5   Deposition list                   39
16    Ex. 1611-6   Trial list                        39
17    Ex. 1611-7   Fee schedule                      46
18    Ex. 1611-8   DHMH press release               206
19
20
21
22
```

Page 3

```
 1            A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFFS:
 3      JAY D. MILLER, ESQUIRE
 4      LAW OFFICES OF PETER G. ANGELOS
 5      One Charles Center
 6      100 North Charles Street
 7      Baltimore, Maryland 21201
 8      (410) 649-2000
 9      MICHAEL COREN, ESQUIRE
10      COHEN, PLACETELLA & ROTH, P.C.
11      127 Maple Avenue
12      Red Bank, New Jersey 07701
13      (723) 747-9003
14    ON BEHALF OF THE DEFENDANTS:
15      GREGORY K. KIRBY, ESQUIRE
16      CATHERINE W. STEINER, ESQUIRE
17      PESSIN KATZ LAW, P.A.
18      901 Dulaney Valley Road
19      Suite 500
20      Towson, Maryland 21204
21      (410) 938-8800
22
```

Page 5

```
 1            P R O C E E D I N G S
 2          LLOYD R. SABERSKI, M.D., having been
 3    previously sworn, testified as follows:
 4              EXAMINATION
 5    BY MR. KIRBY:
 6      Q   Good morning, Dr. Saberski.  I introduced
 7    myself off the record.  But for the record, my name is
 8    Greg Kirby and this is Catherine Steiner and we
 9    represent the Box Hill defendants in this case.  I know
10    you have been deposed many times before and related to
11    other plaintiffs in these cases, but just to explain so
12    that we're all on the same page --
13      A   Yeah, go ahead.
14      Q   This is my only opportunity to ask you
15    questions.  Let me just wait for you to finish.
16      A   I'm just missing my notebook.  I apologize.
17      Q   This is my only opportunity to ask you
18    questions and find out what your answers are to those
19    questions.  You are under oath.  If I ask you a
20    question and you don't understand it, will you ask me
21    to repeat it or rephrase it?
22      A   Yes, sir.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 4 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                              Pages 54..57

Page 54

1      Q   Do you know how many health care providers
2  received MPA, the recalled MPA from NECC?
3      A   No.
4      Q   If it was 100, does that sound about right?
5      A   Well, the product list said 71 -- said 76,
6  excuse me.  76 places got MPA from NECC.
7      Q   At least the recalled MPA, right?
8      A   Well, that's the list, the product list.
9      Q   Correct.  What I'm saying is over the years,
10 it may have been more than that.  But at the time of
11 issue, it --
12     A   That's the only number I've seen.
13         MR. COREN:  Objection.
14 BY MR. KIRBY:
15     Q   And one of those health care providers who
16 purchased MPA from NECC was Box Hill, the defendant in
17 this case?
18     A   Yes.
19     Q   But that wasn't the only health care
20 provider in Maryland, right?
21     A   Well, I don't recall.  I think there were
22 others there, but I don't recall.

Page 55

1      Q   Are you aware of how many customers across
2  the country purchased drugs in general from NECC in the
3  2012 time frame before the recall?
4      A   Well, I think that's a confusing question
5  because NECC made many different products.  The product
6  at issue here are the steroids, and there are only a
7  finite number of organizations getting the compounded
8  steroids, and I think the number was 76 organizations
9  and offices.
10     Q   I'm handing you what's been previously
11 marked in a previous deposition 1585-12.  Have you seen
12 this before?
13     A   Oh, yes.
14     Q   And that's NECC's customer list, and it says
15 at the top "customer list since May 21, 2012, sorted by
16 state," right?
17     A   Right.  I have seen this and I have a
18 version of that with me here today.
19     Q   I went through this with the plaintiffs'
20 other expert, Mr. Chasen.  But if I said that on here
21 were about 3,000 health care providers who were listed
22 as customers of NECC at that period of time, would you

Page 56

1  dispute that?
2         MR. COREN:  Objection to form.
3      A   Well, that's their customer list.  It's not
4  apropos to this case.  NECC had many customers.  The
5  issues here are steroids.  I think there's only 76
6  providers that got compounded steroids.
7  BY MR. KIRBY:
8      Q   Well, as a matter of fact, it wasn't just
9  MPA that was recalled by the government, right, NECC's
10 MPA?  It was other drugs that NECC produced, right?
11     A   Correct.
12     Q   And part of your opinions involve the
13 standard of care of purchasing medications from a
14 compounding pharmacy, right?
15     A   That is correct.
16     Q   And you have to utilize a particular amount
17 of due diligence or order in a particular way, right?
18     A   Yes.
19     Q   So that's not just for the purchase of MPA?
20     A   That's using a compounding pharmacy.
21     Q   You practice in Connecticut.  Other than
22 those states that you listed that you do expert work

Page 57

1  in, Connecticut is the only place that you actually
2  clinically practice?
3      A   Correct.
4      Q   Flip to page 10 and 11.
5      A   Of what?
6      Q   Of page 1585-12, please.  I'm sorry.  I had
7  to go front and back of the pages.
8      A   All right.
9      Q   On pages 10 and 11, it lists all of the
10 entities in Connecticut that ordered drugs from MPA.
11 Do you see that?  It starts at the top of 10 and goes
12 into part of page 11?
13         MS. STEINER:  Drugs from NECC?
14 BY MR. KIRBY:
15     Q   Drugs from NECC, right?
16     A   Yes.
17     Q   Does it look to be about 50 entities who
18 were customers of NECC?
19         MR. COREN:  Objection.  It's whatever the
20 number is.
21 BY MR. KIRBY:
22     Q   Well, I counted it.  It's 47.  Would you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 5 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 58..61

**Page 58**

1  have any reason to doubt that?

2      A   No.

3      Q   Do you see that Yale was a customer of NECC?

4      A   I know they were.  I don't see it on this

5  list right now, but it must be here somewhere.

6      Q   It's on page 11.  It's the seventh one down,

7  Yale New Haven Hospital.

8      A   Correct.

9      Q   And that's where you had worked, had

10  privileges, et cetera?

11      A   Yes.

12      Q   And you'd consider them to be a reasonable

13  health care provider?

14      A   Yes.

15      Q   Do you know how Yale ordered their drugs

16  from NECC?

17      A   No.

18      Q   Were you involved ever with ordering drugs

19  for Yale from NECC?

20      A   No.

21      Q   Would that be the pharmacy that would do

22  that?

**Page 59**

1      A   You would have to talk to Yale.

2      Q   You don't know one way or the other?

3      A   No.

4      Q   Okay.  So it's possible they could have

5  ordered drugs from NECC without patient-specific

6  prescriptions, right?

7          MR. COREN:  Objection.  It calls for

8  speculation.

9      A   I doubt that.

10  BY MR. KIRBY:

11      Q   As we sit here today, you can't say that you

12  know that they did use patient-specific prescriptions

13  when they ordered from NECC?

14          MR. COREN:  Objection.

15      A   It's required.  You need to.

16  BY MR. KIRBY:

17      Q   What evidence do you have one way or the

18  other that they did or didn't?

19          MR. COREN:  Form objection.

20      A   I don't know anything about the practice at

21  Yale.

22  BY MR. KIRBY:

**Page 60**

1      Q   You said you were previously affiliated with

2  Albany Medical Center?

3      A   Yes.

4      Q   Do you see them on this list?

5      A   I didn't look.

6      Q   If you flip to page 48, I think it's in

7  alphabetical order by state.  Is that the Albany Center

8  for Pain Management?

9      A   Well, that has nothing to do with Albany

10  Med.  That's just a private practice in Albany.

11          Albany Medical Center Hospital Cardiology

12  Department.

13      Q   So they order drugs from NECC -- they are on

14  the list?

15      A   They are on the list.  This is a customer

16  list.  This doesn't necessarily mean they got product.

17  Who knows what the list means?  I mean obviously at

18  some point NECC and those organizations may have been

19  doing business.

20      Q   As you sit here today, you can't say one way

21  or the other what business they did or what drugs they

22  ordered?

**Page 61**

1      A   Well, I can say one thing:  They didn't get

2  steroids.

3      Q   How do you know that?

4      A   Because there is a list of places that got

5  steroids, and I think the number was 76 places.

6      Q   And the only reason I ask is are you

7  recalling the list in your head and realizing that Yale

8  didn't order MPA or Albany didn't order steroids?  How

9  can you say that?

10      A   Well, for sure Yale didn't.  I don't know.

11  We'd have to compare the list.  There were only 76

12  places that were involved in the steroids, and the

13  issues that I've brought up in this case pertain to

14  steroids and the national recall pertained to steroids.

15      Q   I was curious so I looked up -- I was

16  interested in which top-ranked facilities were in

17  Connecticut, medical facilities.  And when I looked it

18  up, it said Yale, which is good for you, Hartford

19  Hospital, St. Francis Hospital and Middlesex Hospital

20  were the top four on U.S. News and World Report.  Would

21  that be about what you would say?

22          MR. COREN:  Objection to form.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY     DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                        Pages 66..69

Page 66

1     A   Yes.  I wrote it down this morning just so
2  that I'd get it right.  The Federal Food, Drug and
3  Cosmetic Act of 1938.
4        Q   Anything else?
5     A   Well, over the years that law evolved and
6  had a number of different codifiers.  It was adjusted
7  over the years, but that was the principal law that was
8  put into place.
9        Q   When did you look up the Federal Food, Drug
10  and Cosmetic Act of 1938?
11     A   A couple years ago.
12        Q   Do you know specifically what you would say
13  they violated with regards to that Federal Food, Drug
14  and Cosmetic Act?
15     A   Almost everything involving compliance.
16        Q   Can we agree that NECC's conduct in these
17  cases caused injury to the patients?
18     A   Well, I think their conduct in conjunction
19  with the misconduct of the physicians caused injury to
20  patients.
21        Q   Fair enough.  At least in part we can
22  agree --

Page 67

1     A   In part, yes.
2        Q   You are not going to defend any of NECC's
3  actions in these cases?
4     A   No.  But if these products were never
5  ordered or never administered, these patients would not
6  have a problem.
7        Q   The standard of care did not require
8  Dr. Bhambhani to travel to Boston to NECC's facility to
9  inspect them, did it?
10     A   No.
11        Q   Have you ever heard a reference to UniClean
12  in this litigation?
13     A   No.
14        Q   Are you familiar with ARL's role in testing
15  the NECC's MPA product here?
16     A   That's a name I've seen and I know they have
17  been involved in testing, but I really don't know much.
18        Q   Do you believe that whoever tested the
19  product for NECC fell below the standard in terms of
20  its testing?
21        MR. MILLER:  Objection to form.
22     A   No, I'm not an expert in testing.

