## In the Matter Of:

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY

### DEPOSITION OF

### DAVID CHASON

*December 21, 2016*



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

```
 1   UNITED STATES DISTRICT COURT fOR THE EASTERN DISTRICT
                       OF MASSACHUSETTS
 2

 3
     ------------------------------X
 4                                  :
     IN RE:   NEW ENGLAND           :
 5   COMPOUNDING PHARMACY, INC.     :
     PRODUCTS LIABILITY LITIGATION: MDL NO. 2419
 6                                  :
                                    :
 7   This Documents Relates to:     :  Master Docket
                                    :  1:13-MD-02419-RWZ
 8   All Cases against the Box      :
     Hill Defendants                :
 9                                  :
     ------------------------------X
10

11
                 DEPOSITION OF DAVID CHASON
12

13           WEDNESDAY, DECEMBER 21, 2016
                     10:00 a.m.
14

15         Law Office of Peter G. Angelos
                 One Charles Center
16            100 North Charles Street
                     Suite 2200
17              Baltimore, MD  21201

18

19

20

21

22

23

24

25   Before:  Linda Bahur, RPR
```



### Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        LAW OFFICES OF PETER G. ANGELOS, P.C.
          Glenn E. Mintzer, Esquire
 4        Sharon Houston, Esquire
          100 N. Charles Street
 5        20th Floor
          Baltimore, MD  21201
 6        (410) 649-2000
          gmintzer@lawpga.com
 7
 8   ON BEHALF OF PLAINTIFF THE ESTATE OF BRENDA ROZEK:
 9        COHEN PLACITELLA & ROTH, P.C.
          Michael Coren, Esquire
10        2001 Market Street
          Suite 2900
11        Philadelphia, PA  19103
          (215) 567-3500
12        mcoren@cprlaw.com
13
14   ON BEHALF OF BOX HILL SURGERY CENTER, RITU BHAMBHANI,
     M.D., RITU BHAMBHANI, M.D., LLC:
15
          PESSIN KATZ LAW, P.A.
16        Gregory K. Kirby, Esquire
          Catherine W. STEINER, Esquire
17        901 Dulaney Valley Road
          Suite 500
18        Towson, MD  21204
          (410) 769-6143
19        gkirby@pklaw.com
20
21
22
23
24
25
```

### Page 3

```
 1              I N D E X
 2   Deposition of:                              Page
 3   DAVID CHASON
 4        Examination by Mr. Kirby                  5
 5
 6
 7              E X H I B I T S
 8        (Attached to the transcript)
 9   No.                                         Page
10   Exhibit 1619-1   Notice of Deposition          7
11   Exhibit 1619-2   Third Amended Protective Order 8
                     of Confidentiality
12
     Exhibit 1619-3   Expert Report of David Chason  9
13
     Exhibit 1619-4   Curriculum Vitae              11
14
     Exhibit 1619-5   Invoices                      23
15
     Exhibit 1619-6   NECC ad "Trouble Finding     101
16                    Depo-Medrol?"
17   Exhibit 1619-7   ASPE Issue Brief:  Economic  102
                      Analysis of the Causes of
18                    Drug Shortages
19
20
21
22
23
24
25
```

### Page 4

```
 1           E X H I B I T S (continued)
 2
     Exhibit 1619-8   WHO Guide to Good Prescribing,  103
 3                    A Practical Manual
 4   Exhibit 1619-9A  CD of Box Hill Surgery Center   106
                      depositions of Teresa Davis,
 5                    Belinda Dreisch, Angela
                      Farthing, Bahman Kashi, John
 6                    Millhausen, Brenda Rozek, Linda
                      Torbeck and Edna Young
 7
     Exhibit 1619-9B  CD Deposition Transcripts with  106
 8                    Exhibits Ritu Bhambhani, M.D.
                      2/10/16
 9
     Exhibit 1619-10  Article by Ray Baker, M.D.      211
10                    entitled "The Price of Cost
                      Savings"
11
     1585-12          List 1:  New England Compounding 86
12                    Center Customer List since
                      5/21/12 - Sorted by State
13                    (previously marked in a prior
                      deposition)
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 5

```
 1              P R O C E E D I N G S
 2   Whereupon,
 3              DAVID CHASON
 4   having been first duly sworn, was examined and
 5   testified as follows:
 6              EXAMINATION BY MR. KIRBY:
 7        Q    Good morning, Mr. Chason.
 8        A    Good morning.
 9        Q    I introduced myself off the record, but
10   for the record, Ms. Steiner and I represent Ritu
11   Bhambhani, M.D., Ritu Bhambhani, M.D., LLC, and Box
12   Hill Surgery Center, LLC.
13             Have you had your deposition taken before?
14        A    Yes.
15        Q    Okay.  In what context?
16        A    It was employment-related, and it's been
17   about six years ago.  It was a situation in which we
18   were being sued.  I worked for a nonprofit.  It was
19   being sued over a question about quality.  We stopped
20   payment on an entity that was providing us product,
21   with quality issues, and the case came as a result of
22   that.
23        Q    Who were you working for then?
24        A    MedStar Health.
25        Q    And who was the company that sued?
```


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
DAVID CHASON on 12/21/2016

DEPOSITION OF
Pages 154..157

Page 154

1  corticosteroids?
2     A   Correct.
3     Q   One of many?
4     A   One of many.
5     Q   Okay. Would you agree that in this
6  instance, NECC didn't request particular --
7  patient-specific orders?
8     A   No.
9     Q   Okay. You'd agree that they didn't or
10 what?
11    A   I think they did, but they didn't do it in
12 such a way as to actually link the correct patient to
13 the right drug.
14        That was NECC's attempt to appear to be a
15 pharmacy, operating as a pharmacy.
16    Q   Okay. Now, you were talking about
17 prescription writing. I'm going to go down the list.
18 I made a list.
19        And then I want to know more detail about
20 your opinions, and then more importantly, the basis
21 or bases for your opinions. Okay. So let's look at
22 prescription writing first. Explain your opinion in
23 that with regard.
24        How is Dr. Bhambhani deficient in the
25 prescription writing aspect?

