## In the Matter Of:

### NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY

### VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D.

*February 10, 2016*



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 2 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                     Page 1

```
 1                UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4     IN RE:   NEW ENGLAND
 5     COMPOUNDING PHARMACY, INC.      MDL No. 2419
 6     PRODUCTS LIABILITY LITIGATION   Master Docket
 7                                     1:13-md-02419-RWZ
 8
 9                   - - - - - - - - - - -
10
11          VIDEOTAPED DEPOSITION DUCES TECUM
12               OF RITU T. BHAMBHANI, M.D.
13
14
15             Wednesday, February 10, 2016
16
17
18
19
20
21
22
23     Reported by:   Lori J. Goodin, RPR, CLR, CRR,
24               Realtime Systems Administrator
25     Assignment No. 26236
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 3 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                        Pages 2..5

Page 2

```
 4       The deposition of RITU T. BHAMBHANI, M.D.,
 5  was convened on Wednesday, February 10, 2016,
 6  commencing at 10:01 a.m., at the offices of

 8       PESSIN KATZ LAW
 9       Suite 400
10       901 Dulaney Valley Road
11       Towson, Maryland  21204

13  before Lori J. Goodin, Registered Professional
14  Reporter, Certified LiveNote Reporter, Certified
15  Realtime Reporter, Realtime Systems
16  Administrator, and Notary Public in and for the
17  State of Maryland.
```

Page 3

```
 1                    APPEARANCES
 3  For Plaintiffs:
 4       HARRY ROTH, ESQUIRE
 5       MICHAEL COREN, ESQUIRE
 6       COHEN PLACITELLA & ROTH, P.C.
 7       2001 Market Street
 8       Suite 2900
 9       Philadelphia, PA  19103
10       215-567-3500
11       hroth@cprlaw.com
12       mcoren@cprlaw.com

14  And Co-counsel:
15       PATRICIA KASPUTYS, ESQUIRE
16       SHARON L. HOUSTON, ESQUIRE
17       LAW OFFICES OF PETER G. ANGELOS
18       One Charles Center
19       100 North Charles Street
20       22nd Floor
21       Baltimore, Maryland  21201
22       410-649-2000
23       pjk@lawpga.com
24       shouston@lawpga.com
```

Page 4

```
 1              APPEARANCES CONTINUED
 3  For Defendant:
 4       GREGORY KIRBY, ESQUIRE
 5       CATHERINE W. STEINER, ESQUIRE
 6       PESSIN KATZ LAW
 7       Suite 400
 8       901 Dulaney Valley Road
 9       Towson, Maryland  21204
10       410-938-8800
11       gkirby@pklaw.com
12       csteiner@pklaw.com

14  ALSO PRESENT:
15       Meeko Goodhill, videographer
```

Page 5

```
 1                     CONTENTS
 2  EXAMINATION BY                              PAGE
 3  Mr. Roth                                       8

 5                     EXHIBITS
 6  NO.    DESCRIPTION                           PAGE
 7  Exhibit 1051 Answers to PSC's first set of     9
 8              Interrogatories
 9  Exhibit 1052 Responses to PSC's request for    9
10              Production of documents
11  Exhibit 1053 Responses to Steering Committee   9
12              Revised subpoena request
13  Exhibit 1054 CV of Dr. Ritu Bhambhani         23
14  Exhibit 1055 Earlier version of CV of         31
15              Dr. Ritu Bhambhani
16  Exhibit 1056 Current Policy and Procedure     46
17              Manual and organizational chart
18  Exhibit 1057 Salesman Andrew Howden's card   118
19  Exhibit 1058 Order form used by Box Hill for 118
20              NECC, Bates 000011
21  Exhibit 1059 NECC prescription order form of 131
22              9/21/2012, Bates 13
23  Exhibit 1060 NECC prescription order form of 137
24              9/24/2012
25  Exhibit 1061 NECC invoice for 9/25 order     140
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 4 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                    Pages 6..9

Page 6

```
 1              EXHIBITS CONTINUED
 2  NO.    DESCRIPTION                           PAGE
 3  Exhibit 1062 Packing list from NECC for       141
 4               9/24/2012 order
 5  Exhibit 1063 Packing list from NECC for       142
 6               8/13/2012, Bates 10
 7  Exhibit 1064 Form from Department of Health   157
 8               signed by Dr. Bhambhani, 10/6
 9  Exhibit 1065 Procedure notes of Dr. Bhambhani 201
10               for Ms. Rozek's procedure at
11               Box Hill Surgery Center, 8/31/2012
12
13
14
15
16
17
18        Original Exhibits attached to the
19  original transcript.)
20
21
22
23
24
25
```

Page 7

```
 1                 PROCEEDINGS
 2          THE VIDEOGRAPHER:  We are now on
 3  record.  This is Tape Number 1 to the
 4  videotaped deposition of Dr. Ritu Bhambhani
 5  taken in the matter of In Re:  New England
 6  Compounding Pharmacy, Inc., Products
 7  Liability Litigation.
 8          This deposition is being held at
 9  Pessin Katz Law, located at 901 Dulaney
10  Valley Road, Suite 500, Towson, Maryland,
11  21204, on Wednesday February 10th, 2016, at
12  10:01 a.m.
13          My name is Meeko Goodhill and I am
14  the videographer.  The court reporter is Lori
15  Goodin.
16          Counsel please introduce yourselves
17  for the record, please.
18          MR. ROTH:  My name is Harry Roth.  I
19  am from the firm of Cohen Placitella & Roth,
20  and I represent the estate of Brenda Rozek.
21          MR. COREN:  Michael Coren on behalf
22  of multiple plaintiffs and the estate of
23  Brenda Rozek.
24          MS. HOUSTON:  Sharon Houston on
25  behalf of multiple plaintiffs of the Law
```

