Case 1:13-md-02419-RWZ   Document 3486-8   Filed 10/16/17   Page 1 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015          Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - - - - x

 5   IN RE: NEW ENGLAND COMPOUNDING      MDL No. 2419

 6   PHARMACY, INC. PRODUCTS              Master Dkt.
                                         1:13-md-02419-RWZ
 7   LIABILITY LITIGATION

 8   - - - - - - - - - - - - - - - - - x

 9   THIS DOCUMENT RELATES TO ALL SUITS

10   AGAINST THE SAINT THOMAS ENTITIES

11   - - - - - - - - - - - - - - - - - x

12   THIS DOCUMENT RELATES TO

13   ALL CASES

14   - - - - - - - - - - - - - - - - - x

15

16       VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO

17                 Thursday, June 4, 2015

18                      9:04 a.m.

19              Nutter McClennen & Fish LLP

20                     Seaport West

21                155 Seaport Boulevard

22              Boston, Massachusetts 02210

23

24          Michelle Keegan, Court Reporter
```



```
 1    A P P E A R A N C E S:

 2

 3            GIDEON, COOPER & ESSARY PLC
              By:  Matthew Cline, Esq.
              By:  Christopher Tardio, Esq.
 4            315 Deaderick Street #1100
              Nashville, Tennessee 37238
 5            Phone: (615) 254-0400
              E-mail:  matt@gideoncooper.com
 6            E-mail:  chris@gideoncooper.com
              Counsel for Saint Thomas Outpatient
 7            Neurosurgical Center, LLC; Howell Allen, a
              Professional Corporation; John W. Culclasure,
 8            M.D.; Debra V. Schamberg, RN; Specialty Surgery
              Center; Crossville, PLLC; Kenneth R. Lister,
 9            M.D.; Kenneth R. Lister, M.D., PC;
              Donald E. Jones, M.D.

10

11             NUTTER, MCCLENNEN & FISH LLP
               By:  Sarah P. Kelly, Esq.
12             Seaport West
               155 Seaport Boulevard
13             Boston, Massachusetts 02210
               Phone: (617) 439-2461
14             E-mail:  skelly@nutter.com
               Counsel for Saint Thomas Health, Saint Thomas
15             Network, Saint Thomas West Hospital f/k/a
               Saint Thomas Hospital

16

17            BLUMBERG & WOLK LLC
              By:  Christopher M. Wolk, Esq.
18            158 Delaware Street
              Woodbury, New Jersey 08096
19            Phone: (856) 848-7472
              E-mail:  cwolk@blumberglawoffices.com
20            Counsel for Premier Orthopaedic & Sports
              Medicine Associates of Southern New Jersey,
21            LLC; d/b/a Premier Orthopaedic & Sports
              Associates, LLC; Premier Orthopaedic
22            Associates Surgical Center, LLC; Kimberly
              Yvette Smith, M.D.; Thomas Dwyer, M.D.;
23            Richard C. Diverniero, M.D.; Rhaul Shah, M.D.;
              and Richard Strauss, M.D.

24
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        Q.   Looking at the report, or if you have an

 2   independent recollection, what was different about what

 3   you actually did inside the facility in 2012 versus

 4   2008, if anything?

 5        A.   I don't recall any differences.

 6        Q.   Did you look at documentation in 2012?

 7        A.   We did.

 8        Q.   Did you review policies and procedures in 2012?

 9        A.   We did.

10        Q.   Did you look around the facility in 2012?

11        A.   We did.

12        Q.   Did you look into the clean room, or do you

13   remember?

14        A.   I recall looking into the clean room.

15        Q.   Do you recall going into the clean room?

16        A.   I do not recall going into the clean room.

17        Q.   Generally when you do these vendor audits, do

18   you go into the clean room?

19             MR. ROBERTSON:  I object.  Temporal.  Back then

20   generally did he?

21        Q.   Prior to 2012 when you did these audits, did

22   you go into the clean room?

