```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   - - - - - - - - - - - - - - - - - - x

 5   IN RE:  NEW ENGLAND COMPOUNDING        MDL No. 2419

 6   PHARMACY, INC. PRODUCTS                Master Dkt.
                                            1:13-md-02419-RWZ
 7   LIABILITY LITIGATION

 8   - - - - - - - - - - - - - - - - - - x

 9   THIS DOCUMENT RELATES TO:

10   All Actions

11   - - - - - - - - - - - - - - - - - - x

12

13         VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA

14                Friday, December 4, 2015

15                      9:00 a.m.

16                 Seaport Boston Hotel

17                    1 Seaport Lane

18              Boston, Massachusetts 02210

19          Michelle Keegan, Court Reporter

20

21

22

23

24
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   A P P E A R A N C E S:

 2


 3       GIDEON, COOPER & ESSARY
         By:  C.J. Gideon, Jr., Esq.
 4       By: Matt Nathanson, Esq.
         By: Christopher Tardio, Esq. - (By video stream)
 5       315 Deaderick Street, Suite 1100
         Nashville, Tennessee 37238
 6       Phone: (615) 254-0400
         E-mail: cj@gideoncooper.com
 7       E-mail: mnathanson@gideoncooper.com
         E-mail: chris@gideoncooper.com
 8       Counsel for the Tennessee Clinic Defendants

 9
         NORTON ROSE FULBRIGHT US LLP
10       By:  Adam T. Schramek, Esq.
         98 San Jacinto Boulevard, Suite 1100
11       Austin, Texas 78701-4255
         Phone: (512) 536-5232
12       E-mail: adam.schramek@nortonrosefulbright.com
         Counsel for Saint Thomas Hospital, Saint Thomas
13       Health and the Saint Thomas Network

14
         PESSIN KATZ LAW, P.A.
15       By:  Gregory K. Kirby, Esq.
         901 Dulaney Valley Road, Suite 500
16       Towson, Maryland 21204
         Phone: (410) 769-6143
17       E-mail: gkirby@pklaw.com
         Counsel for Box Hill Surgery Center
18

19       CAPPLIS, CONNORS & CARROLL, PC
         By:  Thomas M. Dolan, III, Esq.
20       18 Tremont Street, Suite 330
         Boston, Massachusetts 02108
21       Phone: (617) 227-0722
         E-mail: tdolan@ccclaw.org
22       Counsel for Dr. O'Connell's Pain Care Center,
         Dr. Abdul Barakat and Ocean State Pain
23       Management

24
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   database.
 2       Q.   Okay.  What else, if anything?
 3       A.   The pharmacy pharmacist licenses would
 4   have been verified against the database.  That
 5   would be the scope.
 6       Q.   Is it also correct, sir, that as part of
 7   this inspection on May 24th, 2011, he did an
 8   inspection of NECC's sterile and nonsterile
 9   processing areas?
10            MS. DOUGHERTY:  Objection.
11       A.   He conducted an inspection of the
12   facility.
13       Q.   Does that include the clean rooms?
14            MS. DOUGHERTY:  Objection.
15       A.   The clean room would be a -- he would
16   visualize it from the outside of the clean room.
17   He is not authorized to enter a clean room.  He
18   cannot enter a clean room.  There would have been
19   a document check.
20       Q.   As part of the document check, would he
21   look at the logs reflecting any contamination of
22   touch plates or fungal blooms or bacteria, any
23   environmental records reflecting contamination?
24       A.   He would look at the certification report
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

