```
 1            IN THE UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3

 4   IN RE NEW ENGLAND COMPOUNDING      | MDL NO. 02419

 5   PHARMACY, INC. PRODUCTS LIABILITY  | DOCKET NO.

 6   LITIGATION                         | 1:13-MD-2419-RWZ

 7   THIS DOCUMENT RELATES TO:

 8   All Actions

 9

10           Deposition of LLOYD R. SABERSKI, M.D.

11                      Baltimore, Maryland

12                   Thursday, January 12, 2017

13                          10:00 a.m.

14

15

16

17

18

19

20   Reported by:   Angela McKinney, Court Reporter

21

22
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

EXHIBIT 2

Page 62

1  A  I don't know how they come up with the
2  ratings, but it sounds appropriate that Yale is on the
3  list.
4  BY MR. KIRBY:
5      Q  They are reputable institutions?
6      A  Those are hospitals.
7      Q  Would it surprise you if all of them were on
8  the customer list that we looked at on 1585-12.
9          MR. COREN: Objection to form.
10     A  Doesn't surprise me one bit. They are on a
11 customer list.
12 BY MR. KIRBY:
13     Q  Have you ever done business with NECC?
14     A  Business?
15     Q  Have you ever had any interaction whatsoever
16 with the New England Compounding Center?
17     A  Yes.
18     Q  Describe that.
19     A  A sales rep came to my office in the early
20 2000s suggesting that we purchase compounded steroids
21 from them. His marketing pitch was it was preservative
22 free and it was cheaper. And I engaged him in a

Page 63

1  conversation as to why I would want to do that, given
2  there are commercially-available products that are
3  perfectly fine.
4      Q  Did you ask him why they were selling -- did
5  you ask him why they were selling preservative-free
6  products as a compounder if there were other
7  commercially-available products available?
8      A  I did either directly or indirectly, but he
9  was a salesperson who knew nothing. Essentially my
10 office would have nothing to do with NECC because they
11 were offering a product that was readily available.
12     Q  So in your estimation, that was improper to
13 do, correct?
14     A  Yes.
15     Q  And did you ever report NECC to the
16 Connecticut Board of Pharmacy?
17     A  I did not.
18     Q  Or the Massachusetts Board of Pharmacy or
19 the FDA?
20     A  I did not.
21     Q  No one. Okay. Is there a reason why you
22 didn't report them if you thought they were doing

Page 64

1  something improper?
2      A  I really didn't understand the gravity of
3  what I was saying no to. I think if I had to do it all
4  over again, I certainly would have called up the
5  appropriate authority. Clearly they were in the wrong
6  and we at my office knew that it was wrong.
7      Q  Can we agree that NECC caused the
8  contamination of the MPA?
9      A  Yes.
10     Q  We can agree that Dr. Bhambhani didn't cause
11 the contamination?
12     A  No.
13         MS. STEINER: Yes, you can agree that, no,
14 she did not?
15     A  Yes.
16 BY MR. KIRBY:
17     Q  Sorry. I thought we were having a moment.
18 I understood.
19         MS. STEINER: Just clarify that.
20 BY MR. KIRBY:
21     Q  So we can agree that Dr. Bhambhani did not
22 cause the contamination, right?

Page 65

1      A  Yes, we can agree.
2      Q  Can we agree that NECC had a duty to its
3  customers to provide safe products?
4      A  Yes.
5      Q  They had a duty to provide -- strike that.
6         That they had a duty to accurately represent
7  the safety and quality of its products to customers and
8  potential customers?
9      A  Yes.
10     Q  Can we agree that in the summer and fall of
11 2012 that NECC failed in its duty to do all those
12 things that we just discussed?
13     A  I believe so.
14     Q  Do you believe that NECC violated the law in
15 these cases?
16         MR. COREN: Objection to form.
17     A  I'm not a lawyer. However, I believe they
18 did.
