Ex. 2

```
 1              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF MASSACHUSETTS
 2

 3

       ------------------------------X
 4                                    :
       IN RE:   NEW ENGLAND           :
 5     COMPOUNDING PHARMACY, INC.     :
       PRODUCTS LIABILITY LITIGATION: MDL NO. 2419
 6                                    :
       This Documents Relates to:     :  Master Docket
 7                                    :  1:13-MD-02419-RWZ
       All Cases against the Box      :
 8     Hill Defendants                :
                                      :
 9     ------------------------------X

10

11                    DEPOSITION OF
                    SHMUEL SHOHAM, M.D.
12

13            THURSDAY, JANUARY 19, 2017
                     10:00 a.m.
14

15        Law Office of Peter G. Angelos
                 One Charles Center
16          100 North Charles Street
                    Suite 2200
17            Baltimore, MD  21201

18

19

20

21

22

23

24

25     Before:  Linda Bahur, RPR
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 42

```
 1  going to give opinions about -- you were going to give
 2  opinions concerning being a medical doctor, in
 3  general, not a pain specialist?
 4         MS. KASPUTYS:  Objection.
 5      A  That's what we talked about.  But they
 6  weren't telling me what to do.  They were saying that
 7  that is something that I can do.
 8      Q  They said it's something you can do?
 9      A  As I recall.  I don't recall the specific
10  words.
11      Q  And did that have to do with standard of
12  care or what did it have to do with?
13      A  Standard of care.
14      Q  So why don't you give me your opinions with
15  regards to that, as a medical doctor, and how it
16  relates to a standard of care in this case.
17      A  So my opinions regarding standard of care
18  in this case are in the report.
19      Q  Okay.  But can you point me to where it is?
20      A  Page 3 is a specific example.
21      Q  What part of page 3?
22      A  Third paragraph.
23      Q  Okay.  So let's look at the first
24  paragraph, the first full paragraph on page 3.  It
25  says, "The manner by which the contaminated steroids
```

Page 43

```
 1  reached patients did not always conform to the
 2  standards of care.  A specific example is the method
 3  and manner in which PF MPA from NECC was prescribed,
 4  ordered, and administered at Box Hill Surgery Center
 5  in Maryland."
 6         So what do you mean by that?  Like, be more
 7  specific.
 8      A  So the way that the products were
 9  prescribed, according to the testimony that I've read,
10  were that patients who had previously been seen at the
11  surgical center, their names were provided as a list
12  and vials were ordered using those names.
13         And then those vials would come and those
14  vials were sometimes given to patients who were
15  different than the ones that it was prescribed for.
16  And additionally, the single use vials were at times
17  used more than one time for one patient for one
18  procedure.
19      Q  Okay.  You've never purchased drugs for an
20  ambulatory surgery center before, right?
21      A  Not that I recall.
22      Q  Okay.  And you don't generate, manage, and
23  treat chronic pain patients, correct?
24      A  That is correct.
25      Q  Now, it says in here "under Maryland law
```

Page 44

```
 1  applicable to prescribing prescription medicines," and
 2  then describes, I guess, some other opinions in here.
 3  But what Maryland law are you referring to?
 4      A  I can give you -- the specific newsletter
 5  is number 13 on page 5, Board of Pharmacy Newsletter,
 6  Fall 2012.
 7      Q  Okay.  Do you have a copy of that?
 8         MS. KASPUTYS:  That's in the documents that
 9  were produced for you.  Third tab.
10         MR. COREN:  Third tab?
11         MR. KIRBY:  I'm not saying you didn't send
12  it out.  I'm just saying I don't see a copy of it.
13         MS. KASPUTYS:  Greg, I'll give you one to
14  look at.
15         MR. KIRBY:  Okay.
16         MS. KASPUTYS:  If I can get it out of the
17  binder.  There you go.
18         MR. KIRBY:  Thanks.
19         MS. KASPUTYS:  Oh, wait a minute.  Let me
20  give you the rest of the pages.  There you go.
21         MR. KIRBY:  I'd like to mark this as an
22  exhibit.  Can we make a copy?
23         MS. KASPUTYS:  Go ahead.  You can use that.
24  Just take it.  I have a stapler if you need one.
25  BY MR. KIRBY:
```

Page 45

```
 1      Q  Doctor, have you found the newsletter you
 2  were referring to in your binders?
