```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3      * * * * * * * * * * * * * * * * * *
                                          *
 4      *IN RE NEW ENGLAND COMPOUNDING    *
         PHARMACY, INC., PRODUCTS LIABILITY  * MDL No. 13-md-02419.
 5       LITIGATION                       *
        _____  *
 6      This document relates to:         *
                                          *
 7      Meghan Handy v. Box Hill          *
        Surgery Center, LLC, et al.       *
 8      No. 14-cv-14019-RWS               *
        * * * * * * * * * * * * * * * * * *

 9

10              BEFORE THE HONORABLE RYA W. ZOBEL
                   UNITED STATES DISTRICT JUDGE
11

12                MOTION FOR SUMMARY JUDGMENT
                      January 25, 2018
13

14      APPEARANCES:

15              COHEN, PLACITELLA & ROTH, PC, (By Michael Coren,
            Esq.), Two Commerce Square, 2001 Market Street, Suite
16          2900, Philadelphia, Pennsylvania  19103, on behalf of
            Meghan Handy
17

18              PESSIN KATZ LAW, P.A., (By Gregory K. Kirby Esq.),
            901 Dulaney Valley Road, Suite 500, Towson, Maryland
19          21228, on behalf of the Box Hill Defendants

20
                                  Courtroom No. 12
21                                1 Courthouse Way
                                  Boston, Massachusetts 02210
22

23              JAMES P. GIBBONS, CSR, RPR, RMR
                     Official Court Reporter
24              1 Courthouse Way, Suite 7205
                Boston, Massachusetts  02210
25                   jmsgibbons@yahoo.com
```

```
1                     P R O C E E D I N G S
2           THE CLERK:  This is In Re:  New England
3  Compounding, 13MD2419.
4       It's actually Handy versus The Box Hill Surgery Center,
5  Civil Action No. 14-14019.
6       I will ask counsel to please identify themselves for
7  the record.
8           MR. COREN:  Good afternoon, your Honor.  Michael
9  Coran, Cohen, Placitella & Roth.
10          THE COURT:  How do you spell your last name?
11          MR. COREN:  C-O-R-E-N.
12          THE COURT:  Coren.
13      Okay.
14          MR. COREN:  And we represent the plaintiffs, your
15  Honor.
16          MR. KIRBY:  Good afternoon, your Honor.  Greg Kirby
17  from Pessin Katz Law, Towson, Maryland, on behalf of the
18  defendants.
19          THE COURT:  Mr. Kirby, you did not also represent
20  the Virginia defendants, did you?
21          MR. KIRBY:  I did not.
22          THE COURT:  I think there's a Kirby there, too?
23          MR. KIRBY:  It's possible.  We're all over the
24  place.
25          THE COURT:  Okay.
```

1           MR. KIRBY:  Not related though.

2           THE COURT:  This is the defendants' motion for

3   summary judgment that we're here on today.  And I guess part

4   of my issue with the briefing and the presentation of the

5   motion is that I think of this as a negligence claim,

6   negligence by malpractice, if you will.  But I don't see it

7   as claims that are sort of pieces of negligence, such as due

8   diligence or, you know, superseding or intervening cause.

9       Cause, of course, is a separate issue, in any event,

10  but negligence is doing something unreasonably and

11  improperly in an unreasonable way.

12      So I think we should approach the argument in that

13  fashion, and I think the defendants' task will be to

14  persuade me that there are no facts in dispute that should

15  withhold allowance of the motion.  I think that's where that

16  part of the motion is, at least as to the negligence claim.

17          MR. KIRBY:  Sure, and --

18          THE COURT:  Does the plaintiff agree with that?

19          MR. COREN:  Yes, your Honor.  I think we, in our,

20  hopefully --

21          THE COURT:  It's okay.  You will get your chance to

22  argue.  I just wanted the know whether I'm on track with

23  respect to both counsel.

24          MR. COREN:  Yes.

25          THE COURT:  I mean, there are other claims.

1    There's the punitive damages issue, which I don't think we

2    need to postpone.  I will deal with it on the papers.

3        And I think there was a Chapter 93A claim --

4            MR. KIRBY:  Correct.

5            THE COURT:  And a corresponding Maryland statute

6    claim, I think.

7            MR. KIRBY:  Actually, that was dismissed.

8            THE COURT:  It was a wrongful death.

9            MR. KIRBY:  That was dismissed about two-and-a-half

10   years ago.  You dismissed the Maryland consumer fraud claim.

11           THE COURT:  Maryland is not in play anymore?

12           MR. KIRBY:  Correct.  The only claim in terms of

13   consumer fraud, alleged consumer fraud, is the Massachusetts

14   consumer fraud claim under Chapter 93A.

15           THE COURT:  Okay.

16       And there are issues whether it is properly in this

17   case.

18           MR. KIRBY:  Correct.

19           THE COURT:  And then there is a wrongful death and

20   loss of consortium claim?

21           MR. KIRBY:  Right.

22           THE COURT:  Which also hinges on negligence.

23           MR. KIRBY:  And, your Honor --

24           THE COURT:  So the negligence really has two

25   components, the harm to the decedent and then the harm to

```
1    the survivors, to the estate, if you will.
2              MR. COREN:  Correct, and they all flow -- like
3    Massachusetts, they all flow through the original, you know,
4    negligence, your harm to Mrs. Rozek --
5              THE COURT:  Negligence is one, and then there are
6    these various pieces that flow from it.
7              MR. COREN:  Right.  And that's the way the whole --
8    that's the way the complaint was structured, your Honor.  I
9    think we should keep on that track.
10             THE COURT:  Claim construction?
11        Did you say "claim construction"?
12             MR. COREN:  No.  That's the way the complaint -- my
13   bad Philadelphia accent.
14        That's the way the complaint was structured.
15             THE COURT:  Actually, it's not a bad way to look at
16   it.
17             MR. COREN:  Yes.
18             THE COURT:  All right, Mr. Kirby.
19             MR. KIRBY:  And, your Honor, do you mind if I sit
20   down in case there are people on the phone?
21             THE COURT:  There is nobody on the phone, I don't
22   think.
23             THE CLERK:  I don't think anyone came on, Judge.
24             MR. ROTH:  Your Honor.
25             THE CLERK:  Oh, there is.
```

1          THE COURT:  We're sorry.  We didn't know you were

2    there.

