UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION ) ) ) | |
| ) | MDL No. 2419 |
| ) | Dkt. No 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| *Handy v. Box Hill Surgery Center, LLC, et al.* ) | |
| ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BOX HILL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE THE REPORTS AND TO EXCLUDE TESTIMONY BY STEVEN COHEN, M.D., THOMAS M. LARKIN, M.D., LAXMAIAH MANCHIKANTI, M.D., AND DAVID MAINE, M.D. AS EXPERT WITNESSES FOR THE BOX HILL DEFENDANTS**

Defendants, Box Hill Surgery Center, L.L.C., Ritu T. Bhambhani, M.D., and Ritu T. Bhambhani, M.D., L.L.C. (hereinafter, collectively "Box Hill Defendants" or "Defendants"), by undersigned counsel, submit this Opposition to Plaintiffs' Motion to Strike the Reports and Exclude Testimony by Steven Cohen, M.D., Thomas M. Larkin, M.D., Laxmaiah Manchikanti, M.D., and David Maine, M.D. [Dkt. 3462] (hereinafter, "Plaintiffs' Motion") and state the following in support thereof:

## I.    INTRODUCTION

Plaintiffs seek to have the reports of the Box Hill Defendants' standard of care experts (hereinafter, the "Experts") stricken and their testimony excluded from trial. Plaintiffs assert that, because the Experts' reports (hereinafter, the "Reports") are similar to each other and to other reports that have been filed by defendants in this MDL, the Reports must therefore be unreliable. Plaintiffs also argue that, to the extent the Experts' opinions and testimony are deemed admissible, their opinions are needlessly cumulative and should be limited so as to avoid "needlessly prolong[ing] this litigation."

That the Reports closely resemble the reports filed by other experts in this MDL is of no import.[1] Expert reports serve to put an opposing party on notice both of an expert's opinions and the bases therefor. In the instant matter, there can be no question that the Reports have served that purpose. Moreover, even setting aside the Reports, Plaintiffs questioned every one of the Experts in depositions that each lasted approximately six and a half hours, with the exception of one which still lasted more than five hours. During these lengthy depositions, each and every Expert provided their qualifications to render expert opinions in this matter, their opinions relating to the standard of care, and their independent bases for the opinions contained in their Reports. Plaintiffs' inability to attack either the bases for the Experts' testimony or their qualifications to render such opinions indicates that their challenge to the admissibility of the Experts' opinions is purely one of form and not of substance. Such a challenge is insufficient to support a finding that the Experts' opinions are unreliable under either Rule 702 of the Federal Rules of Evidence or *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Additionally, Plaintiffs have failed to demonstrate that exclusion of the Experts' opinions is warranted under Rule 403 of the Federal Rules of Evidence.

## II.   RELEVANT BACKGROUND

Plaintiffs' only remaining claims in this matter stem from their allegation that the Box Hill Defendants were negligent in procuring and administering MPA produced by NECC. Specifically, Plaintiffs assert that the Box Hill Defendants were under a duty to perform special "due diligence" prior to ordering from NECC, that there were regulations governing the Box Hill Defendants requiring orders to be placed using patient-specific prescriptions, and that Dr. Bhambhani's actions constituted a breach of the standards of care in her practice as a pain management specialist.

---

[1] In fact, consistency of opinions among the standard of care experts in this matter more readily evidences the standard of care as well as the fact that the Box Hill Defendants did not breach the standard of care.

In order to effectively defend against these allegations, the Box Hill Defendants have designated four standard of care expert physicians: Steven Cohen, M.D.; Laxmaiah Manchikanti, M.D.; David Maine, M.D.; and Thomas Larkin, M.D. They all have different backgrounds and experiences. They have each submitted Reports detailing their opinions in the Box Hill cases as common issue experts, and each Expert has provided extensive deposition testimony explaining their opinions and the bases for their conclusions. Dr. Cohen and Dr. Manchikanti have subsequently been designated as case-specific experts and have provided reports delineating their opinions specific to the care and treatment of Brenda Rozek.  Plaintiffs have not yet requested to depose Dr. Cohen or Dr. Manchikanti as to their case specific opinions.

## III.    ARGUMENT

### A. The Expert testimony is reliable and should therefore not be stricken or excluded.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[2]

As the First Circuit has observed, "Rule 702 has been interpreted liberally in favor of the admission of expert testimony."[3] Consistent with this liberal application of Rule 702, only if an

---

[2] Fed. R. Civ. P. 702; *see also Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993) (internal quotations omitted).

[3] *Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006); *see also* Advisory Committee's Notes on 2000 Amendment to Fed. R. Evid. 702 (observing that "the rejection of expert testimony is the exception rather than the rule").

expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must

such testimony be excluded.[4]

### 1. The Experts are qualified to offer opinions in this matter based on their knowledge, skill, training, experience, and education.

