```
                                                    Page 1

 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2              DOCKET NO. 1:13-MD-2419 (RWZ)
 3          IN RE: NEW ENGLAND COMPOUNDING
                  PHARMACY, INC. PRODUCTS
 4                  LIABILITY LITIGATION
 5
                 THIS DOCUMENT RELATES TO:
 6
         ARMETTA, ET AL. V. BOX HILL SURGERY CENTER,
 7                      LLC, ET AL.
                  NO. 1:14-CV-14022-RWZ
 8
          BOWMAN, ET AL. V. BOX HILL SURGERY CENTER,
 9                      LLC, ET AL.
                  NO. 1:14-CV-14028-RWZ
10
           DAVIS, ET AL. V. BOX HILL SURGERY CENTER,
11                      LLC, ET AL.
                  NO. 1:14-CV-14033-RWZ
12
         DREISCH, ET AL. V. BOX HILL SURGERY CENTER,
13                      LLC, ET AL.
                  NO. 1:14-CV-14029-RWZ
14
        FARTHING, ET AL. V. BOX HILL SURGERY CENTER,
15                      LLC, ET AL.
                  NO. 1:14-CV-14036-RWZ
16
           KASHI, ET AL. V. BOX HILL SURGERY CENTER,
17                      LLC, ET AL.
                  NO. 1:14-CV-14026-RWZ
18
          TORBECK, ET AL. BOX HILL SURGERY CENTER,
19                      LLC, ET AL.
                  NO. 1:14-CV-14023-RWZ
20
           HANDY, ET AL. V. BOX HILL SURGERY CENTER,
21                      LLC, ET AL.
                  NO. 1:14-CV-14019-RWZ
22
23
24   DEPONENT:   LAXMAIAH MANCHIKANTI, M.D.
     DATE:       FEBRUARY 16, 2017
25   REPORTER:   CHELSEA SEVILLA-LOZADA
```

EXHIBIT 6

```
 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4   JAY D. MILLER
 5   SILVIO TRENTALANGE
 6   LAW OFFICES OF PETER G. ANGELOS, P.C.
 7   100 NORTH CHARLES STREET, 22ND FLOOR
 8   BALTIMORE, MARYLAND 21201
 9   TELEPHONE NO.: (410) 649-2000
10   E-MAIL: JMILLER@LAWPGA.COM
11
12   AND
13
14   HARRY M. ROTH
15   COHEN PLACITELLA & ROTH, P.C.
16   201 MARKET STREET, SUITE 2900
17   PHILADELPHIA, PENNSYLVANIA 19103
18   TELEPHONE NO.: (215) 567-3500
19   E-MAIL: HROTH@CPRLAW.COM
20
21
22
23
24
25
```

```
 1                APPEARANCES (CONTINUED)
 2
 3   ON BEHALF OF THE DEFENDANT, BOX HILL SURGERY CENTER:
 4   GREGORY K. KIRBY
 5   PESSIN KATZ LAW, P.A.
 6   901 DULANEY VALLEY ROAD, SUITE 500
 7   TOWSON, MARYLAND 21204
 8   TELEPHONE NO.: (410) 938-8800
 9   E-MAIL: GKIRBY@PKLAW.COM
10
11   ON BEHALF OF THE DEFENDANT, SPECIALTY SURGERY CENTER:
12   ASHLEY GENO
13   BREWE, KRAUSE, BROOKS & CHASTIN, PLLC
14   611 COMMERCE STREET, SUITE 2600
15   NASHVILLE, TENNESSEE 37203
16   TELEPHONE NO.: (615) 256-8787
17   E-MAIL: AGENO@BKBLAW.COM
18
19
20
21
22
23
24
25
```

1  STIPULATION

3  The deposition of LAXMAIAH MANCHIKANTI, M.D. taken at
4  THE PAIN CENTER, 2831 LONE OAK ROAD, PADUCAH, KENTUCKY
5  42003 on THURSDAY, the 16TH day of FEBRUARY, 2017 at
6  approximately 10:00 A.M. CST; said deposition was taken
7  pursuant to the FEDERAL Rules of Civil Procedure. It is
8  agreed that CHELSEA SEVILLA-LOZADA, being a Notary
9  Public and Court Reporter for the State of Kentucky, may
10 swear the witness.

