Page 1

1            UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3     ------------------------------------

      In Re:  NEW ENGLAND COMPOUNDING      :

4     pharmacy, Inc., Products             : MDL No. 2419

      Liability Litigation,                :

5                                          : Docket No.:

                                           : 1:13-md-2419

6     Box Hill Surgery Center, LLC,        :

      et al.                               :

7     ------------------------------------

8                                      Washington, D.C.

9                                      Friday, March 10, 2017

10    Videoconference Deposition of:

11               THOMAS M. LARKIN, M.D.

12    called for oral examination by counsel for

13    Plaintiffs, pursuant to notice, at Veritext Legal

14    Solutions, 1250 I Street, N.W., Suite 350,

15    Washington, D.C., before Felicia A. Newland, CSR, of

16    Veritext Legal Solutions, a Notary Public in and for

17    the District of Columbia, beginning at 1:15 p.m.,

18    when were present on behalf of the respective

19    parties:

20

21

22

EXHIBIT 7

1                    A P P E A R A N C E S
2                    *  *  *  *  *  *  *  *  *
3    On behalf of Plaintiffs:
4         GLENN E. MINTZER, ESQUIRE (via VTC)
5         Law Offices of Peter Angelos, P.C.
6         100 North Charles Street, 22nd Floor
7         Baltimore, MD 21201
8         gmintzer@lawpga.com
9         -- and --
10        MICHAEL COREN, ESQUIRE (via VTC)
11        HARRY M. ROTH, ESQUIRE (via VTC)
12        Cohen, Placitella & Roth, P.C.
13        2001 Market Street, Suite 2900
14        Philadelphia, PA   19103
15        mcoren@cprlaw.com
16
     On behalf of Defendants:
17
18        GREGORY K. KIRBY, ESQUIRE
19        Pessin Katz Law, P.A.
20        901 Dulaney Valley Road, Suite 500
21        Towson, MD 21204
22        gkirby@pklaw.com

Page 54

1  next number is.
2      (Larkin Deposition Exhibit Number 1627-3
3      marked for identification.)
4      MR. KIRBY: Glen, for purposes of
5  clarification, can we just use for the exhibit
6  numbers, if you say, "Larkin Exhibit 3," then we'll
7  just say 1627-3?
8      We're not going like 1, 2, 3, 4, 5, 6,
9  whatever you numbered it, we'll just stick with
10 that so that it's not confusing, since it does
11 say Larkin Exhibit 3 on it.
12     Does that make sense?
13     MR. MINTZER: I'm trying best not to run
14 a foul of the MBL numbers, because if there's
15 another deposition after this, I'm going to report
16 back to somebody, probably, this was the last
17 number that we used, so if they have a deposition
18 in a Tennessee case, that they can pick up and it's
19 sequential.
20     MR. KIRBY: And I don't want to belabor
21 the point, but nobody will ever use the 1627 number
22 again. So whether it's -2, or -3, or -40, it

Page 55

1  shouldn't matter.
2      MR. MINTZER: Do you think that complies
3  with whatever the practice is?
4      I'm fine with that. I'm fine with
5  using my own numbers.
6      MR. KIRBY: Okay. Sounds good.
7  BY MR. MINTZER:
8      Q   Okay. So, Doctor, do you have Exhibit 3
9  in front of you?
10     A   Yes, I do.
11     Q   Okay. It looks familiar to you?
12     A   Yes, it does.
13     Q   Okay. Is this what you know to be your
14 final report in this case?
15     A   Yes, this was.
16     Q   Was or is?
17     A   Yeah, it is. It is.
18     Q   Okay. I'm just making sure.
19         Is that a report that you typed yourself?
20     A   No.
21     Q   Did you happen to dictate the information
22 that's in that report and it was typed up by

Page 56

1  somebody else?
2      A   No.
3      Q   Do you have any understanding as to how
4  the words on those pages got there?
5      A   Okay. I have been working with Greg on
6  this, you know, we went over it -- we had several
7  discussions. He had presented with me what they
8  had typed up and had me -- and I reviewed it so
9  that I could see that it agreed with my opinions,
10 and I signed off on it.
11         Now, there were some typos in it that I
12 discovered later, because sometimes when you read
13 through it a couple of times, you miss that, so
14 there were typos that were -- that I saw later.
15 But that's -- this is an amalgam of multiple
16 conversations. And I can say that I -- you know,
17 that -- you know, what is stated here is my
18 opinion.
19     Q   Do you consider that final report to be a
20 product of your work in this case?
21     A   Yes.
22     Q   And that report contains facts that you

