```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4   IN RE: NEW ENGLAND            : MDL No. 2419

 5   COMPOUNDING PHARMACY, INC.    : Docket No.:

 6   PRODUCTS LIABILITY LITIGATION: 1:13-md-2419(RWZ)

 7   ------------------------------:

 8   This document relates to:     :

 9                                 :

10   ARNETTA, ET AL v. BOX HILL    :

11   SURGERY CENTER, LLC, ET AL    :

12   No. 1:14-cv-14022-RWZ         :

13                                 :

14   BOWMAN, ET AL v. BOX HILL     :

15   SURGERY CENTER, LLC, ET AL    :

16   No. 1:14-cv-14028-RWZ         :

17                                 :

18   DAVIS, ET AL v. BOX HILL      :

19   SURGERY CENTER, LLC, ET AL    :

20   No. 1:14-cv-14033-RWZ         :

21                                 :
```

EXHIBIT 8

```
 1    DREISCH, ET AL v. BOX HILL            :
 2    SURGERY CENTER, LLC, ET AL            :
 3    No. 1:14-cv-14029-RWZ                 :
 4                                          :
 5    FARTHING, ET AL v. BOX HILL           :
 6    SURGERY CENTER, LLC, ET AL            :
 7    No. 1:14-cv-14036-RWZ                 :
 8                                          :
 9    KASHI, ET AL v. BOX HILL              :
10    SURGERY CENTER, LLC, ET AL            :
11    No. 1:14-cv-14026-RWZ                 :
12                                          :
13    TORBECK, ET AL v. BOX HILL            :
14    SURGERY CENTER, LLC, ET AL            :
15    No. 1:14-cv-14023-RWZ                 :
16                                          :
17    HANDY, ET AL v. BOX HILL              :
18    SURGERY CENTER, LLC, ET AL            :
19    No. 1:14-cv-14019-RWZ                 :
20                                     - - - - - - - - - - - - - - - - - -
21
```

1        Deposition of STEVEN PAUL COHEN, M.D.,

2  was taken via Veritext Virtual on Wednesday, March

3  1, 2017, commencing at 10:10 a.m., at Pessin Katz

4  Law, P.A., 10500 Little Patuxent Parkway, Suite

5  650, Columbia, Maryland, before MICHELE D. LAMBIE,

6  Notary Public.

7        ---------------------

12  ALSO PRESENT;  Ashley E. Geno, Esquire

13        (via telephone)

14  Reported By:

15        Michele D. Lambie, CSR-RPR

1  APPEARANCES:

2         ON BEHALF OF PLAINTIFFS ARNETTA, BOWMAN,

3      DAVIS, DREISCH, FARTHING, KASHI, TORBECK

4      AND HANDY:

5   Law Offices of Peter G. Angelos, P.C.

6         GLENN E. MINTZER, ESQUIRE.

7         gmintzer@lawpga.com.

8         SHARON L. HOUSTON, ESQUIRE.

9         100 North Charles Street.

10        Baltimore, Maryland  21201.

11        (410) 649-2000

12

13        ON BEHALF OF PLAINTIFF ROZEK:

14   Cohen, Placitella & Roth, P.C.

15        HARRY M. ROTH, ESQUIRE.

16        hroth@cprlaw.com.

17        SILVIO A. TRENTALANGE, ESQUIRE.

18        strentalange@cprlaw.com.

19        2001 Market Street, Suite 2900.

20        Philadelphia, Pennsylvania  19103.

21        (215) 567-3500

1   APPEARANCES CONTINUED:

2       ON BEHALF OF THE DEFENDANTS:

3   Pessin Katz Law, P.A.

4       GREGORY K.   KIRBY, ESQUIRE.

5       gkirby@plaw.com.

6       901 Dulaney Valley Road.

7       Suite 400.

8       Towson, Maryland   21204.

9       (410) 938-8800

Page 94

1  I'm looking for published data that have reported
2  the development of arachnoiditis in an epidural
3  injection that was not intrathecal.
4     A.  Yes, and I just gave you a recent one
5  from 2013 with a caudal injection. And, again, the
6  reason that that's important is because the, the
7  length that separates where the caudal injection is
8  administered and where the dura ends, and piercing
9  the dura is what makes an injection intrathecal, is
10 several centimeters, so it would be almost
11 impossible to accidentally make a caudal epidural
12 injection go intrathecal. So, in other words,
13 there's something else that, that caused this
14 medication to go intrathecal and create
15 arachnoiditis.
16    Q.  Okay. And that case report that you've
17 described, do you know offhand where it is
18 published?
19    A.  Asian Spine Journal.
20    Q.  And if I write to Mr. Kirby and ask him
21 for the quote, you'll be able to give it to him?

Page 95

1     A.  Yes. He'll, he'll be able to give that,
2  and, and there are a few others. One in, you know,
3  Review of Neurology. Like I said, not every, you
4  know, complication gets published. So in my
5  experience --
6     Q.  I understand.
7     A.  Yeah.
8     Q.  I mean, I understand that. I'm looking
9  for the ones that, you know, that are available.
10 Can you tell me whether or not in those case
11 reports the cause of the arachnoiditis had been
12 determined? In other words, did they say that's
13 the preservative?
14    A.  Yes. It was deemed to be caused
15 by -- well, by the, you know, by the medication,
16 and I believe it was Depo-Medrol. And how can you
17 say, you know, what component of the Depo-Medrol,
18 you know, was responsible for arachnoiditis? No
19 one can say that.
20    Q.  Am I correct that in the medical
21 literature that there is debate about what, whether

