```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3

 4    IN RE: NEW ENGLAND              : MDL No. 2419

 5    COMPOUNDING PHARMACY, INC.      : Docket No.:

 6    PRODUCTS LIABILITY LITIGATION:  1:13-md-2419(RWZ)

 7    -----------------------------:

 8    This document relates to:      :

 9                                    :

10    ARNETTA, ET AL v. BOX HILL     :

11    SURGERY CENTER, LLC, ET AL     :    DEPOSITION OF

                                          DAVID MAINE, M.D.

12    No. 1:14-cv-14022-RWZ          :

13                                    :

14    BOWMAN, ET AL v. BOX HILL      :

15    SURGERY CENTER, LLC, ET AL     :

16    No. 1:14-cv-14028-RWZ          :

17                                    :

18    DAVIS, ET AL v. BOX HILL       :

19    SURGERY CENTER, LLC, ET AL     :

20    No. 1:14-cv-14033-RWZ          :

21                                    :
```

EXHIBIT 9

```
 1    DREISCH, ET AL v. BOX HILL        :
 2    SURGERY CENTER, LLC, ET AL        :
 3    No. 1:14-cv-14029-RWZ             :
 4                                      :
 5    FARTHING, ET AL v. BOX HILL       :
 6    SURGERY CENTER, LLC, ET AL        :
 7    No. 1:14-cv-14036-RWZ             :
 8                                      :
 9    KASHI, ET AL v. BOX HILL          :
10    SURGERY CENTER, LLC, ET AL        :
11    No. 1:14-cv-14026-RWZ             :
12                                      :
13    TORBECK, ET AL v. BOX HILL        :
14    SURGERY CENTER, LLC, ET AL        :
15    No. 1:14-cv-14023-RWZ             :
16                                      :
17    HANDY, ET AL v. BOX HILL          :
18    SURGERY CENTER, LLC, ET AL        :
19    No. 1:14-cv-14019-RWZ             :
20                              ---------------------
21
```

1    Deposition of DAVID MAINE, M.D., was
2    taken on Wednesday, March 8, 2017, commencing at
3    4:36 p.m., at Mercy Medical Center, 435 St. Paul
4    Place, 4th Floor, Baltimore, Maryland, before
5    MICHELE D. LAMBIE, Notary Public.
6               ---------------------
7
8
9
10
11   ALSO PRESENT;   Ashley E. Geno, Esquire
12                  (via telephone)
13   Reported By:
14          Michele D. Lambie, CSR-RPR
15
16
17
18
19
20
21

```
 1   APPEARANCES:

 2              ON BEHALF OF PLAINTIFFS ARNETTA, BOWMAN,

 3         DAVIS, DREISCH, FARTHING, KASHI, TORBECK

 4         AND HANDY:

 5     Law Offices of Peter G. Angelos, P.C.

 6         JAY D. MILLER, ESQUIRE.

 7         jmiller@lawpga.com.

 8         SHARON L. HOUSTON, ESQUIRE.

 9         shouston@lawpga.com.

10         100 North Charles Street.

11         Baltimore, Maryland  21201.

12         (410) 649-2000

13

14         ON BEHALF OF PLAINTIFF ROZEK:

15     Cohen, Placitella & Roth, P.C.

16         MCHAEL COREN, ESQUIRE.

17         mcoren@cprlaw.com.

18         2001 Market Street.

19         Suite 2900.

20         Philadelphia, Pennsylvania  19103.

21         (215) 567-3500
```

```
 1    APPEARANCES CONTINUED:
 2         ON BEHALF OF THE DEFENDANTS:
 3    Pessin Katz Law, P.A.
 4         GREGORY K. KIRBY, ESQUIRE.
 5         gkirby@plaw.com.
 6         901 Dulaney Valley Road.
 7         Suite 400.
 8         Towson, Maryland  21204.
 9         (410) 938-8800
10
11
12
13
14
15
16
17
18
19
20
21
```

