**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC.  PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO:<br><br>All Actions Naming The Specialty Surgery Center, PLLC | |

**MEMORANDUM OF THE PLAINTIFFS' STEERING COMMITTEE IN SUPPORT OF MOTION FOR DISTRIBUTION OF COMMON BENEFIT FEES AND EXPENSES RELATED TO SPECIALTY SURGERY CENTER CASES**

## I.       INTRODUCTION

As the Court is well aware, the Plaintiffs' Steering Committee and the defendants involved in cases stemming from injections at the Specialty Surgery Center, PLLC (the "Specialty Surgery Defendants") reached a global settlement involving all cases in **November** of 2017 (the "Specialty Surgery Center Settlement").

The Plaintiffs' Steering Committee seeks an order from this Court (i) approving an eight percent (8%) assessment from the funds for common benefit fees and expenses from the Specialty Surgery Center Settlement, (ii) approving the payment of reasonable expenses made in support of common benefit efforts as recommended by the PSC from the Specialty Surgery Center Settlement, and (iii) approving the allocation and payment of reasonable attorneys' fees to specified firms in amounts determined by the PSC to be reasonable and necessary for common benefit efforts.

It should be noted that this motion covers strictly time devoted to litigating the Specialty Surgery Center Cases resolved through the Specialty Surgery Center Settlement.  The PSC asked counsel who worked on the Specialty Surgery Center Cases to submit proposed fee and expense requests for time spent solely in advancing the Specialty Surgery Center Cases to successfully completion.  Given that Tennessee lawyers principally drove the Tennessee-specific litigation, Lead

Counsel Tom Sobol designated Tennessee State Chair J. Gerard Stranch, IV to coordinate the filing of the present motion and the significant work undertaken to prepare the present submission.

Because of the relatively small number of claimants at issue in the Specialty Surgery Center Cases – 14 total claimants are covered – the PSC anticipates making only a single payment to eligible settlement plaintiffs. As a result, the PSC files this motion now to finalize the amounts that can be paid to claimants from the Specialty Surgery Center Qualified Settlement Funds. Prior to filing the present motion, the PSC conferred with counsel for the settlement participants and such counsel indicated they did not oppose the timing of this motion or the relief requested.

By the time this motion is resolved by the Court, initial payments to the majority of the 14 claimants covered by the Specialty Surgery Center Settlement may still be awaiting the process of resolving liens asserted by the Center for Medicare and Medicaid Services ("CMS"). The process of resolving a lien asserted by CMS ultimately falls upon the individual lawyers and claimants and the PSC, apart from facilitating some communications and administration, has little to no ability to accelerate that process for any given claimant.[1] To facilitate this process initial awards have been made assuming that the Court will grant the relief requested in this Motion. To the extent that the Court alters the amount of the common benefit, these initial award determinations may need to be altered.

Plaintiffs' counsel expended significant time and expense in litigating the Specialty Surgery Center Cases and the cumulative submitted expenses and initial loadstar of all firms, after review and audit of about $**REDACTED** far exceeds the dollar value of an 8% allocation of the available funds of about $**REDACTED**. As a result, the proposals here result in counsel receiving less than

---

[1] The process of paying funds from the Specialty Surgery Center Settlement will involve a two step process. Initial payments will cover approximately 90% of the funds the PSC reasonably believes will be made available to individual claimants. The 10% reserve will then be paid out after this Court resolves common benefit motions and motions related to fund administration.

their reported or allocated lodestar.  No lawyer will get his or her common benefit time reimbursed dollar-for-dollar.

## II. FACTS

### A. The Outbreak

In 2012, the CDC identified a large number of cases of fungal meningitis and other infections associated with exposure to contaminated lots of methylprednisolone acetate ("MPA") compounded by the New England Compounding Pharmacy, Inc. d/b/a New England Compounding Center ("NECC") in Framingham, Massachusetts, and purchased by dozens of pain clinics, hospitals, and doctors scattered throughout the country.

According to the CDC's update of October 23, 2013, the outbreak of fungal meningitis and other infections have affected individuals in over 20 states and caused more than 64 deaths.  Over 753 people have been diagnosed with meningitis, fungal infections and/or abscesses, and other injuries.[2]  The United States Food and Drug Administration ("FDA") and CDC have confirmed the presence of fungus in unopened vials of NECC's MPA.  The FDA[3] and CDC[4] also identified bacteria and/or fungus present in lots of NECC preservative-free injectable betamethasone, preservative-free triamcinolone, and cardioplegia solution.   There is no dispute that the contaminated products caused widespread injury and death.

