UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419<br>Dkt. No. 1:13-md-2419 (RWZ) |
| THIS DOCUMENT RELATES TO:<br><br>*Mattila v New England Compounding Pharmacy, Inc.*<br>**Case No. 1:13-cv-10430** | |

**PLAINTIFF MILDA MATTILA'S MOTION FOR EQUITABLE AND/OR DECLARATORY RELIEF REGARDING OUTSTANDING MEDICARE LIEN**

Plaintiff, DAVID J. MATTILA, as Personal Representative of the Estate of MILDA J. MATTILA, Deceased, by and through the undersigned, files this Motion for Resolution of Lien Dispute with Medicare, and submits as follows:

1. Plaintiff Milda Mattila (now Estate of Milda Mattila) was / is an individual Plaintiff / Claimant in the NECC Multi-District Litigation[1] arising out of fungal tainted steroid injections.

2. Plaintiff Ms. Mattila is expected to receive a total gross settlement of approximately $340,339.41. However, to date, neither Ms. Mattila nor her beneficiaries have received any of said proceeds, primarily because the Medicare (CMS) lien cannot reasonably be resolved.[2]

3. Plaintiff, 86 year-old Milda Mattila, was injected with an NECC fungus-tainted steroid solution in August of 2012, while a patient at the Michigan Pain Specialist Clinic located

---

[1] Plaintiff is also part of the state court lawsuit filed against the Michigan Pain Specialists in Livingston County, Michigan, *Adair v Michigan Pain Specialists,* Case No. 14-28156-NO.

[2] Presently, CMS is asserting conditional payments in the amount of $353,158.94. Blue Cross is asserting a lien in the amount of $51,175.92, Medicaid (Mich Dept Health & Human Services) is asserting a lien of $3,890, and Select Specialty Hospital is asserting a lien in an unknown amount.

in Genoa Township, Livingston County, Michigan.  Ms. Mattila began feeling ill several weeks later.

4. Ms. Mattila was diagnosed fungal meningitis in October of 2012, after being admitted to St. Joseph Mercy Hospital.  She was also diagnosed with a related epidural abscess near the site of her steroid injection, which required surgery at L4-S1 to decompress and drain same.

5. Some time after the surgery but during the same admission, Ms. Mattila developed a pseudomonas urinary tract infection, which subsequently progressed to sepsis and C Difficile intestinal infection. This in turn caused acute respiratory failure requiring intubation, followed by a tracheostomy and ventilator dependent respiratory failure.

6. Ms. Mattila, a Medicare beneficiary, was discharged from St. Joseph Mercy Hospital and transferred to Select Specialty Hospital (SSH) on December 27, 2012. SSH is a critical illness recovery hospital, where Ms. Mattila was to eventually be weaned from the ventilator.

7. Ms. Mattila was admitted to SSH for almost four months, before she was finally discharged on April 12 2013.

8. The total expenses charged by SSH for Ms. Mattila's four-month admission exceeded $500,000.  During and after Ms. Mattila's admission to SSH, Medicare refused to pay for the SSH medical expenses, reasoning that because she had a pending third party liability action against NECC, Ms. Mattila may eventually receive a recovery which may pay for some or all of the SSH expenses.[3]

---

[3] Prior to being transferred to this Court, the herein individual *Mattila* lawsuit was initially filed on November 16, 2012, in the USDC, Eastern District of Michigan, Case No. 2:12-cv-15083. Shortly after filing, Plaintiff also placed Medicare on notice of the lawsuit, and advised Medicare it may have a right to assert a lien. Medicare responded in May of 2013 that it had no conditional payments.

{01161422.DOCX}                                   2

9.      Medicare's refusal to pay for Ms. Mattila's medical care caused significant problems for Ms. Mattila, including SSH's reluctance to provide continuing care, and SSH slapping a $500,000 lien on Ms. Mattila's NECC action.

10.     This Court will recall that prior to the distribution of settlement checks, claimants were required to either "opt-in" or "opt-out" of the "Lien Resolution Program" (LRP). The LRP was an agreement entered into amongst lead Plaintiffs' counsel, Medicare, Blue Cross, and several other private insurers, whereby these lienholders agreed to accept a designated gross percentage on the claimant's settlement in full satisfaction of the lien.

