1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3    IN RE:                              )
                                         )  MDL No. 13-02419-RWZ
4    NEW ENGLAND COMPOUNDING PHARMACY    )
     CASES LITIGATION                    )  Pages 1 - 34
5                                        )

6

7

8                        **MOTION HEARING**

9
             BEFORE THE HONORABLE RYA W. ZOBEL
10            UNITED STATES SENIOR DISTRICT JUDGE

11

12

13

14
                              United States District Court
15                            1 Courthouse Way, Courtroom 12
                              Boston, Massachusetts  02210
16                            August 16, 2016, 2:06 p.m.

17

18

19

20

21

22                       LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
23               United States District Court
                 1 Courthouse Way, Room 3205
24                    Boston, MA  02210
                       (617)345-6787
25

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFFS:

3

4         KRISTEN A. JOHNSON, ESQ., THOMAS M. SOBOL, ESQ., and
     EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro, LLP,
5    55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts, 02142.

6         FREDERIC L. ELLIS, ESQ., Ellis & Rapacki, LLP,
     85 Merrimac Street, Suite 500, Boston, Massachusetts.

7         WILLIAM DANIEL LEADER, JR., ESQ., Leader, Bulso & Nolan,
     PLC, 414 Union Street, Suite 1740, Nashville, Tennessee, 37219.
8

9         J. SCOTT SEXTON, ESQ., Gentry Locke Rakes & Moore,
     P.O. Box 40013, Roanoke, Virginia, 24022-0013.

10        PATRICK THOMAS FENNELL, ESQ., Crandall & Katt,
     366 Elm Avenue, SW, Roanoke, Virginia, 24016.
11

12   FOR THE DEFENDANTS:

13        TIMOTHY J. DURKEN, ESQ., Jager Smith, P.C.,
     One Financial Center, Boston, Massachusetts, 02111.

14   ALSO PRESENT BY PHONE:

15        CATHY J. BURDETTE, ESQ., Department of Justice, Civil
     Division.
16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2       THE COURT:  Good afternoon.  Please be seated.

3       THE CLERK:  This is 13-MD-02419, In Re:  New England

4  Compounding.

5       THE COURT:  Good afternoon.  As I understand it, we

6  are here to talk about the status of the negotiations with the

7  government about Medicare, in essence, and therefore projecting

8  when distributions can be made from the trust.  So I've looked

9  at the papers that have been filed.  I think we should start

10  with lead counsel's motion for approval of the agreement, and I

11  have some questions about that; primarily, can the Court –- I

12  guess the Court can provisionally approve even though Justice

13  hasn't said anything yet, but until everybody signed off, I

14  assume the trustee can't carry out her duties.

15       MR. SOBOL:  Okay, both of those things are correct,

16  your Honor.  Good afternoon.  Tom Sobol for the Plaintiffs'

17  Steering Committee.

18       THE COURT:  So what would be helpful, Mr. Sobol, is if

19  you were to explain the agreement briefly, the status of the

20  several approval requirements, and I guess the effect of Court

21  approval which you just talked about I think are very

22  independent, the conditional approval that will have to be made

23  final when DOJ signs off.  Then I would like to hear very

24  briefly from the various plaintiffs' counsel on their motion to

25  compel distribution, and I think those should address those

1    parts of the agreement in particular that deal with opting out

2    and doing their own thing.  And if the trustee and the PSC want

3    to respond, I will hear them at that point.  That I think takes

4    care of all of the matters.  And if somebody who is on phone

5    needs to talk, you'll just have to pipe up, not down.

6            MR. SOBOL:  I think also, your Honor, you may also

7    have on the phone a representative from CMS, a Ms. Cathy

8    Burdette.

9            THE COURT:  Now, as I understand it, CMS has signed

10   off.

11           MR. SOBOL:  They have not yet.  All of those people,

12   from CMS to the DOJ, that need to sign off have not yet signed

13   off.  That is part of the issue that the parties have.

14           MS. BURDETTE:  Your Honor, this is Cathy Burdette for

15   the Department of Justice.  That is correct, we do not have

16   final approval, and I would like to make a statement at

17   whatever time is appropriate about that.

18           THE COURT:  Before you make your statement, when do

19   you anticipate signing off?

20           MS. BURDETTE:  Well, that's the difficult part because

21   we were ready to recommend this memorandum up the chain on

22   Friday to the highest levels of the Department of Justice for

23   approval.  However, we have been notified that there's another

24   settlement agreement out there among the private lienholders,

25   and that settlement agreement contradicts our settlement

1    agreement in various material ways that we feel have to be

2    reconciled before we can move this up the chain that changes

3    our agreement significantly.

4         THE COURT:  Excuse me.  This is an agreement between

5    who and whom?

6         MS. BURDETTE:  Between the plaintiffs' counsel and

7    private lienholders, private medical lienholders.

8         MR. SOBOL:  If I may, your Honor?

9         THE COURT:  Okay.  So, Ms. Burdette, we'll hear

10   Mr. Sobol now, in accordance with the agenda that I suggested,

11   and perhaps before we go on to the motion to compel by the

12   Virginia, Tennessee, Michigan, and I've forgotten what else,

13   plaintiffs, maybe you can then respond to Mr. Sobol.

