**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In RE NEW ENGLAND COMPOUNDING PHARMACY, INC. PRODUCTS LIABILITY LITIGATION | MDL No. 2419 MDL No. 1:13-md-2419-RWZ |
| THIS DOCUMENT RELATES TO: Milda Mattila | |

**PLAINTIFF MILDA MATTILA'S REPLY TO CMS's STATEMENT OF INTEREST (RESPONSE) TO PLAINTIFF'S MOTION FOR EQUITABLE RELIEF**

Plaintiff, DAVID J. MATTILA, as Personal Representative of the Estate of MILDA J. MATTILA, Deceased, by and through the undersigned, who submits the following as his Reply to CMS's Statement of Interest (Response) to Plaintiff's Motion for Equitable Relief:

1. **INTRODUCTION – WHY IS MATTILA ASKING FOR THE BENEFIT OF THE REDUCED LIEN AMOUNT SET FORTH IN CMS'S SETTLEMENT AGREEMENT WHEN MATTILA VOLUNTARIULY OPTED OUT OF THAT SAME AGREEMENT SEVERAL YEARS AGO?**

On August 23, 2012, 87 year-old Milda Mattila received a fungal tainted steroid injection in her lumbar spine, in the region of L5, S1.  She became symptomatic several weeks later and was admitted to the hospital.  Ms. Mattila remained in the hospital for seven months straight, from September 28, 2012, through April 12, 2013.  During this time, she was found to have fungal meningitis and epidural abscess which required that she undergo a laminectomy, decompression, and abscess drainage at L4-S1.  She remained in the hospital while receiving aggressive antifungal treatment, but then developed a UTI with a pseudomonas infection in late November.  She was found to have ulcerative colitis and C difficile. She had to be intubated on December 6, 2012, and was "trached" a week later due to vent dependent respiratory failure.  She was placed on a PEG feeding tube and was transferred from St. Joseph Mercy to Select Specialty Hospital on December 27, 2012.  [**Ex A** SSH H&P].  She remained at Select Specialty for the next four months.  She

1

continued to develop infections, massive bed sores, and required lengthy antifungals and antibiotics.

Plaintiff Mattila filed a product liability action against Defendant New England Compounding Pharmacy and the other entities responsible for mixing and distributing the tainted medication in November of 2012.  Mattila's NECC lawsuit was transferred to this court, where it was part of the herein captioned multi district litigation filed against NECC. (Dkt 129, Transfer Order).  Plaintiff Mattila was also a member of the state class action filed against Defendant Michigan Pain Specialists in Livingston County, Michigan. *Adair v Michigan Pain Specialists,* LCCC Case No. 14-28156-NO.

While fighting for her life in Select Specialty Hospital, Medicare decided it will not pay for Mattila's hospital bills.  Medicare essentially told the suffering Mattila "you filed a lawsuit against NECC, you can pay for your own hospital bills out of your settlement money".  By this time, NECC had already filed for bankruptcy. It was well known that any money extracted from the criminally charged and now bankrupt NECC would not make it to the hands of the thousands of Plaintiffs for quite some time.

Having gone a year since treating Ms. Mattila without receiving a single payment from Medicare, Select Specialty asserted a $500,000 against Mattila's settlement proceeds. [**Ex B** SSH Lien].  Mattila's secondary insurance, Blue Cross, asserted a lien of $51,175.92 [**Ex C** BCBS Lien].  Medicare, meanwhile, advised it was not asserting a lien interest on Mattila's NECC settlement since it was not paying Mattila's hospital expenses.  [**Ex D** CMS CPL 05-03-13].

A settlement was ultimately arrived at in the bankruptcy court, but the limited amount of available funds was nowhere near the amounts needed to reasonably compensate the thousands of claimants.  Ms. Mattila was awarded 80.5 matrix points, and at that time, her total settlement

payout was estimated to range between \$253,000 and \$300,186.91.[1]   The limited amount of available proceeds was further compounded by the fact that most claims were subject to significant liens filed by insurance companies, CMS, and in Mattila's case, hospitals.  In a lot of cases, the lien amounts exceeded the claimant's expected recovery.  Thus, the settlement amounts allocated to each claimant amounted to only a fraction of the claimant's full claim for damages.