Page 68

1  BY MR. KIRBY:
2        Q   Do you agree that if proper testing had been
3  done, it likely would have detected the contamination?
4        MR. MILLER:  Object to form.
5     A   I think you need to speak to somebody who
6  does the testing.
7  BY MR. KIRBY:
8        Q   Do you agree that because NECC was licensed
9  as a pharmacy in the state of Massachusetts that the
10  Massachusetts Board of Pharmacy had the power and
11  authority to regulate NECC?
12        MR. MILLER:  Objection to form.
13     A   Again, that's a legal question.  I don't
14  really know the distinction between the federal
15  government and the state government in terms of that
16  particular question.
17  BY MR. KIRBY:
18        Q   Do you agree that the Massachusetts Board of
19  Pharmacy was responsible for enforcing the laws with
20  respect to compounding pharmacies within its borders?
21     A   Again, that's a legal question.  I'm a
22  physician.  My guess is you would think that's the

Page 69

1  case, but it's a legal question.  I can't answer that.
2        Q   I think you answered a similar question in
3  your other Maryland state deposition.
4        Would it be the Massachusetts Board of
5  Pharmacy's responsibility to ensure that a compounding
6  pharmacy obtains an individual prescription for its
7  drugs?
8        MR. MILLER:  Objection to form.
9     A   Again, I don't know whose responsibility it
10  would be in terms of that.
11  BY MR. KIRBY:
12        Q   I think you answered affirmatively in your
13  state deposition.  If that was the case, would you have
14  any reason to change that opinion now?
15     A   Well, I'm not sure what the basis of my
16  opinion was at that time because I really don't know
17  the law, that aspect of the law.
18        Q   Would you agree as a general concept that
19  it's reasonable for a health care provider in a state
20  to assume that that state regulatory board is actually
21  regulating the licensee that it's responsibile for?
22        MR. MILLER:  Objection to form.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017
Pages 78..81

Page 78

1   after being alerted to this, and the risks are just the
2   same with any compounding pharmacy.
3       Q   I know that in medicine a lot of times
4   doctors want to be certain about things and they want
5   to be as concrete as they can.  With regards to your
6   expert testimony, it's just more likely than not is the
7   standard in terms of your opinion.  Are you able to say
8   more likely than not or would you say more likely than
9   not that the patients that we're dealing with here,
10  these eight, would have received contaminated steroids
11  if NECC had been stopped from selling before May 2012?
12          MR. COREN:  Objection to form.
13      A   I think there's another way to clarify it.
14  There are absolutes here.  I mean there is always the
15  possibility that getting your compounded substance from
16  a compounding pharmacy, there are higher risks than
17  getting it from a manufacturer.  But the probability
18  here is if you stopped NECC from delivering its
19  product, you would reduce the risk.
20  BY MR. KIRBY:
21      Q   Right.  But reducing the risk -- and we'll
22  get to that in a little bit.  You are not saying more

Page 79

1   likely than not they still would have received
2   contaminated product?
3       A   The risk is always higher with compounded
4   steroids.  Always.  If you are getting a compounded
5   steroid from a compounding pharmacy, the risk of
6   infection or adverse event is much higher and therefore
7   you should never do that because, first of all, there
8   is no benefit whatsoever that I can think of that you
9   can get from a compounding pharmacy.  All you get is
10  risk.  So there is never, ever a reason to order a
11  product from a compounding pharmacist or a compounded
12  product from a compounding pharmacist.
13      Q   I understand you keep saying there is
14  increased risk, and we'll talk about that later.  But
15  to answer my question, are you going to say more likely
16  than not these patients still would have gotten
17  contaminated steroids if NECC had been stopped from
18  selling the MPA at issue prior to May 2012?
19          MR. COREN:  Objection to form.
20      A   They certainly wouldn't have got NECC's
21  contaminated steroids.  They would have probably, based
22  on Dr. Bhambhani's testimony, they would have gotten a

Page 80

1   compounded steroid from another compounding pharmacy of
2   which all compounded steroids from compounding
3   pharmacies have a higher risk of adverse event than a
4   manufacturer.
5       Q   So I'm not -- I don't know if we're on the
6   same page here.  All I'm asking is would they have
7   still received contaminated steroids more likely than
8   that?  I understand you are talking about risk, but are
9   you here to say that even if NECC had been stopped from
10  selling MPA before May 2012 that they still would have
11  gotten contaminated steroids and had the same injury?
12      A   No, they wouldn't have had the same injury,
13  but I just made the point that if you look at the
14  history between 2000 and 2012, there are whole lot of
15  issues with compounding pharmacies.  Not just NECC.  So
16  compounding pharmacies in general have had a lot of
17  problems delivering end product.  So to answer your
18  question here, and I'm not trying to be evasive -- I
19  mean, look, if they didn't get the NECC product, they
20  probably wouldn't have gotten the fungal infection.
21  But if she continued with a compounding pharmacy, there
22  is a higher risk of having an adverse problem.  It's

Page 81

1   not going to be the problem they had with NECC.
2       Q   I'm just talking about these patients.
3       A   Well, yeah, it's a small -- it's an
4   increased risk using a compounding pharmacist.
5       Q   Other than what you gave me that was in your
6   folder, you showed me what's in your folder, and what's
7   listed in your report, have you reviewed anything else?
8   And maybe the Federal Food, Drug and Cosmetic Act of
9   1973, but anything other than that?
10      A   Yeah, I've shared everything.
11          MR. KIRBY:  Let's take a quick break.
12          (Recess)
13  BY MR. KIRBY:
14      Q   Doctor, we were talking earlier about your
15  expert work.  Would you consider this a medical
16  malpractice case or some other type of case?
17      A   Malpractice.
18      Q   Sterile injected corticosteroids that are
19  used for epidural injections are not something that
20  patients can administer themselves, right?
21      A   No.
22      Q   You'd consider it requires a skilled



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY     DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017     Pages 82..85

Page 82

1 professional like you or Dr. Bhambhani to administer?

2     A   Yes.

3     Q   It's not like going to CVS and picking up a

4 prescription for antibiotics, correct?

5     A   Correct.

6     Q   It would always be a health care provider

7 who's handling the sterile injectables, correct?

8     A   Well, if you are talking about epidural

9 steroids, yes, that is correct.

10     Q   Yes.   Thanks for the clarification.

11     And it would only be a physician who was

12 administering the epidural steroid injection?

13     A   Question?

14     Q   Is that true?

15     A   You didn't ask it as a question.   Only a

16 physician administers an epidural steroid injection?

17     Q   Or a health care provider at a medical

18 institution.

19     A   Right, it could be a CRNA, but an

20 appropriately trained health care provider, yes.

21     Q   It requires medical skill, appropriate

22 medical skill?

Page 83

1     A   Yes.

2     Q   Can we agree that the MPA at issue here that

3 NECC produced, that chemically or pharmacologically

4 they were all the same?   And by that I don't mean that

5 one had contamination and one didn't, but I mean the

6 ingredients that were in the drug were the same,

7 correct?

8     MR. COREN:   Objection as to form.

9     A   That's an interesting question.   Certainly

10 the ingredients as advertised by NECC, they are the

11 same, but the issue is were they all the same

12 concentration.   We don't know.

13 BY MR. KIRBY:

14     Q   But I guess the concentration or the makeup

15 of that solution wasn't dependent on whether a patient

16 had red hair or was overweight or anything like that,

17 right?

18     A   Well, apparently it didn't require anything.

19     Q   Correct.   I understand.   We'll get into the

20 prescription thing later.   But you would agree that the

21 product was all the same?   It wasn't changed, the

22 formulation wasn't changed based on something specific

Page 84

1 about the patient?

2     A   You are basically correct, but I want to

3 make the point here because it was a compounding

4 pharmacy.   They too could not make any two products and

5 guarantee they are exactly the same.   Even though they

6 may have the same ingredients, it may be by

7 concentrations different.   Studies have shown

8 compounding pharmacies can have a vast difference in

9 let's say active ingredient.

10     Q   All I'm getting at is there wasn't anything

11 about patient A or patient B or patient C that at least

12 intentionally would have changed the chemical or

13 pharmacologic formulation of the drug?

14     A   Yeah, I guess that's a very important point

15 in this case.

16     Q   Let's look at your report.   What's the

17 number?

18     MR. COREN:   3.

19 BY MR. KIRBY:

20     Q   We previously marked it as 1611-3.   I only

21 pull it out in case you need to reference it.   I wanted

22 to get a thumbnail sketch, a list, of your opinions in

Page 85

1 this case.   And I trust that you are here to opine that

2 Dr. Bhambhani breached standards of care, correct?

3     A   Yes.

4     Q   So why don't you give me that list and then

5 we can get into more detail and go through each one

6 separately.

7     A   If you turn to page four of my written

8 opinion, I think that outlines it fairly concisely, 1

9 through 9.

10     Q   Okay.   Failing to exercise reasonable

11 care -- I'm just going to read it.   Failing to exercise

12 reasonable and prudent care to ensure that the steroid

13 preparations used for injections were sterile, free of

14 contaminants and compounded in accordance with all

15 applicable industry standards, correct?   Did I read

16 that right?

17     A   Yes.

18     Q   So explain that to me.   What do you mean by

19 that and what are the bases for your opinions in that

20 regard?

21     A   The only way this can -- the best way to

22 ensure the safety of the medications you use for



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 86

1  injection on your patients is to get an FDA-approved
2  product from a manufacturer.  She did not.
3      Q   And why do you say that?
4      A   Because she did not.
5      Q   What's the basis for saying that the only
6  way you can get a safe product is by going to an FDA
7  manufacturer?
8      A   Well, we have data.  It turns out that if
9  you look at the history of infections pertaining to --
10  any sort of a number of infections pertaining to
11  steroids, I think over the past 50 years there is quite
12  a number of infections that have occurred.  I think 100
13  percent of those infections have been from compounded
14  pharmacies and zero from manufacturers.  There has not
15  been a single manufacturer in the United States who has
16  ever had an infection related to steroids.
17      Q   Do you have any literature or anything to
18  back that up, to support that?
19      A   It's well published.
20      Q   What I mean is can you cite to me any
21  articles or anything that I could find?
22      A   No, but it is well published.  You will find

Page 87

1  that there is not a single infection from manufactured
2  steroids causing epidural infections.  In fact, in the
3  last tally of the last 12 years, let's say the 12 years
4  before 2012, I think there are 12 cases of infection
5  that have been recorded and there is zero from the
6  manufacturers.  So very compelling overwhelming
7  numbers.
8      Q   Would you agree that a fungal infection in
9  general is a very rare occurrence?
10      A   Yes.
11      Q   When you say -- well, number one, you don't
12  expect or you wouldn't expect a health care provider to
13  actually test the drugs that they get, would you?
14      A   No.  But I would expect them to do what's
15  customary and expected when they use a parenteral
16  injection to make sure they are using a product that
17  has a higher probability of being safe.
18      Q   So like what?
19      A   A manufactured product from an FDA approved
20  manufacturer.
21      Q   Okay.  So there is nothing that they could
22  do -- are you just saying you can't purchase from a

Page 88

1  compounding pharmacist?
2      A   You can only purchase from a compounding
3  pharmacist if there is actually a need for the
4  compound.  So if the person has a special need -- as
5  you pointed out, they had red hair or they are obese
6  and they have some special need that an FDA product
7  does not provide, sure, they can use a compounding
8  pharmacist as long as they communicate with the
9  compounding pharmacist in an appropriate standard which
10  is a prescription that lays out all the things that are
11  special about your patient.
12      Q   So I've lost you.  How would that situation
13  ensure that they were getting a safe product from that
14  compounder?
15      A   You would only use the compounder on an
16  occasional basis when the need arises.  Compounding
17  agencies are not designed to be a substitute for
18  manufacturers.  They are only available to provide for
19  those patients, and it's been estimated between 1 and 3
20  percent of the patients that need special compounding.
21  Compounders are not available to provide stock.  If you
22  use a compounder for stock, you are going to run into

Page 89

1  problems because the probability of having a problem
2  with their processes is much higher and a greater risk
3  than that of a manufacturer.
4      Q   So what if a physician typically used a
5  particular drug, and let's just say they typically do
6  the same procedure over and over -- and I'm not
7  relating it to this case -- but that drug wasn't
8  available from an FDA-registered manufacturer.
9  Wouldn't they be using that compounder over and over
10  and over again?  It wouldn't be very rarely?
11      A   They would have to write a prescription for
12  that patient specific with that patient's need to get
13  that compounded product to be in accordance to the law.
14      Q   But we can agree that that wouldn't make
15  that drug that they got from the compounder any safer,
16  would it?
17      A   No, but it would decrease the risk to other
18  patients.  You would only get it when necessary.
19      Q   So what if a physician continually used a
20  compounder, and let's say they did it for every patient
21  that had a specific need and they sent in a
22  patient-specific individualized prescription all the



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                        Pages 90..93

Page 90

1  time, that's what they did, and got their drugs from a
2  compounder.  That wouldn't change the safety issue,
3  would it?
4        A    No.  In fact, the safety issue would be
5  exactly the same.  Compounding pharmacies are at higher
6  risk of having infection than manufacturers.  So that
7  is a given.  The literature is rock solid on that.
8  There is absolutely no benefit in going with a
9  manufacturer for your general patients -- excuse me, no
10  benefit in going with a compounder for general
11  patients.  All you add is risk, the risk of infection.
12  Obviously a manufacturer does not have those risks.
13  Certainly the risk is there, but the probability of
14  having a problem with a manufacturer is far less than
15  with a compounder.
16        Q    You have cited 12 cases I think you said in
17  which compounders have had infection events, correct?
18        A    Correct.
19        Q    Out of how many?  Out of how many units?
20  That's 12 out of how many?  What percentage of drugs
21  would that be?
22             MR. MILLER:  If you know.