Page 155

1     Q   The premise that I started with was
2  reviewing her resume and finding out that she was an
3  anesthesiologist, which had some -- I had some
4  experience in working with anesthesiologists, and
5  having information about their prescribing habits and
6  sometimes the lack of knowledge.
7         The practices she recognized should occur
8  when she wrote prescriptions for her patients to
9  receive FDA-approved medications from the pharmacy
10 were clear to her, and she followed those. When it
11 came to obtaining the drug from NECC, it didn't
12 appear that they were followed.
13        During my tenure at both Good Samaritan
14 and Mercy, I trained residents on prescription
15 writing. It's a practice that occurs because the
16 administrative pharmacy personnel provide training
17 and orientation.
18        So we would assign them drug enforcement
19 numbers, DEA numbers, and we would train them on
20 prescription writing. And it was something that we
21 were very adamant about, about the relationship
22 between the patient, the pharmacy and the physician,
23 to make sure that linkage was there.
24    Q   And one of the purposes of that was to
25 kind of train them to provide the information that

Page 156

1  you needed that would be important for the specific
2  patient and the drug that they needed, correct?
3     A   Correct.
4     Q   I mean, take the intrathecal pump example.
5  If the resident or the physician writes the
6  prescription but doesn't include important factors
7  that would help you, you know, get the right dosage,
8  then that would be a waste of time?
9     A   Correct.
10    Q   Okay. Would you agree that thousands --
11 at least based on this chart that I gave you -- or
12 that I showed you, which was 1585-12, thousands of
13 customers of NECC were ordering drugs from NECC in
14 the same manner that Dr. Bhambhani was?
15        MR. MINTZER: Objection.
16        MR. COREN: Form objection.
17    Q   You can answer.
18    A   I think NECC provided the opportunity for
19 them to find a method to obtain the drugs, but that
20 didn't reduce their obligation to behave
21 appropriately. And they weren't.
22    Q   So I'm not talking about responsibility or
23 whatever; I'm just talking about actuality and what
24 was actually done. Whether it was appropriate or
25 not, that's a different question.

Page 157

1         But you'd agree that thousands of other
2  customers of NECC were ordering drugs in the same way
3  as Dr. Bhambhani without using patient-specific
4  prescriptions?
5         MR. COREN: Objection to form.
6     Q   That's what was happening in actuality,
7  right?
8     A   What's happening in actuality --
9         MR. COREN: Objection to form.
10    Q   Okay.
11        MS. STEINER: All three of you were
12 talking at the same time. I know I didn't hear the
13 respective answer, so I'm sure the court reporter is
14 having trouble as well.
15        THE REPORTER: What was your answer?
16        MR. KIRBY: He said yes.
17        THE WITNESS: Yes. Sorry.
18 BY MR. KIRBY:
19    Q   Is it your opinion that all of those
20 healthcare providers who didn't order drugs from NECC
21 using this patient-specific prescription breached the
22 standard of care?
23        MR. COREN: Objection to form. You can
24 respond.
25    A   Yes. And they put their patients at risk.


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 158

1　Q　Can you provide any evidence that any
2　customers of NECC were ordering drugs from NECC using
3　patient-specific prescriptions?
4　　A　I don't have any evidence of that, but
5　Dr. Bhambhani was trying to do that by sending them
6　patient information after the fact.  So there was an
7　attempt on her part to at least do the form of
8　accomplishing it.
9　　Q　Let me just be clear, though.  In saying
10　what you just said, you're not suggesting that
11　Dr. Bhambhani was somehow purposely trying to skirt
12　the rules, are you?
13　　MR. COREN:  Objection as to form.  Go
14　ahead.
15　　Q　Like, she didn't order in a particular way
16　and then try to cover it up by providing the
17　information that she provided.  That's not what
18　you're suggesting, right?
19　　MR. COREN:  Objection as to form.
20　　A　No, I'm not suggesting anything of that
21　nature.  I'm suggesting she should have known and
22　possibly didn't know what the appropriate procedure
23　was.
24　　Q　Okay.  If we know that thousands of
25　customers of NECC were ordering drugs the same way as

Page 159

1　Dr. Bhambhani was, and you don't have any evidence
2　that anyone actually used, you know, the real
3　patient-specific prescriptions as you described, then
4　doesn't the way it was actually done more reasonably
5　define the standard of care?
6　　MR. COREN:  Objection as to form.
7　　Q　Which is what reasonably prudent
8　healthcare providers, physicians would do under the
9　same or similar circumstances?
10　　A　I think you're drawing an incorrect
11　inference because that's a small population of the
12　total number of people involved and the number of
13　prescriptions written.  So it may be a number that
14　appears to you of some magnitude, but that isn't the
15　whole population.
16　　Q　As we sit here today, though, you can't
17　tell me any healthcare providers who actually ordered
18　the way that you say the standard required, though?
19　　MR. COREN:  Objection as to form.
20　　A　As early as the 2000s when these type of
21　companies were beginning to form, we actually were
22　trying to purchase from them from -- in MedStar and
23　could not reconcile the fact that we couldn't give
24　them patient names.  And as a result, we did not do
25　business with them.

Page 160

1　So I'm an example of a company who
2　intentionally did not purchase from companies of this
3　nature because the relationship couldn't be
4　established.
5　　Q　What is it that Good Samaritan did
6　initially to, quote, vet NECC?
7　　A　I don't think anything specifically was
8　done, that I'm aware of.  And I was not at Good Sam
9　after -- I can't tell you what year, but after 2005 I
10　wasn't there.
11　　So I had corporate oversight, but I wasn't
12　dealing with the day-to-day operations of that
13　pharmacy or any pharmacy in MedStar.
14　　Q　Okay.  Because I think you just said that
15　the reason that Good Samaritan didn't order drugs at
16　some point --
17　　A　That was corporately at MedStar Health we
18　made that decision.
19　　Q　Okay.  So for any entities of MedStar
20　Health that may have been ordering drugs from NECC,
21　what was done?  Can you tell me what was done
22　initially to allow ordering drugs from NECC?  Because
23　I know you said -- remember, you said they might may
24　have done it for six months or something, you weren't
25　quite sure?

Page 161

1　　A　Right.  The issue is that when the process
2　started, in any of these situations you obtain the
3　product and then you -- the first thing they do is
4　send you a document asking you to give them patient
5　identification information.  When that data is
6　requested, that should send us a message that there
7　was some disconnect and that they were not operating
8　the way they appeared to operate.  And that's when
9　the process was stopped.
10　　Q　Was there a process before that, though,
11　that when you are considering NECC, that you even
12　allow drugs in the door --
13　　MR. COREN:  Objection.
14　　Q　-- from NECC?
15　　MR. COREN:  Objection.
16　　A　I don't remember any conversation.
17　　Q　Okay.  Just so I'm clear, you can't say
18　one way or the other what Good Samaritan or any of
19　the MedStar hospitals did or didn't do for getting
20　drugs from NECC?
21　　A　That's correct.
22　　Q　Just assume just for a minute that
23　Dr. Bhambhani did what you said the standard of
24　care required, and that is sending in an individual
25　piece of paper or if it's done electronically, so be



Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 162

1  it, but separately for each individual patient.  Can
2  you assume that?
3       A    I'm listening.
4       Q    And can we at least agree that that
5  wouldn't have changed the fact that the drugs
6  manufactured by NECC were contaminated?
7            MR. COREN:  Objection to from.  You can
8  respond.
9       A    I'm sorry?
10           MR. COREN:  You can respond.
11      A    Oh.  Yes.
12      Q    Okay.
13           MS. STEINER:  I'm sorry, I was focused on
14  something else.  Can you just read back the last
15  question and answer?
16                (Record read.)
17      A    And I'd like to add that they weren't
18  manufactured, they were compounded.
19      Q    Okay.  Made.
20      A    Made.
21      Q    Whatever.
22      A    I'll use compounded.
23      Q    Is there anything else about the
24  prescription writing that you had an issue with or
25  believe was a deviation from some standard?