Page 8

```
 1  Offices of Peter Angelos.
 2          MS. KASPUTYS:  Patricia Kasputys,
 3  also with the Law Offices of Peter Angelos on
 4  behalf of multiple plaintiffs.
 5          MS. STEINER:  Catherine Steiner on
 6  behalf of Dr. Ritu Bhambhani, Ritu Bhambhani,
 7  M.D., LLC, and Box Hill Surgery Center.
 8          MR. KIRBY:  Greg Kirby on behalf of
 9  same Box Hill defendants.
10          THE VIDEOGRAPHER:  Court reporter
11  please swear in the witness and we can
12  proceed.
13          RITU T. BHAMBHANI, M.D.,
14  a witness called for examination, having been
15  first duly sworn, was examined and testified as
16  follows:
17                   EXAMINATION
18  BY MR. ROTH:
19      Q.   Good morning Dr. Bhambhani.  How are
20  you?
21      A.   Good, thank you.
22      Q.   You understand that today I'm going
23  to question you generally about the practice at
24  Box Hill Surgical Center and the use of
25  compounded materials that were manufactured or
```

Page 9

```
 1  compounded by NECC, correct?
 2      A.   Yes.
 3      Q.   Before today's deposition, did you
 4  review any material?
 5      A.   Some of the materials that we have
 6  turned in, policies, procedure manuals, I
 7  requested to see, this is my first time doing a
 8  deposition.  So, I requested to see a couple of
 9  depositions to get a sense of what to expect.
10      Q.   Okay.  I had marked before we went
11  on the record Answers to Interrogatories,
12  Responses to Requests for Production of
13  Documents, and Responses to Subpoena Requests.
14            (Exhibit Number 1051
15              marked for identification.)
16            (Exhibit Number 1052
17              marked for identification.)
18            (Exhibit Number 1053
19              marked for identification.)
20  BY MR. ROTH:
21      Q.   Let me show you what I have marked
22  as Exhibit 1051, and this is the answers to the
23  PSC's first set of interrogatories.
24            Did you review these before today's
25  deposition?
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 5 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 70..73

Page 70

1  MPA was wasn't compounded?  I think that was my
2  original question.
3       A.   If I did, I do not remember.
4       Q.   Okay.  And prior to 2013, had you
5  used any MPA that was not compounded?
6            And let me narrow that because that
7  takes you all of the way back to your residency.
8       A.   Yes, to my residency.
9       Q.   And I don't want to do that.
10           Since coming to, being in private
11 practice, had you used any MPA that was not
12 compounded before 2013?
13      A.   So you are saying from 2008 on?
14      Q.   No.  I'm saying from 2000, from 2000
15 to 2013.
16           MS. STEINER:  Across the spectrum of
17    different locations?
18 BY MR. ROTH:
19      Q.   Correct.
20      A.   So, Franklin Square included, the
21 first job included?
22      Q.   Yes.
23      A.   Had I used non-compounded MPA?
24      Q.   Yes.
25      A.   I have to think, I am -- what I can

Page 71

1  say is I had used non-compounded steroid, but I'm
2  not sure if I had used non-compounded MPA
3  specifically.
4       Q.   Okay.  And, that is a good
5  distinction.
6            At Box Hill, between 2013 and 2008,
7  had you used non-compounded steroids for epidural
8  injections?
9       A.   Again, I can't say for sure if I
10 would have.
11           More broadly speaking, I know at
12 some point from the time I started at Franklin
13 Square I have used a non-compounded
14 triamcinolone.  I have used non-compounded and,
15 yeah, non-compounded celestone which is a
16 betamethasone two salt combination.
17           What I can't say for sure is that
18 from 2008 to 2013 if I used a non-compounded MPA.
19      Q.   You can't say that.
20      A.   I cannot say for sure.
21      Q.   Did there come a time in your
22 professional experience where you have made a
23 decision that you were going to use compounded
24 MPA?
25      A.   To some extent, maybe just not as

Page 72

1  black and white as that.  When I was at Harford
2  County Ambulatory Surgical Center, the physician
3  who had brought me on board at Franklin Square
4  also was coming to Harford County Ambulatory
5  Surgery Center, because when I left Franklin
6  Square to become, to come to Harford County
7  Ambulatory Surgery Center, he left Franklin
8  Square at some point soon after I did and started
9  his own practice.
10           And, until he had, I guess, his
11 location set up to be able to do procedures, he
12 was coming to Harford County Ambulatory Surgery
13 Center to do procedures.
14           And he introduced, definitely, me to
15 the possibility of being able to use a
16 preservative-free steroid.
17           And he was using preservative-free
18 MPA at the time.  That is the same physician I
19 have worked with for three years at Franklin
20 Square about ten years my senior.  And, he knew
21 that I had had a couple of patients I was using
22 the same, for the most part I think, the same
23 steroid I had trained with at Franklin Square.
24           And he knew that I had had a couple
25 of patients with some side effects.  And when he

Page 73

1  saw me at Harford County Ambulatory Surgery
2  Center he was using preservative-free MPA and
3  suggested, not just me, but there was another
4  pain provider who was doing pain procedures at
5  Harford County Ambulatory Surgery Center that we
6  try that for the reason that, since the active
7  medication that we were looking for therapeutic
8  factors of the steroid and that is the same, that
9  to use it without the additional chemical of the
10 preservative, that that would be a better choice.
11 And I was agreeable to it, and that is when I
12 first started using a preservative-free steroid.
13      Q.   And at the time that you first