23        A.   I, on any of the audits, have never gone in

24   physically -- I don't recall on any of these audits
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-8   Filed 10/16/17   Page 4 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 84

1    physically going into a clean room.  Always looking into
2    a clean room.
3        Q.   Has Mr. McAteer accompanied you on every
4    compounding pharmacy vendor audit from '07 to '12, or
5    did he from '07 to '12?
6        A.   Yes.
7        Q.   Do you have any recollection of Mr. McAteer
8    ever being allowed to go into the clean room on one of
9    these vendor audits?
10       A.   I don't recall him going into the clean room
11   either.
12       Q.   Do you know why that is, why -- Well, let me
13   ask this to give it a little foundation and avoid three
14   objections.
15            Have you or Mr. McAteer during any of these
16   vendor audits asked to go in the clean room and the
17   vendor said no, we don't allow that?
18       A.   I don't recall being denied or I don't recall
19   asking either.
20       Q.   Why not?  Why do you-all not go into the clean
21   room during these vendor audits?
22       A.   Usually -- and there were multiple places.
23   Usually we can view into the clean room via a window.
24       Q.   On page 140, which is the third page of the



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-8   Filed 10/16/17   Page 5 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 105

1   either Mr. Cadden or somebody from New England

2   Compounding during the audit.  Is that right?

3          MR. ELLIS:  Objection to form.

4      A.   I believe it's in one of the reports.

5      Q.   Right.

6      A.   It says went over and --

7      Q.   In fact, it says it went over point by point.

8   Right?

9      A.   It does say that, right, in the report.

10     Q.   Had you found anything during either the 2008

11  or 2012 audit, prior to the audit, either web-based

12  research or looking at journals or looking at anything,

13  that raised a concern for you with regard to continuing

14  to order from New England Compounding, would you have

15  brought it to Mr. McAteer's attention?

16         MR. GASTEL:  Objection to form.

17     A.   Yes, I would have.

18     Q.   And would you have at the very least addressed

19  that with Mr. McAteer?

20         MR. GASTEL:  Objection to form.

21     A.   Yes, I would have.

22     Q.   And would you have made sure your concerns were

23  satisfied before you signed off on the audit report?

24         MR. GASTEL:  Objection to form.



1      A.   That is correct.

2      Q.   You're not sure which visit it was?

3      A.   Correct.

4      Q.   So do you remember if that was in the back of

5  the building or in the middle center of the building?

6      A.   I don't recall.

7      Q.   Okay.  Now, in neither visit did you ever --

8  you or Fran McAteer never entered the clean room area.

9  Correct?

10      A.   That is correct.

11      Q.   You never entered the anteroom where they gown

12  up?

13      A.   Correct.

14      Q.   You never entered the prep room?

15      A.   Correct.

16      Q.   And you never entered the formal cleaning

17  room -- clean room?

18      A.   Correct.

19      Q.   So you never looked at any of the equipment

20  that was in the clean room.  Correct?

21      A.   Only what I could see through the window.

22      Q.   What you could see through a window.  Okay.

23  And we're going to talk more about that window.

24           You never went into the rooms and did any kind



1   of detailed examination of those clean rooms?

2       A.    Correct.

3       Q.    And if I understand it correctly from this

4   report, at least Exhibit 299 says that it was from 10:00

5   to 12:00 o'clock, the whole visit?

6       A.    This is 2008?

7       Q.    Yeah.

8       A.    I don't recall the time frames, but that --

9       Q.    Do you remember the e-mails where Barry says,

10  I'll give you two hours, 10:00 to 12:00?

11      A.    Right.  So we would have been there around that

12  time.

13      Q.    And I'm not holding you to the minute, but

14  approximately.

15          So the whole visit between arriving, having

16  discussions with Mr. Cadden, looking at the documents

17  that you looked at, walking around the facility, that

18  whole visit took approximately two hours.  Correct?

19      A.    I don't know when it ended.

20      Q.    Okay.  Well, do you have any memory that's

21  different than what's on this report?

22          MR. ROBERTSON:  I object to the form.

23      A.    That's what's on the agenda.  I don't recall

24  whether we finished early or stayed late.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    the higher temperature will encourage more growth.

2    Correct?

3         A.    That's my understanding, yes.

4         Q.    And what, if anything, did you do to follow up

5    on that to see if NECC changed their temperature for

6    that?

7         A.    I don't recall following up on it.

8         Q.    And let's turn back to that -- by the way, the

9    rotating out the sporicidal agents, the reason you

10   rotate sporicidal agents into your cleaning program,

11   that's for the -- it's really for safety reasons.

12   Correct?  To make sure there's no fungal growth.

13   Correct?

14        A.    Correct.

15        Q.    And then let's just look at one other thing

16   from this.  On the narrative on BW_706, the second

17   paragraph, second-to-last sentence, "NECC is moving soon

18   to a new area in the same building complex.  BWH should

19   observe the new operation when completed."  Do you see

20   that?

21        A.    Yes.

22        Q.    Did you follow up to find out when they were

23   moving to the new area?