```
 1    that were provided for room air and the hood air.
 2         Q.   Okay.  And as you -- the Massachusetts
 3    Board of Registration in Pharmacy knows, an
 4    outside vendor certified the air on a biannual
 5    basis.  Correct?
 6              MS. DOUGHERTY:  Objection.
 7         A.   An outside vendor.  Correct.
 8         Q.   Now, what I want to know is, as part of
 9    the inspection, did the inspector there on behalf
10    of the Board of Registration in Pharmacy look at
11    the environmental monitoring records maintained by
12    NECC?
13         A.   At the time of that inspection, he would
14    have looked that the hood was certified and that
15    the room was certified for room air.  The
16    documents that I saw, those passed.
17         Q.   But what about the internal environmental
18    monitoring log for things as simple as the
19    employees' touch plates?
20         A.   At that time, he wouldn't have.
21         Q.   Wouldn't have what?
22         A.   Wouldn't have looked at those.
23         Q.   Would he not look at any environmental
24    monitoring records?
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1  in Pharmacy ever go back to NECC until after the
 2  fungal meningitis outbreak?
 3       A.   After the fungal meningitis outbreak?
 4       Q.   Here is the time frame.  We're talking
 5  today, right now, about May 24th, 2011.  From that
 6  date until after the fungal meningitis outbreak,
 7  did anybody from the Board of Registration in
 8  Pharmacy ever go back and set foot on the premises
 9  to inspect it?
10       A.   NECC, no.
11       Q.   How about anybody ever go and inspect
12  anything that Barry Cadden was doing?
13       A.   That Barry Cadden was doing?
14       Q.   Did you go to NECC for the purposes of
15  inspecting, evaluating, overseeing Barry J.
16  Cadden, pharmacist in charge?
17       A.   Not to -- No.
18       Q.   Was the inspection by Mr. Frisch announced
19  or unannounced?
20       A.   Announced.
21       Q.   In the time frame we talked about, which
22  would be 2005 until September 26th, 2012, did the
23  Board of Registration in Pharmacy have the
24  authority to do an unannounced inspection of a
```


Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-10   Filed 10/16/17   Page 6 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA on 12/04/2015                    Page 306

```
 1        Q.  I'd like to briefly return your attention
 2   to questions that you were asked with respect to
 3   Exhibit 712.  This was the May 24th, 2011,
 4   inspection.
 5            MR. DIGANGI:  Excuse me, Counsel.  He
 6   needs a 2-minute break.
 7            MS. DOUGHERTY:  Sure.  No problem.
 8            THE VIDEOGRAPHER:  The time is 4:29 p.m.
 9   We're going off the record.
10            (Recess taken)
11            THE VIDEOGRAPHER:  The time is 4:33 p.m.
12   We're back on the record.
13            (Exhibit 761 marked for identification)
14   BY MS. DOUGHERTY:
15        Q.  I've handed you what's been marked as
16   Exhibit 761.  Do you recognize this document,
17   Mr. Penta?
18        A.  Yes.
19        Q.  What is it?
20        A.  It's a request for a staff assignment,
21   request for inspection.
22        Q.  Okay.  And does this relate to the
23   May 2011 inspection of the NECC facility?
24        A.  Yes.
```



Case 1:13-md-02419-RWZ   Document 3486-10   Filed 10/16/17   Page 7 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA on 12/04/2015                Page 307

```
 1      Q.  What date was the inspection requested?
 2      A.  4/13/11.
 3      Q.  So there was plenty of notice between the
 4  inspection time of the request and the amount of
 5  time that it took for you guys to actually have
 6  that inspection, May 24th of 2011?
 7      A.  Yes.
 8      Q.  And what specifically is your request
 9  for in that section of summary of assignment?
10      A.  "To conduct an inspection as soon as
11  practicable of New England Compounding Center,
12  697 Waverly Street, Framingham, pursuant to a
13  renovation expansion, pharmacy department
14  application.  They intend to move into the new
15  space on May 2nd.  Inspection can occur pre or
16  post move."
17      Q.  Now, how is it that an inspection can
18  occur pre or post move?  I'm just curious as to
19  the procedures in place at the board.
20      A.  This was a relocation within the same
21  building.  They didn't necessarily even require an
22  inspection because it was from the same suite, if
23  you will.  But it was requested by executive
24  director Coffey to me to conduct an inspection.
```



Case 1:13-md-02419-RWZ   Document 3486-10   Filed 10/16/17   Page 8 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA on 12/04/2015                    Page 308