19 BY MR. KIRBY:
20     Q  I think I know your answer, but just to be
21 clear, when you say you think they did, do you have any
22 statutes or laws or regulations in mind from --


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3511-3   Filed 01/04/18   Page 3 of 4

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY          DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                             Pages 66..69

Page 66

1   A   Yes. I wrote it down this morning just so
2   that I'd get it right. The Federal Food, Drug and
3   Cosmetic Act of 1938.
4   Q   Anything else?
5   A   Well, over the years that law evolved and
6   had a number of different codifiers. It was adjusted
7   over the years, but that was the principal law that was
8   put into place.
9   Q   When did you look up the Federal Food, Drug
10  and Cosmetic Act of 1938?
11  A   A couple years ago.
12  Q   Do you know specifically what you would say
13  they violated with regards to that Federal Food, Drug
14  and Cosmetic Act?
15  A   Almost everything involving compliance.
16  Q   Can we agree that NECC's conduct in these
17  cases caused injury to the patients?
18  A   Well, I think their conduct in conjunction
19  with the misconduct of the physicians caused injury to
20  patients.
21  Q   Fair enough. At least in part we can
22  agree --

Page 67

1   A   In part, yes.
2   Q   You are not going to defend any of NECC's
3   actions in these cases?
4   A   No. But if these products were never
5   ordered or never administered, these patients would not
6   have a problem.
7   Q   The standard of care did not require
8   Dr. Bhambhani to travel to Boston to NECC's facility to
9   inspect them, did it?
10  A   No.
11  Q   Have you ever heard a reference to UniClean
12  in this litigation?
13  A   No.
14  Q   Are you familiar with ARL's role in testing
15  the NECC's MPA product here?
16  A   That's a name I've seen and I know they have
17  been involved in testing, but I really don't know much.
18  Q   Do you believe that whoever tested the
19  product for NECC fell below the standard in terms of
20  its testing?
21      MR. MILLER: Objection to form.
22  A   No, I'm not an expert in testing.

Page 68

1   BY MR. KIRBY:
2   Q   Do you agree that if proper testing had been
3   done, it likely would have detected the contamination?
4       MR. MILLER: Object to form.
5   A   I think you need to speak to somebody who
6   does the testing.
7   BY MR. KIRBY:
8   Q   Do you agree that because NECC was licensed
9   as a pharmacy in the state of Massachusetts that the
10  Massachusetts Board of Pharmacy had the power and
11  authority to regulate NECC?
12      MR. MILLER: Objection to form.
13  A   Again, that's a legal question. I don't
14  really know the distinction between the federal
15  government and the state government in terms of that
16  particular question.
17  BY MR. KIRBY:
18  Q   Do you agree that the Massachusetts Board of
19  Pharmacy was responsible for enforcing the laws with
20  respect to compounding pharmacies within its borders?
21  A   Again, that's a legal question. I'm a
22  physician. My guess is you would think that's the

Page 69

1   case, but it's a legal question. I can't answer that.
2   Q   I think you answered a similar question in
3   your other Maryland state deposition.
4       Would it be the Massachusetts Board of
5   Pharmacy's responsibility to ensure that a compounding
6   pharmacy obtains an individual prescription for its
7   drugs?
8       MR. MILLER: Objection to form.
9   A   Again, I don't know whose responsibility it
10  would be in terms of that.
11  BY MR. KIRBY:
12  Q   I think you answered affirmatively in your
13  state deposition. If that was the case, would you have
14  any reason to change that opinion now?
15  A   Well, I'm not sure what the basis of my
16  opinion was at that time because I really don't know
17  the law, that aspect of the law.
18  Q   Would you agree as a general concept that
19  it's reasonable for a health care provider in a state
20  to assume that that state regulatory board is actually
21  regulating the licensee that it's responsibile for?