 3      A  Yes.  It's on page 7 of the newsletter
 4  that's called "Maryland Board of Pharmacy News," Fall
 5  2012.
 6      Q  I'm sorry, can you say that one more time?
 7      A  Maryland Board of Pharmacy News, Fall 2012,
 8  page 7.
 9      Q  Okay.  So we're going to mark this, it's
10  the same thing you have, as 1612-6, for the record.
11         (Exhibit No. 1612-6 was marked for
12  identification.)
13      Q  As a physician, you don't regularly receive
14  newsletters from the Board of Pharmacy, do you?
15      A  I may.  I'm not sure.
16      Q  Okay.  You don't seek out and review
17  newsletters from the Board of Pharmacy, do you?
18      A  In preparation for this case, I reviewed
19  this material.
20      Q  So I mean, in the normal course of your
21  practice.
22      A  I may receive it.
23      Q  You're talking about you receive Maryland
24  Board of Pharmacy newsletters?
25      A  I may.  I'm not sure.
```


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 1:13-md-02419-RWZ   Document 3519-2   Filed 02/02/18   Page 4 of 8

NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY  DEPOSITION OF
SHMUEL SHOHAM, M.D. on 01/19/2017                          Pages 106..109

Page 106

```
 1   for multiple patients or for multiple procedures in
 2   the same patient is not standard of care.
 3       Q    Okay.  And are you familiar with any
 4   literature that suggests that, I guess, "single-dose
 5   dose vials can be used on multiple patients under
 6   certain circumstances with certain precautions that
 7   are taken"?
 8       A    I have seen a reference that is an opinion
 9   by some people.
10       Q    Okay.  So you wouldn't disagree that some
11   in medicine accept the practice of using single-dose
12   vials multiple times as long as they follow certain
13   precautions?
14       A    That is an opinion.  That is not what the
15   CDC recommends.  The CDC recommends against it.
16       Q    All right.  If other reasonably prudent
17   practitioners believe that it's okay to do it as long
18   as there are certain precautions taken, isn't that the
19   definition of standard practice?
20            MR. COREN:  Objection as to form.
21            MS. KASPUTYS:  Object to form.
22       Q    Maybe not everyone agrees.  You have one.
23   Someone else has a different opinion.  But that
24   doesn't mean that just because it's different than
25   your opinion that it's wrong, correct?
```

Page 107

```
 1       A    You said a lot of things there.
 2       Q    I did, didn't I?  There's not always one
 3   way to satisfy the standard of care, right?  There's
 4   sometimes more than one standard practice, right?
 5       A    As a general statement?
 6       Q    As general statement, right.
 7       A    There are different ways to do things.
 8       Q    And I want to just hand you what's been
 9   previously marked as 1619-10.  It's an article.  At
10   the top, just for the record, that says it's titled
11   "The Price of Cost Savings," Ray M. Baker, in the
12   Clinical Journal of Pain, June of 2008.
13            And did you review in Dr. Bhambhani's
14   deposition her description of the process and how she
15   administers the injection and what precautions she
16   takes?
17       A    Yes.
18       Q    Okay.  So if you look at the second page of
19   this article, page 382, if you look at the right
20   column, the second paragraph up from the bottom, it
21   starts off "If a practitioner chooses."
22       A    Yes.
23       Q    And actually if you look a few lines up
24   from that, it says, "Given the reduced reimbursements
25   for interventional pain procedures."  Do you see?
```

Page 108

```
 1       A    Yes.
 2       Q    "And the push for cost-efficient care, a
 3   case can made for safely reusing a single-dose
 4   medication."  See that?
 5       A    I see that.
 6       Q    And then under there, it's a description of
 7   -- I'm just going to read it.  You can follow along.
 8   It says, "If a practitioner chooses to reuse a
 9   single-dose medication, there must be strict
10   safeguards in place that minimize the risk of
11   infection.  These include using the medication for a
12   limited number of patients and for a single day only,
13   cleansing the stopper thoroughly between uses with
14   isopropyl alcohol or another suitable antimicrobial.
15   Refrigeration of vial between cases if there is a time
16   gap between consecutive cases and discarding the vial
17   if any breach or sterility is suspected."
18            And then it goes on to say, of course, you
19   only, you know, use a needle, one needle per patient,
20   et cetera.
21            If that is the process by which Dr.
22   Bhambhani administers the drug and "reuses the
23   single-dose vial," she follows those precautions,
24   would you agree that according to this article, she's
25   complying with an accepted standard of practice?