3          MR. ROTH:  Harry Roth, your Honor.

4          THE COURT:  So counsel will argue to the microphone

5    so that counsel on the phone can hear them.

6          MR. KIRBY:  Sure.

7     And before I start, I would like to say my law partner,

8    Catherine Steiner, who also entered her appearance in this

9    case, had intended to be here in person.

10     Unfortunately, her mother-in-law took a turn for the

11   worse yesterday and is in the hospital, and it might not be

12   too much longer.  So she sends her regrets.  She wanted to

13   finally meet you in person, but she couldn't be here.  So I

14   wanted to tell you that ahead of time.

15     And, number two, when we filed this summary judgment

16   motion, there were eight actions in this MDL against Box

17   Hill.  Since then, as we pointed out in December, plaintiffs

18   voluntarily dismissed seven of those cases without payment

19   of any kind, which leaves only this Handy/Rozek case in

20   front of your Honor in this MDL.

21     And if say Rozek or Rozek, that's because that's the

22   patient's name.  She's deceased, but Handy is the personal

23   representative.

24          THE COURT:  I understand.

25          MR. KIRBY:  By way of background, in our motion for

summary judgment, we outlined all of the claims that were in

the complaint initially, and your Honor dismissed multiple

of those claims years ago, including battery, *respondeat*

*superior*, strict liability, conspiracy --

        THE COURT:  Because they're not really claims.

        MR. KIRBY:  Understood.  I was just letting you

know.

    -- and the Maryland consumer fraud claim.  Which leaves

only the claims sounding in negligence, which you pointed

out, the standard medical malpractice, informed consent,

wrongful death.  We'll submit on the papers on that.  So I'm

not even going to argue for that.  So that will shorten it

up.

    That also leaves the Massachusetts consumer protection

count and also the punitive damages claim.  And, by

agreement of counsel, we will withdraw our summary judgment

motion as to punitive damages.  I think your honor said you

would rule on the papers, anyway, but I don't intend to

argue about it.  So that simply leaves the Massachusetts

consumer protection.

    In Count 12 plaintiffs pled a violation of the

Massachusetts consumer protection statute under Chapter 93A.

As an initial matter, this case only involves Maryland

plaintiffs against all Maryland defendants.  All the care,

injuries, treatment, occurred in Maryland.  In fact, the

1   case and the Massachusetts consumer protection claim was

2   filed in Maryland state court, the Baltimore County Circuit

3   Court.

4        And although all parties are in Maryland --

5            THE COURT:  You know, Mr. Kirby, I think what I

6   would prefer is to hear the plaintiffs on that claim.  It's

7   not at all clear to me that Massachusetts law is the

8   appropriate law for that.  So let him argue first on that

9   one, and then you finish now with all your other arguments.

10       But I think if Mr. Coren goes first -- not right this

11  minute.  I want Mr. Kirby to finish his part.  But I think I

12  should hear from Mr. Coren first on the issue of 93A and

13  then come back to you.

14           MR. KIRBY:  Fair enough.

15           THE COURT:  So skip that for the moment and talk

16  about the other things.

17           MR. KIRBY:  That's the only argument I have, is on

18  the 93A, Massachusetts consumer protection claim.

19           THE COURT:  Okay.

20       Mr. Coren, go ahead and tell me why I have authority,

21  why 93A applies to this case.

22       As I understand it, everything happened in Maryland,

23  except that NECC was here, and NECC is not now in the

24  litigation.

25           MR. COREN:  Okay.

1      Because, your Honor, the drugs were made here, and I --

2          THE COURT:  I think you want to sit down so that

3   counsel can hear you, too.

4          MR. ROTH:  Whatever he is comfortable with, your

5   Honor.  I can hear both Mr. Kirby and Mr. Coren, your Honor.

6          MR. COREN:  I'm old fashion, your Honor.  I'm used

7   to standing when I address the Court.

8          THE COURT:  If I were really hard of hearing, I

9   would make you sit down, and you couldn't do anything about

10  it because I wouldn't hear you.

11      (Laughter.)

12          MR. COREN:  If you want me to sit, I'll sit, your

13  Honor.

14          THE COURT:  I'm sorry?

15          MR. COREN:  If you want me to sit, I'll sit.

16          THE COURT:  No, no, no, it's fine.  But do speak

17  up, please.

18          MR. COREN:  Will do, your Honor.  Thank you.

19      Your Honor, the drugs were made here, okay.  The fraud

20  originated here.

21      May I hand up something to your Honor?  And this is

22  the -- it makes referencing a little easier.  It's a time

23  line.

24          THE COURT:  Show it to Mr. Kirby.

25          MR. COREN:  This was an exhibit at Dr. Bhambhani's

1    recent deposition.  We confirmed the events on this.

2              THE COURT:  Let me see whether he objects to it.

3              MR. KIRBY:  Do you have an extra copy for me?

4              MR. COREN:  Yes.

5         (Counsel conferred.)