A proposed expert witness must be qualified to testify as an expert by knowledge, skill, training, experience, or education.[5] As explained in Plaintiffs' Motion, "expert-testimony is reliable if it has 'a reliable basis in the knowledge and experience of [the pertinent] discipline.'"[6] Experts who are qualified in a certain field enjoy wide latitude to opine within their area of expertise.[7] Where, as here, the opinions concern particular treatment in a medical malpractice case, courts have found that "the expert's knowledge about the standard of care based upon his experience is a more 'reasonable measure' of reliability than some of the *Daubert* factors."[8]

It is clear that the Box Hill Defendants' pain medicine experts are highly qualified based on education, training, and experience to offer opinions related to the standard of care in their specialty of pain medicine.

Dr. Cohen is the Chief of Pain Medicine, and Director of the Blaustein Pain Treatment Center, at Johns Hopkins School of Medicine, where he also holds joint faculty appointments as a Professor of Anesthesiology & Critical Care Medicine, Neurology, and Physical Medicine & Rehabilitation.[9] Dr. Cohen is currently the Chair of the American Society of Regional Anesthesia and Pain Medicine (ASRA) Guidelines Committee, and he sits on the Boards of Directors for both

---

[4] *Bradley v. Kryvicky*, 577 F.Supp.2d 466, 468 (D. Me. 2008).

[5] *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995).

[6] *See* Plaintiffs' Memorandum [Dkt. 3463] at 6 (citing *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 479 (1st Cir. 2016)).

[7] *Chadwick v. WellPoint, Inc.*, 51 F.3d 38, 48 (1st Cir. 2009) (citing *Daubert*, 509 U.S. at 592).

[8] *Delgado v. Dorado Health Inc.*, 2016 WL 4742257, at *4 (D. P.R. Sept. 2, 2016) (citations omitted). *See also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (Since expert testimony is based on specialized, rather than scientific knowledge, "the *Daubert* factors are not intended to be exhaustive or unduly restrictive").

[9] *See* Expert Report of Steven Cohen, M.D. at 1, attached as **Exhibit 1**.

ASRA and the American Academy of Pain Medicine (AAPM).[10] He was the lead speaker at a 2014 panel the FDA convened on the effectiveness and safety of epidural steroid injections.[11] Dr. Cohen has been consulted by several other similar regulatory agencies in other countries to discuss these topics as well.[12] Dr. Cohen has approximately 300 peer-reviewed publications and book chapters on pain in journals such as Lancet, BMJ, Annals of Internal Medicine, JAMA International Medicine, New England Journal of Medicine, Anesthesiology, Pain, and Cecil Textbook of Medicine.[13] Dr. Cohen also serves on the editorial boards of multiple journals, including PAIN, Anesthesiology, Anesthesia & Analgesia, Pain Medicine, Regional Anesthesia & Pain Medicine, and he is the "Pain Management Consultant" for BMJ.[14] Dr. Cohen is considered one of the leading experts in the country, if not the world, on lower back and neck pain, as well as epidural steroid injections.

Dr. Manchikanti is the Medical Director of several pain management facilities, including the Pain Management Center of Paducah, the Ambulatory Surgery Center in Paducah, Kentucky, the Pain Management Center of Marion, and Pain Care Surgery in Marion, Illinois.[15] He performs a significant number of interventional pain proceedings including epidural steroid injections. He is also the founder, Chairman of the Board, and Chief Executive Officer of the American Society of Interventional Pain Physicians (ASIPP), the Society of Interventional Pain Management Surgery Center (SIPMS), and many state Societies of Interventional Pain Physicians.[16] He also founded the *Pain Physician* Journal, ABIPP, and the ASIPP Foundation.[17] Dr. Manchikanti has

---

[10] *See* Case-Specific Expert Report of Steven Cohen, M.D. at 2–3, attached as **Exhibit 2**.

[11] *See* **Exhibit 1** at 2.

[12] *Id.*

[13] *See* **Exhibit 2** at 3.

[14] *Id.* at 2.

[15] *See* Expert Report of Laxmaiah Manchikanti, M.D. at 2, attached as **Exhibit 3**.

[16] *Id.*

[17] *Id.*

published and served on editorial boards as a reviewer for 26 peer-reviewed journals in areas including, but not limited to, pain medicine practice management, pain medicine, interventional pain medicine, interventional techniques in chronic spinal pain, and anesthesiology.[18] He has authored over 750 peer-reviewed publications and book chapters regarding pain medicine.