Page 74

1  Q  And in that book, don't you indicate that it's
2  very important to put down the specific drug that's
3  being used by the doctor?
4  A  That's correct.
5  Q  So that if you're really not using Depo-
6  Medrol, but rather a compounded drug, shouldn't Dr.
7  Bhambhani have indicated that in her patient's charts,
8  rather than writing Depo-Medrol?
9     MR. KIRBY: Objection. Go ahead.
10 A  Well, she's -- I'm saying specific drug is
11 that you are using lidocaine, you are using Depo-
12 Medrol. Those are the issues. You use
13 methylprednisolone. I'm not saying that you have to use
14 a generic name or a pharmacological name, or a brand
15 name, so that issue was not an issue at that time, and I
16 have routinely dictated that if I use a Depo-Medrol,
17 even though it was from NECC, or from another
18 compounder, I called it Depo-Medrol, only the difference
19 was that if I use a preservative free, I would say it is
20 preservative free.
21 Q  You issued a 24-page report at your last --
22 A  A 24-page report on what?
23 Q  Your expert report in this case.
24 A  Oh, in this case. Yes, sir. I do. I have
25 that right here.

Page 75

1  Q  I've got 24 typed pages that they're first
2  person. It is my opinion, it is my belief. It is
3  written in the first person. Did you, or someone in
4  your office, sit down and type out these 24 pages?
5     MR. KIRBY: Objection to form. It's privileged
6     protected information in Rule 26.
7     MR. MILLER: You can answer.
8  BY MR. MILLER:
9  A  Well, we had both of us, the attorney, Mr.
10 Kirby and I, discussed these issues. I reviewed the
11 documentation first, and then we discussed with this and
12 jointly we came up with this report.
13 Q  Oh, who typed it?
14    MR. KIRBY: Objection to form. Drafting is not
15    discoverable.
16 Q  I didn't ask you who drafted it. I said who
17 typed it.
18    MR. KIRBY: Yeah. Same objection. If you
19    recall.
20    MR. MILLER: Why don't you suggest to him that
21    he not recall.
22 BY MR. MILLER:
23 Q  In court, every question is if you can recall,
24 Doctor, if you can remember. Do you remember typing a
25 24-page report?

Page 76

1  A  I'm not a very good typist. I'm extremely
2  poor, my technical skills are not very good in typing.
3  I'm a good physician, but not a typist. I have
4  transcriptionists, they type if I dictate. Here, we
5  prepared this document together with the discussions, so
6  I believe his office may have typed it.
7  Q  Okay. So this 28 pages was typed at Mr.
8  Kirby's office and sent to you, and then you signed it?
9     MR. KIRBY: Objection to form. Again, it's
10    protected information. Privileged information.
11 A  No. As I said, we -- I reviewed the
12 documentation first, then we had a meeting. This was
13 about two hours or so. We discussed all these issues.
14 We went one by one, and he started writing down, I'm
15 very bad at shorthand either, so after that, then it was
16 typed and it came to me. I made corrections, and then
17 the final document was produced.
18 Q  Have you reviewed the reports of any other
19 pain management physicians in this case?
20 A  I have reviewed the report of Dr. Saberski,
21 Saberski or Saberski, whatever.
22    MR. KIRBY: Saberski.
23 A  Saberski, no, I can't say it. Saberski.
24 Saberski.
25 Q  Box Hill, you read Dr. Main's (phonetic)

Page 77

1  report?
2  A  No. Dr. Main, who is that? Is that in there?
3  I don't recall.
4  Q  He was an expert also hired by Box Hill.
5  A  No. I have not reviewed any of their expert's
6  reports. I have only reviewed your expert's reports to
7  the best of my knowledge.
8  Q  But you are -- are you confident that all of
9  the information in here that says that it's my opinion,
10 that they are truly your opinions?
11 A  Yes, sir. I am.
12 Q  If you could go to page 4?
13 A  Yes.
14 Q  Section B, medication purchasing by the Box
15 Hill defendants.
16 A  Yes.
17 Q  Apparently, Dr. Main has a very -- medication
18 purchased by the Box Hill defendant, as well.
19 A  I didn't understand your prior comment. I'm
20 looking at page 4, Section B, medication purchasing by
21 the Box Hill defendants, and you made some other comment
22 after that. I didn't hear that.
23 Q  I said did Dr. Main, another expert in this
24 case, as a Section B with the same exact title, matter
25 of fact, almost the entire report is the same as yours,

Page 78

1 but we'll get to that.
2     MR. KIRBY: Move to strike. No question. Go
3 ahead.
4   A  Oh, well --
5     MR. KIRBY: There's no question. Just wait.
6   A  Next question.
7   Q  Go down to the second paragraph that begins
8 "Box Hill ordered." Do you see that?
9   A  Yes.
10   Q  This is a prescription order form provided by
11 NECC. Have you actually reviewed the actual
12 prescription order forms that Dr. Bhambhani used in this
13 case?
14   A  Yes. I have.
15   Q  And are you aware that she was sending names
16 that were simply on a schedule that she had seen. Did
17 you see that?
18     MR. KIRBY: Objection to form. You can answer.
19   A  Yeah. I saw that she sent the schedules. I
20 don't understand what the question is. I saw that she
21 was sending the schedules, and some of them had the
22 names, but sometimes she just sent the see attached, the
23 schedule.
24   Q  Right. But the schedule she is sending is a
25 schedule of patients that she has already treated, so