Page 57

1  believe are true in this case?
2      A   Yes.
3      Q   And that report contains opinions that
4  you arrived at while analyzing this case that are
5  your own thoughts and conclusions?
6      A   Yeah. Before this report was finished,
7  I -- like I said, I reviewed about 30 hours of
8  material. This is consistent with what I had seen,
9  what I feel.
10     Q   When you reviewed Dr. Cohen's deposition
11 or Dr. Manchikanti's deposition, was it while
12 reading their depositions that you discovered that
13 there were typos in your report?
14     A   I think -- yeah, I think it was when I
15 seen Dr. Manchikanti's. And then I re-read the
16 report again and then I said, "Oh, stop and see,"
17 so I did.
18     Q   Does the name Joseph Alessandrini mean
19 anything to you as it relates to this case?
20     A   One moment.
21     Q   Are you looking through your report,
22 Doctor?

Page 62

1  I -- that I did not put -- you know, type up this
2  letter.
3       This is an amalgam of multiple different
4  people's opinions on the case. If you want to ask
5  me specifically as to my opinion on what
6  Dr. Bhambhani has done, you know, when she came up
7  with her decision process, I think that would be
8  more applicable, if you're going to pick through
9  this and say, "Well, do you remember reading
10 through this, was this exactly your words," I've
11 already told you that I did not type this up, but I
12 agreed with what was written in it.
13   Q   Can you tell me what kind of inspection
14 Dr. Alessandrini did or Mr. Alessandrini?
15   A   No, I can't.
16   Q   Do you know when it was done?
17   A   May 13th, 2016 is when he was deposed.
18       Once again, you're going back to the
19 same -- I've already given you that point, that I
20 did not type that up. All I can tell you is that I
21 may have -- you know, that I most likely looked at
22 it just to make sure it was true before signing off

Page 63

1  on it.
2       And then, once again, how does it pertain
3  specifically to what Dr. Bhambhani did, I'm not
4  sure what you're getting at. You can keep asking
5  me questions along this same line, but the answer
6  is going to be the same.
7    Q   Have you happened to have seen the expert
8  reports from Dr. Manchikanti, Dr. Cohen, and
9  Dr. Maine?
10   A   No. The experts, I read their
11 depositions, I did not see the expert -- well, I
12 mean, this -- yeah. What am I saying?
13       This -- I did not see their expert
14 reports, no.
15   Q   Okay. Do you know the --
16   A   Wait. Wait. Check that. Check that.
17       Because there was -- I think for
18 different litigation, there was an expert report by
19 Dr. Maine that I did -- that I did see. That was
20 included in the materials that I reviewed.
21   Q   So you have seen Dr. Maine's report in
22 this case?

Page 64

1    A   Not in this case. I think it was in
2  reference to a different case.
3       MR. KIRBY: Glenn, he may be referring to
4  the certificate of qualified expert.
5       MR. MINTZER: Okay.
6  BY MR. MINTZER
7    Q   Doctor, did you know, aside from the
8  section about qualifications, that the expert
9  reports of Dr. Manchikanti, Dr. Cohen, and
10 Dr. Maine are identical to yours?
11   A   I'm sorry. Repeat the question.
12   Q   Did you know that the expert reports of
13 Dr. Manchikanti, Dr. Cohen, and Dr. Maine, except
14 for the beginning about qualifications, for which
15 all of you obviously are different, but the
16 remainder of the report is identical?
17   A   Yes, I was aware of that. And that's
18 what I'm saying, that this is an amalgam of
19 different opinions and different inputs to come up
20 with this -- with this note.
21       You can make it align to writing a paper,
22 not necessarily everything on that paper is written

Page 65

1  by the same person, but it is a group of opinions
2  that were put together.
3    Q   What is it that you gained your
4  understanding that your report was identical to
5  Dr. Manchikanti, Cohen, and Maine?
6    A   I'm sorry. Repeat the question.
7    Q   When did you first understand or find out
8  that Dr. Manchikanti, Dr. Cohen, and Dr. Maine's
9  reports were identical to yours?
10   A   I became aware of it after -- after
11 reading Dr. Manchikanti's deposition.
12   Q   Okay. So you didn't know that when you
13 signed your report, did you?
14   A   When I signed the report, I was signing
15 something, that I agreed with the -- with what it
16 said in the report. Now, if you're going to go
17 back and ask me every little line, there may have
18 been some things that I overlooked.
19       But I read through each line, "The
20 standard of care did not require investigation and
21 product liability suits against NECC," I agree with
22 that. I read what it said about that, and I agree

17 (Pages 62 - 65)