Page 96

1  it's a preservative or whether it's the steroid
2  itself that causes some of these complications?
3     A.  Right. There are, there are
4  literature -- there is literature in very, very
5  well-regarded journals that are peer reviewed that
6  say, you know, it's not the preservative, and then
7  you have, you know, literature in outstanding, you
8  know, journals, such as Lancet Oncology, BMJ,
9  Medical journal of Australia that say, yes, it is
10 the preservative, and no amount of benzyl alcohol
11 or other preservatives are safe.
12       MR. KIRBY: Objection to form.
13 BY MR. ROTH:
14    Q.  You mentioned Depo-Medrol, and I will
15 read the transcript -- strike that.
16       Was there any other preservative-free MPA
17 that was available to Dr. Bhambhani before the
18 outbreak, other than Depo-Medrol by commercial
19 manufacturers?
20    A.  So I, I don't know the answer. I know
21 that there are other forms of -- so you have, you

Page 97

1  know, Depo-methylprednisolone acetate. You have
2  Depo-methylprednisolone succinate, and, you know, I
3  don't know what was and was not available, or even
4  if it was available, whether or not there were
5  shortages of certain, you know, drugs at the time
6  of 2012/2013.
7     Q.  But, again, whether there were shortages
8  or not, you're not going to offer an opinion that
9  Dr. Bhambhani's decision to use NECC's MPA was
10 based upon a drug shortage, correct?
11    A.  I don't know what the basis, you know,
12 for her decision was besides what I read, you know,
13 in her deposition.
14    Q.  Is polyethylene glycol associated with
15 any risks to patients who undergo epidurals?
16       MR. KIRBY: Objection to form.
17       THE WITNESS: Yeah. It, it may affect
18 nerve conduction, you know, when injected around
19 nerves. Like I say, you know, any of these
20 medications can elicit an inflammatory reaction
21 that can result in perhaps arachnoiditis in

Page 98

1 susceptible patients.
2 BY MR. ROTH:
3    Q. Is polyethylene glycol a, is it
4 characterized as a preservative?
5    A. Yes.
6    Q. Doctor, I mentioned earlier that we had
7 been given, we received an email from Mr. Kirby's
8 office yesterday with a drop box of material. Can
9 you tell me -- it says, materials that were sent to
10 Dr. Cohen. Did you do independent research for
11 purposes of this case, other than reviewing
12 materials that were sent to you by Mr. Kirby's law
13 firm?
14    A. You know, I pulled out some abstracts,
15 you know, when I wanted a question answered, but
16 like I said, you know, I speak on epidural steroid
17 injections all the time. So sometimes it's
18 difficult to distinguish, you know, where I
19 obtained, you know, information or what was the
20 reason for me looking this, looking up the answer
21 to a certain question. But, yes, I'm sure that I

Page 99

1 did do some research specifically for this case,
2 including, you know, finding out which journals it
3 was mentioned that these preservatives might be
4 associated with neurotoxicity, finding out the
5 reports of arachnoiditis, you know, in response to
6 medications that were deemed to actually be
7 epidural and not intrathecal.
8    Q. There is a series of folders in this drop
9 box, one of which is called, Literature - Concern
10 for Preservation. First of all, did you receive a
11 drop box of material from Mr. Kirby's law firm?
12    A. You know, honestly nothing personal, I
13 received too many drop boxes from Mr. Kirby's law
14 firm. It would be hard to, to say which, you know,
15 which one, but, yes, I received many.
16    Q. And I guess -- and we'll do this in a
17 follow-up question. In the drop box I received
18 yesterday, and, again, it's called Materials
19 Sent to Dr. Cohen, one of the folders is called
20 Literature - Concern For Preservation, and there
21 are six articles that are included in that folder.

Page 100

1 Now, I don't know whether you have the
2 capacity to be looking at that now, whether that's
3 what you're looking at?
4    MR. KIRBY: He is.
5    THE WITNESS: Yes, I am.
6 BY MR. ROTH:
7    Q. So my question to you is, Are these
8 articles that were given to you or that you sent to
9 Mr. Kirby's office?
10    A. I sent those articles to Mr. Kirby's
11 office.
12    Q. To be clear so that we know what we're
13 talking about, the first article is by
14 Dr. Manchikanti, the first two actually are written
15 by him.
16    MR. KIRBY: Yeah. Hey, Harry, I can
17 shortcut this if you want to make it easier.
18    MR. ROTH: Yes.
19    MR. KIRBY: He didn't send, he didn't
20 send the Manchikanti ones. I think my paralegal
21 just included them because they came from the last

Page 101

1 deposition, but --
2    MR. ROTH: Well, let --
3    MR. KIRBY: He can answer though.
4    MR. ROTH: Thank you.
5 BY MR. ROTH:
6    Q. What I'm trying to discern, Dr. Cohen, is
7 what information was provided to you by Mr. Kirby's
8 office and whether you can tell us what information
9 was a byproduct of your research for this case?
10    A. So I --
11    Q. And -- okay. Go ahead.
12    A. So all of the articles that I'm looking
13 at here I read and provided, except for -- so this
14 one I was very familiar with. So the one article
15 by Manchikanti and Falco, I was familiar with, but
16 I think Dr. Kirby, Mr. Kirby sent that to me, but I
17 had read this article already.
18    MR. KIRBY: That's the one, just for the
19 record, at the top it says, Safeguards to Prevent
20 Neurologic Complications.
21    MR. ROTH: Okay.

26 (Pages 98 - 101)

Page 122

1 the literature and expertise, are these
2 complications that you've described, either steroid
3 psychosis or impairment of wound healing or
4 bleeding, caused by preservatives that are in
5 steroids or by the steroid medication itself?
6    A.  They would be caused by the steroid
7 medication itself if -- and, again, you are
8 correct, this is a big if, I can't see a way, but
9 the only way that it, that they could result
10 possibly from preservatives is if for some reason
11 preservatives, you know, increased the
12 bioavailability, and then you would -- in essence,
13 you would be seeing a higher dose. Your receptors
14 would be seeing more, and you might be more likely
15 to develop steroid-related side effects or
16 complications.
17    Q.  Have you seen any study, data,
18 information that preservatives, in fact, increase
19 bioavailability that would increase the dose of the
20 drug?
21    A.  I don't believe there's any evidence to