Page 22

1  context, but it seems like a reasonable statement;
2  yes.
3     Q. Would you agree because of your unbiased
4  nature if you read something or you learn something
5  throughout this case, throughout this deposition or
6  whenever, if it's contrary to the position that you
7  have already indicated, because you're unbiased and
8  you want to comply with the guidelines, you will
9  tell the attorney and indicate that, Hey, my
10 opinion is not what I thought it was?
11    A. Sure. I mean, I think, you know, when I,
12 when I take a case, it's fairly clear with counsel
13 that my, my opinion is obviously always subject to
14 change if there's new information provided to me in
15 respect to a case, particularly as it pertains to
16 injuries where sometimes I don't get all of the
17 information at the time of my clinical exam or so
18 on and so forth, so.
19    Q. Now, you understand that I have not had a
20 chance to talk to you about this case before. So
21 we have been provided what you have signed as to be

Page 23

1  your report in this case. I believe your signature
2  appears on page 23?
3     A. Correct.
4     Q. It shows me you signed it in October of
5  2016?
6     A. Um-hum.
7     Q. And you -- how did you prepare this
8  report?
9     A. So I first reviewed two giant boxes of
10 information that made my head want to blow up, and
11 then I spent some time synthesizing it. And then I
12 had numerous telephone conversations with
13 Mr. Kirby, and I think it was solely Mr. Kirby,
14 where he asked me questions, and I articulated my
15 opinion. We would -- he would -- that's
16 essentially how I did it.
17    Q. Did you type the pages?
18    A. No.
19       MR. KIRBY: I'm just going to object
20 based on protected information of drafting in the
21 process which I consider privileged.

Page 24

1        MR. MILLER: I'm not asking about the
2  drafting, just his final report.
3  BY MR. MILLER:
4     Q. This final version, you didn't type any
5  of this?
6     A. If I had to type this, I would still be
7  typing right now.
8        MR. COREN: Objection. Just so we're
9  clear on the record, could we give it an exhibit
10 number?
11       MR. MILLER: Sure.
12       (Whereupon, Maine Deposition Exhibit
13 Number 1626-1, Standards of Professionalism: Expert
14 Witness Guidelines, marked for identification.)
15       (Whereupon, Maine Deposition Exhibit
16 Number 1626-2, Report, marked for identification.)
17 BY MR. MILLER:
18    Q. You can use yours. I just want to sit
19 this here.
20    A. That's fine.
21    Q. So the 23 pages was arrived at to a

Page 25

1  series of questions and answers with Mr. Kirby, and
2  then ultimately after a number of conversations
3  just with Mr. Kirby, you telling him information,
4  he put together a typed 23-page report. You
5  received this, and I take it you reviewed it before
6  you signed it?
7     A. Of course, yes. I, I made some changes
8  here and there, but that's correct.
9     Q. And then so this 23-page report contains
10 the entirety of your opinions in this case?
11    A. It's a good summary.
12    Q. Do you have any changes you want to make
13 before we move on?
14       MR. KIRBY: Objection to form and the
15 broad nature of the question. You can answer.
16       THE WITNESS: Not specifically.
17 BY MR. MILLER:
18    Q. Have you reviewed any of the reports that
19 Dr. Cohen filed in this case?
20    A. No.
21    Q. How about the report of Dr. Larkin?

Page 26

1  A. No.
2  Q. Have you seen the report of
3  Dr. Manchikanti?
4  A. No. I read his deposition.
5  Q. Have you read your report prior to today?
6  A. I read it, I think, in September of 2016
7  and maybe in August of 2016 when it was being
8  prepared.
9  Q. Is it fair to say at the time you read
10 it, when you signed it, you were confident that
11 your opinions were truthful, unbiased and
12 scientifically sound?
13 A. These are my opinions.
14 Q. Well, they're obviously truthful?
15 A. So they're truthful, yes.
16 Q. And unbiased?
17 A. Yes, they're my opinions. These are my
18 opinions.
19 Q. Okay. No other doctor's? They're yours?
20 A. No. I mean, they're only biased by my
21 experience in clinical practice.