The catastrophe struck Tennessee particularly hard.  According to the Tennessee, Tennessee patients contracted 153 cases of confirmed infection and 16 Tennesseans lost their lives.

---

[2] http://www.cdc.gov/hai/outbreaks/meningitis-map-large.html#casecount_table.

[3] http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ORAElectronicReadingRoom/UCM325980.pdf.

[4] http://www.cdc.gov/hai/outbreaks/laboratory/index.html.

**B.      Litigation Against Specialty Surgery Center**

25 Specialty Surgery Center patients filed suit in state and federal district courts in Nashville, Tennessee. These cases initially named four categories of defendants:

The "Affiliated Defendants" included NECC and affiliated entities GDC, Medical Sales Management, and Ameridose.

The "Insiders" included NECC's Owners/Shareholders (including Barry Cadden, Lisa Conigliaro Cadden, Greg Conigliaro, and Doug Conigliaro) and pharmacist Glenn Chin.

The "National Defendants" were NECC's vendors, and would be liable to all victims if they were liable to any victims. They included UniFirst (the company that cleaned the NECC cleanroom), Victory (the company that installed and maintained the NECC cleanroom HVAC system), Liberty (the company that built the NECC cleanroom), and ARL (the company that conducted sterility testing on NECC's products).

The Specialty Surgery Defendants which included some combination of the following: Specialty Surgery Center, PLLC, Kenneth Lister, M.D., and/or Kenneth Lister, M.D. P.C and Calisher and Associates, Inc..[5]

Eventually, the Specialty Surgery Center Defendants moved to dismiss some cases for failure to comply with Tennessee's Healthcare Liability Action.[6] The Court granted, in part, this motion, and dismissed 13 of the 25 cases pending against the Specialty Surgery Defendants.[7] Two of the plaintiffs involved in these dismissed cases appealed the Court's dismissal order and this appeal was pending at the First Circuit at the time the PSC reached the settlement agreement with

---

[5] Calisher & Associates was not named in any of the initial complaints. Discovery later uncovered their role in selecting NECC as a vendor for Specialty Surgery Center and as a result some, but not all, plaintiffs moved to add Calisher as a defendant in these cases.

[6] Dkt. No. 3086.

[7] Dkt. No. 3188.

4

the Specialty Surgery Defendants. The remaining 12 plaintiffs that had cases pending in this Court coupled with the 2 plaintiffs who had cases on appeal are the 14 plaintiffs covered by the Specialty Surgery Center Settlement.

**C.     NECC Files For Bankruptcy, The JPML Creates the NECC MDL, And The Resulting Chapter 11 Bankruptcy Plan**

In December 2012, New England Compounding Pharmacy, Inc. filed for bankruptcy under Chapter 11.[8] On February 12, 2013, numerous civil cases were filed in multiple federal jurisdictions naming NECC and others were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the District of Massachusetts for coordinated pretrial proceedings.[9] As of today, the JPML has transferred a total of 379 civil actions to this district. A number of civil actions have also been directly filed in this district or removed from Massachusetts Superior Court.

On June 12, 2013, through operation of the bankruptcy code, the MDL Court acquired jurisdiction of almost all cases across the country – whether pending in state or federal court – that named NECC, its affiliated companies, or its insiders. The Court asserted § 1334 related-to subject matter jurisdiction over "all federal cases against NECC and its affiliates, and all state-court cases against NECC and its affiliates, including cases where the claims are third-party claims for contribution or indemnity." The Court reasoned that the cases pending elsewhere would have a "substantial effect, on the bankruptcy estate," that tort claims and contribution or indemnity claims

---

[8] Voluntary Petition for Chapter 11 Bankruptcy, *In re New England Compounding Pharmacy, Inc. (Debtor)*, 12-br-19882-HJB (Mass. Bankr. Dec. 21, 2012). On April 9, 2013, then-presiding Judge F. Dennis Saylor appointed two lawyers (Thomas M. Sobol and Kristen A. Johnson) as lead counsel and established the seven-person Plaintiffs' Steering Committee. MDL Order No. 2, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419 (D. Mass. Apr. 9, 2013), ECF No. 82.

[9] Transfer Order, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-md-2419 (J.P.M.L. Feb. 12, 2013), ECF No. 119.