11.     Under the LRP, the designated percentage allocated to Ms. Mattila's settlement was 21.5%. This meant that Medicare and Blue Cross would agree to resolve their lien interests by sharing between them 21.5% of Ms. Mattila's gross settlement proceeds. If Ms. Mattila was expected to receive $340,339.91, then the LRP share to be divided between Medicare and Blue Cross would be $73,173.08 ($36,586.54 each).

12.     At the time of the "opt-out" deadline, Plaintiff Mattila was confronted with a $500,000 SSH lien, on top of the Medicare[4] and Blue Cross liens.

13.     It made no sense whatsoever for Plaintiff Mattila to "opt-in" the LRP and agree to resolve the Medicare and Blue Cross liens for $73,173.08, only to have to resolve the $500,000 plus lien asserted by SSH (on a gross settlement of only $340,339.91, which still had to be reduced by costs and attorney fees). Plaintiff had no choice but to "opt-out" of the LRP.

14.     Subsequently, Medicare started asserting significantly higher conditional payment amounts. Medicare also paid SSH for the overdue medical expenses. Because Plaintiff's settlement is no longer burdened by the SSH $500,000 lien, Plaintiff submits that the principles

---

[4] The opt-out deadline was December 28, 2016. At this time, Medicare still did not pay the SSH medical expenses, and was only claiming conditional payments in the amount of $23,208.48 (meaning Plaintiff's payoff for the Medicare lien would only be about $15,500).

of equity and fairness should apply to permit Plaintiff to resolve the Medicare and Blue Cross liens for 21.5% of Plaintiff's gross settlement[5], as was always intended by Medicare and the settling parties under the negotiated LRP.

15. Had Medicare paid the SSH expenses in the usual course of business as expected, SSH would have never burdened Plaintiff's case / settlement with a $500,000 lien, and Plaintiff could and would have "opted-in" for the LRP negotiated 21.5%.

16. Prior efforts to resolve Medicare's significant lien interest have been unsuccessful to date.[6]

17. In the interests of fairness, justice, and equity, and in the interests of preserving the intent of the settling parties to allow the NECC victims to receive a somewhat fair and reasonable recovery for their harm, injuries, and damages, Plaintiff respectfully requests that this Honorable Court consider Plaintiff's prayer and request for equitable and/or declaratory relief, by declaring that Medicare's and BCBS's liens shall be resolved for 10.75% of the gross settlement proceeds, the exact amount each such Defendant would have received under the LRP agreed to by Medicare, Blue Cross, and other insurers during their negotiations of the settlements involving on the NECC litigation.

18. Plaintiff prays and respectfully requests that this Honorable Court set up a status conference amongst the lienholders, for purpose of discussing issues raised above, including resolution thereof.

---

[5] Blue Cross has already represented to Plaintiff that it is amenable to resolving its lien interest by accepting the designated percentage under the LRP.

[6] These efforts include multiple written requests to Medicare through Medicare's internal resolution procedures and the filing of declaratory actions in state and federal court. The USDC Eastern District of Michigan denied Plaintiff's request, without prejudice, after declaring it did not have jurisdiction to decide the controversy. *Mattila v Medicare, et al,* USDC ED MI Case No. 19-cv-10446. This Court does have jurisdiction by virtue of having presided over the NECC cases, including Plaintiff's, in which Medicare was a settling party / participant by contractually agreeing to resolve its lien interest via the Medicare Lien Resolution Agreement.

19.     Venue and jurisdiction are properly vested in this Court by virtue of the Tort Trust Agreement, which states:

"10.11 *Retention of Jurisdiction*. Except as to matters that are reserved to District Court as provided herein and to the extent the reference to the Bankruptcy Court has properly been withdrawn, the Bankruptcy Court shall retain exclusive jurisdiction over any action or proceeding arising out of or relating to this Agreement or the Tort Trust *other* than issues pertaining to the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the Estate for purposes of distribution, and all claims in respect of such action or proceeding may be heard and determined in such Court."

WHEREFORE, Plaintiff respectfully requests the Honorable Court to enter order consistent with the relief requested above.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

_____
GEOFFREY N. FIEGER
TODD J. WEGLARZ
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: December 14, 2021