14        MS. BURDETTE:  Very well.

15        MR. SOBOL:  So, your Honor, I'd like to make a couple

16   of comments regarding the agreement and then hand it over to my

17   colleague, Mr. Notargiacomo, who will go through very briefly

18   just a description to you about how it operates if it goes into

19   effect.

20        First, your Honor, the background of the agreement is

21   that we've been struggling and trying to get an agreement in

22   place so that the tort trustee, Ms. Riley, is in a position to

23   be able to fund the requests and the claims without running the

24   risk of having any exposure to CMS by having improvidently paid

25   off to some of them their payments.

1          THE COURT:  You can assume that I've read all this.

2          MR. SOBOL:  Okay.  And then the other thing I should

3     just say, your Honor, is that there is no provision of the

4     agreement that, as we contemplate it, at least, the plaintiffs

5     contemplate it, in which CMS would not in the meantime process

6     an individual's claim if the individual said, "I don't want

7     anything to do with that agreement.  I want to go it on my

8     own."  And so from our perspective and the Plaintiffs' Steering

9     Committee's perspective, there hasn't been any reason for CMS

10    not to process those individual liens.  In any event, let me

11    hand it over to Mr. Notargiacomo to give an overview of the

12    agreement.

13         THE COURT:  Excuse me.  If there were an individual

14    processing and that process came to a conclusion, and assuming

15    then the trust could distribute, would it distribute whatever

16    the amount is attributable to that plaintiff, who would then

17    out of that fund pay CMS?  Is that how it would work, or would

18    it be withheld?

19         MR. SOBOL:  That's probably the way it would happen

20    unless the trustee were directed to pay directly to CMS the

21    funds.

22         THE COURT:  This is not part of the agreement,

23    however.  I know that the agreement allows opt-outs, but the

24    mechanism wasn't clear to me.

25         MR. SOBOL:  It does allow opt-outs.  So just so that

1    it's clear, there is an agreement that's in the process of

2    approval for the federal government.  That agreement, if it

3    goes into place, still permits people to opt out of that

4    agreement.  In the meantime, there are claimants who, even

5    before the agreement reaches finalization, have already made

6    the decision that they want to opt out regardless and do their

7    own individual negotiation even beforehand.

8            Our position, the Plaintiffs' Steering Committee's

9    position is, we have never thought that there would be any need

10   to hold that process up if there was somebody who wanted to be

11   able to do that.  And hypothetically, just to answer your

12   question, if a person went through that process with CMS and

13   got a resolution, then their claim would be ready to be paid,

14   and either the tort trustee would either pay Medicare directly

15   or whatever other instructions, you know, were appropriately

16   pending.  That's all.  But it's my understanding that CMS is

17   not processing those individual claims; instead is waiting for

18   resolution of this agreement.

19           Let me hand it over to Mr. Notargiacomo.  And I'd also

20   ask Mr. Notargiacomo to address the issue about a couple of

21   other private health plans who we are reaching an agreement

22   with which Ms. Burdette has raised an issue about.

23           THE COURT:  Mr. Notargiacomo?

24           MR. NOTARGIACOMO:  Good afternoon, your Honor.  Thank

25   you, and I will be brief because you said you've read the

1    papers, and most of what I have to say is summarized briefly in

2    those papers.

3           With respect to the agreement that's been reached in

4    principle with CMS, your Honor, I just want to go through some

5    of the salient points, the first being that a claimant who

6    decided to participate in the resolution that's been worked out

7    between us and CMS would have CMS's claim satisfied by

8    reference to the resolution matrix, which is Exhibit C to our

9    motion for approval.  And that is a grid that allows the

10   plaintiff to figure out what percentage of their total payment

11   from the settlement they would pay to CMS to resolve CMS's

12   claim, and that ranges anywhere from 10 percent on the low end

13   to 21.5 percent on the highest end.

14          Now, how do we derive the matrix?  The matrix is based

15   on the points that are being awarded to each claimant by the

16   claims administrator under the settlement.  You may recall that

17   the plan calls for each claimant to submit something to the

18   claims administrator with documentation based on their level of

19   injury, and whether or not they're in Claims 1 through 7, they

20   are assigned a certain number of points, ranging from a high of

21   I think 60 up to a half point on the low end.

22          In addition to those points, those base points,

23   claimants can apply for upwards adjustments based on their own

24   individual circumstances.  The main resolution matrix takes

25   into account two of those upward adjustments:  the long-term

1    hospitalization adjustment and the long-term antifungal

2    treatment adjustment.  Those are the two adjustments that most

3    closely correlate to increased expenditures by CMS for treating

4    particular claimants.

5         The more LAFT, long-term hospitalization and long-term

6    antifungal treatment the person has, the more likely they are

7    to have higher expenditures and the higher the CMS expenditures

8    would have been for that individual.  Therefore, on the matrix,

9    they're assigned a higher percentage of their recovery to pay

10   CMS to resolve the lien, your Honor.

11        A few more salient points.  The time period under

12   which a claimant is eligible for Medicare, participates or at

13   least Medicare will -- let me back up.  There's a time period

14   in the agreement in which if a person, a claimant is eligible

15   for Medicare, this agreement will apply, and that is

16   September 1, 2012, to May 31, 2013.  Anyone who became

17   Medicare-eligible after May 31, 2013, even though Medicare may

18   have had some expenditures on their behalf, will receive the

19   release under this agreement and will not have to pay Medicare

20   to get the release of Medicare.