In an effort to find an equitable solution to the significant lien interests asserted on already significantly compromised settlements, the NECC Tort Trustee, insurance company representatives and CMS agreed to a special lien reduction formula under which claimants could resolve the lien claims asserted against their settlements.  [**Ex E** CMS Settlement Agreement; Dkt 3068-01; Dkt 3073].  Under the lien reduction agreement, Mattila could settle the CMS and Blue Cross liens (for the payments already made) for 21.5% of the gross settlement.[2]   The Lien Agreement did not, however, account for hospital liens (asserted for lack of payment).

Plaintiff Mattila was notified of the CMS Lien Reduction Settlement Agreement at the very end of November of 2016.  The notification advised that 21.5%[3] of each settlement check would automatically be deducted to satisfy the CMS and Blue Cross liens (regardless of the amounts actually paid by these entities), unless Plaintiff sent an opt-out form within the next 30 days.  While the CMS Settlement Agreement benefitted claimants having very high Medicare and Blue Cross liens, it did not benefit claimants having smaller Medicare and Blue Cross liens and larger non-covered liens (ie, hospital liens).

---

[1] It was always understood that if NECC received a tax refund, claimants would likely receive an extra payment and the settlement could be as high as \$340,339.91 (which is what happened and is what Mattila is expected to receive).
[2] The Tort Trustee deducts 21.5% from each settlement check, half of which would be paid to CMS, the other half to Blue Cross.
[3] The CMS lien reduction agreement used a sliding percentage scale ranging between 10% and 21.5%, dependent upon the Category and points awarded to the Claimant.

To determine whether it was in the client's best interests to opt-in or opt-out, Plaintiff's counsel was required to figure out which of the two scenarios would result in a smaller lien payout. Thirty days was not a lot of time to make this determination for well over a hundred clients. Plaintiff's counsel was required to confirm the asserted lien amounts, then make the calculations based on these amounts. During the month of December, Plaintiff's Counsel's team contacted BCRC (Medicare) on several occasions to confirm whether CMS was asserting a lien interest on any conditional payments made on Plaintiff's behalf. CMS was contacted again on the very last day Mattila was permitted to opt-out. CMS advised its conditional payments were only $23,203.48[4], Blue Cross's lien was still $51,175.92, and Select Specialty's lien was still $501,515.23.

If Mattila elected to "opt-in", she was exposed to the following:

- CMS                    $ 32,270.09 - $36,586.54[5]
- Blue Cross             $ 32,270.09 - $36,586.54
- Select Specialty       $501,515.23

  _____

  Total Lien Exposure    $566,055.41- $574,688.31

If Mattila elected to "opt-out", she was exposed to the following:

- CMS                    $15,151.88[6]
- Blue Cross             $34,125.92[7]
- Select Specialty       $501,515.23

  _____

  Total Lien Exposure    $550,793.03

---

[4] Plaintiff's counsel's request for written confirmation via an itemized list of payments could not be accommodated at the time. Plaintiff's Counsel was advised that all CMS / NECC claimants' were assigned to "Special Projects", which meant only a few BCRC staff had authority to work on those accounts. Plaintiff's counsel had to accept the amounts as verbally conveyed by BCRC. HHS / CMS should be able to verify this information through review of their own internal records.

[5] The higher amounts reflect the 21.5% taken from Mattila's total expected settlement of $340,339.41

[6] This amount is based on CMS's represented conditional payments of $23,203.48, reduced by CMS's share of the procurement costs (this formula is independent from the CMS Settlement Agreement and is used on every CMS lien payout).

[7] This amount reflects Blue Cross's $51,175.92 lien reduced by 1/3 to account for procurement costs (agreed to by BCBS).