Page 91

1        A    I don't know the percentage.  Let's compare
2  it to the manufacturers.  They've made millions and
3  millions and millions of doses compared to thousands or
4  hundreds of doses from the compounders.  So we know
5  with millions and millions of doses made by
6  manufacturers, there are no infections.  But we do know
7  with a much smaller number by a number of probably
8  2, there are 12 infections.  So this number is so
9  skewed toward the risk of using compounders that there
10  is no reason to use them for this, unless you have a
11  specific reason to use them.  If you have a patient
12  that has special needs, special risks and special
13  anything, you have to go with the best for that
14  patient.
15        Q    So you are saying -- just so I'm clear,
16  because I don't think your numbers work out, but you
17  are not saying 12 issues of infection out of 100 or
18  1,000 doses, are you?
19        A    No.  I'm making the point that most of the
20  doses in the United States of steroids come from
21  manufacturers, and there are millions of them.  Okay.
22  And they've made millions of doses and presumably

Page 92

1  millions of patients have gotten these and there are
2  zero infections related to those millions and millions
3  of doses.  However, there are compounders in the
4  United States.  I don't know how many they make in
5  terms of doses, but it's way smaller than the
6  manufacturers by a big magnitude, yet they have 12
7  infections.
8        Q    You are good at math I presume as a doctor?
9        A    Don't count on it.
10        Q    So let's say you had a million doses of
11  steroids from a compounding facility and two million
12  doses -- I'm just making up numbers.  I'll get to the
13  point.
14        A    Well --
15        Q    Hear me out.  At some point there is an
16  insignificance, isn't there?  I mean, 1 over 2 million,
17  you know, it might be -- or let's say 5 over a million
18  is not significantly greater than 1 over 5 million,
19  right?
20             MR. COREN:  Form objection.
21        A    You've got to be joking.  We have 12
22  infections -- no, not 12 infections.  I'm talking about

Page 93

1  12 outbreaks.  12 outbreaks.  So that's a lot of
2  patients.  All of them are with compounders.  That's a
3  big number.  It's a huge number.  In terms of comparing
4  injections, I don't know how many injections are made
5  by compounders, but let's say it's 100,000.  It's
6  compared to millions and millions of doses.  So with
7  100,000 injections, they have 12 infections -- or 12
8  outbreaks.
9        Q    Do you know how many doses of MPA that NECC
10  produced over the years?
11        A    No.
12        Q    So if it was 850,000, would that surprise
13  you?
14             MR. COREN:  Objection to form.
15        A    Whatever it is, it is.
16  BY MR. KIRBY:
17        Q    You have no idea?
18        A    No.
19        Q    You just mentioned 100,000 and said, oh,
20  that's probably the number.
21             MR. MILLER:  He didn't say that's probably
22  the number.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 11 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY            DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                               Pages 94..97

Page 94

1        MR. KIRBY:  He's talking about 12 out of
2    100,000 versus millions and millions and millions.
3    BY MR. KIRBY:
4        Q   My point is you don't know how many doses of
5    steroids that were compounded, right?
6        A   No.  But I do know the number of compounding
7    is a fraction, a fraction, of the number of doses
8    manufactured.  That I know.
9        Q   Do you know how many compounders make
10   steroids?
11       A   No.
12       Q   Right.  So how can you sit there and say
13   that you can compare the numbers?  Because I understand
14   you mean 12 outbreaks, but at some point if you get a
15   large enough denominator, doesn't that make that number
16   -- look, it's obviously always significant because you
17   never want to have an event, but if you are talking
18   mathematically, at some point doesn't that number
19   become less significant when you talk about the total
20   number of doses out there?
21       MR. COREN:  Objection to form.
22       A   I think that's incorrect thinking because

Page 95

1    you are spinning that to help the case here.  You have
2    to look at it relative to all the other doses of
3    steroids.  The issue here is contamination of steroids.
4    All the events, all the outbreaks, all 12 that I know
5    of come from compounders.  Zero come from
6    manufacturers.  Just that straight number alone.  Then
7    if you take into account the number of doses made by
8    manufacturers compared to compounders, it even skews it
9    more.  The bulk of the steroids in the United States
10   that are used in clinical practice are made by
11   manufacturers.  The compounders, I'm not debating they
12   make a big number and I don't know what the number is,
13   but that number, whatever that number is, it's a
14   fraction of what manufacturers make.
15   BY MR. KIRBY:
16       Q   But you can't tell us how many total doses
17   of steroids have been compounded throughout the years?
18       A   No.
19       Q   And my point is -- and I'm just making up
20   numbers for purposes of math -- but 100 over 5 million
21   versus 100 over 100 million for manufacturers, if those
22   are the numbers, and they are not, it's still a small,

Page 96

1    small percentage of risk, isn't it?
2        A   No.  Because if you actually do a mathematic
3    P value, you will find that the risk is huge.  When we
4    do population studies, we are looking at large numbers.
5    So you would look at a large number here and, yes, it's
6    a tiny number.  12 out of a hundred million is a small
7    number.  However, we're comparing it to another cohort.
8    So the issue here is does that have statistical
9    significance?  You bet your sweet bippy it does.  It's
10   huge.  So there is no comparison between the
11   compounders and the manufacturers.  Zero.  In fact,
12   manufacturers have such an incredible track record,
13   they should be applauded.
14       Q   So when you do your research and things like
15   that and you do statistical analysis, you actually have
16   to know the numbers, don't you?
17       A   Well, if you are publishing it.
18       Q   Correct.  But here you can't say how many
19   doses of compounded steroids have been produced,
20   correct?
21       A   Well, I can't give you an exact number, no.
22       Q   Right.  So what is the increased percentage

Page 97

1    of risk of compounding pharmacy steroid versus
2    manufactured steroid?
3        MR. COREN:  Objection to form.  You may
4    respond.
5        A   We don't have absolute numbers.  We can just
6    keep it at 12 outbreaks for compounders and zero for
7    manufacturers.
8    BY MR. KIRBY:
9        Q   Well, I understand that but I'm talking
10   about percentages.
11       A   But we can't talk percentages.
12       Q   Because you don't know the numbers, right?
13       A   Right.  But with due diligence you can pull
14   up the numbers and it would not look good.
15       Q   You were engaged to be an expert in this
16   case?
17       A   Yes.
18       Q   To offer your opinions and provide the bases
19   for those opinions?
20       A   Yes.
21       Q   Did you go and search to try to find those
22   numbers?



Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 12 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 98..101

Page 98

1          MR. COREN:  Objection to form.

2      A   I wouldn't even know how to get the number

3  of steroid doses from compounders.

4  BY MR. KIRBY:

5      Q   So 12 outbreaks, how many injuries was that?

6      A   A lot.  I don't remember the exact number.

7      Q   Less than 100?  Over 200?  What?

8      A   I don't remember the exact number.

9      Q   So you can't tell us the number of patients

10  that were injured by compounded steroids or the

11  denominator, the number of total doses that were out

12  there?

13     A   There were 12 outbreaks and there's zero for

14  manufacturers.

15     Q   And I know.  You keep saying that and I

16  totally understand that.

17         When you talk about percentage of risk,

18  what's the risk that when I have a procedure done that

19  I'm going to have a stroke or whatever?  In this case,

20  what is the percentage -- if I were to get an epidural

21  steroid injection using compounded steroids, what would

22  the percentage risk be?

Page 99

1      A   It would be a much higher risk than using a

2  manufacturer.

3      Q   I get that, but that's not very helpful.

4      A   It's very helpful because when it comes to

5  decision making, it's not an issue of numbers.  It's an

6  issue of putting your patient at risk.  Every decision

7  a doctor makes is putting the patient at less risk.

8  Even if the difference was rather small, you are always

9  going to choose that which provides the patient less

10  risk.

11         Here's a case where compounders provide zero

12  benefit.  There is not a single shred of evidence

13  anywhere ever published that shows that compounding

14  provides any benefit, but there is an awful lot of data

15  out there that shows that it provides risk.

16     Q   But you can't give us the percentage?

17     A   Nobody can give you the numbers because

18  nobody has really collected the numbers.

19     Q   Is it less than 1 percent?  When you say an

20  increased risk, I don't know if you are talking 50

21  percent risk or 25 percent risk or what.

22         MR. COREN:  Objection to form.

Page 100

1      A   Well, I don't know what the numbers are.

2  The only number we know is manufactured is zero.

3  BY MR. KIRBY:

4      Q   And there is risk with many things with many

5  different drugs, right?

6      A   But not the same thing.  Actually, in

7  looking at David Main's opinion, he listed five

8  examples of where manufacturers had callbacks.  He

9  actually made a case for why you should never use a

10  compounder because if you actually look at those five

11  cases that he represented as problems with the

12  manufacturing industry, what it shows is the

13  manufacturing industry has a hairline trigger for

14  callbacks.  Not a single one of those cases had

15  anything to do with infection.  They were all things

16  like something got put in the autoclave after they

17  forgot to get the autoclave inspected on time.  So none

18  of those things involved infection, but 100 percent of

19  the problems -- but those 12 cases that I just

20  mentioned were all infection.  And the reason we have

21  the problem with compounders is the only mechanism they

22  had in place for assessing whether they had an issue is

Page 101

1  they do end product testing which is way different than

2  manufacturers that have dozens of different steps that

3  they have to go through.  And if at any time one of

4  those steps is done inappropriately, it's a callback.

5  So David Main's point was look at all these callbacks.

6  Thank God we have all those callbacks.  That's what's

7  protecting America.  The FDA worked and has been

8  working phenomenally well for manufactured injectable

9  steroids.

10     Q   You are not suggesting that FDA registered

11  manufacturers don't suffer any adverse events from

12  their drugs, are you?