Page 163

1       A    No.
2       Q    Okay.  Let's look at Section B on page 4,
3  "Compliance with regulations."  You talk about --
4  well, you tell me what the deviations are here.
5       A    When she began to use a compounding
6  pharmacy, it wouldn't have been appropriate for her
7  to determine whether she was in compliance with
8  Maryland regulations, which it does not appear from
9  any documentation that she did.
10      Q    Okay.  Now, are you aware that she had
11  been ordering from NECC, a compounder, for I don't
12  know, several years, a number of years, prior to this
13  in the same way that she's ordering -- that she was
14  ordering from NECC when she got the contaminated
15  drugs?
16      A    She should have done the due diligence
17  when she started to order from NECC, not when the
18  contamination occurred.
19      Q    Okay.  And I think you had said earlier
20  that you did some Internet research, right, on
21  prescription writing or something?  Remember that?
22  And you said you didn't -- I think you said, and
23  correct me if I'm wrong, that you didn't find
24  anything -- eventually I think you got a document
25  from Plaintiffs' counsel that was a World Health

Page 164

1  Organization document from Europe or something that
2  talked about it, right?
3       A    Correct.
4       Q    So what is it exactly that Dr. Bhambhani
5  should have done?  Start with that.
6       A    In relation to compliance with
7  regulations?
8       Q    Correct.
9       A    That aspect of it?
10      Q    Correct.
11      A    If she had done any research on her own
12  part or had received training as we offered to our
13  residents in the hospital, she probably would have
14  known that the relationship that she was to establish
15  with a compounding pharmacy was not meeting legal
16  requirements.
17      Q    And so let's -- what do you think she
18  would have -- so that's what she would have found if
19  she did the research?
20      A    Uh-huh.
21      Q    You didn't find that, though, did you,
22  when you did your research?
23      A    I didn't find it until the WHO.  But I
24  also knew my history from having taught residents
25  told me that that's a critical aspect.  And it was

Page 165

1  validated by, you know, the chiefs of the various
2  departments of the hospital.  The chief of medicine,
3  chief of surgery, all wanted us to focus on good
4  prescription writing practices.
5       Q    And I guess where I'm losing you is that
6  you said you did research and didn't find anything,
7  right?  So wouldn't it be reasonable to think that if
8  Dr. Bhambhani did the same research that you did, she
9  wouldn't have found anything?
10           And by the way, the World Health
11  Organization article that you found you said you got
12  after you drafted your report, so it wasn't even the
13  basis for your report.  So isn't it more reasonable
14  to suggest that Dr. Bhambhani would have had the same
15  outcome as you did --
16           MR. COREN:  Objection as to form.
17      Q    -- if she had done that research?
18      A    I can't know that.
19      Q    You can't know that one way or the other,
20  right?
21      A    Correct.
22      Q    Okay.  And so let's then take another
23  scenario.  Let's say that she did research and found
24  out that she needed to use patient-specific
25  prescriptions when ordering from NECC, and she did


Nationwide Coverage

1201 West Peachtree Street  
Suite 2300  
Atlanta, GA 30309  
404.847.0999  
www.DiscoveryLit.com

Page 166

1  that. So she then submitted the patient-specific
2  prescriptions.
3          We're then back in section A with the
4  prescription writing thing in the prescription
5  writing section, right? Even if she had found out
6  that information and submitted patient-specific
7  prescriptions, that wouldn't have changed the
8  outcome. Fair enough?
9          MR. COREN: Objection. Objection as to
10 form. What outcome?
11         MR. KIRBY: Well, the outcome in this
12 case. If you object for the record, that's great. I
13 don't need speaking objections. We can ask the
14 witness to leave, okay?
15     A   I think you're missing the aspect that
16 the -- that debate threw me off.
17     Q   I can ask the question again, if you'd
18 like.
19     A   Ask the question again, would you?
20     Q   So I said let's take a different scenario.
21 We already talked about the one scenario. If
22 Dr. Bhambhani did research and through her excellent
23 skills, Internet searching, she found information
24 that suggests that she, in fact, needed to submit
25 patient-specific prescriptions to order drugs from

Page 167

1  NECC, and she did so. Then we're back, I guess, to
2  the prescription writing section where if she had --
3  you'd agree that if she then had submitted
4  patient-specific prescriptions to NECC, then the
5  outcome that we're dealing with in these cases
6  wouldn't have changed, right?
7          MR. MINTZER: Objection.
8          MR. COREN: Objection as to form.
9          MR. MINTZER: Objection, asked and
10 answered.
11         MR. KIRBY: If it's asked and answered and
12 he wants to give the same answer, that's fine with
13 me.
14         MR. COREN: But I still have an objection
15 as to form, Greg.
16     A   The issue is once it goes back to the
17 prescription writing, my expectation would be that
18 the physician would have been signaled that there was
19 some kind of a disconnect in the practice of NECC and
20 may well have caused her to question that process and
21 maybe even contact some agency to ask them to look
22 into, like the Board of Pharmacy, to look into --
23     Q   Go ahead.
24     A   Because they're asking for her to do
25 something. And the question would have been whether

Page 168

1  she complied or not. But is that a signal that their
2  behavior is outside the norm?
3      Q   All right. And that's the disconnect that
4  I have, because I'm asking to you assume that she
5  would submit patient-specific prescriptions. And if
6  she does research and finds that she needs to write
7  patient-specific prescriptions and she doesn't, how
8  in that scenario does it make any difference?
9      A   Only that it would have provided her with
10 a warning about their behavior.
11     Q   That's it?
12     A   Yes.
13     Q   Okay. You mentioned before that MedStar
14 corporate couldn't reconcile NECC asking them just
15 for names, you know, that was improper.
16     A   Uh-huh.
17     Q   But did MedStar report NECC to any agency
18 to investigate?
19     A   Not that I'm aware of. At the time, what
20 NECC was doing was repackaging FDA-approved drugs,
21 which is different than this scenario involving the
22 compounding.
23     Q   How did you know that? You told me
24 earlier that you didn't know -- that you hadn't done
25 any investigation of NECC, you were strictly stuck on