14 started using this preservative-free steroid at,
15 and this was at Harford County?
16      A.   Harford County.
17      Q.   Was the only way to get a
18 preservative-free steroid to get it from a
19 compounding pharmacy?
20      A.   I was not, I guess, part of the
21 ordering process at Harford County, so I'm not
22 sure.
23      Q.   Okay.
24      A.   Or at least at the time I wasn't
25 sure that if they had other options or, if that


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                    Pages 74..77

Page 74
1  was the only way.
2      Q.   But, I, do I understand that the
3  reason why you wanted to use a preservative-free
4  MPA was based on the advice of this more senior
5  physician and you thought that was a way to avoid
6  complications that other patients had with a
7  preservative, with a steroid that did have a
8  preservative?
9      A.   So, that was a long question.
10     Q.   Okay.  Let me break it down then?
11     A.   Yes, sorry.
12     Q.   First of all, let me try something
13 completely different.  What was the steroid that
14 you had used that you had trained with?
15     A.   Triamcinolone.
16     Q.   Okay.
17     A.   I had used triamcinolone and at some
18 point I had used the betamethasone combination,
19 not just, betamethasone is available as, either
20 just a plain one salt versus a combination of two
21 salts which makes it both short and long acting.
22     Q.   Okay.
23     A.   Action.  So, I had used those two
24 non-compounded prior to using the
25 preservative-free MPA.

Page 75
1      Q.   How many patients that you injected
2  with those non-compounded steroids had side
3  effects?
4           MS. STEINER:  Objection as to form.
5           THE WITNESS:  Side effects?
6  BY MR. ROTH:
7      Q.   Side effects that you related to the
8  use of the steroid.
9      A.   So, side effects.  I mean,
10 steroid-related side effects from systemic
11 absorption from a spine injection, happened about
12 5 percent of the times.
13          So, I had seen those probably,
14 approximately that much.
15     Q.   And what type of, what type of
16 complications?
17          MS. STEINER:  Objection as to form.
18          THE WITNESS:  Again, not so much
19     complication, more the side effect, facial
20     redness, mood alteration, muscle cramps,
21     hot/cold sweats, I had noticed those a lot
22     more with the betamethasone.  The
23     triamcinolone, what had really made me even
24     look for something other than what I had
25     trained with, was that I had had at least two

Page 76
1  patients that I can think of who had had
2  these were postmenopausal women with vaginal
3  bleeding that there was a time correlation,
4  when I looked it up in the PDR, that was one
5  of the potential side effects of
6  triamcinolone.
7           So I had tried betamethasone and had
8  much more of the, what are the common side
9  effects, I guess, from the systemic
10 absorption of the steroids.
11          So, timing-wise it was right around
12 when I was kind of saying okay, the
13 triamcinolone had the vaginal bleeding and
14 betamethasone seemed to cause too many other
15 side effects when Dr. Dickson said, you know,
16 I'm using this.
17          And, if anything, you know, the
18 particle size is better than triamcinolone,
19 the duration is similar, and that much I knew
20 in terms of duration of the fact that they
21 were all supposed to be about same.
22          And that was one steroid I had not
23 tried before, either preservative or
24 preservative-free, not that I can remember.
25          So, I was like okay, so one it is

Page 77
1  different from the other two, and the other
2  he felt that the preservative-free was an
3  even better option because you are
4  eliminating one other chemical at the spinal
5  canal would be exposed to.
6           So, when he suggested a Harford
7  County Ambulatory Surgery Center I was
8  agreeable to trying it.
9  BY MR. ROTH:
10     Q.   And who was this doctor?
11     A.   David Dickson.
12     Q.   All right.  And, the side effects
13 that you observed with the compounded steroids,
14 were they related to the steroid itself or were
15 they related to the preservatives in the steroid?
16 Or did you ever make that determination?
17     A.   The side effects that I had observed
18 with the vaginal bleeding or the facial redness
19 or the mood alteration, those were reported as,
20 at least in the PDR, as the side effects when I
21 looked up the steroids themselves.
22     Q.   Uh-huh.
23     A.   I don't remember if they may have a
24 differentiation between, you know, which
25 ingredient of a formulation would cause it.  I



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 7 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016                Pages 78..81

Page 78

1  don't recall making a differentiation at the
2  time.
3      Q.   Okay.  Have you, since using,
4  starting using preservative-free MPA, can you
5  tell me approximately when that was?
6      A.   Sometime when I started doing pain
7  at Harford County Ambulatory Surgical Center.
8           I would have to guess I started
9  there in mid-2008.  So, sometime around --
10          MS. STEINER:  I think you are off.
11          THE WITNESS:  Oh, I'm sorry, 2003.
12     So, somewhere between that and 2004.
13 BY MR. ROTH:
14     Q.   Okay.  And again I was really just
15 looking for an approximation.
16     A.   Right, right, right.
17     Q.   Because I wanted to know, since you
18 began using preservative-free MPA, and by the way
19 was that always, that was always compounded?  The
20 preservative-free MPA?
21          MS. STEINER:  Objection as to
22     foundation.
23 BY MR. ROTH:
24     Q.   Well, was the preservative-free MPA
25 that you began using a compounded steroid?

Page 79

1      A.   At Harford County Ambulatory Surgery
2  Center?