24        A.    I don't recall asking for a date, a specific



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-8   Filed 10/16/17   Page 9 of 21

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF MICHAEL C. COTUGNO on 06/04/2015                    Page 174

1    date or a discussion around an exact date.

2        Q.    Do you remember scheduling an audit so that the

3    new operation could be observed?

4        A.    We did schedule an audit in 2012.

5        Q.    Four years later?

6        A.    Correct.

7        Q.    Between 2008 and 2012, did you receive any type

8    of sterility tests, batch certification reports, on a

9    regular basis from NECC?

10        A.    I don't recall receiving regular reports or

11    actually any reports.

12        Q.    Any equipment validation reports, for example?

13        A.    I don't recall receiving any reports from them.

14        Q.    Did you have a policy where you required your

15    vendors -- your compounding sterile product vendors to

16    report to you if any of their pharmacists or pharmacy

17    techs' licenses were suspended by the board of pharmacy?

18        A.    I don't recall the policy stating about

19    licenses.

20        Q.    So after that 2008 site visit to NECC, did you

21    tell Mr. Churchill, your boss, that you had only been

22    there for approximately two hours?

23        A.    I don't recall a discussion around how long we

24    were there.



1    Q.    Okay.  So can you read what you wrote to Barry

2    Cadden in March of 2012, first paragraph.

3    A.    "It has been about four years since we last

4    visited NECC.  Per our internal policy, we are due to

5    come out for another visit.  It is also a hospital joint

6    commission survey year.  We are hearing that the

7    surveyors are asking hospitals to provide information on

8    the sterile compounding facilities/pharmacies they

9    receive product from."

10    Q.    What is the hospital joint commission that

11    you're referring to there?

12    A.    The joint commission is an agency that

13    accredits hospitals for the government with regards to

14    CMS and Medicare, Medicaid, is my understanding.

15    Q.    And do they come in and do a audit of your

16    facility?

17    A.    They do.

18    Q.    How long does that take for them to do that?

19    A.    They are there usually for a week.

20    Q.    A week.  And they audit your pharmacy?

21    A.    Sometimes.

22    Q.    Sometimes.  That sounds like a real audit.

23          MR. TARDIO:  Objection.

24          MR. ROBERTSON:  Wait for a question.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   went out and did a site visit.  Correct?  And then you

2   wanted something from NECC that says something about

3   their quality.  Correct?

4        A.   Correct.

5        Q.   Just in case the joint commission asked for it,

6   you'd have it.  Correct?

7        A.   Correct.

8        Q.   And then read the second line of that paragraph

9   that you wrote to Barry Cadden in March of 2012.

10   "They," the second line of Paragraph 2.

11        A.   "They are expecting that BWH do this and review

12   this information to ensure our patient safety."

13        Q.   And the "they" in that sentence is again the

14   joint commission?

15        A.   Correct.

16        Q.   And Brigham and Women's -- BWH is Brigham and

17   Women's Hospital.  Correct?

18        A.   Correct.

19        Q.   And then you give him some dates and times.  Do

20   you see that?  To set up the visit.

21        A.   Correct.

22        Q.   And do you say, "I would like to try to start

23   at 8:00 a.m. and finish no later than 1:00 p.m."?

24        A.   Correct.



1    Q.    So you're looking for five hours for the site

2  visit.  Correct?

3    A.    Correct.

4    Q.    And then you say in the next paragraph, "I have

5  a pharmacy resident with me that I would like to bring

6  along."  What was that referring to?

7    A.    We trained pharmacy residents.  These are

8  people who have graduated pharmacy school, so they're

9  not pharmacy interns.  And then they do a year residency

10  at the hospital.

11    Q.    Okay.  Did you send him an audit form for

12  completion -- audit survey form for completion with that

13  e-mail?

14    A.    Yes.

15    Q.    With this e-mail?

16    A.    Oh, I don't recall.  I don't see that there's

17  one of those little things --

18    Q.    It doesn't show an attachment?

19    A.    It doesn't show an attachment.  So I would say

20  it wasn't on this one because it's not there.

21    Q.    You didn't send him that.  And you didn't send

22  him a proposed agenda for the site visit, nor did you

23  ask him for any specific records to be compiled for

24  review at the site visit, did you?

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1          MS. KELLY:  Objection.

2      A.   Not in that e-mail.

3      Q.   Okay.  So let's move to Exhibit 310, which is

4  the next e-mail that we could find concerning this.  And

5  can you identify Exhibit 310, please?