```
 1       Q.   And I believe you testified previously
 2  that at the time of the inspection the facility
 3  was not operational or at least the part of the
 4  facility that you were inspecting was not
 5  operational.  Is that accurate?
 6       A.   William Frisch inspected it.  Yes, he said
 7  it wasn't operational.
 8       Q.   And is that sort of the idea, that you
 9  could do this -- an inspection can occur premove,
10  and you were doing that premove?
11       A.   The logistics on a relocation, renovation,
12  is that to shut something down immediately and
13  expect the next renovation -- the site to be open
14  immediately, it wouldn't occur that way.
15           Just the logistics of that is that there
16  is some -- logistically, there's just a piece of
17  time where you just can't logistically go from one
18  place to another overnight and expect to be
19  operational.
20       Q.   And because it was not operational at the
21  time, is it fair to say that there were no fill
22  logs to be observed?
23       A.   There was -- yeah, it wasn't operational
24  at that time when he was there.  That's correct.
```



Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3486-10   Filed 10/16/17   Page 9 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA on 12/04/2015                                Page 309

```
 1        Q.   And there was also no environmental
 2   monitoring logs that were reviewed at that time?
 3        A.   I don't believe so.
 4        Q.   And I believe you already testified
 5   earlier that the inspector did not go into the
 6   clean rooms at all?
 7        A.   He would not.
 8        Q.   Okay.  And given that it was, again, not
 9   operational, did -- there would not have been an
10   inspection of logged formula worksheets either.
11   Correct?
12        A.   I believe he looked at a logged formula
13   worksheet.  He would have looked at a formulation.
14   He would have looked at -- as part of his
15   documents.  I recall seeing that.
16        Q.   It's fair to say, given that this was a
17   renovation inspection, that there was no
18   evaluation of compliance, for example, with
19   USP 797 that was done by the board at that time?
20        A.   What he did was what we call a CETA.  So
21   he checked the -- he would have had to check the
22   hoods and the -- the certificates for the hoods
23   and the certificates for the rooms.  And that's
24   what he did.
```



Case 1:13-md-02419-RWZ   Document 3486-10   Filed 10/16/17   Page 10 of 11

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF SAMUEL J. PENTA on 12/04/2015                    Page 310

```
 1        Q.   And so essentially he checked off whether
 2   there was a certificate available at that time for
 3   the hoods?
 4        A.   Correct.
 5        Q.   And I believe you previously testified
 6   that it was about an hour and a half, that
 7   inspection?
 8        A.   That's my recollection, yes.
 9        Q.   Now, if the board were to be investigating
10   a complaint as you had done previously, for
11   example, with the FDA in 2002 and 2003, would the
12   inspection have been different from the type of
13   inspection that was performed for this renovation
14   and expansion?
15        A.   Yes.
16        Q.   In what way?
17        A.   It would have been focused on whatever the
18   complaint or the events that were -- other
19   complaints were focused on.  Somebody made a
20   complaint.  That would have been our focus point
21   obviously.  Somebody would go in.  You want to
22   know who the verification pharmacists were, fill
23   pharmacists, those types of things, if that's what
24   you're looking at.  Drug diversion.  Those will
```



100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Nationwide Coverage

```
 1   take -- those take time and so forth.
 2        Q.   Is it also fair to say the investigations
 3   that were done based upon those complaints with
 4   the FDA were far more thorough than the renovation
 5   inspection that was done in 2011?
 6        A.   Yes.
 7             (Exhibit 762 marked for identification)
 8        Q.   I'm going to hand you what's been marked
 9   as Exhibit 762.  Did you review this document,
10   Mr. Penta?
11        A.   I did not.
12        Q.   This appears to be communications between
13   the board and the DPH with respect to after the
14   outbreak.
15             One of the questions that was asked was in
16   Number 3, "Will the shutdown of this facility
17   trigger a shortage of any product?"
18             And the answer that was provided by the
19   DPH states, "No.  All products are accessible
20   through other pharmacies."
21             Is that consistent with your understanding
22   at the time that NECC was shut down?
23             MR. GIDEON:  Objection.  Form.
24        A.   Trigger a shortage . . .
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

100 Mayfair Royal
181 Fourteenth Street
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com