22      MR. MILLER: Objection to form.


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3511-3   Filed 01/04/18   Page 4 of 4

NEW ENGLAND COMPOUNDING PHARMACY INC. PRODUCTS LIABILITY  DEPOSITION OF
LLOYD R. SABERSKI, M.D. on 01/12/2017                     Pages 166..169

### Page 166

1  Massachusetts Board of Pharmacy had information that
2  that's the way that NECC was conducting business that
3  that would be inappropriate, correct?
4      A   Yes.
5      Q   But they didn't stop NECC from selling
6  drugs, did they, until the outbreak?
7      MR. COREN: Objection as to the form.
8      A   Well, they did at the outbreak.
9  BY MR. KIRBY:
10     Q   Prior to the outbreak, they didn't stop
11 them?
12     A   In 2002 I think they were trying to.
13     Q   They didn't prevent NECC from continuing to
14 sell their drugs all across the country, right? Or at
15 least in Maryland? We'll go with that.
16     A   I don't know whose jurisdiction it was for
17 that kind of step, but that's not really my area of
18 expertise.
19     Q   Probably should have been one or the other
20 at least, right?
21     A   Right.
22     Q   Maybe even both?

### Page 167

1      MR. COREN: Objection as to form.
2  BY MR. KIRBY:
3      Q   And you are not aware, and if you are, just
4  provide me the information, that anyone at the Maryland
5  Board of Physicians, the Board of Pharmacy, the
6  Massachusetts Board of Pharmacy, the FDA, the CDC, the
7  DEA, et cetera, ever told Dr. Bhambhani or anyone that
8  they were ordering the drugs wrong and that they
9  couldn't do it that way? You don't have any evidence
10 of that, do you?
11     A   Two questions. I have no evidence and I'm
12 not aware of anybody telling her that.
13     Q   Can we at least agree -- so I understand
14 your position, then, that she was violating standards
15 because she should have used patient-specific
16 prescriptions or whatever. Okay. Let's assume that
17 she had a need to use a compounding pharmacy, a
18 justifiable need to use a compounding pharmacy, and
19 that she was submitting individual patient
20 prescriptions. We can at least agree that that had no
21 effect on the patient injuries, correct?
22     MR. COREN: Objection as to the form.

### Page 168

1  BY MR. KIRBY:
2      Q   Even if she had done it that way, she still
3  would have gotten back contaminated drugs?
4      A   I think that's basically correct, but there
5  is a small caveat here, and we kind of pounded this to
6  the ground earlier, that she was getting multidose
7  vials without a preservative and by getting shipped a
8  multidose vial without preservative, by accessing it
9  multiple times, if that vial happened to be bad, she's
10 potentially vectoring bad stuff to multiple people.
11     Q   But specific to the prescription issue, that
12 in and of itself didn't have an effect? Didn't change
13 the outcome?
14     MR. COREN: Objection as to the form.
15     A   Probably not. I could probably draw some --
16 we'll just say that.
17 BY MR. KIRBY:
18     Q   Would you agree that Dr. Bhambhani was
19 essentially ordering NECC's MPA and other drugs I guess
20 for office use?
21     A   Well, I don't know what her facility is.
22 Isn't it a surgery center?

### Page 169

1      Q   An ambulatory surgery center.
2      A   I think you have to be careful about how you
3  use your words. A surgery center is different than an
4  office. She may very well have been using them in
5  both, but I'm aware of the surgery center stuff.
6      Q   Pardon my incorrect grammar, but when I said
7  office, I was suggesting the surgery center.
8      A   Okay.
9      Q   And if she had ordered from an FDA
10 manufacturer, she wouldn't have needed a prescription,
11 right?
12     A   Right. FDA manufacturers, you are allowed
13 to order a stock.
14     Q   That's essentially what Dr. Bhambhani was
15 doing here, correct?
16     A   Right, which was against the law.
17     Q   I may have asked this before and I can't
18 remember so I'll ask it this time. We can agree the
19 drugs, the MPA that she's ordering is never going in
20 the patient's hands, right? It's always going to be
21 just used by and administered by a skilled professional
22 like Dr. Bhambhani, correct?


DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com