```

Page 109

```
 1            MR. STEINER:  Objection as to form.  You
 2   can answer.
 3       A    According to the CDC, in which I place more
 4   credence than this opinion, a single vial, a
 5   single-dose vial should not be reused.  And I don't
 6   know why this clinician opined as he did.  But even in
 7   2012, I would not say that this was a reasonable
 8   opinion based on the history of multiple outbreaks
 9   related with reusing of single-dose vials.
10       Q    Do you know Dr. Baker?
11       A    No.
12       Q    Are you familiar with this journal?
13       A    I've heard of it.
14       Q    Do you have an opinion, one way or the
15   other, whether this journal is a reasonably reliable
16   journal?
17            MR. COREN:  Objection as to form.
18       A    I don't.
19       Q    And so you would disregard the expressions
20   made here this literature?
21       A    I do not think that the statement of given
22   the reduced reimbursements for interventional pain
23   procedures and the push for cost-efficient care, a
24   case can be made for safely reusing a single-dose
25   medication, and that this is something that could be
```


Discovery Litigation Services — Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 66

1   Q   How so?
2   A   If the events that led to this infection,
3   part of it was the way that the medications were
4   delivered to the patients. Had individual
5   prescriptions been written for individual patients,
6   it's possible but unknowable that the compounding
7   pharmacy would have behaved differently.
8   Q   So are you saying that if Dr. Bhambhani had
9   sent in individual pieces of paper for each patient or
10  done it digitally or whatever, but if she had sent in
11  individual pieces of paper for each patient, that NECC
12  then would have created another version of the MPA
13  that was not adulterated, that didn't have fungus in
14  it?
15  A   I'm saying it's unknowable.
16  Q   But we'd agree that the recalled lots at
17  issue that Dr. Bhambhani ordered, it was all
18  potentially contaminated, right?
19  A   The recalled lots were all potentially
20  contaminated, right.
21  Q   So if on a particular date she sent in one
22  order form with a list of names and then she also sent
23  in, you know, a hundred separate pieces of paper
24  separately for each patient, are you saying she would
25  have gotten back different batches of the MPA, some

Page 67

1   that were contaminated, and another batch that was
2   from an uncontaminated version?
3       MR. COREN:  Form objection.
4   A   I just don't know.
5   Q   Okay. You just can't say one way or the
6   other?
7   A   I can't say one way or the other.
8   Q   Do you know how long Dr. Bhambhani had been
9   using NECC's MPA?
10  A   I don't recall.
11  Q   Do you recall seeing that she had been
12  using it for about eight years with no issues?
13  A   I don't recall the specifics.
14  Q   Okay. Bear with me.
15      So tell me what you know about the
16  outbreak, in general, and the recalled drugs.  Do you
17  know how widespread was the recall?
18      MS. KASPUTYS:  Objection to form.
19  Q   If you know.
20  A   It was very widespread. Across many
21  states.
22  Q   Do you know how many healthcare providers
23  were ordering the MPA from NECC? The recalled MPA
24  from NECC?
25  A   I don't know how many healthcare providers,

Page 68

1   but I can find out for you the number of centers.
2   Q   And what was the number of centers?  76
3   sound about right?  In that ball park?
4   A   That sounds about right.
5   Q   Do you know how many customers of NECC --
6   how many healthcare providers or centers ordered any
7   drug from NECC from May of 2012 until the outbreak?
8   A   I don't recall off the top of my head.
9   Q   Okay. I'm going to hand you what's been
10  marked in previous depositions as Exhibit 1585-12.
11  And at the top it says "New England Compounding Center
12  Customer List since May 21, 2012, Sorted by State."
13  Do you see that?
14  A   Yes.
15  Q   Okay. And so it's 73 pages, right, if you
16  flip to the back?
17  A   Yes.
18      MS. KASPUTYS:  Did you bring another copy
19  we can look at?
20      MR. KIRBY:  I honestly didn't. I've marked
21  it in every deposition since December.
22      MS. KASPUTYS:  I'll find it in my computer.
23      MR. KIRBY:  Sorry about that.
24      MS. KASPUTYS:  It's all right.
25  BY MR. KIRBY:

Page 69

1   Q   Just quick math. If there's -- and I'm not
2   holding anyone to any particular numbers, specific
3   numbers, but if there's 41 or 42 -- let me start over.