6              MR. KIRBY:  I don't object to it.

7              MR. COREN:  May I approach?

8              MR. KIRBY:  My only objection is that it hasn't

9    been included in the briefing for the summary judgment

10   motion, and it happened at a deposition last week, so I

11   guess that --

12             MR. COREN:  Your Honor, I took Dr. Bhambhani's

13   case-specific deposition two weeks ago in Towson, and we

14   covered --

15        (Pause in proceedings.)

16             THE COURT:  I'm listening.

17             MR. COREN:  And we covered the events, your Honor.

18        So in order to give you, real quickly, what happened

19   here timewise, and hope it makes sense.  It was on August 13

20   of 2012 that Dr. Bhambhani ordered one of her many-ordered

21   shipments of MPA preservative-free from NECC up here.  And

22   they were shipped the same day.

23        Then seven days later, as depicted on the chart, for

24   the first time my client ever sees the Doctor in connection

25   with a neck and arm pain problem.  The Doctor recommends at

1     that time a steroid injection, and they have -- and they

2     schedule it for August 31, 2012.  And that's the day she

3     gets it in Maryland.

4         She becomes sick around the beginning of September.

5     She dies on September 16.

6         And the next time that Dr. Bhambhani and Box Hill

7     orders MPA is September 25, 2012.  So her treatment's

8     sandwiched between the orders.

9         The point of all of that, your Honor, is Massachusetts

10    pharmacy regulations govern the dispensing and what was

11    needed.  Why?  Because NECC was here, and that's what the

12    statutes of Massachusetts say.  They determine the choice of

13    law.  If a foreign doctor from any other state, in this case

14    Maryland, wants to have drugs compounded and shipped from

15    Massachusetts or buy drugs in Massachusetts or have their

16    patient fill a prescription in Massachusetts, Massachusetts

17    by statute gives the doctor comity and allows them to write

18    the papers as long as they're licensed in their state and

19    has their federal DEA license and --

20         THE COURT:  How does the statute describe this

21    relationship?

22         MR. COREN:  It says, The physician may -- the

23    physician may write a prescription and the pharmacy may fill

24    the preparation of that foreign doctor, but it has to comply

25    with Massachusetts requirements.  Okay?

```
1            So -- and, by statute, so there -- here's a little bit
2       of good news.  Maryland's law is the same.
3            THE COURT:  That certainly suggests 93A applying to
4       NECC, but I'm not quite sure yet how it brings the conduct
5       of Dr. Bhambhani under the Massachusetts statute.
6            MR. COREN:  It's easy.  In two manners.
7            First, the direct manner.  She submitted bogus
8       prescriptions to get office supplies.  That violates
9       Massachusetts law.  You're not allowed to sell --
10      compounding pharmacies are not allowed to sell office
11      supplies.  You have to have a specific patient, Mrs. Jones;
12      in my case, Mrs. Rozek.  The doctor has to make a decision,
13      examine the person and say --
14           THE COURT:  It doesn't matter where the patient is?
15           MR. COREN:  That's correct.  It doesn't matter
16      where it is.  Massachusetts says, We will allow the pharmacy
17      to dispense on your prescription even though you're not
18      here, but you must comply with Massachusetts law.
19      Massachusetts law requires a patient-specific prescription,
20      and that's because there is what they call the "triad,"
21      physician, patient, pharmacy, okay.
22           And what it is is the object of compounding is that you
23      need a custom-made medicine because there's something in the
24      store-bought or the manufactured medicine that you can't
25      use.  It may be that the child --
```

1          THE COURT:  Are you suggesting that 93A covers

2     anybody anywhere in the world, a doctor from in the world?

3          MR. COREN:  Yes, who commits fraud.  Remember, this

4     is not a one-and-done type of thing.  For seven years

5     Dr. Bhambhani was sending fictitious prescriptions.  They

6     used to handwrite the names from the sheets, and then NECC

7     said, You can just -- you can just attach an old patient

8     list.

9          THE COURT:  Is seven years' worth of conduct

10    admissible in the trial with respect to one plaintiff?

11         MR. COREN:  Yes, because that was the course of

12    conduct.  This is how it is.

13         And it goes back, because what happened is she asked --

14    she worked at one stand-alone or surgery center.  She opens

15    her own, which is Box Hill.  She asks the people who ran the

16    other clinic, and we'll just call it her first clinic, Where

17    do we get the MPA?

18         They told her where to get it.

19         She then orders it.

20         They tell her, You need to give us a list of patients.

21    For every patient you give us a name, we will sell you five

22    vials.  You have a five-to-one relationship.  So she ordered

23    not only five vials, but she ordered the jumbo vials.  She

24    order the 5-milliliter vials.  The normal dosage, your

25    Honor, is 1 milliliter of steroid injected.  Okay.  So she

1    was able to buy -- get the economy of scale of having the

2    jumbo bottle, and not only one, but five to a name.

3              THE COURT:  And one vial would be enough for five

4    patients?

5              MR. COREN:  No.  She told us she gets about three

6    patients out of a vial, because you always have a little

7    head space that you have to leave in when you pierce the

8    rubber.

9         So what happens is that she was using 3 -- a footnote,

10   your Honor.

11        When I examined Dr. Bhambhani two weeks ago, I asked

12   her, Can you tell us what number on the vial Mrs. Rozek was?

13        No.

14        Well, what patient was she that day that was getting a

15   steroid shot that you used MPA?

16        Three.

17        So the inference is that she was the third patient on

18   the vial.

19        The point here, these are single-use vials.  Why are

20   they single-use vials?  Because it doesn't have a

21   preservative, and that's what the CDC says.  And we had to

22   go no further than her own company's documents, her plan, or

23   what they had in the CDC that says, Where it's

24   preservative-free, it's a one-and-done, one use.