Dr. Larkin is the Owner and Co-President of The Pain Management Institute in Bethesda, Maryland, where he serves as an anesthesiologist and pain management physician evaluating patients and performing pain procedures in a clinical setting.[19] Dr. Larkin's past positions include, but are not limited to, Chief of Pain Management Services at Walter Reed Army Medical Center and Chief of the Pain Management Division at Parkway Neuroscience and Spine Institute.[20] He has published and presented in the areas including, but not limited to, anesthesiology, pain diagnosis, pain management, and pain treatment.[21]

Dr. Maine has served as the Medical Director of the Center for Interventional Pain Medicine at Mercy Hospital in Baltimore, Maryland, which is a multidisciplinary pain center emphasizing the treatment of acute and chronic pain conditions, since 2007.[22] Dr. Maine also currently serves as the President of the medical staff at Mercy Medical Center and is the chair of the medical executive committee.[23] Dr. Maine has authored and co-authored original articles, abstracts, book chapters, and newsletters in areas including, but not limited to, regional anesthesia, pain management, drug delivery methods, and epidural steroid injections.[24]

---

[18] *Id.*

[19] *See* Expert Report by Thomas Larkin, M.D. at 3, attached as **Exhibit 4**.

[20] *Id.* at 2–3.

[21] *Id.*

[22] *See* Expert Report by David Maine, M.D. at 1, attached as **Exhibit 5**.

[23] *Id.* at 2.

[24] *Id.*

In each of their Reports, the Experts outlined their distinct and extensive knowledge and experience in the field of pain medicine and management. The Experts also explained that their opinions and testimony were based on their education and training, as well as their review of an extensive compilation of materials.[25] They also provided an extensive level of detail concerning their opinions and the support for their opinions in lengthy depositions taken by Plaintiffs. There can be no question that the Experts are very experienced and reliable, and that they should, therefore, be given wide latitude to opine within their area of expertise of pain medicine. Such expert testimony will assist the trier of fact.

### 2. The Experts' deposition testimony demonstrates the reliability of their opinions and conclusions.

In addition to the Experts' knowledge, experience and training, this Court should look to the deposition testimony provided by the Experts in determining that their opinion testimony—which is what actually constitutes evidence in this case, rather than their respective Reports—is reliable.[26]

Prior to filing their Motion, Plaintiffs had the opportunity to depose all of the Experts. In each of these depositions, Plaintiffs' thorough examination of each Expert's opinions, and the bases for those opinions, exceeded nearly six and a half hours, with the exception of Dr. Maine's deposition which was still more than five hours.[27] It is telling that Plaintiffs' Motion is devoid of

---

[25] *See* **Exhibit 1** at 1–3; **Exhibit 3** at 1–3; **Exhibit 4** at 1–4; **Exhibit 5** at 1–3.

Exhibit 2 of each Report outlines the documents that were provided to, and reviewed by, each Expert. *See* **Exhibit 1** at 64–67; **Exhibit 3** at 101–104; **Exhibit 4** at 34–37; **Exhibit 5** at 28–31. It should be noted, however, that the list of documents reviewed is not a complete list of materials reviewed by each experts, as some of them reviewed more as discovery proceeded and/or did their own research.

[26] *See, e.g.*, *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 83–84 (1st Cir. 1998) (assessing expert deposition testimony in determining whether the expert's opinions are reliable and, therefore, admissible). *See also Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp. 2d 172, 175 (D. Me. June 4, 2003); *TNT Road Co. v. Sterling Truck Corp.*, 2004 WL 1626248, at *2 (D. Me. July 19, 2004); *Small v. General Motors Corp.*, 2006 WL 3332989 (D. Me. Nov. 15, 2006).

[27] *See* Deposition Transcript of Laxmaiah Manchikanti, M.D., 5, 195, excerpts attached as **Exhibit 6** (7 hours and 2 minutes); Deposition Transcript of Thomas Larkin, M.D., 1, 340, excerpts attached as **Exhibit 7** (6 hours and 25

any challenge to the actual substantive opinions, and bases thereto, provided in the Experts' deposition testimony. It is exclusively based on the form, rather than substance, of their Reports. Plaintiffs had these reports for approximately four months[28] prior to the depositions but at no point did they question them as unreliable until the time of the Experts' depositions. At that point, each Expert explained their opinions and the bases of their opinions in great detail.

During their respective depositions, the Experts answered questions at length about the materials that they had reviewed that factored into their opinions in this case. When asked about the opinions contained in his Report, for example, Dr. Larkin explained that he had "reviewed about 30 hours of material" prior to rendering opinions reflecting the conclusions contained in his Report and deposition.[29] The other experts similarly testified to the breadth of material that they reviewed and/or relied on in formulating their opinions and conclusions.[30] Dr. Cohen even testified that he performed his own, independent research specifically for this case—in addition to reviewing the information and documents provided to him—prior to formulating the opinions contained in his Report.[31]

With regard to their conclusions that the ordering practices employed by Dr. Bhambhani were compliant with the standard of care, the Experts uniformly explained that Dr. Bhambhani's ordering practices were consistent with standard practice in the industry as well as the physicians

---

minutes); Deposition Transcript of Steven Cohen, M.D. at 3, 255, excerpts attached as **Exhibit 8** (6 hours and 23 minutes); Deposition Transcript of David Maine, M.D., 3, 284, excerpts attached as **Exhibit 9** (5 hours and 10 minutes).