Page 79

1 you would treat 12 patients on October 12th, October the
2 13th, she filled out a prescription order form and
3 attaches that sheet, which is merely a list of names of
4 patients she saw the previous day.
5     MR. KIRBY: Objection to form. Is there a
6 question?
7     MR. MILLER: I'm getting to it.
8     MR. KIRBY: Okay.
9 BY MR. MILLER:
10   Q  Is it your opinion that that's appropriate?
11   A  Well, if she is going to use the -- if she's
12 going to inject the steroids in the same patients again,
13 Yes. It is appropriate.
14   Q  Okay. If she's not, then it would not be
15 appropriate, correct?
16     MR. KIRBY: Objection to form.
17   A  At least she was under the belief that they
18 were coming back for the injections, that's why they
19 were on the list, and that is the reason she provided
20 the list. That is my interpretation of what I
21 understood from her deposition, as well as looking at
22 the forms.
23   Q  Are you familiar with the regulation that
24 requires single prescriptions for individual patients?
25     MR. KIRBY: Objection. Where is it -- what are

Page 80

1 you talking about? States, federal, I don't know,
2 what are you talking about?
3 BY MR. MILLER:
4   Q  Well, I can give you a list of them. Are you
5 familiar with the Maryland Law co-wire (phonetic) that
6 requires single prescriptions for individual patients?
7   A  Yes. I have seen that, but that is meant for
8 the pharmacist and it is -- it did not come from
9 Maryland Board of Medical Licensure. Also, it is for
10 controlled substances. You just stated controlled
11 substances. So this is not a controlled substance.
12   Q  Well, under Massachusetts definition, all
13 drugs are controlled substances, are they not?
14     MR. KIRBY: Objection.
15   A  I'm not aware of that.
16   Q  Are you aware of the Massachusetts statute
17 that requires single prescription -- individual
18 prescription for individual patients?
19     MR. KIRBY: Objection to form.
20   A  Again, I have seen that several places in this
21 documentation when I was going through, but these are
22 all pharmacy directions. None of them is related from
23 the Board of Medical Licensure. It is not controlling
24 the practice of medicine. If that is the case, many of
25 the doctors are not using that regulation as you call

Page 81

1 it. I'm not sure if it is a regulation, or guideline,
2 or policy. In any case, we have done the same thing and
3 the majority of physicians I know of who have ordered
4 from NECC, uses the same format. In the beginning, we
5 didn't even give patient's names, and later on, they
6 asked us to give us the names of the patients we will be
7 using, so we will just routinely send the schedules and
8 or we send the names of the patients. We -- of course,
9 we send only the patients where they will be receiving
10 the epidural injections, or that will be receiving the
11 steroids.
12   Q  Can you go to page -- I mean Exhibit number
13 13? It's a few pages in, Exhibit 13. It's a
14 prescription order form.
15     MR. KIRBY: We're working on it. Hold on one
16 second. He has it in front of him if you -- just so
17 you know.
18 BY MR. MILLER:
19   Q  Okay. So in the first column where it says
20 "Name of patient," and it says "see attachment of
21 patient names." Do you see that?
22   A  Yes.
23   Q  The next one says "One patient five vials." Do
24 you see that?
25   A  Yes.

Page 94

1 and started looking there, she could find it, but she
2 had no reason to do that.
3 Q You don't think that the doctor has knowledge
4 that a compounding pharmacy they're about to use has
5 been warned by the FDA, and then had instances of other
6 outbreaks?
7 MR. KIRBY: Hey, Jay, can you -- can you please
8 read that back. It didn't all come through.
9 MR. MILLER: Okay.
10 MR. ROTH: Jay, now nothing's coming through.
11 MR. MILLER: My brain went dead. I was trying
12 to --
13 MR. ROTH: Oh, okay. I wasn't sure if it was
14 hardware or software.
15 MR. MILLER: Which one am I?
16 BY MR. MILLER:
17 Q If Dr. Bhambhani was aware prior to the
18 outbreak that the compounder she was using had some
19 problems. They had an outbreak before. Just they'd
20 been warned by the FDA about their practices, they had
21 cut corners, would it have been reasonable for her to
22 decide, maybe I shouldn't use that compounder if she had
23 that information?
24 MR. KIRBY: Objection to form, foundation,
25 hypothetical nature of the question, but, go ahead.