Page 66

1 with that.
2      And then it goes down, each point, yes, I
3 looked at it, I read it, I agree with it. And then
4 I looked down to the next one, read it, agree with
5 it. This is how I came about it.
6      Did I know that Dr. Manchikanti also
7 wrote that -- or had the same thing, and Dr. Cohen
8 had the same letter, no, I didn't know, but I don't
9 see how it applies to my expert -- you know, to --
10 I -- how it -- how it changes how I feel about the
11 decision-making process, how Dr. Bhambhani made her
12 decisions.
13    Q   Doctor, do you know a physician by the
14 name of Autry Parker by any chance?
15    A   No.
16    Q   I'm going to represent to you that
17 Dr. Parker is an expert in a case against a
18 different clinic and a different doctor in the
19 state of Tennessee regarding their use of
20 preservative-free MPA from NECC.
21      My question is: Did you know that that
22 doctor's report, to a large extent, is also

Page 67

1 identical to your report and was signed by that
2 doctor eight months before you signed your report?
3      Did you know that?
4    A   Was I aware of that? No.
5    Q   Does it concern you that you signed a
6 report that's virtually identical to a doctor's
7 report that was submitted eight months earlier
8 regarding a different clinic and a different doctor
9 and a different state?
10      MR. KIRBY: Objection to form.
11      THE WITNESS: Once again, I signed this
12 paper because I agreed with the opinions in it. It
13 is not surprising that you could go through the
14 same points with another plaintiff in a different
15 state, because the same things apply.
16 BY MR. MINTZER
17    Q   Could I -- does that mean that that --
18 that doesn't concern you?
19      MR. KIRBY: Objection to form. I think
20 he answered it.
21      Go ahead.
22      MR. MINTZER: I don't think he did.

Page 68

1      THE WITNESS: What is the question then?
2 BY MR. MINTZER
3    Q   The question I asked was: Does it
4 concern you that you signed a report that is
5 virtually identical to a doctor that's testifying
6 in a different case in a different state that was
7 drafted eight months before yours?
8      MR. KIRBY: Objection to form.
9      THE WITNESS: If I agree with what is
10 written here and I -- and you've got to understand,
11 I signed this without knowing that.
12      And it doesn't matter, because the
13 points are the same. Whether or not that
14 happened by not even by coincidence, whether or
15 not the same supporting points were pertinent to
16 another case or whether they're in
17 Dr. Bhambhani's case, I think it's irrelevant.
18      What I was signing was, each point, did
19 I look at it, did I agree about what was said,
20 and I did. And you can ask me in detail on each
21 thing, and I will -- you know, I'll tell you,
22 I've already told you before, this stuff, I read

Page 69

1 through it, you know, I looked at it, I thought
2 it made the point very well.
3      I was actually very impressed. I
4 remember reading this and going, "Man, this is
5 perfect. This really fits kind of how I'm
6 thinking about it as well."
7      I don't really -- I made a -- I made a
8 few minor changes to it, but I didn't really see
9 something that I needed to change drastically
10 with it. It seemed like, hey, this is great.
11 BY MR. MINTZER
12    Q   Can you tell me one of the changes you
13 made?
14      MR. KIRBY: Objection to form.
15      THE WITNESS: No, I can't recall.
16 Remember, I don't take notes on this, and so I
17 don't know. I may have had an old copy that I put
18 a couple of things in, but there wasn't a lot of
19 changes that I made to it. And it would have been
20 minor, most likely having to do with my biography.
21 BY MR. MINTZER
22    Q   You didn't catch the typo, though, did

Page 158

1  A  Yes.
2  Q  Okay. What questions are you aware of
3  related to any of the death cases or injury cases
4  that we're here to talk about today?
5      MR. KIRBY: Just for the record, we're
6  not going to ask him any questions about that,
7  Glenn. He's happy to answer that, but --
8      MR. MINTZER: That's fine. He can answer
9  it -- it's in his report, that's why I'm asking him
10 about it.
11     MR. KIRBY: Okay.
12     THE WITNESS: I -- I believe one of
13 the -- one of the patients died later on out of the
14 area. I think, if I remember right, that was the
15 96 year old. I'm not sure. Then as far as the
16 other claimed illnesses, I can't say specifically.
17     I mean, I know that this, in general,
18 is a common thing. A lot of people were -- you
19 know, when this came out, a lot of people were
20 claiming illnesses, even people that didn't have
21 the injections.
22

Page 159

1  BY MR. MINTZER:
2  Q  Well, we're not here talking about any --
3  A  Right.
4  Q  -- of those --
5  A  Right.
6  Q  -- people, are we?
7  A  No, we're not.
8  Q  Okay. So on page 7, a little bit further
9  down it says, "It's also my understanding that
10 there were some lawsuits filed on behalf of
11 patients that were later dismissed because the
12 patients had not authorized the attorneys to sue
13 Dr. Bhambhani."
14     Do you see that?
15 A  Yes.
16 Q  Do you have any information about that?
17 A  The only thing I have is Angela Farthing,
18 you know, the note from Angela Farthing. And is
19 it -- you know, she did not -- you know, she -- she
20 signed something that she was not interested in
21 signing at the time.
22 Q  Okay. And do you have that?