Page 123

1 support that. I also don't believe it's been
2 examined, but you're probably right. I -- that's
3 just one possible theoretical explanation, and it's
4 probably not true.
5    Q.  Is that explanation -- okay. You've
6 answered my question. Is that explanation
7 something that you would be able to testify to to a
8 reasonable degree of medical certainty?
9    A.  Definitely not.
10    Q.  All right. In your review of
11 Dr. Bhambhani's, the medical records relating to
12 Dr. Bhambhani's patients at Box Hill, did you see
13 any evidence that her patients had any adverse
14 response to epidurals given before the outbreak?
15    A.  No.
16    Q.  Is there a difference in the -- well,
17 strike that.
18       Did you -- other than conversations with
19 her mentor and her prior use, was there anything
20 else that you will describe that Dr. Bhambhani did
21 to determine that preservative-free steroids were

Page 124

1 safer for her patients than steroids that contained
2 preservatives?
3       MR. KIRBY: Objection to form and
4 foundation. You can answer.
5       THE WITNESS: I saw nothing that she
6 indicated in her deposition to that effect.
7 BY MR. ROTH:
8    Q.  Now, I'm not trying to be duplicative.
9 My first set of questions were related to the
10 choice of preservative versus preservative free,
11 and now I want to ask about NECC and the decision
12 to purchase from NECC.
13       Can you describe what you will testify to
14 as the reason why Dr. Bhambhani ordered steroids
15 from NECC?
16       MR. KIRBY: Objection to form and
17 foundation.
18       THE WITNESS: So I -- it really depends
19 on the, you know, the questions that are asked. So
20 I can testify as to why a reasonable doctor might
21 want to order from there, and I can just testify to

Page 125

1 what I've read in Dr. Bhambhani's deposition where
2 she said it's to avoid some of the side effects
3 that, that she experienced with, with, you know,
4 branded Depo-Medrol and her past good experiences
5 with, with the NECC compound.
6 BY MR. ROTH:
7    Q.  All right. So my question was related to
8 not what any doctor would do, but Dr. Bhambhani,
9 and other than her past experience, is there
10 anything else that you learned from her deposition
11 or from anything that you reviewed regarding why
12 she selected NECC to purchase MPA for her steroids?
13    A.  Just the ones that we've discussed.
14    Q.  You used the phrase on page 8 of your
15 report -- it's just a short one. You talk about
16 the absence of guidelines and information. You
17 used the phrase, Box Hill's due diligence prior to
18 purchasing from NECC.
19       Can you tell me what specific things, if
20 there's anything else than what we have discussed,
21 that comprise Box Hill's due diligence for

Page 126

1 purchasing from NECC?
2   A. You know, as we agreed, Dr. Bhambhani did
3 not review the specific documents from NECC,
4 although if she had, that would have certainly been
5 very reassuring.
6       So the main reason that she did from Box
7 Hill was based on eight to nine years of
8 experience, of very good experience without the
9 same complications using that drug.
10  Q. You testified earlier that you're not
11 the, you have not in your military or civilian
12 experience been the person who determines where to
13 purchase medications from. You understand
14 Dr. Bhambhani had that responsibility for Box Hill,
15 correct?
16  A. Yes, she did, and this is not going to
17 affect -- I just want to be, you know, truthful
18 here in case you look. So at Johns Hopkins for
19 medications, such as the liquid capsaicin that I
20 brought up, I do determine where we buy that
21 from --

Page 127

1   Q. Okay.
2   A. -- and that's just, you know, really
3 specific instances.
4   Q. When you purchase that -- and that's
5 stuff you purchase from a compound pharmacy,
6 correct?
7   A. Yes, here in Maryland.
8   Q. Right. When you purchase that, do you
9 have, do you purchase that as an inventory that is
10 stored, or is that something you purchase via a
11 patient-specific prescription?
12  A. So I can tell you the practices of our
13 pain medicine treatment, and this has gone through,
14 you know, the committee that oversees all
15 medications that are used as well as the pharmacy.
16      So the, the medications that we, that we
17 purchase that are from compounding pharmacies
18 include intrathecal steroids, and once every two
19 years, someone from Johns Hopkins goes down, who is
20 a pharmacologist, and inspects that institution,
21 and they look at all of the documents.

Page 128

1 But for the other one, for, you know,
2 capsaicin, there's been, which we do inject just
3 like, you know, steroids, no one has ever gone to
4 inspect the facility, but what they do is they
5 review all of the documents.
6       They look at, you know, someone from
7 pharmacy, so not for us, and we use this, and this
8 just really recently happened.
9       So for many years, this was not done
10 before. For about ten years, but after the
11 outbreak, they started to review the documents, but
12 they have not inspected that place, even though
13 that place is in, is in Maryland.
14  Q. So, first of all, the inspections that
15 were done by Hopkins of the facility, did that take
16 place before or after the outbreak?
17  A. So there are two places of -- there are,
18 there are two compounding pharmacies that produce
19 product that we use in the pain center. For one of
20 them, Hopkins has inspected them before. It's not
21 annually. It may be every several years, and that

Page 129

1 place is in Florida.
2       For the other one, which we've been using
3 for more than ten years, no one has ever inspected
4 that place, but after the outbreak, the people from
5 pharmacy reviewed the documents, including from the
6 Maryland Board of Pharmacy, and said, This is okay
7 to inject in your patients.
8   Q. Before the outbreak, did the people from
9 pharmacy review the documents for that local
10 compounding pharmacy?
11  A. They did not. This was -- they, they
12 brought this up after the outbreak so that this
13 would not happen to Johns Hopkins.
14  Q. Before the outbreak with the compounding
15 pharmacy that was in Florida, do I understand that
16 that was inspected and documents were reviewed by
17 the Hopkins pharmacy folks?
18  A. So the, the inspections were definitely
19 not every year. They were -- there was at least
20 one inspection, I know that --
21  Q. Okay.