Page 27

1  Q. You wouldn't copy anybody else's opinion.
2  These are your own personal opinions that you
3  reached, right?
4     MR. KIRBY: Object to the form.
5     THE WITNESS: Yeah. These are, these are
6  my opinions. Now, it's not to say that others
7  cannot have the same opinions, but they're my
8  opinions.
9  BY MR. MILLER:
10 Q. If you could turn to page 3, at the top
11 you say that these opinions contained herein are
12 generally relied on your education, training,
13 experience and then the materials you reviewed,
14 correct?
15 A. Correct.
16 Q. Down at the bottom of page 3 where your
17 report states that, Box Hill Surgery Center has a
18 nurse administrator, Andrew Vickers, and you say,
19 Mr. Vickers works part time with Dr. Bhambhani to
20 assist her when performing pain injections --
21 A. Um-hum.

Page 28

1  Q. -- and to help with administrative
2  functions, such as addressing inventory and
3  ensuring that medications and other supplies are
4  fully stocked. Where did you get that information?
5  A. I don't recall specifically.
6  Q. Do you have some specific recollection of
7  reading something that led you to the conclusion
8  that Mr. Vickers helps with addressing inventory
9  and ensuring that stock is kept up to date?
10 A. It might, it might have been
11 Dr. Bhambhani's deposition. I just don't recall
12 specifically.
13 Q. All right. The next paragraph,
14 Dr. Maine, under B, Medication Purchasing, the
15 fourth line down, it says, She -- you're referring
16 to Dr. Bhambhani -- continued to use it -- and
17 we're talking about MPA, correct?
18 A. Correct.
19 Q. Continued to use it out of a concern for
20 potential adverse events due to preservatives. I
21 want to stop right there.

Page 29

1  A. Sure.
2  Q. What specific facts did you rely on to
3  conclude that Dr. Bhambhani used MPA because she
4  was concerned about adverse events due to
5  preservatives?
6  A. Well, Dr. Bhambhani's deposition spoke to
7  that, so that was the primary part of the medical
8  record that I used to garner that, that opinion.
9     I think she spoke to specifically that
10 she had worked with another provider who had used
11 NECC. I think she might have been
12 working -- she has worked for several years using
13 it uneventfully.
14    She had some negative experiences with
15 other steroids, and I think it was shaping those
16 experiences, both positive and negative, that
17 ultimately resulted in her reason of using the
18 preservative-free MPA, that she had a very positive
19 experience with.
20 Q. So it's your belief that Dr. Bhambhani
21 specifically used preservative free or the MPA

8 (Pages 26 - 29)

Page 50

under a single patient's name. You would get the vials, and then when you administered the medication, even though that medication may have been going to a different patient, you would write the lot number and record it, obviously, for that patient. But in terms of ordering, this is what the pharmacies expressed was necessary, and it was done that way, so I considered it standard practice.

Q. Since the NECC meningitis outbreak, is it fair to say you've learned that that was, it may have been standard practice, but it certainly did not comply with the law?

MR. KIRBY: Objection to form. Again, he's not a regulatory expert.

BY MR. MILLER:

Q. You can answer.

A. I mean, I think our knowledge and understanding of these issues has certainly come to the forefront after the NECC outbreak, so I think our understanding of that is much clearer, and, and

Page 51

I will say that.

Q. What's your understanding now of what the law requires when ordering a prescription --

MR. KIRBY: Objection to form.

BY MR. MILLER:

Q. -- from a compounding pharmacy?

A. I think you need -- I think you need a prescription or a specific prescription for a patient for a specific quantity for that patient. The details in terms of ordering and certifications I can't speak to.

Q. And you learned that that's not a new law. That was in existence in 2012?

MR. KIRBY: Objection to form.

THE WITNESS: Again, I wasn't familiar with the law in 2012 --

BY MR. MILLER:

Q. I understand.

A. -- or 2010. I'm, I'm really marginally familiar with it now, other than there seems to be quite a bit more regulatory oversight.

Page 52

Q. So your opinion that she complied with the standard of care in 2012 by ordering it the way she did by using the schedule is based on your belief that the standard of care was what everybody was doing --

A. Well --

Q. -- regardless of what the law said?

MR. KIRBY: Objection to form and foundation.