5

had making "it difficult or impossible to resolve the entire litigation in an equitable and efficient manner."[10] As a result of this ruling, the Court took charge of the Specialty Surgery Center Cases.

Between December 2012 and May 2014, a series of negotiations and settlement documentation discussions ensued. Beginning in early 2014, while the Chapter 11 Trustee was negotiating with the NECC Insiders and their insurers, the PSC and certain designated counsel took the lead in convincing the other National Defendants, ARL, Victory, UniFirst and Liberty, to enter into the mediation process as established by this Court.

These efforts culminated in a May 6, 2014 motion to approve a proposed plan for reorganization under Chapter 11 was filed. On May 20, 2015, the Bankruptcy Court (Boroff, J.) confirmed the Chapter 11 Plan, which effectively resolved claims against NECC, the Insiders, NECC's affiliated companies, and the National Defendants.

With regard to the Specialty Surgery Center Cases, this left only the claims of plaintiffs against the clinic-related defendants to be pursued, although these defendants continued to pursue comparative fault defenses against those entities covered by the confirmed Chapter 11 Plan.

### D.     Efforts Expended On Litigating The Specialty Surgery Center Cases

Through its jurisdiction under the bankruptcy code, the MDL Court chose to retain jurisdiction over this group of cases. As a result, this Court not only coordinated the pre-trial proceedings to prepare these cases for trial, but had set a schedule to actually try the first bellwether cases here in Boston.[11]

Although the MDL consisted of hundreds of cases against other clinic defendants, the Court, upon the PSC's urging, allowed the Specialty Surgery Center Cases to proceed through the bellwether schedule and the Specialty Surgery Center Cases were the second clinic cases set to be

---

[10] Corrected Memorandum and Order on Trustee's Motion to Transfer Cases and Related Motions, *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 13-md-2419-FDS (D. Mass. June 12, 2013), ECF No. 176.

[11] Dkt. Nos. 2309 and 2596.

tried in the MDL (after the Specialty Surgery Center cases), until the parties ultimately reached the global settlement that forms the basis of the present motion.[12]

Nevertheless, lawyers pursuing these cases against the Specialty Surgery Defendants on behalf of the full 25 cases filed against Specialty Surgery Center performed significant work that undoubtedly led to the global settlement of all claims. That work included, but is not limited to:

1. Responding to several motions to dismiss;

2. Preparing written discovery requests and responses;

3. Reviewing the thousands of pages of documents produced specifically for the Specialty Surgery Center Cases;

4. Reviewing the tens of thousands of pages of documents produced by the National Defendants, NECC, the NECC related companies and the National Defendants;

5. Filing various motions to compel and/or opposing motions for protective orders;

6. Filing various motions related to trial venue and defending against Specialty Surgery Center's attempts to remand these cases back to Tennessee federal court;

7. Taking or defending over 10 fact witness depositions;

8. Locating, interviewing, and consulting with both consulting and testifying experts;

9. Reviewing and selecting cases for inclusion in bellwether process and ushering cases through the bellwether selection process ordered by the Court; and

10. Filing motions for judgment on the pleadings regarding certain affirmative defenses asserted by the Specialty Surgery Defendants;

11. Opposing motions for summary judgment;

12. Preparing expert reports;

13. Preparing motions in limine;

This work was hardly limited to Tennessee. To complete this work required significant travel time and expense to not only Boston, Massachusetts but to numerous other cities throughout the country, including Hawai'i.

---

[12] Dkt. No. 2596 and 2898.

7

### III.   ARGUMENT

**A.   The Court should order an eight percent (8%) assessment for the common benefit fund.**

The PSC requests that the Court enter an order approving the assessment of eight percent (8%) on the available Specialty Surgery Center funds, for a total of $**REDACTED** to cover both the fees and expenses expended in pursuing claims in the Specialty Surgery Center Cases.

On August 13, 2014, this Court ordered a prospective, eight percent (8%) assessment on each "Actually Received Recovery."[13] There is little debate that the Specialty Surgery Center Settlement Fund provides $**REDACTED** of actual recovery in the Specialty Surgery Center Cases.

The August order also indicated that this Court "may alter the percentage amount of the assessment, as future circumstances may require" and the order left open to the PSC the ability to "request an allocation of assessment between fees and expenses as circumstances may warrant."[14]

For several reasons the PSC is of the view that an assessment from the current funds[15] received in the Specialty Surgery Center Qualified Settlement Fund – no higher an assessment, nor lower – is warranted under the circumstances.