21        Medicare has also agreed to waive recovery for anyone

22   in Injury Category 7.  People in Injury Category 7 are the

23   least injured individuals.

24        THE COURT:  The people with the headache.

25        MR. NOTARGIACOMO:  Exactly, your Honor.  There is

1       also, and I'll talk a little bit more about this in a second,

2       there is also a provision whereby if an individual has a lien

3       both with Medicare and a private insurer, and the lead counsel

4       and the tort trustee has worked out a similar agreement with

5       that private insurer, Medicare has agreed to split the amount

6       that is derived from the matrix with that private insurer to

7       resolve both the private and the public lien for that claimant,

8       so claimants have an opportunity for one single percentage to

9       resolve both Medicare and the private lien.

10              Finally, your Honor, for almost everyone, not everyone

11      but almost everyone, the agreement is optional.  They have the

12      opportunity to opt out, and, as Mr. Sobol said, can negotiate

13      their liens on an individual basis, both with CMS or/and with

14      other private insurers if they so desire.

15              THE COURT:  And under the agreement, if somebody wants

16      to opt out, can the claimant be paid in the meantime, or does

17      the claimant have to work out some resolution with CMS before

18      they can get paid?

19              MR. NOTARGIACOMO:  If the lien is from CMS, your

20      Honor, and the claimant decides to opt out, they would need to

21      show the tort trustee that they have an agreement with CMS, and

22      the tort trustee would then pay CMS those portions under that

23      agreement, and then the rest would go to the claimant.

24              THE COURT:  Thank you.

25              MR. NOTARGIACOMO:  Finally, let me just address the

1    one point that I think Ms. Burdette made concerning agreements

2    with other private insurers.  I had a conversation with

3    Ms. Burdette on Friday about the CMS agreement.  We provided

4    her all the exhibits, and that agreement also makes reference

5    to participating lienholders.  And we do have a tentative

6    agreement -- it's not a tentative agreement.  We have an

7    agreement -- it has not yet been signed but it will be signed

8    shortly -- with Blue Cross-Blue Shield of Tennessee and Blue

9    Cross-Blue Shield of Michigan to resolve liens from those

10   entities on the same basis as with CMS, and provided, I think

11   on Monday, a copy of that agreement to Ms. Burdette.  This is

12   the first time I'm hearing that there's some conflict, so we

13   have not worked out those issues, whatever Ms. Burdette or the

14   DOJ sees as a conflict.  We don't think there's a conflict,

15   your Honor, but we obviously want to talk to them about that.

16          THE COURT:  Is Blue Cross the only private insurer

17   implicated in this?

18          MR. NOTARGIACOMO:  There's Blue Cross-Blue Shield of

19   Tennessee and Michigan, and there's one other small claim in

20   Michigan.

21          THE COURT:  I mean, is the issues that Ms. Burdette

22   raises with respect to Blue Cross-Blue Shield the same issues

23   that are likely to be raised with respect to other private

24   insurers, or is Blue Cross-Blue Shield in a place of its own?

25          MR. NOTARGIACOMO:  Well, they're in a place of their

1    own, in that they have agreed to sign an agreement, your Honor,

2    a written agreement, which is I think what Ms. Burdette is

3    referring to.

4            THE COURT:  Okay.  Is that it?

5            MR. NOTARGIACOMO:  For now, your Honor, unless you

6    have questions.

7            THE COURT:  Ms. Burdette, what is the problem?

8            MS. BURDETTE:  Well, your Honor, we have been

9    negotiating this agreement for a long time, as I'm sure the

10   plaintiffs have told you that.

11           THE COURT:  Yes, too long.

12           MS. BURDETTE:  And, you know, when we started

13   negotiating this, we were negotiating on behalf of CMS, and we

14   were pushed and pushed and pushed to be able to include the

15   group health plans or the other private lienholders in our

16   agreement and to then share our percentage with those other

17   lienholders, so we agreed to that.  And our agreement provides

18   very specifically the percentage that the person will get out

19   if they're a Medicare-entitled claimant, if they're a GHC,

20   which is an abbreviation for a primary lienholder, and what

21   they would get if they were both Medicare-entitled and

22   GHC-entitled during the period that we're talking about, and we

23   have agreed to those terms.

24           The separate agreement that we only became aware of

25   yesterday does not reflect agreement on certain provisions that

1   we consider material.  For instance, in our agreement in

2   Paragraph 2-C, it states the procedure for people who are

3   Medicare-entitled claimants who are also GHC-entitled claimants

4   and how that would work.  The draft agreement that is being

5   considered or that is being considered for private lienholders

6   states that in no way does this agreement imply or indicate

7   agreement to provide any money for CMS, or provide any

8   information to any person or entity on which CMS may rely.

9   Well, it's a material part of our contract that we get that

10  information, that the tort trustee provide us with proof that

11  there was another insurer and how much the payment was.  And

12  it's also a material part of our agreement that we are paid and

13  get that notice at the same time, and the terms of this other

14  agreement seems to suggest that we will not get proof of the

15  GHC payment at the time that we receive payment but it will be

16  at some other time, which I can't exactly determine from the

17  agreement.  And so, you know, what we have here is that the

18  private lienholders are obligated pursuant to the agreement,

19  the tentative settlement agreement that the Court is

20  considering today, which is completely miss-named the CMS

21  agreement because it does include other lienholders, and that's

22  a very material part of it, and we're being asked to agree, you

23  know, without even knowing the terms of this other settlement

24  agreement and how that's going to affect the terms of our

25  agreement, and, quite frankly, we can't do that.