With an expected settlement payout somewhere in the $300,000 payout range, Mattila was confronted with the scenario where her liens greatly exceeded her settlement.  Her best option was to reduce her payout to CMS and Blue Cross as much as possible, and then negotiate an agreement with Select Specialty.  Because staying in the CMS lien agreement actually increased Mattila's lien exposure to CMS and Blue Cross by nearly $25,000, Plaintiff naturally elected to opt-out and sent in her signed on December 28, 2016.

Exactly one month after Plaintiff opted out, relying on the claims paid information provided by CMS, on January 28, 2017 - Plaintiff's counsel received CMS's 'about-face' conditional payment letter in the amount of *$267,678.04*. [**Ex F** CPL 01-31-17].  CMS followed up in September of 2017 and asserted conditional payments in the amount of *$367,828.72*.   [**Ex G** CPL 09-14-17].  Virtually all asserted payments were for hospitalizations (services) provided in 2012 and 2013.  Plaintiff placed CMS on notice of Plaintiff's lawsuit back in 2013, and CMS never asserted these payments for claims until 4 ½ to 5 years later.  Federal law does not even permit CMS to make a claim on conditional payments more than three years after the service was provided.  See 42 USC §1395y(b)(2)(B)(vi).

CMS apparently waited more than four years before it started making payments on Ms. Mattila's medical bills.  Had CMS properly paid the claims, Select Specialty Hospital would have been paid and would have never asserted its $500,000 lien, CMS would have advised Plaintiff of its enormous conditional payments well before Plaintiff's opt-out deadline, and Plaintiff would have obviously remained in the Lien Resolution Agreement (resolving $400,000 worth of liens for only $72,000).  In other words, we would not be here but for CMS's several year improper delay in paying Ms. Mattila's medical bills.

Ms. Mattila died in a hospital bed on November 10, 2017 at the age of 92 years. Since contracting fungal meningitis from NECC's tainted steroid injection in 2012, Ms. Mattila was confined to a hospital bed in an inpatient hospital setting for the remainder of her life. She never saw a dime of her $340,000 settlement because lienholders have insisted that they, and not the debilitated Ms. Mattila, were more deserving of her money.

Plaintiff's settlement proceeds have been in a holding pattern ever since Medicare abruptly asserted its several hundred thousand dollar lien (30 days after Plaintiff's opt out)[8]. The CMS Settlement Agreement expressly stated that CMS has asserted a *claim* of lien on Plaintiff's settlement proceeds for medical services *paid* by Medicare. [**Ex E**, p. 1, 2nd ¶]. The CMS Agreement further stated that if Plaintiff opted-out, Plaintiff was responsible for negotiating with CMS to resolve CMS's *claim* (defined as services already *paid* by CMS). [**Ex E**, pp, 1, 4 (Art IV)]. Per the literal terms of the CMS Settlement Agreement, Plaintiff is only responsible for resolving the CMS paid services which BCRC / CMS placed Plaintiff on notice of at the time Matilla filed her Opt-Out - **$23,203.48**. In the alternative, because CMS was permitted to unilaterally increase its claim of lien *after* Plaintiff relied on CMS's lower claim amount at the time of opt-out, this Court should rule that its court ordered CMS Lien reduction agreement should be applied to Plaintiff's case, allowing her to resolve the CMS and Blue Cross liens for 21.5% of the gross settlement.

## 2.   THIS COURT HAS SUBJECT MATTER JURISDICTION

Plaintiff's requested relief arises out of the settlement agreements which govern and affect Plaintiff's claims against NECC and MPS. Plaintiff requests enforcement of the Medicare Lien

---

[8] And after CMS apparently decided to pay Mattila's hospital bills *after* being told Mattila opted out.

"Settlement Agreement" agreed to amongst HHS/CMS, the Tort Trustee, and MPS Class Counsel. As an intended beneficiary of this Settlement Agreement, Plaintiff Mattila has legal standing to enforce the terms of the agreement. *Markle v HSBC Mortgage Corp,* 844 F.Supp.2d 172, 181 (D.Mass.2011).  An action for breach, and/or to enforce the terms of, Medicare's own settlement agreement is a waiver of sovereign immunity under the Tucker Acts.  See 28 USC §§1346(a)(2), 1491(a)(1), *U.S. v Zajanckauskas,* 346 F.Supp.2d 251, 257 (D.Mass. 2003).