13     A   No.  I'm talking about infection

14  specifically.  The probability of having a problem with

15  an FDA manufactured drug is way less than a compounder

16  because they have these rigorous steps that they have

17  to go through.  Sure, nothing is a hundred percent

18  absolute.  Sure, a manufacturer could have a problem.

19  But we have 50 years of looking back on this stuff and

20  all the problems are with the compounders in terms of

21  having infections.

22     Q   When you consider the treatments that you



Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 13 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY                    DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                        Pages 102..105

Page 102

1  use, you consider the risk to the patient and I guess
2  the percentage risk.  But when you are considering the
3  risk -- hold on.  Let me finish.  If it's a difference
4  of .02 percent risk versus .3 percent risk or
5  something, it's an increased -- it might be an
6  increased risk, but it's insignificant, isn't it?
7  Don't you have to consider that?
8       A    No.  You are making a mistake here.  Before
9  you consider the risk benefit profile or the risk
10 profile, you have to see is there benefit.
11      Q    So you have to know the numbers, don't you?
12      A    Before you get there, you have to decide if
13 I'm going to use this product, is there a benefit.
14 Once you have established that there is a benefit, then
15 you can start conjugating on the numbers.  But here in
16 this case, there is no benefit.  There has never been a
17 benefit.  There is no reason to use this product.  So
18 nobody who is rationally thinking of this can find an
19 arguable reason to offer the product.
20           Now, if there is a reason for doing it,
21 let's say the patient has some weird allergy or some
22 weird intolerance or something weird and they go to the

Page 103

1  compounding pharmacist, they can make something up
2  that's appropriate for that patient.  At that point, we
3  can talk about the appropriateness of the risk.  But
4  you can never manufacture products at a compounding
5  pharmacy.  If you start manufacturing it -- first of
6  all, it's against the law.  They can't do that.
7       Q    So you are saying that there is absolutely
8  no benefit to compounding pharmacies; it's just an
9  increased risk?
10      A    For injectable deposit steroids, yes.
11      Q    And you read Dr. Bhambhani's deposition,
12 right?
13      A    I have.
14      Q    Okay.  And you read that she believed there
15 was a benefit in this case to using the drugs from
16 NECC, right?
17      A    Not only was she wrong, she was wrong by
18 more than a decade.
19      Q    Well, let me step back.  You saw her
20 discussion, I hope, about using her experience using
21 triamcinolone and betamethasone.  Do you recall that?
22      A    Oh, I do, very much so.  She is confused

Page 104

1  because the problem she associated with triamcinolone
2  and betamethasone have nothing to do with
3  preservatives; had everything to do with the
4  mineralocorticoid and glucocorticoid activities of the
5  drugs they inject.  It had nothing to do with
6  preservatives, so her argument made no sense
7  scientifically.
8           Yes, she had a concern.  She had some
9  problems with betamethasone and triamcinolone.  She was
10 open to using a different product.  It was mentioned to
11 her by one of her colleagues.  She went ahead and
12 ordered it.  No due diligence.
13      Q    And in her mind, there was a benefit and a
14 different therapeutic effect by using NECC's drugs
15 compared to betamethasone and triamcinolone, right?
16      A    Well, I don't recall that.  But even if
17 there was, it's not substantiated in the literature.
18 All three products, Depo-Medrol, triamcinolone and
19 betamethasone, the outcomes are thought to be
20 clinically the same.
21      Q    Would you agree that there was some
22 contingent of respected pain physicians who believed

Page 105

1  that there was a risk associated with injecting
2  steroids with preservative into the spine?
3       A    Well, certainly that began with the sounding
4  of Dewey Nelson back in the '70s, but that issue was
5  completely arrested certainly by late 19 -- certainly
6  by the mid '90s.  So that issue was a non-issue in the
7  '90s.  Plenty of articles have shown that.  And we're
8  talking about epidural injection.  There is certainly
9  some concern about intrathecal injection, but not
10 epidural injection.  So there is no risk to patients
11 with epidural injections and there is not a single
12 society, there is not a single article that has been
13 published that says that epidural injections with
14 manufactured steroids causes arachnoiditis.
15      Q    So it used to be of concern, and you say the
16 guy who brought it up, Dewey, that he was discredited
17 or something?
18      A    No, he wasn't discredited.  His concerns
19 were -- this gets really interesting.  His concern was
20 about polyethylene glycol.  That was the product he was
21 concerned about and he was concerned about intrathecal
22 injections.  Then when they started doing epidural



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 14 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 106..109

Page 106

1   injections in larger numbers in late '80s and '90s, he
2   got concerned that the polyethylene glycol caught in
3   the epidural space could cause arachnoiditis, which is
4   intrathecal.  That was disproven.  That was completely
5   disproven.  There are multiple different studies that
6   looked at that.  Here's the interesting thing:  The one
7   product that was associated with at least the thought
8   of causing arachnoiditis, the one product was
9   polyethylene glycol.  Dr. Bhambhani was injecting her
10  patients with polyethylene glycol.  See, the one
11  product that had been implicated or the one component
12  that had been implicated was the polyethylene glycol.
13  She eliminated the wrong element.  She eliminated
14  benzyl alcohol.  Benzyl alcohol had never been
15  associated with the problem.  It was only in there to
16  protect her.  Her naivete was mind-boggling.  She said
17  something along the lines, "Oh, isn't it better to give
18  something that has less components than more
19  components?  I mean, if you don't need it, why inject
20  it?"
21         My God, the whole purpose of the benzyl
22  alcohol is there to protect the patient and her.  She

Page 107

1   wanted it out.  It doesn't make any sense.
2       Q   How is the benzyl alcohol protecting the
3   patient?
4       A   Well, it makes sure if you are using a
5   multidose vial that you do not introduce -- if you
6   introduce bugs, they are less likely to grow and
7   proliferate.
8       Q   So that's right.  So that's not for purposes
9   of -- that would do nothing with -- it's not for
10  contamination that's introduced in the manufacturing
11  process, right?
12      A   No.  When the manufacturing process is so
13  far afield from being proper, the amount of
14  bacteriostasis that you have probably wouldn't
15  overwhelm it.
16      Q   So what is the added benefit of the benzyl
17  alcohol in this case?
18      A   Well, benzyl alcohol has to be placed in
19  multidose vials.  There is no such thing as a multidose
20  vial without benzyl alcohol.  It's a deviation from
21  acceptable medical practice to have a bottle with 5
22  milliliters of fluid and to stick a needle into it five

Page 108

1   separate times to extract fluid five separate times to
2   distribute to five patients.  That is an egregious
3   deviation from how we practice aseptic technique.
4          Now, if you want to do that technique, you
5   know, use a multidose vial, the product has to have
6   benzyl alcohol or some equivalent of benzyl alcohol in
7   there to cause bacteriostasis.
8          So in this case we have methylparaben --
9   methylprednisolone that's benzyl alcohol-free in
10  multidose vials without benzyl alcohol.  And the
11  problem here is that by entering the needle multiple
12  times, she is actually -- by using that same bottle for
13  multiple different patients, she is actually
14  potentially introducing that infection to multiple
15  patients.
16      Q   You are not suggesting that that was the
17  case here, are you?
18      A   Yes.
19      Q   So then what's your opinion in that regard?
20      A   Well, there is a high probability that, I
21  can't say for sure, but on August 21, two patients who
22  are involved in this case here got injections on the

Page 109

1   same day.  And we know from Dr. Bhambhani's testimony
2   that she uses the bottle over and over again until it's
3   empty.  And at the end of the day, if there is any left
4   over, they throw bottles out.  So there is a
5   reasonable degree of possibility that Torbeck and Rozek
6   on August 31 got injections from the same bottle.
7          Now, the issue here is if she was using
8   single dose -- if she wanted to have something that had
9   less benzyl alcohol, there are single-dose vials.  And
10  if she used a single-dose vial, she would not have had
11  this situation of introducing potentially infection
12  from one bottle to multiple people.
13      Q   So tell me exactly your understanding of
14  Dr. Bhambhani's technique when she is doing epidural
15  steroid injections, and in this case with regards to
16  multiple patients.
17      A   Well, the issue pertains to the steroids.
18  She has 5 milliliter bottles of methylprednisolone
19  benzyl alcohol-free.  There is no such -- that is an
20  oxymoron.  There is no such thing as a multidose benzyl
21  alcohol-free bottle.  So what she did is she used -- I
22  should take that back.  I suppose if she used all 5



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY                          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                              Pages 110..113

1  cc's for one patient, that could be a potential
2  legitimate use, but there is no possibility --
3  generally in clinical practice, we don't use that much
4  for one patient.  She said in her deposition she will
5  enter those bottles three to five times to withdraw
6  medication for her patients.
7       Q   With different syringes each time?
8       A   Irrelevant.  Irrelevant.
9       Q   Are you aware of any literature that allows
10 for the safe use of a multidose vial in a way that
11 Dr. Bhambhani did?
12      A   It's not supposed to be done that way.
13      Q   Says you?
14      A   Aseptic technique.  Let me be very clear
15 here.  The only thing that made it a multidose vial is
16 it had a stopper.  The preparation was not the
17 appropriate preparation for a multidose vial.  Aseptic
18 technique:  When you are using this product that was
19 not designed as a product to have repetitive needles
20 inserted, it can only be used once.
21      Q   So if there is literature out there that
22 supports the technique in the way that Dr. Bhambhani

1  acted in this case with regards to using that vial
2  multiple times, you would disagree with that?
3       A   Well, I don't believe there is any
4  literature.  I have specifically looked at that and
5  basically what the literature says in circumstances
6  where you are stuck in the situation, you have to take
7  an extra amount of time to safely prepare the
8  materials.  So the point is you are not supposed to be
9  in this situation.  I mean, if the situation develops,
10 then there are steps that you can take to ameliorate or
11 minimize your risk, but obviously you never want to be
12 introducing a needle into a vial multiple times that
13 has no way of protecting the solution.  Obviously the
14 concern here is if they are using a contaminated
15 bottle, that contamination could be spread to multiple
16 people.
17      Q   So it's your position that no other
18 reasonably prudent physician would act in the way that
19 Dr. Bhambhani did with regards to using the multidose
20 vial that way?
21      A   Yes.
22      Q   And if it was in literature, then that would

1  be completely incorrect?
2           MR. MILLER:  Objection.  Asked and answered.
3       A   Well, it's not in the literature.  As I
4  said, there is a caveat here that you can prepare it in
5  special circumstances.  But when you have a multidose
6  vial, it has to have some kind of bacteriostatic
7  substance in there to protect the patient.
8  BY MR. KIRBY:
9       Q   I know you said a second ago that you think
10 it's possible that Dr. Bhambhani introduced the
11 contamination.  You are not saying that she introduced
12 fungal contamination into the vial, are you?
13      A   No, but I'm saying that she vectored it from
14 the vial to two different patients.  And if the vial
15 was thrown out after use -- when you have a vial that
16 does not have preservative in it, after you use it you
17 are supposed to throw it out.  But she didn't do that.
18 She used it for the next patient.  My whole point here
19 is these vials were contaminated sort of like a Russian
20 roulette; some were badly contaminated and others
21 weren't.  So she happened to have had a bad vial.
22 Unfortunately, because of her practices, she was able

1  to spread that bad vial with all its badness to other
2  people, and potentially five people if she used it five
3  times.  If she stuck to the standard of care, she would
4  have thrown that vial out and there would not have been
5  four other opportunities for people to get that bad
6  drug.
7       Q   So how can you say -- do you have any
8  evidence to show me that if she had thrown the bottle
9  out then the next bottle she used that's part of that
10 recalled lot wouldn't also have contaminated steroid?
11      A   Well, you're right, I don't have that, but
12 we know that not every single bottle was contaminated.
13 It was Russian roulette.  And there is a reason for
14 that.  Because in compounding, which differs from
15 manufacturing, the steps are done by hand.  Whenever
16 you do things by hand, there is more of a chance of
17 having error.  That's why compounding has a higher risk
18 of having problems like infection.  So in all
19 likelihood, some of the vials got compounded in a way
20 that was much more deleterious than others.
21      Q   You can't say, though, that if let's say two
22 vials were used on August 31, for example, that the



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY     DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017     Pages 118..121

Page 118

1   that diminished over time.  And as I said, the
2   literature strongly supported no risk by the late '90s.
3       Q   And based on her testimony, she had a
4   good-faith belief that using the MPA from NECC was
5   reducing the risk to her patients; do you remember
6   seeing that?
7           MR. COREN:  Objection to form.
8       A   And obviously she was wrong and naive
9   because the very product she was using increased the
10  risk.  How could she possibly think that a multidose
11  vial with no preservative was safer?  I mean, that's
12  inconsistent with everything we teach with aseptic
13  technique.
14  BY MR. KIRBY:
15      Q   Other than the eight years that she used it
16  with no incident?
17      A   Hey, there is a standard of practice here.
18  Just because she got away with it doesn't mean she was
19  okay.  It's always wrong and you are not going to get a
20  physician in here to say that that was appropriate.
21      Q   Well, she wouldn't have been the only one
22  who, quote, got away with it, would you?