Page 169

1  Dr. Bhambhani's behavior.
2      A   It wasn't NECC necessarily. It was any of
3  the compounders where, at an earlier stage, no one
4  was making this type of product, that I was aware of.
5  It was all drug shortages.
6      Q   It would have been easy for you to report
7  a concern with NECC's -- you know, and them asking
8  you or MedStar to provide a patient list, correct?
9  Because at your involvement with the Maryland Board
10 of Pharmacy, you wouldn't have to necessarily report
11 to anyone else, you could just take it back to the
12 board yourself as a commissioner or the license
13 committee chair, right?
14     A   I didn't do that. And over the time I was
15 working this, I wondered whether that would have
16 provided any benefit. But that's hindsight.
17     Q   But yet you're criticizing Dr. Bhambhani
18 for not doing that if that situation had arisen?
19     A   I'm reporting that she didn't do that.
20     Q   You talk about Maryland Health General
21 Regulations -- I'm still on section B -- that she
22 would have -- it says, "She did not perform any
23 documented research regarding appropriate
24 prescription writing practices as listed in the
25 Maryland Health General Regulations."


Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 174

1  A  It was a preprinted form. So she could
2  have changed it to anything that she wanted. It was
3  in her computer system.
4  Q  Right. You read her deposition, right?
5  A  Right. But I also saw her patient records
6  for the various patients, and it was preprinted on
7  her document where she would put in the status of the
8  patient, the injection site and everything else, and
9  she would list the drug.
10 Q  But you read her deposition transcript in
11 which she described that she used Depo-Medrol PF as
12 her shorthand for the drug that she was using, right?
13 A  That didn't make it right.
14 Q  But you're trying to suggest that
15 Dr. Bhambhani can't do that, based on what she
16 wants to use for shorthand?
17    MR. MINTZER: Objection to form.
18 A  The medical record is becoming more and
19 more standardized, and the use of appropriate
20 nomenclature is key to that.
21 Q  But you've never drafted a procedure note
22 for an epidural steroid injection nor are you
23 qualified by practice to do so, right?
24 A  I've helped physicians draft documents for
25 computer systems to identify how they would order and

Page 175

1  administer drugs.
2  Q  But the nomenclature itself, what she
3  used -- I know you have an issue with the
4  nomenclature she used. But that didn't change the
5  drug given and make it contaminated, did it?
6  A  No, of course not. But it didn't --
7  didn't lead me to believe that she practiced --
8  practiced in the most appropriate way.
9  Q  Understood that that's your position. But
10 that doesn't mean that the way in which she used --
11 the way in which she identified the drug, that that
12 caused her patients to get sick?
13    MR. MINTZER: Objection to form.
14 A  I wasn't inferring anything of that
15 nature.
16 Q  I understand. I just need to know one way
17 or the other. So if you're not inferring that,
18 that's fine. So you're not inferring that, correct?
19 A  Correct.
20 Q  Okay. Unless you have anything else on
21 that topic, let's go to the fourth issue that you
22 had, "Research on compounded products."
23 A  Uh-huh.
24 Q  Can you explain what your issue is on that
25 topic?

Page 176

1  A  From the documentation it indicated to me
2  that Dr. Bhambhani didn't conduct any research to
3  confirm that this company was capable of compounding
4  the product. And it didn't appear from her responses
5  that she understood the difference between
6  compounding and manufacturing.
7  Q  Okay. So what exactly was she supposed to
8  have done, specifically?
9  A  My point here was that she was responsible
10 for confirming that the product that she was using
11 was safe and appropriate for her patients, and it
12 didn't appear to me from her documents that she had
13 done this.
14 Q  It was, we can agree, eight years or so,
15 right? Her use of NECC's MPA for eight years was
16 safe, correct?
17    MR. COREN: Objection to form.
18 A  She was lucky enough that for an earlier
19 period that she didn't receive contaminated product.
20 But that doesn't remove the idea that she could have
21 done research to determine whether they were
22 appropriate vendors.
23 Q  But you also have to have some luck to
24 not, you know, have an adverse event from a drug that
25 you get from an FDA supplier, too, right? It's not

Page 177

1  that just because you're getting it from a compounder
2  means that you can't trust them, right?
3     MR. COREN: Objection to form. You can
4  respond.
5  A  When you're bypassing the controls that
6  the FDA places on the production of a product, the
7  physician assumes a higher set of responsibility and
8  there's more risk. So they need to do more due
9  diligence.
10 Q  But there were entities that did do --
11 that did inspect NECC, right?
12    MR. COREN: Objection to form.
13 A  I don't know that.
14 Q  So you weren't provided any information
15 about inspections done by Brigham and Women's
16 Hospital?
17 A  That was outside the scope of what I was
18 focused on. I was focused on her behavior and her
19 actions.
20 Q  Well, you just said, I think, and I could
21 be wrong, correct me if I'm wrong, that if she had
22 done research she would have found out that NECC
23 couldn't provide safe drugs or would provide risky
24 drugs. Didn't you just say that?
25 A  The opportunity was there for her to do


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY
DAVID CHASON on 12/21/2016

DEPOSITION OF
Pages 178..181

Page 178
1  that.
2      Q    Right. Right. But if Brigham and Women's
3  did the inspection and came away finding that there
4  was no issue with NECC, and they were permitted to
5  continue to order drugs, then wouldn't that be
6  contrary to what you just said?
7           MR. MINTZER:  Objection.
8           MR. COREN:  Objection to form. Misstates
9  the record.  Also an incomplete statement of the
10 record.
11     A    I'm sorry I'm laughing, but I'm lost.
12          MS. STEINER:  It's all designed to make
13 you lost.
14     Q    So then I have to ask the question again.
15     A    I know, but this is going on long enough
16 that the answer that I can give you is that she had
17 an obligation.  I don't know what occurred in Brigham
18 and Women's, and I can't speak to that.
19     Q    So if she had done the proper research,
20 what would she have found about NECC?
21     A    I don't know.  But she could have -- the
22 possibility exists she could have found out that they
23 were a subpar producer of product or that she was
24 breaking the standard of care with patient, physician
25 and pharmacist relationships.  And that would have