3      Q.   Yes.
4      A.   I know they were getting it from
5  NECC because that is more so not so much
6  initially when they first started getting, like I
7  said I wasn't involved with the process of
8  getting the medication.
9           But, more so finding out where they
10 were getting it from as I was getting ready to
11 start my practice when, you know --
12     Q.   Understood.  So, I was looking back
13 after your conversation with, I think her name
14 was Barbara.
15     A.   Yes.
16     Q.   You learned they got their MPA from
17 NECC?
18     A.   Correct.
19     Q.   And you learned that that was a
20 compounding pharmacy?
21     A.   Most likely, yes.
22     Q.   Okay.  In any event, since you began
23 using preservative-free MPA, did you do any
24 research or personal investigation to determine
25 whether or not steroids that had preservatives in

Page 80

1  them, that the preservatives in steroids made,
2  created risks for patients?
3           MS. STEINER:  Can you give a time
4      frame on that?
5  BY MR. ROTH:
6      Q.   I want to know from approximately
7  2004?
8           MS. STEINER:  Four.
9  BY MR. ROTH:
10     Q.   Until the recall, did you ever look
11 at the issue of whether preservatives in steroids
12 carried a risk to patients?
13     A.   Other than the discussion with
14 Dr. Dickson when he suggested that I try it and
15 the reason that he gave, I don't remember reading
16 a specific article about that.
17     Q.   Okay.  And was there any discussion
18 with Dr. Dickman about whether or not there were
19 other -- well, there were different manufacturers
20 of preservative-free MPA.
21          MS. STEINER:  Objection as to form
22     and foundation.
23          THE WITNESS:  I had no, I guess,
24     reason to ask about manufacturers.  Just
25     like, you know, when I was at Franklin

Page 81

1      Square, he was there.  These were the
2      steroids available, this is what I used,
3      okay.
4           Over here, I was not involved in the
5      ordering process.  So, I don't remember
6      asking about the actual source at the time
7      when he first -- it probably would have been
8      more a discussion between him and the person
9      ordering, or their nurse manager there at the
10     time.
11 BY MR. ROTH:
12     Q.   In 2008 when you became the person
13 responsible for deciding what medications to
14 purchase for Box Hill and for your patients --
15     A.   Uh-huh.
16     Q.   -- until the recall, did you
17 investigate whether or not there were other
18 manufacturers of preservative-free MPA than NECC?
19     A.   No.
20     Q.   Are you aware or were you aware of
21 whether or not there were any preservative-free
22 steroids available other than the MPA, I'm sorry,
23 and let me set my time frame.
24          After you became responsible for
25 purchasing, for deciding what steroids would be



Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 8 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016    Pages 82..85

Page 82

1  purchased for Box Hill, until the recall, did you
2  know whether or not there was available
3  preservative-free steroids other than what you
4  were purchasing from NECC?
5        A.   I had no reason to, or at least the
6  best that I remember, I don't remember having to
7  look for another source.  I mentioned earlier it
8  was something that I used for years prior, so it
9  was a, not just this one thing but most of the
10 supplies that I got was a simple, kind of thing
11 to say, okay, this is where they got it from, I
12 have used this before, I was fine with it and
13 this is what I'm going to continue using.
14           If I used, like I said anything
15 other than this, I don't remember having to
16 either ask Andy or my nurse or me personally
17 thinking of let me look for an alternative.
18       Q.   Okay.  And again you say you don't
19 remember doing it.
20           But, between 2008 and the time of
21 the recall, was NECC your sole source for
22 injectable steroids at Box Hill?
23       A.   For the most part.  The only part I
24 don't remember, I know somewhere in there, there
25 were case reports of particulate steroid causing

Page 83

1  problems in cervical injections.
2            What I don't remember is if I had
3  that discussion with the nurse at Box Hill or
4  Harford County where I wanted to try a
5  nonparticulate steroid, and there is only a
6  couple of different options there that I would
7  have used that.
8            But as far as the preservative-free
9  MPA, the best I know NECC was pretty much our
10 source the entire time.
11       Q.   Okay.  Let me turn a little bit
12 about the decision to use NECC.
13           You said you spoke with Barbara
14 Wagner at Harford.  What do you recall about your
15 conversation about using NECC?
16       A.   I wouldn't recall a conversation
17 from 2008.
18           The general sense of the time was
19 getting a list of, you know, okay, she says, you
20 know, these are the gloves you used to use, this
21 is the local anesthetic that you have used for
22 the last five years, this is the skin prep you
23 have used for the last five years, this is the
24 steroid you have used, this is the pointers you
25 use, and getting that list and seeing where she

Page 84

1  was getting them from, and, reaching out to the
2  same providers of the different supplies and
3  either, you know, me myself, if I had time or
4  giving it to the nurse and saying research and
5  I'm going with that.
6        Q.   When you first became responsible
7  for ordering the steroids at Box Hill, other than
8  saying, asking, I mean, is it basically Barbara,
9  where did we get the steroids from and she told
10 you it was NECC and gave you contact information?
11       A.   More than likely that is how I would
12 have, like I said, not just the steroid, that