6      A.    It is an e-mail from me to Barry Cadden, with

7  Fran McAteer cc'd, about the NECC site visit.

8      Q.   What's the date of this?

9      A.    The date of the -- well, the date of the top

10  e-mail is May 3rd, 2012.

11      Q.    And the first sentence says, "I just" -- "Hi,

12  Barry.  I just want to make sure we're still on for the

13  BWH vendor audit on Friday, May 4th, at 8:30."  Correct?

14      A.   Correct.

15      Q.   So this is a day before you're about to go out

16  on your 2012 site visit.  Correct?

17      A.   Correct.

18      Q.   And now you do attach something, don't you?

19      A.   I don't recall.

20      Q.   Look at the attachments.  Look at the front of

21  the e-mail.  Look at the attachments.

22      A.   Where would I --

23      Q.   Right under "Subject matter" there's a line

24  called "Attachments."



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   in the front, but I don't recall at the time making any

2   note of what those businesses were or whether they would

3   have said "recycling."

4           And now -- I would then be mixing my knowledge

5   of what I know now of a recycling facility and of what

6   it might have said then didn't register as recycling.

7   Now I do know that because of current events.

8       Q.   Did you make any inquiry of Mr. Cadden during

9   either the 2008 or 2012 visits as to what other

10  businesses were operating at that site?

11      A.   I don't recall asking him that.

12      Q.   So you were asked some questions on direct

13  examination about whether you asked -- whether you asked

14  Cadden during any of these visits whether they had ever

15  had a lawsuit or settled a lawsuit.  And I think you

16  said you don't remember asking that question.

17          Did you ask him whether any of his -- the drugs

18  that had been compounded by NECC had ever killed

19  someone?

20      A.   No, I never asked that question.

21      Q.   Do you know what the Pharmacy Compounding

22  Accreditation Board is?

23      A.   I have heard of it before.

24      Q.   Did you know what it was in 2008, 2012?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1        A.    It's PCAB, right?

2        Q.    PCAB.

3        A.    I would have known.

4        Q.    Did you ask Barry Cadden whether they were

5   accredited by PCAB at either the 2008 or 2012

6   inspections?

7        A.    I don't recall if we asked him that.

8        Q.    Did you take any surface samples for testing at

9   either visit?

10       A.    No.

11       Q.    By the way, when -- we saw a couple order forms

12  before for drugs that Brigham and Women's submitted to

13  NECC.  When NECC -- when Brigham and Women's submitted

14  scripts or order forms for drugs from NECC, did they

15  supply the patient weights, maximum dosage per hour, and

16  route of administration for each of the drugs that were

17  ordered?  You can see it on the form.

18       A.    It's not on those order forms, no.

19       Q.    Do you have any knowledge that Brigham and

20  Women's ever supplied any of that information to NECC?

21       A.    We sent them prescriptions for some items,

22  individual patient prescriptions for items.  I'm not

23  aware that weight was on it.

24       Q.    Or maximum dosage per hour.  You know what that



1  is.  Correct?

2       A.   Yes.  Not that exact term.

3       Q.   Or route of administration?

4       A.   I don't recall seeing that on any of them.

5       Q.   Okay.  You know what maximum valid dilution is,

6  or is that beyond your --

7       A.   I've heard the term, but I wouldn't credit

8  myself with knowing what that definition is and how it's

9  applied.

10      Q.   Okay.  So let's just take another look at this

11 audit report from 2012, Exhibit 316.  Keep the 2008

12 audit report just in front of you but 299 too.  I just

13 want to go through one other comparison with both of

14 those reports.

15           On page BW_138 of Exhibit 316, the 2012 report,

16 under "General," do you see the sentence, "All

17 documentation seemed adequate and compliant to GMP"?  Do

18 you see that?

19      A.   I do.

20      Q.   What is GMP?

21      A.   Good Manufacturing Practices.

22      Q.   Okay.  So what did you understand Mr. McAteer

23 telling you when he wrote that?

24      A.   Well, Good Manufacturing Practices is something



1    manufacturers through the FDA comply with.  That's their

2    regulations, guidelines.

3         Q.    So what did you understand that Mr. McAteer was

4    telling you in his report?

5              MR. ROBERTSON:  I object.

6         A.    I don't recall what I would have thought at the

7    time.  I know what it means reading it now.

8         Q.    Okay.  Do you think you knew what GMP was back

9    in 2012?

10        A.    I did.

11        Q.    GMP is a little stricter than USP 797.  Is that

12   correct?