4       It looks like if you start on page 1, it's
5   listed in alphabetical order by state, starting with
6   Alaska, and it goes all the way to Wyoming on the
7   back.
8       If there's 40 or so entities listed here on
9   each page, and there's 73 page, would you dispute that
10  that's around 3,000 --
11      MR. COREN:  Objection to form.
12  Q   -- customers?
13      MR. COREN:  Objection to form.
14  Q   It's in the thousands, right?
15  A   Probably.
16  Q   70 times 40 is 2800, and it's probably a
17  little more than that, right?
18      MR. COREN:  Form objection.
19  A   Probably.
20  Q   And can you tell me how each of these
21  entities were ordering drugs from NECC?
22      MR. COREN:  Objection as to form.
23  A   I don't know.
24  Q   Okay. Can you provide any evidence that
25  they were using individualized patient-specific


Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 62

1  in a similar situation.
2     Q    Okay.  What are some of the things that can
3  help shape a standard of care or a standard of
4  practice in a particular field?
5     A    The scientific evidence, the medical
6  tradition, the needs of a particular patient.
7     Q    Would you agree -- I want to list a few
8  things and just tell me if you don't agree with any of
9  these.
10        Formal education, what you were taught,
11 something you learn from your mentors, your training,
12 discussions with others, medical conferences,
13 interacting with patients, and a physician's
14 experience in their own practice.  Are those
15 reasonable things that can provide the basis for
16 standard of practice?
17        MR. COREN:  Form objection.
18    A    May we take them one by one?
19    Q    Sure.  So your formal education, can that
20 contribute to forming -- shaping a standard of care
21 practice?
22    A    It depends.
23    Q    How so?
24    A    Depends on the timeliness of the formal
25 education.  If a formal education happened 60 years

Page 63

1  ago, the standard of care may have changed on a
2  particular topic.
3     Q    What if a physician stayed current on
4  continuing education, things like that?
5     A    So what's the question?
6         MS. KASPUTYS:  Objection.
7     Q    So that can contribute to shaping a
8  standard of care or standard of practice, what
9  reasonably prudent physicians do in similar
10 circumstances?
11    A    So continuing medical education can put a
12 clinician in a position to provide standard of care
13 medicine.
14    Q    Okay.  What about experience, your own
15 experience in your practice?
16    A    It depends on the experience.
17    Q    Would you agree that since the meningitis
18 outbreak that we're here discussing today, there's
19 been an increased scrutiny on the pharmaceutical
20 industry?
21        MR. COREN:  Objection as to form.
22    A    That's too broad a statement for me to
23 answer.
24    Q    Do you have any understanding of whether
25 there was an increased focus or increased attention on

Page 64

1  compounding pharmacies or things like that?
2         MR. COREN:  Form objection.
3     A    I'm not aware of the attention that was put
4  on compounding pharmacies outside of my narrow area of
5  expertise, which is fungal infections.  After this
6  event, there was increased scrutiny on the issue of
7  fungal infections in compounding pharmacies.
8     Q    Okay.  Would you agree that the standard of
9  care is prospective and not judged retrospectively in
10 hindsight?
11    A    Can you explain that to me?
12    Q    Yes.  Standard of care, the way what
13 reasonably prudent physicians would do in a
14 circumstance is judged based on what was true at the
15 time or what was known at the time, correct?  It's not
16 Monday morning quarterbacking, looking back after the
17 fact, right?
18    A    So the standard of care is something that
19 relates to that particular event in that particular
20 time.
21    Q    Okay.  If something were to be found out or
22 discovered after the fact, you don't apply that -- you
23 don't go back and retrospectively apply that to the
24 situation that happened before, right?
25    A    Can you be more specific?

Page 65

1     Q    I don't think so.
2     A    It depends on what's found out.  But as an
3  example, if we find out that, say, a certain
4  medication doesn't work, then we would not say that
5  somebody who used that medication when it was thought
6  to work was not within the standard of care.
7     Q    Okay.  That's my point.  Okay.
8     A    So I agree with that point.
9     Q    Okay.  We talked a lot about the
10 prescription issue.  And to cut to the chase, would
11 you agree that the issuance of individual
12 prescriptions didn't cause the contamination in this
13 case?  Didn't cause the vials of MPA to be
14 contaminated with fungus?
15    A    I don't know what caused the vials to
16 become contaminated with fungus and what processes led
17 to that.