25        So now we have three people potentially sickened on the

1    same vial as opposed to one, because nobody knows if every

2    vial was.   It increased the risk of spreading the harm.

3    Thirteen confirmed cases at Box Hill.

4        Brenda Rozek was the first death.   Such a horrible,

5    fulminating death that her doctors at Johns Hopkins

6    published her autopsy report as a case report in the Annals

7    of Internal Medicine on an emergent basis to get the word

8    out to the doctors.

9        So what we have is we have someone who is risking a

10   catastrophe in Maryland who didn't have the wherewithal --

11   and, you know, we provided the reports where it explained

12   the doctor, to the extent that she says she doesn't know,

13   she should have known; to the extent she knows, then she's

14   flagrantly wrong.

15       But, in any event, it's hard to conceive, your Honor,

16   that a doctor, who's a pain specialist, that means that she

17   often prescribes schedule medicines, and I don't have to

18   tell your Honor about schedule medicines, given all the

19   opioid cases and problems we've seen to date.   You know what

20   that means, that doctors have to live to those schedules.

21       They have to know when you're told, Hey, give me a

22   patient list, and I'll give you five vials for each patient

23   name -- I hate to say it, your Honor, but it's sort of

24   reminiscent of going down to the neighborhood and getting,

25   you know, some drugs to sell, or having them transshipped.

1      She knows she should have known better, and it's

2  inconceivable that she didn't.  And when they did that, red

3  flags should have gone off.  "Why am I dealing with this

4  company?"

5      Well, she didn't.  Because it was, I guess, convenient,

6  too.  They give her her office supply, whatever.

7      The problems is, your Honor, Massachusetts law says

8  that's illegal.

9      Once again, Maryland law also says that's illegal.

10 Maryland law also says patient-specific prescriptions.

11 Which means you have to examine Mrs. Rozek.  You have to

12 make a decision that there is no drug out -- that you need

13 something special on the drug.

14     Well, I asked Dr. Bhambhani two weeks ago.

15 Dr. Bhambhani, was she allergic?

16     No.

17     And she couldn't deny that she was -- she couldn't

18 claim she was allergic because throughout all of her own

19 medical charts and records, umpteen times, she was asked

20 about allergies; denied allergies.  She wasn't allergic.  So

21 she could have taken the benzyl alcohol.  She wasn't

22 allergic to it.  That's the preservative.

23     She wasn't allergic to the PEG.

24     There were two preservatives in there.  Dr. Bhambhani

25 wanted the preservative-free.  She got half her wish.  She

```
1    got one without benzyl --
2         THE COURT:  I think what you're arguing really is
3    the negligence case, not the 93A issue.
4         MR. COREN:  I understand, your Honor, but it all
5    links in.  The reason that we have this medication in
6    Maryland is because she violated Massachusetts law by
7    submitting the fraudulent --
8         THE COURT:  But is Massachusetts law designed to
9    protect Maryland citizens?
10        MR. COREN:  Yes.  Yes.
11        THE COURT:  In this context?
12        MR. COREN:  Yes, your Honor.
13    All of these -- all of the pharmacy laws share the
14    sample common goal.  They're prescription medicines for a
15    reason.  They're dangerous to use, so it requires a doctor
16    to make certain prejudgments about its usefulness.
17    Two, the doctor is getting it, so the doctor is going
18    to take the responsibility because that doctor is the
19    learned intermediary of each of her patients.
20    So what we have here is the doctor consciously violated
21    the law.
22    Your Honor, I asked her, Did you agree with them to do
23    it this way?
24    And the answer was, Yes.
25    And I can give you the testimony, you know, from two
```

1    weeks ago there.

2         The point is is that apparently I believe we now make

3    out all the elements of the conspiracy.  Now, your Honor

4    dismissed the conspiracy when we go back to the Tennessee

5    and New Jersey --

6              THE COURT:  Now you're talking about conspiracy?

7              MR. COREN:  No, it's -- I'll tie it together for

8    you, your Honor, I promise.

9              THE COURT:  Do it quickly, please, because I'm

10   losing the thread of it.

11             MR. COREN:  That, I don't want you to do.

12             THE COURT:  I know.

13             MR. COREN:  Your Honor dismissed the conspiracy,

14   and only the conspiracy.  You didn't deal with the concerted

15   action.  You dismissed the conspiracy back then because we

16   couldn't show you a law that the people were violating.

17        I'm telling you the law the people were violating is

18   Chapter 93A.  Because the Attorney General under the

19   regulations said that, If there's a regulation for the

20   public to protect the health and well-being of the public

21   and you violate that regulation, that is a per se violation

22   of Section 2 of Chapter 93.

23        And Section 9 gives any person -- it doesn't say any

24   Massachusettian, it doesn't say anybody standing in

25   Massachusetts or happened to be buying it personally in

1    Massachusetts, it says "any person" has a claim if you

2    violate Section 2.

3        And by violating the pharmacy regulations, that are

4    designed to protect public health -- and that's the key

5    point.  Those regulations are to protect the patient, okay.

6    That's -- it's also to protect the public because they want

7    to control the channels.

8        So what happens is she gets New England Pharmacy to

9    dispense five vials to Mrs. Jones, because we don't know the

10   patient -- she can't tell us what patients' vials she used.

11   But whatever it is, she has five vials that the law says are

12   for Mrs. Jones.

13       A doctor -- and the experts say this violates the

14   standard of care.  It all ties together, your Honor.  The

15   doctor said, You're not allow to transship it.  You can't

16   prescribe for Mrs. Jones and give it to Mrs. Rozek.  That

17   violates the law.  That violates the standard of care, and

18   that also violates common sense.