[28] The Box Hill Defendants' common issue expert reports were electronically filed on October 17, 2016. *See* Box Hill Defendants' Notice of Service of Common Issue Expert Reports, attached as **Exhibit 10**. Laxmaiah Manchikanti, M.D. was the first of the Experts to be deposed by Plaintiffs and his deposition took place on February 16, 2017. *See* **Exhibit 6** at 5.

[29] *See* **Exhibit 7** at 56:19–57:9.

[30] *See* **Exhibit 6** at 172:12–176:11; **Exhibit 9** at 71:7–72:1.

[31] *See* **Exhibit 8** at 98:6–99:15.

that the Experts personally knew who ordered from NECC.[32] There was also reference to depositions by written questions, indicating that additional health care providers testified under oath about similar practices.

The Experts also provided independent grounds for their conclusions that there was no "due diligence" duty or requirement with regard to ordering medications from NECC. Dr. Manchikanti, for example, explained that "there were no requirements from any major medical associations" and that "there were no guidelines" for Dr. Bhambhani or her surgery center to perform the due diligence Plaintiffs allege was required prior to purchasing medication compounded by NECC.[33] Dr. Manchikanti also explained that Dr. Bhambhani's decision to order medications from NECC was reasonable based on her prior dealings with NECC and not in violation of the applicable standard of care.[34] In addition to citing Dr. Bhambhani's prior positive experience ordering medications from NECC, which he testified was one of the "strongest endorsements" she could get, Dr. Larkin also explained that physicians generally don't inspect facilities or do research on the FDA's website.[35]

The Experts also all provided deposition testimony explaining the bases for their opinions that it was appropriate and in compliance with the standard of care for the Box Hill Defendants to

---

[32] *See* **Exhibit 9** at 52:1–53:6 (testifying that Dr. Bhambhani complied with the standard of care for physicians in 2012 by ordering from NECC in the way that she did, and supporting his opinion by explaining that all of the physicians at conferences he attended described ordering from [NECC] using practices identical to those employed by Dr. Bhambhani); **Exhibit 6** at 172:12–176:6 (testifying that his practice, as well as the majority of physicians he knows, ordered from NECC using the same format as Dr. Bhambhani); **Exhibit 7** at 164:10–165:1 (testifying that the ordering practices employed by three thousand health care providers, that were consistent with Dr. Bhambhani's ordering practice, dictate the standard of care); **Exhibit 8** at 229:13–230:6 (testifying that three thousand customers were ordering medications from NECC between May of 2012 and September of 2012, and that the customer list included some of the most well-regarded and prestigious medical institutions in the country).

[33] *See* **Exhibit 6** at 104:10–104:20.

[34] *Id.* at 103:11–103:24. *See also* **Exhibit 8** at 125:19–126:9 (testifying that Dr. Bhambhani decision to purchase MPA from NECC was reasonable given her eight to nine years of very good experience using the MPA without any complications); **Exhibit 9** at 83:13–84:17 (explaining that there were no guidelines requiring the performance of any "due diligence" and that Dr. Bhambhani's decision to order MPA from NECC based on her positive prior experience was reasonable).

[35] *See* **Exhibit 7** at 161:6–162:9.

depend on the FDA, the Massachusetts Board of Registration in Pharmacy, and/or the Maryland Board of Pharmacy to regulate NECC. Dr. Manchikanti, for example, explained that "[h]ere, the FDA is the one which is looking at and State Board of Pharmacies are looking at it. Even with all these checks and balances, NECC is still in business. That essentially gives us confidence that it is doing fine, whatever deficiency they had, they corrected it. Even for a surgery center, if you have a major deficiency, we - - they close it down."[36] Dr. Cohen further explained that "[t]he fact that [NECC was] licensed in Maryland and in Massachusetts [and in all 50 states] means that those regulatory bodies did not believe that [NECC] posed a significant risk, and if the FDA believed they posed a significant risk, then they would have been remiss not to shut them down, and that may or may not have been true, but at the, at the time, you know, it wasn't."[37] Dr. Cohen also testified that the "FDA knew, and the Massachusetts Board of Pharmacy knew what was being done, and they continued to allow [NECC] to do this. Therefore, they obviously thought that it's not a danger to public safety."[38] Drs. Maine and Larkin provided similar support for their contention that Box Hill did not breach the standard of care by depending on regulatory agencies to ensure that NECC was in compliance with the governing laws and standards.[39]

With regard to the Experts' conclusions that the regulations relied upon by Plaintiffs did not apply to the Box Hill Defendants, Dr. Cohen, for example, testified that the rules and regulations that governed ordering medications from a compounding pharmacy were directed

---

[36] *See* **Exhibit 6** at 98:16–98:22.

[37] *See* **Exhibit 8** at 195:10–195:17.

[38] *Id.* at 144:11–144:15.