Page 95

1 A Well, the question is hypothetical,
2 definitely, and, first of all, she did not have any
3 problems to reason, but FDA had problems with it in your
4 situation, what you are saying, but they did not close
5 it down. Nobody -- a consumer would not know there is a
6 major issue if it is not closed down. If you go to a
7 restaurant to eat, you are not going to look at the
8 health survey each time you look at it. If it is open,
9 you think that it is meeting the criteria, that is --
10 the issue is, and if they had a problem five days ago
11 and close it down for two days, and then reopen after
12 meeting the criteria, you still eat there. It just
13 happened to me the other day. I was kind of surprised
14 to read that. That is how this is. As long as if it is
15 functioning, and many of us, all of us, none of us knew,
16 or most of us did not know the difference between
17 manufacturing and compounding, and we went on, and when
18 you keep saying outbreak, what is the nature of the
19 outbreak. How many patients were involved? So we have
20 recalls all the time, so once the recall is over, we
21 start using them in the different batches. That is a
22 common phenomenon in practice of medicine or practice of
23 anything.
24 Q If you heard today that a compounding pharmacy
25 you use on a regular basis had a death, one death,

Page 96

1 because of a fungal release, would that concern you
2 enough to maybe think about using a different
3 compounder?
4 MR. KIRBY: You said today, right?
5 MR. MILLER: Yes.
6 Q You go along back to your office tomorrow and
7 you hear that.
8 A Well, I'm not using compounders today, so that
9 will be a purely hypothetical nature, but let us say if
10 we -- if I did hear this before 2012, again, I will look
11 into that. They -- they recovered from whatever the
12 problem was. They recalled that, and they went on,
13 because they are still in business. If that was a major
14 nature of it, why did they not close them down. Now, in
15 2012, after this happened, they have closed it down.
16 NECC is not in business any longer, but there was
17 nothing like that happened before. We get IV fluids
18 recalled all the time, cardiopathic solutions were
19 recalled, but people are still ordering from them,
20 because that batch is over, and the recall is done.
21 Q Doctor, you would agree that getting a bad
22 meal, and getting a bacterial meningitis from a drug are
23 two different results, wouldn't you?
24 MR. KIRBY: Objection to form. You can answer.
25 A Well, they are not the same. I was too

Page 97

1 simplistic in saying that if you don't understand that
2 if -- let us say there is a major issue with my
3 practice, a government authority comes and says that I
4 have a major problem with my practice, they would close
5 down my practice. I'm not going to be able to see the
6 patients anymore. They suspend my license. I won't be
7 able to see the patients anymore, so if I'm still
8 practicing, that means I'm either trying to correct it,
9 or I have corrected it. FDA is a responsible
10 organization. We think the CDC and FDA are these great
11 organizations. They are very responsible. They will
12 keep the public safe, and they keep them under check so
13 if FDA has not closed down these facilities, that means
14 that whatever the deficiency they had, it has been
15 corrected. That is the natural assumption.
16 Q Do you use a smart phone and you can go on the
17 Internet on your phone?
18 A I don't use my phone for Internet. I use
19 either an iPad or a computer.
20 Q Have you ever in the past ten years gone on
21 your iPad or computer and looked at the reviews of a
22 restaurant to see what other people think or how good
23 they are?
24 A I don't do that, but my children always do
25 that. They always keep telling me that, "Dad, don't eat

Page 98

1 there."
2  Q  Okay. But they go on and they do a quick
3 research to see that it's a good restaurant, right?
4     MR. KIRBY: Objection to form, foundation.
5  A  Yes. They do that, but --
6     MR. KIRBY: Hold on. Hold on. He's not
7 finished. Go ahead.
8  A  Well, they do that and they tell me, while if
9 I'm taking them out to dinner, I do follow their
10 instructions, because they run my life, but if I'm going
11 on my own, I do make my own decision and sometimes when
12 they say there are bad reviews on it, I still go there
13 if somebody else tells me it is a good restaurant. You
14 have to look at yourself, and the reviews are nothing.
15 Everybody individual opinion, there is no checks or
16 balances. Here, FDA is the one which is looking at and
17 State Board of Pharmacies are looking at it. Even with
18 all these checks and balances, NECC is still in
19 business. That essentially gives us the confidence that
20 it is doing fine, whatever the deficiency they had, they
21 corrected it. Even for a surgery center, if you have a
22 major deficiency, we -- they close it down. The state
23 will close down your operation of your surgery center,
24 and after you correct them, you are able to open it.
25 That doesn't mean that you can't go back and have