Page 160

1  A  And I think there were other -- you know,
2  other people continued to go see her even after
3  this occurred.
4      Do I -- in it's her record.
5  Q  Okay. That's something that you read in
6  her medical records?
7  A  Yes.
8  Q  Okay.
9  A  Something along that line.
10 Q  Okay. Anything else, other than that?
11 A  Do I have specific examples to give? No.
12 Q  Page 8, Doctor, of your report --
13 A  Okay.
14 Q  -- towards the bottom of the page,
15 there's a section, "The Box Hill Defendants
16 Experienced Appropriate Due Diligence in Purchasing
17 from NECC." Do you see that?
18 A  Okay.
19 Q  It says, "My expert opinion, the Box Hill
20 Defendants and the involved employees and
21 physicians acted within the standard of acceptable
22 practice and exercised appropriate due diligence in

Page 161

1  selecting NECC as its supplier of MPA."
2      Do you see that?
3  A  Yes.
4  Q  Can you tell me what appropriate due
5  diligence you're referring to there?
6  A  Well, I can tell you that at that time,
7  one of the -- you know, one of the strongest, you
8  know, endorsements that we can get is that you have
9  another organization that's been using that, and
10 she had been using that solution -- you know, MPA
11 from NECC at Hartford County for years without
12 problems.
13     And I know, for the most part, I -- I
14 don't do anything more than that, if I -- if I
15 order Depo-Medrol. I'm not going up to the -- I'm
16 not going up to the factory, I'm not going onto the
17 FDA website and seeing if there's any letters to
18 Pfizer or Hospira, or any of these other -- they're
19 supplying the medication, they have lots of
20 different people that -- you know, other
21 physicians, including other pain doctors who are
22 getting the medication, and there are not

Page 162

1 widespread -- there are not recalls of the
2 medication as far as she knows.
3     So to a certain extent, you know, when
4 you're a physician, you don't have -- you don't
5 have the luxury to all the time look into every
6 medication you order to see whether or not, you
7 know, the cleaning team at that particular place is
8 doing their job. I mean, I think that's asking too
9 much of a physician.
10   Q   So you would agree with that she merely
11 just -- when she opened up Box Hill, she merely
12 continued to use the same compounder that Hartford
13 Ambulatory Surgery Center was using?
14   A   And this is what physicians do, this is
15 what every -- this is how we, as physicians -- a
16 reasonable physician would do it. You know, it's
17 worked before, we've had no problems, you can
18 continue with the same thing that's -- that's
19 worked for you.
20   Q   And you'd agree with me you don't have a
21 problem until you have a problem. Right?
22       MR. KIRBY: Objection to form.

Page 163

1 BY MR. MINTZER:
2   Q   I mean --
3   A   Look, you know, we -- we have a certain
4 reliance on the governmental regulations that exist
5 out there, that if -- if -- I'm sure if
6 Dr. Bhambhani had any idea that there were -- that
7 they were even slightly cutting corners there at
8 NECC, then she -- she wouldn't have gone there.
9 But they're presenting themselves to her as a
10 legitimate producer of these medications, and --
11 and that's reasonable.
12   Q   Doctor, you wouldn't -- you wouldn't
13 disagree with me that asking a doctor to supply
14 schedules for patients in order to get medication
15 and get additional medication for patients that
16 wouldn't be receiving it is not cutting corners?
17       MR. KIRBY: Objection to form.
18       Are you talking about back then or now?
19       MR. MINTZER: I'm talking about when it
20 happened --
21       MR. KIRBY: Both?
22       MR. MINTZER: -- 2012, before the