Page 130

1  A. -- for the one in Florida.
2  Q. And the one inspection, you mean before
3  the outbreak?
4  A. Correct.
5  Q. So we got to this because I asked whether
6  or not you were writing patient prescriptions for
7  the liquid medication that was obtained from the
8  Maryland compounding pharmacy, and then you
9  described what the Hopkins pharmacy folks do.
10 A. So what --
11 Q. Do you write the prescriptions? And if
12 you do, do you write them to Hopkins, or do you
13 write them to the compounding pharmacy itself?
14 A. So this is complicated, but -- actually,
15 it's not, but it's a little bit different. We give
16 the patient a written prescription, and then they
17 bring it to the pharmacy, they fill it, and then
18 they bring it back to Johns Hopkins.
19 Q. When you say they take it to the
20 pharmacy, you mean the compounding pharmacy that's
21 in Maryland?

Page 131

1  A. Yes.
2  Q. And then they bring the substance, the
3  medication back, and then you inject it?
4  A. Correct, so in a sealed, in a sealed
5  vial.
6  Q. Right. Is that something that -- is that
7  the process that was done before the outbreak as
8  well?
9  A. For one of the -- yeah, for the one that
10 we -- for -- yes, for the one in Maryland.
11 Q. I can't remember what it's called, but
12 that's the liquid stuff, the liquid medication you
13 were describing?
14 A. Yes.
15 Q. By the way, we were talking a lot about
16 Dr. Manchikanti. Your decision to not continue
17 with the Interventional Pain Society that he
18 started, did that have anything to do with his
19 qualifications as a pain management physician or a
20 doctor in any way?
21 A. No.

Page 132

1  Q. In other words, he's still a physician
2  whose work you respect and whose research you
3  continue to or articles you continue to look at?
4  A. Yes. I still cite some of his, his
5  articles in my work.
6  Q. I'd like you to -- I'd like to turn to
7  page, to Exhibit 13, please. No. I'm sorry,
8  Exhibit 15.
9     MR. KIRBY: Okay. We have it.
10    MR. ROTH: Thank you.
11 BY MR. ROTH:
12 Q. For some reason -- wait a minute. The
13 page I want you to look at is the fifth page. For
14 some reason -- I'm sorry, the fourth page. I don't
15 see a Bates stamp on it, but it's the May 18th
16 prescription order form. Can you turn to that,
17 please?
18    MR. KIRBY: This is it I think. We've
19 got it.
20    MR. ROTH: All right.
21 BY MR. ROTH:

Page 133

1  Q. Doctor, you've seen this before, correct?
2  A. Yes, I have seen this.
3  Q. Have you ever ordered any medication in
4  the, in the form that Dr. Bhambhani described with
5  NECC?
6     MR. KIRBY: Objection to form and
7  foundation. You can answer.
8     THE WITNESS: No. I would never have had
9  a reason since I don't order my medications from
10 NECC.
11 BY MR. ROTH:
12 Q. How about from any medical either
13 manufacturer or compounder?
14 A. So you don't even need prescriptions
15 for medications when you order from a manufacturer,
16 and for the, the few patients where we order from
17 compounding, you know, pharmacies, unlike steroids
18 in which everyone gets the same dose in the same
19 concentration, the prescriptions or the medications
20 that we use, you know, from compounding pharmacies,
21 such as for intrathecal steroids, are different for

34 (Pages 130 - 133)

Page 134

1 every single patient, so they have to be prepared
2 specially.
3     Q.  I'm sorry, I missed that last part of
4 that. I apologize.
5     A.  So unlike steroids where every patient,
6 you know, basically gets the same preparation,
7 usually the same dose in the same form, for the
8 medications, the few medications that we order from
9 compounding pharmacies, everybody gets a different
10 mixture; therefore, they have to be ordered
11 separately by individual prescriptions.
12    Q.  Are you aware before the outbreak of any
13 rules and regulations that dictate how a physician
14 is to order medications that are compounded by a
15 pharmacy?
16        MR. KIRBY:  Objection to form and
17 foundation.  You can answer.
18        THE WITNESS:  Before this outbreak, I was
19 not aware of, of those regulations.  Those
20 regulations are really directed towards, towards
21 pharmacies, and I have enough --

Page 135

1 BY MR. ROTH:
2     Q.  Well, is that something --
3     A.  Sure.
4     Q.  I'm sorry, Doctor.
5     A.  I was saying I have enough difficulty
6 keeping up with all of the regulations that are
7 directed towards medical doctors.
8     Q.  Would you agree that the standard of care
9 would require a physician who is prescribing
10 medication to know the rules and regulations that
11 would apply to them in, in completing those
12 prescriptions?
13        MR. KIRBY:  Objection to form and
14 foundation.
15        THE WITNESS:  So I would say that that's
16 not standard of care because most people did not
17 know that before 2013.
18        Also, as the, you know, head of the
19 division at Johns Hopkins, we probably have the,
20 the strongest didactic teaching program for any
21 pain medicine fellowship in the world, and as well

Page 136

1 as, you know, at Walter Reed.  That information is
2 not, is never included in any lectures nor are
3 there any lectures at conferences.
4        It's not -- before 2013, it was not
5 mentioned in articles or textbooks, so I would say
6 that it was not standard of care at that time, and
7 it may not be even standard of care at this time.
8 BY MR. ROTH:
9     Q.  How did you learn how to write
10 prescriptions?
11    A.  I learned back in probably, you know,
12 internship from another doctor, maybe from a
13 resident.
14    Q.  Did you come to learn from reading
15 materials in this case how it is that Dr. Bhambhani
16 would order steroids from NECC?
17    A.  Yes.
18    Q.  What did you learn?
19    A.  That she sent NECC, because of their
20 requirements per the Federal Food Drug, Food, Drug,
21 and Cosmetic Act of 1938, because of NECC's