THE WITNESS: Well, I mean, when I -- when I say the word standard practice, standard practice or standard of care, I'm thinking what any reasonably appropriate physician would do in the same situation --

BY MR. MILLER:

Q. Understood.

A. -- and that's what was being done. I remember talking about it at conferences. Everyone was starting up their practices. People were talking about where they were ordering medications and how they were doing it, so this was

Page 53

commonplace.

You know, I mean, I, I can't speak to what the pharmacy regulations were. I mean, that's on pharmacies, but, you know, for physicians, that was commonplace, and I, I would call standard practice.

Q. I'll ask you to turn to page 5 for me. When you make a statement at the top like this where it says, Each of the patients in the instant actions treated by Bhambhani presented, in most cases, as a referral from another physician, what's your source of that? Where do you get that information?

A. I don't recall specifically, but Dr. Bhambhani implied in her deposition that she used these medications for treating patients with back, neck pain, so on and so forth, so.

Q. Do you think it's fair for me to make the assumption that a statement like that where you really don't recall the source is likely a statement made by the attorney in the report, that

Page 70

1  You know, I can only rely on ultimately I
2  think the Medical Examiner's reports and so on and
3  so forth, but there were some hospital reports that
4  spoke to some comorbidities, but I just don't
5  recall the details about them. That was a long
6  time ago.
7      Q.  You don't tend to offer any opinions in
8  any of those comorbidities, specifically what they
9  were and for what patient and --
10     A.  No.
11     Q.  -- that it -- no. Then you say, It is
12 also my understanding that there were some lawsuits
13 filed on behalf of patients that were later
14 dismissed because the patients had not authorized
15 the attorneys to sue Dr. Bhambhani.
16         Do you have any information that any of
17 the clients of Peter Angelos' office, we filed
18 lawsuits on their behalf and we weren't authorized
19 to?
20     A.  I can't -- no, I can't speak to that
21 specifically for, for your office.

Page 71

1      Q.  Is that two sentences really part of your
2  opinion in this case?
3      A.  I think it was discussed with Counsel,
4  and that's why it was put in there. You know, it's
5  not necessarily particularly pertinent to my
6  medical opinions.
7      Q.  On page 6 it says, I received the
8  materials listed in Exhibit 2 in consideration of
9  forming my opinions. Earlier in your, when we were
10 just starting out, you candidly said you looked at
11 so much stuff that, you know, your head was ready
12 to explode. Is that the information that's on
13 Exhibit 2?
14     A.  Can I see Exhibit 2?
15     Q.  Yes. Sure. Should be the back.
16         MR. KIRBY: It's near the back of your
17 report.
18         (Whereupon, there was a pause for
19 document examination.)
20         THE WITNESS: Yes. This looks like it.
21 I mean, I -- a lot of this looks familiar. There

Page 72

1  were two giant boxes.
2  BY MR. MILLER:
3      Q.  When you were going through those
4  materials in Exhibit 2, did you take notes,
5  dictate, or is it all --
6      A.  Yeah, no. I definitely didn't dictate,
7  and I did not take notes.
8      Q.  So is it fair to say then that everything
9  you know about this case, read about this case is
10 all up in Maine brain?
11     A.  That's reasonable to say.
12     Q.  Why would you do that? Why didn't you
13 take notes? I'm just curious.
14     A.  That's just my style. I just don't take
15 notes on -- I take notes on, when I do patient
16 exams because, you know, I might dictate them
17 later, and they need to be accurate. But for
18 large -- with large activities such as this, the
19 scope is just enormous, that my opinions get
20 synthesized over time, over the course of
21 reviewing, and I'm not looking for the little tiny

Page 73

1  details necessarily. It's the sum of parts, and,
2  you know, that's just how my brain works.
3      Q.  If we could go, Dr. Maine, to the bottom
4  of page 6, in the subsection Discussion and
5  Explanation of Medication Purchasing Decisions.
6         So here's where you tell me what your
7  testimony at trial is going to be, and you say, It
8  will include discussion and explanation of
9  medication purchasing decisions, including but not
10 limited to MPA from compounding pharmacies and
11 others. I will go into the factors, to discuss
12 the factors that go into such decisions,
13 including -- and we're talking about the decision
14 to purchase MPA from a compounding pharmacy, right?
15     A.  Um-hum.
16     Q.  You say you're going to testify to the
17 fact that the factor that goes into the decision is
18 the consideration given to representations from a
19 compounding pharmacy. What's that mean?
20     A.  How the compounding pharmacy represents
21 itself to the consumer.