First, the eight percent assessment has been the level of reasonable expectation of counsel and the claimants from the earliest stages of this MDL. As the level has previously been proposed by the PSC and accepted by the Court, it appears to be fair and reasonable from an *ex ante* perspective.

Second, the PSC and the counsel involved in providing common work to the Specialty Surgery Center Cases do not request an assessment over the original eight percent is not warranted,

---

[13] Dkt. No. 1333.

[14] *Id*.

[15] Additional sums are expected to be received into the tort trust, and there may also be non-tort trust administered other settlements that would fall within the Court's assessment orders. This motion only applies to the current funds in the trust.

8

even though the level of approved lodestar for pursuing claims strictly involved in the Specialty Surgery Cases plus approved expenses is $**REDACTED**.  That amount exceeds the eight percent assessment by **REDACTED**%.  Nevertheless, the Master Settlement Agreement makes clear that the amounts made available to claimants would be subject to a common benefit assessment by this Court and at the time claimants and their counsel were reviewing the Master Settlement Agreement and executing individual releases, the PSC had already submitted its first Motion for Distribution of Common Benefit Fees and Expenses related to monies obtained via the National Tort Trust and Specialty Surgery Cases.[16]  In other words, Lead counsel and the PSC indicated at the very time individual claimants were making a decision to accept the terms of the Master Settlement Agreement that an 8% common benefit fee and expense assessment would apply to funds obtained in this MDL, and wavering from that number now would be inappropriate, especially without a compelling reason to change, even though the amount of accumulated approved lodestar and expenses far exceeds the funds available through an 8% assessment.

     Finally, decreasing the assessment below the eight percent is not warranted.  Significant, good work was performed by many lawyers in pursuing claims asserted in the Specialty Surgery Center Cases.  The results of the recoveries are significant, and the enormous work to fairly and accurately allocate and administer the distributions was quite substantial.  By comparison, recoveries of professional fees and expenses in the bankruptcy court were awarded at levels that were either at, or exceeded (in the case of the Chapter 11 Trustee) the reported lodestar levels; those professionals received payment more than a year ago, and in full or greater than reported lodestar. So while the PSC is of the view that the assessment should not be raised to meet the approved lodestar, by the same token the eight percent level should not be reduced.  Thus, all Specialty Surgery Center common benefit recipients will have a pro rata reduction on their approved lodestar.

---

[16] *See* Dkt. No. 3105.

**B.      The Court should allocate from the fund the reasonable expenses of counsel.**

The PSC requests that the Court enter an order (i) approving a total of $**REDACTED** in expenses, and (ii) approving the allocation of those expenses as indicated on Exhibit A.

Lead Tennessee counsel solicited from all plaintiffs' counsel that had performed work in the Specialty Surgery Center Cases to submit, or resubmit, fee and expense reports so that a full itemization would be available. Lead Tennessee counsel then collected each firm's submission, categorized the submission, and all counsel who had submitted fees and/or expenses met and discussed the method of review, accounting, and submissions of the requested fees and expenses.

After this review was conducted, Lead Tennessee Counsel reviewed the expense items. Not many deletions were made for expense items, both because most are toward common benefit matters, and because the amounts are "hard" costs incurred out-of-pocket by the firm. In other words, the expenses sought to be reimbursed are expenses that were clearly incurred in pursuit of the Specialty Surgery Cases and constituted an expense that for many firms and many large expenses, many firms have had to wait years for reimbursement.

The spreadsheet appearing as Exhibit A reflects the submitted and approved expenses for each firm seeking reimbursement of expenses through the Specialty Surgery Center common benefit fund.

**C.      The Court should allocate from the fund the reasonable attorneys' fees as recommended by the PSC.**

The PSC requests that the Court enter an order approving the allocation of common benefit fees amongst the law firms as indicated on Exhibit A. The PSC is of the view that this represents a fair allocation.

   1.      **Guidelines and general issues.**

The PSC guided its review of the common benefit issues on several principles.