1          THE COURT:  What is your position in this?  You are at

2    DOJ?

3          MS. BURDETTE:  Yes, I'm with the Department of

4    Justice.

5          THE COURT:  So you are effectively counsel to --

6          MS. BURDETTE:  Yes, we are counsel to CMS, and it's

7    required by statute and regulation that we approve settlements

8    of this magnitude.

9          THE COURT:  So is CMS objecting to this language, or

10   are you as counsel objecting?

11         MS. BURDETTE:  I'm objecting on behalf of CMS.

12         THE COURT:  But is CMS also objecting?

13         MS. BURDETTE:  Well, we are their counsel, so, yes,

14   CMS is objecting.

15         MR. NOTARGIACOMO:  If I could just address that, your

16   Honor.  I think there's a misunderstanding, and I think it may

17   be --

18         THE COURT:  Can you hear him?  Why don't you sit down.

19   Ms. Burdette, can you hear Mr. Notargiacomo?

20         MS. BURDETTE:  Yes.  Yes, I can hear him.

21         THE COURT:  Okay.

22         MR. NOTARGIACOMO:  So with respect to that particular

23   provision, your Honor, I think that's just a miscommunication

24   or an inability of having the time to communicate with

25   Ms. Burdette.  The substance of that, I think she's

1    misconstrued that.  That portion of the private agreement just

2    says that they're not signing, physically signing onto the CMS

3    agreement, but all the substantive provisions in that private

4    agreement dovetail and are identical to the ones that are

5    agreed to in the CMS agreement.  So they are in fact going to

6    provide the information that CMS requires under the CMS

7    agreement to the tort trustee, and the tort trustee in turn

8    will provide CMS all the information that is required of CMS

9    under the CMS agreement.

10         THE COURT:  Can plaintiffs make available to Justice

11   the copies of these agreements?

12         MR. NOTARGIACOMO:  Yes, your Honor.

13         MS. BURDETTE:  I have the agreement.  I actually have

14   the agreement.  I got it yesterday, and that's what's causing

15   our concern.  I mean, for instance, there's also a provision in

16   this other agreement that if GHC, or frankly anyone, decided to

17   opt out of the entire arrangement for a certain batch of

18   claimants if a certain number of those claimants decided to opt

19   out of the agreement, and that's not in our agreement either.

20   I mean, there are material terms here, and all I'm saying is,

21   while we were prepared to send this up the chain to the Justice

22   Department, it's not moving anywhere until we can figure out

23   what the agreement here is, and, you know, how this is going to

24   work out because this is a material problem.

25         MR. NOTARGIACOMO:  Your Honor, it's just a matter of

1     us speaking with CMS and working through these issues, and I

2     think that can be done relatively quickly, and we'll do so this

3     afternoon.

4          MS. BURDETTE:  Okay, and let me just respond.  This is

5     not just a procedural issue as you stated, and this is not an

6     easy issue, and this will not be resolved this afternoon

7     because I'm on vacation currently, calling in from vacation.

8     So this is going to have to be resolved.  We're going to have

9     to figure out how it's going to work, okay?

10         THE COURT:  When does your vacation end?

11         MS. BURDETTE:  Friday.

12         THE COURT:  So you can give me a report by next Monday

13    afternoon?

14         MS. BURDETTE:  By when?

15         THE COURT:  Monday?

16         MS. BURDETTE:  Uhm, I suppose we could.  I'm not

17    trying to be disagreeable here, but I totally am in doubt about

18    the fact that these disagreements or these contradictions

19    between the two agreements are going to be able to be nailed

20    out in an hour conversation.

21         THE COURT:  Mr. Sobol, do you need to say anything?

22         MR. SOBOL:  I do, your Honor, because I just want to

23    share with you what I think you've already picked up on, which

24    is that winners are sometimes our own worst enemies, because

25    you can see that the private insurers wanted to be able to do a

1    similar deal with CMS but just couldn't physically get their

2    clients to agree to the same physical document, so we created a

3    mirror version of that agreement and made it applicable to the

4    private parties.

5          THE COURT:  Does it include full disclosure to the

6    government of all terms and definitions and all that?

7          MR. SOBOL:  I was under the clear impression that it

8    was, and apparently now there are some issues that have arisen

9    with Ms. Burdette, which upon her return from her vacation we

10   will deal with immediately.  I will say this, your Honor, that

11   having spoken with other people who have yet to chime in, and I

12   also hear their concerns, if this is not done by September 6,

13   as lead counsel, I'm going to recommend to the PSC to pull the

14   deal because my understanding also is that CMS is not

15   processing individual claims, and at some point we have to say

16   "enough is enough."  The lawyers have to be able to work on an

17   agreement and get it done.  Otherwise we --

18         THE COURT:  Now, do any of plaintiffs' counsel from

19   Tennessee, Virginia, or Michigan -- what's the other one?

20         MR. SEXTON:  Indiana.

21         THE COURT:  Indiana.

22         MR. SEXTON:  Yes, your Honor.  Scott Sexton from

23   Virginia.  It's a pleasure to be back in the courtroom.  I'm

24   speaking here today on behalf of 154 represented Virginia

25   plaintiffs and also delegates of the Indiana, Michigan, and

1  Tennessee plaintiffs who filed similar motions that bring us

2  here today.