This Court also has subject matter jurisdiction over Plaintiff's request to enforce the CMS Settlement Agreement which was part and parcel to the NECC Settlement Agreements agreed to under the Bankruptcy Plan.  A court has jurisdiction to adjudicate disputes related to a settlement agreement if the court previously expressed an intent to retain such jurisdiction.  *Kokkonen v Guardian Life,* 511 U.S. 375, 381 (1994); *First Marblehead Corp v The Education Resources Institute, Inc,* 463 B.R. 151, 161 (D.Mass. 2011).

The settlement and lien agreements at issue here were part of the Chapter 11 Plan filed in Defendant NECC's bankruptcy proceedings.  When approving the NECC settlement, the Bankruptcy Court expressly retained original and exclusive jurisdiction of all matters arising under, out of, and related to the Chapter 11 Case and Plan, including for the following purposes:

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, any transactions contemplated by any agreement or document relating to the Plan;

- to take any action and issue such orders necessary to construe, enforce, implement, execute, and consummate or maintain the integrity of the Plan following consummation;

- and to hear and determine any other matters related to the Plan, the Estate Causes of Action, and Tort Trust Documents.

[**Ex H** Ch 11 Plan, pp. 46-47, **Ex I** 3rd Am Plan / Conf Order, pp. 40, 43].

This District Court has subject matter jurisdiction over the bankruptcy cases within its district, and therefore the above court ordered retention of jurisdiction provisions likewise apply to this Court.  See 28 USC §1334(a)(b).  This Court entered its own order specifically approving the Medicare Settlement Agreement. [Dkt 3073].  This Court also approved of the Settlement Tort Trust Agreement, and still oversees the Tort Trustee's distribution of settlement proceeds per the terms of the settlement agreement and procedures. [Dkt 1694].  A party to a settlement agreement (and therefore an intended beneficiary) is also empowered to seek enforcement of the agreement's terms by filing a motion with the trial court.  *United States ex re. Allen v Alere Home Monitoring, Inc.,* 355 F.Supp.3d 18, 23 (D.Mass 2019).

### 3.   PLAINITFF'S MOTION IS NOT BARRED BY COLLATERAL ESTOPPEL

HHS argues that Plaintiff's Motion is barred by the Eastern District of Michigan's prior order of dismissal. First, the only issue considered by the Eastern District of Michigan was whether Plaintiff fully exhausted his internal, administrative remedies under the Medicare Act. Second, after determining Plaintiff did not fully exhaust, the court's dismissal of Plaintiff's action for lack of subject matter jurisdiction was explicitly "without prejudice".  [**Ex J**].  A dismissal without prejudice is not preclusive precedent.  *Rivera-Rosario v LSREF2 Island Hodings, Ltd.,* 2021 WL 2547062 (D. Puerto Rico, June 21, 2021), p. 4.  The phrase "without prejudice" in a dismissal order is to be read as "a signification that the judgment does not preclude a subsequent lawsuit <u>on the same cause of action</u> either in the rendering court or in some other forum".  *Mirpuri v ACT Mfg*, 212 F.3d 624,628 (1st Cir. 2000) (emphasis added)[9].

---

[9] Even if the court is persuaded that collateral estoppel precludes Plaintiff from relitigating the issues decided by the prior court, the only issue so addressed was whether Plaintiff fully exhausted his administrative remedies as a precondition to invoking jurisdiction under the Medicare Act. [**Ex K**].  Plaintiff will not raise / abandon this issue and instead will rely on enforcement of the settlement agreements approved by this Court and its Bankruptcy Court.