Page 119

1       A   Are you saying that other physicians made
2   the same mistake as her and did okay for a while?
3       Q   I'm saying she wasn't the only person using
4   preservative-free drugs, right?
5           MR. MILLER:  When?
6   BY MR. KIRBY:
7       Q   At any point.  People still use
8   preservative-free drugs.
9           MR. COREN:  Objection to form.
10      A   Well, I'm not sure you are correct on that
11  statement in terms of when it comes to steroids for
12  epidural use.
13  BY MR. KIRBY:
14      Q   So anyone now or after the late '90s who
15  ever had a belief that preservative-free steroids from
16  a compounding pharmacy were -- that there would be a
17  benefit to that, they were just completely wrong?
18      A   Yes.
19      Q   So would you disagree with the statement
20  that many physicians using injectable steroids don't
21  want preservatives because of some evidence that the
22  additives, especially one called benzyl alcohol, can

Page 120

1   irritate nerves, kill cells in the retina and damage
2   the brain of premature babies?
3       A   That is apples and oranges.  No, there is no
4   evidence and there is nobody who thinks that.
5       Q   No one at all would think that?
6       A   Certainly there could be.  As I said,
7   that -- I mean, look at the example you just gave.
8   Retinal cells in an embryonic pig.  That's apples and
9   oranges.  They have done a vast number of studies
10  looking at injections in the epidural space, I mean the
11  real thing, and there are no problems.  That's been
12  published looking at -- in fact, I think there is one
13  study.  I think it's the Abram study that looked at 64
14  series.  That's thousands of patients, 7,000 patients,
15  that got epidural steroids and there was no incidence
16  of arachnoiditis.
17      Q   I said can irritate nerves.  So you would
18  completely disagree with that statement?
19      A   Yes. No. No. No.  In the laboratory, yes.
20  In the laboratory they came up with something.  But
21  since that time, this has been well studied and there
22  is no evidence that epidural administration of

Page 121

1   steroids, manufactured steroids, cause a problem.
2   Zero.  That was a discussion at one time, but that is
3   no longer the case.
4       Q   But that's as of the late '90s, it's
5   debunked?
6       A   Yes.
7       Q   So you wouldn't believe that -- that wasn't
8   common in a portion of your field within pain medicine
9   in 2012?
10      A   Definitely not.  If somebody was talking
11  about it and had some opinion about it, it was
12  certainly in the minority because there is a vast
13  copious reservoir of literature that says they are
14  wrong.  In fact, almost every society that involves
15  themselves with epidural injections like ASIPP that you
16  mentioned has no documentation that there is a risk
17  with these injections in the epidural space with
18  manufactured product.
19      Q   So let's just be clear because initially I
20  think you said it's absolutely debunked or absolutely
21  no one would think that or absolutely if anyone did,
22  they'd all be wrong and then you just said there might



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY                 DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                                    Pages 122..125

Page 122

1  be a minority of people.  So can we agree that there
2  may be some, whether it's a minority or 50 percent or
3  what, but there would be some people that have that
4  belief?
5       A    Let me clarify.  Anybody who thinks that
6  there is some benefit in preservative-free, that would
7  be inconsistent with the published literature and they
8  would be operating on the basis of speculation and
9  opinion that is not held by science.
10      Q    So if someone didn't like triamcinolone for
11  some reason or another, would you say that they don't
12  know what they're talking about?
13      A    No.
14      Q    Doctors are entitled to their opinions.
15  They all have training and things like that, right?  So
16  some doctors do believe differently than other doctors,
17  right?
18      A    Okay.
19      Q    Do you not agree with that?
20      A    No, that's fine.  I said okay.  But
21  triamcinolone is a manufactured product.  If they want
22  to use betamethasone, that's a manufactured product.

Page 123

1  If they want to use Depo-Medrol, that's a manufactured
2  product.  That's a whole different animal when you
3  start looking at compounding pharmacies.
4       Q    But no problem with those drugs at all?
5       A    Those drugs?
6       Q    The Depo-Medrol, betamethasone --
7       A    Not administered in an epidural steroid
8  injection in the epidural space.
9       Q    Would you agree that it is a general
10  consensus not to use substances with preservatives,
11  specifically toxic ones, into the epidural space?
12      A    No, I'll disagree with that because so far
13  as we speak about steroids, none of the substances used
14  with steroids have been found to be toxic.  Zero.  What
15  is more, if you took those preservatives out -- the
16  polyethylene glycol is a preservative -- you would
17  convert methylprednisolone into a brick.  You see, you
18  need polyethylene glycol and you need polysorbate 80 to
19  maintain the integrity of the suspension.  So when
20  Dr. Bhambhani says I want to take everything out and
21  just give methylprednisolone, she would be giving them
22  a big chunk of solid mass.  So most of the stuff in

Page 124

1  those ingredients are there to maintain the integrity
2  of the suspension and then the benzyl alcohol is there
3  for bacteriostasis.
4       Q    So regardless of the purpose of the
5  ingredients in these products, anything could be an
6  irritant or a cause of reaction, couldn't it?
7       A    But not these because they have been studied
8  specifically.
9       Q    Do you use anesthetics with preservatives in
10  the epidural space when you do your injections?
11      A    No.
12      Q    Do you use water?
13      A    No.
14      Q    Well, what do you use?  You tell me.
15      A    I use local anesthetics.
16      Q    But they don't have preservatives?
17      A    Preservative-free, yes.
18      Q    And why is that?
19      A    Well, the preservative that's used in most
20  injectables is methylpyridine and that has had some
21  reactions.
22      Q    Okay.  So preservatives are fine unless it's

Page 125

1  the one -- I'm sorry.  The preservative that you don't
2  use is a problem, but all the other ones, there is no
3  problem with them whatsoever?
4       A    Well, it's a different preservative, one.
5  Number two, I get it from a manufacturer.  Period.
6       Q    Would you agree that water if introduced in
7  or around the spine could cause some problems?
8       A    Yes.
9       Q    And explain that.  Why?
10      A    Because it's hypotonic.
11      Q    So even if water could cause problems in
12  that area, then doesn't it sound reasonable that other
13  ingredients could?  I'm not saying that they always do
14  or they would, but they could cause reactions and
15  problems?
16      A    I apologize for saying this, but you are
17  being a little silly here.  Water is a very toxic
18  substance.  It's hypotonic.  It would kill things.  So
19  in the generic world of things, are there bad things
20  that can be put into your spine and cause bad things?
21  Sure.  But these particular products have been vetted
22  out over and over again.  The world's literature does



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017          Pages 130..133

Page 130

1   legitimate real concern and people die from infection.

2      Q   I'm not sure it's a hypothetical concern.

3      A   It is hypothetical.

4      Q   Are you now saying that preservatives in the

5   subarachnoid space aren't a problem?

6      A   I didn't say it wasn't a problem.  I said it

7   depends on the concentration and how they are diluted.

8      Q   So you would have no concern with injecting

9   preservatives, corticosteroids with preservatives, into

10  the subarachnoid space?

11     A   The basic wisdom is you don't want to do

12  that because there is concern about intrathecal

13  administration of large loads of medication.  Okay.

14  Right now we have plenty of data showing that people

15  get partial wet taps where you might do an injection in

16  the epidural space and some of what you are injecting

17  in the epidural space might leak into the intrathecal

18  space, but that's a small amount.  We have zero data to

19  support the development of arachnoiditis from that.

20     Q   What if you end up in the subarachnoid space

21  accidentally?

22     A   You take your needle out and don't inject.

Page 131

1      Q   So it doesn't happen?  There is never a risk

2   of that?

3      A   Well, the risk is small, but when it

4   happens, you either move to a different level or you

5   pull the needle out and come back another day.

6      Q   So you said the late '90s was when there was

7   a consensus that it was just debunked, the preservative

8   issue was debunked?

9      A   Yes.

10     Q   Tell me about the 2015 consensus letter.

11     A   The one where they -- are you talking about

12  the American Society of Anesthesiology?

13     Q   So you were asked about it during your

14  testimony in the Michigan trial?

15     A   Yes.

16     Q   And I think it was a number of organizations

17  that came together in 2015 to offer some position.

18  Tell me about that.

19     A   I haven't looked at that since then.  I do

20  remember the letter that had a list of -- I just

21  haven't looked at it in quite a while.

22     Q   So you haven't looked at it, but your

Page 132

1   opinions wouldn't change from then until now, right?

2      A   Probably not.  I don't know what I said.

3      Q   Well, if the issue was debunked and was a

4   non-issue in the late '90s, why would anyone need to

5   come out in 2015 as a consensus and say it's not a

6   problem?

7      A   I can answer that question.  Because

8   physicians all around the country, like Dr. Bhambhani,

9   were misguided and felt like, oh, I need to use

10  preservative-free.  That's why they came out.  There

11  were other physicians besides Dr. Bhambhani that were

12  misguided.

13     Q   So anyone that used preservative-free drugs

14  because of a concern for arachnoiditis or some other

15  irritation, they would be misguided?

16     A   That's correct.  From clinical a

17  perspective, absolutely.

18     Q   But, in fact, there are certain

19  circumstances where you still can use preservative-free

20  drugs, right?

21     A   Well, the doctor would have to write a

22  prescription specific to that patient, laying out the

Page 133

1   foundation and why he was doing it and then he would

2   have to go ahead and get it.

3          Here is one of the interesting ironies of

4   this case:  Those drugs that were benzyl alcohol-free

5   were available from manufacturers.  Upjohn made a

6   product and so did Alcon.  So the whole point here is

7   Dr. Bhambhani was of the impression that having no

8   benzyl alcohol was better for her patients, yet there

9   were manufactured versions of injectable steroids that

10  were benzyl alcohol-free.  But she chose to go to a

11  compounding pharmacist that couldn't possibly be

12  anywhere near the equivalent standard of a legitimate

13  manufacturer.  Besides, it was against the law for her

14  to do that anyway.