Page 179
1  led her to make some other decisions.
2      Q    So I understand, theoretically, if she had
3  done that, she may theoretically have found out that
4  NECC wasn't a safe supplier of drugs, right?  It's
5  possible that she could have done that.  But sitting
6  here today you can't tell us one way or the other
7  that she would have found that out?
8           MR. COREN:  Objection as to form.
9      A    Theoretically, I could be sitting on that
10 side of the table, too, and ask your question.  But
11 the question doesn't make sense to me.
12     Q    I'm just trying to find out what your
13 opinion is.
14     A    It's circular.
15     Q    And I think that you said it's possible
16 she may have found out --
17     A    And we can't know what would have
18 occurred.
19     Q    Okay.  That's all I need to me.  We just
20 can't say one way or the other.
21     A    Okay.
22     Q    Okay.  We're getting good at this.
23     A    We're getting good at this.  That's what
24 worries me the most.
25     Q    If other entities had inspected or done

Page 180
1  the research, the due diligence, I guess, to find out
2  if NECC was a safe supplier of drugs, and
3  hypothetically they found that NECC was a safe
4  supplier of drugs and it didn't raise any concerns
5  or red flags, then is it fair to say that if
6  Dr. Bhambhani had done that same -- gone through that
7  same process, she would have found -- she would have
8  gotten the same result?
9           MR. COREN:  Objection to form.
10          MR. MINTZER:  Objection.
11     A    That's not a hypothetical that I can get
12 my head around.  I can't answer that.
13     Q    The Massachusetts Board of Pharmacy did an
14 inspection.
15     A    They didn't do their jobs.
16     Q    Do you think they fell below the standard
17 of care?
18     A    Yes.
19     Q    Okay.  Nonetheless, they did an inspection
20 and you're aware of that, correct?  Because the
21 Maryland Board of Pharmacy relied on an inspection
22 report from the Massachusetts Board of Pharmacy in
23 giving NECC a permit, correct?
24     A    All, all licensed pharmacies have to
25 submit one.  I don't have specific information about

Page 181
1  NECC doing it or not doing it.
2      Q    If the record in this case reflects that
3  the Maryland Board of Pharmacy relied on an
4  inspection report, May of 2011, done by the
5  Massachusetts Board of Pharmacy, then it's fair to
6  say that the Maryland Board of Pharmacy relied on the
7  Massachusetts Board inspection with NECC?
8      A    Yes.
9      Q    Kind of along the lines of the
10 Massachusetts Board of Pharmacy, would you also agree
11 that the FDA in this case didn't do their job or its
12 job?
13          MR. COREN:  Objection as to form.
14     A    No, I don't agree with that.
15     Q    And why not?
16     A    The FDA was in a position where there was
17 enough lack of clarity about who had oversight that
18 these kind of situations occurred.  That's changed
19 now.  But the pharmacies were standing in the middle
20 between manufacturing and being a pharmacy and using
21 it to their advantage.
22     Q    So it's your opinion that the FDA lacked
23 clarity in their authority or ability to take action
24 against NECC?
25     A    It was -- there were gray areas between



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

Page 198

1  deposition was that AAAHC -- I'm paraphrasing --
2  leaves no stone unturned, they come in, they check
3  the policies and procedures, they open up the
4  medicine cabinets, look at the medicine, they
5  evaluate everything about the ambulatory surgery
6  center before certifying them, you wouldn't have any
7  reason to dispute that, would you?
8              MR. MINTZER:  Objection.
9              MR. COREN:  Objection to form.
10       Q    You wouldn't have any reason to dispute
11  that, would you?
12             MR. MINTZER:  Same objection.
13             MR. COREN:  Same objection.
14       A    I can't comment on something that I
15  haven't evaluated their standards.  So it's not
16  something that I would be able to venture a guess
17  about, make a statement about.
18       Q    Pardon me.  So I understand that you say
19  you can't venture a guess, but that you also don't
20  have any reason to dispute that?
21             MR. COREN:  Objection to the form.
22             MR. MINTZER:  Objection to the form.
23       Q    The testimony that was in her deposition.
24             MR. MINTZER:  Same objection.
25       Q    Correct?

Page 199

1              MR. MINTZER:  Same objection.
2              MR. COREN:  Same objection.
3        A    I don't think I can answer that question
4   because I don't know what their standards are and I
5   don't know how strictly they adhere to the kind of
6   practices that would have provided some patient
7   safety.
8        Q    Being provided -- you were provided with
9   her deposition by Plaintiffs' counsel, correct?  You
10  reviewed Dr. Bhambhani's deposition, correct?
11       A    Yes.
12       Q    You would have seen in her deposition that
13  she was certified by AAAHC, correct?
14             MR. COREN:  Objection to form.
15             MS. STEINER:  That's a yes?
16       A    That's a yes.
17             MS. STEINER:  You're nodding, he's
18  coughing.  I heard no answer, so that's my job.
19       A    Being the police officer is tough, I see.
20             MS. STEINER:  That's why I'm wearing the
21  black and white.
22       Q    But yet if you're saying you're not
23  familiar with AAAHC, you didn't ask the Plaintiffs'
24  attorneys for any information to support your
25  opinions with regards to the policies and procedures

Page 200

1   and that kind of stuff, right?
2              MR. MINTZER:  Objection to form.
3        A    I conducted my review of the policies and
4   procedures in the light of the way a pharmacist would
5   develop the policies and procedures in the hospital
6   setting that would be compliant with joint commission
7   accreditation rules.  And to me they didn't meet that
8   standard.
9        Q    Understood.  But what a pharmacy would do
10  or a hospital pharmacy would do under the joint
11  commission standards, not standards of an ambulatory
12  surgery center?
13       A    Everyone has their own standards, but
14  there are things that are similar in them, like the
15  use of multidose vials.  And relative to that, I
16  didn't think this was a well-done -- well-maintained
17  policy.
18       Q    Is there anything else about section A
19  that you've talked about that we haven't discussed?
20  Any opinion that you have that we haven't
21  discussed?
22       A    Other than the one reference that their
23  infection control procedures contain references to
24  entities that did not exist in a single practice
25  center.  So that is one indication to me that they

Page 201

1   were still using a packaged product that they hadn't
2   tailored to their needs.
3        Q    Okay.  And all of the basis for your
4   opinions in this section are included here in your
5   report or we've discussed them, correct?
6        A    Correct.
7        Q    Let's look at the vendor review process in
8   section B, bottom of page 5.  What are your opinions
9   in regards to this topic?
10       A    It's a very pointed, succinct statement I
11  tried to make here regarding whether there was
12  actually any process that the surgery center used to
13  evaluate all vendors, not just pharmaceutical
14  vendors.  And I didn't see what I thought was an
15  ongoing and thorough monitoring process for all
16  products, all -- not just products, but personnel, et
17  cetera.
18       Q    Okay.
19       A    That's why that's there.  It's referred to
20  in her deposition.  It refers to her deposition.
21       Q    Let me make sure I understand.  So you're
22  criticizing Dr. Bhambhani because she didn't have a
23  review process in place for other supplies or
24  employees or things like that?
25       A    In this case, vendors.



Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 202

1  Q   Okay.  Are you referring to vendors for
2  drugs, suppliers of drugs?
3  A   Med-surg supplies.  Anything that she used
4  in her practice that was a -- well, let's call it a
5  reuse -- not a reusable product, but all of the
6  supplies that she used.  I didn't see any controls
7  that I thought were appropriate.
8  Q   Okay.  Could Dr. Bhambhani rely on a
9  wholesaler to vet suppliers -- or to vet vendors for
10 supplies?
11 A   If she had a vendor -- my take on it was
12 she was using multiple vendors and, therefore, the
13 responsibility fell on her.
14 Q   For example, McKesson --
15 A   That's one.
16 Q   -- would that be appropriate?
17 A   Right.
18 Q   And I think you said, correct me if I'm
19 wrong, a while back, that Good Samaritan Hospital
20 relied on wholesaler distributors to vet suppliers --
21 to vet vendors for supplies?
22     MR. COREN:   Objection to form.
23 Q   Okay.
24 A   But there's also, you know, manufacturers
25 that the wholesaler distributes that she should make

Page 203

1  evaluations of whether that's the right manufacturer
2  for her needs.  You know, needle sizes, all kinds of
3  things that she might evaluate.
4      And this was a case where I just didn't
5  see the documentation that she was making a concerted
6  effort to evaluate products.
7  Q   And Dr. Bhambhani wasn't a new physician,
8  correct?
9      MR. MINTZER:  Objection to form.
10 A   I don't believe she was a new physician.
11 Q   She'd been doing it for a while?  She'd
12 been practicing medicine for a while, right?
13 A   Right.
14 Q   Okay.  And so your criticism goes to the
15 documentation?
16 A   That she didn't appear to have a process.
17 And she may have, you know, in her earlier period
18 relied on the hospitals that she worked out of to
19 perform this function.  But when she took it over
20 independently, she needed to have controls that I
21 didn't see in her documentation.
22 Q   Is it possible that as a long-practicing
23 pain medicine expert, pain medicine physician, that
24 she would know which needles or which syringes or
25 which supplies she needed without having to rely on

Page 204

1  someone else?
2      MR. MINTZER:  Objection to form.
3  A   The identity of the product is in issue
4  here.  You know, did she get -- did she make
5  evaluations of which vendor to get it from or which
6  manufacturer to use or things of that nature.
7  Q   What specifically did the policies need to
8  say?
9  A   That there was an ongoing -- describing an
10 ongoing process for evaluating the products that she
11 used.  And she used quite a number of products in her
12 practice.
13 Q   And assuming that she had had such a
14 policy in place, what would have changed?  What would
15 the outcome be?
16 A   It was another contributor to my
17 assessment that her practice was not well-managed.
18 It wasn't in itself a singular cause of any one
19 issue.
20 Q   But other than your opinion that her
21 practice wasn't well-managed, specifically as it
22 relates to lacking actual documentation of a policy
23 for vetting vendors, what did that -- what problem
24 did that cause?  I mean, that didn't lead to the
25 outcome in this case, did it?

Page 205

1      MR. COREN:  Objection to form.
2  A   I think I just said that these are all
3  contributing factors.  No one factor caused anything
4  to happen.
5  Q   So I kind of understand that kind of
6  nebulous throw everything into the cloud opinion, but
7  you can't sit here -- you can't say as we're sitting
8  here today more likely than not that Dr. Bhambhani's
9  failure to have this particular policy in place, that
10 that caused her patients to develop meningitis and/or
11 die?
12     MR. COREN:  Objection to form.
13     MR. MINTZER:  Objection to form.
14 A   No one factor caused this situation to
15 develop.  But by the same token -- and the word
16 "nebulous," I'd like to ask you to retract that.
17 Q   And I apologize.  I was -- more like a
18 cloud.
19 A   Yeah.  Okay.  The preponderance of the
20 issues that I pointed out all led me to believe that
21 there were deficiencies in the practice.  No one
22 issue was so overwhelming to say that caused her to
23 have a failure point, because it was another outside
24 vendor who was the real source of the first failure
25 point.


Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 206

1   Q   But you also -- you also know that she was
2   evaluated by AAAHC and received certification by
3   them, right?
4           MR. COREN:  Objection to form.
5   A   Can I say asked and answered?
6   Q   Well, you can say "yes" and that would
7   make it a lot simpler.
8           MR. MINTZER:  What was the question?  Are
9   you going to -- are you on the same question, because
10  if you're going to leave it, I won't ask her to read
11  it back.  I want to hear it again.
12          (The last question was read into the
13  record.)
14  BY MR. KIRBY:
15  Q   And you're unfamiliar with AAAHC's way of
16  auditing healthcare providers?
17  A   And you told me that they evaluated her
18  before and after.  So that's the limitation of my
19  knowledge regarding them.
20  Q   So it's possible that AAAHC evaluated
21  Dr. Bhambhani with regards to all policies and
22  procedures, including this one at issue, and found
23  that it was perfectly fine?
24          MR. COREN:  Objection to form.
25          MR. MINTZER:  Objection

Page 207

1   A   That's not a conclusion I can reach.
2   Q   You just can't say one way or the other?
3   A   That's not a conclusion I can reach.
4   Q   Okay.  Is there anything else about this
5   topic that we haven't discussed?
6   A   No.
7   Q   Okay.  I think we're on to storage and
8   refrigeration practices.
9           Can you tell any what your criticisms are
10  here?
11  A   There are a couple of components there.
12  One was that products that are stored should be away
13  from patient care areas during storage because the
14  potential for contamination is greater when they're
15  not separated.  You don't necessarily store your
16  drugs -- it's like storing your food and other things
17  in the same room.  It's a good practice not to do
18  that.
19          In addition, there were compounded
20  products that I'm believe should have been
21  refrigerated and weren't.  There were vials that had
22  been opened to be used a second time, and they should
23  have been refrigerated.
24          So it was my conclusion that storing
25  product under refrigeration would have reduced the

Page 208

1   potential for those contamination to be as
2   significant.  The best thing to grow bacteria and
3   fungi is to leave them unrefrigerated.
4           Now, their statement, I believe -- in
5   here, I think is contradicted.  I don't believe that
6   to be the case.  But she also used vials more than
7   once and didn't store them in refrigeration.  That is
8   really a failure.
9   Q   We'll talk about that in one second.  You
10  referred just a second ago to 1619-6, this marketing
11  material that you reviewed with regards to NECC's
12  representation about their products, correct?
13  A   Uh-huh.
14  Q   And what does it say in the middle of the
15  page under storage?  It says "room temperature,"
16  doesn't it?
17  A   Uh-huh.
18          MS. STEINER:  That a "yes"?
19  A   That's correct, it says that.  I don't
20  believe that to be a correct statement.
21  Q   Okay.  Well, NECC is representing to their
22  customers that proper storage for the MPA is room
23  temperature, aren't they?
24  A   In this document, yes.
25  Q   So you as a pharmacist don't believe that