13 would have been for pretty much --
14       Q.   For everything?
15       A.   -- for most supplies that I would
16 use for the pain procedures.
17       Q.   Okay.  And when she gave you
18 information, first of all, when you were at
19 Harford, had you had any contact with anybody
20 from NECC?
21       A.   Not, to the best of my recollection.
22       Q.   Had any, anybody ever talked to you
23 at all, had you even heard the name NECC before
24 you asked Barbara where do we get the steroid
25 from?

Page 85

1        A.   I mean, if I had, you know, in the
2  general course of being there five days a week as
3  their anesthesiologist, but I don't remember
4  anything out of the ordinary.
5        Q.   Okay.  Did you ever get any --
6  strike that.
7            In 2008, when you became responsible
8  for purchasing your medications and steroids and
9  Barbara tells you okay, we got this stuff from
10 NECC, did you talk to, did you find out any
11 information about how NECC, you know, did its
12 work?  Made its compounds?
13           MS. STEINER:  Objection as to form
14    and foundation.
15           THE WITNESS:  How they made their
16    compounds?
17 BY MR. ROTH:
18       Q.   Sure.
19       A.   I was ordering something I had used
20 before.  I have no reason to ask that particular
21 question of any of the suppliers of any of the
22 products I was getting at the time because I
23 wasn't really, in my mind at least I wasn't
24 changing anything of what I had done at an
25 established center.  They were Medicare certified


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 9 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 86..89

Page 86

1  state licensed, AAAC accredited, I had done it
2  for years over there.  I was not consciously
3  making a particular change to look into anything
4  further about these specific companies, I guess.
5      Q.   Okay.
6      A.   Process.
7      Q.   And, so, all of those things you
8  were mentioning about they were Medicare
9  approved, they were AAA, you know, rated, that
10 related to Harford, right?
11     A.   Uh-huh.
12          MS. STEINER:  That is a yes?
13          THE WITNESS:  Yes, sorry.
14 BY MR. ROTH:
15     Q.   So, in a, do I understand then
16 because they were relying on this, on these
17 providers, whether it was NECC or others, that
18 was a good enough reference for you to use those
19 providers as well when you started your own shop?
20     A.   I mean, I had used those things
21 before.
22          So, the fact that I was at a place
23 that I had worked at and I had used those
24 products before for every single thing that I
25 needed to continue doing pain management, it

Page 87

1  seemed like a reasonable thing to continue using
2  the same.
3      Q.   What is a compounding pharmacy?  I
4  mean, do you know what a compounding pharmacy is?
5      A.   If they have like a legal
6  definition, I'm not sure.
7           But, my best understanding is it is
8  a pharmacy that can put together a medication in
9  a form that a, I guess a regular manufacturing
10 company does not.
11     Q.   Okay.  And, do you, did you, between
12 2008 and the time of the recall, know whether or
13 not compounding pharmacies were subject to FDA
14 oversight?
15     A.   Since the day I came to the country
16 I assumed every medicine is under FDA oversight.
17 So I have to admit I don't recall ever
18 specifically thinking about the, oversight over
19 compounding pharmacies specifically.
20     Q.   Okay.  So, I take it then you were
21 not aware that compounded drugs don't have FDA
22 findings of safety, efficacy and manufacturing
23 quality.
24          MS. STEINER:  Objection as to form
25     and foundation.

Page 88

1           THE WITNESS:  I'm sorry, say that
2      again.
3  BY MR. ROTH:
4      Q.   I take it then that you were not
5  aware that compounded drugs lack FDA findings of
6  safety, efficacy, manufacturing quality.
7           MS. STEINER:  Objection as to form
8      and foundation.
9           THE WITNESS:  I do not know about
10     the FDA's thing other than back then and even
11     now I work under what I think is a reasonable
12     assumption that the FDA has oversight over
13     any medication, prescription or
14     over-the-counter.
15 BY MR. ROTH:
16     Q.   Well, sitting here today, if you
17 were to learn that compounding pharmacies do not
18 have FDA oversight, would that affect your
19 thinking about whether or not you would prescribe
20 compounds for your patients?
21          MS. STEINER:  Objection as to form
22     and foundation.
23          THE WITNESS:  Still sitting here
24     today, I find it hard to believe that FDA
25     does not have oversight over a medication.

Page 89

1  BY MR. ROTH:
2      Q.   Okay.  So I want you to assume for a
3  moment that the FDA did not have oversight over
4  compounded pharmacies.
5           Would that affect your decision
6  about whether or not to prescribe or use
7  compounds for your patients?
8           MS. STEINER:  Let me just object to
9      the hypothetical, because you are asking her
10     to assume something prior to the 2012 time
11     frame and asking her to make a decision now
12     based upon it.
13 BY MR. ROTH:
14     Q.   Well, I'm actually asking her now.
15 I'm sorry if I got my tenses screwed up.
16          Were you to learn that the FDA does
17 not have oversight over compounded pharmacies,
18 would that affect your decision about whether or
19 not to prescribe or use compounds for your
20 patients?
21          MS. STEINER:  Objection.  Same
22     objection.
23          THE WITNESS:  I have to admit I
24     would find it very hard to envision the FDA
25     not having oversight over a medication.



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 10 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 98..101

Page 98