13        A.    Yes.

14        Q.    Did you think that NECC was GMP compliant?

15             MR. ROBERTSON:  I object.

16        A.    No.

17        Q.    Did you ask Mr. McAteer, Why are you saying

18   they're compliant with GMP?

19        A.    I did not.

20        Q.    Do you know why you didn't ask that?

21        A.    I don't recall.

22        Q.    Did you read the report before you signed it?

23        A.    I did read the report.

24        Q.    Would you have liked NECC to be GMP compliant



1  to make such a fine distinction.

2          MR. ELLIS:   This is not a distinction.

3      Q.   You said you understood from Recommendation

4  Number 1 that they were not compliant with USP 797.

5  Correct?

6      A.   (No verbal response)

7      Q.   You understood from reading Recommendation

8  Number 1 on the action limits for viable air sampling

9  that Mr. McAteer was telling you they're not compliant

10  with USP 797 on this.  Correct?

11          MR. ROBERTSON:   I object.

12      A.   That's what is in the report.

13      Q.   I'm not asking you whether you know it's true,

14  whether you completely understand it.  What he's telling

15  you there is that at least with respect to this, they're

16  not in compliance with USP 797?

17      A.   Yes, that's what he's telling me.

18      Q.   But on the page before the report, Mr. McAteer

19  had written, "Overall, NECC is compliant for USP 797

20  regulations."

21      A.   That's what he wrote on the -- yes.

22      Q.   Well, did you think, well, maybe there's some

23  inconsistencies there?

24          MR. ROBERTSON:   I object.  Did he have that



```
 1    thought in 2012?
 2            MR. ELLIS:  When he read the report before he
 3    signed it.
 4        Q.   Did you say maybe this isn't quite accurate?
 5        A.   To be honest --
 6        Q.   Yes.  I'm asking you to be very honest here
 7    today.
 8        A.   Sorry.  I do recall the CFU limit registering
 9    in my mind.  I actually believe I took out my copy of
10    USP to look at that.  That rings a bell to me of when I
11    saw it I said:  Gee, I wonder what -- that doesn't -- I
12    didn't know that -- I was confused by that statement at
13    the time.
14        Q.   Okay.  By the way, did you do anything to
15    follow up after this report with NECC to see if they'd
16    come into compliance with USP 797 on their action limits
17    for viable air sampling?
18        A.   I don't recall any followup discussions with
19    NECC after this.
20        Q.   Did you send this report to NECC after the site
21    visit?
22        A.   I don't recall.  And I don't know if that
23    was -- if we did that with all the vendors.  We may have
24    done that with some of the vendors, but I don't recall
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   person was working.

2        Q.   But you didn't answer my question.  Did you

3   see --

4             MR. ROBERTSON:  Whoa, whoa, whoa.

5        Q.   Did you see then gowning, hand washing, and

6   whether they were complying with aseptic technique?

7        A.   I don't recall what they were doing.

8        Q.   And what about Slide Number 30?  Does that look

9   familiar, the one entitled "Facility tour goals.

10  Observe actual compounding process in action"?

11       A.   Whether it was this exact slide or similar-type

12  slides, there is wording in here that I recognize.

13       Q.   Okay.  And what this was about was, when you're

14  doing one of these vendor audits of a compounding

15  pharmacy who's supplying sterile products to a

16  healthcare provider, that you should observe actual

17  compounding process in action.

18            Look for compliance with established SOPs,

19  meaning that -- not just that they have procedures, but

20  they're actually following the procedures in action.

21  Look for system double-checks.  Look for use of

22  medication safety technology.  Look for the pharmacist's

23  role in product preparation and validation.  Observe

24  them during the documentation processes.  Check for



```
 1   documentation and calibration of any automated devices
 2   that may be in use.
 3           Did you do any of that when you were at NECC in
 4   either 2008 or 2012, sir?
 5       A.   During the tour, there were people working.  I
 6   don't recall exactly what pieces of that -- I couldn't
 7   say exactly which pieces -- recall which pieces they
 8   were doing.
 9       Q.   Okay.  But you never went into the clean room
10   on either visit?
11           MR. TARDIO:  Objection.
12       A.   We did not go in the clean room.
13           MR. ELLIS:  I'm going to mark this as
14   Exhibit 344.
15           (Exhibit Number 344
16           marked for identification)
17       Q.   Do you recognize what I've marked as
18   Exhibit 344?
19       A.   Correct.  I do.
20       Q.   What is this, sir?
21       A.   It's a presentation on implementing sterile
22   product services.
23       Q.   Okay.  And did you give this at a -- the South
24   Carolina Society of Health-System Pharmacists on
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com