18    Q    Okay.  Put simply, whether Dr. Bhambhani
19 ordered the drugs the way she did or sent in 80
20 individualized pieces of paper, 80 separate pieces of
21 paper in the manner that you say should have been
22 ordered, that wouldn't have -- that wouldn't have
23 changed the outcome, right?  She still would have
24 gotten contaminated drugs?
25    A    That's unknowable.



Page 54

1  said, so...
2  BY MR. KIRBY:
3      Q    What is it specifically about these
4  prescriptions?  What did Dr. Bhambhani need to put on
5  each prescription -- on each prescription that would
6  have been different for patient A versus patient D?
7      A    I think it depends on the patient.  I can
8  speak to an individual patient with an individual
9  prescription.
10     Q    Is it your understanding that Dr. Bhambhani
11 was using the MPA at issue kind of in an office supply
12 situation?
13     A    Yes.
14     Q    And is it your understanding that it didn't
15 matter to her whether she used vial 1 or vial 12, it
16 was going to be the same for each patient?
17          MR. COREN:  Objection to form.
18     A    I don't know that.
19     Q    Okay.  You don't know one way or the other?
20     A    I don't know that.
21     Q    Is there anything else that you have with
22 regards to your opinion about how Dr. Bhambhani
23 breached the standard of care in ordering the drugs?
24          MS. KASPUTYS:  Objection to form of the
25 question.

Page 55

1      A    Can you repeat your question?
2      Q    I'm just trying to exhaust your opinions.
3  Is there anything else that we haven't talked about
4  with regards to how Dr. Bhambhani ordered the drugs at
5  issue that you say was wrong?
6      A    If we can go to her deposition, or one of
7  the depositions mentioned getting medications from
8  another clinic, I believe.
9      Q    Okay.  Feel free to look at her deposition.
10          So feel free to keep looking if you want.
11 But can you recall anything off the top of your head
12 about what you were referring to?
13     A    What I recall off the top of my head was
14 that there were medications that were obtained by the
15 Box Hill center from another surgical center.
16     Q    Okay.  And tell me what you believe was the
17 problem with that.  What's your criticism?
18     A    That if a medication for a specific person
19 that's prescribed should be coming from the
20 manufacturer or from a pharmacy, not from another
21 center.
22     Q    Do you have an understanding of what
23 Dr. Bhambhani's relationship was with that other
24 ambulatory surgery center you just referred to?
25     A    Not a good understanding.

Page 56

1      Q    Okay.  So you're not sure what
2  relationship -- what type of relationship they had?
3      A    I'm not sure.
4      Q    Would you agree that Dr. Bhambhani was
5  ordering the MPA for general use in her ambulatory
6  surgery center?
7           MR. COREN:  Objection as to form.
8      A    It seems that way, but I'm not sure of that
9  because she was using specific patient names.
10     Q    Typically when we think of prescriptions,
11 we think of a patient getting a piece of paper and
12 taking it to CVS or the doctor sending us, you know, a
13 piece of paper to the pharmacy for the drug so that
14 the patient can pick it up and take it home, right?
15     A    No.
16     Q    Okay.  Well, tell me what -- I mean, isn't
17 that generally what people think of when they think
18 about getting a prescription drug?
19          MR. COREN:  Objection as to form.
20     A    I don't know what people think of.
21     Q    Okay.  Regardless, that's not what we're
22 dealing with here, right?  I mean, the patients in
23 these cases never handled the MPA, right?
24     A    I don't know.
25     Q    Is it your understanding that

Page 57

1  Dr. Bhambhani -- well, tell me how you think she was
2  ordering the drug from NECC.
3      A    Well, what I think that she was doing was
4  sending in lists of patients for whom the drug may or
5  may not be given and ordering the drug for those
6  patients and then using it either for those patients
7  or for other patients.
8      Q    And what's your basis for saying that?
9      A    The deposition of Dr. Bhambhani and of
10 Nurse Vickers and the exhibits of the deposition.
11     Q    Okay.  So it's your understanding that she
12 was ordering drugs -- is it your understanding that
13 she was ordering drugs per the instructions of NECC?
14          MR. COREN:  Objection as to form.  You can
15 answer.
16     A    I believe that it was a combination of the
17 instructions from NECC and the advice that she had
18 received from the nurse she was working with then from
19 the other center that she had worked with.