19           THE COURT:  That may be, but you keep leaving out

20   93A and why the Massachusetts law should apply to a Maryland

21   citizen, a Maryland doctor, for a conduct in Maryland.

22           MR. COREN:  Because Maryland will not give somebody

23   that medicine when you defraud -- when you defraud the

24   system.  It will not allow you to -- a doctor to go to a

25   pharmacy in Maryland to get them to dispense drugs to use on

1    other patients.

2            THE COURT:  That doesn't explain why the

3    Massachusetts law should apply in Maryland to all Maryland

4    parties.

5            MR. COREN:  Because it applies because -- for two

6    reasons.

7        One, they're aiding and abetting the New England

8    people, and that's why we gave to Judge Stearns' recent

9    decision.

10           THE COURT:  That case doesn't have much to do with

11   this one.

12           MR. COREN:  Well, somewhat.

13       By -- first of all, is it Judge Thompson who wrote from

14   the First Circuit?

15           THE COURT:  Judge Thompson.

16           MR. COREN:  Judge Thompson, in his [sic] marvelous

17   style, chose the easy cases that were in the indictment.

18   And those were the ones that named Wonder Woman, Tony the

19   Tiger, Mickey Mouse.  Those were the easy ones.  He didn't

20   really need to go any further than that.

21       Our cases, my clients' cases, are part of that

22   indictment.

23           THE COURT:  Okay.

24           MR. COREN:  Okay.  They are part of that

25   indictment, so what it is is you're violating -- you're

1    aiding and abetting the New England people to violate the

2    fact -- because they're not allowed to dispense, and

3    Chapter 93 comes in and fills in the gap.

4         Your Honor, I mean, they read -- in your decision, you

5    already passed upon this issue when we were in the pleading

6    stage.

7              THE COURT:  I'm sorry?

8              MR. COREN:  You already passed upon this issue when

9    we were in the pleading stage in this case.

10             THE COURT:  But now we know more facts.

11             MR. COREN:  I understand.

12             THE COURT:  And I think I am obliged to re-examine

13   it in light of what we know now, which we did not know then.

14             MR. COREN:  I agree with you, your Honor.  I fully

15   agree.  Because I'm going to ask you, because she agreed to

16   do this, because she aid and abetted this, I am going to ask

17   you to give us back our conspiracy count on this case.

18   Because I think it's justified.  I think the elements are.

19   Because Chapter 93A provides it.

20        Your Honor, Klairmont v. Gainsboro Restaurant -- and I

21   don't know if you've ever see this case.  It's a Supreme

22   Judicial Court, 2013.  The facts are a student, a young lad,

23   went to answer -- to talk on the phone.  Walked through the

24   restaurant.  It was dark.  They had plastic hanging down,

25   fell down the steps, cracked his skull, and died in two

```
 1   days.  This case held that because the restaurant violated
 2   repeatedly, systematically, the building codes, that that
 3   was a 93 --
 4              THE COURT:  This was in Massachusetts?
 5              MR. COREN:  That's right.  It was in Massachusetts.
 6         But I'm just telling you --
 7              THE COURT:  So the conduct, the wrongful conduct,
 8   was in Massachusetts.
 9              MR. COREN:  That's right.
10         And the wrongful conduct of the people dispensing, and
11   here's the key, it's dispensed when they give that drug to
12   the Federal Ex. people to go deliver it.
13         All of the action that was necessary to make the
14   misbranding stopped there.
15         Once again, it's why I gave you the First Circuit case,
16   to show you, you know, because it illustrates in this case,
17   this particular case --
18              THE COURT:  Thank you.
19              MR. COREN:  So, hopefully I tied it together for
20   you to see how all of it does.
21         The statute on its face applies.  The fact pattern
22   applies.  It was to protect the public.  We did not get the
23   benefits sought, what Massachusetts sought to do, to protect
24   my client and the 12 other people at Box Hill who got harmed
25   by this.
```

 1          THE COURT:  Thank you.

 2          MR. COREN:  Thank you, your Honor.

 3          MR. KIRBY:  I'm going to talk about Chapter 93A.

 4      This is all subterfuge.  It's a good opening statement.

 5  He talks about pharmacy laws being violated.  The evidence

 6  is clear.  There is no contradiction.  She's not a

 7  pharmacist and the pharmacy laws don't apply to her.  There

 8  were no bogus prescriptions.  He talked a lot about that.

 9      But it's simple, with the Chapter 93A claim, the plain

10  language of the statute is clear, that a Chapter 93A claim

11  is not appropriate in this matter.  It was filed in the

12  state court in Maryland, Circuit Court of Baltimore County.

13  There is a dispute about whether Section 11 or Section 9, or

14  maybe both, apply to this case, you know, govern the claim.

15      Regarding Section 11 -- it doesn't make any difference

16  either way though, your Honor.

17      Regarding Section 11, just because I want to touch on

18  it, we pointed out that the statute says that the claim must

19  be brought in -- must be brought in the superior court or

20  housing court or even a district court in this Commonwealth,

21  and that wasn't done here.

22      Plaintiff seems to agree with that, I guess, because

23  they say, Well, no, Section 11 doesn't apply; let's look at

24  Section 9, and Section 9 applies to consumers.  And that

25  might be the case.  The problem for plaintiff is that they

1    still suffer the same fate even when you look at Section 9.