[39] *See* **Exhibit 9** at 151:12–151:21 (explaining that it was appropriate and in compliance with the standard of care to depend on the FDA, or the Massachusetts or the Maryland Board of Pharmacy, because "[y]ou are relying on regulatory bodies to oversee an entity that you certainly don't have an expertise in overseeing."); **Exhibit 7** at 314:1–314:8 (explaining that it was incumbent on the Attorney General of Massachusetts or on the FDA to let NECC know that they were violating the law).

towards pharmacies rather than physicians.[40] When asked whether he would agree that the standard of care would require a physician to know the rules and regulations that apply to ordering medication, Dr. Cohen explained:

> So I would say that that's not the standard of care because most people did not know that before 2013.
>
> Also, as the, you know, head of the division at Johns Hopkins, we probably have the, the strongest didactic teaching program for any pain medicine fellowship in the world, and as well as, you know, at Walter Reed. That information is not, is never included in any lectures nor are there any lectures at conferences.
>
> It's not - - before 2013, it was not mentioned in articles or textbooks, so I would say that it was not the standard of care at that time, and it may not even be the standard of care at this time.[41]

When asked about a Massachusetts statute requiring individual prescriptions, Dr. Manchikanti explained that he had seen the statute in several places while he was reviewing the records, but that they "are all pharmacy directions. None of them is related from the Board of Medical Licensure. It is not controlling the practice of medicine."[42] Dr. Maine and Dr. Larkin similarly provided support for their conclusion that the statutes and regulations relied upon by Plaintiffs governed pharmacists rather than physicians.[43]

---

[40] *See* **Exhibit 8** at 134:12–134:21.

[41] *Id*. at 135:8–136:7.

[42] *See* **Exhibit 6** at 80:16–80:24.

[43] *See* **Exhibit 9** at 52:10–53:6 (explaining that Dr. Bhambhani's ordering practices from NECC were compliant with the standard of care, as determined by other reasonably appropriate physicians in the same situation, and that Dr. Bhambhani was not bound by any pharmacy regulations); **Exhibit 7** at 306:17–306:20, 312:2–312:16 (explaining that a Maryland physician, such as Dr. Bhambhani, would not be responsible for Massachusetts laws governing pharmacists).

11

### 3. The fact that the Experts have similar opinions does not render their testimony unreliable.

Rather than challenge the qualifications of the Experts, the methodologies employed by these experts or the way in which the methodologies were applied to the facts underlying Plaintiffs' claims, Plaintiffs point to the fact that the Experts share the same conclusions as the sole grounds for striking their Reports and excluding their testimony. Plaintiffs rely on the fact that the Experts are all in agreement that the Box Hill Defendants did not breach the standards of care and argue that, as a result, the Experts' opinions are necessarily unreliable. Stated differently, Plaintiffs' contention is that the Experts are unreliable because they share the expert opinion that the Box Hill Defendants were not negligent. On the contrary, the fact that four different experts have defined the standard of care in the same way gives their opinions credibility and corroboration.

Each of the Experts explicitly affirmed that the actual opinions and conclusions contained in their Reports were their own and based on their experience, knowledge, and extensive review of records relating to this case. Their experience is uncontroverted by Plaintiffs. Moreover, the Experts also explained that they were unaware at the time that their Reports were drafted and signed that their opinions and conclusions in this matter were consistent with any other expert.[44]

### 4. The case law cited by Plaintiffs allegedly in support of their contention is easily distinguishable from the facts in this case.

The case law cited by Plaintiffs in support of their contention that the Report should be stricken can be condensed into two different circumstances: (1) cases where the experts did not engage in their own independent investigation as to the underlying facts and merely adopted the report of others who did; and (2) cases where experts in one field adopted the report of experts

---

[44] *See* **Exhibit 6** at 77:4–77:11; **Exhibit 7** at 63:7–63:14, 65:7–67:15; **Exhibit 8** at 156:16–157:15, 159:4–159:13; **Exhibit 9** at 25:18–26:13.

from a different field. In both lines of cases, the grounds for exclusion are wholly distinguishable from the instant matter.

By way of example, Plaintiffs find "instructive" *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012). As Plaintiffs point out in their Motion, the court reasoned that exclusion was proper because plaintiff's expert failed to "exercise independent judgment," took the other expert's conclusions, "engaged in little, if any, evaluation of their merits and reproduced [them]…wholesale (*including its typographical errors*) as his own work."[45] Dispositive in *Cholakyan* was the fact that the expert subject to exclusion had adopted the opinions of another expert without conducting any independent testing of his own.[46] The facts supporting the court's grant of exclusion in *Cholakyan* are inconsistent with the facts in the instant matter. Unlike the expert in *Cholakyan*, the Experts reviewed an extensive compilation of documents and depositions transcripts, as well as information stemming from their own independent investigations and research into this matter, prior to rendering their opinions in this case. Indeed, the court in *Cholakyan* actually addressed the facts underlying the instant matter and explained that "[b]y contrast, an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence."[47] It is worth reiterating that the Experts in this matter did not "adopt" or "take" the opinions of the other experts, as they were able to fully support their opinions with their own education, training, and experience and because they were unaware at the time their Reports were completed that their opinions were shared by other experts in this matter. That said, C*hokalyan* explained that even were such an "adoption" to have occurred that it would not be grounds for

---

[45] *Id*. at 546 (emphasis in original).
[46] *Id*. at 545.
[47] *Id*. at 544.

exclusion given the Experts' independent evaluation and judgment in this case. Again, the Experts in this case were clearly able to support their opinions with strong evidence during their lengthy depositions.