Page 99

1 surgery there. That happens to the hospitals all the
2 time.
3  Q  Well, Doctor, that was quite a long answer to
4 whether you ever reviewed a restaurant, but okay. I'm
5 with you. Go to page 8 of your report for me, please.
6 It's -- at the top, it's continued from the previous
7 page, but I want to pick up three words in where it
8 begins "If or when," do you see that?
9  A  Yes.
10  Q  "She obtained materials from NECC, she saw or
11 would have seen representations by NECC that" -- and
12 then you list, that they were compliant, that
13 medications were formulated by properly licensed
14 pharmacist extensively trained in aseptic compounding,
15 that NECC used only USD quality ingredients in
16 formulating medications, that NECC utilize a state of
17 the art compounding facility and equipment, and you go
18 on. Where did you get your information that Dr.
19 Bhambhani saw all those representations by NECC?
20     MR. KIRBY: Objection. That's not what that's
21 saying.
22  A  Oh, in fact, I don't think she said that she
23 has seen it. I have seen this information in reviewing
24 the documentation on this, so I would say that if she
25 has seen this, the information is, like a manufacturer,

Page 100

1 everything is -- they are complying with everything, so
2 she would -- she would have not had any reason to worry
3 about NECC. That is what I'm trying to get at. If I
4 misled you, I'm sorry.
5  Q  Okay. So you would agree with me you have no
6 reason to say she saw any representation that they only
7 used properly licensed pharmacists extensively trained
8 in aseptic compounding. You don't know that, do you?
9     MR. KIRBY: Objection. I'm going to ask the
10 witness to step out of the room for a second, okay?
11 You can just step right outside. Hey, Jay, the
12 witness is outside of the room. I didn't want to
13 make a long speaking objection, but I think it's
14 unfair, the question you're asking because you read
15 this -- you read the sentence and it said if or
16 when, so if or when she obtained materials from
17 NECC, she would have seen these representations.
18 And now you're saying, you're suggesting that he's
19 trying to misrepresent to you, and in his report,
20 that he -- that she definitely saw these documents
21 and that's -- you know, and would've, you know, seen
22 those representations made of them. This report
23 specifically says -- puts that in there. If she had
24 obtained, if or when, but, you know, if she had
25 obtained materials from NECC, she would have seen.

Page 101

1 So I'm just -- I think you're mischaracterizing the
2 report, and I don't think it's fair, so I just
3 wanted to put that on the record.
4     MR. MILLER: I appreciate that, but that's why
5 I -- I was going to go through each one, and my
6 question was you can't say that she saw anything.
7 There's no evidence indicates that she saw some
8 representation by a properly licensed pharmacy.
9     MR. KIRBY: Sure. And I appreciate that, and
10 it's your deposition. I just wanted the record to
11 reflect that it -- you know, he's not saying that
12 she definitely saw, and I think he may have
13 clarified that, but I just didn't -- I didn't kind
14 of like that misrepresentation, but that's fine. We
15 can bring the doctor back in unless you have
16 anything further.
17     MR. ROTH: I'm just going to chime in, I was
18 listening and certainly appreciate your objection
19 the way you handled it. I didn't hear -- I didn't
20 hear the question that way, as challenging the
21 doctor for making a misrepresentation, nor did I
22 think the question misrepresented what the report
23 said. I just didn't want to leave that hanging out
24 there, either. We'll all read the transcript, but,
25 you know, again appreciate the way that you handled

26 (Pages 98 - 101)

Page 102

1  this objection.
2      MR. KIRBY: Okay. Thank you. I'll call him
3  back in. By the way, while he's out, what's the --
4  how much longer do you think you have, Jay, because
5  I know then Harry probably has some questions, too.
6      MR. MILLER: I've got to stop probably at
7  around quarter of 3:00.
8      MR. MILLER: Meaning the deposition has to be
9  done by then?
10     MR. MILLER: No. I'm going to -- I'll let --
11 I'll stop questioning, Glenn will take over and let
12 Harry do his questioning, but we'll be done our part
13 by quarter of 3:00.
14     MR. KIRBY: Okay. Harry, do you think -- do
15 you think with your questioning, I don't know how
16 much you have, that we could be done by 4:30? Wait,
17 wait, wait. So we're on -- we're in separate time -
18 - this can be off the record, by the way.
19     (OFF THE RECORD)
20 BY MR. MILLER:
21  Q  Doctor, I want to clarify this paragraph that
22 begins "If or when she obtained materials from NECC, she
23 saw or would have seen representations by NECC," and
24 then there's about seven lines of different
25 representations. Isn't it true that you now know that

Page 103

1  Dr. Bhambhani didn't see any representations from NECC,
2  correct?
3   A  That's correct.
4   Q  So his opinion, then, really isn't applicable
5  anymore. I mean, there was no reassurance from any
6  representation, because we know she didn't get any,
7  correct?
8      MR. KIRBY: Objection to form.
9   A  Yes. That's correct, she has not seen any of
10 this.
11  Q  Okay. Is your opinion that Dr. Bhambhani had
12 no inclination to do any investigation, however limited,
13 of NECC prior to using them at Box Hill based in part
14 because she had had this prior experience with NECC at
15 her prior employer?
16     MR. KIRBY: Objection to form. You can answer.
17  A  Well, not in part. She had the prior
18 experience of her own, and that doesn't have anything to
19 do with the prior employer. The prior employer was the
20 one who initiated -- in any case, she was practicing on
21 her own, whether she was employed by someone else or
22 that -- that suffices to make orders from the same
23 entity where you are getting them from. That is
24 satisfactory. That is standard of practice.
25  Q  Well, continuing with that propriety we were