Page 164

1 outbreak.
2       THE WITNESS: Cutting -- I don't think it
3 would be cutting corners. They're asking you to
4 actually provide more information, that requires
5 more work from the prescribing doctor.
6 BY MR. MINTZER:
7   Q   That was -- was the more information
8 correct information or was it incorrect
9 information?
10  A   Well, you know, a lot of times, you know,
11 you go by what the -- what the manufacturers, what
12 you're told to provide in order to get these
13 medications. And so this is what they were telling
14 her.
15      If it was such a problem, you know,
16 somewhere along the line, you would think that some
17 of the 3,000 people on their list of users for NECC
18 would have raised an objection to this. So after a
19 while, you say, "Okay. This is a regulation that I
20 don't know the details of the regulation, but
21 they're saying it's okay, being -- I'm reassured
22 that this is a -- this is standard practice." And

Page 165

1 you just go by what is the standard practice.
2   Q   So that practice that you're aware of
3 that went on with Dr. Bhambhani and the way that
4 she was ordering from NECC, you don't consider that
5 to be cutting corners?
6       MR. KIRBY: Objection to form.
7 BY MR. MINTZER:
8   Q   Yes or no?
9   A   No. I think it -- I think it requires
10 more work.
11  Q   Okay.
12  A   And no. If she wanted to cut corners,
13 you know, you wouldn't have to put the extra step
14 in. So she's not working that, she's working more
15 to get that --
16  Q   What is --
17  A   -- preservative-free medication.
18  Q   Okay. Do you know whether or not
19 Dr. Bhambhani knew that while she was working at
20 Hartford County Ambulatory Surgery Center and using
21 preservative-free MPA, that that entire time that
22 she was using it there, it was coming from NECC?

Page 302

1  done by someone else, and then I could have been
2  giving that tainted steroid.
3       I had worked at a couple of other
4  surgery centers, and I had nothing to do with how
5  they were ordering. If they handed me a vial of
6  NECC steroid and said, "This is what we have," I
7  would used it. I'm sorry, I wouldn't have gone
8  through and done due diligence and said, "Oh,
9  I've never seen this before, can you look it up?"
10      I could chance it. I know how I am, I
11 usually would use what the medication is that
12 they use at that place. That's why I use
13 Depo-Medrol at one place and I use Triamcinolone
14 at another, because as long as it's a long-acting
15 particular steroid, their strength is about the
16 same, they're the same dosage.
17 BY MR. COREN:
18  Q   Understood.
19      MR. COREN: Greg, could you hand the
20 Doctor I believe it's in tab 30, or the folder 30,
21 and it will be a Massachusetts statute, Section
22 Chapter 94C, Section 19.

Page 303

1       (Larkin Deposition Exhibit Number 1627-30
2        marked for identification.)
3       MR. COREN: And also for the reader of
4  the deposition, it was part of a package identified
5  in the --
6       MR. KIRBY: Sure, we're getting it.
7  Hold.
8       On a second, I need to ask the
9  receptionist a question.
10      (Brief break.)
11 BY MR. COREN:
12  Q   Doctor, we have identified this as this
13 Massachusetts statute. And what this is, I'll
14 explain it to you, it's the statute that we looked
15 at for your -- looking at the footnotes when we
16 looked at the Physicians Guide. This is one of
17 those statutes that are issued for -- enacted by
18 the Massachusetts Legislature.
19      And this is the lovely law of
20 Massachusetts, and this deals with at least
21 controlled substances, which I wanted you to
22 understand is everyday prescriptions also. Okay?

Page 304

1  A   Okay.
2  Q   So in Section 19, it says, "Authorized
3  purposes for which the prescriptions may be
4  issued," and it then repeats that sentence that we
5  looked at. And I won't do it again, that it has to
6  be issued for legitimate purposes by a practitioner
7  in the usual course of his professional practice.
8       Now, I'll recall your attention to the
9  second sentence, "The responsibility for the proper
10 prescribing and dispensing a controlled substance
11 shall be upon the prescribing practitioner, but a
12 corresponding responsibility shall rest with the
13 pharmacist who fills with the prescription."
14      Okay. Seeing that, Doctor, that second
15 sentence, do you now appreciate that in
16 Massachusetts, the onerous is on the prescribing
17 doctor to do the prescription proper and the
18 pharmacist only has a corresponding similar duty?
19      MR. KIRBY: Objection to form and
20 foundation.
21 BY MR. COREN:
22  Q   Do you understand it's the doctor's