Page 137

1 requirements, she gave them past patient lists of
2 patients that she anticipated would have epidural
3 steroid injections.  She sent those to the, to the
4 pharmacy, and they, in turn, sent back medications,
5 and all of the medications were the same.
6     Q.  Where did you -- I'm sorry.  I thought
7 you were finished.
8     A.  I was just saying, and that she ordered
9 some 1 cc and 5 cc's vials and 40 and 80 milligrams
10 per cc, but aside from those minor differences, all
11 of the medications that she used were the same.
12 And I learned about her practices from, you know,
13 from actually reviewing the records.
14    Q.  Do you -- I'm sorry.  Every time I'm
15 about to ask you a question, it sounds like you're
16 going to add something.
17    A.  No. No. No. Ask.
18    Q.  Where did you learn that the requirement
19 that she provide a patient list came from the FDA?
20    A.  I think I had been reading material
21 pertaining to this case.  It might have been a

Page 142

1  you order it from, you know, Pfizer or, or Upjohn
2  because they're the same, and it was the same for
3  ordering the steroids from NECC. They were the
4  same for every single patient. So why do you need
5  an individual prescription?
6      Q.  When you say they're the same, the
7  specifications for them are identical, correct?
8      A.  Correct. So it doesn't matter what
9  patient --
10     Q.  Let me --
11     A.  Yeah.
12     Q.  So, but there could be a difference in
13 the way that a compounding pharmacy manufactures
14 something versus an FDA approved manufacturer,
15 isn't that true?
16         MR. KIRBY: Objection.
17         THE WITNESS: In the way that they
18 manufacture, there could be. I'm not an expert in,
19 you know, in manufacturing, but what I would say is
20 that, is that just like Pfizer was sending out
21 identical 1 cc vials of Depo-Medrol, NECC was

Page 143

1  sending out to hundreds of people who use them
2  identical vials of, you know, 5 cc, 1 cc steroids;
3  therefore, that really negates the, the very reason
4  that you would need an individual prescription.
5  BY MR. ROTH:
6      Q.  Well, then why did NECC request it?
7      A.  So the Act is, as you know, is, you know,
8  80 years old, and at the time, it was very
9  relevant. If anyone would comply with this, their
10 practice would go under immediately, right, because
11 you could never -- if someone comes in, you know,
12 tomorrow and sees me and I say, You need an
13 epidural steroid, if I would write a single
14 prescription for that patient, I wouldn't be able
15 to treat them for several months.
16         So we know that delaying treatment is bad
17 for patients. It's also a way to bankrupt your,
18 you know, your practice.
19         Look, I'm not a legal expert, and I'm not
20 trying to say that I am, but I do know this: That
21 there are many, many laws that are on the books.

Page 144

1  There are 14 states that have laws against
2  homosexuality. There are many states that have
3  laws against adultery, but I can tell you that I've
4  never seen a police officer prosecuting, you know,
5  anyone, let alone another police officer because
6  someone was committing, you know, adultery.
7          So, you know, it's the same thing for
8  immigration. You know, people have to figure out
9  what's important, what's the intent of the law and
10 deciding to enforce this.
11         FDA knew, and the Massachusetts Board of
12 Pharmacy knew what was being done, and they
13 continued to allow them to do this. Therefore,
14 they obviously thought that it's not a danger to
15 public safety.
16     Q.  Okay. So what I'm trying to get to is,
17 and you have taken us a little bit far afield, is
18 this requirement, this FDA requirement that you say
19 NECC had to get prescriptions, and I'm looking for
20 the source of that requirement. Can you tell me
21 what it is --

Page 145

1      A.  The source was --
2      Q.  -- other than generally the FDA Act?
3      A.  So NECC, as far as I know, was complying
4  with that 1938 Federal Food, Drug, and Cosmetic
5  Act. What section they were complying with I
6  couldn't tell you.
7          Dr. Bhambhani would not be expected to,
8  to have read that Act, just like I haven't read
9  that Act --
10     Q.  My --
11     A.  -- because we're not, we're not
12 pharmacists --
13     Q.  My question, Doctor, was --
14     A.  -- and she was complying with NECC's
15 regulations requirements.
16     Q.  So the answer is you don't know the
17 specific provision of the FDA Act that NECC was
18 complying with --
19     A.  That is correct.
20     Q.  -- is that correct? Okay. By the way in
21 her experience with NECC, had it always required

Page 154

1 with minimizing risks. And if you read -- and
2 actually, this is, you know, Manchikanti's
3 infection --
4    Q. I don't think you've answered my
5 question.
6        MR. KIRBY: Hold on. Hold on.
7 BY MR. ROTH:
8    Q. Sorry.
9        MR. KIRBY: You can't talk over him. The
10 court reporter is typing it down.
11       MR. ROTH: I can, I can if it's not
12 answering my question.
13       MR. KIRBY: Well, just finish your answer
14 and then you can ask him --
15 BY MR. ROTH:
16    Q. My question --
17       MR. KIRBY: Just finish your answer.
18       MR. ROTH: Well, it's not responsive to
19 my question.
20       THE WITNESS: Well, you asked me if I was
21 responsible for the policy, and so --

Page 155

1 BY MR. ROTH:
2    Q. No, I did not ask that.
3    A. -- the policy --
4    Q. I did not ask that. I asked whether you
5 were one of the doctors who was following the
6 directives of the Hopkins pharmacy folks when there
7 was this shortage?
8    A. Yes.
9    Q. That was the question.
10   A. I decide whether to implement this.
11   Q. Okay. I think you explained the policy,
12 and I understood it. That's why I was talking over
13 you because I didn't think you were responding to
14 my, to the question that I asked.
15       In those circumstances where you decided
16 whether or not you were going to reuse a vial, you
17 knew, did you not, whether the vial was a
18 single-use or multi-use vial?
19       MR. KIRBY: Objection to form. You can
20 answer.
21 BY MR. ROTH:

Page 156

1    Q. Correct?
2    A. Yes, I knew.
3    Q. All right. Am I correct -- well, I
4 shouldn't say it this way. Would the standard of
5 care before this outbreak require that a physician
6 know whether or not a vial they are using for
7 multiple patients is a single or multi-use vial?
8    A. I think that's something that most
9 physicians would know.
10   Q. Because if it's a single-use vial that
11 you're going to reuse, there are certain
12 precautions that should be taken to maintain
13 sterility and reduce the risk of infection for the
14 next patient, do I understand that correctly?
15   A. Yes.
16   Q. Doctor, who prepared your report that you
17 signed and it was dated October 16th, October
18 14th --
19       MR. KIRBY: Objection.
20 BY MR. ROTH:
21   Q. -- 2016?