Page 82

1  talking about the drug, the MPA. Not the pharmacy,
2  the MPA.
3      A. So they're kind of related, aren't they?
4      Q. Well, let me ask you -- no, strike that.
5         Okay. So on page 7 your next paragraph
6  begins, Compliance with the standard of care.
7  Stated succinctly, I believe it was appropriate and
8  within the standard of care for Box Hill Surgery
9  Center, LLC, and then you can see what the rest is,
10 to purchase compounded preservative-free MPA from
11 NECC, including 2012, and then you say, The
12 following is a more detailed recitation of the
13 factors that support this opinion. All of my
14 opinions are held to a reasonable degree of medical
15 certainty. Is -- well, strike that.
16        Because you say, stated succinctly, are
17 you saying that, I'm going to get into the details
18 later, but my overall opinion is it was perfectly
19 fine for her to purchase preservative-free MPA from
20 NECC?
21     A. It was a reasonable standard of

Page 83

1  acceptable practice.
2      Q. That's the gist of your opinion, and then
3  the next paragraphs go into why you say that?
4      A. Correct.
5      Q. Now, you're explaining that opinion.
6  You're now giving your, the more detailed
7  recitation of the factors supporting this opinion,
8  and you say, Box Hill Defendants and the involved
9  employees and physicians acted within the accepted,
10 standard of acceptable practice and exercised
11 appropriate due diligence in selecting NECC as its
12 supplier of MPA.
13        What do you mean when you say appropriate
14 due diligence?
15     A. Well, I think in this, in this case,
16 again, I guess I'll speak to her experience, so her
17 experience was positive.
18        If her experience was negative and she
19 didn't act on that, that would not be appropriate.
20 So she had appropriate experience.
21        She had a positive relationship with them

Page 84

1  in terms of I order it, you send, it works out, I
2  pay, you bill, and so on and so forth. It was my
3  understanding that it was a very good relationship
4  and reliable relationship. So in that respect, I
5  thought that was a reasonable avenue to pursue for
6  continuing care.
7      Q. All right. So, the positive experience
8  that she had, that's appropriate due diligence?
9  I'm just making sure.
10     A. Yeah, essentially. Essentially. I
11 mean --
12     Q. Okay.
13     A. -- she was under the presumption that
14 they were regulatory, they were appropriate from a
15 regulatory standpoint and so on and so forth, and
16 all of those presumptions I think lead me to an
17 acceptable reasoning to utilize.
18     Q. Due diligence has one or two different
19 meanings, but the standard one is it's an
20 investigation. Other than having that positive
21 experience, you don't believe the standard of care

Page 85

1  required any further diligence or investigation on
2  her part?
3         MR. KIRBY: Objection to form. You can
4  answer.
5  BY MR. MILLER:
6      Q. She was perfectly appropriate relying on
7  her experience she had at Harford?
8      A. I mean, I -- if you're implying that a
9  reasonable physician in this same situation is
10 supposed to go into the FDA database, do a Google
11 search, look in all of these different options to
12 investigate a specific place that you're ordering,
13 I would say that's not at all reasonable and does
14 not occur.
15     Q. That wouldn't be a bad idea, but how long
16 would that take?
17     A. It just -- it just -- we don't do that.
18 We're not the regulatory body of medications, you
19 know, so, so we just don't do that.
20        That's the -- to suggest that I came here
21 and then looked up Pfizer and found out exactly how

22 (Pages 82 - 85)