First, this Court issued orders structuring the sharing and funding of discovery and pretrial expenses and costs for the common benefit of the litigation, and establishing a process for tracking and seeking reimbursement for expended common benefit time and expenses. *See* MDL Order Nos. 3 [Dkt. No. 85] and 8 [Dkt. No. 1333]. In MDL Order No. 3, the Court ordered the PSC to be responsible for funding common discovery and pretrial costs and proposing a reasonable prospective contingent assessment upon recoveries on the claims. MDL Order No. 3, ¶ 1. It further set forth "standards and procedure…to be utilized by any counsel seeking fees and/or expense reimbursement." *Id.* at ¶ 2. The Court ordered that any "claimants' counsel who seeks reimbursement or compensation for common-benefit time and expenses (including any state-court counsel) shall comply with these guidelines and any submission by such counsel shall be in accordance with this order." *Id.* at ¶ 2.A.1. The Court provided the following instructions to counsel seeking reimbursement for common benefit time and expenses:

Common benefit time is defined as "[o]nly time spent on matters common to all claimants in this litigation…[n]o time spent on developing or processing any case for an individual claimant should be submitted, unless the case is specifically determined by the PSC or the Court to be a 'common-benefit case.'" *Id.* at 2.B.1. Similarly, common benefit costs or expenses are defined as those "incurred for the common benefit of the MDL plaintiffs as a whole" or "for the global benefit of the MDL plaintiffs," with no individual client-related costs being considered "unless the case is determined by the PSC to the Court to be a 'common-benefit case.'" *Id.* at ¶¶ 2.C.1. and 2.E.1.

The Court also ordered the PSC to propose expense limitations and guidelines for use by all plaintiffs' counsel and for Lead Counsel to establish forms and procedures to implement and carry out the time and expense submissions required by the Court. *Id.* at ¶ 2.E.2.

In MDL Order No. 8, the Court ordered a contingent eight percent (8%) assessment on recoveries received in all cases. [ECF No. 1333]. The Court ordered that "[n]o common benefit fees

and/or expenses may be paid out of the Common Benefit Fund except by formal motion, with reasonable notice and opportunity to be heard," hence the impetus for this motion. MDL Order No. 8, p. 3. The Court attached a Participation Agreement as Exhibit A to MDL Order No. 8, which reiterated

> the amounts deposited in the Common Benefit Fund will be available for distribution to attorneys who have performed professional services or incurred expenses for the benefit of the plaintiffs in MDL 2419 pursuant to written authorization from Plaintiffs' Lead Counsel. Such sums will be distributed only upon an Order of the Court in MDL 2419, which will be issued in accordance with applicable law governing the award of fees and costs in cases involving the creation of a common benefit. Appropriate consideration will be given to the experience, talent, and contribution made by all of those authorized to perform activities for the common benefit, including the Participating Attorneys.

MDL Order No. 8, Ex A, ¶ 3. It also set forth the applicability of the orders and agreement to "each and every claim or action (whether state or federal, filed or unfiled) relating to the clients listed on the attached Exhibit(s) and arising from the use of NECC product(s) in which the Participating Attorneys have a right or claim to a fee recovery beginning from April 9, 2013." *Id.* at ¶ 10.

Second, we were guided by the law of common benefit awards and specifically the significant work the Court and counsel have already performed in setting up an approved Motion for Common Benefit already in this MDL.

Finally, we are guided by the important principle that lawyers ought to avoid disputes about fees and Lead Tennessee Counsel sought input throughout the stages of this process both from the lawyers seeking common benefit fees and expenses and lawyers representing clients effected by the present request.

    2.    **Process Undertaken**

Late in 2017, Lead Tennessee Counsel solicited requests from Lead Counsel, the PSC, and Tennessee lawyers that performed work in the Specialty Surgery Cases to submit time and expenses

for inclusion in a proposed common benefit request to be made to this Court. Three firms submitted for reimbursement of common benefit time and expenses.

Over the course of the following months counsel reviewed records and pulled time related to the Specialty Surgery Center Cases. Lead Tennessee Counsel, or attorneys in his firm, then reviewed the time submitted, formatted the entries for universal formatting, and shared with all such counsel each firm's fee and expense submission so that each firm could review each other's submission. Thereafter a preliminary draft of Exhibit A was circulated to counsel for discussion covering areas of concern, methods of accounting and allocation, and to reviewing firm-specific issues that appeared in the submissions.

In January of 2018, Lead Tennessee Counsel submitted a final version of the present motion along with exhibits for final comment from all Tennessee counsel involved in the Specialty Surgery Center Settlement and solicited comments. Lead Tennessee Counsel received no objections.