3          THE COURT:  Now, I very much understand the need for

4  expedition here.  Maybe you could address the -- first of all,

5  do you have a problem with the agreement as it was presented to

6  me through the lead counsel?

7          MR. SEXTON:  Well, I think we've touched upon the

8  biggest problem with the agreement and one that I don't believe

9  the trustee would ever want to sign at this point, as it is an

10  agreement that you would approve with no limit as to when the

11  government must act.  For example, if you approve it today --

12          THE COURT:  That's what they're working on.

13          MR. SEXTON:  Right -- it could be two years before

14  this thing gets approved.

15          THE COURT:  No, no.

16          MR. SEXTON:  And Mr. Sobol's comment is one directly

17  to our concern, which is, in sitting back, the Virginia

18  plaintiffs, we have done the math, at least I have in my firm

19  with all of our clients, and to a client, they're each better

20  off to opt out of the deal and just take the traditional

21  Medicare lien reduced for procurement costs.  So the standard

22  Medicare process, they would fare much better than they would

23  under this deal.  Now, that is probably not true for a great

24  many plaintiffs, and the Plaintiffs' Steering Committee has

25  done a yeoman's job of trying to get the best deal they can for

1    the largest number they can; but in our situation, and I

2    believe in Tennessee and perhaps in some other states, North

3    Carolina perhaps, there are people who definitely will know

4    that they need to opt out of this deal or risk paying two,

5    three times more than they would ordinarily to Medicare.  So we

6    represent -- and, now, the gentleman to my right is Bill

7    Leader.  He represents the folks from Tennessee, and he is in

8    roughly the same boat, I believe, as we are.  But one of the

9    problems that we have had is that it has been extremely

10   frustrating to Virginia lawyers that we cannot even open up

11   claims with CMS, which is the traditional process.  When you

12   settle a case, you open a claim with CMS.  They must open this

13   claim under regulations, I think it's within 60 days.

14         THE COURT:  Is that a provision of the agreement, or

15   is that something that CMS is imposing?

16         MR. SEXTON:  That's federal law, and it's something

17   that CMS --

18         THE COURT:  It's federal law based on what?  They're

19   negotiating they won't pay private claims?

20         MR. SEXTON:  No.  I'm saying federal law requires CMS

21   to respond to a request to open a claim within 60 days.  That's

22   the standard course of events.  And in this instance, many

23   Virginia lawyers, in fact all of them, have run into situations

24   where CMS says they will not open the claims, and they send

25   letters to the lawyers in CMS saying, "We are in negotiation

1    with the Plaintiffs' Steering Committee.  Direct your questions

2    to Tom Sobol."  So that's been very frustrating because that

3    starting point, after you do that starting point, it takes

4    60 days to get a conditional payment letter, and a conditional

5    payment letter is the magic thing you need from CMS.

6           THE COURT:  What can I do about that, if anything?

7           MR. SEXTON:  Okay, one of the things that you could

8    do, we believe -- you're being asked to approve this

9    settlement, correct?  So as the person in charge of approving

10    the settlement, it is our view that you could do several

11    things:  First off, the plaintiffs who want to opt out should

12    be allowed to opt out now.  In other words, as far as this

13    bickering about what one document says and what another one

14    says and whether they conflict, we literally have clients

15    dying -- I had one die this weekend -- while this process is

16    waiting.  Many are elderly, and many, many need the money very

17    desperately.  We have clients --

18           THE COURT:  I understand all that.  I want to

19    understand what I can do.

20           MR. SEXTON:  Well, okay, one of the things that we can

21    do is to allow us to opt out now.  The way the agreement is

22    written that is before you for approval, I cannot opt my

23    clients out until CMS signs the agreement.  I would like for an

24    order to say that I can opt them out now.  Now, to his credit,

25    Mr. Sobol has just last week written a letter to CMS asking

1   them to please stop this hold that they have on opening our

2   claims.  That's a great first step, but, as we know, the

3   government can do what the government wants to do.  And so CMS

4   is free to accept his suggestion that they should move forward

5   or continue in their posture of not opening our claims, but

6   this is a huge problem for people in Virginia and Tennessee and

7   in other states.  So that's one thing that we can do.

8          Another thing we can do is to set a deadline, as

9   Mr. Sobol suggested, if there is going to be this endless

10  process.  And everyone knows, I think, that CMS has had this

11  final agreement now for six plus weeks in final form.  They're

12  either going to sign it or they're not going to sign it, but it

13  shouldn't take an act of Congress to decide whether they are or

14  are not.  And so a deadline would make --

15         THE COURT:  If it would take an act of Congress, you

16  would be here ten years from now.

17         MR. SEXTON:  I know.  But it seems reasonable to us,

18  and we have proposed -- and I don't believe we get much

19  pushback from the Plaintiffs' Steering Committee -- that a

20  deadline of September 6 be imposed, at which point CMS will

21  either have signed the agreement or they won't have signed the

22  agreement.  And if they're not going to sign the agreement, the

23  deal is off, and everybody is in a situation of essentially

24  opting out.  So that is another thing that we have asked.