4.  **THIS COURT SHOULD ENFORCE THE SETTLEMENT AGREEMENT AND HOLD CMS TO THE TERMS TO WHICH IT AGREED**

The relevant terms of the CMS Settlement Agreement are as follows:

- CMS has asserted a Medicare Secondary Payer <u>claim</u> under 42 USC 1395y(b) against Claimant's Settlement, with respect to services *paid* by Medicare; [**Ex E**, p. 1];

- Claimant may Opt-Out of the Negotiated Lien Payment by filing Opt-Out form 30 days after notice by Tort Trustee of same [**Ex E**, p. 4];

- If Claimant opted-out, Plaintiff was responsible for negotiating with CMS to resolve CMS's <u>claim</u> (defined as services previously *paid* by CMS). [Ex E, pp, 1, 4 (Art IV)].

- If any disputes arises between the parties concerning this Agreement, the parties agree to <u>attempt to resolve such dispute in good faith</u> [**Ex E**, Art IX, p. 8]

Under Massachusetts law, contract interpretation questions are ordinarily questions of law for the court. *Albertini v Summit Technical Services,* 287 F.Supp.2d 92, 98 (D.Mass 2003). Any doubt concerning the interpretation of a contract term should be construed against the drafter of the contract. *Id.* Per the literal terms of the CMS Settlement Agreement, Plaintiff is only responsible for resolving the CMS paid services which BCRC / CMS placed Plaintiff on notice of at the time Matilla filed her Opt-Out. That amount is **$23,203.48,** the amount represented by BCRC / CMS to Plaintiff's Counsel on December 28, 2016. In the alternative, because CMS was permitted to unilaterally increase its claim of lien *after* Plaintiff relied on CMS's lower claim amount at the time of opt-out, this Court should rule that its court ordered CMS Lien reduction agreement should be applied to Plaintiff's case, allowing her to resolve the CMS and Blue Cross liens for 21.5% of the gross settlement. In the further alternative, because there is a dispute concerning the CMS Settlement Agreement, this Court should order HHS / CMS to "attempt to resolve such dispute in good faith" as required by the Agreement.

### 5.   ALTERNATIVELY, PLAINTIFF'S RELIEF SHOULD BE GRANTED UNDER THE DOCTRINE OF UNJUST ENRICHMENT

If the court is not convinced that enforcement of the settlement and CMS's lien agreement will provide the relief Plaintiff requests, Plaintiff alternatively his relief under the doctrine of 'unjust enrichment". At the time of opt-out, Plaintiff reasonably believed opting out was in the best financial interests of Ms. Mattila. Medicare did not pay her medical bills for four years. Plaintiff did not believe Medicare's lien claim would increase by hundreds of thousands of dollars within a matter of weeks. CMS, per its own agreement, was fine with resolving its claim of lien per the lien reduction percentage in its own agreement. Even if Mattila's decision to opt-out was an honest mistake, the principles of equity, especially when considering Ms. Mattila's settlement is but pennies on the dollar when compared to the suffering and damages she endured for years, mandate that fairness be restored by placing the parties in the position of CMS's settlement agreement. Without such relief, Ms. Mattila's settlement will have been in vain, whereby all of her proceeds will be eaten up by significant liens.

A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Massachusetts v Mylan Labs*, 357 F.Supp.2d 314, 323 (2005); *Nat'l Shawmut Bank of Boston v. Fidelity Mut. Life Ins. Co*, 318 Mass. 142, 61 N.E.2d 18, 20 (1945) (quoting Restatement (First) of Restitution § 1 (1951)). "A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money." Restatement § 1 comment (a). Unjust enrichment "does not require any contractual or fiduciary relationship between the parties." *Mylan Labs, supra,* at 323; *Greenwald v. Chase Manhattan Mortgage Corp*., 241 F.3d 76, 78 n. 1 (1st Cir.2001). Unjust enrichment does not require that a defendant receive direct payments from a plaintiff. *Id.*

"Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." *Id.*

For the reasons stated above, Plaintiff respectfully requests this Honorable Court to enter an order consistent with the relief requested herein.

Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

/s/ Todd J. Weglarz
GEOFFREY N. FIEGER
TODD J. WEGLARZ
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: June 11, 2022

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel of record who are registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 11, 2022

By:   /s/ Todd J. Weglarz
Todd J. Weglarz