15     Q   She and other health care providers in 23

16  states, right, just to be clear?

17     A   Being ignorant of your responsibility as a

18  physician and deviating from the standard of care, no

19  matter how many you put on board, is still a deviation

20  of the standard of care.  These guys deviated from the

21  standard of care.

22     Q   Anyone who did that is unreasonable,



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
LLOYD R. SABERSKI, M.D. on 01/12/2017

DEPOSITION OF
Pages 134..137

Page 134

1  correct?  Is that your position?

2       A   No.  I just laid out there is no basis for

3  using it.  The number one basis for using a compounding

4  pharmacist is you have to have a reason.  You have no

5  reason.  But on top of that, even if you thought you

6  had a reason, manufacturers made a product without

7  benzyl alcohol so there was no reason to ever consider

8  to go to a compounding pharmacist.

9       Q   No reasonably prudent physician would go to

10  a compounding pharmacist for preservative-free MPA?

11      A   Not at that time because there were products

12  available in the United States manufactured to an

13  appropriate standard that could be used.

14      Q   But yet physicians in hospitals in 23 states

15  did so, correct?

16      A   You know, it's interesting.  If you go to a

17  flee market and you see some people getting some

18  rip-off Rolex watches, lots of people are going over

19  there and getting Rolex watches and they are happy with

20  the Rolex watches and think they are great.  They might

21  be happy with the Rolex watches, but the probability of

22  that Rolex that you are getting from the flee market

Page 135

1  for 20 bucks is probably not going to be the same

2  quality as getting a Rolex from a certified jeweler.

3       Q   Dr. Bhambhani wasn't trying to buy a ripped

4  off Rolex watch, was she?

5       A   No, but Dr. Bhambhani was misguided and so

6  were a number of other physicians that you are claiming

7  here that did the same thing.  It doesn't make a

8  difference that there were a lot of them that did it.

9  They were all misguided.  They all made the mistake.

10  Their decisions are not supported in science and there

11  is no one in here who can come in here and say there is

12  a scientific basis for that.  In fact, David Main, who

13  wrote an opinion on this case, didn't even touch that.

14  That's the hot third rail.  He wrote in his note,

15  Dr. Bhambhani, she wished to use preservative-free.  He

16  did not even attempt to address the issue that, one,

17  there was no basis for it and, number two, it's against

18  the law.

19      Q   Well, she provided the basis for why she

20  used it, didn't she, in her deposition?

21      A   It's irrelevant what her opinion is because

22  it's not consistent with the practice of medicine and

Page 136

1  what we know as doctors.

2       Q   So Dr. Bhambhani, who also has a medical

3  degree, she's well trained, she's been doing epidural

4  steroid injections for however many years, but yet her

5  opinion in terms of the care of her patients doesn't

6  matter?

7       A   Well, in this one particular niche, she is

8  inadequately trained.  Period.

9       Q   It's not against the law to use

10  preservative-free drugs, right?

11      A   Yes, it is, in terms of the laws that

12  regulate -- in this particular case, yes, because as a

13  physician you are not allowed to use a compounded

14  product if there is a commercially manufactured product

15  available.  So that is a deviation from acceptable

16  medical practice to use a compounder if you actually

17  have a product that's available.

18          Number two, you are never supposed to use a

19  compounder as a manufacturer.  You are only supposed to

20  use a compounder when you have a specific reason to use

21  it.  So if you had a single patient who had special

22  needs, by all means use the compounder, but you cannot

Page 137

1  use a compounder to make all your methylprednisolone

2  that you'll need that coming month.

3       Q   You said that there were other products

4  available.  I know that you touched on it a little

5  earlier, but I want to make sure I have them all down.

6  What are all that you said?  Upjohn had a product?

7       A   Yes, Upjohn has a product.

8       Q   Is that now Pfizer?

9       A   It's Upjohn Pfizer.

10      Q   So that's the Depo-Medrol?

11      A   Yes.  They are single-dose vials of

12  Depo-Medrol and do not have benzyl alcohol.

13      Q   You are saying there were no shortages of

14  Depo-Medrol at that time?

15      A   There were no shortages of -- there were

16  shortages from time to time, but never at any time was

17  there shortages of all the medication.  So there was

18  always one.  No one has ever determined that one is

19  better than the other.  So if there wasn't enough

20  Depo-Medrol, you could you triamcinolone, and if there

21  was not enough triamcinolone, you could use

22  betamethasone, all from certified manufacturers.



Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 20 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 146..149

Page 146

1      A   Yes.
2      Q   You are aware of that?
3      A   Yes.
4      Q   Have you seen the audit report?
5      A   I have at one time.  I've not looked at that
6  recently.
7      Q   Would you agree at least that Brigham and
8  Women's found NECC to be a safe supplier of drugs and
9  they were then allowed to continue ordering drugs from
10 NECC?
11         MR. COREN:  Objection as to form.
12         You can answer.
13     A   That was the conclusion of the report, but
14 my recollection is that they never actually went in to
15 look at the clean room.
16 BY MR. KIRBY:
17     Q   You are not a microbiologist, are you?
18     A   I am not.
19     Q   Do you typically inspect clean rooms?
20     A   Typically, no.  Have I done it?  Yes.
21     Q   Do you typically do inspections and things
22 like that?

Page 147

1      A   No.
2      Q   But you would agree that the conclusion
3  drawn was that Brigham and Women's was -- hold on.  Let
4  me find it.  That they were approved for sterile
5  compounding preparations for Brigham and Women's
6  Hospital?
7          MR. COREN:  Objection to form.
8      A   I would have to look at the actual sentence,
9  but I do know that Brigham and Women's did continue to
10 do business with NECC.
11 BY MR. KIRBY:
12     Q   So you are kind of drawing the conclusion?
13     A   Yes.
14     Q   For the record, that's Exhibit 302.
15         When we talked earlier, you don't think that
16 Dr. Bhambhani needed -- or anybody for that matter had
17 to go and inspect NECC themselves, right?
18         MR. COREN:  Objection as to form.
19 BY MR. KIRBY:
20     Q   Before using them?
21     A   No.
22     Q   Let me cut to the chase.  Is there any

Page 148

1  amount of due diligence that Dr. Bhambhani or other
2  health care providers could have done in your mind to
3  make NECC a supplier of preservative-free MPA?
4          MR. COREN:  Objection to form.
5      A   The first order of business is they
6  have to establish whether there is a need for having
7  it.  So if she would have done due diligence, she would
8  have found there was no need and therefore would have
9  quickly saved her patients' complications by never
10 using NECC.  So that's -- and we know she did no due
11 diligence because she admitted it in her deposition.
12 BY MR. KIRBY:
13     Q   But you can't say if she had done due
14 diligence whether she would have found there was a drug
15 shortage or not?
16         MR. COREN:  Objection to the form.
17     A   She would have found that to need a
18 compounding pharmacy, you have to have a special need
19 that's specific enough to write a prescription
20 specific.
21 BY MR. KIRBY:
22     Q   You said I think before that if there was a

Page 149

1  need, meaning there wasn't a commercially -- well, two
2  things:  That if there wasn't a commercially available
3  product of methylprednisolone acetate
4  preservative-free, then she could get it from a
5  compounding pharmacy, right?
6      A   No.  There were other products that were
7  equally as good that would substitute.  Nobody has ever
8  demonstrated any improvement of Depo-Medrol or
9  methylprednisolone over the triamcinolone and
10 betamethasone.  And as I mentioned earlier, there is
11 data accruing now that Depo-Medrol may have more of a
12 hazard in terms of a gluten issue and emboli.
13     Q   And that's your opinion?
14     A   No.  That's been published.
15     Q   But you are not foreclosing that other
16 reasonably prudent and trained physicians might have a
17 different opinion?
18     A   About what?
19     Q   That methylprednisolone acetate is better or
20 that there is a reason not to use triamcinolone or
21 betamethasone.
22     A   Nobody has that opinion -- well, I don't


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

LLOYD R. SABERSKI, M.D. on 01/12/2017

DEPOSITION OF

Pages 150..153

Page 150

1  want to do absolute certainty.  There is no scientific
2  literature published that supports that there is
3  benefit of one product over another.  Period.  There
4  are publications now that suggest that there is
5  increased risk in terms of emboli when you get into a
6  blood vessel with Depo-Medrol over the other smaller
7  particles.
8      Q   So are there different lengths of
9  therapeutic effect when you compare triamcinolone,
10  betamethasone and methylprednisolone?
11     A   Generally not.  There are a lot of variables
12  to look at here.  For depo steroids, they can have
13  their antiinflammatory effect in situ for maybe four to
14  six weeks.  They all seem to be about the same.  But
15  when you look at a cross-section of the population who
16  has gotten epidural steroids, whatever variety of depo
17  steroids, they all seem to do about the same.  Nobody
18  has ever specifically found depo or triamcinolone or
19  betamethasone better than one of the other.
20     Q   So triamcinolone is particle free?
21     A   No.  It's smaller particles.  The largest
22  particles are Depo-Medrol, then triamcinolone is much

Page 151

1  smaller, and then the smallest are the betamethasones.
2      Q   Just so I'm clear, you are referring to it
3  as Depo-Medrol and triamcinolone.  Depo-Medrol is the
4  brand name of the methylprednisolone, right, or it is a
5  brand name of methylprednisolone?
6      A   Yes.
7      Q   And the triamcinolone is I guess the
8  chemical name, right?  Is it Kenalog the brand name for
9  triamcinolone?
10     A   Yes, that's one of the brands, and
11  Aristocort is another.  The reason I made the
12  distinction here is usually I talk in chemical names.
13  In this particular case when talking about
14  methylprednisolone, I have to talk about Depo-Medrol
15  versus methylprednisolone because that's the issue at
16  hand.
17     Q   You want to clarify?
18     A   Yes.
19     Q   I thought I read somewhere that
20  triamcinolone has a quicker onset but also a quicker
21  resolution of the therapeutic effect compared to
22  methylprednisolone; is that accurate?

Page 152

1      A   I don't know.  I'm not sure of that one.
2      Q   It's possible.  You just don't know one way
3  or the other?
4      A   I've never read that.  I've always seen it
5  as clinically equivalent.  Everything I've read shows
6  that they're clinically equivalent.  I don't know what
7  particular circumstance we're talking about.  I'm
8  talking about epidural steroids.  Perhaps in vivo in a
9  specific clinical circumstance, an erythematous plaque
10  someplace, it's different.  But in terms of in vivo for
11  epidural steroids, the outcome appeared to be the same
12  for the three different depo steroids.
13     Q   And based on your personal experience and
14  use of triamcinolone --
15     A   I didn't do a study.  I'm just telling you
16  what I read.
17     Q   But to the extent that you use betamethasone
18  and triamcinolone, you don't see a difference?
19     A   No.
20     Q   And you don't use Depo-Medrol?
21     A   I do not.
22     Q   Say that again.