Page 209

1   room temperature is proper?  You would say that it
2   would be better to refrigerate it, correct?
3   A   Correct.
4   Q   But that's not what NECC is saying, are
5   they?
6   A   Correct.
7   Q   Now, you talked a second ago about
8   Dr. Bhambhani's use of these vials.  You said these
9   single-dose vials.  And so what exactly is your
10  understanding of how Dr. Bhambhani used the MPA at
11  issue?  What was her process?
12  A   Based on her deposition, there were
13  occasions where she drew solution out of same vial
14  more than one time, using it then as a multi-dose
15  vial, which it was not intended for.
16  Q   What else did she do in terms of taking
17  precautions and using aseptic technique in that
18  regard, using those vials?
19  A   Two things that I documented here were
20  that she stored it in the operating suite, and she
21  used the vials more than one time.  That's my two
22  conclusions.
23  Q   And NECC says it's okay to store, not
24  refrigerate it, correct?
25  A   Right.  And therefore, her practice should


1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com
Nationwide Coverage

Page 210

1  have determined whether accepting that statement is
2  valid.  That would have been something I would have
3  thought she might look into.
4      Q    And Dr. Bhambhani testified on this issue.
5  I think she was questioned extensively by Plaintiffs'
6  counsel, and she testified in detail in her
7  deposition as to the actual practice that she used,
8  didn't she?  Did you see that in there?
9      A    I reviewed her testimony, yes.
10     Q    And we can look at it if you want, but I
11 believe that she testified that she may have used it
12 on a limited number of patients if they were coming
13 in in a short time after.  If she had took long
14 breaks or there weren't patients coming in for a
15 while or it was the end of the day, that she got rid
16 of it, correct?  Can we agree that she didn't use it
17 over multiple days?
18     A    But that's still a breach of protocol.
19     Q    Okay.
20     A    She should not have drawn fluid out of it
21 twice.
22     Q    Okay.  And I think she also testified as
23 to her aseptic technique, that she always used a new
24 needle; that if she had to go back to the vial, she
25 would get a new needle.  If she dropped that needle

Page 211

1  that she'd already drawn up solution in on the floor,
2  she threw the vial away and got a new vial.  And that
3  in between sticks with the syringe, that it was
4  swabbed with alcohol.
5           Do you remember seeing that?
6      A    Yes.
7      Q    Okay.  But it's your opinion that
8  Dr. Bhambhani shouldn't have been using it this way,
9  that that was breach of the standard of care?
10     A    Yes.
11     Q    Okay.  I want to refer you to an article
12 that was, I think, provided by Plaintiffs' counsel to
13 me yesterday.
14          (Exhibit No. 1619-10 was marked for
15 identification.)
16          MR. KIRBY:  And we will mark it as
17 1619-10?
18          MS. STEINER:  Yes.
19          THE WITNESS:  Also a gate-keeper.
20          MS. STEINER:  I serve many roles.
21 BY MR. KIRBY:
22     Q    And for the record, can you identify what
23 this is?
24     A    It's an editorial addressing the issue of
25 the price of cost savings, written in June 2008.

Page 212

1      Q    Okay.  The author, Ray Baker.  Dr. Baker,
2  do you know him?
3      A    No.
4      Q    It's in the journal -- Clinical Journal of
5  Pain Medicine it looks like.
6           Do you subscribe to that journal?
7      A    I do not.
8      Q    That's more a journal for -- by pain
9  medicine experts, do you think?  Pain medicine
10 physicians?
11     A    Correct.
12     Q    Okay.  I want to specifically refer you to
13 something on the back, on the second page.
14     A    382?
15     Q    That's correct, 382.  And by the way, I
16 don't want to keep you from reviewing this.  If you
17 want to read the whole article before I ask the
18 question, that's fine with me.  But if you don't,
19 I'll continue.
20     A    Continue.
21     Q    And I'm looking about halfway down.  It's
22 in that second full paragraph.
23     A    Single issues?
24     Q    So it says -- I'll give it to you.  It
25 says, "Given the reduced" --

Page 213

1      A    Different side.
2           MS. STEINER:  Second column.
3      Q    Oh, yeah.  Right there.  So this is an
4  ancillary point first.  But it says, "Given the
5  reduced reimbursements for interventional pain" --
6      A    Wait a minute now.  I'm not finding it.  I
7  thought you pointed it out to me.
8           MS. HOUSTON:  What page are you on?  382?
9           MR. KIRBY:  Yes.  I just put an arrow.
10 It's three words in from the arrow.
11 BY MR. KIRBY:
12     Q    And just follow along.  I'll read it and
13 let me know if I read it accurately.  It says, "Given
14 the reduced reimbursements for interventional pain
15 procedures and the push for cost efficient care, a
16 case can be made for safely reusing a single-dose
17 medication."
18          Do you see that?
19     A    Yes.
20     Q    And so this article that's written by a
21 physician, and it's in the Clinical Journal of Pain
22 Medicine, suggests that -- and correct me if I'm
23 wrong, that you can use -- you can safely reuse a
24 single-dose medication under particular
25 circumstances.


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 226

1 specifically know what -- how that was documented.
2   Q   So again, you just -- you don't know the
3 manner in which or the ease at which Dr. Bhambhani
4 provided information to the Department of Health and
5 Mental Hygiene with regards to patients who
6 potentially received contaminated MPA, right?
7       MR. MINTZER:  Objection, form.
8   A   I'm not addressing the issue of whether
9 she was able to verbally describe to someone what she
10 thought she had done.  I'm describing the fact that
11 good medical records have certain standards, and she
12 didn't do that.
13  Q   So you don't --
14  A   Didn't meet that.
15  Q   I'm sorry to interrupt.
16      So you don't know the process that she
17 used?  You didn't see that in her deposition?  You
18 don't know the interaction that she had with the
19 Department of Health and Mental Hygiene after this,
20 but you're saying that it's all about she just should
21 have had it written down on paper and that would have
22 made all the difference?
23      MR. MINTZER:  Objection to the form.
24  A   I believe she, again, demonstrated
25 inadequate practices by not recording the medications