```
 1     has already answered in this deposition?
 2          MR. ROTH:  Yes.
 3          THE WITNESS:  I was going to say I
 4     have gone beyond this and given more
 5     background in having had problems or side
 6     effects, seeing side effects from the steroid
 7     used prior, the reason I started using it
 8     based on Dr. Dickson's recommendation, having
 9     used it for years over there without any
10     problems.  It is correct I was not involved
11     with the purchasing decision over there.
12          And when I started Box Hill Surgery
13     Center I decided I was going to continue
14     using the same products I had used prior
15     without any issues.
16  BY MR. ROTH:
17     Q.   Well, to be fair, the issues with
18  respect to side effects, the conversations you
19  had with the doctor who you had worked with,
20  those related to a decision to use
21  preservative-free MPA.
22          At the time you didn't know that
23  they were purchasing from NECC; isn't that right?
24     A.   When Harford County decided to
25  purchase it?
```

Page 99

```
 1     Q.   Right.
 2     A.   I don't, I am not sure if that is
 3  who they got it from day one over there or not.
 4  That is who they were getting it from when I left
 5  and I asked who were they getting it from at the
 6  time in 2008.
 7     Q.   Right.  And so, my, all of that
 8  background that you have described, related to
 9  your decision to use preservative-free MPA, not
10  the source of that preservative-free MPA.
11          I mean earlier on in this
12  deposition, you are looking at me like I have two
13  heads here.
14     A.   No, no.
15     Q.   Early in the deposition I was asking
16  you about your decision to use preservative-free
17  MPA, and drew a distinction between that decision
18  and the source of it, do you recall that?
19     A.   So, if the question is the decision
20  to use it?
21     Q.   No, I'm sorry.
22     A.   Or where to get it from?
23     Q.   That's right.  What I'm trying to
24  confirm is that your decision to purchase from
25  NECC was based upon your conversation with the
```

Page 100