20     Q    Okay.  And she was ordering, using
21 something that said -- a one sheet of paper that said
22 "Prescription Order Form" at the top.  Are you aware
23 of that?
24     A    Yes.
25     Q    Okay.  And you're saying she was listing


Discovery Litigation Services
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 58

1  names or providing a patient schedule to NECC?
2       A    I don't know about a patient schedule, but
3  I do know that there were names listed and redacted on
4  the copy that I have.  But based on her testimony,
5  then yes.
6       Q    Okay.  And so do you recall in her
7  testimony that the schedule of patients were patients
8  who were going to receive or who had received epidural
9  steroid injections; is that your understanding?
10           MS. KASPUTYS:  Objection.
11      A    Can you ask that again?
12      Q    Yes.  And I'm trying to parse out what
13 you're saying.
14           Is it your understanding that the names
15 that she provided -- or that Dr. Bhambhani testified
16 that she provided a patient schedule, is it your
17 understanding that those patients would receive or had
18 received epidural injections?
19           MR. COREN:  Objection as to form.
20      A    Some of the patients had received.  I'm not
21 sure about the patients that would receive.
22      Q    Okay.  I guess, suffice it to say, you're
23 not sure one way or the other whether the patients
24 that were listed on there received injections or not,
25 correct?

Page 59

1       A    I am not sure how she came up with the list
2  of those names.
3       Q    And is it your understanding that
4  Dr. Bhambhani intended for the MAP that she used, vial
5  to vial, that she expected it to be any different for
6  one patient versus another?
7            MS. KASPUTYS:  Objection to the form.
8       A    I don't know.
9       Q    Okay.  Would you agree that if she
10 anticipated that the MPA would be the same formulation
11 for each patient, that there wouldn't be anything --
12 any specific factor about a particular patient that
13 she would need to list on a prescription?
14      A    I don't know.
15      Q    Can you order drugs in bulk from an
16 FDA-registered manufacturer without prescriptions?
17      A    I have not ordered drugs in bulk myself.
18 But I believe that you do not need a prescription,
19 that you can, for example, during vaccine season,
20 stock the office with vaccines and there would be no
21 prescription for the individual patient.
22      Q    All right.  And that was okay, right?
23      A    What was okay?
24      Q    You didn't have a problem with that, not
25 having a -- you didn't have a problem with having an

Page 60

1  office supply of drugs and not having a specific
2  prescription for a particular patient, right?
3            MS. KASPUTYS:  Objection, form.
4       A    Can you ask your question again?
5       Q    Yeah.  I mean, when you needed the drug, it
6  was there for you to use, right?
7            MS. KASPUTYS:  Objection.
8       A    Yeah.  I don't know what that means, when I
9  needed the drug it was there for me to use.
10      Q    Well, you didn't order the drugs, right?
11           MS. KASPUTYS:  Objection.
12      A    I do not order drugs.
13           MS. KASPUTYS:  Counsel, what drugs are you
14 referring to --
15           MR. KIRBY:  I'm sorry.
16           MS. KASPUTYS:  -- that the witness ordered?
17           MR. KIRBY:  If he doesn't understand, he
18 can let me know.
19 BY MR. KIRBY:
20      Q    We made that clear before, okay?
21           And we were referring to you said you don't
22 order drugs in bulk or whatever, and then you said you
23 have -- there were time where you need a drug for a
24 patient that you're treating and that drug might --
25 would be there for you to use, I thought you said,

Page 61

1  without having to send away a prescription to get the
2  drug.  Isn't that what said?
3            MS. KASPUTYS:  Objection.  Mischaracterizes
4  testimony.
5       A    So ask the question again.
6       Q    Okay.  It's a lot of predicates to that.
7            Didn't you just say that there were times
8  where you need a drug for a patient to treat a
9  patient, that you don't need to send away a
10 prescription and wait for the drug to come in, you
11 already have the drug there ready to use, correct?
12           MS. KASPUTYS:  Same objection.
13           MR. COREN:  Objection.
14      A    I don't recall what I said, but maybe she
15 can read it out to us, what I said, and then I can
16 agree or not.
17      Q    Okay.  What's your general definition of
18 the term "standard of care"?
19      A    It's the care that a reasonable clinician
20 would provide to a patient under the circumstances of
21 that situation.
22      Q    Okay.  In other words, what other doctors
23 who were similarly situated would reasonably actually
24 do, correct?
25      A    What other reasonable clinicians would do


Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com