2         In the plaintiff's own opposition, when they quote the

3    clear language of Section 9, and that's at page 25 of their

4    opposition, it's a long block quote, it indicates that even

5    with a Section 9 action, any injured person must bring it in

6    the superior court or housing court in the Commonwealth of

7    Massachusetts.

8         There's no difference in that.  Plaintiffs don't tell

9    you that.  They just put in the quote and then don't talk

10   about it anymore.

11        So the Circuit -- like I said, it was filed in the

12   Circuit Court for Baltimore County.  The Circuit Court for

13   Baltimore County doesn't have subject matter jurisdiction

14   over the claim.

15        Not deterred by that fatal flaw, the plaintiffs tried

16   to talk about the long-arm statute and say that the claims

17   should still be allowed pursuant to the long-arm statutes.

18        However, even under the long-arm statute, it still

19   wouldn't apply, and there's several reasons --

20             THE COURT:  I don't know what the long-arm statute

21   has to do with it.

22             MR. KIRBY:  I'm just telling you what they argued.

23   I don't think it has anything to do with it at all, and if

24   your Honor believes that, I don't need to go any further,

25   but --

1    THE COURT:  I didn't hear Mr. Coren to argue that

2    now, that the long-arm statute gets us application of 93A in

3    this case.

4    MR. KIRBY:  The only reason I bring it up, your

5    Honor is because it's in his brief, and I just want to make

6    sure that we're clear.  I mean, he didn't really bring up

7    anything with 93A.

8    However, with regard to the long-arm statute, the cause

9    of action still must arise from tortious injury caused in

10   the Commonwealth of Massachusetts.  Even if it's a bad act

11   outside of Massachusetts, it must have occurred -- the

12   tortious injury must occur in the Commonwealth.

13   And clarity can be found on that point by looking at

14   the Snyder case, which we cited.

15   Interestingly, the plaintiff cited -- said it supported

16   their claim.  It didn't.

17   In that case, four people sustained injury and died in

18   a plane crash in Massachusetts.  So that's why the long-arm

19   statute applied to that case, because the tortious injury

20   occurred in Massachusetts.  And that's obviously

21   distinguishable from the Rozek -- the Handy case here, where

22   it's clear that the tortious injury was suffered, you know,

23   in Maryland, nowhere near Massachusetts, in all respects,

24   whether it's the parties or the actions or where it was

25   filed.

1          And even more importantly, the whole point of the

2     long-arm statute is whether -- the whole point of the

3     plaintiff's argument was whether this Court in Massachusetts

4     has personal jurisdiction based on those long-arm statutes

5     over an outside party for a Massachusetts consumer

6     protection claim.

7          Plaintiffs even argue on page 28 of their opposition

8     that this Court, and I quote, has personal jurisdiction

9     based on the long-arm statutes.  However, even assuming that

10    the long-arm statutes theoretically give this Court personal

11    jurisdiction, plaintiffs still filed their claim in Maryland

12    state court and not in this court, sitting in its role as an

13    MDL court.

14         And so the question is, does the claim apply, or is it

15    valid, in the complaint filed in Baltimore County, Maryland.

16         So plaintiff's point is moot, and consideration of

17    personal jurisdiction is only valid if the claim was filed

18    here or, better yet, by statute via Section 9, you know, in

19    a district court, superior court or housing court.

20         So based on all those reasons, the plaintiff's

21    Massachusetts consumer protection claim is invalid and

22    summary judgment should be granted.

23              THE COURT:  Thank you.

24         Now, Mr. Kirby, you have no argument concerning the

25    other pieces of this; namely, summary judgment in general

```
1    with respect to the negligence claim?

2           MR. KIRBY:  We're just going to submit on the

3    papers.

4           THE COURT:  Okay.

5       And with respect to punitive damages, the parties agree

6    I decide that on the papers, correct?

7           MR. KIRBY:  We had agreed -- and that's fine, if

8    that's what your Honor wants to do.  We had agreed

9    before that we would defer --

10          THE COURT:  It makes sense.  We have a trial

11   coming.  So I think I really need to do this, and I don't

12   see any point in counsel traveling for that.

13          MR. COREN:  We have no objection, your Honor.

14          MR. KIRBY:  That's fine.

15      My only concern is that there were a lot of things

16   submitted to the Court, you know, within the last week, and

17   we've tried to look into it and research --

18          THE COURT:  If you want to file any additional

19   document, do it before the end of next week, and we'll take

20   it, whatever you want, both of you.

21          MR. KIRBY:  Thank you, your Honor.

22          MR. COREN:  Thank you.

23          THE COURT:  But no more than ten pages total,

24   please.

25      93A is now a separate issue based on the arguments and
```

```
 1    the briefs that have been submitted.

 2         Causation is something that I'm not really considering

 3    now.  I think there are facts concerning causation that

 4    probably would deny summary judgment.

 5         And then there was the multiple damages, the wrongful

 6    death, and consortium claim, and punitive damages, and I

 7    think you gave up punitive damages, right?

 8              MR. COREN:  No.

 9              THE COURT:  No.

10              MR. KIRBY:  We don't think there should be any, but

11    that's in our brief, and we'll file something by the end of

12    next week.

13              THE COURT:  So the trial is when?

14              THE CLERK:  April 9.

15              THE COURT:  That was the date we agreed on earlier.

16              MR. COREN:  That's the one you set.

17              THE COURT:  And we have a pretrial date, I think,

18    as well sometime in March.

19              THE CLERK:  Yes, Judge, March 22 at 2:00.

20              THE COURT:  Now, at the pretrial conference, if you

21    want to do it by telephone, I'm perfectly amenable to doing

22    that.

23         What I want to discuss with you are precisely what the

24    issues are that we're going to try, and it will not be in

25    the detail in which the defendant was trying to parse the
```

```
 1   negligence case.

 2        It will be negligence, maybe by certain things, like

 3   getting the stuff from Massachusetts without, you know --

 4             MR. COREN:  It's patient --

 5             THE COURT:  -- of multiple plaintiffs or something,

 6   if they had multiple patients.

 7             MR. COREN:  Patient-specific prescriptions.

 8             THE COURT:  And another issue -- so negligence is

 9   one.

10        Causation, I think, is another issue that we will have

11   as an issue to be tried.

12        I want to outline what exactly this trial is going to

13   look like and what the parties are going to have to do in

14   order to get to the end of it.

15             MR. COREN:  May I ask just one quick question on

16   that, your Honor?

17        When you say causation, "Did the shot cause Brenda

18   Rozek's death?

19             THE COURT:  Did the conduct of the defendant cause

20   damage?

21             MR. COREN:  Yeah, because I have --

22             THE COURT:  Cause the damage complained of.

23             MR. COREN:  I believe -- I am hoping there will be

24   a stipulation that the shot caused it, okay.

25             THE COURT:  That's what -- I am delighted to have
```

```
 1    stipulations, but I want to look at the big picture.  I want
 2    to know what this trial is going to look like and what the
 3    issues are that we're going to try, not what the evidence
 4    will be to support the issues.
 5          So the main question is, Was the defendant negligent?
 6          Second, And how, by what mechanisms?
 7          Did that negligence cause the plaintiff's injury?
 8          And then, If so, what is the amount of damages?  And
 9    there I would like to understand what the elements of
10    damages are, because there seems to be some dispute about
11    medical expenses.  And I don't know what the law is in
12    Maryland on that, but I suspect that somehow there has to be
13    accommodation for the fact that Medicare is going to have to
14    be reimbursed, unless it already has been from the NECC
15    settlement?
16                MR. COREN:  No.
17          One, it would have been, you're correct as to that,
18    but, no, it wasn't.  She was in her early 50s.
19                THE COURT:  I'm sorry?
20                MR. COREN:  Brenda Rozek was 52.  So we're not
21    dealing with a Medicare --
22                THE COURT:  Or any insurance?  I mean, to the
23    extent that somebody else paid for her medical care, there
24    will likely be a lien against any funds created as a result
25    of this case.
```