Plaintiffs also cite to *Bouyges Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722, 729 (E.D.N.C. 2007), in which the court noted that "the wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed. R. Evid. 702." In *Bouyges*, however, the premise of the argument in favor of exclusion was that the expert at issue had inappropriately relied on the opinions of others "to the extent that their areas of expertise were beyond" that of the expert at issue.[48] In excluding that expert, the court explained that "an expert with perhaps overlapping, yet admittedly different, area of expertise should [not] be permitted to merely adopt and incorporate verbatim another's 'expert' opinion."[49] In the present matter, the Experts are all board certified in the fields of anesthesiology with specialty qualifications in pain medicine and management. This is not a case involving experts with different areas of expertise; rather, this is a case in which experts who are all qualified in the same field and practice agree as to the definition of the standard of care and what it required. Moreover, they all reached the same conclusion that Dr. Bhambhani did not breach the applicable standard of care based on their independent reviews of the case, and based on their separate and unique education, training, and experience.

Additionally, Plaintiffs here rely heavily on *Moore v. BASF Corp.*, 2012 U.S. Dist. LEXIS 170411 (E.D. La. Nov. 30, 2012) in support of their contention that the Reports and testimony of the Experts should be excluded.[50] Prior to reaching its conclusion, the court in *Moore* explained that "[u]sing the opinions of another does not automatically render expert testimony inadmissible.

---

[48] *Id*. at 728.
[49] *Id*. at 729 (emphasis added).
[50] *See* Plaintiffs' Motion at 8–9.

*See e.g.*, *Legier & Matterne v. Great Plains Software, Inc.*, 2005 U.S. Dist. LEXIS 17868, at *4 (E.D. La. Aug. 3, 2005) (denying motion to strike testimony based in part on allegations that paragraph in expert report was plagiarized)."[51] The court in *Moore*, however, found that the expert at issue should be excluded because the calculations employed by the expert were "far too speculative to provide a reliable opinion."[52] Again, this case is wholly distinguishable from the facts underlying the instant matter. Unlike *Moore*, the Experts, in addition to their Reports, provided testimony explaining the bases of their opinions and the extensive qualifications that allow them to render their opinions.[53] Furthermore, the Experts unequivocally established that the opinions contained in their Reports and deposition testimony were the product of considerable independent investigations and analyses.[54]

      In the cases cited by Plaintiffs in which certain experts were excluded, those experts were deemed to be "merely a mouthpiece for," "merely parroting," or "merely regurgitating" another expert's findings and conclusions, either without being qualified in the applicable specialty or without performing independent investigations and analyses prior to rendering their opinions. In the instant matter, the Experts are widely renowned as being the pillars of their practice areas and are unquestionably qualified to render the opinions they have provided. The Experts have testified at length that their opinions are the product of their independent review of the case and that they were unaware that others shared those same opinions. Moreover, despite hours of difficult questioning while being deposed by Plaintiffs' counsel, each of the Experts were able to defend their opinions with reliable reasoning. These Experts were certainly not just "mouthpieces" for someone else, and this fact was readily apparent during their depositions.

---

[51] *Moore*, 2012 U.S. Dist. LEXIS 170411, at *22.

[52] *Id*.

[53] *See, supra*, Section III.A.1.

[54] *See, supra,* Section III.A.2.

### B. Challenges to credibility are properly reserved for the fact-finder because the Experts are reliable.

"A review of case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule" and that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[55] As the First Circuit has explained:

> As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. *See Daubert*, 509 U.S. at 590, 596.[56]

In order to be submitted to the finder of fact, experts need only have reached their conclusions in a scientifically sound and methodologically reliable fashion. In the context of medical malpractice litigation, an expert's knowledge about the standard of care based upon his experience is generally a reasonable measure of reliability.[57]

As has been discussed at length, the Experts have undoubtedly demonstrated in their Reports and deposition testimony that their opinions as to the standard of care—and whether Dr. Bhambhani breached or complied with the standard of care—are based on their experience, knowledge, training, and education in the fields of anesthesiology and pain medicine and management. Thus, under *Daubert* and Rule 702 of the Federal Rules of Evidence, those opinions are reliable and, therefore, admissible. As such, Plaintiffs' challenge to the Experts' opinions is more accurately framed as an indictment on the weight and credibility that should be afforded by

---

[55] Advisory Committee's Notes on 2000 Amendment to Fed. R. Evid. 702 (citations omitted).