Page 104

1  just talking about, at the very end reinforces the
2  propriety of Box Hill's due diligence prior to
3  purchasing from NECC.
4   A  Which one is that?
5      MR. KIRBY: What's the question?
6   A  What page are we talking about?
7   Q  Page 8, the same paragraph we were just
8  talking about, the very last line of that paragraph.
9   A  Oh, okay.
10  Q  Reinforces the propriety of Box Hill's due
11 diligence prior to purchasing from NECC. Due -- what
12 due diligence did Dr. Bhambhani exercise?
13     MR. KIRBY: Objection to form, foundation, and
14 the commentary before the question.
15  A  Well, if you are reading -- if I'm reading
16 that sentence that is related to your question, there
17 were no guidelines from any major medical associations,
18 that is true, there were no guidelines for her to do a
19 due diligence, or for -- by her surgery center prior to
20 purchasing medication compounded such as NECC.
21  Q  My question is what due diligence did Dr.
22 Bhambhani do? She did nothing, right?
23     MR. KIRBY: Objection. Asked and answered.
24  A  Well, her own experience is the due diligence
25 to a great extent. Then she did not do any additional

Page 105

1  due diligence and that is what we are saying. I am
2  saying, that there are no guidelines to do such thing,
3  for example, we did not do any due diligence either
4  afterwards, or before, so that is the standard practice
5  among surgery centers, and offices, and by physician
6  practices.
7   Q  So if we take away her prior employment
8  experience, I want you to assume hypothetically that Dr.
9  Bhambhani started practice on her own in 2007, has never
10 heard of NECC, and says "I've got to purchase a
11 compounded drug," opens a phone book up and picks NECC,
12 do your testimony and your opinions that's all she's
13 required to do, if they're a licensed compounding
14 pharmacy, she's met the standard of care?
15     MR. KIRBY: Objection to form, foundation, the
16 hypothetical nature, and facts not in evidence. You
17 can answer.
18  A  Well, as you said, it is completely
19 hypothetical, but if that situation arises, if she opens
20 the telephone book, she will not find NECC there. The
21 way she will find where to get these drugs is, again,
22 she has to go back to her previous employer or where she
23 was trained, or a senior or a friend, or somebody else
24 and find out about the information, and then if she is
25 not satisfied with that information, then she may check

27 (Pages 102 - 105)

Page 170

1 mean, he's not going to comment on the lawsuits
2 filed and dismissed and why they were dismissed,
3 things like that. I mean, that's not in his -- in
4 his purview as a medical expert.
5     MR. ROTH: Okay.
6 BY MR. ROTH:
7   Q   So let me ask you to turn to page 7. Again,
8 I'm trying to move through this quickly, because my
9 timing is -- because I'm really trying to get back at
10 it, and I hope to be done. Just going through my notes
11 in sort of random order here. You talk about your
12 testimony at trial, including a discussion and
13 explanation for medication purposes. And I want to
14 focus on number 2, which is "Consideration given to
15 supply and demand of a particular medication." Doctor,
16 do you have any information regarding the availability
17 to Dr. Bhambhani, and Box Hill, about MPA that was made
18 by a manufacturer, as opposed to a compound pharmacy?
19   A   No, I do not.
20   Q   Okay. And do you have any information that
21 Dr. Bhambhani -- actually, strike that. I think you
22 already testified. You have no information about any
23 representations made by NECC to Dr. Bhambhani, correct?
24   A   No, I do not. That is correct.
25     MR. ROTH: All right. All right. I think,

Page 171

1 unless someone tells me I'm not...
2     MR. KIRBY: Going once. Going twice.
3 BY MR. ROTH:
4   Q   Do you know whether or not compounding
5 pharmacies are permitted to -- by law to act as a
6 manufacturer?
7     MR. KIRBY: Objection to form. Foundation.
8   A   After 2012, I know that they -- they are not
9 permitted to act as a manufacturer.
10   Q   Separate and apart from whether you know, or
11 you knew, before 2012, were compounding pharmacies
12 permitted to act as manufacturers?
13     MR. KIRBY: Same objection.
14   A   No, they were not.
15     MR. KIRBY: And hey, Harry, I just want to put
16 on the record, can I get an objection, the same as I
17 had before to the extent that he's not an FDA
18 regulatory expert.
19     MR. ROTH: That's fine.
20     MR. KIRBY: Okay.  MR. ROTH: And if I
21 inartfully asked, I was -- I was trying to ask in
22 the context of his being a pain management
23 specialist who makes decisions and is expressing
24 opinions about information one needs to know before
25 ordering medications, and that really is for all