Page 305

1  responsibility?
2       MR. KIRBY: Same objection.
3       THE WITNESS: Okay. In order -- okay.
4  So standard of care does not equal the law, okay.
5  So this is a regulation, and why Dr. Bhambhani
6  would be expected to know this particular law, and
7  the fact that all -- you know, all prescriptions
8  that are not Schedule 2 through 5, or Schedule 6 in
9  Massachusetts, I think that's what my understanding
10 is.
11      In reading through that, she would have
12 to know that, she'd have to know that somehow New
13 England Compounding Pharmacy, that came to her
14 with this -- presenting her with the idea that
15 everything was above board and then they --
16 they're in Massachusetts, if anyone should know
17 the law in Massachusetts, it should have been
18 them and they should have presented that to her.
19 She did not knowingly do this.
20 BY MR. COREN:
21  Q   The State of Massachusetts -- or excuse
22 me, the Commonwealth of Massachusetts seems to

Page 306

1 disagree with you, doesn't it?
2       It states that the responsibility for the
3 proper prescribing and dispensing of a controlled
4 substance shall be upon the doctor. Right?
5       MR. KIRBY: Objection to form and
6 foundation. And asked and answered.
7       THE WITNESS: Yeah, I think I answered
8 this. I'm sorry. I mean, she's not a
9 Massachusetts physician.
10 BY MR. COREN:
11   Q   So she's --
12   A   The only people --
13   Q   -- the --
14   A   The only people --
15   Q   I'm --
16   A   I'm sorry.
17       The only people there who would know the
18 codes in -- you know, the Massachusetts codes would
19 be the pharmacist, who resides in Massachusetts, or
20 a lawyer. She's neither.
21       There's no way she knowingly did this.
22   Q   Now, so you're saying that she did not

Page 307

1 affix her -- she didn't know she was signing a
2 prescription form when she signed her name and gave
3 her DEA number?
4   A   No, she did not -- I don't think she knew
5 that this was considered a controlled substance.
6   Q   And if you don't know, you could just act
7 in ignorant bliss?
8       MR. KIRBY: Objection to form and
9 foundation.
10       THE WITNESS: I mean, there are a lot of
11 things that we have to know in medicine. Some -- a
12 detail like this -- unless someone's coming to you
13 and saying -- or even if you have one doctor that
14 gets prosecuted on this, it goes like wildfire. We
15 all know about it.
16       I mean, nobody was -- nobody was
17 basically enforcing this rule. At least for that
18 kind of thing, at least for what New England
19 Compounding Pharmacy did it. If somebody did,
20 the word gets out.
21 BY MR. COREN:
22   Q   If we look at Section B, Doctor --

Page 308

1   A   Sure.
2   Q   -- it states, "No prescription shall be
3 issued in order for a practitioner to obtain
4 controlled substances for supplying to the
5 practitioner for the purpose of general dispensing
6 to patient."
7       First of all, would you agree with what
8 Dr. Bhambhani was doing and acquiring this medicine
9 was for general dispensing to her patients?
10   A   Yes.
11   Q   Okay. And you understand that in
12 Massachusetts, the legislature says it's illegal to
13 acquire office supplies of medicine?
14       Do you understand that, about that
15 section?
16       MR. KIRBY: Objection to form and
17 foundation.
18       THE WITNESS: I'm getting back to the
19 same thing; if this were the case, if this were the
20 law in Massachusetts, why didn't anybody stop New
21 England Compounding Center?
22       Why did not anybody step in and say,

Page 309

1 "Hey, you guys are breaking the law. You're
2 going to the doctor who doesn't know any better"?
3       They're not lawyers, they're not
4 looking at this, and tell them it's okay when, in
5 reality, they're breaking, you know, this Chapter
6 94C of the Controlled Substance Act.
7       This is not -- this is well above and
8 beyond the standard of care. As a matter of
9 fact, I reviewed a lot of depositions and nobody
10 brings any of this up.
11       So obviously you find this in -- you
12 know, after months of people testifying, and
13 everything else, you found this and you say,
14 okay, she should have known that.
15       Well, I saw other depositions, and
16 nobody mentioned this, so should they have all
17 known about it, too?
18       MR. COREN: Move to strike.
19 BY MR. COREN:
20   Q   Doctor, it's your opinion that -- so all
21 of your opinions hinge and turn upon your belief
22 that the standard of care is not informed by the

Page 310

1  law?
2      MR. KIRBY: Object to the form.
3      THE WITNESS: So that's a loaded
4  question. Look, there's some laws, which are
5  basically regulations, I may be violating and not
6  knowing it. I don't think there's a lot, I
7  think -- you know, I think we try to keep abreast.
8  But this would be a small one that you wouldn't
9  necessarily know, obviously not.
10     Like I said, I looked through a lot of
11 depositions and nobody brings this up. You would
12 have thought that if it was such common knowledge
13 and people should have known that they were
14 breaking the law, why didn't any of these other
15 older depositions, did they bring it up?
16 BY MR. COREN:
17  Q   Seeing that law and seeing the way that
18 New England Compounding was having the doctors,
19 like at Box Hill and those other 70 pharmacies
20 in -- excuse me, some of these other surgery
21 centers that had gone with them in Maryland filling
22 out this, using old patient names, don't you think