Page 157

1        MR. KIRBY: Objection.
2        THE WITNESS: So I read the, you know,
3 the information, and we discussed this. And I said
4 these are the important things that, that I want to
5 be included in the report, in the report, so it was
6 a back-and-forth, you know, process between, you
7 know, between the editing. It went back and forth
8 probably a half dozen times before I agreed that,
9 before we both agreed that this was a good report.
10 BY MR. ROTH:
11   Q. You testified you did not read the report
12 of Dr. Manchikanti, correct?
13   A. Yes.
14   Q. Did you read the report of Dr. Larkin?
15   A. No.
16   Q. We've talked about the need to be
17 independent as an expert, and you agree with that,
18 right?
19   A. I agree.
20   Q. And to do your own work?
21       MR. KIRBY: Objection. I don't even know

Page 158

1  what that means, but if you know, Doctor.
2  BY MR. ROTH:
3  Q. That you agreed, I thought, that as an
4  expert coming into court, testifying under oath,
5  expressing your opinion that you should be doing
6  your own work. They should be your opinions,
7  correct?
8      MR. KIRBY: Well, objection to form.
9  Whether they're his opinions or whether he did his
10 own work, whatever that means I think is different,
11 but if you can answer.
12     MR. ROTH: Well, let --
13 BY MR. ROTH:
14 Q. Well, Dr. Cohen, do you understand -- do
15 you understand what it means to do your own work?
16     MR. KIRBY: Objection to form and
17 foundation. You can answer.
18     THE WITNESS: Yes.
19 BY MR. ROTH:
20 Q. You understood when you signed this
21 report that it was going to go to lawyers like me

Page 159

1  who were going to review it and then ask you a
2  bunch of questions about it, right?
3  A. That's right.
4  Q. Doctor, would it surprise you to learn
5  that there are pages of your report that contain
6  the exact same language as the report that was
7  submitted by Dr. Manchikanti?
8  A. Since I read his deposition, it would
9  not.
10 Q. Would it surprise you, Doctor, that it's
11 not only the exact same language, but it also
12 includes the same typographical errors?
13 A. I didn't know that.
14 Q. Do you know what STOPNC is?
15 A. No.
16 Q. Well, do you have your report before you?
17 A. Yeah.
18 Q. Turn to page 11. The last sentence on
19 page 11 reads, All of these factors support the
20 conclusion that it was reasonable and appropriate
21 for STOPNC to purchase compounded MPA, which is a

Page 160

1  reasonable equivalent to Depo-Medrol.
2      Now, on this report that you signed,
3  Doctor, can you tell us please who STOPNC is?
4      MR. KIRBY: Yeah, and I'm just going to
5  object.
6      MR. ROTH: Excuse me, Mr. Kirby.
7      MR. KIRBY: No, no.
8      MR. ROTH: You can allow the witness to
9  answer the question.
10     MR. KIRBY: I'm perfectly within my
11 right --
12 BY MR. ROTH:
13 Q. Do you know --
14     MR. KIRBY: I'm perfectly within --
15 BY MR. ROTH:
16 Q. Do you know --
17     MR. KIRBY: Wait.
18     MR. ROTH: Mr. Kirby, please don't --
19     MR. KIRBY: Go ahead. Go ahead and
20 answer the question.
21     MR. ROTH: Please don't answer.

Page 161

1      MR. KIRBY: I'm perfectly within my right
2  to object, so go ahead and ask.
3      MR. ROTH: You can object, but you don't
4  need to make a speaking objection.
5      MR. KIRBY: I can object and state my
6  reason. Go ahead.
7  BY MR. ROTH:
8  Q. Who is STOPNC?
9      MR. KIRBY: Right, and I'm objecting on
10 the basis of Rule 26 and the privilege of
11 protections of the drafting process. I've said
12 before it was a typo in previous depositions. If
13 you know who STOPNC is, then you can say.
14     MR. ROTH: That's great. Thank you,
15 Mr. Kirby.
16 BY MR. ROTH:
17 Q. Doctor, do you know --
18     MR. KIRBY: Doctor, he can still answer
19 the question as to whether he knows who STOPNC is.
20 I don't know if he does or not.
21     THE WITNESS: Box Hill Pharmacy.

Page 194

1  you know, ten years ago.
2  Q. Is it your opinion if we look at those
3  order forms from ten years ago there's going to be
4  no patient names?
5      MR. KIRBY: Objection. Asked and
6  answered. Go ahead.
7      THE WITNESS: I don't know.
8  BY MR. MINTZER:
9  Q. Right. Okay. In your report on page 14
10 at the very beginning of section 5C, it looks like
11 VI it states, It was appropriate and in compliance
12 with the standard of care for Box Hill to rely on
13 the FDA, the Massachusetts Board of Registration in
14 Pharmacy and/or the Maryland Board of Pharmacy to
15 regulate NECC. Do you see that?
16     MR. KIRBY: I'm sorry, where are you?
17     THE WITNESS: Here, VI.
18     MR. MINTZER: I'm on the doctor's report,
19 page 14, the first full paragraph, the first
20 sentence.
21     MR. KIRBY: Okay.