Case 1:13-md-02419-RWZ   Document 3531-9   Filed 03/05/18   Page 11 of 14

Dr. David Maine                                              March 8, 2017

Page 126

1 things to purchase any medication.
2 BY MR. MILLER:
3  Q. So is it, not that you don't need to be
4 aware of what's in that inspection, your issue is
5 how difficult it is to obtain that inspection. If
6 it's easy to obtain it, you know, then you're okay
7 with it, but you're not -- you don't want to put a
8 doctor --
9  A. I mean --
10  Q. Before you take issue, is that why you
11 used the words reasonably or generally available?
12  A. I mean, they're not readily accessible.
13 They're not disseminated. Like the Maryland Board
14 of Physicians will disseminate information to
15 physicians quarterly.
16     This is not something that physicians are
17 educated on. They're not expected to do it.
18 There's certainly no easy or, or -- you know, I
19 can't speak to the mechanism of going after such
20 thing, but it certainly was not expected and
21 something that I think anyone in the same situation

Page 127

1 would do. I mean, I think they would do the exact
2 same things, not certainly dig into all of that.
3  Q. Go down about halfway --
4  A. Sure.
5  Q. -- and look at the line that says, The
6 Massachusetts Board of Pharmacy offers verification
7 of licenses to the public via its website, which
8 also includes a place for disciplinary actions.
9 Then you say, Prior to the outbreak no disciplinary
10 actions were noted for NECC. That's not something
11 you went back and researched. Is that something
12 you were told by Counsel?
13  A. I think we discussed it, and we may have
14 looked at documents. I'm sure we looked at
15 documents, but what they were exactly I can't
16 recall.
17  Q. Is that the basis for your opinion that
18 even if Box Hill had done a search of the website
19 of the Massachusetts Board of Pharmacy, it would
20 not have resulted in the discovery of any
21 disciplinary action because you looked at documents

Page 128

1 and there wasn't any?
2     MR. KIRBY: Objection to form.
3     THE WITNESS: I just -- I don't recall
4 exactly the documents I looked at, but I believe
5 that there were no disciplinary actions that were
6 on the Massachusetts Board of Pharmacy that were
7 readily available.
8 BY MR. MILLER:
9  Q. Okay. Keep in mind I'm trying to
10 determine what opinion you arrived at versus what
11 opinion you arrived at, in part, based on
12 information that was provided to you as opposed to
13 information you got on your own. That's all. I
14 just want to know the distinction.
15  A. Well, I mean -- I mean, all -- this
16 information -- this opinion came to by looking at
17 documents and discussing it with Counsel and
18 understanding the environment at the time, so I'm
19 not going to be able to give you a specific
20 document. I just can't. I just --
21  Q. Is that your language, Accordingly, even

Page 129

1 if Box Hill had queried the website, it would not
2 have resulted in the discovery of any disciplinary
3 action?
4  A. I apologize. Where are you now?
5  Q. The fourth line from the bottom of page
6 11.
7  A. Okay.
8     (Whereupon, there was a pause for
9 document examination.)
10    THE WITNESS: Yeah, I think we discussed
11 that. That's not -- those aren't -- as I
12 mentioned, these are not my words verbatim, but it
13 is my opinion.
14 BY MR. MILLER:
15  Q. The reason I'm pushing you on the
16 details, Doctor --
17  A. Sure.
18  Q. -- is because, again, as I indicated,
19 that exact same line, as I indicated, is in the
20 opinions of every other doctor in this case
21 verbatim.

33 (Pages 126 - 129)

Veritext Legal Solutions

Page 130

1  MR. KIRBY: That's not a question.
2  BY MR. MILLER:
3  Q. So I'm trying to determine what part of
4  some of these lines are yours versus what part of
5  it Mr. Kirby told you and you said, I can agree
6  with that. Do you understand the distinction I'm
7  drawing?
8  A. I think so. I mean, they're all my
9  opinions. I think I can leave it at that. I don't
10 know what else to tell you except they're my
11 opinions.
12 Q. Okay. But do you -- can you agree with
13 me that the opinion that if Box Hill had looked at
14 this website, it would not have resulted in the
15 discovery of any disciplinary action, that's a very
16 specific opinion. Hey, if they had
17 looked --
18 A. If Box Hill --
19 Q. Yes. If Box Hill had looked at this
20 website, they wouldn't have found anything about
21 NECC because there wasn't any listing of any