The recommendations set forth below are a culmination of this process. Every firm was given an opportunity to discuss their submission. We are of the view that the result is a fair result. We request the Court allocate common benefit fees as determined by the Tennessee counsel that performed common benefit work in achieving successful completion of the Specialty Surgery Center Cases.

    3.    **Recommendations**

*Branstetter Stranch & Jennings, PLLC.* Branstetter was appointed by the MDL Court as a member of the PSC. Work was primarily undertaken by Gerard Stranch and Ben Gastel. Given their lead role in assisting the preparation of Tennessee cases, others in the firm did important work. The firm was heavily involved in many aspects of the Specialty Surgery Center Cases including: 1) managing discovery and document review; 2) drafting and/or filing many of the motions filed with

the Court related to the Specialty Surgery Center Cases; 3) organizing, taking, and defending depositions; and 4) coordinating the bellwether selection process.

Overall, Branstetter was approved for compensation of 1,251.35 hours. Branstetter does not dispute this amount.

***Lieff Cabraser Heimann & Bernstein***. LCHB was appointed by the MDL Court as a member of the PSC. Work was primarily undertaken by Mark Chalos, Annika Martin and others of this firm; they were heavily involved in most aspects of the MDL. The firm was heavily involved in many aspects of the Specialty Surgery Center Cases including: 1) reviewing documents and preparing discovery requests and responses; 2) drafting and/or filing many of the motions filed with the Court related to the Specialty Surgery Center Cases; 3) taking and defending depositions; and 4) preparing bellwether cases for trial.

After review, Lieff Cabraser was approved for compensation of 438.4 hours of time. Lieff Cabraser does not dispute this amount.

***Kinnard, Clayton & Beveridge.*** Work was undertaken by Randy Kinnard and Daniel Clayton, and they were involved principally in preparing bellwether cases for trial, shephearding this individual bellwether case through the discovery process, and were actively involved in mediating the Specialty Surgery Center Cases.

After review, Kinnard, Clayton was approved for compensation of 26.5 hours of time. Kinnard, Clayton does not dispute this amount.[17]

---

[17] Kinnard Clayton did not submit for paralegal time as many of the other firms requesting a common benefit award did. Paralegal time represented between 4-12% of a firm's total submission. As a result, Kinnard Clayton received a special adjustment of 8% on their time to compensate for the fact that they had paralegals who provided substantial support to the common advancement of the Specialty Surgery Center Cases but did not keep track of their individual hours.

## IV. CONCLUSION

Accordingly, the PSC respectfully requests that the Court assess an 8% common benefit assessment against the Specialty Surgery Center Qualified Settlement Fund and apportion the payment of this assessment in accordance with Exhibit A hereto.

Dated: March 8, 2018

Respectfully submitted,

**/s/ J. Gerard Stranch, IV**
J. Gerard Stranch, IV
Benjamin A. Gastel
BRANSETTER, STRANCH &
JENNINGS PLLC
223 Rosa Parks Ave., Suite 200
Nashville, TN  37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@branstetterlaw.com
beng@bsjfirm.com

Thomas M. Sobol (BBO# 471770)
Kristen A. Johnson (BBO# 667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com

*Plaintiffs' Lead Counsel*

Elizabeth J. Cabraser
Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ecabraser@lchb.com
mchalos@lchb.com

*Federal/State Liaison*

Marc E. Lipton
LIPTON LAW
18930 W. 10 Mile Road
Southfield, MI 48075
Phone: (248) 557-1688
Fax: (248) 557-6344
marc@liptonlawcenter.com

Kim Dougherty
JANET, JENNER & SUGGS, LLC
31 St. James Avenue, Suite 365
Boston, MA  02116
Telephone:  (617) 933-1265
kdougherty@myadvocates.com

Patrick T. Fennell
CRANDALL & KATT
366 Elm Avenue, S.W.
Roanoke, Virginia 24016
Phone:  (540) 342-2000
pfennell@crandalllaw.com

Mark Zamora
ZAMORA FIRM
6 Concourse Parkway, 22nd Floor
Atlanta, GA 30328
Phone: (404) 451-7781
Fax: (404) 506-9223
mark@markzamora.com

*Plaintiffs' Steering Committee*

## **CERTIFICATE OF SERVICE**

I, J. Gerard Stranch, IV, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: March 8, 2018                     **/s/ J. Gerard Stranch, IV**
                                         J. Gerard Stranch, IV