25         Now, one of the things that we would also like that is

1     not within the agreement, and I'm sure Mr. Sobol can address

2     this, the practicality of it, is that for those of us who do

3     opt out, there is really no -- we would like very much to have

4     within the agreement a provision that specifies how quickly CMS

5     must respond, bearing in mind that we have been kept in a

6     holding pattern now for months and months and months where we

7     could not open claims.  What's the benefit of opening a claim?

8     Had we been able to open a claim, we would have conditional

9     payment letters that would tell us the amount of the lien that

10    CMS is claiming.

11            Now, for some of my colleagues, particularly

12    Mr. Leader and others in Tennessee, and I know some of my

13    colleagues in Virginia, they have clients for whom they don't

14    know the actual amount of the Medicare lien, and it's

15    impossible for them to actually calculate it because the

16    healthcare providers are refusing to provide that reimbursement

17    data to them, so they --

18            THE COURT:  When you say healthcare providers, you're

19    talking not about CMS but other --

20            MR. SEXTON:  Hospitals, hospitals and doctors.

21            THE COURT:  I'm sorry?

22            MR. SEXTON:  Hospitals would be the healthcare

23    provider.  For example, some of my colleagues have asked

24    hospitals to provide them with -- "Tell us what Medicare

25    reimbursed you for these hospital charges," and they have

1    refused, so that lawyer cannot get the lien information from a

2    hospital --

3              THE COURT:  I don't have authority to tell the

4    hospitals.  They're not the client.

5              MR. SEXTON:  Exactly, I think you do.  And then --

6              THE COURT:  I do have that?

7              MR. SEXTON:  I have not had that problem.  I know

8    Mr. Leader has had that problem, and I think Mr. Fennell has

9    had that problem as well as others, but we were fortunate in

10   getting our information I guess early on while the cases were

11   still active and pending.

12             So my point is, these people have no data point by

13   which they can judge the proposed deal.  As the Plaintiffs'

14   Steering Committee just said, the top percentage bracket for

15   the proposed deal with CMS has claimants paying 21.5 percent of

16   their gross recovery to CMS.  Now, whether that's a good deal

17   or not depends upon those claimants knowing what their real

18   lien is in the first place:  Is that a reduction or is that an

19   increase?  And so people do not have the information to make

20   that call.  And so one of the things that I have been asked to

21   request from your Honor are terms by which once a client asks

22   for it from CMS, if you would impose terms in the order that

23   CMS would have to give a conditional payment letter within an

24   expedited time frame.  It is typically 60 days is the maximum,

25   and we are requesting 20 days.

1              The next part of that process --

2         THE COURT:  What did you call this, a conditional --

3         MR. SEXTON:  Conditional payment letter.

4         THE COURT:  And that is the letter that says how much

5    Medicare paid on behalf of that claimant?

6         MR. SEXTON:  Correct.  It's the first letter in the

7    process.  Once that is received by any plaintiff's attorney

8    anywhere in the United States, that plaintiff's attorney looks

9    at that document and sees if it contains extraneous charges

10   that are unrelated to the illness at issue.  Assuming it is

11   correct, the plaintiff's lawyer then writes back to CMS and

12   says, "Give us a final demand letter."  The final demand letter

13   is the one that we would then present to Ms. Riley, the

14   trustee, and say, "Here is what CMS is saying is the final

15   lien."  That is an undetermined process as far as the amount of

16   time that takes between when you request it and when you get

17   it.

18        THE COURT:  The first time is what under the statute

19   or regulation?

20        MR. SEXTON:  Sixty days.

21        THE COURT:  Is how much?

22        MR. SEXTON:  Sixty days.  That's my recollection, and

23   I'm sure --

24        THE COURT:  And you want to shorten that?

25        MR. SEXTON:  And I would like to shorten that to

1   20 days.  And, correspondingly, once we have a conditional

2   payment letter, we would like to shorten the time for a final

3   letter to be 20 days from the date one is requested.  And as I

4   understand the regulations, really the only thing that gets

5   added after you have a conditional payment letter are any

6   intervening medical charges related to that illness, so it's

7   not nearly as complicated as getting the conditional payment

8   letter.  So those are terms that we would ask the Court to

9   consider as conditions for the approval of the agreement.

10          And, finally, I guess we are looking at the reality of

11  what happens if CMS picks up its balls and just goes home and

12  says, "We don't want to do the deal, and we're not going to do

13  the deal because, you know, these terms are too onerous," and

14  how would you deal with that, and how would the tort trustee

15  deal with that, and how could that possibly relate to the

16  various documents that govern the behavior in this case?

17          Well, first off, if that occurs and if September 6

18  comes and goes and nobody has signed this final agreement, then

19  we believe that the tort trustee should then just satisfy the

20  reporting obligations that are attendant to her under the tort

21  trust agreement, under the plan, and under most of the

22  settlement agreements.  What that is, your Honor, when a

23  defendant settles a case that may have a CMS component, the

24  defendant is called a "responsible reporting entity," and that

25  defendant has to then give notice to CMS of the amount of the

1    settlement, the name of the claimant, the claimant's date of

2    birth, things like that, identifying information, so that CMS

3    would then have notice of the fact that there was a potential

4    recovery there.  In this instance, I'm almost one hundred

5    percent sure that that has already occurred, but we would need

6    for that box to be checked because otherwise our defendant --

7              THE COURT:  Who would check it, CMS?

8              MR. SEXTON:  The tort trustee.  The tort trustee would

9    just have to tell us, "I have met the reporting obligations."