Page 153

1      A   I do not.
2      Q   You do not.  Okay.
3          So other than finding out whether she was
4  allowed to use a compounder I guess, is there anything
5  else that you are saying that Dr. Bhambhani needed to
6  do as some sort of due diligence?
7      A   So she would have found out that compounders
8  are only supposed to be used when you have a reason and
9  then she would have found out if she did due diligence
10  that the only way you can communicate to a compounder
11  is that you have to write a patient-specific
12  prescription for that patient's need and it has to be
13  written specific.
14     Q   So other than those two things, and we'll
15  touch on those two things, you are not saying that she
16  needed to submit a FOIA request or public information
17  request to the FDA or anything, are you?
18     A   No.  She's a physician.  She's expected to
19  operate along the standard of care of all physicians.
20  And the use of a compounding pharmacist is something
21  that we've all used in our practices and there are set
22  rules of engagement on how to use a compounding



Case 1:13-md-02419-RWZ   Document 3486-2   Filed 10/16/17   Page 22 of 27

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                              Pages 154..157

Page 154

1  pharmacy. We call them the standard of practice, and
2  she violated the standard of practice.
3      Q   You said she's required to follow the
4  standard of practice that all physicians use, right?
5  You meant reasonably prudent physicians, correct? You
6  are not saying that every physician always has the same
7  standard of practice?
8      A   No, they all have the same. This is the
9  law. This is the law that operates in the
10  United States. She and all other physicians are
11  required to do this. And if they don't do it, even if
12  there are 100 of them, they are all wrong. The law
13  stipulates what you have to do. It's in the Cosmetic
14  Act of 1938 and it's followed up with the 1992
15  revision.
16      Q   So you are saying that Dr. Bhambhani broke
17  the law?
18      A   Yes.
19      Q   Can you give me any example of any
20  physicians across the country who ordered the same way
21  that Dr. Bhambhani did who were ever prosecuted or
22  charged or reprimanded or anything for ordering the

Page 155

1  drugs the way they did?
2      A   It's a deviation from the standard of care.
3  Doctors don't have those kinds of charges. They get
4  malpractice cases like we are here.
5      Q   You had made the distinction that it was a
6  law and she broke the law. That is why I followed up
7  with that.
8          So you can't tell me that anyone was
9  actually reprimanded or charged or anything with
10  regards to the way they ordered the drugs from NECC?
11      A   No -- well, that's not true. The way that's
12  handled at the physician level is through civil
13  litigation and a lawsuit like this. She is now getting
14  reprimanded through this litigation.
15      Q   But you are talking -- you tell me. What
16  laws are you talking about? What laws did she break?
17      A   She violated the Federal Food, Drug and
18  Cosmetic Act of 1938.
19      Q   Anything else?
20      A   That's it. That's the main act. And then
21  they modified it in 1992. So obviously the law
22  requires that there be a prescription specific to the

Page 156

1  patient and obviously there needs to be a need.
2      Q   I think I saw that in your report. When did
3  you form your opinion that she and others broke the
4  Federal Food, Drug and Cosmetic Act?
5      A   As soon as I read what they did.
6      Q   When was the first time you became familiar
7  with the Federal Food, Drug and Cosmetic Act?
8      A   I don't think I looked up the name until
9  after the litigation, but I was fully aware of the fact
10  that you can't use a compounding pharmacist -- you have
11  to have a reason to use a compounding pharmacist. I
12  knew that from my training. And I also knew that every
13  compounding pharmacist that you are asking to create a
14  medication for, you have to write it down and have a
15  specific need for it. So I knew that from my
16  education, training and experience with compounding
17  pharmacists. I also knew that it was the law, but I
18  had never looked it up until these litigations came up.
19  So I immediately knew that it was required by law. We
20  certainly as physicians educated and trained our
21  physicians. I was responsible for a curriculum. I
22  taught my physicians how to use compounding pharmacies.

Page 157

1  This is something that I knew from anesthesia. This is
2  something that we have taught over and over again.
3      Q   Can I interrupt you real quick just because
4  I want to hit this point. You said that she needed a
5  reason to use a compounding pharmacy. And to be clear,
6  she provided a reason in her deposition. You are just
7  simply saying that her reason wasn't good enough?
8      A   Her reason doesn't exist.
9      Q   As we discussed before?
10      A   Yes.
11      Q   We don't need to get into it all again.
12          So when you were engaged as an expert, did
13  you go to the attorneys and say, okay, any of these
14  positions breached the standard of care because they
15  violated the Federal Food, Drug and Cosmetic Act or was
16  that information that was provided to you?
17      A   No, I provided it to them. And actually I
18  think I just provided it to them recently.
19      Q   Like when, out of curiosity?
20      A   At the last deposition. I did this for my
21  own education. So I looked it up and then at the last
22  deposition they asked what law is it and I couldn't



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
LLOYD R. SABERSKI, M.D. on 01/12/2017

DEPOSITION OF
Pages 166..169

Page 166

1  Massachusetts Board of Pharmacy had information that
2  that's the way that NECC was conducting business that
3  that would be inappropriate, correct?
4      A   Yes.
5      Q   But they didn't stop NECC from selling
6  drugs, did they, until the outbreak?
7          MR. COREN:  Objection as to the form.
8      A   Well, they did at the outbreak.
9  BY MR. KIRBY:
10     Q   Prior to the outbreak, they didn't stop
11 them?
12     A   In 2002 I think they were trying to.
13     Q   They didn't prevent NECC from continuing to
14 sell their drugs all across the country, right?  Or at
15 least in Maryland?  We'll go with that.
16     A   I don't know whose jurisdiction it was for
17 that kind of step, but that's not really my area of
18 expertise.
19     Q   Probably should have been one or the other
20 at least, right?
21     A   Right.
22     Q   Maybe even both?

Page 167

1          MR. COREN:  Objection as to form.
2  BY MR. KIRBY:
3      Q   And you are not aware, and if you are, just
4  provide me the information, that anyone at the Maryland
5  Board of Physicians, the Board of Pharmacy, the
6  Massachusetts Board of Pharmacy, the FDA, the CDC, the
7  DEA, et cetera, ever told Dr. Bhambhani or anyone that
8  they were ordering the drugs wrong and that they
9  couldn't do it that way?  You don't have any evidence
10 of that, do you?
11     A   Two questions.  I have no evidence and I'm
12 not aware of anybody telling her that.
13     Q   Can we at least agree -- so I understand
14 your position, then, that she was violating standards
15 because she should have used patient-specific
16 prescriptions or whatever.  Okay.  Let's assume that
17 she had a need to use a compounding pharmacy, a
18 justifiable need to use a compounding pharmacy, and
19 that she was submitting individual patient
20 prescriptions.  We can at least agree that that had no
21 effect on the patient injuries, correct?
22         MR. COREN:  Objection as to the form.

Page 168

1  BY MR. KIRBY:
2      Q   Even if she had done it that way, she still
3  would have gotten back contaminated drugs?
4      A   I think that's basically correct, but there
5  is a small caveat here, and we kind of pounded this to
6  the ground earlier, that she was getting multidose
7  vials without a preservative and by getting shipped a
8  multidose vial without preservative, by accessing it
9  multiple times, if that vial happened to be bad, she's
10 potentially vectoring bad stuff to multiple people.
11     Q   But specific to the prescription issue, that
12 in and of itself didn't have an effect?  Didn't change
13 the outcome?
14         MR. COREN:  Objection as to the form.
15     A   Probably not.  I could probably draw some --
16 we'll just say that.
17 BY MR. KIRBY:
18     Q   Would you agree that Dr. Bhambhani was
19 essentially ordering NECC's MPA and other drugs I guess
20 for office use?
21     A   Well, I don't know what her facility is.
22 Isn't it a surgery center?

Page 169

1      Q   An ambulatory surgery center.
2      A   I think you have to be careful about how you
3  use your words.  A surgery center is different than an
4  office.  She may very well have been using them in
5  both, but I'm aware of the surgery center stuff.
6      Q   Pardon my incorrect grammar, but when I said
7  office, I was suggesting the surgery center.
8      A   Okay.
9      Q   And if she had ordered from an FDA
10 manufacturer, she wouldn't have needed a prescription,
11 right?
12     A   Right.  FDA manufacturers, you are allowed
13 to order a stock.
14     Q   That's essentially what Dr. Bhambhani was
15 doing here, correct?
16     A   Right, which was against the law.
17     Q   I may have asked this before and I can't
18 remember so I'll ask it this time.  We can agree the
19 drugs, the MPA that she's ordering isn't going in
20 the patient's hands, right?  It's always going to be
21 just used by and administered by a skilled professional
22 like Dr. Bhambhani, correct?



Page 170

1    A   Yes.

2    Q   Let's assume she bought the MPA from an FDA
3  registered manufacturer.  You can't foreclose the idea
4  that that FDA manufacturer isn't experiencing some sort
5  of contamination event or other adverse production
6  issue, can you?

7    A   No, but -- well, we have a history of 50
8  years that they have had no infections and we also have
9  a history of multiple different callbacks for various
10  violations let's say in the protocols.  But none of
11  those actually amounted to being an infection.  So the
12  industry, the manufacturing industry, has a hairpin
13  trigger.  They are constantly doing callbacks because
14  they are looking at small violations and calling back
15  product just to be safe.  We don't have that with
16  compounders.  It just goes out and they do end-product
17  testing.

18    Q   I understand your answer, but my simple
19  question is that just because she orders from an FDA
20  registered manufacturer doesn't mean that there is no
21  chance that there could be a problem.

22        MR. COREN:  Objection as to the form.

Page 171

1  BY MR. KIRBY:

2    Q   I understand the caveat that you added, but
3  my premise is also correct, right?

4    A   Nothing rules out 100 percent.  But in terms
5  of the probability of having a problem, you are more
6  likely to have a problem with a compounding pharmacist
7  because they don't achieve the same standards as
8  manufacturers.  But is it absolute zero?  No, it's
9  never zero.  But the probability of having a problem is
10  higher with compounding and hence we have a dozen
11  outbreaks for compounders and zero for manufacturers.

12    Q   But again we can't say how much higher or
13  how many people were injured with the compounding drugs
14  than the --

15    A   Oh, yeah, I can do that.  Zero for
16  manufacturers.  So if you were to work out the numbers,
17  those numbers alone, since we're using zero,
18  compounders are infinitely more dangerous and have a
19  higher risk, infinite, because manufacturers have zero.

20    Q   So what were all the injuries in these 12
21  outbreaks using compounding pharmacy drugs?  What was
22  the injury sustained?

Page 172

1    A   Some were meningitis, others were staph
2  infections, stuff like that, strep infections.

3    Q   So they were contamination events?

4    A   Right.  They don't have those in
5  manufacturers.  Zero.

6    Q   They don't have contamination events?

7    A   Not in the injectable steroids.  Zero.

8    Q   But you would agree that they have them in
9  other products?  I mean, similar to your example of
10  just because you do it and you get away with it doesn't
11  mean it's not going to happen.  Just because in the FDA
12  world -- and I'm not agreeing to your statement that
13  it's never happened.  But assuming that's true, just
14  because the FDA registered manufacturers have gotten
15  away with it, haven't had a contamination event with
16  regards to injectable steroids, doesn't mean that it
17  can't happen, correct?

18        MR. COREN:  Objection as to the form.

19    A   Of course it can happen, but the
20  manufacturers have a great track record.  They have
21  made millions and millions and millions of doses.  I
22  don't know how many millions, but the number of doses

Page 173

1  made by compounders is a fraction of that by a
2  magnitude of maybe 10,000 and yet even though it's so
3  much less, they still have the 12 outbreaks.

4  BY MR. KIRBY:

5    Q   But we have no way of knowing how many
6  compounded drug doses have ever been in existence,
7  right, the denominator of this number we're trying to
8  figure out?

9    A   It's trivial compared to the number of
10  manufactured doses.  And I'm not here to say it's a --
11  that trivial number could be a big number.