Page 227

1 properly.
2   Q   And we're talking about the standard of
3 practice of a physician --
4   A   Right.
5   Q   -- in creating medical records and
6 documenting --
7   A   Right.
8   Q   -- procedures, correct?
9   A   Right.  And that observation comes from
10 assisting physicians and working with medical records
11 in the hospital setting.
12  Q   But not actually doing it yourself or
13 being permitted to do it yourself?
14  A   Pharmacists now document, and have
15 since -- in a clinical environment, as far back as
16 10, 15 years, have been documenting in the medical
17 record administration of drugs.
18  Q   Understood, but not for epidural steroid
19 procedures, right?
20      MR. MINTZER:  Objection to form.
21  Q   Or in an ambulatory surgery center
22 environment?
23  A   I don't see them as differing that they
24 have a contributing lower standard.
25  Q   Does that cover your opinions with regards

Page 228

1 to -- well, actually, we can move on to E.  Track --
2 or we just did that one, I think, right?
3       Bear with me for a second.
4       So you're critical of Dr. Bhambhani for
5 the way in which she documented the lot in the
6 medical records.  And I assume -- or maybe you said
7 that you're critical of that because it led to a
8 delay in informing patients; is that right?
9       MR. MINTZER:  Objection, misstates his
10 testimony.
11  A   That's one outcome.  It also is not, in my
12 opinion, of good practice.
13  Q   But you don't know the rapidity with which
14 Dr. Bhambhani's patients were identified, do you?
15  A   Identified as?
16  Q   To the Department of Health.
17  A   No, I don't know that.
18  Q   Okay.
19  A   But it -- was it that she was able to
20 point out the lot numbers or was it as a result of
21 demonstrated disease?
22  Q   You don't know one way or the other, do
23 you?
24  A   I don't know.  I'm saying that I'm not
25 sure that you can conclude that either.

Page 229

1   Q   And is it your opinion -- or you'd agree
2 that that didn't cause harm?  Her documenting in the
3 medical records didn't cause the MPA to become
4 contaminated at NECC, and it didn't cause her
5 patients to develop meningitis or die, did it?
6       MR. COREN:  Objection to form.
7   A   I'd like to say how many times can you ask
8 that same question and still expect me to give you a
9 different answer?  I think we've done that like --
10 I'm up to like 40 times that you've asked that
11 question that way.  And I would just like to protest
12 that I think that that's badgering me.
13  Q   In fairness -- and I'm not intending to
14 badger you, Mr. Chason, trust me.  In fairness, it's
15 a different question with regards to each of the
16 criticisms you have.  I keep asking you about that
17 aspect, too.  And I say specific to this.
18      And so if your answer is the same as the
19 others, then that's fine.  You know, you can just say
20 no, it didn't cause harm and I'm perfectly fine with
21 that.
22  A   Okay.
23      MR. MINTZER:  Objection to form.
24  Q   So just so the record is clear, was that a
25 "no," this specific issue with documenting in the


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 230

1  medical records didn't itself cause the contamination
2  or cause meningitis?
3       MR. COREN:  Objection to form.
4     A   Every one of her processes that I
5  delineated in this document I believe contributed to
6  her not providing an adequate level of care.  No one
7  was a causative factor.  And if NECC hadn't been in
8  the mix, maybe none of this would have occurred.
9     Q   So she documents in her medical records
10 after she performs the care, right?
11    A   That's the typical process, yes.
12    Q   Right.  So her documenting the procedures
13 that she did in her medical records didn't in and of
14 itself affect the patient that she gave the
15 injection, did it?
16    A   It's depending on the time lapse between
17 doing things, because physicians can forget what they
18 did or -- you know, and there were a number in the
19 medical records, there are a number of steps that
20 were shown that she went through in documentation
21 after the fact.  So those were ticklers and reminders
22 to help her do that.  So I guess the answer to your
23 question is "yes."
24       MR. KIRBY:  Off the record.
25       (Record read by the reporter.)

Page 231

1  BY MR. KIRBY:
2     Q   So my question was, and what I was talking
3  about was patient care.  And I think you used that
4  phrase about 30 seconds ago.  And all I was saying
5  was we can agree, can't we, that Dr. Bhambhani
6  documenting after the procedures is over what lot
7  number she used on that patient, if that were the
8  case, that didn't impact the actual patient care, the
9  actual injection, did it?  It's paperwork, right?
10    A   Correct.  As long as they didn't delay in
11 documenting.
12    Q   And you have no reason to believe one way
13 or the other that she delayed in documenting
14 anything, correct?
15    A   I do not know.
16    Q   Okay.  So let's look at -- was that
17 section E?
18       MS. STEINER:  Uh-huh.
19    Q   And we did F.  So let go to what was A.
20    A   I don't know how I --
21    Q   Sometimes it autoformats like that.  Okay.
22 So this is the second A on page 7, "Deficiencies and
23 Root Cause Analysis Process."
24       What are your criticisms and your basis
25 for those criticisms?

Page 232

1     A   In reviewing the documents that were
2  provided, it indicated to me that the physician was
3  making a concerted attempt to develop an analysis of
4  what had gone wrong.  And it was a stepwise
5  progression of each of the things it could be, but it
6  wasn't thorough enough to get to the conclusion that
7  turned out to be the right conclusion, that it was
8  that drug that was causing the problem.
9        And what made me believe that was that she
10 did isolate that drug but then she went and purchased
11 it from another source.  So she wasn't really doing
12 the analysis.
13       So a root cause analysis is a very
14 structured stepwise process that, I think in this
15 case, could have led her to more real conclusions if
16 she had conducted it more thoroughly.
17    Q   You'd agree, wouldn't you, that she did
18 conduct a thorough root cause analysis, right?
19       MR. MINTZER:  Objection to form.
20    A   Take the word "thorough" out.
21    Q   Well, what's your definition of thorough
22 versus not thorough?  How many pages was her root
23 cause analysis or the outline of her root cause
24 analysis?
25       MR. MINTZER:  Objection to form.

Page 233

1     A   I'm not sure, but I think it was two
2  pages.  I'm not sure of that but I think that might
3  be the case.  It wasn't how many pages the document
4  is, it's whether it is thorough enough and looks at
5  all of the factors and includes enough of the
6  personnel in the organization and the vendors or
7  whomever to dig deeply enough to get a good
8  resolution.
9        And it didn't appear to me that she
10 thoroughly analyzed the situation.
11    Q   Okay.  I'm just trying to get more
12 information -- more detail.  You say it wasn't
13 thorough enough.
14       What in your thought process is thorough
15 enough and what factors needed to be considered that
16 she didn't consider?
17    A   She didn't consider that enough
18 information regarding the vendor, is what concerns me
19 the most.  She did look at her practices to a degree,
20 but she didn't -- in my recollection, did not look at
21 whether multi-dose use of multi-dose vials was a
22 contributing factor.
23       So those two things, you know, lead me to
24 be concerned about the value of it, whether it
25 actually -- because root cause analysis is all about



Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com