```
 1  folks from Harford, right?
 2     A.   And having used NECC's
 3  preservative-free MPA at Harford for years
 4  without any problem.
 5     Q.   Right.
 6     A.   Yes.
 7     Q.   Okay.  And, other than speaking with
 8  the folks from Harford in 2008, did you have any
 9  conversation with anybody else about NECC in 2008
10  when you made the decision to continue with them?
11     A.   Not that I recall.
12     Q.   Okay.  One of the things you mention
13  in the Answers to Interrogatories is that NECC
14  was a, was licensed with the Maryland Department
15  of Pharmacy.
16          Did you verify that in 2008?
17     A.   I don't remember specifically one
18  way or the other.
19          Again, it was being used at the
20  other center where I was.
21          They had been getting it for a
22  period of time.  I had been using it there no
23  problems.
24          So, when I decided to get it, did I
25  specifically ask for that license?  I don't
```

Page 101

```
 1  remember.
 2     Q.   Okay.  I think it is 1055 is the
 3  subpoena?
 4          MS. STEINER:  No, 1055 is the first
 5       version of her CV.  1054 is the CV.
 6          MR. ROTH:  1053?
 7          MS. STEINER:  1053 is the response
 8       to the PSC's revised opinion.
 9          MR. ROTH:  Can I just make sure I'm
10       looking at the same.  Right, okay.  1053 is
11       the response to the subpoena.
12  BY MR. ROTH:
13     Q.   And, if you look at Page 8, one of
14  the things, Request Number 12 asks for, I'm
15  looking at the wrong document.
16          It asks for "Any marketing
17  information, any and all documents and/or
18  electronic stored information reflecting or
19  containing marketing information from NECP (sic),
20  NECP's agents, or any sales company or person,
21  marketing or selling or attempting to sell
22  products on behalf of NECP."
23          In response, we were provided under,
24  it is Tab 12; it is on Page 137 and 138.
25          MS. STEINER:  You said 138?
```



Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 11 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016    Pages 102..105

Page 102

1  THE WITNESS: 37 did you say?
2  MR. ROTH: Well, 37 is the tab.
3  BY MR. ROTH:
4  Q.  We were provided with a copy of what
5  looks like a business card for Andrew Howden.  Do
6  you see that?
7  A.  Uh-huh, yes.
8  Q.  Did you look for any marketing
9  information that you received from NECC to get to
10  your counsel?
11  A.  I must have gone through a folder,
12  if there was anything that was provided.
13  Q.  Okay.  And, did you ever receive any
14  reports from NECC regarding -- well, strike that.
15  Are you aware of whether or not
16  under Maryland's, the regulations promulgated by
17  the Maryland Board of Pharmacy, where the
18  compounding pharmacies, or anyone licensed has to
19  provide reports of inspections to the Maryland
20  board?
21  I will try it again.
22  MS. STEINER: We are not on
23  Mr. Howden's business card.
24  BY MR. ROTH:
25  Q.  Well, I wanted to know whether or

Page 103

1  not there was any other material that you
2  received.  I just wanted to make sure that that
3  was the only document that you provided, and I
4  thought she said yes.
5  MS. STEINER: I was just going to
6  visually switch gears on her, because --
7  BY MR. ROTH:
8  Q.  That is fine.
9  A.  I'm sorry, the Maryland Board of
10  Pharmacy?
11  Q.  Yes.  Are you aware of whether or
12  not pharmacies have to provide reports of
13  inspections to the Maryland Board of Pharmacies?
14  MS. STEINER: At what point in time?
15  BY MR. ROTH:
16  Q.  Between 2008, or, yes, 2008 and the
17  time of the recall.
18  A.  I was not aware of the Board of
19  Pharmacies, requirement of regulations for
20  pharmacies.
21  Q.  And the reason why I asked about the
22  business card, do you have anywhere in your
23  records or files, any reports, any inspection
24  reports of NECC?
25  MS. STEINER: Let me just be clear

Page 104

1  and I will let her answer the question.  You
2  were directing her attention to the PSC
3  Subpoena Request Number 12 which has to do
4  with marketing information.
5  You are now asking about a different
6  type of document.
7  MR. ROTH: Well I'm not sure that it
8  is a different type.
9  And I'm not trying to play any games
10  here.
11  I just don't know what type of
12  reports or documents NEC may have provided to
13  its customers.  Whether it is in the form of
14  a market report that is a glossy brochure
15  that says we are inspected X, Y, and Z, and
16  here is what it shows.  So I just don't know.
17  MS. STEINER: I don't have any
18  problem with her answering any questions
19  about any documents that she may or may not
20  have received from NECC, I just wanted to be
21  clear that what was provided in response to
22  Number 12 was specifically with regard to
23  marketing information.  And that is why I
24  asked her how.
25  MR. ROTH: That is fine.  Okay.

Page 105

1  Fair enough.  I wasn't trying to be critical
2  about that.  I just wanted to know whether
3  there was anything else.
4  Let me try it this way.
5  BY MR. ROTH:
6  Q.  Other than this card, have you
7  received any information from NECC about its
8  products, about its process, anything that says
9  here is what we do, here is who we are?
10  A.  Offhand not that I remember.
11  Most of our products that we use, we
12  usually keep a folder per vendor or per wherever
13  we are getting that stuff from.
14  I handed over the whole NECC folder.
15  So, if you are asking me to think
16  through that.  The best that I remember, I don't
17  remember seeing any brochures or like a flyer or
18  anything like that.
19  Q.  Okay.  So, what was produced by way
20  of marketing is the only thing you had in that
21  folder, and that is that business card?
22  A.  That is it, yes.
23  Q.  And separate and apart from whether
24  it is called marketing or not, did you ever
25  obtain any inspection reports of NECC facilities



Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 12 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016        Pages 106..109

Page 106

1  between 2008 and the time of the recall?
2      A.   No, not for NECC or any other
3  supplier of products that I was getting.
4      Q.   Were you aware between 2008 and the
5  time of the recall as to whether or not NECC had
6  microbiology reports or data?
7      A.   Not that I recall them sending
8  anything like that to us.
9      Q.   Did you ever request NECC to provide
10 you with microbiology reports between 2008 and
11 2013?
12     A.   I don't personally remember
13 requesting a report.
14          If anything, unless my nurse reached
15 out to get something like that after the recall,
16 I'm not aware.
17          I don't personally remember reaching
18 out to NECC to try and get a report like that
19 before or after the recall.
20     Q.   Okay.  Well right now I want to
21 focus on 2008 and before the recall.
22          MS. STEINER:  Your question had
23     included up until 2013, previously.
24          THE WITNESS:  2013.
25          MR. ROTH:  Thanks, I apologize for

Page 107

1  that.
2  BY MR. ROTH:
3      Q.   Between 2008 and until the time of
4  the recall, did you ever request or did anyone
5  from Box Hill ever request any microbiology data
6  from NECC?