1          Now, whether any of this came out of the -- did she

2     participate in the NECC settlement?

3          MR. COREN:  The family did.

4          THE COURT:  Okay.  So I know that that settlement

5     required payment to whoever the third parties that had

6     provided funds for the care of the plaintiff, and so that

7     may not be an issue.

8          MR. COREN:  I think you're correct, your Honor.

9          THE COURT:  And then the question is, Does she have

10    any medical expenses over and above what others paid for?

11    And that, I think, is probably an appropriate element for

12    this case.  But I don't think she's entitled to recover for

13    what she's been reimbursed for, for the amounts that have

14    been reimbursed or have been paid by somebody else.

15         MR. COREN:  And it gets a little complicated, and

16    we tried in our brief to explore --

17         THE COURT:  I know you mentioned it, and I'm not

18    trying to decide it now.  I am just telling you what --

19         MR. COREN:  We need to address it with you at the

20    pretrial, is what you're telling us.

21         THE COURT:  And there are other elements of

22    damages, for example, on the death part of it, as opposed to

23    pain and suffering, which I assume is an element.  So I want

24    to outline what these elements are, because understand, that

25    the pretrial order that results from this meeting will be my

1    program for making evidentiary rulings as well.  So it's

2    important to me to have it correctly.

3        I will wish to discuss with you, and you may want to

4    think about this ahead of time, what the evidence -- how you

5    will deal with the evidence.  I would much prefer that

6    counsel agree that most of the evidence can come in by

7    agreement.  You can make a list of it.  You can mark it with

8    little stickies giving them numbers.  And to the extent that

9    you cannot agree, then we will have a separate list of

10   exhibits for identification.

11       With respect to witnesses, one of the main things I

12   want to talk about with you is whether they will all be here

13   in person or whether they're going to testify by deposition.

14   Are they mostly deposition?

15            MR. KIRBY:  We would say in person for our

16   witnesses.

17            THE COURT:  All in person?

18            MR. KIRBY:  I can't say all, your Honor, but I

19   would say that's our preference, to have them here in

20   person.

21            THE COURT:  If anybody testifies by deposition, I

22   will ask you to decide ahead of time what testimony you're

23   going to offer.  I would prefer not to have deposition

24   testimony that lasts more than half-an-hour because the jury

25   goes to sleep; and, if they don't, I do.

1          And then to the extent there are objections to anything

2     that either of you offers, I would like to have a copy of

3     the transcript with the objections noted in the margin, and

4     I will rule on it in that way.  But I will need to have that

5     at least the day before you're going to offer it.  So you

6     need to think about that.  And that's one of the other

7     things we need to talk about.

8          How long will this trial take?

9               MR. COREN:  Your Honor set aside two weeks for

10    trial.

11              THE COURT:  Ten trial days?

12              MR. COREN:  That's what you set aside for it.

13    That's what's we're going to go for.

14              MR. KIRBY:  We thought it was going to take three

15    weeks, but he said two weeks.  So I guess we're stuck at two

16    weeks.

17              THE COURT:  I was going to cut it to one.

18         (Laughter.)

19              THE COURT:  All right, so I'm assuming that means

20    that the case will go to the jury at the end of the second

21    week.

22              MR. COREN:  Your Honor, are those full days or half

23    days?