[56] *Ruiz-Troche*, 161 F.3d at 85 (emphasis added). *See also Santos v. Posadas De Puerto Rico Associates, Inc.*, 452 F.3d 59, 64 (1st Cir. 2006); *Milward v. Acuity Specialty Prods. Group, Inc.*, 639 F.3d 11, 22 (1st Cir. 2011); *United States v. Vargas*, 471 F.3d 255, 264 (1st Cir. 2006); *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005).

[57] *See, supra*, *Delgado*, 2016 WL 4742257, at *4 (explaining that an expert's knowledge about the standard of care based upon his experience is a more "reasonable measure" of reliability than some of the *Daubert* factors).

16

the finder of fact. Indeed, Plaintiffs even acknowledged in the deposition of Dr. Maine that their objection to the Reports and testimony of the Experts is one that is properly reserved for the fact-finder.[58]

### C. The Experts' opinions and testimony are not "needlessly cumulative" and therefore should not be excluded.

In a "last ditch" effort to exclude otherwise admissible testimony, Plaintiffs contend that the expert opinions should be excluded under Rule 403 of the Federal Rules of Evidence because the testimony, although relevant, is needlessly cumulative. This argument also fails.

The First Circuit has explained that Rule 403 does not give the Court discretion to exclude relevant evidence *unless* the balance is significantly tipped in favor of exclusion:

> The phrasing of Rule 403 makes it clear that the discretion to exclude does not arise when the balance between the probative worth and the countervailing factors is debatable; there must be significant tipping of the scales against the evidentiary worth of the proffered evidence.[59]

Accordingly, in determining whether to exclude evidence under Rule 403 on grounds that it is needlessly cumulative, the question is "whether the evidence on one side is so full that no jury that rejected it would be likely to change its mind because of the introduction of the proffered evidence."[60]

The basis of Plaintiffs' argument is that the Experts will "submit indistinguishable opinions" and that those opinions will "unnecessarily prolong the trial and cause Plaintiffs and this Court to incur avoidable costs."[61] As a preliminary matter, it is critical to note that the Experts' have differing backgrounds, experiences, and practices despite being in the pain medicine

---

[58] *See* **Exhibit 9** at 130:3–131:7.

[59] *United States v. Devin*, 918 F.2d 280, 286 (1st Cir. 1990).

[60] 22 Wright & Graham, Federal Practice & Procedure § 5220 at 306 (1st ed. 1978).

[61] *See* Plaintiffs' Motion at 20.

specialty. Nonetheless, they all have well-reasoned opinions as to why Dr. Bhambhani complied with the standard of care. Even assuming *arguendo* that the expert testimony was similar, Plaintiffs' argument that they should be excluded under Rule 403 still fails. A finding as to negligence in the instant matter does not involve a rigid, formulaic calculation to determine whether the Box Hill Defendants acted reasonably; rather, a determination as to the standard of care in medical malpractice cases necessarily involves testimony from multiple experts in order to determine how a reasonably prudent physician would have acted in circumstances similar to those faced by Dr. Bhambhani. Accordingly, the Experts' testimony is extremely probative—if not dispositive—as to the standard of care by which Dr. Bhambhani should be judged.

Plaintiffs' alternate request that this Court limit the introduction to only one expert is also without merit. Testimony is not "needlessly cumulative" for purposes of Rule 403, and therefore subject to potential exclusion, merely because experts rely on the same underlying facts in performing their distinct analyses and in formulating distinct deposition testimony.[62] To limit the presentation of expert standard of care testimony to one expert would unfairly and unjustifiably prejudice the Box Hill Defendants, while also leading the jury to believe that only one expert was able to defend the claims against the Box Hill Defendants. Moreover, in the context of litigation involving the "standard of care" in medical malpractice cases, it is critical that the Box Hill Defendants submit multiple experts in order to demonstrate that the practices employed by Dr. Bhambhani were consistent with those employed by similarly situated and reasonably prudent physicians in her field of practice.

---

[62] *See, e.g.*, *Price v. Wolford*, 2008 WL 2570952, at *1 (W.D. Okla. June 24, 2008) (denying exclusion of two experts as cumulative even where the experts were "specialists in the same field... and will be testifying regarding the same issues"); *Olson v. Ford Motor Co.*, 411 F. Supp. 2d 1149, 1157 (D. N.D. 2006) (denying motion to exclude experts on both Rule 702 and 403 grounds, noting that "[c]umulative evidence is not bad per se; it is the 'needless presentation' that is to be avoided").

At the core of Plaintiffs' claims against the Box Hill Defendants is their stance that **no** reasonably prudent physician would act in the same manner as the Box Hill Defendants. Based on this assertion, alone, the probative value of demonstrating that multiple experts—including experts who are widely renowned as being the pillars of this practice area—disagree with Plaintiffs' claims is certainly not "substantially outweighed" by any purported prejudice stemming from presenting such testimony.