Page 172

1 other questions that I asked in that regard. Yeah,
2 I have no further questions.
3     MR. KIRBY: Glen, or, I guess, do you have any?
4 Are you good? (NO VERBAL ANSWER) Okay. Hey, Harry,
5 I have just a few, just probably a few questions.
6     MR. ROTH: Oh.
7     MR. KIRBY: A few minutes' worth of questions.
8     MR. ROTH: I do have one question, and I wanted
9 -- I apologize and if you have some questions,
10 that's fine.
11 BY MR. ROTH:
12   Q   Doctor, there is a list of exhibits, a list of
13 documents that was Exhibit 2, your report, and again,
14 I'm trying to accommodate Greg. Do you read and rely,
15 forming your opinions on all of those documents that are
16 listed in a report?
17   A   Well, initially, I looked over those, but
18 later on, they told me that this was limited to certain
19 documents and that they were trying to reduce the time I
20 spent on it. So certain documents I reviewed, they are
21 more two, three, four, five, six.
22     MR. KIRBY: He can read you which ones, I
23 think, he reviewed, but hey, let me just say this.
24 We didn't tell him that he had to limit his time in
25 reviewing documents at all. That was not -- that

Page 173

1 was not the case. I just want that to be clear, but
2 for example, and I explained this in the other
3 depositions, Harry, and I know you were busy, you
4 know, winning your case, but we sent a lot of
5 documents to a lot of different experts. Not all of
6 them, necessarily, were going to be relevant, but
7 I'm not the expert. So I didn't know which ones
8 might or might not be relevant. And so we sent a
9 large number of documents, but for example, you
10 know, the --
11     MR. ROTH: Well, before you -- before you go do
12 this, because I know you have questions you want to
13 ask.
14     MR. KIRBY: Sure.
15     MR. ROTH: We will -- we will send a letter
16 asking specifically which documents from Exhibit 2
17 the doctor relied upon in forming his opinion.
18     MR. KIRBY: Fair.
19     MR. ROTH: If that's okay?
20     MR. KIRBY: Fair enough, and also, we have here
21 with us, and we can just go ahead and mark them as
22 cumulative exhibits if you want, is some literature
23 and articles and recall notices and things with
24 regards to FDA registered entities. We have here --
25 we can mark that as --

Page 174

1 BY MR. ROTH:
2  Q  I'm not going to, you know -- look without
3 knowing what they are, I guess my initial question is,
4 Doctor, did you look at any of those or are any of those
5 documents that you relied upon that are not listed in
6 Exhibit 2 in forming the opinions you're going to offer
7 at trial?
8      MR. KIRBY: Okay. And it's literature, just so
9   you know, it's literature that we -- that --
10     MR. ROTH: I'm asking him a question.
11     MR. KIRBY: Oh, got you. Okay.
12     MR. ROTH: Sorry, Greg. I don't want to --
13  A  Well, I have looked over all these. It just
14 mainly shows all the recalls happening --
15 BY MR. ROTH:
16  Q  Yeah.
17  A  -- with multiple drugs.
18  Q  Okay.
19  A  And market withdrawals of Depo-Medrol and
20 those kinds of information.
21  Q  My question is more specific than that,
22 Doctor. Before --
23  A  I -- I have reviewed it, yes. Yes, sir.
24  Q  Sorry?
25  A  Your question --

Page 175

1  Q  Question for me?
2      MR. KIRBY: He said he has reviewed them. I'm
3   just repeating his answer.
4  Q  I know. I'm sorry, because I -- we're talking
5 over each other. Did you review those materials before
6 you prepared your report?
7  A  Before I prepared the report, I reviewed some
8 of them, but more recently, like, yesterday and day
9 before, I reviewed all of them.
10  Q  And the materials that are these exhibits that
11 we have not seen and that are not on the list, did you
12 pull those, or were those provided to you by counsel, by
13 Mr. Kirby, or someone in his office?
14  A  Some were provided by him, and some, I found
15 them myself.
16     MR. ROTH: Okay. So we're going to ask for a
17  list of what the doctor provided and what was
18  provided by counsel.
19     MR. KIRBY: Okay.
20 BY MR. ROTH:
21  Q  There are also a number of depositions that
22 are on Exhibit 2, did you read all of these deposition
23 transcripts?
24  A  Initially, I read a lot of them, and almost
25 all of them, but now, more recently, I have read some of