Page 311

1  now you say, well, gee, this is basically being
2  complicit with NECC in violating Massachusetts law?
3      MR. KIRBY: Objection to form, talking
4  about the standard of care in 2012.
5      THE WITNESS: Yeah. I -- I mean, once
6  again, I'm talking about -- I'm referring to
7  standard of care, too. I am sure if Dr. Bhambhani
8  thought that she was doing anything untoward, she
9  wouldn't have done it. She's a caring physician.
10 You can see that in her notes. You can see that
11 other doctors send their parents to her.
12     I mean, she's detailed oriented, she's
13 not -- she doesn't seem -- I don't get the idea
14 that she's lazy. This is, you know, about these
15 kind of things. I think this is just such a
16 small thing, that we're going to miss it.
17     And I could be missing it, too, and I'd
18 like to think that I -- that I try to keep on top
19 of things.
20 BY MR. COREN:
21  Q   I just need to put a finer point on
22 this --

Page 312

1  A   Okay.
2  Q   -- so I understand when we meet again,
3  should we meet again in court, is your opinion --
4  is it your opinion that the -- that the law that
5  governs prescriptions is not the standard of care
6  upon doctors?
7      MR. KIRBY: Objection to form and
8  foundation.
9      THE WITNESS: There are a lot of
10 regulations out there that we may or may not be
11 aware that -- that as a Maryland physician in
12 regards to Massachusetts law, because she's getting
13 a prescription filled by a Massachusetts pharmacy,
14 and that pharmacy is -- it's their responsibility
15 because they're in that state to let her know that,
16 and they didn't do that.
17     And now you're asking me to say, oh,
18 does the law matter? Of course, the law matters.
19 But you're -- you're drawing out something that
20 somebody typically wouldn't do. And no, it
21 wouldn't be the standard of care for her to know
22 the laws in Massachusetts. Especially, if the

Page 313

1  pharmacy that is -- that is domiciled in
2  Massachusetts, doesn't tell them that. "Okay.
3  This is the law, you need to do this." They
4  weren't telling them that, they were giving them
5  the opposite information.
6  BY MR. COREN:
7   Q   So taking a whole patient list, putting
8  it down on a prescription order form, putting your
9  doctor's signature, putting your doctor's DEA
10 number, no bells went off that this might be not
11 kosher?
12     MR. KIRBY: Objection to form and
13 foundation. Asked and answered several times.
14     THE WITNESS: Yeah, I think I've -- I
15 think I have answered this quite a few times.
16 BY MR. COREN:
17  Q   Okay. So just I can simplify things; the
18 law is below the standard of care in the hierarchy
19 of things that doctors must do. Do I have that
20 right?
21     MR. KIRBY: Objection to form and
22 foundation. Asked and answered.

79 (Pages 310 - 313)

Page 314

1    THE WITNESS: I'm not saying -- I'm not
2  saying that the law is below the standard of care.
3  You've got to know what the law -- the -- it's --
4  it's beholding on the Massachusetts, you know,
5  legislature to let them know. It's beholding on
6  the Attorney General of Massachusetts to let NECC
7  know they're violating, or the FDA to let NECC know
8  that they're violating.
9        And, please, let the physicians,
10 they're unknowingly writing and getting these
11 prescriptions filled out, let them know that they
12 can't do that.
13 BY MR. COREN:
14   Q   If I'm driving in Massachusetts and I'm
15 licensed in Pennsylvania, my driver's license, and
16 I drive a hundred miles down the Massachusetts
17 Turnpike, a hundred miles an hour, and the state
18 trooper pulls me over, is it appropriate, using
19 your model to say, "Yeah, I didn't know the
20 Massachusetts' speed limit was 75"?
21       MR. KIRBY: Objection to --
22       THE WITNESS: Well --

Page 315

1        MR. KIRBY: Hold on.
2        THE WITNESS: I'm going to answer this.
3        MR. KIRBY: Objection to form and
4  foundation, scope, and hypothetical.
5        Go ahead.
6        THE WITNESS: All over that highway, they
7  have the posted speed limit, okay, if you don't
8  know the posted speed limit -- they're telling you
9  all -- not only that, they're not telling you one
10 time, they're telling you 50 times while you're
11 driving down that interstate, "This is the speed
12 limit. You can't go over that."
13       So you can't use that analogy.
14 BY MR. COREN:
15   Q   Let me ask you, see if we can fill in
16 this blank, "Ignorance of the law is no"?
17       MR. KIRBY: Objection.
18 BY MR. COREN:
19   Q   Do you want to complete that sentence?
20       MR. KIRBY: Objection.
21       THE WITNESS: Say that again.
22