Page 195

1      THE WITNESS: So, yes, I, I agree with
2  that statement a hundred percent.
3  BY MR. MINTZER:
4  Q. Can you direct me to any information in
5  the case that indicates that the Box Hill
6  Defendants were relying on the FDA, the
7  Massachusetts Board of Registration and Pharmacy
8  and/or the Maryland Board of Pharmacy to regulate
9  NECC? Was there any testimony to that effect?
10 A. The fact that they were licensed in
11 Maryland and in Massachusetts means that those
12 regulatory bodies did not believe that they posed a
13 significant risk, and if the FDA believed they
14 posed a significant risk, then they would have been
15 remiss to not shut them down, and that may or may
16 not have been true, but at the, at the time, you
17 know, it wasn't.
18 Q. I hear what you're saying, Doctor, and I
19 understand that, and I think you have testified to
20 that already in the deposition.
21     My question to you is, Is there any

Page 196

1  information in any of the documents you have
2  reviewed or the deposition testimony that anybody
3  at Box Hill stated that they were relying on these
4  entities to do anything?
5  A. They did not --
6      MR. KIRBY: Objection to the form.
7      THE WITNESS: Yeah, they did not
8  specifically cite any documents that they reviewed.
9  BY MR. MINTZER:
10 Q. Did anybody from Box Hill, Mr. Vickers,
11 Dr. Bhambhani, did either one of them testify that
12 they were relying on any agency or pharmacy board
13 to police the drugs?
14     MR. KIRBY: Objection to form and
15 foundation. You can answer.
16     THE WITNESS: They, they did not.
17 BY MR. MINTZER:
18 Q. Do you have any information that the
19 Maryland Board of Pharmacy was aware back in 2012
20 that NECC was not requiring doctors to provide
21 individual prescriptions to patients?

Page 197

1      MR. KIRBY: Objection.
2      THE WITNESS: I don't have any
3  information to that effect.
4  BY MR. MINTZER:
5  Q. Again, switching gears, Doctor. Do you
6  keep any notes related to your research for the
7  talks that you've been asked to do related to the
8  outbreak that you talked about earlier for some of
9  those foreign entities or governments?
10 A. No.
11 Q. Do you keep copies of the talks that you
12 give? Do you write them ahead of time?
13 A. I have some -- I do have copies of the
14 talks.
15 Q. Okay. Could you provide those to
16 Mr. Kirby so he may produce those to us in this
17 litigation?
18 A. You know, my FDA talk, which is very
19 comprehensive, is probably available online.
20 Q. I've read the FDA one. I wouldn't need
21 that one. That's true.

Page 226

1 did not need to know the difference between the
2 safety profile of drugs manufactured by a
3 compounding pharmacy as opposed to those
4 manufactured by, you know, an FDA manufacturer to
5 meet the standard of care --
6        MR. KIRBY: Objection.
7 BY MR. ROTH:
8   Q.  -- is that right?
9        MR. KIRBY: Objection. Asked and
10 answered. We've been over this. Go ahead.
11       THE WITNESS: Correct. The smartest,
12 most knowledgeable physicians on this subject did
13 not know this. This did not, you know, appear in
14 the, you know, the biggest, best-selling, you know,
15 textbooks of, of pain medicine or, or the highest,
16 you know, the most highly cited, you know,
17 articles.
18       This decision just really wasn't on the
19 radar of most pain doctors, and certainly we never
20 taught -- we never had lectures on this topic at
21 any institution that I've been affiliated with.

Page 227

1 BY MR. ROTH:
2   Q.  And, again, that's specifically about the
3 difference between compounding pharmacies and
4 manufacturers, the FDA manufacturers?
5   A.  Right, and we're talking, again, about,
6 you know --
7   Q.  Pre-event?
8   A.  -- yeah, pre-event.
9   Q.  Okay.
10       MR. ROTH: Doctor, I don't have any other
11 questions. Thank you.
12      THE WITNESS: Thank you.
13      MR. KIRBY: I have do have some
14 questions. Can you deal with another ten
15 minutes --
16      THE WITNESS: Yeah.
17      MR. KIRBY: -- without a break?
18      THE WITNESS: That's fine.
19              EXAMINATION
20      BY MR. KIRBY:
21   Q.  Dr. Cohen, do you have an opinion whether

Page 228

1 those other healthcare providers, you were just
2 asked a series of questions, whether those other
3 healthcare providers who you said also ordered
4 compounded drugs or used preservative-free drugs
5 and did what Dr. Bhambhani did, do you have an
6 opinion whether they were reasonable healthcare
7 providers?
8       MR. ROTH: Objection.
9       MR. MINTZER: Objection.
10      MR. ROTH: Form and foundation. Do you
11 know who they are?
12      THE WITNESS: No, I don't know any of
13 them by name.
14      MR. ROTH: Okay.
15 BY MR. KIRBY:
16   Q.  Was it unreasonable for her to order
17 preservative-free drugs to order from NECC?
18   A.  Well, actually, I do know one person by
19 name, but I won't mention him. No, I would say
20 that there were -- if there were 76 people who
21 ordered methylprednisolone from NECC and in those

Page 229

1 peoples' practice there may have been 2 or 300
2 doctors and NECC is only one of many, many
3 compounding pharmacies, you might conclude that
4 there are several hundred, you know, people who are
5 board certified or who are practicing pain who made
6 this same decision. Are all of them bad doctors,
7 or were they all negligent? I, I don't think
8 that's the case.
9   Q.  You were asked about --
10      MR. ROTH: Excuse me, Mr. Kirby. Let me
11 just finish. Move to strike, and go ahead.
12 BY MR. KIRBY:
13   Q.  You were also asked a lot of questions
14 about, you know, ordering drugs from NECC in
15 general and the safety of compounding pharmacies.
16      Are you aware of the number of customers
17 who ordered drugs just in general from NECC from
18 May of 2012 to September of 2012?
19   A.  Three thousand.
20   Q.  What is that based on?
21   A.  It's based on material that I, that I