Page 131

1  disciplinary action?
2  A. I believe that's correct.
3  Q. I understand that that's your opinion,
4  but what I'm saying is from my perspective, that
5  exact same opinion is in four other doctors'
6  reports verbatim, and I'm -- that's -- as any jury
7  will tell you, that's too much of a coincidence.
8  You all didn't come up with that same sentence.
9  A. Sure.
10 Q. Either one of you did and the lawyer told
11 the rest of you and you agreed with it or the
12 lawyer told all of you. That's all I'm trying to
13 distinguish in this report.
14    What was told to you and you said, I can
15 agree with that, put that in the report versus what
16 did you specifically say? What did you come up
17 with on your own?
18    MR. KIRBY: Objection. Argumentative.
19 Asked and answered several times now. I don't even
20 know if it's a question, but --
21 BY MR. MILLER:

Page 132

1  Q. You can answer.
2     MR. KIRBY: I -- okay.
3     THE WITNESS: You know, I, I think I've
4  said this, I've said it several times, so when I
5  was giving my opinions, I went through countless
6  documents. I talked with Mr. Kirby extensively.
7     We talked about -- you know, there were
8  some narratives discussed and, you know, some
9  things that I changed and so on and so forth, but
10 the bottom line is these are my opinions. Plain
11 and simple these are my opinions, so I did not -- I
12 had no knowledge of the others, and it may be the
13 same thing because maybe it's all our opinions, but
14 regardless of how this came about, it's my
15 opinions.
16 BY MR. MILLER:
17 Q. So that is your language, Accordingly
18 even if Box Hill had queried the website, it would
19 not have resulted in the discovery of any
20 disciplinary action? It was not Mr. Kirby's
21 language, that's your specific question?

Page 133

1     MR. KIRBY: Objection. Asked and
2  answered.
3     THE WITNESS: I mean, I think, like I
4  mentioned, I did not type this up. So all of my
5  opinions are conveyed in this, but if you're asking
6  if I sat in front of a microphone and said all of
7  these words, that did not happen.
8  BY MR. MILLER:
9  Q. No. I guess I'm referring to the
10 specific -- within your opinions, over 23 pages,
11 there are a number of explanatory statements, a
12 number of thoughts that back up the general opinion
13 which was Box Hill did enough in this case, okay?
14 A. (Nodding head yes.)
15 Q. In those explanations, you make comments
16 like, Look, they did enough. They didn't have to
17 go out and look on the website, because even if
18 they did, they wouldn't have found anything.
19    Well, there's about 80 of those
20 statements made throughout here, those kind of, and
21 all 80 of those are repeated in every expert's

Page 150

1  MR. KIRBY: Objection to form and
2  foundation.
3      THE WITNESS: I can't speak to what
4  Dr. Bhambhani -- I don't know if she knew that or
5  did not know that.
6  BY MR. MILLER:
7  Q. Is it -- just a lot of what we're talking
8  about is what's standard, and is it fair for us to
9  assume that if you didn't know they were fairly
10 common until you researched, she wouldn't have
11 known they were fairly common back in 2012 either?
12 Is that a fair statement?
13 A. I think that's a reasonable statement.
14 Q. Page 13 under the second big paragraph on
15 that page, It was appropriate and in compliance
16 with the standard of care for Box Hill to rely on
17 the FDA, the Massachusetts Board of Registration
18 and/or the Maryland Board of Pharmacy to monitor
19 and regulate NECC and to take action if NECC was
20 utilizing unsafe practices in compounding sterile
21 medications.

Page 151

1     What facts do you have to support your
2  opinion that Box Hill was relying on knowledge that
3  the Massachusetts Board of Registration was
4  monitoring and regulating NECC?
5  A. So, again, I'm not a regulatory expert,
6  but I -- it's -- the FDA, the Massachusetts Board
7  of Registration in Pharmacy and/or the Maryland
8  Board of Pharmacy, some regulatory entity was
9  monitoring to regulate NECC. That's a reasonable
10 presumption that any reasonable physician would
11 have made at that time.
12 Q. So it's not that it was appropriate and
13 in compliance for Box Hill to rely on the FDA or
14 the Mass or the Maryland Board. It was appropriate
15 and in compliance with the standard of care for Box
16 Hill to assume that the FDA or the Mass Board or
17 the Maryland Board was regulating the NECC?
18 A. I'm not sure the difference. Rely,
19 assume -- I mean, you are relying on other
20 regulatory bodies to oversee an entity that you
21 certainly don't have expertise in overseeing.