10   And that is very significant because defendants have that

11   obligation by law.

12             Then what we were suggesting and discussing among the

13   various counsel is that, yes, it is a pain to have to deal with

14   CMS on an individualized basis on all of these claims.  It is

15   our belief, and certainly among the people who have filed these

16   motions, Mr. Leader and myself and Mr. Fennell particularly,

17   that we are more than happy to take on that role of negotiating

18   with CMS on these liens.  And so we would ask then, within the

19   context of the plan and what it requires, that the tort trustee

20   simply deputize us as her agents for purposes of doing that,

21   and then we go out and we negotiate these liens.  In fact, she

22   could even distribute money to plaintiffs' counsel.  We do this

23   every day.  It happens in law firms across the country.  We

24   receive money on behalf of our clients.  We hold it in trust.

25   We wait till we have the proper paperwork.  We present that

1    paperwork to Ms. Riley as tort trustee, and then we tell her,

2    "Okay, here is the sign-off from CMS, and this is what we

3    propose to distribute," and then we distribute.  Perhaps that

4    would be something that would assist in this process because it

5    is not our goal to increase the cost to the tort trustee.  It

6    is our goal to simply serve the interest of our clients, who

7    are increasingly frustrated.

8             THE COURT:  Mr. Sexton, if the agreement fails, the

9    defendant only has to report what?

10            MR. SEXTON:  The defendant only has to report the

11   amount of the settlement and the beneficiary.

12            THE COURT:  I mean, by definition, we're now in the

13   contingency that the agreement fails.

14            MR. SEXTON:  Correct.

15            THE COURT:  I thought that's what you were referring

16   to.

17            MR. SEXTON:  Yes, I am.

18            THE COURT:  They have to report what at that point?

19            MR. SEXTON:  They have to report the amount of the

20   settlement, the settlement that the plaintiffs are going to

21   receive, not the settlement with CMS.  I'm sorry, I think

22   that's where I confused you.  If the agreement with CMS fails,

23   then one of the obligations of the tort trustee is to stand in

24   the shoes of the defendant and report the amount of the global

25   settlement, the amount of the individual settlement that the

1    individual is going to get --

2            THE COURT:  You mean the amount allocated to the

3    individual pursuant to the plan?

4            MR. SEXTON:  Correct, correct.

5            THE COURT:  Okay.

6            MR. SEXTON:  And that would go to CMS, and that's just

7    a -- that's just under regulations that require that.  And it's

8    discussed in the plan as, you know, the obligations of

9    responsible reporting entities, RREs under the terms of the

10   plan.

11           THE COURT:  So what you're suggesting is that the

12   global settlement be abandoned, that the tort trustee report

13   the amount of the fund and the amount allocable to each

14   claimant to the fund as of now, and that then counsel for the

15   individual plaintiffs in Virginia, et cetera, undertake a

16   negotiation of another agreement, which may or may not go

17   through and that Justice may have to look at also?

18           MR. SEXTON:  No.  No, what I am suggesting is that

19   Justice doesn't have to look at what happens every day, day in

20   and day out, which is lawyers like me negotiating the actual

21   Medicare lien that applies to their client's recovery.

22           THE COURT:  But you're talking about negotiating not

23   as an individual plaintiff but to the entire group of

24   plaintiffs whom you represent?

25           MR. SEXTON:  Correct, I'm talking about each of the

1    plaintiffs that I represent, each of the plaintiffs that

2    Mr. Leader --

3              THE COURT:  So a separate negotiation as to each?

4              MR. SEXTON:  Yes.  That's the way we do it.  We have

5    to do it individually.

6              THE COURT:  How can that possibly be less expensive

7    than what is being negotiated?

8              MR. SEXTON:  Well, it is because some of our clients

9    are paying three times as much under the proposed deal.

10             MR. FENNELL:  Your Honor, this is Patrick Fennell.

11   I'm also representing plaintiffs in Virginia.  It would be less

12   expensive in the end because the tort trustee wouldn't have to

13   expend her resources on it.  It would be individual plaintiffs'

14   attorneys who are spending their time to negotiate individual

15   liens with CMS, and we don't get paid for that other than what

16   our contingency fee arrangement is with our clients anyway.

17             MR. SEXTON:  Your Honor, my point is -- and I don't

18   want to suggest that anyone here before you is saying that the

19   deal should be scrapped nationally.  That was only a

20   contingency in the event that the deal is not signed by

21   September 6, and that deadline we are asking that you impose

22   because the plaintiffs throughout the country are waiting for a

23   resolution on this, and one is either going to happen or not

24   happen within that time period.

25             THE COURT:  Let me ask this.  Is it Burnette N or

1    Burdette D?

2           MS. BURDETTE:  Burdette, it's Burdette with a D.

3    Thank you, your Honor.

4           THE COURT:  What is your view about what you just

5    heard?

6           MS. BURDETTE:  Well, first of all, under the

7    settlement, defendant's settlement agreement with the

8    Plaintiffs' Steering Committee and the other GHCs, the

9    reporting requirements are raised, but the trustee has no

10   obligation to have to report anything (Indiscernible) of the

11   settlement.