12    Q   Like what?  I'm not going to hold you to a
13  number.

14    A   I don't know.  I just know that whatever
15  that number is, it's made by hand and compounders make
16  things by hand.  That's by definition.  They can't be
17  manufacturers.  They differ from the manufacturer that
18  makes tens of thousands of product in a given day.
19  There can't be a comparison, not even anywhere near a
20  comparison.  Compounders make a small number of
21  product.  Over the last couple of decades, the numbers
22  add up, but manufacturers make millions and millions



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 174

1  and millions.

2      Q   If Dr. Bhambhani was ordering other products

3  from NECC -- and it's a hypothetical.  But if she's

4  ordering dye or things like that from NECC, would she

5  also need to order with patient-specific prescriptions?

6      A   Well, if the product she's ordering is

7  available by the FDA from a manufacturer, yes.

8  Absolutely.  You have to have a reason.

9          A compounder by law is not allowed to

10 adulterate a product and redistribute it.  It violates

11 I think interstate commerce laws.  So they cannot touch

12 any product and repackage it and give it to somebody

13 else for consumption if that product exists.  It's a

14 violation of the law.

15         So unless she had a specific reason -- I

16 mean, obviously that's why they leave it to the

17 doctor's discretion.  If a specific patient had a

18 specific reason to have something compounded, sure.

19 Knock yourself out.  But you can't stock your surgery

20 center with compounding pharmacies.  One, it's against

21 the law; two, it's unsafe.

22     Q   So it would be improper to the extent that

Page 175

1  the customer list, they are ordering other drugs from

2  NECC other than just MPA -- let me just finish to be

3  clear.  To the extent that these other customers of

4  NECC, they are ordering products from NECC that might

5  not just be MPA, they could also be violating standards

6  of practice or violating the law with regards to

7  ordering those products as well?

8      A   Well, I don't know.  We'd have to review

9  that, but that's possible.

10         You have to understand here that steroids

11 themselves bring a special risk.  It appears that

12 steroids suppress the immune system which is not a good

13 thing to have happen when you are just starting an

14 infection.  Number two, it may be that the steroids

15 themselves serve as food for some types of fungi.  So

16 steroids inherently bring more risk.  And on top of

17 that, it's very difficult to sterilize the end product

18 of steroids.  You can't heat it because you'll destroy

19 it.  So it's a very difficult product to bring to

20 market safely in a sterile package.

21     Q   Is there a statistical significant number

22 that you would be okay with in terms of an increased

Page 176

1  risk?  And I'm not necessarily just talking about MPA.

2  But if you are choosing between drugs and one carried a

3  particular risk of something and then a different

4  product had an increased risk, I'm not sure what that

5  is, is there a statistically significant number that

6  would cause you to say that's not a significant enough

7  risk to not use that product?

8          MR. COREN:  Form objection.

9          Go ahead.

10     A   Basically you would have a mathematician or

11 a statistician look at it and see if there is a

12 significant P value.  That's worked out mathematically.

13 But in this case there is an infinite number,

14 obviously.  It's 12 to zero.

15     Q   I understand that, but it's a fraction.

16 First of all, physicians don't sit there and calculate

17 P values and that when they are considering the risk

18 and what drugs they are going to use or what treatment

19 or procedures they are going to use, do they?

20         MR. COREN:  Objection as to the form.

21     A   The way you put the question, if you want to

22 sit down and figure it out, that's how you do it.

Page 177

1  BY MR. KIRBY:

2      Q   You keep saying 12 to zero, but it is a

3  fraction isn't it?  The percentage of risk -- just to

4  be clear, if there is a 2 percent risk of something

5  happening, that's 2 over 100, right?  2 percent?  So if

6  you have 12 occurrences, and I know that we don't know

7  how many patients are injured, but it's 12 over some

8  number.  It's a fractional number, right?

9          MR. COREN:  Objection.

10     A   Which compares to -- you can't just take

11 that number in isolation because if you look at that

12 number in isolation -- well, let's just make up a

13 number.  Let's say it's 12 infections to a million.

14 Okay.  Then let's compare it to the manufacturers.

15 Again I'm making up numbers.  Let's say it's zero

16 infections to 500 million.  That's a huge difference.

17     Q   And we finally have gotten to the point that

18 I was trying to make or get across.  12 over 1 million

19 would be like .00000012 percent, right?

20     A   Uh-huh.

21     Q   I mean generally speaking.  You know what

22 I'm talking about, right?



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY     DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017     Pages 182..185

**Page 182**

1 but there is only one standard of care and I've been
2 speaking about the standard of care. You can't find
3 people that are going to say it's appropriate to
4 violate the standard of care. Not only is it the
5 standard of care, it's the law of the land.
6 BY MR. KIRBY:
7     Q You said that FDA manufacturers never had
8 any issues with adverse events with steroids, sterile
9 injectables?
10     A I didn't say that.
11     Q I'm sorry. What did you say?
12     A Didn't have infections.
13     Q So you are limiting the adverse events -- so
14 when the decision comes of do I buy from a compounder
15 or do I buy from an FDA manufacturer, everything else
16 being equal and assuming people are doing things right,
17 you are just saying you can only compare the risk of
18 FDA manufacturers and compounders as to what's happened
19 with steroids?
20     A No. I'm saying if you as a doctor want to
21 take the bacteriostatic benzyl alcohol out of your
22 steroid preparation, you sure as hell better know what

**Page 183**

1 you are doing. Because the one reason why
2 manufacturers do well is twofold: They follow a strict
3 guideline as to manufacture; and, number two, they put
4 a specific preservative, a bacteriostatic preservative,
5 to protect them. If you take that preservative out,
6 you actually increase the probability of having a
7 problem.
8     These manufacturers didn't dream up to put
9 this stuff in there for no reason. They put it in
10 there for a specific reason: To protect Dr. Bhambhani
11 and to protect the public. In fact, Dr. Bhambhani by
12 withdrawing the benzyl alcohol actually violated --
13 basically violated the food and cosmetics act and put
14 her patients at risk.
15     Q How so? By not using benzyl alcohol? Why?
16     A By using a multidose vial without an
17 appropriate preservative like benzyl alcohol.
18     Q Says you, but you said it's not supported in
19 the literature, correct?
20     A No. What are you talking about?
21     There is not a single person who will say it
22 is appropriate to access a multidose vial multiple

**Page 184**

1 times with five different syringes without having a
2 preservative in there. A vial of drug that does not
3 have preservative can only be accessed once. One time.
4     Q Never an exception to that?
5     A If you have a good reason you can do it and
6 you have to take the appropriate precautions. But you
7 can't do it routinely. It's not a routine thing.
8     Q Are you saying that she didn't take the
9 appropriate precautions in her process?
10     A She sure as heck did not. It is a violation
11 of the standard of care to take a needle and stick it
12 into the bottle five separate times when this bottle
13 did not have preservative.
14     Q No other reasonably prudent physicians would
15 think that Dr. Bhambhani was doing it according to
16 standards?
17     A Well, they can't because it's a violation of
18 the aseptic technique standards. And what's more, on
19 August 31, two people had an infection and there is a
20 reasonable degree of medical probability that she used
21 that same bottle on these two patients which really
22 means because she didn't throw the bottle out. It's

**Page 185**

1 technically a single-dose medication. She vectored the
2 infection to two people.
3     Q When were they injected?
4     A August 31.
5     Q I know that. But in terms of time?
6     A August 31.
7     Q The time of day?
8     A What?
9     Q Do you know the time of day?
10     A No.
11     Q Just that it's August 31?
12     A Right.
13     Q So it's not like you can sit there and
14 say -- you weren't in there and you didn't see that she
15 used the same vial on both, right?
16     A Yes, it's a hypothesis that needs to be
17 further studied, but it just shows that by violating
18 the standard of care for aseptic technique, potentially
19 you can put other patients at risk by vectoring an
20 infection that should have just been in that vial to
21 the patient, to another patient.
22     Q So pharmacologically, the benzyl alcohol,



NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY  DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                      Pages 190..193

1      Q    Did you also have an opinion with regard to
2  informed consent?
3      A    Yes.
4      Q    What's your opinion with regard to informed
5  consent?
6      A    Informed consent is only appropriate and
7  considered informed consent when the physician complies
8  with the standard of care.  Informed consent, a patient
9  just assumes their doctor is going to do everything to
10 the appropriate standard of care and in the event that
11 something happens, they have an understanding that
12 things happen when you stick to the standard of care.
13 In this particular case, Dr. Bhambhani deviated from
14 the standard of care at multiple different levels and
15 the patients were not aware of that.  The patients did
16 not know that she was providing them with a compounded
17 substance when they had access to a manufactured
18 substance that was essentially with less risk, maybe
19 even no risk, in terms of infection compared to the
20 compounded substance.
21     Q    What exactly was Dr. Bhambhani required to
22 tell her patients to be in accordance with the standard

1  of care as to obtaining informed consent?
2          MR. COREN:  Objection as to the form.
3      A    Well, if you are going to be using a non FDA
4  certified product over an available product, you need
5  to tell them why.
6  BY MR. KIRBY:
7      Q    And that would be true if it was dye as
8  well?  It's not just steroids, right?
9      A    If you are using a product that is
10 compounded and there is an FDA manufactured product
11 that's exactly the same, you better tell them because
12 that would be a deviation from acceptable medical
13 practice.  You only can use compounded products if
14 there is a reason for it and if there is not an FDA
15 manufactured product that suits your needs.
16     Q    So anytime you use a compounded drug, if
17 there is an FDA registered manufactured product
18 available, you have to tell them about that?  I'm not
19 questioning you.  I'm just asking you to confirm.
20     A    Well, the answer is sort of yes.  If there
21 is a manufactured product, you use that product.
22 That's the standard of care.  If you don't use that

1  product, you are deviating from the standard of care.
2  There is no place on earth that says the standard of
3  care is to use a compounded substance when you have an
4  equivalent substance that comes from a manufacturer.
5  Nobody can say that the standard of care says it's okay
6  to use compounded substances when there is a
7  manufactured FDA approved substance.
8      Q    I'm just focussing on informed consent and
9  what Dr. Bhambhani had to say to her patients.
10     A    She needed to tell them that she was going
11 outside the protective system for patients.  She was no
12 longer working inside the protections that the FDA
13 provided.  She was working outside the system.  And at
14 this point, it's her decision making.  There is no FDA
15 to help her.
16     Q    Do they then have to explain the FDA
17 regulatory process and how that works and how the
18 product obtains FDA approval and how it was tested and
19 things like that?
20     A    Well, Dr. Bhambhani doesn't know the
21 difference between --
22     Q    Well, that wasn't my question, if you are

1  going down that road.  Do you need to tell them all
2  that?
3      A    You need to tell them that you are using a
4  different product and you need to tell them why you are
5  using it.  And if you don't have a reason for using it,
6  then you shouldn't be using it.
7      Q    But did she have to -- you said she has to
8  tell them it's not an FDA approved product.  Does she
9  have to explain all that; that this is why FDA is
10 important because they do this and they have these
11 checks?  Does she have to get into all that regulatory
12 business?
13     A    Yes, she would have to get into that if she
14 was explaining it to the patient.  She obviously didn't
15 get into it because she didn't know the difference.
16 And that's the problem with this case.  To this day in
17 her deposition, she doesn't understand the difference.
18     Q    The difference of what?
19     A    An FDA approved product versus a compounder,
20 although eventually she changed her mind and she is now
21 using FDA approved products.
22     Q    Would you agree generally that it's not



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com