7      A.   No, like I said earlier, not from
8  NECC or who we were getting the other injectables
9  from, no.
10     Q.   Okay.  And who else were you
11 getting, were you getting injectable MPA from
12 anyone other than NECC?
13     A.   No, not injectable.  Any other
14 injectables, dye, or local anesthetic, or the
15 kits are sterile, or the skin prep, I don't
16 remember requesting such reports for any of
17 those.
18     Q.   Are the dyes or the, are they
19 compounded?
20     A.   Not to the best of my knowledge.
21     Q.   Who did you get the dyes from?
22     A.   Over the years I used Isovue and
23 Omnipaque.  I'd have to go through the records to
24 see who would have been the supplier, not the
25 manufacturer, but the supplier for those at

Page 108

1  different times.
2      Q.   Okay.  And was the supplier somebody
3  who was local in the Maryland area?
4      A.   I mean the supplier would be someone
5  like Henry Schein or CuraScript, these are
6  national companies.  Do they have a local office?
7  I don't know.
8      Q.   Okay.  You have answered my
9  question.  Who were suppliers that you used
10 between 2008 and up to the time of the recall for
11 injectables?
12     A.   Those would be Henry Schein or
13 CuraScript or McKesson for, there is someone I'm
14 missing, I can't remember off the top of my head.
15     Q.   Okay.  And I apologize if I asked
16 you this question.
17          Do you know whether or not between
18 2008 and before the recall there were
19 alternatives to MPA preservative-free for an
20 injectable steroid?
21          MS. STEINER:  Objection, asked and
22     answered.  But you can answer it again.
23          THE WITNESS:  Yes, because like I
24     said before, I don't remember looking around
25     for other alternatives since I had already

Page 109

1  used it before.  No problems.
2          And not just that, all of the other
3     products, too, decided that I was going to
4     continue using the same.
5  BY MR. ROTH:
6      Q.   Is Depo-Medrol MPA?
7      A.   Depo-Medrol is methylprednisolone.
8      Q.   Is that a brand name, Depo-Medrol?
9      A.   That is a brand name.
10     Q.   And who manufacturers it?
11     A.   Currently Pfizer.
12     Q.   Did you know whether or not in,
13 between 2008 until the time of the recall, Pfizer
14 made Depo-Medrol in a preservative-free form?
15     A.   I don't know.
16     Q.   Pfizer is not a compounding
17 pharmacy, correct?
18     A.   I understand they are a
19 manufacturing company.
20     Q.   Okay.  I think you can put that
21 stuff away.  I'm going to switch gears a little
22 bit.
23          I want to talk a little bit about
24 how you purchased MPA from NECC.
25          Were you aware between 2008 and the


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-7   Filed 10/16/17   Page 13 of 13

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF RITU T. BHAMBHANI, M.D. on 02/10/2016          Pages 114..117

Page 114

 1      That is how the, I guess, if the
 2 understanding, the question I understand correct
 3 is how we decided how much to order, that is what
 4 that was based on, is in anticipation of the
 5 volume that was being done and what we would need
 6 over the subsequent period.
 7      Q.   Did you understand when you were
 8 completing the order form that you were writing
 9 prescriptions for the patients listed on the
10 sheet?
11           MS. STEINER:  Objection as to
12      foundation.
13           THE WITNESS:  We were filling out
14      the order form that they provided.  In my --
15      well, if I think about it, if you ask me was
16      I filling out a prescription, I can't say I
17      was thinking of it as a prescription.  I have
18      never had a company provide me a prescription
19      to write for a patient.
20           And, I have never written a, I
21      guess, a prescription to order medication
22      that I planned to inject for a patient.  When
23      I am used to writing prescriptions over the
24      years it is where I am writing a prescription
25      for a patient, handing it to the patient to

Page 115

 1      take to the pharmacy or sending to the
 2      pharmacy.
 3           These were forms that were provided
 4      to us by NECC.  They said fill it out with
 5      this information and that is what we were
 6      providing to them.
 7 BY MR. ROTH:
 8      Q.   Okay.  And when, you got the forms
 9 or when NECC said okay, here is what we want you
10 to do to order this compound, and in 2008 when
11 you opened Box Hill this is the first time you
12 would have seen one of these order forms?
13      A.   Correct.
14      Q.   Okay.  And when they said here is
15 what you do, you fill out the form and give us a
16 list of patients, did you ask them why they
17 needed patient names?
18      A.   I guess I didn't have a reason to
19 ask.  And they were a company, I had used a
20 product before.  I was following instructions for
21 a variety of vendors or providers or suppliers at
22 the time.
23           Some were forms to be filled out,
24 some had application, some had a contract and
25 some had a form.  To us this is what NECC

Page 116

 1 provided as to how we could order the steroid
 2 from them.
 3           I followed their instructions.
 4      Q.   Okay.  So, were there other
 5 companies when you started out that you were
 6 purchasing injectable steroids from?
 7           MS. STEINER:  Objection, asked and
 8      answered.  You can answer again.
 9           THE WITNESS:  No, this was it, when
10      I started.
11 BY MR. ROTH:
12      Q.   Okay.  And so when they said here is
13 our form, you know, fill this out.  Did you
14 verify with anybody or did you ask anybody,
15 whether it was NECC or anyone else whether or
16 not, you know, this is the way it is proper to
17 order injectable steroids for my patients?
18           MS. STEINER:  Objection as to form
19      and foundation.
20           THE WITNESS:  I don't recall asking
21      anyone.  If I asked, since I was still doing,
22      going to Harford County and if I had asked
23      them, you know, is this how, again this
24      wasn't the only thing.  It wasn't different
25      from a routine.

Page 117

 1           It was setting up a variety of
 2      different vendors for different products at
 3      the time and following instructions from each
 4      one.  I had no reason to specifically ask for
 5      that particular form if that was.
 6 BY MR. ROTH:
 7      Q.   Okay.  And I want to make a
 8 distinction between -- were there, the reason why
 9 I was asking about, were there other vendors you
10 were buying injectable steroids from, were there
11 other compounding pharmacies that you were
12 purchasing medications from that you were going
13 to give to your patients besides NECC?
14      A.   I was not purchasing, as I remember,
15 any other medication from another compounding
16 pharmacy besides NECC at that time.
17      Q.   Okay.  And you were, NECC was a
18 compounding pharmacy, correct?  Did you --
19      A.   Yes, like I said, I probably didn't
20 know when I was at Harford County, but -- I
21 probably didn't, I had no reason to specifically
22 question about one of their, one particular
23 vendor.
24           But, yes, I knew when I started Box
25 Hill that they were a compounding pharmacy.