24              THE COURT:  The equivalent of a full day.  We start

25    at 9:00.  We quit at 1:00.  We have one recess in between,

```
1    period.  I do no other business when the trial goes on.
2              MR. COREN:  Thank you.
3              THE COURT:  So that's it.
4         Now, with respect to experts, if you can agree on the
5    qualifications of the expert, that also will streamline the
6    case.
7         Anyhow, if I think of other things I will bring them up
8    at the time of the pretrial conference.  I want you to
9    understand that's what it will look like.  It's simply to
10   get the case to the trial in the most efficient way
11   possible.
12        And if I could have your requests for instructions and
13   proposed questions to the jury on special verdict maybe the
14   Monday of the second week, that would help.
15             MR. KIRBY:  I'm sorry, your Honor, when did you
16   say?
17             THE COURT:  I suggested the Monday of the second
18   week.
19             MR. KIRBY:  Okay.  Thank you.
20             THE COURT:  And any voir dire questions to the jury
21   we can discuss at the pretrial conference, but maybe the
22   week before the trial is supposed to start.
23             MR. COREN:  May I ask, because I practice in two
24   states that are polar extremes, I practice in Pennsylvania
25   and I practice in New Jersey, Pennsylvania, it's
```

```
1   old-fashioned voir dire where we get to ask the jurors

2   questions.  New Jersey, the judge asks all the questions.

3            THE COURT:  That's true here, too.

4            MR. COREN:  What?

5            THE COURT:  The judge asks all the questions and

6   decides what questions to ask, which may or may not be on

7   your list.

8            MR. COREN:  Understood, but we may need to give you

9   proposed voir dire questions.

10           THE COURT:  I will explain to you at the pretrial

11  conference what we do to impanel the jury and how many

12  jurors.  Think about how many jurors you want.  I normally

13  impanel eight.  If we get more, it becomes more complicated

14  and cumbersome.  But give that some thought.  We will make

15  final decisions at the pretrial conference.

16      If there's anything that I haven't mentioned that you

17  deem important for the conduct of the trial, bring it up

18  then, and we will deal with it.

19           MR. COREN:  Your Honor, we have pending --

20           THE COURT:  I'm sorry?

21           MR. COREN:  We have pending before you, and your

22  Honor deferred it, and so as we get toward the trial date, a

23  motion to strike a number of the generic witnesses offered

24  by the Box Hill defendants.  They have four of the same

25  doctors, is one example, so why do we have to -- you know,
```

```
1    which one tell us --
2            THE COURT:  Why don't you talk to each other and
3    see what you can work out before you get me involved.
4            MR. COREN:  But then it gets a little bit more into
5    it.  I don't want to pre-argue it, other than to say, we
6    have a serious question going to the bona fides of the
7    reports.
8            THE COURT:  Okay, when it's appropriate, go talk to
9    him.
10           MR. COREN:  I just want -- all I'm doing is
11   reminding your Honor that pending is that motion.
12           THE COURT:  I anticipate that counsel will work out
13   an awful lot of the mechanics of this.  You know far more
14   about the case than I do, and you're in a far better
15   position to do that, understanding that since I know
16   nothing, my decisions are likely to be very arbitrary about
17   that kind of thing.
18       Mr. Kirby, anything?
19           MR. KIRBY:  I don't have anything else.
20           THE COURT:  Are you happy?
21           MR. KIRBY:  Hm-hmm.
22           THE COURT:  Well, that's good.
23       (Laughter.)
24           MR. COREN:  May I just -- one indulgence.
25       I think maybe Mr. Kirby, when we were arguing the 93,
```

```
 1   made one little misspeak.
 2              THE COURT:  I'm sorry?
 3              MR. COREN:  I believe Mr. Kirby made one little
 4   misspeak.
 5        He said under Section 93, 9 it was "must" be filed in
 6   Superior Court.
 7        The language of the statute is preparatory.  It's "may
 8   be."
 9        And, candidly, we have filed 93 actions all over the
10   United States, along with Rick Ellis, and Tom Sobol and I,
11   you know, so it's like news that we can't do, outside of
12   Maryland, a 93A action.
13              THE COURT:  We'll check it out.
14        Now, one final question, and nothing to do with the
15   trial -- well, it does have to do with the trial.
16        The other Maryland cases have settled, or they were
17   simply dismissed?
18              MR. KIRBY:  They were dismissed voluntarily without
19   payment of any kind.
20              THE COURT:  After the NECC payment?
21              MR. KIRBY:  Correct.  They got the benefit of the
22   NECC-to-a-trust payment, but that was it.
23              THE COURT:  So what's the chances of settling this
24   one?
25              MR. COREN:  Your Honor, we've asked to sit down,
```

1    and all we were told is, No, we'll see you at trial.

2         They made our life very easy.

3              MR. KIRBY:  There is no interest in settling the

4    case.

5              THE COURT:  The Maryland defendants don't want to

6    settle?

7              MR. KIRBY:  Correct.

8              THE COURT:  Okay.  So let's just go ahead and try

9    it.

10        Thank you.

11             MR. COREN:  Thank you, your Honor.

12             MR. KIRBY:  Thank you, your Honor.

13             THE CLERK:  All rise.

14      Court is in recess.

15        (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**


    I, James P. Gibbons, Official Court Reporter for the
United States District Court for the District of
Massachusetts, do hereby certify that the foregoing pages
are a true and accurate transcription of my shorthand notes
taken in the aforementioned matter to the best of my skill
and ability.


   /s/James P. Gibbons             February 9, 2018
      James P. Gibbons


             JAMES P. GIBBONS, CSR, RPR, RMR
                Official Court Reporter
              1 Courthouse Way, Suite 7205
              Boston, Massachusetts 02210
                  jmsgibbons@yahoo.com