Plaintiffs have failed to even remotely demonstrate that the standard of care opinions offered by the Experts are needlessly cumulative, much less that the purported "cumulative" nature of their opinions "substantially outweigh" their probative value. This Court should observe the general rule that the balance under Rule 403 should be struck in favor of admission of evidence,[63] and the Experts' testimony should not be excluded.

### D.  Striking expert testimony is improper and would be draconian

The First Circuit has maintained that it is improper to strike expert testimony where that testimony should come as no surprise in view of the expert's disclosures.[64] Accordingly, the draconian remedy of exclusion is typically exercised only where there is a bad faith failure to comply with discovery obligations and that failure results in serious and incurable prejudice to the other party.[65] In the instant matter, Plaintiffs are not able to point to any serious or incurable prejudice, nor can they feign surprise of the Experts' testimony given the fact that they were in possession of the Reports for approximately four months prior to the first expert deposition.

---

[63] *See Dente v. Riddell, Inc.*, 664 F.2d 1, 6 (1st Cir. 1982).

[64] *See Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004) (finding that a magistrate just did not abuse discretion where he refused to strike part of an affidavit that the moving party was on notice from prior expert report); *Thibeault v. Square D. Co.*, 960 F.2d 239, 245 (1st Cir. 1992) (the "focus of a preclusion inquiry is mainly on surprise and prejudice").

[65] *See* 7 James Wm. Moore et al., Moore's Federal Practice § 37.60[2][b] at 37-120 (3d ed. 2004) ("many judges are reluctant to exclude evidence that is important to the merits of the case without a showing of substantial and largely irremediable prejudice, as well as bad faith, willfulness or substantial fault") (collecting cases).

Excluding the Experts would likely be dispositive as to Plaintiffs' claims of medical negligence in this matter.[66] Indeed, the draconian nature of excluding expert reports and testimony was highlighted in *Cholakyan*, *supra*, a case upon which Plaintiffs relied heavily in their Motion.[67]

Plaintiffs are unable to demonstrate that admitting the Experts' Reports and testimony would result in any "serious and incurable prejudice." Additionally, Plaintiffs cannot demonstrate any irremediable prejudice since they are fully aware of the opinions held by the Experts given their detailed exploration into those opinions during the depositions and the detailed reasoning the Experts provided in their depositions in support of their opinions. Accordingly, the draconian punishment of exclusion is inappropriate in this matter and this Court should refuse to strike the expert reports and/or preclude the experts from testifying at trial.

## IV.   CONCLUSION

WHEREFORE, the Box Hill Defendants respectfully request that this Court deny Plaintiffs' Motion to Strike the Reports and Exclude Testimony by Steven Cohen, M.D., Thomas M. Larkin, M.D., Laxmaiah Manchikanti, M.D., and David Maine, M.D. [Dkt. 3462].

[SECTION INTENTIONALLY LEFT BLANK]

---

[66] *See Rodriguez v. Clarke*, 400 Md. 39 (2007) (affirming the grant of summary judgment based on failure to adduce expert testimony on the standard of care); *Global ADR, Inc. v. City of Hammond*, 2004 WL 1576674, *3 (E.D. La. 2004) (refusing to strike expert witness because it would severely impact plaintiff's case).

[67] *Cholakyan*, 281 FRD at 544–45 ("*Gray v. United States*, 2007 WL 4644736, *8 (S.D. Cal. Mar. 17, 2007) ("Ms. Hyland[ ] ... states that she considered all of the input and also considered information from the San Diego County Medical Society and from a compendium of physician compensation studies. In light of Ms. Hyland's indication that she has interviewed Dr. Gray, reviewed medical records, as well as consulted with search firms, the Court declines to, at this time, take the drastic measure of excluding her report and testimony")).

Respectfully submitted,

/s/ Catherine W. Steiner
Catherine W. Steiner
Gregory K. Kirby
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland  21204
(410) 938-8800
***Attorneys for Box Hill Surgery Center, L.L.C.,***
***Ritu T. Bhambhani, M.D., and Ritu T.***
***Bhambhani, M.D., L.L.C.***

## REQUEST FOR HEARING

Box Hill Defendants respectfully request a hearing on the issues raised in their Opposition to Plaintiffs' Motion to Strike the Reports and to Exclude Testimony by Steven Cohen, M.D., Thomas Larkin, M.D., Laxamaiah Manchikanti, M.D., and David Maine, M.D. as Expert Witnesses for the Box Hill Defendants.

/s/ Catherine W. Steiner
Catherine W. Steiner, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 5th day of March, 2018, a copy of the foregoing was electronically filed in the United States District Court for the District of Massachusetts and electronically served upon counsel of record through the Court's CM/ECF system.

/s/ Catherine W. Steiner
Catherine W. Steiner, Esq.