Page 176

1 them, and you were saying you were going to ask us for a
2 list, ask him for a list. But mainly I read the
3 deposition of Lori Zebrowski (phonetic) and David Chasen
4 (phonetic).
5  Q  Okay. All right.
6  A  And I read the deposition of Bhambhani.
7  Q  There are documents called "Depositions upon
8 written questions of clinics." Did you read those
9 before you prepared your report?
10  A  I have read several of them, but Dr. Bhambhani
11 and Box Hill Surgery Center, I have read them, yes.
12  Q  Okay. And those are deposition transcripts.
13 These are -- I'm referring to something different, which
14 is a series of questions that are written with typed
15 answers, and I want to know whether before you wrote
16 your report, you read these. I think they are listed in
17 Exhibit 2 as "Depositions, Rule 32." I'm sorry, "Rule
18 31." I'm looking right at it and said 32. Did you read
19 any of those? Faye Mentor, Donald Bartnik, Susan
20 Calhoun, Charlotte Rue, Diana Holt --
21  A  Yes.
22  Q  -- Laura Ross --
23  A  Yes, yes.
24  Q  -- Kimberly Mason --
25  A  Yes.

Page 177

1  Q  -- James Kathee, Noli, N-O-L-I, Dominguez,
2 D-O-M-I-N-G-U-E-Z, or Rhonda Proscia, P-R-O-S-C-I-A?
3  A  Yes, I --
4  Q  Do you have those?
5  A  I have read those -- read them before, but
6 more recently, I have read the -- in that section, I
7 have read some of them, not all of those.
8      MR. ROTH: That's all I have.
9      MR. KIRBY: Okay. Why don't we do this. I
10  think the doctor has to go to the bathroom. I'm
11  going to stay right here, but can we just -- can I
12  just get a few minutes to go through my notes and my
13  follow-up questions? I could probably knock out a
14  bunch of them, but that way he can go to the
15  bathroom and I can ask my questions. I can look
16  through my notes. Is that okay? Just a few,
17  literally a few minutes? I'm conscious of time,
18  so...
19     (OFF THE RECORD)
20     CROSS EXAMINATION
21 BY MR. KIRBY:
22  Q  Dr. Manchikanti, I just have some follow-up
23 questions from the questions that plaintiff's counsel
24 asked. You were questioned about informed consent
25 earlier. When obtaining informed consent, do you have

Page 194

1 Q But order the prescription -- that you order
2 the medication you were using for a particular patient,
3 correct?
4     MR. KIRBY: Objection to form.
5 A That's correct. But we still don't write
6 individual prescriptions for each patient, though. That
7 is one thing, and --
8 Q Well, if I gave -- if I gave a list of
9 patients as -- I read about it in a paper, and this is
10 not Dr. Bhambhani, and it is not you that had made-up
11 names, or the names of cartoon characters, as opposed to
12 real patients, that would give me an indication that I'm
13 dealing with a manufacturer, wouldn't it?
14     MR. KIRBY: Objection to form.
15 A Well, that would give me an indication that
16 they -- it is a fraudulent -- fraudulent entity, so...
17 Q That may be. Well, let's change -- let's
18 change it up a little bit. If I write -- if I give the
19 compounder names of patients, who I have not yet
20 determined need an epidural, would that be an indication
21 that I am dealing with a manufacturer, and not a
22 compounder?
23     MR. KIRBY: Objection to form.
24 A Again, that is not even an issue here. For
25 manufacturer, we don't give the names of the patients.

Page 195

1 We just order them, so...
2 Q Uh-huh. When you order from the compounder,
3 without giving any names, as you did for many years,
4 that then was an indication you were dealing with a
5 compounder -- I mean, with a manufacturer, correct?
6 A If I had then, such knowledge, yes. That
7 would be red flag to me, if I knew what I know today.
8 Q Well, you -- you knew -- you knew that you
9 were ordering from NECC, without giving any names,
10 because you were surprised to learn when they changed
11 their policy, right?
12 A That's correct.
13     MR. ROTH: Okay. I don't have any further
14 questions. Thank you.
15     MR. KIRBY: Thanks guys.
16     (DEPOSITION CONCLUDED AT 5:02 P.M.)

Page 196

1 CERTIFICATE OF REPORTER
2 COMMONWEALTH OF KENTUCKY AT LARGE
3
4 I do hereby certify that the witness in the foregoing
5 transcript was taken on the date, and at the time and
6 place set out on the Title page hereof by me after first
7 being duly sworn to testify the truth, the whole truth,
8 and nothing but the truth; and that the said matter was
9 recorded by me and then reduced to typewritten form
10 under my direction, and constitutes a true record of the
11 transcript as taken, all to the best of my skills and
12 ability. I certify that I am not a relative or employee
13 of either counsel, and that I am in no way interested
14 financially, directly or indirectly, in this action.
15
16
17
18
19
20
21
22 CHELSEA SEVILLA-LOZADA,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 06/16/2019
25 SUBMITTED ON: 02/20/2017