Page 316

1  BY MR. COREN:
2    Q   Ignorance of the law is no, can you
3  complete the sentence for me?
4        MR. KIRBY: Objection.
5        If you can't, you can't.
6        THE WITNESS: Yeah, I -- is that a quote
7  that -- well, I -- is that a quote or --
8  BY MR. COREN:
9    Q   I'll help you. Let me see if I can give
10 you the full quotation, maybe that will help.
11   A   Okay.
12   Q   "Ignorance of the law is no excuse," are
13 you familiar with that?
14       MR. KIRBY: Objection.
15       THE WITNESS: There are so many laws on
16 the books right now, and I'm sure a person
17 committing adultery in a certain area, you know, a
18 certain state is breaking the law and they aren't
19 even aware of it. And is that an excuse?
20       No. The excuse is it's an arcane rule,
21 and they weren't notified that this was against
22 the law. Usually, most laws, we're well aware

Page 317

1  when we're -- when we're breaking them,
2  essentially.
3        This was not the case in this
4  situation, because there was not a wide-spread
5  publication of this code. There was not
6  prosecution of doctors, there was not prosecution
7  of pharmacists with relation to this, so how were
8  we supposed to know?
9        If the information doesn't get out, if
10 the FDA sits on the information for years, what
11 are we supposed to do as physicians?
12 BY MR. COREN:
13   Q   Doctor, I want to leave this topic. And
14 I'm sure we'll all be happy.
15   A   Sure.
16   Q   I want to -- I see on your curriculum
17 vitae that you're on the Editorial Board of the
18 Journal of Pain?
19   A   What?
20   Q   Are you on the Editorial Board --
21   A   On my curriculum vitae?
22       Are you sure you got the right one?

Page 338

BY MR. KIRBY:
2  Q  Okay. You were asked if compounded drugs
3  had been associated with adverse events prior to
4  2012. Do you have an opinion whether
5  FDA-manufactured drugs, and that's drugs
6  manufactured by FDA-registered entities, also have
7  been associated with adverse events prior to 2012?
8  A  Prior to 2012?
9  Q  Or since, but sure.
10 A  Yes, they have. If you ask me to go into
11 detail --
12 Q  You were -- bear with me.
13 A  You could just go, like, buy --
14 Q  Hold on one second.
15    Are you licensed to practice medicine in
16 Massachusetts?
17 A  No.
18 Q  Is Dr. Bhambhani?
19 A  No.
20 Q  You were asked questions earlier about
21 prescriptions and you were taken through different
22 Massachusetts law on prescriptions and I guess

Page 339

1  asked whether Dr. Bhambhani was submitting
2  prescriptions to NECC.
3      I want you to take a look at her
4  deposition.
5  A  Okay.
6  Q  I know Plaintiff's Counsel read some
7  things in her deposition on various points, but I
8  want you to read -- I'll read it, but you can
9  follow along.
10 A  Okay.
11 Q  At Page 120, Line 18, it says, "All
12 right. They were asking you, under your address it
13 says we must have facility name and address to
14 process your prescription order, and I get back to
15 you, did you understand that this was a
16 prescription for the patients who you were
17 providing MPA to."
18    The answer, "Like I said earlier, I do
19 not think of this as a prescription for the
20 patient, more of an order form to order the
21 medication."
22    And that ends in Page 21, Line 2. Did I

Page 340

1  read that correctly?
2  A  Yes.
3  Q  So based on that deposition testimony,
4  does that indicate to you whether Dr. Bhambhani
5  considered this order form as prescriptions or as
6  an order form?
7  A  She obviously --
8     MR. MINTZER: Form.
9     THE WITNESS: -- considered it an order
10 form.
11 BY MR. KIRBY:
12 Q  Okay. Do you consider particulate matter
13 or material in a vial that wasn't supposed to be in
14 that vial as contamination?
15 A  Yes.
16    MR. KIRBY: Those are all the questions
17 that I have.
18    Any more, Glenn or Mike?
19    MR. MINTZER: I have none.
20    MR. COREN: I don't have any either.
21    (Whereupon, at 7:40 p.m., the deposition
22    of THOMAS LARKIN, M.D. was concluded;

Page 341

1  signature reserved.)