Page 230

1 reviewed, many pages of, of documents, and these
2 include some of the most well-regarded and
3 prestigious, prestigious medical institutions in
4 the United States, such as Brigham and Women's
5 Hospital, Yale University, Massachusetts General
6 Hospital.
7     Q. You were asked about whether you had any
8 experience deciding where to purchase drugs, and I
9 know there was a discussion in there about how
10 Hopkins does it, but do you have experience
11 determining which drugs to use, and -- and that's
12 the question.
13        MR. ROTH: Objection.
14        THE WITNESS: Certainly --
15        MR. ROTH: Doctor, just because I object,
16 don't stop.
17        THE WITNESS: Certainly as doctors if we
18 decided that, that one medication was better than
19 another medication, we could try to undergo the
20 process by which the medications are, are changed
21 and -- but in terms of who to purchase it from,

Page 231

1 these are from, you know, contracts that the, that
2 the university has that are way above my pay grade.
3 BY MR. KIRBY:
4     Q. If Dr. Bhambhani had checked to see if
5 NECC was licensed, licensed in Maryland or
6 Massachusetts, what would she have found?
7     A. NECC was licensed in both states.
8     Q. I think you were asked a question several
9 hours ago about whether Dr. Bhambhani intended to
10 inject these patients intrathecally. Is it
11 possible for drugs that are even intended to be
12 injected epidurally to go intrathecally?
13    A. It definitely is, and it's not a rare
14 event.
15    Q. Are you -- you mentioned Dr. Saberski.
16 Are you familiar with the Plaintiffs' expert,
17 Dr. Saberski?
18    A. Dr. Saberski, you know, doesn't really
19 attend, you know, meetings. I know he doesn't
20 review for the journals that I'm an editor of, so I
21 have, I have never met him, but I know who he is.

Page 232

1     Q. Through your review of the records and
2 his deposition, do you know what type of steroid
3 he, he uses when he does injections?
4     A. I believe that he said he uses
5 triamcinolone.
6     Q. Do you agree with the use of
7 triamcinolone?
8         MR. ROTH: Objection.
9         MR. MINTZER: Objection to form.
10        THE WITNESS: So there is something that
11 I disagree with in his statement. He said that
12 triamcinolone is associated with smaller particles
13 than Depo-Medrol.
14       If you look at the two best articles on
15 this, one by Benzon and one by Derby, that's not
16 true. They come up with conflicting conclusions,
17 but what there is consensus about is that
18 triamcinolone aggregates at a much greater rate
19 than Depo-Medrol.
20       Because -- and this is based on the, you
21 know, the FDA, you know, Multispecialty Working

Page 233

1 Group Safety Guidelines. Because injection of Depo
2 steroids into small arteries that feed the spinal
3 cord has been responsible for probably a hundred
4 cases of death or paralysis, and this is the basis
5 for their recommendation, since triamcinolone
6 aggregates more than Depo-Medrol, you can conclude
7 by deductive reasoning that triamcinolone has a
8 higher risk of complications.
9       There's one randomized study that
10 actually compared Depo-Medrol to triamcinolone, and
11 it found that Depo-Medrol was better.
12       So if you consider, you know, a higher
13 risk and possibly lower effectiveness, you could
14 say, Why would anyone use triamcinolone?
15 BY MR. KIRBY:
16    Q. So despite, despite that criticism, the
17 fact that you, I guess as a pain physician, don't
18 agree with him personally, do you believe he
19 breached, that he's breaching the standard of care
20 by using triamcinolone?
21        MR. ROTH: Objection.

Page 254

1  transcript, do you know whether he has any evidence
2  whatsoever to show that the customers of NECC
3  ordered drugs using patient-specific prescriptions
4  are any different than Dr. Bhambhani?
5      MR. ROTH: I'm sorry. Mr. Kirby, I just
6  didn't get that question. Either it can be read
7  back, or can you repeat it?
8      MR. KIRBY: Sure. I'll try.
9  BY MR. KIRBY:
10     Q. So what I said is in reviewing
11 Dr. Saberski's deposition, do you know whether he
12 had any evidence whatsoever to show that any of
13 those customers of NECC were actually, had used
14 patient-specific prescriptions when ordering from
15 NECC?
16     A. I -- he has no evidence that the ordering
17 practices of the 75 other doctors were any
18 different from those of Dr. Bhambhani.
19     Q. Okay. And then you were asked -- I
20 swear, it's my last question. You were asked a
21 question by Mr. Roth a second ago about rigorous

Page 255

1  inspections from the FDA. Despite the rigorous
2  inspections of manufacturers, do they still have
3  problems?
4      MR. ROTH: Objection to form.
5      THE WITNESS: Yes. I think, as we
6  discussed, FDA approved manufacturers, including
7  those of steroids such as Pfizer, have had their
8  share of problems in the past.
9      MR. KIRBY: Thank you so much. Those are
10 all of the questions I have, Doctor. Are we good?
11 Do you guys want to order?
12     MR. ROTH: Doctor, thank you very much.
13     MR. MINTZER: Nothing further.
14     MR. KIRBY: Do you guys want to order any
15 transcripts or what?
16     MR. MINTZER: I would like an E-tran,
17 please.
18     MR. KIRBY: That's Glenn.
19     MR. ROTH: Okay. Me too.
20     (Whereupon, the deposition of Steven Paul
21 Cohen, M.D. was concluded at 4:33 p.m., and the

Page 256

1  reading and signing of the transcript was not
2  waived.)

Page 257

1      Arnetta, et al v. BHSC, et al
2      Steven Paul Cohen, M.D.
3      INSTRUCTIONS TO THE WITNESS
4      Please read your deposition over
5  carefully and make any necessary corrections. You
6  should state the reason in the appropriate space on
7  the errata sheet for any corrections that are made.
8      After doing so, please sign the errata
9  sheet and date it.
10     You are signing same subject to the
11 changes you have noted on the errata sheet, what
12 will be attached to the deposition.
13     It is imperative that you return the
14 original errata sheet to the deposing attorney
15 thirty (30) days of receipt of the deposition
16 transcript by you. If you fail to do so, the
17 deposition transcript may be deemed to be accurate
18 and may be used in court.