Page 152

1  Q. Let me explain the difference and see if
2  it makes better sense and you can answer it any
3  better.
4     One scenario, Dr. Bhambhani knows that
5  the FDA or the Maryland Board of Pharmacy is
6  monitoring and regulating NECC. The other one is
7  you don't know if she knows, but you think it's
8  perfectly appropriate for her to assume that one of
9  those boards would, would be regulating or
10 monitoring NECC. Isn't that what you're doing
11 here? You don't know if she knew that at all, do
12 you?
13    MR. KIRBY: Objection to form. You can
14 answer.
15    THE WITNESS: I'm not certain. I don't
16 know if I can differentiate the two.
17 BY MR. MILLER:
18 Q. As you sit here today, can you say under
19 oath that back in 2012 Dr. Bhambhani knew that the
20 FDA or the Mass Board or Maryland Board of Pharmacy
21 was monitoring NECC?

Page 153

1     MR. KIRBY: Other than her deposition
2  testimony?
3     MR. MILLER: Are you going to cheat?
4     MR. KIRBY: Well, you're trying to trick
5  him. I mean, come on. You're mischaracterizing
6  all of his testimony.
7     MR. MILLER: Greg, that was a fair,
8  nicely-worded, appropriate question. What you did
9  was inappropriate.
10    MR. KIRBY: Look, you asked a question
11 about rely and then assume. He explained -- we can
12 ask him to leave if you want, but he said to him,
13 there's no difference. And then you asked him a
14 similar question and then mischaracterized the
15 testimony.
16    MR. MILLER: But I'm allowed to do that.
17 You're not allowed to give him an answer.
18    MR. KIRBY: Right. So you're allowed to
19 trick experts into giving --
20    MR. MILLER: You know what, we'll let the
21 record stay the way it is. What you did was wrong,

### Page 282

BY MR. KIRBY:

Q. Have I ever put any opinions in your mouth?

A. No.

Q. Did the opinions in your report reflect the opinions that you have in this case?

A. They do.

MR. KIRBY: Those are all of the questions I have, Doctor. Follow-ups?

MR. COREN: It was very nice --

MR. MILLER: Just one. I'm sorry.

MR. COREN: Go ahead.

REEXAMINATION

BY MR. MILLER:

Q. Do you know whether Dr. Bhambhani ever ordered from NECC 1 milliliter and 5 milliliter combined, both?

A. I don't know.

Q. If she ordered single prescriptions for her individual patients, she would have gotten 1 milliliter, correct?

### Page 283

MR. KIRBY: Objection.

THE WITNESS: I don't know, actually.

BY MR. MILLER:

Q. Do you know -- in response to your Attorney's question, you answered that no matter how she orders the prescriptions, it wouldn't have made a difference. She still would have gotten contaminated drugs.

Is it your understanding that every single drug that she obtained of MPA was contaminated with meningitis?

MR. COREN: You mean vial?

BY MR. MILLER:

Q. Vial?

A. I'm not sure like when they went back for testing which ones. I mean, there were three lots, and, you know, I think some of them -- I don't know the exact details. I think some tested okay, and others did not, unfortunately.

Q. So assume hypothetically that she had ordered in the way that Mr. Coren suggested the law

### Page 284

said, which is an individual prescription for an individual patient and, in return, received 1 milliliter vials for each of her patients and none of the vials were contaminated, then it would have made a difference how she ordered it, wouldn't it?

MR. KIRBY: Objection.

THE WITNESS: So I don't know if the 1 milliliter vials were contaminated, but if none of them were contaminated and she ordered the 1 milliliter vials, then, yes, the outcome would be different.

MR. MILLER: That's all I have.

MR. COREN: Thank you.

THE WITNESS: I'll waive.

(Whereupon, the deposition of David Maine, M.D. was concluded at 9:46 p.m., and the reading and signing of the transcript was waived.)

### Page 285

State of Maryland

County of Baltimore, to wit:

I, Michele D. Lambie, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 21st day of March 2017.

*Michele D Lambie*