12          Secondly, you know, we have been proceeding as fast as

13   we can approving this settlement.  You know, I didn't even have

14   all the attachments to the tentative agreement until last

15   Friday.  I just happened to see that -- you know, plaintiffs'

16   counsel referred to Attachment F.  I've never seen that before.

17   So, I mean, that's not a material term, I'm not claiming it is,

18   but the point is, you know, these motions have proceeded.

19   There are things that we have just learned that we are

20   concerned about and rightfully so.  And contrary to what

21   Mr. Sobol has stated in absolute terms, the other agreement

22   with private lienholders is not a mirror image of this

23   agreement by any stretch.  There are paragraphs that are copied

24   into that agreement, I agree, but there are also provisions

25   that conflict.  I mean, our agreement or the agreement that you

1    are asked to approve, it includes GHC, it includes private

2    lienholders.  They have obligations under this agreement that

3    you're being asked to approve as well as CMS having

4    obligations.  This is not just a CMS claim.  There have been

5    negotiations with both parties, very long negotiations.  And so

6    how can our agreement bind these people if they have a separate

7    agreement that says they're not bound by our agreement?  I

8    don't understand that.  That's not -- I, frankly, legally don't

9    understand that.

10           THE COURT:  Well, I'm not privy to these agreements,

11   and I have no intention of reading them, even if I were.

12   However, it seems to me that given the stress on all parties in

13   this case from this standstill, if you will, I wonder if it

14   would not be possible to let me know by five o'clock next

15   Tuesday that the matter has been finally resolved between the

16   parties.  We have another meeting in this case on Thursday.  We

17   would have Wednesday then to put it into final shape, and on

18   Thursday it will be announced as being done.  Plaintiffs, the

19   individuals who want to opt out will start the opting-out

20   process.  CMS will then be able to deal with it, and the whole

21   thing can be done.

22           My experience is that unless I set ridiculous

23   deadlines, it doesn't get done, so I'm setting a ridiculous

24   deadline.

25           MR. SOBOL:  I agree.

1        MS. BURDETTE:  Your Honor, respectfully, I cannot tell

2   you that our discussions with plaintiffs' counsel will, you

3   know, be resolved by Monday such that we are negotiating final

4   terms to it on Tuesday, and then we have to send our -- you

5   know, then we send up our memo on Tuesday to, you know, the

6   authorities within the Justice Department who have to approve

7   it.  So I cannot tell you that this would be approved by next

8   Thursday because I think that's probably optimistic.

9        THE COURT:  Well, I'd be optimistic.  See what you can

10   do to get it done.  I mean, you know, you can futz around

11   forever and ever with language, and I think the emphasis here

12   should be of just getting it done, getting an agreement that is

13   reasonable to all people, that maybe there's a common

14   agreement, that maybe --

15        MS. BURDETTE:  Your Honor, I agree with you, and we

16   thought we had that agreement.  That's the problem, you know.

17   And it turns out, in terms of this other agreement, it doesn't

18   appear we do have that.  That's our only problem here.

19        THE COURT:  Mr. Sobol and Mr. Notargiacomo, whoever is

20   negotiating on behalf of the plaintiffs, you need to give a

21   little too maybe.  And I hope that you can get together Monday

22   to do this and Tuesday, and that by Wednesday you will have the

23   draft that you can tell me on Thursday is the draft and it's

24   done.  If not, then we may have to see what else to do in order

25   to get it done or to abandon it.

1          MR. SOBOL:  And we'll also have the lawyers sit

2     privately and holders on the phone with CMS --

3          THE COURT:  I'm sorry?

4          MR. SOBOL:  We'll also have the lawyers for those

5     private lienholders, Blue Cross-Blue Shield of Tennessee and

6     Michigan, so if there's any issues that they have are resolved.

7          THE COURT:  That's a very good idea, and they need to

8     give too in order to make it happen.

9          Ms. Burdette, I understand that this is difficult for

10    you.  We called you away during your vacation.  I hope you have

11    a good vacation until Monday, and at that point I hope that the

12    matter can be addressed fully and successfully.  And I look

13    forward --

14         MS. BURDETTE:  Thank you, your Honor, and I hope that

15    too.  Thank you.

16         THE COURT:  I look forward to hearing from you all on

17    Thursday.  And, Ms. Burdette, you're more than welcome to

18    participate on Thursday by telephone as well.

19         MS. BURDETTE:  Thank you, your Honor.

20         THE COURT:  What else can we do today?  Mr. Sobol?

21         MR. SOBOL:  Nothing, your Honor.

22         THE COURT:  Mr. Sexton?

23         MR. SEXTON:  Nothing, your Honor.

24         THE COURT:  Anybody else?  Thank you all.

25         Oh, Lisa reminded me the hearing is on Wednesday, so

1    we're here on Wednesday, wherever you are on Wednesday.   Thank

2    you.   Sorry about that.

3            I also wish to thank all counsel.

4            MS. JOHNSON:   Thank you, your Honor.

5            (Adjourned, 1:51 p.m.)

1              C E R T I F I C A T E

2

3
   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 34 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 13-02419-RWZ,

11 In Re:  New England Compounding Pharmacy Class Litigation, and

12 thereafter by me reduced to typewriting and is a true and

13 accurate record of the proceedings.

14          Dated this 19th day of September, 2016.

15

16

17

18

19          /s/ Lee A. Marzilli
           _____
20          LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER
21

22

23

24

25